# No. 14-157
# No. 14-567

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

### In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

## BRIEF OF APPELLANTS BLUE CROSS AND BLUE SHIELD ENTITIES AND WELLPOINT ENTITIES

Anthony F. Shelley
  *Counsel of Record*
Adam P. Feinberg
Laura G. Ferguson
Michael N. Khalil
Katherine E. Pappas
Miller & Chevalier Chartered
655 Fifteenth St., NW, Suite 900
Washington, DC 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Email: ashelley@milchev.com

*Counsel for Blue Cross and Blue Shield Entities and WellPoint Entities*

June 16, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the Court's order of May 27, 2014, the Merchant Appellants are filing in a single document all of the corporate disclosure statements required in the appeals, including the corporate disclosure statement for the Blue Cross and Blue Shield entities and WellPoint entities.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ............................................................. iv

LOCAL RULE 28.1 PRELIMINARY STATEMENT ...................................... 1

STATEMENT OF JURISDICTION.................................................... 1

ISSUES PRESENTED.................................................................. 2

STATEMENT OF THE CASE ......................................................... 2

STATEMENT OF FACTS ............................................................. 7

      1.    The Volume of Credit Card Transactions by Health Insurers Before Preliminary Approval of the Settlement........................... 8

      2.    Anticipated Use of Credits Cards Resulting from the Implementation of the Affordable Care Act ................................. 9

      3.    Limitations on Health Insurers' Use of Surcharging .................. 12

SUMMARY OF ARGUMENT ....................................................... 16

STANDARD OF REVIEW .......................................................... 17

ARGUMENT ....................................................................... 18

I.    THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE RULE 23(b)(2) SETTLEMENT CLASS POSSESSED THE REQUIRED COHESION OF INTERESTS ......... 18

II.    THE PLAINTIFFS-APPELLEES DID NOT ADEQUATELY
       REPRESENT THE HEALTH INSURERS AND OTHER
       MERCHANTS WITH MINIMAL OR NO CREDIT CARD USE
       PRIOR TO 2014 ............................................................................ 21

III.   THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING
       THAT THE SETTLEMENT WAS FAIR, REASONABLE, AND
       ADEQUATE............................................................................ 28

CONCLUSION ............................................................................ 31

CERTIFICATE OF COMPLIANCE............................................................*post*

CERTIFICATE OF SERVICE ....................................................................*post*

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*In re Am. Int'l. Group, Inc., Secs. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ................................................................18, 22, 28

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................*passim*

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998) ...............................................................18

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
  Managed Care, L.L.C.*,
  504 F.3d 229 (2d Cir. 2007) .......................................................17, 26

*Expressions Hair Design v. Schneiderman*,
  975 F. Supp. 2d 430 (S.D.N.Y. 2013) ..............................................12

*In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab.
  Litig.*, 55 F.3d 768 (3d Cir. 1995).....................................................26, 28

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2010) ..............................................................25

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ..............................................................17, 21

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
  660 F.2d 9 (2d Cir. 1981) ...................................................................29

*Omega Eng'g, Inc. v. Omega, S.A.*,
  432 F.3d 437 (2d Cir. 2005) ..............................................................17

*Ortiz v. Fireboard Corp.*,
  527 U.S. 815 (1999)............................................................................24

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005) ...........................................................18

iv

*Stephenson v. Dow Chem. Co.*,
    273 F.3d 249 (2d Cir. 2001), *vacated in part on other grounds by*
    539 U.S. 111 (2003) ........................................................................... 24, 25

*TBK Partners, Ltd. v. Western Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ................................................................ 29

*United States v. American Express Co.*,
    No. 10-CV-04496 (E.D.N.Y.) ............................................................. 26

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ................................................................... 18, 19

**Statutes**

26 U.S.C. § 5000A(a) ............................................................................... 9

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

28 U.S.C. § 1332 ...................................................................................... 1

28 U.S.C. § 1337 ...................................................................................... 1

28 U.S.C. § 1367 ...................................................................................... 1

28 U.S.C. § 2201 ...................................................................................... 1

28 U.S.C. § 2202 ...................................................................................... 1

42 U.S.C. § 300gg-18 ............................................................................. 13

42 U.S.C. § 18031 .................................................................................. 10

42 U.S.C. § 18041 .................................................................................. 10

**Other Authorities**

(26 C.F.R.) Treas. Reg. §§ 1.5000A-0 - 1.5000A-5 .................................. 9

45 C.F.R. Part 158, Subpart B ............................................................... 13

45 C.F.R. § 155.240 ...............................................................................10

45 C.F.R. § 156.1240 .............................................................................10

45 C.F.R. §§ 158.110-.170 .....................................................................13

45 C.F.R. § 158.130 ...............................................................................14

45 C.F.R. § 158.140 ...............................................................................14

45 C.F.R. § 158.150 ...............................................................................14

45 C.F.R. § 158.160 ...............................................................................14

45 C.F.R. § 158.221 ...............................................................................13

45 C.F.R. § 158.240 ...............................................................................14

45 C.F.R. § 158.242 ...............................................................................14

78 Fed. Reg. 53,646 (Aug. 30, 2013) ......................................................9

78 Fed. Reg. 54,070 (Aug. 30, 2013)..............................................10, 11

Fed. R. Civ. P. 23 .............................................................................*passim*

CMS, *Federally Facilitated Marketplace Enrollment Operational
    Policy & Guidance* (Oct. 3, 2013),
    http://www.cms.gov/CCIIO/Resources/Regulations-and-
    Guidance/Downloads/ENR_OperationsPolicyandGuidance_5CR_1
    00313.pdf .......................................................................................12

Jessica Banthin and Sarah Masi, *Updated Estimates of the Insurance
    Coverage Provisions of the Affordable Care Act* (Mar. 4, 2014),
    http://www.cbo.gov/publication/45159 ............................................10

## LOCAL RULE 28.1 PRELIMINARY STATEMENT

This is an appeal from the district court's Class Settlement Order and Final Judgment entered on January 14, 2014, SPA73-87, and the related December 13, 2013 Memorandum and Order granting final approval of the proposed class action settlement and plan of allocation, SPA1-55.  Appellants Blue Cross and Blue Shield entities and the WellPoint entities (as listed in the Corporate Disclosure Statement) filed objections to the proposed class action settlement agreement.  On appeal, they join the Joint Brief for the Merchant Appellants ("Merchants' Joint Brief").  The purpose of this brief is to highlight the flaws in the Federal Rule of Civil Procedure ("Rule") 23(b)(2) settlement class certification and the lack of fairness in the settlement as it relates to health insurers.

## STATEMENT OF JURISDICTION

The jurisdiction of the trial court rested on 28 U.S.C. §§ 1331, 1332, 1337, 1367, 2201, and 2202, and this Court's jurisdiction rests on 28 U.S.C. § 1291. Final judgment was entered on January 14, 2014, and the Blue Cross and Blue Shield entities and WellPoint entities timely filed their Notice of Appeal on February 7, 2014 (as well as a protective Subsequent Notice of Appeal on January 10, 2014).

## ISSUES PRESENTED

1.  Whether the district court erred in finding that the Rule 23(b)(2) settlement class has the requisite cohesion when it included categories of class members (such as health insurers) who could not materially benefit from the injunctive relief provided.

2.  Whether the district court erred in finding that the class representatives adequately represented the Rule 23(b)(2) class when, in return for receiving substantial monetary relief as Rule 23(b)(3) class members, they agreed to a broad release of future damages claims for Rule 23(b)(2) class members.

3.  Whether the district court erred in ruling that the settlement was fair, adequate, and reasonable as to the non-opt out Rule 23(b)(2) settlement class when it required them to release all future claims, including those for monetary relief, in exchange for injunctive relief of minimal benefit to categories of the class, including health insurers.

## STATEMENT OF THE CASE

This appeal arises from a class action filed in 2005, alleging that Defendant-Appellees Visa, U.S.A., MasterCard International Incorporated, and their respective issuing banks violated antitrust laws by imposing rules and restraints that caused the interchange fees that merchants pay for credit and debit card transactions to be imposed at supra-competitive levels.  Plaintiff-Appellees are a

number of merchants purporting to represent a class of approximately 12 million members.

The Appellees filed a Definitive Class Settlement Agreement on October 19, 2012, SPA98-202, and moved for preliminary approval of the proposed settlement agreement, which the district court granted on November 27, 2012. [Dkt. No. 1745].[1]  The proposed settlement agreement included a Rule 23(b)(3) settlement class, as to whom monetary relief would be allocated, and a separate Rule 23(b)(2) settlement class.  The proposed settlement agreement defined the "Rule 23(b)(2) Settlement Class" broadly to include "all persons, businesses and other entities that of the Settlement Preliminary Approval Date *or in the future* accept any Visa-Branded Cards and/or MasterCard-Branded Cards in the United States," subject to a few exceptions not relevant here.  SPA118 (emphasis added).  As the district court noted in approving the settlement, "Class Counsel estimate that approximately 12 million merchants comprise the class."  SPA23.  The release language for the Rule 23(b)(2) class is similarly expansive.  It requires members of the Rule 23(b)(2) Settlement Class to do the following:

> [I]rrevocably waive, and fully, finally, and forever settle, discharge, and release the Rule 23(b)(2) Settlement Class Released Parties from any and all manner of claims . . . for any

---

[1] References to documents contained in the district court's docket are cited as "[Dkt. No. __]."

form of declaratory, injunctive, or equitable relief, *or any damages or other monetary relief* relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order, regardless of when such claims accrue, whether known or unknown, . . in law or in equity that any Rule 23(b)(2) Settlement Class Releasing Party now has, or hereafter can, shall, or may in the future have, arising out of or relating in any way to any conduct acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(2) Settlement Class Released Party that are alleged or which could have been alleged from the beginning of time until the date of the Court's entry of the Class Settlement Preliminary Approval Order . . . .

SPA169-70 (emphasis added). The release includes, among other things, future claims relating to "any interchange rules, interchange fees, or interchange rates . . . with respect to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States." SPA170. Despite the broad class definition (which includes any entity that accepts Visa or MasterCard branded credit cards in the future) and broad release of future claims for monetary relief arising out of Defendant's rules and agreements relating to interchange fees, the proposed settlement agreement does not allow any opt-outs from the Rule 23(b)(2) Settlement Class. *See id.* at 118 ("exclusions shall not be permitted").

Following preliminary approval of the settlement agreement and notice to class members, class members had until May 28, 2013, to opt out of the Rule 23(b)(3) damages class, object to the proposed settlement, or both. SPA13.

- 4 -

Pursuant to Rule 23(e)(5), thousands of members of the putative Rule 23(b)(2) or 23(b)(3) settlement classes filed objections.  As the district court found, the objectors, which included some of the nation's largest retailers, "in the aggregate represent 19% of the total transaction volume."  SPA23.  The objectors also included two groups of health insurance companies, Appellants Blue Cross and Blue Shield ("Blues") entities and Appellants WellPoint entities (collectively, "Health Insurers").[2]  The WellPoint entities filed their objections to the proposed settlement on May 27, 2013.  [Dkt. No. 2493].  The Blues entities filed their objections on May 28, 2013.  [Dkt. No. 2643].

Prior to 2014, the Health Insurers generally did not engage in significant volumes of credit card transactions.  The implementation of the Affordable Care Act, however, created the prospect that, beginning in October 2013, the Health Insurers would begin to engage in substantial volumes of credit card transactions as large numbers of individuals enter the health care market through the Health Benefits Exchanges mandated by the Act.  Having not engaged in significant

---

[2] For ease of reference, we use the term "Health Insurers" to refer to all of the Blues and WellPoint Objectors-Appellants, even though a small number of them are not health insurers (although they are affiliated with a health insurer).  These non-health insurers, as well as the health insurers, object to the settlement on the grounds that, as applied to merchants generally, the settlement violates due process and Fed. R. Civ. P. 23, for the reasons stated in the Merchants' Joint Brief.  This brief focuses on issues unique to health insurers.

volumes of credit card transactions in the past, the Health Insurers stood little, if anything, to gain from inclusion in the Rule 23(b)(3) class. As heavily regulated entities, the Health Insurers also received little tangible benefit as members of the Rule 23(b)(2) class. For example, the principal injunctive relief offered to members of the Rule 23(b)(2) class was the ability to surcharge Visa and MasterCard users at both the brand and product levels. *See* SPA36 (describing elimination of the rule prohibiting surcharging by merchants as "[o]ne of the principal accomplishments of the injunctive relief obtained by the proposed settlement"). As discussed below, the Affordable Care Act's Medical Loss Ratio requirement, state laws prohibiting surcharging, and the prospect of state or federal regulation prohibiting health insurers from surcharging served to make the chief feature of the injunctive relief provided to the Rule 23(b)(2) class of minimal benefit to the Health Insurers.

On December 13, 2013, following a Rule 23(e) fairness hearing, the district court entered its Memorandum and Order granting final approval of the class action settlement agreement. SPA1-55. With respect to the objections of the Health Insurers, the district court "agree[d] with these objectors that no one thought of their unique concern in formulating the settlement," but summarily concluded that "that is no reason not to approve it." SPA48.

The Health Insurers filed a protective Notice of Appeal on January 10, 2014 [Dkt. No. 6176], which was docked as No. 14-157.  The district court entered the Class Settlement Order and Final Judgment on January 14, 2014.  SPA73-97. Following entry of the Final Judgment, the Health Insurers filed a Subsequent Notice of Appeal on February 7, 2014 [Dkt. No. 6238], which was docketed as No. 14-567.  Both appeals (Nos. 14-157 and 14-567) were subsequently consolidated with the lead appeal, No. 12-4671(L).

## STATEMENT OF FACTS

For the most part, the Health Insurers are health insurance companies located in specific states or regions throughout the country.  The Blues entities include numerous independent licensees of the Blue Cross and Blue Shield Association that provide Blue Cross and Blue Shield-branded products and services throughout the United States.  In addition, certain WellPoint entities provide Blue Cross and Blue Shield-branded products and services in 14 states (Colorado, Nevada, Connecticut, Indiana, Kentucky, Maine, Missouri, New Hampshire, Ohio, Virginia, Wisconsin, California, New York, and Georgia), offer UniCare-branded products across the country, and provide other health plan services in certain markets through the CareMore subsidiaries.  [Dkt. No. 2493-2 ¶ 2].

### 1. *The Volume of Credit Card Transactions by Health Insurers Before Preliminary Approval of the Settlement.*

As of May 2013, when the WellPoint entities filed their objections, payments by credit card represented a small percentage of the total payments for health care premiums received by the WellPoint companies. [*Id.* ¶ 3]. As of May 2013, the WellPoint companies that offer health insurance accepted credit card payments by individuals only for their initial premium payments and for payments made by telephone. [*Id*].

The same was generally true of the Blues entities. For example, as of May 2013, credit card payments accounted for "a very small portion of the total payments received" from BlueCross BlueShield of South Carolina's customers. [Dkt. No. 2643-3 ¶ 4]. At that time, Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ") "ha[d] never accepted credit cards for premiums that it collects from its customers." [Dkt. No. 2643-4 ¶ 5]. From 2004-2009, BCBS-AZ accepted credit cards for application fees for individual insurance, but those transactions represented only a "tiny fraction" of its revenue. *Id.* Blue Cross of Northeastern Pennsylvania ("BCNEPA") did not accept credit cards for any purposes until "very late in 2011." [Dkt. No. 2643-7 ¶ 6]. During the time it began accepting credit card payments in 2011 through 2012, BCNEPA paid less than $11,000 in Visa and MasterCard interchange fees. *Id.* As a final example, as of May 2013,

Independence Blue Cross in Philadelphia had not accepted credit cards for any purposes at least since 2004.  [Dkt. No. 2643-6 ¶ 4].

### 2. *Anticipated Use of Credit Cards Resulting from the Implementation of the Affordable Care Act.*

Although enacted in 2010, many provisions of the Patient Protection and Affordable Care Act did not go into effect until 2014.  As a result of the Affordable Care Act, health insurers began accepting a significantly higher volume of credit card transactions beginning in October of 2013 (the beginning of the first open enrollment period under the Act), making them subject to a correspondingly higher volume of interchange fees.  Yet, other features of the Affordable Care Act, especially the Medical Loss Ratio requirement, and the prospect of additional state and federal regulation governing insurers' relationships with individuals covered under the Act, limit the Health Insurers' ability to benefit from the surcharging relief, which is the principal injunctive relief offered to members of the Rule 23(b)(2) settlement class.

The Affordable Care Act's individual mandate provisions require most individuals, beginning after 2013, either to obtain qualifying coverage for themselves and their dependents or to pay a penalty.  26 U.S.C. § 5000A(a); Treas. Reg. §§ 1.5000A-0 through 1.5000A-5, 78 Fed. Reg. 53646, 53655 (Aug. 30, 2013). The Affordable Care Act also requires the creation of Health Benefits Exchanges, which are internet-based marketplaces set up by the states or federal government to

facilitate the purchase of individual and small-employer policies. *See* 42 U.S.C. §§ 18031, 18041. The Congressional Budget Office and Joint Committee on Taxation anticipate that, during the period from 2017 through 2024, as a result of the Affordable Care Act, 24 or 25 million people will obtain health insurance each year through the Health Benefits Exchanges.[3]

The sizeable expansion in the individual market is expected to lead to an increased amount of health insurance premium payments that insurance companies will accept by credit card. [Dkt. No. 2493-2 ¶ 5]. Under regulations promulgated by the U.S. Department of Health and Human Services ("HHS"), a Health Benefits Exchange may establish a process to facilitate the collection and payment of an individual's premiums by electronic means, *e.g.*, by credit card. 45 C.F.R. § 155.240(c). HHS regulations issued in August 2013 specify that health insurers offering coverage through an Exchange must, *"[a]t a minimum*, for all payments in the individual market, accept paper checks, cashier's checks, money orders, EFT, and all general-purpose pre-paid debit cards as methods of payment." 45 C.F.R. § 156.1240(a)(2) (emphasis added); 78 Fed. Reg. 54070, 54126-27 (Aug. 30, 2013).

---

[3] *See* Jessica Banthin and Sarah Masi, *Updated Estimates of the Insurance Coverage Provisions of the Affordable Care Act* (Mar. 4, 2014), http://www.cbo.gov/publication/45159.

The health insurer also must "present all payment method options equally for a customer to select their preferred payment methods." *Id.*

More importantly, "due to [the] apparent customer preference for credit cards, there may be increased competitive pressure on health insurance companies to accept credit cards in the future as the method for making all manner of payments under health insurance plans." [Dkt. No. 2493-1 ¶ 5]. Indeed, even when the objections were filed in May 2013, some of the Health Insurers had already decided to accept credit cards for payments of premiums on the Health Benefits Exchanges beginning in late 2013 or 2014. *See* [Dkt. No. 2643-3 ¶ 5] (BlueCross and BlueShield of South Carolina); [Dkt. No. 2643-4 ¶ 6] (BCBS-AZ); [Dkt. No. 2643-7 ¶ 5] (BCNEPA). Many Health Insurer entities expect that an increasing portion of premiums for individual coverage will be paid by credit cards, starting in late 2013 or 2014 and into the foreseeable future. *See, e.g.,* [Dkt. No. 2643-3 ¶ 5; Dkt. No. 2643-4 ¶ 6; Dkt. No. 2643-6 ¶ 5]. In fact, one of the Blues entities (BCNEPA) "expects credit cards to be the dominant payment vehicle for its products sold on the Exchange." [Dkt. No. 2643-7 ¶ 5]. Health Insurers that do not accept credit cards on the Exchanges "would be at a distinct competitive disadvantage." *See* [Dkt. No. 2643-4 ¶ 6].

### 3. Limitations on Health Insurers' Use Of Surcharging

As an initial matter, some of the Health Insurers insure individuals in states where surcharging is prohibited as a matter of state law. *See* SPA215-32; [Dkt. No. 2493-2 ¶ 14].[4]  As to those Health Insurers, the change to the surcharging rules provides no benefit whatsoever.  Further, at the time the Blues entities filed their objections to the proposed settlement, one of the entities predicted:  "It is also possible that state and/or federal regulators may not permit health insurers to impose surcharges on enrollees."  *Id.* ¶ 16.  Subsequently, in October 2013, HHS's Center for Consumer Information & Insurance Oversight, which is charged with implementing many aspects of the Affordable Care Act, issued its "Federally Facilitated Marketplace Enrollment Operational Policy & Guidance," in which it expressly states that a Qualified Health Plan issuer "may not pass on administrative fees for processing a premium payment via credit card."[5]  Thus, for individuals who signed up for health insurance on a federal exchange and pay their premiums with credit cards, the Health Insurers are not allowed to surcharge.

---

[4] In October 2013, a federal court in New York preliminarily enjoined enforcement of New York's anti-surcharging statute on the ground that it violated the First Amendment.  *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430 (S.D.N.Y. 2013)

[5] CMS, *Federally Facilitated Marketplace Enrollment Operational Policy & Guidance* at 13 (Oct. 3, 2013), http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/ENR_OperationsPolicyandGuidance_5CR_100313.pdf.

But even where surcharging is theoretically allowed and even assuming additional statutes and regulations are not adopted limiting the Health Insurers' ability to surcharge, the Affordable Care Act's Medical Loss Ratio requirement limits the financial benefit of the ability to surcharge. The "Medical Loss Ratio" rules require health insurers that offer individual (or group) health insurance coverage to spend a specified minimum percentage of their premium revenue for a calendar year (less federal and state taxes, and licensing and regulatory fees) on enrollees' medical claims and expenditures that improve health care quality, or else they will be required to distribute annual rebates to their customers. 42 U.S.C. § 300gg-18(b); 45 C.F.R. Part 158, Subpart B.[6] For the individual health insurance market, if the result of the fraction is less than 80%,[7] the insurer will be required to issue rebates to each of its subscribers in that market to account for the shortfall.

---

[6] A health insurer's Medical Loss Ratio is reported as a fraction, in which the numerator consists of enrollee medical claims and expenditures that improve health care quality (including specified expenses related to health information technology and meaningful use requirements) and the denominator consists of the insurer's earned premium revenue less certain federal and state taxes and licensing and regulatory fees. 42 U.S.C. § 300gg-18(a) (enacted by ACA §§ 1001(5), 10101(f)); 45 C.F.R. §§ 158.110-.170, 158.221.

[7] A health insurer's Medical Loss Ratio must be calculated separately for its collective individual health insurance policies, group health insurance policies sold to "small employers," and group health insurance policies sold to "large employers," respectively. The applicable Medical Loss Ratio threshold for small employer policies is 80 percent (the same threshold as for individual health insurance policies), while the threshold for large employer policies is 85 percent. 42 U.S.C. § 300gg-18(b)(1)(A)(i)-(ii).

*See* 45 C.F.R. §§ 158.240(c), 158.242(a).  Hence, the Health Insurers can use at most 20% of their revenue to cover administrative costs and their profit.

Credit card interchange fees would constitute non-claims costs that count toward the annual 20% limit associated with the individual-market Medical Loss Ratio.  Non-claims costs include any administrative expenses that do not constitute adjustments to a health insurer's earned premium revenue, enrollee medical claim costs, expenditures that improve health care quality, or federal and state taxes or licensing or regulatory fees.  *See* 45 C.F.R. § 158.160(a), (b)(1).  Credit card interchange fees do not constitute any of these types of expenditures, but rather fall within the "general and administrative expenses" category of non-claims costs. *See id*. §§ 158.130(b), 158.140(b)(3), 158.150, 158.160(b)(2)(v); *see also* [Dkt. No. 2493-2 ¶ 11] ("The regulations promulgated under the Act indicate that interchange fees would be viewed as administrative costs that would not be categorized as Qualifying Expenditures").

Each year, the Health Insurers must calculate their Medical Loss Ratios and are at risk of falling below the threshold.  *See, e.g.*, [Dkt. No. 2643-3 ¶ 6] ("BCBS-SC reported Medical Loss Ratios to the U.S. Department of Health and Human Services for both individual and small group markets that were below the 80% threshold for 2011 (the most recent year for which BCBS-SC has reported Medical Loss Ratios)"); [Dkt. No. 2643-4 ¶ 7] ("BCBS-AZ's Medical Loss Ratio for the

individual market for 2011 was 77.9%.  For the small group market it also was 77.9%.").

For the Health Insurers at or below the required Medical Loss Ratio threshold, surcharging is of minimal benefit.  For the Health Insurers already below the Medical Loss Ratio threshold, the surcharge will increase the amount of annual rebates the Health Insurer must provide.  For a Health Insurer at or just above the Medical Loss Ratio threshold, surcharging could bring the Health Insurer below the threshold and put the Health Insurer in the annual rebate posture. To simplify, if a hypothetical health insurer has $1,000,000 in premium revenue and $800,000 of qualifying expenditures, its Medical Loss Ratio is at 80% and no rebate is required.  The remaining 20% ($200,000) would cover the health insurer's administrative expenses (including merchant discount fees) and profits. If, however, the health insurer decides to surcharge, thereby increasing its revenues to account for $20,000 in merchant discount fees, then its Medical Loss Ratio drops to 78.4% ($800,000 / $1,020,000).  The health insurer is now 1.6% below the Medical Loss Ratio and must now provide an annual rebate of $16,320 (1.6% of $1,020,000) to its customers in addition to paying the merchant discount fee.

Accordingly, as a result of the Medical Loss Ratio rules, for the Health Insurers at or below the Medical Loss Ratio threshold, 80% of any newly created surcharging revenue must be spent on providing health benefits if the Health

Insurer is to avoid providing additional annual rebates. Even if the Health Insurers attempt to recoup the cost of interchange fees through higher premiums rather than an express surcharge, the result is the same: roughly 80% of the additional revenue must be used for medical claims and other approved health quality expenditures. In this way, the Health Insurers are fundamentally different from other merchants who can pass on the cost of interchange fees to their customers in the form of higher prices or, at least in some states, surcharges.

## SUMMARY OF ARGUMENT

As noted in the Preliminary Statement, the Health Insurers join in the Merchants' Joint Brief, including the following arguments set forth in that brief: (I) the district court's judgment impermissibly extinguishes class members' individualized claims without opt-out rights; (II) the mandatory (b)(2) settlement class lacked the required cohesion of interests; (III) the (b)(2) settlement class did not receive adequate representation; and (IV) by releasing all future antitrust claims, the settlement violates controlling precedent and exceeds the power of a federal court.

Below, the Health Insurers elaborate on points I, II, and III made in the Merchants' Joint Brief. First, the Rule 23(b)(2) class lacked the requisite cohesion because, contrary to the district court's assessment, the ability of the class members to surcharge did not "affect all (b)(2) class members equally." *See*

SPA53 n.20.  The surcharging injunctive relief is of negligible benefit to the Health

Insurers because of the regulated environment in which they operate.  Second, the

Plaintiff-Appellees did not adequately represent class members, such as the Health

Insurers, who receive virtually no monetary benefit from membership in the Rule

23(b)(3) class and who can benefit from little if any of the injunctive relief.  Third,

the settlement did not satisfy Rule 23(e)'s fairness requirement because it required

class members, such as the Health Insurers to release all future claims for monetary

damages even though they received minimal benefit from the settlement.

## STANDARD OF REVIEW

A district court's decisions to certify a class and to approve the settlement of

a class action are reviewable under an abuse-of-discretion standard.  *See In re*

*Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir.

2011); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco*

*Managed Care, L.L.C.*, 504 F.3d 229, 246-47 (2d Cir. 2007).  The "factual

conclusions related to a settlement agreement" are reviewed "under the clearly

erroneous standard of review" and "a district court's legal conclusions with respect

to its interpretation of the terms of a settlement agreement" are reviewed de novo.

*Cent. States*, 504 F.3d at 247 (citing *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d

437, 443 (2d Cir. 2005)).

## ARGUMENT

## I. THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE RULE 23(b)(2) SETTLEMENT CLASS POSSESSED THE REQUIRED COHESION OF INTERESTS

"[I]n the context of settlement, Rules 23(a) and (b) . . . 'focus[] court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives.'" *In re Am. Int'l. Group, Inc., Secs. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997)). In addition to meeting Rule 23(a)'s typicality and commonality requirements, *see* Fed. R. Civ. P. 23(a)(2), (3), a class can be certified under Rule 23(b)(2) only if "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011). Because of the non-opt out nature of a Rule 23(b)(2) class, "even greater cohesiveness generally is required than in a Rule 23(b)(3) class." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005); *see also Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998) ("a (b)(2) class may require more cohesiveness than a (b)(3) class").

Here, the district court viewed the surcharging relief as "[o]ne of the of principal accomplishments" of the rule change relief provided to the Rule 23(b)(2)

class.  *See* SPA36; *see also* SPA15.  That relief, however, was not appropriate for categories of class members, including the Health Insurers; nor did it "provide relief to each member of the class," as *Dukes* requires.  Accordingly, the Rule 23(b)(2) class lacked the requisite cohesiveness of interests.

The district court rejected the objectors' argument that the Rule 23(b)(2) class was not sufficiently cohesive to be certified for settlement purposes.  SPA51.  The court concluded:  "all merchants have the same interest in being able to inform cardholders at the point of sale of the acceptance costs of their credit cards and to either steer them to lower-cost alternatives or recoup the cost of acceptance."  *Id.*  The court also found that "the rules reforms created by the settlement – in particular, the ability for merchants to surcharge – affect all (b)(2) class members equally."  *Id.* at SPA53 n.20.

The Health Insurers, although not typical "merchants," are nonetheless included in the Rule 23(b)(2) class if they "as of the Settlement Preliminary Approval Date or in the future accept any Visa-Branded Cards and/or Master Card-Branded Cards."  SPA118.  Because they operate in the highly-regulated health insurance market, the Health Insurers, unlike the typical merchant, cannot simply steer customers to lower-cost payment alternatives or recoup the cost of accepting credit cards either directly through surcharging or indirectly through increased prices for products or services.  As noted, as a result of the new HHS guidance,

health insurers who insure individuals on the federally-facilitated Heath Benefits Exchange may not surcharge customers who use credit cards for premium payments. Some plans also are prohibited by state law from surcharging. *See* [Dkt. No. 2493-2 ¶ 14]; *see also* SPA215-32 (state statutes prohibiting surcharging).

Even assuming the state and federal regulatory regime in which the Health Insurers operate did not expressly forbid surcharging, the Medical Loss Ratio rules greatly limit the benefit of that practice. In the individual market, the Health Insurers must spend 80% of their revenue on enrollee medical claims and expenditures that improve health care quality. Thus, if the Health Insurers that are not safely above the Medical Loss Ratio threshold attempt to recoup the cost of interchange fees either through increased premiums or by surcharging, they will only recoup a small portion of the fees. In general, 80% of the surcharge or increased premium revenue would have to be spent on health care expenditures to avoid the rebate penalty.

The Rule 23(b)(2) settlement class of approximately 12 million included a diverse group of entities whose only point of commonality was their past or future acceptance of Visa-Branded or MasterCard-Branded credit cards. Because the class included within it categories of class members who could benefit from the surcharging relief along with categories of class members (such as the Health

Insurers) who obtained little if any benefit from the injunctive relief, the class

lacked the necessary cohesion to be certified as a Rule 23(b)(2) settlement class.

This is especially so where, as here, the class was required to release all future

claims for damages relief.

Separately, the class lacked the requisite cohesion of interests because some

class members received substantial monetary relief as Rule 23(b)(3) class members

and other members of the Rule 23(b)(2) class received little or no monetary

recovery as a result of the settlement, even though both classes were required to

give similar releases of claims.  The facts regarding this divergence of interests are

discussed in more detail in the following section.

## II. THE PLAINTIFFS-APPELLEES DID NOT ADEQUATELY REPRESENT THE HEALTH INSURERS AND OTHER MERCHANTS WITH MINIMAL OR NO CREDIT CARD USE PRIOR TO 2014

A class can be certified only if "the representative parties will fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Rule

23(a)(4)'s adequacy inquiry  "serves to uncover conflicts of interest between

named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625.  To

satisfy the adequacy requirement, the class representatives must possess the same

interests and suffer the same injuries as the class members and "must have no

interests antagonistic to the interests of other class members."  *In re Literary*

*Works*, 654 F.3d at 249 (internal quotation marks and citation omitted).  When, as

- 21 -

here, a class is certified for settlement purposes, "the Rule 23(a) requirements 'designed to protect' [absent class members] 'demand undiluted, even heightened, attention.'" *In re Am. Int'l. Group, Inc., Secs. Litig.*, 689 F.3d at 239 (quoting *Amchem*, 521 U.S. at 620). Here, the class representatives could not adequately represent the interests of class members, such as the Health Insurers, whose injuries would primarily arise in the future.

Under the settlement agreement approved by the district court, the Rule 23(b)(3) class will receive an estimated $7.25 billion in monetary compensation (before opt-outs) through two funds: (1) the $6.05 billion Cash Fund, to be distributed to merchants based on the amount of interchange fees they paid during the Class period of January 1, 2004, to November 28, 2012; and (2) an Interchange Fund (worth approximately $1.2 billion), to be distributed to merchants based on the interchange fees they paid during the July 29, 2013, to March 29, 2014 period.[8] *See* SPA13; SPA120-23. Because some of the Health Insurers engaged in minimal credit card transactions before the 2014 implementation of the Affordable Care Act, they receive almost no benefit from membership in the Rule 23(b)(3) class. Other Health Insurers did not accept any credit card transactions between January

---

[8] Only those entities that accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States during the period January 1, 2004, to November 28, 2012, are eligible to participate in the Interchange Fund. *See* SPA118.

1, 2004, to November 28, 2012, and – along with countless other class members including emerging and future merchants – are not in the Rule 23(b)(3) class at all.[9]  With the implementation of the Affordable Care Act and establishment of an individual market on the Health Benefits Exchanges, the Health Insurers began accepting credit cards (and thus pay interchange fees) with greater frequency only after the period covered by the Rule 23(b)(3) class.  The Health Insurers thus are predominately concerned with future injuries and preserving their individualized claims for damages.

The class representatives, on the other hand, are squarely in both the (b)(3) monetary and (b)(2) injunctive classes.  The backward-looking nature of their injuries created conflicts of interest with the Health Insurers and other emerging merchants, whose injuries would primarily, if not exclusively, arise in the future. This is the very sort of conflict that Rule 23(a)(4) prohibits.  In *Amchem*, the named plaintiffs had already suffered asbestos-related injuries and crafted a

---

[9] Some merchants accepted credit cards during the period for which the Interchange Fund was meant to provide compensation (*i.e.*, July 29, 2013, to March 29, 2014 period), but will not be eligible to receive any of the Fund because they did not accept credit cards between January 1, 2004, to November 28, 2012, and are thus excluded from the Rule 23(b)(3) class definition.  For example, a Health Insurer like Independence Blue Cross that never accepted credit cards between January 1, 2004, to November 28, 2012 (*see* [Dkt. No. 2643-6 ¶ 4]), is ineligible to receive any cash settlement even if it incurs enormous interchange fees during the July 29, 2013, to March 29, 2014 Interchange Fund period.

settlement which favored class members with known injuries. Noting "[t]he disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category," the Supreme Court characterized the settlement as achieving "a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." 521 U.S. at 626, 627. For these reasons, the Court held that the class representatives did not meet the requirements of Rule 23(a)(4). *Id.* at 627. As the Supreme Court further explained in *Ortiz v. Fireboard Corp.*: "it is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter . . . [attributable] to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel." 527 U.S. 815, 856 (1999). The reasoning of *Amchem* and its progeny is equally applicable to the instant appeal.

This Court also has found similar conflicts to preclude a finding that a class meets Rule 23(a)(4)'s adequacy requirement. Where a class "purports to represent both present and future claimants," the class "may encounter internal conflicts." *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 261 (2d Cir. 2001), *vacated in part on other grounds by* 539 U.S. 111, 112 (2003). Indeed, this Circuit has previously categorized as "obvious," for purposes of this adequacy analysis, the "conflict between those currently injured and those who had yet to suffer injury, but would

in the future." *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2010). Moreover, where "[n]o provision was made" for claimants whose injuries were discovered after the expiration of a settlement fund but the litigation "purported to settle all future claims, this Circuit said that the conflict between class representatives and the members of the class whose claims were beyond the settlement period was "apparent." *Stephenson*, 273 F.3d at 260-61.

Here, although many current and future Rule 23(b)(2) class members were not included in the Rule 23(b)(3) class, all the class representatives consisted exclusively of established merchants included in the (b)(3) class settlement. None of the class representatives represented those merchants whose only or primary concern was the (b)(2) injunctive and declaratory relief. Additionally, the release for the Rule 23(b)(3) settlement class is of similar scope as the release for the Rule 23(b)(2) settlement class. *Compare* SPA134-36 *with* SPA169-72. Having released their claims for damages arising from future anticompetitive conduct associated with interchange fees, the Plaintiffs-Appellees who benefited from the Rule 23(b)(3) settlement had no incentive to negotiate to avoid a broad release of individualized claims for monetary relief for the Rule 23(b)(2) class members. The result of the settlement agreement was a large monetary award benefitting established merchants in exchange for a broad release of all future damages claims, with limited rule change injunctive relief for emerging and future merchants.

In fact, in negotiating the settlement agreement, the class representatives may have sacrificed other injunctive relief in favor of a greater monetary reward. The class representatives "'had no incentive to maximize the recovery' of the other class members" given the monetary recovery they were negotiating. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007) (quoting *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995)).

In return for releasing all future claims for monetary relief, the Rule 23(b)(2) class members received only modest changes in the interchange rules that were the subject of the lawsuit. As set forth above, the main relief provided to the Rule 23(b)(2) class was the change to the rules prohibiting merchants from surcharging customers who use credit cards. Because of the regulatory regime in which the Health Insurers operate and the Medical Loss Ratio rules, this relief was largely useless to the Health Insurers. Other relief was of similarly limited value. The reaffirmation of relief awarded in *United States v. American Express Co.*, No. 10-CV-04496 (E.D.N.Y.), and the rules on minimum payments set out by statute offer little added value to any class members. In addition, for the Health Insurers, which have no retail stores and will be making nearly all credit card sales through web-based Health Benefits Exchanges, the modification of the "all outlets" rule has no value. And, for large companies, the allowance of *bona fide* buying groups

offers little added value.  Presumably, this provision was designed to benefit small merchants who might have increased negotiating power if they banded together.  In any event, the use of *bona fide* buying groups is limited to situations where Visa or MasterCard "believe[]" that a proposal "provides reasonable commercial benefits to the parties."  SPA149-50, SPA163.  In other words, the use of this mechanism will remain entirely in Visa and MasterCard's control.

In sum, the Health Insurers' interests were not adequately represented.  The class representatives received ample monetary consideration as Rule 23(b)(3) class members in exchange for their release of the ability to bring future claims for monetary relief as Rule 23(b)(3) class members.  And, having waived such claims as members of the 23(b)(3) class, they had no incentive to negotiate against a similar release for Rule 23(b)(2) class members.  The Health Insurers, although faced with the threat of injury from anticompetitive conduct associated with interchange fees arising from their future acceptance of credit cards, will not receive any meaningful monetary consideration for their Rule 23(b)(2) release – the scope of which is as broad as the release given by those who received substantial financial rewards under the settlement.  For these reasons, the trial court abused its discretion in finding that the requirements of Rule 23(a) were met.

## III.   THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE SETTLEMENT WAS FAIR, REASONABLE, AND ADEQUATE

Under Rule 23(e)(2), a court may approve a class settlement agreement that would bind class members only "on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  This fairness inquiry does not "supplant" the Rule 23(a) inquiry discussed *supra*.  *See In re Am. Int'l Group, Inc. Secs. Litig.*, 689 F.3d 229, 239 n.8 (2d Cir. 2012).  Rather, it "'function[s] as an additional requirement.'"  *Id.* (quoting *Amchem*, 521 U.S. at 621).  The trial court abused its discretion in approving the settlement agreement; it was not fair, reasonable, and adequate.

"One sign that a settlement may not be fair is that some segments of the class are treated differently from others," and an appellate court may find error where the trial court did not "adequately account[] for the different abilities (not inclinations) of class members to use the settlement."  *In re General Motors Corp.*, 55 F.3d at 808.  The trial court acknowledged that "no one thought of [the Health Insurers'] unique concern in formulating the settlement."  SPA48.  Ultimately, the settlement was designed to favor merchants in the Rule 23(b)(3) class that previously accepted high volumes of credit card transactions.  As set out *supra*, it provides minimal relief to members of the Rule 23(b)(2) alone, who did not accept

credit cards during the Class Period, and yet requires them to give the same prospective release of claims as members of the Rule 23(b)(3) class.

This Circuit has previously recognized that, in making the fairness inquiry required by Fed. R. Civ. P. 23(e), "special care must be taken to ensure that the release of a claim not asserted within a class action or not shared alike by all class members does not represent an 'advantage to the class by the uncompensated sacrifice of claims of members, whether few or many.'" *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir. 1981)). That care was not taken in the instant case; and "the danger that a class representative not sharing common interests with other class members would 'endeavor to obtain a better settlement by sacrificing the claims of others at no cost to themselves' by throwing the others' claims 'to the winds,'" was realized. *See id.* at 462 (quoting *Nat'l Super Spuds*, 660 F.2d at 19 n.10, 17 n.6 (internal brackets omitted)). Indeed, the Rule 23(b)(2) release is impermissibly broad and the trial court abused its discretion in approving it.

In sum, the settlement creates a non-opt out Rule 23(b)(2) class that requires a broad release of future claims in exchange for relief that is of virtually no benefit to a category of class members (the Health Insurers). The settlement therefore is not fair, adequate, and reasonable to the extent it continues to include the Health

Insurers in the Rule 23(b)(2) settlement class.   Even if the Court generally affirms the district court's approval of the settlement, it should remand with direction that the district court remove the Health Insurers from the Rule 23(b)(2) settlement class definition.

## <u>CONCLUSION</u>

The judgment of the district court should be reversed and the case should be remanded to the district court for further proceedings.

Respectfully submitted,

/s/ Anthony F. Shelley
Anthony F. Shelley
  *Counsel of Record*
Adam P. Feinberg
Laura G. Ferguson
Michael N. Khalil
Katherine E. Pappas
Miller & Chevalier Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Email: ashelley@milchev.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

<u>XX</u> this brief contains 6,883 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

\_\_\_ this brief uses a monospaced typeface and contains [*state the number of lines*] of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because:

<u>XX</u> this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font in Times New Roman, or

\_\_\_ this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

 

 

    <u>June 16, 2014</u>        <u>/s/ Anthony F. Shelley</u>
         Date                  Anthony F. Shelley

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2014, I electronically filed the foregoing **BRIEF OF APPELLANTS** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to counsel of record for the parties.

I also certify that, on June 16, 2014, I have dispatched by Federal Express, the requisite six (6) copies of the **BRIEF OF APPELLANTS** to the Clerk of the United States Court of Appeals for the Second Circuit.

/s/ Anthony F. Shelley    
Anthony F. Shelley
