# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),
13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON),
14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON),
14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON),
14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),
14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON)
14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON),
14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON),
14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

―――――――――――

*On Appeal from the United States District Court
for the Eastern District of New York*

**JOINT DEFERRED APPENDIX
VOLUME V OF XXII
Pages A1011 to A1250**

*Submitted on Behalf of All Parties*

# **Table of Contents**

**Page**

### **Volume I**

District Court Docket Entries .................................................................. A1

### **Volume II**

District Court Docket Entries (cont'd) .................................................... A251

### **Volume III**

District Court Docket Entries (cont'd) .................................................... A501

### **Volume IV**

District Court Docket Entries (cont'd) .................................................... A751

Transfer Order, dated October 20, 2005 [Docket No. 2]....................... A822

Excerpts of First Consolidated Amended Class Action Complaint,
   dated April 24, 2006 [Docket No. 317] .......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
   Antitrust Litigation*, CV-96-5238, dated July 21, 2006
   [Docket No. 455-4] ......................................................................... A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
   Antitrust Litigation*, CV-96-5238,
   dated July 21, 2006 [Docket No. 455-5]......................................... A850

Excerpts of First Amended Supplemental Class Action Complaint
   (redacted), dated February 20, 2009 [Docket No. 1152]............... A856

Excerpts of Second Consolidated Amended Class Action
   Complaint (redacted), dated February 20, 2009
   [Docket No. 1153] .......................................................................... A858

i

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154]................ A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ............................................ A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] ......................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533]................. A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536]........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ............................................. A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ................................ A945

### **Volume V**

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545]................. A1011

**Table of Contents**
**(continued)**

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
Rule 56.1(b) (redacted), dated October 21, 2011
[Docket No. 1550] ........................................................... A1014

Excerpts of Network Defendants' Memorandum in Opposition to
the Individual Plaintiffs' Motion for Summary Judgment
(redacted), dated October 21, 2011 [Docket No. 1551]................. A1030

Excerpts of European Commission Notification Pursuant to Article
254 of the EC Treaty (redacted), dated November 23, 2011
[Docket No. 1573-3] ....................................................... A1032

Notice of Filing of Memorandum of Understanding,
dated July 13, 2012 [Docket No. 1587]......................... A1042

Memorandum of Understanding, dated July 13, 2012
[Docket No. 1588] .......................................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
[Docket No. 1588-1] ....................................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
dated August 21, 2012 [Docket No. 1616-3]................................ A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
Approval, dated October 19, 2012 [Docket No. 1656].................. A1086

Excerpts of Appendices to Definitive Class Settlement
Agreement, dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
Honorable John Gleeson, US District Judge,
dated November 9, 2012 [Docket No. 1732]................................ A1096

**Table of Contents**
**(continued)**

Page

Excerpts of Revised Appendix F2: Notice of Class Action
Settlement Authorized by the U.S. District Court, Eastern
District of New York, dated November 26, 2012
[Docket No. 1740-2] .................................................................... A1098

Class Settlement Preliminary Approval Order,
dated November 27, 2012 [Docket No. 1745] ............................... A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
Plaintiffs' Motion to Stay Class Settlement Preliminary
Approval Order, dated November 29, 2012 [Docket No. 1751] ... A1111

Letter from Class Counsel to Judge Orenstein,
dated December 10, 2012 [Docket No. 1760] ............................... A1114

Excerpts of Defendants' Memorandum in Support of Final
Approval of Definitive Class Settlement Agreement,
dated April 11, 2013 [Docket No. 2110] ....................................... A1118

Excerpts of Memorandum in Support of Class Plaintiffs'
Motion for Final Approval of Settlement, dated April 11, 2013
[Docket No. 2111-1] ....................................................................... A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
of Class Plaintiffs' Motion for Final Approval of Settlement,
dated April 11, 2013 [Docket No. 2111-2] .................................... A1131

Declaration of Eric D. Green, dated April 11, 2013
[Docket No. 2111-3] ....................................................................... A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
Class Settlement, dated April 11, 2013 [Docket No. 2111-5] ....... A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
Administrator's Implementation of Settlement Notice Plan,
dated April 11, 2013 [Docket No. 2111-6] .................................... A1200

## **Table of Contents**
### (continued)

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
    Implementation and Adequacy of Settlement Notice Program,
       dated April 11, 2013 [Docket No. 2113-7].................................... A1215

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
       Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........ A1238

**Volume VI**

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
       Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
       (Cont'd).......................................................................................... A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
    Plaintiffs' Motion for Final Approval of Settlement and Class
    Plaintiffs' Joint Motion for Award of Attorneys' Fees,
    Expenses and Class Plaintiffs' Awards,
       dated April 11, 2013 [Docket No. 2113-6].................................... A1296

Excerpts of Objection of City of Oakland to Final Approval of
    Proposed Settlement, dated May 15, 2013 [Docket No. 2279] ..... A1434

Retailers and Merchants' Objection to Final Approval of the Class
    Action Definitive Settlement Agreement, dated May 15, 2013
    [Docket No. 2281] ......................................................................... A1437

Objection of U.S. Public Interest Research Group to Final
    Approval of Proposed Class Settlement, dated May 23, 2013
    [Docket No. 2361] ......................................................................... A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
    dated May 23, 2013 [Docket No. 2364] ........................................ A1476

Statement of Objections of B & H Foto Electronics Corp.,
    d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........ A1480

**Table of Contents**
**(continued)**

**Page**

Excerpts of Statement of Objections by Boscov's,
dated May 24, 2013 [Docket No. 2411] ........................................ A1483

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] ........................................................................ A1486

**Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] (cont'd) ........................................................ A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] .............. A1512

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated May 24, 2013 [Docket No. 2427] .................... A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2432] ..... A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
Approval of the Settlement, dated May 24, 2013
[Docket No. 2433] ........................................................................ A1541

Excerpts of Objection of David's Bridal to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2434] ..... A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2435] ..... A1553

Declaration of John R. Manna, Vice President Operational
Controller, Lowe's Companies, Inc., dated May 24, 2013
[Docket No. 2437] ........................................................................ A1555

# **Table of Contents**
## (continued)

**Page**

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2438] ........................................................................ A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2439] ........................................................................ A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2441] ........................................................................ A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
Final Approval of the Proposed Settlement, dated May 25,
2013 [Docket No. 2444] ................................................................ A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2445] ..................... A1588

Excerpts of Objection of Carter's to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2446] ..................... A1601

Objection of Coborn's Incorporated to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
Final Approval of the Proposed Settlement,
dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2449] ............... A1615

Objection of Alon USA, LP to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2450] ..................... A1621

# Table of Contents
## (continued)

**Page**

Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2451] ....................................................................... A1627

Objection of IKEA US to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2458] .................... A1632

Objection of Jetro Holdings, LLC to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2459] ..... A1650

Objection of Michaels Stores, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2460] ..... A1656

Objection of NATSO Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2461] .................... A1659

Objection of National Restaurant Association to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2464] ....................................................................... A1667

Objection of Panera Bread Company to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2466] ..... A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2467] .................... A1681

Objection of Retail Industry Leaders Association to Final Approval
of the Settlement, dated May 25, 2013 [Docket No. 2469] .......... A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2470] ....................................................................... A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2471] .............. A1699

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of The Wendy's Company to Final Approval
   of the Proposed Settlement, dated May 25, 2013
      [Docket No. 2473] ........................................................ A1703

Objection of National Grocers Association to Final Approval of the
   Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
   Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
      [Docket No. 2493] ........................................................ A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
   Class Members WellPoint, Inc., etc., to the Proposed Rule
   23(b)(2) Settlement Agreement, dated May 27, 2013
      [Docket No. 2493-1] .................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
   Objections of WellPoint Entities, dated May 17, 2013
      [Docket No. 2493-2] .................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
   Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
      [Docket No. 2495] ........................................................ A1752

**Table of Contents**
**(continued)**

**Page**

Excerpts of Memorandum in Support of Objections of Absent
    Putative Rule 23(b)(2) Class Members Target Corporation,
    Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
    Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
    L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
    Ross Company, Closeout Distribution, Inc., Ascena Retail
    Group, Inc., Abercrombie & FitchCo., OfficeMax
    Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
    Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
    American Signature, Inc. to the Proposed Rule 23(b)(2) Class
    and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2495-1] ...................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,*
    *v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
    dated May 27, 2013 [Docket No. 2495-2] ..................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
    [Docket No. 2509] .......................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
    Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
    Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
    Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
    Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517] ........... A1828

Statement of Objections of Office Depot, Inc., Viking Office
    Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
    and Solutions4Sure.com, Inc., dated May 27, 2013
    [Docket No. 2519] .......................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
    Superstore East, Inc., Staples the Office Superstore, LLC,
    Staples Contract & Commercial, Inc., Quill Corporation, Quill
    Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
    Thrive Networks, Inc., and SchoolKidz.com,
    dated May 27, 2013 [Docket No. 2525] ......................................... A1836

x

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Michael S. Weisbach,
    dated May 27, 2013 [Docket No. 2533-2].....................................    A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
    Settlement, dated May 27, 2013 [Docket No. 2534] ....................    A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
    Settlement, dated May 27, 2013 [Docket No. 2536] ....................    A1847

Objections to Final Approval of Proposed Class Action Settlement
    and Notice of Intent to Appear of The Iron Barley Restaurant,
    Homestead Restaurant (Historical Homestead, Inc.), The Feral
    Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
    (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
    dated May 28, 2013 [Docket No. 2537] ........................................    A1850

National Retail Federation Statement of Objection to Final
    Approval of the Proposed Rule 23(B)(2) Agreement,
    dated May 28, 2013 [Docket No. 2538] ........................................    A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
    28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2] .......    A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
    dated May 28, 2013 [Docket No. 2538-20]..................................    A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
    Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
    [Docket No. 2538-21]...................................................................    A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
    [Docket No. 2540] ........................................................................    A1924

Objection of National Cooperative Grocers Association to Final
    Approval of the Proposed Settlement, dated May 28, 2013
    [Docket No. 2546] ........................................................................    A1926

## **Table of Contents**
### (continued)

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2559] .....   A1934

Objection of National Association of Convenience Stores to Final
    Approval of Proposed Settlement, dated May 28, 2013
    [Docket No. 2561] .......................................................................   A1942

Objection of Affiliated Foods Midwest to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2563] .....   A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
    Settlement, dated May 28, 2013 [Docket No. 2587] ....................   A1963

The Home Depot's Statement of Objections to the Proposed Class
    Settlement and Memorandum in Support, dated May 28, 2013
    [Docket No. 2591] .......................................................................   A1973

### **Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
    Settlement and Memorandum in Support, dated May 28, 2013
    [Docket No. 2591] (Cont'd) ..........................................................   A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
    Home Depot's Objection to the Proposed Class Settlement,
    dated May 28, 2013 [Docket No. 2591-2].....................................   A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
    Settlement, dated May 28, 2013 [Docket No. 2592] ....................   A2028

Objection of Consumers Union of United States, Inc. to Final
    Approval of Proposed Class Settlement, dated May 28, 2013
    [Docket No. 2598] .......................................................................   A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
    Settlement, dated May 28, 2013 [Docket No. 2605] ....................   A2040

## **Table of Contents**
### (continued)

**Page**

Excerpts of Objection of Starbucks to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2606] ..... A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
    Partners LLC, dated May 28, 2013 [Docket No. 2613]................. A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
    dated May 28, 2013 [Docket No. 2613-1].................................... A2075

Objection of National Community Pharmacists Association to Final
    Approval of the Proposed Settlement, dated May 28, 2013
    [Docket No. 2619] ........................................................................ A2107

Statement of Objections and Amici Curiae Brief of States to Final
    Approval of the Settlement, dated May 28, 2013
    [Docket No. 2623] ........................................................................ A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643] ..................... A2147

Excerpts of Declaration of David Cote in Support of BlueCross
    BlueShield of South Carolina Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-3]................. A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
    and Blue Shield of Arizona, Inc. Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-4]................. A2180

Excerpts of Declaration of Matthew Brolly in Support of
    Independence Blue Cross Objections to Proposed Settlement,
    dated May 28, 2013 [Docket No. 2643-6].................................... A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
    Cross of Northeastern Pennsylvania Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-7]................. A2184

xiii

**Table of Contents**
**(continued)**

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28, 2013 [Docket No. 2644] ................................................................. A2186

Excerpts of Objection of American Express Company, American Express Travel Related Services Company, Inc., Travel Impressions, Ltd., American Express Publishing Corp., Serve Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee, USA, Amex Assurance Company, and Accertify, Inc. to the Class Settlement Agreement, dated May 28, 2013 [Docket No. 2648] ........................................................................................... A2213

Declaration of Stephen B. McCurdy in Support of Objections of American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

**Volume X**

Notice of Motion of DFS Services LLC and Discover Bank to Intervene, dated May 28, 2013 [Docket No. 2655] ...................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013 [Docket No. 2657-6] ....................................................... A2252

Objection of DFS Services LLC, Discover Loans, Inc., and Discover Bank to Final Approval of Proposed Settlement, dated May 28, 2013 [Docket No. 2659] ....................................... A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule 23(b)(3) Damages Case, dated May 28, 2013 [Docket No. 2663] ....................................................... A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in Opposition to Motion for Final Approval of Settlement, dated May 28, 2013 [Docket No. 2670] ................................................. A2278

**Table of Contents**
(continued)

Excerpts of Declaration of Jeffrey I. Shinder in Support of
    Opposition to Class Plaintiffs' Motion for Final Approval of
    the Proposed Class Settlement, dated May 28, 2013
    [Docket No. 2670-1]....................................................... A2300

Excerpts of Report of Professor Jerry Hausman,
    dated May 28, 2013 [Docket No. 2670-5].................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: "Industry Facts Concerning Debit Card Regulation
    Under Section 920," by Stephen Craig Mott,
    BetterBuyDesigns, on Behalf of the Merchants Payments
    Coalition, submitted to Federal Reserve System, October 29,
    2010; Attachment F: "2011 Interchange Fee Revenue, Covered
    Issuer Costs, and Covered Issuer and Merchant Fraud Losses
    Related to Debit Card Transactions," Board of Governors of
    the Federal Reserve System, March 5, 2013
    [Docket No. 2670-6]....................................................... A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
    - Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
    Reactions to Credit Card Settlement", by Maria Aspan and
    Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
    Analysis of the Proposed Interchange Fee Litigation
    Settlement," by Adam J. Levitin, Georgetown Law and
    Economics Research Paper No. 12-033, August 21, 2012; Ex.
    70: The Nilson Report, February 2013, Issue 1,011; American
    Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
    "Merchant Surcharging – Understanding Payment Card
    Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
    to Support the U.S. Merchant Litigation Settlement," Visa,
    2013; Ex, 77: "Notice of MasterCard Rule Changes,"
    MasterCard Worldwide, December 2012; Ex. 78:
    Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
    Territories, regarding Merchant Class Action Litigation
    Settlement – Important Changes to Merchant Acceptance

**Table of Contents**
(continued)

Page

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses
Q2 2012 Results - Earnings Call Transcript," Visa, May 20,
2013; Ex. 84: "New Visa, MasterCard fees stir debate within
industry," The Green Sheet Online, March 12, 2013; Ex. 94:
MasterCard Incorporated Management Discusses Q2 2012
Results - Earnings Call Transcript, May 20, 2013; Ex. 95:
MasterCard's CEO Discusses Q4 2012 Results - Earnings Call
Transcript, May 20, 2013 [Docket No. 2670-8] .......................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder:
Ex. 97: "Reform of Australia's Payments System: Preliminary
Conclusions of the 2007/08 Review," Reserve Bank of Australia,
April, 2008; Ex. 108: Amended and Restated Global Restructuring
Agreement [Docket No. 2670-9] ................................... A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed
Class Settlement Agreement, dated June 5, 2013
[Docket No. 3074] ......................................................... A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013
[Docket No. 3755] ......................................................... A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed
Class Settlement Agreement, dated June 6, 2013
[Docket No. 4237] ......................................................... A2405

Excerpts of Statement of Objections of the Society of Independent
Gasoline Marketers of America, dated June 7, 2013
[Docket No. 4640] ......................................................... A2407

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated June 7, 2013 [Docket No. 4654] ...................... A2415

xvi

**Table of Contents**
**(continued)**

**Page**

Statement of Objections of Life Time Fitness, Inc.,
    dated June 11, 2013 [Docket No. 5385] ........................................ A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
    dated June 11, 2013 [Docket No. 5406] ........................................ A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
    [Docket No. 5651] ........................................................................ A2434

Excerpts of Defendants' Reply Memorandum in Support of
    Final Approval of Definitive Class Settlement Agreement,
    dated August 16, 2013 [Docket No. 5937] ................................... A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
    Further Support of Settlement Final Approval,
    dated August 16, 2013 [Docket No. 5939] ................................... A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
    [Docket No. 5939-3] ..................................................................... A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
    to the Proposed Class Settlement (redacted),
    dated August 16, 2013 [Docket No. 5939-5] ................................ A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
    Plaintiffs' Motion for Final Approval of the Proposed Class
    Settlement, dated August 16, 2013 [Docket No. 5939-6] .............. A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
    Joint Motion for Award of Attorneys' Fees, Expenses and
    Class Plaintiffs' Awards, dated August 16, 2013
    [Docket No. 5940] ........................................................................ A2471

Excerpts of Reply Memorandum in Support of FDC's
    Motion to Opt Out of Rule 23(b)(2) Class Settlement,
    dated August 23, 2013 [Docket No. 5957] ................................... A2473

**Table of Contents**
**(continued)**

**Page**

Report from Court appointed expert Professor Alan O. Sykes,
    dated August 28, 2013 [Docket No. 5965] .................................... A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
    dated August 28, 2013 [Docket No. 5965] (Cont'd) .................... A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
    Report of Professor Alan O. Sykes, dated September 4, 2013
    [Docket No. 5978] ......................................................... A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
    Professor Alan O. Sykes, dated September 4, 2013
    [Docket No. 5982] ......................................................... A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
    Correct Misstatements in Supplemental Declaration of
    Craig Wildfang and in Opposition to Final Approval,
    dated September 10, 2013 [Docket No. 6006-1] .......................... A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
    Misstatements in Supplemental Declaration of Craig Wildfang
    and in Opposition to Final Approval, dated September 10, 2013
    [Docket No. 6006-2] ..................................................... A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
    Misstatements in Supplemental Declaration of Craig Wildfang
    and in Opposition to Final Approval, dated September 10, 2013
    [Docket No. 6006-3] ..................................................... A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
    Misstatements in Supplemental Declaration of Craig Wildfang
    and in Opposition to Final Approval, dated September 10, 2013
    [Docket No. 6006-4] ..................................................... A2553

**Table of Contents**
**(continued)**

Page

Excerpts of Transcript of Fairness Heating before the
    Honorable John Gleeson, U.S. District Court Judge,
        dated September 12, 2013 [Docket No. 6094]............................... A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
    dated December 13, 2013 [Docket No. 6125] ............................... A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
    dated December 13, 2013 [Docket No. 6126] ............................... A2588

Notice of Appeal of Target Group Objectors,
    dated December 13, 2013 [Docket No. 6128] ............................... A2589

Notice of Appeal of National Retail Federation,
    dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
    [Docket No. 6175] ........................................................ A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
    WellPoint Objectors, dated January 10, 2014
    [Docket No. 6176] ........................................................ A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
    [Docket No. 6178] ........................................................ A2602

Notice of Appeal of First Data Corporation, First Data Merchant
    Services, TASQ Technology, Inc., TRS Recovery Services,
    Inc., First Data Government Solutions, and Telecheck Services,
    Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
    Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
    Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
    Tousled Hair Studio), and Kristina Newman – Hair,
    dated January 10, 2014 [Docket No. 6182] .................................. A2606

**Table of Contents**
**(continued)**

Notice of Appeal of U.S. PIRG, dated January 13, 2014
    [Docket No. 6189] ........................................................ A2608

Notice of Appeal of Consumers Union of United States, Inc.,
    dated January 13, 2014 [Docket No. 6190] .................................. A2609

Amended Notice of Appeal of Target Group Objectors,
    dated January 21, 2014 [Docket No. 6212] .................................. A2610

Amended Notice of Appeal of Temple Eagle,
    dated January 13, 2014 [Docket No. 6227] .................................. A2611

Notice of Appeal of National Federation of Independent Business,
    dated February 7, 2014 [Docket No. 6234] .................................. A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
    Objectors and WellPoint Objectors, dated February 7, 2014
    [Docket No. 6238] ........................................................ A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
    Homestead Restaurant (Historical Homestead, Inc.), The Feral
    Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
    (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
    dated February 13, 2014 [Docket No. 6245] ................................ A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
    (Amending Notice Of Appeal Filed December 13, 2013),
    dated February 13, 2014 [Docket No. 6248] ................................ A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
    Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
    dated February 13, 2014 [Docket No. 6251] ................................ A2625

# **Table of Contents**
## **(continued)**

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
LLC and Temple Eagle Partners LLC, dated February 18, 2014
[Docket No. 6257] ........................................................................ A2626

Amended Notice of Appeal of R & M Objectors,
dated February 25, 2014 [Docket No. 6263] ................................ A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
dated June 25, 2009 ...................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
Credit Cards: *Rising Interchange Fees Have Increased Costs
for Merchants, but Options for Reducing Fees Pose
Challenges*, dated 11/2009 ............................................................ A2638

Final Judgment as to Defendants MasterCard International
Incorporated and Visa Inc., *U.S. v. American Express Co*.,
CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
CV-4996 DE 143] .......................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

### **Volume XII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) .................................................. A2751

### **Volume XIII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) .................................................. A3001

### **Volume XIV**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) .................................................. A3251

# **Table of Contents**
## (continued)

**Page**

### **Volume XV**

Visa International Operating Regulations,
   dated October 15, 2012 (Cont'd) ................................................... A3501

### **Volume XVI**

Visa International Operating Regulations,
   dated October 15, 2012 (Cont'd) ................................................... A3751

### **Volume XVII**

Interlink Network, Inc. Operating Regulations,
   dated November 15, 2012 ............................................................ A4009

### **Volume XVIII**

MasterCard Rules, dated April 11, 2012 ............................................. A4259

### **Volume XIX**

MasterCard Rules, dated April 11, 2012 (Cont'd) .............................. A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
   Case T-111/08, Judgment of the General Court
   (Seventh Chamber), dated May 24, 2012 ...................................... A4614

Minute Order deeming all pending motions for relief withdrawn
   without prejudice to reinstatement if the settlement is not
   consummated, dated July 17, 2012................................................. A4616

Minute Order upholding Judge Orenstein's order denying
   disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

## **Table of Contents**
### (continued)

**Page**

Excerpts of Class Settlement Agreement, *In re Am. Express
Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2]............................................. A4623

### **Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express
Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2] (Cont'd) .............................. A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for
Final Approval of Class Action Settlement, *In re: American
Express Anti-Steering Rules Antitrust Litig*., 11-md-2221
(NGG)(RER), (Redacted - Public Version), dated April 15,
2014 [Docket No. 11-md-2221 DE 362] ....................................... A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American
Express Anti-Steering Rules Antitrust Litig*., 11-md-02221
(NGG)(RER) (redacted), dated April 15, 2014
[Docket No. 11-md-2221 DE 370] ................................................. A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee
and Merchant Discount Antitrust Litig*., No. 14-md-1720
(JG)(JO), dated July 18, 2014
[Docket No. 14-md-1720 DE 104] ................................................. A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card
Interchange Fee and Merchant Discount Antitrust Litig*.,
No. 14-md-1720 (JG)(JO), dated July 18, 2014
 [Docket No. 14-md-1720 DE 105] ................................................. A4836

# Table of Contents
## (continued)

**Page**

### Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
    Judgment of the Court (Third Chamber),
    dated September 11, 2014.............................................................. A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.
    Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
    dated September 26, 2014 [Docket No. 13-cv-5746 DE 41]......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
    No. 13-4537 ................................................................................. A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
    Education ..................................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
    U.S. District Court, Eastern District of New York ...................... A5090

### Volume XXII

#### *Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
    (filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
    to Individual Plaintiffs' Statement of Undisputed Facts,
    Pursuant to Local Rule 56.1(b) (filed under seal),
    dated May 6, 2011 [Docket No. 1477-7]....................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
    There is No Genuine Issue to be Tried (filed under seal), dated
    February 11, 2011 [Docket No. 1478-4] ....................................... A5125

# **Table of Contents**
## (continued)

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
dated July 2, 2009 [Docket No. 2088]............................................ A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
under seal), dated December 14, 2009 [Docket No. 2088]............ A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
seal), dated December 14, 2009 [Docket No. 2088]...................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
dated May 3, 2011 [Docket No. 2088] ......................................... A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
dated May 3, 2011 [Docket No. 2088] ......................................... A5191

Memorandum of Law in Support of Motion to Intervene of DFS
Services LLC and Discover Bank (filed under seal), dated May
28, 2013 [Docket No. 2657-1] ...................................................... A5200

Declaration of Jennifer M. Selendy (filed under seal),
dated May 28, 2013 [Docket No. 2657-3] .................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
dated May 28, 2013 [Docket No. 2657-4] .................................... A5231

Declaration of Roger Hochschild (filed under seal),
dated May 28, 2013 [Docket No. 2657-5] .................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
Notice of Class Action Settlement Authorized by the U.S.
District Court, Eastern District of New York (filed under seal)
[Docket No. 2657-7] ..................................................................... A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
dated July 2, 2009 ........................................................................ A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
dated December 15, 2009 ............................................................. A5295

**Table of Contents**
**(continued)**

**Page**

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
dated June 22, 2010 ....................................................... A5297

## A1011

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

37459728
E-SERVICE
May 6 2011
9:55PM

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO)<br><br>**REDACTED** |

**Class Plaintiffs' Counterstatement of Facts in Response to Defendants' Rule 56.1 Statement of Facts (Unannotated)**

K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181

Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058
Fax: 619-231-7423

H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

Co-Lead Counsel for MDL 1720 Class Plaintiffs

**CONTAINS HIGHLY CONFIDENTIAL MATERIAL -- TO BE FILED UNDER SEAL**

# A1012

Visa U.S.A. document acknowledges the risk that merchant litigation could reduce interchange fees to par."[431]

g.   "An internal Chase email expressed concern about how Chase could 'really retain control over structure and governance."[432]

156.20. After the IPO, the Board of Directors of MasterCard delegated authority for setting interchange to the CEO who establishes uniform schedules of default interchange fees that apply to all MasterCard transactions, including in the United States.[433]The European Commission found that "[t]he banks agreed to the IPO and the ensuing changes in the organisation's governance in order to perpetuate the MIF as part of the business model in a form which they perceived to be less exposed to antitrust scrutiny."[434]

156.21. Visa testimony and internal documents confirm that Visa designed its restructuring in response to court rulings that it was a conspiracy among competing banks.[435] For example, an internal memo reflected that "litigation was a key factor in our bringing on independent directors to the board (just as MC did) and turning over the interchange setting function to them. It was also a primary reason for looking at a publicly traded model similar to MC's efforts."[436] The European Commission found that "[t]he banks agreed to the IPO and the ensuing changes in the organisation's governance in order to perpetuate the MIF as part of the business model in a form which they perceived to be less exposed to antitrust scrutiny."[437]

156.22. The MasterCard restructuring was undertaken as a response to court rulings that decided it to be a "structural conspiracy."[438] The rules and the

---

[431]   *Id.* ¶ 63 (citing VUSAMDL1-07905305, at VUSAMDL1-07905311).

[432]   Webb Dep. Ex. 27628, at CHASE001479508, Oct. 27, 2008.

[433]   SUF ¶ 60.

[434]   *Id.* ¶ 61.

[435]   *Id.* ¶ 38.

[436]   *Id.* ¶ 38(g).

[437]   *Id.* ¶ 61.

[438]   *Id.* ¶ 34.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

fee-setting methodology that were the products of agreements among banks remained unchanged after the networks' IPOs.[439]

156.23. The banks continue to receive interchange fees pursuant to the rules that they established as a consortium of competitors. [440]

156.24. Visa's member banks understood that Visa would continue to operate in their best interests after its IPO.[441] Additionally, Visa's member banks received assurances that Visa would continue to operate in their best interests even after the IPO.[442]

156.25. Since Visa's IPO, the non-bank-representative members of the Board of Directors of Visa U.S.A. establish uniform schedules of default interchange fees that apply to all Visa transactions in the United States.[443] Visa employs the same methodology to set interchange fees after its IPO as it used before the IPO.[444]

156.26. MasterCard employs the same methodology to set interchange fees after its IPO as it had used before the IPO.[445]

156.27. Post-IPO, Visa continues to solicit member banks' input when setting interchange rates.

    a.    Visa's Executive Vice President of Client Services and Member Sales, John Gardner, who was responsible for Visa's relationship with several large issuing banks, testified that after March 20, 2008, he (a) was not aware that Visa enacted any policies regarding communications between Visa employees and representatives of member banks; (b) did not receive any instruction that Visa employees were not to discuss interchange fees with member

---

[439] *Id.* ¶¶ 4-5, 23, 31-32, 51, 62.

[440] *Id.* ¶¶ 4, 31(b)(ii), 32(a)(ii).

[441] *Id.* ¶ 39.

[442] *Id.* ¶ 40.

[443] *Id.* ¶ 50.

[444] *Id.* ¶ 51.

[445] *Id.* ¶ 62; *see id.* ¶ 63 (Plaintiffs' SUF for Defendants' effective interchange rates for credit cards, signature-debit cards, and PIN-debit cards from 2003 to 2009).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

# A1014



## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO) |

**DEFENDANTS' COUNTER-STATEMENT IN OPPOSITION TO CLASS PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS, PURSUANT TO LOCAL RULE 56.1(b)**

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL**



# A1015

was around [ ] looking at costs and cost recovery" but that currently

███████████████████████████████████████

█████████████████████████████[234]█████████

- Visa's expert Dr. Klein agreed that Visa's interchange fees are not cost-based.[235]

---

[233]  Sheedy 30(b)(6) Dep. 155:20-156:5, June 17, 2008. (SUFEX185)

[234]  Steele Dep. 314:01-320:23, Apr. 3, 2008; see also 323:10-324:5 (noting that Visa was not able to make arguments that interchange was cost-based because "it's value-based," not cost-based). (SUFEX178)

[235]  Klein Dep. 399:07-401:14, Mar. 24, 2010. (SUFEX188)

*Defendants' Response to Paragraph 45f:*

Disputed.  As described in Defendants' Response to Paragraph 45, Visa considers and has considered costs incurred by participants in the Visa system when setting default interchange rates to maintain the viability of the Visa payment system.  (*See* Defendants' Response to Paragraph 45.)

Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.)  Mr. Steele did not confirm that various categories of Visa interchange fees currently bear no relationship to the costs of Visa or its member banks.  In the sentence immediately following that quoted by class plaintiffs, Mr. Steele continued to testify that he could "████████

████████████████████████████████████████

████████████████████████████████████████████████████

██████."  (Steele Dep. at 320.)  Mr. Steele also testified that "████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████."

(Steele Dep. at 319.)

# A1016

Dr. Klein agreed with a Visa document that stated "[t]he determination of fees is moved from a more cost-based approach . . . to a more market-based approach over the years." (Klein Dep.[103] at 400-01.) This language does not stand for the proposition that interchange fees are not cost-based, as costs still play a factor in determining interchange fees.

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

g.   **The costs of the technology necessary to operate a Payment-Card Network have decreased significantly.**

- **A 2005 Wells Fargo Merchant Services marketing plan commented: "The pattern of steadily rising prices for credit card payments seems a little off, especially since the cost of processing electronic payments is undoubtedly falling with the scale and lower cost information technology."[236]**

- **According to a 2005 Visa Consumer Credit Card Issuer Benchmark Study, average issuer cost of authorization, clearing and settlement in 2005 was ▮▮▮ per transaction, ▮▮▮ less than in 1996. Payment processing costs similarly decreased.[237]**

- **According to a 2000 Visa Deposit Products Study, based on extensive review of ▮▮▮ Visa debit card issuers, the direct expense of operating their debit portfolios fell from ▮▮▮ to ▮▮▮ of POS (point of sale) transaction volume for Signature debit from 1993 to 1999 and from ▮▮▮ to ▮▮▮ for PIN (personal identification number) debit during the same period.[238]**

- **According to a Visa 2007 Debit Card Study, the average expense of operating Visa debit portfolios dropped from ▮▮▮ to ▮▮▮ per transaction for Signature debit from 2003 to 2006. And during the same time period, PIN debit expenses fell from ▮▮▮ to ▮▮▮ per transaction.[239]**

---

[103]   Deposition of Benjamin Klein (Mar. 23-24, 2010) ("Klein Dep.").

# A1017

<u>Plaintiffs' Paragraph 93:</u>

93      Visa and MasterCard have been able to increase Interchange Fees in the markets for General-Purpose-Card Network Services, Offline-Debit-Card Network Services, and PIN-Debit-Card Network Services without losing merchant acceptance.

*Defendants' Response to Paragraph 93:*

Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Evidence on which class plaintiffs rely in subparagraphs a-m, or elsewhere, does not support their assertion that there are separate markets for "General-Purpose-Card Network Services, Offline-Debit-Card Network Services, and PIN-Debit-Card Network Services."

a.      **Defendants' expert, Dr. Klein generally agrees that merchants have not dropped acceptance despite increases in interchange fees.**[511]

---

[511]      *See* Klein Rep. at 76, 78 making references to increased interchange fees and merchants not dropping interchange ("Visa increased interchange fees in response to...") and ("Rather, the fact that merchants have not dropped acceptance of Visa . . . ."). (SUFEX212)

*Defendants' Response to Paragraph 93a:*

Undisputed.

b.      **Prof. Elzinga agreed that despite the increase in Visa and MasterCard interchange fees, few merchants stopped accepting Visa or MasterCard cards.**[512]

---

[512]      Elzinga Rep. at 51. (SUFEX250)

336

# A1018

such as improved cash flow, by paying merchants immediately upon receipt of sales drafts. (Stearns, "Think of it as Money," at 44; Nocera, *A Piece of the Action*, at 27.)

130.    When Bank of America allowed other banks to enter the BankAmericard system as franchisees, "cardholders from one bank could now use their card to make purchases at merchants represented by a different bank." (Stearns, "Think of it as Money," at 50.) This meant that, with respect to any given transaction, it was now possible for one bank to be the cardholder's issuing bank and a different bank to be the merchant's acquiring bank. Rules had to be established to govern the interchange of the transaction information and funds between the issuing and acquiring banks on each transaction where the two functions were performed by different banks. "Interchange" provided the means for "the two banks [ ] to clear and settle those transactions." (Stearns, "Think of it as Money," at 50; *see also* Nocera, *A Piece of the Action*, at 67 ("It is impossible to overstate the importance of a workable interchange system; without it, nationwide bank credit cards simply cannot exist. . . . A merchant will accept a credit card because he knows, absolutely, that his bank will reimburse him, no matter what. A bank will pay the merchant, knowing absolutely that it will get its money from other banks. A customer will take his credit card out of his wallet knowing absolutely that it is as acceptable to the merchant as cash. Interchange is the structure that supports our faith that a credit card will do what we expect it to").) And because BankAmericard did not charge cardholders a fee for using the card, interchange provided a means for allocating the merchant discount when the issuing and merchant servicing functions on a given transaction were performed by different banks.

131.    Under the BankAmericard system, individual acquiring banks set their own merchant discount fees. (*See* Stearns, "Think of it as Money," at 56 ("the amount [of the merchant discount] is negotiated when the merchant signs the contract with the

480

# A1019

bank.") Originally, however, the BankAmericard franchise agreements provided that when the card issuing and merchant servicing functions were performed by different banks, the merchant-acquiring bank had to remit to the card-issuing bank either the actual merchant discount fee earned on the particular transaction, or an amount equal to the merchant bank's "average" merchant discount fee. (*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592, 595 (11th Cir. 1986).)   The allocation of the entire merchant discount fee to issuers reduced acquiring banks' incentives to compete for and sign up merchants and caused acquiring banks to look for ways to evade the requirement, such as by underreporting the amount of the merchant discount. (*See* Nocera, *A Piece of the Action*, at 68; *see also* Stearns, "Think of it as Money," at 75.) Issuing banks retaliated by refusing to accept transactions from acquiring banks that they thought had violated the rules, and by holding sales drafts from merchant banks for weeks to accrue interest they otherwise would not have earned. (Nocera, *A Piece of the Action*, at 68-69.)

132.   In 1970, Bank of America spun BankAmericard off to create National BankAmericard Inc. ("NBI"). (Mandell, *The Credit Card Industry*, at 31.)  NBI recognized that "[e]stablishing a fixed and fair fee was crucial to the viability of the system, as issuers needed a high-enough fee to make a profit, yet acquirers needed a low-enough fee to be able to offer competitive merchant discounts." (Stearns, "Think of it as Money," at 76.)  In 1971, NBI imposed a formal, system-wide interchange fee for transactions with different issuing and acquiring banks. (*See National Bancard Corp. v. Visa U.S.A.*, 596 F. Supp. 1231, 1239 (S.D. Fla. 1984); *see also* Stearns at 77-78.)  The fee was uniform across all members and was to be paid by acquiring banks to issuing banks. (*NaBanco*, 596 F. Supp. at 1239; Stearns, "Think of it as Money," at 78.)  Acquiring banks were free to set their own merchant discount, but they paid the same interchange rate independent of the level of the merchant discount they set. (David Evans,

# A1020

149. ██████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████

150.    Visa and MasterCard themselves do not sell network services to merchants, and merchants do not purchase network services as such from either Visa or MasterCard. (GAO Rep., at 6-7.) These network services are packaged by acquiring banks into "merchant services" that are sold to merchants. (GAO Rep., at 6-7; MCI_MDL02_11073165 to 11073367,[356] at 321 (identifying services that acquirers have to provide to merchants).)

151.    For these merchant services, merchants acquiring banks charge a merchant discount fee. (GAO Rep., at 7; Class Compl. ¶ 8(r); Frankel Rebuttal Rep. ¶ 136; Frankel Dep. at 157; McCormack Rep. ¶¶ 24, 78; McCormack Dep. at 128; Oct. 2010 Visa Rules, Core Principle 10.2; 2010 MasterCard Rules § 5.11.2; Topor Dep. at 60; Ivancikova Dep. at 104; Zuritsky Dep. at 124; Wenning Dep. at 143-44; Schumann Dep. at 61; Berman Dep. at 172; Gule Dep. at 191; Mullings Dep. at 175-76; Schermerhorn Dep. at 91.)

152.    Merchant acquirers are free to set the merchant discount fee they charge their merchant customers on the basis of their own profit goals and cost demands, and merchant discount fees are accordingly negotiated between each merchant and its merchant acquirer. (GAO Rep., at 7; Oct. 2010 Visa Rules, Core Principle 10.2.) Plaintiffs acknowledge that the

---

[356] MasterCard Merchant Rules Manual (Jul. 2004).

networks do not establish a merchant's merchant discount fees. (*See, e.g.*, Fletcher Dep.[357] Ex. 18704,[358] at DHZEDVMC00001170; Fletcher Dep. at 133.) The merchant acquiring business is competitive (OCC Handbook, at 1, 13; McCormack Rep. ¶ 85), and merchant discount fees vary from merchant to merchant as merchant acquirers compete for merchant accounts.

### D.    Credit Cards, Signature Debit Cards, And PIN-Debit Cards Are Substitutes

153.    Visa and MasterCard employees testified that consumers can and do readily switch among payment methods. (Abrams Dep. at 42 (MasterCard competes with cash, check, and ACH; Sheedy 30(b)(6) Dep. at 76-77 (one of Visa's goals in setting interchange is to "penetrate cash and check and volume from alternative means of payment), 116 ("we compete with cash and check and other card programs, and ACH and PIN debit"); *see also* MDL1720-0032761 to 0032806,[359] at 2781 ("The majority of debit cardholders . . . use a combination of the two [PIN and signature functionalities]. With one card supporting two functions, it is not surprising that many consumers use the two capabilities interchangeably.").) As Visa's head of debit products explained, "we classify within our concept of debit transactions as being, you know, cash and checks included in that as well as ACH and other competing types of debit instruments like merchant issued cards, ACH cards from supermarkets or from other stores." (Pinkerd Dep. at 30.)

154.    ███████████████████████████

███████████████████████████████

---

[357] Deposition of Patti Fletcher (Jul. 24, 2008) ("Fletcher Dep."). Ms. Fletcher testified as the Rule 30(b)(6) witness for plaintiff Delhaize America, Inc. regarding forms of payment (Fletcher Dep. at 8; Fletcher Dep. Ex. 18700 (30(b)(6) Deposition Notice).)

[358] Promotional Agreement between Visa USA Inc. and Food Lion LLC, bearing control numbers DHZEDVMC00001168 to 00001171(Apr. 2002).

[359] PULSE Sales and Business Development Organizational Review (undated).

492

# A1022

American Express introduced rewards programs that gave cardholders the opportunity to earn one point for every dollar spent on the American Express Optima card, with points redeemable for restaurant meals, flowers, books, concert tickets and vacation packages. (Credit Card News.[364])

157.    In three-party systems like American Express and Discover, these cardholder rewards programs were funded primarily by merchant discount fees that the network charged to merchants that accepted the network's card. (2010 American Express 10-K, at 3 ("This [higher average spending per card] enables us to earn a premium discount rate and thereby invest in greater value-added services for merchants and Cardmembers"); Business Insider Website at 4[365] (American Express "uses this higher discount revenue to invest in rewards programs which provide a higher payout than competing programs"); Murphy Rep. ¶¶ 11 n.5, 121-22, 127.)

158.    In four-party systems like Visa and MasterCard, these cardholder rewards programs were funded primarily by interchange revenues that flowed from acquiring banks, who collected merchant discount fees from participating merchants, to issuing banks, who provided the rewards to their cardholders. (Olebe Dep.[366] at 145-46 ("Q. And what was the justification for having higher rates for the Enhanced World program? A. I think it would be, based on the overall cost of the program being higher, they were trying to balance the economics for the

---

[364]  "Optima puts on a new face and jumps into the Rewards game," *Credit Card News*, Vol. 5 Issue 23, at 4 (Mar. 15, 1993) ("Credit Card News").

[365]  Available at http://www.businessinsider.com/blackboard/american-express (last visited Apr. 28, 2011).

[366]  Deposition of Edward Olebe (Jul. 25, 2008) ("Olebe Dep."). Mr. Olebe testified as MasterCard's Rule 30(b)(6) witness regarding premium cards. (Olebe Dep. at 10-12; Olebe Dep. Ex. 24875 (30(b)(6) Deposition Notice).)

# A1023

power that consumers have, that benefits merchants as they try to sell products. There are a long list of benefits that I believe merchants receive from accepting Visa products that are directly linked to the features and the functionalities of Visa cards."); Steele Dep. at 277-78 (merchants have increased "speed at their point of sale, the total number of customers he can service in a particular time through a given lane and the number of lanes they have to keep open and staff for -- we know again through acceptance of payment cards in general, but also through the waiver of our signature requirement, designed to speed things up at the point of sale, that greater throughput puts merchants in position to get by with fewer cashiers, take more payments more quickly and that again has value in the form of reduced labor costs and all of the other costs that come with having employees."); *id.* at 278 (merchants receive value "in reduced cash handling and the pilferage . . . that can occur when cash is on hand in a store and employees or, you know, other unreputable people can get access to cash and take it away, steal it [because] with Visa, the account monies are transferred electronically and we know deposited more quickly in the merchant's bank"); *compare with* MCI_MDL02_06958361 to 06958379,[372] at 364 (costs of cash include, "bank charge costs, deposit preparation time, security/insurance, tender time and transportation costs.").)

      168. Issuing banks bear the cost of payment guaranteed services for credit and debit card transactions. (MCI_MDL02_06093408 to 06093440,[373] at 437 (referencing "payment guarantee" as an issuer cost); Munson Dep. at 105 (describing the components of issuer costs including "processing costs, payment guarantee, which is default and fraud, and financial

---

[372] The Real Merchant Cost of Cash.

[373] Interchange Overview: MasterCard Interchange Methodology Cost Analysis (Jun. 2006).

# A1024

carrying costs."); T. Murphy Decl. ¶¶ 26, 29-30; Visa Payment Card Fraud and Merchants[374]

("In face-to-face transactions, merchants are not liable for fraud when the transaction is properly

authenticated. This represents the vast majority of Visa transactions.").)

    **G.**    <u>Other Payment Networks Have Similar Merchant Acceptance Rules as Visa and MasterCard</u>

    169.   The ███████████████████████████



(AMEXMT00032149 to 00032183,[375] at 159.)  *See also*

McNeal Dep.[376] at 149-50; AMEXM50388284 to 50388287,[377] at 285 (████████████

    170.  ██████████████████████████

---

[374] Available at http://usa.visa.com/merchants/risk_management/payment_card_fraud.html (last visited May 2, 2011).

[375] AXP Question & Answer Summary Package.

[376] Deposition of Glenda McNeal (Apr. 22, 2009) ("McNeal Dep."). Ms. McNeal testified as American Express' rule 30(b)(6) witness on American Express card acceptance provisions and policies regarding acceptance. (McNeal Dep. Ex. 36200.)

[377] Important Information about American Express Prepaid Cards.

[378] ████████████████████████████████████████

[379] Terms and Conditions for American Express Card Acceptance.

# A1025

180.   Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that Discover's share of total credit and charge card purchase volume in 2004 was $73.60 of $1,431.44 billion (approximately 5.1%), and in 2008 was $106.13 of $1,942.40 billion (approximately 5.5%).  (Vellturo Rep. Ex. 11.) Discover's change in share from approximately 5.1% in 2004 to approximately 5.5% in 2008 is an increase of approximately 8%.

## I.   Additional Procompetitive Rationales for Interchange

181.   Default interchange rules avoid the need for time-consuming and inefficient individual bi-lateral arrangements between the thousands of bank issuers and hundreds of bank acquirers that today are in the Visa network and in the MasterCard network. (Sheedy Decl. ¶ 25; Sheedy Dep. at 97 ("I'm aware of many discussions within Visa that concluded that the default interchange rate structure that exists today, the structure, is necessary because of the impracticalities associated with bilateral arrangements among thousands of financial institutions."); *see id.* at 109-113 ("look[ing] at the merchant, the acquirer, the issuer . . . [and] at the multitude of relationships that exist in the U.S. since we have tens of -- over 10,000 financial institutions and over seven and a half million merchants, I can't imagine a scenario where bilateral arrangements at a practical level can supplant the default interchange rate structure"); Towne Dep. Ex. 26,026, VUSAMDL2-0024218 to 0024241 at 224 (members process transactions under the "traditional, Visa-established IRF rates" given "the efficiency of doing so"); T. Murphy Decl. ¶¶ 24-28; Munson Dep. at 201-02 (although MasterCard allows bilateral agreements, they are not feasible for every transaction); Hanft at 123-24 (there are "too many issuers and acquirers in most jurisdictions to have simply kind of have a required bilateral arrangement with no fallback interchange rates").)

505

# A1026

182.   Visa and MasterCard can and do provide interchange incentives to improve the quality of network services by adopting new and improved technologies.  For example, Visa has used interchange as a "strategic tool . . . to, without changing volumes, strengthen system security, improve transaction quality in terms of the data quality being provided on the transaction, and drive other issuer incentives or acquirer incentives to generally improve the quality of the Visa network." (Steele Dep. at 321; *see also* Towne Dep. at 427-28 ("Visa established a different interchange fee associated with electronically-authorized transactions.  The results of that interchange fee modification along with other efforts by Visa had the resulting impact that there was a very rapid migration to electronically-authorized transactions that resulted in benefits for all stakeholders; customers had faster speed at points of sale, issuers had more accurate information, merchants experienced more rapid checkouts, less chargebacks.  The system was more efficient in terms of less paper.); Jorgensen Dep. at 159-61 (testifying about Visa's use of default interchange rates "to incent technology and operational improvements"); Sheedy Decl. ¶ 17.)

183.   MasterCard similarly recognizes that many factors are considered in setting interchange rates, including "the desire to incent new technologies." (Jonas Methodology Dep. at 69-70; *see also* Kapteina Dep. at 182 (in listing factors that MasterCard uses to set rates, deponent answered: "Technology, such as you've heard [sic] the Mobile Speed Pass. . . . If something new like that were to come out in the marketplace we might want to incent the usage of that."); T. Murphy Decl. ¶¶ 17, 21.)

184.   Visa and MasterCard can and do provide interchange incentives to improve the quality of network services by reducing fraud and chargeback levels.  For example, Visa introduced performance-drive debit and credit interchange fee structures tied, among other

506

# A1027

things, to fraud and chargeback levels. (VUSAMDL1-06224291 to 06224311,[390] at 303; *see also* VUSAMDL1-05929654 to 05929672,[391] at 664 ("The fraud and chargeback performance requirements ensure that best practices are being utilized at the point of sale by offering incentives in the form of reduced interchange to those merchants that have lower levels of fraud and chargebacks when compared to the Visa system."); Sheedy Decl. ¶ 17.)  In order to improve fraud controls, MasterCard "██████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████" (Jonas 30(b)(6) Dep. Ex. 23132[392], at MCI_MDL02_03305644; T. Murphy Decl. ¶¶ 17, 21.)

185.    The improved fraud controls and processing efficiencies that consumers receive from default interchange likewise benefit merchants. (Sheedy 30(b)(6) Dep. at 404-05 ("I'm certain that there's data within Visa that speak to reductions in fraud tied to product features, risk features, increasing speed of authorization at the point of sale, the benefits of reduced tender time for – for electronic payments tied to Visa cards.  I have seen data tied that relates to higher levels of transaction activity, Ticket lift that benefit merchants, and the purchasing power from the thousands of dollars that cardholders have, typical cardholders have in purchasing power on credit lines and access to funds to be able to purchase goods from merchants that I believe that's why the merchants are in the business, so it's beneficial to them."); Sheedy Decl. ¶ 32; T. Murphy Decl. ¶¶ 30-31.)

---

[390]  Visa Board Meeting Presentation (Feb. 20, 2004).

[391]  Visa Business Review (Feb. 2005).

[392]  Email from B. Kapteina to S. Gamsin, B. Coleman, and S. Jonas (Feb. 14, 2005) attaching communication talking points document, bearing control numbers MCI_MDL02_03305643 to MCI_MDL02_03305646.

# A1028

186.    Default interchange also can drive increased consumer usage of Visa or MasterCard cards, such as through banks issuers' rewards programs, which provides merchants with the benefit of incremental sales.  (*See* VUSAMDL1-03585517 to 03585520,[393] at 518 ("Given the competitive marketplace, increased interchange fees to card issuing financial institutions have historically allowed Issuers to lower costs to cardholders and also permit Issuers to add features and benefits to cards, which help increase usage and provide cardholders greater utility thereby benefiting Merchants through incremental sales and customer satisfaction."); (Sheedy Dep. at 451 ("Our data suggests that consumers that carry rewards based products purchase higher ticket amounts and on average spend more money with merchants than do consumers that don't carry rewards based products."); Steele Dep. at 268-69 ("Visa credit cardholders spend more, and I view that to be a result of Visa's marketing and branding and promotion sponsorships and so forth, all of which leads to a high level usage and spend which again if that -- you know, it has value to the merchant in the sense that those represent incremental sales opportunities.  We also have, through the Visa Incentive Network, a marketing platform . . . [so] merchants can identify cardholders to be targeted for promotions.  They could be consumers or credit cardholders that shop in their area and in that merchant's category, but not at that merchant, and help that merchant acquire those customers as new customers and make incremental sales."); Sheedy Decl. ¶ 31; Kapteina Dep. at 408 (deponent is aware of data showing the "average ticket for a World Elite supermarket category is higher than a standard Gold or Platinum card."; T. Murphy Decl. ¶¶ 18, 31; Murphy Rep. ¶147, Ex. 4.8.)

---

[393]    Visa Business Review, Visa Check Card, Interlink, and ATM Interchange Reimbursement Fee Modifications, Issue No. 041109 (Nov. 2004).

# A1029

187.    Default interchange further provides revenue to bank issuers that allows them to guarantee payment to acquirers for properly authorized Visa and MasterCard card payments, which also benefits merchants.  (Sheedy 30(b)(6) Dep. at 491-92 ("Are there parties to electronic payment transactions who benefit from the payment guarantee other than the merchant? . . . THE WITNESS: I think the acquirer benefits from the payment guarantee."); Saunders Dep. at 254 ("there are a litany of things that we provide people, one of which is surety of payment and, you know, all of that is embraced in the interchange fee, and the interchange fee does not cover everything that we spend money on"); *id.* at 255 ("Acceptance of credit cards and debit cards ensures the surety of payment at the point of sale, and it eliminates risk that's associated with insufficient funds and it eliminates the risks that are associated with handling cash.  It eliminates the fraud.  It eliminates a lot of things.  It all depends on who you are as to what extent it does those things."); Payment Card Fraud and Merchants[394] ("In face-to-face transactions, merchants are not liable for fraud when the transaction is properly authenticated.  This represents the vast majority of Visa transactions."); Sheedy Decl. ¶ 32; Jonas Methodology Dep. at 191-92 (merchants benefit from doing business with card-carrying customers while receiving the payment guarantee offered by payment cards); Munson Dep. at 87-88 ("When we are talking about, you know, why do merchants take cards or not . . . . The merchant has to be assured that the customer -- that the merchant is going to get paid.  And, of course, one of the great advantages of a MasterCard card is that the merchant can do business with people all over the world who may not have sufficient cash, but of course the quid pro quo is that the MasterCard system has to deliver on that guarantee."); T. Murphy Decl. ¶¶ 25-26, 30.)

---

[394]   Available at http://usa.visa.com/merchants/risk_management/payment_card_fraud.html (last visited Apr. 29, 2011).



37459612

May 6 2011
8:51PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **MDL No. 1720 (JG) (JO)** |
| | **ORAL ARGUMENT REQUESTED** |
| **This Document Applies to:  All Actions.** | |

**NETWORK DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**THE INDIVIDUAL PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# REDACTED

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

consumers and lead them to shop at competing merchants. (Counter SMF ¶ 165.) Such

degradation of brand value from surcharging would make Visa and MasterCard less competitive

with other credit card networks and payment systems.

The "no surcharge" rules also ensure that merchants do not undermine the output

maximizing function that default interchange serves in the both Visa and MasterCard networks.

(Counter SMF ¶ 166.)



If merchants imposed surcharges on consumers' payments with Visa or MasterCard cards, that

would impose an additional "price" on Visa and MasterCard transactions and interfere with those

output-maximizing interchange incentives, making Visa and MasterCard less competitive with

other credit card networks and payment systems. (Counter SMF ¶ 170.) *See*, *e.g.*, *SouthTrust*,

913 F. Supp. at 1524-25 (analyzing "the interchange fee and the no-surcharge rule" of an ATM

network and concluding that "the net effect . . . is procompetitive").

**Redeeming And Procompetitive Virtues Of The "No Discount" And "No
Discrimination" Rules.** Visa's so-called "no discount" rule has required acquiring banks to

ensure that their merchants provide the same discounts to consumers for payments with Visa

credit cards that are provided for payments with cards of competing credit card networks like

MasterCard, American Express, and Discover. (Counter SMF ¶¶ 42-45.) MasterCard's

**A1032**

# REDACTED EXHIBIT 3

# A1033

 **EUROPEAN COMMISSION**

SECRETARIAT-GENERAL

Brussels, 19/XII/2007
SG-Greffe(2007) D/ **208054**

MasterCard Europe S.p.r.l.

Chaussée de Tervuren 198A

B-1410 Waterloo

Subject :   **NOTIFICATION PURSUANT TO ARTICLE 254 OF THE EC TREATY**

For the Secretary-General

**Karl VON KEMPIS**

Encl. :   **C(2007)6474 final
The Hearing Officer's final report**

EXHIBIT 3402
WIT: Gurney
DATE: 12/14/07
T.M. PASTOR, RPR, CLR

Commission européenne, B-1049 Bruxelles / Europese Commissie, B-1049 Brussel - Belgium. Telephone: (32-2) 299 11 11.
Office: BERL 8/375  Telephone. direct line (32-2) 296 88.09. Fax: (32-2) 292.07 94.

http://ec.europa.eu/dgs/secretariat_general
E-mail: karl.von-kempis@ec.europa.eu

Highly Confidential Subject to Protective Order      MCI_MDL03_00022345

SUFEX081-0001

# A1034

**Executive Summary**

*Article 81 (1) of the Treaty*

1.    The present case deals with MasterCard's network rules and decisions of its member bank delegates and the organisation's management on Intra-EEA fallback interchange fees and SEPA fallback interchange fees. These multilateral interchange fees (MIFs) are retained for each payment card transaction and apply to cross-border card payments in the European Economic Area (EEA) and domestic card payments within several Member States of the EEA with MasterCard or Maestro branded payment cards. The fees are "fallback" fees in the sense that they are only charged in the absence of specific bilateral agreements between an issuing and an acquiring bank on interchange fees. Under the organisation's network rules the acquiring banks pay the fees to the issuing banks.

2.    The MIF in MasterCard's scheme restricts competition between acquiring banks by inflating the base on which acquiring banks set charges to merchants and thereby setting a floor under the merchant fee. In the absence of the multilateral interchange fee the merchant fees set by acquiring banks would be lower.

3.    The European Board **[AND/OR]** the Global Board **[OF MASTERCARD]** **[BUSINESS SECRET – 2a]** decisions on the level and structure of Intra-EEA fallback interchange fees and the related network rules adopted by the Global Board of MasterCard International Inc. are decisions of an association of undertakings within the meaning of Article 81(1) of the Treaty. They remain decisions of an association also after the Initial Public Offering (IPO) of MasterCard Incorporated on 25 May 2006 and the related changes in the governance of the payment organisation in Europe with regard to the authority for setting the level of multilateral fallback interchange fees. The banks agreed to the IPO and the ensuing changes in the organisation's governance in order to perpetuate the MIF as part of the business model in a form which they perceived to be less exposed to antitrust scrutiny. Even after the IPO of MasterCard Incorporated interchange fees in the MasterCard organisation are not "unilaterally imposed". MasterCard's member banks still share a common interest as regards the MIF because it yields guaranteed revenues for their issuing business. There is thus a continuing commonality of the banks' interests in a MIF after the IPO which is also reflected in the setting of interchange fee rates by MasterCard **[BUSINESS SECRET – 2a]** In setting interchange fee rates the Global Board cannot ignore the commercial interests of the banks without whom the system would not function, because it yields guaranteed revenues for their issuing business.

4.    An open payment card scheme such as MasterCard's can operate without a MIF as is evidenced by the existence of comparable open payment card schemes without a MIF.

BRJ- 1318056v54

*Article 81 (3) of the Treaty*

5.　As to the first condition of Article 81 (3) of the Treaty MasterCard's arguments on the existence of objective efficiencies remained unproven.

6.　The Commission does not dispute in general that payment systems are characterized by indirect network externalities and that in theory a revenue transfer between issuing and acquiring banks may help optimise the utility of the network to its users. However, whether a collectively fixed interchange fee should flow from acquirers to issuers or *vice versa*, and at which level it should be set cannot be determined in a general manner by economic theory alone, as theories always rely on assumptions that may not sufficiently reflect market reality. Rather, any claim that a MIF creates efficiencies within the first condition of Article 81(3) of the Treaty must be founded on a detailed, robust and compelling analysis that relies in its assumptions and deductions on empirical data and facts. MasterCard in particular failed to provide empirical evidence for its central claim that the MIF maximises the scheme's "output" and for a causal link to other objective efficiencies claimed. It was therefore not established that the restrictive effects of the MIF in the acquiring markets are duly offset by objective efficiencies. Despite repeated requests by the Commission MasterCard failed to submit any empirical evidence on the positive effects of its MIF on system output and related efficiencies.

7.　The Commission does not share MasterCard's view that the competitive process and market forces automatically lead to a MIF that can safely be assumed to be efficiency enhancing. Neither the forces of inter-system competition nor acquiring banks or merchants exert sufficient constraints on the body in charge of setting the MIF in the MasterCard organisation.

8.　The specific framework underlying MasterCard's MIF is a model written by William Baxter in 1983. This model is, however, severely limited by the fact that it takes consumer and merchant demand as given in that neither strategically reacts to possible actions by the other. The Baxter model also relies on the unrealistic assumption that there is no variation in the benefits that merchants perceive from accepting cards, this means that merchants are homogeneous. Baxter's result finally relies on the unrealistic assumption of a perfectly competitive banking industry.

9.　Moreover, the methodologies used by MasterCard for implementing this framework in practise are unconvincing as they do not sufficiently reflect the underlying theory. The methodologies suffer from considerable shortcomings as they establish an imbalance between card issuing and merchants acquiring solely on the basis of cost considerations while omitting to consider the banks' revenues, as well. Moreover, contrary to the merchant demand analysis, MasterCard does not even attempt to quantify the willingness to pay of cardholders and simply assumes the relative unwillingness of this customer group to pay for the convenience of using payment cards. There are also doubts as to the usefulness of MasterCard's proxy for quantifying the willingness to pay of merchants in the credit card segment.

10.　As to the second condition of Article 81(3) of the Treaty all customer groups in a payment card system, that is cardholders and merchants (as well as subsequent purchasers), must get a fair share of the benefits which result from

5

# A1036

the efficiencies of a MIF. While merchants may benefit through enhanced network effects from the issuing side, this does not necessarily offset their losses which result from paying inflated merchant fees. The Commission has therefore reviewed MasterCard's methodology ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **[BUSINESS SECRET – 2a]** However, MasterCard's cost based benchmarks include cost items that are neither intrinsic in the payment functionality of a card nor related to services that clearly benefit the customers that bear the expenses of this MIF. Without further evidence, which MasterCard failed to submit, it cannot therefore safely be assumed that by maximising system output MasterCard is equally benefiting its member banks' customers. MasterCard failed to demonstrate that efficiencies outweigh restrictions to merchants (as well as subsequent purchasers).

11.   As to the third condition of Article 81(3) of the Treaty MasterCard has not proven to the requisite standard that its current MIF is indispensable to maximise system output.

12.   Due to unrealistic assumptions underlying the conceptual underpinnings of MasterCard's MIF, due to the lack of evidence for a causal link between this MIF and objective efficiencies claimed and due to the fact that MasterCard's methodologies do not sufficiently reflect the underlying framework and operate with inflated cost benchmarks, the Commission concludes that such MIF does not fulfil the first three conditions of Article 81(3) of the Treaty.

*Remedy*

13.   As MasterCard's MIF restricts price competition between acquiring banks without fulfilling the first three conditions of Article 81(3) of the Treaty the Commission orders MasterCard to withdraw its intra-EEA and SEPA/intra-Eurozone fallback interchange fees within six months upon adoption of this decision. This remedy excludes one aspect of MasterCard's MIF as far as commercial cards are concerned. The Commission will further research the possibility of efficiencies in this respect. The order does not prevent MasterCard ▮▮▮▮▮▮▮▮▮▮▮ **[BUSINESS SECRET – 2a]** from adopting an entirely new MIF (other than the Intra-EEA fallback interchange fees and the SEPA/intra-Eurozone fallback interchange fees) that can clearly be proven to fulfil the four cumulative conditions of Article 81(3) of the Treaty based on solid empirical evidence.

14.   For this order to be effective, the Commission imposes provisional periodic penalty payments on MasterCard if MasterCard fails to comply with the remedy after the six months transition period lapses. Moreover, to speed up the pass-on of the ensuing gains for acquiring banks to merchants and subsequent purchasers, MasterCard is ordered to publish specific information on its website on the abolition of its Intra-EEA fallback interchange fees until a non confidential version of the decision is publicly available. MasterCard is finally ordered to inform all Clearing Houses and member banks in Europe on the abolition of this MIF.

6

# A1037

of merchants and increased competition, but also to the regulatory scrutiny of their business model: "Many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure, in which our customers – our member financial institutions – own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors. While we strongly dispute these challenges, we believe that a more open ownership and governance structure following the offering transaction should leave us less prone to challenges and provide us with additional defences to the challenges that we may face (...)."

*e. New Global Board is vested with powers to establish interchange fees*

98.



[116] [BUSINESS SECRET – 2a]

*f. Conclusion*

99.     The banks were a driving force behind the IPO of MasterCard Incorporated. They agreed to it as they knew that the new management on the Global Board would continue to act in their common interest. While the European banks were aware that they would loose control over the body setting Intra-EEA fallback interchange fees, they consented to the change in the organisation's governance with the expectation that the independence of the Global Board would reduce each individual bank's exposure to regulatory scrutiny and antitrust litigations, thereby safeguarding their proceeds from interchange and maintaining the MasterCard MIF as part of the business model. Considering the IPO in its overall context, the banks voting in favour of the corporate changes to MasterCard Incorporated "outsourced" the co-ordination of their competitive behaviour to an independent body while maintaining control of decision making on other key matters that are not sensitive from an antitrust perspective.

## 2.2.     The market position of the MasterCard payment organisation

*a) Volume and value of MasterCard / Maestro payments*

*MasterCard cards*

100.    Both the number and value of MasterCard cross-border transactions in the Community are growing fairly steadily. In the five years 2000 to 2005 the value of cross-border payments increased by [30-50%] from EUR [5 000-15 000] million (2000) to EUR [10 000-15 000] million (2005).[117] This represents an average year to year increase of [0-10] %.

Table 1

---

[116]     *35908*, pt. 7 on the agenda.
[117]     *28099*, MasterCard reply 8 May 2006, Annex 1.

# A1038

176.    MasterCard stated that it also takes into account other considerations such as the level of competitors' fees.[206]

*b) Methodology for setting MIF for Maestro branded cards*

177.                                                    the "*MasterCard Global Debit Interchange Methodology*"



[207] [BUSINESS SECRET – 2a]

178.

[209] [BUSINESS SECRET – 2a]

179.

    i.

    ii.

---



206

*3442*, MasterCard letter of 13.6.2001, Annex 1,

, page 4 and 5. [BUSINESS SECRET – 2a]

207
208     *35401*, Q 10. For information on the SEPA fallback interchange fees see section 3.1.2.a.

*33983*, pt. 706.

[BUSINESS SECRET – 2a]

209

[BUSINESS SECRET – 2a]

210     *24698*, 2nd paragraph; *33984* at pts 700 – 703.
211

212     [BUSINESS SECRET – 2a]

[BUSINESS SECRET – 2a]

methods of coordinating conduct between undertakings. The very purpose of the concept of an "association of undertakings" is to safeguard the *effet utile* of the prohibition set out in Article 81(1) of the Treaty. It prevents that competitors co-ordinate their commercial behaviour on the market *indirectly* by delegating the co-ordination to a common body and by submitting upfront with binding effect to the respective decisions of that body.[436]

378.   It was set out in sections 2.1.2. and 2.1.4. that MasterCard's member banks shaped and eventually approved the IPO in order to perpetuate the MIF as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny. Contrary to MasterCard's argument[437] the aim of avoiding exposure to antitrust risks due to the MasterCard MIF was a clear driving force behind the IPO.[438] Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making. The member banks effectively *"outsourced"* this decision making to a new management body and made sure that their direct influence on the Global Board's directors would be limited to minority rights. However, the banks also agreed to the IPO of MasterCard Incorporated after MasterCard's management assured them that the banks' interests will continue to be preserved under a new "enhanced customer approach"[439] and via the local input of the banks in the decision making[440]

379.   It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the member banks legitimately expected and therefore agreed that this Board would henceforth set the MIF in a manner that is in their common interest. The member banks were a driving force behind the new governance model and they approved the preceding and subsequent "outsourcing" of interchange related decision making from boards of bank directors (the European Board, the MasterCard Member Forum in the United Kingdom) to ████████████ ████████  [BUSINESS SECRET – 2a] the Global Board whose task it

---

436   *Loewenheim/Meessen/Riesenkampff*, Kartellrecht, Bd 1, Europäisches Recht (2005), Art 81 (1) pt. 62

437   ████████████████████████████████████████████████████
      ████████████████████████████  [BUSINESS SECRET – 3b]

438   See section 2.1.4
439   *35929*, MCI page 834,
      ████████████████████████████████████████████████████
      ████████████████████████████████████████████████████

      [BUSINESS SECRET – 3b]
440   *35929*, MCI page 834,
      ████████████████████████████████████████████████████
      ████████████████████████████████████████████████████

      ████████  [BUSINESS SECRET – 3b]

108

# A1040

would be to manage interchange in a manner that is ██████████ ████████████ [BUSINESS SECRET – 3b] [441]

380.  By approving the IPO the banks effectively resolved to continue using the Global Board of MasterCard Incorporated as "common structure or body" for the co-ordination of their policies regarding the pricing of MasterCard and Maestro payment card acceptance. Decisions of the Global Board remain the "faithful expression of the association's resolve to coordinate the commercial conduct of its members" as they reflect the common interest of the organisation's ███ [BUSINESS SECRET – 4] European member banks.[442]

*MIF still adopted in banks' common interest*

381.  The circumstance that members of the Global Board are "independent" within the meaning of the NYSE criteria (cf. section 2.1.3.1.) is not a decisive question for there to be an association of undertakings. As an organisation's members entrust decision making powers to a common body with the expectation that the body's subsequent coordination of their competitive behaviour will occur in the common interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision of an association of undertakings.

382.  In the case at hand MasterCard's member banks could as well chose a notary public or an independent consultant who is subject to deontological rules for setting the level of interchange fees. They rather resolved to delegate these powers to a small number of bank delegates on the European Board and - after the IPO – to ██████████ [BUSINESS SECRET – 2a] the Global Board. In both instances there is no guarantee that the decision maker fulfils the wishes of *each* individual member bank that submits to the decision or that each bank effectively controls the outcome of the decision makers. This is not the decisive point. The decisive question here is whether overall it is in the common interest of the banks that some entity or person, whom they entrust with decision making powers, establishes through the MIF a minimum price which merchants in Europe must pay for accepting MasterCard and Maestro branded payment cards. This is the case.

383.  Despite the IPO there is still a clear and pronounced commonality of interests amongst the banks of the MasterCard payment organisation in Europe in having a MIF which results from the fact that all banks benefit from a common minimum price floor merchants must pay for accepting MasterCard and Maestro branded payment cards. Both issuing and acquiring banks have an interest in the perpetuation of the system with a MIF, even if some banks may prefer a different level of the MIF than others. MasterCard's argument[443] that

---

[441]  *35925*, MCI page 1258-1259, message of [A SENIOR MANAGER OF MASTERCARD EUROPE S.P.R.L], of February 2005:

████████████████████████████████████████████████████
████████████████████████████████████████████████████  [Emphasis

added]. [BUSINESS SECRET – 3b]

[442]  See *Verband der Sachversichere*, 32 (*"the recommendation .. constituted the faithful expression of the applicant's resolve to coordinate the conduct of its members on the German insurance market"*).

[443]  Pt. 182 of MasterCard's reply to the letter of facts.

109

there is no "commonality of interests" *on all* interchange related issues between the banks, because some banks are "net issuers", and therefore have a short-term financial interests in high interchange fees, while others are "net acquirers" and therefore have a short-term financial interest in a lower interchange fee, is legally not relevant.

384.  For there to be a "decision" it is not required that the members of an association unanimously approve it and that each of them agrees on *all* aspects of a decision but it is sufficient that a decision is taken by the competent body within an association.[444] Hence, the fact that some banks (whether issuers or acquirers) may not be satisfied with *all* interchange related issues decided by the European Board or -since the IPO- by **[MASTERCARD]** ▓▓▓▓▓ **[BUSINESS SECRET – 2a]** is irrelevant.

385.  MasterCard also ignores the fact that until 31 December 2004 the "No-Acquiring-Without-Issuing" rule obliged every acquirer also to carry an issuing activity. As a result, almost all acquirers are at the same time issuers and their interest in high interchange for the issuing part of their cards business is common. Net acquirers may be less interested in a high level of MIF than acquirers with an issuing business but they, too, have an interest in maintaining a MIF as part of the organisation's business model. This is because a MIF raises the marginal cost of all acquirers alike in a collective manner which allows them to yield a rent from merchants which they could not obtain under competitive circumstances. The additional revenues are then transferred by acquiring banks to issuing banks with the expectation that some of the money is used by issuers to subsidise card issuing. This in turn could spur an increase of sales volumes at merchant outlets thereby raising every acquirer's profits.

386.  The commonality of interests in a MIF also extends to the scheme owner MasterCard Incorporated and its consolidated subsidiaries as the membership fees they charge to banks in exchange for their co-ordination and network services are transaction related (that is to say ad valorem and/or flat fees per card payment).[445]

387.  Moreover, the interests of MasterCard Incorporated's shareholders – be they banks or not – are also not opposed to those of the member banks in having a MIF.[446] As MasterCard Incorporated can expect higher revenues and thus higher profits the more banks join the scheme and the higher membership fees are, it is unlikely that stockholders in MasterCard Incorporated would oppose the MIF as it artificially attracts banks to the scheme through revenues.

388.  Finally, it is a fact that the Global Board still takes decisions on a MIF virtually *"on behalf of the banks".*[447] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[444]  Case T-39/92 and T-40/92, *Groupement des cartes bancaires "CB" et Europay International SA v Commission,* [1994] ECR II-49; *Verband der Sachversicherer,* at pts. 30 to 32.

[445]  The higher a MIF, the less sensitive the banks are to the level of membership fees charged by the scheme owner. Moreover, MasterCard Incorporated's commercial success in selling network services to banks also depends on the number of banks participating in the scheme. A MIF attracts issuing banks to the detriment of other card schemes operating without a MIF or with a lower MIF. Hence, MasterCard Incorporated shares its member banks' interest in having a MIF.

[446]  MasterCard's argument that by setting interchange fees in the member banks' interests, the new Global Board would necessarily neglect the interests of public (non-bank) stockholders is unfounded.

[447]  See sections 3.1.2. b) and 3.1.9.2.

110

BRI-1318056v5

# A1042

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re PAYMENT CARD INTERCHANGE | : | MDL No. 1720(JG)(JO) |
| FEE AND MERCHANT DISCOUNT | : | |
| ANTITRUST LITIGATION | : | |
| | : | |
| | : | |
| | : | |
| This Document Relates To: | : | |
| | : | |
| ALL CLASS ACTIONS. | : | |
| | : | |
| | : | |
| | : | |
| | x | |

## NOTICE OF FILING OF MEMORANDUM OF UNDERSTANDING

PLEASE TAKE NOTICE that Willkie Farr & Gallagher LLP, counsel for Defendant MasterCard Incorporated and MasterCard International Incorporated, will file on behalf of all defendants and the class plaintiffs in the above-captioned actions the Memorandum of Understanding with respect to the settlement of the class actions.

Dated: New York, NY
        July 13, 2012

WILLKIE FARR & GALLAGHER LLP

By: _____

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000
kravelo@willkie.com
wpowell@willkie.com
mfreimuth@willkie.com

*Attorneys for Defendant MasterCard Incorporated*
*and MasterCard International Incorporated*

To: All Counsel of Record

# A1043

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**IN RE PAYMENT CARD**
**INTERCHANGE FEE AND MERCHANT**
**DISCOUNT ANTITRUST LITIGATION**

**This Document Applies to:  All Cases.**

---

**No. 05-MD-1720 (JG) (JO)**

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding sets out the parties' binding obligation to enter into a Class Settlement Agreement in the form attached as Exhibit 1, subject to and promptly after satisfaction of all of the following conditions:

(1) the parties' successful completion of all Appendices to Exhibit 1 hereto, which, except as to the Plan of Administration and Distribution, the parties shall negotiate in good faith with the intent of completing on or before September 21, 2012, and as to the Plan of Administration and Distribution the plaintiffs shall develop and complete, with timely and regular consultation with defendants, on or before September 21, 2012; provided, however, that if all of the Appendices are not mutually agreed to by September 21, 2012, then the parties shall confer with the Court, at a time convenient to the Court, regarding any open issues pertaining to such Appendices (the Appendices, together with Exhibit 1 hereto, constitute the "Definitive Settlement Agreement");

(2) the successful negotiation of a settlement agreement between and among the parties to the non-class actions now pending as part of MDL 1720;

(3) any necessary approvals of the Definitive Settlement Agreement by the board of directors or other comparable decision-making body of any party, which the parties shall seek promptly upon completion of the Definitive Settlement Agreement; and

# A1044

(4) approval of the Definitive Settlement Agreement by the requisite vote of the members of Visa U.S.A. Inc. entitled to vote thereon, which Visa U.S.A. Inc. shall seek to obtain promptly after each of the foregoing conditions is satisfied.

In addition, from the date of execution of this Memorandum of Understanding to the execution of the Class Settlement Agreement, the Visa Defendants shall provide Class Counsel with advance notice of any material changes to their by-laws, rules, operating regulations, practices, policies, or procedures that pertain to Paragraphs 40-45 and 48 of Exhibit 1 hereto, and the MasterCard Defendants shall provide Class Counsel with advance notice of any material changes to their by-laws, rules, operating regulations, practices, policies, or procedures that pertain to Paragraphs 53-58 and 61 of Exhibit 1 hereto.

This Memorandum of Understanding may be executed in counterparts.

BERGER & MONTAGUE, PC

By:     H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane
1622 Locust Street
Philadelphia, PA 19103

**ROBINS, KAPLAN, MILLER & CIRESI**

By:     K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402

(4) approval of the Definitive Settlement Agreement by the requisite vote of the members of Visa U.S.A. Inc. entitled to vote thereon, which Visa U.S.A. Inc. shall seek to obtain promptly after each of the foregoing conditions is satisfied.

In addition, from the date of execution of this Memorandum of Understanding to the execution of the Class Settlement Agreement, the Visa Defendants shall provide Class Counsel with advance notice of any material changes to their by-laws, rules, operating regulations, practices, policies, or procedures that pertain to Paragraphs 40-45 and 48 of Exhibit 1 hereto, and the MasterCard Defendants shall provide Class Counsel with advance notice of any material changes to their by-laws, rules, operating regulations, practices, policies, or procedures that pertain to Paragraphs 53-58 and 61 of Exhibit 1 hereto.

This Memorandum of Understanding may be executed in counterparts.

BERGER & MONTAGUE, PC

By:    _____
      H. Laddie Montague, Jr.
      Merrill G. Davidoff
      Bart D. Cohen
      Michael J. Kane
      1622 Locust Street
      Philadelphia, PA 19103

ROBINS, KAPLAN, MILLER & CIRESI

By:    K. Craig Wildfang
      Thomas J. Undlin
      Ryan W. Marth
      800 LaSalle Avenue, Suite 2800
      Minneapolis, MN 55402

- 2 -

**ROBBINS GELLER RUDMAN & DOWD LLP**

By:  Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay
Carmen A. Medici
655 West Broadway, Suite 1900
San Diego, CA  92101

*Co-Lead Counsel for Class Plaintiffs*


**ARNOLD & PORTER LLP**

By:  Robert J. Vizas
Three Embarcadero Center, Seventh Floor
San Francisco, CA  94111-4024

Robert C. Mason
399 Park Avenue
New York, NY  10022-4690

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, N.W.
Washington, DC  20004-1206

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,
and Visa International Service Association*

# A1047

**ROBBINS GELLER RUDMAN & DOWD LLP**

By:   Patrick J. Coughlin
      Bonny E. Sweeney
      David W. Mitchell
      Alexandra S. Bernay
      Carmen A. Medici
      655 West Broadway, Suite 1900
      San Diego, CA 92101

*Co-Lead Counsel for Class Plaintiffs*

**ARNOLD & PORTER LLP**

By:   Robert J. Vizas
      Three Embarcadero Center, Seventh Floor
      San Francisco, CA 94111-4024

      Robert C. Mason
      399 Park Avenue
      New York, NY 10022-4690

      Mark R. Merley
      Matthew A. Eisenstein
      555 12th Street, N.W.
      Washington, DC 20004-1206

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,*
*and Visa International Service Association*

**WILLKIE FARR & GALLAGHER LLP**

By:    Keila D. Ravelo
      Wesley R. Powell
      Matthew Freimuth
      787 Seventh Avenue
      New York, New York 10019-6099

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

      Kenneth A. Gallo
      Joseph J. Simons
      2001 K Street, N.W.
      Washington, DC 20006-1047

      Andrew C. Finch
      Gary R. Carney
      1285 Avenue of the Americas
      New York, New York 10019-6064

*Attorneys for Defendant MasterCard Incorporated and MasterCard International Incorporated*

**MORRISON & FOERSTER LLP**

By:    Mark P. Ladner
      Michael B. Miller
      1290 Avenue of the Americas
      New York, NY   10104-0050

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

- 4 -

**WILLKIE FARR & GALLAGHER LLP**

By:   Keila D. Ravelo
      Wesley R. Powell
      Matthew Freimuth
      787 Seventh Avenue
      New York, New York 10019-6099


**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**

      Kenneth A. Gallo
      Joseph J. Simons
      2001 K Street, N.W.
      Washington, DC 20006-1047

      Andrew C. Finch
      Gary R. Carney
      1285 Avenue of the Americas
      New York, New York 10019-6064


*Attorneys for Defendant MasterCard Incorporated
and MasterCard International Incorporated*


**MORRISON & FOERSTER LLP**

By:   Mark P. Ladner
      Michael B. Miller
      1290 Avenue of the Americas
      New York, NY  10104-0050


*Attorneys for Defendants Bank of America, N.A., BA
Merchant Services LLC (f/k/a Defendant National
Processing, Inc.), Bank of America Corporation, and
MBNA America Bank, N.A.*

- 4 -

SHEARMAN & STERLING LLP

By:   Wayne D. Collins
      Lisl J. Dunlop
      599 Lexington Avenue
      New York, NY 10022-6069

*Attorneys for Defendants Barclays Financial Corp.
and Barclay's Bank plc*


**O'MELVENY & MYERS LLP**


By:   _____
      Andrew J. Frackman
      Times Square Tower
      7 Times Square
      New York, N.Y. 10036


*Attorneys for Defendants Capital One Bank (USA),
N.A., Capital One F.S.B., and Capital One Financial
Corp.*


**SKADDEN, ARPS, SLATE, MEAGHER
       & FLOM LLP**


By:   _____
      Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY   10036

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720

*Attorneys for Defendants JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., Chase Bank USA,
N.A., Chase Manhattan Bank USA, N.A., Chase
Paymentech Solutions, LLC,  Bank One
Corporation, Bank One Delaware, N.A., and J.P.
Morgan Chase Bank, N.A. as acquirer of certain
assets and liabilities of Washington Mutual Bank*

- 5 -

**SHEARMAN & STERLING LLP**

By: _____
    Wayne D. Collins
    Lisl J. Dunlop
    599 Lexington Avenue
    New York, NY 10022-6069

*Attorneys for Defendants Barclays Financial Corp.*
*and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

By: _____
    Andrew J. Frackman
    Times Square Tower
    7 Times Square
    New York, N.Y. 10036

*Attorneys for Defendants Capital One Bank (USA),*
*N.A., Capital One F.S.B., and Capital One Financial*
*Corp.*

**SKADDEN, ARPS, SLATE, MEAGHER**
**    & FLOM LLP**

By: _____
    Peter E. Greene
    Peter S. Julian
    Four Times Square
    New York, NY  10036

    Michael Y. Scudder
    155 North Wacker Drive
    Chicago, IL  60606-1720

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., Chase Bank USA,*
*N.A., Chase Manhattan Bank USA, N.A., Chase*
*Paymentech Solutions, LLC,  Bank One*
*Corporation, Bank One Delaware, N.A., and J.P.*
*Morgan Chase Bank, N.A. as acquirer of certain*
*assets and liabilities of Washington Mutual Bank*

# A1052

**SHEARMAN & STERLING LLP**

By:   Wayne D. Collins
      Lisl J. Dunlop
      599 Lexington Avenue
      New York, NY 10022-6069

*Attorneys for Defendants Barclays Financial Corp.*
*and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

By:   Andrew J. Frackman
      Times Square Tower
      7 Times Square
      New York, N.Y. 10036

*Attorneys for Defendants Capital One Bank (USA),*
*N.A., Capital One F.S.B., and Capital One Financial*
*Corp.*

**SKADDEN, ARPS, SLATE, MEAGHER**
  **& FLOM LLP**

By:   Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY   10036

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., Chase Bank USA,*
*N.A., Chase Manhattan Bank USA, N.A., Chase*
*Paymentech Solutions, LLC,  Bank One*
*Corporation, Bank One Delaware, N.A., and J.P.*
*Morgan Chase Bank, N.A. as acquirer of certain*
*assets and liabilities of Washington Mutual Bank*

- 5 -

**SIDLEY AUSTIN LLP**

By: David F. Graham
Eric H. Grush
One South Dearborn Street
Chicago, IL 60603

Benjamin R. Nagin
787 Seventh Ave
New York, N.Y. 10019

*Attorneys for Defendants Citibank (South Dakota),*
*N.A., Citibank, N.A., Citigroup Inc., and Citicorp*


**KEATING MUETHING & KLEKAMP PLL**


By: Richard L. Creighton
Joseph M. Callow, Jr.
Drew M. Hicks
One East Fourth Street
Suite 1400
Cincinnati, OH 45202

*Attorneys for Defendant Fifth Third Bancorp*


**KUTAK ROCK LLP**


By: John P. Passarelli
James M. Sulentic
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186

*Attorneys for Defendant First National Bank of*
*Omaha*

- 6 -

# A1054

**SIDLEY AUSTIN LLP**

By:    David F. Graham
       Eric H. Grush
       One South Dearborn Street
       Chicago, IL 60603

       Benjamin R. Nagin
       787 Seventh Ave
       New York, N.Y. 10019

*Attorneys for Defendants Citibank (South Dakota), N.A., Citibank, N.A., Citigroup Inc., and Citicorp*

**KEATING MUETHING & KLEKAMP PLL**

By:    Richard L. Creighton
       Joseph M. Callow, Jr.
       Drew M. Hicks
       One East Fourth Street
       Suite 1400
       Cincinnati, OH 45202

*Attorneys for Defendant Fifth Third Bancorp*

**KUTAK ROCK LLP**

By:    John P. Passarelli
       James M. Sulentic
       The Omaha Building
       1650 Farnam Street
       Omaha, NE 68102-2186

*Attorneys for Defendant First National Bank of Omaha*

# A1055

**SIDLEY AUSTIN LLP**

By: _____
    David F. Graham
    Eric H. Grush
    One South Dearborn Street
    Chicago, IL 60603

    Benjamin R. Nagin
    787 Seventh Ave
    New York, N.Y. 10019

*Attorneys for Defendants Citibank (South Dakota),*
*N.A., Citibank, N.A., Citigroup Inc., and Citicorp*

**KEATING MUETHING & KLEKAMP PLL**

By: _____
    Richard L. Creighton
    Joseph M. Callow, Jr.
    Drew M. Hicks
    One East Fourth Street
    Suite 1400
    Cincinnati, OH 45202

*Attorneys for Defendant Fifth Third Bancorp*

**KUTAK ROCK LLP**

By: John P. Passarelli
    James M. Sulentic
    The Omaha Building
    1650 Farnam Street
    Omaha, NE 68102-2186

*Attorneys for Defendant First National Bank of*
*Omaha*

- 6 -

# A1056

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:  David S. Lesser
     399 Park Avenue
     New York, N.Y. 10022

     Ali M. Stoeppelwerth
     Perry A. Lange
     1875 Pennsylvania Ave., N.W.
     Washington, D.C. 20006

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings Inc.*

**JONES DAY**

By:  John M. Majoras
     Joseph W. Clark
     51 Louisiana Avenue, NW
     Washington, DC  20001

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*

**PULLMAN & COMLEY, LLC**

By:  Jonathan B. Orleans
     Adam S. Mocciolo
     850 Main Street
     Bridgeport, CT  06601-7006

*Attorneys for Defendant Texas Independent Bancshares, Inc.*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:   _____
      David S. Lesser
      399 Park Avenue
      New York, N.Y. 10022

      Ali M. Stoeppelwerth
      Perry A. Lange
      1875 Pennsylvania Ave., N.W.
      Washington, D.C. 20006

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings Inc.*

**JONES DAY**

By:   _____
      John M. Majoras
      Joseph W. Clark
      51 Louisiana Avenue, NW
      Washington, DC  20001

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*

**PULLMAN & COMLEY, LLC**

By:   _____
      Jonathan B. Orleans
      Adam S. Mocciolo
      850 Main Street
      Bridgeport, CT  06601-7006

*Attorneys for Defendant Texas Independent Bancshares, Inc.*

# A1058

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By: _____
David S. Lesser
399 Park Avenue
New York, N.Y. 10022

Ali M. Stoeppelwerth
Perry A. Lange
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings Inc.*

**JONES DAY**

By: _____
John M. Majoras
Joseph W. Clark
51 Louisiana Avenue, NW
Washington, DC 20001

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*

**PULLMAN & COMLEY, LLC**

By: _____
Jonathan B. Orleans
Adam S. Mocciolo
850 Main Street
Bridgeport, CT 06601-7006

*Attorneys for Defendant Texas Independent Bancshares, Inc.*

- 7 -

# A1059

**ALSTON & BIRD LLP**

By:   Teresa T. Bonder
     Valarie C. Williams
     Kara F. Kennedy
     1201 W. Peachtree Street, N.W.
     Atlanta, GA 30309

*Attorneys for Defendants SunTrust Banks, Inc. and
SunTrust Bank*

**PATTERSON BELKNAP WEBB & TYLER
LLP**

By:   Robert P. LoBue
     Norman W. Kee
     Patterson Belknap Webb & Tyler LLP
     1133 Avenue of the Americas
     New York, NY 10036

*Attorneys for Defendants Wachovia Bank, NA.,
Wachovia Corporation, and Wells Fargo
& Company and for Wells Fargo Bank, N.A.*

July 13, 2012

- 8 -

# A1060

**ALSTON & BIRD LLP**

By:    Teresa T. Bonder
      Valarie C. Williams
      Kara F. Kennedy
      1201 W. Peachtree Street, N.W.
      Atlanta, GA 30309

*Attorneys for Defendants SunTrust Banks, Inc. and*
*SunTrust Bank*

**PATTERSON BELKNAP WEBB & TYLER**
**LLP**

By:    Robert P. LoBue
      Norman W. Kee
      Patterson Belknap Webb & Tyler LLP
      1133 Avenue of the Americas
      New York, NY  10036

*Attorneys for Defendants Wachovia Bank, NA.,*
*Wachovia Corporation, and Wells Fargo*
*& Company and for Wells Fargo Bank, N.A.*

July 13, 2012

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** **This Document Applies to:  All Cases.** | **No. 05-MD-1720 (JG) (JO)** |

<u>CLASS SETTLEMENT AGREEMENT</u>

(qq)    "Rule 23(b)(3) Settlement Class" means the members of the settlement

class as defined in Paragraph 2(a) below and, after the end of the Class Exclusion Period,

excluding those members who have become Opt Outs.

(rr)    "Rule 23(b)(3) Settlement Class Released Parties" means the persons,

businesses, or other entities described in Paragraph 32 below.

(ss)    "Rule 23(b)(3) Settlement Class Releasing Parties" means the persons,

businesses, or other entities described in Paragraph 31 below.

(tt)    "Settlement Administration Costs" means the expenses incurred in the

administration of this Class Settlement Agreement, including all amounts awarded by the Court

for costs associated with providing notice to the Rule 23(b)(3) Settlement Class and the Rule

23(b)(2) Settlement Class, locating members of those classes or determining their eligibility to be

an Authorized Cash Claimant and/or an Authorized Interchange Claimant, calculating or

verifying the amount of the Class Exclusion Takedown Payments or Default Interchange

Payments, obtaining information regarding the claims of members of the Rule 23(b)(3)

Settlement Class, administering, calculating, and distributing the Net Cash Settlement Fund to

Authorized Cash Claimants and the Net Interchange Settlement Fund to Authorized Interchange

Claimants, other costs of claims administration, payment of Taxes or administration costs with

respect to the Class Settlement Cash Escrow Account(s) and the Class Settlement Interchange

Escrow Accounts as provided in Paragraph 7 below, and other reasonable third-party fees and

expenses incurred by the Class Administrator in connection with prosecuting, handling, and

settling the Class Actions, and administering the terms of this Class Settlement Agreement, that

are not categorized as Attorneys' Fee Awards, Expense Awards, or Class Plaintiffs' Awards.

(uu)    "Settlement Class Notices" means the long-form and publication notices

concerning this Action and this Class Settlement Agreement to be provided to members of the

Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class, which are contained in Appendix F hereto.

(vv) "Settlement Final Approval Date" means the business day after all of the following conditions have been satisfied: (i) notice of the Class Settlement Agreement has been provided to the members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class as provided in Paragraphs 79-93 below and ordered by the Court; and (ii) the Court has entered the Class Settlement Order and Final Judgment without material modification from the form of the attached Appendix G hereto, including without any modification of the certification for the purposes of settlement of the Rule 23(b)(3) Settlement Class, and the Rule 23(b)(2) Settlement Class (from which exclusions are not permitted), and including without any modification of the releases and covenants not to sue provided by those settlement classes.

(ww) "Settlement Final Date" means the business day after all of the following conditions have been satisfied: (i) the Court has entered the Class Settlement Order and Final Judgment without material modification from the form of the attached Appendix G hereto, including without any modification of the certification for the purposes of settlement of the Rule 23(b)(3) Settlement Class, and the Rule 23(b)(2) Settlement Class (from which exclusions are not permitted), and including without any modification of the releases and covenants not to sue provided by those settlement classes; (ii) in the event that there is an appeal from the Court's Class Settlement Order and Final Judgment, it is affirmed without material modification, including without any modification of the certification for the purposes of settlement of the Rule 23(b)(3) Settlement Class, and the Rule 23(b)(2) Settlement Class (from which exclusions are not permitted), and including without any modification of the releases and covenants not to sue provided by those settlement classes; and (iii) the Class Settlement Order and Final Judgment is no longer subject to further court review by rehearing, appeal, petition for certiorari, or

otherwise.  The Class Settlement Order and Final Judgment shall be deemed to be no longer subject to further court review either (x) seventy-five days after the Class Settlement Order and Final Judgment has been entered by the Court if no notice, motion, or other document is filed within that time seeking any rehearing, reconsideration, vacation, review, appeal, or any other action regarding the Class Settlement Order and Final Judgment or this Class Settlement Agreement, or (y) if any such notice, motion, document is filed, then ten business days after the date on which all appellate and/or other proceedings resulting from any such notices, motions, or documents have been finally terminated or resolved without modification of the Class Settlement Order and Final Judgment or this Class Settlement Agreement and in such a manner as to permit no further judicial action, challenge, modification, or review of the Class Settlement Order and Final Judgment or this Class Settlement Agreement, unless (z) if as of the date on which (x) or (y) is satisfied, any other action or proceeding instituted by a member of the Rule 23(b)(3) Settlement Class or the Rule 23(b)(2) Settlement Class is pending that challenges or seeks relief at variance with the Class Settlement Order and Final Judgment or this Class Settlement Agreement, except for an action by an Opt Out that seeks only damages based on a Defendant's conduct prior to the date of the Court's entry of the Class Settlement Preliminary Approval Order, then ten business days after any such action or proceeding is dismissed or fully resolved through final judgment or otherwise and there is no possibility of any modification of that dismissal or resolution through any rehearing, appeal, or otherwise.

(xx)  "Settlement Preliminary Approval Date" means the business day after all of the following conditions have been satisfied:  (i) the Class Plaintiffs, Class Counsel, and the Defendants all have executed this Class Settlement Agreement, (ii) the Class Plaintiffs, Class Counsel, the Visa Defendants, and the MasterCard Defendants have established the Class Settlement Cash Escrow Account(s) and the Class Settlement Interchange Escrow Account(s);

16

# A1065

(iii) this Class Settlement Agreement has been approved by the requisite vote of the members of Visa U.S.A. Inc. entitled to vote thereon; and (iv) the Court has entered the Class Settlement Preliminary Approval Order without material modification from the form of the attached Appendix D hereto, including without any modification of the provisional certification for the purposes of settlement of the Rule 23(b)(3) Settlement Class, and the Rule 23(b)(2) Settlement Class (from which exclusions are not permitted), and including without any modification of the releases and covenants not to sue provided by those settlement classes.

(yy)    "Taxes" means (i) any and all applicable taxes, duties, and similar charges imposed by a government authority (including any estimated taxes, interest, or penalties) arising in any jurisdiction, if any, (A) with respect to the income or gains earned by or in respect of the Escrow Account(s) including, without limitation, any taxes that may be imposed upon Defendants with respect to any income or gains earned by or in respect of an Escrow Account for any period while it is held by the Escrow Agent during which the Escrow Account does not qualify as a qualified settlement fund for federal or state income tax purposes, or (B) with respect to the income or gains earned by or in respect of any of the Escrow Account(s), or by way of withholding as required by applicable law on any distribution by the Escrow Agent(s) of any portion of the Escrow Account(s) to the Class Administrator, Authorized Cash Claimants, Authorized Interchange Claimants, or other persons entitled to such distributions pursuant to this Class Settlement Agreement, and (ii) any and all expenses, liabilities, and costs incurred in connection with the taxation of the Escrow Account(s) (including without limitation expenses of tax attorneys and accountants).

(zz)    "Total Cash Payment Amount" means the amount specified in Paragraph 9 below, and does not include the Default Interchange Payments defined in Paragraph 1(w).

17

(aaa)   "United States" means all the States, territories, and possessions of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any political subdivision of the foregoing.

(bbb)   "Visa-Branded Card" means any Credit Card or Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by a Visa Defendant, or that is issued under any such brand or mark.

(ccc)   "Visa Defendants" means Visa U.S.A. Inc., Visa International Service Association, and Visa Inc., and each of their respective subsidiaries, successors, purchasers, and assigns (including an acquirer of all or substantially all of their respective assets, stock, or other ownership interests).

**Settlement Classes**

2.      The Class Plaintiffs will seek, and the Defendants will not oppose, the Court's certification of two settlement classes for settlement purposes only, defined as follows.

(a)      A "Rule 23(b)(3) Settlement Class" under Federal Rules of Civil Procedure 23(a) and (b)(3), from which exclusions shall be permitted, consisting of all persons, businesses, and other entities that have accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that this Class does not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date, or the United States government.

(b)      A "Rule 23(b)(2) Settlement Class" under Federal Rules of Civil Procedure 23(a) and (b)(2), from which exclusions shall not be permitted, consisting of all

persons, businesses, and other entities that as of the Settlement Preliminary Approval Date or in the future accept any Visa-Branded Cards and/or MasterCard-Branded Cards in the United States, except that this Class shall not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time since January 1, 2004, or do so in the future, or the United States government.

3.       The Class Plaintiffs and the Defendants stipulate and agree that, in paragraph 108 of the Second Consolidated Amended Class Action Complaint, paragraph 258 of the First Amended Supplemental Class Action Complaint, and paragraph 223 of the Second Supplemental Class Action Complaint, the definitions of "Class I" are amended to be the same as the Rule 23(b)(3) Settlement Class, and the definitions of "Class II" are amended to be the same as the Rule 23(b)(2) Settlement Class, and that the Court's orders preliminarily and finally approving this Settlement Agreement must so amend those Operative Class Complaints.

4.       The Class Plaintiffs will seek, and the Defendants will not oppose, the Court's appointment of the law firms of Robins, Kaplan, Miller & Ciresi L.L.P., Berger & Montague, P.C., and Robbins Geller Rudman & Dowd LLP as Class Counsel to represent the members of the Rule 23(b)(3) Settlement Class and the members of the Rule 23(b)(2) Settlement Class.

5.       The Class Plaintiffs agree that they (a) will not seek to become Opt Outs or otherwise exclude themselves from the Rule 23(b)(3) Settlement Class, or in any way, by class definition or otherwise, seek to exclude themselves from the Rule 23(b)(2) Settlement Class, and (b) will not object to the Court's preliminary or final approval of this Class Settlement Agreement.  The Class Plaintiffs will seek, and on the basis of and in reliance on this commitment the Defendants will not oppose, the Court's appointment of the Class Plaintiffs as

the representative members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class.

**Class Settlement Escrow Account(s)**

6.      Within seven business days after execution of this Class Settlement Agreement, the Class Counsel, the Visa Defendants, and the MasterCard Defendants shall establish the Class Settlement Cash Escrow Account(s) and the Class Settlement Interchange Escrow Account(s) pursuant to the terms of the escrow agreements provided in Appendices B and C hereto.  Funds in those Escrow Account(s) shall be invested solely as provided in Appendices B and C hereto. The Class Plaintiffs and the Defendants agree that each Class Settlement Cash Escrow Account and each Class Settlement Interchange Escrow Account is intended to be and shall be treated as a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1 and any analogous local, state, and/or foreign statute, law, regulation, or rule.  No signature or approval from the Visa Defendants or the MasterCard Defendants shall be required for disbursement from any of the Escrow Account(s) commencing the day after ten business days after the Settlement Final Date.

7.      All Taxes with respect to any sums in any Class Settlement Cash Escrow Account or any Class Settlement Interchange Escrow Account, the administrative costs of paying such Taxes, and any other costs of establishing, maintaining, or administering that Escrow Account shall be paid from that Escrow Account by the Escrow Agent(s).

8.      No payments from the Class Settlement Cash Escrow Account(s) or the Class Settlement Interchange Escrow Account(s), or any other use of those Escrow Account(s), shall be made without the prior approval of the Court (which may include approval of payments consistent with proposed budgets and expenses).  Class Plaintiffs shall provide Defendants with prior notice of any applications to the Court for such approvals sought up to ten business days

any way concerning the Class Settlement Order and Final Judgment, shall not delay the Settlement Final Date that otherwise would occur with respect to the Class Settlement Order and Final Judgment.

**Final Court Approval**

94.     Upon the Court's entry of the Class Settlement Preliminary Approval Order, the Class Plaintiffs, Class Counsel, and the Defendants agree to use reasonable and good faith efforts to effectuate the Court's final approval of this Class Settlement Agreement, including filing the necessary motion papers and scheduling any necessary hearings for a date and time that are convenient for the Court.

95.     Separately from any motions for Attorneys' Fee Awards, Expense Awards, or Class Plaintiffs' Awards, the Class Plaintiffs agree to file with the Court a motion and supporting papers seeking final approval of this Class Settlement Agreement, after providing Defendants with at least ten days advance notice of the contents of those papers, and to seek the Court's entry of the Class Settlement Order and Final Judgment in the form in Appendix G hereto, which will:

(a)     Determine that the Court has jurisdiction over the Class Plaintiffs, all members of the Rule 23(b)(3) Settlement Class, all members of the Rule 23(b)(2) Settlement Class, and the Defendants, and jurisdiction to finally approve this Class Settlement Agreement.

(b)     Approve the notice and exclusion procedures provided to the Rule 23(b)(3) Settlement Class, and the notice procedures provided to the Rule 23(b)(2) Settlement Class, as fair, adequate, and sufficient, as the best practicable notice under the circumstances, and as reasonably calculated to apprise members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class of the Action, this Class Settlement Agreement, and their objection rights, and to apprise members of the Rule 23(b)(3) Settlement Class of their exclusion

# A1070

rights, and as fully satisfying the requirements of Federal Rule of Civil Procedure 23, any other

applicable laws or rules of the Court, and due process.

(c)     Finally approve this Class Settlement Agreement, including its

consideration and release provisions, and find that the Class Settlement Agreement was made in

good faith, following arm's-length negotiations, and was not collusive, and further find that the

Class Settlement Agreement is fair, reasonable, and adequate for the Rule 23(b)(3) Settlement

Class and the Rule 23(b)(2) Settlement Class, and consistent with the requirements of federal law

and all applicable court rules, including Federal Rule of Civil Procedure 23.

(d)     Finally certify the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2)

Settlement Class, both as defined in Paragraph 2 above, for settlement purposes only, and declare

that in the event of termination of this Class Settlement Agreement, certification of the Rule

23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class shall automatically be vacated

and each Defendant may fully contest certification of any class as if no Rule 23(b)(3) Settlement

Class or Rule 23(b)(2) Settlement Class had been certified.

(e)     List all Opt Outs that timely and properly excluded themselves from the

Rule 23(b)(3) Settlement Class, and state the agreed-upon or Court-resolved Class Exclusion

Takedown Payments to be made, respectively, to the Visa Defendants and to the MasterCard

Defendants from the Class Settlement Cash Escrow Account(s).

(f)     Certify that the notification requirements of the Class Action Fairness Act,

28 U.S.C. § 1715, have been met.

(g)     Approve the plan for the submission, processing, and allocation of claims

to be made for members of the Rule 23(b)(3) Settlement Class with respect to the Net Cash

Settlement Fund and the Net Interchange Settlement Fund.

(h)     Order that the Class Plaintiffs and Class Counsel shall provide to the Visa Defendants and the MasterCard Defendants such information as they may reasonably request, as needed in connection with litigation, regarding the claims made by, and payments made to, members of the Rule 23(b)(3) Settlement Class from the Class Settlement Cash Escrow Account(s), which information may be produced subject to the terms of the protective order in this Action.

(i)     Incorporate all terms and conditions of this Class Settlement Agreement by reference, state the settlement consideration and full terms of the release and covenant not to sue of the Rule 23(b)(3) Settlement Class, state the full terms of the release and covenant not to sue of the Rule 23(b)(2) Settlement Class, provide that each Rule 23(b)(3) Settlement Class Releasing Party unconditionally, fully, and finally releases and forever discharges each of the Rule 23(b)(3) Settlement Class Released Parties from all released claims and waives any rights of Rule 23(b)(3) Settlement Class members to the protections afforded under California Civil Code § 1542 and/or any other similar, comparable, or equivalent laws, and provide that each Rule 23(b)(2) Settlement Class Releasing Party unconditionally, fully, and finally releases and forever discharges each of the Rule 23(b)(2) Settlement Class Released Parties from all released claims and waives any rights of Rule 23(b)(2) Settlement Class members to the protections afforded under California Civil Code § 1542 and/or any other similar, comparable, or equivalent laws.

(j)     Enjoin all members of the Rule 23(b)(3) Settlement Class, and those subject to their control, from commencing, maintaining, or participating in, or permitting another to commence, maintain, or participate in on its behalf, any claims released against Rule 23(b)(3) Settlement Class Released Parties, and enjoin all members of the Rule 23(b)(2) Settlement Class from commencing, maintaining, or participating in, or permitting another to commence,

maintain, or participate on its behalf, any in any claims released against Rule 23(b)(2) Settlement Class Released Parties.

(k)     Provide that the Court retains exclusive continuing jurisdiction in MDL 1720 over the Class Plaintiffs, the members of the Rule 23(b)(3) Settlement Class, the members of the Rule 23(b)(2) Settlement Class, and the Defendants to implement, administer, consummate, and enforce this Class Settlement Agreement and the Class Settlement Order and Final Judgment, including any disputes relating to, or arising out of, the release and covenant not to sue of the Rule 23(b)(3) Settlement Class or any claim for payment from the Class Settlement Cash Escrow Account(s) or the Class Settlement Interchange Escrow Account(s), and including any disputes relating to, or arising out of, the release and covenant not to sue of the Rule 23(b)(2) Settlement Class or any claim concerning any by-law, rule, operating regulation, practice, policy, or procedure of any Visa Defendant or MasterCard Defendant.

(l)     Direct that, as to the Defendants, all putative class actions consolidated in MDL 1720, listed in Appendix A hereto, be dismissed with prejudice and without costs (except as provided for herein).

(m)     Determine that there is no just reason for delay in entering the final judgment, and direct that the Class Settlement Order and Final Judgment shall be final and appealable.

**<u>Termination</u>**

96.     In the event that (a) any condition for the Settlement Preliminary Approval Date is not satisfied, (b) the Class Administrator fails to provide its report described in Paragraph 89 above by the date specified in Paragraph 89 or by such other date ordered by the Court, or (c) any condition for the Settlement Final Approval Date is not satisfied, Class Plaintiffs as a group or Defendants as a group may terminate this Class Settlement Agreement.

97.     Defendants as a group may terminate this Class Settlement Agreement by providing written notice to the other parties and the Court within ten business days after determining that the sum of the Class Exclusion Takedown Payments calculated under Paragraphs 18 and 19 above, without regard to Paragraph 20 above, would exceed twenty-five percent of the Total Cash Payment Amount.

98.     Class Plaintiffs as group or Defendants as a group, after conferring with the other group, may unilaterally terminate this Class Settlement Agreement by providing written notice to the other parties and the Court within twenty business days in the event that the Settlement Preliminary Approval Order, or the Court's Class Settlement Order and Final Judgment are materially modified or not fully affirmed on any appeal or otherwise, including but not limited to any modification of certification for the purposes of settlement of the Rule 23(b)(3) Settlement Class, and the Rule 23(b)(2) Settlement Class (from which exclusions are not permitted), and including but not limited to any modification of the releases and covenants not to sue provided by those settlement classes.  Class Plaintiffs and Defendants agree to confer in good faith about whether to modify the twenty business day period provided in this Paragraph based on the circumstances.

99.     In the event that this Class Settlement Agreement is terminated pursuant to Paragraphs 96-98 above:

(a)     two-thirds of any sums in the Class Settlement Cash Escrow Account(s), less any Taxes due and Settlement Administration Costs approved by the Court and already paid or incurred, shall promptly be paid to an account that the Visa Defendants shall designate, and one-third of any sums in the Class Settlement Cash Escrow Account(s), less any Taxes due Settlement Administration Costs approved by the Court and already paid or incurred, shall promptly be paid to an account that the MasterCard Defendants shall designate;

91

**A1074**

# ATTACHMENT C

# A1075

## ARNOLD & PORTER LLP

Robert J. Vizas
Robert.Vizas@aporter.com

+1 415.471.3311
+1 415.471.3400 Fax

7th Floor
Three Embarcadero Center
San Francisco, CA 94111-4024

August 21, 2012

BY EMAIL

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue, 9th Floor
New York, NY 10017

Re:   *In re Payment Card Interchange Fee and Merchant
Discount Antitrust Litigation,* MDL 1720 (E.D.N.Y.)

Dear Jeff:

As promised in my email on Friday, we have discussed your request to co-lead counsel for the class plaintiffs for materials that include highly confidential and commercially sensitive business information that Visa has produced in MDL 1720. Your letter seeks this information as counsel for four trade associations: the National Association of Convenience Stores, the National Grocers Association, the National Community of Pharmacists Association, and the National Cooperative Grocers Association. While you have not yet made a request to Visa for this information or made any application to the Court, your request raises concerns that we need to raise with you prior to any production. I wanted to get this letter to you as soon as possible.

Initially, it is not clear to us why you need this information to assess the publicly filed Class Settlement Agreement. Insofar as the four trade associations remain plaintiffs in MDL 1720, the Court has appointed co-lead counsel for the class plaintiffs to represent their interests, and your trade association clients have not filed any motion challenging that appointment by the Court. The Court presumably will address in connection with the proposed class notice the information concerning this action and its settlement that will be made available to members of the proposed settlement classes.

In addition, in considering whether to agree to the production of commercially sensitive Visa information to your firm and your trade association clients, we have serious questions about the use of that information and how it will be maintained as "highly confidential" under the terms of the protective order in this action.

Please understand that my purpose in raising these concerns with you is not in any way to cast aspersions on you, your law firm, or your trade association clients. Let me

ARNOLD & PORTER LLP

Jeffrey I. Shinder
Page 2

briefly summarize some of those concerns for you so that you can better understand them
and hopefully answer some questions that concern us.

The first set of concerns relate to how you, your firm, and your clients would
handle any confidential and commercially sensitive Visa information that might be
produced to you. We understand that in addition to representing these four trade
associations, your firm has represented other payments industry participants, including in
connection with issues directly related to the subject matter of MDL 1720. While our
knowledge is far from complete, some examples might be helpful for you to understand
and address our concerns.

1.     We understand that you and your firm have represented Discover for a
number of years during MDL 1720. You represented Discover in an action against Visa
and MasterCard from 2004 to 2008. Your firm appeared on behalf of Discover in
MDL 1720 to oppose a discovery request filed by the plaintiffs, some of whom you now
represent. This concerns us because Discover is a competitor of Visa and MasterCard.
Discover has policies, including a no-surcharge rule, of the same type that were being
attacked by the plaintiffs in this case, including your trade association clients. You also
were involved in complaints to the DOJ concerning the consent order between DOJ and
Visa regarding modifications to the discounting rules, although we are not entirely sure
whether this was on behalf of Discover, Wal-Mart, and/or trade associations.

2.     We understand that you and your firm represent Wal-Mart, which has
been a vocal leader of the opposition to the settlement. Wal-Mart has recently announced
that it has formed a business venture with others (the Merchant Customer Exchange or
Merchant Purchasing Network), some of whom may be competitors to Visa, which is
described in the attached article from the Wall Street Journal. While we do not know the
extent of your firm's involvement with this venture or its participants, nor the exact scope
of the venture, it appears from what we have heard or seen in the press that the venture
may be competitive with Visa and/or its customer financial institutions. It also appears
that your firm may have provided legal advice concerning this venture.

3.     We have heard that you and your firm have worked with industry
participants in lobbying efforts on Capitol Hill with respect to interchange rates/rules and
other subjects at issue in MDL 1720. Again, we do not have first-hand knowledge of the
nature and extent of this work, but it raises concerns that we would like to explore with
you. Attached is an article from Bloomberg that relates to this concern.

The second set of concerns revolves around the use of the mediation and
settlement process. Your trade association clients and their counsel participated in the
mediation, which by agreement of all parties was conducted on a confidential basis. We
were troubled over the last six or more months to see and hear a steady stream of reports,
media inquiries, and comments that could only have come from participants in the

**A1077**

## ARNOLD & PORTER LLP

Jeffrey I. Shinder
Page 3

mediation process. Again, I am not making any accusations about anyone's conduct. But these facts heighten our concern.

Immediately following the public announcement that an agreement had been reached, we saw what can only be described as a well-orchestrated media campaign to oppose the settlement of this case. These trade associations, along with Wal-Mart and some other merchants, were very outspoken in their opposition the settlement. While everyone is entitled to their opinion, and the right to comment, this campaign raises questions and concerns about the use of the media and settlement process.

In order to help allay these concerns, we would appreciate it if you would provide us with the following information:

(1) When did anyone affiliated with each trade association first communicate with you or your firm on what you or the trade association considers to be a privileged or confidential basis?

(2) On what date did each trade association first retain you or your firm?

(3) Before July 13, 2012, did you, your firm, or anyone affiliated with these trade associations communicate concerning the mediation or settlement negotiations with anyone other than the trade associations' retained counsel, co-lead counsel for class plaintiffs, counsel for defendants, the Court, or another class plaintiff? If so, when and with whom?

(4) Did you or your firm talk about proposed terms of the settlement, or urge its rejection, with any merchant, trade group, or their counsel prior to July 13, 2012? Did you receive any information or reports from anyone connected with the mediation and settlement process prior to that time?

Again, this letter is meant to raise promptly issues of possible concern. It is not meant to be accusatory or exhaustive but rather to illustrate our concerns.

We look forward to hearing from you so that we can gain further information in order to assess promptly your request for information produced by Visa in MDL 1720. Please feel free to give me a call if you would like and we can discuss how best to proceed. My cell is 619-743-6070 and the best way to reach me since I will not be in the office the next few days.

Sincerely,

Robert J. Vizas

## ARNOLD & PORTER LLP

Jeffrey I. Shinder
Page 4

cc:  Co-Lead Counsel for Class Plaintiffs
     Counsel for Defendants
     Counsel for the Individual Plaintiffs

Attachments

Payments Network Takes On Google - WSJ.com



Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.     Order a reprint of this article now

## THE WALL STREET JOURNAL.
WSJ.com

TECHNOLOGY  |  Updated August 15, 2012, 5:34 a.m. ET

# Payments Network Takes On Google

*Retailers Including Wal-Mart, Target and 7-Eleven to Unveil Mobile System Employing Smartphones*

By ROBIN SIDEL

More than a dozen big merchants are expected to announce Wednesday their plans to jointly develop a mobile-payments network that would battle similar services from Google Inc. and other companies, people involved in the effort said.

Wal-Mart Stores Inc., Target Corp., 7-Eleven Inc. and Sunoco Inc. are among the companies hoping to elbow their way into the burgeoning market that turns smartphones into devices for making purchases.



Mercury News/Zuma Press

Retailers plan a rival mobile system to Google's Wallet, pictured above.

The push by merchants, called Merchant Customer Exchange, or MCX, is at an early stage, and the companies haven't set a launch date or hired a chief executive. A CEO search is under way. It isn't clear how much money each participating merchant is contributing to the network's development.

Financial institutions and technology firms are pouring billions of dollars into the development of mobile-payment systems that operate as so-called digital wallets.

While few shoppers use their phones as mobile-payment devices, industry executives are convinced that consumers eventually will be just as comfortable buying with their phones as they now are when using credit cards and debit cards.

The technology relies on applications that a customer can download onto a smartphone and then make purchases in a store by tapping the phone against a reader placed by the cash register.

Mobile-payment transactions are expected to surge to an estimated $600 billion world-wide by 2016, up from $172 billion this year, according to market-research firm Gartner Inc. A Federal Reserve report in March said 87% of Americans have a mobile phone. Nearly half of those are smartphones, cellphones with computer applications and Internet access.

Among people with a mobile phone and bank account, 11% used mobile payments in the previous year, the survey found.

The new mobile-payments efforts already is running behind rivals such as the Google effort, called Google Wallet, which began operating last year on the technology company's Android devices.

# A1080

Payments Network Takes On Google - WSJ.com                                                    Page 2 of 3

Isis, a collaboration of mobile carriers AT&T Inc., Deutsche Telekom AG's T-Mobile USA Inc. unit and the Verizon Wireless joint venture between Verizon Communications and the U.K.'s Vodafone Group PLC, will start trials later this summer in Salt Lake City and Austin, Texas.

And in another sign of the growing interest in mobile payments, start-up Square Inc. said last week Starbucks Corp. will invest $25 million in the company and use its technology to eventually process all credit and debit transactions at about 7,000 Starbucks outlets in the U.S.

The proliferation of mobile-payments systems might confuse consumers, skeptics say. But participants say the rival efforts reflect a predicament: Each industry needs the other to make mobile payments succeed, but each group wants to lead the way.

"We're open to all partners, but it has to be beneficial to member merchants in a way that improves the system and doesn't layer on additional costs," said Mike Cook, corporate vice president and assistant treasurer at Wal-Mart.

All the mobile-payments efforts now under way are aimed at satisfying growing demand from consumers, particularly younger ones, for payments that are less cumbersome and faster. Merchants believe that building such electronic systems will deepen customer loyalty

By setting up their own system, the merchants in MCX also are counting on leveraging existing relationships with customers to get them accustomed to paying with a phone.



Google and telecom providers know far less about shoppers' buying habits than the merchants do, they say.

Companies in the latest effort have combined annual sales of about $1 trillion and serve nearly every smartphone user in the U.S., they say.

Like their rivals, the merchants plan to develop targeted offers and promotions for consumers that will be available through smartphones.

So far, 14 merchants have signed onto the retail-led venture, including Best Buy Co., CVS Caremark Corp., Lowe's Cos ., Royal Dutch Shell PLC, Publix Super Markets Inc., Sears Holdings Corp., gasoline marketer Alon Brands Inc., Darden Restaurants Inc., grocery chain Hy-Vee Inc. and the HMSHost unit of Autogrill SpA.

"I do believe that retailers are uniquely qualified to address what we believe are consumer desires in this space," said Terry Scully, president of Target's financial and retail services.

Among the uphill challenges facing mobile payments, many consumers have expressed discomfort with loading personal financial information into a phone.

A recent survey of 2,000 consumers found that 60% of respondents were concerned that mobile payments could jeopardize their financial or personal security, according to Market Strategies International, a consulting firm in Livonia, Mich.

But while yet another mobile-payments system might rattle confuse customers who don't understand differences between various systems, the growing number of options could help the overall effort gain traction. Executives from Isis and Google have said that competition is important to propelling the nascent industry. Some of the merchants involved in the new group already are dabbling with mobile payments. Target customers can use a mobile phone to buy and send a Target gift card. The mobile payment card has a bar code that can be read at checkout line.

Payments Network Takes On Google - WSJ.com                                   Page 3 of 9

**Write to** Robin Sidel at robin.sidel@wsj.com | WSJ.com Law Page | Lexis Advance™ | lexis.com® | Lexis® for Microsoft® Office | Meale

*A version of this article appeared August 15, 2012, on page C1 in the U.S. edition of The Wall Street Journal, with the headline: Payments Network Takes On Google.*

Copyright 2012 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

## You Might Like

'Dark Knight' Faces Another Human Tragedy

Mobile Payments Dance Draws a Crowd

A Tablet With a Stylus and a Split Screen

Westfield Posts Profit Rise

What They're Wearing at Phillips de Pury & Co.

## From Around the Web

Content from Sponsors What's this?

Billionaire Warns: Dollar 'Going To Hell', U.S. Facing Financial Ruin (Moneynews)

Closing Bank Accounts and Your Credit Score (TransUnion)

Why You Should Cancel Your Cell Phone Contract (Daily Finance)

Geithner Drops 'F-Bombs,' U.S. Blows $400 Million an Hour (Bloomberg.com)

Why Do Most Traders Lose Money? (DailyFX)

Durbin Sees Visa Accord Thwarting Push to Cap Card Fees - Bloomberg                Page 1 of 4

# Bloomberg

## Durbin Sees Visa Accord Thwarting Push to Cap Card Fees

By Matt Townsend and Dakin Campbell - Aug 13, 2012

U.S. Senator Richard Durbin's office told retailers that their efforts to have Congress rein in credit-card swipe fees will be imperiled if they support a $6.6 billion settlement with Visa (V) Inc. and MasterCard Inc. (MA)

"This is going to foreclose the prospect of good legislation for the foreseeable future," Dan Swanson, senior judiciary counsel for the Illinois Democrat, said in a conference call with the Food Marketing Institute. "It will essentially be game over."

Durbin, the majority whip, won the inclusion of limits on debit-card swipe fees, or interchange, in the 2010 Dodd-Frank Act. That trimmed annual revenue for the biggest U.S. banks by about $8 billion and benefited retailers including Wal-Mart Stores Inc. (WMT) and Target Corp. (TGT) Credit-card swipe fees are higher and generate about $40 billion a year for lenders such as JPMorgan Chase & Co., Bank of America Corp. (BAC) and Citigroup Inc. (C)

Max Gleischman, a Durbin spokesman, confirmed that Swanson discussed the settlement with the Food Marketing Institute and National Retail Federation. He declined to say whether Durbin, the Senate's No. 2 Democrat, will push for more legislation or if merchants' approval of the accord would damage such efforts.

Retailers should "think hard" before taking the deal, Durbin said Aug. 2, according to the Congressional Record. He called it a "stunning giveaway" to Visa and Purchase, New York-based MasterCard.

Visa dropped 0.6 percent to $128.32 in New York, and MasterCard declined 0.1 percent to $425.63.

## Antitrust Case

The Food Marketing Institute, a trade group whose members include Target, Sears Holdings Corp. (SHLD) and Bentonville, Arkansas- based Wal-Mart, doesn't have a position on the settlement, said Heather Garlich, a spokeswoman for the Arlington, Virginia-based organization.

# A1083

Visa, MasterCard and banks agreed last month to resolve the seven-year-old antitrust case. In addition to cash payments, the deal includes a temporary reduction in credit-card swipe fees and allows retailers to impose surcharges on such transactions. The accord requires the approval of U.S. District Judge John Gleeson in Brooklyn, New York, may be nullified if enough merchants refuse to join the proposed class action.

## 'Complex Dispute'

"In our view, if this settlement is finalized, or even if it's preliminarily approved, merchants had better be sure this is going to fix the interchange problem," Swanson said in the conference call last month with the Food Marketing Institute.

Earlier this month, his boss said it wouldn't.

"The settlement does nothing to change the anticompetitive fee-fixing that Visa and MasterCard do on behalf of their member banks," Durbin said. "In fact, it gives Visa and MasterCard broad and permanent legal immunity to continue doing exactly that in the future."

The Electronic Payments Coalition, which represents banks, MasterCard and San Francisco-based Visa, has said that Congress shouldn't interfere.

"The legal system was and is the appropriate system to resolve a large and complex dispute between companies, not Washington," Trish Wexler, a spokeswoman for the trade group, said last week.

Retailers, even if they reject the settlement, still may struggle to push more interchange regulation through Congress, which approved the Dodd-Frank financial regulatory overhaul when Democrats controlled both chambers. Durbin abandoned efforts to cap credit-card fees after failing to persuade enough colleagues to support them, and Republicans, most of whom opposed the debit caps, now control the U.S. House.

## Checking Accounts

The payments industry escaped earlier attempts to regulate interchange on credit cards, which average about 2 percent of each transaction, saying the fees are needed to compensate banks for the risk of lending money. That argument isn't relevant to debit cards, which tap funds held in consumer checking accounts.

The National Retail Federation, which criticized the settlement, hasn't advised members to oppose it, said Mallory Duncan, the trade group's general counsel. Members of the NRF, which describes itself as the world's largest retail trade group, include Macy's Inc. (M) and Gap Inc. (GPS)

"Senator Durbin doesn't have to gin up opposition to this settlement," Duncan said in an interview. An "overwhelming majority" of NRF members already don't support it, he said.

Wal-Mart urged all merchants to reject the agreement, saying it would limit their right to take legal action against Visa and MasterCard, the world's biggest bank-card networks, and constrain payments-industry innovation. Target, based in Minneapolis, said the accord would "perpetuate a broken system," according to a July 20 statement on its website.

## 'Washington Game'

The National Community Pharmacists Association, National Association of Convenience Stores and National Grocers Association, all named plaintiffs in the lawsuit, said they oppose the settlement. Their position doesn't stem from concerns that support would diminish chances that Congress will act, said Jeffrey Shinder, a lawyer for the three groups.

"The suggestion that this is just some kind of Washington game cannot withstand any scrutiny when you look at what's going on out there," Shinder said in a phone interview.

Peter Larkin, chief executive officer of the National Grocers Association, said on July 27 that his group plans to push for more legislation.

## 'Further Reforms'

"It's hard to predict what Congress will do and won't do," Larkin said in an interview. "It would be our intention to continue to talk to Congress because we think we need to achieve further reforms."

The proposed settlement must be submitted to Gleeson by Oct. 19. If he gives preliminary approval, notice of the deal will be sent to members of the class, which includes about 7 million U.S. retailers who accepted Visa or MasterCard credit cards since 2004.

Durbin's comments and the decision by some retailers to reject the settlement isn't surprising and doesn't mean the accord won't be approved, said Glenn Fodor, a Morgan Stanley analyst.

"With 7 million merchants and with this structured the way it was, you can't keep everyone happy," Fodor said in a phone interview. "This was well within the realm of expectations."

# A1085

Durbin Sees Visa Accord Thwarting Push to Cap Card Fees - Bloomberg    Page 12 of 12    Page 4 of 4

The case is In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 05-md-01720, U.S. District Court, Eastern District of New York (Brooklyn).

To contact the reporters on this story: Matt Townsend in New York at mtownsend9@bloomberg.net; Dakin Campbell in San Francisco at dcampbell27@bloomberg.net

To contact the editors responsible for this story: Robin Ajello at rajello@bloomberg.net; David Scheer at dscheer@bloomberg.net

®2012 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# A1086

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re: PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Relates To:**<br>**ALL CLASS ACTIONS** | **MDL Docket No. 1720 (JG)(JO)**<br><br>**Civil No. 05-5075 (JG)(JO)** |

### NOTICE OF CLASS PLAINTIFFS' MOTION FOR CLASS SETTLEMENT PRELIMINARY APPROVAL

PLEASE TAKE NOTICE THAT, upon the accompanying Memorandum of Law, Plaintiffs Photos Etc. Corp.; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS Inc.; Crystal Rock LLC; Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless ShoeSource, Inc.; ("Class Plaintiffs") pursuant to Rule 23(e) of the Federal Rules of Civil Procedure will move this Court, before Judge John Gleeson, at the United States Courthouse for the Eastern District of New York, 225 Cadman Plaza, Brooklyn, N.Y., on a date and time determined by the Court, for an order granting preliminary approval of a class-wide settlement of this litigation. Attached hereto as Exhibit 1 is the complete and fully executed Class Settlement Agreement.

Pursuant to Magistrate Judge Orenstein's Minute Order of August 22, 2012 (Dkt. No. 1617), all opposing papers and supporting evidentiary materials shall be served within thirty days from this date.

# A1087

Dated:  October 19, 2012

ROBINS, KAPLAN, MILLER
 & CIRESI, L.L.P.

By:     */s/ K. Craig Wildfang*
K. Craig Wildfang
Martin R. Lueck
Thomas J. Undlin
Ryan W. Marth
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
(612) 349-8500

BERGER & MONTAGUE, P.C.

By:     */s/ H. Laddie Montague, Jr..*
H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

ROBBINS GELLER RUDMAN
 & DOWD LLP

By:     */s/ Bonny E. Sweeney*
Bonny E. Sweeney
Patrick J. Coughlin
David W. Mitchell
Alexandra S. Bernay
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

*Class Plaintiffs' Co-Lead Counsel*

**A1088**

Exhibit 1

# A1089

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD
INTERCHANGE FEE AND MERCHANT
DISCOUNT ANTITRUST LITIGATION

This Document Applies to:  All Cases.

No. 05-MD-1720 (JG) (JO)

## DEFINITIVE CLASS SETTLEMENT AGREEMENT

# A1090

## APPENDIX F – Settlement Class Notices

### Appendix F1

*Notice of Class Action Settlement*

*Authorized by the U.S. District Court, Eastern District of New York*

## — Notice of 6+ Billion Dollar Class Action Settlement —

*Si desea leer este aviso en español, llámenos o visite nuestro sitio web.*

**TO:** Merchants who have accepted Visa and MasterCard at any time since January 1, 2004

This notice is authorized by the Court to inform you about an agreement to settle a class action lawsuit that may affect you. The lawsuit claims that Visa and MasterCard, separately, and together with banks, violated antitrust laws and caused merchants to pay excessive fees for accepting Visa and MasterCard credit and debit cards, including by:

* Agreeing to set, apply, and enforce rules about merchant fees (called *default interchange fees*);
* Limiting what merchants could do to encourage their customers to use other forms of payment through, for example, charging customers an extra fee or offering discounts; and
* Continuing that conduct after Visa and MasterCard changed their corporate structures.

The defendants say they have done nothing wrong. They say that their business practices are legal and the result of competition, and have benefitted merchants and consumers. The Court has not decided who is right because the parties agreed to a settlement. On MM DD, 201Y, the Court gave preliminary approval to this settlement.

### A.    The settlement

Under the settlement, Visa, MasterCard, and the bank defendants have agreed to make payments to two settlement funds:

* The first is a "Cash Fund" – a $6.05 billion fund that will pay valid claims of merchants that accepted Visa or MasterCard credit or debit cards at any time between January 1, 2004 and MM DD, 201Y.
* The second is an "Interchange Fund" – estimated to be approximately $1.2 billion – that will be based on a portion of the interchange fees attributable to certain merchants that accept Visa or MasterCard credit cards for an eight-month "Interchange Period."

Additionally, the settlement changes some of the Visa and MasterCard rules applicable to merchants who accept their cards.

This settlement creates two classes:

* A *Cash Settlement Class* (Rule 23(b)(3) Settlement Class), which includes all persons, businesses, and other entities that accepted any Visa or MasterCard cards in the U.S. at any time from January 1, 2004 to MM DD, 201Y, and
* A Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class), which includes all persons, businesses, and entities that as of MM DD, 201Y or in the future accept any Visa or MasterCard cards in the U.S.

### B.    What merchants will get from the settlement

Every merchant in the Cash Settlement Class that files a valid claim will get money from the $6.05 billion Cash Fund, subject to a deduction (not to exceed 25% of the fund) to account for merchants who exclude themselves from the Cash Settlement Class. The value of each claim, where possible, will be based on the actual or estimated interchange fees attributable to the merchant's MasterCard and Visa payment card transactions from January 1, 2004 to MM DD, 201Y. Payments to merchants who file valid claims for a portion of the Cash Fund will be based on:

* The money available to pay all claims,

# A1091

- The total dollar value of all valid claims filed,
- The deduction described above not to exceed 25% of the Cash Settlement Fund, and
- The cost of settlement administration and notice, money awarded to the class representatives, and attorneys' fees and expenses all as approved by the Court.

In addition, merchants in the Cash Settlement Class that accept Visa and MasterCard during the eight-month Interchange Period and file a valid claim will get money from the separate Interchange Fund, estimated to be approximately $1.2 billion. The value of each claim, where possible, will be based on an estimate of one-tenth of 1% of the merchant's Visa and MasterCard credit card dollar sales volume during that period. Payments to merchants who file valid claims for a portion of the Interchange Fund will be based on:

- The money available to pay all claims,
- The total dollar value of all valid claims filed, and
- The cost of settlement administration and notice, and any attorneys' fees and expenses that may be approved by the Court.

Attorneys' fees and expenses and money awarded to the class representatives:    For work done through final approval of the settlement by the district court, Class Counsel will ask the Court for attorneys' fees in an amount that is a reasonable proportion of the Cash Settlement Fund, not to exceed 11.5% of the Cash Settlement Fund of $6.05 billion and 11.5% of the Interchange Fund estimated to be $1.2 billion to compensate all of the lawyers and their law firms that have worked on the class case. For additional work to administer the settlement, distribute both funds, and through any appeals, Class Counsel may seek reimbursement at their normal hourly rates, not to exceed an additional 1% of the Cash Settlement Fund of $6.05 billion and an additional 1% of the Interchange Fund estimated to be $1.2 billion. Class Counsel will also request reimbursement of their expenses (not including the administrative costs of settlement or notice), not to exceed $40 million and up to $200,000 per Class Plaintiff in service awards for their efforts on behalf of the classes.

## C.    How to ask for payment

To receive payment, merchants must fill out a claim form. If the Court finally approves the settlement, and you do not exclude yourself from the Cash Settlement Class, you will receive a claim form in the mail or by email. Or you may ask for one at: www.PaymentCardSettlement.com, or call: 1-888-777-6666.

## D.    Other benefits for merchants

Merchants will benefit from changes to certain MasterCard and Visa rules, which will allow merchants to, among other things:

- Charge customers an extra fee if they pay with Visa or MasterCard credit cards;
- Offer discounts to customers who do not pay with Visa or MasterCard credit or debit cards, and
- Form buying groups that meet certain criteria to negotiate with Visa and MasterCard.

Merchants that operate multiple businesses under different trade names or banners will also be able to accept Visa or MasterCard at fewer than all of the merchant's trade names and banners.

## E.    Legal rights and options

Merchants who are included in this lawsuit have the legal rights and options explained below. You may:

- **File a claim to ask for payment.** You will receive a claim form in the mail or email or file online at: *www.PaymentCardSettlement.com.*
- **Exclude yourself** from the Cash Settlement Class (Rule 23(b)(3) Settlement Class). If you exclude yourself, you can sue the Defendants for damages based on alleged conduct occurring on or before MM DD, 201Y on your own at your own expense, if you want to. If you exclude yourself, you will not get any money from this settlement. If you are a merchant and wish to exclude yourself, you must make a written request, place it in an envelope, and mail it with postage prepaid and postmarked no later than MM DD, 201Y to Class Administrator,

# A1092

P.O. Box 1234, ABC City, State 12345. The written request must be signed by a person authorized to do so and provide all of the following information: (1) the words "In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation," (2) your full name, address, telephone number, and taxpayer identification number, (3) the merchant that wishes to be excluded from the Cash Settlement Class (Rule 23(b)(3) Settlement Class), and what position or authority you have to exclude the merchant, and (4) the business names, brand names, and addresses of any stores or sales locations whose sales the merchant desires to be excluded.

*Note:* **You cannot be excluded from the Rule Changes Settlement Class** (Rule 23(b)(2) Settlement Class).

▪ **Object to the settlement.** The deadline to object is: MM DD, 201Y.
To learn how to object, see: *www.PaymentCardSettlement.com* or call 1-888-777-6666. Note: If you exclude yourself from the Cash Settlement Class you cannot object to the terms of that portion of the settlement.

For more information about these rights and options, visit: *www.PaymentCardSettlement.com.*

### F.   If the Court approves the final settlement

Members of the Rule Changes Settlement Class are bound by the terms of this settlement. Members of the Cash Settlement Class, who do not exclude themselves by the deadline, are bound by the terms of this settlement whether or not they file a claim for payment. Members of both classes release all claims against all released parties listed in the Settlement Agreement. The settlement will resolve and release any claims by merchants against Visa, MasterCard or other defendants that were or could have been alleged in the lawsuit, including any claims based on interchange or other fees, no-surcharge rules, no-discounting rules, honor-all-cards rules and other rules. The settlement will also resolve any merchant claims based upon the future effect of any Visa or MasterCard rules, as of MM DD, 201Y and not to be modified pursuant to the settlement, the modified rules provided for in the settlement, or any other rules substantially similar to any such rules. The releases will not bar claims involving certain specified standard commercial disputes arising in the ordinary course of business.

For more information on the release, see the settlement agreement at: *www.PaymentCardSettlement.com.*

### G.   The Court hearing about this settlement

On MM DD, 201Y, there will be a Court hearing to decide whether to approve the proposed settlement, class counsels' requests for attorneys' fees and expenses, and awards for the class representatives. The hearing will take place at:

United States District Court for the Eastern District of New York
Courtroom # XX
225 Cadman Plaza
Brooklyn, NY 11201

You do not have to go to the court hearing or hire an attorney. But you can if you want to, at your own cost. The Court has appointed the law firms of Robins, Kaplan, Miller & Ciresi LLP, Berger & Montague, PC, and Robbins Geller Rudman & Dowd LLP to represent the Class ("Class Counsel").

### H.   Questions?

For more information about this case *(In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* MDL 1720), you may:

Call toll-free: 1-888-777-6666
Visit: *www.PaymentCardSettlement.com.*
Write to the Class Administrator:  P.O. Box XXXX, Portland, OR 97208-XXXX, or
Email: info@PaymentCardSettlement.com.

# A1093

APPENDIX J – Final Judgment in United States v. American Express

Case 1:10-cv-04496-NGG-RER   Document 143   Filed 07/20/11   Page 1 of 15 PageID #: 3333

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 20 2011 ★

BROOKLYN OFFICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF ARIZONA,<br>STATE OF CONNECTICUT,<br>STATE OF IDAHO,<br>STATE OF ILLINOIS,<br>STATE OF IOWA,<br>STATE OF MARYLAND,<br>STATE OF MICHIGAN,<br>STATE OF MISSOURI,<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF NEW HAMPSHIRE,<br>STATE OF OHIO,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>STATE OF UTAH, and<br>STATE OF VERMONT,<br><br>        Plaintiffs,<br><br>        v.<br><br>AMERICAN EXPRESS COMPANY,<br>AMERICAN EXPRESS TRAVEL<br>RELATED SERVICES COMPANY, INC.,<br>MASTERCARD INTERNATIONAL<br>INCORPORATED, and VISA INC.,<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action<br>No. CV-10-4496<br><br>(Garaufis, J.)<br>(Reyes, M.J.) |

## FINAL JUDGMENT AS TO DEFENDANTS
## MASTERCARD INTERNATIONAL INCORPORATED AND VISA INC.

WHEREAS, Plaintiffs, the United States of America and the States of Arizona,

Connecticut, Idaho, Illinois, Iowa, Maryland, Michigan, Missouri, Montana, Nebraska, New

# A1094

Case 1:10-cv-04496-NGG-RER   Document 143   Filed 07/20/11   Page 5 of 15 PageID #: 3337

15.   "Rule" means any rule, bylaw, policy, standard, guideline, or practice applicable to Merchants in the United States.

16.   "Type" means a category of General Purpose Cards, including but not limited to traditional cards, rewards cards, or premium cards (*e.g.*, a "Visa Signature Card" or a "World MasterCard").

17.   "Visa" means Visa Inc., a Delaware corporation with its principal place of business in San Francisco, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees, but shall not include Visa Europe Limited and its wholly owned affiliates.

18.   The terms "and" and "or" have both conjunctive and disjunctive meanings.

### III. APPLICABILITY

This Final Judgment applies to MasterCard and Visa and all other Persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

### IV. PROHIBITED CONDUCT

A.   The purpose of this Section IV is to allow Merchants to attempt to influence the General Purpose Card or Form of Payment Customers select by providing choices and information in a competitive market. This Final Judgment should be interpreted to promote such efforts and not limit them. Accordingly, neither MasterCard nor Visa shall adopt, maintain, or enforce any Rule, or enter into or enforce any agreement that directly or indirectly prohibits, prevents, or restrains any Merchant in the United States from

5

J–5

# A1095

1.      offering the Customer a discount or rebate, including an immediate discount or rebate at the point of sale, if the Customer uses a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

2.      offering a free or discounted product if the Customer uses a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

3.      offering a free or discounted or enhanced service if the Customer uses a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

4.      offering the Customer an incentive, encouragement, or benefit for using a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

5.      expressing a preference for the use of a particular Brand or Type of General Purpose Card or a particular Form of Payment;

6.      promoting a particular Brand or Type of General Purpose Card or a particular Form or Forms of Payment through posted information, through the size, prominence, or sequencing of payment choices, or through other communications to a Customer;

6

J-6

# A1096

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

                  :
                  : 05-MDL-01720 (JG)(JO)
                  :
In re:  PAYMENT CARD       :
                  :
                  : United States Courthouse
INTERCHANGE FEE AND MERCHANT : Brooklyn, New York
                  :
DISCOUNT ANTITRUST      : Friday, November 9, 2012
LITIGATION,            : 11:30 a.m.
                  :
                  :
                  :
                  :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE JOHN GLEESON
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**      SEE FOLLOWING PAGES

Court Reporter:    VICTORIA A. TORRES BUTLER, CRR
                 225 Cadman Plaza East
                 Brooklyn, New York 11201
                 **VButlerRPR@aol.com**

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.

VB     OCR     CRR

# A1097

Proceedings                                          9

1    will start?

2              MS. SWEENEY:  Sure.

3              MR. MONTAGUE:  First of all, you might recall,

4    Your Honor, when we moved for class certification back in, I

5    guess, argued in November, a while ago.

6              THE COURT:  Excuse me -- can everyone who wants to

7    hear, hear?  Can you hear in the back all right?

8              I'll take that as a no.

9              MR. MONTAGUE:  Is this better?  Thank you.

10             You may recall, when we argued the class

11   certification motions a while back, we moved for both a (b)(2)

12   and a (b)(3) class.  The negotiations before the mediators

13   were always -- one issue was monetary, the other issue was

14   equitable relief.  One was not going to be reached without

15   reaching the other.  But there are different classes.  The

16   (b)(3) class is for damages and conduct in the past.  The

17   (b)(2) class is for conduct ongoing in the future.  They're

18   just two separate things.

19             The injunctive relief is meaningful.  It is for the

20   whole purpose of putting downward pressure on the rates and

21   the interchange rates going forward and, over time, we expect

22   that that is exactly what's going to happen.

23             THE COURT:  Let me focus your attention.  There are

24   actually conflicting arguments among the objectors in one

25   sense.  Target and sixteen other retailers say that the

VB        OCR        CRR

# A1098

REVISED APPENDIX F2

NOTICE OF CLASS ACTION SETTLEMENT

AUTHORIZED BY THE U.S. DISTRICT COURT, EASTERN DISTRICT OF NEW YORK

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

*A federal court directed this Notice. This is not a solicitation from a lawyer.*

- The Court has preliminarily approved a proposed $6+ billion settlement in a class action lawsuit, called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720(JG)(JO). The lawsuit is about claims that merchants paid excessive fees to accept Visa and MasterCard cards because Visa and MasterCard, individually, and together with their respective member banks, violated the antitrust laws.

- The monetary portion of the settlement consists of two funds. The first is a cash fund in the amount of $6.05 billion that will pay valid claims of any person, business or other entity that accepted Visa or MasterCard branded credit or debit cards in the U.S. between January 1, 2004 and MM DD, 201Y. The second fund is estimated to be up to approximately $1.2 billion in total and is equivalent to a portion of the interchange fees attributable to merchants that do not exclude themselves from the Rule 23(b)(3) Settlement Class ("Cash Settlement Class") and that accepted Visa and MasterCard credit cards during an eight-month period to begin on MM DD, 201Y. This fund will pay valid claims of members of the Cash Settlement Class that accepted Visa or MasterCard credit cards during the eight-month period.

- The settlement will also require Visa and MasterCard to change some rules for merchants who accept their cards, including to allow merchants to do the following:

  - Charge customers an extra fee if they pay with Visa or MasterCard credit cards,

  - Offer discounts to customers who pay with payment forms less expensive than Visa or MasterCard credit or debit cards,

  - Accept Visa or MasterCard cards at fewer than all of the merchant's trade names or banners, and

  - Form "buying groups" that meet certain criteria to negotiate with Visa and MasterCard.

  The rule changes are explained in greater detail below and in the Class Settlement Agreement.

- The settlement creates two classes: Cash Settlement Class (Rule 23(b)(3) Settlement Class) and Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class).

**QUESTIONS? CALL 1-800-000-0000 OR VISIT**
**WWW.PAYMENTCARDSETTLEMENT.COM**
SI DESEA RECIBIR ESTA NOTIFICACIÓN EN ESPAÑOL, LLÁMENOS O VISITE NUESTRA PÁGINA WEB.

# A1099

**Claim Preregistration Form**

Class members with more than one location or a franchise that accepts Visa or MasterCard cards may also fill out a pre-registration form at the website. You do not have to pre-register but doing so may be helpful, and does not impact your rights in this case.

**What if the Class Administrator doesn't have my data?**

The claim form also allows class members for whom no financial data is available or who were not identified as class members to file a claim. Those merchants will have to fill out and sign a claim form and return it by the deadline.

**Can anyone else file a claim for me?**

There are specialized companies that may offer to fill out and file your claim in return for a percentage of the value of your claim. Before you sign a contract with one of these companies, you should examine the claim-filing process provided here and decide whether it is worth the cost.  You can always seek help from the Class Administrator or Class Counsel.

| |
|---|
| **11. Am I giving up anything by filing a claim or not filing a claim?** |

If the Court finally approves the settlement, members of the Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class) cannot be excluded from the Rule Changes Settlement Class. They will be bound by the terms of that settlement, including releasing all claims that were or could have been alleged in this case against any of the released parties identified in Paragraph 67 of the Class Settlement Agreement.

Members of the Cash Settlement Class (Rule 23(b)(3) Settlement Class) (who do not exclude themselves by the deadline) whether or not they file a claim for payment, will be bound by the terms of that settlement, which include agreeing not to file a claim against any of the released parties identified in Paragraph 32 of the Class Settlement Agreement.

In general, the settlement will resolve and release all claims by persons, businesses and other entities that arise from or relate to their capacity as merchants that accept Visa-Branded Cards and/or MasterCard-Branded Cards in the United States against Visa, MasterCard or banks that were or could have been alleged in the lawsuit, including any claims about interchange or other fees, no-surcharge rules, no-discounting rules, honor-all-cards rules and other rules.

The settlement will also resolve any merchant claims based upon the future effect in the United States of:

•    any Visa or MasterCard rules, as of MM DD, 201Y, that are not to be modified pursuant to the settlement,
•    the modified rules provided for in the settlement, or
•    any other rules substantially similar to any such rules.

The releases will not bar claims involving new conduct or rules in the future that are not substantially similar to either existing conduct or rules or conduct or rules modified by the settlement (*e.g.* imposition of a new rule not substantially similar to existing rules or rules modified by the settlement, or reversion to

# A1100

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 27 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

**IN RE PAYMENT CARD
INTERCHANGE FEE AND MERCHANT
DISCOUNT ANTITRUST LITIGATION**

**This Document Applies to: All Cases.**

No. 05-MD-1720 (JG) (JO)

---

## CLASS SETTLEMENT PRELIMINARY APPROVAL ORDER

WHEREAS, the Court has considered the Definitive Class Settlement Agreement, including its Appendices, fully executed as of October 19, 2012 (the "Class Settlement Agreement") among the Class Plaintiffs and the Defendants, which sets forth the terms and conditions for a proposed settlement of the Class Actions in MDL 1720, and the termination and disposition of all causes of action against the Defendants in those Class Actions with prejudice;

WHEREAS, the Court has considered the motion of Class Plaintiffs for preliminary approval of the Class Settlement Agreement, the Memorandum of Law and evidence filed in support thereof, the objections to preliminary approval of the Class Settlement Agreement and all evidence filed in support of such objections, and all other papers submitted in connection with the Class Settlement Agreement; and

WHEREAS, the Court held a hearing on November 9, 2012, at which the Court heard argument on whether the Class Settlement Agreement should be preliminarily approved;

NOW, THEREFORE, IT IS HEREBY ORDERED AND DECREED as follows:

1.    This Class Settlement Preliminary Approval Order incorporates by reference the definitions in the Class Settlement Agreement, and all terms herein shall have the same meanings as set forth in the Class Settlement Agreement.

1

# A1101

2.      The Court has subject matter and personal jurisdiction over the Class Plaintiffs, all members of the settlement classes provisionally certified below, and the Defendants.

3.      The Court preliminarily approves the Class Settlement Agreement, including specifically the Plan of Administration and Distribution contained in Appendix I of the Class Settlement Agreement, as within the range of a fair, reasonable, and adequate settlement within the meaning of Federal Rule of Civil Procedure 23 and applicable law, and consistent with due process.

4.      The Court orders Class Counsel, the Visa Defendants, and the MasterCard Defendants to establish and maintain the Class Settlement Cash Escrow Account(s) and the Class Settlement Interchange Escrow Account(s) as provided in Paragraphs 6-8 of the Class Settlement Agreement, the Class Settlement Cash Escrow Agreement in Appendix B to the Class Settlement Agreement, and the Class Settlement Interchange Escrow Agreement in Appendix C to the Class Settlement Agreement.

5.      Based on and pursuant to the class action criteria of Federal Rules of Civil Procedure 23(a) and 23(b)(3), the Court provisionally certifies, for settlement purposes only, a Rule 23(b)(3) Settlement Class, from which exclusions shall be permitted, consisting of all persons, businesses, and other entities that have accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that this Class does not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date, or the United States government.

2

6.      Based on and pursuant to the class action criteria of Federal Rules of Civil Procedure 23(a) and 23(b)(2), the Court provisionally certifies, for settlement purposes only, a Rule 23(b)(2) Settlement Class, from which exclusions shall not be permitted, consisting of all persons, businesses, and other entities that as of the Settlement Preliminary Approval Date or in the future accept any Visa-Branded Cards and/or MasterCard-Branded Cards in the United States, except that this Class shall not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time since January 1, 2004, or do so in the future, or the United States government.

7.      The definitions of the proposed classes in the Operative Class Complaints are hereby amended to be the same as the settlement classes provisionally certified above.

8.      In the event of termination of the Class Settlement Agreement as provided therein, certification of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class shall automatically be vacated and each Defendant may fully contest certification of any class as if no Rule 23(b)(3) Settlement Class or Rule 23(b)(2) Settlement Class had been certified.

9.      The Court finds and concludes that the Class Plaintiffs will fairly and adequately represent and protect the interests of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class, and appoints them to serve as the representatives of those Settlement Classes. Based on and pursuant to the criteria of Federal Rule of Civil Procedure 23(g), the Court appoints the law firms of Robins, Kaplan, Miller & Ciresi L.L.P., Berger & Montague, P.C., and Robbins Geller Rudman & Dowd LLP to serve as Class Counsel.

3

10.     The notice requirements of the Class Action Fairness Act, 28 U.S.C. § 1715, have been met.

11.     The Court appoints Epiq Systems, Inc. as the Class Administrator to assist Class Counsel in effectuating and administering the Notice Plan delineated in Appendix E to the Class Settlement Agreement and the exclusion process for Opt Outs, in analyzing and evaluating the amount of the Class Exclusion Takedown Payments and the Default Interchange Payments, and in effectuating and administering the claims process for members of the Rule 23(b)(3) Settlement Class.

12.     The Court determines that notice should be provided to members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class, but that exclusion rights should be afforded only to members of the Rule 23(b)(3) Settlement Class as to their participation in the Rule 23(b)(3) Settlement Class.

13.     The Court approves the method of notice to be provided to the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class that is described in the Class Settlement Agreement and in the Notice Plan contained in Appendix E to the Class Settlement Agreement, including use of the long-form website and mail notice and the publication notice contained in Appendix F to the Class Settlement Agreement. The Court finds and concludes that such notice: (a) is the best notice that is practicable under the circumstances, and is reasonably calculated to reach the members of the Rule 23(b)(3) Settlement Class and Rule 23(b)(2) Settlement Class that would be bound by the Class Settlement Agreement and to apprise them of the Action, the terms and conditions of the Class Settlement Agreement, their right to opt out and be excluded from the Rule 23(b)(3) Settlement Class, and to object to the Class Settlement Agreement; and (b) meets the requirements of Federal Rule of Civil Procedure 23 and due process.

4

14.     Consistent with the Notice Plan, the Court directs the Class Administrator, as soon as practicable following the Court's entry of this Class Settlement Preliminary Approval Order, but before commencement of the mail and publication notice, to establish the dedicated Case Website, post office box, and toll-free telephone line for providing notice and information to members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class, and receiving exclusion requests from members of the Rule 23(b)(3) Settlement Class.

15.     Within ninety days following the Court's entry of this Class Settlement Preliminary Approval Order, the Class Administrator shall complete the mail and publication notice to members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class that is described in the Notice Plan, using the long form mail notice and the publication notice contained in Appendix F to the Class Settlement Agreement.

16.     As explained in the long-form notice and publication notice, any member of the Rule 23(b)(3) Settlement Class that does not wish to participate in the Rule 23(b)(3) Settlement Class shall have until one hundred eighty days after the Court's entry of this Class Settlement Preliminary Approval Order— i.e., ninety days after the last date for completion of the mail and publication notice (the "Class Exclusion Period")— to submit a request to become an Opt Out and be excluded from the Rule 23(b)(3) Settlement Class.

17.     A member of the Rule 23(b)(3) Settlement Class may effect such an exclusion by sending a written request to the Class Administrator, by first-class mail with postage prepaid and postmarked within the Class Exclusion Period. The written request must be signed by a person authorized to do so, and provide all of the following information:

(a)     The words "In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation."

(b)     A statement of the Rule 23(b)(3) Settlement Class member's full name, address, telephone number, and taxpayer identification number.

(c)     A statement that the Rule 23(b)(3) Settlement Class member desires to be excluded from the Rule 23(b)(3) Settlement Class, and by what position or authority he or she has the power to exclude the member from the Rule 23(b)(3) Settlement Class.

(d)     The business names, brand names, and addresses of any stores or sales locations whose sales the Rule 23(b)(3) Settlement Class member desires to be excluded from the Rule 23(b)(3) Settlement Class.

18.     As also explained in the long-form notice and publication notice, any Rule 23(b)(3) Settlement Class member that does not submit a request for exclusion, or any Rule 23(b)(2) Settlement Class member, shall have until one hundred eighty days after the Court's entry of the Class Settlement Preliminary Approval Order— i.e., ninety days after the last date for completion of the mail and publication notice (the "Class Objection Period")— to submit an objection to the Class Settlement Agreement, any request for Attorneys' Fee Awards, any request for Expense Awards, or any request for Class Plaintiffs' Awards (be an "Objector"), and to file any notice to appear.

19.     Such an Objector must file a written statement of objections with the Court within the Class Objection Period, and send it to the following designees of Class Counsel and counsel for the Defendants, by first-class mail and postmarked within the Class Objection Period:

Designee of Class Counsel: Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101-3301.

Designee of Defendants: Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019.

20.     The Objector's written statement of objections must: (a) contain the words "In re Interchange Fee and Merchant Discount Antitrust Litigation"; (b) state each and every objection

6

of the Objector and the specific reasons therefor; (c) provide all legal support and all evidence

that the Objector wishes to bring to the Court's attention in support of any objection; (d) state the

full name and address and telephone number of the Objector; (e) provide information sufficient

to establish that the Objector is a member of the Rule 23(b)(3) Settlement Class and/or the Rule

23(b)(2) Settlement Class; and (f) state the full name, mail address, email address, and telephone

number of any counsel representing the Objector in connection with the objections.

21.     In addition, any Objector or counsel for an Objector that desires to appear at the

final approval hearing must file with the Court within the Class Objection Period, and send to the

designees of Class Counsel and the Defendants identified above, by first class mail and

postmarked within the Class Objection Period, a separate notice of intention to appear that

identifies by name, position, address, and telephone number each person who intends to appear

at the final approval hearing on behalf of the Objector.

22.     Prior to forty five days before the end of the Class Exclusion Period and Class

Objection Period — i.e., within one hundred thirty five days after the Court's entry of this Class

Settlement Preliminary Approval Order — Class Counsel will file all motion and supporting

papers seeking the Court's final approval of the Class Settlement Agreement, and the Court's

approval of any Attorneys' Fee Awards, Expense Awards, or Class Plaintiffs' Awards with

respect to any Class Action in MDL 1720. Class Counsel will also file any additional details

regarding the Plan of Administration and Distribution, after timely and regular consultation with

the Defendants and subject to the Court's approval, prior to forty-five days before the end of the

Class Exclusion Period and Class Objection Period. Class counsel will provide notice of such

motions and any additional details to members of the Rule 23(b)(3) Settlement Class and to

members of the Rule 23(b)(2) Settlement Class by causing all such motions and supporting

7

papers, and any additional details regarding the Plan of Administration and Distribution, to be posted prominently on the Case Website prior to, or simultaneously with, their filing with the Court.

23.     Within one hundred ninety-five days after the Court's entry of the Class Settlement Preliminary Approval Order— i.e., within fifteen days after the conclusion of the Class Exclusion Period — the Class Administrator shall prepare a report, and file it with the Court and provide it to the following designees of Class Counsel, the Visa Defendants, the MasterCard Defendants, and the Bank Defendants:

> Designee of Class Counsel: Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101-3301.

> Designee of Visa Defendants: Matthew A. Eisenstein, Arnold & Porter LLP, 555 Twelfth Street, NW, Washington, DC 20004.

> Designee of MasterCard Defendants: Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019.

> Designee of Bank Defendants: Peter E. Greene, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036.

24.     The Class Administrator's report shall:

(a)     Confirm that the Notice Plan was carried out and that the website notice, mail notice, publication notice, and any other notice to members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class was provided in the manner directed by the Court.

(b)     Identify the date when the Case Website was fully established and its content made available to the members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class, the date or dates on which mail notices were mailed, the dates of the publication notices, and the date or dates of any other notice directed by the Court.

(c)     List each member of the Rule 23(b)(3) Settlement Class that sought to become an Opt Out and be excluded from the Rule 23(b)(3) Settlement Class, and on what date

# A1108

the request to be excluded was postmarked and received, and state whether the Rule 23(b)(3) Settlement Class member's request for exclusion was timely and properly made.

(d)    Attach a copy of all documentation concerning each request for exclusion that the Class Administrator received, with any taxpayer identification number, or other confidential information filed under seal with the Court.

25.    As provided in the Class Settlement Agreement, within approximately two hundred forty days after the Court's entry of the Class Settlement Preliminary Approval Order, in the event that the Class Plaintiffs and the Defendants have not resolved all differences regarding the amount of the Class Exclusion Takedown Payments to be made to the Visa Defendants and the MasterCard Defendants, they shall submit their dispute to the Court for resolution in connection with the final approval hearing, so that the Court's Class Settlement Order and Final Judgment may identify each Opt Out and state the Class Exclusion Takedown Payments to be made, respectively, to the Visa Defendants and to the MasterCard Defendants from the Class Settlement Cash Escrow Account(s) as provided in the Class Settlement Agreement.

26.    The Class Administrator's expenses for the foregoing notice and exclusion activities, including those of any third-party vendors it uses to perform tasks necessary for the implementation or effectuation of its duties, shall be paid from the Class Settlement Cash Escrow Account(s). In no event shall any Defendant, Rule 23(b)(3) Settlement Class Released Party, or Rule 23(b)(2) Settlement Class Released Party have any obligation, responsibility, or liability with respect to the Class Administrator, the Notice Plan, or the exclusion procedures for members of the Rule 23(b)(3) Settlement Class, including with respect to the costs, administration expenses, or any other charges for any notice and exclusion procedures.

9

# A1109

27.     The Court will hold a final approval hearing at least two hundred eighty five days after the Court's entry of this Class Settlement Preliminary Approval Order, at *10* o'clock on *September 12* 2013, at the Courthouse for the United States District Court for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, NY 11201. At that final approval hearing, the Court will conduct an inquiry as it deems appropriate into the fairness, reasonableness, and adequacy of the Class Settlement Agreement, address any objections to it, and determine whether the Class Settlement Agreement and the Plan of Administration and Distribution should be finally approved, whether final judgment should be entered thereon, and whether to approve any motions for Attorneys' Fee Awards, Expense Awards, and Class Plaintiffs' Awards.

28.     The Court stays all further proceedings in this Action as between the Class Plaintiffs or any other plaintiff in a putative class action consolidated in MDL 1720, and the Defendants or any other defendant in a putative class action consolidated in MDL 1720, except for proceedings in MDL 1720 related to effectuating and complying with the Class Settlement Agreement, pending the Court's determination of whether the Class Settlement Agreement should be finally approved or the termination of the Class Settlement Agreement.

29.     The Court enjoins the members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class, pending the Court's determination of whether the Class Settlement Agreement should finally be approved or the termination of the Class Settlement Agreement, from challenging in any action or proceeding any matter covered by this Class Settlement Agreement or its release and covenant not to sue provisions, except for (a) proceedings in MDL 1720 related to effectuating and complying with the Class Settlement Agreement; and (b) any Opt Out's claims for damages based on any conduct, acts, transactions, events, occurrences, statements, omissions, or

# A1110

failures to act of any Rule 23(b)(3) Settlement Class Released Party prior to the date of the Court's

entry of this Class Settlement Preliminary Approval Order.

IT IS SO ORDERED.

DATED: _November 27, 2012_                s/John Gleeson
                                _____
                                THE HONORABLE JOHN GLEESON
                                UNITED STATES DISTRICT JUDGE

11

# A1111


KENNY
NACHWALTER

1100 MIAMI CENTER
201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131-4327
TELEPHONE 305.373.1000
FACSIMILE 305.372.1861
WWW.KENNYNACHWALTER.COM

E-Mail
wblechman@knpa.com

November 29, 2012

Honorable John Gleeson                                    ***Via ECF***
United States District Judge
United States Federal Courthouse
225 Cadman Plaza East
Room 727
Brooklyn, New York  11201

Re:   ***In re Payment Card Interchange Fee and Merchant
      Discount Antitrust Litigation - MDL No. 1720***

Dear Judge Gleeson:

Pursuant to the Court's Order of November 27, 2012, we write on behalf of the Individual Plaintiffs[1] in opposition to the Objecting Plaintiffs' motion to stay the Class Settlement Preliminary Approval Order.  The Individual Plaintiffs submit this letter as members of the Rule 23(b)(2) Class.   We oppose the Objecting Plaintiffs' motion because it would delay implementation of the Visa and MasterCard Rule reforms in the Class Settlement – which is required sixty (60) days after the Approval Order, *i.e.*, January 27, 2013 – and that would materially harm merchants in the Rule 23(b)(2) settlement class.

The Class Settlement Agreement requires a number of important reforms in the Visa and MasterCard payment systems:

- It reforms the Visa and MasterCard no-surcharge rules, which previously had barred merchants from surcharging credit cards at the brand (*i.e.*, Visa, MasterCard) and product (*e.g.*, Visa Classic, Visa Traditional Rewards, Visa Signature, MasterCard Standard, MasterCard World, MasterCard World Elite) level.   Merchants will now be able to engage in brand- or product-level surcharging of Visa and MasterCard credit cards up to certain amounts related to

---

[1]        The Individual Plaintiffs include: Ahold U.S.A., Inc.; Albertson's Inc.; BI-LO, LLC; Bruno's Supermarkets, Inc.; Delhaize America, Inc.; Eckerd Corporation; The Great Atlantic & Pacific Tea Company; H.E. Butt Grocery Company; Hy-Vee, Inc.; The Kroger Co.; Maxi Drug, Inc. (and doing business as Brooks Pharmacy); Meijer, Inc.; Meijer Stores Limited Partnership; Pathmark Stores, Inc.; Publix Supermarkets, Inc.; QVC, Inc.; Raley's; Rite Aid Corporation; Safeway, Inc.; SuperValu Inc.; Wakefern Food Corporation; and Walgreen Co.

TEXAS OFFICE
ONE CONGRESS PLAZA
111 CONGRESS AVENUE, SUITE 1060
AUSTIN, TEXAS 78701
TELEPHONE 512.480.8023
FACSIMILE 512.480.8037

WASHINGTON SATELLITE OFFICE
1101 PENNSYLVANIA AVENUE, N.W., 6TH FLOOR
WASHINGTON, D.C. 20004-2436
TELEPHONE 202.756.4373
FACSIMILE 202.756.7323

**Honorable John Gleeson**                                    **November 29, 2012**
                              **Page 3**
_____

that high-priced card.[2]  A customer who values a lower ticket price instead of the rewards may decide instead to pay with lower-cost payment means such as a PIN debit card or a lower cost credit card.  The customer can make an informed choice of payment based on price information conveyed by the merchant at the POS (and elsewhere), and customers paying with lower cost payment means can stop subsidizing the prices charged customers who pay with more expensive payment methods.  A merchant whose credit card acceptance costs have spiraled not because of interchange rates on basic Visa or MasterCard consumer credit cards but because of premium rewards credit cards can target those high-priced cards with product-level surcharging.  If Visa or MasterCard does not want to be disfavored at the POS by merchant surcharging of its credit cards or discounting of its rivals' cards, or wants to be favored at the POS by merchant discounting of its cards, then it will be incentivized to compete on price for merchant credit and debit card volume.  It is that price competition for merchants' card volume which will ultimately give merchants the ability to constrain their Visa and MasterCard card acceptance costs.

This is not merely a theoretical outcome.  In Australia, where the central bank required Visa and MasterCard to remove their no-surcharge rules in 2003, and American Express voluntarily agreed to do so as well, Visa, MasterCard and American Express have reportedly significantly reduced their interchange rates[3] to merchants who were willing to forego surcharging in return for an even lower (read "competitive") rate.  That dynamic can occur in the United States if the Visa and MasterCard Rule reforms are implemented.  This will empower and enable merchants who accept those networks' cards to communicate with their customers about price and payment preference, steer Visa and MasterCard cardholders to lower cost payment means, and put pressure on other networks to reform their anti-steering rules or policies as well.  None of that will happen, however, if the Court stays implementation of the Rule modifications in the Class Settlement.

The Rule reforms in the Class Settlement were not easily achieved and represent the culmination of more than fifteen (15) years of continuous litigation over the Visa and MasterCard system.  In 1996, Wal-Mart and several other large merchants brought a class action against Visa and MasterCard over their Rules requiring merchants to accept their credit and debit card products.  The *Wal-Mart* case also challenged Visa's and MasterCard's interchange rate setting.  In 1998, the United States sued Visa and MasterCard over *inter alia* their Rules barring banks issuing their cards from issuing cards of any other network.  In 2004, Visa and MasterCard settled the *Wal-Mart* case based upon, among other consideration, a release that extinguished merchants' clams for *any* conduct by Visa or MasterCard (or their

_____

[2]        The Class Settlement Agreement sets forth the arithmetic to be used to compute the upper bounds of the surcharge.

[3]        The networks call these fees "merchant discount rates," but there is nothing about these fees that represents a "discount" to merchants.

_____

KENNY NACHWALTER, P.A.

**Honorable John Gleeson**                                    **November 29, 2012**
### Page 4

banks), including interchange rates and rules, at any time prior to January 1, 2004. Before Visa and MasterCard fully funded the *Wal-Mart* settlement, merchants filed the present case in 2005. This case, *In re Interchange Rate and Merchant Discount Fee Antitrust Litigation*, MDL 1720 (E.D.N.Y.), took up the unfinished business in *Wal-Mart*, principally the alleged collective setting of interchange rates and the networks' anti-steering rules.

In response to the Complaints in MDL 1720, MasterCard (2006) and Visa (2008) restructured into single entities through initial public offerings. The IPOs removed the banks from their boardrooms and the business of setting, or participating in the setting, of Visa and MasterCard interchange rates. That left the Rules in need of reform, as Plaintiffs in MDL 1720 alleged that interchange rates remained artificially elevated because of the networks' anti-steering rules.

The discovery record from MDL 1720 provided Congress and the Justice Department with a substantial record on which to evaluate those Rules. Congress acted first with the Durbin Amendment in 2010. The next year, the Justice Department extended on the Durbin Amendment in the Consent Decree with Visa and MasterCard. American Express refused to enter into the Consent Decree, thus prompting the United States to bring an antitrust case against that network because of its anticompetitive no-discrimination rule/policy. *See United States and Certain Plaintiff States v. American Express Company et al.*, Case No. 10-CV-4496 (E.D.N.Y.) The Class Settlement Agreement in MDL 1720 now extends on this reform process. Combined with the Durbin Amendment and the DOJ Consent Decree, the Class Settlement provides merchants with a full complement of cardholder steering tools at the POS, including surcharging, to incent Visa and MasterCard to compete on price for merchants' card volume.

This real, substantial and important progress will be jeopardized if the Court delays implementation of the Rule reforms in the Class Settlement, and merchants in the Rule 23(b)(2) class will be materially harmed as a result. There are several reasons for this material harm:

First, the benefits of the Rule reforms to merchants and consumers as described above will not be realized as long as the Visa and MasterCard Rule modifications in the Class Settlement are not implemented as scheduled on January 27, 2013. It was no small feat for the Class to negotiate to require Visa and MasterCard to implement their Rule modifications sixty (60) days after the Court's Preliminary Approval Order rather than after the Final Approval Order (which conventionally occurs). As a result, merchants in the Rule 23(b)(2) class will get the benefits of those Rule reforms on January 27, 2013 rather than at some time *after* September 12, 2013, which is the current date of the Fairness Hearing. The ultimate date of implementation of the Rule reforms could very well be substantially later than September 12, 2013 depending upon when the Court issues its fairness ruling and appeals, if any. It is no stretch to think that unless the Court allows the Class Settlement Agreement to be implemented now, it could be years before the Rule modifications go into effect depending upon the nature and disposition of motions to appeal the Court's fairness decision. In the meantime, merchants will be deprived of tools they need at the POS to cause Visa and MasterCard to compete on price for merchants' credit and debit card volume. A stay of the Class Settlement Preliminary

# A1114

ROBINS, KAPLAN, MILLER & CIRESI LLP

2800 LASALLE PLAZA
800 LASALLE AVENUE
MINNEAPOLIS, MN  55402-2015
TEL: 612-349-8500  FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

K. Craig Wildfang
KCWildfang@rkmc.com
612-349-8554

December 10, 2012

The Honorable James Orenstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   *In re Payment Card Interchange Fee and Merchant Discount Antitrust*
> *Litigation,* Case No. 1:05-md-1720-(JG)(JO)

Dear Judge Orenstein:

I write on behalf of Class Plaintiffs to renew and supplement our motion of October 12, 2011 [D.E. 1531][1] to compel certain documents from third party American Express. We respectfully request that the Court issue an order in the form of the attached proposed order[2] compelling the production of the 59 documents enumerated in the October 2011 motion, and 39 documents relating to the same topic that have since been produced in *In re American Express Anti-Steering Rules Antitrust Litigation*, MDL 2221 ("*Amex ASR*"). In the alternative, Class Plaintiffs request leave of Court to serve a subpoena on American Express that requests the documents referenced in this motion. Class Plaintiffs respectfully request oral argument on this motion at a mutually convenient time after American Express submits its response.

As Judge Gleeson made clear at the preliminary-approval hearing, the efficacy of merchant surcharging as a competition-inducing tool is centrally relevant to the evaluation of the injunctive relief in the settlement agreement. Counsel in *Amex ASR* have advised Class counsel, in general terms, that the documents referenced in this motion contain singularly powerful evidence regarding the efficacy of merchant surcharging in fostering competitive pressures in the marketplace. We understand that these documents relate to American Express's experience with merchant surcharging in Australia after it rescinded its

---

[1]      For the Court's convenience, the parties' briefing on this motion is attached as Exhibit 1.
[2]      Exhibit 2.

ATLANTA          BOSTON          LOS ANGELES          MINNEAPOLIS          NAPLES          NEW YORK

December 10, 2012
Page 2

anti-surcharging rules in connection with the RBA reforms.[3] More specifically, we understand that the documents focus largely on Amex's experiences beginning in 2007-08, when merchant surcharging in Australia began to take hold. According to counsel in that litigation—some of whom are also among Class counsel and Individual Plaintiffs' counsel in MDL 1720—these documents will provide a significantly clearer picture of the real value and efficacy of merchant surcharging than any other documents produced to date in MDL 1720.[4] This motion is not within the scope of the stay issued by this Court in its Preliminary Approval Order because it helps effectuate the Class Settlement Agreement by assisting the Court in determining whether to finally approve the settlement.[5]

Class Plaintiffs served the subpoena on American Express on November 9, 2007 and amended it on November 14, 2008.[6] Class Plaintiffs' October 2011 motion was fully briefed but never decided. On October 24, 2012, Class counsel wrote a letter to counsel for American Express, asking that it produce the documents in the proposed order.[7] On a telephone conference on November 21, American Express refused, which it confirmed on November 29. The parties are therefore at impasse.

We do not understand American Express to question the relevance of the requested documents. Instead, it claimed that it is excused from compliance because: (i) the request for documents occurred after the close of discovery; (ii) compliance would impose undue burden on it; and (iii) it was entitled to special treatment as a "nonparty." None of these arguments justify American Express's resistance.

*First*, the discovery cutoff is irrelevant to this motion because American Express has a duty to supplement its discovery responses, even after the discovery close. Rule 45 imposes the same obligations on subpoena recipients as parties to litigation.[8] Under Rule 26(e), a party must supplement its discovery responses if it

---

[3]    The RBA ordered Visa and MasterCard to decrease their interchange rates and repeal their no-surcharge rules. The RBA also secured "voluntary undertakings" from American Express and Diner's Club to repeal their own restrictions on merchant surcharging. *See* Reserve Bank of Australia, Reform of Australia's Payments System: Conclusions of the 2007/08 Review, Table 1 (Sept. 2008) *available at http://www.rba.gov.au/payments-system/reforms/review-card-reforms/index.html*.

[4]    We have not been advised of the content of the documents sought, but we understand all of these documents are responsive to Request Nos. 4-8 in Class Plaintiffs' Subpoena to American Express. *See* Exhibit A to Cl. Pls' Oct. 12, 2011 Ltr. Br. [Exhibit 1 to this motion.]

[5]    *See* Prelim. App. Or., Dkt. # 1745 ¶ 28 (Nov. 27, 2012).

[6]    *See* Exhibit A to Cl. Pls' Oct. 12, 2011 Ltr. Br. [Exhibit 1 to this motion.]

[7]    Ltr., R. Marth to P. Korologos, Oct. 24, 2012. [Exhibit 3.]

[8]    Fed. R. Civ. P. 45, Adv. Cmte. Notes, 1991 Am., subd (a).

December 10, 2012
Page 3

―――――――――――――――――――――――――――――――――――――――

"learns that in some material respect [its response] is incomplete or incorrect," or "as ordered by the Court." The "unexplained and unexcused delay" that American Express attributed to Class Plaintiffs in its prior motion response does not relieve it of its obligations under Rule 45. Moreover, while the requested documents were produced in *AmEx ASR*, they were not produced there until some years after the close of discovery in this case.  Thus, Class Plaintiffs had no way to know of the existence of these documents –which should have been produced here in any event.[9]

*Second*, the alleged burden to American Express is non-existent.   American Express claims that producing the requested documents requires it to provide notice to third parties (for example, merchants) whose commercial arrangements are reflected in those documents.  We are advised by counsel in the *Amex ASR* cases, however, that third-party information is minimal in the documents sought, and could readily be redacted or anonymized. In fact, American Express produced some documents in MDL 1720 with merchants' names redacted or anonymized. This "burden" is also overstated inasmuch as American Express has already provided notice to the appropriate parties that information relating to them would be produced in Amex ASR.

*Third*, American Express is not the "quintessential disinterested bystander" that courts seek to protect from third-party discovery.[10] American Express has rules similar to those being reformed in MDL 1720, which are the subject of coordinated proceedings before Judge Garaufis. As American Express acknowledges in its objection, its "*primary interest*" is maintaining its own anti-steering restraints[11]—an objective that has been enabled by the presence of Visa and MasterCard's anti-steering rules. One of the significant benefits of the rules reforms obtained by Class Plaintiffs is that the substantial rescission of Visa and MasterCard's rules exposes American Express's policies to new competitive pressures. American Express has a clear stake here and should not be allowed to benefit from the fact that its case is pending down the hall from this one.

―――――――――――――――

[9]        *See Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 80 (W.D.N.Y. 2011) (ordering supplementation of discovery responses with documents created after close of discovery); *See Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 19-21 (S.D.N.Y. 1995) (compelling plaintiff to produce records created after its initial response to defendant's request).

[10]        *See Dow Chem. Co. v. Reinhard*, 2008 U.S. Dist. LEXIS 35398, at *5 (S.D.N.Y. Apr. 29, 2008).

[11]        Obj. of American Express at 9 [D.E. 1680] (Nov. 2, 2012) ("American Express' primary interest is to protect its ability to compete effectively against Visa and MasterCard in the payments industry by, among other things, shielding its consumers from discriminatory treatment imposed by merchants (including surcharges)."

**A1117**

December 10, 2012
Page 4

---

There is no dispute that the documents Class Plaintiffs request will be highly relevant at final approval. As set forth above, American Express's arguments for resisting production are not justified. Class Plaintiffs therefore respectfully request that the Court grant their motion and issue an order in the form of the attached, proposed Order.

Respectfully submitted,

*s/ K. Craig Wildfang*

K. Craig Wildfang

cc:     All counsel of record (via ECF)

83553164.1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**IN RE PAYMENT CARD**
**INTERCHANGE FEE AND MERCHANT**          Case No. 05-MD-01720 (JG) (JO)
**DISCOUNT ANTITRUST LITIGATION**

                                          **ORAL ARGUMENT REQUESTED**

**This Document Applies to:  All Actions.**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF FINAL**
**APPROVAL OF DEFINITIVE CLASS SETTLEMENT AGREEMENT**

The Visa and MasterCard network rules modifications provided in the settlement will provide merchants with additional ways to steer customers to use other brands and forms of payment, thereby addressing class plaintiffs' claim that "anti-steering" and other rules have insulated Visa and MasterCard from competition and allowed them to set default interchange rates at inflated levels.  The rules modifications more than adequately address class plaintiffs' claims, especially given the unlikelihood that class plaintiffs could establish liability or a basis for injunctive relief.

The settlement does not modify the Visa and MasterCard default interchange rules or mandate a reduction in interchange rates.  This is entirely appropriate, given the other consideration provided to merchants, the evidence demonstrating the pro-competitive nature of default interchange, and the networks' IPOs.

## II. THE RULE 23(b)(2) SETTLEMENT CLASS IS PROPER

Objectors to the settlement to date primarily have attacked the Rule 23(b)(2) Settlement Class.  As demonstrated below, those objections lack merit.

### A. The Rule 23(b)(2) Settlement Class Is Proper Despite Class Plaintiffs' Damages Claims Because a Separate Rule 23(b)(3) Settlement Class Is Settling the Damages Claims

Some objectors have argued that the Rule 23(b)(2) Settlement Class is improper because class plaintiffs claim substantial money damages, which the objectors say cannot be sought by a Rule 23(b)(2) class, due to the decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  But the Rule 23(b)(2) Settlement Class is seeking only injunctive relief, which would modify the rules and practices of the Visa and MasterCard networks prospectively.  That Class is not seeking damages for past conduct.  Those damages claims are the subject of the relief being sought and settled by the separate Rule 23(b)(3) Settlement Class.

# A1120

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

In re PAYMENT CARD INTERCHANGE : MDL No. 1720(JG)(JO)
FEE AND MERCHANT DISCOUNT :
ANTITRUST LITIGATION : Civil No. 05-5075(JG)(JO)
 :
———————————————————— :
 : MEMORANDUM IN SUPPORT OF CLASS
This Document Relates To: : PLAINTIFFS' MOTION FOR FINAL
 : APPROVAL OF SETTLEMENT
ALL ACTIONS. :
 : Judge: The Honorable John Gleeson
———————————————————— x Date: September 12, 2013
 Time: 10:00 a.m.
 Courtroom: 6C

830006_2

# A1121

## I.     Introduction

Class Counsel, on behalf of Class Plaintiffs, respectfully request that this Court finally approve a proposed class action settlement that:

- Creates two cash funds, with a combined estimated value of $7.25 billion;

- Gives class members the right to surcharge credit transactions, which could result in savings estimated to be more than $26 billion over the next decade;

- Gives merchants the ability to join together in "buying groups" to negotiate with Visa and MasterCard for better rates;

- Permits merchants to utilize different acceptance strategies at different outlets; and

- Locks in minimum price, discounting, and cost-information reforms.

With the largest-ever cash relief in an antitrust class action settlement plus unprecedented rules changes that will enable merchants to recover their costs of credit card acceptance, encourage customers to use less-costly payment methods and brands, increase transparency at the point of sale, and make the payment card market more competitive, the proposed settlement is far more than "fair, adequate, and reasonable."  The agreement was negotiated at arm's length by highly experienced antitrust counsel, with the assistance of two nationally-recognized mediators and the Court, and reached only after the completion of all fact and expert discovery and following the briefing and argument of numerous dispositive motions and a motion for class certification.  Because this settlement easily satisfies the standard for assessing whether a settlement is fair, adequate, and reasonable, Class Counsel respectfully urge that final approval is warranted.

In support of their motion, Class Counsel also submit the declarations of the Honorable Edward A. Infante (Ret.), Professor Eric D. Green, the Honorable Charles B. Renfrew (Ret.), Dr.

- 1 -

830006_2

Objectors also argue that the surcharging relief is worthless for merchants that do business only in a state prohibiting surcharging.[46] This objection ignores the manner in which Visa and MasterCard set interchange rates: on a nationwide basis, not state-by-state. Thus if, as expected, surcharging by merchants in those states where surcharging is permitted causes interchange rates to decline, that decline will be enjoyed by merchants in *all* states.[47] As Dr. Frankel states, "[w]ith common interchange fees throughout the United States, the constraining effect of surcharging and potential surcharging in states where it is possible to surcharge protects even merchants located in states that prohibit surcharging." Frankel Decl., ¶59. Merchants that choose not to surcharge will likewise benefit from the competitive pressure exerted by merchants that do surcharge, or that threaten to surcharge. *Id.*, ¶60.

Objectors also complain that the "level-playing-field" provision makes it impossible for merchants to surcharge, because most merchants that accept Visa and MasterCard also accept American Express. While American Express's limitations on surcharging may currently present some impediment to universally surcharging Visa and MasterCard, that impediment is not as great as objectors claim. A significant number of merchants that accept Visa and MasterCard do not accept American Express, and so are literally unconstrained by American Express' rules. *The Nilson Report*, Issue No. 1011, at 10 (Feb. 2013) (of the roughly 9 million merchant acceptance locations

---

[46]     Dkt. No. 1925, *see* form objection; Dkt. No. 1681 at 7-8, Obj Opp to Prelim App.

[47]     If Visa or MasterCard were to modify their interchange-setting policies in response to surcharging in some states, that conduct would not be protected by the release from future suit. SA, ¶68(g)-(h) (claims challenging these new practices would not be claims "alleged or which could have been alleged" in the litigation, and would not be "substantially similar" conduct or rules). Such conduct might also stimulate retraction of the no-surcharge legislation, or indeed, constitute a violation of the Settlement Agreement.

- 37 -

# A1123

currently in the United States that accept Visa and MasterCard, only 6.2 million also accept American Express).[48]  Thus, there are almost 3 million merchants for whom the level-playing-field provision does not apply, and who can currently surcharge Visa and MasterCard transactions due to this Settlement.  In addition, merchants that want to surcharge Visa and MasterCard may choose to ignore American Express's anticompetitive rules (which are currently being challenged by the Justice Department), and surcharge all three brands, or may choose to discontinue accepting American Express.  As Dr. Frankel explains, "even modest responses to the threat of surcharging or modest amounts of surcharging will result in substantial savings and recoupment of costs by merchants."  Frankel Decl., ¶66.  *See also id.*, ¶63 ("although American Express' policy, while it persists, reduces the ability of merchants to use surcharge strategies to lower their costs, it does not eliminate it").[49]

Some objectors complain that the Settlement does not go far enough in its reform of Visa and MasterCard no-surcharge rules, because merchants cannot surcharge debit transactions.[50]  However, since the Federal Reserve Bank capped most debit interchange fees at 21 cents plus 0.05% of the transaction following enactment of the Durbin Amendment, the average debit interchange paid per transaction for Visa and MasterCard debit has decreased drastically, from 43 cents to 24 cents.  *See* Federal Reserve Board:  Average Debit Card Interchange Fee by Payment Card Network (*available at* http://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm) (last visited

---

[48]     Frankel Decl. at n.80.

[49]     This litigation, even if tried to verdict, cannot address state legislation or American Express's rules.

[50]     Dkt. No. 1681 at 2; 6-7, Obj Opp to Prelim App.

# A1124

April 10, 2013).  Thus, as the objectors concede, most merchants will want to steer credit card users to debit, not away from debit.[51]  The fact that merchants now have a low-cost, payment-card alternative to credit greatly enhances the economic value to merchants of the elimination of the anti-steering rules.  If the Durbin Amendment cap is lifted, under the Settlement Agreement merchants will be permitted to surcharge Visa and MasterCard debit transactions.  SA, ¶¶42(g), 55(g).

## 2.       The Group Buying and All-Outlets Provisions Provide Real Benefits to Class Members

While some objectors are dismissive of the group buying and all-outlets provisions because they will not take advantage of them, that is no basis for upholding those objections.  *Lagarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013 U.S. Dist. LEXIS 42725, at *15-*16 (N.D. Cal. Mar. 25, 2013) (while "it is unknown as to how many class members will actually take advantage" of the relief, "the Court concludes that these deficiencies do not weigh against a finding of fairness and adequacy").  Others complain that this relief is illusory, because Visa and MasterCard rules did not previously prohibit merchants from engaging in joint negotiations or employing different acceptance practices at different trade names.[52]  There is, however, no history of negotiations between Visa and buying groups or MasterCard and buying groups.  Class Counsel Decl., ¶¶193.  Now there is an affirmative obligation on the part of the networks to negotiate in "good faith," which makes buying groups a realistic option.  SA, ¶¶43, 56.  Similarly, while Visa and MasterCard rules did not explicitly prohibit merchants from using different acceptance practices at outlets operating under different "banners" or "trade names," the practical effect of the networks' volume-based interchange

---

[51]     *See id.*

[52]     Dkt. No. 1681 at 8-9, Objectors Opp to Prelim App.

- 39 -

# A1125

particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle").  As the Court of Appeals has recognized, "[p]ractically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability."  *Wal-Mart*, 396 F.3d at 106.

### 2.      The Releases' Express Language and the Class Definition Circumscribe the Releases' Scope

Both releases are expressly limited in scope to claims that were alleged or could have been alleged in this case:

> any and all manner of claims, demands, actions, suits, and causes of action . . . [that a member of either the Rule 23(b)(2) or b(3) classes] now has, or hereafter can, shall, or may in the future have, arising out of or relating in any way to any conduct . . . ***that are alleged or could have been alleged*** . . . .

SA, ¶¶33, 68.  In *Visa Check*, this Court approved a release that contained identical limiting language.  297 F. Supp. 2d at 512 (releasing "'***claims which have been asserted or could have been asserted in this litigation***'") (emphasis in original).  Affirming this Court's approval of the settlement in *Visa Check*, the Second Circuit recognized that "Plaintiffs in a class action may release claims that were or could have been pled in exchange for settlement relief."  *Wal-Mart*, 396 F.3d at 106; *see also Literary Works*, 654 F.3d at 247 (same).

Claims that were or could have been alleged are related to claims arising out of the "identical factual predicate" as the settled conduct.  *Wal-Mart*, 396 F.3d at 106; *see also Literary Works*, 654 F.3d at 248.  Recently, the court in *Lehman Brothers* explained the identical factual predicate doctrine as follows:

> As the Second Circuit has put it, "[a]ny released claims not presented directly in [a class action] complaint . . . must be based on the identical factual predicate as that underlying the claims in the settled class action."  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) (internal quotation marks and citation omitted); *accord TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d

- 44 -

# A1126

456, 460 (2d Cir. 1982) ("[A] court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."); *Wal-Mart*, 396 F.3d at 107.  The underlying principle is that "[i]f a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either."  *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981).

*In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 (LAK), 2012 WL 2478483, at *6 (S.D.N.Y. June 29, 2012).  "In other words, a settlement may be framed to prevent future suits 'depending on the very same set of facts,' . . . but future claims are barred only 'where there is a realistic identity of issues' between the former and future cases and 'where the relationship between the suits is at the time of the class action foreseeably obvious to notified class members.'"  *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 399-400 (S.D.N.Y.  2011).

In this case, claims relating to those rules that enabled Visa and MasterCard to set and maintain their respective default interchange fees in the United States at supra-competitive levels that were actually challenged or could have been challenged in this litigation are released.  Likewise, claims relating to conduct that enabled Visa and MasterCard to set and maintain their respective default interchange fees in the United States at supra-competitive levels that was actually challenged or could have been challenged in this litigation are released.  Also released are all claims that Visa and MasterCard are structural conspiracies based on the mere existence of their respective rules, and all claims related to their respective IPOs.  Finally, both releases are limited to claims by persons, businesses, and other entities that arise from or relate to their capacity as merchants (the only members of the settlement classes).[59]  Therefore, any claim arising in any capacity other than as a

---

[59]      Dkt. No. 1745, ¶¶5-6, Class Settl Prelim App Order.

- 45 -

# A1127

merchant, such as a competitor network or an ATM operator, is not released. Moreover, it is obvious that the release only bars claims of merchant class members, and does not bar claims of others who may have standing to challenge any anticompetitive conduct of the Defendants, including 300+ million consumers, 50 state attorneys general, and the Department of Justice. SA, ¶¶2, 31, 33, 66, 68.

> **3.      Only the Future Effects of the Unmodified Rules and Conduct in Place at the Time of Preliminary Approval and All Rules Modified Pursuant to the Settlement Agreement Are Released**

For clarity's sake, the releases explicitly state that certain types of claims that were alleged or could have been alleged are released. Such released claims are the future effects of the continued imposition of or adherence to the unmodified rules in place at the time of preliminary approval of the settlement and the rules modified pursuant to the settlement:

> [T]he future effect in the United States of the continued imposition of or adherence to any Rule of Any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order, any Rule modified or to be modified pursuant to this Class Settlement Agreement, or any rules that is substantial similar to any Rule in effect in the United Stats as of the date of the Court's entry of the Class Settlement Preliminary approval Order or any Rule modified or to be modified pursuant of this Class Settlement Agreement.

SA, ¶¶33(g) & 68(g). This provision is unremarkable as it merely releases the status quo going forward once the releases become effective. The first clause in the provision releases the future effects of the continued imposition of or adherence to the rules of Visa and MasterCard in place as of preliminary approval and not modified pursuant to the settlement that were or could have been challenged in this litigation. This prevents re-litigation of the claims central to this litigation. The second clause in the provision releases the future effects of rules of Visa and MasterCard modified pursuant to the settlement. Together these two clauses prevent a merchant from collaterally

- 46 -

# A1128

challenging the status quo as it was agreed to in the settlement.  However, any substantive deviation from these rules by Visa or MasterCard is ***not*** released.  Also not released are the effects of any new rules adopted and implemented after the Settlement's Preliminary-Approval Date, or a reversion to any old rule before it was modified or eliminated by the settlement.

A related, explicitly released claim is the claim challenging future effects of conduct related to those Visa and MasterCard rules as well as the future effects of conduct related to the setting of interchange rates:

> [T]he future effect in the United States of any conduct of any Rule 23(b)(3) Settlement Class Released Party substantially similar to the conduct of any Rule 23(b)(3) Settlement Class Released Party related to or arising out of interchange rules, interchange fees or interchange rates, any Rule of any Visa Defendant or MasterCard Defendant modified or to be modified pursuant to this Class Settlement Agreement, any other Rule of any Visa Defendant or any MasterCard Defendant in effect as of the date of the court's entry of the Class Settlement Preliminary Approval Order, or any Rule substantially similar to any of the foregoing Rules.

SA, ¶¶33(h) & 68(h).  Again, this provision must be read in the context of claims that were alleged or could have been alleged in this litigation.  As with subparagraphs 33(g) and 68(g) above, the purpose of this provision is to prevent re-litigation of claims that have been settled and released.  Any substantive deviation from this conduct, or a new unrelated course of conduct or reversion to any old rule that was modified or eliminated by the settlement, is not released.  Thus, this provision merely releases the status quo going forward once the release becomes effective.

The scope of the future effects of the rules and conduct released described in paragraphs 33(g-h) and 68(g-h) of the Settlement Agreement includes "substantially similar" rules and conduct.

830006_2

# A1129

That term makes clear that non-substantive, non-material changes to the released rules and conduct maintains the status quo and thus those same rules and conduct continue to be released.[60]

Accordingly, as to conduct that was alleged or could have been alleged in this litigation, the Releases apply only to class members in their capacity as merchants and release only conduct relating to Visa's and MasterCard's rules in the United States existing under the settlement, either those rules which existed and were unchanged or those rules which were modified, including the conduct's future effects.

### 4.        The Future Effects of Ongoing Conduct Can Be Released Where the Conduct Has Never Been Found to be Illegal

Contrary to the claim of several objectors, the release does not in any way grant Defendants antitrust immunity.  Rather, it simply prevents members of the settlement classes from challenging the rules and rule modifications in place by reason of the settlement.  So as long as the Defendants comply with the terms of the equitable relief required by the settlement, the challenged conduct is released for damage claims going forward.

In this case, none of the ongoing released conduct has ever been found to violate the antitrust laws.  In particular, Visa's and MasterCard's rules concerning, and practices for setting, interchange and related fees have never been found to be illegal by any United States court.  Where, as here at the time of the settlement, no court has ever found the challenged practices to be illegal – the illegality of the conduct is not a certainty – the court may approve a settlement that releases the future effects of that ongoing conduct.  *See Robertson v. NBA*, 556 F.2d 682, 687 (2d Cir. 1977); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 321 (7th Cir. 1980) ("before a settlement may be

---

[60]        A change without a material difference is a "substantially similar" rule.

- 48 -

# A1130

rejected because it initiates or authorizes a clearly illegal or unconstitutional practice, prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule" based on the state of the law at time settlement); *Handschu Servs. v. Special Servs. Div.*, 605 F. Supp. 1384, 1395 (S.D.N.Y. 1985), *aff'd*, 787 F.2d 828 (2d Cir. 1986). As the Court of Appeals recognized long ago, "a court in approving a settlement should not in effect try the case by deciding unsettled legal questions." *Robertson*, 556 F.2d at 686. Otherwise, courts would be required to rule on unsettled legal and factual questions that the parties chose not to litigate, which would be "clearly inappropriate in a case resolved by settlement" and would eviscerate the purpose of settling the case. *Armstrong*, 616 F.2d at 322; *see also Robertson*, 556 F.2d at 682; *Handschu*, 605 F. Supp. at 1395.

Accordingly, a release that "prevent[s] the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution" is proper and enforceable. *VKK Corp. v. NFL*, 244 F.3d 114, 126 (2d Cir. 2001); *see also Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009) ("courts have enforced even general releases to bar antitrust claims predicated on ***continuing violations of pre-release*** conduct, such as 'conspiracies alleged to continue post-release'") (emphasis in original); *Managed Care Litig. v. Humana Inc.*, No. 00-MD-1334-MORENO, 2010 U.S. Dist. LEXIS 142863, at *64 (S.D. Fla. Aug. 15, 2010) ("The problem that Provider Plaintiffs have in this case is that the claims at issue being prosecuted in the UCR Litigation are based on conspiratorial conduct, practices and 'chain of events' that took place long before the execution and approval of this Settlement Agreement. . . . [P]ublic policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint on trade."). *See also Literary Works*, 654 F.3d at 248 (where a complaint seeks an injunction against future uses, a settlement releasing future

- 49 -

830006_2

**A1131**

EXHIBIT 1

# A1132

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————— x

In re PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

—————————————————————

This Document Relates To:

    ALL ACTIONS.

—————————————————— x

:  MDL No. 1720(JG)(JO)
:
:  Civil No. 05-5075(JG)(JO)
:
:  DECLARATION OF THE HONORABLE
:  EDWARD A. INFANTE (RET.) IN
:  SUPPORT OF CLASS PLAINTIFFS'
:  MOTION FOR FINAL APPROVAL OF
:  SETTLEMENT

828289_1

**A1133**

I, The Honorable Edward A. Infante (Ret.), hereby declare as follows:

1.      I am the former Chief Magistrate Judge of the United States District Court, Northern District of California.  I currently serve as a mediator with JAMS, the nation's largest private provider of alternative dispute resolution services.  As a U.S. Magistrate Judge and then as a mediator at JAMS, I have more than 35 years of dispute resolution experience, having conducted over 3,000 settlement conferences in all types of litigation, including antitrust, consumer, securities fraud and shareholder class actions.

2.      The parties approached me in early 2008 to mediate settlement negotiations in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 1:05-MD-1720- (JG) (JO) (E.D.N.Y.) ("MDL 1720"), and I agreed.

3.      Over the next four years, I participated in numerous mediation sessions with the parties, including several all-day and multi-day mediation sessions in San Francisco, New York, and Boston, numerous meetings with individual parties or their representatives, and numerous conference calls.

4.      In mid-2009, Eric D. Green, Professor of Law at Boston University School of Law and principal of Resolutions, LLC, became involved in the mediation with Class Plaintiffs.  I understand that, prior to that date, Professor Green was involved in mediation discussions among the defendants and the individual, or "direct action," plaintiffs in MDL 1720.

5.      The first mediation occurred in San Francisco, California over two days in early May 2008.  Class Plaintiffs submitted extensive written materials.  All parties made oral presentations. We conducted additional two-day mediation sessions on several occasions in 2009.  At each of these sessions, the parties presented vastly different perspectives on liability, class certification, and damages issues.

- 1 -

828289_1

# A1134

6.      Between February 2010 and December of 2011, I continued to participate in mediation discussions among the parties. I attended several in-person meetings in San Francisco and New York, and engaged in dozens of telephonic communications with the parties and with Professor Green. The parties continued to provide extensive written materials, updating me on the status of the litigation, providing briefing and expert reports, and exchanging detailed offers and demands.

7.      In early December 2011, following oral argument on the parties' cross motions for summary judgment, and the parties' cross motions to exclude expert testimony, the Court conducted a multi-day settlement conference at the federal courthouse in Brooklyn, New York. I participated in that settlement conference, along with Professor Green, Judge Gleeson, Magistrate Judge Orenstein, and counsel for all of the parties. Most parties, including most of the proposed class representatives, participated through inside counsel or principals in addition to outside counsel.

8.      Following numerous additional conference calls among the parties, Professor Green and I made a "mediators' proposal" to defendants and Class Plaintiffs on December 22, 2011. On February 10, 2012, the parties held a settlement conference with Judges Gleeson and Orenstein. With the consent of the parties, Professor Green, myself and the judges met together and separately with representatives from defendants, class and individual plaintiffs. By February 21, 2012, all of the parties, including all the proposed class representatives in the Second Consolidated Amended Class Action Complaint, had agreed "to negotiate towards a final settlement . . . through the process laid out by the mediators and the Court in this matter."

828289_1

# A1135

9.      Between February and July of 2012, I participated in several in-person and telephonic mediation sessions with the parties to mediate the negotiations over a settlement agreement based on the terms set forth in the mediators' proposals.   There was also a settlement conference with the Court in June of 2012.   Because of a pre-existing scheduling conflict, I did not attend that conference, but was apprised of the discussions and results by Professor Green.   At the conclusion of the conference, the parties announced to the Court that they had reached agreement on the principal terms of a settlement agreement.

10.      In mid-July of 2012, the parties reached a documented agreement.   The terms of the final settlement agreement are consistent with the terms of the mediators' proposals.

11.      This is a very complex antitrust case, with many novel and challenging legal issues. In every instance the parties' written and oral submissions were extensive and vigorously disputed by the other side. All parties faced significant risks.   Plaintiffs faced significant risks that they would not prevail on class, liability or damages.   Defendants faced significant risks that a plaintiffs' verdict would result in ruinous liability.

12.      The lawyers on both sides are highly experienced antitrust and class action lawyers who had the benefit of a complete record when they made the decision to settle.   At all times these lawyers zealously represented the interests of their clients.   There is no evidence of collusion among the parties.   The settlement negotiations were extended, extraordinarily complicated, and sometimes contentious.   On several occasions the discussions were on the verge of collapsing.   It is my opinion that the settlement negotiations were fair, adversarial, and always conducted at arms-length.

13.      In light of the risks, the necessary delay and expense required to litigate the case through trial and appeals, and the advanced stage of the litigation, the lawyers who represent the parties were able adequately to evaluate the risks and benefits of going forward versus the risks and

- 3 -

828289_1

# A1136

benefits of settling.  In my opinion the terms of the settlement agreement are fair, reasonable and adequate to the settling class members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _//_ day of April, 2013, at San Francisco, California.

Edward A. Infante

- 4 -

828289_1

**A1137**

# EXHIBIT 2

# A1138

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This document refers to:  All Actions | MDL No. 1720<br>Case No. 1:05-md-1720-JG-JO |

DECLARATION OF ERIC D. GREEN

ERIC D. GREEN declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a full time professional mediator with Resolutions, LLC, an ADR firm located in Boston, Massachusetts. I recently retired as a Professor at the Boston University School of Law where for thirty years I taught negotiation, mediation, complex ADR processes, resolution of mass torts, constitutional law and evidence. I am a co-founder and principal of Resolutions, LLC. I previously co-founded JAMS/Endispute and was a member of the Center for Public Resources Institute of Dispute Resolution virtually since its inception and have served on many of its panels and committees and spoken at numerous of its conferences and programs on mediation and ADR. I was a co-author with Professors Frank Sander and Stephen Goldberg of the first edition of Dispute Resolution, the first legal textbook on ADR, and have written numerous books and articles on dispute resolution and evidence. I maintain an active ADR/mediation practice for complex, legally-intensive disputes.

2.      I have successfully mediated many high stakes cases, including the United States v. Microsoft antitrust case, the various MasterCard/Visa merchants' class action antitrust cases, portions of the Enron Securities class action cases, the Monsanto PCB cases in Alabama, the childhood and adult cancer cases in Toms River, New Jersey, numerous large construction cases, including most of the disputes arising out of the design and construction of major league baseball and football stadiums, insurance coverage, intellectual property, international disputes, ERISA cases, and consumer cases. I have also mediated many complex, multi-party class action cases involving horizontal and vertical price-fixing anti-trust claims, mergers and acquisitions, contract disputes, patent disputes, securities fraud, shareholder derivative claims, accounting problems, mass torts, employment and consumer claims. In the past few years, I have mediated countless cases arising out of the 2007-2008 financial crisis, including class actions involving all aspects of mortgage-based securities, CDO's, auction-rate securities, private equity, and various types of financial fraud. I have also served as court-appointed Special Master, Legal Representative for Future Claimants, Mediator and Guardian Ad Litem

1

in class or mass claimant matters in the Northern District of Ohio, Southern District of New York, District of Massachusetts and Eastern District of Texas.

3.      I am a 1968 Honors graduate of Brown University and graduated in 1972 from Harvard Law School, magna cum laude, where I was Executive Editor of the Harvard Law Review. I am a member of the bars of the states of California (inactive) and Massachusetts, the United States District Courts for the Northern and Central Districts of California and the District of Massachusetts, several Courts of Appeal, and the Supreme Court of the United States. Prior to teaching at Boston University School of Law, I clerked for the Hon. Benjamin Kaplan, Supreme Court of Massachusetts and then was an associate and partner at Munger Tolles & Olson in Los Angeles.

4.      I have delivered hundreds of lectures, panel discussions and training sessions on ADR and taught or supervised more than a thousand students in ADR while mediating more than a hundred cases a year for over 30 years. In 2001, I was awarded a Lifetime Achievement Award from the American College of Civil Trial Mediators. I was voted Boston's Lawyer of the Year for Alternative Dispute Resolution for 2011 based on my "particularly high level of peer recognition." In 2011, I received the rarely awarded James F. Henry Award for Outstanding Contributions to the field of ADR from The International Institute for Conflict Prevention & Resolution.

5.      I was retained by the Parties in the above-referenced matter (the "Interchange Litigation"), to serve as a private mediator to facilitate potential settlement discussions.  For purposes of this Declaration, the "Parties" are the Class Plaintiffs, the Individual Plaintiffs, and the Defendants.

6.      I was first contacted in connection with the Interchange Litigation in January 2009.  At that time it was explained to me that in 2008 the Parties had agreed to private mediation of this matter, and that the Parties had selected former Judge Edward Infante as the initial mediator, but had selected me to serve as a second mediator if and when a second mediator became necessary.  After conducting my usual conflicts check and considering whether this was a matter in which my service as a mediator might be useful to the Parties, I agreed to be retained by the Parties.  As it turned out, initially I was asked to mediate the claims of the Individual Plaintiffs against Visa and MasterCard as a way to try to break the impasse in settlement discussions between Class Plaintiffs and Defendants.

7.      The first mediation session in which I was involved in took place on April 30, 2009 in New York.  In advance of this session, the Individual Plaintiffs and the Defendants exchanged comprehensive mediation statements, with multiple exhibits, setting forth their positions on merits, causation and damages issues.  During the initial mediation session with the Individual Plaintiffs and the Defendants the Parties engaged in vigorous, arms-length debate about all aspects of the merits of the case and damages.  Despite the efforts of the Parties, this meeting did not result in an agreement to settle the claims of the Individual Plaintiffs.  I concluded that the Parties needed more time to reflect on the developments that had taken place during this

# A1140

session and further discussion and consideration of the issues relating to liability, damages, and remedies.

8.      As detailed further below, between the time I first became involved with the Interchange Litigation, and the time we notified the Court that the Parties had reached a settlement, June 22, 2012, I conducted numerous mediation sessions and had dozens of separate meetings with counsel and representatives for the various Parties.  At those sessions and meetings, the Parties were represented by a multitude of lawyers and client representatives. On the Class Plaintiffs' side, the class counsel group included, but was not limited to Craig Wildfang, Tom Undlin, Laddie Montague, Merrill Davidoff, Joe Goldberg, Bonny Sweeney, Martin Lueck, Dennis Stewart, and Patrick Coughlin, or their designated colleagues, along with, at several meetings, clients and lawyers from the merchant trade associations or individual merchants themselves.  Counsel for the Individual Plaintiffs included Richard Arnold, Bill Blechman, Linda Nussbaum, Paul Slater, and Steve Shadowen.  On the defense side, at virtually all sessions multiple counsel and client representatives attended from Visa, including outside counsel Robert Vizas, Robert Mason and Mark Merley, along with in-house counsel Adam Eaton and/or Josh Floum, and from MasterCard, outside counsel Ken Gallo and Keila Ravelo and in-house counsel Jim Masterson and/or Noah Hanft.  Mediation sessions also included outside counsel, and often client representatives and inside counsel for most of the Bank defendants, including but not limited to Peter Greene for Chase, Mark Ladner for Bank of America, David Graham for Citi, Andrew Frackman for Capital One, Chris Lipsett for HSBC, John Pasarelli for First National Bank of Omaha, Richard Creighton for Fifth Third, and Joseph Clark for PNC Bank.  Based on my observations and first-hand experience, counsel involved in these mediation sessions are among some of the most knowledgeable, sophisticated and accomplished attorneys in the fields of antitrust and complex litigation.  The level of advocacy for all Parties throughout this process was exceptionally informed, engaged and effective.

9.      In addition to mediation sessions with all Parties present, and those with either only Individual Plaintiffs, Class Plaintiffs, or Defendants, I also met, from time to time, with some of the Chief Executives of the credit card companies and/or banks, including the Chairman of the Visa Litigation Committee and the senior executives of some of the merchant trade associations.  At the request and direction of Class Counsel, I also had many conversations with other leading merchants.

10.     It had always been clear to the Parties that any settlement to which the Defendants would agree would have to be a global settlement, resolving the claims of both the Class and the Individual Plaintiffs against all Defendants.  Since the Defendants and the Class Plaintiffs were making essentially no progress in their settlement discussions through 2009, and thus stood as a roadblock to an overall global agreement, in July 2009 the Defendants and Individual Plaintiffs asked me to become involved in the mediation of the Class's claims against the Defendants, which, up until that time, had been handled solely by the Honorable Edward Infante (ret.).

11.     Crucial to the eventual settlement of this case was the fact that it was co-mediated with Judge Infante.  Judge Infante presided over the initial mediation sessions between the Class Plaintiffs and Defendants and held many sessions with the Parties by himself.  Subsequently, after I joined the mediation team, Judge Infante and I co-mediated all aspects of this case.  Judge Infante participated with me at most of the face-to-face sessions and on most of the teleconferences, in addition to his conducting separate conferences to the ones I conducted.  Judge Infante and I carefully coordinated our actions such that the mediation process as a whole was truly a joint effort.  It is fair to say that the time, focus, effort, and consideration that went into mediating this case was double that of a case in which there is a single mediator.

12.     My first mediation session with the Class Plaintiffs was held on October 15, 2009.  Prior to this session, I met individually with counsel for the Class Plaintiffs in August of 2009, when I was extensively briefed on the Class's position on merits, causation and damages issues.  I had a similar meeting that month with the collective Defendants as well.  In addition to these meetings, the Parties exchanged comprehensive mediation statements, with multiple exhibits, including expert reports, setting forth their positions on the merits.

13.     At my initial mediation session the Parties engaged in vigorous, arms-length debate about all aspects of the case - liability, damages, class certification, and remedies.  Despite the best efforts of the Parties, the initial meeting did not result in an agreement to settle the claims of the Individual or Class Plaintiffs.  It became clear to me that while the Individual Plaintiffs had made some progress with the Defendants, the Class Plaintiffs and Defendants were still very far apart on most issues.  Nonetheless, I believed that all Parties had a sincere desire to try to settle the case, and were prepared to devote more effort to that end.  Between August 2009 and December 2011 I arranged for and participated in numerous in-person mediation sessions with the Class, the Defendants, or both.  I had hundreds of telephone conversations with counsel for all Parties, sometimes in a group, and sometimes individually.

14.     Several weeks after the initial mediation session, the Parties informed me that they were prepared to resume settlement discussions.  The second mediation session took place on December 10 and 11, 2009.  The mediation was attended by essentially the same counsel and representatives as the prior meeting.  All Parties exchanged supplemental mediation statements in advance of the mediation.  The Parties again engaged in vigorous negotiation but were unable to achieve settlement at this session.

15.     Between February 2010 and December 2011, I continued to engage all Parties in an effort to bring them closer together to attempt to reach a resolution to the litigation.  These efforts included countless conference calls, emails, and meetings with individuals.  It can fairly be said that few days passed when I was not working towards trying to find grounds for a resolution.  Through these interactions with the Parties, I gained additional insight and clarity on the numerous complicated issues present in the litigation, which greatly informed the terms of the eventual Mediators' Proposal that I collaborated on with Judge Infante.

16.     At the same time that Judge Infante and I were working on the Class Litigation, I continued to mediate with the Individual Plaintiffs and Defendants, now with Judge Infante's participation.  Those two groups reached a tentative settlement, with some terms necessarily dependent on a potential Class Settlement, in early 2011.  This constituted a significant breakthrough in the settlement process.

17.     With the Parties' input and consent, Judge Infante and I briefed Magistrate Judge Jamie Orenstein and Judge John Gleeson on the status of the mediation effort.  I first spoke with Magistrate Judge Orenstein in June of 2010.  From that point, while I kept the judges generally apprised of the status of the mediation, I maintained the confidential nature of the substance of the negotiations.

18.     Judge Infante and I continued to work on the Class Plaintiffs' case.  While I continued to believe that the Parties were sincere in their desire to settle the case, given the risks to all Parties of continued litigation, the progress in the discussions was exceedingly difficult and deliberative with consultations between counsel and their many clients taking considerable time.

19.     In my experience, sometimes it is only the imminence of trial, or rulings on important motions that are sufficient to get Parties to consider potential compromises, or creative solutions to apparently intractable problems. I believe that this was the case in this matter.  By November 2011 the Parties had briefed and argued many important and substantive motions, including Class Plaintiffs' motion for class certification, Defendants' motions to dismiss, the Parties' cross motions for summary judgment, and the Parties' cross motions to exclude expert testimony.

21.     On December 1, 2011, I met with a group of proposed class representatives along with Class Counsel.  This meeting provided the proposed class representatives with an opportunity to directly discuss with me their goals in the litigation and the bases for their settlement positions.  We engaged in a full and frank discussion of the mediation process to date and all who attended the meeting were encouraged to share their views.

22.     After counsel for the Parties had argued the cross motions for summary judgment and for excluding expert testimony, the Court ordered, and then conducted, a multi-day settlement conference at the federal courthouse in Brooklyn, NY on December 2 and 3, 2011.  I participated in that settlement conference, along with Judge Infante, Judge Gleeson, Magistrate Judge Orenstein, and counsel for all of the Parties.  Pursuant to the Court's order setting the conference, most Parties, including most of the proposed class representatives, and most of the Defendants, participated through inside counsel or principles in addition to outside counsel.

23.     At the December 2011 settlement conference the Parties engaged in what diplomats would call "a frank and candid exchange of views."  Despite the strongly held views of many of the Parties, I believe that the ability to interact personally with Judge Gleeson and Magistrate Judge Orenstein was a great benefit to the Parties as they tried to determine what

would be the best course for their respective constituencies. Those Parties who appeared to be the most knowledgeable and sophisticated about the risks of litigation of this magnitude seemed to understand better the need for compromise and resolution of the claims. At the conclusion of the two day settlement conference with the Court, Judge Infante and I believed that the time might be right for making a Mediators' Proposal to resolve the litigation on a global basis.

24.     Following the conclusion of the December settlement conference, Judge Infante and I embarked on an intense series of telephone conference calls with counsel. These calls reinforced our view that making a Mediators' Proposal would be the next best step in the settlement process.

25.     With the consent of all counsel, on December 22, 2011, Judge Infante and I issued a Mediators' Proposal to the Class Plaintiffs and Defendants. The Mediators' Proposal contained proposed settlement terms for the core issues that the Parties were negotiating over, but anticipated that further negotiations would be necessary to finalize the details of the settlement. By the terms of the Mediators' Proposal, each party was to respond by January 13, 2012 with either a "YES" or "NO" on a confidential, double-blind basis as to whether it was prepared to enter into a written agreement on the essential terms of the Mediators' Proposal. If the mediators received a positive response from both the Class and Defendants, they would inform the Parties and the Court that there was a conditional Agreement in Principle subject to the execution of a final Settlement Agreement.

26.     The Mediators' Proposal set off a flurry of activity among counsel and the Parties, including a series of questions from Parties seeking clarifications on certain terms. Judge Infante and I issued written responses to the questions we received. By January 13 counsel for all Parties notified the mediators that they were prepared to accept the Mediators' Proposal, but certain counsel asked for time to consult further with their clients and the mediators and with the Court before committing themselves to the final detailed terms of a settlement.

27.     On February 6, 2012, I travelled to Alexandria, VA to meet with a group of proposed class representatives and Class Counsel. Certain proposed class representatives attended with separately retained outside counsel. At this meeting the proposed class representatives in attendance shared their opinions on the terms of the Mediators' Proposal and their goals for the terms of a final settlement.

28.     The Parties held a second settlement conference with Judges Orenstein and Gleeson on February 10, 2012. Again, with the Parties' consent, together with Judge Infante and myself, the judges met together and separately with representatives from the Class Plaintiffs, Individual Plaintiffs, and Defendants. Any individual party who requested separate time to speak with the judges was also given the opportunity for a private caucus.

29.     By February 21, 2012, all of the Parties, including all of the proposed class representatives in the Second Consolidated Amended Class-Action Complaint, agreed "to

negotiate towards a final settlement…through the process laid out by the mediators and the Court in this matter."

30.     Between February and June 2012, the Parties conducted numerous in-person, telephonic and email negotiations by themselves and with the assistance of the mediators. Together, the Parties worked to agree on the precise language of a final, definitive settlement agreement consistent with the Mediators' Proposal.

31.     The Parties held another settlement conference with myself and Judges Orenstein and Gleeson on June 20-22, 2012.  Because of a scheduling conflict, Judge Infante was not able to attend this session, but I consulted with him throughout.  During this session, the Parties vigorously negotiated all outstanding terms of a Settlement Agreement, sometimes through me, but often in direct meetings with each other.  With all sides fighting hard for their positions, the Parties finally reached Agreements in Principle to settle the claims of the Class and the Individual Plaintiffs against all of the Defendants.  The Parties informed the Court orally on the evening of June 22, 2012 that a full and complete settlement had been reached and would proceed to finalize the Settlement Agreement and file a Memorandum of Understanding attaching the Agreement with the Court by July 13, 2012.

32.     After filing the MOU, the Parties went to work on drafting the other supporting documentation of the settlement, *e.g.* the bank escrow agreement, the form of class notice, the form of the order for preliminary approval, the form of the order for final approval, and the many other documents that form a part of the complete settlement package.

33.     Throughout the mediation, the Parties engaged in very extensive adversarial negotiations over every issue in the case.  The facilitated negotiations were lengthy, exhaustive, difficult, and often contentious.  The negotiations were conducted by many extremely qualified attorneys with extensive experience and knowledge in antitrust and class action law, and with the guidance and involvement of their clients.  In my opinion, the outcome of these mediated negotiations is the result of a fair, thorough, and fully-informed arms-length process between highly capable, experienced, informed, and motivated Parties and counsel.  The final settlement represents the Parties' and counsels' best professional effort and judgment about a fair, reasonable and adequate settlement after thoroughly investigating and litigating the case for years, taking into account the risks, strengths and weaknesses of their respective positions on the substantive issues of the case and the risks and costs of continued litigation.

        I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 11, 2013.


_____
Eric D. Green

7

**A1145**

EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

|
**IN RE PAYMENT CARD** |
**INTERCHANGE FEE AND MERCHANT** |   **No. 05-MD-1720 (JG) (JO)**
**DISCOUNT ANTITRUST LITIGATION** |
|
**This Document Applies to: All Cases.** |
|
_____|

**DECLARATION OF ALAN S. FRANKEL, Ph.D. RELATING TO THE PROPOSED CLASS SETTLEMENT**

**Table of Contents**

1. **Introduction and Summary of Opinions** ................................................................................. 2

2. **The Ability to Steer Consumers to Lower Cost Payment Brands and Methods, as Provided by the Proposed Settlement, Enhances Competition and Benefits Merchants** ........................... 5

  2.1  Steering in Competitive Markets ......................................................................................... 7

  2.2  Anti-Steering Rules Subvert the Competitive Process and Lead to Higher Prices ........................ 8

3. **The Proposed Settlement Preserves Reforms Obtained From Dodd-Frank and the DOJ Settlement Which Benefit Merchants and Contribute to the Creation of a More Competitive Marketplace** ................................................................................................. 12

4. **The Additional Relief from the Proposed Settlement Will Benefit Merchants and Consumers by Providing Additional Means to Constrain the Networks' Market Power** .............. 17

  4.1  The Evidence Shows That Merchants Benefit From the Ability to Surcharge ........................... 17

    4.1.1  Merchants Are Increasingly Likely to Surcharge at Fee Levels Prevailing in the United States ....................................................................................................... 19

    4.1.2  Surcharging Induces Many Consumers to Switch to Non-Surcharged Payment Brands and Methods ........................................................................................... 23

    4.1.3  Actual and Threatened Surcharging Constrains the Level of Merchant Fees .................... 26

  4.2  The Ability to Surcharge Credit Card Transactions is More Competitively Effective than the Ability to Discount ..................................................................................................... 29

  4.3  Alternative Forms of Surcharging Permitted by the Proposed Settlement ............................. 32

  4.4  Some Merchants Can Take Advantage of Selective Acceptance Across Their Different Banners to Reduce Card Acceptance Fees ........................................................................... 33

  4.5  Merchant Buying Groups May Help Merchants Negotiate Lower Fees ..................................... 34

  4.6  The Effects of State Statutes and American Express' Non-Discrimination Policy........................ 35

    4.6.1  State Surcharge-Related Statutes .................................................................................. 35

1

4.6.2    American Express' Non-Discrimination Policy ........................................................ 37

4.7    An Illustration of the Benefits from Surcharging ................................................... 39

**5.    Conclusion........................................................................................................................ 44**

# 1.    Introduction and Summary of Opinions

1.    I have been asked by counsel for the class plaintiffs to evaluate the likely

economic impact of the relief with respect to merchant rules contained in the proposed class

settlement ("Proposed Settlement"), and, in particular, whether that relief will benefit the

members of the class by reducing the cost to merchants to accept MasterCard or Visa credit

card payments from their customers.[1]  I have also been asked to provide some estimate of the

value of any such benefit to the members of the class.  The main aspects of the proposed relief

are:

- Reform of MasterCard's and Visa's (collectively "the Networks'") "no-surcharge" rules.  Subject to certain limitations, merchants may now assess "brand-level" or "product-level" surcharges on use of the Networks' credit cards;

- Reform of the Networks' rules to allow merchants to accept the Networks' cards at fewer than all of the merchant's "trade names" or "banners;"

- The commitment by each Network to negotiate in good faith with buying groups of merchants over the terms and conditions under which they accept the Network's cards;

- Recommitment to the relief provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") (*i.e.*, removal of the "no-minimum purchase" and "no-discount" rules) notwithstanding any subsequent modification or repeal of the Dodd-Frank Act;[2] and

---

[1]    Under the terms of the Proposed Settlement, MasterCard and Visa will also pay up to $7.25 billion in monetary relief.

[2]    Public Law 111–203 – July 21, 2010, Sec. 1075.  The Dodd-Frank Act also authorized the Federal Reserve to regulate debit card interchange fee rates, required that at least two networks can be accessed by a debit card, and forbid networks from prohibiting a merchant from routing a debit card transaction over an alternative network accessible by the card.

2

- Recommitment to the relief provided by the settlement between MasterCard and Visa and the United States Department of Justice ("DOJ Settlement") notwithstanding any end to the Networks' requirements under that settlement.[3]

2.      This litigation commenced in 2005 when the full range of the Networks' merchant restraints ("Anti-Steering Rules") was in effect.[4]  Since then, in addition to the reforms to rules required under the Proposed Settlement, some of the Anti-Steering Rules have been reformed as a result of legislation and settlement of litigation against the Networks brought by the United States Department of Justice and certain states.  As described above, the Proposed Settlement ensures the continuation of those reforms and further extends them.

3.      I have previously submitted two reports in this litigation relating to liability and damages.[5]  In those reports, I explained the anticompetitive nature of Defendants' rules and actions, including the Anti-Steering Rules used to maintain and enhance their market power and the level of merchant fees.  My opinions with respect to the anticompetitive effects of Defendants' rules remain unchanged.  In this report, I examine the benefits to merchants from

---

[3]   See, e.g., Competitive Impact Statement in United States of America, et al. v. American Express Company, American Express Travel Related Services Company, Inc., MasterCard International Incorporated, and Visa Inc., Civil Action No. CV-10-4496, October 4, 2010.  American Express did not reach a settlement with the Department of Justice and litigation continues between the DOJ (as well as by other parties) and American Express concerning that network's merchant restrictions, which I discuss further in Part 4.6.2, *infra*.

[4]   I describe the Anti-Steering Rules in detail in Part 5.2 of my initial report.

[5]   Report of Alan S. Frankel, Ph.D., July 9, 2009 ("Frankel Report"); Rebuttal Report of Alan S. Frankel, Ph.D., June 22, 2010 ("Frankel Rebuttal Report").  My background and qualifications regarding the issues in this case are also described in those reports.  Since submitting my Rebuttal Report, I have submitted two reports and testified as an expert on behalf of Canada's Commissioner of Competition in a case against MasterCard and Visa regarding certain of those networks' merchant rules.  I also spoke about related issues at conferences hosted by the Federal Reserve Bank of Kansas City in March 2012, and The Clearing House Association in New York in November 2012.  I attach my current CV as Exhibit 1.  In preparing this declaration I drew on my extensive research into these issues as described in my earlier reports in this case, the materials cited therein, and in my published writings.  I attach a list of materials that I specifically relied on in preparing this declaration in Exhibit 2.

3

the reforms of those rules resulting from the Dodd-Frank Act, the DOJ Settlement, and the Proposed Settlement.  My main opinions are as follows.

4.        **Opinion #1: Merchants benefit from the ability to steer customers to less costly payment methods, an ability that is enhanced by the Proposed Settlement.**  Interchange fees, the main component of merchant fees, are paid to banks that issue payment cards.  As described in my prior reports, MasterCard and Visa Anti-Steering Rules have historically limited competition for merchant transactions between those networks.[6]  By enforcing the Anti-Steering Rules, which impeded or prohibited discounting, surcharging or other mechanisms to incentivize or advise customers to employ less costly payment mechanisms, the Networks stifled interbrand competition at the point of sale that otherwise would have been a countervailing competitive force to the Networks' incentive to increase interchange fees.  The ability to steer made possible through reforms of the Networks' Anti-Steering Rules thus creates price transparency to consumers and introduces competition into this marketplace by giving merchants the ability to exert normal competitive pressure on interchange fees, and thus constrains the Networks' market power.

5.        **Opinion #2: The relief provided by the Dodd-Frank Act and the DOJ Settlement is helpful to merchants, and the Proposed Settlement's preservation of that relief is therefore valuable.**  The changes to no-discount and no-minimum purchase rules affected by the Dodd-Frank Act and the DOJ Settlement provided merchants with additional tools to steer transactions to lower cost forms of payment.  However, the relief granted by the Dodd-Frank Act, for example, came through legislation that could be repealed (and that the banks and the

---

[6]     See, e.g., Frankel Report, Part 6.4; Frankel Rebuttal Report, Part 3.6.

# A1150

Networks have favored repealing).[7]  The Proposed Settlement ensures that those reforms are not undone.

6.        **Opinion #3: The ability to surcharge credit card transactions, refuse to accept cards (or surcharge them) at particular banners, and the requirement for Defendants to negotiate with buying groups of merchants in good faith will generate significant benefits for merchants by providing additional, effective means of constraining the Networks' market power.**  The Proposed Settlement provides several additional means of constraining the Networks' market power, including giving merchants the ability to surcharge at either the brand or product level, the ability to refuse to accept cards at particular banners or trade names but not others, and the requirement that the Networks negotiate in good faith with merchant buying groups.  Each of these reforms contributes to increasing interbrand competition and providing merchants with more ability to steer customers to less expensive payment methods, thus constraining the Networks' market power.

7.        I explain the bases for these three opinions in Parts 2 through 4, respectively.  I also provide a range of estimates of the potential impact with respect to the ability to surcharge.

## 2.    The Ability to Steer Consumers to Lower Cost Payment Brands and Methods, as Provided by the Proposed Settlement, Enhances Competition and Benefits Merchants

8.        "Steering" in the context of this case refers to strategies merchants use to influence consumer payment choices at the point of sale, to incentivize customers to use lower-cost payment

---

[7]        In 2011, for example, MasterCard delayed implementing aspects of the Dodd-Frank Act regulations in hopes that the law would be repealed.  (http://www.reuters.com/article/2011/03/01/us-finance-summit-mastercard-debit-idUSTRE72058B20110301).  See also, e.g., http://www.businessweek.com/news/2012-05-14/jpmorgans-inconvenient-truth-hits-romneys-dodd-frank-repeal-vow; http://www.cnbc.com/id/45971366).

methods.  Steering by merchants introduces transparency to consumers of the costs of their payment choices and introduces direct competition into the marketplace to lower the costs to merchants and, thus, to their customers.  The Networks have long enforced a variety of Anti-Steering Rules designed to minimize that merchant influence and competition.

9.      Anti-Steering Rules have blunted the normal competitive consequences which should have resulted from the Networks' merchant fees, which cost merchants more than other payment methods.[8]  The rules ensured that the high merchant fees were opaque to consumers, thereby encouraging them to make costlier (and riskier) payment choices.  Other consumers, including those who paid by cash or check, bore the increased costs of the merchants' acceptance of the Networks' cards, including the costs associated with special premium credit cards offered only to the highest income and highest-spending cardholders, which resulted in even higher interchange fee rates and merchant costs.[9]  Through rewards and other benefits, these cardholders are encouraged to use the premium credit cards.  But lower income consumers – including those using credit cards without rewards, debit cards, checks, or cash – fund a large portion of those interchange fees (and rewards) and get none of the reward benefits themselves.

10.     In a more competitive market, by contrast, merchants can transparently convey to consumers how their choices affect merchant and consumer costs, including by offering discounts for low cost purchases or additional fees for additional or more costly services.  However, the Networks have been able to set fees at higher levels than otherwise by using their rules to curtail normal competitive forces, and therefore, more transactions are completed using these high-fee credit cards

---

[8]      Frankel Report, Part 5.2; Frankel Rebuttal Report, Part 4.2.  See also Expert Report of Joseph Stiglitz, Ph.D. ("Stiglitz Report"), ¶27 ("In a competitive system, merchants would be expected to react to a payment network's attempt to charge supracompetitive fees by charging or threatening to charge the users of such cards.  This would make it economically less attractive for the payment network to attempt to charge such high fees.").

[9]      For example, see Frankel Report, Part 4.1.5 and note 193.

than would occur in a more competitive market.[10]  Merchants have been harmed, but so have their customers, including those who have used lower cost payment brands and methods – and those predominantly low income customers who do not use a credit card – but who nevertheless pay prices elevated by the Networks' high fees.[11]

## 2.1   Steering in Competitive Markets

11.     The most important steering mechanism is a transparent price system.[12]  The freedom of sellers to set prices transparently lies at the heart of our competitive market economy.  In competitive retail markets, individual merchants normally are free to choose what prices they set for sales to their customers, constrained only by competition with other merchants and the responses of their customers.  Merchants in competitive markets are also free to change those prices in response to changes in cost and market conditions.  Their

---

[10]   See also Reply Report of Joseph Stiglitz, Ph.D., June 22, 2010 ("Stiglitz Reply Report"), p. 2 ("The interference with price signals severs the usual connection between private choices and gains in social welfare.  With the Merchant Restraints in place, the market cannot ensure that customers collectively value the benefits of credit card (or premium card) usage by more than its cost.  The Merchant Restraints prevent shoppers who choose to use the cards from knowing and incurring the costs of that choice.  Without the market discipline of well-informed customer choices, the Defendants can and do raise the interchange fees above the competitive and efficient level.").

[11]   Federal Reserve economists Scott Schuh, Oz Shy and Joanna Stavins estimate that "83 percent of banks' revenue from credit card merchant fees is obtained from cash payers, and disproportionately from low-income cash payers."  Scott Schuh, Oz Shy and Joanna Stavins, "Who Gains and Who Loses from Credit Card Payments? Theory and Calibrations," Federal Reserve Bank of Boston, Public Policy Discussion Paper No. 10-03 (August 2010), p. 3.  See also Stiglitz Reply Report, p. 45 ("The interchange fees will increase the average marginal cost to merchants of selling goods.  Basic economic principles imply that merchants are then expected to react to the 'tax' on credit card use by raising retail prices.  But under the Merchant Restraints, the price will increase to all customers.  This will cause some welfare loss to non-credit card using customers." Notes omitted.).

[12]   See, for example, Stiglitz Report, ¶39 ("To interfere with the price mechanism is to interfere with the efficient functioning of a market.  Prices are the principal means by which buyers are informed of the social costs of their consumption decisions.  The elimination of pricing information at the point of sale nearly guarantees an inefficient allocation of resources; the market's 'invisible hand' cannot function because buyers lack appropriate information and incentives to guide their decisions.  With competition among alternative credit card payment networks and alternative payment mechanisms – with the use of price signals to guide buyers' choices – buyers' choices of the desired payment form and merchants' choices to accept and encourage use of the alternatives will be based on their respective costs and benefits."  Notes omitted.).

customers are likewise free to respond to the selection of products offered by different merchants at different prices by making choices from among competing stores and brands. A merchant setting its prices higher than those charged by competitors for comparable goods or services will tend to lose sales to the lower price merchants, all else equal. A high priced *supplier* to the merchant will likewise tend to lose sales to lower priced suppliers as merchants tend to charge higher prices for those higher cost products, and merchants' customers respond by shifting some or all of their purchases to lower priced alternatives.

12.     In addition to using simple price differences between products, of course, merchants frequently use other steering strategies. For example, they might promote one brand but not another, provide more prominent shelf space to one brand, offer a free camera case with purchase of one brand of camera, but not with other brands, and so on. In a competitive credit card market unconstrained by the exercise of market power through Anti-Steering Rules, sellers similarly would use such strategies to offer better deals to – and thus share the benefits with – their customers who make lower cost choices. Retailers are highly motivated to increase their sales and reduce their costs, and use many strategies and incentives to accomplish this.

**2.2     Anti-Steering Rules Subvert the Competitive Process and Lead to Higher Prices**

13.     In addition to restricting inter-brand competition at the point of sale, the Anti-Steering Rules also erected an entry barrier by making it difficult for a low cost competitor to

# A1154

enter and succeed by getting merchants to steer transactions effectively to the entrant's network.[13]

14.    In a competitive market, by contrast, if the price to merchants to accept one brand of credit cards is higher than the cost to accept other credit cards (or other payment methods), merchants can be expected increasingly to engage in steering strategies that encourage or reward the use of lower cost payments, and discourage or surcharge the use of the higher cost card.  This would constrain the level of the Networks' fees: high fees generate more revenue for a completed transaction, but the aggregate effect of merchant steering causes a loss of transaction volume.  That lost volume makes it unprofitable for the Networks to maintain their fees as high as they would if they could continue to enforce the Anti-Steering Rules.

15.    All else equal, banks always have an economic incentive to collect higher fees rather than lower, but – in a competitive market – the ability of their customers to make choices from among competing alternatives reduces the profitability of price increases by reducing the volume of sales they will make when they raise their prices.  With the Anti-Steering Rules, banks that issued the Network's cards (and therefore collected the resulting interchange fees) faced none of this normal competition.[14]

---

[13]   See also Stiglitz Report, ¶55 ("The Merchant Restraints also help maintain supracompetitive profits by raising the cost of entry and expansion in the EFT [electronic funds transfer] industry.  Entry, potential entry, and expansion play an important role in the efficiency of a market system.").

[14]   This is not to say that there can never be circumstances where there might be other, efficiency-enhancing effects from such practices.  In this case, I explained that the various defenses offered by the Defendants' experts lacked merit and did not offset the anticompetitive effects of the Anti-Steering Rules.  Frankel Rebuttal Report, Part 5.2.

# A1155

16.      If merchants can respond in a normal way to these higher fees with competitive strategies that cause a higher price network to *lose* transaction volume to a lower cost network, this dysfunctional dynamic can be reversed.  With the Networks' merchant rules in place, however, merchants were unable to stop the relentless increase in card acceptance fees.  On one occasion in the late 1990s, Visa explained to merchants how merchants' inability to steer transactions at the point of sale to lower cost card leads directly to increases in interchange fees:

> The differential [between MasterCard and Visa interchange rates] now has reached approximately 17 basis points and banks are no longer willing to accept the difference. ***As long as merchants allow Visa and Mastercard to be treated equally at the point of sale, there is simply not enough reason/incentive for banks to issue the lower priced card***. They are beginning to switch brands. In fact, Visa share of the debit card market dropped 2 full percentage points in 1997, shifting volume to the higher priced Mastercard product.

> Bottom line, Mastercard has failed to win with consumers so they have shifted their attention and resources in an attempt to accomplish the same desired result by appealing to the issuing banks. In order to halt their share decline, they have substantially raised interchange. ***In effect, what MasterCard is doing is reaching right into your pocket - taking your money and handing it to a card issuer to pay for conversions of Visa cards to MasterCard.***

> It may sound absurd, but, it is true. MasterCard is using your money to grow their market share***. How ironic it is that Mastercard is using increased pricing to merchants in order to fund share growth of a higher priced card product that will then detract even further from merchant profits…***

> Now, put yourself in our board members' shoes. ***We charge less for our superior products, but are treated exactly the same way as Mastercard at the point of sale. Visa gets absolutely no credit for a lower price!*** …

> Importantly, even if we do not raise interchange rates, merchants will still lose because with MasterCard's price advantage, there will increasingly be conversions of lower priced Visa cards to higher priced Mastercards.

> ***In our view, as long as MasterCard maintains a meaningful interchange differential and merchants quietly accept this higher pricing by treating***

10

# A1156

*MasterCard and Visa equally at the point of sale, then a share shift to MasterCard, the higher priced bankcard, will occur. Visa simply can not allow this to happen. We will have to raise our rates.*[15]

17.     Visa correctly recognized that that merchants' identical treatment of MasterCard and Visa transactions at the point of sale, despite a price differences between the brands, caused an increase in the use of the high cost brand and led to increases in interchange fees, increased merchant costs, and reduced merchant profits.   But Visa neglected to explain that it, like MasterCard, enforced no-surcharge and other Anti-Steering Rules, which required that Visa be treated "exactly the same way as Mastercard at the point of sale."  The Anti-Steering Rules prohibited merchants from engaging in exactly the types of strategies – treating card brands *unequally* – that Visa conceded would favor competitive card networks that charged lower prices to merchants.

18.     MasterCard, too, has conceded that merchants' ability to treat customers differently at the point of sale constrains the level at which it sets its interchange fees.  In a proceeding before the European Commission, MasterCard explained that in setting the level of interchange fees:

> MasterCard tries to answer the question: "How high could interchange fees go before we would start having either serious acceptance problems, where merchants would say: we don't want this product anymore, *or by merchants trying to discourage the use of the card either by surcharging or discounting for cash*[...]"[16]

19.     The more competitive tools that merchants have available to them to discourage the use of the Networks' high-priced cards, the more competitive pressure those tools will tend

---

[15]   Visa "Merchant Presentation Messages," VUSAMDL00153736 (emphasis added).

[16]   Judgment of the General Court (Seventh Chamber), Case T-111/08, May 24, 2012, ¶158; available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:62008TJ0111:EN:HTML (emphasis added).

to put on the networks to keep their fees low.  In Part 3, I explain that the Dodd-Frank Act and the DOJ Settlement provided some such tools.  In Part 4, I explain why the additional relief provided by the Proposed Settlement is likely to have a significant additional constraining effect on the level of interchange fees relative to those which would be charged in the absence of that relief, by providing the merchant with additional steering tools.

### 3.    The Proposed Settlement Preserves Reforms Obtained From Dodd-Frank and the DOJ Settlement Which Benefit Merchants and Contribute to the Creation of a More Competitive Marketplace

20.    This litigation commenced in 2005.  Since then, certain of the Networks' Anti-Steering Rules have been reformed as a result of legislation and settlement of litigation against the Networks brought by the United States Department of Justice.  In June 2010, Congress passed and the President signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act.  Among the provisions of the Dodd-Frank Act were reforms of certain of the Networks' Anti-Steering Rules – the "no minimum purchase" and "no discount" rules – which had been challenged by the class plaintiffs in this case.  In particular, the Dodd-Frank Act required that the Networks permit merchants to:

- post minimum purchase amounts (up to $10) for the use of credit cards; and

- offer discounts or in-kind incentives for use of payment methods other than credit cards, including cash, checks, or debit cards.[17]

21.    Many (typically small) merchants have long shown their willingness to set minimum purchase amounts even though such minimums were prohibited by the Networks' rules.  For very small purchases (e.g., a cup of coffee), the fees merchants pay to accept

---

[17]    Public Law 111–203 – July 21, 2010, Sec. 1075.  The Dodd-Frank Act also authorized the Federal Reserve to regulate debit card interchange fee rates and other aspects of debit cards and debit card networks.

# A1158

MasterCard and Visa credit cards can represent a substantial fraction of the merchant's expected profit.[18]  By letting individual merchants set a minimum purchase amount if they choose to do so, each merchant can evaluate the gains and losses from this strategy.  The higher MasterCard and Visa interchange fees and network fees are, the more likely additional merchants are to take advantage of the ability to set minimum purchase amounts, causing more of a decline in transaction volume (and thus a greater competitive constraint) than if merchants could not set minimums.  Reducing interchange fees reduces the incidence of merchants setting minimum charge amounts, which increases the incentive to reduce the fees.  Merchants that choose to set minimum purchase amounts benefit directly by shifting some transactions to lower cost payments, but all merchants – whether they set minimums or not – will benefit to the extent that merchants in the aggregate have an additional tool to make the demand for credit card acceptance more elastic, altering the incentives facing MasterCard and Visa when they set their interchange fee rates.

     22.     Originally, Network rules prohibited any differential pricing at the point of sale.  In the United States, Federal legislation in the early 1980s permitted merchants to offer discounts for the use of cash (and the Networks thereafter did not prohibit such cash discounts even after the original legislation expired).  But Visa had another rule, which required that a merchant's posted or advertised prices be the price available to a Visa card customer.  If a merchant's strategy was to increase its posted prices slightly but offer a discount to cash customers sufficient to reduce those prices below those charged by non-discounting

---

[18]    Starbucks, for example, has indicated that credit cards are relatively expensive for it and for other small-ticket-item merchants.  In 2005 the cost to Starbucks of accepting a credit card for payment was three times the cost of accepting cash.  "Forces Shaping the Payments Environment: A Summary of the Chicago Fed's 2005 Payments Conference," The Federal Reserve Bank of Chicago, Chicago Fed Letter No. 219a, October 2005, p. 4.

# A1159

merchants, under Visa's rule it had to promote the higher credit card price, not the lower cash price.  Some merchants, particularly gas stations which could easily post both cash and credit card prices, nonetheless took advantage of the ability to offer cash discounts.

23.     The Dodd-Frank Act ensured that merchants could offer discounts for (generally low cost) cash, checks, or debit cards.  (As a result of other aspects of that legislation, debit cards typically have a relatively low, fixed interchange fee.)  Over time, some merchants are likely to find the ability to offer discounts for debit cards to be a useful steering strategy, especially if credit card interchange fees remain at high levels relative to debit card interchange fees.

24.     The Dodd-Frank Act, however, did not forbid the Networks from enforcing their "no-discrimination" rules which prevented merchants from offering different discounts or in-kind benefits at the point of sale for different *brands* of credit cards, and which the class plaintiffs challenged in this case.  The Act also did not eliminate Visa's posted price rule which may have limited the ability of merchants to profitably use discounting strategies.  In October 2010, the DOJ Settlement accomplished these reforms by requiring the Networks to permit merchants to encourage the use of alternative brands of credit cards through discounts and other benefits at the point of sale.[19]

25.     The Department of Justice explains the anticompetitive effects of the no-discrimination rules that it challenged as follows.

---

[19]     Under the terms of the DOJ Settlement, merchants were also permitted to display two prices (one for credit cards and one for cash or, e.g., debit) at the point of sale without having to mark each item with two prices.  See Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, in United States of America, et al. v. American Express Company, American Express Travel Related Services Company, Inc., MasterCard International Incorporated, and Visa Inc., June 14, 2011, pp. 25-26.

# A1160

The Complaint alleges that Defendants' Merchant Restraints suppress price and non-price competition by prohibiting a merchant from offering discounts or other benefits to customers for the use of a particular General Purpose Card. These prohibitions allow Defendants to maintain high prices for network services with confidence that no competitor will take away significant transaction volume through competition in the form of merchant discounts or benefits to customers to use lower cost payment options. Defendants' prices for network services to merchants are therefore higher than they would be without the Merchant Restraints.

Absent the Merchant Restraints, merchants would be free to use various methods, such as discounts or non-price benefits, to encourage customers to use the brands of General Purpose Cards that impose lower costs on the merchants. In order to retain merchant business, the networks would need to respond to merchant preferences by competing more vigorously on price and service to merchants. The increased competition among networks would lead to lower merchant fees and better service terms.

Because the Merchant Restraints result in higher merchant costs, and merchants pass these costs on to consumers, retail prices are higher generally for consumers. Moreover, a customer who pays with lower-cost methods of payment pays more than he or she would if Defendants did not prevent merchants from encouraging network competition at the point of sale. For example, because certain types of premium General Purpose Cards tend to be held by more affluent buyers, less affluent purchasers using non-premium General Purpose Cards, debit cards, cash, and checks effectively subsidize part of the cost of expensive premium card benefits and rewards enjoyed by those cardholders.

The Complaint also alleges that the Merchant Restraints have had a number of other anticompetitive effects, including reducing output of lower-cost payment methods, stifling innovation in network services and card offerings, and denying information to customers about the relative costs of General Purpose Cards that would cause more customers to choose lower-cost payment methods. Defendants' Merchant Restraints also have heightened the already high barriers to entry and expansion in the network services market. Merchants' inability to encourage their customers to use less-costly General Purpose Card networks makes it more difficult for existing or potential competitors to threaten Defendants' market power.[20]

26.     According to the Department of Justice, the settlement it reached with

the Networks[21] benefits merchants:

---

[20]    Competitive Impact Statement in United States of America, et al. v. American Express Company, American Express Travel Related Services Company, Inc., MasterCard International Incorporated, and Visa Inc., Civil Action No. CV-10-4496, October 4, 2010 ("Competitive Impact Statement"), pp. 9-10.

[21]    The DOJ explains that the relief it obtained "prohibits Visa and MasterCard from adopting, maintaining, or enforcing any rule, or entering into or enforcing any agreement, that prevents any merchant from: (1) offering the customer a price discount, rebate, free or discounted product or service, or other benefit if the customer uses a particular brand or type of General Purpose Card or particular form of payment; (2) expressing a

Merchants that currently accept only Visa or MasterCard, or both, will benefit immediately from the Final Judgment by having the freedom to encourage their customers to choose the merchants' preferred method of payment. Merchants will have several new options available to accomplish this, such as offering customers a price discount, a rebate, a free product or service, rewards program points, or other benefits; placing signs that encourage customers to use particular payment methods; prompting customers to use particular General Purpose Cards or other forms of payment; or communicating to customers the costs of particular forms of payment.[22]

27.     American Express, also a defendant in the DOJ action, has not yet agreed to these provisions and litigation by the government and other parties continues against that network.  I discuss the effects of American Express' anti-steering policy in Part 4.6.2 below.

28.     By providing additional steering tools to merchants, the Dodd-Frank and DOJ Settlement relief benefitted merchants and consumers and contributed to introducing competition into the general purpose card acceptance (network) services market; and, by ensuring that those benefits remain in effect, the Proposed Settlement's provisions also provide a benefit in the event that the original bases for those rule changes are eliminated.

---

preference for the use of a particular brand or type of General Purpose Card or particular form of payment; (3) promoting a particular brand or type of General Purpose Card or particular form of payment through posted information; through the size, prominence, or sequencing of payment choices; or through other communications to the customer; or (4) communicating to customers the reasonably estimated or actual costs incurred by the merchant when a customer pays with a particular brand or type of General Purpose Card." Id., pp. 10-11.

[22]   Id., p. 14. Another aspect of the Networks' no-discrimination rules was that a merchant could not favor customers presenting cards issued by a particular card issuing member bank of a Network over customers presenting cards issued by another of the Network's member banks.  Subsequent to the Proposed Settlement, Visa altered its rules to permit merchants to offer discounts for use of a particular issuer's cards, and announced a new initiative to facilitate such arrangements.  "Chase/Visa Network Partnership," Nilson Report #1013, March 2013, pp. 1, 7.  This generates an increased economic incentive for a particular credit card issuing bank to enter into a favorable low-cost arrangement with a merchant for acceptance of that bank's Visa credit cards, because the bank can expect to gain increased transaction volume from the merchant's steering to that bank's cards.  Prior to the rule change, a low cost arrangement with a merchant could not result in such steering to a particular bank's credit cards.

16

**4.**  **The Additional Relief from the Proposed Settlement Will Benefit Merchants and Consumers by Providing Additional Means to Constrain the Networks' Market Power**

29.     Although the Dodd-Frank Act and the DOJ Settlements provided additional useful steering tools to merchants, they did not address the Networks' no-surcharge rules.  No-surcharge rules have a different, more significant competitive effect in the marketplace than no-discount rules because consumers react differently (and more strongly) to surcharges than they react to discounts.[23]  In addition to reaffirming the previously obtained relief, the Proposed Settlement reforms the MasterCard and Visa no-surcharge rules.  It also enables merchants to accept the Networks' credit cards at some of their chains ("banners") without having to accept those cards at all of their banners, so that, for example, a merchant might choose not to accept the Network's credit cards in a discount store banner it operates while continuing to accept the cards in its other stores.  Finally, the Proposed Settlement requires MasterCard and Visa to negotiate in good faith with merchant buying groups over the terms and conditions under which they accept the Networks' card transactions.  These reforms can be expected to benefit merchants that take advantage of those newly permitted strategies and benefit merchants generally whether or not they do so.

**4.1   The Evidence Shows That Merchants Benefit From the Ability to Surcharge**

30.     Experience shows that there is a long history of merchants using fees or surcharges to steer customers to lower cost payment methods and recoup the additional costs when customers

---

[23]     See also Stiglitz Report, ¶42 ("Placing an explicit price on use of a card (what the networks call 'surcharging') can be an effective merchant response to above-competitive interchange fees.  Some cardholders will respond to the price signal by continuing to use the card, and the price will allow the merchant to recover some of the interchange fees.  Other cardholders will respond to the price signal by switching to an alternative, less-costly means of payment.  This elasticity of user response to the price signal will cause the profit-maximizing interchange fee to the merchant to fall.  Thus, by preventing 'surcharging,' Visa and MasterCard have reduced the elasticity of demand for the usage of the cards and reduced the cross-elasticity of demand between alternative payment mechanisms."  Notes omitted.).

17

# A1163

nevertheless impose higher costs on the merchant. [24] For example, as long ago as 1902, Sears allowed customers to pay for their orders with postage stamps but with a 5 percent surcharge, so if "you order an article priced at $2.00 and send stamps you should send $2.10. If a $3.00 article you should send $3.15 in stamps."[25] And many U.S. merchants have already taken advantage of existing exceptions to the Networks' no-surcharge rules to charge "convenience fees" – a euphemism for surcharges for use of the Networks' credit cards.[26]

31.    When MasterCard voluntarily eliminated its no-surcharge rule in Europe in 2004, it explained that permitting surcharges "is in tune with the spirit of moving to more open competition and greater choice for merchants and consumers" and expressed its belief that if Visa followed, it would create "a level competitive environment built on the true benefits that card payments offer both to merchants and consumers."[27]

32.    There are three main ways that merchants and their customers benefit from merchants' ability to surcharge credit card transactions. First, by surcharging credit card payments, the merchant recovers all, or a significant portion, of the costs associated with accepting credit card transactions.[28] Second, by surcharging, merchants will steer a significant number of their customers to use alternative, lower cost and non-surcharged payment methods or brands. This will reduce the merchant's overall average cost (and the average prices paid by consumers), which, all else equal, can be expected to

---

[24]    See also Stiglitz Report, ¶27 ("In a competitive system, merchants would be expected to react to a payment network's attempt to charge supracompetitive fees by charging or threatening to charge the users of such cards. This would make it economically less attractive for the payment network to attempt to charge such fees.").

[25]    Sears, Roebuck and Co. 1902 Catalog, p. 4.

[26]    See, e.g., Frankel Report, ¶162 (many colleges and universities apply surcharges – the University of Illinois, for example, explains that if interchange fees decline, so will the amount of the surcharge).

[27]    MCI_MDL02_10577117.

[28]    At the same time, the merchant's posted shelf price will tend to decrease. Frankel Report, Part 5.3; Frankel Rebuttal Report, Part 4.6.2. This will help surcharging merchants to increase sales to customers who pay with cash, check, and debit cards (who benefit from the lower prices as they no longer subsidize the additional cost of serving credit card customers).

# A1164

increase total merchant sales.[29]  This benefits merchants that surcharge, but it can also benefit other merchants to the extent that some consumers alter their payment habits and use credit cards less frequently even at non-surcharging merchants.  Third, because the Networks will lose more transactions if they maintain high interchange fees with surcharging than without surcharging, they will have an economic incentive to set lower interchange fees (and network fees) when merchants have the ability to surcharge.  This will benefit all merchants, whether or not they surcharge.

### 4.1.1  Merchants Are Increasingly Likely to Surcharge at Fee Levels Prevailing in the United States

33.      For surcharging to have these beneficial effects for merchants, at least some merchants must be willing to surcharge (or credibly threaten to surcharge) the Network's credit card transactions at the level of fees that would prevail absent of the ability to surcharge.  The evidence (along with common sense) indicates that the likelihood that a merchant will surcharge use of a particular form of payment increases with the cost of that form of payment.[30]  Surveys performed on behalf of the European Commission, for example, found that surcharging was more common in the Netherlands, where merchant fees were higher, than in Sweden, where merchant fees were lower.[31]

34.      The Australian experience provides useful evidence as to what might be expected in the United States.  Since 1999, the Reserve Bank of Australia ("RBA") has been actively involved in reforming the competitive structure of Australia's payment systems, including its credit card networks.  The RBA

---

[29]   To illustrate, a typical $100 credit card transaction might cost a merchant more than $2.00, while use of a debit card to complete the same transaction today might cost a merchant $0.50 or less.  For each $100 transaction that migrates from credit to debit as a result of merchant surcharges on credit cards, merchants will then save more than $1.50 in fees.

[30]   MasterCard has agreed with this proposition.  See "Payments System Regulation: Response by MasterCard Worldwide to the Issues for the 2007/08 Review," (Submission to the Reserve Bank of Australia), August 31, 2007, pp. 16-17 ("Merchants will have a higher incentive to surcharge the higher merchant fees are... An increase in merchant service fees will clearly raise the gains from surcharging relative to the costs, and hence make it more likely that surcharging will occur.").

[31]   Frankel Rebuttal Report, ¶269.  Moreover, in the Netherlands, more merchants were surcharging than knew that it was legal to do so.

19

studied the effects of no-surcharge rules intensively before deciding to eliminate those rules.  In 2000, the RBA (together with the country's competition authority) concluded that no-surcharge rules were "not desirable."[32]  At the end of 2001, the RBA concluded from its economic analysis that it should eliminate no-surcharge rules,[33] and it used its regulatory powers to do so, effective in 2003.[34]

35.    The RBA has continued to study and monitor the effects of its elimination of no-surcharge rules.  In 2008, the RBA concluded, again following a review of the economic evidence, that "[t]here was no case for allowing schemes to reimpose their no-surcharge rules."[35]  In that review, the RBA considered permitting card networks to limit the amount of surcharges, but it did not do so.  It took up that issue again in 2011, at which time it permitted card networks to limit surcharges to amounts reasonably related to the cost of card acceptance.[36]  At the same time, the RBA again affirmed its view that permitting merchants to surcharge has had competitive benefits:

> The removal of the no-surcharge rules was expected to have a number of benefits for the efficiency of the payments system. First, it was expected to improve price signals to

---

[32]    Reserve Bank of Australia and Australian Competition and Consumer Commission, *Debit And Credit Card Schemes In Australia: A Study Of Interchange Fees And Access*, October 2000, p. 55 ("The study's view is that 'no surcharge' rules suppress price signals that guide the efficient allocation of resources. They result in cross-subsidisation of cardholders by consumers who do not use credit cards; they restrict competition between merchants by limiting the range of pricing strategies they can use; and they prevent end-users exerting competitive pressures on merchant service fees and interchange fees. On balance, the study concludes that 'no surcharge' rules are not desirable. Merchants should not be prevented by the credit card schemes from passing on some or all of the merchant service fee through surcharges, even if some merchants do not avail of the flexibility for their own commercial reasons.").

[33]    Reserve Bank of Australia, Reform of Card Schemes in Australia I: A Consultation Document, December 2001, p. 78 ("In the Reserve Bank's opinion, restrictions imposed by credit card schemes on the freedom of merchants to set their own prices are not in the public interest. These restrictions harm consumers who do not use credit cards because they pay higher prices for goods and services than they would otherwise. By distorting the relative prices of payment instruments, the restrictions are not conducive to efficiency in the payments system. In addition, the restrictions undermine the competitive pressure which merchants might impose on interchange fees and merchant service fees by limiting them to an 'all or nothing' choice about taking cards.").

[34]    Reserve Bank of Australia, Reform of Card Schemes in Australia IV: Final Reforms and Regulation Impact Statement, August 2002, p. 46.

[35]    Reserve Bank of Australia, Reform of Australia's Payments System, Conclusions of the 2007/08 Review, September 2008, p. 7.

[36]    Reserve Bank of Australia, A Variation to the Surcharging Standards: A Consultation Document, December 2011.

20

# A1166

cardholders about the relative costs of different payment methods… Second, the ability to surcharge provides a negotiating tool for merchants who might use the threat of surcharging to negotiate lower fees. Third, with the ability to surcharge, merchants no longer need to build the costs of accepting card payments into the overall prices of their goods and services; hence, customers who choose alternative payment methods are no longer subsidising credit card users. The Payments System Board is satisfied that surcharging has been successful in achieving these benefits…[37]

36.     At first, relatively few merchants in Australia surcharged credit card transactions.  It can take time for significant numbers of merchants to surcharge because it is difficult for merchants to be among the first to surcharge while most of their competitors still do not.  The same negative reaction by consumers that provides the market discipline on the Networks over the level of their fees can create a "first-mover" disadvantage for merchants imposing surcharges, thus risking the loss of some credit card customers to rival merchants that do not surcharge (although surcharging merchants will tend to attract more cash and debit card users).  Experience has shown, however, that some merchants are nonetheless willing to surcharge, and the public learns to accept and adapt to surcharging.[38]  Although the RBA has found it difficult to assemble reliable, comprehensive data on the extent of surcharging, it has cited the trends shown in Figure 1 to illustrate how merchants gradually increased their willingness to surcharge credit card transactions.

---

[37]   Reserve Bank of Australia, A Variation to the Surcharging Standards: A Consultation Document, December 2011, p. 2.

[38]   For example, this occurred in the United States in 1996, when ATM owners first began assessing surcharges on a substantial basis.  Public reaction was quite negative at first, but, over time, the public backlash subsided and consumers adapted by increasingly using their own banks' terminals and economizing on cash withdrawals.

# A1167

**Figure 1**
**Merchant Surcharging in Australia since No-Surcharge Rules Lifted in 2003**



Source: Reserve Bank of Australia, Review of Card Surcharging: A Consultation Document, June 2011, p. 2 (citing East & Partners' Merchant Acquiring & Cards Market program).

37.     As the RBA explains:

Surcharging was slow to develop among merchants in the first few years following the removal of no-surcharge rules. This likely reflected inertia on the part of merchants and the strong expectation by cardholders that no surcharges would apply, given the history of these practices being prohibited. In recent years, though, the rate of surcharging appears to have grown significantly; data from East & Partners' semi-annual survey of the merchant acquiring business suggest that almost 30 per cent of merchants imposed a surcharge on at least one of the credit cards they accepted in December 2010.[39]

---

[39]     Reserve Bank of Australia, Review of Card Surcharging: A Consultation Document, June 2011, p. 2.

22

# A1168

**4.1.2   Surcharging Induces Many Consumers to Switch to Non-Surcharged Payment Brands and Methods**

38.      In Australia, it has been more common for merchants to surcharge American Express or Diners Club cards than MasterCard and Visa cards,[40] and, when all are surcharged, merchants sometimes charge higher surcharge amounts for American Express and Diners Club than for MasterCard and Visa.  The reason is that merchants generally pay much higher fees to accept American Express and Diners Club cards than they pay to accept MasterCard or Visa cards, because MasterCard's and Visa's interchange fees are regulated in Australia.  In December, 2009, for example, the average fees in Australia to accept American and Diners Club cards were more than double the amount that merchants paid to accept MasterCard and Visa credit cards, with average MasterCard and Visa merchant fees of 0.86% (due to the regulated interchange fee rate of 0.50%), while American Express and Diners Club were 1.94% and 2.13%, respectively.[41]

39.      In the United States, the average fees merchants pay to accept MasterCard and Visa credit cards exceed the average fees paid in Australia to accept American Express and Diners Club (and exceed by far the average fees to accept MasterCard and Visa credit cards in Australia) due to the much higher interchange fee rates prevailing in this country on the Networks' credit card transactions.  The average MasterCard credit card interchange fee in December 2009, for example, was 1.99% in the United States.[42]  Total merchant fees (of which the interchange fee is a component) generally exceed

---

[40]   According to one survey, 63.7% of merchants that accepted Diners Club and 73.1% of merchants that accepted American Express in December 2009 applied a surcharge to at least some cards, compared to the overall average of 24.5% which surcharge at least some credit cards among all merchants that accept Visa and MasterCard credit cards.  East & Partners, Australian Merchant Payments: Market Analysis Report, February 2010, Table 31.

[41]   Reserve Bank of Australia, Merchant Fees for Credit and Charge Cards, http://www.rba.gov.au/statistics/tables/xls/c03hist.xls?accessed=2013-03-17-14-09-41.

[42]   MasterCard Systemwide Interchange Report_GCMS Cleared Purchase Vol_US Issued Acquired 2009.xls.

# A1169

this amount – one Visa data source suggests by an average of roughly 0.35%.[43]  So average merchant fees to accept MasterCard and Visa credit cards were roughly 2.34% (with many small merchants likely paying well above this amount).  Thus, the experience of American Express and Diners Club in Australia with respect to merchants' ability to surcharge is a useful benchmark for providing information about the likely effects of surcharging of MasterCard and Visa credit cards in the United States.  That is, in Australia, merchants have an incentive to surcharge American Express and Diners Club cards because those cards are priced substantially (more than 1% of the transaction amount) above the rate-regulated MasterCard and Visa credit cards (and even farther above the cost of accepting debit cards).  In the United States, merchants will have a similar incentive to surcharge all credit cards, so long as those cards are priced substantially above the rate-regulated debit cards, as they currently are.

40.     When merchants do surcharge in Australia, many of their customers switch to alternative payment brands or methods that are not surcharged.  Diners Club, for example, reported to the RBA that "[t]he effect of surcharging Diners Club has been to significantly reduce the number of transactions that are paid for using Diners Club cards…"[44]  This experience is consistent with the reported effects of surcharging of debit cards in the Netherlands.  A study in that country concluded that "a large minority of retailers" assessed surcharges.[45]  Merchants that did so experienced a significantly lower share of payments on the surcharged cards, and, again not surprisingly, the higher the level of the surcharge, the less likely customers were to use the surcharged cards.[46]

---

[43]     Remarks of Bill Sheedy, (then) Executive Vice President, Interchange Strategy, Visa U.S.A., in "Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?," Federal Reserve Bank of Kansas City (2005), Chart 4, p. 180.

[44]     "Review of Reform of Australia's Payments System: Regulation of Credit Card Payments and the role of Diners Club," September 6, 2007, Report to Diners Club (commercial-in-confidence version) by the Allen Consulting Group, p. 12.

[45]     Wilko Bolt, Nicole Jonker and Corry van Renselaar, Incentives at the Counter: An Empirical Analysis of Surcharging Card Payments and Payment Behaviour in the Netherlands, Journal of Banking & Finance (2009), p. 2.

[46]     Id., p. 5.

41.     Overall, the RBA concluded that in Australia "consumers appear to respond to price signals by avoiding surcharges where possible."[47]  The Australian market research firm East & Partners similarly concluded that "[t]he effect of lifting restrictions on merchant surcharging has seen cardholders refusing to absorb the higher costs of using their credit cards and increasingly opting for cheaper debit cards to make payments."[48]  The results of an RBA payment choice study "suggest that around half of consumers that hold a credit card will seek to avoid paying a surcharge by either using a different payment method that does not attract a surcharge (debit card or cash) or going to another store."[49] Moreover, "consumers respond to differential surcharging: when faced with a surcharge that is higher on one type of credit card than another, only around 10 per cent of consumers indicated that they would complete the transaction with the card attracting the higher surcharge, while around 40 per cent indicated that they would complete the transaction with the card attracting the lower surcharge."[50] Thus, higher merchant fees lead to higher surcharges, on average, which steers consumers to switch to lower cost cards.  It is this ability for surcharges to align consumer incentives with those of merchants that makes the practice a potentially powerful constraint on otherwise escalating credit card fees.

42.     The limited experience with surcharging in the United States is consistent with the history of surcharging in Australia.  The Networks here have made some exceptions to their no-surcharge rule policies.  In particular, they have permitted certain higher education, government, and utility merchants to impose surcharges (euphemized as "convenience fees") on credit card

---

[47]   Reserve Bank of Australia, Review of Card Surcharging: A Consultation Document, June 2011, p. 3.

[48]   "Merchant Surcharging in Australia," East & Partners, February 2007, p. 7.

[49]   Reserve Bank of Australia, "A Variation to the Surcharging Standards: Final Reforms and Regulation Impact Statement," June 2012, p. 3.

[50]   Id., p. 4.

transactions.[51]  When merchants have been permitted to charge these "convenience fee" surcharges, many customers have switched to alternative payment methods.

> [O]ur more significant issue relates to the fact that surcharges suppress usage and undermine the considerable investment the Membership has made in the Visa brand. The colleges and universities that have dropped Visa are the very schools that have provided us the data to support these statements. For example, when Indiana University dropped Visa and imposed a percentage-based surcharge, card usage dropped 80%.[52]

Another Visa document explained:

> [A]ll additional charges result in suppressing usage. Convenience fees suppress usage because they increase the cost of a good or service to a consumer. Consumers will actively seek a cheaper payment alternative or shop for the good or service at a competing store.[53]

43.    When a merchant surcharges, therefore, experience shows that many of its customers shift from using credit cards to using debit cards (or cash), saving the merchant the substantial differential costs, for which interchange fees are primarily responsible.

### 4.1.3   Actual and Threatened Surcharging Constrains the Level of Merchant Fees

44.    Because surcharging causes many consumers to switch to alternative lower-cost payment brands or methods, merchants need not actually surcharge for the *ability* to surcharge to have a constraining effect on the level of merchant fees.[54]  Woolworths, one of the largest merchant chains in

---

[51]   They also offer utilities lower interchange fees in exchange for not surcharging.  See, e.g., Visa International Operating Regulations, 15 October 2012, http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf (visited March 28, 2013), pp. 1014-1015 ("To qualify for the Visa Utility Interchange Reimbursement Fee Program, a U.S. Merchant must… [n]ot charge a Convenience Fee to a Cardholder for processing a Visa Transaction. This restriction also applies to a third-party agent that processes Transactions for a utility Merchant.").

[52]   VUSAMDL1-00748463 (12/14/2004).

[53]   Visa U.S.A. White Paper, VUSAMDL1-09042437, p. 5.

[54]   For example, a MasterCard expert in a European proceeding recognized that "[p]rice competition of payment systems for merchants is enhanced by the fact that surcharges (and cash discounts, etc.) are possible. From the point of view of the payments system, surcharging of the system by many merchants is to be avoided. The attractiveness of cards among cardholders is negatively affected by widespread surcharging[…] Therefore the risk of increased surcharging after an increase of fees is one of the most powerful forces to keep merchant fees low. We would expect that actual surcharging is rather infrequent because payment systems have a great interest to avoid merchant surcharging of their system. But nevertheless, merchants' right to surcharge

Australia, used the threat of surcharging to negotiate lower merchant fees from American Express without ever actually surcharging the cards.[55]  Woolworths explained that "surcharging results in downward pressure on merchant service fees/interchange fees because [networks]/acquirers are concerned that surcharging will result in decreased use of the payment method on which a surcharge is placed."[56]  In a deposition in this case, a MasterCard witness testified, "Surcharging is one of the elements if it were to become significant practice that would actually raise our attention to the reaction of merchants to interchange fees, yes."[57]

45.    As Figure 2 shows, despite the fact that American Express and Diners Club merchant fees were not directly regulated by the RBA (while the RBA did regulate MasterCard and Visa interchange rates), the former networks have faced competitive pressure to reduce their merchant fees. American Express has recognized this fact, explaining in Australia that "[t]he Reserve Bank has applied a consistent regulatory policy to American Express with the explicit intention – and actual effect – of driving down its merchant pricing."[58]

---

imposes substantial downward pressure on merchant fees."  C. Christian von Weizsäcker, "Economics of Credit Cards - Expert Report on behalf of MasterCard International Incorporated and Europay International SA" dated 23 January 2002, p. 19-20.  "MasterCard considers that the ability of merchants to discourage card use, by such means as cash discounts and surcharging, should be more than sufficient to avoid excessive interchange fees.  Credit card schemes have an interest in avoiding discouragement by merchants, because it lessens card use.  It should not, therefore, be surprising that schemes will set interchange fees to dissuade widespread discouragement practices by merchants…The threat of discouragement has value to the merchant (in restraining merchant fees) as long as it is credible, even if it is not exercised" (note omitted) in "Payments System Regulation: Response by MasterCard Worldwide to the Issues for the 2007/08 Review," (Submission to the Reserve Bank of Australia), August 31, 2007, pp. 16-17.

[55]    Declaration of Dhun Karai, head of Group Financial Services for Woolworths, September 22, 2009, ¶¶5.5-5.19.

[56]    Declaration of Dhun Karai, head of Group Financial Services for Woolworths, September 22, 2009, ¶5.1.

[57]    Deposition of Etienne Goosse, October 22, 2008 (MasterCard 30(b)(6) witness on UK rules), p. 198.

[58]    American Express Australia Limited, "Review of Payment System Reforms: A Submission to the Reserve Bank of Australia," August 2007, p. 16.

# A1173



**Figure 2**
**Cumulative Change in Level of Interchange Fee and**
**Merchant Discount Fee Rates in Australia Since March 2003**

Source: http://www.rba.gov.au/statistics/tables/xls/c03hist.xls.

46.     The ability for merchants in Australia to surcharge American Express and Diners Club

transactions played an important role in the reduction of those networks' merchant fees.  American

Express explained that:

> [O]ur merchant service fees have declined sharply in response to competition from the
> lower merchant fees of our competitors and pressure from merchants following the
> implementation of the Interchange Standard by the dominant schemes…
>
> The effect of sustained competitive pressure on American Express, driven by price
> reductions in the dominant schemes, and the effects of merchant surcharging – or the
> threat of surcharging – have prevented the three-party schemes from achieving
> anything more than a transitory high-water mark increase in market share…[59]

---

[59]     American Express Australia Limited, "Review of Payment System Reforms: A Submission to the Reserve Bank
of Australia," August 2007, pp. 11-12.

# A1174

Diners Club similarly reported that "competitive forces have led to falls in Diners Club [merchant fee rates] over time," that "[f]rom the time that merchants have been permitted (but not obligated) to surcharge, these falls have been particularly large" and that "[t]he effect of surcharging Diners Club has been to significantly reduce the number of transactions that are paid for using Diners Card cards."[60]

47.      After reviewing the experience in Australia, the New Zealand Commerce Commission brought a case against and reached settlements with MasterCard and Visa, under which the Networks ceased enforcing their no-surcharge rules in New Zealand.  As the Commission explained in announcing its settlement with MasterCard:

> Merchants will no longer be prevented from applying surcharges to payments made by credit cards or by specific types of credit cards. Any surcharges will be disclosed to cardholders at the time of sale and bear a reasonable relationship to the merchant's costs of accepting MasterCard products. Merchants will also be able to encourage customers to pay by other means…

> "The agreed changes to the MasterCard rules will boost competition in the provision of credit card services to retailers in New Zealand," said Commerce Commission Chair Dr. Mark Berry. "The Commission is pleased that MasterCard has agreed to settle the Commission's claims on the same basis as Visa."

> "The settlement can be expected to reduce overall costs to consumers of payment systems by driving down interchange fees and facilitating merchant steering towards lower cost payment methods. It will also ensure that costs of credit card use fall to a greater extent on the card users themselves, who can make informed choices about payment methods, and less on other consumers," said Dr. Berry.[61]

**4.2     The Ability to Surcharge Credit Card Transactions is More Competitively Effective than the Ability to Discount**

48.      While it is possible to craft a combination of shelf prices with a list of discounts for various low cost payment methods that is *algebraically* equivalent to a (lower) shelf price

---

[60]   The Allen Consulting Group, "Review of Reform of Australia's Payments System: Regulation of Credit Card Payments and the role of Diners Club," September 6 2007, http://www.rba.gov.au/payments-system/reforms/review-cardreforms/pdf/dc-06092007.pdf, pp. 11-12.

[61]   "Commerce Commission and MasterCard Agree to Settle Credit Card Interchange Fee Proceedings," press release, August 24, 2009, http://www.comcom.govt.nz/media-releases/detail/2009/commercecommissionandmastercardagr.

# A1175

with a list of surcharges for more costly credit card transactions, it has long been recognized

that the two potential merchant strategies are not *economically* equivalent.  In the real world,

consumers react differently to higher versus lower posted prices, and they react differently to

perceived penalties (such as a surcharge) than they do to perceived rewards of equal

magnitude.  With respect to credit card surcharges, this reality was noted by economist Richard

Thaler in 1980.[62]  Visa has agreed with Thaler's explanation, stating that "it is much more

difficult to depict surcharges in a positive light, since they represent a penalty to credit

purchasers."[63]  American Express similarly explained that while surcharges and discounts may

be equivalent "from a theoretical or mathematical viewpoint,"[64] there is in fact "a world of

difference between a discount for cash and a surcharge for credit card use.  Any similarity exists

in theory only because the two are not functionally equivalent in the marketplace."[65]

---

[62]   Richard Thaler, "Toward A Positive Theory Of Consumer Choice," 1 Journal of Economic Behavior and Organization 39, 45 (1980) ("Credit cards provide a particularly clear example [of the economic difference between rewards and penalties]. Until recently, credit card companies banned their affiliated stores from charging higher prices to credit card users. A bill to outlaw such agreements was presented to Congress. When it appeared likely that some kind of bill would pass, the credit card lobby turned its attention to form rather than substance. Specifically, it preferred that any difference between cash and credit card customers take the form of a cash discount rather than a credit card surcharge. This preference makes sense if consumers would view the cash discount as an opportunity cost of using the credit card but the surcharge as an out-of-pocket cost.").

[63]   Prepared Testimony of Visa USA, Inc., before the Committee on Banking. Finance and Urban Affairs, Subcommittee on Consumer Affairs and Coinage, United States House of Representatives, "Hearing on Credit Card Surcharges," March 27, 1984, pp. 107-08. In his testimony before the U.S. Senate, Visa U.S.A.'s then President Charles Russell was asked, "[i]f you're concerned about confusion and having both cash discount and credit card surcharge programs operating at the same time, how would you feel about prohibiting cash discounts but permitting credit surcharges?" Russell responded, "I think that's a giant step backward... [T]he benefits all seem to favor cash discount as opposed to surcharges." Testimony of Charles Russell, President, Visa U.S.A., Inc., Before the Committee on Banking, Housing and Urban Affairs, Subcommittee on Consumer Affairs, United States Senate, "The Cash Discount Act," February 7, 1984, p. 161.

[64]   Prepared Testimony of Hugh H. Smith, Senior Vice President, Government Affairs, on behalf of the American Express Co., before the United States House of Representatives, Committee on Banking, Finance and Urban Affairs, Subcommittee on Consumer Affairs and Coinage, The Cash Discount Act, February 5, 1981, p. 27.

[65]   Testimony of Hugh H. Smith, Senior Vice President, American Express Company, Before the Committee on Banking, Housing and Urban Affairs, Subcommittee on Consumer Affairs, United States Senate, "The Cash Discount Act," February 7, 1984, p. 105.  Smith criticized those who claimed the practices were equivalent and

# A1176

49.     As Federal Reserve economists noted with respect to the DOJ Settlements, which

resulted in expanded discounting options for merchants but did not alter the Network's no-

surcharge rules:

> Although cash discounts and card surcharges may have equivalent arithmetic representations in some situations, they are not equivalent from a behavioral perspective. As first shown by Kahneman and Tversky's (1979) work on prospect theory, individuals perceive a bigger impact of losses than of gains, even when the monetary value is the same (a phenomenon known as loss aversion). As a result, consumers are likely to respond differently to discounts than to surcharges even if their value is nominally arithmetically equivalent…

> Consumers view them differently because consumers are loss averse. If surcharges on credit card transactions are allowed, credit card use may decline, resulting in lower revenues for credit card issuers and networks. This may be why banks and credit card networks are opposed to surcharges.[66]

50.     Surcharges pose a more substantial threat to the value of the Network's brands

than do discounts, because consumers react more negatively to surcharges than to the offer of

discounts.[67]  This greater threat to the Networks is why surcharges have a greater constraining

effect on the level of merchant fees than do discounts.

---

both should therefore be permitted, testifying that "what they're doing is trying to apply some abstract ivory tower theory to the real world, without taking into account what happens in that real world."  Statement of Hugh H. Smith, Senior Vice President, American Express Co., Before the Subcommittee on Consumer Affairs and Coinage of the Committee on Banking, Finance and Urban Affairs, March 27, 1984, p. 131.  He further testified, "I also want to challenge the notion that a cash discount and a surcharge for credit card use are equivalent or interchangeable.  There is a substantial difference in the marketplace." Id., p. 140.

[66]  Scott Schuh, Oz Shy, Joanna Stavins, and Robert Triest, "An Economic Analysis of the 2010 Proposed Settlement between the Department of Justice and Credit Card Networks," Federal Reserve Bank of Boston, Public Policy Discussion Paper No. 11-4 (2011), http://www.bostonfed.org/economic/ppdp/2011/ppdp1104.pdf.

[67]  See, e.g., Report of Kenneth G. Elzinga, December 14, 2009, pp. 65-78. Expert Report of Dr. Benjamin Klein, December 14, 2009, p. 4, ¶50. Report of Professor Barbara E. Kahn, December 14, 2009 (generally). MasterCard claims that surcharges are "not consumer friendly."  See, e.g., Reserve Bank of Australia, Proceedings of Payments System Review Conference, 29 November 2007, p. 195.  MasterCard and Visa have argued that their cardholders react more negatively to surcharges than to discounts so that surcharging threatens the Networks more than discounting.  See, e.g., Closing Argument of MasterCard International Inc., in The Commissioner of Competition [Canada], Applicant, And Visa Canada Corporation And MasterCard International Incorporated, Respondents, And The Toronto-Dominion Bank And Canadian Bankers Association, Intervenors, http://www.ct-tc.gc.ca/CMFiles/CT-2010-

31

51.     Because surcharges permit a merchant to set lower shelf prices and more effectively steer customers to use lower cost payments, the ability to surcharge under the terms of the Proposed Settlement benefits merchants and their customers in addition to the benefits realized from the concurrent ability to offer discounts for lower cost payment methods.

### 4.3    Alternative Forms of Surcharging Permitted by the Proposed Settlement

52.     The Proposed Settlement permits merchants to implement either "brand-level" or "product-level" surcharges.[68]  A brand-level surcharge would apply to all MasterCard-branded credit card transactions or all Visa-branded credit card transactions (and those surcharge amounts could be different if the cost to the merchant of those brands differed).  A product-level surcharge permits a merchant to differentially surcharge different types of Visa or MasterCard credit cards (such as by surcharging differently for Visa's high interchange fee "Signature Preferred" or commercial credit cards than for traditional Visa credit cards that impose a lower interchange fee).[69]  As the RBA pointed out in Australia:

> A transaction made with a premium/platinum card will, therefore, at many merchants incur a higher merchant service fee than a transaction on a standard card because premium/platinum cards attract a higher interchange fee. Reflecting this, the merchant

---

010_Closing%20Argument%20of%20Mastercard%20International%20Inc._300_45_6-29-2012_5632.pdf. ¶212 ("Credit card companies oppose surcharging because it poses a threat to brand reputation, and, in contrast, implementation of discounting poses no immediate threats to the brands."); ¶516 ("Comparatively, consumers love discounts and display little affection for other steering mechanisms.").  In the same case, Visa similarly argued that "The hostile consumer reaction to surcharging undermines the Visa brand" and "[t]his hostile reaction to surcharging and its impact on Visa's brand is different from the brand effect of discounting."  Closing Argument of Visa Canada Corporation, ¶47.

[68]    Proposed Settlement, ¶¶42, 55.

[69]    The details of these surcharge options described in the Proposed Settlement vary with respect to the maximum surcharge amount the merchant may assess.  For brand-level surcharges, the Networks may limit the surcharge amount to the merchant's cost of acceptance, up to a cap currently set at 4%.  For product-level surcharges, the Networks may limit the amount of a surcharge on a product to the differential between that product's cost and the merchant's cost to accept debit cards.

may choose to signal the different costs of acceptance for different card types by imposing card-specific surcharges.[70]

53.     Some merchants have been particularly unhappy with the proliferation of premium credit cards carrying significantly higher interchange fees.  Banks, meanwhile, have sometimes switched cardholders (unprompted) to premium cards or aggressively marketed premium cards or commercial cards to existing cardholders.  Under the settlement, a merchant would now have the option to use product-level surcharging to surcharge business customers presenting commercial credit cards, but not other consumers presenting personal credit cards.  In addition to the benefits from being able to steer customers away from such high cost cards as discussed in the prior section, this may help to deter the Networks and their member banks from continuing their strategy of encouraging the issuance of premium, high cost (to merchants) credit cards.  The ability to engage in product-level surcharging thus provides an additional option for merchants to specifically steer customers away from using the Networks' highest cost cards, and can be expected to benefit the merchants that use that option and other merchants by reducing the economic incentive for the Networks to set very high interchange fees on their premium cards and for their card issuing member banks to issue those credit cards.

### 4.4     Some Merchants Can Take Advantage of Selective Acceptance Across Their Different Banners to Reduce Card Acceptance Fees

54.     Some merchant companies operate multiple store brands or "banners," and they may operate a discount banner at which they would prefer not to accept credit cards in order to keep costs (and prices) as low as possible.  Under Visa's rules and fee schedules, a merchant could face far higher interchange fees across all of its store banners if it did not agree to accept Visa cards at one or more banners, as Visa generally made substantial volume discounts available to large merchants, but only if the merchants accepted Visa credit cards at all of their

---

[70]     Reserve Bank of Australia, "Review of Card Surcharging: A Consultation Document," June 2011, pp. 8-9.

outlets and banners.  Thus, merchants lost the practical ability to use lower costs to help lower prices at their discount outlet banners.  Under the terms of the Proposed Settlement, the Networks agree to permit merchants to selectively accept the Networks' credit cards at some, but not all, of the merchants' banners, without losing access to generally available volume-based discounts.[71]  Because a merchant's willingness to refuse acceptance of a card brand at a banner is greater if the level of the brand's fees are greater, this rule change will tend to further increase the elasticity of demand with respect to merchant fees, and thus intensify the competitive constraints facing the Networks over the level of their merchant fees.

### 4.5   Merchant Buying Groups May Help Merchants Negotiate Lower Fees

55.      The Proposed Settlement also contains provisions under which MasterCard and Visa agree to negotiate in good faith with merchant buying groups.[72]  MasterCard and Visa generally have set relatively lower interchange fees for larger merchants and merchants that can more easily steer consumers to use alternative payment methods or brands.[73]

56.      Buying groups may facilitate the ability of smaller merchants to obtain the scale economies, organizational efficiencies and negotiating ability of large merchants.  For example, authors of a national survey of participants in hospital buying groups found that such groups "serve to contain rising health care costs by reducing product prices" by "brokering, negotiating and aggregating supply

---

[71]   Proposed Settlement, ¶¶41, 54.

[72]   Proposed Settlement, ¶¶43, 56.

[73]   See, e.g., Alan S. Frankel, "Interchange Fees in Various Countries: Commentary on Weiner and Wright," in Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?, Federal Reserve Bank of Kansas City (2005), pp. 51-61.

contracts between manufacturers and hospitals… [and] thus enable hospitals to achieve purchasing economies of scale."[74]

57.     To the extent that merchant buying groups enable their member merchants the opportunity to steer a significant volume of transactions toward or away from one of the Networks, they may be especially effective at contributing towards enhancing the competitive constraints on the level of merchant fees.

### 4.6    The Effects of State Statutes and American Express' Non-Discrimination Policy

58.     I have explained that the ability to surcharge can be expected to introduce more competition in the credit card acceptance (network) services market and hence impose a more significant competitive constraint on the pricing decisions of the Networks than has existed before, and that merchants will generally be more willing to surcharge a credit card brand the higher that the fees are to accept that brand.  This is not to say that there are no restrictions on surcharging other than the Networks' rules.  I understand that some U.S. states currently have statutory provisions which may restrict merchants' ability to surcharge credit card transactions.  I also understand that American Express – a generally higher cost brand to accept – enforces a "no-discrimination" policy and that the Proposed Settlement has provisions that link a merchant's ability to surcharge the Networks' card transactions on the merchants' surcharging of American Express transactions (assuming they are more costly to the merchant).  I address below the effects of these dynamics on the likelihood of effective surcharging.

### 4.6.1    State Surcharge-Related Statutes

59.     Ten U.S. states currently have statutes which may affect the ability of merchants to surcharge credit card transactions in those states.[75]   These statutes do not eliminate the benefits from

---

[74]   "Hospital Purchasing Alliances: Utilization, Services and Performance," Health Care Management Review, July-September 2008, pp. 203-215, at p. 213.

# A1181

merchants' ability to surcharge under the terms of the Proposed Settlement, even in a state that may forbid any surcharging of credit card transactions.[76]  There was no dispute in this case that the relevant geographic market is the United States (e.g., not a worldwide market or separate state-specific markets).  MasterCard and Visa set different interchange fee rates in the United States versus other countries, but they do not set different interchange fees for merchants located in different states or geographic areas within the United States.  Indeed, multi-state merchants account for a large fraction of total retail sales.  With common interchange fees throughout the United States, the constraining effect of surcharging and potential surcharging in states where it is possible to surcharge will benefit even merchants which operate only in states in which surcharging is not possible.  Moreover, a general shift in payment preferences due to surcharging where it is permitted can be expected to reduce credit card usage in other states for travel-related payments, Internet payments, and other payments if, for example, there is a general migration by some consumers towards habitual use of lower-cost debit cards instead of credit cards.

60.    Any state statutes which restrict credit card surcharges have existed to date in a competitive vacuum.  The Network rules prohibited surcharges, so state statutes were not subject to any significant marketplace challenge, such as might occur if, for example, Internet and other merchants operating in states in which merchants cannot surcharge begin to lose sales or profits relative to merchants operating in states in which merchants can surcharge.  Analogously, states which enforced strict usury limits on credit card interest rates found themselves losing card issuing and servicing businesses, market share, and employment to states that repealed usury laws, ultimately leading to

---

[75]   Elzinga Report, p. 67; Kahn Report, ¶110; Klein Report, ¶¶80, 111; Topel Report, ¶15d; Wecker Report, ¶73. See also, http://usa.visa.com/personal/using_visa/checkout_fees/index.html.

[76]   Frankel Rebuttal Report, Part 5.2.2.4.

additional states relaxing their own usury laws.[77]  A similar phenomenon may occur with state surcharge laws.  In the meantime, however, while merchants in states in which statutes may prohibit credit card surcharges may not be able to use surcharges to steer transactions to lower cost payments, they will benefit from the overall enhanced constraining effect on the Networks' interchange fees from the relief as discussed above.

### 4.6.2   American Express' Non-Discrimination Policy

61.      The Proposed Settlement contains clauses which limit a merchant's ability to surcharge MasterCard and Visa credit card transactions so that a merchant does not treat customers who use higher cost credit cards more advantageously than customers who use a MasterCard or Visa card.[78] Primarily, the issue relates to the fact that American Express maintains a practice of requiring "non-discrimination" by merchants between customers who use American Express cards and customers who use alternative credit or debit card brands.[79]  Under the provisions of the Dodd-Frank Act, American Express must permit merchants that accept American Express cards to offer discounts for debit cards, but American Express otherwise has not altered its policy.  Under that policy, a merchant may only surcharge an American Express card transaction if the merchant also surcharges all other credit and debit card transactions by at least as much as the merchant surcharges American Express transactions.

62.      I understand that American Express' policy is being challenged in separate litigation by merchants, states, and the United States Department of Justice.  Merchants and their customers would

---

[77]   See, e.g., David S. Evans and Richard Schmalensee, Paying With Plastic (2nd ed. 2005), pp. 69-70 ("[I]n an attempt to attract or retain such movable card operations, some states began to modify their usury laws.").

[78]   Proposed Settlement, ¶¶42a(iv-v), ¶¶55a(iv-v),

[79]   According to the complaint filed by the U.S. Department of Justice, American Express generally requires that "[m]erchants must not... impose any restrictions, conditions, [or] disadvantages... when the [American Express] Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks..." and that American Express "defines 'Other Payment Products'... as 'any charge, credit, debit, stored value or smart cards, account access devices, or other payment cards, services, or products other than the [American Express] Card."  Complaint, in United States of America, et al. v. American Express Company, et al., CV10-4496, October 4, 2010, pp. 10-11.

# A1183

benefit more if American Express' non-discrimination policy were eliminated.  As a generally higher cost brand, American Express would be more likely to be surcharged, and at higher rates, if its "non-discrimination" policy were no longer in effect.  By forcing a merchant to surcharge even low-cost debit card transactions in order to surcharge American Express cards, American Express' policy prevents merchant that accept American Express cards from using surcharging to encourage or steer their customers to use debit cards instead of credit cards, or to use lower cost credit cards instead of high cost credit cards.

63.     Nevertheless, although American Express' policy, while it persists, reduces the ability of merchants to use surcharge strategies to lower their costs, it does not eliminate it.

- Some merchants do not accept American Express cards, so are unaffected by the American Express policy.[80]

- Some merchants might choose to *drop* acceptance of American Express so that they can surcharge MasterCard and Visa card transactions under the terms of the Proposed Settlement, or may credibly threaten to do so in exchange for rate reductions from American Express.  For some merchants, American Express represents a small percentage of their transaction volume or the benefits from surcharging may outweigh the benefits of accepting American Express cards.  The ability to surcharge may cause such merchants to consider dropping American Express.

- Some merchants receive few debit card transactions, and could decide to accept only credit cards with a surcharge in addition to, e.g., cash or checks, thus steering customers to those lower cost alternatives.

64.     The linkage in the Proposed Settlement of a merchant's surcharging of MasterCard and Visa transactions to surcharging American Express transactions likely has little significance with respect to merchants' benefits from the settlement: the competitive problem stems from the American Express rule, not from the linkage of surcharging of MasterCard and Visa credit card transactions to surcharging American Express transactions.  Absent the linkage, it would be *contractually* possible for a merchant to surcharge MasterCard and Visa credit card transactions, but not American Express transactions.  But this

---

[80]     American Express cards are reportedly accepted at about one-third fewer merchant locations in the United States than MasterCard and Visa credit cards.  See, The Nilson Report No. 1011, February 2013, p. 10.

is unlikely to have been a desirable competitive strategy for merchants even without the linkage provision, because surcharging steers customers to non-surcharged alternatives, and few merchants would likely want to steer customers to use more costly American Express cards.[81]

### 4.7    An Illustration of the Benefits from Surcharging

65.    Estimating the aggregate dollar value to U.S. merchants from the new relief contained in the Proposed Settlement is difficult.  Unlike a damages calculation, which is retrospective in nature, this prospective value depends on forecasting a number of parameters and conditions.  Just focusing on the value to merchants from surcharging, these include at least the following:

- The aggregate amount of credit card charge volume each year if there are no surcharges.
- The amount by which surcharging would depress the level of interchange fees relative to those which otherwise would exist.
- The percentage of merchant dollar charge volume that would be in states that may forbid surcharges.
- The percentage of merchant dollar charge volume that would be at merchants that will surcharge.
- The average amount of surcharges that merchants would choose.
- Shifts in usage between payment methods from the factors above and from other changes in the economy.[82]

66.    Nevertheless, it is possible to show that even modest responses to the threat of surcharging or modest amounts of surcharging will result in substantial savings and recoupment of costs by merchants.[83]

---

[81]    If the cost to a merchant of accepting American Express happens to be lower than the cost to the merchant of accepting MasterCard and Visa then, under the Proposed Settlement, the merchant may surcharge MasterCard and Visa without surcharging American Express.

[82]    Note that these parameters in turn depend on a variety of other factors.  For example, the percentage of volume subject to surcharging may depend on a range of commercial, legal, and contractual factors, such as merchants' business considerations, the evolution of state laws on surcharging, and other contractual restrictions on surcharging such as American Express' no-discrimination policy currently being challenged in other litigation.

[83]    See also Stiglitz Reply Report, pp. 50-51 ("If, however, the merchant could steer its customers to alternative payment means in response to a high interchange fee without losing the customers to its rivals, the merchant would have greater expected profits from such steering than from rejection of the card.  Because such

# A1185

67.     A total of $1.5 trillion in MasterCard and Visa credit card charges were transacted at U.S. merchants in 2012.[84]  Since the end of the recent recession, dollar charge volume has resumed robust growth of 8.5% per year in 2011 and 2012 (similar to pre-recession growth rates).  If growth continues at an 8% annual rate, over the next ten years (2014-2023) there will be another $25.6 trillion in MasterCard/Visa credit card transactions.  For every basis point (0.01%) reduction in interchange fee rates due to competitive pressure resulting from surcharging or the threat of surcharging, therefore, merchants throughout the United States will save about $2.6 billion over the next decade.

68.     Merchants that surcharge (or those who use the threat of surcharging to negotiate lower fees) will realize the greatest savings.  To illustrate, suppose the difference between the cost to merchants of accepting debit cards and credit cards were 1.00% of the transaction amount, and surcharging merchants set the credit card surcharge equal just to that difference between the two payment types.[85]  In that case, if a $100 transaction would have been made using a credit card, and the merchant applies a 1.00% surcharge, then the merchant will recoup the $1 difference in payment cost from the credit card customer.  If, alternatively, the customer chooses to pay with a debit card instead, the merchant will again save the $1 due to the lower fees on debit.[86]  Using those assumptions, for every one percent of merchant charge volume that is actually surcharged over the next decade, merchants will

---

steering through, for example, surcharging causes significant adverse effects on the network and issuing banks, the ability to steer will likely result in a reduction in the equilibrium profit maximizing interchange fee." Notes omitted.).

[84]   Based on quarterly operating data releases issued by MasterCard and Visa.

[85]   This assumption simplifies the computations.  To the extent that some merchants are likely to set credit card surcharge amounts at levels similar to their cost of accepting credit cards, this will tend to result in more significant altering of cardholder payment patterns towards lower cost alternatives and generate more complete recoupment of merchants' credit card acceptance costs.

[86]   By assuming that the surcharge amount equals the difference between credit and debit, the result to the merchant is financially identical with either choice.  For simplicity, I assume that customers are paying with either credit or debit.  The basic point is simply that merchants can either recoup some of their costs through surcharging or can benefit from lower fees through successful steering.  Merchants will consider the possibility that customers faced with a surcharge will not make a purchase at all when deciding whether to surcharge, but merchants that do choose to surcharge will presumably have concluded that relatively few customers would do so.

# A1186

recoup or save an additional $2.6 billion (roughly 1% savings on each 1% of total charge volume over that period).[87]

69.     Finally, increased surcharging by merchants may induce consumers to rely more generally on debit cards.[88]  This permits even merchants that do not surcharge to benefit from a change in payment usage patterns.  The amount of this benefit depends on the proportion of merchants that surcharge and the effect of surcharging on payment usage generally.

70.     Projecting the amount by which merchants will potentially benefit thus requires estimates of the amount by which interchange fees will be depressed by merchants' ability to surcharge, the percentage of charge volume for which merchants will in fact apply surcharges, and the shift of transactions at non-surcharging merchants from credit to debit.  Although these factors cannot be predicted with precision, the experience in Australia provides some useful benchmarks, because surcharging of American Express transactions is now permitted in Australia and American Express' merchant fee rates in Australia have been similar to the level of MasterCard and Visa rates in the United States.

71.     The first source of savings to (all) merchants in the United States will be the competitive pressure that can be expected to reduce the level of MasterCard and Visa credit card interchange fees. For the past few years, the average cost to Australian merchants to accept American Express cards has exceeded the cost to accept MasterCard or Visa cards by about 1% of the transaction amount[89] – similar to the assumed gap in this country between the cost of accepting credit and debit card transactions.  But

---

[87]   This amount will be impacted by changes in the difference between credit and debit card interchange fee rates. I take this factor into account in the example I describe below.

[88]   Consumers tend to develop strong preferences to use favorite cards either overall or for particular types of transactions.  Although, as I explained in Part 3 of my initial report, debit card acceptance has not been a sufficiently good substitute from the perspective of merchants to be considered part of the same relevant product market as credit card acceptance, surcharging can be expected to induce more substitution by some customers, to the benefit of merchants and consumers alike.

[89]   The average gap was 1.04% (and declining) during the 2009-2012 period. http://www.rba.gov.au/statistics/tables/xls/c03hist.xls?accessed=2013-03-17-14-09-41.

# A1187

the competitive effects from surcharging continue to pressure American Express to reduce its merchant

fees in Australia.  For the past three years, the gap between American Express and MasterCard/Visa has

narrowed by about four basis points (0.04%) per year.  If that pattern is repeated here for MasterCard

and Visa credit card interchange fee rates, it will generate the savings shown in column 3 of Table 1,

which total $62.8 billion over the next ten years.

**Table 1**
**Illustration of Potential Surcharging Benefits**
**($ Billions)**

| | Credit Charge Volume ($ Billions, No Surcharging) (1) | Assumed Reduction in Interchange Rates Due to Surcharging (2) | Savings From Lower Interchange Rates (3) = (1) x (2) | Percentage of Merchants (by Volume) That Surcharge (4) | Savings/ Recoupment by Merchants That Surcharge (5) = (1) x (1%-(2)) x (4) | Portion of Credit Volume Switched to Debit at Non-Surcharging Merchants (6) | Savings From Shift to Debit at Non-Surcharging Merchants (7) = (1-(4)) x (6) x (1) x (1%-(2)) | Total Savings (8) = (3) + (5) + (7) |
|---|---|---|---|---|---|---|---|---|
| 2013 | $1,636.2 | 0.00% | $0.0 | 0% | $0.0 | 0% | $0.0 | $0.0 |
| 2014 | $1,767.1 | 0.04% | $0.7 | 2% | $0.3 | 1% | $0.2 | $1.2 |
| 2015 | $1,908.5 | 0.08% | $1.5 | 4% | $0.7 | 2% | $0.3 | $2.6 |
| 2016 | $2,061.1 | 0.12% | $2.5 | 6% | $1.1 | 3% | $0.5 | $4.1 |
| 2017 | $2,226.0 | 0.16% | $3.6 | 8% | $1.5 | 4% | $0.7 | $5.7 |
| 2018 | $2,404.1 | 0.20% | $4.8 | 10% | $1.9 | 5% | $0.9 | $7.6 |
| 2019 | $2,596.4 | 0.24% | $6.2 | 12% | $2.4 | 6% | $1.0 | $9.6 |
| 2020 | $2,804.2 | 0.28% | $7.9 | 14% | $2.8 | 7% | $1.2 | $11.9 |
| 2021 | $3,028.5 | 0.32% | $9.7 | 16% | $3.3 | 8% | $1.4 | $14.4 |
| 2022 | $3,270.8 | 0.36% | $11.8 | 18% | $3.8 | 9% | $1.5 | $17.1 |
| 2023 | $3,532.4 | 0.40% | $14.1 | 20% | $4.2 | 10% | $1.7 | $20.1 |
| **Total** | | | **$62.8** | | **$22.0** | | **$9.5** | **$94.3** |

72.     The second type of savings accrues to merchants that actually surcharge, thereby

realizing cost savings as customers switch to debit cards or recouping the cost of accepting credit cards

when customers use their credit cards.  It is likely that the percentage of merchants that surcharge, as in

Australia, will increase over time.  In Australia, the RBA reports that "almost 30 per cent of merchants

imposed a surcharge on at least one of the credit cards they accepted in December 2010" (i.e., seven

years after surcharging was permitted).[90]  (See also Figure 1.)  As I explained in Part 4.1.2 above,

moreover, American Express cards may be surcharged significantly more frequently than average.  But

even if surcharging of MasterCard and Visa credit card transactions in the United States grew steadily to

20% of merchant charge volume over a ten year period (and surcharges continue to equal the savings

---

[90]     Reserve Bank of Australia, "Review of Card Surcharging: A Consultation Document," June 2011, p. 2.

# A1188

each year of debit relative to credit, adjusting for a declining spread between the two), then merchants will save or recoup an additional $22.0 billion from this source.  Finally, if there is a gradual change in the overall mix of credit and debit card use, even at merchants that do not surcharge, as shown in column (6), then non-surcharging merchants will benefit by an additional $9.5 billion over ten years from these changing payment patterns, for total savings of $94.3 billion.[91]

73.    Further, as noted above, the projected benefits will depend on a variety of factors, including the effect of American Express' non-discrimination policy (should its enforcement of that policy persist).  The American Express no-discrimination policy might cause some merchants to drop American Express cards, which could permit merchants to save by not paying American Express' typically higher fees, but, as I have explained, it will also prevent other merchants from fully realizing the potential benefits from competition at the point of sale.  In addition, ten states have statutes that may affect merchants' ability to surcharge credit card transactions in those states.  Exactly how these factors will affect the magnitude of the benefits to merchants is difficult to predict, but Table 2 shows that even if they are assumed to cause a large (three-quarters) reduction in each of the assumed factors (the reduction in interchange, the percent of merchants surcharging and the portion of volume switched to debit at non-surcharging merchants), merchant benefits over the next decade would total $26.4 billion (Table 2).

---

[91]    This amount represents about 18% of the interchange fees which would otherwise be collected (at current rates of about 2%) on MasterCard and Visa credit card transactions over the next decade as shown in column 1 of Table 1.

# A1189

**Table 2**
**Illustration of Potential Surcharging Benefits With Assumed Attenuated Effects**
**($ Billions)**

|  | Credit Charge Volume ($ Billions, No Surcharging) (1) | Assumed Reduction in Interchange Rates Due to Surcharging (2) | Savings From Lower Interchange Rates (3) = (1) x (2) | Percentage of Merchants (by Volume) That Surcharge (4) | Savings/ Recoupment by Merchants That Surcharge (5) = (1) x (1%-(2)) x (4) | Portion of Credit Volume Switched to Debit at Non-Surcharging Merchants (6) | Savings From Shift to Debit at Non-Surcharging Merchants (7) = (1-(4)) x (6) x (1) x (1%-(2)) | Total Savings (8) = (3) + (5) + (7) |
|---|---|---|---|---|---|---|---|---|
| 2013 | $1,636.2 | 0.00% | $0.0 | 0.0% | $0.0 | 0.00% | $0.0 | $0.0 |
| 2014 | $1,767.1 | 0.01% | $0.2 | 0.5% | $0.1 | 0.25% | $0.0 | $0.3 |
| 2015 | $1,908.5 | 0.02% | $0.4 | 1.0% | $0.2 | 0.50% | $0.1 | $0.7 |
| 2016 | $2,061.1 | 0.03% | $0.6 | 1.5% | $0.3 | 0.75% | $0.1 | $1.1 |
| 2017 | $2,226.0 | 0.04% | $0.9 | 2.0% | $0.4 | 1.00% | $0.2 | $1.5 |
| 2018 | $2,404.1 | 0.05% | $1.2 | 2.5% | $0.6 | 1.25% | $0.3 | $2.1 |
| 2019 | $2,596.4 | 0.06% | $1.6 | 3.0% | $0.7 | 1.50% | $0.4 | $2.6 |
| 2020 | $2,804.2 | 0.07% | $2.0 | 3.5% | $0.9 | 1.75% | $0.4 | $3.3 |
| 2021 | $3,028.5 | 0.08% | $2.4 | 4.0% | $1.1 | 2.00% | $0.5 | $4.1 |
| 2022 | $3,270.8 | 0.09% | $2.9 | 4.5% | $1.3 | 2.25% | $0.6 | $4.9 |
| 2023 | $3,532.4 | 0.10% | $3.5 | 5.0% | $1.6 | 2.50% | $0.8 | $5.9 |
| **Total** |  |  | **$15.7** |  | **$7.3** |  | **$3.5** | **$26.4** |

## 5.    Conclusion

74.    In articles that Dennis Carlton and I published in the mid-1990s, we first explained that no-surcharge rules and other Anti-Steering Rules reduce competition over the level of merchant fees, ensure that cash customers (who are on average poorer than credit card customers) bear the costs of the higher fees along with credit card customers through the higher retail prices which result, and that no-surcharge rules have a different and more significant competitive impact than no-discount rules.[92]

---

[92]    Dennis W. Carlton and Alan S. Frankel, "The Antitrust Economics of Credit Card Networks," 63 Antitrust Law Journal 643 (1995), at p. 660 ("The credit card companies themselves often prohibit surcharges or any actions by retailers that 'discriminate' against users of their credit card brand relative to users of other credit cards… The existence of such restrictions likely reduces competition on merchant discounts."); and pp. 660-61 ("Interchange fees can be viewed as a way to raise costs to merchants who then pass those costs on to cash and credit customers alike by charging the same higher price to both."); Dennis W. Carlton and Alan S. Frankel, "Antitrust and Payment Technologies," 77 Federal Reserve Bank of St. Louis Review 41 (1995), at p. 49 ("[A]ntitrust policy should probably encourage the relaxation of restrictions on merchants' abilities to influence the choice of payment method at the point of sale."). See also, Alan S. Frankel, "Monopoly and Competition in the Supply and Exchange of Money," 66 Antitrust Law Journal 313 (1998), at p. 348 ("merchants should be given the freedom to pass payment system costs along to consumers through whatever surcharges, rebates, or multi-tier pricing systems they choose, as long as there is full disclosure to consumers of their pricing policies.") and p. 346 (absent that freedom, cash customers subsidize the use of credit cards, and "[t]he interchange fee 'tax' on cash paying customers that funds the benefits provided to credit card customers is probably regressive, because the poor use cash relatively more and credit cards relatively less than the wealthy.")

# A1190

From an economic perspective, it is an important achievement that merchants have obtained the ability to surcharge in the United States as a result of the Proposed Settlement. The more tools that merchants have to steer transactions to lower cost payments, the lower will be their costs, the lower will be their prices, and the more credit card networks will be pressured to reduce their fees. Although it is difficult to quantify how much merchants will save as a result of the relief contained in the Proposed Settlement, the savings are likely to be substantial.

April _10_, 2013

_____
Alan S. Frankel

# A1191

**Exhibit 1**



**ALAN S. FRANKEL**

Coherent Economics LLC
2800 Acacia Terrace
Buffalo Grove, Illinois 60089
(847) 913-8187
alan.frankel@coherentecon.com

**EDUCATION**

UNIVERSITY OF CHICAGO, Chicago, Illinois
Ph.D., Economics, December 1986.
M.A., Economics, March 1985.
B.A., Economics, March 1982.

**PRESENT POSITIONS**

COHERENT ECONOMICS, LLC,
Founder and Director, 2008 -

COMPASS LEXECON, Chicago, IL.
Senior Advisor, 2008 -
Senior Vice President, 2004 – 2008.
Vice President, 1989 - 1996.
Economist, 1985 - 1989.

ANTITRUST LAW JOURNAL
Senior Editor, 1999 -
Associate Editor 1998 - 1999
Assistant Editor 1996 - 1998

**PROFESSIONAL AND ACADEMIC EXPERIENCE**

LECG, Evanston, Illinois.
Director, 1998-2004
Principal, 1996-1997

UNIVERSITY OF CHICAGO, GRADUATE SCHOOL OF BUSINESS, Chicago, IL, 1983 - 1984.
Research Assistant

UNIVERSITY OF CHICAGO, COMMITTEE ON PUBLIC POLICY STUDIES,
Chicago, IL, 1983
Teaching Assistant

# A1192

UNIVERSITY OF CHICAGO, DEPARTMENT OF ECONOMICS, Chicago, IL, 1980 - 1982.
<u>Research Manager</u> for U.S. Environmental Protection Agency contract research project.

Various consulting work, including National Association of Realtors and Synergy Inc., 1981 - 1983.


**FIELDS OF SPECIALIZATION**

Industrial Organization, Antitrust, Intellectual Property, Applied Econometrics, Regulation, Financial Institutions, Payment Systems, Damages.


**PUBLICATIONS**

"Towards a Competitive Card Payments Marketplace," in Reserve Bank of Australia, Payments System Review Conference, Proceedings of a Conference held in Sydney on 29 November 2007 (2008).

"Economic Effects of Interchange Fees," with Allan Shampine, 73 Antitrust Law Journal 627 (2006).

"Transaction Costs, Externalities, and 'Two-Sided' Payment Markets," with Dennis Carlton, 2005 *Columbia Business Law Review* 617 (2005).

"Interchange Fees in Various Countries: Comment on Weiner and Wright," in Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?" Federal Reserve Bank of Kansas City (2005).

"The Control of Externalities in Sports Leagues: An Analysis of Restrictions in the National Hockey League," with Dennis Carlton and Elizabeth Landes, 112 *Journal of Political Economy* S268 (2004).

"Editor's Note: EFT Networks And The Canadian Experience" 67 *Antitrust Law Journal* 385 (1999)

"Monopoly and Competition in the Supply and Exchange of Money," 66 *Antitrust Law Journal* 313 (1998).

"Cash Machines: Fee Disclosure and Competition vs. Regulation," with James Langenfeld, *The Global Competition Review* (August/September 1997).

"'Sea-Change' or 'Submarkets?'" (Federal Trade Commission v. Staples, Inc. and Office Depot, Inc.), with James Langenfeld, *The Global Competition Review* (June/July 1997).

"Antitrust and Payment Technologies," with Dennis Carlton, 77 Federal Reserve Bank of St. Louis *Review* 41, December 1995.

"The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee Comment," with Dennis Carlton, 63 *Antitrust Law Journal* No. 3, Spring 1995.

"The Antitrust Economics of Credit Card Networks," with Dennis Carlton, 63 *Antitrust Law Journal* No. 2, Winter 1995.

<u>Countervailing Effects of Automobile Emission Control Regulations</u>, Ph.D. dissertation, University of Chicago, Department of Economics, 1986.


**SPEECHES**

"Interchange Regulation – A Pitched Battle of Ideas," panelist, The Clearing House annual meeting, November 2012.

"Payment Innovation: Competitive Impediments and Opportunities," presented at *Consumer Payment Innovation in the Connected Age*, Federal Reserve Bank of Kansas City, March 2012.

"Does Disclosure Matter?," American Bar Association Section of Antitrust Law, Panel on the Proposed Consumer Financial Protection Agency, Washington, DC, April 2010.

"The MasterCard Decision: An Economic Review," Organization for Economic Cooperation and Development, Paris, France, June 2008.

"Towards a Competitive Card Payments Marketplace," Reserve Bank of Australia and Melbourne Business School, Sydney, Australia, November 2007.

"Evaluating Self-Regulation of Interchange Fees," Organization for Economic Cooperation and Development, Paris, France, June 2006.

"A More Competitive, Deregulated Market Structure: The Role of Networks vs. the Role of Banks," International Cards & Payments Council, Rome, Italy, October 2005

"House of Cards: The Economics of Interchange Fees," Presented at *Antitrust Activity in Card-Based Payment Systems: Causes and Consequences*, Federal Reserve Bank of New York, September 2005.

"Dysfunctional Competition in Retail Payment Systems," Presented at *Innovations, Incentives, and Regulation: Forces Shaping the Payments Environment*, Federal Reserve Bank of Chicago, May 2005

"Interchange Fees in Various Countries: Comments on Weiner and Wright," Presented at *Interchange Fees in Credit and Debit Card Industries:  What Role for Public Authorities?* Federal Reserve Bank of Kansas City, Santa Fe, New Mexico, May 2005.

Columbia University School of Law, *Conference on Two-Sided Markets*, April 2005.

Chicago Bar Association Antitrust Committee speaker, Credit Card Issues, February 2002.

"Anticompetitive Effects of Interchange Fees," Econometrics Society Australasian Meetings, Auckland, New Zealand, July 2001

American Bar Association Antitrust Section, Financial Markets Committee *Brownbag Seminar* on interchange fees, Washington, DC, March 2001

"The Economic Analysis of Intellectual Property Damages," Panel discussion moderator, Chicago, Illinois, October 1998

Spring Antitrust Developments panelist, Vedder, Price, Kaufman & Kammholz, P.C., May 1997.

*Credit Card Pricing and Competition:  The Environment Today and Future Marketplace and Regulatory Trends*, before the American Bar Association, Consumer Financial Services Committee, November 1995

"Antitrust and Payment Technologies," presented at Antitrust and Payment Systems, Federal Reserve Bank of St. Louis, May 1995

**FELLOWSHIPS**

Olin Foundation Fellowship, Center for the Study of the Economy and the State, Graduate School of Business, University of Chicago, 1984.

University of Chicago Graduate Economics Fellowship, 1982 - 1984.

**PROFESSIONAL AFFILIATIONS**

Member, American Economic Association, 1984 - present.

Associate Member, American Bar Association, 1991 - present. (Section of Antitrust Law)

3

**TESTIMONY AND OFFICIAL PROCEEDINGS**

Report, Reply Report and Testimony in The Matter Between The Commissioner of Competition and Visa Canada Corporation and MasterCard International Incorporated.

Joint Report, Rebuttal Report, and Deposition in Best Buy Co., Inc., v. AU Optronics Corp., et al., In Re LCD (Flat Panel) Antitrust Litigation, United States District Court, Northern District Of California, San Francisco Division

Testimony before the European Commission in Visa Europe.

Brief of Evidence and Reply Brief of Evidence, in New Zealand Commerce Commission v. Cards NZ Limited and Others, DSE (NZ) Limited and Others.

Report to the Reserve Bank of Australia in its Review of Payment Systems Reforms.

Brief of Evidence, in New Zealand Commerce Commission v. American Express International (NZ) Incorporated

Testimony before the European Commission in MasterCard.

Brief of Evidence, in New Zealand Commerce Commission v. Westpac Banking Corporation, District Court, Auckland, New Zealand.

Brief of Evidence, in New Zealand Commerce Commission v. Bank of New Zealand, Limited, District Court, Auckland, New Zealand.

Joint Report, In the Matter of the Decision of the Office of Fair Trading dated 6 September 2005 No. CA 98/05/05 of 6 September 2005 in Case CP/0090/00/S (MasterCard Multilateral Interchange Fee), Competition Appeal Tribunal (U.K.)

Declaration, Report, Rebuttal Report, and Deposition, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, U.S. District Court, Eastern District of New York.

Brief of Evidence, in New Zealand Commerce Commission v. ANZ National Bank Limited, New Zealand Commerce Commission v. Bank of New Zealand, Limited, District Court, Auckland, New Zealand.

Declaration in David Salkin v. MasterCard International, Court of Common Pleas, Philadelphia County, Pennsylvania.

Report in CFS-Related Securities Litigation, U.S. District Court, Northern District of Oklahoma, and District Court for Tulsa County, State of Oklahoma.

Report in Commercial Financial Services, Inc., v. Mayer Brown Rowe & Maw, P.A., f/k/a Mayer Brown & Platt, and J.P. Morgan Securities, Inc., f/k/a Chase Securities, Inc., Civil Action No. CJ 2002 03028, District Court of Tulsa County, State of Oklahoma.

Rebuttal Testimony and Affidavit in TDS Metrocom, LLC v. Wisconsin Bell, Inc. d/b/a SBC Wisconsin, Public Service Commission Of Wisconsin Docket No. 6720-TI-175.

Affidavit and Deposition in Elizabeth A. Fischer and Jennifer Herbst, on Behalf of Themselves and All Others Similarly Situated, v. MasterCard International, Inc.

Direct Testimony and Rebuttal Testimony on Behalf of SBC Illinois Before The Illinois Commerce Commission, Docket No. 03-0553.

Report in V.P. Intellectual Properties, L.L.C. v. Nobel Biocare USA, Inc., Implant Innovations, Inc. And Implant Innovations International Corporation v. Leonard I. Linkow, And Anthony W. Rinaldi.

Report and Trial Testimony in Enrique Calva-Cerqueira v. United States of America.

Report, Deposition, Amended Report, and Direct Testimony in Charter Federal Savings Bank v. United States of America

4

# A1195

Declaration, Deposition, Trial Testimony, and Rebuttal Testimony in Adam Schwartz vs. Visa International, Inc., Visa International Service Association, Inc., Visa USA, Inc., and MasterCard International, Inc.

Report in Cardiac Pacemakers, Inc., Guidant Sales Corporation, and Eli Lilly and Company v. St. Jude Medical, Inc., Pacesetter, Inc., and Ventritex, Inc.

Testimony before the European Commission in Visa International.

Declaration, Report, Deposition, and Supplemental Report in Columbia First Bank, FSB v. United States of America

Affidavit in Century Shopping Center Fund I, Limited Partnership v. Frank Pio Crivello

Report and Deposition in Gregory F. Daniel, et al. v. American Board of Emergency Medicine, et al.

Report and Declaration in 1st Home Liquidating Trust v. Unites States of America

Report and Deposition in Pi Electronics Corp. v. United States of America

Report in WDP Limited v. Gelatin Products International, Inc. and R.P. Scherer Corp.

Joint Declaration, Joint Report, Deposition, Trial Testimony, and Rebuttal Testimony in C. Robert Suess, et al. v. United States of America.

Declaration and Supplemental Declaration in Robert Johnstone, et al. v. First Bank National Association, et al.

Testimony in Keisha Johnson, Shapearl, et al. v. Aronson Furniture Co. and Heilig-Meyers Co.

Report, Deposition and Trial Testimony in ProtoComm Corporation v. Novell Advanced Services (Formerly Fluent)

Joint Affidavit in Kahn v. Emerson Electric Co., Hazeltine Corporation and Motorola, Inc. et al.

Affidavit, Deposition and Trial Testimony in Masco Corporation of Indiana v. Price Pfister, Inc.

Deposition in Loomis Armored, Inc. v. City of Chicago.

Joint Declaration, Joint Reply Declaration, and Joint Supplemental Declaration in the Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation.

Deposition in American Fidelity Fire Insurance v. General Railway Signal Corp.

Deposition in General Farebox, et al. v. Landa Corp., et al.

Affidavit in Lincoln Savings & Loan Association v. Federal Home Loan Bank Board and M. Danny Wall.


**OTHER**

FAA-certified private pilot

PADI-certified open water diver

January 2013

5

**Exhibit 2**

## Materials Relied Upon

**Case Filings**

In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, No. 05-MDL-1720 (JG)(JO) Definitive Class Settlement Agreement

Deposition of Etienne Goosse, October 22, 2008 (MasterCard 30(b)(6) witness on UK rules)

Declaration of Dhun Karai, head of Group Financial Services for Woolworths, September 22, 2009

Expert Report of Joseph Stiglitz, Ph.D., June 25, 2009

Report of Alan S. Frankel, Ph.D., July 9, 2009

Report of Professor Kenneth G. Elzinga, December 14, 2009

Expert Report of Dr. Benjamin Klein, December 14, 2009

Report of Barbara E. Kahn, Dean of the University of Miami, School of Business Administration, December 14, 2009

Expert Report of Robert H. Topel, December 14, 2009

Report of William Wecker, December 14, 2009

Rebuttal Report of Alan S. Frankel, Ph.D., June 22, 2010

Reply Report of Joseph Stiglitz, Ph.D., June 22, 2010

**Other Legal Documents**

Competitive Impact Statement in United States of America, et al. v. American Express Company, American Express Travel Related Services Company, Inc., MasterCard International Incorporated, and Visa Inc., Civil Action No. CV-10-4496, October 4, 2010

Judgment of the General Court (Seventh Chamber), Case T-111/08, May 24, 2012, available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:62008TJ0111:EN:HTML

Final Judgment as to Defendants MasterCard International Incorporated and Visa Inc., Civil Action No. CV-10-4496, July 20, 2011

Complaint, in United States of America, et al. v. American Express Company, et al., CV10-4496, October 4, 2010

Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, , in United States of America, et al. v. American Express Company, et al., CV10-4496, June 14, 2011

Closing Argument of MasterCard International Inc., in The Commissioner of Competition [Canada], Applicant, And Visa Canada Corporation And MasterCard International Incorporated, Respondents, And The Toronto-Dominion Bank And Canadian Bankers Association, Intervenors, http://www.ct-tc.gc.ca/CMFiles/CT-2010-010_Closing%20Argument%20of%20Mastercard%20International%20Inc._300_45_6-29-2012_5632.pdf

Closing Argument of Visa Canada Corporation, in The Commissioner of Competition [Canada], Applicant, And Visa Canada Corporation And MasterCard International Incorporated, Respondents, And The Toronto-Dominion Bank And Canadian Bankers Association, Intervenors

Prepared Testimony of Visa USA, Inc., before the Committee on Banking. Finance and Urban Affairs, Subcommittee on Consumer Affairs and Coinage, United States House of Representatives, "Hearing on Credit Card Surcharges," March 27, 1984

**Exhibit 2**

Statement of Hugh H. Smith, Senior Vice President, American Express Co., Before the Subcommittee on Consumer Affairs and Coinage of the Committee on Banking, Finance and Urban Affairs, March 27, 1984

Testimony of Charles Russell, President, Visa U.S.A., Inc., Before the Committee on Banking, Housing and Urban Affairs, Subcommittee on Consumer Affairs, United States Senate, "The Cash Discount Act," February 7,1984

Prepared Testimony of Hugh M. Smith, Senior Vice President, Government Affairs, on behalf of the American Express Co., before the United States House of Representatives, Committee on Banking, Finance and Urban Affairs, Subcommittee on Consumer Affairs and Coinage, The Cash Discount Act, February 5, 1981

Testimony of Hugh M. Smith, President, Visa U.S.A., Inc., Before the Committee on Banking, Housing and Urban Affairs, Subcommittee on Consumer Affairs, United States Senate, "The Cash Discount Act," February 7, 1984

Public Law 111–203 – July 21, 2010, Sec. 1075


**Articles, Books, Papers**

Wilko Bolt, Nicole Jonker and Corry van Renselaar, Incentives at the Counter: An Empirical Analysis of Surcharging Card Payments and Payment Behaviour in the Netherlands, Journal of Banking & Finance (2009)

Dennis W. Carlton and Alan S. Frankel, "The Antitrust Economics of Credit Card Networks," 63 Antitrust Law Journal 643 (1995)

Dennis W. Carlton and Alan S. Frankel, "Antitrust and Payment Technologies," 77 Federal Reserve Bank of St. Louis Review 41 (1995)

Julie Hirschfeld Davis and Lisa Lerer. "Romney Vowing Dodd-Frank Repeal Hits JPMorgan Risky Trades." Bloomberg News. May 14, 2012. Web. http://www.businessweek.com/news/2012-05-14/jpmorgans-inconvenient-truth-hits-romneys-dodd-frank-repeal-vow

David S. Evans and Richard Schmalensee, Paying With Plastic (2nd ed. 2005)

Alan S. Frankel, "Monopoly and Competition in the Supply and Exchange of Money," 66 Antitrust Law Journal 313 (1998)

Alan S. Frankel, "Interchange Fees in Various Countries: Commentary on Weiner and Wright," in Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?, Federal Reserve Bank of Kansas City (2005)

Steve Liesman, "Treasury Hits Back at Critics of Dodd-Frank Rules." CNBC. January 12, 2012. Web. http://www.cnbc.com/id/45971366

Scott Schuh, Oz Shy and Joanna Stavins, "Who Gains and Who Loses from Credit Card Payments? Theory and Calibrations," Federal Reserve Bank of Boston, Public Policy Discussion Paper No. 10-03 (August 2010)

Scott Schuh, Oz Shy, Joanna Stavins, and Robert Triest, "An Economic Analysis of the 2010 Proposed Settlement between the Department of Justice and Credit Card Networks," Federal Reserve Bank of Boston, Public Policy Discussion Paper No. 11-4 (2011), http://www.bostonfed.org/economic/ppdp/2011/ppdp1104.pdf

# A1198

**Exhibit 2**

Remarks of Bill Sheedy, (then) Executive Vice President, Interchange Strategy, Visa U.S.A., in "Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?," Federal Reserve Bank of Kansas City (2005)

Richard Thaler, "Toward A Positive Theory Of Consumer Choice," 1 Journal of Economic Behavior and Organization 39, 45 (1980)

C. Christian von Weizsäcker, "Economics of Credit Cards - Expert Report on behalf of MasterCard International Incorporated and Europay International SA" dated 23 January 2002

Sears, Roebuck and Co. 1902 Catalog

"Forces Shaping the Payments Environment: A Summary of the Chicago Fed's 2005 Payments Conference," The Federal Reserve Bank of Chicago, Chicago Fed Letter No. 219a, October 2005

"Hospital Purchasing Alliances: Utilization, Services and Performance," Health Care Management Review, July-September 2008, pp. 203-215

"Commerce Commission and MasterCard Agree to Settle Credit Card Interchange Fee Proceedings," press release, August 24, 2009, http://www.comcom.govt.nz/media-releases/detail/2009/commercecommissionandmastercardagr

"MasterCard: Delay processing-fees rule." Reuters. March 1, 2011. Web. http://www.reuters.com/article/2011/03/01/us-finance-summit-mastercard-debit-idUSTRE72058B20110301

The Nilson Report No. 1011, February 2013

"Chase/Visa Network Partnership," Nilson Report #1013, March 2013

**Bates Numbered Documents**

VUSAMDL1-00748463

Visa White Paper, VUSAMDL1-09042437

Visa "Merchant Presentation Messages," VUSAMDL00153736

MCI_MDL02_10577117

**RBA documents**

Reserve Bank of Australia and Australian Competition and Consumer Commission, *Debit And Credit Card Schemes In Australia: A Study Of Interchange Fees And Access*, October 2000

Reserve Bank of Australia, Reform of Card Schemes in Australia I: A Consultation Document, December 2001

Reserve Bank of Australia, Reform of Card Schemes in Australia IV: Final Reforms and Regulation Impact Statement, August 2002

"Merchant Surcharging in Australia," East & Partners, February 2007

American Express Australia Limited, "Review of Payment System Reforms: A Submission to the Reserve Bank of Australia," August 2007

"Payments System Regulation: Response by MasterCard Worldwide to the Issues for the 2007/08 Review," (Submission to the Reserve Bank of Australia), August 31, 2007

"Review of Reform of Australia's Payments System: Regulation of Credit Card Payments and the role of Diners Club," September 6, 2007, Report to Diners Club (commercial-in-confidence version) by the Allen Consulting Group

# A1199

**Exhibit 2**

The Allen Consulting Group, "Review of Reform of Australia's Payments System: Regulation of Credit Card Payments and the role of Diners Club," September 6 2007, http://www.rba.gov.au/payments-system/reforms/review-cardreforms/pdf/dc-06092007.pdf

Reserve Bank of Australia, Proceedings of Payments System Review Conference, 29 November 2007

Reserve Bank of Australia, Reform of Australia's Payments System, Conclusions of the 2007/08 Review, September 2008

East & Partners, Australian Merchant Payments: Market Analysis Report, February 2010

Reserve Bank of Australia, Review of Card Surcharging: A Consultation Document, June 2011

Reserve Bank of Australia, A Variation to the Surcharging Standards: A Consultation Document, December 2011

Reserve Bank of Australia, "A Variation to the Surcharging Standards: Final Reforms and Regulation Impact Statement," June 2012

http://www.rba.gov.au/statistics/tables/xls/c03hist.xls?accessed=2013-03-17-14-09-41.

http://www.rba.gov.au/payments-system/resources/statistics/index.html

Reserve Bank of Australia, Merchant Fees for Credit and Charge Cards, http://www.rba.gov.au/statistics/tables/xls/c03hist.xls?accessed=2013-03-17-14-09-41

**MasterCard and Visa Public Documents**

MasterCard Systemwide Interchange Report_GCMS Cleared Purchase Vol_US Issued Acquired 2009.xls

Visa International Operating Regulations, 15 October 2012, http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf

http://usa.visa.com/personal/using_visa/checkout_fees/index.html.

Visa Inc. Quarterly Operational Performance Data, http://investor.visa.com/phoenix.zhtml?c=215693&p=quarterlyearnings

MasterCard Inc. Quarterly Financial Results, http://investorrelations.mastercardintl.com/phoenix.zhtml?c=148835&p=irol-calendarpast

**A1200**

# EXHIBIT 5

# A1201

**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**IN RE PAYMENT CARD INTERCHANGE**
**FEE AND MERCHANT DISCOUNT**
**ANTITRUST LITIGATION**

**This Document Applies to:  All Cases.**

**No. 05-MD-1720 (JG) (JO)**

---

## DECLARATION OF NICOLE F. J. HAMANN ON
## CLASS ADMINISTRATOR'S IMPLEMENTATION OF SETTLEMENT NOTICE PLAN

I, NICOLE F.J. HAMANN, declare as follows:

1.       I am the Senior Vice President of Client Services for Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Class Administrator in the above-captioned case.  Epiq is a firm with more than 40 years of experience in data processing.  Epiq has been retained to administer hundreds of class action settlements including some of the largest and most complex settlements in U.S. history.  I personally have over 15 years of class action administration experience.  I am authorized to make the following declaration on behalf of Epiq. I hereby declare, based upon my personal knowledge, information provided to me by associates and staff under common supervision, and upon a review of the business records maintained by Epiq, as follows:

2.       As Senior Vice President of Client Services, I am responsible for the administration of numerous legal settlements.  I direct a multitude of services, such as system design, data processing, document mailing, phone services, document control, website design, claim processing, distribution, tax preparation and reporting.

3.       On November 27, 2012, the Court appointed Epiq as the Class Administrator and approved the Notice Plan submitted by Epiq's sister company, Hilsoft Notifications [Docket

Entry 1745].  With respect to the Notice Plan, my staff is specifically responsible for provision of individual notice and related fulfillment activities.

4.      After the Court's preliminary approval of the Settlement, we began implementing the Notice Plan.  This declaration details the data received from Visa, MasterCard, settling banks, and third-party acquirers and what Epiq did with this data to create the database that was used to send notice to the class in MDL 1720. It also outlines the direct mail portion of the Notice Program and the related support services provided by Epiq such as return mail processing, phone system support, the public website, the claim preregistration system and processing of exclusion requests.

## DATA PROCESSING

5.      Pursuant to Section 81 of the Definitive Class Settlement Agreement, Epiq and Co-Lead Counsel worked with Visa, MasterCard, settling bank defendants, and third-party acquirers to obtain class member data for the individual notice effort. Epiq processed all data files received and created a Notice Database that was used to mail notice to the class in MDL 1720.

6.      Section 81 (d) of the Definitive Class Settlement Agreement provides that "Class Plaintiffs shall subpoena, to obtain the names and locations of any members of the Rule 23(b)(3) Settlement Class or the Rule 23(b)(2) Settlement Class, as many non-Bank Defendant acquirers as would be necessary to attempt to obtain merchant name and location information attributable to more than 90% of merchant transaction volume and 90% of merchant outlets as reported in Nilson Report 990 (March 2012)."

7.      In July 2012, either a document request and protective order or a subpoena was sent to 25 entities.  A document request and protective order was sent to the following six settling defendants: Bank of America Merchant Services, Chase Paymentech Solutions, Citi

Merchant Services, SunTrust Merchant Services, Vantiv (Fifth Third Bancorp), and Wells Fargo Merchant Services.  Subpoenas were sent to the following 19 acquirers: BB&T Corporation, Bancorp Bank, Elavon, Inc., EVO Merchant Services, LLC, Fidelity National Information Services, Inc., First Data Resources, Inc. ("First Data"), Global Payments Direct, Inc., Heartland Payment Systems, Inc., Intuit, Inc., iPayment, Inc., Merchant E-Solutions, Mercury Payment Systems, LLC, Merrick Bank Corporation, Moneris Solutions, Inc., PNC Financial Services Group, Inc., Santander Holdings USA, Inc., Transfirst, LLC, TSYS Merchant Solutions, LLC, and Worldpay US, Inc.

8.     Each document request and subpoena requested name, address and related information for each merchant for whom the entity had acquired or processed Visa or MasterCard transactions at any time between January 1, 2004 through August 1, 2012.

9.     Throughout the data gathering process, Epiq worked with counsel to ensure that the various security protocols of the parties that supplied the data were followed. I participated in numerous phone calls about data selection, production, transmission, validation and retention.

10.     **Merchant data provided by Visa and MasterCard**. Visa provided Epiq extracts from two databases containing merchants who accepted Visa during the class period: the Visa Merchant Profile Database ("VMPD") and the Common Merchant Systems ("CMS") database. These databases were provided to Epiq on August 29, 2012. After initial analysis of the data, Epiq detected anomalies and requested that Visa replace the data. Subsequent files were provided by Visa on October 3, 2012. On December 18, 2012, Visa also produced updated VMPD and CMS files.  MasterCard provided two Aggregate Merchants List files that were imported on November 1, 2012 and December 21, 2012.

# A1204

11. **Settling bank defendant data**. Among the settling bank defendants, Wells Fargo Bank, N.A. and Vantiv (Fifth Third Bancorp) produced data directly for Epiq. Files produced by First Data also included records of the following settling bank defendants: Bank of America, Chase, Citi, PNC, SunTrust and Wells Fargo.

12. **Third-party acquirer data.** The following third-party acquirers provided data for the Notice Database: BB&T Corporation, Bancorp Bank, Elavon, Inc., Fidelity National Information Services, Inc., First Data, Global Payments Direct, Inc., Heartland Payment Systems, Inc., Intuit, Inc., Merchant E-Solutions, Merrick Bank Corporation, Moneris Solutions, Inc., Transfirst, LLC, TSYS Merchant Solutions, LLC, and Worldpay US, Inc.

13. **Summary of raw merchant data received.**  Epiq received one or multiple files from each entity.  In some cases, smaller files from the same entity were combined for initial processing.  The last data file was received from First Data on February 6, 2013.  The following table shows each import file, the entity that provided the data and the number of discrete records provided to Epiq.  Altogether, Epiq received 115,045,756 rows of data containing merchant name, address and related information as shown in the table below. Transactional data was also received from MasterCard and Visa that is not reflected in this table because transactional data was not used to assemble the database of known class members and was processed separately.

| Import Date | Source | Records |
|---|---|---|
| 10/26/12 | Visa VMPD | 38,778,882 |
| 10/26/12 | Merrick Bank | 363,335 |
| 10/29/12 | Bancorp Bank | 41,209 |
| 10/29/12 | Vantiv (Fifth Third) | 539,423 |
| 10/29/12 | Visa CMS | 698,652 |
| 10/29/12 | Merchant E Solutions | 140,435 |
| 10/30/12 | Intuit | 608,605 |

DECLARATION OF NICOLE F. J. HAMANN ON CLASS ADMINISTRATOR'S
IMPLEMENTATION OF SETTLEMENT NOTICE PLAN

# A1205

| 10/30/12 | Wells Fargo | 590,311 |
|---|---|---|
| 10/31/12 | WorldPay | 363,728 |
| 10/31/12 | Transfirst | 370,879 |
| 10/31/12 | BB&T | 105,141 |
| 11/01/12 | MasterCard | 1,905,593 |
| 11/01/12 | Elavon | 1,657,925 |
| 11/07/12 | Fidelity | 83,573 |
| 11/08/12 | TSYS Merchant Solutions | 30,079,143 |
| 11/09/12 | Moneris | 77,760 |
| 11/16/12 | Heartland | 486,779 |
| 11/30/12 | Global Payments | 896,907 |
| 12/14/12 | Intuit | 624,672 |
| 12/18/12 | First Data | 14,064,345 |
| 12/21/12 | Visa VMPD | 5,444,082 |
| 12/21/12 | Visa CMS | 141,259 |
| 12/21/12 | MasterCard | 868,043 |
| 02/04/13 | Moneris | 577,640 |
| 03/05/13 | First Data | 1,833,332 |
| 03/05/13 | First Data | 13,704,103 |

**Total   115,045,756**

14. For each source data set, Epiq undertook the following activities:

   a. **File analysis.** For each file, the account open date, account close date, Bank Identification Number ("BIN"), and Tax Identification Number ("TIN") fields were analyzed for data integrity and internal completeness. Based on this analysis, First Data, Intuit, Moneris, TransFirst and WorldPay were subsequently contacted by counsel to provide supplemental files.

   b. **Address standardization and cleaning**. Because a merchant may have changed acquirers several times in the nine-year class period, Epiq often received multiple records from different entities related to the same merchant. The merchant data provided by Visa and MasterCard also overlapped with acquirer records provided

to Epiq.  With respect to mailing addresses, extensive data analysis efforts were undertaken to maximize the accuracy of the deduplication efforts described below and to enhance the deliverability of the mailing effort.  Each mailing address was first processed through a standardization tool acquired from Melissa Data Corp. which incorporates a database of all standardized United States Postal Service ("USPS") addresses.  Melissa Data results were analyzed and it was determined for each record whether to use the original or standardized address.  When the original address was retained, additional steps were taken to remove extraneous data elements from the address fields (e.g. TIN, SSN and contact names) and enhance deliverability.  Data analytics also sought to enhance city, state, zip code and country data integrity.

c. **Deduplication**. Epiq worked with Co-Lead Counsel to develop an approach for the deduplication of records that shared key characteristics, indicating that they referred to the same merchant. In this way, separate records could be "rolled-up" into one record for the notice mailing. The method selected was to combine records that shared a TIN and mailing address such that for each unique TIN and mailing address combination, only one Long-Form Notice was sent.

Other possible approaches, such as deduplication based on mailing address or TIN alone would have unduly reduced the Notice Database.  For instance, had Epiq combined on address alone, only a single merchant in many shopping malls would have been mailed a Long-Form Notice.  Similarly, there were situations in which hundreds of TIN's matched to a single mailing address.  These addresses are potentially billing or accounting offices which are performing processing

DECLARATION OF NICOLE F. J. HAMANN ON CLASS ADMINISTRATOR'S
IMPLEMENTATION OF SETTLEMENT NOTICE PLAN

6

services on behalf of their merchant clients.  It was therefore reasonable to mail a Long-Form Notice to each individual merchant at these addresses.  With respect to a single TIN with multiple mailing addresses, it was impractical to determine a single preferred mailing address for each TIN (such as the current corporate headquarters) for the millions of discrete merchants included in the settlement.

Finally, Epiq manually reviewed groupings of records that resulted in more than 1,000 mailings to one address. In certain instances, it was reasonable to consolidate these records down to one or a few mailings.

15.     **Excluded entities.** Epiq also undertook careful and conservative efforts to identify entities not included in the settlement classes.  In addition to the named Defendants, financial institutions that have issued Visa or MasterCard Branded Cards during the class period are not included in the settlement nor is the United States government.  Epiq first undertook a name search for key terms such as "Wells Fargo," "Chase," and "United States." Once records with key terms in the name field were identified and manually validated, a search was conducted for records that shared a valid TIN with any of the identified records. From this list, Epiq worked with Co-Lead Counsel to manually review the thousands of resulting records.  Only those records that were validated through each step in this process were removed from the final mailing files.

16.     **Final Notice Database record count**. After all of the efforts described above, the resulting Notice Database contained 20,844,892 mailing records based on the data files provided by Visa, MasterCard, the settling bank defendants and third-party acquirers.  The Notice Database includes 10,159,268 unique TIN's; for a further 911,227 records, a TIN was not provided to Epiq.

DECLARATION OF NICOLE F. J. HAMANN ON CLASS ADMINISTRATOR'S
IMPLEMENTATION OF SETTLEMENT NOTICE PLAN

## NOTICE MAILING

17.     Prior to mailing, postal addresses were checked against the USPS National Change of Address (NCOA) database. When the record in question had an updated address, the updated address was used instead.

18.     **Initial notice mailing**. A total of 19,874,922 initial Long-Form Notices were mailed between January 29, 2013 and February 22, 2013. The mailing started with approximately 500,000 pieces per day and increased up to a peak of 2 million pieces mailed in a single day.  A copy of the Long-Form Notice as printed and mailed is included as **Attachment A**.

19.     **Supplemental notice mailing.**  On February 6, 2013, Epiq received 13,704,103 additional records from First Data.  Epiq promptly began processing and deduplicating these additional records against all other merchant data previously received. As a result, a supplemental mailing of 969,970 Long-Form Notices was completed on March 29, 2013.

20.     **USPS address forwarding.** The return address on the Long-Form Notice is a post office box maintained by Epiq.  Epiq has remailed 23,171 Long-Form Notices for addresses that were corrected through the USPS.

21.     **Undeliverable processing.**  As of March 31, 2013,[1] Epiq has been notified by the USPS that 4,635,054 Long-Form Notices were undeliverable.

      a.  **Data analysis**. Because Epiq received data from many different sources, it was known at the time of mailing that the Notice Database would very likely include addresses that are no longer valid.  In situations in which there are multiple mailing records related to a single TIN at different addresses, Epiq analysts

---

[1] ECA figures in this report were finalized as of March 31, 2013 in preparation for submission on April 11, 2013.

DECLARATION OF NICOLE F. J. HAMANN ON CLASS ADMINISTRATOR'S
IMPLEMENTATION OF SETTLEMENT NOTICE PLAN

identify TIN's in which all Long-Form Notices have been returned as undeliverable.

b. **Address research**. For TIN's in which a Long-Form Notice has not been delivered to any address, research is conducted through the LexisNexis B-Find database with the Long-Form Notices remailed to any better addresses obtained. Epiq has remailed 218,379 Long-Form Notices to such better addresses.

c. **Unique undeliverables**. As of March 31, 2013, there are only 1,103,597 unique TIN's in which all mailings have been returned as undeliverable.  Among records without a TIN, only 220,225 are currently undeliverable.

22.    **Document requests.** Individual requests to receive the Long-Form Notice and/or Settlement Agreement by mail have been processed by Epiq on a rolling basis. As of March 31, 2013, Epiq has fulfilled 6,752 Long-Form Notice and 7,403 Settlement Agreement requests.

## TELEPHONE AND E-MAIL SUPPORT

23.    Epiq worked with Co-Lead Counsel to develop a script for the automated Interactive Voice Response ("IVR") telephone system. By December 18, 2012, the IVR toll-free number was fully operational. By calling this number potential Class Members can listen to the answer to frequently asked questions as well as request the Long-Form Notice and Settlement Agreement. As of January 23, 2013, the IVR system was also available in Spanish.

24.    Epiq worked with Co-Lead Counsel to develop a script for live operators to respond to commonly asked questions. By January 28, 2013, the toll-free number was fully operational with English and Spanish-speaking operators available to assist Class Members. For callers who speak other languages, Epiq utilizes instantaneous interpreters provided by Language Services Associates, Inc.

DECLARATION OF NICOLE F. J. HAMANN ON CLASS ADMINISTRATOR'S
IMPLEMENTATION OF SETTLEMENT NOTICE PLAN

9

# A1210

25.     In addition to working with Epiq to draft the live operator scripting, Co-Lead Counsel Alexandra Bernay and Ryan Marth came to Epiq's facilities and assisted in the training of the live operators. Further, a procedure has been put into place that allows telephone operators to escalate complex calls to Co-Lead Counsel. Each day, Epiq sends Co-Lead Counsel a list of Class Members who have either requested to speak to Class Counsel, or who have questions that require an answer from a lawyer.

26.     As of March 31, 2013, the IVR system has received 93,478 calls representing 426,156.63 minutes of use.  Among these calls, 50,218 have been transferred to operators totaling 323,676 minutes.

27.     Beginning in February, 2013, Epiq operators were directed to categorize the primary reason for each call.  As shown in the following table, more than half of calls received through March 31, 2013 relate to questions about how to obtain settlement benefits including preregistration and submitting a claim form.

### Call Dispositioning as of March 31, 2013

| Category | Calls | Percent |
|---|---|---|
| Claim Form/Claim Process | 21,766 | 48.17% |
| Preregistration | 3,685 | 8.16% |
| Settlement Benefits | 2,958 | 6.55% |
| Rules/Surcharges | 80 | 0.18% |
| Objecting | 19 | 0.04% |
| Opting Out | 114 | 0.25% |
| Multiple/Other/Uncategorized | 16,562 | 36.65% |
| **Total** | **45,184** | **100.0%** |

28.     Epiq also maintains an e-mail inbox at info@PaymentCardSettlement.com. As of March 31, 2013, Epiq has received 6,023 e-mails and sent 5,290 e-mails in response.

# A1211

## <u>INFORMATIONAL WEBSITE</u>

29.    A neutral, informational notice website (www.PaymentCardSettlement.com) (the "Settlement Website") was created to serve as the notice page for the Settlement where Class Members can obtain additional information and documents including the Long-Form and Summary Notice, and the Settlement Agreement.  The Settlement Website became available on December 7, 2012. Representative screenshots of the Settlement Website are included as **Attachment B**.

30.    Epiq worked with Co-Lead Counsel to develop the content of the Settlement Website. Important dates and links to key documents are displayed prominently on the sidebar of each page of the Settlement Website. Visitors to the Settlement Website are able to see an overview of important information on the Home page, review Frequently Asked Questions, request the Long-Form Notice and/or Settlement Agreement, and view over sixty documents pertinent to the case (which are searchable by date, key word and docket number).

31.    The Settlement Website was translated into Spanish, Korean, Russian, Thai, Japanese, Chinese and Vietnamese, with links to each language prominently listed at the top of each page. The Long-Form Notice and Summary Notice are also posted in each respective language.  The translated versions of the Settlement Website became available on February 22, 2013. Examples of translated versions of the Home page are included as **Attachment C**.

32.    As of March 31, 2013, there have been 237,864 unique visitors to the Settlement website and over 3.743 million website pages presented.

## CLAIM PREREGISTRATION

33.     The Settlement Website allows Class Members to preregister and provide information to help the Class Administrator in the preparation of the Class Member's Claim Form.

34.     The preregistration system allows merchants with multiple locations to advise the Class Administrator which locations should be linked together. For each location, the merchant is able to provide their payment processor(s), account number(s) and respective account dates. An automated Excel utility allows merchants to upload their location and payment processor data via an Excel workbook. Finally, Class Members can update their mailing information or have their Claim Form, and future communications, sent by e-mail instead of or in addition to postal mail.  If their information changes, the merchant may securely return to the preregistration system at any time and update their submission.

35.     The preregistration system has been developed with sufficient functionality to support merchant class members with thousands of locations and related payment processor accounts.  At the same time, it has a simple design allowing merchants with only a few locations to quickly and easily complete the preregistration process.

36.     In collaboration with Co-Lead Counsel, Epiq has developed functionality for Class Members with specific needs and/or concerns.  For third-party representatives who are acting on behalf of merchant Class Members (e.g. accountants, attorneys and third-party claim filers), third-party submitters provide their contact information and organization type along with information about their merchant clients.  An automated utility allows third-party submitters to upload proof of representation as part of the preregistration process.  For businesses with ownership changes and/or legal proceedings during the class period that may affect claim

# A1213

submission (e.g. merger, asset sale, dissolution or bankruptcy), specific functionality has been provided.   Once preregistration is completed, the submitter may automatically generate a Merchant Report within the software application which documents the entire submission in pdf format.

37.     As of March 31, 2013, there have been 71,529 preregistration accounts created and 43,260 completed preregistration submissions.   Sample pages from the preregistration system are included as **Attachment D**.

## OPT OUTS

38.     As described in the settlement Long-Form Notice, Opt Outs are to be submitted by mail to Epiq as the Class Administrator. As of March 31, 2013, Epiq has received 517 Opt Outs.   After the May 28, 2013 postmark deadline to request exclusion from the Rule 23(b)(3) Settlement Class, Epiq will provide a further report.

# A1214

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

Nicole F.J. Hamann

Dated:  4/5/13

**A1215**

# EXHIBIT 6

# A1216

**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Applies to:  All Cases.** | **No. 05-MD-1720 (JG) (JO)** |

## DECLARATION OF CAMERON R. AZARI, ESQ. ON
## <u>IMPLEMENTATION AND ADEQUACY OF SETTLEMENT NOTICE PROGRAM</u>

I, CAMERON R. AZARI, ESQ., hereby being duly sworn, deposes and states as follows:

1.     My name is Cameron R. Azari, Esq.  I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2.     I am a nationally recognized expert in the field of legal notice and I have served as an expert in dozens of federal and state cases involving class action notice plans.

3.     I am the Director of Legal Notice for Hilsoft Notifications; a firm that specializes in designing, developing, analyzing and implementing large-scale, un-biased, legal notification plans.  Hilsoft is a business unit of Epiq Systems Class Action and Claims Solutions ("ECA").

4.     Hilsoft has been involved with some of the most complex and significant notices and notice programs in recent history.  With experience in more than 200 cases, notices prepared by Hilsoft Notifications have appeared in 53 languages with distribution in almost every country, territory and dependency in the world.  Judges, including in published decisions, have recognized and approved numerous notice plans developed by Hilsoft Notifications, which decisions have always withstood collateral reviews by other courts and appellate challenges.

# A1217

## <u>EXPERIENCE RELEVANT TO THIS CASE</u>

5.    Hilsoft Notifications has served as notice expert and has been recognized and appointed by courts to design and provide notice in many of the largest and most significant cases, including: *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL 2179 (E.D. La.) (dual landmark settlement notice programs to separate "Economic and Property Damages" and "Medical Benefits" settlement classes.  Notice effort included over 7,900 television spots, over 5,200 radio spots, and over 5,400 print insertions and reached over 95% of Gulf Coast residents); *In Re: Checking Account Overdraft Litigation*, MDL 2036 (S.D. Fla.) (multiple bank settlements in 2010-2013 involving direct mail and email to millions of class members and publication in relevant local newspapers.  Representative banks include, Fifth Third Bank, National City Bank, Bank of Oklahoma, Webster Bank, Harris Bank, M & I Bank, Community Bank, PNC Bank, Compass Bank, Commerce Bank, Citizens Bank, Great Western Bank, TD Bank, Bancorp, Whitney Bank, and Associated Bank); *In re Residential Schools Class Action Litigation*, (Canada) (notice program for the landmark settlement between the Canadian government and Aboriginal former students.  Phase IV of the notice program was implemented during 2012); and *In re Department of Veterans Affairs (VA) Data Theft Litigation*, MDL 1796 (D. D.C.) (notices appeared across the country in newspapers, consumer magazines, and specialty publications with a total circulation exceeding 76 million).

6.    Courts have recognized our testimony as to which method of notification is appropriate for a given case, and I have provided testimony on numerous occasions on whether a certain method of notice represents the best notice practicable under the circumstances.  For example:

    a)    *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL 2179 (E.D. La.), Judge Carl J. Barbier stated on January 11, 2013:

> The Court finds that the Class Notice and Class Notice Plan satisfied and continue to satisfy the applicable requirements of Federal Rule of Civil Procedure 23(c)(2)(b) and 23(e), the Class Action Fairness Act (28 U.S.C. § 1711 et seq.), and the Due Process Clause of the United States Constitution (U.S. Const., amend. V), constituting the best notice that is practicable under the circumstances of this litigation.

> The notice program surpassed the requirements of Due Process, Rule 23, and CAFA. Based on the factual elements of the Notice Program as detailed below, the Notice Program surpassed all of the requirements of Due Process, Rule 23, and CAFA.

> The media notice effort alone reached an estimated 95% of adults in the Gulf region an average of 10.3 times each, and an estimated 83% of all adults in the United States an average of 4 times each. These figures do not include notice efforts that cannot be measured, such as advertisements in trade publications and sponsored search engine listings. The Notice Program fairly and adequately covered and notified the class without excluding any demographic group or geographic area, and it exceeded the reach percentage achieved in most other court-approved notice programs.

    b)    In *Schulte v. Fifth Third Bank*, No. 1:09-cv-6655 (N.D. Ill.), Judge Robert M. Dow, Jr. stated on July 29, 2011:

> The Court has reviewed the content of all of the various notices, as well as the manner in which Notice was disseminated, and concludes that the Notice given to the Class fully complied with Federal Rule of Civil Procedure 23, as it was the best notice practicable, satisfied all constitutional due process concerns, and provided the Court with jurisdiction over the absent Class Members.

    c)    In *Williams v. Hammerman & Gainer Inc.*, No. 11-C-3187-B (27th Jud. D. Ct. La.), Judge Ellis J. Daigle stated on June 30, 2011:

> Notices given to Settlement Class members and all other interested parties throughout this proceeding with respect to the certification of the Settlement Class, the proposed settlement, and all related procedures and

DECLARATION OF CAMERON R. AZARI, ESQ. ON
INDPLEMENTATION AND ADEQUACY OF SETTLEMENT NOTICE PROGRAM

# A1219

> *hearings—including, without limitation, the notice to putative Settlement Class members and others more fully described in this Court's order of 30th day of March 2011 were reasonably calculated under all the circumstances and have been sufficient, as to form, content, and manner of dissemination, to apprise interested parties and members of the Settlement Class of the pendency of the action, the certification of the Settlement Class, the Settlement Agreement and its contents, Settlement Class members' right to be represented by private counsel, at their own cost, and Settlement Class members' right to appear in Court to have their objections heard, and to afford Settlement Class members an opportunity to exclude themselves from the Settlement Class.  Such notices complied with all requirements of the federal and state constitutions, including the due process clause, and applicable articles of the Louisiana Code of Civil Procedures, and constituted the best notice practicable under the circumstances and constituted due and sufficient notice to all potential members of the Settlement Class.*

> d) In *In re: Department of Veterans Affairs (VA) Data Theft Litigation*, MDL

1796 (D. D.C.), Judge James Robertson stated on September 23, 2009:

> *The Notice Plan, as implemented, satisfied the requirements of due process and was the best notice practicable under the circumstances. The Notice Plan was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the action, the terms of the Settlement, and their right to appear, object to or exclude themselves from the Settlement.  Further, the notice was reasonable and constituted due, adequate and sufficient notice to all person entitled to receive notice.*

7. Numerous other court opinions and comments as to our testimony, and opinions on the adequacy of our notice efforts, are included in Hilsoft Notifications' curriculum vitae included as **Attachment 1**.

8. In forming my expert opinions, I and my staff draw from our in-depth class action case experience, as well as our educational and related work experiences.  I am an active member of the Oregon State Bar, receiving my Bachelor of Science from Willamette University and my Juris Doctor from Northwestern School of Law at Lewis and Clark College.  I have served as the Director of Legal Notice for Hilsoft Notifications since 2008 and have overseen the detailed

# A1220

planning of virtually all of our court-approved notice programs since that time.  Prior to assuming my current role with Hilsoft Notifications, I served in a similar role as Director of Epiq Legal Noticing (previously called Huntington Legal Advertising).  Overall, I have over twelve years of experience in the design and implementation of legal notification and claims administration programs having been personally involved in well over one hundred successful notice programs. I have been directly and personally responsible for designing all of the notice planning here, including analysis of the individual notice options and the media audience data and determining the most effective mixture of media required to reach the greatest practicable number of Settlement Class members.

## **NOTICE PLAN**

9.    On October 19, 2012, the Notice Plan prepared by Hilsoft Notifications was submitted to the Court as Appendix E of the Definitive Class Settlement Agreement [Docket Entry 1656-1].  Over the two months prior to the submission of the Settlement Agreement, my staff and I worked with counsel to draft proposed notices.  Initial drafts prepared by counsel were extensively edited by my staff and I to render the terms of the settlement in "plain, easily understood language."   During the drafting process, counsel were also assisted by an independent plain-language expert, Maria Mindlin.[1]  Because this is a complex settlement, both counsel and Hilsoft's staff were especially mindful of the following admonition from the Committee Notes on the 2003 Amendment to Rule 23: "The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members."   The Notices as

---

[1] Maria Mindlin is Language Specialist & CEO of Transcend..

DECLARATION OF CAMERON R. AZARI, ESQ. ON
IMPLEMENTATION AND ADEQUACY OF SETTLEMENT NOTICE PROGRAM

submitted to the Court were clearly worded with an emphasis on simple, plain language to facilitate class member comprehension.

10.   On November 27, 2012, the Court granted preliminary approval of the Settlement and approved the Notice Plan [Docket Entry 1745].  On December 17, 2012, the Court approved final versions of the Publication and Long-form Notice.

11.   After preliminary approval, we began implementing the Notice Program.  This declaration details the notice activities undertaken, provides "proofs of performance," and explains how and why the Notice Plan was comprehensive, well suited to the Class, and conformed to the standards that federal courts and jurisprudence require.  In my experience, the reach and frequency of the Notice Plan media effort, as implemented, met and exceeded due process requirements.  The reach and frequency to all U.S. adults, U.S. business owners, and U.S. business financial decision makers are also consistent with the most thorough and expansive class action media notice efforts.

12.   The facts in this declaration are based on what I personally know, as well as information provided to me in the ordinary course of my business by my colleagues at Hilsoft Notifications and ECA, who worked with us to implement the notification effort.

## OVERVIEW

13.   The Settlement Agreement defines the Court's certification of two settlement classes for settlement purposes only, defined as follows:

> A.   **Rule 23(b)(3) Settlement Class.**   Under Federal Rules of Civil Procedure 23(a) and (b)(3), from which exclusions shall be permitted, consisting of all persons, businesses, and other entities that have accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that this Class does not include the

DECLARATION OF CAMERON R. AZARI, ESQ. ON
IMPLEMENTATION AND ADEQUACY OF SETTLEMENT NOTICE PROGRAM

named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date, or the United States government.

and

B. **Rule 23(b)(2) Settlement Class.**  Under Federal Rules of Civil Procedure 23(a) and (b)(2), from which exclusions shall not be permitted, consisting of all persons, businesses, and other entities that as of the Settlement Preliminary Approval Date or in the future accept any Visa-Branded Cards and/or MasterCard-Branded Cards in the United States, except that this Class shall not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time since January 1, 2004, or do so in the future, or the United States government.

14.   I further understand that the capitalized terms in the Settlement Class definitions have the following meanings:

- "MasterCard-Branded Card"  means any Credit Card or Debit Card that bears or uses the name MasterCard, Maestro, Cirrus, or any other brand name or mark owned or licensed by a MasterCard Defendant, or that is issued under any such brand or mark.

- "Visa-Branded Card" means any Credit Card or Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by a Visa Defendant, or that is issued under any such brand or mark.

15.   As described in *Declaration of Nicole F. J. Hamann on Class Administrator's Implementation of Settlement Notice Plan* ("*Hamann Declaration*") filed contemporaneously with this declaration, considerable efforts have been undertaken to compile a database of individuals and entities that have accepted MasterCard or Visa during the nine year class period stretching from 2004 through 2012.  Over 115 million merchant records were gathered from MasterCard, Visa and the largest U.S. payment processors resulting in a database of between 10

and 11 million distinct merchants and the mailing of over 20 million Long-Form Notices.  By comparison, the U.S. Census Bureau reports that in 2008 there were 5,930,132 firms in the U.S.[2] There are widely varying approaches to counting businesses in the United States.  Not all business accept MasterCard and Visa; businesses open and close every year.  Nevertheless, the compilation of a notice database that represents roughly a 2:1 ratio of distinct merchants identified compared to the number of firms in the U.S. in 2008 suggests that reasonable efforts have been undertaken to identify Settlement Class members in order to provide individual notice.

16.    Because the actual number of Settlement Class members is unknown, the measured media selection to reach Settlement Class members was established based on three broad target audiences: (1) all adults aged 18 years and older in the U.S., (2) all U.S. business owners; and (3) all U.S. business financial decision makers.

17.    To date, the Notice Plan has been implemented as ordered by the Court, including dissemination of individual notice to likely Rule 23(b)(3) Settlement Class members and Rule 23(b)(2) Settlement Class members via postal mail, an extensive schedule of well-read consumer magazines, national business publications, Sunday local newspapers (via newspaper supplements), and highly trafficked websites.  Notice placements also appeared in non-measured trade, business & specialty publications, language & ethnic targeted publications, and U.S. territories newspapers.  An informational release, Internet sponsored listings, and Settlement website also provided additional notice exposures.

18.    Through March 31, 2013, a total of 20,844,892 individual notices to likely Settlement Class members have been sent by first class postal mail.  To complement this massive

---

[2] U.S. Census Bureau, *Statistics of U.S. Businesses:2008*, http://www.census.gov/epcd/susb/2008/us/US--.HTM (Last visited March 22, 2013).

# A1224

individual direct mailing effort, the combined measurable paid print and Internet effort alone reached an estimated 82.4% of adults aged 18 years and older in the U.S. an average of 2.7 times each, an estimated 81.1% of U.S. business owners an average of 2.7 times each, and 82.8% of U.S. business financial decisions makers an average of 2.8 times each.[3]

19.    Not reflected in the calculable reach and average frequency of exposure are additional efforts that were utilized, but for which reach and average frequency of exposure are either incalculable or provide qualitative, not quantitative, enhancement (*e.g.*, the notice placements in trade, business & specialty publications, language & ethnic targeted publications, U.S. territories newspapers, the informational release to news outlets, Internet sponsored listings, and a Settlement website).

20.    Altogether, the very significant paid media effort included 475 separate print publication units with a combined circulation of over 80 million and 770 million adult Internet banner impressions.  While the majority of the Notice Program appeared English, the notice was also published in seven additional languages (Spanish, Chinese, Japanese, Korean, Russian, Thai, and Vietnamese) to reach Settlement Class members whose native language is not English.

21.    All notice documents were designed to be noticeable, clear, simple, substantive, and informative.  No significant or required information was missing.

22.    In my opinion, the Notice Program fairly and adequately covered and notified the Class without excluding any demographic group or geographic area.

---

[3] Reach is defined as the percentage of a class exposed to notice, net of any duplication among people who may have been exposed more than once.  Notice exposure is defined as the opportunity to see a notice.  The average frequency of notice exposure is the average number of times that those reached by a notice would be exposed to the notice.

23. In my opinion, each person reached has been provided with adequate time prior to the Fairness Hearing to make appropriate decisions, such as whether to opt-out or object to the Settlement.

24. In my opinion, the Notice Plan was the best notice practicable under the circumstances of this case and satisfied the requirements of due process, including its "desire to actually inform" requirement.[4]

## NOTICE PLAN IMPLEMENTATION

### *Individual Notice*

25. To provide individual notice to Settlement Class members, Co-Lead Counsel and ECA assembled name and address records of likely Settlement Class members. This effort resulted in over 115 million records obtained from Visa, MasterCard, settling banks, and third-party acquirers. After reasonable efforts to normalize, combine and de-duplicate these multiple datasets, ECA determined that there were 20,844,892 records that would be mailed individual notice. *See Hamann Declaration*.

26. Prior to mailing, ECA checked all postal addresses against the National Change of Address (NCOA) database maintained by the USPS.

27. Between January 29, 2013 and February 22, 2013, ECA disseminated 19,874,922 individual notices by USPS first class mail to likely Settlement Class members. In February, 2013, ECA received multiple files containing millions of additional merchant name and address records from First Data Resources, Inc. This additional data led to a supplemental mailing of

---

[4] "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . ." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).

969,970 Long-Form Notices, which was complete on March 29, 2013.  As of March 31, 2013, ECA has also fulfilled 6,752 requests for a Long-Form Notice and 7,403 requests for a Settlement Agreement in response to individual requests.

28.    The Long-Form Notice sent by postal mail to likely Settlement Class members, is an 8½" x 11" self-mailer booklet with specific design features to alert recipients to the important legal information enclosed.  The return address shows that the Long-Form Notice is from the "Payment Card Interchange Fee Settlement."  The address panel of the self-mailer has a bold callout on the front: ("**Legal Notice about a class action settlement.**") and the back of the self-mailer: ("**A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.**").  The back of the self-mailer also included a tagline translated into Spanish, Chinese, Japanese, Korean, Russian, Thai, and Vietnamese, which stated, "To read this notice in [respective language], call or visit our website."  The Settlement website address and toll-free telephone were also included on the back of the self-mailer for further information and assistance.  A copy of the Long-Form Notice as printed and mailed is included as **Attachment 2**.

29.    As of April 5, 2013, ECA has re-mailed 23,171 Long-Form Notices for addresses that were corrected through the USPS.  As of March 31, 2013, ECA has received 4,635,054 Long-Form Notices that were returned by the USPS as undeliverable.  For Long-Form Notices that were returned as undeliverable, ECA undertook additional public record research, which has resulted in the re-mailing of 218,379 Long-Form Notices.

*Media Notice*

30.   To guide the selection of measured media in reaching Settlement Class members, the Notice Plan had a broad primary target audience of all adults aged 18 years and older in the U.S.  To focus the reach of the Notice Plan to likely Settlement Class members, the Notice Plan included additional target audiences of U.S. business owners and U.S. business financial decision makers.

*National Newspaper Inserts*

31.   The Publication Notice appeared once in the national newspaper supplements *Parade* and *USA Weekend*, which were inserted into more than 1,200 Sunday newspapers nationwide with distribution in large cities and small towns.  The Notice appeared as a highly visible, double-page spread ad unit in each publication.  The Notice ran on the dates and pages indicated below:

| Publication | On-Sale Date[5] | Page Position |
|---|---|---|
| *Parade* | 2/10/13 | 18-19 |
| *USA Weekend* | 2/10/13 | 10-11 |

32.   Combined, *Parade and USA Weekend* have an estimated circulation of more than 55 million.  A copy of the Publication Notice as published is included as **Attachment 3**. Individual tear sheets of the Notice as it appeared in each of these selected national newspaper inserts are included as **Attachment 4**.

*Consumer Magazine Publications*

33.   To target all demographic groups, the Publication Notice appeared in five selected leading weekly and monthly publications.  In the selected publications, the Notice appeared

---

[5] The date the publication is first available to readers.

# A1228

twice in *TV Guide, People*, and *Sports Illustrated* and once in *People en Espanol* and *National Geographic*, for a total of eight insertions.  The Notice appeared as a highly visible, double-page spread in each publication.  The Notice ran on the dates and pages indicated below:

| Publication | On-Sale Date One | Page Position | On-Sale Date Two | Page Position |
|---|---|---|---|---|
| *TV Guide* | 1/24/13 | 26-27 | 2/7/13 | 26-27 |
| *People* | 2/1/13 | 62-63 | 2/8/13 | 92-93 |
| *Sports Illustrated* | 2/6/13 | 218-219 | 2/12/13 | 70-71 |
| *People en Espanol* | 2/8/13 | 144-145 | n/a | n/a |
| *National Geographic* | 2/20/13 | 30-31 | n/a | n/a |

34.    The selected publications have a combined circulation of over 13.5 million.  Individual tear sheets of the Notice as it appeared in each of these selected consumer magazine publications are included as **Attachment 5**.

### *National Business Publications*

35.    To target business owners and business financial decision makers, the Publication Notice appeared in eight selected leading national business publications as a full-page spread or equivalent size ad unit.  The selected publications include some of the largest circulating publications in the U.S.

| Publication | On-Sale Date | Page Position |
|---|---|---|
| *Forbes* | 1/28/13 | 94-95 |
| *Bloomberg Businessweek* | 2/8/13 | 60-61 |
| *Barrons* | 2/9/13 | M14-M15 |
| *Wall Street Journal* | 2/11/13 | C7 |
| *Financial Times* | 2/11/13 | 17 |
| *New York Times* | 2/11/13 | B9 |
| *Investors Business Daily* | 2/11/13 | A13 |
| *Fortune* | 2/11/13 | 108-109 |

36.   The selected publications have a combined circulation of over seven million. Individual tear sheets of the Notice as it appeared in each of these selected national business publications are included as **Attachment 6**.

### Trade, Business & Specialty Publications

37.   The Publication Notice appeared in 72 selected trade, business & specialty publications once or twice as a double-page spread or equivalent size ad unit for a total of 139 insertions.   The selected publications, which include all editions of *Crain's* and the entire network of *Business Journals*, have a combined circulation of over one million.   A complete list of the trade, business & specialty publications in which the Publication Notice appeared, including each on-sale date and page number, is provided as **Attachment 7**.   An example of the Notice as it appeared in these publications is included as **Attachment 8**.   Individual tear sheets for each trade, business & specialty publication insertion have been collected by Hilsoft Notifications and are available upon request.

### Language & Ethnic Targeted Publications

38.   To target foreign language and ethnic business owners and business financial decision makers affected by the Settlement, the Publication Notice appeared in 161 language & ethnic targeted publications.[6]   The Publication Notice appeared as a full-page or double-page spread ad unit two times in selected daily or weekly publications and one time in selected monthly publications for a total of 305 insertions.   The Publication Notice was translated into Spanish, Chinese, Japanese, Korean, Russian, Thai, and Vietnamese where appropriate.   The 161

---

[6] One publication included in the Notice Plan, *Vietnam Weekly News* is currently not publishing due to publisher printer complications so the Publication Notice did not run twice in this publication as proposed.  Another publication, *Lighthouse* ran the first insertion as scheduled however, due to a publisher error the second insertion did not run.

# A1230

selected language & ethnic targeted publications have a combined circulation of over 6.5 million. A complete list of the language & ethnic targeted publications in which the Publication Notice appeared, including each on-sale date and page number, is provided as **Attachment 9**. An example of the Notice as it appeared in these publications is included as **Attachment 10**. Individual tear sheets for each language & ethnic targeted publication insertion have been collected by Hilsoft Notifications and are available upon request.

### *U.S. Territories Newspapers*

39.    The Publication Notice appeared once as a standard magazine sized ad unit double-page spread or equivalent size ad unit in 10 leading daily and weekly newspapers in Puerto Rico, Guam, the Northern Mariana Islands, American Samoa, and the U.S. Virgin Islands. Below is a complete list of the U.S. territories newspapers in which the Publication Notice appeared, including the on-sale date and the page number for each publication.

| Publication | Region | On-Sale Date | Page Position |
|---|---|---|---|
| *Agana Pacific Daily News* | Guam | 2/11/13 | A12-A13 |
| *El Nuevo Dia* | Puerto Rico | 2/11/13 | 32-33 |
| *El Vocero De Puerto Rico* | Puerto Rico | 2/11/13 | 10-11 |
| *Primera Hora* | Puerto Rico | 2/11/13 | 16-17 |
| *Saipan Tribune* | Northern Mariana Islands | 2/11/13 | 14-15 |
| *Samoa News* | American Samoa | 2/11/13 | 10-11 |
| *St. John Trade Winds* | U.S. Virgin Islands | 2/11/13 | 12-13 |
| *Virgin Islands Daily News* | U.S. Virgin Islands | 2/11/13 | C8-C9 |
| *St. Croix Avis* | U.S. Virgin Islands | 2/12/13 | 12-13 |
| *Caribbean Business* | Puerto Rico | 2/14/13 | 24-25 |

40.    The selected publications have a combined circulation of over 500,000. An example of the Notice as it appeared in these publications is included as **Attachment 11**. Individual tear sheets for each U.S. territories newspaper insertion have been collected by Hilsoft Notifications and are available upon request.

### *Internet Banner Notices*

41.    The Notice Plan included Banner Notices measuring 728 x 90 pixels and 300 x 250 pixels, which were placed on the national online networks: *24/7 Real Media* (a network that represents over 900 websites)*, Yahoo!*, *MSN (MSN.com, MSN Money,* and *MSNBC)*, *AOL Email*, *Washingtonpost.com*, and *National Network of Business Journal Websites*.  A 100 x 72 pixel unit with adjacent copy was also placed on *Facebook*.

42.    Combined, approximately 770 million adult impressions were generated by these banner notices, which ran from January 24, 2013 to February 20, 2013.  Clicking on the banner links readers to the Settlement website where they can obtain information about the Settlement. A depiction of the Banner Notice is included as **Attachment 12**.

### *Informational Release*

43.    To build additional reach and extend exposures, a party-neutral Informational Release was issued on January 23, 2013 to approximately 4,200 print and broadcast and 5,500 online press outlets throughout the United States.

44.    The Informational Release served a valuable role by providing additional notice exposures beyond that which was provided by the paid media.  Although it is impossible to capture all the news stories generated, as of March 31, 2013, we have identified 1,009 news stories related to the settlement, several of which appeared in broad-reaching media such as *Fox Business*, *Reuters*, *HispanicBusiness.com*, *Chicago Business News*, *Money.CNN.com*, and *Boston Herald*.  A copy of the Informational Release as it was distributed is included as **Attachment 13**. A list of the press outlets containing the news stories and the date in which they appeared is included as **Attachment 14**.

*Informational Settlement Website*

45.  On December 7, 2012, a neutral, informational notice website (www.PaymentCardSettlement.com) went live.  The Settlement website address was displayed prominently on all notice documents and the Banner Notices linked directly to the Settlement website.  By visiting the Settlement website, Settlement Class members can obtain additional information and documents including the Publication Notice, Long-Form Notice, and the Settlement Agreement and all Exhibits.

46.  The Settlement website was translated and available in Spanish, Chinese, Japanese, Korean, Russian, Thai, and Vietnamese with translated versions of the Publication Notice and the Long-Form Notice.  Links for each language and corresponding country flag are displayed prominently in the top right corner of all keys pages of the website.  A screenshot of the Settlement website is included as **Attachment 15** and an illustrative, sample Publication Notice translated into Vietnamese is included as **Attachment 16**.  Included as **Attachment 17** are notarized certificates verifying the accuracy of the translations.

47.  As of March 31, 2013, there have been 237,864 unique visitors to the Settlement website and over 3.743 million website pages presented.  To facilitate locating the Settlement website, sponsored search listings were acquired on the three most highly-visited Internet search engines:  Google, Yahoo!, and Bing.  When search engine visitors search on common keyword combinations such as "Interchange Settlement", "Visa Class Action", or "MasterCard Settlement", the listing is generally displayed either at the top of the page prior to the search results or in the upper right hand column.  As of March 31, 2013, entering the search terms "Interchange Settlement", "Visa Class Action", or "MasterCard Settlement", into Google returns

the Settlement sponsored search listing as the first such listing at the top of the page. As of March 31, 2013, the sponsored listings have been displayed 288,999 times, resulting in 50,976 clicks that displayed the Settlement website. A complete list of the sponsored search keyword combinations is included as **Attachment 18.** Examples of the sponsored search listing as displayed on each search engine are included as **Attachment 19**.

### *Toll-free Number*

48. On December 18, 2012, the toll-free number (1-800-625-6440), set up and hosted by ECA, became operational. By calling this number, Settlement Class members can listen to answers to frequently asked questions, request a copy of the Long-Form Notice and and/or Settlement Agreement, and speak to a live operator. As of March 31, 2013, the toll-free number has handled 93,478 calls representing 426,156.63 minutes of use. During normal business hours, callers can speak with a live operator. As of March 31, 2013, operators have handled 50,218 calls representing 323,676 minutes of use.

### *Email Inbox*

49. ECA also maintains an e-mail inbox at info@PaymentCardSettlement.com. As of March 31, 2013, ECA has received 6,023 e-mails and sent 5,290 e-mails in response.

### *Objections and Exclusions*

50. I am unaware of any substantive objections received to date regarding the Notice Plan or Notices. The deadline for the submission of objections is May 28, 2013. If there are objections related to notice, I will address those in a subsequent declaration. As of March 31, 2013, ECA has received 517 requests for exclusion.

## PERFORMANCE AND DESIGN OF NOTICE PROGRAM

51.  ***Objectives were met***.  The primary objective of the settlement notice effort was to effectively reach the greatest practicable number of potential Settlement Class members with a "***noticeable***" notice of the Settlement, and provide them with every reasonable opportunity to understand that their legal rights were affected, to be heard, and to object if they so choose. These efforts were successful.

52.  ***The Notice reached Settlement Class members effectively***.  Our conservative and careful calculations indicate that the combined measurable paid print and Internet effort alone reached an estimated 82.4% of adults aged 18 years and older in the U.S., an estimated 81.1% of U.S. business owners, and an estimated 82.8% of U.S. business financial decision makers. Although not calculable, reach was enhanced further by the substantial individual notice effort, notice placements in trade, business & specialty publications, language & ethnic targeted publications, U.S. territories newspapers, an informational release, Internet sponsored listings, and the Settlement website.  Based on our conservative calculations, I can confidently state that the Class was adequately reached.

53.  ***Frequency of exposure was provided***.  The Notice Plan was designed to provide Settlement Class members exposed to the Notice with multiple opportunities to view or read and understand it.  The Plan unavoidably utilized various overlapping media, which provided multiple notice exposures to each person reached.  Here, adults aged 18 years and older in the U.S. were exposed to the Notice an average of 2.7 times each, U.S. business owners were exposed to the Notice an average of 2.7 times, and U.S. business financial decision makers were exposed to the Notice an average of 2.8 times each through the measurable paid print and

Internet efforts alone. This average frequency of exposure does not include the individual notice effort, notice placements in trade, business & specialty publications, language & ethnic targeted publications, U.S. territories newspapers, an informational release, Internet sponsored listings, and the Settlement website.

54. ***More than adequate time and opportunity to react to Notices***. The individual, mailed notice and media portions of the Notice Plan were substantially completed on February 23, 2013, which allowed more than adequate time for Settlement Class members to see the Notice and respond accordingly before the May 28, 2013 objection deadline and exclusion deadline. With 94 days from the substantial completion of the Notice Plan until the objection and exclusion deadline and 201 days until the September 12, 2013 Fairness Hearing, Settlement Class members were allotted more than adequate time to act on their rights.

55. ***Notices were designed to increase readership and comprehension***. All Notices were designed to be "noticed," reviewed, and—by presenting the information in plain language—understood by Settlement Class members. The design of the Notices followed the principles embodied in the Federal Judicial Center's illustrative "model" notices posted at www.fjc.gov. Many courts have approved notices that we have written and designed in a similar fashion. The Notices contained substantial, albeit easy-to-read, summaries of all of the key information about Settlement Class members' rights and options. The Notices, as produced, were worded clearly with an emphasis on simple, plain language to encourage readership and comprehension.

56. The Publication Notice featured a prominent headline ("**To merchants who have accepted Visa and MasterCard at any time since January 1, 2004: Notice of a 6+ billion**

**dollar class action settlement.**") in bold text.  Design elements alerted recipients and readers that the Notice was an important document authorized by a court and that the content may affect them, thereby supplying reasons to read the Notice.

57. The Long-Form Notice provides substantial information to Settlement Class members.  The Long-Form Notice begins with a summary page providing a concise overview of the important information and a table highlighting key options available to Settlement Class members.  A table of contents, categorized into logical sections helps to organize the information, while a question-and-answer format makes it easy to find answers to common questions by breaking the information into simple headings.

58. The ad units in which the Publication Notice appeared promoted attention to the Settlement.  In most print publications, the Notices were either full-page units or full-page spreads to promote readership.

<u>**CONCLUSIONS**</u>

59. Based on conservative calculations, the combined measurable paid print and Internet effort alone reached an estimated 82.4% of all adults aged 18 years and older in the U.S. an average of 2.7 times each, an estimated 81.1% of U.S. business owners an average of 2.7 times each, and an estimated 82.8% of U.S. business financial decision makers an average of 2.8 times each.  Although not calculable, reach and frequency of exposure were enhanced further by the individual notice effort, notice placements in trade, business & specialty publications, language & ethnic targeted publications, U.S. territories newspapers, an informational release, Internet sponsored listings, and the Settlement website.  This reach and average frequency of

# A1237

exposure indicates that the notice campaign was highly successful in providing notice to potential Class members.

60.   In preparing the Notices, we have employed communications methods that are well established in our field, and eschewed the idea of producing old-fashioned case-captioned, lengthy, legalistic notice documents.

61.   In my opinion, the Notice Program was the best notice practicable under the circumstances of this case, conformed to all aspects of Federal Rule of Civil Procedure 23, and comported with the guidance for effective notice articulated in the Manual for Complex Litigation, 4th.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Dated: April 5, 2013

_____
Cameron R. Azari. Esq.

*© 2013 Hilsoft Notifications*

**A1238**

EXHIBIT 4

# A1239

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | x | |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | : | MDL No. 1720(JG)(JO) |
| | : | |
| | : | Civil No. 05-5075(JG)(JO) |
| ——————————————— | : | |
| | : | **ELECTRONICALLY FILED** |
| This Document Relates To: | : | |
| | : | DECLARATION OF PROFESSOR |
| ALL ACTIONS. | : | CHARLES SILVER CONCERNING THE |
| | : | REASONABLENESS OF CLASS |
| | : | COUNSEL'S REQUEST FOR AN AWARD |
| | : | OF ATTORNEYS' FEES |
| ——————————————— | x | |

I, Charles Silver, declare as follows:

## 1.    SUMMARY OF OPINIONS

Two facts stand out in this case.  First, considering only the monetary relief, the proposed

settlement is the largest class-based antitrust recovery in history and one of the largest recoveries

regardless of case type in the history of American civil litigation.[1]  At $7.25 billion, it ranks

alongside the two landmark recoveries of the 21st Century: the $7.2 billion Enron settlement and the

proposed $7.8 billion BP settlement.  In an interesting way, it even rivals the settlement of the states'

---

[1] The settlement also requires the Defendants to change their procedures going forward.  Relying on a report submitted by Dr. Alan Frankel, Class Counsel contends that the injunctive reforms will save merchants between $26.2 and $62.2 billion over the next decade.  Memorandum in Support of Class Counsel's Motion for Final Approval of Settlement (Draft of March 24, 2013).  I took no account of the non-cash relief when formulating the opinions expressed herein.  The cash fund alone is easily sufficient to justify the requested award of fees.

historic tobacco lawsuits. From 2002 to 2012, only the three most populous states (California, New York, and Texas) received payments from the tobacco companies exceeding $7.25 billion.[2]

Second, the credit for this accomplishment belongs in large part to the private attorneys who investigated the price-fixing scheme, initiated the litigation, and shouldered its cost over nearly a decade. Collectively, an army of plaintiffs' lawyers expended more than half a million hours and bore about $40 million in out of pocket expenses. These are enormous amounts of resources to have invested in a single, risky lawsuit against well-funded defendants. But, again, they are on par with the risks lawyers took in comparable cases. In *Enron*, for example, class counsel expended about 300,000 hours and bore $45 million in costs. Lawsuits that generate historic recoveries require exceptional dedication and impose enormous risks and costs on attonryes.

If lawyers working on contingency are to find cases like these financially attractive, the rewards must offset the costs and risks the lawyers have to bear. In the private market for legal services, where clients hire lawyers directly, compensation is automatically set at the level needed to do this. Otherwise, lawyers would decline to represent clients with large claims and find less risky work. In class actions, of course, fees are set by courts, not by clients and lawyers bargaining at arms' length. The possibility therefore arises that courts will set fees too low, in which event lawyers will be discouraged from handling big cases, or too high, in which event lawyers will receive more than the risks warrant.

Judges can avoid these bad outcomes by using the private market for legal services as a guide. In the private market, sophisticated clients pay only what they have to, to get the legal services they desire. Typically, they neither waste money by over-paying nor price themselves out

---

[2] Campaign for Tobacco-Free Kids, Actual Tobacco Settlement Payments Received by the States, 2002-2012, available at http://www.tobaccofreekids.org/research/factsheets/pdf/0365.pdf.

of the market for legal services by offering too little.  By studying the amounts sophisticated clients pay attorneys to handle big cases, judges can reliably estimate the fees that are needed to persuade lawyers to accept the risks big class actions entail.  The Second Circuit agrees that "market rates, where available, are the ideal proxy for [class action lawyers'] compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000).

In the private market for legal services where sophisticated clients shop for attorneys, contingent fees normally equal or exceed 25 percent of recoveries.  This is true even in cases where recoveries can be large.  Agreed fees are sometimes lower in securities fraud cases where sophisticated investors seeking to serve as lead plaintiffs hire attorneys, but even here they commonly fall near 20 percent.[3]  Taking the private market as a guide, then, one could justify a fee award of 20 percent or more in this case on the ground that the class as a whole, acting in the manner of a sophisticated client, would rationally have offered to pay that amount when litigation commenced.

In fact, several class members agreed to pay fees well in excess of 20 percent.  When the original named plaintiffs in this lawsuit hired the lawyers who became Class Counsel,[4] many signed contracts setting fees at 33.33 percent of the recovery.  Some even agreed to pay this amount out of their own recoveries, should the Court award less or should they settle individually rather than as part of a class.  The private market thus sent a clear signal as to what a reasonable fee in this litigation would be.

---

[3] See Lynn A. Baker, Michael A. Perino and Charles Silver, *Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment*, VANDERBILT LAW REVIEW (forthcoming 2013).

[4] Class Counsel are Robins, Kaplan, Miller & Ciresi L.L.P.; Berger & Montague, P.C.; and Robbins Geller Rudman & Dowd LLP

Yet, the lawyers are requesting far less. They have asked the Court to award approximately 10 percent in fees. This is a substantial amount of money, but it is on par with the $688 million Enron fee award and the $600 million in fees and expense reimbursements provided for in the BP settlement agreement. Taking market rates as a guide, the request is entirely reasonable and considerably below what the attorneys ought to receive.

## 2.    CREDENTIALS

I have testified as an expert on attorneys' fees many times. Judges have cited or relied upon my opinions when awarding fees in the following enormous cases, as well as many smaller ones: *Allapattah Services, Inc. v. Exxon Corp.*[5] (30 percent fee award on recovery exceeding $1 billion); *In re Checking Account Overdraft Litigation*, No. 09-md-2036,( S.D. Fla. 2011) (fee award of 30 percent on recovery of $410 million);[6] *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($688 million fee award on a $7.2 billion recovery); *Silverman v. Motorola, Inc.*, No. 07 C 4507 (N.D. Ill. May 7, 2012) (unpublished) (fee award of 27.5 percent on recovery of $200 million).

Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure

---

[5] See Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs, *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

[6] See Order of Final Approval of Settlement, Authorizing Service Awards, Granting Application for Attorneys' Fees, and Overruling Objections to Settlement, available at http://www.bofaoverdraftsettlement.com/CourtDocuments.aspx.

in 1991.  Since then I have been a Visiting Professor at University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years.  I have published over 70 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report.  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004).

Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field.  I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association.  In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

I have attached a copy of my resume as Exhibit A to this declaration.

**3.     DOCUMENTS REVIEWED**

When preparing this Report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case.  I also reviewed other items including, without limitation, cases and published scholarly works.

- Declaration of K. Craig Wildfang, Esq

# A1244

- Declaration of Thomas J. Undlin

- Engagement Letter, CHS Inc., dated June 14, 2005

- Engagement Letter, 30 Minutes Photos, Etc., Inc., dated May 6, 2005

- Engagement Letter, Traditions Classic Home Furnishings, dated April 21, 2005

- Engagement Letter, National Association of Convenience Stores, dated September 23, 2005

- Definitive Class Settlement Agreement

- Publication Notice, available at https://www.paymentcardsettlement.com/Content/Documents/Settlement%20Publication%20Notice.pdf

- Init B & M Draft Payment Card Fee Petition - Legal Section (3.14.13)

- Memorandum in Support of Class Plaintiffs' Motion for Class Settlement Preliminary Approval

- Objecting Plaintiffs' Opposition to Class Plaintiffs' Motion for Preliminary Approval of Proposed Settlement

- Retailers & Merchants' Objection to Proposed Class Settlement Agreement

- Amended Retailers & Merchants' Objection to Proposed Class Settlement Agreement

- Other Objections to Request for Preliminary Approval of Proposed Settlement

- Engagement Letter, Affiliated Foods Midwest Cooperative, Inc., dated November 10, 2005

- Engagement Letter, National Restaurant Association, dated April 14, 2006

- Engagement Letter, Coborn's, Incorporated, dated November 9, 2005

- Engagement Letter, NATSO, February 24, 2006

- Engagement Letter, D'Agostino Supermarkets, October 31, 2005

- Engagement Letter, National Community Pharmacists Association, February 7, 2006

- Engagement Letter, Jetro Holdings, Inc., September 16, 2005

- Engagement Letter, National Grocers Association, dated October 31, 2005

- Memorandum in Support of Class Counsel's Motion for Final Approval of Settlement (Draft of March 24, 2013)

4.    **TO ENSURE THAT CLASS MEMBERS RECEIVE ZEALOUS REPRESENTATION, COURTS SHOULD PAY LAWYERS WHO WIN CLASS ACTIONS AT MARKET RATES**

Starting with the first article I published as a law professor, I have urged judges to base fee awards in successful class actions on market rates.[7]  Market rates comport with the law of restitution, the body of law upon which lawyers' rights to fee awards are based.[8]  Market rates also create desirable incentives while protecting class members against over-payments.  Many judges have accepted this argument.  Some agreed with me; others reached the same conclusion on their own.

The view that class action lawyers should be compensated at market rates has been the rule in the Seventh Circuit since 1992, when Judge Richard A. Posner wrote that "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order."  *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 568 (7th Cir. 1992).  See also *Id.*, at 572 ("The object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible.").[9]

Judge Frank Easterbrook elaborated on the rationale for the Seventh Circuit's rule in *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001).  He pointed out that rates prevailing in

---

[7] See Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL LAW REVIEW 656 (1991) ("Silver, *Restitutionary Theory*").

[8] *Id.*, at p. 700.  See also Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985) ("Quasi-contract proceeds on the fiction of an implied promise to pay....  If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that.").

[9] Other Seventh Circuit cases establishing the rule are *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 409 (7th Cir. 2000); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998); *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995) (Florin II); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994) (Florin I); and *In re Continental Illinois Securities Litigation*, 985 F.2d 867 (7th Cir. 1993) (Continental II).

private markets compensate lawyers for the costs and risks they incur.  *Id*. at p. 724 ("The greater the risk of loss, the greater the incentive compensation required."); *Id*. at p. 731 ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case.").  He also noted that, because claimants always prefer larger recoveries to smaller ones, "markets would not tolerate" the "mega-fund" approach the district court judge applied, which encouraged class counsel to settle for lesser amounts.  *Id*. at 723.  He completely rejected the "mega-fund" rule, according to which fees must fall in the 6 percent to 10 percent range when recoveries exceed $75 million, because the market would never punish success.  *Id*. at 722 ("We have never suggested that a 'megafund rule' trumps these market rates.").  To the contrary, "if counsel considering the representation in a hypothetical arms' length bargain at the outset of the case would decline the representation if offered only [the "mega-fund"] prospective return," the fee award had to be higher.  *Id*.  For these reasons, Judge Easterbrook urged "[district] courts [to] do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."  *Id*. at 718.

It probably surprises no one that Judges Posner and Easterbrook endorse the use of market rates.  They usually prefer markets to other forms of regulation.  But in this instance, they are right, and they have the most defensible account of fee awards going.  To see this, one must initially recognize that fee award practices create the incentives to which lawyers are subject when acting on class members' behalf.   Good fee award practices foster good incentives; bad practices foster bad ones.  It remains to consider what makes particular incentives good or bad.

Due process law provides the relevant criterion, as I explained more than a decade ago. Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TULANE

LAW REVIEW 1809 (2000). It permits judgments and settlements in class actions to bind absent class members only when they are zealously represented by lawyers whose interests align with their own. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999) (rejecting a proposed settlement partly because "[c]lass counsel [] had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class"). Fee award practices directly impact the extent to which the interests of class members and their lawyers harmonize. Good practices align their interests closely; bad practices cause their interests to conflict.

With this background in place, the relevance of fee-related practices prevailing in the market for legal services can quickly be explained. When sophisticated claimants, such as businesses seeking to enforce patent or antitrust claims, hire plaintiffs' attorneys in the private market, they use fee arrangements that align their interests and their lawyers' interests as closely as possible. By doing this, they position themselves to reach the goal they seek, which is to maximize their expected recoveries net of litigation costs. By studying the market for legal services, then, judges can learn how sophisticated clients with good incentives and information use fee arrangements to encourage plaintiffs' attorneys to provide zealous representation. By mimicking the market when awarding fees in class actions, judges can then give class members the greatest possible assurance of receiving the faithful representation that the law of due process requires.

When the Second Circuit took up the subject of class action lawyers' compensation in 2000, it "agree[d] that "that lawyers who successfully prosecute [class actions] deserve reasonable compensation, and that market rates, where available, are the ideal proxy for their compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). However, the Second Circuit had two concerns. First, trial judges "cannot know precisely what fees common fund

# A1248

plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." Id. Second "'hard data' on analogous situations-such as the fees sophisticated corporate plaintiffs typically agree to pay their attorneys-are "sketchy."

Id.

Neither concern should cause the Court to stray from market-based compensation in this case. For one thing, we know more about the fees sophisticated corporate clients pay when hiring lawyers on contingency than we did in 2000, and the evidence, which I survey below, shows that the fee Class Counsel requests is reasonable by comparison. For another, in this case, we have the fee agreements actually entered into by several trade associations that represent thousands of individual businesses.[10][11] When retaining Robbins, Miller, Kaplan and Ciresi LLP as Class Counsel and agreeing to pay a one-third of the class-wide recovery as fees, the trade associations "engage[d] in collective arm's-length negotiation with counsel", *Goldberger*, 209 F.3d at 52, as their members'

---

[10] The National Association of Convenience Stores is "an international trade association representing more than 2,200 retail and 1,600 supplier company members". About NACS, http://www.nacsonline.com/About_NACS/Pages/default.aspx. NATSO "represents more than 1,230 travel plazas and truckstops nationwide, owned by over 200 corporate entities"/ About NATSO, http://www.natso.com/about. The National Restaurant Association "is the largest foodservice trade association in the world*—supporting nearly 500,000 restaurant businesses". About Us, http://www.restaurant.org/About-Us. "The National Community Pharmacists Association … represents the pharmacist owners, managers, and employees of more than 23,000 independent community pharmacies across the United States." Introducing NCPA, http://www.ncpanet.org/index.php/home/introducing-ncpa. "The National Grocers Association (NGA) is the national trade association representing the retail and wholesale grocers that comprise the independent sector of the food distribution industry." Who We Are, http://www.nationalgrocers.org/who-we-are.

[11] Years after retaining Class Counsel, the trade associations withdrew as a named plaintiff and now oppose the proposed settlement. For present purpose, this is irrelevant. All that matters is that they thought one-third of the class-wide recovery was a reasonable contingent fee when hiring lawyers to advance the interests of their members at the start of litigation.

# A1249

representatives.  In this case, the Court has the information recognized in *Goldberger* as legitimating the use of market rates.

5.     **BY BASING FEE AWARDS ON MARKET RATES, JUDGES CAN AVOID OVER-PAYING ATTORNEYS OR UNDER-PAYING THEM**

The view that judges should base class action fee awards on market rates has many adherents.  It also appeals to judges regardless of political affiliation.  Judges Easterbrook and Posner were appointed the bench by a Republican President.  So was Judge Melinda Harmon, who awarded $688 million in fees out of the $7.2 billion *Enron* recovery.  In dollars, this is the largest fee award I know of, and it was based in important part on market-based practices.[12] See, e.g., *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 753 (S.D. Tex., 2008) (rejecting the mega-fund rule and citing *Synthroid,* 264 F.3d at 718).

*Enron* is far from the only mega-fund case in which a judge granted an enormous fee award.  For example, in the three *Air Cargo* settlements, which collectively generated $422.2 million in settlement monies, this Court awarded 25 percent of the total recovery—over $100 million—as fees.[13]  Nor were the awards in the *Air Cargo* cases unprecedented.  To the contrary, many mega-

---

[12] *Enron* was a federal securities action governed by the Private Securities Litigation Reform Act, [cite] ("PSLRA").  Under the PSLRA, the lead plaintiff candidate with the largest financial stake in the outcome of litigation gains control of the case and retains counsel for the class.  As a result, there was a real fee contract between the Regents of the University of California—the *Enron* lead plaintiff—and the law firm of Coughlin, Stoia, Geller Rudman & Robbins LLP.  Following the Seventh Circuit's lead, Judge Harmon found that the contract was reasonable and based the fee award on its terms.  Judge Harmon also invoked the private market when addressing objections to the fee request.  When an objector contended that she should assess the riskiness of the litigation *ex post* (as of the date of the first settlement with a major defendant), Judge Harmon pointed out that the private market values risk *ex ante* (when litigation begins).  See *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d at 824 (quoting *Florin v. Nationsbank, N.A.,* 34 F.3d 560, 565 (7th Cir.1994)).

[13] See *In re Air Cargo Shipping Servs. Antitrust Litig.* ("*Air Cargo I*"), No. 06–MD–1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ($85 million recovery/$12.75 million in fees); *In re Air Cargo*

11

# A1250

fund cases have yielded large percentage fee awards.  Table 1 lists 66 cases with recoveries of at least $100 million and fee awards equal to or greater than 20 percent.

---

*Shipping Services Antitrust Litig.* ("*Air Cargo II*"), No. 06–MD–1775, MDL 1775, 2011 WL 2909162 (E.D.N.Y. July 15, 2011) ($153.8 million recovery/$38.5 million in fees); and *In re Air Cargo Shipping Services Antitrust Litig.* ("*Air Cargo III*"), No. 06–MD–1775, MDL 1775, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ($183.4 million recovery/$54.3 million in fees).