# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),
13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON),
14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON),
14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON),
14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),
14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON)
14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON),
14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON),
14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

*On Appeal from the United States District Court
for the Eastern District of New York*

## JOINT DEFERRED APPENDIX
## VOLUME VI OF XXII
## Pages A1251 to A1500

*Submitted on Behalf of All Parties*

# **Table of Contents**

**Page**

**Volume I**

District Court Docket Entries ................................................... A1

**Volume II**

District Court Docket Entries (cont'd) ................................................... A251

**Volume III**

District Court Docket Entries (cont'd) ................................................... A501

**Volume IV**

District Court Docket Entries (cont'd) ................................................... A751

Transfer Order, dated October 20, 2005 [Docket No. 2]....................... A822

Excerpts of First Consolidated Amended Class Action Complaint,
    dated April 24, 2006 [Docket No. 317] ......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238, dated July 21, 2006
    [Docket No. 455-4] ........................................................ A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238,
    dated July 21, 2006 [Docket No. 455-5]........................................ A850

Excerpts of First Amended Supplemental Class Action Complaint
    (redacted), dated February 20, 2009 [Docket No. 1152]............... A856

Excerpts of Second Consolidated Amended Class Action
    Complaint (redacted), dated February 20, 2009
    [Docket No. 1153] ........................................................ A858

i

## **Table of Contents**
### **(continued)**

**Page**

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154]................ A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ............................................ A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] ......................................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533]................. A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536]........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ............................................................ A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ................................ A945

### **Volume V**

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545]................. A1011

# Table of Contents
## (continued)

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
    Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
    Rule 56.1(b) (redacted), dated October 21, 2011
    [Docket No. 1550] ........................................................................ A1014

Excerpts of Network Defendants' Memorandum in Opposition to
    the Individual Plaintiffs' Motion for Summary Judgment
    (redacted), dated October 21, 2011 [Docket No. 1551]................. A1030

Excerpts of European Commission Notification Pursuant to Article
    254 of the EC Treaty (redacted), dated November 23, 2011
    [Docket No. 1573-3] ...................................................................... A1032

Notice of Filing of Memorandum of Understanding,
    dated July 13, 2012 [Docket No. 1587] ......................................... A1042

Memorandum of Understanding, dated July 13, 2012
    [Docket No. 1588] .......................................................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
    [Docket No. 1588-1] ....................................................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
    dated August 21, 2012 [Docket No. 1616-3]................................. A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
    Approval, dated October 19, 2012 [Docket No. 1656].................. A1086

Excerpts of Appendices to Definitive Class Settlement
    Agreement, dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
    Honorable John Gleeson, US District Judge,
    dated November 9, 2012 [Docket No. 1732]................................. A1096

**Table of Contents**
(continued)

Excerpts of Revised Appendix F2: Notice of Class Action
    Settlement Authorized by the U.S. District Court, Eastern
    District of New York, dated November 26, 2012
    [Docket No. 1740-2].................................................................... A1098

Class Settlement Preliminary Approval Order,
    dated November 27, 2012 [Docket No. 1745]............................... A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
    Plaintiffs' Motion to Stay Class Settlement Preliminary
    Approval Order, dated November 29, 2012 [Docket No. 1751] ... A1111

Letter from Class Counsel to Judge Orenstein,
    dated December 10, 2012 [Docket No. 1760] ............................... A1114

Excerpts of Defendants' Memorandum in Support of Final
    Approval of Definitive Class Settlement Agreement,
    dated April 11, 2013 [Docket No. 2110] ....................................... A1118

Excerpts of Memorandum in Support of Class Plaintiffs'
    Motion for Final Approval of Settlement, dated April 11, 2013
    [Docket No. 2111-1]....................................................................... A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
    of Class Plaintiffs' Motion for Final Approval of Settlement,
    dated April 11, 2013 [Docket No. 2111-2].................................... A1131

Declaration of Eric D. Green, dated April 11, 2013
    [Docket No. 2111-3]....................................................................... A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
    Class Settlement, dated April 11, 2013 [Docket No. 2111-5]....... A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
    Administrator's Implementation of Settlement Notice Plan,
    dated April 11, 2013 [Docket No. 2111-6].................................... A1200

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
Implementation and Adequacy of Settlement Notice Program,
dated April 11, 2013 [Docket No. 2113-7].................................... A1215

Declaration of Professor Charles Silver Concerning the
Reasonableness of Class Counsel's Request for an Award of
Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........ A1238

### **Volume VI**

Declaration of Professor Charles Silver Concerning the
Reasonableness of Class Counsel's Request for an Award of
Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
(Cont'd)............................................................................. A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
Plaintiffs' Motion for Final Approval of Settlement and Class
Plaintiffs' Joint Motion for Award of Attorneys' Fees,
Expenses and Class Plaintiffs' Awards,
dated April 11, 2013 [Docket No. 2113-6].................................... A1296

Excerpts of Objection of City of Oakland to Final Approval of
Proposed Settlement, dated May 15, 2013 [Docket No. 2279] ..... A1434

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 15, 2013
[Docket No. 2281] ......................................................... A1437

Objection of U.S. Public Interest Research Group to Final
Approval of Proposed Class Settlement, dated May 23, 2013
[Docket No. 2361] ......................................................... A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
dated May 23, 2013 [Docket No. 2364] ......................... A1476

Statement of Objections of B & H Foto Electronics Corp.,
d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........ A1480

# **Table of Contents**
## (continued)

**Page**

Excerpts of Statement of Objections by Boscov's,
dated May 24, 2013 [Docket No. 2411] ......................................... A1483

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] .......................................................................... A1486

### **Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] (cont'd) ............................................................ A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] .............. A1512

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated May 24, 2013 [Docket No. 2427] .................... A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2432] ..... A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
Approval of the Settlement, dated May 24, 2013
[Docket No. 2433] .......................................................................... A1541

Excerpts of Objection of David's Bridal to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2434] ..... A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2435] ..... A1553

Declaration of John R. Manna, Vice President Operational
Controller, Lowe's Companies, Inc., dated May 24, 2013
[Docket No. 2437] .......................................................................... A1555

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2438] ........................................................... A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2439] ........................................................... A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2441] ........................................................... A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
    Final Approval of the Proposed Settlement, dated May 25,
    2013 [Docket No. 2444] .................................................. A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2445] ..................... A1588

Excerpts of Objection of Carter's to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2446] ..................... A1601

Objection of Coborn's Incorporated to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
    Final Approval of the Proposed Settlement,
    dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
    the Settlement, dated May 25, 2013 [Docket No. 2449] .............. A1615

Objection of Alon USA, LP to Final Approval of the Proposed
    Settlement, dated May 25, 2013 [Docket No. 2450] ..................... A1621

vii

# **Table of Contents**
## (continued)

                                                                                            **Page**


Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
    the Proposed Settlement, dated May 25, 2013
    [Docket No. 2451] ........................................................................ A1627

Objection of IKEA US to Final Approval of the Proposed
    Settlement, dated May 25, 2013 [Docket No. 2458] .................... A1632

Objection of Jetro Holdings, LLC to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2459] ..... A1650

Objection of Michaels Stores, Inc. to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2460] ..... A1656

Objection of NATSO Inc. to Final Approval of the Proposed
    Settlement, dated May 25, 2013 [Docket No. 2461] .................... A1659

Objection of National Restaurant Association to Final Approval of
    the Proposed Settlement, dated May 25, 2013
    [Docket No. 2464] ........................................................................ A1667

Objection of Panera Bread Company to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2466] ..... A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
    Settlement, dated May 25, 2013 [Docket No. 2467] .................... A1681

Objection of Retail Industry Leaders Association to Final Approval
    of the Settlement, dated May 25, 2013 [Docket No. 2469].......... A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
    the Proposed Settlement, dated May 25, 2013
    [Docket No. 2470] ........................................................................ A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
    the Settlement, dated May 25, 2013 [Docket No. 2471] .............. A1699

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of The Wendy's Company to Final Approval
of the Proposed Settlement, dated May 25, 2013
[Docket No. 2473] ........................................................................ A1703

Objection of National Grocers Association to Final Approval of the
Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
[Docket No. 2493] ........................................................................ A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
Class Members WellPoint, Inc., etc., to the Proposed Rule
23(b)(2) Settlement Agreement, dated May 27, 2013
[Docket No. 2493-1] ..................................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
Objections of WellPoint Entities, dated May 17, 2013
[Docket No. 2493-2] ..................................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
[Docket No. 2495] ........................................................................ A1752

**Table of Contents**
(continued)

**Page**

Excerpts of Memorandum in Support of Objections of Absent
    Putative Rule 23(b)(2) Class Members Target Corporation,
    Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
    Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
    L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
    Ross Company, Closeout Distribution, Inc., Ascena Retail
    Group, Inc., Abercrombie & FitchCo., OfficeMax
    Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
    Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
    American Signature, Inc. to the Proposed Rule 23(b)(2) Class
    and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2495-1] ...................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,*
    *v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
    dated May 27, 2013 [Docket No. 2495-2] ...................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
    [Docket No. 2509] .......................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
    Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
    Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
    Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
    Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517] ........... A1828

Statement of Objections of Office Depot, Inc., Viking Office
    Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
    and Solutions4Sure.com, Inc., dated May 27, 2013
    [Docket No. 2519] .......................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
    Superstore East, Inc., Staples the Office Superstore, LLC,
    Staples Contract & Commercial, Inc., Quill Corporation, Quill
    Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
    Thrive Networks, Inc., and SchoolKidz.com,
    dated May 27, 2013 [Docket No. 2525] ......................................... A1836

x

**Table of Contents**
**(continued)**

Page

Excerpts of Declaration of Michael S. Weisbach,
    dated May 27, 2013 [Docket No. 2533-2]..................................... A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
    Settlement, dated May 27, 2013 [Docket No. 2534] ..................... A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
    Settlement, dated May 27, 2013 [Docket No. 2536] ..................... A1847

Objections to Final Approval of Proposed Class Action Settlement
    and Notice of Intent to Appear of The Iron Barley Restaurant,
    Homestead Restaurant (Historical Homestead, Inc.), The Feral
    Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
    (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
    dated May 28, 2013 [Docket No. 2537] ......................................... A1850

National Retail Federation Statement of Objection to Final
    Approval of the Proposed Rule 23(B)(2) Agreement,
    dated May 28, 2013 [Docket No. 2538] ......................................... A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
    28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2] ....... A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
    dated May 28, 2013 [Docket No. 2538-20].................................... A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
    Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
    [Docket No. 2538-21].................................................................... A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
    [Docket No. 2540] ......................................................................... A1924

Objection of National Cooperative Grocers Association to Final
    Approval of the Proposed Settlement, dated May 28, 2013
    [Docket No. 2546] ......................................................................... A1926

# **Table of Contents**
## **(continued)**

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2559] ..... A1934

Objection of National Association of Convenience Stores to Final
Approval of Proposed Settlement, dated May 28, 2013
[Docket No. 2561] ........................................................................ A1942

Objection of Affiliated Foods Midwest to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2563] ..... A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
Settlement, dated May 28, 2013 [Docket No. 2587] .................... A1963

The Home Depot's Statement of Objections to the Proposed Class
Settlement and Memorandum in Support, dated May 28, 2013
[Docket No. 2591] ........................................................................ A1973

## **Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
Settlement and Memorandum in Support, dated May 28, 2013
[Docket No. 2591] (Cont'd) .......................................................... A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
Home Depot's Objection to the Proposed Class Settlement,
dated May 28, 2013 [Docket No. 2591-2] ..................................... A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
Settlement, dated May 28, 2013 [Docket No. 2592] .................... A2028

Objection of Consumers Union of United States, Inc. to Final
Approval of Proposed Class Settlement, dated May 28, 2013
[Docket No. 2598] ........................................................................ A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
Settlement, dated May 28, 2013 [Docket No. 2605] .................... A2040

# **Table of Contents**
## (continued)

**Page**

Excerpts of Objection of Starbucks to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2606] .....    A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
Partners LLC, dated May 28, 2013 [Docket No. 2613].................    A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
dated May 28, 2013 [Docket No. 2613-1]....................................    A2075

Objection of National Community Pharmacists Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2619] ........................................................................    A2107

Statement of Objections and Amici Curiae Brief of States to Final
Approval of the Settlement, dated May 28, 2013
[Docket No. 2623] ........................................................................    A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643] .....................    A2147

Excerpts of Declaration of David Cote in Support of BlueCross
BlueShield of South Carolina Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-3].................    A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
and Blue Shield of Arizona, Inc. Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-4].................    A2180

Excerpts of Declaration of Matthew Brolly in Support of
Independence Blue Cross Objections to Proposed Settlement,
dated May 28, 2013 [Docket No. 2643-6]....................................    A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
Cross of Northeastern Pennsylvania Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-7].................    A2184

# Table of Contents
### (continued)

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28, 2013 [Docket No. 2644] ............................................................. A2186

Excerpts of Objection of American Express Company, American Express Travel Related Services Company, Inc., Travel Impressions, Ltd., American Express Publishing Corp., Serve Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee, USA, Amex Assurance Company, and Accertify, Inc. to the Class Settlement Agreement, dated May 28, 2013 [Docket No. 2648] ......................................................................................... A2213

Declaration of Stephen B. McCurdy in Support of Objections of American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

### Volume X

Notice of Motion of DFS Services LLC and Discover Bank to Intervene, dated May 28, 2013 [Docket No. 2655] ...................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013 [Docket No. 2657-6] ....................................................... A2252

Objection of DFS Services LLC, Discover Loans, Inc., and Discover Bank to Final Approval of Proposed Settlement, dated May 28, 2013 [Docket No. 2659] ........................................ A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule 23(b)(3) Damages Case, dated May 28, 2013 [Docket No. 2663] ........................................................................ A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in Opposition to Motion for Final Approval of Settlement, dated May 28, 2013 [Docket No. 2670] .................................................. A2278

xiv

**Table of Contents**
**(continued)**

Page

Excerpts of Declaration of Jeffrey I. Shinder in Support of
    Opposition to Class Plaintiffs' Motion for Final Approval of
    the Proposed Class Settlement, dated May 28, 2013
    [Docket No. 2670-1] ...................................................... A2300

Excerpts of Report of Professor Jerry Hausman,
    dated May 28, 2013 [Docket No. 2670-5] ..................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: "Industry Facts Concerning Debit Card Regulation
    Under Section 920," by Stephen Craig Mott,
    BetterBuyDesigns, on Behalf of the Merchants Payments
    Coalition, submitted to Federal Reserve System, October 29,
    2010; Attachment F: "2011 Interchange Fee Revenue, Covered
    Issuer Costs, and Covered Issuer and Merchant Fraud Losses
    Related to Debit Card Transactions," Board of Governors of
    the Federal Reserve System, March 5, 2013
    [Docket No. 2670-6] ...................................................... A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
    - Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
    Reactions to Credit Card Settlement", by Maria Aspan and
    Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
    Analysis of the Proposed Interchange Fee Litigation
    Settlement," by Adam J. Levitin, Georgetown Law and
    Economics Research Paper No. 12-033, August 21, 2012; Ex.
    70: The Nilson Report, February 2013, Issue 1,011; American
    Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
    "Merchant Surcharging – Understanding Payment Card
    Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
    to Support the U.S. Merchant Litigation Settlement," Visa,
    2013; Ex, 77: "Notice of MasterCard Rule Changes,"
    MasterCard Worldwide, December 2012; Ex. 78:
    Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
    Territories, regarding Merchant Class Action Litigation
    Settlement – Important Changes to Merchant Acceptance

**Table of Contents**
**(continued)**

Page

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses
Q2 2012 Results - Earnings Call Transcript," Visa, May 20,
2013; Ex. 84: "New Visa, MasterCard fees stir debate within
industry," The Green Sheet Online, March 12, 2013; Ex. 94:
MasterCard Incorporated Management Discusses Q2 2012
Results - Earnings Call Transcript, May 20, 2013; Ex. 95:
MasterCard's CEO Discusses Q4 2012 Results - Earnings Call
Transcript, May 20, 2013 [Docket No. 2670-8] ........................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder:
Ex. 97: "Reform of Australia's Payments System: Preliminary
Conclusions of the 2007/08 Review," Reserve Bank of Australia,
April, 2008; Ex. 108: Amended and Restated Global Restructuring
Agreement [Docket No. 2670-9] .................................................. A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed
Class Settlement Agreement, dated June 5, 2013
[Docket No. 3074] ...................................................................... A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013
[Docket No. 3755] ...................................................................... A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed
Class Settlement Agreement, dated June 6, 2013
[Docket No. 4237] ...................................................................... A2405

Excerpts of Statement of Objections of the Society of Independent
Gasoline Marketers of America, dated June 7, 2013
[Docket No. 4640] ...................................................................... A2407

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated June 7, 2013 [Docket No. 4654] ...................... A2415

**Table of Contents**
**(continued)**

**Page**

Statement of Objections of Life Time Fitness, Inc.,
  dated June 11, 2013 [Docket No. 5385] ........................................ A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
  dated June 11, 2013 [Docket No. 5406] ........................................ A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
  [Docket No. 5651] ........................................................... A2434

Excerpts of Defendants' Reply Memorandum in Support of
  Final Approval of Definitive Class Settlement Agreement,
  dated August 16, 2013 [Docket No. 5937] .................................... A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
  Further Support of Settlement Final Approval,
  dated August 16, 2013 [Docket No. 5939] .................................... A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
  [Docket No. 5939-3] ........................................................ A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
  to the Proposed Class Settlement (redacted),
  dated August 16, 2013 [Docket No. 5939-5] ................................. A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
  Plaintiffs' Motion for Final Approval of the Proposed Class
  Settlement, dated August 16, 2013 [Docket No. 5939-6] .............. A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
  Joint Motion for Award of Attorneys' Fees, Expenses and
  Class Plaintiffs' Awards, dated August 16, 2013
  [Docket No. 5940] .......................................................... A2471

Excerpts of Reply Memorandum in Support of FDC's
  Motion to Opt Out of Rule 23(b)(2) Class Settlement,
  dated August 23, 2013 [Docket No. 5957] ................................... A2473

**Table of Contents**
**(continued)**

Page

Report from Court appointed expert Professor Alan O. Sykes,
  dated August 28, 2013 [Docket No. 5965] ................................... A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
  dated August 28, 2013 [Docket No. 5965] (Cont'd) .................... A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
  Report of Professor Alan O. Sykes, dated September 4, 2013
  [Docket No. 5978] ......................................................... A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
  Professor Alan O. Sykes, dated September 4, 2013
  [Docket No. 5982] ......................................................... A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
  Correct Misstatements in Supplemental Declaration of
  Craig Wildfang and in Opposition to Final Approval,
  dated September 10, 2013 [Docket No. 6006-1] .......................... A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-2] ....................................................... A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-3] ....................................................... A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-4] ....................................................... A2553

**Table of Contents**
**(continued)**

Page

Excerpts of Transcript of Fairness Heating before the
    Honorable John Gleeson, U.S. District Court Judge,
        dated September 12, 2013 [Docket No. 6094].............................. A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
    dated December 13, 2013 [Docket No. 6125] .............................. A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
    dated December 13, 2013 [Docket No. 6126] .............................. A2588

Notice of Appeal of Target Group Objectors,
    dated December 13, 2013 [Docket No. 6128] .............................. A2589

Notice of Appeal of National Retail Federation,
    dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
    [Docket No. 6175] ........................................................................ A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
    WellPoint Objectors, dated January 10, 2014
    [Docket No. 6176] ........................................................................ A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
    [Docket No. 6178] ........................................................................ A2602

Notice of Appeal of First Data Corporation, First Data Merchant
    Services, TASQ Technology, Inc., TRS Recovery Services,
    Inc., First Data Government Solutions, and Telecheck Services,
    Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
    Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
    Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
    Tousled Hair Studio), and Kristina Newman – Hair,
    dated January 10, 2014 [Docket No. 6182] .................................. A2606

**Table of Contents**
**(continued)**

**Page**

Notice of Appeal of U.S. PIRG, dated January 13, 2014
[Docket No. 6189] ........................................................... A2608

Notice of Appeal of Consumers Union of United States, Inc.,
dated January 13, 2014 [Docket No. 6190] .................................. A2609

Amended Notice of Appeal of Target Group Objectors,
dated January 21, 2014 [Docket No. 6212] .................................. A2610

Amended Notice of Appeal of Temple Eagle,
dated January 13, 2014 [Docket No. 6227] .................................. A2611

Notice of Appeal of National Federation of Independent Business,
dated February 7, 2014 [Docket No. 6234] .................................. A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
Objectors and WellPoint Objectors, dated February 7, 2014
[Docket No. 6238] ........................................................... A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
Homestead Restaurant (Historical Homestead, Inc.), The Feral
Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
(d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
dated February 13, 2014 [Docket No. 6245] ................................ A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
(Amending Notice Of Appeal Filed December 13, 2013),
dated February 13, 2014 [Docket No. 6248] ................................ A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
dated February 13, 2014 [Docket No. 6251] ................................ A2625

# **Table of Contents**
## (continued)

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
    LLC and Temple Eagle Partners LLC, dated February 18, 2014
    [Docket No. 6257] ......................................................................... A2626

Amended Notice of Appeal of R & M Objectors,
    dated February 25, 2014 [Docket No. 6263] ................................. A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
    dated June 25, 2009 ....................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
    Credit Cards: *Rising Interchange Fees Have Increased Costs*
    *for Merchants, but Options for Reducing Fees Pose*
    *Challenges*, dated 11/2009 ............................................................ A2638

Final Judgment as to Defendants MasterCard International
    Incorporated and Visa Inc., *U.S. v. American Express Co*.,
    CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
    CV-4996 DE 143] .......................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

## **Volume XII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A2751

## **Volume XIII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3001

## **Volume XIV**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3251

**Table of Contents**
(continued)

Page

**Volume XV**

Visa International Operating Regulations,
  dated October 15, 2012 (Cont'd) .................................................... A3501

**Volume XVI**

Visa International Operating Regulations,
  dated October 15, 2012 (Cont'd) .................................................... A3751

**Volume XVII**

Interlink Network, Inc. Operating Regulations,
  dated November 15, 2012 .............................................................. A4009

**Volume XVIII**

MasterCard Rules, dated April 11, 2012 ............................................ A4259

**Volume XIX**

MasterCard Rules, dated April 11, 2012 (Cont'd) .............................. A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
  Case T-111/08, Judgment of the General Court
  (Seventh Chamber), dated May 24, 2012 ...................................... A4614

Minute Order deeming all pending motions for relief withdrawn
  without prejudice to reinstatement if the settlement is not
  consummated, dated July 17, 2012 ................................................ A4616

Minute Order upholding Judge Orenstein's order denying
  disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

**Table of Contents**
**(continued)**

Page

Excerpts of Class Settlement Agreement, *In re Am. Express*
*Anti-Steering Rules Antitrust Litig.* (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2].............................................  A4623

**Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express*
*Anti-Steering Rules Antitrust Litig.* (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2] (Cont'd) ..............................  A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for
Final Approval of Class Action Settlement, *In re: American*
*Express Anti-Steering Rules Antitrust Litig.*, 11-md-2221
(NGG)(RER), (Redacted - Public Version), dated April 15,
2014 [Docket No. 11-md-2221 DE 362] ......................................  A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American*
*Express Anti-Steering Rules Antitrust Litig.*, 11-md-02221
(NGG)(RER) (redacted), dated April 15, 2014
[Docket No. 11-md-2221 DE 370] ................................................  A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee*
*and Merchant Discount Antitrust Litig.*, No. 14-md-1720
(JG)(JO), dated July 18, 2014
[Docket No. 14-md-1720 DE 104] ................................................  A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card*
*Interchange Fee and Merchant Discount Antitrust Litig.*,
No. 14-md-1720 (JG)(JO), dated July 18, 2014
 [Docket No. 14-md-1720 DE 105] ...............................................  A4836

# Table of Contents
## (continued)

**Page**

### Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
    Judgment of the Court (Third Chamber),
    dated September 11, 2014.............................................................. A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.
    Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
    dated September 26, 2014 [Docket No. 13-cv-5746 DE 41].......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
    No. 13-4537 .................................................................................. A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
    Education ...................................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
    U.S. District Court, Eastern District of New York ....................... A5090

### Volume XXII

#### *Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
    (filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
    to Individual Plaintiffs' Statement of Undisputed Facts,
    Pursuant to Local Rule 56.1(b) (filed under seal),
    dated May 6, 2011 [Docket No. 1477-7] ...................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
    There is No Genuine Issue to be Tried (filed under seal), dated
    February 11, 2011 [Docket No. 1478-4] ...................................... A5125

**Table of Contents**
**(continued)**

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
dated July 2, 2009 [Docket No. 2088]............................................ A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
under seal), dated December 14, 2009 [Docket No. 2088]............ A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
seal), dated December 14, 2009 [Docket No. 2088]....................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
dated May 3, 2011 [Docket No. 2088] .......................................... A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
dated May 3, 2011 [Docket No. 2088] .......................................... A5191

Memorandum of Law in Support of Motion to Intervene of DFS
Services LLC and Discover Bank (filed under seal), dated May
28, 2013 [Docket No. 2657-1]........................................................ A5200

Declaration of Jennifer M. Selendy (filed under seal),
dated May 28, 2013 [Docket No. 2657-3]..................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
dated May 28, 2013 [Docket No. 2657-4]..................................... A5231

Declaration of Roger Hochschild (filed under seal),
dated May 28, 2013 [Docket No. 2657-5]..................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
Notice of Class Action Settlement Authorized by the U.S.
District Court, Eastern District of New York (filed under seal)
[Docket No. 2657-7]....................................................................... A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
dated July 2, 2009 ......................................................................... A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
dated December 15, 2009 ............................................................... A5295

## **<u>Table of Contents</u>**
### **(continued)**

**<u>Page</u>**

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
    dated June 22, 2010 ....................................................................... A5297

# A1251

Table 1: Mega-Fund Class Actions with Fee Awards of At Least 20%

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 1 | *Allapattah Services, Inc. v. Exxon Corp.* , 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,060 | 31.33% |
| 2 | *In re AT & T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) | $956 | 20.00% |
| 3 | *In re Brand Name Prescription Drugs Antitrust Litig.* , No. 94 C 897, 2000 WL 204112 (N.D. Ill. Feb. 10, 2000) | $697 | 25.00% |
| 4 | *In re Fructose Antitrust Litig.*, MDL No. 1087, Master File No. 94-1577 (C.D. Ill. Oct. 4, 2004) | $531 | 25.00% |
| 5 | *In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 6 | *Spartanburg Regional Health Services Dist., Inc., et al. v. Hillenbrand Industries, Inc. et al.* , No. 7:03-2141-HFF (D. S.C. Aug. 15, 2006) | $468 | 25.00% |
| 7 | *In re Adelphia Communs. Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529(LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) | $455 | 21.40% |
| 8 | *In re Air Cargo Shipping Servs. Antitrust Litig. ("Air Cargo I")*, No. 06–MD–1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ($85 million); *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo II)*, No. 06–MD–1775, MDL 1775, 2011 WL 2909162 (E.D.N.Y. July 15, 2011) ($153.8 million); & *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo III)*, No. 06–MD–1775, MDL 1775, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ($183.4 million) | $422.2 | 25.00% |
| 9 | *In Re (Bank of America) Checking Account Overdraft Litigation* , 830 F.Supp.2d 1330 (S.D. Fla. 2011) | $410 | 30.00% |
| 10 | *In re Freddie Mac Sec. Litig.,* No. 03-CV-4261 (JES), (S.D.N.Y. Oct. 27, 2006) | $410 | 20.00% |
| 11 | *In re Vitamins Antitrust Litig.* , No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 12 | *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M:02-cv-01486-PJH, MDL-02-1486 (N.D. Cal. Nov. 1, 2006) | $326 | 25.00% |
| 13 | *In re Rite Aid Corp. Sec. Litig. (Rite Aid I)*, 146 F.Supp.2d 706 (E.D.Pa.2001)($193 million) & *In re Rite Aid Corp. Sec. Litig. (Rite Aid II)*, 362 F.Supp.2d 587 (E.D.Pa.2005) ($126 million) | $319 | 25.00% |
| 14 | *Cooper v. IBM Personal Pension Plan* , 2005 WL 1981501 (S.D. Ill. 2005)[1] | $314 | 28.30% |
| 15 | *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-FHM (N.D. Okla. Feb. 12, 2007) | $311 | 25.00% |
| 16 | *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (S.D.N.Y. June 2003) | $300 | 28.00% |
| 17 | *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004) | $300 | 22.50% |
| 18 | *In re Enron Corp. Sec. and ERISA Litig.*, MDL 1446. Case 4:01-cv-03913 (S.D. Tex. July 24, 2006) | $264 | 20.00% |

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 19 | *In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz. July 24, 1990)[2] | $250 | 26.60% |
| 20 | *In re Comverse Technology, Inc. Securities Litig.*, 2010 WL 2653354, 6 (E.D.N.Y., 2010) | $225 | 25.00% |
| 21 | *In re Buspirone Antitrust Litig.*, No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[3] | $220 | 33.30% |
| 22 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30.00% |
| 23 | *In re Waste Mgmt., Inc. Sec. Litig.*, No. 97-7709, 21 Class Action Rep. 263 (N.D. Ill. filed Sept. 17, 1999) | $220 | 20.80% |
| 24 | *In re Washington Mutual, Inc. Sec. Litig.*, No. 2:08-md-01919 MJP (W.D. Wash. Nov. 4, 2011) | $208.5 | 21.00% |
| 25 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30.00% |
| 26 | *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) | $200 | 27.50% |
| 27 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.*, No. 91-05637 (116th Dist. Ct. Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 28 | *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D.Tex.1999)[4] | $190 | 25.00% |
| 29 | *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 | 30.00% |
| 30 | *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000)[5] | $185 | 40.00% |
| 31 | *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) | $175 | 33.30% |
| 32 | *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519 (D.N.J. Jan. 30, 2013) | $164 | 27.50% |
| 33 | *In re: (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Dec., 19, 2012) | $162 | 30.00% |
| 34 | *In re Dollar Gen. Corp. Sec. Litig.*, No. 01-388 Order (M.D. Tenn. May 24, 2002) | $162 | 21.60% |
| 35 | *MBA Surety Agency, Inc. v. AT&T Mobility LLC*, No.1222-CC09746 (Mo. Cir. Ct. Mar. 7, 2013) | $152.6 | 25.00% |
| 36 | *In re: Managed Care Litig.*, No. 00-MD-1334, MDL1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003 | $150 | 29.00% |
| 37 | *Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K, 2005 WL 3148350 (N.D.Tex. Nov.5, 2005) | $150 | 22.2% |
| 38 | *In re Coordinated Pretrial Proceedings In Petroleum Prods. Antitrust Litig.*, No. MDL 150, 1994 WL 675265 (C.D. Cal. Aug. 11, 1994) | $140 | 21.00% |
| 39 | *Carpenters Health v. Coco-Cola Co.*, 587 F.Supp.2d 1266 (N.S. Ga. 2008) | $138 | 21.00% |
| 40 | *In re: (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Mar. 12, 2013) | $137.5 | 30.00% |
| 41 | *In re Computers assocs. Class Action Sec. Litig.*, CV-98-4839 (TCP) (E.D. NY 2003)[6] | $136 | 25.00% |
| 42 | *In re Informix Corp. Sec. Litig.*, Master File No. C-97-1289 CRB (N.D.Cal. Nov. 2, 1999) | $132 | 30.00% |

# A1253

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 43 | *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36.00% |
| 44 | *In re Infant Formula Antitrust.*, MDL No. 878, (N.D. Fla. Sept. 7, 1993) | $125 | 25.00% |
| 45 | *PaineWebber Ltd. P'ships Litig. v. Geodyne Res., Inc.*, 999 F. Supp. 719 (S.D.N.Y. 1998) | $125 | 20.80% |
| 46 | *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30.00% |
| 47 | *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475-NRB (S.D.N.Y.2005) | $120 | 28.00% |
| 48 | *Hershey, et al, v. Pac. Inv. Mgmt. Co. LLC*, No. 1:05-cv-04681 (N.D. Ill. May 2, 2011)[7] | $120 | 28.00% |
| 49 | *In re: Bank One Sec. Litig. First Chicago S'holder Claims*, No. 00-CV-0767 (N.D. Ill. Aug. 26, 2005) | $120 | 22.50% |
| 50 | *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 | 27.50% |
| 51 | *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30.00% |
| 52 | *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D.Tex. Apr. 9, 2010) | $110 | 30.00% |
| 53 | *In re Cardizem CD Antitrust Litig.*, No. 99-MD-1278, at 18-20 (E.D.Mich. Nov. 26, 2002) | $110 | 30.00% |
| 54 | *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F.Supp. 97 (S.D.N.Y.1996) | $110 | 27.00% |
| 55 | *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323 (S.D.Fla.2001) | $110 | 25.00% |
| 56 | *In re DPL Inc. Sec. Litig.*, 307 F.Supp.2d 947 (S.D. Ohio 2004) | $110 | 20.00% |
| 57 | *In re Methionine Antitrust Litig.*, No. C 99-3491, MDL No. 00-1311 (N.D. Cal. Oct. 3, 2002) | $107 | 23.30% |
| 58 | *In re Automotive Refinishing Paint Antitrust* Litigation, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 59 | *City of Greenville v. Syngenta Crop Protection*, No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 | 33.33% |
| 60 | *Haynes v. Shoney's*, No. 89-30093-RV, 1993 WL 19915 (N.D. Fla. Jan. 25, 1993)[8] | $105 | 23.20% |
| 61 | *In re Prison Realty Sec. Litig.*, Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30.00% |
| 62 | *Ingram v. Coca-Cola, Corp.*, 200 F.R.D. 685 (N.D. Ga. 2001)[9] | $104 | 20.00% |
| 63 | *In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation*, 3:09-md-02032-MMC (D. N.J. 2012) | $100 | 25.00% |
| 64 | *Baird v. Thomson Consumer Elecs.*, No. 00-761 (Ill. Cir. Court, Madison Co. June 15, 2001) | $100 | 22.00% |

# A1254

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 65 | *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160 (3d Cir. 2006) | $100 | 21.25% |
| 66 | *Stop N Shop Supermarket Company, et. al. v. SmithKline Beecham Corp.*, Civil Action No. 03-CV-4578 (E.D. Pa. 2005) | $100 | 20.00% |

[1] The Court awarded a graduated amount ranging from 17–29% of the recovery. After an appeal reversed a portion of the award, this table reflects the actual settlement and fee realized.

[2] The Court awarded an increasing graduated amount (25% of the first $150 million and 29% of any larger amount). This table reflects the values realized.

[3] The global settlement exceeded $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

[4] The Court awarded 25% in five settlements and a 15% fee award in two others. This table lists $190 million, the total recovery from all settlements.

[5] While technically not a class action, this case is equivalent to a class-action in which the fee was negotiated *ex ante*.

[6] The settlement fund was paid in shares of stock. Class counsel received a percentage of the stock as fees.

[7] The attorneys' fee award was not part of the final judgment. The settlement notice stated that class counsel would request 20% of the recovery as fees and the final judgment

[8] This amount reflects only the cash relief. Additional non-cash relief was valued at $30 million.

[9] The fund amount excludes $10 million in a "Promotional Achievement Fund" and $43.5 million in "future pay equity adjustments."

# A1255

A curious observer might reasonably ask whether in *Enron*, the *Air Cargo* cases, and the other cases listed in Table 1 the presiding judges were too generous. The fee awards were certainly large. Were they sized appropriately or excessive?

The mimic-the-market approach provides an objective basis for answering this question. A fee award is right-sized if it pays the amount that is reasonably thought to be needed to obtain legal services in the private market, given the best available evidence of prevailing rates. It is too large if it pays more than this amount and too small if it pays less. The basis for these conclusions is straightforward. By awarding a market-based fee, a judge transfers only the amount of resources that is needed to acquire legal services on contingency, as demonstrated by actual transactions between clients and lawyers. By picking a percentage above the market rate, a judge would require class members to pay more than the services are worth. In other words, the fee will exceed the amount class members could have offered plaintiffs' lawyers and found ready takers. By choosing a below-market rate, a judge would fail to cover the value of the legal services, as demonstrated by the amounts lawyers are willing to accept and real clients are willing to pay. Consequently, they would discourage lawyers from handling class actions.

The market-based approach also meshes well with the law of restitution, the law upon which lawyers' payment rights are based. A standard measure of recovery in restitution is the market value of the service supplied, often referred to as the providers usual and customary charge.[14] It makes sense to use the market for this purpose. Restitution provides for payments when, for various

---

[14] See Silver, *Restitutionary Theory*, *supra*, at p. 700 ("Quasi-contractual damages usually equal the reasonable or market value of the service provided."). Douglas Laycock, arguably the most prominent living writer on restitution, concurs. "Quasi-contract proceeds on the fiction of an implied promise to pay.... If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that." Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985)).

17

# A1256

reasons, service recipients and service providers cannot bargain directly.  Had direct negotiations been possible, however, there is every reason to think that the parties would have settled on the going rate.  The recipient would have had no reason to pay more than the market price, that being demonstrably sufficient to obtain the service.  The provider would have had no reason to work for less, other opportunities being more profitable.  The rate prevailing in the market is thus the most reliable measure of the payment that would have changed hands had a voluntary exchange been possible.

To evaluate the reasonableness of the fee awards in *Enron*, the *Air Cargo* cases, and the other mega-fund class actions listed in Table 1, one thus needs evidence of the amount clients willingly pay for legal services and lawyers willingly accept.  The next two sections of this report survey the evidence I have been able to amass about fees agreed to in cases involving sophisticated clients.  Section 6 shows that sophisticated clients use the percentage approach.  Section 7 shows that they commonly pay 20 percent of recovered amounts or more.

If fees paid by *un*sophisticated clients were dispositive, the discussion would be very brief.  There is broad agreement that contingent fees normally range from 25 percent to 40 percent in personal injury representations.[15]  See, e.g., Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & Table 5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997)

---

[15] Somewhat lower rates prevail in commercial airplane crash cases, where liability is usually conceded.   Higher rates are charged in medical malpractice cases and many mass tort representations, where costs are unusually high and the risk of losing can be great.

(reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee). Fees tend to be about the same, or perhaps slightly higher, in mass tort cases that involve large numbers of injured claimants.[16] Lower fees are said to prevail in cases arising out of commercial airplane crashes, where liability is often conceded.[17] Market forces account for this. When a defendant concedes liability and puts a

---

[16] See, e.g., *In re A.H. Robins Co., Inc.*, 182 B.R. 128, 131 (E.D.Va. 1995) (reporting that thousands of women injured by the Dalkon Shield signed contingent fee arrangements providing for fees between one-quarter and one-half of the recovery, with most charging one-third); Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, New York Times, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html (reporting that thousands of rescue and clean-up workers who were harmed as a result of the terrorist attacks on September 11, 2001, hired lawyers on terms requiring them to pay one-third of their recoveries); Martha Neil, *Frustration Over Uncontained Gulf Oil Spill—and Tort Claim Contingency Fees of Up to 50 Percent*, ABA JOURNAL (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill--and_tort_legal_fees_of_up_to_5/ (reporting that thousands of clients with claims against BP arising out of the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40 percent to 50 percent); James S. Kaklik, et al., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983) (finding that asbestos claimants whose cases closed before August, 1982, paid legal fees and other litigation equal to about 42 percent of their recoveries); James S. Kakalik et al., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984) (finding that asbestos claimants paid legal fees and expenses equal to 39 percent of their recoveries); Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & tbl.5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997) (reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee); Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 NEW YORK UNIVERSITY LAW REVIEW 805, 846 (2011) (reporting that "every one of the twelve [high volume plaintiffs' firms she] studied charge[d] a tiered contingency fee," with most charging "at least 33%--and perhaps as high as 40%").

[17] See ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily sent out the 'Alpert letter' which makes an early settlement offer and concedes all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery") (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 THE BRIEF 4, 38 (November 1982)).

# A1258

settlement offer on the table from the get-go, risks fall and the market pays contingent fee lawyers less for handling cases.

Many judges know that market rates normally equal or exceed 33.3 percent of recoveries in personal injury cases. For example, in *Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir.1998), where he affirmed a 38 percent fee, Judge Posner stated that the market range for contingent fee cases is 33 percent to 40 percent. Many cases contain similar observations. *See, e.g., Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33% to 40% of the amount recovered.").

By comparison to the rates charged in any context where plaintiffs' lawyers represent unsophisticated clients on contingency, the fee Class Counsel requests is low. Thus, if fees paid by unsophisticated clients are considered, the reasonableness of Class Counsel's fee request is patent.

## 6.    THE FEE AWARD SHOULD BE A PERCENTAGE OF THE RECOVERY

When awarding fees in *Enron*, Judge Harmon understood that, to approximate the bargain class members and their attorneys would have struck in direct negotiations, she needed evidence of prevailing market rates. She cited *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005), for the following proposition:

> Although it is impossible to know *ex post* exactly what terms would have resulted from arm's length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions."

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 824 (S.D.Tex., 2008). For reasons that need not be addressed here, class counsel auctions were discredited after *Taubenfield* was decided. Even so, the spirit of *Taubenfeld* is absolutely correct. To mimic the

20

private market for legal services, judges need to know how the market compensates plaintiffs' attorneys.  This is a factual matter requiring evidence.

When searching for evidence, one must narrow the focus.  Lawyers who handle class actions normally work on contingency.  They get paid when they win and not otherwise.  This is so because class members rarely agree to hire them on other terms.  That was true here.  Upon being asked to submit a report on attorneys' fees in this case, I asked Class Counsel whether the named plaintiffs signed retainer agreements.  On learning that they had, I requested copies of the agreements and examined their terms.  Without exception, the named plaintiffs hired the lawyers on contingency.[18]

There is nothing odd about this.  To the contrary, it would be extremely unusual, although not entirely unprecedented,[19] for a named plaintiff to pay a lawyer a guaranteed hourly rate for waging a class suit.[20]  Consider securities fraud class actions filed after the enactment of the Private Securities

---

[18] See Engagement Letter, CHS Inc., dated June 14, 2005; Engagement Letter, 30 Minutes Photos, Etc., Inc., dated May 6, 2005; Engagement Letter, Traditions Classic Home Furnishings, dated April 21, 2005; and Engagement Letter, National Association of Convenience Stores, dated September 23, 2005; Engagement Letter, Affiliated Foods Midwest Cooperative, Inc., dated November 10, 2005; Engagement Letter, National Restaurant Association, dated April 14, 2006; Engagement Letter, Coborn's, Incorporated, dated November 9, 2005; Engagement Letter, NATSO, February 24, 2006; Engagement Letter, D'Agostino Supermarkets, October 31, 2005; Engagement Letter, National Community Pharmacists Association, February 7, 2006; Engagement Letter, Jetro Holdings, Inc., September 16, 2005; and Engagement Letter, National Grocers Association, dated October 31, 2005.

[19] *Trustees v. Greenough*, 105 U.S. 527 (1881), is the most recent reported case I can think of in which a named plaintiff paid a lawyer to wage a class action out of his own pocket.

[20] It would be unusual for personal injury clients to do so as well.  In 1998, Professor Herbert Kritzer, now of the University of Minnesota Law School, published the results of a survey of Wisconsin lawyers that produced 511 usable responses containing information on 989 cases, including 332 that were unfiled, 390 that were filed but not tried, and 267 that went to trial.  Only 3% of the cases "involved a fee with a contingency element that did not conform to the standard percentage fee arrangement".  Interestingly, none of the variations Professor Kritzer described resembled the lodestar method; that is, none combined a contingent hourly rate with a multiplier.  Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL LAW REVIEW 267, 284-288 (1998).

# A1260

Litigation Reform Act in 1995.  In my academic study of these cases and my experience with them as a consultant, both of which are extensive, I have encountered not a single instance in which an investor serving as a lead plaintiff agreed to pay class counsel by the hour.  This is true even though lead plaintiffs are often wealthy institutional investors that could afford to pay guaranteed rates if they thought that advisable.  Lead plaintiff in securities fraud class actions offer contingent fees because they want to transfer litigation-related risks and costs to lawyers.

The relevant part of the market for legal services to scour for evidence is, then, the sector in which sophisticated clients agree to pay contingent fees.  This is important for a simple reason: contingent fees are almost always set as percentages of clients' recoveries.  Although judges sometimes base fee awards on hourly rates or use so-called "lodestar cross-checks", sophisticated clients who hire lawyers on contingency rarely do.  No one has ever shown that sophisticated clients use the hourly-rate based lodestar method extensively, or even frequently, when hiring lawyers on contingency, and I represent to the Court that they do not.  Percentage-of-the-recovery compensation predominates.  See, e.g., David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335 (2012) (reviewing contingent fee agreements used in patent cases and reporting on percentage compensation offered).  This being so, the mimic-the-market approach establishes that judges should also use the percentage approach was awarding fees in class actions.

Abundant evidence supports my contention that sophisticated clients use percentage-based fee arrangements.  In this case, for example, the named plaintiffs that hired Robbins Miller Kaplan & Ciresi LLP agreed to pay a percentage of the recovery.  In *Enron* and other securities fraud class actions where compensation terms are set in *ex ante* agreements, lead plaintiffs also use percentage-based approaches.  See, e.g., *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586

22

# A1261

F.Supp.2d 732, 766 (S.D. Tex., 2008) (finding that "[t]he *ex ante* fee agreement," according to which Class Counsel was hired on contingency pursuant to a rising scale of percentages, "weighs heavily in support of awarding Lead Counsel 9.52% of the net settlement fund"); Expert Report of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for An Award of Attorneys' Fees, submitted in *In re Enron Corp. Securities, Derivative & ERISA Litigation*, Civil Action No. H-01-3624 (S.D. Texas—Houston) (reporting scales of percentages set in *ex ante* fee agreements in securities fraud class actions). The same is true in patent representations and other commercial lawsuits.

Presumably, the market favors percentage-based compensation in contingent fee representations because these arrangements motivate lawyers to prosecute claims aggressively by giving them sizeable stakes in the upside of litigation. Lodestar-based fee payments would not have this effect because they tie lawyers' rewards more heavily to time expended than to results obtained. Multipliers or bonuses linked to amounts recovered could improve matters somewhat. But the overwhelming use of percentage-based compensation in the private market suggests that anchoring fees primarily to hours expended creates interest conflicts that fee enhancements cannot readily ameliorate.

Second Circuit precedent allows the Court to use the percentage method. In *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir.2000), the Second Circuit freed district courts from having "to undertake the cumbersome, enervating, and often surrealistic process of lodestar computation." *Id.*, 209 F.3d at 49-50 (internal quotation marks omitted). See also *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("Courts may award attorneys' fees in common fund cases under either the "lodestar" method or the "percentage of the fund" method.") The reversal of precedent worked in *Goldberger* was based partly on the Supreme Court's pronouncement that

23

# A1262

"under the 'common fund doctrine,' ... a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984) (quoted in *Goldberger*, 209 F.3d at 49). It makes overwhelming sense when one considers practices prevailing in the market as well.

*Goldberger* allows the Court to base a percentage fee award on prevailing market rates as well. After holding that percentage-based fee awards are permitted, the Second Circuit identified the "criteria" a district court just must consider "in determining a reasonable common fund fee", including: the magnitude and complexities of the litigation; the risk of the litigation, the requested fee in relation to the settlement; and public policy considerations. *Goldberger*, 209 F.3d at 50. The first three factors all matter in the private market transactions where contingent percentages are set. The last permits the Court to decide that, as a matter of public policy, it makes sense to take percentage fees paid by sophisticated clients as a guide.

Plainly, the magnitude and complexity of litigation and the risk involved determine the size of contingent percentages in the private sector. For example, percentages are higher in medical malpractice cases than in most other personal injury cases because the former are more expensive to wage and harder to win. Percentages are also high in patent infringement cases because they involve sizeable commitments of resources and, therefore, large risks. These matters are discussed further below.

The requested fee in relation to the settlement practically begs for a market-based comparison. What can it mean to say that the relation is appropriate except that it falls in the usual and customary range? And how can the usual and customary range be determined, except by studying the workings of the private market, where lawyers collect contingent fees every day.

24

Finally, as a policy matter, percentage-based awards are justified on the ground that they create superior incentives for attorneys to maximize class members' expected recoveries. This conclusion reflects the high frequency with which sophisticated clients pay lawyers contingent percentage fees when acting as plaintiffs in civil lawsuits. Given the due process imperative to ensure that class members are represented zealously, judges desirous of protecting class members' rights should learn from the market and use the contingent percentage approach.

## 7.   SOPHISTICATED CLIENTS NORMALLY PAY CONTINGENT FEES OF 20 PERCENT OR MORE

Having established that judges should use the percentage method when awarding fees in class actions, it remains to consider how large fee percentages should be. In this section, I survey what is known about the fees sophisticated clients, normally businesses, usually pay. Because business clients can shop for lawyers and compare rates, are experienced negotiators, and have good information, the fees they pay should reflect the value of the services lawyers provide.

We know less about the fees businesses pay than we might.[21] No publicly available database collects this information, and businesses that sue as plaintiffs do not often make their fee agreements public. Consequently, most of what is known is drawn from anecdotal reports. Businesses also sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses.[22]

---

[21] I have studied the costs insurance companies incur when *defending* liability suits. See Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AMERICAN LAW AND ECONOMICS REVIEW 185 (2008). Unfortunately, this information sheds no light on the amounts businesses play when acting as plaintiffs.

[22] In a recent case against Bank of American, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery. Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORPORATE COUNSEL (Online) April 9, 2010. I note that the combination of a guaranteed payment with a contingent bonus differs from the lodestar method, which is a contingent hourly rate.

25

# A1264

These arrangements hold few lessons for class actions because lawyers representing plaintiff classes must work on straight contingency.  That said, the limited evidence available on the use of pure contingent fees by sophisticated clients shows that marginal percentages tend to be high.

Consider patent infringement representations.  Reports of high percentages in this area abound.  The most famous such instance may be the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.  Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement,[23] after securing a $501 million jury award against Boston Scientific.  Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA JOURNAL (May 20, 2008).[24] In yet another instance, the Texas law firm of McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc.  Penalties and interest added $90 million to the total.  The firm's share, under another *partial* contingent fee agreement, was reported to be $60 million,

---

[23] In a partial contingent fee agreement, the contingent bonus, usually but not necessarily a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate.  Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide no guidance for fee percentages in securities class actions.

[24] The parties later settled the case for $50 million.  AMERICAN LAWYER, *Interest Award Brings Doctor's Judgment Against Johnson & Johnson to $593 Million In Patent Fight Over Stents*, April 01, 2011, http://www.dicksteinshapiro.com/files/News/264f90ee-6c20-49c9-a487-98a0b5487d82/Presentation/NewsAttachment/af4ec2e6-3255-4a0b-b3d8-996140459f30/American%20Lawyer_Saffran.pdf.

assuming the verdict held up.  Cheryl Hall, *Patents and patience pay off for Dallas law firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010.

In a recent article, Assistant Professor David L. Schwartz reports findings based on interviews with 44 experienced lawyers who represent plaintiffs in patent cases and his review of 42 contingent fee agreements.[25]  His conclusion: The percentages are high.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges.  There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased.  Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, *supra*, at 360.  In a case like this one that lasted almost a decade, the highest graduated rates would apply.[26]

---

[25] See David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335 (2012).

[26] Professor Schwartz's findings are consistent with reports found in patent blogs.  The following passage appeared in Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).
    *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors—a strictly results-based system.
This item can now be found at http://patentlitigationstrategy.com/?page_id=30.

# A1266

Another example of the use of scaled contingent percentages in patent litigation appears in *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003), which involved a sophisticated client with an enormous intellectual property claim. The decision reports that the plaintiff agreed to pay his attorneys a scale of contingent percentages. "Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million." *Id.* at 248-249. The agreement also contained other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction." "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id.* at 249. Like NTP in the *Blackberry* litigation, Tanox agreed to pay both a high percentage and a potentially enormous amount.

The payment of high contingent fees in patent cases is not a new phenomenon. In 1993, the AMERICAN LAWYER ran a cover story featuring patent litigator Gerald Hosier, who, by handling cases on contingency, reportedly made over $150 million in a single year, "more than the draws of all the equity partners at New York's Cravath, Swaine & Moore and Chicago's Winston & Strawn combined." Stewart Yerton, *The Sky's the Limit*, AMERICAN LAWYER (May 1993). An article published in 1997 reported that attorney Alfred Engelberg began handling patent cases on contingency in 1985. In an interview, Engelberg stated that he "ha[d] been involved in seven contingent patent challenges over the last 10 years … and ha[d] received remuneration in excess of $100 million. On an hourly basis, even if the cases had been fully staffed, the cases would have produced a total of no more than ten to fifteen million dollars in billing." P.L. Skip Singleton, Jr., *Justice For All: Innovative Techniques for Intellectual Property Litigation*, 37 IDEA 605, 610

# A1267

(1997). Clearly, in the segment of the market where sophisticated businesspeople hire lawyers to handle patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates. The reason is obvious. When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns.

Turning from patent lawsuits to business representations more generally, many examples show that high percentage compensation is common. A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E). ETSI Pipeline Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. In a sworn affidavit, Harry Reasoner, V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment. We litigated the matter for 5 years. At the conclusion, we had settled with all defendants for a total of $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation,* MDL No. 551 (D. Arizona, Nov. 30, 1990).

Several things about this example are noteworthy. First, the contingency fraction was one-third of the recovery in a massive case. Second, V&E bore no liability for out-of-pocket expenses. The percentage was high even though, by comparison to this case, where Class Counsel advanced costs and bore the risk associated with them until the end of litigation, the deal was favorable to the law firm. Third, the case was enormous, ultimately generating a recovery greater than $600 million.

29

# A1268

Fourth, the client was a sophisticated business with access to the best lawyers in the country.  No claim of pressure or undue influence by V&E could possibly be made.

If lawyers who write about fee arrangements in business cases can be believed, high contingent percentages remain common today.  In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine."  It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOC. (TEXAS) 20 (2011).

A recent case shows, in monetary terms, that lawyers who handle business disputes on contingency can earn enormous premiums over their hourly rates.  In 2012, the U.S. Court of Appeals for the Tenth Circuit decided a case involving a dispute over the fee a business client owed

# A1269

to the law firm of Susman & Godfrey ("S&G"). S&G had handled an oil and gas matter for the client on the following terms. "Under the Fee Agreement, [the client] agreed to pay [S&G] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, (10th Cir. February 16, 2012), available at http://law.justia.com/cases/federal/appellate-courts/ca10/10-1248/10-1248-2012-02-16.html. "*[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed.*" *Id.* The fee agreement thus entitled S&G to be paid $50 million for a year of work—and that is what an arbitrator decided S&G should receive, before the case went to the Tenth Circuit, subject to an offset of less than $2 million that, for present purposes, is irrelevant.

Examples of high contingent fees can also be found in reported cases involving business clients who retained lawyers to participate on their behalf in class actions. Several appear in the *Synthroid* opinion written by Judge Easterbrook. He reports that, *after a settlement was already on the table*,

> a group of more than 100 [third party payers] … contracted with two law firms to represent them…. [T]he contracts provided for a 25% contingent fee at maximum. The "Porter Wright Group" (18 [third party payers] referred to collectively by their law firm's name) also negotiated with and hired counsel. Their setup allowed each insurance company to pick one of two fee options. Either the client paid Porter Wright's full costs and 70% of its normal hourly fees each month, with a 4% of recovery kicker at the end, or the client paid only costs each month but had to pony up 15% of the final settlement. Insurers are sophisticated purchasers of legal services, and these contracts define the market. Unfortunately, though, they identify a market

31

# A1270

mid-way through the case, after defendants already had agreed to pay substantial sums.[27]

*In re Synthroid Marketing Litig.*, 264 F.3d at 727.  In *Synthroid*, the lawyers' job was merely to garner as large a portion of the settlement fund as possible for the third party payers.  They bore minimal risk of non-payment.  Even so, their sophisticated clients promised them large percentage fees than Class Counsel is seeking in this case, where the non-payment risk was enormous.

One can also consider the fees sophisticated business client serving as named plaintiffs or opt-out claimants agree to pay when they hire lawyers in connection with class actions.  In *In re: High Fructose Corn Syrup Antitrust Litigation*, the two named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30% and "more than 25%", respectively, and an opt-out claimant, Gray & Co, agreed to pay its attorney 33%-40% of the recovery, depending on the time of settlement.  *Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2.  In securities fraud class actions, where lead plaintiffs sometimes enter into *ex ante* fee agreements with their chosen counsel, substantial percentages are also promised.  For example, the State of Wisconsin Investment Board (SWIB), a sophisticated client, promised the fees set out in Table 2 when it served as lead plaintiff in three securities fraud cases.

---

[27]

# A1271

| Table 2: Fees Promised by SWIB in Three Securities Fraud Class Actions | | |
|---|---|---|
| **Case** | **Fee** | **Recovery** |
| *In re Anicom Inc. Securities Litigation*, 00-CV-04391 (N.D. Ill.) | 23.5% | $40 Million |
| *In re Physician Computer Network, Inc. Securities Litigation*, Civil No. 98-981 (D.N.J.) | 15% | $21 Million |
| *Gluck v. CellStar Corp.*, 976 F. Supp. 542 (N.D. Tex. 1997) | 18% | $15 Million |

Source: Letter from Keith Johnson, Chief Legal Counsel, State of Wisconsin Investment Board (May 21, 2005), filed in *Schwartz v. TXU Corp.*, Civil Action No. 3:02-CV-2243-K (N.D. Texas—Dallas).

Having studied and consulted on securities class actions for years, I know of many other cases in which lead plaintiffs agreed to pay fees in this range. Rather than belabor the matter, though, I will represent to the Court that lead plaintiffs often agree to pay fees of 15 percent or more in securities class actions. This is so even in cases that generate larger recoveries than those listed in Table 2.

Really, though, the Court need not search through other cases to learn how much business clients serving as named plaintiffs are willing to pay. The Court need only consider the fee agreements signed by several of the named plaintiffs in this case. In all, I reviewed retainer agreements entered into by 12 class merchants. The agreements vary in important respects, indicating that they were negotiated agreements, but generally provide that Class Counsel will receive a fee equal to one-third of the class-wide recovery.[28] Some contain additional provisions

---

[28] Typical language reads as follows:

(a) Fees As Class Counsel

(1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any

33

promising to make up any difference between one-third of the class-wide recovery and the actual fee from the client's share of the recovery or to pay a one-third fee from the client's recovery if the client recovers individually rather than as part of a class action. The market thus sent a strong signal that a fee well above the percentage Class Counsel requests would be reasonable in this case.

I hope the Court agrees that the cumulative weight of the examples presented in this section overwhelming. Sophisticated business clients routinely pay contingent fees of 15 percent or more (usually the latter) and rarely pay less. Class Counsel's request for about 10 percent of the recovery is thus at the far low end of the range and is therefore unquestionably reasonable.

## 8.     RISK INCURRED

The papers filed in support of the requested fee award describe the litigation risks Class Counsel incurred in detail. They make clear, for example, that this lawsuit has lasted about eight years, from the time (2005) the original complaint was filed through the fairness hearing on the proposed settlement (2013).

But the papers do not explain that, by class action standards, nine years is a very long time. A study of federal class actions resolved in 2006 and 2007 found that antitrust class actions lasted

---

request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.

(2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.

(b) Fees Owed If Recovery Is Made Outside Of Class Action.

In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

34

# A1273

1,140 days on average.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 820, Table 2 (2010).  The longest antitrust class action in the dataset resolved in 2,480 days.  At 8 years and counting, this case has already outlived the longest class action in Professor Fitzpatrick's dataset.[29]

When this case started, no one could say with confidence when it would end.  Even now, the answer is not entirely clear.  Even assuming that the Court approves the proposed settlement and the requested fee award, there may be appeals that drag on for months or years.

I mention case duration because the difficulty of predicting it provides a vivid reminder of the risks Class Counsel incurred when the investigation that preceded this litigation began nine years ago.  Today, with $7.25 billion on the table, it is all too easy to think that a hugely successful result was inevitable.  It may even be difficult for many people to credit the possibility that the suit might have been lost.  As social scientists have shown repeatedly, when people know how a risk actually turned out, they often grossly over-estimate the likelihood of the observed result.  "Hindsight vision is 20/20. People overstate their own ability to have predicted the past and believe that others should have been able to predict events better than was possible. Psychologists call this tendency for people to overestimate the predictability of past events the 'hindsight bias.'" Chris Guthrie, Jeffrey J.

---

[29] Studies also find that other types of class actions typically resolve much faster than this one has. See, e.g., Thomas E. Willging et al., AN EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 16 (Federal Judicial Center 1996) (reporting that, in the four federal district courts studied, median time periods from filing to closing for settled non-securities class actions ranged from "eleven and thirteen months" on the low end to "thirty-six and fifty months" on the high end); Michael Klausner and Jason Hegland, *When are Securities Class Actions Dismissed, When Do They Settle, and For How Much?—Part II*, XXIII PLUS JOURNAL 1, 4 (2010) (study of securities class actions filed from 2000 to 2003 reporting the cases that survived a motion to dismiss settlement in a mean length of time 24 months after the motion was decided).

# A1274

Rachlinski and Andrew J. Wistrich, *Inside the Judicial Mind*, 86 CORNELL LAW REVIEW 777, 799 (2001) (citations omitted).

In the fee-setting context, the hindsight bias may cause a court to over-estimate the likelihood of a successful result.  In other words, a court may inadvertently set the risk of non-recovery, and the related risk of non-payment, too low, simply because it knows that the case turned out well for the plaintiffs.  As Judge Easterbrook wrote in the *Synthroid* case,

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d at 724.

In *Inside the Judicial Mind*, Professors Chris Guthrie, Jeffrey J. Rachlinski and Andrew J. Wistrich documented the tendency of the hindsight bias to influence judge's estimates of *ex ante* likelihoods.  They gave more than 150 federal magistrate judges a statement describing a case in which a prisoner appealed after being sanctioned by a trial judge for filing a frivolous complaint. One-third of the statements indicated that the appellate court affirmed the sanction; another third indicated that the appellate court imposed a lesser sanction; and the last third indicated that the appellate court vacated the sanction entirely.  All the judges were then asked to "go back in time" and identify the result that was most likely to occur.  Demonstrating the influence of the hindsight bias, the judges' estimates of the *ex ante* likelihoods depended on the information they received about the actual outcome.  "[T]he judges exhibited a predictable hindsight bias; when they learned

that a particular outcome had occurred, they were much more likely to identify that outcome as the most likely to have occurred."  Guthrie et al., *Inside the Judicial Mind, supra*, at 803.

 The Court possesses an enormous amount of information about the actual outcomes associated with probabilistic events in this litigation.  For example, the Court is knowledgeable regarding all of the motions filed in the case and the risks they pose for all parties. Through their motions and oral arguments, the Court also knows what many documents obtained in discovery revealed and what many witnesses testified to in depositions.  This knowledge could only have been guessed at when the lawsuit started, but today they are known outcomes which, because of the hindsight bias, may seem far more likely to have occurred than they actually were.

To accurately assess the risks Class Counsel incurred when litigation started in 2005, the Court would somehow have to blind itself to much of what it knows about the case.  That is impossible, obviously.  But there is a way out.  The Court can take guidance from the private market for legal services, including the fees set in the retainer agreements signed by the named plaintiffs and information about prevailing market rates more generally.  This is appropriate because in the contingent fee sector, compensation terms are set *ex ante*—when litigation begins—not *ex post*—when the results are known.  *Ex ante* fees can provide valuable guidance concerning the fees that are needed to offset the litigation risks that are actually incurred.

## 9.   WHEN DONE CORRECTLY, FEE-SETTING IS A POSITIVE-SUM GAME

Judges take seriously their role as absent plaintiffs' guardians when awarding fees from class action settlements.  However, because they ordinarily set fees at the end of litigation rather than the beginning, they tend to believe that fee setting is a zero-sum game in which more for the lawyers means less for the class.  This view exerts strong downward pressure on fees that may hurt class members in many ways, such as by discouraging lawyers from handling risky cases and from developing the cases they do take as fully and intensively as warranted.

37

The belief that class members always prefer lower fees to higher ones is incorrect. Taken to the limit, it implies that class members would be happiest with a fee of 0 percent. This is obviously wrong. At the outset of litigation, a 0 percent fee looks terrible to a class member (indeed, to any claimant) because no lawyer will take a case for that amount. When the fee is zero, a class member's expected recovery is also zero. Because any positive recovery is better than zero, any positive fee is also better than a zero fee.

The market for legal services, in which contingent fees are set *ex ante*, recognizes that fee setting is a positive-sum game, not a zero-sum competition. A higher attorney's fee can mean a larger expected net recovery for a claimant because a lawyer will take the case, expend effort on it, and increase the value of the client's claim by an amount that exceeds the lawyer's fee. Both the Third Circuit and the Seventh Circuit recognize this. The Third Circuit observed that "[t]he goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee*. The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) (emphasis added). The Seventh Circuit agreed in *Synthroid I*. It rejected the so-called "mega-fund rule," according to which the fee percentage must be capped at a low percentage when the recovery is very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. 264 F.3d at 718. Judge Harmon also rejected the "mega-fund rule" in *Enron*, as previously states.

When setting fees, then, a court should not ask 'What is the lowest possible fee?' but 'What fee would a group of claimants rationally have agreed to pay when this lawsuit began?' The best

# A1277

answer is 'The market rate' because that is the fee shown by real engagements of attorneys to be most likely to maximize the expected value of claims net of litigation costs.

**10.    ANALYSIS OF THE COURT'S OPINION IN *IN RE VISA CHECK/ MASTERMONEY ANTITRUST LITIGATION***

In the preceding sections, I have urged the Court to place great weight on fee percentages prevailing in the market for legal services when fixing the size of Class Counsel's fee award. I know that in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), the Court considered and rejected several arguments like those I have made.  I therefore take a moment to respectfully urge the Court to give the "mimic the market" approach another look.

In *Visa Check*, the Court's decision to award a low percentage fee seems to have been strongly influenced by the Second Circuit's observation in *Goldberger* that "in megafund cases [], courts have 'traditionally accounted for [] economies of scale by awarding fees in the lower range[s]'". *Visa Check*, 297 F. Supp. 2d at 521 (quoting *Goldberger,* 209 F.3d at 52).  Importantly, the quoted language appears in a portion of the *Goldberger* opinion where the Second Circuit criticized the benchmark approach employed in the Ninth Circuit, which employs a presumption that 25 percent is a reasonable fee.

> Moreover, even a theoretical construct as flexible as a "benchmark" seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case. Starting an analysis with a benchmark could easily lead to routine windfalls where the recovered fund runs into the multi-millions. "Obviously, it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." [citation omitted.]

*Goldberger*, 209 F.3d at 52.

# A1278

I agree with this observation. A benchmark set at 25 percent could over-compensate lawyers for many reasons, one being the existence of economies of scale in litigation costs. That said, over-compensation cannot occur when judges set fees on the basis of rates prevailing in the market in cases where substantial economies of scale are present. Securities fraud class actions provide the best examples of cases fitting this description. Like antitrust class actions, they involve thousands or millions of claimants and, therefore, enormous scale economies. They also provide evidence of market-based fees because law firms compete for opportunities to represent institutional investors with large financial stakes. Many institutional investors routinely consider multiple proposals or hold 'beauty pageants' before choosing law firms and agreeing on fees. As Associate Professor David H. Webber observed recently, "institutions are ideally situated to force [law] firms to compete with one another, particularly on price." David H. Webber, *The Plight of the Individual Investor in Securities Class Actions*, 106 NORTHWESTERN UNIVERSITY LAW REVIEW 157, 167 (2012).

In securities fraud class actions, I have never seen or read about a fee agreement between an institutional investor and a law firm that entitled the firm to 6.511 percent of the recovery, the amount the Court awarded in *Visa Check*. Contracted-for fees are always higher. The fee agreement in *Enron*, arguably the most comparable case and surely one where the scale economies were enormous, never dipped that low. It started at 8 percent of the first billion dollars recovered and topped out at 10 percent of all dollars in excess of $2 billion. This signals the possibility that the 6.511 percent fee discounted for economies of scale too heavily. Were the Court to apply the *Enron* fee agreement to the cash portion of this settlement, the fee award would equal $695 million, 9.6 percent of the recovery.[30]

---

[30] (.08 * $1 billion) + (.09 * $1 billion) + (.10 * $5.25 billion) = $80 million + $90 million + $525 million = $695 million.

Mistakes are inevitable, I believe, when fee awards are based on "reasonableness factors" alone without the benefit of evidence of market rates. When acting as guardians charged with protecting class members from excessive fees, many judges are predisposed to cut fee requests, especially in cases that generate enormous settlements and seemingly breathtaking requests for fees. The benefit to class members seems obvious. But both the restitutionary impulse to compensate lawyers reasonably and class members' rational desire to maximize their expected recoveries will be frustrated if judges use the existence of scale economies as a reason for cutting fees too much. Too be clear, my point is not that judges are wrong in believing that class actions generate scale economies—I am confident that they are right about this. Rather, the weight scale economies should receive is an empirical matter requiring evidence, and market rates provide the only source of evidence that is both reliable and readily available. Judges can learn how much weight to give scale economies by studying the amounts real clients pay real lawyers in securities fraud class actions and other cases that involve large numbers of claimants.

## 11.    FEE AWARDS IN OTHER CLASS ACTIONS

In my experience, courts often are interested in the results of empirical studies of fee awards in class actions. I am familiar with these studies and am in the process of conducting one of my own. This section presents the results.

Before addressing the studies, however, I think it is important to make two points. First, fee awards in other class actions do *not* provide direct evidence of market rates. They show how judges regulate fees, and judges often deviate from market-based practices. The findings reported in this section are therefore fallible guides. Second, it is perilous to use the studies as a basis for the fee award in this case because there are no other antitrust class actions as enormous as this one. A dataset that contains no comparable cases cannot provide much to go on.

41

# A1280

Because empirical studies of class action fee awards document judicial practices, I begin by mentioning Table 1 of this report, which lists 66 mega-fund cases with recoveries of $100 million or more and fee awards of at least 20 percent.  These cases provide ample precedent in support of the requested fee award.  I also point to the $688 million award in Enron, arguably the most comparable case.  Finally, I note that in the Vioxx MDL, which settled for $4.85 billion, the court awarded the lead attorneys $315,250,000 in common benefit fees *on top of* the enormous sum the very same lawyers received from their clients pursuant to contingent fee agreements capped at 32 percent.  Order & Reasons, *In re Vioxx Products Liability Litigation*, MDL 1657 (E.D. LA, Oct. 19, 2010).  Although the total amount the lead *Vioxx* attorneys took home is unknown, it surely equals or exceeds the amount Class Counsel is requesting even though the recovery in this case is billions of dollars larger.

I now turn to empirical studies of fee awards in class actions.  There are many of these,[31] so I focus first on two of the most recent that examine class actions of diverse types: Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811 (2010) ("*Fitzpatrick Study*"); and Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248 (2010) ("*E&M Study*").  Both studies were peer-reviewed.

---

[31] See, e.g., Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, RECENT TRENDS IV: WHAT EXPLAINS FILINGS AND SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS?, Table 9 (1996); Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 151 (1996); Mukesh Bajaj, et al., SECURITIES CLASS ACTION SETTLEMENTS: AN EMPIRICAL ANALYSIS (Nov. 16, 2000); Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 CLASS ACTION REPORTS 167 (2003); and Theodore Eisenberg and Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 27, 75 (2004).

# A1281

Before discussing studies, it will be helpful to explain a statistics concept: the standard deviation. The standard deviation is a measure of the extent to which data points are spread about a reported estimate. A larger standard deviation means that the data points are spread farther from the point estimate than a smaller standard deviation, which indicates closer clustering.

The standard deviation also provides an easy way of identifying the core of a distribution. Assuming a normal distribution, about 68 percent of the data points will fall within one standard deviation above or below the reported point estimate. For example, suppose the average height of a U.S. adult male is 70" with a standard deviation of 3". It follows that the range running from 67" to 73" will capture about 68 percent of all adult U.S. males. If the standard deviation were 4", a wider spread running from 66" to 74" would be required to achieve the same result.

Turning to the studies, Fitzpatrick collected all class action settlements approved by federal judges in 2006 and 2007, a total of 668 reported and unreported decisions. The following figure describes the range of fee awards in cases where judges applied the percentage method with or without a lodestar cross-check. As is apparent, awards ranging from 30 percent to 35 percent of the recovery constitute the most common category. Over 30 percent of the cases in Fitzpatrick's dataset had fee awards this large.

43



*Figure 4:* The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.

SOURCES: Westlaw, PACER, district court clerks' offices.

Source:  *Fitzpatrick Study*, *supra*, at p. 834.

Fitzpatrick also reported aggregate settlement amounts and fee awards in antitrust class actions, which numbered 29 in all.  In 2006, the antitrust settlements in his dataset collectively brought in $1.079 billion, 26 percent of which was awarded as fees.  In 2007, settlements totaled $660.5 million, of which attorneys received 24 percent. *Fitzpatrick Study*, *supra*, at 825, Table 4 & p. 831, Figure 7.

Breaking down settlements by size, Fitzpatrick reported mean fee percentages for settlements in the largest decile, which contained 45 cases and spanned an incredible range from $72.5 million to $6.6 billion.  The mean fee was 18.4 percent with a standard deviation of 7.9 percent, meaning that about two-thirds of the cases fell in the range extending from 10.5 percent to 26.3 percent.  See *Fitzpatrick Study*, at p. 839, Table 10.  The fee requested by Class Counsel falls at the low end of this range.

The *E&M Study* examined common fund class actions that closed from 1993 to 2008, a total of 689 cases.  The authors drew their sample from Westlaw, Lexis and other reporters.  For the entire dataset, the average fee-to-recovery ratio was 23 percent.  *E&M Study*, *supra*, at pp. 258-259.

# A1283

Focusing on antitrust cases, of which the dataset contained 71, the authors found a mean fee award of 22 percent on an average gross recovery of $163.48 million.  *Id.*, at p. 262, Table 5.

Eisenberg and Miller also found a strong inverse correlation between the percentage awarded and the size of the common fund.  Fee percentages tended to be larger in cases with smaller recoveries and smaller in the cases that produced the largest common funds.  Figure 7, shown below, makes this relationship clear.

| Table 7:   Mean, Median, and Standard Deviation of Fee Percent, Controlling for Class Recovery Amount, 1993–2008 | | | | |
|---|---|---|---|---|
| *Range of Class Recovery (Millions) Decile* | *Mean* | *Median* | SD | N |
| Recovery <= 1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery > 1.1 <= 2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery > 2.8 <= 5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery > 5.3 <= 8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery > 8.7 <= 14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery > 14.3 <= 22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery > 22.8 <= 38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery > 38.3 <= 69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery > 69.6 <= 175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery > 175.5 | 12.0 | 10.2 | 7.9 | 68 |
| SOURCES: Westlaw, LexisNexis, PACER. | | | | |

Source:  *E&M Study*, *supra*, at p. 265.

Obviously, the recovery in this case, $7.25 billion (excluding the non-cash relief), falls at the extreme high end of this the table.  For the 68 cases in this decile, the mean (average) fee award was 12 percent with a standard deviation of 7.9 percent.  The core of the distribution thus extended from about 4.1 percent to about 19.9 percent.  The fee percentage requested by Class Counsel is lower than the mean and squarely within this size range.

The *E&M Study* also found a positive correlation between fee awards and risk.  In most of the case categories studied, "mean fee percentages were higher in high-risk cases than in other cases."  *E&M Study*, *supra*, at 265.  The measure of risk was exceedingly noisy, however.  The researchers could not assess the riskiness of any case directly, so they coded cases on the basis of the

45

comments about risk that appeared in judges' opinions.  Consequently, although the finding makes sense, it would be a mistake to place much weight on the numbers.  Having said that, the average fee in cases coded as high-risk was 26.1 percent, with no standard deviation reported. *E&M Study*, *supra*, at p. 265.  Because this case was exceptionally risky, the requested fee of about 10 percent can easily be justified on that basis.

I will now briefly discuss two recent studies of fee awards in securities class actions, which can also be large, high-risk cases.  Choi *et al*. found that fees averaged 30% of the recovery in cases led by individual investors and private institutions, and 25% in cases led by public institutions. Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 WASHINGTON UNIVERSITY LAW QUARTERLY 869, 897, Table 6A (2005).  More recently, Professor Michael Perino, who also studied securities class actions, reported average fees of 26.6 percent, which dropped to 19.3 percent in cases where public pension funds served as lead plaintiffs.  Michael Perino, *Institutional Activism Through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions,* 9 JOURNAL OF EMPIRICAL LEGAL STUDIES 368, 380, Table 1 (2012). Viewed as a percentage of the recovery, the fee requested in this case is well below average for cases led by public institutional investors.

In sum, empirical studies of fee awards in class actions suggest that a fee of about 10 percent in a case of this magnitude would be a normal result.

**A1285**

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  April 10, 2013

_____
CHARLES SILVER

**A1286**

**EXHIBIT 1: RESUME OF PROFESSOR CHARLES SILVER**

# A1287

## CHARLES SILVER

Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

Charles Silver holds the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the School of Law at the University of Texas at Austin. He has published widely in law reviews and peer-reviewed journals. His articles use economic theory, philosophical and doctrinal reasoning, and empirical methodologies to shed light on issues arising in the areas of civil procedure, liability insurance, and the professional regulation of attorneys. He has written about group lawsuits (including class actions and other mass proceedings), attorneys' fees (including contractual compensation arrangements, common fund fee awards, and statutory fee awards), and professional responsibility (focusing on lawyers involved in civil litigation on behalf of plaintiffs and defendants). In recent years, as Co-Director of the Center on Lawyers, Civil Justice and the Media at the University of Texas, he has worked with a group of empirical researchers on a series of studies of medical malpractice litigation in Texas. The research group's findings are to appear in a book with the working title "To Sue is Human" on Yale University Press.

Professor Silver served as Associate Reporter on the Principles of the Law of Aggregate Litigation, published by the American Law Institute in 2010. He taught as a Visiting Professor at the Harvard Law School, the University of Michigan Law School, and the Vanderbilt University Law School.

Professor Silver has given many presentations at academic conferences, including programs sponsored by the American Law and Economics Association, the Conference on Empirical Legal Studies, the Law & Society Association, RAND, and the Searle Center on Law, Regulation and Economic Growth. He has also spoken at faculty colloquia at law schools across the U.S.

Professor Silver often consults with attorneys and serves as an expert witness. He has strong ties with all segments of the litigating bar. On the plaintiffs' side, he submitted an expert report on attorneys' fees in the massive Enron settlement and served as professional responsibility advisor to the private attorneys who handled the State of Texas' lawsuit against the tobacco industry. On the defense side, he advises on the responsibilities of lawyers retained by insurance carriers to defend liability suits against policyholders. Professor Silver has also testified to legislative committees and submitted amicus curiae briefs to courts on topics ranging from class certification to lawyers' fiduciary duties to medical malpractice litigation.

In 2009, the Tort Trial & Insurance Practice Section (TIPS) of the ABA awarded Professor Silver the Robert B. McKay Law Professor Award for outstanding scholarship on tort and insurance law.

## ACADEMIC EMPLOYMENTS

# A1288

UNIVERSITY OF TEXAS SCHOOL OF LAW

| | |
|---|---|
| Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure | 2004-present |
| Co-Director, Center on Lawyers, Civil Justice, and the Media | 2001-present |
| Robert W. Calvert Faculty Fellow | 2000-2004 |
| Cecil D. Redford Professor | 1994-2004 |
| W. James Kronzer Chair in Trial & Appellate Advocacy | Summer 1994 |
| Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow | 1991-1992 |
| Assistant Professor | 1987-1991 |

HARVARD LAW SCHOOL
Visiting Professor                                        Fall 2011

VANDERBILT UNIVERSITY LAW SCHOOL
Visiting Professor                                        2003

UNIVERSITY OF MICHIGAN LAW SCHOOL
Visiting Professor                                        1994

UNIVERSITY OF CHICAGO
Managing Editor, Ethics: A Journal of Social, Political and          1983-1984
    Legal Philosophy

## EDUCATION

JD 1987, Yale Law School
MA 1981, University of Chicago (Political Science)
BA 1979, University of Florida (Political Science)

## SPECIAL PROJECTS

Associate Reporter, Principles of the Law of Aggregate Litigation, American Law Institute (2010) (with Samuel Issacharoff (Reporter), Robert Klonoff and Richard Nagareda (Associate Reporters)).

Co-Reporter, Practical Guide for Insurance Defense Lawyers, International Association of Defense Counsel (2002) (with Ellen S. Pryor and Kent D. Syverud) (published on the IADC website in 2003 and revised and distributed to all IADC members as a supplement to the <u>Defense Counsel J.</u> in January 2004).

## BOOKS UNDER CONTRACT

*To Sue is Human: Medical Malpractice Litigation in Texas 1988-2005* (coauthored with Bernard Black, David Hyman, William Sage and Kathryn Zeiler), Yale University Press (in progress).

*Professional Responsibilities of Insurance Defense Counsel* (coauthored with William T. Barker), Lexis Nexis Matthew Bender (in progress)

- 3 -

*Law of Class Actions and Other Aggregate Litigation* (1st Edition sole authored by Richard Nagareda; 2nd Edition coauthored with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley), Foundation Press (in progress)

*Health Law and Economics* (coedited with Ronen Avraham and David Hyman), Edward Elgar (in progress)

## PUBLICATIONS AND RECENTLY PRESENTED WORKS IN PROGRESS

1.  "Philosophers and Fiduciaries" (in progress) (presented at several law schools and conferences).

2.  "Does Tort Reform Affect Physician Supply? Evidence from Texas," (with David A. Hyman and Bernard Black) (in progress) (presented at Petrie Flom Center, Harvard Law School) (under submission).

3.  "ETHICAL OBLIGATIONS OF INDEPENDENT DEFENSE COUNSEL," <u>COVERAGE</u> (FORTHCOMING 2012) (WITH WILLIAM T. BARKER)

4.  "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 <u>New England Law Review</u> 101 (2012) (invited symposium).

5.  "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?", 87 <u>Chicago-Kent L. Rev.</u> 163 (2012) (coauthored with David A. Hyman) (invited paper prepared for Conference on Medical Malpractice and Compensation in Global Perspective, Institute for European Tort Law, Vienna, Austria, Dec. 2, 2010).

6.  "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press (forthcoming 2012) (with David A. Hyman).

7.  "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard Black, David A. Hyman, Myungho Paik), J. Empirical Legal Stud. (2012) (peer-reviewed).

8.  "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas, 1988-2007" (with Bernard Black, David A. Hyman, Myungho Paik, and William Sage), available at http://ssrn.com/abstract=1605331.

9.  "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 <u>Fordham L. Rev.</u> (2011) (invited symposium on legal ethics).

10. "Fiduciaries and Fees," 79 <u>Fordham L. Rev.</u> 1833 (2011) (with Lynn A. Baker) (invited symposium on legal ethics).

11. "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 <u>J. Empirical Leg. Stud.</u> 48-84 (2011) (with Bernard Black and David A. Hyman) (peer reviewed).

12. "Ethics and Innovation," 79 <u>George Washington L. Rev.</u> 754 (2011) (invited symposium).

13. "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 <u>J. Empirical Legal Stud</u>. 379 (2010) (with Bernard Black and David A. Hyman) (peer reviewed).

14. "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 <u>Fordham Urb. L. J.</u> 357 (2010) (with David A. Hyman) (invited ABA symposium on access to justice).

15. "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 <u>Vanderbilt L. Rev</u>. 107 (2010) (with Geoffrey P. Miller).

16. "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 <u>J. Empirical Legal Stud</u>. 723 (2009) (with David A. Hyman and Bernard S. Black) (peer-reviewed).

17. "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 <u>J. Legal Analysis</u> 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue) (peer-reviewed).

18. "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 <u>The Advocate</u> 25 (2008) (with David A. Hyman and Bernard Black) (invited symposium).

19. "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 <u>Amer. Law & Econ. Rev.</u> 185 (2008) (with Bernard Black, David A. Hyman, and William M. Sage) (peer-reviewed).

20. "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 <u>DePaul L. Rev.</u> 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

21. "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 33 <u>Geneva Papers on Risk and Insurance: Issues and Practice</u> 177-192 (2008) (with David A. Hyman, Bernard S. Black, William M. Sage and Kathryn Zeiler) (peer-reviewed).

22. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 <u>J. Legal Stud.</u> S9 (2007) (with Bernard Black, David A. Hyman, William Sage, and Kathryn Zeiler) (peer-reviewed).

23. "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," <u>J. Empirical Legal Stud.</u> 3-68 (2007) (with Bernard Black, David A. Hyman, William M. Sage, and Kathryn Zeiler) (peer-reviewed).

24. "The Allocation Problem in Multiple-Claimant Representations," 14 <u>S. Ct. Econ. Rev.</u> 95 (2006) (with Paul Edelman and Richard Nagareda) (peer-reviewed).

25.     "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, "Report on Contingent Fees in Class Action Litigation," 25 Rev. of Litig. 459 (2006)).

26.     "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

27.     "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

28.     "A Rejoinder to Lester Brickman: *On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

29.     "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

30.     "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard Black, David A. Hyman, and William S. Sage) (peer-reviewed).

31.     "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

32.     "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?," 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

33.     "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

34.     "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

35.     "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

36.     "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

37.     "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

38.     "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

39.     "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

- 6 -

# A1292

40.    "A Critique of *Burrow v. Arce*," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

41.    "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

42.    "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).

43.    "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

44.    "What's Not To Like About Being A Lawyer?," 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

45.    "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

46.    "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

47.    "Representative Lawsuits & Class Actions," in Int'l Ency. Of L. & Econ., B. Bouckaert & G. De Geest, eds., (1999) (peer-reviewed).

48.    "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

49.    "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

50.    "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

51.    "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

52.    "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

53.    "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

54.    "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

# A1293

55.  "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6-3 <u>Coverage</u> 47 (May/June 1996) (with Michael Sean Quinn).

56.  "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6-2 <u>Coverage</u> 21 (Jan./Feb. 1996) (with Michael Sean Quinn).

57.  "Bargaining Impediments and Settlement Behavior," in <u>Dispute Resolution: Bridging the Settlement Gap</u>, D.A. Anderson, ed. (1996) (with Samuel Issacharoff and Kent D. Syverud).

58.  "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

59.  "Do We Know Enough About Legal Norms?" in <u>Social Rules: Origin; Character; Logic; Change</u>, D. Braybrooke, ed. (1996).

60.  "The Professional Responsibilities of Insurance Defense Lawyers," 45 <u>Duke L. J.</u> 255 (1995) (with Kent D. Syverud), reprinted in <u>Ins. L. Anthol.</u> (1996) and 64 <u>Def. L. J.</u> 1 (Spring 1997).

61.  "Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

62.  "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

63.  "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994), reprinted in Practising Law Institute, <u>Insurance Law: What Every Lawyer and Businessperson Needs To Know</u>, Litigation and Administrative Practice Course Handbook Series, PLI Order No. H0-000S (1998).

64.  "Thoughts on Procedural Issues in Insurance Litigation," VII <u>Ins. L. Anthol.</u> (1994).

65.  "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 <u>Clearinghouse Rev.</u> 114 (June 1994) (with Stephen Yelenosky).

66.  "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 <u>Tex. Rev. of Litig.</u> 301 (1993).

67.  "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 <u>Va. L. Rev.</u> 1585 (1991), reprinted in VI <u>Ins. L. Anthol.</u> 857-870 (1992).

68.  "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 <u>Tex. L. Rev.</u> 865 (1992).

69.  "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

70.  "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

# A1294

71.    "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987) (peer-reviewed).

72.    "Justice In Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman) (peer-reviewed).

73.    "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985) (peer-reviewed).

74.    "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984) (peer-reviewed).

75.    "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro) (peer-reviewed).

## NOTABLE SERVICE ACTIVITIES

Associate Reporter, American Law Institute Project on the Principles of Aggregate Litigation

Interested Party, Statistical Information Task Force, National Association of Insurance Commissioners, Model Medical Malpractice Closed Claim Reporting Law

Invited Academic Member, American Bar Association/Tort & Insurance Practice Section Task Force on the Contingent Fee

Chair, Dean Search Committee, School of Law, University of Texas at Austin

Chair, Budget Committee, School of Law, University of Texas at Austin

Coordinator, General Faculty Colloquium Series, School of Law, University of Texas at Austin

Sole Drafter, Assessment Report for the Juris Doctor Program at the School of Law, University of Texas at Austin, for the Commission on Colleges of the Southern Association of Colleges and Schools

## RECENT AWARDS

Robert B. McKay Law Professor Award, Tort Trial & Insurance Practice Section, American Bar Association (2009)

Faculty Research Grants, University of Texas at Austin (various years)

## MEMBERSHIPS

American Bar Foundation

Texas Bar Foundation (Life Fellow)

- 9 -

**A1295**

State Bar of Texas (admitted 1988)

Tort Trial and Insurance Practice Section, American Bar Association

Society for Empirical Legal Studies

American Law and Economics Association

American Association for Justice

**A1296**

# EXHIBIT 5

# A1297

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This document refers to: All Actions | MDL No. 1720<br>Case No. 1:05-md-1720-JG-JO |

**Declaration of K. Craig Wildfang, Esq.
in Support of Class Plaintiffs' Motion for Final Approval of Settlement
and Class Plaintiffs' Joint Motion for Award of Attorneys' Fees, Expenses
and Class Plaintiffs' Awards**

831749_1

# A1298

## TABLE OF CONTENTS

**Page**

I.    Introduction and Overview ........................................................................... 1

II.   Pre-filing Investigation by Robins, Kaplan, Miller & Ciresi L.L.P. ................................. 4

    A.    Expertise in Payment-Card Markets ....................................................... 4

    B.    Analysis of Market Conditions after *Visa Check* ........................................ 6

    C.    Meetings and Information Gathering with Merchants and Trade Associations ........................................................................................ 7

III.  History of this Litigation ............................................................................. 8

    A.    The First Cases Filed by Robins, Kaplan, Miller & Ciresi L.L.P. ......................... 8

    B.    Related Cases, Individual Cases, and Consolidation into One MDL Proceedings ............................................................................... 10

    C.    Early Motion Practice – Lead Counsel and Disqualification .............................. 10

    D.    Class Counsel Organization, Early Status Conferences, Early Discovery and Court's Case Management Role ...................................................... 11

    E.    The First Amended Complaint (April 2006) and Motions to Dismiss ............... 12

    F.    The Networks' Restructurings and Class Plaintiffs' Decision to Challenge Them ........................................................................................... 14

    G.    Defendants' Motions to Dismiss the FCACAC and Supplemental Complaint ..................................................................................... 18

    H.    Class Counsel Building the Record .......................................................... 19

        1.    Organizing the Discovery Effort ........................................................ 19

        2.    Early Stages of Discovery ............................................................... 20

        3.    Depositions and Document Discovery of Defendants ........................... 22

        4.    Discovery of Class Plaintiffs ........................................................... 26

        5.    Discovery of Third Parties ............................................................... 27

        6.    Supplementation of the Discovery Record ......................................... 28

        7.    CaseMap Cataloging of Facts ......................................................... 28

    I.    Class Certification Motion .................................................................... 29

    J.    The Relevance of Foreign Proceedings .................................................... 30

    K.    Congressional Efforts Leading to Durbin Amendment ..................................... 32

        1.    Assistance to Merchants in Developing a Legislative Strategy – The Passage of Dodd-Frank ............................................................. 32

# A1299

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| | L. | Department of Justice Investigation | 38 |
| | M. | Second Amended Complaints and New Motions to Dismiss | 42 |
| | N. | Merits Experts Reports and Depositions | 45 |
| | O. | Summary Judgment and *Daubert* Motions | 53 |
| | P. | Communications with Class Plaintiffs | 57 |
| | Q. | Coordination with the Individual Plaintiffs | 58 |
| | R. | Trial Preparation | 58 |
| IV. | Mediation and Settlement | | 59 |
| V. | The Settlement is an Excellent Result in Light of Risks Faced by the Class and the Settlement is far Superior to all Alternatives | | 65 |
| VI. | The Objecting Class Members' Objections are Ill-Founded and the Objectors Have Failed to Present any Superior Alternatives | | 72 |
| VII. | Post Settlement Activities through January 31, 2013 | | 73 |
| | A. | Selection of Claims Administrator, Escrow Banks, etc. | 73 |
| | | 1. Co-Lead Counsel Selected the Class Administrator Following a Lengthy Process | 73 |
| | | 2. Co-Lead Counsel Selected Escrow and Custodial Banks to Manage the Class Settlement Cash and Interchange Escrow Account | 74 |
| | | 3. Following the Selection of the Class Administrator, Co-Lead Counsel Worked Closely with the Administrator to Craft the Notice to the Class | 75 |
| | | 4. Co-Lead Counsel Took Significant Steps to Obtain Class Member Contact Information to Ensure the Class Received Sufficient Notice of the Settlement | 76 |
| | | 5. Class Member Support via the Toll-Free Number, Dedicated Website and Through Co-Lead Counsel | 78 |
| | B. | Motion for Preliminary Approval | 79 |
| | C. | Activities in the Second Circuit | 80 |
| VIII. | The Plan of Allocation is Fair | | 81 |
| IX. | The Fee Request is Reasonable | | 81 |
| X. | Conclusion | | 85 |

# A1300

## I.    Introduction and Overview

1.      I, K. Craig Wildfang, am a partner in Robins, Kaplan, Miller & Ciresi L.L.P. I submit this Declaration in support of the Class Plaintiffs' Motion for Final Approval of Settlement and Class Plaintiffs' Joint Motion for Award of Attorneys' Fees and Expenses and Class Plaintiffs' Awards.

2.      This declaration summarizes the factual and procedural history of this litigation, summarizes the benefits to the classes obtained by the Settlement Agreement, describes the risks faced by the Class Plaintiffs in the litigation, and explains why the Settlement is vastly superior to any available alternative. Finally, this declaration addresses some of the objections that certain merchants have lodged against the settlement and explains why those objections are ill-founded and provide no basis for the Court to deny final approval to the settlement.

3.      As explained more fully below, under the leadership of the three Co-Lead Counsel[1] appointed by the Court - Robins, Kaplan, Miller & Ciresi L.L.P., Berger & Montague P.C., and Robbins Geller Rudman & Dowd LLC - Class Counsel have achieved a settlement for the Class with injunctive relief which is a substantial further step in the reform of the payment-card markets in the United States that will provide enormous benefits to merchants over the next decade, estimated by the leading expert in the field to be worth between $26.4 and $94.3 billion in the next 10 years. *See* Declaration of Dr. Alan Frankel dated April 11, 2013. In addition, Defendants have agreed to cash payments to the Class of approximately $7.25 billion, by far the largest ever cash settlement in an antitrust class action.

4.      This result was not the inevitable outcome of the filing of these actions in 2005. Rather, this result was achieved over the determined and vigorous opposition of the Defendants.

---

[1] While the Definitive Class Settlement Agreement defines the three lead firms as "Class Counsel", for readability and to avoid possible confusion, I refer to the three lead counsel firms as "Co-Lead Counsel" and the collective of all class firms who participated in this action as "Class Counsel", unless otherwise explained in the text.

1

Only persistent, prolonged and effective efforts of Class Counsel under the leadership and direction of Co-Lead Counsel over the last seven years enabled the Class to achieve this exceptional result.

5.    As the Court is well aware from its management of these actions over the last seven years, everything about this case has been difficult and complex. Despite the many difficulties and complexities, and over the determined opposition of the largest financial institutions in the world, represented by many of the most renowned law firms in the world, through the efforts of Class Counsel, upon the approval of this Settlement, the prosecution of the Class's claims will have resulted in the almost complete restructuring of the payment-card industry. Before the filing of this case in 2005, the payment-card industry had been dominated by a cartel of banks which owned and controlled the only two four-party networks in the world, Visa and MasterCard. The bank cartel had successfully avoided or defeated all challenges to the bank-dominated industry structure which the banks had created and maintained for over 30 years

6.    The risks posed to the banks by the broad-based challenges, such as MDL 1720, stimulated the banks to more seriously consider the unthinkable, *i.e.* divesting their ownership and control of Visa and MasterCard. In fact, we now know from discovery that within three months of the filing of the first action in June, 2005, the banks set in motion their strategy to try to limit their litigation exposure by restructuring both MasterCard and Visa into publicly-owned companies. Thus, one of the principal remedies sought by the Class Plaintiffs when the first case was filed, requiring the banks to divest themselves of their ownership and control of Visa and MasterCard, was accomplished even before the litigation was concluded by the settlement now before the Court.

7.    As described in more detail below, the relief obtained by the Department of Justice in its 2010 consent judgment with Visa and MasterCard, which eliminated many of the networks'

2

# A1302

anti-steering rules, was based almost entirely on the record and work product compiled by Class Counsel in MDL 1720.

8.    Moreover, knowledgeable observers in Washington, D.C. have noted that the existence of this litigation, led by counsel who were willing to engage with Congress, and provide important strategic insights to merchants, were important factors that helped to convince Congress to enact legislation capping interchange fees on debit-card transactions as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

9.    Now, in addition to the structural reforms accomplished via the MasterCard and Visa restructurings, Class Plaintiffs have negotiated a settlement which goes beyond the legislative and Department of Justice consent judgment and which will enhance competition in card acceptance. It further reforms the industry by eliminating the Anti-Steering Rules ("ASRs") of Visa and MasterCard[2] so that, for the first time ever, merchants will be able to employ a full range of transparent price signals to their customers that will lead to increased competition among payment-card networks for the business of merchants. The ASRs prevented any downward competitive pressure on the interchange fees, whereas the competition among the networks for bank issuance creates pressure to *increase* interchange fees, as that revenue was paid to issuers. The ASRs of Visa and MasterCard had stood for over 30 years as the principal barriers to entry by new networks, because they effectively foreclosed the typical strategy of a new entrant, *i.e.* offering lower prices in return for greater sales volume. Since the ASRs prevented merchants from rewarding low prices by steering their customers to low-priced alternatives, there has been no successful new entrant into the relevant market since Discover in the mid-1980s.

10.    The remainder of this Declaration will: (1) describe the genesis and history of this litigation, from the pre-filing investigation in 2004 and 2005, to the argument on summary

---

[2] The ASRs are described in the Report of Alan S. Frankel, Ph.D., July 2, 2009 ¶169.

judgment and *Dauber*t motions in late 2011; (2) recount the lengthy and arduous mediation process which stretched over several years, and the settlement that finally resulted from that mediation in 2012; (3) explain the benefits to the Classes from the Settlement; (4) analyze the risks faced by the Class Plaintiffs in the litigation; (5) explicate why the Settlement is superior to any other alternative; and (6) summarize the time and expenses spent by Class Counsel over the last eight years to prosecute, at great risk, the Class's claims. We respectfully submit that the record we present to the Court will amply warrant the Court granting final approval to the Settlement, and the award of attorneys' fees and costs sought by Class Counsel.

## II.   Pre-filing Investigation by Robins, Kaplan, Miller & Ciresi L.L.P.

### A.   Expertise in Payment-Card Markets

11.   The genesis of what became MDL 1720 began in 2003. I had become generally familiar with the economics and antitrust issues related to the payment-card industry during my service as Special Counsel to the Assistant Attorney General for Antitrust with the Department of Justice Antitrust Division in the mid-1990s. I added to my knowledge of the industry when I represented two large merchants, Best Buy Stores, Inc. and Darden Restaurants (Olive Garden, Red Lobster, Capital Grille) in the *In re Visa Check/MasterMoney Antitrust Litigation.*

12.   While representing Best Buy and Darden, I pursued contacts with several large merchants and merchant trade associations. What I learned was that merchants were dissatisfied with the continued domination of the payment-card industry by the country's largest banks. Although the Department of Justice had succeeded in its case against Visa and MasterCard in 2002, and although the class in *In re Visa Check/MasterMoney Antitrust Litigation* had obtained relief in the form of eliminating the tying agreement between credit and debit card acceptance for merchants, merchants believed that the competitive problems in the payment-card industry had not been substantially alleviated. It was also self-evident that merchants would be reluctant to commit their own resources to another antitrust challenge to the bank cartel.

4

# A1304

13.    My experience, knowledge and investigation led me to conclude that a new antitrust class action undertaken by counsel on a contingent fee basis, and advancing the costs of the litigation out of the pockets of the lawyers, was the only option that offered any realistic chance of achieving a more competitive market for payment-card services success in the foreseeable future. I also concluded that any such new action would have to be a broad-based attack on the structure of the industry and, in particular, must include an attack on the ownership and control of Visa and MasterCard by the nation's largest banks.

14.    During 2004 and 2005 I and my law firm conducted our pre-filing investigation, which included consulting with expert economists, industry experts, and antitrust academics to further inform our judgment about the antitrust claims to pursue. As we reached tentative conclusions about what allegations to make and what claims to assert, we began a new round of meetings with merchants and merchant groups to assess their interest in being representative plaintiffs in the action we contemplated. One of the conclusions we had reached, however, was that in order to obtain the type of thorough relief that we thought necessary, the action would have to include as defendants the banks that controlled Visa and MasterCard, as well as the networks themselves. It quickly became apparent to us that for many merchants, including most large merchants, any action naming the banks as defendants was seen as posing business risks of retaliation. Most large merchants had important banking relationships with many of the very would-be defendants.[3] However, we also found that this same fear of the banks did not necessarily extend to smaller merchants, who tended to have banking relationships with smaller banks who were not likely to be defendants.

15.    In the spring of 2005 I was contacted by two small merchants who, after some discussion, decided that they were ready, willing and able to become representative plaintiffs in

---

[3] As a result of concentration, in the banking industry (in my view accomplished by lax enforcement of the antitrust laws) by 2005, 89% of MasterCard issuing volume was consolidated in the hands of five issuing banks. Five banks accounted for 75% of Visa issuing volume.

5

the new class action. These two small merchants, who were prepared to undertake this litigation when it appeared that perhaps no other merchant would, were Photos Etc. Corp. and Traditions Ltd. Once these two merchants stepped forward, other merchants became more willing to lend their names to the cause.

### B.    Analysis of Market Conditions after *Visa Check*

16.    Following the resolution of the government's case against Visa and MasterCard[4] and the settlement in *In re Visa Check*, very little had changed in the way the market was structured and the way it was likely to perform in the absence of further reforms. The bank cartel still owned and controlled both Visa and MasterCard. They used their ownership and control of those networks to enforce a set of rules which were designed to inhibit the entry of new competitors by disabling merchants from conveying transparent price signals at the point-of-sale. Thus, unlike competitive markets where new entrants can succeed and build sales volume by offering products at a lower price, in the payment-card market that method of entry was impossible. Merchants and consumers could not reward low-priced competitors to Visa and MasterCard.

17.    In addition, not only had the banks successfully enforced these rules, but they also were able to increase the interchange rates paid by merchants on both credit-card and debit-card transactions. They did this not only by raising the pre-existing rates on standard "traditional" credit cards, but also by issuing new "premium" cards which carried much higher interchange rates to support the cost of providing those rewards to the cardholder. Finally, as consumers shifted their form of payment away from cash and checks and towards credit and debit cards, the proportion of retail sales volume paid for with credit or debit cards, versus checks or cash, increased dramatically. By 2005 the total costs of acceptance for merchants increased dramatically. Payment cards accounted for 38% of retail sales volume[5] and interchange-fee

---

[4] *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003).
[5] Nilson Report No. 896 at 1, 7-9 (Dec. 2006).

6

revenue paid by merchants to Visa and MasterCard card issuing banks had risen to over $30 billion per year.

18.   It became clear to me that the only long-term solution for merchants was to get the banks out of the boardrooms of Visa and MasterCard, and to reform the rules such that transparent price signals could be provided at the point-of-sale so that the usual competitive market mechanisms would work to make the merchants' costs of acceptance more reflective of actual competitive conditions.

### C.   Meetings and Information Gathering with Merchants and Trade Associations

19.   In November 2004 my law firm's Executive Board approved the filing of the action that we were contemplating. RKM&C had a history of representing parties in very high-stakes litigation. I have represented plaintiffs and defendants in both class and non-class antitrust litigation since 1983. While we had confidence in the merits of the case we were planning to file, we understood that it represented a great risk to the law firm and its partners who would be risking millions of dollars to take on the largest members of the U.S. banking industry.  I know from speaking with my Co-Counsel during this case, that they too understood the enormity of the risk they were undertaking when they chose to pursue this case.

20.   Between November 2004 and June 2005 we continued to perform legal research and factual investigation as we drafted our first complaint. We continued to meet with a number of large merchants and several merchant trade associations, both to gather information from them regarding their experiences in the payment-card market, but also to assess whether they were interested in being a part of this effort. We also interviewed and engaged an economic consulting firm, Lexecon, to advise us on the many complicated economic issues that we would face. And

831749_1

# A1307

we engaged Professor Herbert Hovenkamp, the leading academic in the field of antitrust law, and the author of the most cited and most respected antitrust treatise.[6]

21.    By June 2005 we had our complaint fully drafted, and had been retained by five merchants Photos Etc. Corporation; CHS Inc.; Traditions LTD.; A Dash of Salt, L.L.C.; and KSARRA, L.L.C. to file the case on their behalf. These brave merchants were willing to take on not only Visa and MasterCard, but also the banks that owned and controlled both networks. Our research had led us to believe that the most favorable law on the important legal issues in our case was in the Second Circuit. Therefore, on June 25, 2005 we filed the first complaint in the District of Connecticut, where two of the Class Plaintiffs did business.[7]

## III.   History of this Litigation

### A.    The First Cases Filed by Robins, Kaplan, Miller & Ciresi L.L.P.

22.    Consistent with our strategy, the first complaint constituted a frontal attack on the foundations of the Visa and MasterCard networks. It challenged, as horizontal price fixing, the banks' agreement on the level of interchange fees each would charge merchants for transactions by consumers using their cards. It also challenged, as horizontal agreements restraining trade under Section 1 of the Sherman Act and as unlawful monopolization under Section 2, many of the rules of Visa and MasterCard which disabled merchants from providing discounts, or employing surcharges, or to take other steps designed to make the transaction at the point-of-sale more transparent and to steer customers to a lower cost form of payment at the point-of-sale.

---

[6] Philip E. Arecda. Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Applications*, (Aspen 2012).
[7] Prior to and concurrent with our investigation, long-time class action leaders Berger & Montague, P.C. and Robbins Geller Rudman & Dowd LLP were developing their expertise as to litigation involving payment cards, in particular, by pursuing a series of complex cases alleging various antitrust violations by several of the Defendants in the case.  *See, e.g., Currency Conversion Fee Antitrust Litigation, MDL 1409 (S.D.N.Y.)*

8

23.    The initial complaint named as defendants Visa, MasterCard and the following banks: Bank of America Corporation; Bank of America, N.A.; National Processing, Inc.; Bank One Corporation; Bank One, Delaware, N.A.; Chase Manhattan Bank USA, N.A.; JPMorgan Chase & Co.; First Century Bank, N.A.,; First Century Bankshares, Inc.; Fleet Bank (RI), N.A.; Fleet National Bank; Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation; Citicorp; Citigroup, Inc.; Citibank, N.A.; First National Bank of Nebraska; First National Bank of Omaha; HSBC Finance Corporation; HSBC Holdings, PLC; HSBC North America Holdings, Inc.; MBNA America Bank, N.A.; National City Corporation; National City Bank of Kentucky; Providian Financial Corporation; Providian National Bank; RBC Centura Banks, Inc.; RBC Royal Bank of Canada; People's Bank; RBS National Bank of Bridgeport; Royal Bank of Scotland Group, PLC; Suntrust Banks, Inc.; Texas Independent Bancshares, Inc.; USAA Federal Savings Bank; Wachovia Corporation; Wachovia Bank, N.A.; and Westpac Banking Corporation.

24.    While that initial action contained a damage claim, and we certainly expected damages to be enormous, the primary goals were to reform the market by eliminating the horizontal agreements among the banks to fix the levels of interchange fees and enforce the rules that we were challenging. Although we thought that obtaining the divestiture of the banks' ownership interests in Visa and MasterCard would be difficult, because very few private antitrust actions in the history of the antitrust laws have ever succeeded in obtaining such extensive relief, we were determined to make that effort. We believed that, because our goal was to get the banks out of their position as owners and controllers of Visa and MasterCard, a settlement was unlikely and a trial would be necessary. After all, the nation's largest banks had spent billions of dollars over 30 years to structure the payment-card industry to serve their interests, and we did not expect them to abandon those investments without a trial. Our plan was to move the case along quickly and efficiently in order to get to trial as soon as possible.

9

**B.  Related Cases, Individual Cases, and Consolidation into One MDL Proceedings**

25.   Within six days of the filing of our complaint, similar cases began to be filed in various district courts around the country. Most of these cases, like ours, were brought as class actions. A complete list of these actions is attached as Exhibit 1. However, also among these cases were a number of non-class, individual actions brought on behalf of various large merchants. Ultimately over 38 class actions, and seven individual actions on behalf of 19 large merchants, were filed in several different federal courts. The filing of such a large number of similar cases led to proceedings before the Judicial Panel on Multidistrict Litigation. A hearing was held on September 29, 2005 before the JPML and on October 19, 2005 the Panel ordered that all of these similar cases be consolidated and coordinated in the Eastern District of New York, before Judge Gleeson.

**C.  Early Motion Practice – Lead Counsel and Disqualification**

26.   Even before the JPML proceedings, I had initiated and organized discussions among counsel in the various cases that had been filed in order to determine if we could agree upon a leadership structure to recommend to the Court. Given the number of actions filed by almost 50 law firms, it was obvious that an organizational structure was imperative to the efficient prosecution of these actions. By December 2005 a significant majority of counsel in the various cases that had been filed agreed upon an organizational and leadership structure to recommend to the Court. After reaching this agreement, we filed a motion with the Court recommending the entry of an order designating three firms as Co-Lead Counsel, Robins, Kaplan, Miller & Ciresi L.L.P., Berger & Montague, P.C., and Robbins Geller Rudman & Dowd LLP.[8] This motion was opposed by a smaller group of law firms, who instead asked that the firm Milberg Weiss be

---

[8] When the Court issued its Order appointing Co-Lead Counsel this firm was named Coughlin, Stoia, Geller, Rudman & Robbins L.L.P.

10

appointed as sole lead counsel. By Order dated February 24, 2006 the Court appointed as Co-Lead Counsel for the Class the three firms referred to above. [Dkt. No. 279].

27.    Before the leadership structure could be determined and put in place by the Court, another matter had to be resolved. In the fall of 2005 counsel for MasterCard had raised with me the issue of whether I should be disqualified from representing plaintiffs in the litigation due to my prior service a decade earlier in the United States Department of Justice Antitrust Division. After very serious consideration of MasterCard's position, I wrote to MasterCard's counsel declining to withdraw from the case.

28.    Shortly thereafter, on December 21, 2005, MasterCard filed a motion with this Court seeking an order disqualifying me from representing plaintiffs in this matter. After a hearing on MasterCard's motion held before Magistrate Judge Orenstein on January 27, 2006, by Order dated January 27, 2006 the Court denied MasterCard's motion. Magistrate Judge Orenstein issued a written memorandum detailing the Court's reasoning in denying MasterCard's motion on August 7, 2006. MasterCard then appealed the Order of Judge Orenstein to Judge Gleeson. By Order dated September 24, 2007 Judge Gleeson rejected MasterCard's appeal.

**D.    Class Counsel Organization, Early Status Conferences, Early Discovery and Court's Case Management Role**

29.    Based upon their vast experience in managing large, multi-defendant antitrust class actions, Co-Lead Counsel knew that it was crucial to the success of their management of these consolidated actions that we persuade the Court to actively supervise and manage these actions. Class Counsel requested Magistrate Judge Orenstein to require the parties to file a joint status report every other month, followed by regularly scheduled status conferences. [Dkt. No. 125, 1/09/06, at page 12]. We also knew that it was crucial to the efficient conduct of this case that the efforts of all of the law firms which had filed cases now consolidated as MDL 1720 be carefully coordinated and directed so that there would be as little duplication of effort as possible. To that

11

end, Co-Lead Counsel designated two other highly experienced law firms to serve as Co-Chairs of the Class Plaintiffs' Steering Committee, Freedman, Boyd, Hollander, Goldberg, Urias & Ward P.A., and Hulett Harper Stewart LLP. The talented lawyers at these two firms assisted the Co-Lead Counsel in managing the efforts of Class Counsel, and in developing the strategy that proved successful.

30.   Magistrate Judge Orenstein agreed to our suggestion that regularly scheduled status conferences be held. As a result, throughout the pretrial period, regularly scheduled status conferences were held and Class Plaintiffs pushed for an early start for discovery. As a result, at the status conference held on May 17, 2006, Magistrate Judge Orenstein ordered that the Defendants immediately produce the documents from prior cases, including documents produced in *In re Visa Check/MasterMoney Antitrust Litigation* and *United States v. Visa U.S.A. and MasterCard International Co*. (hereinafter the "legacy productions").

31.   At the Court's direction the legacy productions were made by Defendants on a rolling basis over the next several months. This enabled Class Plaintiffs to begin preparing the background information for the more current discovery to come.

## E.   The First Amended Complaint (April 2006) and Motions to Dismiss

32.   Pursuant to the Scheduling Order of March 23, 2006 [Dkt. No. 303], Class Plaintiffs filed the First Consolidated Amended Class Action Complaint ("FCACAC") on April 24, 2006. The complaint contained 347 paragraphs, 16 claims for relief under federal and state antitrust laws, and spanned 87 pages. Since discovery had just commenced, the allegations were all based only on facts in the public domain. Recognizing the certainty that motions to dismiss would be filed by Defendants against the new complaint, Co-Lead Counsel organized and directed an exhaustive review of materials in the public domain around the world.

33.   The FCACAC alleged the existence of two classes—a monetary-relief class under Rule 23(b)(3) and an injunctive-relief class under Rule 23(b)(2). The complaint was set forth in

12

831749_1

three parts: the first setting out the factual background for all claims; the second alleging facts specific to claims relating to the fixing of credit-card interchange fees; and the third alleging facts specific to the fixing of signature-debit-card interchange fees.

34.    The chart below summarizes the various claims for relief in the FCACAC.

| Claim # | Class | Defendants | Cause of Action |
|---|---|---|---|
| 1 | I | Visa & Bank Defendants | Sherman Act § 1—Visa Intranetwork Conspiracy (Credit) |
| 2 | I | MasterCard & Bank Defendants | Sherman Act § 1—MC Intranetwork Conspiracy (Credit) |
| 3 | I | Visa, MasterCard & Bank Defendants | Sherman Act §1— Visa & MC Internetwork Conspiracy (Credit) |
| 4 | I | Visa & Bank Defendants | Sherman Act §1—Visa Anti-Steering Restraints. |
| 5 | I | MasterCard & Bank Defendants | Sherman Act §1—MC Anti-Steering Restraints |
| 6 | I | Visa & Bank Defendants | Sherman Act §2—Monopolization Through Anti-Steering Restraints. |
| 7 | I | Visa & Bank Defendants | Sherman Act §1—Tying/bundling of Various Services Within Network Services |
| 8 | I | MasterCard & Bank Defendants | Sherman Act §1— Tying/bundling of Various Services Within Network Services |
| 9 | I | Visa & Bank Defendants | Sherman Act §1—Exclusive dealing for Fraud Protection and Transaction Processing |
| 10 | I | MasterCard & Bank Defendants | Sherman Act §1—Exclusive dealing for Fraud Protection and Transaction Processing |
| 11 | I | Visa & Bank Defendants | Cal. Cartwright Act—Intranetwork Conspiracy (Credit) |
| 12 | II | All Defendants | Clayton Act §16—Declaratory and Injunctive Relief Relating to Conduct Alleged in Claims 1-10. |
| 13 | I | Visa & Bank Defendants | Sherman Act §1—Intranetwork Conspiracy (Debit) |
| 14 | I | MasterCard & Bank Defendants | Intranetwork Conspiracy (Debit) |
| 15 | I | Visa & Bank Defendants | Cartwright Act—Intranetwork Conspiracy (Debit) |
| 16 | II | All Defendants | Clayton Act §16—Declaratory and Injunctive Relief Relating to Conduct Alleged in Claims 13-15 |

13

35.    Class Plaintiffs' prayer for relief requested monetary damages for the (b)(3) Class "for the fullest time period permitted by the applicable statutes of limitations and the purported settlement and release in *In re Visa Check/MasterMoney Antitrust Litigation*." By including this clause in the prayer for relief, Class Counsel sought damages from as far back in time as possible.

36.    The complaint was the result of a comprehensive effort by Class Counsel, including several hundreds of hours of attorney time to marshal the facts in the public record. At the direction of Co-Lead Counsel, my colleague, Ryan Marth, was the primary draftsperson for the initial draft of the new complaint. However, I and attorneys at the other Co-Lead firms all provided input, comments and edits such that the final product was truly a joint effort. Industry, economic, and legal experts were also consulted with regard to the factual and legal allegations in the complaint. All Class Plaintiffs—including their in-house and outside counsel—also received drafts of the FCACAC and were asked to provide substantive input into the facts that were alleged and the theories that were pursued.

## F.    The Networks' Restructurings and Class Plaintiffs' Decision to Challenge Them

37.    On May 25, 2006—a little more than a month after the FCACAC was filed—MasterCard completed and consummated its restructuring. Discovery conducted by Class Counsel suggested that a major motivation of the IPO was to escape or mitigate Defendants' damage liability in MDL 1720.

38.    The banks' goal was described in MasterCard's contemporaneous documents as obtaining "U.S. Antitrust Certainty" which MasterCard meant as achieving a 90% certainty that any antitrust challenge to its ownership and governance structure would be dismissed on the pleadings. (Cl. Pls' SUF ¶ 34; Tim Murphy Dep. Ex. 21904, at MCI_MDL02_10147110; T. Murphy Dep. Tr. Feb. 29, 2009 ("[Antitrust litigation across the world] was—it was a primary

14

reason [for the IPO], yes.")). The chart below demonstrates that, while MasterCard viewed the status quo as failing the "antitrust certainty" test, its chosen option (5F) would, in the opinion of MasterCard's specially-retained antitrust counsel, meet the 90% test:



39.     The MasterCard restructuring posed significant risks for Class Plaintiffs. If MasterCard's lawyers were right and MasterCard was successful in establishing that its restructuring converted it from a "consortium of competitors," as found by the Second Circuit, into a "single entity," it would be immune from challenge under Section 1 of the Sherman Act when it establishes interchange fees and other rules. That would greatly limit Defendants' damage exposure and, more importantly, would greatly imperil Class Plaintiffs' prospects for injunctive relief. A MasterCard that was adjudicated to be a single entity could not so easily be compelled to modify the rules that Class Plaintiffs were challenging in this litigation. The MasterCard restructuring almost certainly assured an appeal from any judgment Class Plaintiffs might obtain in the District Court, thus adding both additional risk and delay to an already risky and lengthy litigation.

40.     Discovery disclosed that in September 2005, less than three months after the first actions were filed challenging the banks' use of Visa and MasterCard as price-fixing vehicles, MasterCard publicly announced that it was considering restructuring itself by having its bank owners divest their ownership interests in MasterCard and sell their stock to the public via an

initial public offering (IPO). Within weeks of MasterCard's announcement, Visa also announced that it was considering a similar restructuring. We now know from the extensive discovery taken with respect to the MasterCard and Visa restructurings, including depositions of the principal architects of these transactions, that one of the primary motivations for the banks to give up their ownership and control of the two networks was the recognition of potentially ruinous damage exposure from the actions then being consolidated under MDL 1720. We also know from discovery that the banks desired alternatives that would permit them to remain in control of the two networks, while minimizing their antitrust liability. The banks feared that, without ownership and control of Visa and MasterCard, the networks would abandon their "bank-centric" business model. Ultimately, the banks were advised by their counsel that no alternative short of complete divestiture of their ownership interests in both MasterCard and Visa would provide them the opportunity to limit their antitrust damage exposure that they sought, and accepted the risk that, freed of bank control, Visa and MasterCard would pursue their own economic interests, and not the banks.

41.    At the time that I first heard of MasterCard's planned restructuring, it seemed to me that the agreements by which that restructuring would be accomplished could conceivably be challenged as antitrust violations themselves, under either Section 1 of the Sherman Act or Section 7 of the Clayton Act. I asked my team at RKM&C to begin researching the law on these issues. We also consulted with our antitrust expert Professor Herbert Hovenkamp. Based on our research and analysis, we concluded that, while there was literally no precedent for such an antitrust challenge to the conversion of a joint venture into a single entity, if we could credibly allege and prove that the transactions by which the restructurings were accomplished unreasonably restrained competition (Section 1 of the Sherman Act) and/or threatened to reduce competition in a relevant market (Section 7 of the Clayton Act), we might survive motions to dismiss. We recognized, however, that our ability to prevail on such a claim would critically depend upon the facts obtained in discovery and proven at trial.

16

42.   On May 22, 2006, only three days before MasterCard's planned IPO, we informed the Court and MasterCard and its banks that the Class intended to commence a new action challenging the MasterCard restructuring under Section 1 of the Sherman Act and Section 7 of the Clayton Act. While this claims had substantial risks for the Class Plaintiffs, it also created risks for Defendants by keeping the prospect of ruinous and ever-growing damage exposure on the bank Defendants.

43.   The MasterCard restructuring posed several novel legal and factual issues. Despite hours of legal research and multiple conversations with leading antitrust scholars, Class Counsel could not find another instance in which a court applied the antitrust laws to the reorganization of a joint venture into a publicly traded company. The precedent-setting nature of this issue was confirmed in the Defendants' briefing on the issue, in which they also did not point to a single instance in which this issue was addressed by a court or antitrust-enforcement agency.

44.   The claims challenging the MasterCard restructuring were set forth in the First Supplemental Class Action Complaint ("FSCAC"), which was intended to be filed pursuant to Fed. R. Civ. P. 15(d). The complaint alleged—without the benefit of any discovery at that time— that the MasterCard restructuring was an attempt by the banks that then controlled MasterCard to continue their anticompetitive conduct shielded from the proscriptions of Section 1 of the Sherman Act. We further alleged that, because the entity arising out of the IPO was adjudicated by the Second Circuit to have market power, the IPO created a single entity with market power. We challenged the creation of such an entity under Section 7 of the Clayton Act and Section 1 of the Sherman Act—the two federal antitrust statutes regulating mergers. Of course, making such allegations was far easier than proving them at trial, and even the assertion of such claims guaranteed an appeal to the Second Circuit.

45.   Like the main consolidated amended complaint, the FSCAC was the result of hundreds of hours of attorney time. Class attorneys and advisors mined MasterCard's SEC

filings to fill in factual allegations regarding the mechanics of and the stated justifications for the MasterCard IPO. Leading antitrust scholars were also consulted and provided their input into the supplemental complaint.

46.    As discussed below, Class Counsel also challenged the Visa restructuring that was consummated on March 18, 2008 when we filed the Second Supplemental Class Action Complaint in January of 2009.

### G.    Defendants' Motions to Dismiss the FCACAC and Supplemental Complaint

47.    On June 9, 2006, Defendants moved to dismiss the pre-2004 damages claims in the FCACAC or, in the alternative, to strike allegations relating to pre-2004 damages. Defendants argued that the release in *Visa Check* precluded all such damage claims.

48.    On July 21, 2006, we filed our opposition to Defendants' motion. Defendants filed their reply brief on August 18, 2006.

49.    Oral arguments on Defendants' motion to dismiss were conducted on November 21, 2006.

50.    On September15, 2006, Defendants moved to dismiss the FSCAC in its entirety. We filed our response on October 30 and Defendants filed their reply on November 29, 2006.

51.    Like the FSCAC itself, Class Plaintiffs' brief in opposition to Defendants' motion to dismiss it was the product of hundreds of hours of attorney time, and was drafted in consultation with Class Plaintiffs' expert economists and leading antitrust scholars, including Professor Hovenkamp. The Court held oral argument on Defendants' motion to dismiss the FSCAC on February 2, 2007.

52.    On July 7, 2007, Magistrate Judge Orenstein issued a report and recommendation that the Defendants' motion to dismiss pre-2004 damages be granted. Class Plaintiffs appealed to

18

Judge Gleeson and filed written objections to the report and recommendation on November 13, 2007. Judge Gleeson adopted the report and recommendation on January 8, 2008.

53.   On February 12, 2008, Judge Orenstein issued a report and recommendation that partially dismissed the FSCAC with leave to re-plead. Even though Judge Orenstein recommended partial dismissal, his report and recommendation accepted Class Plaintiffs' premise that the MasterCard restructuring could harm competition and thus could violate Section 7 of the Clayton Act. In an issue that was largely one of first impression, Judge Orenstein concluded that Section 7 of the Clayton Act applied both to MasterCard and the banks, as both had acquired "assets of another." He also concluded that the FSCAC alleged a substantial likelihood of harm to competition, as required by Section 7 of the Clayton Act. Judge Orenstein partially dismissed the antitrust claims of the FSCAC as to the banks, however, because Class Plaintiffs technically failed to allege that the banks acquired "assets of another". The Defendants filed objections to the Report and Recommendation, arguing that the complaint should have been dismissed in it's entirely for failure to state a claim.

54.   On November 25, 2008, Judge Gleeson upheld Defendants' objection and dismissed the FSCAC with leave to re-plead.

### H.   Class Counsel Building the Record

#### 1.   Organizing the Discovery Effort

55.   Building a record that would be sufficient to persuade the Court and a jury of the merits of Class Plaintiffs' claims was a mammoth undertaking. The Class had sued 19 banks, including most of the world's largest banks, as well as Visa and MasterCard, the two largest payment-card networks in the world. These Defendants had virtually limitless resources and were represented by many of the largest and most prestigious law firms in the world, whose job it was *every day* for almost seven years to protect their interests.

831749_1

56.    In addition, we knew that the Defendants would retain experts with sterling qualifications to help the banks' and networks' version of the story. The Defendants, and most particularly Visa, had been funding "academic research" by prestigious economists all over the world, building Visa's argument that in "two-sided markets," standard economics and the antitrust rules, do not apply.

57.    In discovery many Defendants' documents were withheld on the basis of privilege by reason of the document being copied to legal counsel, even on routine correspondence. The result was that the privilege logs of each Defendant contained tens of thousands of entries. Visa's privilege log contained over 100,000 entries.

58.    Faced with such daunting obstacles, it was imperative that Co-Lead Counsel organize the discovery efforts to be able to efficiently obtain, review, analyze and summarize the evidence necessary to prove our case. This was accomplished by Co-Lead Counsel assigning tasks to Class firms according to their capabilities and resources. We established policies and practices to assure "quality control." So, for example, no firm (or lawyer) was assigned any work on the case until the firm/lawyer had attended a training session in order to gain a more complete understanding of the case. We also established procedures by which important evidence discovery by one firm was shared with other firms, so that the knowledge base was continually expanding.

59.    To organize pleadings and correspondence, RKM&C established a case "Extranet," to which Executive Committee firms had access. The Extranet contained, among other things, all correspondence, discovery requests, substantive pleadings from MDL 1720 and related cases, court orders, legal research, factual analysis, and news articles.

2.    Early Stages of Discovery

60.    Despite the obstacles thrown up by Defendants, the discovery record in MDL 1720 became one of the largest in any private civil antitrust case. Including documents produced in

20

# A1320

other litigation, the Defendants produced over four-and-a-half million documents, totalling over 65 million pages. Class Plaintiffs produced nearly 200,000 documents, totalling over 1.6 million pages. Individual Plaintiffs' production added over 8.6 million pages to this count. In addition, third parties subpoenaed by Plaintiffs or Defendants produced nearly 300,000 documents totalling over four million pages. The record also included 370 depositions taken in MDL 1720 and over 570 taken in other matters.

61.   Discovery formally began on May 1, 2006. Even before that time, however, Class Counsel began preparing for discovery from each of the 19 Class Plaintiffs named in the SCACAC.

62.   Before discovery formally began, Class Counsel met with each of the Class Plaintiffs to discuss which individuals and categories of documents were likely to have information responsive to Defendants' discovery requests and to organize each client's mandated, initial disclosures.

63.   We anticipated that reviewing and analyzing the documents produced in discovery would be a complicated, difficult and labor-intensive undertaking. Thus, in February 2006, Class Counsel sent out several requests for proposal ("RFPs") to leading e-discovery vendors requesting that each provide an estimate for processing the materials produced by Defendants in discovery and making it accessible to Class Counsel via a web portal. We selected Encore Legal Solutions.

64.   As noted above, the first documents Class Plaintiffs requested were documents previously produced in prior litigations. Defendants did not willingly turn over the legacy productions. Obtaining these already-amassed documents required extensive negotiation and was accomplished only after Judge Orenstein ordered these "legacy productions" produced during a status conference, in early 2006.

21

65.     After we culled down the universe of potentially relevant documents using search terms, we assigned dozens of attorneys at Class Counsel firms to review and code those documents for relevance to several issues in the case. We held multiple training sessions at RKM&C offices in Minneapolis, as well as at B&M in Philadelphia and RGRD in San Diego. After being trained on the issues in the case, Class attorneys collectively spent thousands of hours reviewing and coding the legacy documents.

66.     Also before the May 1, 2006 start of formal discovery, my colleagues and I, working in conjunction with Individual Plaintiffs' counsel, began drafting the initial sets of interrogatories and document requests to be served on Defendants. On May 1, Class and Individual Plaintiffs together served 417 document requests and 370 interrogatories. On May 3, 2006, Defendants collectively served 69 interrogatories and 122 document requests on Class Plaintiffs. Each of these figures includes subparts.

67.     Because of the volume and complexity of requests and the sheer number of parties, the "meet and confer" sessions that typically occur in litigation were particularly involved. Many in-person meet-and-confer sessions were held in the first months of discovery. Typically, these involved at least one attorney from each named Defendant, and multiple attorneys from the Class Plaintiffs and the Individual Plaintiffs. In addition, several telephonic meet and confers occurred regarding the parties' initial discovery requests and subsequent rounds of requests. Altogether, there were dozens of meetings and telephone calls held to try to reach agreement on discovery disputes.

    3.      Depositions and Document Discovery of Defendants

68.     By the initial discovery cutoff in 2009, Class and Individual Plaintiffs collectively had served 718 document requests and 631 interrogatories, and five requests for admissions.

69.    The volume of documents produced by Defendants to Class Plaintiffs in MDL 1720 was proportional to the monumental scope of this litigation. Exhibit 2 sets forth the number and pages of documents produced by each party to MDL 1720.

70.    In addition to physical and electronic documents, the parties turned over massive amounts of data in discovery. Visa, for example, produced six years' worth of its transaction-level databases to Class Plaintiffs. Producing this volume of data was extraordinary for Visa, which per corporate policy could transport the data to Class Plaintiffs only via personal delivery to Co-Lead Counsel by armed guards.

71.    A small team of Class Counsel was also tasked with gathering mass quantities of data from each of the bank Defendants to support Class Plaintiffs' motion for class certification. This data discovery was conducted in addition to the document-production process. Members from several firms were tasked with ensuring that that data needed by Class Plaintiffs' experts were produced. During a several-month period in 2008 and 2009—while the parties were in the throes of deposition discovery—Class Counsel held multiple meet-and-confer sessions with Defendants' counsel to secure this data.

72.    Not surprisingly, Defendants did not turn over this volume of information willingly. Class Counsel therefore engaged in significant motion practice relating to discovery issues. In addition to motion practice, Class and Individual Plaintiffs' Counsel raised numerous discovery issues in regularly scheduled status conferences before Judge Orenstein. The scheduling of regular status conferences was an enormous help in resolving disputes, as many issues were resolved by the parties before, at, or immediately following status conferences, before those issues required motion practice.

73.    Prior to each status conference, the parties—including Individual Plaintiffs—worked together to craft a status conference report that laid out for the Court all pending issues. For each report, Class Counsel, Individual Plaintiffs and Defendants took turns as the primary drafter of

831749_1

the report. Putting together the reports—in a manner that would assist the Court—while at the same time ensuring each side's position was clearly stated, often took many days of back and forth negotiations to finalize.

74.    Class Counsel began receiving document productions from Defendants on a rolling basis in the fall of 2006. Defendants substantially completed their initial document productions in the spring of 2007.

75.    To assist in the review of documents, understanding the Defendants' businesses and the preparation for depositions, Class and Individual Plaintiffs' Counsel conducted Rule 30(b)(6) depositions of each of the Defendants on issues related to their corporate structures and the identity of their employees with knowledge of the relevant facts in this litigation. These depositions occurred in the summer and fall of 2006.

76.    Like the legacy productions, the Defendants' main productions in MDL 1720 had to be reviewed and coded before Class Counsel could begin any substantive depositions. Each bank Defendant was assigned one or more Co-Lead Counsel or Executive Committee firms, which would take a leading role in reviewing their documents and deposing those Defendants' employees.

| CLASS COUNSEL – DEFENDANT ASSIGNMENTS | | |
|---|---|---|
| DEFENDANT | PRIMARY RESPONSIBLITY | CO-LEAD ASSISTANCE |
| MASTERCARD | Robbins Geller Rudman & Dowd LLP Robbins, Kaplan, Miller & Ciresi L.L.P. Scott+Scott LLP | |
| VISA | Robbins Geller Rudman & Dowd LLP Robbins, Kaplan, Miller & Ciresi L.L.P. | |
| BANK OF AMERICA | Berger & Montague, P.C. | |
| BARCLAYS | Boni & Zack LLC Kohn, Swift & Graf, PC | Robbins, Kaplan, Miller & Ciresi L.L.P. |
| CAPITAL ONE | Freedman, Boyd, Hollander, Goldberg, Urias & Ward P.A. | Berger & Montague, P.C. |

24

# A1324

| CHASE | Robins, Kaplan, Miller & Ciresi L.L.P. | |
| CITICORP | Robbins Geller Rudman & Dowd LLP | |
| FIFTH THIRD | Lockridge Grindal Nauen, PLLP | Robins, Kaplan, Miller & Ciresi L.L.P. |
| FIRST NATIONAL BANK OF OMAHA | Hulett Harper Stewart LLP | Robins, Kaplan, Miller & Ciresi L.L.P. |
| HSBC | Friedman Law Group LLP | Robbins Geller Rudman & Dowd LLP |
| NATIONAL CITY | Gustafson Gluek PLLC | Berger & Montague, P.C. |
| SUNTRUST | Pomerantz Grossman Hufford Dahlstrom & Gross LLP | Berger & Montague, P.C. |
| TEXAS INDEPENDENT BANCSHARES | Scott + Scott LLP | Robins, Kaplan, Miller & Ciresi L.L.P. |
| WACHOVIA | Labaton Sucharow LLP Barrack, Rodos & Bacine | Robbins Geller Rudman & Dowd LLP |
| WASHINGTON MUTUAL | Lieff Cabraser Heimann & Bernstein LLP | Berger & Montague, P.C. |
| WELLS FARGO | Fine, Kaplan & Black, R.P.C. | Robbins Geller Rudman & Dowd LLP |

77.   Reviewing the documents of the 19 Defendants was a mammoth undertaking. Class Counsel who were charged with reviewing a particular custodian's documents and writing a document-review memorandum that summarized that custodian's role in the Defendant's business, and salient documents in his or her files. Class Counsel reviewed the files of 880 custodians, and wrote custodial review memoranda for many of these.

78.   The documents of top-level employees of each Defendant were reviewed by senior attorneys, most of whom were from Co-Lead Counsel firms.

79.   Class Counsel began taking substantive depositions of Defendants' employees in the summer of 2007 and continued through the end of fact depositions in early 2009. Partners at Co-Lead Counsel firms deposed the top-level executives at the network and bank Defendants. At key depositions, those partners at Co-Lead Counsel firms were supported by an associate where

25

appropriate. For all depositions, junior lawyers were responsible for identifying from among the hundreds-to-thousands of documents that were tagged as relevant for the deponent, those documents most likely to be helpful as deposition exhibits. Senior associates at Class Counsel deposed some of the lower-to-mid level employees of Defendants. For each deposition, paralegals worked with the associate taking or supporting the deposition to arrange for the copying and shipment of documents to the deposition location.

80.   A deposition-scheduling committee, made up of representatives from Class Counsel, Individual Plaintiffs, and Defendants met on a regular basis to propose depositions, arrange schedules, and ensure the multi-tracked depositions were properly staffed with court reporters and videographers. Procedures were in place to limit the number of depositions in a given month by party and the members of the committee held calls sometimes weekly to organize the schedules.

81.   Co-Lead Counsel and the firms assigned to each Defendant reviewed documents and deposed Defendants' employees in a manner designed and directed by Co-Lead Counsel. Exhibit 3 summarizes the depositions that were taken.

### 4.   Discovery of Class Plaintiffs

82.   While some attorneys at Class Counsel firms were reviewing Defendants' documents and taking depositions, other firms responded to Defendants' discovery requests and defended Class Plaintiff depositions. Defendants aggressively pursued discovery of even the smallest Class Plaintiffs.

83.   Over the course of the case, Defendants propounded 135 document requests and 295 interrogatories (including subparts) on Class Plaintiffs.

84.   Defendants were also aggressive in seeking depositions of Class Plaintiffs' employees. For example, Defendants demanded three full days of deposition testimony from

26

# A1326

Class Plaintiff Traditions Ltd.—a small furniture retailer with two outlets in Minneapolis-St. Paul and one in Naples, Florida.

85.    Generally speaking attorneys at the Co-Lead Counsel firms who were primarily responsible for the Class Plaintiffs' discovery responses took the lead in preparing for those Class Plaintiffs' depositions. Oftentimes, attorneys from Berger & Montague first chaired the defense of these depositions. Each deposition required at least several hours of document review plus a full day of preparation with the witness, in addition to defending the deposition. Most of these depositions required travel to the location of the deposition. Exhibit 4 summarizes the Class Plaintiff depositions that Class Counsel defended.

86.    Defendants took numerous depositions of Individual Plaintiffs' employees as well, which also are summarized in Exhibit 5. Even when Class Counsel did not directly participate in these depositions, Class Counsel monitored the depositions for their effect on the record.

## 5.    Discovery of Third Parties

87.    Class Counsel, working together with Individual Plaintiffs' Counsel, also pursued extensive discovery of third parties. Some of these third parties included consulting firms that had performed work for Defendants, rival payment-card networks, and member banks of Visa and MasterCard that were not named defendants in this lawsuit.

88.    Disputes arose with these third parties as they had with the Defendants over the discovery directed at them. Class Counsel therefore engaged in motion practice and extensive meet-and-confer sessions with the third parties' counsel.

89.    Third parties' document production is summarized at Exhibit 6.

90.    In addition to seeking and obtaining document discovery from third parties, Class Counsel took many depositions of third-party witnesses. Furthermore, Class Counsel also

27

questioned witnesses in third-party depositions noticed by Defendants or Individual Plaintiffs. *See* Exhibit 7 which lists the third party depositions.

### 6. Supplementation of the Discovery Record

91.   Many major developments occurred in the payment-card industry since the initial discovery requests were served. To name just a few, MasterCard and Visa completed their restructurings, each network was investigated by antitrust-enforcement agencies in the United States and abroad, and new payment technologies were being developed and implemented in the marketplace.

92.   Because of these developments, Class Plaintiffs needed to supplement the discovery record to present an accurate picture of the marketplace and Defendants' conduct for trial. Thus, Class Plaintiffs requested multiple rounds of discovery supplementation from Defendants. Each of these rounds was vigorously resisted by Defendants, required additional meet-and-confer sessions, additional correspondence between the parties, and, in some cases, further motion practice.

### 7. CaseMap Cataloging of Facts

93.   As fact discovery was nearing a close, Bonny Sweeney and I, respectively, prepared a master outline and  a master  evidentiary narrative which provided a roadmap for organizing the evidence that Class Counsel had obtained in discovery and would ultimately need for trial.  This formed the starting point for building our CaseMap database. CaseMap is a West product that allows users to upload facts and exhibits into an organizational structure of legal and factual issues. This effort was a necessary step in the preparation to try the case. Bonny Sweeney's team then created the matrices that converted these documents into a format appropriate for CaseMap.

94.   Once the outline was created, junior attorneys at the Co-Lead firms undertook the task of reviewing each deposition summary, transcript, and exhibit. These attorneys marked

28

# A1328

where each piece of evidence should be placed in the outline and ensured that the information was inputted into the appropriate module in the CaseMap system.

95.    As we progressed into summary-judgment motion drafting, the CaseMap database was one of our primary sources of information. It would have also been the basis for our trial plan if the case would have proceeded to trial.

## I.    Class Certification Motion

96.    The issue of class certification was another major undertaking with enormous consequences for the viability of meaningful relief. It was only after much research that it was decided to pursue certification of both a Rule 23(b)(3) class for damages and a Rule 23(b)(2) class for equitable relief. Discovery was calculated to support each class.

97.    Class Plaintiffs retained Dr. Gustavo Bamberger of Lexecon as the expert economist supporting class certification. Co-Lead Counsel and the co-chairs of the steering committee worked with Dr. Bamberger to be sure he had all the information he needed to form his opinions for his expert report. This required marshaling materials from discovery (both documents and deposition testimony). These same attorneys worked with Dr. Bamberger in the preparation of his deposition and defended his two-day deposition by Defendants.

98.    Defendants retained Dr. Edward A. Snyder, as their expert opposing class certification. Co-Lead Counsel's preparation required an extensive review of his prior writings and opinions, as well as the discovery record upon which he relied. Co-Lead Counsel deposed Dr. Snyder for two days.

99.    Co-Lead Counsel and the co-chairs of the steering committee worked with Dr. Bamberger to prepare a rebuttal report, which was submitted along with Class Plaintiffs' Reply Memorandum in Support of Class Certification. Defendants then deposed Professor Bamberger again for one more day.

29

100.  The Court devoted a full day to class certification argument. That occurred on November 19, 2009 and was argued by Merrill G. Davidoff of Berger & Montague.

## J.    The Relevance of Foreign Proceedings

101.  One of the many things that made MDL 1720 the incredibly complex and difficult case that it became was the fact that investigations and proceedings analyzing the antitrust and economic issues related to the payment-card industry were taking place in a large number of countries around the world.[9] Even prior to filing the initial class action in this case, we undertook an extensive analysis of these foreign proceedings to determine what foreign antitrust-enforcement authorities were doing with respect to many of the same conduct issues that we were planning to challenge in our case. It was very important for us to understand the claims that were being investigated or pursued by these foreign antitrust enforcement or regulatory authorities, and equally important, to understand the defenses and rationale that Visa and MasterCard were giving for their conduct in these other countries. Moreover, the relief obtained by these foreign antitrust or regulatory authorities, and the effects thereof, informed Class Counsel's view on the equitable relief to be sought in this case

102.  Although it was not the first country in the world to investigate payment-card industry issues, Australia became an early leader in efforts to address some of the competition issues that were raised by the banks' ownership and control of Visa and MasterCard. In 2003, after a multi-year investigation, the Reserve Bank of Australia[10] determined that interchange fees charged to merchants in Australia were higher than they would have been if there had been true competition. Like the Federal Reserve Board in the United States, the Reserve Bank of Australia ("RBA") has authority to regulate the banking industry in Australia. Exercising its regulatory

---

[9] *See* Expert Report of Alan Frankel dated July 2, 2009 ¶447, for a listing of foreign proceedings since 2000.
[10] The equivalent to the United States Federal Reserve Board.

authority, in 2003 the RBA by rule imposed limits on interchange fees on credit-card transactions using Visa or MasterCard credit cards.

103.  In addition to requiring the reduction in credit-card interchange fees, the RBA rules required that Visa and MasterCard no longer prohibit the use of surcharges on credit-card transactions by merchants. In filings made by both Visa and MasterCard in the RBA proceedings, both networks acknowledged that the ability of merchants to impose surcharges on credit-card transactions would lead to the reduction of interchange fees. Indeed, the evidence from Australia has now demonstrated that even the merchant discount fees charged by American Express have been reduced toward the level of Visa and MasterCard fees by the threat of surcharging by merchants.[11]

104.  In addition to the proceedings in Australia, in the European Union ("EU") the Directorate General for Competition has conducted intensive investigations of both Visa and MasterCard, in addition to the payment-card industry generally. The investigation of MasterCard's cross-border interchange fees in the EU led to a decision in that proceeding which examined and rejected all of the various defenses that MasterCard has historically offered in defense of its interchange fees and anti-steering rules.

105.  Because of the importance of foreign proceedings, Class Counsel closely monitored developments in other countries. Associate-level attorneys were assigned particular, relevant jurisdictions for which they reviewed public filings and discovery documents and summarized their findings in memoranda which were posted on the Extranet. The associates who drafted the initial memoranda were then responsible for tracking developments in their jurisdictions. The information gathered from this procedure became useful during deposition discovery as defendant custodians were questioned on their business practices and regulatory interventions in foreign jurisdictions.

---

[11] The evidence from Australia is covered in greater detail in the accompanying Declaration of Dr. Alan Frankel.

31

# A1331

### K.   Congressional Efforts Leading to Durbin Amendment

106.  In many countries merchants and merchant groups have had success in obtaining relief from the anticompetitive rules and conduct in the payment-card industry by persuading legislatures and regulators to take appropriate steps to regulate the payment-card industry. Efforts by merchants in the United States have been, with one recent exception, completely unsuccessful. It is widely believed by knowledgeable persons in Washington DC that merchants and their trade associations have been particularly ineffective in interesting state and federal regulators in taking action to address problems in the structure and conduct of the payment-card networks and their bank owners. For example, in 2009 many merchant groups unsuccessfully threw their support behind a bill in Congress that would adopt a rate-setting mechanism using a three-judge panel to set interchange rates that could be charged to merchants by Visa and MasterCard.

### 1.   Assistance to Merchants in Developing a Legislative Strategy – The Passage of Dodd-Frank

107.  In 2009 I was asked by several of my merchant clients in MDL 1720 to become involved in strategizing with merchant groups to try to find a more effective, and hopefully more successful, legislative strategy. Because Co-Lead Counsel viewed developments in Washington, D.C., both in Congress and at the Department of Justice, as important adjuncts to the litigation, beginning in 2009 and continuing to the present I became significantly involved in the development of strategic options for merchants with respect to legislative and regulatory remedies. My law firm retained a lobbying/consulting firm in Washington, D.C. to assist us in this task.

108.  Once I became involved, it became apparent to me that some of the merchants and their trade associations were divided on what a successful strategy might be, with some merchant trade associations favoring the intrusive regulatory approach referred to above, and others in

32

# A1332

favor of broad congressional legislation to simply capping interchange fees charged to merchants on credit-card transactions.

109.  It was my view, and the view of the lobbying firm which we had retained, that the only strategy that stood any chance of success in the near-term would be one focused solely on debit cards. The story of debit cards was much easier to tell than the more complicated story with respect to credit-card interchange fees. For almost 100 years there had been no interchange fees on checks processed through the Federal Reserve System.[12] This was due to the evolution of the check-processing system in United States under competitive conditions. In urging Congress to enact limitations on debit-card interchange fees, it was relatively easy to make the argument that debit cards were just electronic checks, and that there was no reason why banks should be able to impose interchange fees on debit cards when they did not, and could not, impose interchange fees on checks.

110.  After a series of meetings and other discussions with merchants and their trade associations, in the spring of 2010 the merchants agreed to adopt a unified strategy (for the first time) focused on drafting legislation, and urging its passage, which would direct the Federal Reserve Board to adopt regulations imposing limitations on interchange fees charged to merchants on debit-card transactions, and to leave credit-card interchange fees for another day. Thus, in the spring of 2010 I became intimately involved in the drafting and strategizing regarding legislative proposals that ultimately came to be called the Durbin Amendment, after its author Sen. Dick Durbin of Illinois. The principal focus of the Durbin Amendment was to authorize the Federal Reserve Board to adopt rules limiting the level of interchange fees that debit-card networks could impose on merchants. The Durbin Amendment also contained other important relief, such as requiring issuing banks to enable debit cards to be processed over at least two competing networks, allowing merchants to provide discounts to consumers for

---

[12] Alan S. Frankel & Allen Shampine, *The Economic Effects of Interchange Fees*, 73 Antitrust L.J. 627, 637-39 (2006).

payment by cash, check, or debit card, in lieu of credit cards, and allowing merchants to place a minimum purchase amount of up to $10.00 on credit-card transactions.

111. Ultimately, in the first six months of 2010 I traveled to Washington, D.C. eight times to meet with merchants and their counsel, and occasionally with senators and their staff, to assist with the efforts to get the Senate to adopt the Durbin Amendment as an amendment to the bill that ultimately became known as the Dodd Frank Act. I also participated in literally dozens of telephone conference calls to discuss these efforts, as well. Although proponents of the Durbin Amendment felt that momentum was building in their favor in the Senate, it was still widely believed that the Durbin Amendment would fail when it came to a floor vote in the Senate. After all, in recent years when everything in the Senate is subject to a filibuster, requiring 60 votes to pass any bill or amendment, given the enormous political power of the banks and the networks, it seemed unlikely that Sen. Durbin and the merchants could round up more than 60 votes for his amendment. Nonetheless, on May 12, 2010 during the debate on the Dodd Frank Act on the floor of the Senate, Sen. Durbin offered his amendment and, to the astonishment of almost all knowledgeable observers, it passed with a bipartisan total of 64 votes.

112. However, this was not the end of the legislative fight. There was no comparable provision in the House counterpart bill to the Senate bill, and thus the differences between the two bills were going to be resolved (if at all) in a conference committee. Although conference committees formerly were a common feature of the passage of legislation in Congress, I learned that the conference committee to put together the final version of the Dodd Frank Act was the first conference committee in several years. I spent several days monitoring the work of the conference committee. During the meetings of the conference committee, the banks and the networks were furiously trying to get enough support among the conferees to keep the Durbin Amendment out of the final legislation, ultimately the large bipartisan vote in the Senate gave the Senate conferees a persuasive argument to keep the Durbin Amendment in the final bill.

831749_1

113.  The enactment of the Durbin Amendment as part of Dodd-Frank, which, after the Federal Reserve Board adopted its rules limited interchange fees on debit-card transactions to a maximum of about $0.24, was highly significant to the litigation of MDL 1720. The reason for this was that it gave merchants, for the first time, a substantially lower-priced form of payment other than cash to which they now could try to steer their customers. Debit-card transaction volume already was growing at a faster rate than was credit-card transaction volume, and the Durbin Amendment seemed certain to accelerate that growth. After the enactment of the Durbin Amendment the elimination of the Visa and MasterCard anti-steering rules became an even more valuable form of relief for merchants, as they now had the opportunity, if those rules could be eliminated as part of a judgment or settlement of MDL 1720, to steer their customers to the very low-priced debit cards. We knew then that merchants in other countries had successfully employed steering strategies when they were permitted to surcharge, or threaten to surcharge. Indeed, as described in the Declaration of Dr. Alan Frankel, the experiences in other countries demonstrate that the ability to surcharge has enormous value to merchants.

114.  In 2011, after the enactment of Dodd-Frank, but before the Federal Reserve Board had adopted its final debit-card rules, Visa, MasterCard and the banks mounted a determined effort to repeal the Durbin Amendment portion of Dodd-Frank. They persuaded Sen. Jon Tester, a Montana Democrat, to offer an amendment to various pieces of legislation that would be voted on the Senate floor, that would have repealed all or most of the reforms contained in the Durbin Amendment, or, alternatively, would have delayed the implementation of the Federal Reserve Board's rules. At the request of my clients I again became involved in the development of a strategy to defeat the Tester amendment. I traveled to Washington several times in the late spring and early summer of 2011 to meet with my clients and with the lobbying firm that we had retained to assist us with the goal of assisting the merchants in persuading a sufficient number of

35

senators to vote no on the Tester amendment. When Sen. Tester offered his amendment on the floor of the Senate on June 8, 2011 it was defeated in a close vote of 54 in favor and 44 against.[13]

115. We were also asked by our clients to assist them in connection with the development of the rules by the Federal Reserve Board that were required by the Durbin Amendment. One of the principal concerns that merchants had about the delegation of rulemaking authority to the FRB was that, since the FRB had never engaged in any type of regulation of payment cards, it lacked expertise and experience, and even basic knowledge, of the important economic issues that it would have to understand in order to properly carry out its function in developing the rules required by the Durbin Amendment.

116. To assist the merchants, after the enactment of Dodd-Frank in the summer of 2010, we prepared materials for submission to the FRB, brought a motion before the Court to lift some of the restrictions on the Protective Order so that we could provide litigation materials to the FRB that we believed would assist the FRB in caring out its responsibilities under the Durbin Amendment, and personally met with and corresponded with the staff at the Federal Reserve Board that were responsible for the development of the rules. Our goal was to try to educate them about the economics of payment cards generally, and debit cards in particular. We knew that the banks were engaged in a type of disinformation campaign with the FRB staff, and, because the FRB regulates many aspects of banks business, banks had regular communications with the FRB and had the ability to influence the rulemaking process far beyond the ability of merchants. Ultimately, the merchants' fears were proven true when the FRB adopted final rules setting the limit on debit interchange fees at a level twice as high as the FRB had indicated in its draft rules. Nonetheless, the limitation on debit interchange fees of approximately $0.24 per transaction was sufficiently low to make steering to debit desirable for merchants.

---

[13] Only because current Senate rules require 60 affirmative votes did the Tester amendment fail.

# A1336

117.  Even before the Tester challenge, in October 2010 a large Minnesota-based bank, TCF National Bank, brought suit in the United States District Court for the District of South Dakota against the Board of Governors of the Federal Reserve Bank, charged with ratemaking for interchange fees on debit-card transactions under the Durbin Amendment. One feature of the Durbin Amendment was that the FRB rules would not apply to banks that had assets of less than $10 billion. TCF had assets above that level and thus its claim against the FRB was that the Durbin Amendment, and any FRB rules to be adopted pursuant to the new law, would violate the Equal Protection Clause and amount to an unconstitutional confiscatory taking under the Due Process Clause. TCF had built its business model around the interchange fees that it earned on debit-card transactions and did not issue credit cards. Although to many lawyers the claim seemed far-fetched as a matter of law, by filing in South Dakota, where many banks have long had their payment card business headquarters due to favorable South Dakota law, merchants were very concerned that it would be a favorable forum for TCF. Merchants were also concerned that the FRB might not be motivated to put up a vigorous opposition to the lawsuit, given its generally pro-bank biases. Thus, merchants came to me and asked me to provide assistance to the lawyers for the FRB in formulating their response to the TCF lawsuit. We did so. We prepared a long memorandum educating the FRB lawyers on history of payment cards in United States, and describing many of the legal and economic issues that were relevant to TCF's claims. We also prepared and submitted an *amicus* brief, along with a declaration from our expert Dr. Alan Frankel, in opposition to TCF's motion for preliminary injunction to stop the FRB from conducting its ratemaking. Ultimately, the District Court in South Dakota denied TCF's preliminary injunction motion in April 2011.  The Eighth Circuit Court of Appeals affirmed the denial in June 2011.  Co-Lead Counsel submitted an *amicus* brief in support of the FRB on appeal as well.

37

### L.  Department of Justice Investigation

118.  I had had discussions with the Department of Justice regarding the competitive problems in the payment-card markets since my representation of Best Buy and Darden Restaurants in the *In re Visa Check* litigation. After the commencement of MDL 1720, I continued those discussions with the goal of motivating the Department of Justice to open an investigation and to begin enforcement proceedings against Visa, MasterCard and the banks. Beginning in early 2006, those discussions accelerated, as first the Department of Justice, and then several state attorneys general, became more interested in the claims the Class was asserting in MDL 1720.

119.  In October 2008, the Department of Justice opened an investigation into the rules and conduct of Visa and MasterCard. By the spring of 2009 attorneys at the Department of Justice and at several state attorneys general's offices began requesting information from Class Plaintiffs. I explained that our ability to provide information to them was significantly constrained by the Protective Order the parties had negotiated and the Court had entered in MDL 1720. The Department of Justice eventually concluded that the most efficient way for them to gather information was to serve a Civil Investigative Demand ("CID") on the Class Plaintiffs in MDL 1720, which it did on April 21, 2009. The CID requested that the Class Plaintiffs:

> 1) Submit all products of discovery relating to the Anti-Steering Rules, including their competitive effects and justifications, produced by the entities listed in Appendix A in connection with the Merchant Discount Antitrust Litigation, including products of discovery relating to interrogatory responses, depositions, responses to requests for admissions, and documents produced.

> 2) Submit all pleadings, filings, motions, transcripts, rulings, and orders relating to the Anti-Steering Rules, including their competitive effects and justifications, from any proceeding or hearing as part of the Merchant Discount Antitrust Litigation.

120.  Co-Lead Counsel determined that there were only two alternatives for complying with the CID. The first was to produce to the Department of Justice the entire documentary

38

# A1338

record in the case, which by mid-2009 amounted to approximately 50 million pages of documents. Not surprisingly, the Department of Justice rejected this option, telling us that their data storage lacked the capacity to store and manage such a massive production. The second alternative was for the Class to produce to the Department of Justice only the documents and deposition testimony that were most relevant to the Class's claims but that risked waived the work product privilege as to those materials and perhaps others.

121.  Since it was certainly in the Class's interests to assist the Department of Justice investigation, which offered the prospect of the government challenging the same conduct the Class was challenging, I had several discussions with the Department of Justice trying to identify a mutually acceptable solution. We finally determined that the only solution was to seek a modification of the Protective Order to permit the Class to comply with the CID by producing to the Department of Justice the Class's work product without that being considered a waiver of our work product protections. Not surprisingly, the Defendants declined to agree to such a modification, since their interests were best served by slowing down, and making more difficult and costly, the Department of Justice investigation. Therefore, on May 20, 2009 [Dkt. No. 1209] Class Plaintiffs moved the Court for an order modifying the Protective Order such that the Class could freely share our work product with the Department of Justice without the risk of a waiver. On June 18, 2009 [Dkt. No. 1235], over Defendants' opposition, the Court granted Class Plaintiffs' Motion.

122.  Thus began a sixteen-month period of support by private plaintiffs of a Department of Justice antitrust investigation. Over that three-year period, Class Counsel provided to the Department of Justice unfettered access to the document and deposition databases which Class Counsel had created, at great expense. The document database ultimately consisted of over 65 million pages of documents, which was completely searchable by custodian, key word, or by any one of dozens of electronic "tags" that Class document reviewers had placed on documents to indicate their relevance to particular issues. The deposition database contained the transcripts and

39

# A1339

exhibits of over 370 depositions taken, or defended, by Class or Individual Plaintiff's Counsel. We provided access to 15 state-attorney-general staff attorneys with access to the same database. The Class was charged $100 per month by our database management firm for each user and the Class paid a total of over $94,000 for such use, for which we were not reimbursed by the Department of Justice or the states.

123.  In addition to having complete access to the entire discovery record in MDL 1720, the Department of Justice and the state attorneys general requested from Class Counsel a wide variety of our work product. This included memoranda on important legal issues, summaries of depositions, compilations of key documents, and access to our experts. For many months one of the RKM&C team attorney's principal assignments was to respond to requests from lawyers at the Department of Justice or the states. Attached to this declaration as Exhibit 8 is a summary of the information provided to the Department of Justice and the states and our responses. Typically, DOJ or state AG attorneys asked the RKM&C attorney for evidence supporting a specific proposition or propositions, to which the RKM&C attorney responded by providing portions of the discovery record, Class Counsel's work product, or publicly available documents known to Class Counsel through the prosecution of this case. In addition to the communications reflected in Exhibit 8, RKM&C attorneys were often asked informally for their analysis of particular issues or facts. RKM&C attorneys responded to at least 24 informal requests for evidence or analysis.

124.  DOJ and the states also conducted telephone interviews with several merchants in the course of their investigation. Many of these merchant interviews—including Class Plaintiffs Traditions Ltd. and Photos Etc.—were arranged by Co-Lead Counsel. We also prepared these merchants for their interviews with DOJ and the states and participated in the telephonic interviews.

40

125. The Class's involvement was not limited to lower-level attorneys. As the investigation progressed, I had numerous telephonic and in-person meetings with DOJ and state attorney-general attorneys to discuss the high-level antitrust analysis applicable to their investigations. Especially in the late stages of the investigation, I was often joined by the senior members of the Co-Lead Counsel firms, including Bonny Sweeney, Merrill Davidoff, Laddie Montague and Gary Friedman. Many of these meetings included senior DOJ officials, including John Read, the section chief responsible for the Visa/MasterCard investigation and Carl Shapiro, the Deputy Assistant Attorney General for Economic Analysis.

126. We also expanded Dr. Frankel's engagement to include persuading DOJ and the states that the Defendants' conduct was anticompetitive from an economic perspective. Thus, Dr. Frankel attended two of our meetings with DOJ officials in Washington, D.C. and participated in conference calls with state AG attorneys, at which he gave detailed presentations on the economic analysis of the record and also discussed the issues surrounding the case telephonically with them on several occasions.

127. Our involvement with the DOJ and state attorney-general investigations culminated with a meeting with Assistant Attorney General Christine Varney and her senior staff at which we urged the Department of Justice to conclude its investigation by commencing an action against Visa and MasterCard challenging the ASRs. Shortly after that meeting the Department announced that it was going to file suit against Visa and MasterCard, and that both networks had agreed to eliminate many of the ASRs. The result of this extraordinary assistance by the Class to the Department of Justice and the states was that the government investigation was able to be completed in a much shortened period of time,[14] and at vastly less cost to the government's limited resources. To the best of my knowledge the Department of Justice and the states did not

---

[14] From the date of the CID to Class Plaintiffs on April 21, 2009, it took DOJ only until October 4, 2010 to complete its investigation, draft a Complaint and negotiate a consent decree with Visa and MasterCard. Bringing a case of this magnitude, in a huge industry, to successful closure in 18 months is unheard of, and could not have been accomplished so quickly, if at all, without the comprehensive assistance of Class counsel.

take *any* of their own depositions, and only issued a small number of CIDs. To my knowledge it is unheard of for a DOJ investigation to be concluded, especially so quickly, with the DOJ doing so little of their discovery and investigation. In a matter involving such an important sector of the economy, I think it is fair to infer from DOJ's conduct that both the senior decision-makers as well as the trial attorneys at DOJ had a high degree of confidence in the quality of Class Counsel's discovery efforts.

### M.   Second Amended Complaints and New Motions to Dismiss

128.  In the summer of 2008, Class Counsel notified Defendants of our intention to file a Second Consolidated Amended Class Action Complaint, a First Amended Supplemental Class Action Complaint challenging the MasterCard restructuring, and a Second Supplemental Class Action Complaint challenging the Visa restructuring that was consummated the previous March.

129.  These three complaints were filed on January 29, 2009. Because the complaints referenced documents and deposition testimony that had been designated "highly confidential" under the protective order, the complaints were filed under seal. After the parties' counsel met and conferred extensively, Class Plaintiffs filed redacted public versions on February 20, 2009.

130.  By the time the amended complaints were filed, the fact-discovery record was nearly complete. Drafting amended complaints therefore became a fact-intensive exercise akin to summary-judgment briefing in a typical antitrust case.

131.  In December 2008 and January 2009, teams of Class attorneys worked on drafting the amended complaints and pulling evidence from the discovery record to support the amended claims. Like the original consolidated and supplemental complaints, Class Counsel invested hundreds of hours of attorney time on the Second Consolidated Amended Class Action Complaint, the First Amended Supplemental Class Action Complaint, and the Second Supplemental Class Action complaint.

42

831749_1

# A1342

132.  This significant time investment into the complaints—especially the supplemental complaints—was required in order to review and incorporate discovery record in the tens of millions of pages in order to find the most persuasive documents and deposition excerpts to support the claims that Judge Gleeson had concluded were insufficient in their pre-discovery forms. We also supplemented the SCACAC with salient facts from the record, both to support our theory of post-IPO liability and to conform our allegations to the discovery record.

133.  In addition to adding factual detail to the allegations in the FCACAC, the SCACAC added new claims and revised previously asserted claims. Primarily to address the now-accomplished MasterCard and Visa restructurings. It added claims that both Visa and MasterCard's default interchange fees constituted unreasonable restraints on trade, even after the IPOs. An injunctive-relief claim under Sherman Act Section 2 for monopolization was asserted against MasterCard in relation to its Anti-Steering Restraints. The complaint also added a damages and injunctive-relief claim against Visa and certain Bank Defendants for the fixing of default interchange fees on Visa's Interlink PIN-debit-card product. Finally, the inter-network conspiracy claim and the claims relating to the no-surcharge rule—for which plaintiffs previously sought damages and injunctive relief—were converted to claims for injunctive-relief only.

134.  On March 31, 2009, Defendants moved to dismiss each of the amended complaints. As Defendants had argued with respect to the FSCAC, the Defendants argued that the amended complaints challenging the restructurings failed to allege a substantial likelihood of harm to competition and—in the case of MasterCard—failed to allege a fraudulent conveyance.

135.  Unlike the original motion to dismiss the pre-2004 damages claims in the FCACAC, the Defendants raised a broad-based challenge to the SCACAC that sought to completely dismiss Class Plaintiffs' case. They moved to dismiss on the following bases: (i) that the release in the *In re Visa Check* case released *all* of Class Plaintiffs' damages and injunctive-relief claims; (ii) that

43

# A1343

the complaint failed to allege a "restraint on trade" sufficiently to state a claim under § 1 of the Sherman Act; (iii) that the complaint failed to allege a "plausible" inter-network conspiracy under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); (iv) that *Twombly* barred the complaint's allegations of post-IPO conspiracies within Visa and MasterCard; and (v) that Class Plaintiffs' claims were barred by the doctrine of *Illinois Brick*.

136.  In addition to the motions filed on behalf of all Defendants, Chase moved to strike its acquiring entity, Chase Paymentech, as a Defendant, arguing that Class Plaintiffs improperly added it as a Defendant without obtaining leave of court.

137.  Class Counsel again devoted substantial efforts to opposing Defendants' motions, which threatened to derail our entire case. The three Co-Lead firms, in addition to Scott + Scott, (which now had attorneys formerly with Co-Lead Counsel RGRD) divided the briefing up among themselves. Each firm assigned multiple attorneys to drafting opposition briefs. After nine weeks of briefing, Class Plaintiffs filed three separate opposition briefs: 42 pages in response to the motion to dismiss the SCACAC; 46 pages in response to the motions to dismiss the IPO complaints; and 9 pages in opposition to the motion to strike Chase Paymentech.

138.  Oral arguments on the motions to dismiss the amended complaints and on the class-certification motion were set for August 18 and 20, 2009 in front of Judge Orenstein. We divided the arguments on the motions to dismiss among my co-counsel, Bonny Sweeney, and me. Merrill Davidoff of Berger & Montague was set to argue the class-certification motion. Joseph Goldberg, of Freedman Boyd Hollader, was to argue the defense of Defendants' motion to disqualify Class Plaintiffs' class expert, Gustavo Bamberger.

139.  My colleagues and I prepared exhaustively for the oral arguments on the motions to dismiss and Class certification, including the compilation of three-ring binders of evidence. We also selected approximately two-dozen exhibits to use at the hearing, which we prepared for use as demonstratives and also placed in three large exhibit books for the Court. On August 12-13,

# A1344

2009, Class Counsel held mock arguments on the motions to dismiss and the class-certification motion at RKM&C's offices in Minneapolis. We retained the services of retired Minnesota Supreme Court Justice James H. Gilbert to preside over the mock arguments. Junior-to-mid level RKM&C associates who were not involved in the *In re Payment Card* case prepared bench memoranda for Justice Gilbert based on the parties' briefs and the relevant case law.

140.  Due to the sudden and unexpected unavailability of one of the Defendants' primary counsel, the Court rescheduled oral arguments from August to November 18-19, 2009.

141.  Because two-and-a-half months had passed since the originally scheduled arguments, Co-Lead Counsel had to duplicate many of our original preparation efforts before the November arguments.

## N.    Merits Experts Reports and Depositions

142.  As in any antitrust action, in this case the selection and use of experts was crucial to the successful prosecution of the Class Plaintiffs' claims. Starting even before the first case was filed, Co-Lead Counsel conducted an exhaustive review of the economic literature related to payment-card networks and interviewed several economists who had expertise in this field. In our review of the literature, we did not limit ourselves only to those articles which viewed the economics favorably from the merchant's point-of-view, but also tried to understand the economics from the point-of-view of the banks and networks. The process was laborious but necessary and contributed to our final selection of the economists that we retained as consultants and those that ended up providing testimony for the Class both at class certification and on the merits.[15]

143.  Since all parties recognized the importance of the role of expert testimony in this massive antitrust case, the parties spent many long days, over many months negotiating over

---

[15] The expert issues related to class certification are discussed *Supra*. at III.I.

**A1345**

stipulations and understandings as to the timing and role of expert testimony. These discussions resulted, among other things, in a stipulation with regard to expert discovery which was filed with the Court on November 27, 2006. The purpose of the stipulation was to try to anticipate in advance, and to resolve, potential disputes before they arose. As part of the same discussions the parties agreed upon a schedule for expert discovery which called for initial reports by Plaintiffs' merits experts on February 5, 2008. Unfortunately, that deadline, like others in the case, was required to be extended due to the time necessary to complete other merits discovery. Ultimately, the initial merits expert reports of both the Class Plaintiffs and the Individual Plaintiffs were filed on July 2, 2009. Plaintiffs retained a highly-acclaimed slate of experts, experienced in providing testimony in complex, high-stakes antitrust cases. Class Plaintiffs filed a total of five initial expert reports, totalling over 377 pages of text. Individual Plaintiffs filed a total of four initial expert reports, totalling over 214 pages of text. The Class Plaintiffs' expert reports were founded upon the massive factual base assembled by Class Counsel, including the document database of over 75 million pages of documents, the deposition database consisting of nearly 900 depositions, with over 10,880 deposition exhibits. The tables below list Class and Individual Plaintiffs' experts.

46

| CLASS PLAINTIFFS' EXPERTS | | | | |
|---|---|---|---|---|
| **Deponent** | **Subject Matter** | **Company** | **Title** | **Education** |
| Bamberger, Gustavo | Class certification | | Economist at Compass Lexecon | Ph.D., University of Chicago, 1987, Graduate School of Business; M.B.A., University of Chicago, 1984, Graduate School of Business; B.A., Southwestern at Memphis, 1981 |
| Fleischer, Victor | Motivations for networks' IPOs | University of Colorado | Assoc. Prof. of Law, University Colorado | J.D., Columbia University, 1996 |
| Frankel, Alan | Economic analysis of Class Plaintiffs' claims | Coherent Economics, LLC/Compass Lexecon/Antitrust Law Journal | Director of Coherent Economics, LLC; Senior Advisor to Compass Lexecon | Ph.D., Economics, University Chicago, 1986 |
| Henry, Kevin | Class Plaintiffs' fraudulent-conveyance claim | Freeman & Mills, Inc. | V.P., Freeman & Mills, Inc. | B.S. Business and Administrative Studies – Finance, Lewis & Clark College |
| Macey, Jonathan | MasterCard corporate governance | Yale Law School | Sam Harris Professor of Corporate Law, Finance, and Securities Regulation, Yale | J.D., Yale |
| McCormack, Michael | Industry background / *Illinois Brick* | Palma Advisors, LLC | President, Palma Advisors, LLC | B.A., Political Science, Cal. Poly., 1988 |
| McFarlane, Bruce | Defendants' accounting for interchange fees / *Illinois Brick* | LitNomics | Managing Director / CEO, LitiNomics | B.A., Bus. Admin., University Washington, 1984 |

47

# A1347

| CLASS PLAINTIFFS' EXPERTS | | | | |
|---|---|---|---|---|
| **Deponent** | **Subject Matter** | **Company** | **Title** | **Education** |
| Wolter, Kirk[16] | Critique of Mr. Houston's survey of Australian merchants. | National Opinion Research Center/University of Chicago, Dept. of Statistics | E.V.P., National Opinion Research Center; University of Chicago, Dept. of Statistics | Ph.D., Statistics, Iowa State, 1974 |

| INDIVIDUAL PLAINTIFFS' EXPERTS | | | | |
|---|---|---|---|---|
| **Deponent** | **Subject Matter** | **Company** | **Title** | **Education** |
| Ariely, Dan | Behavioral economic analysis of anti-steering restraints | Duke University | James B. Duke Professor of Behavioral Economics at the Fuqua School of Business, The Center for Cognitive Neuroscience, and the Economics Department at Duke University | Ph.D. Cognitive Psychology, University of N.C. 1996; Ph.D. Business Administration, Duke University 1998 |
| Porter, Katherine | Effect of Defendants' business practices on consumer lending. | University of Iowa College of Law/ Robert Braucher Visiting Professor Harvard Law School | Prof. of Law, University Iowa | J.D., Harvard, 2001 |
| Stiglitz, Joseph | Economic analysis of ASR-claims | Columbia Business School/Sebago Associates, Inc. | Prof., Columbia, Recipient of 2001 Nobel Prize in Economics. | Ph.D., Economics, M.I.T., 1967. |
| Vellturo, Christopher | Economic analysis of Individual Plaintiffs' claims | QES | Pres., Quantitative Economic Solutions, LLC | Ph.D., Economics, M.I.T., 1989 |
| Warren, Elizabeth | Economic analysis of ASR-claims | | U.S. Senator, former Leo Gottlieb Professor of Law, Harvard | J.D., Rutgers, 1976 |

---

[16] Kirk Wolter was an expert for the Individual Plaintiffs as well.

48

# A1348

144.  The Class Plaintiffs' expert reports were also the product of the efforts of Co-Lead Counsel, and the co-chairs of the steering committee, to provide to the various experts information they requested from the factual record we had assembled, and to organize the efforts of the experts to address the various issues in the case that were within their respective areas of expertise. The lawyers who had been assigned to work with the various experts met frequently, and talked by telephone even more frequently over the many months during which the preparation of the expert reports took place, in order to keep the effort efficient and well organized, and to assure that all of the necessary issues were covered by at least one of our experts.

145.  Under the agreed-upon schedule, the Defendants served their initial expert reports on December 14, 2009. The Defendants served a total of 12 separate expert reports, totaling over 800 pages of text. Among Defendants' experts were several economists with great reputations in their fields. The table below lists Defendants' experts.

| DEFENDANTS' EXPERTS | | | | |
|---|---|---|---|---|
| **Deponent** | **Subject Matter** | **Company** | **Title** | **Education** |
| Atkins, J.T. | Class Plaintiffs' fraudulent conveyance claim | Cypress Associates LLC | Managing Director, Cypress Assocs. LLC | J.D., Harvard, 1982 |
| Daines, Robert | MasterCard IPO | Stanford Law School | Pritzker Professor of Law and Business, Stanford | J.D., Yale |
| Elzinga, Kenneth | Economic analysis of Plaintiffs' claims | University of Virginia | Robert C. Taylor Professor of Economics, Univ. Va. | Ph.D., Michigan State University, 1967 |
| Houston, Gregory | Australian payment-card industry post RBA reforms | NERA Economic Consulting | Director, NERA Economic Consulting | B.S.c (First Class Honours), Economics, Univ. Canterbury, (NZ) 1982 |

49

# A1349

| DEFENDANTS' EXPERTS | | | | |
|---|---|---|---|---|
| **Deponent** | **Subject Matter** | **Company** | **Title** | **Education** |
| James, Christopher | Market definition and market power | University of Florida | William H. Dia/SunBank Eminent Scholar in Finance and Economics, University of Florida; Visiting Scholar for the San Francisco Federal Reserve Bank | Ph.D., Economics, Industrial Organization, Finance, Michigan, 1978 |
| Kahn, Barbara | Effect of anti-steering restraints on networks' brands | University of Miami School of Business Adm | Dean and Schein Family Professor of Marketing, School of Business Administration, University of Miami, Coral Gables, FL | Ph.D., Marketing, Columbia, 1984 |
| Klein, Benjamin | Economic analysis of anti-steering restraints | EA Associates/ Compass Lexecon | President, EA Associates, Inc. | PhD, Economics, Univ. Chicago, 1970 |
| Litan, Robert E. | Economic analysis of Individual Plaintiffs' claims | Brookings Institution | Senior Fellow, Economic Studies and Global Economy and Development Programs, The Brookings Institution | Ph.D., Economics, Yale, 1987; J.D., Yale, 1977. |
| Murphy, Kevin | Economic analysis of Plaintiffs' claims | University of Chicago | George J. Stigler Distinguished Service Professor of Economics, Booth School of Business & Dep't of Econ., Univ. Chicago | Ph.D., University of Chicago, 1986 |

50

# A1350

| DEFENDANTS' EXPERTS | | | | |
|---|---|---|---|---|
| **Deponent** | **Subject Matter** | **Company** | **Title** | **Education** |
| Snyder, Edward | Class Certification | | Dean and George Pratt Shultz Professor of Economics at the University of Chicago Graduate School of Business | B.A., Colby College, 1975 (Economics, Government); M.A., University of Chicago, 1978 (Public Policy); Ph.D., University of Chicago, 1984 (Economics) |
| Topel, Robert H. | Damages | University of Chicago | Isidore and Gladys J. Brown Professor, Booth School of Business, University of Chicago | Ph.D., Economics, UCLA, 1980 |
| Wecker, William E. | Damages | William E. Wecker Assoc. | President, William E. Wecker Associates, Inc. | Ph.D., Statistics and Management Science, Michigan, 1972 |
| Woodward, Suan E. | Profitability of credit-card lending | Sand Hill Econometrics | President, Sand Hill Econometrics | Ph.D., Financial Economics, UCLA, 1978 |

146.  Upon receiving these Defendants' expert reports, Co-Lead Counsel reviewed and analyzed each, and then organized the preparation of appropriate responses by Class Plaintiffs' experts. As with the initial expert reports, Co-Lead Counsel made assignments to various of the senior lawyers in the firms mentioned above to work with our experts in first understanding the reports we had received from the Defendants, doing the necessary analysis of the opinions reflected in those reports and the factual support (or lack thereof) for those opinions, then doing

51

# A1351

our own further analysis to determine whether any of the Class experts needed to expose errors in the analysis and/or factual support reflected in the Defendants' expert reports.

147.   Part of the exercise of responding to Defendants' expert reports included preparing for and taking depositions of Defendants' experts. Each of Defendants' 12 experts were deposed, for a total of 17 days of testimony. Senior Class lawyers took the lead on these depositions and were supported by more junior attorneys who scrutinized the experts' prior reports and publications and the documents that they relied upon. Class Counsel was also in frequent contact with Class experts and their support staff to help them analyze the economic arguments made by Defendants' experts.

148.   Under the agreed-upon schedule, the Class Plaintiffs' rebuttal expert reports were due on July 28, 2010. The time between our receipt of the Defendants' initial expert reports in December 2009 and our serving of our rebuttal expert reports in July 2010 was a period of frenetic activity as we and our experts worked diligently to perform the necessary analysis of the opinions reflected in the Defendants' many expert report, understand the factual support (if any) for those opinions, identify facts that might contradict opinions proffered by any of the Defendants' experts, and then to do our own further analysis of the economics and the facts to determine what our experts would say in rebuttal.

149.   Defendants deposed Class and Individual Plaintiffs' experts in the late summer and early fall of 2010. In total, Defendants deposed each of Plaintiffs' experts for a total of 15 days of testimony. This included the three-day deposition of Dr. Frankel, Class Plaintiffs' principal economic expert. Defending depositions also required extensive preparation by Class Counsel, who reviewed prior publications and testimony of each expert and spent days preparing them for questioning.

150.   Therefore, in our experts' July 28, 2010 rebuttal reports our experts offered criticism of those aspects of the Defendants' expert opinions that deserved criticism, pointed out errors

52

# A1352

where errors had been made, and generally replied to and rebutted the criticisms of our experts' initial reports. In the course of performing the analysis which underlay the opinions offered in our experts' rebuttal expert reports, they identified certain of the opinions of certain of the Defendants' experts which appeared to be so unreliable as to be worthy of a motion to exclude their testimony at trial. Thus, almost immediately after the service of our rebuttal expert reports in July 2010, and knowing that the deadline for the filing of dispositive and *Daubert* motions was fast approaching, we began the preparation of drafts of motions to exclude the testimony of certain Defendants' experts.

### O.    Summary Judgment and *Daubert* Motions

151.  On February 11, 2011, Class Plaintiffs, Individual Plaintiffs, and Defendants served motions for summary judgment. The parties also served several *Daubert* motions on the same day.

152.  Class Plaintiffs moved for summary judgment on liability on Claims 1, 2, 5, 10, 11, 13, 14, 17, 18, and 20 in the SCACAC. Generally speaking, these were the claims relating to the intra-network fixing of interchange fees before and after the networks' restructurings. Individual Plaintiffs moved for summary judgment with respect to their claims that the Defendants' anti-steering restraints constituted *per se* violations of the antitrust laws.

153.  The Defendants moved for summary judgment on the entirety of Class Plaintiffs' and Individual Plaintiffs' cases. They argued that summary judgment against Class Plaintiffs was appropriate on the following bases: that the *Visa Check* release barred Class Plaintiffs' claims; that the *Illinois Brick* doctrine precluded our claims; that the setting of interchange fees was not a "restraint on trade" within the meaning of Section 1 of the Sherman Act; that Defendants' conduct did not reduce output; that no material issue of fact existed on our inter-network conspiracy claims; that Defendants were entitled to summary judgment on our claims challenging the networks' restructurings and our post-IPO Section 1 claims; and that Plaintiffs

53

had not raised a material issue of fact with respect to the claims based on the anti-steering restraints.

154.  The Defendants moved to exclude each of the Plaintiffs' primary experts under *Daubert*. These include Alan Frankel, Kevin Henry, and Victor Fleischer for the Class Plaintiffs and Christopher Vellturo, Joseph Stiglitz, and Daniel Ariely for the Individual Plaintiffs. The Class and Individual Plaintiffs filed a joint motion to exclude the testimony of the Defendants' primary economic expert, Kevin Murphy, and accounting expert, J.T. Atkins.

155.  Moving for and opposing summary judgment with hundreds of depositions and tens of millions of pages in the record required nearly a year's worth of effort by the Co-Lead Counsel and other firms. Associate and partner-level attorneys at Co-Lead Counsel firms provided significant contributions, including drafting important sections of the memoranda of law and the Rule 56.1 fact statements. Attorneys at Executive Committee firms were also involved in this effort as necessary.

156.  With the assistance of the Co-Lead firms, my team at RKM&C began the process of drafting our affirmative summary-judgment briefs and Local Rule 56.1 Statements of Undisputed Facts (SUF) in the summer of 2010.

157.  Those who worked on this project reviewed the record for documents or deposition testimony that supported the various points in the SUF. They reviewed—among other sources— the CaseMap database in its entirety, the class-certification record in its entirety, the deposition summaries of all witnesses, as well as all documents tagged as "hot" or relevant to particular issues, all documents cited in class and merits expert reports, the *United States v. Visa* trial record and the *Visa Check* summary-judgment record in their entirety, the expert reports in their entirety, the entire deposition transcripts of all important witnesses, the European Commission's decision ruling that MasterCard's interchange fees violated EU competition law, and other

54

materials from foreign regulatory and judicial bodies that were available publicly or obtained in discovery.

158.  In the final days and weeks leading up to the service of our affirmative motion for summary judgment, attorneys at Co-Lead Counsel firms worked even more intensely on the motion papers. Senior attorneys at each firm provided substantive input while senior-associate and junior-partner level attorneys edited the documents for style.

159.  Two lead paralegals at RKM&C cataloged all documents that were referenced as exhibits and cross-referenced them in the brief and statement of undisputed facts. This was an extraordinarily demanding and labor-intensive task as each of the 589 documents that were served as exhibits to our summary-judgment motion had to be cross-referenced to the brief and SUF in the appropriate places.

160.  Class Plaintiffs served a memorandum of law in opposition to Defendants' motion for summary judgment, along with a Rule 56.1 Counterstatement of Fact (CSF) on May 6, 2011. Summary-judgment briefing was completed on June 30, 2011, upon the service of Class Plaintiffs' reply brief and Rule 56.1 Reply Statement of Facts (RSF). That same day, summary-judgment and *Daubert* motion papers were filed with the Court under seal. The opposition papers to Defendants' motion and the reply papers in further support of Class Plaintiffs' motion demanded the same level of intensity and teamwork among Co-Lead Counsel.

161.  Briefing on *Daubert* motions followed the same schedule as the motions for summary judgment. It also required teamwork among lawyers at each of the Co-Lead firms and Individual Plaintiffs' counsel. We argued that Professor Murphy should be disqualified for two primary reasons: (i) his use of data from a study by Daniel Garcia-Swartz was plainly erroneous because he failed to take account for revisions to the data used in that study; and (ii) his analysis relating to the effect of credit availability on prices is plainly unreliable and therefore inadmissible.

# A1355

162.  Joseph Goldberg, along with attorneys from Berger & Montague, were primarily responsible for drafting Class Plaintiffs' response to Defendants' motion to disqualify Alan Frankel. The response to Defendants' motion to disqualify Kevin Henry was primarily drafted by attorneys from Robbins Gellar Rudman & Dowd. These attorneys also provided invaluable assistance to our motion to disqualify Professor Murphy.

163.  After the sealed dispositive motions and *Daubert* motions were on file, the parties exchanged proposed public versions of the pleadings and supporting exhibits. Class Plaintiffs recommended no redactions. Some Defendants, on the other hand, proposed substantial redactions. After approximately two weeks of line-for-line, intense negotiations, the parties were able to reach agreement on a mutually acceptable set of redactions for the written pleadings.

164.  To assist the Court's review of the summary-judgment memoranda and supporting exhibits, we created "hyperlinked" versions of the non-public and public versions of the summary-judgment and *Daubert* motions. These are electronic copies of the pleadings that allow the user to see the documents supporting various propositions by clicking a mouse on electronic links within the documents. This task fell largely upon paralegals and litigation-and-case support staff at Co-Lead firms.

165.  Oral arguments on the summary-judgment and *Daubert* motions were set for November 3, 2011. Once again, we divided up responsibilities for arguing the motions. I agreed to argue the motion to disqualify Professor Murphy, as well as the portions of the summary-judgment motions relating to the networks' IPOs, Defendants' liability under Section 1, and their market power. My Co-Counsel, Bonny Sweeney, took the defense of the Defendants' *Illinois Brick* and output arguments and also planned to argue the portion relating to the Defendants' argument that the Class Plaintiffs could not demonstrate a restraint on trade. Joseph Goldberg argued the defense of the Defendants' motion to disqualify Alan Frankel. All of those assigned to

56

argue portions of these motions received invaluable assistance from lawyers and staff at the Co-lead Counsel firms and at Mr. Goldberg's and Mr. Harper's firms.

166.  Oral argument obviously involved an intensive preparation process. For example, I personally conducted three practice arguments with my colleagues.

167.  Justice Gilbert presided over our summary-judgment mock arguments at RKM&C's offices in Minneapolis. As with the Rule 12 and class-certification motions, our Co-Lead Counsel from across the country flew to Minneapolis for the argument and practiced their portions. Also similar to the previous arguments, RKM&C associates drafted bench memoranda for Justice Gilbert, which he used in his preparation for mock arguments. Justice Gilbert provided oral feedback on the date of the argument and written feedback shortly thereafter.

168.  The arguments took place as scheduled on November 3 and 4, 2011. The Court kindly complimented us on the quality of the briefs and argument.

## P.    Communications with Class Plaintiffs

169.  Throughout the litigation, it was the practice of Co-Lead Counsel to communicate on a regular basis with all of the class representatives. Co-Lead Counsel met on dozens of occasions with groups of the class representatives, and met individually with them on many more occasions. In addition to the in-person meetings, we had frequent conference calls in which all class representatives were invited to participate. In addition to the meetings and phone calls, we maintained regular written communications with them as well. Subject to the limitations of the Protective Order, we provided to class representatives as much detailed information about the evidence we were accumulating, and the progress of the litigation generally, as we could. In particular it was my practice to try to communicate with class representatives before and after each formal mediation session.

# A1357

### Q.    Coordination with the Individual Plaintiffs

170.  Also throughout the litigation, Co-Lead Counsel endeavored to communicate with and coordinate the prosecution of the litigation with Counsel for the Individual Plaintiffs. This was necessary for the efficient and orderly progress of the case, and it was in the interests of both the Class Plaintiffs and the Individual Plaintiffs that we present, as nearly as possible, a united front against the Defendants, notwithstanding certain differences of view in how the claims should be asserted against the Defendants. To this end, we met regularly with counsel for the Individual Plaintiffs and, with rare exceptions, jointly served discovery and took depositions of the Defendants, and presented common positions on motions.

### R.    Trial Preparation

171.  While most of the activities of Class Counsel to this point could be fairly characterized as preparing for trial, we began explicit trial planning in early 2011. At that time, Co-Lead Counsel and the co-chairs of the steering committee interviewed a handful of prominent trial-and-graphics consultants who might assist us in presenting our case to a jury. A firm was selected in early 2011.

172.  At approximately the same time, Class Counsel, Individual Plaintiffs' Counsel, and Defendants each established small groups of lawyers who were tasked with meeting and conferring on issues relating to trial preparation, such as motion schedules and procedures, time limits, and designation of witness testimony.

173.  Co-Lead Counsel and the co-chairs of the steering committee met with the trial consultants in May 2011 to discuss case themes and presentation strategies for trying the case to a jury. Based on this session, break-out groups prepared materials for a focus-group session in Brooklyn in the fall of 2011. The results of the focus-group session informed Class Counsel's future trial-planning activities.

58

174.  In preparing the case for trial, Class Counsel also drafted comprehensive jury instructions and verdict forms which were to form the backbone of Class Plaintiffs' trial plan. The jury instructions were based on an analysis and assessment of jury instructions from more than 50 other antitrust cases, with significant work being done to account for the unique issues in this litigation. The verdict forms were designed to guide the jury through the complex and thorny issues raised in the case. Additionally, work began on various expected motions *in limine* and Class Counsel began the time-consuming process of culling the massive record down to trial exhibits, with consideration given to issues related to admissibility and other evidentiary concerns.

## IV.  Mediation and Settlement

175.  The Settlement that was reached in 2012 was the result of a prolonged and difficult mediation process spanning over four years. Ultimately, the parties agreed on using two of the most distinguished and most experienced mediators, retired Magistrate Judge Edward Infante and Professor Eric Green. By the time the settlement was reached and a Memorandum of Understanding was filed on July 13, 2012, counsel for the parties, either jointly or separately, had met with one or both of the mediators approximately 45 times. There were many hundreds, perhaps even thousands, of telephone calls and e-mails with the mediators. I and my co-counsel maintained regular communications with the Class Plaintiffs advising them of the status of the settlement discussions and mediation sessions.

176.  In a series of status conferences in 2007 the Court had inquired of the parties if there were any discussions being held to see if the case could be settled. At that time there were some very preliminary discussions between the Class and one of the Defendants, however in ensuing discussions, then and over the next several years, it became apparent that a settlement was going to be extraordinarily difficult to achieve given the complexity, scope and magnitude of the litigation.

831749_1

177. Once the parties had reached agreement on trying to settle the case via mediation, the parties needed to agree on a mediator who could have the confidence of all of the parties. The process of selecting the mediator began with the parties agreeing to exchange lists of proposed mediators. These lists were exchanged in August and September 2007. Over the next several weeks counsel for all of the parties had a series of telephone calls and exchange of correspondence to try to identify a mediator to whom all parties could agree. The result of those discussions was that the parties agreed on retired Chief Magistrate Judge Edward Infante, with who each of the Co-Lead Counsel had prior experience in mediations. Recognizing that there was a possibility given the number of parties and, in particular, the different approaches to the litigation being taken by the Class and the Individual Plaintiffs, that there might be a need at some point in the litigation for a second mediator, the parties also agreed at that time that, if such a need arose, the parties would use Professor Eric Green, who had served as the mediator in the prior case *In re Visa Check/MasterMoney Antitrust Litigation*.

178. The first mediation session with Judge Infante was set for April 14-15, 2008. Judge Infante had asked parties to prepare and submit to him in advance of the mediation session mediation statements. After appropriate consultation with the class representatives, Co-Lead Counsel prepared and submitted to Judge Infante a mediation statement which described at length the factual and legal basis for the class's claims, and attached relevant materials that would assist the Judge in getting up to speed on the case. In that first mediation session, the parties met separately with Judge Infante to make the points already made in our mediation statement, and to respond to questions from the Judge regarding the case. There was a brief joint meeting of all the parties that was not substantive. It was reinforced in that first mediation session that the parties were miles apart in their positions with respect to settlement, and that it was going to take a lot of time and effort to get the Defendants to the point where they would be willing to settle on terms that Class Counsel would be prepared to recommend to the class.

60

179. Another mediation session took place on June 10, 2008 with both outside and inside counsel for Defendants present. Together with my Co-Lead Counsel I prepared a detailed set of PowerPoint slides which described the legal and factual basis for our claims, and, in particular, described the potential damage liability which the Defendants faced. The Individual Plaintiffs made a similar presentation focused on the narrower set of claims which they had brought. With respect to these formal mediation sessions, it was my general practice to try to communicate with the class representatives both before and after the session. These communications were sometimes by memorandum, and sometimes by telephone. My records show that, during the litigation I or my Co-Lead Counsel participated in hundreds of conference calls and dozens of in-person meetings with some or all of the class representatives. In addition, Co-Lead Counsel frequently prepared memoranda to the class representatives summarizing the status of the litigation, including the status of settlement discussions.

180. After the mediation session at which the plaintiffs made their presentations, the parties embarked on a long series of in person mediation sessions, telephone calls, e-mails and other written communications trying to see if the parties could make progress towards a resolution. The mediation process was made more difficult by the differing interests among the banks and network defendants.

181. Between April of 2008 and December of 2011, the Class Plaintiffs and the Defendants, sometimes together with the Individual Plaintiffs, had dozens of face-to-face meetings, and hundreds of telephone calls, e-mails and other written communications trying to determine whether the parties could make progress toward the settlement. I and my Co-Lead Counsel recognized that a settlement was in the best interests of the class, because the alternative was both risky and lengthy. As described in Section III.G. of this Declaration, the Defendants had moved to dismiss many of the Class Plaintiffs' claims, including all claims for damages after the MasterCard and Visa reorganizations, as well as motions for summary-judgment which were served by Defendants in February 2011. In addition, Class Plaintiffs had moved for class

61

# A1361

certification in May of 2008, and the Court had this motion under advisement into 2011 when we argued the summary judgment motions. While we were confident in the legal and factual support for Class Plaintiffs' claims, we nonetheless recognized the risks to our claims of potentially adverse decisions in the District Court or in the Court of Appeals. The case law on important issues to the Class Plaintiffs, including the law relating to class certification, had evolved in a direction which emphasized the already existing risks in MDL 1720. We also recognized that the continuation of the litigation itself had adverse effects on merchants in that, damages would continue to mount without a realistic chance of collection and that some tools needed to fight rising interchange fees would continue to be absent from the marketplace. We had determined by 2011 that the mere continuation of the litigation was likely now adverse to the interests of the merchants, notwithstanding the accumulating money damages.

182.  In addition, the passage of the Durbin Amendment (see Section III.K. of this Declaration) affected Class Counsel's evaluation of the value of the elimination of the Visa and MasterCard anti-steering rules. Thus, by the middle of 2011 Class Counsel had determined that a renewed push for settlement was warranted.

183.  After the argument on the summary judgment motions before Judge Gleeson on November 2, 2011, the Court had expressed interest in assisting the parties and the mediators in trying to resolve the litigation. To that end, on November 2, 2011 Judge Gleeson issued an order setting a two day settlement conference with the Court, the mediators, counsel and all parties in the action. That settlement conference was scheduled for December 2-3, 2011. In the days leading up to that settlement conference, I and my Co-Counsel had several telephone conference calls and in person discussions with many of the class representatives in preparation for them to attend the settlement conference. At the conference Judges Gleeson and Orenstein, as well as the mediators Judge Infante and Professor Green, all encouraged the parties to make every possible effort to try to reach agreement. During the conference the very substantial risks that all parties were facing in this litigation now that the dispositive motions had been briefed and argued

62

became apparent. Of course, this was well known to counsel for the parties, as we were the ones who had conducted the litigation over the past seven years and had briefed and argued these crucial motions. However, the parties themselves, including the Class Plaintiffs, had never really had to focus on the risks they were facing as opposed to the potential gain that they might get from victory in the litigation, and some still do not want to address those risks.

184.  After the two-day settlement conference was concluded, there was another flurry of communications between and among the mediators and the parties, and between and among Class Counsel and the class representatives. One of the mechanisms often used by experienced mediators to accomplish a settlement, particularly in complicated cases, is for the mediator to craft a mediator's proposal, which the adverse parties must either accept or reject in its entirety. Only if all parties agree to the proposal does any party know what any other party's answer was to the proposal. The possibility of the mediators making such a mediator's proposal had been discussed over the last several months of 2011, as the parties seemed to be making some progress in getting at least somewhat closer together. It was raised again in these discussions after the settlement conference in December. Thus, it was no surprised when the parties learned in December 2011 that the mediators intended to make a proposal. On December 22, 2011 we received the mediator's proposal.

185.  The receipt by Class Counsel of the mediator's proposal immediately set off another intense flurry of discussions among Class Counsel and with the class representatives. There were several telephone conference calls, and at least one in person meeting which was held in Washington on January 5, 2012. Although there were aspects of the mediator's proposal which were not exactly as Class Counsel would have liked, when compared it to what was reasonably likely to be obtained by injunction in a trial before Judge Gleeson, and when compared to the available alternatives to settling the case on the terms proposed by the mediators, Class Counsel forged the unanimous view that accepting the mediator's proposal on behalf of the Class was far preferable to the only alternative, which was many more years of litigation while merchants

63

continued to be hamstrung by the no surcharge rules of Visa and MasterCard and remaining anti-steering rules. And even at the end of that additional year of litigation there was no reasonable likelihood in our view, based upon all of the facts that we knew at the time, that a significantly superior outcome could be obtained for the class in a bench trial before Judge Gleeson. Moreover, while the recovery of money damages had always been only a secondary goal of the litigation, the amount of the cash portion of the settlement – approximately $7.25 billion – was reasonable in light of the risks and equitable relief. To my knowledge it is by far the largest settlement ever in an antitrust class action in United States.

186.  Unlike other litigation, in a class-action it is ultimately Class Counsel who must exercise their best judgment on behalf of the class as a whole as to whether or not to recommend to the Court that the Court approve a settlement of the Class's claims. In this case, after seven years of litigation and the substantial reform of the industry that had been accomplished in part due to the litigation and in part related to the notoriety of the issues that were contributed to by the litigation, coupled with the additional reforms contained in the settlement, and in light of all of the risks and delay, Class Counsel concluded that they could not, in good conscience, fail to accept the mediators proposal, consummate a final Settlement Agreement consistent with that proposal, and recommend that settlement to the Court.

187.  At the meeting held in Washington, D.C. Class Counsel provided their unanimous recommendation to the class representatives. Most of the class representatives were supportive of the views of Class Counsel and understood that there were significant risks associated with continuing the litigation, most significantly the risk of substantial delay and a less desirable outcome.

188.  In January and February, 2012 there were additional meetings, discussions and correspondence between and among Class Counsel, the class representatives, the mediators, and the Court as the parties continued their consideration of the mediator's proposal. *See* Declaration

of Eric Green at ¶¶ 26 – 29. By February 21, 2012, all of the parties, including all of the

proposed class representatives in the Second Consolidated Amended Class-Action Complaint,

agreed "to negotiate towards a final settlement. .... Through the process laid out by the mediators

and Court in this matter."

189.  Between February and June, 2012 counsel for all parties continued to negotiate over

the fine details of the settlement agreement. On June 20 – 22, 2012 the parties participated in

another settlement conference with judges Orenstein and Gleeson, and mediator Eric Green.

After two days of great effort to reach agreement on minor language details the parties informed

the court on the evening of June 22, 2012 that an agreement on all of the primary terms of a

settlement had been reached, and of the parties would proceed to finalize the Settlement

Agreement and file a memorandum of understanding attaching the agreement with the Court by

July 13, 2012.

## V.    The Settlement is an Excellent Result in Light of Risks Faced by the Class and the Settlement is far Superior to all Alternatives

190.  The Settlement now pending final approval before the Court is the result obtained by

Class Counsel after many years of protracted and arms' length negotiation during hard-fought

litigation and in the face of substantial risks. Each of the three individuals who served on a day-

to-day basis as Co-Lead Counsel has tried to verdict antitrust cases with damages approaching or

over a hundred million dollars. Other partners in the three Co-Lead Counsel firms have tried to

verdict many cases of a similar magnitude. Moreover, these firms have litigated massive cases in

many industries involving antitrust, securities, and/or environmental claims over the last three

decades with exemplary results for their clients. In addition, the almost all of the other Class

Counsel firms bring substantial trial experience and antitrust expertise to their roles in the case.

All Class Counsel, other counsel for the Class Plaintiffs and all counsel for the Individual (non-

831749_1

class) Plaintiffs (who have litigated alongside Class Counsel in MDL 1720) support this settlement as fair, reasonable, and adequate.

191.  In addition to their own experiences and expertise, Class Counsel received the valuable assistance of two of the most experienced and respected mediators in the country, Professor Eric Green and Judge Edward Infante. Finally, towards the end of the long mediation process, the parties received the assistance of the Court, and Judges Gleeson and Orenstein are two experienced trial lawyers themselves, in addition to being experienced jurists.

192.  Class Counsel submit that no group of lawyers could possibly be in a better position to evaluate the merits of the settlement and to assess those merits as compared to the option of proceeding further with the litigation. Class Counsel were and are unanimously in favor of settling the case on the terms embodied in the Settlement Agreement. It represents our collective judgment that the Settlement far exceeds the applicable legal standard of being fair, adequate and reasonable to the Class.

193.  The benefits to the Class of the settlement are enormous and unprecedented. The cash amount of the settlement alone – $7.25 billion – is by far the largest ever antitrust class-action settlement in the history of U.S. Courts. However, in addition, Class Counsel negotiated for the elimination of the remaining anti-steering rules previously enforced by Visa and MasterCard, and obtained a new affirmative obligation on the part of the networks, which they had historically adamantly resisted, obligating them to negotiate in good faith with merchant buying groups on terms and conditions of the merchants acceptance of Visa and MasterCard credit and debit cards.

194.  The injunctive relief obtained in the Settlement Agreement is momentous. To combat high credit-card interchange fees, this settlement provides merchants the right to impose surcharges at the point-of-sale, in order to incent cardholders to use debit or other cheaper payment products. This important tool has been sought by merchants and forward-thinking

policymakers since the early 1980's, when merchant and consumer groups (including Consumer's Union) joined Senator William Proxmire in resisting the credit-card companies' bid to permanently enshrine their no-surcharge rules into federal law.

195.  Winning the surcharging tool is the most consequential and empowering development yet in the long battle U.S. merchants have waged to counter the anticompetitive practices and legacies in the credit-card industry. As the Australian experience demonstrates, over the long term, as a small but meaningful number of merchants begin to employ surcharging strategies to recoup their credit-card acceptance costs, a substantial portion of U.S. transaction volume will move from costly credit-card transactions over to debit transactions, where the prices to merchants are regulated by the Federal Reserve. Meanwhile, the threat of surcharging will enable many merchants to negotiate lower credit-card rates with the networks. And in the event that the Fed ever ceases to regulate debit, the proposed settlement provides that merchants will have the right to employ the surcharge tool in the debit arena as well.

196.  In the short run, we expect merchants may be understandably averse to assessing surcharges on their customers' credit-card transactions. Certainly, that was the pattern we saw in Australia: after the networks were forced to rescind their no-surcharge rules in 2003, large Australian merchants announced they had no interest in surcharging their customers. Within several years, however, almost all of those merchants had used the threat of surcharging to negotiate lower merchant fees with American Express – the one major network in Australia whose rates are not government regulated.[17] Indeed, the availability of the surcharging tool has driven American Express's rates in Australia down by 70 basis points – *more* than regulation has driven down Visa and MasterCard.

---

[17]  In considering evidence of the Australian experience with respect to surcharging, it is appropriate to focus on American Express, rather than Visa or MasterCard, whose regulated rates are sufficiently low to remove the incentives for most merchants to impose surcharges.

67

197.  The surcharging tools provided to merchants under this proposed agreement, moreover, are robust. The cap on surcharges is the amount of the full discount fee incurred by the merchant – and not some subset of that fee. Merchants may surcharge brand-wide (*e.g.*, all Visa credit cards), or they may employ a more nuanced strategy and impose surcharges on one or more product groups (*e.g.*, Visa Signature cards, or MasterCard World Elite cards, which carry higher fees for many merchants). And the disclosure requirements are modest and sensible, requiring the merchants merely to advise consumers that the surcharge does not exceed the merchant's cost of acceptance, and to disclose the amount of the surcharge before it is incurred (much like an ATM surcharge) and on a receipt.

198.  The proposed settlement here would allow merchants the freedom to implement the new surcharging tools right away, with one critical exception: if another network brand that the merchant accepts continues to maintain a no-surcharge rule, then the merchant may not surcharge Visa and MasterCard without also surcharging transactions on that competitor network. This exception – referred to as the "Level Playing Field" exception -- was necessary to ensure that other networks are not able to use their own anticompetitive rules to maintain inflated merchant fees, which they could then use to offer banks and consumers higher interchange fees and rewards, and to take volume away from Visa and MasterCard. In reality, this restriction boils down to a simple recognition that Visa and MasterCard will be at a competitive disadvantage vis-à-vis American Express, if they are forced to rescind their no-surcharge rules while American Express maintains what is, for all intents and purposes, a no-surcharge rule of its own.[18] Importantly, the Department of Justice took the position that the Level Playing Field restriction was reasonable and necessary, and that it would be unfair to expect Visa and MasterCard to

---

[18]American Express's rule is that a merchant who imposes a surcharge upon an American Express transaction must also impose an equal surcharge upon all transactions on all other payment products, *including* regulated debit. So if a merchant imposes a 3% surcharge on an Amex transaction, that merchant must also impose a 3% surcharge on a debit transaction – even though such transactions cost the merchant less than one-half of one percent. It thus operates as a no-surcharge rule.

expose themselves to merchant surcharging at establishments that do not and cannot surcharge American Express. Likewise, had there been a remedies hearing in the instant litigation following a trial on the merits, the Defendants would have sought and likely would have obtained similar measures to protect against the immediate imposition of surcharging at Amex-accepting merchants. In other words, this litigation could not eliminate this limitation.[19]

199.  Meanwhile, any restrictive rules on competitor networks that would impede merchants from exploiting the opportunities afforded them under the proposed settlement here are being challenged or have already been rescinded. American Express's rules are under vigorous attack in a separate litigation spearheaded by the Department of Justice, a merchant class and many large individual merchants, including Kroger, Safeway and Walgreens. Discover voluntarily rescinded its no-surcharge rule in response to demands from counsel for the merchant class.[20]

200.  The power of the surcharging tool achieved by this settlement is magnified and augmented by the other reforms this litigation has helped to obtain. *First*, the IPOs which followed shortly after the filing of this litigation fundamentally revamped the balance of power in the payments markets going forward. While the networks' provenance as associations of competitors continues to affect their market power, the future holds the promise of a dramatically leveled field of play, as the merchants use their new tools in negotiations with single-firm networks, for whom the banks are but one of numerous constituencies.[21] Indeed, these same

---

[19] Likewise, nothing in this litigation could eliminate the no-surcharging statutes of certain states.

[20] After dropping its prohibition on surcharging, Discover adopted a so-called "Non-Discrimination Rule," requiring that merchants imposing a surcharge on Discover credit cards must also surcharge all other <u>credit</u> cards (but not debit). Clearly, such a rule in no way undercuts the ability of merchants to use surcharging to steer transactions to debit. In any event, the proposed settlement provides that merchants may surcharge Visa and MasterCard transactions without surcharging cards of this type (e.g., Discover), so long as such cards are priced meaningfully below the price to the merchant on Visa and MasterCard – a feature that is designed to promote price competition *within* credit cards.

[21] This is not to deny at all that the defendants have substantial market power as single firms, just as the DOJ and private plaintiffs intend to demonstrate with respect to American Express, which has always been a single firm.

69

networks, as unilateral actors, can now actually *leverage* the power of merchant surcharging to compete with other networks for transaction volume, by reducing rates or offering other inducements to merchants.

201.  *Second*, relying on the work done in the instant case, DOJ was able to secure a commitment from the Defendants to allow merchants to offer discounts for the use of favored payment products, and to rescind bans on the ability of merchants to employ verbal and signage prompting in an effort to steer transactions. Going forward, merchants' ability to combine their surcharging and discounting tools may open up additional opportunities, beyond what those that are obvious today.

202.  *Third*, the Durbin Amendment to Dodd-Frank ensures cheap debit acceptance services. Defendants cannot use their market power to increase debit pricing. This greatly heightens the impact of the powerful steering tools that this settlement procures for merchants: it ensures merchants have something to steer *towards*, no matter what the Defendants may do. Surcharging – including the easily implemented strategy of imposing a single surcharge amount on all credit-card transactions – is the most powerful tool available to any merchant seeking to steer consumers to use inexpensive debit.

203.  The proposed settlement achieves all of the injunctive relief that could meaningfully have been achieved after a trial of this matter. Certainly, this private antitrust action could not have achieved mandated interchange rate reductions. No court would or could regulate price in that fashion. Nor is it reasonable to argue that this litigation could have stopped Visa and MasterCard from setting prices. Whatever market power those networks might possess, they are now single firms, and it is their prerogative to set a price for their services – even if they are adjudicated monopolists. No court can mandate that a single firm charge a price for its goods or

_____

However, with meaningful steering tools in the hands of merchants, these single-firm networks (Amex and post-IPO Visa and MasterCard) will be forced into competition in ways that bank-controlled networks could not have been.

# A1370

services determined by the court. What a private antitrust lawsuit *can* achieve is the eradication of anticompetitive restraints that inflate prices. That is what this lawsuit *has* achieved, subject to final approval by the Court.

204. All antitrust litigation is risky, and big complex antitrust cases such as this one are exceptionally risky. The topic of the risk the Class faced when it finally decided to settle 2012 is covered in more detail in the Declaration of Charles B. Renfrew submitted here with. There are two kinds of risks that I think deserve mentioned in this declaration. The first is the risk of delay in this case. The case has now been pending over seven years, and if this settlement is not approved, it is certainly conceivable that it could go another seven years. And even if the additional delay is only three or four years, which sounds hopelessly optimistic at this point, the belief that is being obtained in the settlement for merchants will be postponed just that much longer. And, as is discussed in the Declaration of Dr. Alan Frankel, the sooner that merchants are able to use the new surcharge and tool, the sooner they are likely to see relief from high interchange fees.

205. The second kind of risk that deserves mention here is the risk of the law changing adversely to the interests of the class. Attached as Exhibit 9 is an article from *The Wall Street Journal* that comments on the significant changes in the law of class actions that is making class-action cases much more difficult for the plaintiffs. In fact, just within the last few weeks, the Supreme Court has decided another case that is potentially problematic for class actions, *Comcast Corp. v. Behrend*, 569 U.S.__, No. 11-864 (Mar. 27, 2013). It is indisputably true that if the class in MDL 1720 fails to get certified, that the principal leverage that merchants have over the networks to settle the case on reasonable terms will be gone. Those merchants who are objecting to the settlement do not consider these risks at all in forming their positions. Indeed, an organization of which many of them are members, the Retail Litigation Center, submitted an amicus brief in support of the defendant in the *Comcast* case. They must not understand that they

71

are members of a class that needs to get certified and yet they are taking positions contrary to the interests of that class in the Supreme Court.

## VI.   The Objecting Class Members' Objections are Ill-Founded and the Objectors Have Failed to Present any Superior Alternatives

206.  Since the parties reached agreement on the Memorandum of Understanding on July 13, 2012, this Settlement has been the subject of a vocal and well-organized objection campaign, led by former Class Plaintiff NACS. NACS and the other objectors primarily make three objections to the settlement: that the settlement fails to cap interchange fees; that the surcharging relief is "illusory" because of state statutes restricting surcharging and "level playing field" provisions; and that the release perpetually insulates Visa and MasterCard from antitrust challenge. As is fully addressed in Class Plaintiffs' Memorandum of Law in Support of Final Approval, these objections are ill-founded and do not justify overturning this historic agreement.

207.  The objectors' attacks on the injunctive relief in the settlement confuse their ideal world with what can realistically be accomplished in a judgment or a settlement in an antitrust lawsuit. For example, the objectors' desire for long-term court-mandated rate relief ignores the well-established principle that a U.S. antitrust court will not mandate prices as part of injunctive relief. Similarly, the state restrictions on surcharging operate independently of the networks' no-surcharge rules, such that no outcome in this litigation—whether litigated or negotiated—could have changed them. The complaints against the "level playing field" provisions suffer a similar defect. Even without those provisions, the fact that American Express has generally higher acceptance costs than Visa and MasterCard and also restricts surcharging means that merchants that surcharge Visa or MasterCard and also accept American Express would have to consider the possibility that surcharging Visa and MasterCard would drive consumers to a more expensive payment form, *i.e.,* American Express. Thus, it is American Express's rule rather than any aspect of this settlement that creates the situation that the objectors complain about.

72

208.  The objectors' criticisms of the release granting perpetual antitrust immunity are addressed at length in Class Plaintiffs' memorandum of law. In short, the objectors overlook the fact that the release is conduct-based. Thus, if the Defendants engaged in any new conduct or adopt any new rules that were not in existence at the time of the settlement—including re-establishing the rules that this settlement reforms—the release does not cover claims based on that conduct.

209.  More fundamentally, however, the objectors fail to identify a realistic option that is preferable to this settlement. If Class Plaintiffs would have rejected the mediator's proposals and proceeded to trial, we would have risked losing significant parts of our claim at summary judgment. Most importantly, we faced a real risk that the Court would have dismissed our post-IPO and IPO claims, which would have severely restricted our ability to get *any* injunctive relief. And even if Judge Gleeson certified our class, we would risk a reversal or a de-certification order by the Second Circuit, especially in light of recent Supreme Court precedent that has been hostile to class actions. But the one thing that would have been a *certainty* if we continued to litigate the case would have been delay. Defendants could have easily delayed trial for two years with an interlocutory appeal of a class-certification order. And even if Class Plaintiffs were able to obtain a jury verdict at trial, that verdict would be subject to years of post-trial motions, appeals, and continued uncertainty.

## VII.  Post Settlement Activities through January 31, 2013

### A.    Selection of Claims Administrator, Escrow Banks, etc.

#### 1.    Co-Lead Counsel Selected the Class Administrator Following a Lengthy Process

210.  After an agreement in principal was reached in this action on June 22, 2012, Co-Lead Counsel sought preliminary requests for proposals from a number of the top claims administration companies in the United States. Following the receipt of signed non-disclosure

agreements as well as signed confidentiality agreements required by the Fourth Amended Protective Order, certain publicly-available information regarding the litigation and detailed bid forms were sent to the candidate firms. Co-Lead Counsel scrutinized these proposals and developed detailed comparison charts and memos assessing the various submissions.

211. Following the July 13, 2012 settlement announcement, Co-Lead Counsel invited several firms to present official proposals for notice and claims administration. In total, nine bids were received. After reviewing the voluminous submissions from the highly-qualified firms, a decision was made to invite five firms to in-person meetings to further discuss details related to the proposals for notice and claims administration. Those meetings took place in New York on August 8 and 9, 2012 and were attended by several of the senior members of the litigation team, with representatives from all three Co-Lead Counsel firms in attendance. Co-Lead Counsel then held several internal meetings. After a detailed review and assessment of the proposals, Co-Lead Counsel decided to recommend Epiq Class Action & Claims Solutions, Inc. ("Epiq") as the notice and claims administrator for the class.

212. Hilsoft Notifications, a business unit of Epiq, served as the firm responsible for designing, developing, analyzing and implementing the notice plan. Hilsoft's services were included as part of Epiq's bid to serve as Class Administrator. Hilsoft has experience in more than 200 cases and notice plans developed by the company have been recognized and approved by courts throughout the United States.

213. On November 27, 2012 the Court approved appointment of Epiq as the Class Administrator.

> 2. Co-Lead Counsel Selected Escrow and Custodial Banks to Manage the Class Settlement Cash and Interchange Escrow Account

214. Following the July 13, 2012 settlement announcement, Co-Lead Counsel was aware of their fiduciary duties to the class to consider and select escrow and custodial banks to manage

Settlement Cash and Interchange Escrow Accounts.  Co-Lead counsel sought proposals from reliable and healthy banks that had experience in managing qualified settlement funds, particularly of the size and potential complexity presented by this Settlement.  After reviewing proposals, conducting interviews, and obtaining favorable fee quotes, Co-Lead counsel selected Huntington Bank as the primary escrow bank and US Bank as a secondary custodial bank. Currently each bank holds and manages approximately one-half of the Settlement Cash Escrow of $6.05 million, which was funded by Defendants on December 12, 2012, in US treasury bills. Huntington has been working with Co-Lead Counsel since the fund was established to manage the accounts and disburse administrative expenses for class notice and administration with approval by the Court.  Defendants, as per the Settlement Agreement, have participated in the process by approving Co-Lead Counsel's selection of the banks and in approving requested escrow functions.

> 3. Following the Selection of the Class Administrator, Co-Lead Counsel Worked Closely with the Administrator to Craft the Notice to the Class

215.  On October 19, 2012, the Notice Plan prepared by Hilsoft was submitted to the Court as Appendix E of the Definitive Class Settlement Agreement. [Dkt. No. 1656-1]. During the two months prior to the submission of the Settlement Agreement, Hilsoft, Co-Lead Counsel and Defendants worked together to draft the proposed notices. During the drafting process, counsel was also assisted by an independent plain-language expert, Maria Mindlin. Senior attorneys from the Co-Lead Counsel firms worked extensively with Epiq and Defendants to craft a notice that would meet or exceed the due process requirements under the Constitution and Federal Rule of Civil Procedure 23. Numerous iterations of the long-form and publication notice were drafted, with input from all parties. Negotiations regarding the content and form of the notice were lengthy, spanning several weeks.

216.  Once the language of the notices was agreed upon, additional work regarding everything from type size to margins was considered and evaluated by senior lawyers from the

75

Co-Lead Counsel firms. Proofs of the notices were approved by all parties on October 19, 2012 and revised on November 26, 2012. Following the agreement regarding the content of the notices, further decisions regarding set up for mailing, paper thickness and other details were made by the attorneys and Epiq.

217.  Co-Lead Counsel also worked with Hilsoft on the paid media effort which included 475 separate print publication units with a combined circulation of over 80 million and 770 million adult internet banner impressions.

> ### 4.    Co-Lead Counsel Took Significant Steps to Obtain Class Member Contact Information to Ensure the Class Received Sufficient Notice of the Settlement

218.  Paragraph 81(d) of the Definitive Class Settlement Agreement provides that "Class Plaintiffs shall subpoena, to obtain the names and locations of any members of the Rule 23(b)(3) Settlement Class or the Rule 23(b)(2) Settlement Class, as many non-bank Defendant acquirers as would be necessary to attempt to obtain merchant name and location information attributable to more than 90% of merchant transaction volume and 90% of merchant outlets as reported in Nilson Report 990 (March 2012)."

219.  Pursuant to that Paragraph, on July 2012 Co-Lead Counsel sent either a document request or subpoena to 25 entities. A document request and protective order was sent to following six settling Defendants: Bank of America Merchant Services, Chase Paymentech Solutions, Citi Merchant Services, SunTrust Merchant Services, Vantiv (f/k/a Fifth Third Bancorp), and Wells Fargo Merchant Services. Subpoenas were sent to the following 19 acquirers: BB&T Corporation, The Bancorp Bank, Elavon, Inc., EVO Merchant Services, LLC, Fidelity National Information Services, Inc., First Data Resources, Inc. ("First Data"), Global Payments Direct, Inc., Heartland Payment Systems, Inc., Intuit, Inc., iPayment, Inc., Merchant E-Solutions, Mercury Payment Systems, LLC, Merrick Bank Corporation, Moneris Solutions, Inc.,

76

PNC Financial Services Group, Inc., Santander Holdings USA, Inc., TransFirst, LLC, TSYS Merchant Solutions, LLC, and Worldpay US, Inc.

220. Each document request and subpoena requested name, address and related information for each merchant for whom the entity had acquired or processed Visa or MasterCard transactions at any time between January 1, 2004 through August 1, 2012.

221. Following the return date, several of the entities objected to the subpoenas via written objections. Several of the entities refused to produce the requested data without additional protective orders or agreements regarding confidentiality. Co-Lead Counsel firms held numerous meet and confer negotiations with the subpoenaed entities. Dozens of telephone conferences and email negotiations with the various entities were conducted by Co-Lead Counsel attorneys.

222. Special agreements regarding the confidentiality of produced data were created for several entities, including: First Data Heartland Payment Systems, Inc.; Global Payments Direct, Inc.; TransFirst LLC; and Wells Fargo Merchant Services, LLC. Getting to agreement on these confidentiality provisions entailed significant back and forth between the parties and included executives at Epiq (the entity that was to receive the data) as well as counsel for Visa and MasterCard.

223. Co-Lead Counsel had difficulty getting any data from some of the subpoenaed parties and as to a few of the entities, a motion to compel was threatened before the requested data was turned over. As to First Data, a letter motion to compel was filed after the parties reached impasse regarding the subpoena. That motion was filed on December 7, 2012. [Dkt. No. 1757]. It was later taken off calendar following First Data's agreement to produce requested data.

224. Co-Lead Counsel also worked with Defendants Visa and MasterCard to obtain data for use in the notice process. Visa provided extracts from two databases containing merchants who accepted Visa during the class period: the Visa Merchant Profile Database ("VMPD") and

831749_1

the Common Merchant Systems ("CMS") database. MasterCard provided two Aggregate Merchants List files that were imported on November 1, 2012 and December 21, 2012.

225.  In all, Co-Lead Counsel was able to provide Epiq with 115,045,756 rows of data containing merchant name, address and related information from the subpoenaed entities.

226.  Co-Lead Counsel worked with Epiq on all aspects of the development of the notice database, including working with the administrator to develop an approach for the de-duplication of records that shared key characteristics. Another significant part of the development of the notice database related to the identification of excluded entities under the class definition. Named Defendants, financial institutions that have issued Visa or MasterCard Branded Cards during the class period and the United States government are excluded from the class definition. Co-Lead Counsel worked with Epiq to manually review thousands of records to determine whether the entity was properly excluded from the notice database.

227.  Once the notice database was finalized, Co-Lead Counsel worked closely with Epiq to monitor the mailing of the approximately 20 million notices. The initial notice mailing began January 29, 2013 and ended on February 22, 2013. Issues related to re-mailing of notices, undeliverable mail and other technical issues are monitored by lawyers at Co-Lead Counsel firms on a daily basis.

## 5.    Class Member Support via the Toll-Free Number, Dedicated Website and Through Co-Lead Counsel

228.  Co-Lead Counsel worked with Epiq to develop a script for an automated Interactive Voice Response ("IVR") telephone system. By calling this number potential Class Members can listen to the answer to frequently asked questions as well as request the Long-Form Notice and Settlement Agreement. Co-Lead Counsel also worked with Epiq to develop a script for live operators to respond to frequently asked questions. By January 28, 2013, the toll-free number was fully operational. Lawyers from Co-Lead Counsel assisted in in-person training of the live

78

operators as the system was being rolled out. As of March 31, 2013, the IVR system has received 93,478 calls, representing 426,157 minutes of use.  Among these calls, 50,218 have been transferred to operators totaling 323,676 minutes of time.

229.  Attorneys from the Co-Lead Counsel firms regularly respond to class members who have called into the toll-free line, but require more detailed information. On a daily basis staff at Epiq provide Co-Lead Counsel with a list of Class Members who have either requested to speak to Class Counsel, or who have questions that require an answer from a lawyer. Co-Lead Counsel also have responded to hundreds of class member calls and emails that have come in through the Co-Lead Counsel's mail and phone systems. Responding to class member calls is a continuing process, with calls, emails and letters being received on a daily basis.

230.  Epiq and Co-Lead Counsel worked extensively together to develop the content of the Settlement Website which became available on December 7, 2012. Attorneys from the Co-Lead Counsel firms worked on every aspect of the website, ensuring the content was neutral and informative.

231.  The Settlement Website allows Class Members to preregister and provide information to help the Class Administrator in the preparation of the Class Member's Claim Form. Co-Lead Counsel worked with Epiq in the development and testing of the preregistration module, ensuring ease of use for class members.

### B.    Motion for Preliminary Approval

232.  As required by the applicable scheduling orders, on October19, 2013, Class Plaintiffs filed their motion for Preliminary Approval. This filing included the final definitive Settlement Agreement, the two-Class settlement escrow agreements, a plan for proving notice to over eight million merchants, a proposed settlement notice, and a plan of administration and distribution. Class Plaintiffs also filed a memorandum of law in support of preliminary approval.

# A1379

233.  There were several groups of objectors who filed oppositions to the Class Plaintiffs motion for Preliminary Approval. The Court – we believe wisely - avoided a long, confusing and unnecessarily redundant battle over preliminary approval, by sitting hearing soon after the oppositions were filed, which was held on November 9, 2012. After giving the opponents of preliminary approval fair opportunity to make their arguments, the Court concluded that the standard for granting preliminary approval was met by Class Plaintiffs and granted the motion for preliminary approval from the bench, followed by a written order issued on November 22, 2012.

### C.    Activities in the Second Circuit

234.  One of the oppositions to preliminary approval was submitted by The Home Depot, which indicated its intention to lodge an interlocutory appeal of preliminary approval if it was granted. On November 27, The Home Depot appealed the preliminary-approval order. That same day, the objectors represented by Constantine Cannon requested that the district court stay its preliminary-approval order. Two days later, Class Plaintiffs, Individual Plaintiffs, and Defendants each submitted a letter opposing the stay. Also on November 29, The Home Depot filed a motion with the Second Circuit to expedite briefing on the appeal, which was supported by a 22-page affidavit. In the affidavit, The Home Depot argued that this Court's injunction against collateral attacks while settlement approval was pending deprived it of its due process rights. It also argued that expedited briefing would prevent the "massive and costly notice process" from occurring in the case that the Second Circuit overturned the preliminary-approval order. Class Plaintiffs opposed The Home Depot's motion and cross-moved to defer all briefing until any appeal that may occur from final approval, arguing that the preliminary-approval order did not impose irreparable harm on The Home Depot or any other member of the class. On December 10, 2012, the Second Circuit sided with Class Plaintiffs, denying The Home Depot's motion and granting that of Class Plaintiffs.

80

## VIII. The Plan of Allocation is Fair

235.   The plan of allocation is fair and reasonable because it uses the best available data to estimate the amounts that merchants paid in interchange fees over the Class period, and proposes to pay to each merchant who files a claim the merchant's pro-rata share of the net settlement fund. It also permits any merchant claimant to challenge the Class Administrator's estimate regarding interchange fees paid, if they believe that the data in the Class Administrator's database does not accurately reflect the amount of interchange fees they believe that they paid.

236.   The plan of allocation follows from the Class Plaintiffs' theory of damages, based on the expert report of Dr. Alan Frankel, that in the "but for" world every merchant in the Class would have paid proportionately less in interchange fees than they did in the real world affected by the Defendants' anticompetitive conduct.

237.   These allocation procedures are similar to those in other antitrust class actions, in that they attempt to use the best available data to estimate the magnitude of harm to each claiming class member, and then distributing the net settlement fund on a pro rata basis.

## IX.   The Fee Request is Reasonable

238.   Class Counsel seek an award of attorneys' fees equal to approximately 10 percent of the estimated value of the cash portion of the settlement, which will total as much as $7.25 billion. This percentage does not take into account the estimated value of the injunctive relief. The requested attorney's fee award of an estimated $725 million translates into a multiplier of 4.48 on the total lodestars of all Class Counsel based on time expended through November 30, 2012, at historical rates, and after significant review and reductions of almost $14 million in lodestar submitted by all firms, according to criteria established by Co-Lead Counsel.[22] The

---

[22]  If RKM&C were to apply its *current* rates to its own total hours, the firm's lodestar would increase by approximately 16%.  If that same percentage increase was assumed across all firms' lodestars, then the total lodestar would increase by about $25 million to just over $187 million and the total fee request would represent a 3.88 multiplier.

81

Declaration of Thomas J. Undlin in support of Class Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and Class Plaintiffs' Awards summarizes the total lodestar for each law firm in this matter, the review criteria and resulting reductions that have been applied. Class Counsel also request reimbursement of $27,037,716.97 in out-of-pocket expenses advanced by the Class Counsel for the benefit of the classes during the litigation from inception through November 30, 2012. These case-wide expenses, also reviewed and reduced, are detailed in the Undlin Declaration and were reasonably incurred in the litigation.[23]

239.  Co-Lead Counsel for the class required each Class Counsel firm to report their time and expenses on a regular basis. I periodically reviewed summaries of the reported time and expenses to assure that the time reported appeared reasonably related to tasks that had been assigned to each firm. I also periodically reviewed the summaries of reported expenses for the same purpose. In addition, Co-Lead Counsel has retained the accounting firm of CliftonLarsonAllen to audit the reported time and expenses of each Class Counsel firm to assure that the reported time is accurate, and reflects the performance of tasks which were assigned to each firm. That audit will be completed before the hearing on final approval in September.

240.  In determining the lodestar fees for each Class Counsel firm Co-Lead Counsel established certain criteria and limitations on fees reported so that there would be reasonable uniformity in how time was reported and lodestar's calculated. These criteria are set forth in the Undlin Declaration.

241.  The requested fee is reasonable in light of the results achieved, the work counsel performed to the benefit of the class, and the risks Plaintiffs would have faced at summary judgment, trial, and on appeal. As described above and in the accompanying briefs, the efforts of Class Counsel in this matter resulted not only in the largest ever cash recovery in an antitrust

---

[23] Obviously, substantially more effort and expense has been expended since November 30, 2012 and will continue to be expended.

class action, but a thorough reform of the payment-card industry itself which will pay enormous long-term benefits to the class. The cash recovery alone is more than sufficient to support the requested fee. When the other benefits to the class that were related to the litigation, *e.g.* the divestiture by the banks of their ownership interests in both Visa and MasterCard, the consent judgment obtained by the Department of Justice based entirely on the work of Class Counsel, and the enactment of the Durbin Amendment, the long-term benefits to the class are perhaps incalculable. To date, Class Counsel have received no compensation for the time expended or the expenses advanced. Between fees and expenses, and through the date of preliminary approval in late November, 2012, Class Counsel have collectively invested almost $190 million to further the interests of the class.

242.  Many of my clients in this matter who became Class Plaintiffs in the amended complaints had entered into engagement agreements with my firm prior to undertaking litigation in which they agreed to support a fee request of one-third of the value of the recovery, including the economic value of the injunctive relief. The term value of the recovery was intended to reflect the likelihood that, in addition to a cash recovery it was expected that any judgment or settlement would contain injunctive relief that would have value to the class and for which counsel should be compensated.

243.  It is typical in declarations of this sort in support of a fee request in an antitrust class action for there to be a representation that the requested fee is well within the range of fees awarded in other comparable antitrust class action settlements. Such a representation is difficult in this case because there are no comparable antitrust class action settlements. The cash recovery alone is almost three times the magnitude of the next largest antitrust class action settlement, which was achieved in *In re Visa Check/MasterMoney Antitrust Litigation*, adjusted for the present value of that settlement, which was paid over a period of ten years. Moreover, to the best of my knowledge there is no antitrust class action which has achieved the substantial restructuring of an entire industry.

83

# A1383

244.  What is possible to represent in this declaration is that the requested fee is certainly within a range that has been approved by courts in mega-fund cases involving settlement funds of $1 billion or more. Perhaps the most comparable settlement to the settlement now before the Court was not in an antitrust case, but rather in a securities fraud case. That case *In re Enron Corporation Securities, Derivatives & ERISA Litigation*, 586 F.Supp.2d 732 (S.D. Tex 2008), settled in 2007 for a cash component - $7,227,000,000 – comparable to the cash component in MDL 1720 estimated to be $7,250,000,000. In *Enron* Judge Harmon applied the multi-factor test used in some federal courts in determining appropriate fees in common fund cases, and awarded a fee of $688 million, which amounted to 9.52% of the settlement amount. The court noted that that was the amount agreed to by the lead plaintiff, the University of California Board of Regents, in an engagement agreement entered into prior to the litigation. In addition to the requested fee being reasonable under either the percentage of the fund approach or using the lodestar method, the court found that the fee agreement was negotiated by sophisticated clients and should be accorded some weight in determining a fair fee. As noted above, many of the Class Plaintiffs in MDL 1720 also entered into engagement agreements prior to their participation in the litigation in which they agreed to support a fee of one-third of the "Value of the Recovery" to the Class. As in *Enron*, these Class Plaintiffs are sophisticated business people, often with in-house counsel and/or other outside counsel to advise them. As also noted above, without exception the Class Plaintiffs were unwilling (or unable) to risk their own funds in support of a highly risky and costly litigation, and recognized that a substantial fee was necessary to attract sophisticated and experienced counsel to represent them and the class in this case.

245.  Another instructive fee opinion was that issued by Chief Judge Hogan in *In re Vitamins Antitrust Litigation*. In that case, where the class settled for $1,050,000,000 (before reduction for opt-outs), the court awarded a fee of $123,000,000, equal to 33.7% of the common fund after reduction for opt-outs.

84

246. As Professor Silver emphasizes in his declaration filed herewith, and as Class Counsel argue in our petition for award of fees, many courts now believe that the best approach in awarding fees to counsel in a contingent class-action context is to determine the market rate for such legal services. In that regard it is relevant to know the fees that counsel in this case have been paid in comparable litigation on a contingent basis by clients who negotiated an arms'-length arrangement.

247. For many years my firm has had a significant contingent fee practice in complex commercial litigation. One example of a contingency agreement that is in the public domain is Exhibit 10. It is the contingent fee agreement between my law firm and the State of Minnesota whereby the state retained my firm to represent it in action asserting antitrust and fraud claims against tobacco companies. As the court will observe, the State of Minnesota agreed to pay the firm a contingent fee of 25% of the recovery.[24]

248. RKM&C has for the past two decades represented plaintiffs in patent infringement litigation on a contingent basis. These clients range from individual inventors, small companies, publicly held companies to major universities. The contingent fee agreed to in these matters ranges from 25% to 45%.

## X.    Conclusion

249. The preceding paragraphs in this Declaration have described in some measure the extreme effort, dedication and expense that has been required to bring this complex and lengthy case to a successful conclusion. When we started this case, Visa and MasterCard were consortia of competing banks whose primary goal in their dual ownership of the payment card networks was to drive card issuance and use through the promise of higher interchange rates, paid to the banks, and protected by anti-steering rules. This struggle will have spanned over eight years by

---

[24] The recovery in that case, obtained via settlement, was approximately $6.1 billion to be paid over 25 years.

# A1385

the time of the hearing on whether to finally approve this settlement. Class Counsel has obtained, reviewed and prepared for trial, evidence from millions of pages of documents and from the testimony of hundreds of witnesses. And the Class Plaintiffs have responded in kind to the reciprocal discovery demands of defendants. The parties have engaged in long, arduous and often-stalled settlement negotiations that began before the Great Recession that eliminated some of the bank defendants originally named.

250.  But today, because of the efforts of Class Counsel, and their merchant clients, we are on the cusp of a much different payment card world. The banks have divested their ownership of the networks, Congress has provided through the Durbin Amendment a low cost debit card alternative to which merchants can migrate, and the Justice Department has imbedded the right of merchants to encourage lower cost payment forms through discounts or other incentives. This proposed settlement largely completes the reformation by providing merchants the ability to steer to debit cards via surcharge, make independent card acceptance decisions at different store outlets, and collectively negotiate with the networks for lower interchange rates or other benefits. The settlement also provides an almost unprecedented sum of monetary relief for past damages.

251.  In the past several months, much has been said in the press by certain merchants and trade associations reacting negatively to the settlement. However, there is much more to the story than what these parties have been telling the press. This settlement, along with the other reforms that have been promoted by Class Counsel, provide merchants, for the very first time, with effective tools to fight back against high interchange fees by forcing the banks and networks to set their interchange rates in a competitive environment. And the proposed agreement brings relief to merchants in the near term. The rules changes required of the banks and networks have now gone into effect. Certain objectors have criticized the settlement because it does not do more, specifically, that the settlement does not directly eliminate the default interchange rule. They have offered no suggestion for how such a result could be accomplished short of running the table in trial and upon appeal. Such a strategy is not risk free. Even more, pursuing such a

86

# A1386

strategy means that *any* relief from interchange rates is not only uncertain, but many years away, under the best of circumstances. And while compromise is clearly a part of any settlement, this compromise was achieved without a single material decision by the Court ruling against the class on any of the class claims for relief. This means that the settlement was negotiated against defendants from a relative position of strength in the litigation, something that may not be true in the future.

252.  This settlement addresses the issues that motivated this litigation in 2005 - it eliminates the core competitive problems of the networks and banks. As a result of the settlement, Visa and MasterCard have now been forced to change their rules in ways that will permit merchants to more effectively steer customers to cheaper forms of payment. Because of these rule changes, merchants will be allowed to send price signals to customers so they can understand and make alternative payment choices that will lower merchants' and, ultimately, consumers' costs. Prior to this settlement, all consumers, even cash payers, were "surcharged" for interchange through the price of goods. With transparency and choice, consumers can avoid cross-subsidizing others who use high cost rewards cards and lower their own costs at the till if they so choose.

253.  And finally, this settlement is good for America. The combined pressure of transparency and choice will discipline and eventually drive down interchange rates, that are essentially a private, and until now hidden, tax on the economy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:      Minneapolis, Minnesota.
            April 11, 2013

87

**A1387**

_s/K. Craig Wildfang_
K. Craig Wildfang

83833635.1

88

831749_1

# A1388

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| Photos Etc., Corp; CHS, Inc; Traditions, Ltd; A Dash of Salt, LLC; KSARRA, LLC | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International, Inc.; JP Morgan Chase & Co.; Chase Bank USA, N.A.; Chase Manhattan Bank U.S.A., N.A.; Citigroup, Inc.; Citicorp; Citibank, N.A.; MBNA America Bank, N.A.; Bank of America Corporation; Bank of America, N.A.; Capital One Financial Corporation; Capital One Bank; National Processing, Inc.; Bank One Corp; Bank One Delaware, N.A.; First Century Bank, N.A.; Fleet Bank (RI), N.A.; Fleet National Bank; Capital One Bank; Capital One FSB; Capital One Financial Corp; First National Bank of Nebraska; First National Bank of Omaha; HSBC Finance Corp; HSBC Holdings PLC; HSBC NA Holdings, Inc.; MBNA America Bank, N.A.; National City Corp; National City Bank of Kentucky; Providian Financial Corp; Providian National Bank; RBC Centura Banks, Inc.; RBC Royal Bank of Canada, People's Bank; RBS National Bank of Bridgeport; Royal Bank of Scotland Group, PLC; Suntrust Banks, Inc.; Texas Independent Bancshares, Inc.; USAA Federal Savings Bank; Wachovia Bank, N.A.; Wachovia Corp; Westpac Banking Corp | 6/22/2005 | Interchange Fee Class Action | Connecticut (New Haven) | 3:05-cv-01007 | 1:05-cv-05071 |
| NuCity Publications, Inc. | Visa U.S.A., Inc.; MasterCard International Corporation | 6/28/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-05991 | 1:05-cv-05075 |

# A1389

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | CLAIMS | DATE | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| Fairmont Orthopedics & Sports Medicine, PA; Gary FS Inc. | Visa U.S.A., Inc.; Visa International; MasterCard International Incorporated | Interchange Fee Class Action | 7/8/2005 | New York - Southern District (Foley Square) | 1:05-cv-06259 | 1:05-cv-05076 |
| Parkway Corporation; Quality Koi Company, Inc. | Visa U.S.A., Inc.; Visa International; MasterCard International Incorporated | Interchange Fee Class Action | 7/12/2005 | New York - Southern District (Foley Square) | 1:05-cv-06349 | 1:05-cv-05077 |
| Tabu Salon & Spa Inc. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated | Interchange Fee Class Action | 7/13/2005 | Connecticut (New Haven) | 3:05-cv-01111 | 1:05-cv-05072 |
| Kroger Co.; Albertson's, Inc.; Safeway, Inc.; Ahold USA, Inc.; Walgreen Co.; Maxi Drug, Inc.; Eckerd Corporation; Delhaize America, Inc. | Visa U.S.A., Inc.; Visa International Service Association | No Surcharge, Interchange Fee | 7/14/2005 | New York - Southern District (Foley Square) | 1:05-cv-06409 | 1:05-cv-05078 |
| Baltimore Avenue Foods, LLC | Visa U.S.A., Inc.; Visa International; MasterCard International | Interchange Fee Class Action | 7/19/2005 | New York - Southern District (Foley Square) | 1:05-cv-06532 | 1:05-cv-05080 |
| Broken Ground, Inc. | Visa U.S.A., Inc.; Visa International; MasterCard International | Interchange Fee Class Action | 7/19/2005 | New York - Southern District (Foley Square) | 1:05-cv-06543 | 1:05-cv-05082 |
| Rookies, Inc.; Jasa, Inc. | Visa U.S.A., Inc.; MasterCard International | No Surcharge Rule Class Action | 7/19/2005 | California - Northern District (San Francisco) | 3:05-cv-02933 | 1:05-cv-05069 |

# A1390

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| East Goshen Pharmacy, Inc. d/b/a Optioncare of Chester County | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 7/22/2005 | Interchange Fee Class Action | Connecticut (New Haven) | 3:05-cv-01177 | 1:05-cv-05073 |
| Jasperson, Randall d/b/a Jasperson Sod Service | Visa U.S.A., Inc.; MasterCard International | 7/22/2005 | No Surcharge Rule Class Action | California - Northern District (San Francisco) | 3:05-cv-02996 | 1:05-cv-05070 |
| Bonte Wafflerie, LLC; David L. Hoexter, D.M.D., P.C. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 7/26/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-06708 | 1:05-cv-05083 |
| Lakeshore Interiors | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 7/26/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-06683 | 1:05-cv-05081 |
| JGSA, Inc. | Visa U.S.A., Inc.; MasterCard International | 7/27/2005 | No Surcharge Rule Class Action | Wisconsin Eastern District (Milwaukee) | 2:05-cv-00801 | 1:05-cv-05885 |
| Bishara, Abdallah d/b/a Uncle Abe's Phillip 66 | Visa U.S.A., Inc. | 8/3/2005 | Interchange Fee Class Action | Pennsylvania Eastern District (Philadelphia) | 2:05-cv-04147 | 1:05-cv-05883 |
| Lombardo Bros., Inc. | Visa U.S.A., Inc. | 8/3/2005 | Interchange Fee Class Action | Pennsylvania Eastern District (Philadelphia) | 2:05-cv-04146 | 1:05-cv-05882 |
| 518 Restaurant Corp. | American Express Travel Related Services Company, Inc.; Discover Financial Services, Inc.; MasterCard International; Visa U.S.A., Inc. | 8/9/2005 | No Surcharge Rule Class Action | Pennsylvania Eastern District (Philadelphia) | 2:05-cv-04230 | 1:05-cv-05884 |
| Jennifer A. Lee d/b/a Jennifer Lee Photograph | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 8/10/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-03800 | 1:05-cv-03800 |

# A1391

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| Performance Labs, Inc. | American Express Travel Related Services Company, Inc.; MasterCard International; Visa U.S.A., Inc. | 8/10/2005 | No Surcharge Rule Class Action | New Jersey | 2:05-cv-03959 | 1:05-cv-05869 |
| Hy-Vee, Inc. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 8/16/2005 | No Surcharge, Interchange Fee | New York - Eastern District (Brooklyn) | 1:05-cv-03925 | 1:05-cv-03925 |
| Resnick Amsterdam & Leshner P.C. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 8/16/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-03924 | 1:05-cv-03924 |
| Cohen, Leeber M.D. | Visa U.S.A., Inc.; Visa International; MasterCard International | 8/18/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-07317 | 1:05-cv-05878 |
| LDC, Inc. | Visa U.S.A., Inc.; Visa International; MasterCard International | 8/18/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-07316 | 1:05-cv-05871 |
| Discount Optics, Inc. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard International | 8/21/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-07175 | 1:05-cv-05870 |
| G.E.S. Bakery d/b/a Strauss Bakery | Visa U.S.A., Inc.; Visa International; MasterCard International | 8/22/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-07414 | 1:05-cv-05879 |
| Connecticut Food Association, Inc.; Crystal Rock, LLC; M,W.E., Inc.; Cosmos, Inc.; Highlands Bar & Grill; Bottega; Chez Fon Fon; Bombay Corp. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International, Inc.; JP Morgan Chase & Co.; Chase Bank USA, N.A.; Citigroup, Inc.; Citicorp; Citibank, N.A.; MBNA America Bank, N.A.; Bank of America Corporation; Bank of America, N.A.; Capital One Financial Corporation; Capital One Bank | 8/23/2005 | Interchange Fee Class Action | New York - Southern District (Foley Square) | 1:05-cv-07456 | 1:05-cv-05880 |

Page 4

**A1392**

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| Hyman, Roy Dr.; Sharp Pro-Formance LLC | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International, Inc.; Bank of America, N.A.; Bank of America Corporation; Fleet Bank (RI); Fleet National Bank; National City Corp; National City Bank of Kentucky | 8/25/2005 | Interchange Fee Class Action | Kentucky - Western District (Louisville) | 3:05-cv-00487 | 1:05-cv-05866 |
| Meijer, Inc.; Meijer Distribution, Inc. | Visa U.S.A., Inc.; Visa International Service Association | 8/25/2005 | Interchange | New York - Eastern District (Brooklyn) | 1:05-cv-04131 | 1:05-cv-04131 |
| Twisted Spoke, Inc. | Visa U.S.A., Inc.; MasterCard International | 9/1/2005 | No Surcharge Rule Class Action | Ohio Eastern District | 1:05-cv-02108 | 1:05-cv-05881 |
| Fringe, Inc. | Visa U.S.A., Inc.; Visa International; MasterCard Incorporated; MasterCard International | 9/2/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-04194 | 1:05-cv-04194 |
| Harris Stationers, Inc.; Evolve Studios, Inc.; Steven Weinberg; DVM d/b/a Mobile Pets Veterinary Service; Leon's Transmission Service, Inc. | Visa International Service Association; Visa U.S.A., Inc.; MasterCard Incorporated; MasterCard International; JP Morgan Chase & Co.; Chase Manhattan Bank USA, N.A.; Bank One, Delaware, N.A.; Bank One Corporation; Bank of America Corporation; Bank of America, N.A.; Fleet Bank (RI); National Processing, Inc.; Capital One Financial Corp.; Capital One Bank; Capital One F.S.B.; Citigroup Inc.; Citibank, N.A.; Citicorp; MBNA Corp.; MBNA America Bank N.A.; National City Corporation; National City Bank of Kentucky; Wells Fargo & Co.; Wells Fargo Bank, N.A.; Wachovia Corporation; Wachovia Bank, N.A.; First National of Nebraska, Inc.; First National Bank of Omaha | 9/2/2005 | Interchange Fee Class Action | California Central District, Western Division (Los Angeles) | 2:05-cv-06541 | 1:05-cv-05868 |

# A1393

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| 47 West 55th Rest. Inc., d/b/a Giovanni Ristorante | Visa U.S.A., Inc.; MasterCard International | 9/16/2005 | Tying Class Action | New York - Southern District (White Plains) | 7:05-cv-08057 | |
| Cetta, Michael d/b/a Sparks Steak House | Visa U.S.A., Inc.; MasterCard International | 9/16/2005 | Tying Class Action | New York - Southern District (White Plains) | 7:05-cv-08060 | |
| Jax Dux & Bux d/b/a The Red Barn Sports Center | Visa U.S.A., Inc.; MasterCard International | 9/16/2005 | Tying Class Action | New York - Southern District (White Plains) | 7:05-cv-08058 | |

Page 6

# A1394

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| Jetro Holdings, Inc.; Jetro Cash & Carry Enterprises, Inc. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International, Incorporated; Bank of America Corporation; Bank of America, N.A.; National Processing, Inc.; Bank One Corporation; Bank One, Delaware, N.A.; Chase Manhattan Bank USA, N.A.; JPMorgan Chase & Co.; Fleet Bank (R.I.), N.A.; Fleet National Bank; Barclays Bank Limited; Barclays Group Holdings Limited; Juniper Financial Corporation; Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation; CitiCorp; CitiGroup, Inc.; CitiBank, N.A.; First National Bank of Nebraska; First National Bank of Omaha; HSBC Finance Corporation; HSBC Holdings, PLC; HSBC North America Holdings, Inc.; MBNA America Bank, N.A.; National City Corporation; National City Bank of Kentucky; Providian Financial Corporation; Providian National Bank; RBC Centura Banks, Inc.; RBC Royal Bank of Canada; People's Bank; RBS NB; Royal Bank of Scotland Group, PLC; Texas Independent Bancshares, Inc.; USAA Federal Savings Bank; Wachovia Corporation; Wachovia Bank, N.A.; and Westpac Banking Corporation | 9/23/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-04520 | 1:05-cv-04520 |

Page 7

**A1395**

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| National Association of Convenience Stores; National Association of Chain Drug Stores; National Community Pharmacists Association; National Cooperative Grocers Association | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; Bank of America Corporation; Bank of America, N.A.; National Processing, Inc.; Bank One Corporation; Bank One, Delaware, N.A.; Chase Manhattan Bank USA, N.A.; JPMorgan Chase & Co.; Fleet Bank (R.I.), N.A.; Fleet National Bank; Barclays Bank Limited; Barclays Group Holdings Limited; Juniper Financial Corporation; Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation; CitiCorp; CitiGroup, Inc.; CitiBank, N.A.; First National Bank of Nebraska; First National Bank of Omaha; HSBC Finance Corporation; HSBC Holdings, PLC; HSBC North America Holdings, Inc.; MBNA America Bank, N.A.; National City Corporation; National City Bank of Kentucky; Providian Financial Corporation; Providian National Bank; RBC Centura Banks, Inc.; RBC Royal Bank of Canada; People's Bank; RBS NB; Royal Bank of Scotland Group, PLC; Texas Independent Bancshares, Inc.; USAA Federal Savings Bank; Wachovia Corporation; Wachovia Bank, N.A.; and Westpac Banking Corporation | 9/23/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-04521 | 1:05-cv-04521 |
| Supervalu Inc. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 9/30/2005 | Tying | New York - Eastern District (Brooklyn) | 1:05-cv-04650 | 1:05-cv-04650 |
| Publix Supermarkets, Inc. | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 10/4/2005 | Tying | New York - Eastern District (Brooklyn) | 1:05-cv-04677 | 1:05-cv-04677 |

# A1396

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

**COMPLAINTS FILED ON/AFTER JUNE 22, 2005**

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| Seaway Gas & Petroleum, Inc. | Visa U.S.A., Inc.; Visa International; MasterCard International | 10/6/2005 | Tying Class Action | Eastern District of New York (Brooklyn) | 3:05-cv-04728 | 1:05-cv-04728 |
| Raley's | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International | 10/12/2005 | Interchange | New York - Eastern District (Brooklyn) | 1:05-cv-04799 | 1:05-cv-04799 |
| Lepkowski, Joseph, D.D.S. d/b/a Oak Park Dental Studio | MasterCard International; American Express Travel Related Services Company, Inc.; Discover Financial Services, Inc.; Visa U.S.A., Inc. | 10/25/2005 | No Surcharge Rule Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-04974 | 1:05-cv-04974 |
| Payless Shoesource, Inc. | Visa U.S.A., Inc.; MasterCard International | 10/31/2005 | Tying Class Action | New York - Southern District (White Plains) | 7:05-cv-09245 | |
| Fitlife Health Systems Of Arcadia, Inc. | MasterCard International; Visa U.S.A., Inc. | 11/3/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-05153 | 1:05-cv-05153 |

Page 9

A1397

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

## COMPLAINTS FILED ON/AFTER JUNE 22, 2005

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| American Booksellers Association | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International, Incorporated; Bank of America Corporation; Bank of America, N.A.; National Processing, Inc.; Bank One Corporation; Bank One, Delaware, N.A.; Chase Manhattan Bank USA, N.A.; JPMorgan Chase & Co.; Fleet Bank (R.I.), N.A.; Fleet National Bank; Barclays Bank Limited; Barclays Group Holdings Limited; Juniper Financial Corporation; Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation; CitiCorp; CitiGroup, Inc.; CitiBank, N.A.; First National Bank of Nebraska; First National Bank of Omaha; HSBC Finance Corporation; HSBC Holdings, PLC; HSBC North America Holdings, Inc.; MBNA America Bank, N.A.; National City Corporation; National City Bank of Kentucky; Providian Financial Corporation; Providian National Bank; RBC Centura Banks, Inc.; RBC Royal Bank of Canada; People's Bank; RBS NB; Royal Bank of Scotland Group, PLC; Texas Independent Bancshares, Inc.; USAA Federal Savings Bank; Wachovia Corporation; Wachovia Bank, N.A.; and Westpac Banking Corporation | 11/14/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-05319 | 1:05-cv-05319 |

**A1398**

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

COMPLAINTS FILED ON/AFTER JUNE 22, 2005

| PLAINTIFF | DEFENDANT | DATE | CLAIMS | ORIGINAL COURT | COURT # | EDNY |
|---|---|---|---|---|---|---|
| National Grocers Association; D'Agostino Supermarkets; Minnesota Grocers Association; Affiliated Foods Midwest Cooperative, Inc.; Coborn's Incorporated | Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International, Incorporated; Bank of America Corporation; Bank of America, N.A.; National Processing, Inc.; Bank One Corporation; Bank One, Delaware, N.A.; Chase Manhattan Bank USA, N.A.; JPMorgan Chase & Co.; Fleet Bank (R.I.), N.A.; Fleet National Bank; Barclays Bank Limited; Barclays Group Holdings Limited; Juniper Financial Corporation; Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation; CitiCorp; CitiGroup, Inc.; CitiBank, N.A.; First National Bank of Nebraska; First National Bank of Omaha; HSBC Finance Corporation; HSBC Holdings, PLC; HSBC North America Holdings, Inc.; MBNA America Bank, N.A.; National City Corporation; National City Bank of Kentucky; Providian Financial Corporation; Providian National Bank; RBC Centura Banks, Inc.; RBC Royal Bank of Canada; People's Bank; RBS NB; Royal Bank of Scotland Group, PLC; Texas Independent Bancshares, Inc.; USAA Federal Savings Bank; Wachovia Corporation; Wachovia Bank, N.A.; and Westpac Banking Corporation | 11/14/2005 | Interchange Fee Class Action | New York - Eastern District (Brooklyn) | 1:05-cv-05207 | 1:05-cv-05207 |
| Rite Aid Corporation; Pathmark Stores, Inc. | Visa U.S.A., Inc.; Visa International Service Association | 11/14/2005 | No Surcharge, Interchange Fee, Tying | Eastern District of New York (Brooklyn) | 1:05-cv-05352 | 1:05-cv-05352 |

Page 11

# A1399

EXHIBIT 2 to Declaration of K. Craig Wildfang, Esq.

## DOCUMENT PRODUCTION BY DEFENDANT

| DEFENDANT | DOCUMENTS | PAGES |
|---|---|---|
| MasterCard | 692,331 | 12,700,836 |
| Visa | 855,064 | 11,376,679 |
| Bank of America | 110,267 | 6,448,787 |
| Barclays | 22,994 | 877,604 |
| Capital One | 35,074 | 972,988 |
| Chase | 238,252 | 3,708,686 |
| Citi | 129,790 | 2,595,857 |
| Fifth Third | 217,059 | 2,549,733 |
| FNBO | 124,792 | 1,184,764 |
| HSBC | 55,833 | 708,610 |
| National City | 12,037 | 259,926 |
| SunTrust | 53,164 | 845,324 |
| Texas Independent | 7,220 | 51,300 |
| Wachovia | 29,476 | 291,363 |
| Washington Mutual | 41,517 | 1,116,489 |
| Wells Fargo | 44,416 | 738,034 |
| Legacy productions | 1,035,482 | 7,709,856 |
| Non MDL Deposition transcripts and exhibits | 15,169 | 330,065 |
| MasterCard/DOJ | 89,525 | 496,758 |
| Visa/CID | 164,574 | 1,069,618 |
| **TOTAL** | **3,974,036** | **56,033,277** |

# A1400

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Coscia, Albert 30(b)(6) on Organizational | 6/15/2006 | Visa USA | San Francisco, CA |
| Thoma, Joy 30(b)(6) on Organizational | 6/29/2006 | MasterCard | New York, NY |
| Hudson, Michael Sean 30(b)(6) on Organizational | 7/11/2006 | SunTrust | Atlanta, GA |
| McDonnell, Kristen 30(b)(6) on Organizational | 7/12/2006 | Washington Mutual | San Francisco, CA |
| Baxter, Nicholas 30(b)(6) on Organizational | 7/14/2006 | First National Bank of Omaha | Omaha, NE |
| Tabaczynski, Jeanine 30(b)(6) on Organizational | 7/18/2006 | Wachovia | Atlanta, GA |
| Madairy, David 30(b)(6) on Organizational | 7/19/2006 | Bank of America NA | New York, NY |
| Estabrook, Bard 30(b)(6) on Organizational | 7/20/2006 | Chase (Debit, issuing) | Columbus, OH |
| Wright, Michael 30(b)(6) on Organizational | 7/20/2006 | Bank of America NA | New York, NY |
| Counsellor, Melissa 30(b)(6) on Organizational | 7/21/2006 | Barclays | New York, NY |
| Potter, Catherine Owens 30(b)(6) on Organizational | 7/24/2006 | Texas Independent Bancshares | Galveston, TX |
| Goeden, David 30(b)(6) on Organizational | 7/25/2006 | HSBC | New York, NY |
| Rhein, Kevin 30(b)(6) on Organizational | 7/25/2006 | Wells Fargo | Minneapolis, MN |
| Likerman, Karyn 30(b)(6) on Organizational | 7/26/2006 | Citicorp Credit Services | New York, NY |
| Smith, Kathryn Jo 30(b)(6) on Organizational | 7/26/2006 | Chase Bank USA | Dallas, TX |
| Howe, Gaylon 30(b)(6) on Organizational | 7/27/2006 | Visa International | San Francisco, CA |
| Bostwick, William 30(b)(6) on Organizational | 7/28/2006 | National City | Kalamazoo, MI |
| Brashears, Kerry 30(b)(6) on Organizational | 7/31/2006 | SunTrust | Atlanta, GA |
| Banaugh, Michelle 30(b)(6) on Organizational | 8/4/2006 | Wells Fargo | San Francisco, CA |
| Pyke, Jacqueline 30(b)(6) on Organizational | 8/11/2006 | Capital One | Falls Church, VA |
| Dinehart, Shelley 30(b)(6) on Organizational | 10/17/2006 | Chase | Wilmington, DE |
| Bell, Chris 30(b)(6) on Organizational | 11/1/2006 | Fifth Third | Cincinnati, OH |

# A1401

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Doyle, Charles 30(b)(6) on Visa BOD | 11/29/2006 | Texas Independent Bancshares | Texas City, TX |
| Hsu, Peter 30(b)(6) on June 2003 interchange rate change | 6/14/2007 | Visa USA | San Francisco, CA |
| Haarma, Hannu | 8/2/2007 | Visa USA | San Francisco, CA |
| Towne, Robert 30(b)(6) on June 2003 interchange rate change | 8/30/2007 | Visa USA | Washington, DC |
| Lauritzen, Bruce | 9/14/2007 | First National Bank of Omaha | Omaha, NE |
| Jonas, Steven 30(b)(6) on June 2003 interchange rate change | 9/18/2007 | MasterCard | New York, NY |
| Kapteina, Elizabeth | 10/11/2007 | MasterCard International | New York, NY |
| Hawkins, Jay | 11/15/2007 | Visa USA | San Francisco, CA |
| Miller, Stephanie | 11/28/2007 | Chase | Columbus, OH |
| Batchelder, Elizabeth | 11/30/2007 | Bank of America NA | Charlotte, NC |
| Cullinane, Cathy | 12/4/2007 | Visa USA | San Francisco, CA |
| Williams, Elizabeth | 12/4/2007 | Visa USA | San Francisco, CA |
| Gelb, Valerie | 12/6/2007 | MasterCard International | New York, NY |
| Leoni, Giovanni | 12/14/2007 | Visa USA | San Francisco, CA |
| Bhamani, Riaz | 12/17/2007 | Bank of America NA | Charlotte, NC |
| Middleton, Dan | 12/20/2007 | Wells Fargo | San Francisco, CA |
| Quinlan, Greg | 12/20/2007 | Citigroup | Chicago, IL |
| Gore, Fred | 1/8/2008 | MasterCard International | Boston, MA |
| Kelleher, John | 1/8/2008 | Visa International (former), Washington Mutual (present) | San Francisco, CA |
| Fam, Hany | 1/9/2008 | MasterCard International | New York, NY |
| Marshak, Robert | 1/9/2008 | Visa USA | San Francisco, CA |
| Offenberg, Alex | 1/9/2008 | Visa USA | San Francisco, CA |
| Beck, Gary | 1/11/2008 | Visa USA | Denver, CO |
| Demanett, David | 1/11/2008 | Wells Fargo | Minneapolis, MN |
| Rossi, Debra | 1/15/2008 | Wells Fargo | San Francisco, CA |
| Morais, Diane | 1/16/2008 | Bank of America NA | Charlotte, NC |
| Eulie, Steven | 1/17/2008 | First National Bank of Omaha | Omaha, NE |
| Madairy, David | 1/17/2008 | Bank of America NA | Charlotte, NC |
| Moss, Kevin | 1/17/2008 | Wells Fargo | San Francisco, CA |
| Gauer, Matt | 1/18/2008 | First National Bank of Omaha | Omaha, NE |
| Thom, Christopher | 1/18/2008 | MasterCard International | New York, NY |
| Cramer, David | 1/22/2008 | Visa USA (former) | Cincinnati, OH |
| D'Agostino, Vincent | 1/24/2008 | Chase | New York, NY |
| Aafedt, John | 1/29/2008 | Visa USA | San Francisco, CA |
| Hunt, Donna | 1/30/2008 | Visa International | San Francisco, CA |
| Morrissey, Richard | 1/30-31/2008 | Visa USA | San Francisco, CA |

# A1402

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Robinson, Chris | 1/30/2008 | Citicorp Credit Services | New York, NY |
| Fisher, Katherine | 1/31/2008 | Bank of America NA | Charlotte, NC |
| Leoni, Giovanni | 1/31/2008 | Visa USA | San Francisco, CA |
| DeVinney, Ericka | 2/5/2008 | Barclays | New York, NY |
| Best, Wayne | 2/6/2008 | Visa USA | San Francisco, CA |
| Forsey, Gareth | 2/8/2008 | MasterCard | New York, NY |
| Zuercher, Peter | 2/8/2008 | Visa USA | San Francisco, CA |
| Duffy, Michael | 2/11/2008 | Chase (Paymentech) | Dallas, TX |
| Lamba, Lakhbir | 2/19/2008 | National City | Cleveland, OH |
| Campbell, Radie Dickey | 2/20/2008 | Texas Independent Bancshares | Texas City, TX |
| DePhillipis, Ed | 2/20/2008 | MasterCard International | New York, NY |
| Huber, Marsha | 2/20/2008 | Chase (Chase debit) | Columbus, OH |
| Hughes, Kevin | 2/20/2008 | Citibank | New York, NY |
| Daly, Michael | 2/22/2008 | Bank of America NA | Wilmington, DE |
| Reid, Margaret | 2/22/2008 | Visa International | San Francisco, CA |
| Campbell, William | 2/26/2008 | Chase | New York, NY |
| Miller, Larry | 2/26/2008 | MasterCard International | New York, NY |
| Swales, Roger | 2/27/2008 | Visa International | San Francisco, CA |
| Kaiser, Caryn | 2/28/2008 | Chase (JP Morgan Corp) | Wilmington, DE |
| Landheer, Jamie | 2/28/2008 | Fifth Third | Cincinnati, OH |
| Murphy, Timothy 30(b)(6) on IPO | 2/28-29/2008 | MasterCard International | New York, NY |
| Robinson, Benjamin | 3/3/2008 | Bank of America NA | Charlotte, NC |
| Garofalo, Edward | 3/5/2008 | Citibank | New York, NY |
| Drury, Larry | 3/7/2008 | Visa International | San Francisco, CA |
| Pukas, Julie | 3/7/2008 | Citigroup | New York, NY |
| Abrams, Steve | 3/13/2008 | MasterCard | New York, NY |
| Lee, Bill | 3/13/2008 | Visa International | San Francisco, CA |
| Ehrlich, Susan | 3/14/2008 | Washington Mutual | Chicago, IL |
| Mattea, Karen | 3/18/2008 | Citigroup | Chicago, IL |
| Sommer, Kenneth | 3/20/2008 | Visa International | San Francisco, CA |
| Cullen, Lorinda | 3/25/2008 | Chase | New York, NY |
| Lampasona, Peter | 3/25/2008 | MasterCard | New York, NY |
| Pyke, Mark | 3/25/2008 | Bank of America NA | New York, NY |
| Rossi, Debra | 3/25/2008 | Wells Fargo | San Francisco, CA |
| Vaglio, Steven | 3/28/2008 | Bank of America NA | Charlotte, NC |
| Gustafson, Pete | 4/1/2008 | Visa USA (former) | San Francisco, CA |
| Fox, Eric | 4/2/2008 | Capital One | Richmond, VA |
| Steele, Tolan | 4/2-3/2008 | Visa USA | San Francisco, CA |
| Kresge, David | 4/3/2008 | Bank of America NA | Tampa, FL |
| League, Steven | 4/4/2008 | Bank of America NA | Wilmington, DE |
| Perry, Linda | 4/8/2008 | Visa USA | San Francisco, CA |
| Raymond, Douglas | 4/8/2008 | Mastercard | New York, NY |

# A1403

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Buse, Elizabeth individual and 30(b)(6) on Premium Cards | 4/10-11/2008 | Visa USA | San Francisco, CA |
| Fischer, Raymond | 4/10/2008 | Chase | Wilmington, DE |
| Doyle, Deborah individual and 30(b)(6) on Merchant Rules | 4/21-22/2008 | MasterCard | New York, NY |
| Jonas, Steven 30(b)(6) on Interchange Methodology | 4/23-24/2008 | MasterCard | New York, NY |
| Gallo, Paul | 4/24/2008 | Visa USA | Chicago, IL |
| Goldman, Ira | 4/24-25/2008 | Chase | New York, NY |
| Sabiston, Diana | 4/24/2008 | Citigroup | Jacksonville, FL |
| Morrison, Douglas | 4/30/2008 | Citigroup | Chicago, IL |
| Siraj, Mohamed | 4/30/2008 | SunTrust | Atlanta, GA |
| Baum, Elaine | 5/1/2008 | Visa USA | San Francisco, CA |
| Healy, Tim | 5/7/2008 | Wells Fargo | San Francisco, CA |
| Clay, Charmaine | 5/8/2008 | Wells Fargo | San Francisco, CA |
| Lehman, Luba | 5/8/2008 | Visa USA | San Francisco, CA |
| Banaugh, Michelle | 5/9/2008 | Wells Fargo | San Francisco, CA |
| Johnson, William | 5/14/2008 | Citicorp Credit Services | Atlanta, GA |
| Portelli, Jeffery | 5/14/2008 | MasterCard | New York, NY |
| Rethorn, Mike | 5/15/2008 | Mastercard | New York, NY |
| Knitzer, Peter | 5/21/2008 | Citicorp Credit Services | New York, NY |
| Sachs, Jeff | 5/21/2008 | Visa USA | San Francisco, CA |
| Christian, Frank Phillip | 5/22/2008 | Chase | Wilmington, DE |
| Baxter, Nicholas | 5/29/2008 | First National Bank of Omaha | Omaha, NE |
| Lyons, Richard | 5/29/2008 | Mastercard | New York, NY |
| Kadletz, Edward Michael | 5/30/2008 | Wells Fargo | Minneapolis, MN |
| Poorman Tschantz, Martha | 6/11/2008 | Bank of America NA | Wilmington, DE |
| Yankovich, Margaret | 6/13/2008 | HSBC | New York, NY |
| Sheedy, William 30(b)(6) on Interchange Methodology | 6/17-18/2008 | Visa USA | New York, NY |
| Birnbaum, Robert | 6/18/2008 | Chase | Wilmington, DE |
| Martinez, Adrian | 6/23/2008 | HSBC | New York, NY |
| James, Michael | 6/25/2008 | Wells Fargo | San Francisco, CA |
| Srednicki, Richard | 6/25/2008 | Chase | Wilmington, DE |
| Grathwohl, Sue | 6/26/2008 | Fifth Third | Cincinnati, OH |
| Poturalski, Joseph | 6/26/2008 | Visa USA | Denver, CO |
| Barth, Eric | 6/27/2008 | Bank of America NA | Louisville, KY |
| Beidler, Melissa | 6/27/2008 | Visa USA | San Francisco, CA |
| Mangan, Kara | 6/27/2008 | Fifth Third | Cincinnati, OH |
| Bruesewitz, Jean | 7/2/2008 | Visa USA | San Francisco, CA |
| Charron, Dan | 7/2/2008 | Chase | Dallas, TX |
| Friedman, Theodore | 7/2/2008 | MasterCard | New York, NY |
| Attinger, Tim | 7/8/2008 | Visa USA | San Francisco, CA |
| Jorgensen, Chris | 7/9/2008 | Visa USA | San Francisco, CA |

# A1404

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Munto, Tim | 7/15/2008 | Bank of America NA | Louisville, KY |
| Stewart, James | 7/16/2008 | Barclays | Wilmington, DE |
| McWilton, Chris | 7/17/2008 | MasterCard | New York, NY |
| Donnelly, Kathleen | 7/22/2008 | Citigroup | Hagerstown, MD |
| Peppas, Jamie | 7/23/2008 | HSBC | New York, NY |
| Schultz, Kevin | 7/24/2008 | Visa USA | Milwaukee, WI |
| Olebe, Edward 30(b)(6) on Premium Cards | 7/25/2008 | MasterCard | New York, NY |
| Vague, Richard | 7/25/2008 | Barclays | Philadelphia, PA |
| Malone, Wayne | 7/28/2008 | Citigroup | New York, NY |
| Groch, Jon | 7/29/2008 | Fifth Third | Cincinnati, OH |
| McElhinney, Bruce | 7/29/2008 | Visa USA | San Francisco, CA |
| Hambry, Doug | 7/30/2008 | Visa USA | San Francisco, CA |
| Marshall, Ruth Ann | 7/30/2008 | MasterCard | Santa Fe, NM |
| Fellman, Herbert | 7/31/2008 | Bank of America NA | Charlotte, NC |
| Ruwe, Steve | 8/5/2008 | Visa USA (former) | Chicago, IL |
| Kranzley, Art | 8/6/2008 | MasterCard | New York, NY |
| Murdock, Wendy | 8/7/2008 | MasterCard | New York, NY |
| Kilga, Ken | 8/8/2008 | HSBC | New York, NY |
| DiSimone, Harry | 8/14/2008 | Chase | New York, NY |
| Phillips, G. Patrick | 8/14/2008 | Bank of America NA | Charlotte, NC |
| Van Ryn, Carolyn | 8/14/2008 | MasterCard | New York, NY |
| Gardner, John | 8/15/2008 | Visa USA | Denver, CO |
| Hackett, Gail | 8/15/2008 | MasterCard | New York, NY |
| Pinkerd, Stacey individual and 30(b)(6) on Convergence Strategy | 8/19-20/2008 | Visa USA | San Francisco, CA |
| Taglione, Richard | 8/20/2008 | Chase | Wilmington, DE |
| Halle, Bruce | 8/27/2008 | Citigroup | New York, NY |
| Baker, David | 9/4/2008 | Fifth Third | Cincinnati, OH |
| Partridge, John 30(b)(6) on Reorganization | 9/4-5/2008 | Visa USA | San Francisco, CA |
| Towne, Robert | 9/4-5/2008 | Visa USA | Washington, DC |
| Peirez, Joshua | 9/5/2008 | MasterCard | New York, NY |
| Lorberg, Dana | 9/10/2008 | MasterCard | New York, NY |
| Weichert, Margaret | 9/10/2008 | Bank of America NA | Charlotte, NC |
| DiSimone, Harry | 9/11/2008 | Chase | New York, NY |
| Knupp, Billy | 9/11/2008 | Visa USA | San Francisco, CA |
| Massingale, Faith | 9/16/2008 | Citi (former) | New York, NY |
| Munson, Carl | 9/17/2008 | MasterCard | New York, NY |
| Nadeau, Robert 30(b)(6) on Merchant Rules | 9/17/2008 | Chase | Dallas, TX |
| Weaver, Lance | 9/17/2008 | Bank of America NA | Wilmington, DE |
| Hammonds, Bruce | 9/22/2008 | Bank of America NA | Wilmington, DE |
| Mehta, Siddharth | 10/1/2008 | HSBC (former) | Chicago, IL |

# A1405

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Wechsler, Robert | 10/1/2008 | Chase | Dallas, TX |
| Flood, Gary | 10/2/2008 | MasterCard | New York, NY |
| Rhein, Kevin | 10/2/2008 | Wells Fargo | Minneapolis, MN |
| Saunders, Joseph | 10/2/2008 | Visa USA | San Francisco, CA |
| Hinderaker, James | 10/7/2008 | Bank of America NA | Charlotte, NC |
| Moran, Patrick | 10/7/2008 | Fifth Third | Cincinnati, OH |
| Naffah, Albert 30(b)(6) on Australia Related Topics | 10/7/2008 | MasterCard | New York, NY |
| Steel, Tim | 10/8/2008 | Visa Europe | London, England |
| Boeding, Donald | 10/9/2008 | Fifth Third | Cincinnati, OH |
| Stumpf, John | 10/9/2008 | Wells Fargo | San Francisco, CA |
| Davila, Kelly Ann 30(b)(6) on Merchant Rules | 10/15/2008 | Bank of America NA | Charlotte, NC |
| Heuer, Alan | 10/16/2008 | MasterCard | New York, NY |
| Macnee, Walter | 10/17/2008 | MasterCard | New York, NY |
| Humphrey, Thomas 30(b)(6) on Merchant Rules | 10/21/2008 | Fifth Third | Cincinnati, OH |
| Rajamannar, M.V. | 10/21/2008 | Citigroup | New York, NY |
| Reilly, Patricia | 10/21/2008 | Chase | New York, NY |
| Dahir, Victor | 10/22/2008 | Visa USA | San Francisco, CA |
| Goosse, Etienne 30(b)(6) on Europe and UK | 10/21-22/2008 | MasterCard | New York, NY |
| Rogers, Dan | 10/24/2008 | Wells Fargo (former), Presently at Fifth Third Bank | San Francisco, CA |
| Webb, Susan | 10/27/2008 | Chase | New York, NY |
| Wright, Michael | 10/29/2008 | Bank of America NA | Wilmington, DE |
| Holman, Jerrilyn | 10/30/2008 | SunTrust | Atlanta, GA |
| Bergman, Ginger | 11/4/2008 | Visa USA | San Francisco, CA |
| Kranzley, Art 30(b)(6) on Technology Issues | 11/4/2008 | MasterCard | New York, NY |
| Lorberg, Dana 30(b)(6) on Technology Issues | 11/4/2008 | MasterCard | New York, NY |
| McGee, Liam | 11/5/2008 | Bank of America NA | Charlotte, NC |
| Scharf, Charles | 11/5/2008 | Chase | New York, NY |
| Steele, Tolan 30(b)(6) on European/UK Topics and Australia | 11/5-6/2008 | Visa USA | San Francisco, CA |
| Atal, Vikram | 11/6/2008 | CitiGroup | New York, NY |
| Hanft, Noah | 11/7/2008 | MasterCard | New York, NY |
| Jenkins, Ben | 11/7/2008 | Wachovia | Charlotte, NC |
| Dimon, Jamie | 11/13/2008 | Chase | New York, NY |
| Boehm, Steve | 11/17/2008 | Wachovia | Charlotte, NC |
| Selander, Robert | 11/17/2008 | MasterCard | Purchase, NY |
| Alexander, Lou Anne | 11/19/2008 | Wachovia | Charlotte, NC |
| Freiberg, Steve | 11/20/2008 | CitiGroup | New York, NY |

# A1406

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Sheedy, William | 11/20-21/2008 | Visa USA | Washington, DC |
| Stein, Alejandro | 11/21/2008 | Chase | New York, NY |
| Floum, Joshua | 12/2/2008 | Visa USA | San Francisco, CA |
| Flanagan, Veronica  30(b)(6) on Merchant Rules | 12/4/2008 | Wells Fargo | New York, NY |
| Grathwohl, Sue | 12/8/2008 | Fifth Third | Cincinnati, OH |
| Mangan, Kara | 12/8/2008 | Fifth Third | Cincinnati, OH |
| Gracia, Anthony 30(b)(6) on Merchant Relations | 12/9/2008 | MasterCard | New York, NY |
| Sharkey, Thomas 30(b)(6) on Merchant Relations | 12/9/2008 | MasterCard | New York, NY |
| Doyle, Charles | 12/12/2008 | Texas Independent Bancshares | Texas City, TX |
| Portelli, Jeffery 30(b)(6) on Premium Cards | 12/12/2008 | MasterCard | New York, NY |
| Allen, Paul | 12/16/2008 | Visa USA | San Francisco, CA |
| Coghlan, John | 12/16/2008 | Visa USA | San Francisco, CA |
| Attinger, Tim 30(b)(6) on Technology | 12/17/2008 | Visa USA | San Francisco, CA |
| Gonella, Michael 30(b)(6) on Technology | 12/17/2008 | Visa USA | San Francisco, CA |
| Gregory, Robert individual and 30(b)(6) on Card Business | 12/17-18/2008 | Capital One | Richmond, VA |
| Pascarella, Carl | 12/17-18/2008 | Visa USA | San Francisco, CA |
| Somerville, Una 30(b)(6) on Merchant Rules | 12/19/2008 | Visa USA | San Francisco, CA |
| Walker, Richard 30(b)(6) on Card Business | 12/19/2008 | Capital One | Richmond, VA |
| Selander, Robert | 1/26/2009 | MasterCard | Purchase, NY |
| Fulton, Henry | 2/12/2009 | Bank of America NA | Charlotte, NC |
| Fairbank, Richard | 4/7/2009 | Capital One | McLean, VA |
| Somerville, Una 30(b)(6) on Merchant Rules | 4/7/2009 | Visa USA | San Francisco, CA |

# A1407

EXHIBIT 4 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF CLASS PLAINTIFFS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Feeney, James 30(b)(6) on Organizational Structure | 8/10/2006 | Payless | Topeka, KS |
| Schumann, Michael | 11/15/2007 | Traditions | Minneapolis, MN |
| Schermerhorn, David | 12/4/2007 | NCGA | Minneapolis, MN |
| Agan, Colleen | 1/8/2008 | NCPA | Washington, DC |
| Ivancikova, Daniela | 1/8/2008 | Parkway (former) | Bala Cynwyd, PA |
| D'Agostino, Nicholas | 1/10/2008 | D'Agostino | New York, NY |
| Archer, Vincent | 1/17/2008 | Leon's | Los Angeles, CA |
| Emmert, Brian | 1/17/2008 | Jetro | New York, NY |
| Buckley, Neil | 1/18/2008 | D'Agostino | New York, NY |
| Schumacher, Jerome | 1/24/2008 | Coborns | Minneapolis, MN |
| Smith, Gary (Chuck) | 1/24/2008 | NCPA | Washington, DC |
| Vasco, Nunzi | 1/31/2008 | Capital Audio | New York, NY |
| Menard, Steve | 2/5/2008 | CHS | Minneapolis, MN |
| McPadden, Denise | 2/8/2008 | D'Agostino | New York, NY |
| Thueringer, Robert | 2/12/2008 | Coborns | Minneapolis, MN |
| Hall, Terry | 2/20/2008 | NCPA | Washington, DC |
| Gule, Roberta Avoletta | 2/21/2008 | Crystal Rock | Waterbury, CT |
| Smith, Kelly | 2/25/2008 | NCGA | Iowa City, IA |
| Hardman, John | 2/26/2008 | CHS | Minneapolis, MN |
| Schumann, Suzanne | 2/26/2008 | Traditions | Naples, FL |
| Shrader, Robynn | 2/26/2008 | NCGA | Iowa City, IA |
| Opper, Norman | 2/27/2008 | Discount Optics | Boca Raton, FL |
| Wolfe, Stephen | 2/28/2008 | NCGA | Madison, WI |
| Platkin, Susan | 3/13/2008 | Capital Audio | New York, NY |
| Ierubino, Paul | 3/20/2008 | Parkway | Bala Cynwyd, PA |
| Fiereck, Linda | 3/27/2008 | Coborns | Minneapolis, MN |
| Jurasek, David | 3/27/2008 | Crystal Rock | Waterbury, CT |
| Hayes, Pamela | 4/4/2008 | NATSO | Alexandria, VA |
| Berman, Carl | 4/10/2008 | Photos, Inc. | Los Angeles, CA |
| Severson, Duane | 4/10/2008 | Affiliated Foods | Omaha, NE |
| Beckwith, Lyle | 4/15/2008 | NACS | Washington, DC |
| Zlotnikoff, Stuart | 4/16/2008 | NGA | Washington, DC |
| Doughty, Peggy | 4/24/2008 | CHS (former) | Minneapolis, MN |
| Engelhaupt, David | 4/24/2008 | Affiliated Foods | Omaha, NE |
| Zuritzky, Robert | 4/30/2008 | Parkway | Bala Cynwyd, PA |
| Tucker, David | 5/2/2008 | NACS (Former) | Washington, DC |
| Hamilton, Kathy | 5/6/2008 | CHS | Minneapolis, MN |
| Wenning, Thomas | 5/23/2008 | NGA | Washington, DC |
| Lieberman, Erik | 6/4/2008 | NGA | Washington, DC |
| Sprague, Kristie | 6/10/2008 | CHS | Minneapolis, MN |
| Ching, Vic | 6/17/2008 | Affiliated Foods | Minneapolis, MN |
| DiPasquale, Frank | 6/18/2008 | NGA | Washington, DC |
| Taylor, Gray | 6/26/2008 | NACS | Addison, TX |
| Ihry, Reed | 7/1/2008 | CHS | Minneapolis, MN |
| Lindberg, Michael | 7/2/2008 | CHS | Minneapolis, MN |

# A1408

EXHIBIT 4 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF CLASS PLAINTIFFS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Diehl, Carmen | 7/8/2008 | Affiliated Foods | Rapid City, SD |
| Shuman, Robert | 7/8/2008 | NATSO | Alexandria, VA |
| Kirschner, Richard | 7/17/2008 | Jetro | New York, NY |
| Zentner, Arlen | 7/23-24/2008 | Payless | Topeka, KS |
| Richman, Teri | 7/29/2008 | NACS | Washington, DC |
| Cooke, Brent | 7/31/2008 | Payless | Topeka, KS |
| Goldstone, Mitch | 8/6/2008 | Photos, Inc. | Los Angeles, CA |
| Riehle, Hudson | 8/6/2008 | NRA | Washington, DC |
| Leibman, Mark 30(b)(6) on Organizational structure, services, payment systems, studies & investigations | 8/7/2008 | NRA | Washington, DC |
| Mullings, Lisa | 8/13/2008 | NATSO | Alexandria, VA |
| Olson, Donald | 8/14/2008 | CHS | Minneapolis, MN |
| Chung, Anderson | 8/15/2008 | D'Agostino | New York, NY |
| Miller, James | 8/22/2008 | Affiliated Foods | Omaha, NE |
| Opper, Deborah | 8/27/2008 | Discount Optics | Boca Raton, FL |
| Culver, Paul individual and 30(b)(6) on Marketer/Merchant Agreements Rule | 8/28-29/2008 | CHS | Minneapolis, MN |
| Coborn, Chris | 9/4/2008 | Coborns | Minneapolis, MN |
| Munkittrick, Ron | 9/9/2008 | D'Agostino | New York, NY |
| Zaucha, Thomas | 9/19/2008 | NGA | Washington, DC |
| D'Agostino, Nicholas | 9/25/2008 | D'Agostino | New York, NY |
| Sinclair, Scott 30(b)(6) on Country Operations | 10/10/2008 | CHS | Minneapolis, MN |
| Cummings, Richard | 10/15/2008 | CHS | Minneapolis, MN |
| Armour, Henry | 10/22/2008 | NACS | Washington, DC |
| Culver, Paul 30(b)(6) on Proprietary Cards | 10/29/2008 | CHS | Minneapolis, MN |
| Harari, Abraham | 10/30/2008 | Capital Audio | New York, NY |
| Pearson, Harold | 10/30/2008 | Payless | Topeka, KS |
| D'Agostino, Nicholas 30(b)(6) on Payment Practices and Recordkeeping | 11/5/2008 | D'Agostino | New York, NY |
| Bendle, Bradley (Woody) | 11/14/2008 | Payless | Topeka, KS |
| Schumann, Michael 30(b)(6) on Cost of Payment Systems | 12/4/2008 | Traditions | Naples, FL |

# A1409

EXHIBIT 5 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF INDIVIDUAL PLAINTIFFS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Browning, Carol | 12/13/2007 | Bi-Lo | Greenville, SC |
| Minasi, Michael | 12/19/2007 | Safeway | San Francisco, CA |
| Mueller, Ken | 1/8/2008 | Raley's | Sacramento, CA |
| Transtrum, Denise | 1/10/2008 | Raley's | Sacramento, CA |
| Coward, Christopher | 1/23/2008 | Publix | Lakeland, FL |
| Rachowicz, Earl | 1/23/2008 | Ahold | Chicago, IL |
| Topor, Kathy | 1/30/2008 | Rite Aid | Providence, RI |
| Grace, Denise | 2/8/2008 | Publix | Lakeland, FL |
| Oliver, Marty | 2/19/2008 | Publix | Lakeland, FL |
| Aront, Aaron | 2/22/2008 | Wakefern | Keasbey, NJ |
| Goodwin, Dwayne | 2/28/2008 | Bi-Lo | Greenville, SC |
| Spitz, Carol | 2/28/2008 | Walgreen's | Chicago, IL |
| Fox, Bradley | 3/5/2008 | Safeway | San Francisco, CA |
| Cardinale, Gerald | 3/7/2008 | Rite Aid | Harrisburg, PA |
| Gilliam, Kim | 3/11/2008 | Delhaize | Salisbury, NC |
| Reeve, Kevin | 3/18/2008 | Hy-Vee | Des Moines, IA |
| Vowles, Stephen | 3/28/2008 | Ahold | Boston, MA |
| Hohenstein, Kathleen | 4/1/2008 | Delhaize | Salisbury, NC |
| Hooper, David | 4/9/2008 | Ahold | Harrisburg, PA |
| Woodbridge, David | 4/16/2008 | Walgreen's | Deerfield, IL |
| Pastre, Toni | 4/18/2008 | Pathmark (former) | Montvale, NJ |
| Skokan, Michael | 4/23/2008 | Hy-Vee | Des Moines, IA |
| Kearns, Scott | 4/29/2008 | Wakefern | Keasbey, NJ |
| Sadler, Anthony | 4/29/2008 | Rite Aid | Harrisburg, PA |
| Ross, Jay | 5/1/2008 | Rite Aid | Harrisburg, PA |
| McCauley, Tim | 5/6/2008 | Walgreen's | Deerfield, IL |
| Olson, Janet | 5/7/2008 | Walgreen's | Deerfield, IL |
| Carter, Michael | 5/14/2008 | Publix | Lakeland, FL |
| Cox, Laura | 5/14/2008 | Albertsons | Boise, ID |
| Cronin, Stephen | 5/21/2008 | Wakefern | Elizabeth, NJ |
| Briggs, John | 5/28/2008 | Hy-Vee | Des Moines, IA |
| McArthur, Scott | 5/30/2008 | Walgreen's | Deerfield, IL |
| Croteau, Bryan | 6/3/2008 | Delhaize | Portland, ME |
| Steffler, Marcia | 6/3-4/2008 | Meijer | Grand Rapids, MI |
| Allard, Cherie | 6/5/2008 | Meijer | Grand Rapids, MI |
| Trachsler, Sharon | 6/5/2008 | Pathmark | Roseland, NJ |
| Kleiner, Richard | 6/6/2008 | Ahold | Boston, MA |
| Mielke, Chris | 6/13/2008 | Albertsons | Minneapolis, MN |
| Tabak, Natan | 6/17/2008 | Wakefern | Keasbey, NJ |
| Williams, Cheryl | 6/18/2008 | Wakefern | Keasbey, NJ |
| Learish, John | 6/20/2008 | Rite Aid | Harrisburg, PA |
| Younger, Kim | 6/24/2008 | Raley's | Sacramento, CA |
| Ciancio, David | 6/26/2008 | Kroger | Cincinnati, OH |
| Schroeder, Matthew | 6/27/2008 | Rite Aid | Harrisburg, PA |
| Bullock, Karen | 7/1/2008 | QVC | West Chester, PA |
| Koci, Michele | 7/2/2008 | Albertsons | Boise, ID |

# A1410

EXHIBIT 5 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF INDIVIDUAL PLAINTIFFS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Mills, Kay | 7/15/2008 | Bi-Lo | Greenville, SC |
| Stokely, Dennis individual and 30(b)(6) on Payment Systems | 7/15-17/2008 | Safeway | San Francisco, CA |
| Estep, Sandra | 7/17-18/2008 | Publix | Lakeland, FL |
| Fletcher, Patti individual and 30(b)(6) on Payment Systems | 7/24-25/2008 | Delhaize | Salisbury, NC |
| Ross, Michael | 7/25/2008 | Meijer | Grand Rapids, MI |
| DeVries, Susan | 7/29-30/2008 | Walgreen's | Chicago, IL |
| Koudsi, Samia | 8/5/2008 | Supervalu | Bloomington, MN |
| Carlin, Michael | 8/20/2008 | QVC | West Chester, PA |
| Kelly, Kathleen | 8/21/2008 | Kroger | Cincinnati, OH |
| Webb, Daniel | 8/22/2008 | Meijer | Grand Rapids, MI |
| Marques, John | 8/25-26/2008 | Pathmark (former) | Roseland, NJ |
| Hanna, Kathy | 9/3/2008 | Kroger | Cincinnati, OH |
| Hanna, Kathy | 9/4/2008 | Kroger | Cincinnati, OH |
| Tabak, Natan | 9/9-10/2008 | Wakefern | West Chester, PA |
| Snyder, Jacki | 9/16-17/2008 | Supervalu | Minneapolis, MN |
| Williams, Alan | 9/16/2008 | Ahold | Boston, MA |
| Gregoire, Neal | 9/18/2008 | Delhaize | Portland, ME |
| Ebel, Leonard individual and 30(b)(6) on Payment card acceptance and programs | 9/22-23/2008 | Rite Aid | Harrisburg, PA |
| Coglianese, Marleen | 9/24/2008 | Walgreen's | Chicago, IL |
| Collier, Robert individual and 30(b)(6) on Payment Cards | 10/1-2/2008 | Wakefern | Keasbey, NJ |
| Hally, Tom | 10/9/2008 | Wakefern | Keasbey, NJ |
| Rose, Douglas | 10/14/2008 | QVC | West Chester, PA |
| Morton, Gary | 10/15/2008 | Albertsons | Boise, ID |
| Boyd, John | 10/16/2008 | Albertsons | Boise, ID |
| Morton, Gary | 10/17/2008 | Albertsons | Boise, ID |
| Kaercher, Carl | 10/22/2008 | Supervalu | Minneapolis, MN |
| Wyrofsky, Randy | 10/22/2008 | Eckerd | Providence, RI |
| Gargano, Kathy | 10/23/2008 | Supervalu | Minneapolis, MN |
| Sloan, Richard | 10/28/2008 | Eckerd | Clearwater, FL |
| Carney, Brian | 10/30/2008 | Bi-Lo | Greenville, SC |
| Henderson, Scott | 10/30/2008 | Kroger | Cincinnati, OH |
| Methvin, Steven | 11/3/2008 | Bi-Lo | Hartford, CT |
| Rae, Rick | 11/6-7/2008 | Raley's | Pleasanton, CA |
| Roche, Talbott | 11/6/2008 | Safeway | San Francisco, CA |
| Bonney, Susan | 11/7/2008 | QVC | West Chester, PA |
| Zabroske, Paul | 11/7/2008 | Rite Aid | Harrisburg, PA |
| Jones, Kenneth individual and 30(b)(6) on Payment Systems | 11/11-12/2008 | Bi-Lo | Greenville, SC |
| James, Richard | 11/12/2008 | Delhaize | Salisbury, NC |
| Haaf, Michael | 11/13/2008 | Delhaize | Salisbury, NC |

# A1411

EXHIBIT 5 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF INDIVIDUAL PLAINTIFFS

| Deponent | Date | Company | Location |
|---|---|---|---|
| Tabak, Natan 30(b)(6) on Member Specific Payment Form Acceptance & Programs | 11/17/2008 | Wakefern | Keasbey, NJ |
| Elworthy, Maureen individual and 30(b)(6) on Payment Systems | 11/20-21/2008 | Ahold | Boston, MA |
| Fruchterman, Howard | 12/11/2008 | Wakefern | Keasbey, NJ |
| Tabak, Natan 30(b)(6) on Member-Specific Payment Form Acceptance & Programs | 12/11/2008 | Wakefern | Keasbey, NJ |

# A1412

EXHIBIT 6 to the Declaration of K. Craig Wildfang, Esq.

## DOCUMENT PRODUCTION BY THIRD PARTY

| THIRD PARTY | DOCUMENTS | PAGES | NOTICING PARTY |
|---|---|---|---|
| Accenture | 443 | 5,760 | Class |
| Affinity Solutions | 6 | 758 | Defendants |
| American Express | 205,066 | 3,020,493 | All parties |
| Argus Information & Advisory Services | 2,317 | 54,964 | Class |
| Auriemma Consulting | 50 | 4,886 | All parties |
| Barnes and Noble | 573 | 5,282 | Defendants |
| Bayshore Consulting | 7,421 | 206,367 | Class |
| Better Buy Design | 108 | 3,938 | All parties |
| Bill Me Later | 157 | 3,148 | Defendants |
| Boston Consulting Group | 4,404 | 107,442 | Class |
| Card Analytics Consulting | 842 | 45,226 | All parties |
| Center for Marketing Effectiveness | 558 | 1,552 | Individual Plaintiffs |
| DFS Services | 16,513 | 76,002 | Individual Plaintiffs |
| Diamond Management & Technology | 12 | 158 | Defendants |
| Discover Financial | 8 | 845 | Defendants |
| Dove & Associates | 714 | 17,311 | All parties |
| Edgar Dunn / Peter Dunn | 456 | 5,564 | Class |
| Electronic Payments Coalition | 453 | 2,296 | Class |
| First Annapolis Consulting | 14,620 | 127,641 | All parties |
| First Data Corporation | 31 | 17,205 | All parties |
| Food Marketing Institute | 1,766 | 7,004 | Defendants |
| Franchise Payments Network | 2 | 15 | Defendants |
| Lloyds TSB Bank PLC | 3 | 14 | Individual Plaintiffs |
| McKinsey & Company | 2,539 | 90,011 | All parties |
| Merchant e-Solutions Inc. | 458 | 3,910 | Defendants |
| Merchant Payment Coalition | 519 | 4,365 | Defendants |
| MODA Solutions Corp | 11 | 152 | Defendants |
| National Payment Card | 4 | 249 | Defendants |
| NYCE Payments Network | 223 | 5,449 | Defendants |
| Outpost Natural Foods | 631 | 15,646 | Defendants |
| Revolution Money | 170 | 1,860 | Individual Plaintiffs |
| Royal Bank of Canada | 2,740 | 35,682 | Class |
| Royal Bank of Scotland | 25,129 | 212,068 | Class |
| Saks Incorporated | 1,881 | 20,905 | Class |
| Starbucks Corporation | 12 | 114 | Defendants |
| Target Corporation | 1 | 10 | Defendants |
| Tempo Payments | 103 | 1,194 | Defendants |
| The Goldman Sachs Group | 301 | 25,896 | Individual Plaintiffs |
| US Bank | 2,401 | 28,727 | Individual Plaintiffs |
| USAA Federal Savings Bank | 124 | 3,920 | Class |
| Westpac Banking Corporation | 892 | 18,189 | Class |
| Wheatsville Food Co-op | 293 | 1,745 | Defendants |
| Wright Express | 243 | 2,155 | Defendants |
| **TOTAL** | **295,198** | **4,186,118** | |

# A1413

EXHIBIT 7 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF THIRD PARTIES

| Deponent | Date | Company | Location |
|---|---|---|---|
| Dunn, Peter | 4/17-18/2008 | Edgar, Dunn & Co. | New York, NY |
| Campbell, Christopher | 10/17/2008 | Westpac | New York, NY |
| Garabedian, John | 11/6/2008 | Boston Consulting | Chicago, IL |
| Aviles, James | 11/11/2008 | Merchant e-Solutions | San Francisco, CA |
| Honor, Cathy | 12/4/2008 | Royal Bank of Canada | Toronto, ON, CA |
| Pomerleau, Ricky | 12/9/2008 | Wright Express | Portland, ME |
| Randazza, Joseph | 1/7/2009 | National Payment Card LLC | Boca Raton, FL |
| Sourges, James | 1/13/2009 | MODASolutions | New York, NY |
| Grossman, Michael | 1/15/2009 | Tempo Payments | San Francisco, CA |
| Rathgaber, Steven | 2/17/2009 | NYCE Payments Network, LLC | New York, NY |
| Polikoff, Ira | 3/19/2009 | American Express | New York, NY |
| McCurdy, Stephen | 3/24/2009 | American Express | New York, NY |
| Smits, Suzanne | 4/14-15/2009 | DFS Services LLC (Discover) | Chicago, IL |
| Hatcher, Jennifer | 4/17/2009 | Food Marketing Institute | Washington, DC |
| McNeal, Glenda | 4/22/2009 | American Express | New York, NY |

# A1414

EXHIBIT 8 to the Declaration of K. Craig Wildfang, Esq.

**DOCUMENTS PRODUCED TO THE DEPARTMENT OF JUSTICE AND STATE ATTORNEYS GENERAL**

| Category | Item Produced | Date Produced | Produced To |
|---|---|---|---|
| Australia Materials | 2008 RBA Preliminary Conclusions of 2007 08 Review of Payment System | 5/19/2009 | DOJ |
| Australia Materials | 2007 RBA Issues for Review of Payment System Reforms | 5/19/2009 | DOJ |
| Australia Materials | 2008 RBA Conclusions of 2007 08 Review of Payment System Reforms | 5/19/2009 | DOJ |
| EU Materials | 4.06.09 Press Release re Statement of Objections to Visa Europe | 5/19/2009 | DOJ |
| EU Materials | 12.19.07 MasterCard Prohibition Decision | 5/19/2009 | DOJ |
| EU Materials | 4.12.06 Sector Inquiry re Payment Cards | 5/19/2009 | DOJ |
| EU Materials | 7.24.02 Visa Exemption Decision | 5/19/2009 | DOJ |
| EU Materials | 8.9.01 Visa Negative Clearance Decision | 5/19/2009 | DOJ |
| UK Materials | 2.2003 MasterCard OFT Preliminary Conclusions | 5/19/2009 | DOJ |
| UK Materials | 7.19.06 MasterCard CAT Decision | 5/19/2009 | DOJ |
| UK Materials | 9.6.05 MasterCard Companion Paper to OFT Decision | 5/19/2009 | DOJ |
| UK Materials | 9.6.05 MasterCard OFT Decision | 5/19/2009 | DOJ |
| Class Briefs | Letter brief re: order declaring that responding to CID does not waive WP protection | 5/21/2009 | DOJ |
| Plaintiff Expert Submissions | Individual Plaintiff Expert Reports | 7/9/2009 | DOJ |
| Class Briefs | Memos in Support of Class Certification, with Declarations and Exhibits | 7/24/2009 | DOJ |
| Class Briefs | Memos in Opposition to Motions to Dismiss SCACAC, FASC and SSC with Declarations and Exhibits | 7/24/2009 | DOJ |
| Internal Memos | Potential Exhibit Indices for certain defense witness depositions | 7/24/2009 | DOJ |
| Internal Memos | Foreign Proceedings Memos | 7/24/2009 | DOJ |
| Internal Memos | Deposition Summaries | 7/24/2009 | DOJ |
| Internal Memos | Memo re: Permissive Steering | 7/24/2009 | DOJ |
| Internal Memos | Spreadsheet re: hot ASR docs | 7/24/2009 | DOJ |
| Internal Memos | Custodial Doc Review Memos | 7/24/2009 | DOJ |
| Plaintiff Expert Submissions | Bamberger Declarations (initial and reply) | 7/24/2009 | DOJ |
| Plaintiff Expert Submissions | Frankel Report | 7/24/2009 | DOJ |
| Plaintiff Expert Submissions | Fleischer Report | 7/24/2009 | DOJ |
| Plaintiff Expert Submissions | Henry Report | 7/24/2009 | DOJ |
| Plaintiff Expert Submissions | McCormack Report | 7/24/2009 | DOJ |
| Plaintiff Expert Submissions | McFarlane Report | 7/24/2009 | DOJ |
| Pleadings and Written Discovery | Unredacted SCACAC | 7/24/2009 | DOJ |

# A1415

EXHIBIT 8 to the Declaration of K. Craig Wildfang, Esq.

**DOCUMENTS PRODUCED TO THE DEPARTMENT OF JUSTICE AND STATE ATTORNEYS GENERAL**

| Category | Item Produced | Date Produced | Produced To |
|---|---|---|---|
| Pleadings and Written Discovery | Unredacted FASC re: MC IPO | 7/24/2009 | DOJ |
| Pleadings and Written Discovery | Unredacted SSC re: Visa IPO | 7/24/2009 | DOJ |
| Class Briefs | Memos in Opposition to Motions to Dismiss SCACAC, FASC and SSC with Declarations and Exhibits | 8/18/2009 | AGs |
| Internal Memos | Potential Deposition Exhibit Indices | 8/18/2009 | AGs |
| Internal Memos | Foreign Proceedings Memos | 8/18/2009 | AGs |
| Internal Memos | Deposition Summaries | 8/18/2009 | AGs |
| Internal Memos | Spreadsheet re: Permissive Steering | 8/18/2009 | AGs |
| Internal Memos | Spreadsheet re: hot ASR docs | 8/18/2009 | AGs |
| Internal Memos | Custodial Doc Review Memos | 8/18/2009 | AGs |
| Plaintiff Expert Submissions | Bamberger Declarations (initial and reply) | 8/18/2009 | AGs |
| Plaintiff Expert Submissions | Frankel Report | 8/18/2009 | AGs |
| Plaintiff Expert Submissions | Fleischer Report | 8/18/2009 | AGs |
| Plaintiff Expert Submissions | Henry Report | 8/18/2009 | AGs |
| Plaintiff Expert Submissions | McCormack Report | 8/18/2009 | AGs |
| Plaintiff Expert Submissions | McFarlane Report | 8/18/2009 | AGs |
| Pleadings and Written Discovery | Unredacted SCACAC | 8/18/2009 | AGs |
| Pleadings and Written Discovery | Unredacted FASC re: MC IPO | 8/18/2009 | AGs |
| Pleadings and Written Discovery | Unredacted SSC re: Visa IPO | 8/18/2009 | AGs |
| Encore Access | Encore Database Access | 8/28/2009 | AGs |
| Australia Materials | East and Partners Report | 9/2/2009 | DOJ |
| Def's Expert Submissions from AmEx/ Discover Litig. | Oster Report from AmEx/ Discover Litig. | 9/2/2009 | DOJ |
| Def's Expert Submissions from AmEx/ Discover Litig. | Peirce Report from AmEx/ Discover Litig. | 9/2/2009 | DOJ |
| Def's Expert Submissions from AmEx/ Discover Litig. | Postlewaite Report from AmEx/ Discover Litig. | 9/2/2009 | DOJ |
| Def's Expert Submissions from AmEx/ Discover Litig. | Ramesh Report from AmEx/ Discover Litig. | 9/2/2009 | DOJ |
| Def's Expert Submissions from AmEx/ Discover Litig. | Hall Report from AmEx/ Discover Litig. | 9/2/2009 | DOJ |

# A1416

EXHIBIT 8 to the Declaration of K. Craig Wildfang, Esq.

**DOCUMENTS PRODUCED TO THE DEPARTMENT OF JUSTICE AND STATE ATTORNEYS GENERAL**

| Category | Item Produced | Date Produced | Produced To |
|---|---|---|---|
| Def's Expert Submissions from AmEx/ Discover Litig. | Teece Report from AmEx/ Discover Litig. | 9/2/2009 | DOJ |
| Def's Expert Submissions from AmEx/ Discover Litig. | Wecker Report from AmEx/ Discover Litig. | 9/2/2009 | DOJ |
| Internal Memos | Summary of Foreign Investigations | 9/2/2009 | DOJ |
| Internal Memos | Spreadsheet re: Merchant Testimony re: ASR issues | 9/2/2009 | DOJ |
| Plaintiff Expert Submissions | Documents Cited in Frankel Report | 9/2/2009 | DOJ |
| Wal-Mart Expert Reports | Fisher Damages Report | 9/2/2009 | DOJ |
| Wal-Mart Expert Reports | Fisher Liability Report | 9/2/2009 | DOJ |
| Wal-Mart Expert Reports | Fisher Rebuttal Report | 9/2/2009 | DOJ |
| Wal-Mart Expert Reports | Fisher Revised Report | 9/2/2009 | DOJ |
| Wal-Mart Expert Reports | Fisher Supplemental Report | 9/2/2009 | DOJ |
| Deposition Transcripts | Arajs (Visa) from AmEx litigation | 9/4/2009 | DOJ |
| Fact Deposition Transcripts | Lampasona (MC) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Doyle (MC) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Baum (Visa) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Somerville (Visa) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Aafedt (Visa) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Bergman (Visa) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Humphrey (Fifth Third) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Nadeau (Chase) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Flanagan (Wells Fargo) | 10/2/2009 | AGs |
| Fact Deposition Transcripts | Davila (B of A) | 10/2/2009 | AGs |
| Deposition Exhibits | All Deposition Exhibits | 10/6/2009 | AGs |
| Internal Memos | Index of all merchant depositions to date | 10/6/2009 | DOJ |
| Deposition Transcripts | Access to all Defendants' Deposition Transcripts on Merrill Website | 10/14/2009 | AGs |
| Internal Memos | Analysis of bank interchange income and rewards expense | 10/19/2009 | DOJ |
| Deposition Transcripts | All Plaintiff and Third Party Deposition Transcripts | 10/21/2009 | AGs |
| Deposition Transcripts | Carlin (QVC) | 11/6/2009 | DOJ |
| Deposition Transcripts | Chris Coborn (Corborn's) | 11/6/2009 | DOJ |
| Deposition Transcripts | Culver (CHS) | 11/6/2009 | DOJ |
| Deposition Transcripts | D'Agostino 30b6 | 11/6/2009 | DOJ |

# A1417

EXHIBIT 8 to the Declaration of K. Craig Wildfang, Esq.

**DOCUMENTS PRODUCED TO THE DEPARTMENT OF JUSTICE AND STATE ATTORNEYS GENERAL**

| Category | Item Produced | Date Produced | Produced To |
|---|---|---|---|
| Deposition Transcripts | D'Agostino | 11/6/2009 | DOJ |
| Deposition Transcripts | Diehl (Affiliated Foods) | 11/6/2009 | DOJ |
| Deposition Transcripts | Emmert (Jetro) | 11/6/2009 | DOJ |
| Deposition Transcripts | Estep (Publix) | 11/6/2009 | DOJ |
| Deposition Transcripts | Hamilton (CHS) | 11/6/2009 | DOJ |
| Deposition Transcripts | Ihry (CHS) | 11/6/2009 | DOJ |
| Deposition Transcripts | Jurasek (Crystal Rock) | 11/6/2009 | DOJ |
| Deposition Transcripts | Kirschner (Jetro) | 11/6/2009 | DOJ |
| Deposition Transcripts | Kleiner (Ahold) | 11/6/2009 | DOJ |
| Deposition Transcripts | Koudsi (SuperValu) | 11/6/2009 | DOJ |
| Deposition Transcripts | Sinclair 30b6 (CHS) | 11/6/2009 | DOJ |
| Deposition Transcripts | Zaucha (NGA) | 11/6/2009 | DOJ |
| Deposition Transcripts | Zlotnikoff (NGA) | 11/6/2009 | DOJ |
| Deposition Transcripts | Zuritzky (Parkway) | 11/6/2009 | DOJ |
| Fact Deposition Transcripts | Garofalo (Citi) | 11/6/2009 | DOJ |
| Internal Memos | Analysis of bank interchange income and rewards expense and supporting materials | 11/6/2009 | DOJ |
| Internal Memos | Draft memo re: costs and benefits of rewards cards and supporting documents | 11/6/2009 | DOJ |
| Australia Materials | MasterCard response to Preliminary Conclusions of 2007/08 RBA Review | 12/2/2009 | DOJ |
| Australia Materials | MasterCard response to issues for the 2007/08 RBA Review | 12/2/2009 | DOJ |
| Australia Materials | Review of Reform of Australia's Payments System, Allen Consulting Group (September 6, 2007) | 12/2/2009 | DOJ |
| Internal Memos | Internal Memorandum regarding Defendants' statements on effects of surcharging on interchange rates | 12/2/2009 | DOJ |
| Oral Argument Materials | Exhibits from Class Cert and Rule 12 oral arguments | 12/2/2009 | AGs |
| Oral Argument Materials | Argument outlines from Rule 12 oral arguments | 12/2/2009 | AGs |
| Oral Argument Materials | Argument outlines from Rule 12 oral arguments | 12/2/2009 | DOJ |
| UK Materials | Von Weizsacker - Economics of Credit Cards, Jan. 2002 | 12/2/2009 | DOJ |
| UK Materials | 9.6.05 MasterCard Companion Paper to OFT Decision | 12/2/2009 | DOJ |
| UK Materials | 9.6.05 MasterCard OFT Decision | 12/2/2009 | DOJ |
| Internal Memos | Memo re: Merchant Testimony re: ASR issues | 12/3/2009 | AGs |
| Deposition Transcripts | Mike Schumann (Traditions) Transcripts (personal and 30b6) and Exhibits | 12/4/2009 | DOJ |
| Def's Expert Reports from MDL 1720 | All 12 Defendants' Expert Reports from MDL 1720 | 12/15/2009 | DOJ |
| Def's Expert Reports from MDL 1720 | All 12 Defendants' Expert Reports from MDL 1720 | 12/15/2009 | AGs |

# A1418

EXHIBIT 8 to the Declaration of K. Craig Wildfang, Esq.

**DOCUMENTS PRODUCED TO THE DEPARTMENT OF JUSTICE AND STATE ATTORNEYS GENERAL**

| Category | Item Produced | Date Produced | Produced To |
|---|---|---|---|
| Def's Expert Reports from MDL 1720 | Supporting materials for defendants' expert reports | 1/21/2010 | DOJ |
| Deposition Transcripts | Discover 30(b)(6) Deposition Transcripts | 1/26/2010 | DOJ |
| Def's Expert Reports from MDL 1720 | Six CD of supporting materials for defendants' expert reports - Houston written opinion & testimony, Houston additional materials, Wecker computer code, Topel reproduction of certain tiffs, Murphy reproduction of certain tiff, Murphy footnotes 283 & 284 | 2/3/2010 | DOJ |
| Deposition Exhibits | Smits deposition & exhibits, Discover | 2/9/2010 | DOJ |
| Defendant Documents | CHASE000121109-121675; CHASE003810230.001-3810230.372; CHASE003810242.001-3810242.281 | 2/16/2010 | DOJ |
| Articles and Studies | Diamond Consulting study entitled New Card Business Model | 2/24/2010 | AGs |
| Articles and Studies | Rochet & Tirole paper entitled Tying in Two-Sided Markets and the Honor All Cards Rule | 2/24/2010 | AGs |
| Deposition Exhibits | Sheedy and Lehman exhibits re: processing costs, migration to signature, and debit convergence | 2/24/2010 | AGs |
| Internal Memos | Expert analysis re: total price in Australia and rewards cards | 3/5/2010 | DOJ |
| Def's Expert Depositions | Deposition transcripts and exhibits of Daines, Houston | 3/11/2010 | AGs |
| New Zealand Materials | MC New Zealand Settlement Agreement | 3/11/2010 | AGs |
| Def's Expert Depositions | Deposition transcripts and exhibits of Elzinga, Woodward | 3/30/2010 | AGs |
| Deposition Transcripts | All Plaintiff and Third Party Deposition Transcripts - MDL 1720 plaintiffs & third party depo transcripts and exhibits | 3/30/2010 | DOJ |
| Deposition Transcripts | Access to all Defendants' Deposition Transcripts on Merrill Website | 3/30/2010 | DOJ |
| New Zealand Materials | Visa New Zealand Settlement Agreement | 3/30/2010 | AGs |
| Internal Memos | Index of all depositions taken in MDL 1720 | 4/13/2010 | DOJ |
| Def's Expert Depositions | Deposition transcripts and exhibits of Aitkins, James, Kahn, Klein, Wecker | 4/14/2010 | AGs |
| Pleadings and Written Discovery | All pleadings and written discovery, class complaints post MDL, discovery | 4/28/2010 | DOJ |
| Def's Expert Depositions | Deposition transcripts and exhibits of Murphy, Topel, Litan | 4/29/2010 | AGs |
| Articles and Studies | Visa 2008 Credit Card Issuer Functional Cost Study | 5/5/2010 | DOJ |
| Internal Memos | Indices of all Profit Analysis Reports, Functional Cost Studies, Issuer Benchmarking Studies, and Visa IRF Reports | 5/5/2010 | DOJ |
| Internal Memos | Internal Memorandum re: best evidence on ASR related paragraphs of consolidated complaint | 5/6/2010 | AGs |

# A1419

EXHIBIT 8 to the Declaration of K. Craig Wildfang, Esq.

**DOCUMENTS PRODUCED TO THE DEPARTMENT OF JUSTICE AND STATE ATTORNEYS GENERAL**

| Category | Item Produced | Date Produced | Produced To |
|---|---|---|---|
| Encore Access | Encore Database Access | 5/7/2010 | DOJ |
| Internal Memos | Memo summarizing Defendants' Expert Opinions on Effect of Repeal of No-Surcharge Rule | 5/13/2010 | AGs |
| Pleadings and Written Discovery | MDL 1720 Substantive Pleadings | 5/20/2010 | DOJ |
| Pleadings and Written Discovery | Core documents and select pleadings | 6/11/2010 | DOJ |
| Articles and Studies | Allan Shampine's latest draft of Submission to Review of Network Economics, Estimating the Effect of the Two-Sided Price from the RBA Intervention in Australia | 7/19/2010 | DOJ |
| Def's Expert Reports from MDL 1720 | Defendants' Supplemental Report of Murphy | 8/3/2010 | DOJ |
| Articles and Studies | Allan Shampine's latest draft of Submission to Review of Network Economics, Estimating the Effect of the Two-Sided Price from the RBA Intervention in Australia | 8/12/2010 | AGs |

# A1420

Thursday, March 28, 2013 | **B3**

EXHIBIT 9 to
Declaration of
K. Craig Wildfang, Esq.

# High Court Sides With Comcast

BY BRENT KENDALL

WASHINGTON—A divided Supreme Court on Wednesday put the brakes on a class-action lawsuit against Comcast Corp., the latest example of the court's conservative majority limiting large suits against companies.

The case was brought by Philadelphia-area subscribers who said they were forced to pay too much for cable television because the company allegedly eliminated local competition.

The court, in a 5-4 ruling that split along ideological lines, agreed with Comcast that a trial judge erred in allowing the case to proceed as a class action. The court found that the challengers proposed a flawed method for calculating monetary damages if they eventually won.

Justice Antonin Scalia, writing for the majority, said the proposed model wasn't acceptable for measuring damages on a class-wide basis because Comcast customers in different counties may not have all suffered the same alleged harms.

"For all we know," he said, some customers might have paid more because of alleged elimination of satellite competition, while others might have paid more because of Comcast's alleged increased bargaining power.

The different permutations of possible harm to two million Comcast subscribers located in different counties "are nearly endless," he said.

The four members of the court's liberal wing dissented, and both Justices Ruth Bader Ginsburg and Stephen Breyer read portions of their dissents aloud during the court's morning session, a rare move that signals a justice's particular displeasure with a case outcome.

The dissenters said the court should never have issued a ruling because Comcast had previously forfeited its right to make the legal arguments it advanced at the high court. The Supreme Court's decision offered a "profoundly mistaken view of antitrust law" and was "unwise and unfair" to the customers who brought the lawsuit, they said.

Wednesday's ruling is the latest in which the court has tightened rules on class actions. In 2011, the court threw out a sweeping gender-discrimination class-action suit against Wal-Mart Stores Inc., brought on behalf of more than a million women who were current or former employees. The court found that the women's experiences were too dissimilar to be represented as a class.

Archis Parasharami of law firm Mayer Brown, who defends businesses in class-action cases, said Wednesday's decision would encourage courts to consider monetary damages and other relevant questions much earlier in cases.

Wednesday's ruling was a blow to Philadelphia-area cus-

**The 5-4 ruling is the latest example of the court's conservative majority limiting large suits against firms.**

tomers who argued their cable bills were too high because Comcast had an anticompetitive grip on the region.

The lawsuit, which dated back to 2003, alleged the company gained a dominant position in the Philadelphia market by buying up other cable providers and by swapping geographic territories with competitors.

Comcast, which disputed the allegations, said plaintiffs were seeking more than $875 million on behalf of more than two million past and present subscribers. The company said in a short statement that it was pleased with the ruling.

Wednesday's ruling may also help Comcast defend against similar lawsuits in other cities.

Barry Barnett, a lawyer representing the Philadelphia challengers, said he disagreed with the ruling but looked forward to satisfying the Supreme Court's concerns when the case returned for more proceedings in the lower courts.

# A1421

EXHIBIT 10 to
Declaration of
K. Craig Wildfang, Esq.

## STATE OF MINNESOTA
## OFFICE OF THE ATTORNEY GENERAL

### SPECIAL ATTORNEY APPOINTMENT

I, HUBERT H. HUMPHREY III, Attorney General of the State of Minnesota ("the Attorney General"), by virtue of the authority vested in me by statute, do hereby constitute and appoint the law firm of Robins, Kaplan, Miller & Ciresi ("RKM&C"), of Minneapolis, Minnesota, and Michael V. Ciresi, as Special Attorneys to serve at the pleasure of the Attorney General specifically to provide legal services to the State of Minnesota ("the State") and the Attorney General, subject to the terms and conditions set forth:

1. **DUTIES.** The Special Attorneys, who shall not be considered state employees and shall not be eligible for any state employee leave or other benefits except those expressly provided herein, shall provide legal services to the State and Attorney General relative to seeking recovery and relief from third parties for damages arising from the sale and/or distribution of cigarettes (hereafter "the Litigation"). The Special Attorneys shall provide legal consultant services as requested by the Attorney General. Such duties are more fully set forth in the attached Exhibit A, which is incorporated herein by reference, as are all exhibits hereto.

2. **COMPENSATION AND EXPENSES.** As compensation for the performance of the duties described, the Special Attorneys

1

# A1422

shall be compensated as set forth in the attached Exhibit B.

3. **BILLING STATEMENTS.**  The Special Attorneys shall submit a monthly statement to the Attorney General in care of John R. Tunheim, Chief Deputy Attorney General, 102 State Capitol, St. Paul, MN 55155, setting forth in detail the activities and charges with respect to this appointment.

4. **STATE AUDITS.**  All records, documents, and accounting procedures and practices of the Special Attorneys relevant to this appointment shall be subject to examination by the Attorney General and the Legislative Auditor.

5. **AVOIDANCE OF CONFLICTS.**  The Special Attorneys shall not undertake legal work for the Attorney General outside of the scope of this appointment and shall not represent a party involved in a claim, dispute or transaction of any kind which would create a conflict of interest for the Special Attorneys or the Attorney General unless and until the Special Attorneys have informed the Chief Deputy Attorney General of the proposed representation and received his written approval to proceed.  The Special Attorneys also agree to inform their clients of any case involving a potential conflict.

2

# A1423

6.    **TERM.**   This appointment is effective July 25, 1994.   This appointment may be terminated by the Attorney General at any time and for any reason.


HUBERT H. HUMPHREY, III
Attorney General

By: _____

JOHN R. TUNHEIM
Chief Deputy Attorney General

Date: ___8/2/94___


ROBINS, KAPLAN, MILLER & CIRESI

By: _____

MICHAEL V. CIRESI

Date: ___7/21/94___


3

# A1424

EXHIBIT A

CASE HANDLING AGREEMENT


The Special Attorneys are retained to provide legal services to the Attorney General and the State for the purpose of seeking recovery and relief from third parties for damages arising from the sale and/or distribution of cigarettes.  This appointment shall be subject to the following guidelines:


1.  The Attorney General, as the chief legal officer of the State, retains final authority over all aspects of the Litigation that affect the State's claims.


2.  The Attorney General shall appoint delegates from his staff to monitor, review, and fully participate in the handling of the Litigation.  The Special Attorneys shall consult and obtain the prior approval of a delegate concerning all policy and other major, substantive issues affecting the Litigation, including but not limited to the complaint and dispositive motions, selection of consultants and experts, and whether the Special Attorneys may represent additional co-plaintiffs in the Litigation.  Regular status meetings shall be held as requested by either a delegate or the Special Attorneys.


3.  The Special Attorneys shall provide the Attorney General with a copy of all significant correspondence and all pleadings,

1

# A1425

discovery requests, and other documents served and/or filed in the Litigation.

4.      The Attorney General shall designate one or more staff members to act as liaison with such state agencies as become substantially involved in the Litigation. To the extent feasible, the Special Attorneys shall work through such liaison in communicating with such agencies. A copy of all written communications between the Special Attorneys and the state agencies shall be provided to the Attorney General.

5.      Subject to the terms of this appointment, it is recognized and agreed that Robins, Kaplan, Miller & Ciresi and Michael V. Ciresi shall act as chief litigation counsel for the Litigation. Further, it is recognized and agreed that the Special Attorneys may also act as litigation counsel for Blue Cross and Blue Shield of Minnesota ("BCBSM") for its claims prosecuted as part of the Litigation.

6.      The Attorney General shall provide attorneys and other members of his staff to work on the Litigation with the Special Attorneys. The identity and responsibilities of such personnel so assigned shall be determined solely by the Attorney General. Coordination of the Attorney General's staff work on the Litigation will be principally handled by

# A1426

the Attorney General's appointed delegate, in consultation with the Special Attorneys.

# A1427

EXHIBIT B

## CONTINGENT FEE RETAINER AGREEMENT FOR STATE CLAIMS

WHEREAS, cigarette smoking is the most preventable cause of death in our society;

WHEREAS, cigarette smoking kills approximately 400,000 people each year in the United States (including more than 6,000 Minnesotans each year) -- more than the number of deaths caused by guns, drug use, and automobile accidents combined;

WHEREAS, in addition to the human carnage, the economic costs of cigarette smoking, and, in particular, health care expenditures from smoking-attributable diseases, amount to an onerous burden to society and to the State;

WHEREAS, the tobacco industry has been able to enjoy virtual immunity from its actions due to its economic and political power and its scorched earth tactics in litigation, reaping billions of dollars of profits from unconscionable activities and never to the knowledge of the Attorney General or the Special Attorneys paying any damages despite decades of litigation;

WHEREAS, the Attorney General and the Special Attorneys believe that, despite the tobacco industry's past successes, the laws of the state of Minnesota were meant to apply to all entities, no matter how powerful;

WHEREAS, the laws of the State are intended to place the consequences of unlawful conduct on the perpetrator, and the contemplated Litigation is the most just and efficient way to

1

# A1428

accomplish that purpose with respect to the carnage caused by the tobacco industry;

WHEREAS, the State recognizes that RKM&C's undertakings pursuant to the Special Attorney Appointment involve substantial factual and legal issues of first impression, the resolution of which cannot be fully ascertained at this time;

WHEREAS, the State acknowledges that the successful resolution of the Litigation will require the Special Attorneys to devote substantial resources (both temporal and financial) in furtherance of their undertakings;

THEREFORE, due to all the complex considerations involved in the Special Attorney Appointment, the State and the Special Attorneys have agreed as follows:

1.  The State is not liable to pay compensation otherwise than from amounts collected for the State by the Special Attorneys, unless the State terminates this appointment and the Litigation does not result in a monetary recovery to the State.  In the event the State terminates this appointment before the State receives a monetary recovery, the State's responsibility for payment shall be as set forth in paragraphs 7-9 below.

2.  The contingency upon which compensation is to be paid is the recovery for the State of monies (at law or in equity), whether by settlement or judgment, from third parties liable

2

# A1429

for damages arising from the sale and/or distribution of cigarettes.

3.  Compensation on the foregoing contingency is to be paid by the State to the Special Attorneys on the following basis: twenty-five percent (25%) of the total recovery to the State, including but not limited to compensatory or punitive damages, restitution, civil penalties, interest, and any amounts which may later be payable to the federal government under the Medicaid program.  There is nothing to be subtracted in determining the total recovery, except court-awarded attorneys' fees and costs.  In addition to these fees, in the event of recovery, the State shall reimburse the Special Attorneys for costs and disbursements advanced during the course of the Litigation by the Special Attorneys, in an amount to be approved by the Attorney General.

4.  Notwithstanding paragraph 3 above, the State shall pay no higher percentage for compensation of the Special Attorneys than is paid by any other co-plaintiff that the Special Attorneys represent in the Litigation on solely a contingent fee basis. If the Special Attorneys represent any other co-plaintiff in the Litigation on other than solely a contingent fee basis, the State shall pay no higher comparable rate of compensation to the Special Attorneys considering the totality of circumstances of the different retainer or appointment

3

agreements, including but not limited to the risk factors inherent in the Litigation and the time value of money.

5. The compensation paid hereunder is separate and independent from any compensation which the Special Attorneys may receive from any other party that the Special Attorneys represent in the Litigation.

6. If the court awards, or the adverse parties pay, attorneys' fees and costs, such fees and costs shall be paid to the Special Attorneys to the extent that the award is based on services furnished by the Special Attorneys and to the State to the extent that the award is based on services furnished by Attorney General staff members. Any such fees awarded by the court or paid by the adverse parties to the Special Attorneys shall be credited to the State and deducted from the fees payable to the Special Attorneys pursuant to paragraph 3 above.

7. If the Attorney General terminates this appointment before a monetary recovery has been achieved, and the Litigation is dismissed or otherwise does not result in a monetary recovery, then the Attorney General shall apply to the Legislature for the reasonable value of the Special Attorneys' services, as determined by the appropriate court, including fees and costs, and shall use his best efforts to secure a specific

4

appropriation.  The Attorney General has no obligation to pay under this paragraph in the absence of such a specific appropriation.  In calculating the value of such services, the court or Legislature may deduct the value of the Special Attorneys' services furnished for the benefit of other parties involved in the joint prosecution of the Litigation.

8.   If the Attorney General terminates this appointment before a monetary recovery has been achieved, and the Litigation later results in a monetary recovery, then the Special Attorneys shall be paid, from the recovery, the reasonable value of their services, as determined by the appropriate court, plus fees and costs, but not more than they would have received if this appointment had not been terminated.

9.   In determining the reasonable value of the Special Attorneys' services pursuant to paragraphs 7 and 8 above, all factors affecting the value of the Special Attorneys' contributions shall be taken into account, including but not limited to, the length of time spent on the case, the funds invested, the time value of money, the quality of representation, the result of the Special Attorneys' efforts, and the viability of the claim at the time of termination.

10.  During the course of the Litigation, the Special Attorneys shall advance costs and disbursements.  If the State is the

# A1432

only plaintiff which the Special Attorneys represent in the Litigation, the State's obligation to reimburse the Special Attorneys' costs is that set forth in paragraphs 1-9 above. If there are other parties plaintiff to the Litigation, and the State enters into a Costs and Disbursements Pro Rata Sharing Agreement providing for the sharing of costs and disbursements by the State and such other parties plaintiff, then the State would reimburse the Special Attorneys only for its agreed upon pro rata share of the costs and disbursements and only after the recovery of monies whether by settlement or judgment from third parties liable for damages arising from the sale and/or distribution of cigarettes.

11.   In the event there is no recovery, or the recovery is less than enough to cover the State's pro rata share of the Special Attorneys' costs and disbursements, the State shall not be responsible for the deficiency of its pro rata share of costs and disbursements, provided, however, that (1) neither the State nor the Special Attorneys shall be responsible for a court award of costs and disbursements to adverse parties arising out of the conduct of the other, and (2) if the State terminates this appointment in the absence of a monetary recovery, paragraphs 7-9 above shall apply.

12.   In no event shall the State be obligated to pay to the Special Attorneys more under this agreement than it receives in any

**A1433**

monetary recovery, nor to pay any amount until the Litigation is finally resolved, whether by dismissal, final judgment, or settlement, except as noted in paragraphs 7-9 above.

# A1434

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE      :     MDL No. 1720 (JG)(JO)
FEE AND MERCHANT DISCOUNT           :
ANTITRUST LITIGATION                :     **OBJECTION OF CITY**
                                    :     **OF OAKLAND TO FINAL**
                                    :     **APPROVAL OF PROPOSED**
                                    :     **SETTLEMENT**
----------------------------------------------------------------x

     1.    The City of Oakland, California ("Oakland") objects to the proposed settlement in

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* (MDL 1720) (the

"Proposed Settlement") on its own behalf and that of its residents.

     2.    Oakland is a municipal corporation and government entity located in the San

Francisco Bay Area.  It has a population of nearly 400,000 residents, with more than 20% living

in poverty.

     3.    As Oakland recently learned from the Notice of the Proposed Settlement, it is a

member of both classes in the Proposed Settlement:  the damages class because Oakland has

accepted Visa and MasterCard payment cards for the payment of various city services since

2004; and the proposed injunctive relief class because it accepts such cards today and will do so

in the future.

     4.    Oakland objects to the Proposed Settlement for several distinct reasons.  First and

foremost, the Proposed Settlement does not reform the payment system's deepest problem – a

failed market that enables excessive and conspiratorial interchange fees that are passed on to

consumers in the form of higher prices.  Interchange fees on credit card transactions result in

1

265738.1

# A1435

continue to charge excessive interchange fees.  Oakland's residents will continue to suffer as a result.

## II.   THE CITY OF OAKLAND WILL CONTINUE TO SUFFER HARM UNDER THE PROPOSED SETTLEMENT

### A. The Surcharging Provisions Offer No Relief to Oakland

15.    The City itself will continue to suffer harm under the Proposed Settlement.  Under the rules changed by the Proposed Settlement, surcharging would only be allowed in certain limited circumstances.  While California state law permits the City of Oakland to surcharge – unlike private sector merchants who are prohibited from surcharging credit card transactions – other restrictions in the Settlement render the relief unavailable to Oakland.

16.    Specifically, Oakland accepts American Express for the payment of services and fees.  The rules changes in the proposed settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brands such as American Express.  The result is to make surcharging Visa or MasterCard impossible, defeating any ability to play one card brand against the other to promote price competition in the industry.

### B.   The Mandatory Release Threatens to Further Reduce Competition

17.    Under the Proposed Settlement, Visa and MasterCard are released from liability, forever, for any rules or conduct currently in place (including the interchange rules) and any "substantially similar rules" or conduct instituted at any time in the future.  The broad release

4

265738.1

# A1436

will insulate Visa and MasterCard from the threat of litigation going forward, and thereby give it the ability to dominate future payment technologies, such as mobile payments, to the detriment of consumers.

18.     Members of the rules changes class – including Oakland – cannot opt out of the rules changes class, and thus are compelled to accept the rules changes and the accompanying release of defendants.

## C.   The Damages Portion of the Settlement Is Inadequate

19.     Oakland further objects to the Proposed Settlement because the settlement fund represents only a few months (approximately three) of total interchange fees paid to defendants. Moreover, the Proposed Settlement specifically bars any challenge in the future to interchange rates (along with a host of other rules), thereby allowing defendants to raise prices in the future and quickly recoup any payments they have made to settle the case.

20.     Oakland believes that this is not only inadequate compensation – which is in part why Oakland is objecting to the settlement – but also bad policy. A relatively small fine representing only three months' worth of interchange fees, coupled with the express ability to continue raising rates, will have little or no deterrent effect.

21.     The lawyers who negotiated the settlement did not adequately represent Oakland's interests.

265738.1



RETAILERS AND MERCHANTS' OBJECTION
TO FINAL APPROVAL OF THE CLASS ACTION
DEFINITIVE SETTLEMENT AGREEMENT

**I.      INTRODUCTION AND PRELIMINARY STATEMENT**

In the Definitive Class Settlement Agreement (the "Settlement Agreement"), the
Visa Defendants, Mastercard Defendants, and Bank Defendants (collectively
"Visa/Mastercard") – along with fewer than <u>half</u> of the originally proposed class
representatives willing to support the settlement[1] (the "Class Representatives") – have
agreed to grant Visa/Mastercard immunity from liability stemming from any *future*
application, interpretation, or conduct under their presently effective rules governing
merchants.  In exchange, Visa/Mastercard have committed to pay to a class "comprised of
*millions*" of members (Mem. Law Supp. Mot. Class Cert. 30) an amount roughly

---

[1] In the initial motion for class certification, Class Counsel offered "nineteen Plaintiff class
representatives."  (Redacted Mem. Law Supp. Mot. Class Cert. 7.)  When it became time
to provisionally certify the Class for purposes of preliminary approval of this settlement,
only *nine* remained.  (Mem. Supp. Mot. Class Settlement Prelim. Approval 1 n.2.)  Gone
are merchants and organizations such as D'Agostino Supermarkets, Inc., the National
Restaurant Association, the National Association of Convenience Stores, and the National
Grocers Association (*cf.* First Consol. Am. Class Action Compl. ¶¶ 18, 23-27, 40-46),
leaving others like Payless ShoeSource, Inc. and Leon's Transmission Service, Inc. to fend
for the Class (*see* Mem. Supp. Mot. Class Settlement Prelim. Approval 1 n.2).

1

equivalent to the sum collected over *a couple of months* from credit card "swipe" fees, even though the operative pleadings allege that Visa/Mastercard carried on their antitrust conspiracy for *years*.  Visa/Mastercard have additionally approved changes to a few of the numerous rules subject to the applicable releases, and the Settlement Agreement requires them to offer a discounted swipe fee, or "interchange" rate, for a period of a scant eight months.  After that, should the Court approve the settlement, Visa/Mastercard may proceed with their anticompetitive conduct with impunity, comfortable that they are free to do so thanks to the releases within the Settlement Agreement.

Visa/Mastercard and the Class Representatives seek to accomplish the relinquishment of future antitrust damage claims through the imposition of a mandatory, non-opt-out, class under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  The use of a Rule 23(b)(2) non-opt-out class to release future claims "exceeds what the Court may permit." *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y 2011) (denying final approval to a settlement that would have released future claims, even in a Rule 23(b)(3) class which would have allowed opt-outs).  Moreover, "[t]he defendants would obtain these releases without agreement to permanently alter the conduct which gave rise to the lawsuit," *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 580 (E.D. Pa. 2001), and the releases would cover *all* Visa/Mastercard rules presently in effect, rather than the few at issue in this dispute, so that they then would "extend far beyond the conduct challenged in the litigation," *id.* at 576.  For these and other reasons discussed throughout this objection, final approval of the Settlement Agreement should be denied.

II.     **THE OBJECTING PARTIES**

The objectors opposing the Settlement Agreement in this Objection are those retailers and merchants originally named in the Retailers & Merchants Objection to Proposed Class Settlement Agreement [Document 1653], filed on October 18, 2012 (the "R&M Objectors"), and additional retailers and merchants who oppose final approval of the Settlement Agreement after having received notice of the settlement.  These retailers and merchants are:

1.    Landers McLarty Bentonville, LLC d/b/a Landers McLarty Ford Dodge Chyrsler Jeep – Bentonville, Arkansas

2.    Landers McLarty Bentonville Nissan, LLC d/b/a Landers McLarty Nissan, LLC – Bentonville, Arkansas

3.    Bessemer AL Automotive, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Bessemer, Alabama

4.    Shreveport Dodge, LLC d/b/a Landers Dodge – Bossier City Louisiana

5.    RML Branson MO, LLC d/b/a Tri Lakes Motors – Branson, Missouri

6.    RML Burleson TX, LLC d/b/a Burleson Nissan – Burleson, Texas

7.    RML Bel Air, LLC d/b/a Bel Air Honda – Falston, Maryland

8.    Landers McLarty Fayetteville TN, LLC d/b/a Landers McLarty Toyota – Fayetteville, Tennessee

9.    RML Ft. Worth TX, LLC d/b/a Nissan Ft. Worth – Fort Worth, Texas

10.   RML Huntsville Chevrolet, LLC d/b/a Landers McLarty Chevrolet –

3

Huntsville, Alabama

11. RML Huntsville AL, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Huntsville, Alabama

12. RML Huntsville AL Automotive, LLC d/b/a Mercedes Benz of Huntsville – Huntsville, Alabama

13. RML Huntsville Nissan, LLC d/b/a Landers McLarty Nissan – Huntsville, Alabama

14. RML Huntsville, AL, LLC d/b/a Landers McLarty Subaru – Huntsville, Alabama

15. Landers McLarty Lee's Summit MO, LLC d/b/a Lee's Summit Chrysler Jeep Dodge – Lee's Summit, Missouri

16. RML Lee's Summit MO, LLC d/b/a Lee's Summit Nissan – Lee Summit, Missouri

17. RML Olathe II, LLC d/b/a Olathe Dodge Chrysler Jeep – Olathe, Kansas

18. RML Waxahachie Dodge, LLC d/b/a Waxahachie-Dodge Chrysler Jeep – Waxahachie, Texas

19. RML Waxahachie Ford, LLC d/b/a Waxahachie Ford Mercury – Waxahachie, Texas

20. RML Little Rock, Inc. d/b/a Landers Harley Davidson – Little Rock, Arkansas

21. RML Little Rock, Inc. d/b/a Landers Harley Davidson – Hot Springs, Arkansas

4

22.     RML Little Rock, Inc. d/b/a Landers Harley Davidson – Conway, Arkansas

23.     Landers Auto Group No. 1 d/b/a Landers Scion – Little Rock, Arkansas

24.     Landers Auto Group No. 1 d/b/a Landers Toyota – Little Rock, Arkansas

25.     Landers Auto Group No. 1 d/b/a The Boutique at Landers Toyota –
        Little Rock, Arkansas

26.     Landers CDJ, Inc. – Little Rock, Arkansas

27.     Landers CDJ, Inc. d/b/a Steve Landers Chrysler Dodge Jeep – Little Rock,
        Arkansas

28.     Landers of Hazelwood, Inc. – Hazelwood, Missouri

29.     A&D Wine Corp. – New York, New York

30.     A&Z Restaurant Corp. – New York, New York

31.     105 Degrees, LLC – Oklahoma City, Oklahoma

32.     The Pantry Restaurant Group, LLC – Little Rock, Arkansas

33.     PPT Inc., d/b/a Graffiti's Restaurant – Little Rock, Arkansas

34.     Sansole's Tanning Salon – Little Rock, Arkansas

35.     Greenhaw's, Inc. – Little Rock, Arkansas

36.     Roberson's Fine Jewelry, Inc. – Little Rock, Arkansas

37.     Don's Pharmacy, Inc. – Little Rock, Arkansas

38.     Gossett Motor Cars, Inc. – Memphis, Tennessee

39.     Gossett Motor Cars, Inc. – Atlanta, Georgia

40.     JB Cook, LLC. d/b/a Downtown Oil & Lube – Hope, Arkansas

5

41.     Storage World Limited Partnership, LLC – Little Rock, Arkansas

42.     Leisure Landing RV Park – Hot Springs, Arkansas

43.     Pinnacle Valley Liquor Store, Inc. – Little Rock, Arkansas

44.     The Tennis Shoppe, Inc. – Little Rock, Arkansas

45.     The Grady Corporation d/b/a Whole Hog Barbeque (Northwest Arkansas) – Bentonville, Arkansas

46.     The Grady Corporation II d/b/a Whole Hog Barbeque (Northwest Arkansas) – Fayetteville, Arkansas

47.     Coulson Oil Company – North Little Rock, Arkansas

48.     Diamond State Oil LLC – North Little Rock, Arkansas

49.     Superstop Stores, LLC – North Little Rock, Arkansas

50.     PetroPlus, LLC – North Little Rock, Arkansas

51.     Port Cities Oil, LLC – North Little Rock, Arkansas

52.     New Mercury, LLC – North Little Rock, Arkansas

53.     New Vista, LLC – North Little Rock, Arkansas

54.     New Neptune, LLC – North Little Rock, Arkansas

55.     SVI Security Solutions – Olive Branch, Mississippi

55.     Shepherd's Flock – Townshend, Vermont

The retailers and merchants represented in this objection to final approval of the Class Settlement Agreement are a broad-based, diverse group of businesses representing restaurants, clothing stores, oil and gas companies, convenience stores, car dealerships, jewelry shops, beverage retailers, and other type of trades in numerous states, including,

but not limited to New York, Vermont, Maryland, Arkansas, Tennessee, Mississippi, Alabama, Georgia, Kansas, Missouri, Oklahoma, Texas and Louisiana. These objecting retailers and merchants sell goods to consumers in exchange for payment by credit cards and pay interchange ("swipe") fees.

From the original objection, by approximately half of the original class representatives this past summer, to the large group of objectors present at the preliminary approval hearing held on November 9, 2012, the objection to this proposed class settlement is significant, material and continues to grow.[2] The reasons are simple: This settlement: (1) proposes to bind absent class members to the settlement and release future claims related to the swipe fees while providing immunity to Visa/Mastercard and member banks for future anticompetitive behavior; (2) violates the due process rights of Class Members by providing no legitimate right of opt-out to Class Members; (3) releases Visa/Mastercard from liability for conduct completely unrelated to matters litigated in this case; (4) contains deficient notice because the notice does not provide a legitimate opt-out opportunity; and (5) provides illusory and non-uniform and class-wide relief in the form of a surcharge, which many absent class members will not impose on their customers for several reasons.

Further, the exodus of a large group of class representatives from the settlement illustrates its inherent flaws and unfairness. The Settlement Agreement is materially flawed in its current form. For these reasons, and as discussed in further detail below,

---

[2] By way of comparison, the Court's approval of the settlement agreement in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (Gleeson, J.), while it involved some 5 million merchants, only had 18 merchant objectors. 297 F. Supp. 2d at 409.

R & M Objectors respectfully submit the settlement is not reasonable, adequate or fair to the entire class bound by the Settlement Agreement.

### III.   ARGUMENT

#### A.   The Settlement Agreement Violates Due Process

By its very nature, a proposed class action settlement that violates the Due Process Clause of the United States Constitution can be neither "fair, reasonable, [nor] adequate," Fed. R. Civ. P. 23(e)(2), which is the standard governing the propriety of final approval, *see id.* The Settlement Agreement violates due process in a variety of ways, among them the proposed – and mandatory – release of Visa/Mastercard from liability for any future damages in derogation of the nation's antitrust laws, without any legitimate right to opt-out. The Settlement Agreement is wholly improper, and final approval should not be forthcoming.

##### 1.   The Release Of *Future* Antitrust Liability By Way Of A Mandatory 23(b)(2) Class Is Completely Impermissible Under United States Supreme Court Precedent

The present settlement includes a Class to be certified under Rule 23(b)(2) of the Federal Rules of Civil Procedure, thus affording no opportunity for any of the millions of Class Members to opt out of the terms which would bind that aggregation of merchants. *See* Fed. R. Civ. P. 23(b)(2), (c)(2)(A) (confirming that a (b)(2) class includes no right to "opt-out"). Thus, should final approval occur, the individuals and businesses within this enormous class will have had no choice but to release Visa/Mastercard from any causes of action regarding *future* damages for violations of antitrust laws. The United States Supreme Court has rejected collusive settlements just like this.

8

In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Supreme Court considered the permissibility under Rule 23 of a settlement that would relinquish class members' future claims without giving them an opportunity to opt out. *Id.* at 843-48 . After emphasizing the "serious constitutional concerns raised by the mandatory class resolution of individual legal claims, *especially where a case seeks to resolve future liability in a settlement only action.*" *id.* at 842 (emphasis added),[3] the Court wasted no time in rejecting the settlement before it. *Id.* at 830, 864-65; *see also Molski v. Gleich*, 318 F.3d 937, 948-49 (9th Cir. 2003) ("[T]he Supreme Court in *Ortiz* expressed its growing concern regarding the constitutionality of certifying mandatory classes when damages are at issue.").

The Court made clear that a class settlement which would sacrifice monetary damages claims possessed by individual members of the class, with no chance to opt out of that result, is beset with Constitutional infirmities. First of all, "the certification of a mandatory class followed by settlement of its action for money damages obviously implicates the Seventh Amendment jury trial rights of absent class members." *Ortiz*, 527 U.S. at 845-46. Continuing on, the Court explained, "By its nature . . . a mandatory

---

[3] Elsewhere in the *Ortiz* opinion, the Court reiterated the increased concern for absent class members necessary whenever certification occurs only to facilitate settlement of classwide claims. *Ortiz*, 527 U.S. at 842, 848-49; *see also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 570 (E.D. Pa. 2001) (exercising "*great care* in reviewing the settlement" because it had "only conditionally certified the class" (emphasis added)). Of course, certification here occurred only in the context of settlement. (*See* Order of 7/17/2012 (deeming Plaintiffs' Motion for Class Certification "withdrawn" in light of anticipated settlement); Prelim. Approval Order ¶ 6 ("[T]he Court *provisionally* certifies, *for settlement purposes only*, a Rule 23(b)(2) *Settlement Class*, from which exclusions shall not be permitted . . . . " (emphases added).)

9

settlement-only class action with legal issues and future claimants compromises [class action plaintiffs'] Seventh Amendment rights without their consent." *Id.* at 846.

In addition to violating class members' rights under the Constitution's Seventh Amendment, mandatory, settlement-only classes also run afoul of the Due Process Clause. The *Ortiz* opinion elaborated:

> The inherent tension between representative suits and the day-in-court ideal is only magnified if applied to damage claims gathered in a mandatory class. Unlike Rule 23(b)(3) class members, objectors to the collectivism of a mandatory [class] action have no inherent right to abstain. The legal rights of absent class members (which in a class like this one *would include claimants who by definition may be unidentifiable when the class is certified*) are resolved regardless either of their consent, or, in a class with objectors, their express wish to the contrary.

*Ortiz*, 527 U.S. at 846-47(emphasis added). As such, the Court confirmed "that before an absent class member's right of action [is] extinguish[ed] due process require[s] . . . *at a minimum* [that] an absent plaintiff . . . be provided with an opportunity to remove himself from the class." *Id.* at 848 (emphasis added and quotation omitted).

The mandatory, non-opt-out, settlement-only class created by the Settlement Agreement does not at all live up to the minimum constitutional requirements emphasized in *Ortiz*. *See Molski*, 318 F.3d at 949 n.13 (observing that the concerns highlighted in *Ortiz* "appl[y] to any mandatory class, whether under 23(b)(1) or (b)(2)"). The R&M Objectors submit that the Rule 23(b)(2) class now before the Court, by releasing unliquidated *future* damages claims with respect to rules of Visa/Mastercard *unrelated to this litigation*, contains a damages component that is more than "incidental" to the

injunctive relief.  *See Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 164 (2d Cir. 2001) ("By definition . . . incidental damages must be susceptible to computation by means of objective standards and not dependent in any significant way on . . . intangible, subjective differences." (quotation omitted)).  Consequently, the *only* way this Class can be salvaged is through the issuance of a *new* notice affording Class Members a chance to opt out.  *Cf. id.* at 166 ("[A]ny due process risk posed by (b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members . . . .").

### 2.   The Release Of *Future* Antitrust Liability By The Rule 23(b)(3) Class Is Inappropriate

Perhaps doubting the sustainability of the proposed 23(b)(2) class, Visa/Mastercard and Class Representatives also included releases of future antitrust claims in the Rule 23(b)(3) "damages" class described in the Settlement Agreement.  (*See, e.g.,* Definitive Class Settlement Agreement ¶ 33(h) (affirming that Rule 23(b)(3) release includes claims "based on or relating to . . . the *future* effect in the United States of the continued imposition of or adherence to any Rule of [Visa/Mastercard] in effect in the United States as of the date of the Court's entry of the [Preliminary Approval Order]" (emphasis added)).  Because this Rule 23(b)(3) class does not offer Class Members a legitimate opportunity to opt out of a settlement that releases future damages,[4] this release, too, falls short of constitutional demands.  This is especially so given the heightened scrutiny directed

---

[4] As explained in Section III.B. of this Objection, the Notice itself is constitutionally defective because, as a practical matter, it does not offer class members a legitimate opportunity to opt-out of the proposed relief.

toward this settlement-only class. *Ortiz*, 527 U.S. at 848-49, 119 S. Ct. at 2316 ("When a district court . . . *certifies for class action settlement only*, the moment of certification requires 'heightene[d] attention' to the justification for binding the class members." (emphasis added)).

The Supreme Court's opinion in *Ortiz*, as well as its decision in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997), stand as towering authorities for the general proposition that, when it comes to releases for *future* conduct, "the interests of present and future victims are so unavoidably opposed that the one group cannot 'fairly and adequately protect the interests' of the other." James Grimmelmann, FUTURE CONDUCT AND THE LIMITS OF CLASS-ACTION SETTLEMENTS, 91 N.C. L. Rev. 387, 391 (2013) (citing Fed. R. Civ. P. 23(a)(4), *Ortiz*, *supra* and *Amchem*, *supra*)).

The Settlement Agreement seeks to release future claims and insulate Visa/Mastercard from future transgressions of an anticompetitive nature. The Court's own docket is filled with substantial opposition to this unfair term of the Settlement Agreement. The large numbers of objections to the settlement agreement and opt outs with valid concerns weighs heavily against approving the class settlement as fair, reasonable and adequate. *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 676 (S.D. N.Y. 2011) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785, 812 (3d Cir. 1995)). Moreover, it is significant that the Settlement Agreement proposes to release *future* antitrust conduct engaged in by the Defendants on a class-wide basis. District courts have generally held that in cases involving antitrust law, future

12

violations cannot be waived in the context of a class action settlement. *See Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561 (E.D. Pa. 2001); *Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975) (citing cases from several circuits that while a general release of antitrust violations is permitted, a release may not "waive damages from future violations of antitrust laws").

*Schwartz* is persuasive and its reasoning applies here. In *Schwartz*, the district court rejected a Rule 23(b)(3) class settlement in an antitrust lawsuit, finding the release in the settlement agreement was too broad. *Schwartz*, 157 F. Supp. 2d at 577-78. The district court regarded the release too broad "because it bars later claims based on future conduct." *Id*. at 578. The *Schwartz* court held it was improper to "bar later claims based not only on past conduct but also future conduct." *Id*. The district court also held that because the release was so broad there was a lack of consideration for the class members bound by the settlement agreement. The court reasoned:

> Under the release proposed by the parties, defendants could potentially expand their alleged bundling activities in other non-exempt channels of communication (such as the Internet) and face no potential liability with respect to the 1.8 million class members as long as they provide Single Sunday Ticket for satellite distribution under the terms expressed in the Settlement Agreement. *Such a result offers the possibility of far greater protection for defendants than is justified from the benefits obtained by the class*.

*Id*.

Here, the Settlement Agreement would prevent lawsuits against the Defendants for future wrongful conduct that is the same or ***similar*** to the wrongful conduct challenged. Defendants can violate the law eight (8) months after the class settlement is approved and

13

all class members would be unable to vindicate their rights and stop the unlawful conduct. Generally, injunctive relief preventing violations of antitrust law is ***permanent***.  Not with this settlement.  There is a short period of injunctive relief and then tremendous loopholes for Defendants to tweak their market behavior and set high, lock-step swipe fees, which retailers and merchants would be forced to pay after the injunction.  In light of the minimal injunctive (prospective) relief, the settlement provides far greater protection for the Defendants than is "justified from the benefits obtained by the class." *Schwartz*, 157 F. Supp. 2d at 578.[5]  This attempt by Visa/Mastercard and the Class Representatives and Class Counsel to bind absent (even unknown or not yet conceived) class members for years into the future from bringing suit for antitrust or other violations is unprecedented in scope, unconstitutional, fundamentally flawed and unfair.  *Cf. Ortiz*, 527 U.S. at 847, 119 S. Ct. at 2315 (indicating that a court must be especially vigilant to protect absent class members "who by definition may be unidentifiable when the class is certified"); James Grimmelmann, FUTURE CONDUCT AND THE LIMITS OF CLASS-ACTION SETTLEMENTS, 91 N.C. L. Rev. 387, 394 (2013) (stating that the proposed Visa Mastercard settlement would "prevent businesses-including ones not yet in business-from objecting to many of their policies until 2021"); Adam J. Levitin, AN ANALYSIS OF THE PROPOSED INTERCHANGE FEE

---

[5] Tellingly, the Court in *Schwartz* expressed strong criticism for a settlement that would have prevented the defendants from engaging in the challenged conduct for at least one, but possibly no more than two, years.  *Schwartz*, 157 F. Supp. 2d at 573.  This Settlement Agreement does not even go that far.  Even more than *Schwartz*, then, the prospective relief in this case "provides limited additional consumer choice to the members of the class" and "is minimal at best."  *Id.*

# A1451

LITIGATION SETTLEMENT 14-19 (Aug. 21, 2012).[6]

The United States Court of Appeals for the Second Circuit  has held that class member's rights to due process are violated where a Rule 23(b)(3) class settlement releases unaccrued future claims.  *Stephenson v. Dow Chemical Co*., 273 F.3d 249, 259-61 (2d Cir. 2001), *aff'd in part by an equally divided court*, *vacated in part on other grounds*, 539 U.S. 111 (2003).  Similarly, recently faced with a proposed class settlement involving release of future claims, the United States District Court for the Southern District of New York rejected the settlement.  *Google*, 770 F. Supp. 2d at 677.  The release of defendant Google from liability for *future* acts was in excess of what the district court viewed as permissible, and this aspect of the class settlement at issue was not fair, reasonable, or adequate.  *Id*. The district court cited the United States Supreme Court reasoning in *Amchem*: "'Rule 23 . . . must be interpreted with fidelity to the Rules Enabling Act and *applied with the interests of absent class members in close view*.'"  770 F. Supp. 2d at 677 (emphasis added) (quoting *Amchem*, 521 U.S. at 629, 117 S. Ct. 2252)).  Thus, even though class counsel may be highly qualified, it is the interests and substantive rights of absent class members that have to be protected by the district court and not abridged or modified by a class settlement, lest the Rules Enabling Act be offended.  *Id*.

Objectors respectfully submit the Settlement Agreement, which purports to cram-down an unfair settlement on absent class members with no right to opt-out, unconstitutionally impairs the right to due process afforded absent retailers and merchants

---

[6] Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361.

# A1452

by the United States Constitution and should not be judicially approved. *Alchem*, *Ortiz*, *Stevenson*, *Google*, and *Schwartz*. The release of future claims possessed by a future class of entities presently known and unknown (as the releasing parties) impairs or abridges substantive rights of absent class members. *See, e.g., Ortiz*, 527 U.S. at 856. Therefore, Objectors respectfully submit, it is incumbent that the Court reject this part of the settlement as not fair, adequate or reasonable under, among other things, the Rules Enabling Act. *See* 28 U.S.C. § 2072(b) (directing that procedural rules "shall not abridge, enlarge or modify any substantive right"); *Amchem*, 521 U.S. at 629, 117 S. Ct. at 2252 ("Rule 23 . . . must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view.").

Further, the release of the "future effect in the United States of any conduct" by any Settlement Class Released Party if it is "substantially similar to the conduct of any Rule 23(b)(3) Settlement Class Released Party related to or arising out of interchange rules, interchange fees, or interchange rates, *any* Rule[7] of any Visa Defendant or MasterCard Defendant" (*see, e.g.,* Settlement Agreement ¶ 33(h)) is excessively broad and vague in scope such that it encompasses other conduct in the future that is not directly related to this case, but which may be an unlawful variation, which substantially affects retailers and merchants. This overly broad language in the release was conspicuously not addressed at the preliminary hearing. Notably, neither Visa nor Mastercard  referred  to  this

---

[7] A *select few* rules of Visa/Mastercard were at issue in this litigation (*see* Second. Am. Compls. ¶ 23(G)-(K) (listing rules at issue), but the releases cover future claims over *any* provision in rulebooks spanning *hundreds* of pages (*see, e.g.,* Settlement Agreement ¶¶ 33(g), (h), 35(g), (h)). Consequently, as demonstrated in Section III.A.3. of this Objection, the Settlement is invalid as overbroad.

16

# A1453

overreaching, overarching and overlybroad language that releases  future claims and conduct "substantially similar to the conduct of any Rule 23(b)(3) Settlement Class Relased Party related to or arising out of interchange rules, interchange fees, interchange rates . . . . "  This specific language, buried in the subsections of paragraph 33 of the Settlement Agreement, is yet another reason that this Settlement Agreement violates due process, and it speaks volumes that class counsel did not address this at the preliminary approval hearing.  To summarize, this due process violation in the release goes far beyond what the United States Supreme Court allows in nationwide class settlements and should be stricken.  *Id*.  In fact, neither Visa nor Mastercard has ever publically explained why this unfair, unreasonable and inadequate hidden language on the 25th page of the Long Form Notice at paragraph 68(h) in the release does not violate due process.

The district court in *Google* was concerned about the release of future conduct and rejected the class settlement.  The district court in *Schwartz* was concerned about the release of future conduct and rejected the class settlement.  R&M Objectors respectfully submit the class settlement here should be rejected as unfair, unreasonable and inadequate for class members.

Significantly, in addition to large opposition, the withdrawal of several class representatives from approving the settlement reached indicates the settlement is not fair, reasonable or adequate.  Rather, it further demonstrates, the non-opt-out settlement is largely one-sided in favor of the Defendants, who give little to gain a lot, including insulation and immunity from future claims brought against them for unlawful conduct, as

17

# A1454

yet uninvented, that may touch upon the swipe fee. This procedural and constitutional dilemma for the Plaintiffs' Class Counsel and remaining Class Representatives requires a higher bar and scrutiny for approval because of the fiduciary interests and the constitutional rights that must be protected and not abridged or modified through the Rule 23 class procedure. *Amchem*, *supra*. The district court, as a fiduciary for the absent class members, must ensure this settlement treats the class members fairly, particularly with objections and objecting proposed class representatives. *See, e.g.*, *In re "Agent Orange" Product Liability Litig*., 996 F.2d 1425, 1438 (2d Cir. 1993) ("A judge in a class action is obligated to protect the interests of absent class members."), *cert. denied*, 510 U.S. 1140 (1994). Where a dispute exists between the class counsel and proposed class representatives as to the proposed settlement, the decision cannot "rest entirely with either the named plaintiffs or with class counsel." *Pettway v. American Cast Iron Pipe Co*., 576 F.2d 1157, 1176-77 (5th Cir. 1978), *cert denied*, 439 U.S. 1115 (1979).

There are at least three conflicts present in this class settlement. First, there is a large segment of class representatives who have withdrawn. *Pettway*, *supra*. Second, the Supreme Court has held that future claims of unknown entities cannot be released and present class representatives <u>cannot</u> adequately represent and release these claims for future entities. Grimmelmann, FUTURE CONDUCT AND THE LIMITS OF CLASS-ACTION SETTLEMENTS, 91 N.C. L. Rev. at 391 (citing to Fed. R. Civ. P. 23(a)(4), *Ortiz* and *Amchem*.). Third, absent Class Members are not given a legitimate opportunity to opt-out of the settlement class. With these real conflicts and objections, the class settlement agreement as currently written, cannot be judicially approved as "fair, reasonable, and adequate" under Fed. R.

18

Civ. P. 23(e)(2).  *Ortiz*, *Amchem*, *Google*, and *Schwartz*      While the Settlement Agreement is touted as unprecedented for the $6 billion monetary fund, Defendants will, as a practical matter, recoup any monetary amount paid out in this class settlement (which amounts to only 2-3 months worth of swipe fees) by *increasing* the swipe fee imposed upon retailers and merchants to 4% (and potentially higher) after the eight month injunction period expires.  Notably, United States Senator Richard Durbin of Illinois, a strong advocate for retailers and merchants, expressed these comments on the Senate Floor:

> The bottom line is that this proposed settlement does not make our credit card system better.  Instead, it gives Visa and Mastercard free reign to carry on their anti-competitive swipe fee system with no real constraints and no legal accountability to the millions of American businesses that are forced to pay their fees.  This is a stunning giveaway to Visa and Mastercard, all for a payout of a mere two months worth of swipe fees.  This is a *bad deal*.

Cong. Rec. S5961 (daily ed. August 2, 2012) (statement of Sen. Durbin) (emphasis added).  There is no disincentive for the Defendants in this class settlement to agree to pay a couple of months' worth of fees, after which they will raise the fee percentage to a higher amount for all credit transactions (which is a large part of the overall goods purchased), and then be immune from suit for agreeing to raise the swipe fee.  If Defendants want to charge an anti-competitive rate in the future, the nationwide market suffers, the consumer suffers, retailers and merchants suffer and so does the Constitution, because there is no avenue to seek recourse for future wrong conduct since the release language is overbroad and excessive.  Settlement of this class action on the terms proposed exceeds the bounds of fairness and adequacy because any future claims and rights are released.  *Google*.  The

19

withdrawing class representatives understood this and oppose this settlement because it is not fair, reasonable or adequate.

In sum, releasing future claims, in the circumstances presented here, is unconstitutional.  It is also inappropriate under the Rules of Civil Procedure as unfair, inadequate, and unreasonable for absent class members whose individual rights are taken away, with no right to opt-out.  *See, e.g., Alexander v. Gardner-Denver Co*., 415 U.S. 36, 51 (1974) (holding "there can be no prospective waiver of an employee's rights under Title VII."); *see also* Grimmelmann, FUTURE CONDUCT AND THE LIMITS OF CLASS-ACTION SETTLEMENTS, 91 N.C. L. Rev. at 410 (citing to *Three Rivers Motor Co. v. Ford Motor Co*., 522 F.2d 885, 896 n.27 (3d Cir. 1975) (citing cases from several circuits that while a general release of antitrust violations is permitted a release may not "waive damages from future violations of antitrust laws")).  Certification of this settlement as a class to bind absent retail and merchant class members (some not yet known), should ***not*** be approved and future claims should not be released.  *Ortiz,* 527 U.S. at 842-43.

3.   **The Settlement Agreement Violates Due Process Because It Releases Conduct Far Beyond What Has Been Litigated In This Action**

The R&M Objectors recognize that "class action releases may include claims not presented and even those which could not have been presented" in a lawsuit.  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005).  This authority is not limitless, however, in that any settled claims must satisfy the "identical factual predicate" doctrine.  *See id.*; *Google Inc.*, 770 F. Supp. 2d at 675 ("[T]he released conduct [must] arise[] out of the identical factual predicate as the settled conduct." (quotation omitted)).

Applying this analysis, the Second Circuit has suggested that released claims occupy the same factual predicate as those litigated when they "have been central to [a] case from its inception" or involve "essentially the same issues." *Wal-Mart Stores*, 396 F. 2d at 108-09. Stated another way, a release may encompass claims that were not pleaded in an action only so long as they "arise from the 'same nucleus of operative fact'" as pleaded claims. *Schwartz*, 157 F. Supp. 2d at 577. The releases in the Settlement Agreement waive claims completely *extraneous* to the "nucleus of operative fact" animating this litigation.

More specifically, the releases here abandon all causes of action related to "the continued imposition of or adherence to [or conduct regarding] *any Rule* of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order." (Settlement Agreement ¶¶ 33(g), (h), 35(g), (h).) This proceeding, by contrast, revolved around only a very distinct subset of those rules. (*See* Second. Am. Compls. ¶ 23(G)-(K) (specifying rules at issue.) By releasing Visa/Mastercard from liability for conduct surrounding *any* of their rules – which are found in rulebooks numbering hundreds of pages, *see* Mastercard Rules (December 12, 2012) (Exhibit 1); Visa Int'l Operating Regulations (Oct. 15, 2012) (Exhibit 2) – when this action involved only a select few of those rules, the Settlement Agreement exceeds the bounds of the "identical factual predicate" rule. Many unpleaded claims released by the Settlement Agreement bear no relation to the "nucleus of operative fact" actually litigated here. *See Google Inc.*, 770 F. Supp. at 678-79 (determining that settlement would "release claims well beyond those contemplated by the pleadings," when

releases authorized Google to sell full versions of books scanned online, but case only challenged the practice of making available "snippets" of those copyrighted works); *Schwartz*, 157 F. Supp. 2d at 576-78 (concluding that release "extend[ed] far beyond the conduct challenged in the litigation" when it would insulate Defendants from claims related to events shown on cable television or the internet, even though the lawsuit dealt exclusively with satellite broadcasts).

The Settlement Agreement does not comply with the "identical factual predicate" doctrine.  On this additional ground, final approval should be denied.

**B.**      **The Notice to the Class Is Deficient Because It Does Not Provide Class Members With Notice Of Any Real Opportunity To Opt-Out**

Effective notice is an essential prerequisite to the final approval of a class settlement.  "Adequate notice is necessary to bind absent class members."  *Stephenson v. Dow Chemical Co.*, 273 F.3d 249, 261 n.8 (2d Cir. 2001).  The reason for this is straightforward:  "[C]lass notice serves as the class members' primary, if not exclusive, source of information for deciding how to exercise their rights under Rule 23."  *Wal-Mart Stores, Inc.*, 396 F. 3d at 115.  Because the ability to opt out is a constitutional prerogative possessed by all Rule 23(b)(3) class members, *see Stephenson*, 273 F.3d at 260 ("Due process requires . . . an opportunity to opt out."), the notice must contain any information that might be an "essential factor" in a class member's decision whether to opt out of the class, *see Wal-Mart Stores, Inc.*, 396 F.3d at 115.

The notice here is insufficient because it only advises class members of an ability

22

# A1459

to opt out of an insignificant portion of the settlement,[8] while informing them that they have no option but to accept the most meaningful aspect of the deal:  The waiver of any ability to sue Visa/Mastercard in the future.   Faced with this Hobson's Choice, a merchant will most likely elect not to opt-out, in order to preserve a meaningful objection (which would be unavailable upon opting out from the Rule 23(b)(3) Class) to the settlement of future damages, which is the most significant and offensive aspect of the settlement.  The notice does not provide a legitimate opportunity to opt-out to protect individual claims against the Defendants for their future conduct.

This settlement is so fundamentally flawed, and the Notice is so intrinsically deficient, that even the most legally astute Class Member would be uncertain of what action to take upon receiving this Notice.  As things stand now, all absent Class Members have been told that even if they opt-out of the Rule 23(b)(3) Class, they will lose the ability to sue Visa/Mastercard in the future.  In this circumstance, even if a merchant disagrees with the relief afforded by the current "damages" settlement, it is likely to stay in the class so as to retain the ability to object to the more significant waiver of future rights.[9]  Should this Court agree that the relinquishment of future damage claims under a

---

[8] Class Counsel will undoubtedly trumpet the total dollar amount of the settlement, but it must be remembered that it will be divided among "millions" of Class Members (Mem. Law Supp. Mot. Class Cert. 30).  That being so, the amount any individual Class Member might expect to receive from this settlement is negligible.

[9] In this unique settlement, which involves a merger of 23(b)(2) and 23(b)(3) classes, it is anything but clear whether a Class Member could object to the 23(b)(2) release of future claims even while opting out of the 23(b)(3) class.  If there is disagreement among lawyers whether this might theoretically be possible, there is assuredly great confusion among the laymen comprising the Classes.

# A1460

mandatory Rule 23(b)(2) class is improper, or conclude that such a release is inappropriate under Rule 23(b)(3), or both, the entire analysis surrounding a decision to opt out is altered.  In that scenario, if a business could preserve future damage claims by opting out of the 23(b)(3) class – without being forced to accept the loss of future damage claims – it may very well decide to opt-out even though it is not doing so now.  On the other hand, if this Court invalidates future damages releases under both 23(b)(2) and 23(b)(3), the same Class Member might determine that it makes sense to remain a party to the claim for current damages.  Basically, the point is that a *new notice, containing a new – and legitimate – opportunity to opt out,* will be required should this Court revise the aspect of the Settlement Agreement releasing future damage claims.

In essence, the notice presents Class Members with no opportunity to opt out at all – at least no opportunity to effectively do so – and it is therefore defective.[10]  Final approval of the settlement should be denied.

**C.    The Surcharge is Illusory and Non-Uniform Class Relief**

Class certification is impermissible where the proposed relief among class members is not uniform.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2557 (2011).

---

[10] It is also important to bear in mind that the releases apply to *future* causes of action that have not yet materialized.  As such, those who will possess those claims have no way of presently deciding whether they should opt out or not.  It was in just this sort of situation that the Supreme Court in *Amchem* doubted whether notice could ever be effective. *Amchem*, 521 U.S. at 591 ("Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out.").  Of course, this case is even worse than *Amchem*, given that a merchant who makes an "intelligent" decision to opt out of the Rule 23(b)(3) class, attempting to preserve future damages claims, will still be bound by the mandatory 23(b)(2) release.  This settlement is hopelessly flawed.

Ten states prohibit retailers and merchants from imposing surcharges on customers.  These states are California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma and Texas.  Other states such as New Jersey and Rhode Island are also looking at regulating the surcharge on consumers.  This surcharge prohibition eliminates a large percentage of transactions from achieving any benefit from the settlement, (*Prelim. Approval Hr'g. Tr.* at 51, lines 21:24), and it places the absent class member in conflict with state law so the benefit cannot be realized.  *See, e.g.*, *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 808 (3d Cir. 1995) ("One sign that a settlement may not be fair is that some segments of the class are treated differently from others."); *True v. American Honda Motor Co.*, 749 F.Supp.2d 1052, 1067 (C.D. Cal. 2010) ("Courts generally are wary of settlement agreements where some class members are treated differently than others.").

Under the Supreme Court's holding in *Dukes*, *supra*, that "an indivisible injunction" must  benefit "all its members at once," or the court must undertake a case-specific inquiry into whether class issues predominate or whether the class action is a superior method of adjudicating the dispute. Predominance and superiority are not self-evident.  *Id*.  The surcharge, proposed as an element of class relief, is not nationwide relief and does not benefit the entire class. Class members are treated differently. Nevertheless, the class release binds absent class members and releases their substantive rights in the prohibited states. Thus, class members release rights to past and future conduct and do not receive the same benefits.  Since the entire class does not benefit, nationwide class

certification is, therefore, inappropriate.  *Id*.  Further, binding class members to the entire

settlement to force settlement violates due process.  *Amchem*.

As a practical matter, a majority of retailers and merchants in states where the

surcharge is not expressly prohibited, will <u>not</u> impose a surcharge on their customers

purchasing goods with a credit card. To begin with, customers want <u>less</u>, not more fees.

As one article in the New York Times shortly after the agreement was reached noted:

> Given a shaky economy, many restaurants and other retailers said they had
> no plans to charge more when customers paid with credit cards.

> "Shopping with a credit card is a convenience for our customers and is an
> important part of our customer service," said Carolyn Beem, a
> spokeswoman for L.L. Bean. "We have absolutely no plans to add a
> surcharge for credit card purchases."

> Rick Camac, chief executive of the Fatty Crew group of six restaurants,
> including Fatty Crab, said that "<u>customers might see it as another way
> you're trying to get at them.</u>" (emphasis added).

> "I think you have to take the hit, or make it up by adjusting your prices,"
> Mr. Camac said of paying for the credit card fees.

Stephanie Clifford, Stefanie Strom, *Merchants Considering Credit Card Surcharges*, N.Y.

Times, July 16, 2012.

Recent articles indicate even the Defendants acknowledge that retailers will not

surcharge.  *See* Emily Jane Fox, *Credit card checkout fee taking effect*, CNNMONEY.com,

Tuesday, January 29, 2013 (stating: "Mastercard said it doesn't expect most merchants to

put the surcharge into effect, since stores won't want to drive away business.").  Even

though credit card swipe charges have grown nine times since 1995 of his business, the

# A1463

chain Redner's nor other chains will pass that expense to customers acknowledging "such a move would probably turn some away."[11]

The surcharge is also a concern to the Court regarding "the economic effect of the proposed rules change." *Prelim. Approval Hr'g. Tr*. at 63, lines 20:21. Retailers and merchants, in the states that permit a surcharge, will have to make all types of disclosures to customers that the charge is on the cost of goods and must also display the surcharge on the receipt. The retailer and merchant must treat cards similarly to avoid complaints and will encounter customers who leave the establishment, or even lawsuits from customers for imposing such a surcharge for all goods.

The surcharge is not permitted in all states and will likely not be utilized by many retailers and merchants who are members of the class to recoup Defendants' unlawful behavior. The surcharge is not legitimate class-wide relief and makes class certification improper, *see, e.g. Dukes*. Further, it pits the retailer and merchant class members against the customer for an illegal fee exacted by the Defendants. Retailers and merchants would be unfairly penalizing customers for Defendants' unlawful actions in charging the excessive swipe fee and would be releasing current and future claims against the Defendants. The class settlement agreement as written is not fair, reasonable or adequate. Fed. R. Civ. P. 23(e)(2).

---

[11] *Retailers, consumers take swipe at credit card surcharge*, February 18, 2013, readingeagle.com, http://readingeagle.com/mobile/article.aspx?id=453496.

**D.**    **R&M Objectors Essential Discovery for Evaluating the Fairness, Adequacy and Reasonableness of Settlement Agreement**

R & M Objectors have requested that an essential compendium of documents be made available in order to give Objectors a meaningful opportunity to exercise their rights with respect to the Settlement Agreement, as to fairness, adequacy and reasonableness. See, October 22, 2012 Letter from R&M Objectors requesting discovery, Document 1657.

The evidence requested is necessary for R&M Objectors to effectively examine the fairness, reasonableness and adequacy of the merits of the Proposed Settlement, which is a Settlement Only Class.  The request is <u>not</u> burdensome and is directly relevant to the Settlement Agreement and examination of its terms, fairness, reasonableness and adequacy.  Objectors respectfully request a reasonable and meaningful opportunity to examine the merits for absent class members, to prepare experts and to cross-examine experts at the Final Fairness Hearing with documents pertaining to settlement and execution of the Settlement Agreement. *See, e.g.*, *Girsh v. Jepson*, 521 F.2d 153, 157 (1975) ("As an objector, Frackman was in an adversary relationship with both plaintiffs and defendants and was entitled to at least a reasonable opportunity to discovery against both.").  The request is narrow in scope and focuses on two areas of relevant documents: (1) all communication pertaining to settlement negotiations and execution of the Settlement Agreement and (2) discovery of all drafts and documents pertaining to development of draft settlement documents through final execution of the Settlement Agreement.  These documents are necessary, relevant and important for the Objectors to examine the merits of the Proposed Settlement, to properly evaluate the terms of the

28

# A1465

Settlement Agreement on the record at the Final Fairness Hearing and to ensure that the Settlement Agreement is fair, reasonable and adequate for absent class members.  To expect objectors to exercise their rights as to a Settlment Agreement in any meaningful way, tools must be developed to allow for thorough review.

Discovery is appropriate for objectors where lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors. *In re Community Bank of Northern Virginia*, 418 F.3d 277, 316 (3d Cir. 2005) (citing *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)).  Discovery may be made available to objectors for review. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 n.8 (1974).

In *Grinnell Corp.*, a document depository was made available for objectors to inspect and examine documents in support of their objection to a proposed class settlement. *Id*.  The Second Circuit discussed what the depository contained in detail:

> The inventory of the depository includes documents produced to the government, depositions taken in the government case, the entire record in the government case, documents produced by and depositions of defendants taken in the Philadelphia actions, as well as hundreds of thousands of additional documents demanded pursuant to Rule 34 by the plaintiffs in these cases.  In addition many documents produced by the discovery procedures in the instant cases were placed in the depository.  These documents include many spreadsheets of painstakingly assembled transaction data and calculations requested by plaintiffs to support damage theories they planned to assert.  One answer by one defendant alone contains hundreds of thousands of statistics on transactions with subscriber plaintiffs.  In addition, the documents produced by defendant ADT include the most detailed financial data (e.g., full revenue and cost analyses for each of its approximately 125 central stations) and more than 50,000 competition reports detailing the significant competitive factors pertinent to individual bids and transactions.

*Id*.

In *Grinnell Corp*., a tremendous amount of discovery was made readily available to objectors.  Here, the R&M Objectors are not seeking a large production of documents or depository, such as discussed in *Grinnell Corp*.  Rather, the R&M Objectors have provided a narrow, specific request that is not unduly burdensome and is relevant to evaluating the fairness, adequacy and reasonableness of the Settlement Agreement.  The request confirms adequate discovery was obtained for the class action and settlement discussion and execution was not a product of collusion or slanted because of the availability of large attorney fees.  *See, e.g., In re Warner Communications Securities, Litig*., 798 F.2d 35, 37 (2d Cir. 1986) (providing that a class settlement agreement must be fair, reasonable and adequate, not a product of collusion and must adequately represent class members' interests); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (providing that participation in fairness hearing is to evaluate risk of collusion over attorney's fees and the terms of the settlement).  Second, the discovery request provides objectors an opportunity to review information actually obtained, discussed and reviewed during the actual settlement process.  Objectors respectfully submit as a matter of due process that they have the opportunity to examine documents pertaining to development of settlement dialogue through the final execution of the Settlement Agreement.  Discovery of this nature is narrow, focused, <u>not</u> unduly burdensome and provides objectors a meaningful opportunity to cross-examine the merits of a proposed class settlement by being able to view some of the discovery provided in the case.

R&M Objectors submit that they have no greater or lesser right to discovery than as was granted in *Grinnell Corp*.  These objectors have purposefully narrowed their focus and

the scope of the discovery request to a discovery area relevant to examining the fairness, adequacy and reasonableness of the Settlement Agreement.  E-mail correspondence and drafts of the settlement will be helpful in illuminating the course of settlement discussions, whether settlement was arms-length, what terms were evaluated, how the terms were evaluated and why the final Settlement Agreement was executed.   R&M Objectors respectfully submit their request is in accord with legal authority, is not unduly burdensome and permits objectors a meaningful opportunity to develop the record and support their examination of the merits by cross examination and argument to the court. *Grinnell*, *supra*; *In re Community Bank of Northern Virginia*, *supra*.

In sum, the R&M Objectors respectfully submit their discovery request is narrow in scope, in accord with legal authority, is not unduly burdensome and permits access to relevant information to make a meaningful inquiry on cross-examination into the merits of the Proposed Settlement.  *In re Community Bank of Northern Virginia*, 418 F.3d 277, 316 (3d Cir. 2005) (citing *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)).

## CONCLUSION

For the reasons stated herein, it is respectfully submitted that approval of the Settlement Agreement is not appropriate under the circumstances presented to this Court. Approval of the Settlement should, therefore, be denied.

# A1468

Dated this 15th day of May, 2013.

Respectfully Submitted,


By:      _s/ Jerrold S. Parker_____
         Jerrold S. Parker
         Jay L.T. Breakstone
         **Parker Waichman, LLP**
         6 Harbor Park Drive
         Port Washington, NY 11050
         Telephone:  (516)-723-4620

         jerry@yourlawyer.com
         jbreakstone@yourlawyer.com

         Phillip Duncan
         Richard Quintus
         **Duncan Firm, P.A.**
         900 S. Shackleford, Suite 725
         Little Rock, AR 72211
         Telephone:  (501) 228-7600
         phillip@duncanfirm.com
         richard@duncanfirm.com

         Thomas P. Thrash, ABN #80147
         Marcus N. Bozeman, ABN #95287
         **Thrash Law Firm, P.A.**
         1101 Garland Street
         Little Rock, Arkansas 72201
         Telephone: 501-374-1058
         Facsimile: 501-374-2222
         tomthrash@sbcglobal.net
         bozemanmarcus@sbcglobal.net

### CERTIFICATE OF SERVICE

On this 15th day of May, the above and foregoing has been sent by United States mail to the following:

Payment Card Interchange Fee Settlement
P.O. Box 2530
Portland, OR 97208-2530

Alexandra S. Bernay
Bonny E. Sweeney
**Robbins, Geller, Rudman & Dowd, LLP**
655 W. Broadway, Suite 1900
San Diego, CA 92101

Wesley R. Powell
**Wilkie, Farr & Gallagher, LLP**
787 Seventh Ave.
New York, NY 10019

K. Craig Wildfang
**Robins, Kaplan, Miller & Ciresi, LLP**
2800 LaSalle Plaza
800 LaSalle Ave.
Minneapolis, MN 55402

H. Laddie Montague, Jr.
**Berger & Montague, P.C.**
1622 Locust Street
Philadelphia, PA 19103

Matthew A. Einstein
**Arnold & Porter, LLP**
555 Twelfth Street NW
Washington, DC 20004

Peter E. Greene
**Skadden, Arps, Slate**
  **Meagher & Flom, LLP**
4 Times Square
New York, NY 10036

_s/ Jerrold S. Parker_
        Jerrold S. Parker

33

# A1470

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                                       :
In re PAYMENT CARD INTERCHANGE   :        MDL No. 1720(JG)(JO)
FEE AND MERCHANT DISCOUNT         :
ANTITRUST LITIGATION              :
                                                       :
------------------------------------------------------x

## OBJECTION OF U.S. PUBLIC INTEREST RESEARCH GROUP
## TO FINAL APPROVAL OF PROPOSED CLASS SETTLEMENT

The United States Public Interest Research Group ("U.S. PIRG") submits this Objection

to the proposed settlement in *In re Payment Card Interchange Fee and Merchant Discount*

*Antitrust Litigation* (the "Proposed Settlement").

### U.S. PIRG'S INTEREST IN THE PROPOSED SETTLEMENT

U.S. PIRG is a federation of independent, state-based, citizen-funded organizations that

advocate for the public interest.  Since 1970, state PIRGs have delivered results-oriented citizen

activism, stood up to powerful special interests, and used the time-tested tools of investigative

research, media exposés, grassroots organizing, advocacy, and litigation to win real results on

issues that matter.  Across the country, state PIRGs employ close to 400 organizers, policy

analysts, scientists and attorneys, and are active in 47 states, with a federal lobby office in

Washington, D.C.  On national issues, state PIRGs coordinate their efforts, pool resources, and

share expertise as U.S. PIRG so that they can have the biggest impact.

U.S. PIRG has long supported interchange fee reform.  All consumers, whether they pay

with cash or plastic, pay more at the store, more at the pump, and more on the Internet, due to the

non-negotiable interchange fees set by the Visa and MasterCard.  These fees average around two

cents or more on the dollar for plastic transactions, with debit cards somewhat lower and airline

1

rewards credit cards much higher (3-4 cents). Interchange fees are paid to the card-issuing bank, while other processing fees go to the network and the merchant's bank.

As a representative of U.S. consumers, U.S. PIRG and its member organizations have a strong interest in the fairness of the proposed settlement. U.S. PIRG believes an appropriate lawsuit settlement should end the illegal behavior, compensate injured parties, and introduce competition that will benefit consumers. The settlement of this litigation will directly affect every consumer in the U.S., every merchant, and a large percentage of the U.S. economy.

In light of its commitment to consumer interests, combined with its long-term research on and advocacy against unfair practices in the payments card industry, U.S. PIRG believes it may be of special assistance to the Court in its efforts to evaluate the fairness of the proposed settlement and provide unique insights not provided by other parties in this litigation. This conclusion is reinforced by the consumer welfare purpose of the antitrust laws. Accordingly, U.S. PIRG has a strong interest in assisting the Court reach the correct decision on the motion for final approval of the Proposed Settlement.

U.S. PIRG is also a member of the two proposed classes in this case. U.S. PIRG has in the past and currently accepts Visa and MasterCard credit and debit cards, as well as Discover and American Express cards, for the donations that sustain U.S. PIRG. Excessive interchange rates – including especially high rates for the card-not-present transactions which make up the bulk of our payment card transactions – directly impact our bottom line and our ability to fulfill our mission. From January 2004 until November 2012, U.S. PIRG has paid thousands of dollars in interchange fees – at an interchange rate of approximately 2.5% – for credit and debit card transactions running on the Visa and MasterCard networks, and continues to pay such fees each month. Because U.S. PIRG members (as well as state and local PIRG chapters) rely on

grassroots canvassers in the field to accept credit and debit card transactions, we have little choice but to accept Visa and MasterCard cards to facilitate donations, despite their high rates of interchange.

### BASES OF OBJECTION

### I.    CONSUMERS WILL CONTINUE TO SUFFER HARM UNDER THE PROPOSED SETTLEMENT

The Proposed Settlement explicitly permits Visa and MasterCard to continue to fix interchange fees for their banks, and will thus perpetuate the practice of forcing consumers to pay higher prices for goods and services.  As the Complaint in this case alleges, Visa and MasterCard conspired for years with their banks to impose excessive interchange fees on merchants who accept their credit and debit cards.  Faced with excessive interchange fees, merchants raised their prices to consumers.  Because merchants have not been able to charge higher prices to consumers paying with credit cards, this hidden and regressive tax has fallen equally on those who make cannot qualify for a credit card and who effectively subsidize the credit card cash-back and rewards programs of more affluent consumers.

The Proposed Settlement does not change the interchange system.  Rather, under the express provisions of the Settlement Agreement, Visa and MasterCard have free rein to continue to charge excessive interchange fees.  Consumers will continue to suffer as a result.

### II.    CONSUMERS WILL CONTINUE TO SUFFER HARM UNDER THE PROPOSED SETTLEMENT

#### A.  The Ability to Surcharge Does Not Remedy Anticompetitive Interchange Practices and Will Harm Consumers

The main aspect of the proposed settlement gives merchants a limited ability to surcharge consumers if they use credit cards for purchases.  This "relief" will not solve the problems of interchange, and will immediately cause consumer dissatisfaction.  As reflected in many

3

objections filed with the Court, most merchants will not surcharge their customers.  However, to

the extent that some do surcharge, such surcharging almost certainly will be too isolated –

because of the state prohibitions and American Express limitation discussed below – to have an

impact on overall interchange fees.

The settlement will permit Visa and MasterCard to continue to fix interchange rates for

the banks.  The public has a strong interest in a fast, cost-effective, and secure payment system,

not one that is burdened by unnecessary and excessive interchange fees that will be perpetuated

and insulated from all further legal challenge by this settlement.  Surcharging also raises

questions about pricing accuracy and complexity that have the potential to further harm

consumers.

Under the rules changed by the Proposed Settlement, surcharging is only allowed in

certain limited circumstances.  Importantly, now that Utah recently passed a no-surcharge bill, 11

states and Puerto Rico ban credit card surcharging, including the four most populous states in the

country.  Shortly after the rules changes took effect, many state legislatures – some 21 – took up

bills to ban surcharging.  While these laws are presented as pro-consumer, in reality they further

diminish the power of merchants to resist payment card fees.  The current laws in the 11 states

cover more than 40% of the population.  Coupled with new states considering such laws, this

makes it even more unlikely that any merchant would choose to surcharge, making the prospect

of using surcharging as leverage against price increases extremely remote.

U.S. PIRG would be disinclined to surcharge members of the public making donations to

support our mission.  In addition, U.S. PIRG accepts American Express.  The rules changes in

the proposed settlement only allow merchants to surcharge Visa or MasterCard credit card

transactions under the same terms as any "Competitive Card Brand" that is as or more expensive

4

than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brands such as American Express. The result is to make surcharging Visa or MasterCard impossible, defeating any ability to play one card brand against the other to promote price competition in the industry. U.S. PIRG would not consider surcharging donations under the current rules.

### B.   The Mandatory Release Threatens to Further Reduce Competition

Under the Proposed Settlement, Visa and MasterCard are released from liability, forever, for any rules or conduct currently in place (including the interchange rules) and any "substantially similar rules" or conduct instituted at any time in the future. The broad release may insulate Visa and MasterCard from the threat of litigation going forward, and thereby give it the ability to dominate future payment technologies, such as mobile payments, to the detriment of consumers.

The payments industry is on the cusp of innovation. Emerging mobile payment systems have the potential to offer consumers reduced costs and a higher quality experience than traditional payment cards. Visa and MasterCard could enact new rules or apply existing rules to give their mobile payment platforms an unfair advantage over emerging competitors, and merchants and competitors may not be able to take any legal action due to the proposed settlement's mandatory release. That could have irreversible consequences that would be harmful to consumers. The Court's approval of the proposed settlement has the potential to damage innovation to the detriment of consumers. Members of the rules changes class – including U.S. PIRG – cannot opt out of the rules changes class, and thus are compelled to accept the rules changes and the accompanying release of defendants.

*       *       *       *

# A1475

The lawyers who negotiated the settlement did not adequately represent U.S. PIRG's interests.  U.S. PIRG is represented in this matter by:

> Robert L. Begleiter
> Schlam Stone & Dolan LLP
> 26 Broadway
> New York, NY  10004
> Phone: 212-344-5400
> Fax: 212-344-7677
> rbegleiter@schlamstone.com

Dated:  New York, New York
        May 23, 2013

                    SCHLAM STONE & DOLAN LLP


                    By: _____/s_____
                            Robert L. Begleiter
                    26 Broadway
                    New York, NY  10004
                    Phone: 212-344-5400
                    Fax: 212-344-7677
                    rbegleiter@schlamstone.com

                    *Attorneys for U.S. PIRG*

6

# A1476

TO:   Clerk of Court
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, NY 11201



Alexandra S. Benay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Wesley R. Powell
Wilkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

## STATEMENT OF OBJECTIONS BY JO-ANN STORES, INC.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x
In re PAYMENT CARD INTERCHANGE   :
FEE AND MERCHANT DISCOUNT   :   No. 05-MD-01720 (JG) (JO)
ANTITRUST LITIGATION   :
---------------------------------------------------------------x

Statement of Objections

    Jo-Ann Stores, Inc. (including certain of its wholly-owned subsidiaries) (hereinafter

collectively referred to as "Jo-Ann") is a member of the Cash Settlement Class and the Rule

Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant*

*Discount Antitrust Litigation* (hereinafter referred to as the "Litigation").

    Jo-Ann is a Class member because it has its principal office at the address set forth below

and has accepted Visa and MasterCard payment cards during the entire time period covered by

the Litigation and continues to accept such payment cards.

# A1477

MasterCard imposed a new "Acquirer Licensee Fee and Type III TTP Fee" in August 2012 that costs Jo-Ann approximately $3,000 per month, again with very short advance notice and no economically-sound justification.  Likewise, when the Federal Reserve Board issued its regulations pursuant to the Durbin Amendment, Visa and MasterCard treated the fee cap also as a floor, raising the interchange fee on smaller transactions notwithstanding Congress' intent to LOWER debit interchange costs when it enacted the Durbin Amendment. Even since the Court's preliminary approval of the settlement MasterCard has had the audacity to increase its Network Access and Brand Usage Fee.

The monetary relief included in the proposed settlement represents only a small percentage of the price-fixing overcharges alleged in the complaint. It can be assumed that Visa and MasterCard promptly will recover the proposed monetary payments via additional new and increased swipe fees.  The proposed release, which will be imposed on all persons accepting Visa or MasterCard payment cards during the class period or in the future REGARDLESS OF WHETHER SUCH PERSON OPTS-OUT OF THE MONETARY RELIEF PORTION OF THE SETTLEMENT, includes perpetual immunity for Visa and MasterCard so merchants will not be able to challenge such new and additional swipe fees.  While class counsel and defendants argue that this is not the case, the plain language of the proposed release suggests otherwise, as discussed further in the next point to Jo-Ann's objections.

2.   Particularly objectionable is the mandatory release that will apply to EVERY merchant which has accepted, now accepts, or in the future accepts Visa and/or MasterCard payment cards even if that merchant opts-out of the Rule 23(b)(3) class. For example, a

# A1478

merchant that comes into existence 100 years from now, and subsequently accepts a single Visa or MasterCard transaction will be subject to this release.

The release also is objectionable in that it covers Visa and MasterCard rules and conduct that have nothing to do with the Litigation and/or that first arise after the settlement date. The release, by its terms covers ALL Visa and MasterCard rules that were in place on the preliminary approval date, and all future rules and future conduct that are substantially similar to the rules and conduct in place on the preliminary approval date. This encompasses 100's of pages of rules, some of which have never been disclosed to Jo-Ann and the other class members by Visa and MasterCard. The majority of the rules have absolutely no relationship to the allegations in the Litigation complaint. It is safe to say that virtually any lawsuit brought by a merchant against Visa and MasterCard in the future will be met by a motion to dismiss on the basis of the release in this Litigation.

The payment industry is on the cusp of significant technology change, with new potential vendors developing alternative technologies to payment cards (e.g., mobile payments). Freed by the settlement releases from any challenge to their anticompetitive activities aimed at thwarting the potential new competition, Visa and MasterCard can mount a strong effort to defeat the potential competitors and extend their duopoly into the new payment technologies, as they were able to do with respect to the debit card business when it became a competitive threat to credit cards.

The remedies being provided by the settlement, that allegedly justify the unprecedented scope of the release, are of little to no value to Jo-Ann, and to merchants accounting for the bulk of the interchange payments which are the subject of the Litigation, as explained in detail in the next point.  If the Court grants final approval to

the settlement, it is imperative that both the Rule 23(b)(2) and Rule 23(b)(3) releases be substantially modified to eliminate their clear over-breadth, which is contrary to due process and public policy.

3.    The primary justification for the broad scope of both the Rule 23(b)(2) and Rule 23(b)(3) releases – that merchants will be able to use the newly-granted right to surcharge to offset market power and marketplace abuse by Visa and MasterCard – is false.

Jo-Ann and all other merchants who operate in any of the eleven states that currently prohibit surcharging cannot surcharge in those states. SIGNIFICANTLY, SUCH MERCHANTS ALSO CAN NOT SURCHARGE IN ANY OTHER STATE due to the Visa and MasterCard rules and this settlement, which prohibit selective surcharging within each brand or product class of payment card. Thus, as a starting point, the right to surcharge only exists for merchants who do not do business in ANY of the eleven states that currently prohibit surcharging and which do not make any e-commerce, catalog, telephone, mail order or other sales into states that prohibit surcharging. A small brick and mortar merchant with a single location in a state that permits surcharging will lose the right to surcharge if it makes a single mail-order credit card sale to a customer in a state that prohibits surcharging. The states that prohibit surcharging include some of most populous states (e.g., California, Florida, Texas and New York). In the case of Jo-Ann, more than 35% of our stores and more than 37% of our sales are in the 11 states that currently prohibit surcharging. The percentage is likely to grow since many additional states currently are considering surcharging bans.

Jo-Ann and all other merchants that accept American Express cards also are prohibited from surcharging due to the interplay of the proposed settlement and American

# A1480

## STATEMENT OF OBJECTIONS

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 2 2 2013 ★

BROOKLYN OFFICE

May 17, 2013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                                      :
In re PAYMENT CARD INTERCHANGE                        :
FEE AND MERCHANT DISCOUNT                             :
ANTITRUST LITIGATION                                  :
                                                      :
-----------------------------------------------------x

No. 05MD01720 (JG) (JO)

B & H Foto & Electronics Corp., D/B/A B&H Photo, is a member of the plaintiff class in the case referenced above. Since our founding in 1973 we have operated a photographic and electronics business. We have grown over the years and currently employ over 1,700 employees. Our retail store is located at 420 9th Ave., New York, NY 10001. We also maintain a thriving international business-to-business, Internet and mail-order catalog business. Our URL is www.bhphoto.com.

We have accepted Visa and MasterCard, among other credit cards, from the 1970s to the present day.

We object to the settlement in this lawsuit because the proposed settlement does not address the core issue of Visa's and MasterCard's price fixing of interchange rates for the issuing banks. The proposed settlement actually validates that practice, enabling Visa and MasterCard to continue to fix fees for the banks that merchants and their customers have no choice but to pay. I fear that maintaining the current anti-competitive structure will simply enable Visa and MasterCard to recoup their settlement disbursements through inflated interchange rates and assessment fees well into the future.

I realize that the Defendants have agreed to modify their operating rules and conduct in modest ways (e.g., to permit surcharging), but such relief is of no practical utility for a variety of logistical and regulatory reasons. As a New York domiciled business, we are not permitted to surcharge on sales transactions for which New York has regulatory jurisdiction. Moreover, our inability to surcharge for American Express transactions (under the terms of our Merchant Agreement) further constrains our ability to surcharge for Visa and MasterCard transactions. Perhaps most significantly, our business model would suffer grave injury from a customer perspective should we choose to surcharge. Therefore, it is our belief that the proper remedy should be to reverse the anti-competitive structure of the interchange-setting process.

I believe that the release of all future claims against Visa and MasterCard for their historical operating rules and conduct (or substantially similar operating rules and conduct as may be implemented in the future) is too valuable a chit to offer to the Defendants. This "get out of jail free" card should not be granted; rather, the Defendants should continue to be held accountable for past anti-competitive actions unless their underlying anti-competitive business model is terminated.

# A1481

## STATEMENT OF OBJECTIONS - continued

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                           :
In re PAYMENT CARD INTERCHANGE            :
FEE AND MERCHANT DISCOUNT              :          No. 05MD01720 (JG) (JO)
ANTITRUST LITIGATION                              :
                                                           :
                                                           :
-----------------------------------------------------------x

I am aware that this lawsuit has dragged on for many years and that the Lead Plaintiffs, Defendants and even the Court may be favorably disposed to a reaching a resolution in the near term.  While I'm not asserting that any party is acting in bad faith, I'm afraid the interests of the broader Class of merchants may have taken a back seat to this interest of the litigants, to our possible detriment.

Thank you for your consideration.  Please do not hesitate to contact me should you wish to discuss these issues further.

Sincerely yours,

David Barach
Assistant Treasurer
B & H Foto & Electronics Corp.
420 Ninth Ave.
New York, NY 10001
davidba@bhphoto.com
*212-239-7500 x2552*

Distribution:

> United States District Court for the Eastern District of New York
> Clerk of the Court
> 225 Cadman Plaza
> Brooklyn, NY 11201

> Alexandra S. Bernay                        Wesley R. Powell
> Robbins Geller Rudman & Dowd LLP           Willkie Farr & Gallagher LLP
> 655 West Broadway, Suite 1900              787 Seventh Avenue
> San Diego, CA 92101                        New York, NY 10019

A1482



# T H E   P R O F E S S I O N A L ' S   S O U R C E

**David Barach**
**Assistant Treasurer**

May 17, 2013

United States District Court for the Eastern District of New York
Clerk of the Court
225 Cadman Plaza
Brooklyn, NY 11201

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAY 22 2013 ★

BROOKLYN OFFICE

To the Honorable Judge Gleeson:

Please find attached our letter of objection to the proposed settlement of PAYMENT CARD
INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION, Docket No.
05MD01720 (JG)(JO).

Please do not hesitate to contact me should the Court or any of the parties require additional
information.

Sincerely yours,

David Barach

enclosure

Copies to:

Alexandra S. Bernay                          Wesley R. Powell
Robbins Geller Rudman & Dowd LLP             Willkie Farr & Gallagher LLP
655 West Broadway, Suite 1900                787 Seventh Avenue
San Diego, CA 92101                          New York, NY 10019

212-239-7500, x2552
davidba@bhphoto.com
B&H Foto & Electronics Corp.
420 Ninth Avenue
New York, NY 10001
www.bhphotovideo.com

# A1483

**Boscov's Department Store, LLC**
P.O. Box 4116, Reading, PA 19606-0516 / Phone: 610.779.2000 / www.boscovs.com

**STATEMENT OF OBJECTIONS**

*Boscov's*

**TO:** Clerk of Court
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, NY 11201

Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Wesley R. Powell
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x
              :
In re PAYMENT CARD INTERCHANGE    :    No. 05MD01720 (JG) (JO)
FEE AND MERCHANT DISCOUNT      :
ANTITRUST LITIGATION           :    **STATEMENT OF OBJECTIONS**
              :
------------------------------------------------------x

    The following company is a member of the Rule 23(b)(2) plaintiff class in the case called *In re*

*Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.* This company is a class

member because it operates:

    Business Name(s): Boscov's Department Store, LLC

    Street Address: 4500 Perkiomen Ave

    City: Reading   State: PA   Zip Code: 19606

and it has accepted Visa and/or MasterCard from at least the 1970s until present.

1

# A1484

This company objects to the settlement in this lawsuit for the following reasons:

1.  This company is a member of National Retail Federation ("NRF") and it adopts and incorporates by reference the objections set forth in the submission made by NRF in opposition to the proposed settlement.

2.  The proposed settlement does not address Visa's and MasterCard's price fixing of interchange rates for the banks, the subject of the core claims in the case. The proposed settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that merchants and their customers have no choice but to pay.

3.  Instead of addressing the core claims in the case, the settlement merely provides merchants with a limited ability to surcharge Visa and MasterCard credit card transactions that is of virtually no value to us.

    We operate stores in the state of New York which prohibits surcharging of credit card transactions.  Because of this law, the principal relief is of speculative value to us.

4.  We accept American Express transactions. We cannot realistically drop American Express acceptance without serious detriment to our business.  The settlement limits our ability to surcharge Visa and MasterCard credit card transactions because under its proposed terms we can only surcharge Visa and MasterCard transactions if we also surcharge American Express transactions (because American Express transactions cost us more on average than Visa or MasterCard).  However, American Express requires that we surcharge all other payment cards if we surcharge American Express.   This would mean that we would have to surcharge American Express cards *and* MasterCard cards even if it was only our intent to surcharge Visa cards. We also would have to surcharge Visa and MasterCard labeled debit cards, thus discouraging consumers from using debit, even though debit is a cheaper form of payment. The perverse result of the settlement's surcharging provisions (if they were to be used at all which we doubt given these problems) would be to create inaccurate price cues to consumers and, thereby, to defeat the very purpose for which the lawsuit allegedly was brought: to undo the anti-competitive constraints the card networks have imposed on this market.  The surcharging provision is not only of no value, it would make us worse off than we are currently.

5.  The release will not allow this company to protect against mistreatment by Visa/MasterCard. It purports to cover all Visa and MasterCard rules and conduct that were in place upon preliminary approval of the settlement, and all future rules and future conduct that are substantially similar to rules and conduct in place at preliminary approval stage.  These rules are unfair and problematic for this company.

6.  Based on the outcome of the settlement, we do not believe the lawyers who negotiated it represented our best interests.

# A1485

My contact information is:

> Name: Toni Miller
>
> Title: SEVP/CAO/CFO
>
> Street Address: 4500 Perkiomen Ave.
>
> City:  Reading  State:  PA   Zip Code:  19606
>
> Phone No.: 610-779-2000

The contact information for my company's general counsel is:

> Name:  Scott Esterbrook
>
> Street Address: 2500 One Liberty Place
>
> City: Philadelphia  State:  PA  Zip Code: 19103
>
> Phone No.: 215-851-8146

Signature: _____

Date: May 22, 2013

# A1486

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

IN RE PAYMENT CARD INTERCHANGE FEE        05-md-1720 [JG] [JO]
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

------------------------------------------------------------------ X

### RETAILERS AND MERCHANTS' OBJECTION
### TO FINAL APPROVAL OF THE CLASS ACTION
### DEFINITIVE SETTLEMENT AGREEMENT

## I.    INTRODUCTION AND PRELIMINARY STATEMENT

In the Definitive Class Settlement Agreement (the "Settlement Agreement"), the

Visa Defendants, Mastercard Defendants, and Bank Defendants (collectively

"Visa/Mastercard") – along with fewer than <u>half</u> of the originally proposed class

representatives willing to support the settlement[1] (the "Class Representatives") – have

agreed to grant Visa/Mastercard immunity from liability stemming from any *future*

application, interpretation, or conduct under their presently effective rules governing

merchants.  In exchange, Visa/Mastercard have committed to pay to a class "comprised of

*millions*" of members (Mem. Law Supp. Mot. Class Cert. 30) an amount roughly

---

[1] In the initial motion for class certification, Class Counsel offered "nineteen Plaintiff class representatives."  (Redacted Mem. Law Supp. Mot. Class Cert. 7.)  When it became time to provisionally certify the Class for purposes of preliminary approval of this settlement, only *nine* remained.  (Mem. Supp. Mot. Class Settlement Prelim. Approval 1 n.2.)  Gone are merchants and organizations such as D'Agostino Supermarkets, Inc., the National Restaurant Association, the National Association of Convenience Stores, and the National Grocers Association (*cf.* First Consol. Am. Class Action Compl. ¶¶ 18, 23-27, 40-46), leaving others like Payless ShoeSource, Inc. and Leon's Transmission Service, Inc. to fend for the Class (*see* Mem. Supp. Mot. Class Settlement Prelim. Approval 1 n.2).

1

equivalent to the sum collected over *a couple of months* from credit card "swipe" fees, even though the operative pleadings allege that Visa/Mastercard carried on their antitrust conspiracy for *years*. Visa/Mastercard have additionally approved changes to a few of the numerous rules subject to the applicable releases, and the Settlement Agreement requires them to offer a discounted swipe fee, or "interchange" rate, for a period of a scant eight months. After that, should the Court approve the settlement, Visa/Mastercard may proceed with their anticompetitive conduct with impunity, comfortable that they are free to do so thanks to the releases within the Settlement Agreement.

Visa/Mastercard and the Class Representatives seek to accomplish the relinquishment of future antitrust damage claims through the imposition of a mandatory, non-opt-out, class under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The use of a Rule 23(b)(2) non-opt-out class to release future claims "exceeds what the Court may permit." *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y 2011) (denying final approval to a settlement that would have released future claims, even in a Rule 23(b)(3) class which would have allowed opt-outs). Moreover, "[t]he defendants would obtain these releases without agreement to permanently alter the conduct which gave rise to the lawsuit," *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 580 (E.D. Pa. 2001), and the releases would cover *all* Visa/Mastercard rules presently in effect, rather than the few at issue in this dispute, so that they then would "extend far beyond the conduct challenged in the litigation," *id.* at 576. For these and other reasons discussed throughout this objection, final approval of the Settlement Agreement should be denied.

## II.    **THE OBJECTING PARTIES**

These objectors opposing the Settlement Agreement in this Objection are in addition to those retailers and merchants originally named in the Retailers & Merchants Objection to Proposed Class Settlement Agreement [Document 1653], filed on October 18, 2012 (the "R&M Objectors"), and additional objections of retailers and merchants who oppose final approval of the Settlement Agreement after having received notice of the settlement, Objection filed May 15, 2013 [Document 2281].   The following additional retailers and merchants (collectively "R&M Objectors") are:

1.   AIMCO Equipment Company, LLC – Little Rock, Arkansas

2.   Desert European Motorcars, Ltd. – Rancho Mirage, California

3.   Newport European Motorcars, Ltd. – Newport Beach, California

4.   San Diego European Motorcars, Ltd. – San Diego, California

5.   Park Hill Collections, LLC – Little Rock, Arkansas

6.   Riverbike of Tennessee, Inc. – Nashville, Tennessee

7.   Par's Custom Cycle, Inc. – Oklahoma City, Oklahoma

8.   V.I.P. Motor Cars Ltd. – Palm Springs, California

These retailers and merchants represented in this objection to final approval of the Class Settlement Agreement are a broad-based, diverse group of businesses in Arkansas, Tennessee, Oklahoma and California.  These objecting retailers and merchants sell goods to consumers in exchange for payment by credit cards and pay interchange ("swipe") fees.

From the original objection filed by the R&M Objectors, by approximately half of

3

the original class representatives this past summer, to the large group of objectors present at the preliminary approval hearing held on November 9, 2012, the objection to this proposed class settlement is significant, material and continues to grow.[2]  The reasons are simple:  This settlement: (1) proposes to bind absent class members to the settlement and release future claims related to the swipe fees while providing immunity to Visa/Mastercard and member banks for future anticompetitive behavior; (2) violates the due process rights of Class Members by providing no legitimate right of opt-out to Class Members; (3) releases Visa/Mastercard from liability for conduct completely unrelated to matters litigated in this case; (4) contains deficient notice because the notice does not provide a legitimate opt-out opportunity; and (5) provides illusory and non-uniform and class-wide relief in the form of a surcharge, which many absent class members will not impose on their customers for several reasons.

Further, the exodus of a large group of class representatives from the settlement illustrates its inherent flaws and unfairness.  The Settlement Agreement is materially flawed in its current form.  For these reasons, and as discussed in further detail below, these R & M Objectors respectfully submit the settlement is not reasonable, adequate or fair to the entire class bound by the Settlement Agreement.

---

[2] By way of comparison, the Court's approval of the settlement agreement in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (Gleeson, J.), while it involved some 5 million merchants, only had 18 merchant objectors.  297 F. Supp. 2d at 409.

III.    **ARGUMENT**

A.      **The Settlement Agreement Violates Due Process**

By its very nature, a proposed class action settlement that violates the Due Process Clause of the United States Constitution can be neither "fair, reasonable, [nor] adequate," Fed. R. Civ. P. 23(e)(2), which is the standard governing the propriety of final approval, *see id.*  The Settlement Agreement violates due process in a variety of ways, among them the proposed – and mandatory – release of Visa/Mastercard from liability for any future damages in derogation of the nation's antitrust laws, without any legitimate right to opt-out.  The Settlement Agreement is wholly improper, and final approval should not be forthcoming.

1.      **The Release Of *Future* Antitrust Liability By Way Of A Mandatory 23(b)(2) Class Is Completely Impermissible Under United States Supreme Court Precedent**

The present settlement includes a Class to be certified under Rule 23(b)(2) of the Federal Rules of Civil Procedure, thus affording no opportunity for any of the millions of Class Members to opt out of the terms which would bind that aggregation of merchants.  *See* Fed. R. Civ. P. 23(b)(2), (c)(2)(A) (confirming that a (b)(2) class includes no right to "opt-out").  Thus, should final approval occur, the individuals and businesses within this enormous class will have had no choice but to release Visa/Mastercard from any causes of action regarding *future* damages for violations of antitrust laws.  The United States Supreme Court has rejected collusive settlements just like this.

In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815  (1999), the Supreme Court considered

5

the permissibility under Rule 23 of a settlement that would relinquish class members' future claims without giving them an opportunity to opt out.  *Id.* at 843-48 .  After emphasizing the "serious constitutional concerns raised by the mandatory class resolution of individual legal claims, *especially where a case seeks to resolve future liability in a settlement only action*." *id.* at 842 (emphasis added),[3]  the Court wasted no time in rejecting the settlement before it.  *Id.* at 830, 864-65; *see also Molski v. Gleich*, 318 F.3d 937, 948-49 (9th Cir. 2003) ("[T]he Supreme Court in *Ortiz* expressed its growing concern regarding the constitutionality of certifying mandatory classes when damages are at issue.").

The Court made clear that a class settlement which would sacrifice monetary damages claims possessed by individual members of the class, with no chance to opt out of that result, is beset with Constitutional infirmities.  First of all, "the certification of a mandatory class followed by settlement of its action for money damages obviously implicates the Seventh Amendment jury trial rights of absent class members."  *Ortiz*, 527 U.S. at 845-46.  Continuing on, the Court explained, "By its nature . . . a mandatory settlement-only class action with legal issues and future claimants compromises [class

---

[3] Elsewhere in the *Ortiz* opinion, the Court reiterated the increased concern for absent class members necessary whenever certification occurs only to facilitate settlement of classwide claims.  *Ortiz*, 527 U.S. at 842, 848-49; *see also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 570 (E.D. Pa. 2001) (exercising "*great care* in reviewing the settlement" because it had "only conditionally certified the class" (emphasis added)).  Of course, certification here occurred only in the context of settlement.  (*See* Order of 7/17/2012 (deeming Plaintiffs' Motion for Class Certification "withdrawn" in light of anticipated settlement); Prelim. Approval Order ¶ 6 ("[T]he Court *provisionally* certifies, *for settlement purposes only*, a Rule 23(b)(2) *Settlement Class*, from which exclusions shall not be permitted . . . . " (emphases added).)

# A1492

action plaintiffs'] Seventh Amendment rights without their consent." *Id.* at 846.

In addition to violating class members' rights under the Constitution's Seventh Amendment, mandatory, settlement-only classes also run afoul of the Due Process Clause. The *Ortiz* opinion elaborated:

> The inherent tension between representative suits and the day-in-court ideal is only magnified if applied to damage claims gathered in a mandatory class. Unlike Rule 23(b)(3) class members, objectors to the collectivism of a mandatory [class] action have no inherent right to abstain. The legal rights of absent class members (which in a class like this one *would include claimants who by definition may be unidentifiable when the class is certified*) are resolved regardless either of their consent, or, in a class with objectors, their express wish to the contrary.

*Ortiz*, 527 U.S. at 846-47(emphasis added). As such, the Court confirmed "that before an absent class member's right of action [is] extinguish[ed] due process require[s] . . . *at a minimum* [that] an absent plaintiff . . . be provided with an opportunity to remove himself from the class." *Id.* at 848 (emphasis added and quotation omitted).

The mandatory, non-opt-out, settlement-only class created by the Settlement Agreement does not at all live up to the minimum constitutional requirements emphasized in *Ortiz*. *See Molski*, 318 F.3d at 949 n.13 (observing that the concerns highlighted in *Ortiz* "appl[y] to any mandatory class, whether under 23(b)(1) or (b)(2)"). The R&M Objectors submit that the Rule 23(b)(2) class now before the Court, by releasing unliquidated *future* damages claims with respect to rules of Visa/Mastercard *unrelated to this litigation*, contains a damages component that is more than "incidental" to the injunctive relief. *See Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 164 (2d Cir.

7

2001) ("By definition . . . incidental damages must be susceptible to computation by means of objective standards and not dependent in any significant way on . . . intangible, subjective differences." (quotation omitted)).  Consequently, the ***only*** way this Class can be salvaged is through the issuance of a ***new*** notice affording Class Members a chance to opt out.  *Cf. id.* at 166 ("[A]ny due process risk posed by (b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members . . . .").

> 2.   **The Release Of *Future* Antitrust Liability By The Rule 23(b)(3) Class Is Inappropriate**

Perhaps doubting the sustainability of the proposed 23(b)(2) class, Visa/Mastercard and Class Representatives also included releases of future antitrust claims in the Rule 23(b)(3) "damages" class described in the Settlement Agreement.  (*See, e.g.,* Definitive Class Settlement Agreement ¶ 33(h) (affirming that Rule 23(b)(3) release includes claims "based on or relating to . . . the *future* effect in the United States of the continued imposition of or adherence to any Rule of [Visa/Mastercard] in effect in the United States as of the date of the Court's entry of the [Preliminary Approval Order]" (emphasis added)).  Because this Rule 23(b)(3) class does not offer Class Members a legitimate opportunity to opt out of a settlement that releases future damages,[4] this release, too, falls short of constitutional demands.  This is especially so given the heightened scrutiny directed toward this settlement-only class.  *Ortiz*, 527 U.S. at 848-49, 119 S. Ct. at 2316 ("When a

---

[4] As explained in Section III.B. of this Objection, the Notice itself is constitutionally defective because, as a practical matter, it does not offer class members a legitimate opportunity to opt-out of the proposed relief.

district court . . . *certifies for class action settlement only*, the moment of certification requires 'heightene[d] attention' to the justification for binding the class members." (emphasis added)).

The Supreme Court's opinion in *Ortiz*, as well as its decision in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997), stand as towering authorities for the general proposition that, when it comes to releases for *future* conduct, "the interests of present and future victims are so unavoidably opposed that the one group cannot 'fairly and adequately protect the interests' of the other." James Grimmelmann, FUTURE CONDUCT AND THE LIMITS OF CLASS-ACTION SETTLEMENTS, 91 N.C. L. Rev. 387, 391 (2013) (citing Fed. R. Civ. P. 23(a)(4), *Ortiz*, *supra* and *Amchem*, *supra*)).

The Settlement Agreement seeks to release future claims and insulate Visa/Mastercard from future transgressions of an anticompetitive nature. The Court's own docket is filled with substantial opposition to this unfair term of the Settlement Agreement. The large numbers of objections to the settlement agreement and opt outs with valid concerns weighs heavily against approving the class settlement as fair, reasonable and adequate. *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 676 (S.D. N.Y. 2011) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785, 812 (3d Cir. 1995)). Moreover, it is significant that the Settlement Agreement proposes to release *future* antitrust conduct engaged in by the Defendants on a class-wide basis. District courts have generally held that in cases involving antitrust law, future

violations cannot be waived in the context of a class action settlement.  *See Schwartz v. Dallas Cowboys Football Club, Ltd*., 157 F. Supp. 2d 561 (E.D. Pa. 2001); *Three Rivers Motor Co. v. Ford Motor Co*., 522 F.2d 885, 896 n.27 (3d Cir. 1975) (citing cases from several circuits that while a general release of antitrust violations is permitted, a release may not "waive damages from future violations of antitrust laws").

*Schwartz* is persuasive and its reasoning applies here.  In *Schwartz*, the district court rejected a Rule 23(b)(3) class settlement in an antitrust lawsuit, finding the release in the settlement agreement was too broad.  *Schwartz*, 157 F. Supp. 2d at 577-78.  The district court regarded the release too broad "because it bars later claims based on future conduct." *Id*. at 578.  The *Schwartz* court held it was improper to "bar later claims based not only on past conduct but also future conduct."  *Id*.  The district court also held that because the release was so broad there was a lack of consideration for the class members bound by the settlement agreement.  The court reasoned:

> Under the release proposed by the parties, defendants could potentially expand their alleged bundling activities in other non-exempt channels of communication (such as the Internet) and face no potential liability with respect to the 1.8 million class members as long as they provide Single Sunday Ticket for satellite distribution under the terms expressed in the Settlement Agreement.  *Such a result offers the possibility of far greater protection for defendants than is justified from the benefits obtained by the class*.

*Id*.

Here, the Settlement Agreement would prevent lawsuits against the Defendants for future wrongful conduct that is the same or ***similar*** to the wrongful conduct challenged. Defendants can violate the law eight (8) months after the class settlement is approved and

all class members would be unable to vindicate their rights and stop the unlawful conduct. Generally, injunctive relief preventing violations of antitrust law is ***permanent***.  Not with this settlement.  There is a short period of injunctive relief and then tremendous loopholes for Defendants to tweak their market behavior and set high, lock-step swipe fees, which retailers and merchants would be forced to pay after the injunction.  In light of the minimal injunctive (prospective) relief, the settlement provides far greater protection for the Defendants than is "justified from the benefits obtained by the class."  *Schwartz*, 157 F. Supp. 2d at 578.[5]  This attempt by Visa/Mastercard and the Class Representatives and Class Counsel to bind absent (even unknown or not yet conceived) class members for years into the future from bringing suit for antitrust or other violations is unprecedented in scope, unconstitutional, fundamentally flawed and unfair.  *Cf. Ortiz*, 527 U.S. at 847, 119 S. Ct. at 2315 (indicating that a court must be especially vigilant to protect absent class members "who by definition may be unidentifiable when the class is certified"); James Grimmelmann, FUTURE CONDUCT AND THE LIMITS OF CLASS-ACTION SETTLEMENTS, 91 N.C. L. Rev. 387, 394 (2013) (stating that the proposed Visa Mastercard settlement would "prevent businesses-including ones not yet in business-from objecting to many of their policies until 2021"); Adam J. Levitin, AN ANALYSIS OF THE PROPOSED INTERCHANGE FEE

---

[5] Tellingly, the Court in *Schwartz* expressed strong criticism for a settlement that would have prevented the defendants from engaging in the challenged conduct for at least one, but possibly no more than two, years.  *Schwartz*, 157 F. Supp. 2d at 573.  This Settlement Agreement does not even go that far.  Even more than *Schwartz*, then, the prospective relief in this case "provides limited additional consumer choice to the members of the class" and "is minimal at best."  *Id.*

LITIGATION SETTLEMENT 14-19 (Aug. 21, 2012).[6]

The United States Court of Appeals for the Second Circuit  has held that class member's rights to due process are violated where a Rule 23(b)(3) class settlement releases unaccrued future claims.  *Stephenson v. Dow Chemical Co*., 273 F.3d 249, 259-61 (2d Cir. 2001), *aff'd in part by an equally divided court*, *vacated in part on other grounds*, 539 U.S. 111 (2003).  Similarly, recently faced with a proposed class settlement involving release of future claims, the United States District Court for the Southern District of New York rejected the settlement.  *Google*, 770 F. Supp. 2d at 677.  The release of defendant Google from liability for *future* acts was in excess of what the district court viewed as permissible, and this aspect of the class settlement at issue was not fair, reasonable, or adequate.  *Id*. The district court cited the United States Supreme Court reasoning in *Amchem*: "'Rule 23 . . .  must be interpreted with fidelity to the Rules Enabling Act and *applied with the interests of absent class members in close view*.'"  770 F. Supp. 2d at 677 (emphasis added) (quoting *Amchem*, 521 U.S. at 629, 117 S. Ct. 2252)).  Thus, even though class counsel may be highly qualified, it is the interests and substantive rights of absent class members that have to be protected by the district court and not abridged or modified by a class settlement, lest the Rules Enabling Act be offended.  *Id*.

These Objectors respectfully submit the Settlement Agreement, which purports to cram-down an unfair settlement on absent class members with no right to opt-out, unconstitutionally impairs the right to due process afforded absent retailers and merchants by the United States Constitution and should not be judicially approved. *Alchem*, *Ortiz*,

---

[6] Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361.

# A1498

*Stevenson*, *Google*, and *Schwartz*.  The release of future claims possessed by a future class of entities presently known and unknown (as the releasing parties) impairs or abridges substantive rights of absent class members.  *See, e.g., Ortiz*, 527 U.S. at 856.  Therefore, Objectors respectfully submit, it is incumbent that the Court reject this part of the settlement as not fair, adequate or reasonable under, among other things, the Rules Enabling Act.  *See* 28 U.S.C. § 2072(b) (directing that procedural rules "shall not abridge, enlarge or modify any substantive right"); *Amchem*, 521 U.S. at 629, 117 S. Ct. at 2252 ("Rule 23 . . . must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view.").

Further, the release of the "future effect in the United States of any conduct" by any Settlement Class Released Party if it is "substantially similar to the conduct of any Rule 23(b)(3) Settlement Class Released Party related to or arising out of interchange rules, interchange fees, or interchange rates, *any* Rule[7] of any Visa Defendant or MasterCard Defendant" (*see, e.g.,* Settlement Agreement ¶ 33(h)) is excessively broad and vague in scope such that it encompasses other conduct in the future that is not directly related to this case, but which may be an unlawful variation, which substantially affects retailers and merchants.  This overly broad language in the release was conspicuously not addressed at the preliminary hearing.   Notably, neither Visa nor Mastercard  referred to this

---

[7] A *select few* rules of Visa/Mastercard were at issue in this litigation (*see* Second. Am. Compls. ¶ 23(G)-(K) (listing rules at issue), but the releases cover future claims over *any* provision in rulebooks spanning *hundreds* of pages (*see, e.g.,* Settlement Agreement ¶¶ 33(g), (h), 35(g), (h)).  Consequently, as demonstrated in Section III.A.3. of this Objection, the Settlement is invalid as overbroad.

# A1499

overreaching, overarching and overlybroad language that releases  future claims and conduct "substantially similar to the conduct of any Rule 23(b)(3) Settlement Class Relased Party related to or arising out of interchange rules, interchange fees, interchange rates . . . . "  This specific language, buried in the subsections of paragraph 33 of the Settlement Agreement, is yet another reason that this Settlement Agreement violates due process, and it speaks volumes that class counsel did not address this at the preliminary approval hearing.  To summarize, this due process violation in the release goes far beyond what the United States Supreme Court allows in nationwide class settlements and should be stricken.  *Id*.  In fact, neither Visa nor Mastercard has ever publically explained why this unfair, unreasonable and inadequate hidden language on the 25th page of the Long Form Notice at paragraph 68(h) in the release does not violate due process.

The district court in *Google* was concerned about the release of future conduct and rejected the class settlement.  The district court in *Schwartz* was concerned about the release of future conduct and rejected the class settlement.  These R&M Objectors respectfully submit the class settlement here should be rejected as unfair, unreasonable and inadequate for class members.

Significantly, in addition to large opposition, the withdrawal of several class representatives from approving the settlement reached indicates the settlement is not fair, reasonable or adequate.  Rather, it further demonstrates, the non-opt-out settlement is largely one-sided in favor of the Defendants, who give little to gain a lot, including insulation and immunity from future claims brought against them for unlawful conduct, as yet uninvented, that may touch upon the swipe fee.  This procedural and constitutional

14

# A1500

dilemma for the Plaintiffs' Class Counsel and remaining Class Representatives requires a higher bar and scrutiny for approval because of the fiduciary interests and the constitutional rights that must be protected and not abridged or modified through the Rule 23 class procedure. *Amchem*, *supra*. The district court, as a fiduciary for the absent class members, must ensure this settlement treats the class members fairly, particularly with objections and objecting proposed class representatives. *See, e.g.*, *In re "Agent Orange" Product Liability Litig.*, 996 F.2d 1425, 1438 (2d Cir. 1993) ("A judge in a class action is obligated to protect the interests of absent class members."), *cert. denied*, 510 U.S. 1140 (1994). Where a dispute exists between the class counsel and proposed class representatives as to the proposed settlement, the decision cannot "rest entirely with either the named plaintiffs or with class counsel." *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1176-77 (5th Cir. 1978), *cert denied*, 439 U.S. 1115 (1979).

There are at least three conflicts present in this class settlement. First, there is a large segment of class representatives who have withdrawn. *Pettway*, *supra*. Second, the Supreme Court has held that future claims of unknown entities cannot be released and present class representatives <u>cannot</u> adequately represent and release these claims for future entities. Grimmelmann, FUTURE CONDUCT AND THE LIMITS OF CLASS-ACTION SETTLEMENTS, 91 N.C. L. Rev. at 391 (citing to Fed. R. Civ. P. 23(a)(4), *Ortiz* and *Amchem*.). Third, absent Class Members are not given a legitimate opportunity to opt-out of the settlement class. With these real conflicts and objections, the class settlement agreement as currently written, cannot be judicially approved as "fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e)(2). *Ortiz*, *Amchem*, *Google*, and *Schwartz*    While the Settlement Agreement

15