# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),
13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON),
14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON),
14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON),
14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),
14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON)
14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON),
14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON),
14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

*On Appeal from the United States District Court
for the Eastern District of New York*

### JOINT DEFERRED APPENDIX
### VOLUME VII OF XXII
### Pages A1501 to A1751

*Submitted on Behalf of All Parties*

# **Table of Contents**

**Page**

**Volume I**

District Court Docket Entries ................................................................ A1

**Volume II**

District Court Docket Entries (cont'd) ................................................. A251

**Volume III**

District Court Docket Entries (cont'd) ................................................. A501

**Volume IV**

District Court Docket Entries (cont'd) ................................................. A751

Transfer Order, dated October 20, 2005 [Docket No. 2] ...................... A822

Excerpts of First Consolidated Amended Class Action Complaint,
    dated April 24, 2006 [Docket No. 317] .......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238, dated July 21, 2006
    [Docket No. 455-4] ........................................................................ A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238,
    dated July 21, 2006 [Docket No. 455-5] ........................................ A850

Excerpts of First Amended Supplemental Class Action Complaint
    (redacted), dated February 20, 2009 [Docket No. 1152] ............... A856

Excerpts of Second Consolidated Amended Class Action
    Complaint (redacted), dated February 20, 2009
    [Docket No. 1153] ......................................................................... A858

i

**<u>Table of Contents</u>**
**(continued)**

<u>Page</u>

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154]................ A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ............................................ A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] ......................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533].................. A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536] ........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ............................................. A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ............................... A945

**Volume V**

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545]................. A1011

## **Table of Contents**
### **(continued)**

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
　Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
　Rule 56.1(b) (redacted), dated October 21, 2011
　[Docket No. 1550] ........................................................ A1014

Excerpts of Network Defendants' Memorandum in Opposition to
　the Individual Plaintiffs' Motion for Summary Judgment
　(redacted), dated October 21, 2011 [Docket No. 1551]................. A1030

Excerpts of European Commission Notification Pursuant to Article
　254 of the EC Treaty (redacted), dated November 23, 2011
　[Docket No. 1573-3] ....................................................... A1032

Notice of Filing of Memorandum of Understanding,
　dated July 13, 2012 [Docket No. 1587] ......................... A1042

Memorandum of Understanding, dated July 13, 2012
　[Docket No. 1588] ......................................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
　[Docket No. 1588-1] ...................................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
　dated August 21, 2012 [Docket No. 1616-3]................................ A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
　Approval, dated October 19, 2012 [Docket No. 1656].................. A1086

Excerpts of Appendices to Definitive Class Settlement
　Agreement,dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
　Honorable John Gleeson, US District Judge,
　dated November 9, 2012 [Docket No. 1732]................................ A1096

**Table of Contents**
**(continued)**

**Page**

Excerpts of Revised Appendix F2: Notice of Class Action
　　Settlement Authorized by the U.S. District Court, Eastern
　　District of New York, dated November 26, 2012
　　[Docket No. 1740-2] ....................................................... A1098

Class Settlement Preliminary Approval Order,
　　dated November 27, 2012 [Docket No. 1745].............................. A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
　　Plaintiffs' Motion to Stay Class Settlement Preliminary
　　Approval Order, dated November 29, 2012 [Docket No. 1751] ... A1111

Letter from Class Counsel to Judge Orenstein,
　　dated December 10, 2012 [Docket No. 1760] ............................. A1114

Excerpts of Defendants' Memorandum in Support of Final
　　Approval of Definitive Class Settlement Agreement,
　　dated April 11, 2013 [Docket No. 2110] ...................................... A1118

Excerpts of Memorandum in Support of Class Plaintiffs' Motion
　　for Final Approval of Settlement, dated April 11, 2013
　　[Docket No. 2111-1] ....................................................... A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
　　of Class Plaintiffs' Motion for Final Approval of Settlement,
　　dated April 11, 2013 [Docket No. 2111-2].................................... A1131

Declaration of Eric D. Green, dated April 11, 2013
　　[Docket No. 2111-3] ....................................................... A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
　　Class Settlement, dated April 11, 2013 [Docket No. 2111-5] ....... A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
　　Administrator's Implementation of Settlement Notice Plan,
　　dated April 11, 2013 [Docket No. 2111-6].................................... A1200

# **Table of Contents**
## (continued)

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
    Implementation and Adequacy of Settlement Notice Program,
    dated April 11, 2013 [Docket No. 2113-7].................................... A1215

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
    Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........ A1238

## **Volume VI**

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
    Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
    (Cont'd)............................................................................................ A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
    Plaintiffs' Motion for Final Approval of Settlement and Class
    Plaintiffs' Joint Motion for Award of Attorneys' Fees,
    Expenses and Class Plaintiffs' Awards,
    dated April 11, 2013 [Docket No. 2113-6].................................... A1296

Excerpts of Objection of City of Oakland to Final Approval of
    Proposed Settlement, dated May 15, 2013 [Docket No. 2279] ..... A1434

Retailers and Merchants' Objection to Final Approval of the Class
    Action Definitive Settlement Agreement, dated May 15, 2013
    [Docket No. 2281] ......................................................................... A1437

Objection of U.S. Public Interest Research Group to Final
    Approval of Proposed Class Settlement, dated May 23, 2013
    [Docket No. 2361] ......................................................................... A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
    dated May 23, 2013 [Docket No. 2364] ........................................ A1476

Statement of Objections of B & H Foto Electronics Corp.,
    d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........ A1480

**Table of Contents**
**(continued)**

**Page**

Excerpts of Statement of Objections by Boscov's,
dated May 24, 2013 [Docket No. 2411] ........................................ A1483

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] ........................................................................ A1486

**Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] (cont'd) ........................................................... A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] .............. A1512

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated May 24, 2013 [Docket No. 2427] .................... A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2432] ..... A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
Approval of the Settlement, dated May 24, 2013
[Docket No. 2433] ........................................................................ A1541

Excerpts of Objection of David's Bridal to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2434] ..... A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2435] ..... A1553

Declaration of John R. Manna, Vice President Operational
Controller, Lowe's Companies, Inc., dated May 24, 2013
[Docket No. 2437] ........................................................................ A1555

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2438] ........................................................................ A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2439] ........................................................................ A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2441] ........................................................................ A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
Final Approval of the Proposed Settlement, dated May 25,
2013 [Docket No. 2444] ................................................................ A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2445] ..................... A1588

Excerpts of Objection of Carter's to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2446] ..................... A1601

Objection of Coborn's Incorporated to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
Final Approval of the Proposed Settlement,
dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2449] ............... A1615

Objection of Alon USA, LP to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2450] ..................... A1621

vii

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2451] ........................................................................ A1627

Objection of IKEA US to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2458] .................... A1632

Objection of Jetro Holdings, LLC to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2459] ..... A1650

Objection of Michaels Stores, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2460] ..... A1656

Objection of NATSO Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2461] .................... A1659

Objection of National Restaurant Association to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2464] ........................................................................ A1667

Objection of Panera Bread Company to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2466] ..... A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2467] .................... A1681

Objection of Retail Industry Leaders Association to Final Approval
of the Settlement, dated May 25, 2013 [Docket No. 2469] .......... A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2470] ........................................................................ A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2471] .............. A1699

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of The Wendy's Company to Final Approval
    of the Proposed Settlement, dated May 25, 2013
        [Docket No. 2473] ........................................................ A1703

Objection of National Grocers Association to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
    [Docket No. 2493] ........................................................ A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
    Class Members WellPoint, Inc., etc., to the Proposed Rule
    23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2493-1] ..................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
    Objections of WellPoint Entities, dated May 17, 2013
    [Docket No. 2493-2] ..................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
    Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
    [Docket No. 2495] ........................................................ A1752

**Table of Contents**
**(continued)**

Excerpts of Memorandum in Support of Objections of Absent
Putative Rule 23(b)(2) Class Members Target Corporation,
Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
Ross Company, Closeout Distribution, Inc., Ascena Retail
Group, Inc., Abercrombie & FitchCo., OfficeMax
Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
American Signature, Inc. to the Proposed Rule 23(b)(2) Class
and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
[Docket No. 2495-1] ....................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,
v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
dated May 27, 2013 [Docket No. 2495-2] ...................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
[Docket No. 2509] ........................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517].......... A1828

Statement of Objections of Office Depot, Inc., Viking Office
Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
and Solutions4Sure.com, Inc., dated May 27, 2013
[Docket No. 2519] ........................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
Superstore East, Inc., Staples the Office Superstore, LLC,
Staples Contract & Commercial, Inc., Quill Corporation, Quill
Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
Thrive Networks, Inc., and SchoolKidz.com,
dated May 27, 2013 [Docket No. 2525] ......................................... A1836

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Michael S. Weisbach,
  dated May 27, 2013 [Docket No. 2533-2]..................................... A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
  Settlement, dated May 27, 2013 [Docket No. 2534] .................... A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
  Settlement, dated May 27, 2013 [Docket No. 2536] .................... A1847

Objections to Final Approval of Proposed Class Action Settlement
  and Notice of Intent to Appear of The Iron Barley Restaurant,
  Homestead Restaurant (Historical Homestead, Inc.), The Feral
  Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
  (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
  dated May 28, 2013 [Docket No. 2537] ........................................ A1850

National Retail Federation Statement of Objection to Final
  Approval of the Proposed Rule 23(B)(2) Agreement,
  dated May 28, 2013 [Docket No. 2538] ........................................ A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
  28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2] ....... A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
  dated May 28, 2013 [Docket No. 2538-20].................................. A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
  Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
  [Docket No. 2538-21]................................................................. A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
  [Docket No. 2540] ...................................................................... A1924

Objection of National Cooperative Grocers Association to Final
  Approval of the Proposed Settlement, dated May 28, 2013
  [Docket No. 2546] ...................................................................... A1926

**Table of Contents**
**(continued)**

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2559] ..... A1934

Objection of National Association of Convenience Stores to Final
    Approval of Proposed Settlement, dated May 28, 2013
    [Docket No. 2561] ........................................................................ A1942

Objection of Affiliated Foods Midwest to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2563] ..... A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
    Settlement, dated May 28, 2013 [Docket No. 2587] .................... A1963

The Home Depot's Statement of Objections to the Proposed Class
    Settlement and Memorandum in Support, dated May 28, 2013
    [Docket No. 2591] ........................................................................ A1973

**Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
    Settlement and Memorandum in Support, dated May 28, 2013
    [Docket No. 2591] (Cont'd) ........................................................ A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
    Home Depot's Objection to the Proposed Class Settlement,
    dated May 28, 2013 [Docket No. 2591-2] .................................... A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
    Settlement, dated May 28, 2013 [Docket No. 2592] .................... A2028

Objection of Consumers Union of United States, Inc. to Final
    Approval of Proposed Class Settlement, dated May 28, 2013
    [Docket No. 2598] ........................................................................ A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
    Settlement, dated May 28, 2013 [Docket No. 2605] .................... A2040

**Table of Contents**
**(continued)**

                                                                    **Page**


Excerpts of Objection of Starbucks to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2606] .....   A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
    Partners LLC, dated May 28, 2013 [Docket No. 2613]................   A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
    dated May 28, 2013 [Docket No. 2613-1]....................................   A2075

Objection of National Community Pharmacists Association to Final
    Approval of the Proposed Settlement, dated May 28, 2013
    [Docket No. 2619] ........................................................................   A2107

Statement of Objections and Amici Curiae Brief of States to Final
    Approval of the Settlement, dated May 28, 2013
    [Docket No. 2623] ........................................................................   A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643] ....................   A2147

Excerpts of Declaration of David Cote in Support of BlueCross
    BlueShield of South Carolina Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-3].................   A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
    and Blue Shield of Arizona, Inc. Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-4].................   A2180

Excerpts of Declaration of Matthew Brolly in Support of
    Independence Blue Cross Objections to Proposed Settlement,
    dated May 28, 2013 [Docket No. 2643-6]....................................   A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
    Cross of Northeastern Pennsylvania Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-7]................   A2184

xiii

**Table of Contents**
**(continued)**

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28,
2013 [Docket No. 2644] ................................................................ A2186

Excerpts of Objection of American Express Company, American
Express Travel Related Services Company, Inc., Travel
Impressions, Ltd., American Express Publishing Corp., Serve
Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee,
USA, Amex Assurance Company, and Accertify, Inc. to the
Class Settlement Agreement, dated May 28, 2013 [Docket No.
2648] ........................................................................................... A2213

Declaration of Stephen B. McCurdy in Support of Objections of
American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

**Volume X**

Notice of Motion of DFS Services LLC and Discover Bank to
Intervene, dated May 28, 2013 [Docket No. 2655] ...................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013
[Docket No. 2657-6] ..................................................................... A2252

Objection of DFS Services LLC, Discover Loans, Inc., and
Discover Bank to Final Approval of Proposed Settlement,
dated May 28, 2013 [Docket No. 2659] ........................................ A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule
23(b)(3) Damages Case, dated May 28, 2013
[Docket No. 2663] ........................................................................ A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in
Opposition to Motion for Final Approval of Settlement, dated
May 28, 2013 [Docket No. 2670] .................................................. A2278

**Table of Contents**
(continued)

Excerpts of Declaration of Jeffrey I. Shinder in Support of
    Opposition to Class Plaintiffs' Motion for Final Approval of
    the Proposed Class Settlement, dated May 28, 2013
    [Docket No. 2670-1]........................................................ A2300

Excerpts of Report of Professor Jerry Hausman,
    dated May 28, 2013 [Docket No. 2670-5].................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: "Industry Facts Concerning Debit Card Regulation
    Under Section 920," by Stephen Craig Mott,
    BetterBuyDesigns, on Behalf of the Merchants Payments
    Coalition, submitted to Federal Reserve System, October 29,
    2010; Attachment F: "2011 Interchange Fee Revenue, Covered
    Issuer Costs, and Covered Issuer and Merchant Fraud Losses
    Related to Debit Card Transactions," Board of Governors of
    the Federal Reserve System, March 5, 2013
    [Docket No. 2670-6]........................................................ A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
    - Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
    Reactions to Credit Card Settlement", by Maria Aspan and
    Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
    Analysis of the Proposed Interchange Fee Litigation
    Settlement," by Adam J. Levitin, Georgetown Law and
    Economics Research Paper No. 12-033, August 21, 2012; Ex.
    70: The Nilson Report, February 2013, Issue 1,011; American
    Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
    "Merchant Surcharging – Understanding Payment Card
    Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
    to Support the U.S. Merchant Litigation Settlement," Visa,
    2013; Ex, 77: "Notice of MasterCard Rule Changes,"
    MasterCard Worldwide, December 2012; Ex. 78:
    Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
    Territories, regarding Merchant Class Action Litigation
    Settlement – Important Changes to Merchant Acceptance

**Table of Contents**
(continued)

Page

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses Q2 2012 Results - Earnings Call Transcript," Visa, May 20, 2013; Ex. 84: "New Visa, MasterCard fees stir debate within industry," The Green Sheet Online, March 12, 2013; Ex. 94: MasterCard Incorporated Management Discusses Q2 2012 Results - Earnings Call Transcript, May 20, 2013; Ex. 95: MasterCard's CEO Discusses Q4 2012 Results - Earnings Call Transcript, May 20, 2013 [Docket No. 2670-8] ........................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder: Ex. 97: "Reform of Australia's Payments System: Preliminary Conclusions of the 2007/08 Review," Reserve Bank of Australia, April, 2008; Ex. 108: Amended and Restated Global Restructuring Agreement [Docket No. 2670-9] ................................... A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed Class Settlement Agreement, dated June 5, 2013 [Docket No. 3074] ....................................................... A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013 [Docket No. 3755] ....................................................... A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed Class Settlement Agreement, dated June 6, 2013 [Docket No. 4237] ....................................................... A2405

Excerpts of Statement of Objections of the Society of Independent Gasoline Marketers of America, dated June 7, 2013 [Docket No. 4640] ....................................................... A2407

Excerpts of Objections of First Data Corporation, First Data Merchant Services, TASQ Technology, Inc., TRS Recovery Services Inc., First Data Government Solutions, and TeleCheck Services Inc. to Final Approval of Definitive Class Settlement Agreement, dated June 7, 2013 [Docket No. 4654] ..................... A2415

xvi

**Table of Contents**
**(continued)**

**Page**

Statement of Objections of Life Time Fitness, Inc.,
  dated June 11, 2013 [Docket No. 5385] ........................................   A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
  dated June 11, 2013 [Docket No. 5406] ........................................   A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
  [Docket No. 5651] ........................................................   A2434

Excerpts of Defendants' Reply Memorandum in Support of
  Final Approval of Definitive Class Settlement Agreement,
  dated August 16, 2013 [Docket No. 5937] ...................................   A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
  Further Support of Settlement Final Approval,
  dated August 16, 2013 [Docket No. 5939] ...................................   A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
  [Docket No. 5939-3] ......................................................   A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
  to the Proposed Class Settlement (redacted),
  dated August 16, 2013 [Docket No. 5939-5] ...............................   A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
  Plaintiffs' Motion for Final Approval of the Proposed Class
  Settlement, dated August 16, 2013 [Docket No. 5939-6].............   A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
  Joint Motion for Award of Attorneys' Fees, Expenses and
  Class Plaintiffs' Awards, dated August 16, 2013
  [Docket No. 5940] ........................................................   A2471

Excerpts of Reply Memorandum in Support of FDC's
  Motion to Opt Out of Rule 23(b)(2) Class Settlement,
  dated August 23, 2013 [Docket No. 5957] ...................................   A2473

xvii

**Table of Contents**
**(continued)**

**Page**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] ................................... A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] (Cont'd) .................... A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
Report of Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5978] ......................................................... A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5982] ......................................................... A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
Correct Misstatements in Supplemental Declaration of
Craig Wildfang and in Opposition to Final Approval,
dated September 10, 2013 [Docket No. 6006-1] .......................... A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-2] ...................................................... A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-3] ...................................................... A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-4] ...................................................... A2553

**Table of Contents**
**(continued)**

**Page**

Excerpts of Transcript of Fairness Heating before the
    Honorable John Gleeson, U.S. District Court Judge,
        dated September 12, 2013 [Docket No. 6094].............................. A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
    dated December 13, 2013 [Docket No. 6125] ............................... A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
    dated December 13, 2013 [Docket No. 6126] ............................... A2588

Notice of Appeal of Target Group Objectors,
    dated December 13, 2013 [Docket No. 6128] ............................... A2589

Notice of Appeal of National Retail Federation,
    dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
    [Docket No. 6175] ........................................................................ A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
    WellPoint Objectors, dated January 10, 2014
    [Docket No. 6176] ........................................................................ A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
    [Docket No. 6178] ........................................................................ A2602

Notice of Appeal of First Data Corporation, First Data Merchant
    Services, TASQ Technology, Inc., TRS Recovery Services,
    Inc., First Data Government Solutions, and Telecheck Services,
    Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
    Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
    Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
    Tousled Hair Studio), and Kristina Newman – Hair,
        dated January 10, 2014 [Docket No. 6182] ................................... A2606

**Table of Contents**
**(continued)**

**Page**

Notice of Appeal of U.S. PIRG, dated January 13, 2014
[Docket No. 6189] ........................................................... A2608

Notice of Appeal of Consumers Union of United States, Inc.,
dated January 13, 2014 [Docket No. 6190] ..................... A2609

Amended Notice of Appeal of Target Group Objectors,
dated January 21, 2014 [Docket No. 6212] ..................... A2610

Amended Notice of Appeal of Temple Eagle,
dated January 13, 2014 [Docket No. 6227] ..................... A2611

Notice of Appeal of National Federation of Independent Business,
dated February 7, 2014 [Docket No. 6234] ..................... A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
Objectors and WellPoint Objectors, dated February 7, 2014
[Docket No. 6238] ........................................................... A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
Homestead Restaurant (Historical Homestead, Inc.), The Feral
Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
(d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
dated February 13, 2014 [Docket No. 6245] .................... A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
(Amending Notice Of Appeal Filed December 13, 2013),
dated February 13, 2014 [Docket No. 6248] .................... A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
dated February 13, 2014 [Docket No. 6251] .................... A2625

**Table of Contents**
**(continued)**

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
    LLC and Temple Eagle Partners LLC, dated February 18, 2014
    [Docket No. 6257] ........................................................................ A2626

Amended Notice of Appeal of R & M Objectors,
    dated February 25, 2014 [Docket No. 6263] ................................. A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
    dated June 25, 2009 ...................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
    Credit Cards: *Rising Interchange Fees Have Increased Costs*
    *for Merchants, but Options for Reducing Fees Pose*
    *Challenges*, dated 11/2009 ............................................................ A2638

Final Judgment as to Defendants MasterCard International
    Incorporated and Visa Inc., *U.S. v. American Express Co*.,
    CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
    CV-4996 DE 143] .......................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

**Volume XII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A2751

**Volume XIII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3001

**Volume XIV**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3251

# **Table of Contents**
## (continued)

**Page**

### **Volume XV**

Visa International Operating Regulations,
  dated October 15, 2012 (Cont'd) ................................................... A3501

### **Volume XVI**

Visa International Operating Regulations,
  dated October 15, 2012 (Cont'd) ................................................... A3751

### **Volume XVII**

Interlink Network, Inc. Operating Regulations,
  dated November 15, 2012 ............................................................. A4009

### **Volume XVIII**

MasterCard Rules, dated April 11, 2012 ............................................. A4259

### **Volume XIX**

MasterCard Rules, dated April 11, 2012 (Cont'd) .............................. A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
  Case T-111/08, Judgment of the General Court
  (Seventh Chamber), dated May 24, 2012 ...................................... A4614

Minute Order deeming all pending motions for relief withdrawn
  without prejudice to reinstatement if the settlement is not
  consummated, dated July 17, 2012 ............................................... A4616

Minute Order upholding Judge Orenstein's order denying
  disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

**Table of Contents**
**(continued)**

Excerpts of Class Settlement Agreement, *In re Am. Express*
*Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2]............................................ A4623

**Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express*
*Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2] (Cont'd) .............................. A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for
Final Approval of Class Action Settlement, *In re: American*
*Express Anti-Steering Rules Antitrust Litig*., 11-md-2221
(NGG)(RER), (Redacted - Public Version), dated April 15,
2014 [Docket No. 11-md-2221 DE 362] ...................................... A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American*
*Express Anti-Steering Rules Antitrust Litig*., 11-md-02221
(NGG)(RER) (redacted), dated April 15, 2014
[Docket No. 11-md-2221 DE 370] ................................................ A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee*
*and Merchant Discount Antitrust Litig*., No. 14-md-1720
(JG)(JO), dated July 18, 2014
[Docket No. 14-md-1720 DE 104] ................................................ A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card*
*Interchange Fee and Merchant Discount Antitrust Litig*.,
No. 14-md-1720 (JG)(JO), dated July 18, 2014
[Docket No. 14-md-1720 DE 105] ............................................... A4836

## Table of Contents
### (continued)

**Page**

### Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
 Judgment of the Court (Third Chamber),
  dated September 11, 2014............................................................ A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.*
 *Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
  dated September 26, 2014 [Docket No. 13-cv-5746 DE 41]......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
 No. 13-4537 ............................................................................... A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
 Education ................................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
 U.S. District Court, Eastern District of New York ...................... A5090

### Volume XXII

#### *Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
 (filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
 to Individual Plaintiffs' Statement of Undisputed Facts,
 Pursuant to Local Rule 56.1(b) (filed under seal),
  dated May 6, 2011 [Docket No. 1477-7]....................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
 There is No Genuine Issue to be Tried (filed under seal), dated
  February 11, 2011 [Docket No. 1478-4] ....................................... A5125

**Table of Contents**
**(continued)**

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
dated July 2, 2009 [Docket No. 2088]............................................ A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
under seal), dated December 14, 2009 [Docket No. 2088]............ A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
seal), dated December 14, 2009 [Docket No. 2088]...................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
dated May 3, 2011 [Docket No. 2088] .......................................... A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
dated May 3, 2011 [Docket No. 2088] .......................................... A5191

Memorandum of Law in Support of Motion to Intervene of DFS
Services LLC and Discover Bank (filed under seal), dated May
28, 2013 [Docket No. 2657-1]....................................................... A5200

Declaration of Jennifer M. Selendy (filed under seal),
dated May 28, 2013 [Docket No. 2657-3].................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
dated May 28, 2013 [Docket No. 2657-4].................................... A5231

Declaration of Roger Hochschild (filed under seal),
dated May 28, 2013 [Docket No. 2657-5].................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
Notice of Class Action Settlement Authorized by the U.S.
District Court, Eastern District of New York (filed under seal)
[Docket No. 2657-7]...................................................................... A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
dated July 2, 2009 ......................................................................... A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
dated December 15, 2009 .............................................................. A5295

## **Table of Contents**
### **(continued)**

**Page**

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
dated June 22, 2010 ........................................................................ A5297

is touted as unprecedented for the $6 billion monetary fund, Defendants will, as a practical matter, recoup any monetary amount paid out in this class settlement (which amounts to only 2-3 months worth of swipe fees) by *increasing* the swipe fee imposed upon retailers and merchants to 4% (and potentially higher) after the eight month injunction period expires.  Notably, United States Senator Richard Durbin of Illinois, a strong advocate for retailers and merchants, expressed these comments on the Senate Floor:

> The bottom line is that this proposed settlement does not make our credit card system better.  Instead, it gives Visa and Mastercard free reign to carry on their anti-competitive swipe fee system with no real constraints and no legal accountability to the millions of American businesses that are forced to pay their fees.  This is a stunning giveaway to Visa and Mastercard, all for a payout of a mere two months worth of swipe fees.  This is a *bad deal*.

Cong. Rec. S5961 (daily ed. August 2, 2012) (statement of Sen. Durbin) (emphasis added).  There is no disincentive for the Defendants in this class settlement to agree to pay a couple of months' worth of fees, after which they will raise the fee percentage to a higher amount for all credit transactions (which is a large part of the overall goods purchased), and then be underlined from suit for agreeing to raise the swipe fee.  If Defendants want to charge an anti-competitive rate in the future, the nationwide market suffers, the consumer suffers, retailers and merchants suffer and so does the Constitution, because there is no avenue to seek recourse for future wrong conduct since the release language is overbroad and excessive.  Settlement of this class action on the terms proposed exceeds the bounds of fairness and adequacy because any future claims and rights are released.  *Google*.  The withdrawing class representatives understood this and oppose this settlement because it is not fair, reasonable or adequate.

In sum, releasing future claims, in the circumstances presented here, is unconstitutional.  It is also inappropriate under the Rules of Civil Procedure as unfair, inadequate, and unreasonable for absent class members whose individual rights are taken away, with no right to opt-out.  *See, e.g., Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) (holding "there can be no prospective waiver of an employee's rights under Title VII."); *see also* Grimmelmann, Future Conduct and the Limits of Class-Action Settlements, 91 N.C. L. Rev. at 410 (citing to *Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975) (citing cases from several circuits that while a general release of antitrust violations is permitted a release may not "waive damages from future violations of antitrust laws")).  Certification of this settlement as a class to bind absent retail and merchant class members (some not yet known), should ***not*** be approved and future claims should not be released.  *Ortiz,* 527 U.S. at 842-43.

3.  **The Settlement Agreement Violates Due Process Because It Releases Conduct Far Beyond What Has Been Litigated In This Action**

These R&M Objectors recognize that "class action releases may include claims not presented and even those which could not have been presented" in a lawsuit.  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005).  This authority is not limitless, however, in that any settled claims must satisfy the "identical factual predicate" doctrine.  *See id.*; *Google Inc.*, 770 F. Supp. 2d at 675 ("[T]he released conduct [must] arise[] out of the identical factual predicate as the settled conduct." (quotation omitted)).  Applying this analysis, the Second Circuit has suggested that released claims occupy the

17

same factual predicate as those litigated when they "have been central to [a] case from its inception" or involve "essentially the same issues." *Wal-Mart Stores*, 396 F. 2d at 108-09. Stated another way, a release may encompass claims that were not pleaded in an action only so long as they "arise from the 'same nucleus of operative fact'" as pleaded claims. *Schwartz*, 157 F. Supp. 2d at 577. The releases in the Settlement Agreement waive claims completely *extraneous* to the "nucleus of operative fact" animating this litigation.

More specifically, the releases here abandon all causes of action related to "the continued imposition of or adherence to [or conduct regarding] *any Rule* of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order." (Settlement Agreement ¶¶ 33(g), (h), 35(g), (h).) This proceeding, by contrast, revolved around only a very distinct subset of those rules. (*See* Second. Am. Compls. ¶ 23(G)-(K) (specifying rules at issue.) By releasing Visa/Mastercard from liability for conduct surrounding *any* of their rules – which are found in rulebooks numbering hundreds of pages, *see* Mastercard Rules (December 12, 2012) (Exhibit 1); Visa Int'l Operating Regulations (Oct. 15, 2012) (Exhibit 2) – when this action involved only a select few of those rules, the Settlement Agreement exceeds the bounds of the "identical factual predicate" rule. Many unpleaded claims released by the Settlement Agreement bear no relation to the "nucleus of operative fact" actually litigated here. *See Google Inc.*, 770 F. Supp. at 678-79 (determining that settlement would "release claims well beyond those contemplated by the pleadings," when releases authorized Google to sell full versions of books scanned online, but case only challenged the practice of making available "snippets" of those copyrighted works);

18

# A1504

*Schwartz*, 157 F. Supp. 2d at 576-78 (concluding that release "extend[ed] far beyond the conduct challenged in the litigation" when it would insulate Defendants from claims related to events shown on cable television or the internet, even though the lawsuit dealt exclusively with satellite broadcasts).

The Settlement Agreement does not comply with the "identical factual predicate" doctrine.  On this additional ground, final approval should be denied.

**B.**   **The Notice to the Class Is Deficient Because It Does Not Provide Class Members With Notice Of Any Real Opportunity To Opt-Out**

Effective notice is an essential prerequisite to the final approval of a class settlement.  "Adequate notice is necessary to bind absent class members."  *Stephenson v. Dow Chemical Co.*, 273 F.3d 249, 261 n.8 (2d Cir. 2001).   The reason for this is straightforward:  "[C]lass notice serves as the class members' primary, if not exclusive, source of information for deciding how to exercise their rights under Rule 23."  *Wal-Mart Stores, Inc.*, 396 F. 3d at 115.   Because the ability to opt out is a constitutional prerogative possessed by all Rule 23(b)(3) class members, *see Stephenson*, 273 F.3d at 260 ("Due process requires . . . an opportunity to opt out."), the notice must contain any information that might be an "essential factor" in a class member's decision whether to opt out of the class, *see Wal-Mart Stores, Inc.*, 396 F.3d at 115.

The notice here is insufficient because it only advises class members of an ability to opt out of an insignificant portion of the settlement,[8] while informing them that they

_____

[8] Class Counsel will undoubtedly trumpet the total dollar amount of the settlement, but it must be remembered that it will be divided among "millions" of Class Members (Mem.

19

have no option but to accept the most meaningful aspect of the deal: The waiver of any ability to sue Visa/Mastercard in the future. Faced with this Hobson's Choice, a merchant will most likely elect not to opt-out, in order to preserve a meaningful objection (which would be unavailable upon opting out from the Rule 23(b)(3) Class) to the settlement of future damages, which is the most significant and offensive aspect of the settlement. The notice does not provide a legitimate opportunity to opt-out to protect individual claims against the Defendants for their future conduct.

This settlement is so fundamentally flawed, and the Notice is so intrinsically deficient, that even the most legally astute Class Member would be uncertain of what action to take upon receiving this Notice. As things stand now, all absent Class Members have been told that even if they opt-out of the Rule 23(b)(3) Class, they will lose the ability to sue Visa/Mastercard in the future. In this circumstance, even if a merchant disagrees with the relief afforded by the current "damages" settlement, it is likely to stay in the class so as to retain the ability to object to the more significant waiver of future rights.[9]  Should this Court agree that the relinquishment of future damage claims under a mandatory Rule 23(b)(2) class is improper, or conclude that such a release is inappropriate under Rule 23(b)(3), or both, the entire analysis surrounding a decision to opt out is altered. In that scenario, if a business could preserve future damage claims by

Law Supp. Mot. Class Cert. 30). That being so, the amount any individual Class Member might expect to receive from this settlement is negligible.

[9] In this unique settlement, which involves a merger of 23(b)(2) and 23(b)(3) classes, it is anything but clear whether a Class Member could object to the 23(b)(2) release of future claims even while opting out of the 23(b)(3) class. If there is disagreement among lawyers whether this might theoretically be possible, there is assuredly great confusion among the laymen comprising the Classes.

opting out of the 23(b)(3) class – without being forced to accept the loss of future damage claims – it may very well decide to opt-out even though it is not doing so now.  On the other hand, if this Court invalidates future damages releases under both 23(b)(2) and 23(b)(3), the same Class Member might determine that it makes sense to remain a party to the claim for current damages.  Basically, the point is that a ***new notice, containing a new – and legitimate – opportunity to opt out,*** will be required should this Court revise the aspect of the Settlement Agreement releasing future damage claims.

In essence, the notice presents Class Members with no opportunity to opt out at all – at least no opportunity to effectively do so – and it is therefore defective.[10]  Final approval of the settlement should be denied.

### C.   The Surcharge is Illusory and Non-Uniform Class Relief

Class certification is impermissible where the proposed relief among class members is not uniform.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2557 (2011). Ten states prohibit retailers and merchants from imposing surcharges on customers.  These states are California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma and Texas.  Other states such as New Jersey and Rhode Island are also

---

[10] It is also important to bear in mind that the releases apply to *future* causes of action that have not yet materialized.  As such, those who will possess those claims have no way of presently deciding whether they should opt out or not.  It was in just this sort of situation that the Supreme Court in *Amchem* doubted whether notice could ever be effective. *Amchem*, 521 U.S. at 591 ("Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out.").  Of course, this case is even worse than *Amchem*, given that a merchant who makes an "intelligent" decision to opt out of the Rule 23(b)(3) class, attempting to preserve future damages claims, will still be bound by the mandatory 23(b)(2) release.  This settlement is hopelessly flawed.

looking at regulating the surcharge on consumers.  This surcharge prohibition eliminates a large percentage of transactions from achieving any benefit from the settlement, (*Prelim. Approval Hr'g. Tr.* at 51, lines 21:24), and it places the absent class member in conflict with state law so the benefit cannot be realized.  *See, e.g.*, *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 808 (3d Cir. 1995) ("One sign that a settlement may not be fair is that some segments of the class are treated differently from others."); *True v. American Honda Motor Co.*, 749 F.Supp.2d 1052, 1067 (C.D. Cal. 2010) ("Courts generally are wary of settlement agreements where some class members are treated differently than others.").

Under the Supreme Court's holding in *Dukes*, *supra*, that "an indivisible injunction" must  benefit "all its members at once," or the court must undertake a case-specific inquiry into whether class issues predominate or whether the class action is a superior method of adjudicating the dispute. Predominance and superiority are not self-evident.  *Id.*  The surcharge, proposed as an element of class relief, is not nationwide relief and does not benefit the entire class. Class members are treated differently. Nevertheless, the class release binds absent class members and releases their substantive rights in the prohibited states. Thus, class members release rights to past and future conduct and do not receive the same benefits.  Since the entire class does not benefit, nationwide class certification is, therefore, inappropriate.  *Id.*  Further, binding class members to the entire settlement to force settlement violates due process.  *Amchem.*

As a practical matter, a majority of retailers and merchants in states where the surcharge is not expressly prohibited, will not impose a surcharge on their customers

purchasing goods with a credit card. To begin with, customers want <u>less</u>, not more fees.

As one article in the New York Times shortly after the agreement was reached noted:

> Given a shaky economy, many restaurants and other retailers said they had no plans to charge more when customers paid with credit cards.
>
> "Shopping with a credit card is a convenience for our customers and is an important part of our customer service," said Carolyn Beem, a spokeswoman for L.L. Bean. "We have absolutely no plans to add a surcharge for credit card purchases."
>
> Rick Camac, chief executive of the Fatty Crew group of six restaurants, including Fatty Crab, said that "<u>customers might see it as another way you're trying to get at them.</u>" (emphasis added).
>
> "I think you have to take the hit, or make it up by adjusting your prices," Mr. Camac said of paying for the credit card fees.

Stephanie Clifford, Stefanie Strom, *Merchants Considering Credit Card Surcharges*, N.Y. TIMES, July 16, 2012.

Recent articles indicate even the Defendants acknowledge that retailers will not surcharge. *See* Emily Jane Fox, *Credit card checkout fee taking effect*, CNNMONEY.com, Tuesday, January 29, 2013 (stating: "Mastercard said it doesn't expect most merchants to put the surcharge into effect, since stores won't want to drive away business."). Even though credit card swipe charges have grown nine times since 1995 of his business, the chain Redner's nor other chains will pass that expense to customers acknowledging "such a move would probably turn some away."[11]

---

[11] *Retailers, consumers take swipe at credit card surcharge*, February 18, 2013,

23

# A1509

The surcharge is also a concern to the Court regarding "the economic effect of the proposed rules change." *Prelim. Approval Hr'g. Tr.* at 63, lines 20:21. Retailers and merchants, in the states that permit a surcharge, will have to make all types of disclosures to customers that the charge is on the cost of goods and must also display the surcharge on the receipt. The retailer and merchant must treat cards similarly to avoid complaints and will encounter customers who leave the establishment, or even lawsuits from customers for imposing such a surcharge for all goods.

The surcharge is not permitted in all states and will likely not be utilized by many retailers and merchants who are members of the class to recoup Defendants' unlawful behavior. The surcharge is not legitimate class-wide relief and makes class certification improper, *see, e.g. Dukes*. Further, it pits the retailer and merchant class members against the customer for an illegal fee exacted by the Defendants. Retailers and merchants would be unfairly penalizing customers for Defendants' unlawful actions in charging the excessive swipe fee and would be releasing current and future claims against the Defendants. The class settlement agreement as written is not fair, reasonable or adequate. Fed. R. Civ. P. 23(e)(2).

## <u>CONCLUSION</u>

For the reasons stated herein, it is respectfully submitted that approval of the Settlement Agreement is not appropriate under the circumstances presented to this Court. Approval of the Settlement should, therefore, be denied.

---

readingeagle.com, http://readingeagle.com/mobile/article.aspx?id=453496.

# A1510

Dated this 24th day of May, 2013.

Respectfully Submitted,


By:        */s/Jerrold S. Parker*         
Jerrold S. Parker
Jay L.T. Breakstone
**Parker Waichman, LLP**
6 Harbor Park Drive
Port Washington, NY 11050
Telephone:  (516)-723-4620
jbreakstone@yourlawyer.com
jerry@yourlawyer.com


Phillip Duncan
Richard Quintus
**Duncan Firm, P.A.**
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com


Thomas P. Thrash, ABN #80147
Marcus N. Bozeman, ABN #95287
**Thrash Law Firm, P.A.**
1101 Garland Street
Little Rock, Arkansas 72201
Telephone: 501-374-1058
Facsimile: 501-374-2222
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

25

**A1511**

## CERTIFICATE OF SERVICE

On this 24th day of May, 2013, the above and foregoing has been sent by United States mail to the following:

Payment Card Interchange Fee Settlement
P.O. Box 2530
Portland, OR 97208-2530

Alexandra S. Bernay
Bonny E. Sweeney
**Robbins, Geller, Rudman & Dowd, LLP**
655 W. Broadway, Suite 1900
San Diego, CA 92101

Wesley R. Powell
**Wilkie, Farr & Gallagher, LLP**
787 Seventh Ave.
New York, NY 10019

K. Craig Wildfang
**Robins, Kaplan, Miller & Ciresi, LLP**
2800 LaSalle Plaza
800 LaSalle Ave.
Minneapolis, MN 55402

H. Laddie Montague, Jr.
**Berger & Montague, P.C.**
1622 Locust Street
Philadelphia, PA 19103

Matthew A. Einstein
**Arnold & Porter, LLP**
555 Twelfth Street NW
Washington, DC 20004

Peter E. Greene
**Skadden, Arps, Slate
    Meagher & Flom, LLP**
4 Times Square
New York, NY 10036

_/s/ Jerrold S. Parker_
Jerrold S. Parker

26

# A1512

**NOTICE OF OPT OUTS**

UNITED STATES DISCTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____
In re Payment Card Interchange Fee and    :      No. 05-MD-01720 (JG)(JO)
Merchant Discount Antitrust Litigation      :
_____ :

## I.      PRELIMINARY STATEMENT REGARDING OPT-OUTS

       The Notice of Settlement the class received regarding the Definitive Settlement Agreement ("Settlement Agreement") was confusing regarding the substantive rights of absent class members and whether these substantive rights would be impaired by the binding effect of a judgment entered in this case. As stated in the Class Notice and Settlement Agreement, businesses would release future claims because of the form of the release contained in the Settlement Agreement and notice plan. In particular, but not limited to: *Settlement Classes*, paragraphs 33, subparts g-h, and 68, subparts g-h of the Settlement Agreement waive future claims as published in the Notice of Settlement to the class.

       All the businesses opting out by way of this notice of opt-out feel compelled to do so in an attempt to preserve future claims against Defendants involving Defendants' Rules. Both of the settlement classes described in the Notice of Settlement waive these future claims, but it is presently unclear whether this Court will approve that waiver. These potential Class Members do not believe a waiver of future claims is valid under either Rule 23(b)(2) or 23(b)(3). The businesses identified in this Notice are opting out in case the Court allows the waiver to remain a part of the Rule 23(b)(3) settlement. If the Court determines that the waiver of future claims made under Rule 23(b)(2) is invalid, these businesses would still sacrifice the right to bring future claims against Defendants by not opting out of the Rule 23(b)(3) class.

       Given the uncertainty surrounding this settlement, the unclear and confusing class notice, and with no way of knowing what this Court will ultimately approve, these businesses feel forced to opt-out of the Rule 23(b)(3) class at this time to preserve their substantive rights and not be bound by a judgment entered in this case. However, depending upon the settlement structure ultimately sanctioned by this Court, the analysis surrounding the opt-out decision could change dramatically. If, for instance, the Court allows the waiver of future claims to remain a part of both the 23(b)(2) and 23(b)(3) releases – such that opting out of the Rule 23(b)(3) class will not, in any event, allow these businesses to seek future redress from Defendants under their Rules – these businesses may very well determine that it makes no sense to opt out of the Rule 23(b)(3) class. The same conclusion might follow should the Court *disallow* the relinquishment of future claims for both classes. In light of this confusing scenario, these businesses respectfully request that new notice be delivered to the class, with a new opportunity to opt-out or reverse an earlier decision to opt out, after the Court definitively passes upon the terms of the settlement and its binding effect on absent class members for both the 23(b)(2) and (b)(3) Settlement Classes as to future claims. Thus, in sum, the following businesses conditionally opt-out.

1

# A1513

To repeat, the businesses identified in this notice are now opting out because they feel constrained to do so as the only possible way they might somehow rescue their ability to bring future claims against the Defendants.

## II.   OPT-OUTS

I, Thomas P. Thrash, Phillip Duncan and Jay Breakstone, attorneys for the following merchants, want to exclude them from the Cash Settlement Class of the settlement in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*:

- Landers McLarty Bentonville, LLC d/b/a Landers McLarty Ford Dodge Chrysler Jeep – Bentonville, Arkansas

  Taxpayer ID Number: XXXX
  Business Location:   2609 South Walton Road
                       Bentonville, Arkansas  72712

- Landers McLarty Bentonville Nissan, LLC d/b/a Landers McLarty Nissan, LLC – Bentonville, Arkansas

  Taxpayer ID Number: XXXX
  Business Location:   2501 SE Moberly Lane
                       Bentonville, Arkansas  72712

- Bessemer AL Automotive, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Bessemer, Alabama

  Taxpayer ID Number: XXXX
  Business Location:   5080 Academy Lane
                       Bessemer, Alabama  35022

- Shreveport Dodge, LLC d/b/a Landers Dodge– Bossier City, Louisiana

  Taxpayer ID Number: XXXX
  Business Location:   2701 Benton Road
                       Bossier City, Louisiana  71111

- RML Branson MO, LLC d/b/a Tri Lakes Motors – Branson, Missouri

  Taxpayer ID Number: XXXX
  Business Location:   180 State Highway F & 65
                       Branson, Missouri  65616

2

# A1514

- RML Burleson TX, LLC d/b/a Burleson Nissan – Burleson, Texas

  Taxpayer ID Number: XXXX
  Business Location:    300 North Burleson Boulevard
                        Burleson, Texas  76028

- RML Bel Air, LLC d/b/a Bel Air Honda – Falston, Maryland

  Taxpayer ID Number: XXXX
  Business Location:    1800 Bel Air Road
                        Fallston, Maryland  21047

- Landers McLarty Fayetteville TN, LLC d/b/a Landers McLarty Toyota– Fayetteville, Tennessee

  Taxpayer ID Number: XXXX
  Business Location:    2970 Huntsville Highway
                        Fayetteville, Tennessee  37334

- RML Ft. Worth TX, LLC d/b/a Nissan Ft. Worth – Fort Worth, Texas

  Taxpayer ID Number: XXXX
  Business Location:    3451 W. Loop 820 South
                        Fort Worth, Texas  76116

- RML Huntsville Chevrolet, LLC d/b/a Landers McLarty Chevrolet – Huntsville, Alabama

  Taxpayer ID Number: XXXX
  Business Location:    4930 University Drive
                        Huntsville, Alabama  35816

- RML Huntsville AL, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Huntsville, Alabama

  Taxpayer ID Number: XXXX
  Business Location:    6533 University Drive, NW
                        Huntsville, Alabama  35806

- RML Huntsville AL Automotive, LLC d/b/a Mercedes Benz of Huntsville – Huntsville, Alabama

  Taxpayer ID Number: XXXX
  Business Location:    6520 University Drive, NW
                        Huntsville, Alabama  35806

3

# A1515

- RML Huntsville Nissan, LLC d/b/a Landers McLarty Nissan– Huntsville, Alabama

  Taxpayer ID Number: XXXX
  Business Location:    6520 University Drive, NW
                        Huntsville, Alabama  35806

- RML Huntsville, AL, LLC d/b/a Landers McLarty Subaru – Huntsville, Alabama

  Taxpayer ID Number: XXXX
  Business Location:    5790 University Drive
                        Huntsville, Alabama  35806

- Landers McLarty Lee's Summit MO, LLC d/b/a Lee's Summit Chrysler Jeep Dodge – Lee's Summit, Missouri

  Taxpayer ID Number: XXXX
  Business Location:    1051 SE Oldham Parkway
                        Lee's Summit, Missouri  64081

- RML Lee's Summit MO, LLC d/b/a Lee's Summit Nissan – Lee's Summit, Missouri

  Taxpayer ID Number: XXXX
  Business Location:    1025 SE Oldham Parkway
                        Lee's Summit, Missouri  64081

- RML Olathe II, LLC  d/b/a Olathe Dodge Chrysler Jeep – Olathe, Kansas

  Taxpayer ID Number: XXXX
  Business Location:    15500 West 117th Street
                        Olathe, Kansas  66062

- RML Waxahachie Dodge, LLC d/b/a Waxahachie-Dodge Chrysler Jeep – Waxahachie, Texas

  Taxpayer ID Number: XXXX
  Business Location:    2405 N. I-35 E
                        Waxahachie, Texas  75165

- RML Waxahachie Ford, LLC d/b/a Waxahachie Ford Mercury – Waxahachie, Texas

  Taxpayer ID Number: XXXX
  Business Location:    2401 N. I-35 E
                        Waxahachie, Texas  75167

4

# A1516

- RML Little Rock, Inc.  d/b/a Landers Harley-Davidson – Little Rock, Arkansas

    Taxpayer ID Number: XXXX
    Business Location:    10210 Interstate 30
                          Little Rock, Arkansas  72209

- RML Little Rock, Inc. d/b/a Landers Harley-Davidson – Hot Springs, Arkansas

    Taxpayer ID Number: XXXX
    Business Location:    205 Garrison Road
                          Hot Springs, Arkansas  71913

- RML Little Rock, Inc. d/b/a Landers Harley-Davidson – Conway, Arkansas

    Taxpayer ID Number: XXXX
    Business Location:    1110 Colliers Drive
                          Conway, Arkansas  72032

- Landers Auto Group No. 1 d/b/a/ Landers Scion – Little Rock, Arkansas

    Taxpayer ID Number: XXXX
    Business Locations:   10825 Colonel Glenn Road
                          Little Rock, AR 72204

- Landers Auto Group No. 1 d/b/a Landers Toyota – Little Rock, Arkansas

    Taxpayer ID Number: XXXX
    Business Locations:   10825 Colonel Glenn Road
                          Little Rock, AR 72204

- Landers Auto Group No. 1 d/b/a The Boutique at Landers Toyota – Little Rock, Arkansas

    Taxpayer ID Number: XXXX
    Business Locations:   10825 Colonel Glenn Road
                          Little Rock, AR 72204

- Landers CDJ, Inc. – Little Rock, Arkansas

    Taxpayer ID Number: XXXX
    Business Locations:   10825 Colonel Glenn Road
                          Little Rock, AR 72204

# A1517

- Landers CDJ, Inc. d/b/a Steve Landers Chrysler Dodge Jeep – Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   10825 Colonel Glenn Road
  Little Rock, AR 72204

- Landers of Hazelwood, Inc. – Hazelwood, Missouri

  Taxpayer ID Number: XXXX
  Business Locations:   9091 Dunn Road
  Hazelwood, MO 63042

- A&D Wine Corp. – New York, New York

  Taxpayer ID Number: XXXX
  Business Locations:   65 Second Ave.
  New York, NY 10003

- A&Z Restaurant Corp. – New York, New York

  Taxpayer ID Number: XXXX
  Business Locations:   65 Second Ave.
  New York, NY 10003

- 105 Degrees, LLC – Oklahoma City, Oklahoma

  Taxpayer ID Number: XXXX
  Business Locations:   5820 N. Classen Blvd., Ste. 1
  Oklahoma City, OK 73118

- Roberson's Fine Jewelry, Inc. – Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   11525 Cantrell Road, Suite 703
  Little Rock, AR 72212

- Gossett Motor Cars, Inc. – Memphis, Tennessee

  Taxpayer ID Number: XXXX

  Business Locations:   Kia – Covington Pike
  1900 Covington Pike
  Memphis, TN 38128

6

# A1518

Mazda/Hyundai/Mitsubishi
1870 Covington Pike
Memphis, TN 38128

Volkswagen/Audi/Porsche
1875 Covington Pike
Memphis, TN 38128

Chrysler/Jeep/Dodge
1901 Covington Pike
Memphis, TN 38128

- Gossett Motor Cars, Inc. – Memphis, Tennessee

  Taxpayer ID Number: XXXX
  Business Locations:  Fiat
  Wolfchase Mall
  2760 N. Germantown Parkway
  Memphis, TN 38133

  Volkswagen Germantown
  7420 Winchester
  Memphis, TN 38125

  Kia South
  2660 Mt. Moriah
  Memphis, TN 38115

  Hyundai South
  2680 Mt. Moriah
  Memphis, TN 38115

- JB Cook, LLC d/b/a Downtown Oil & Lube – Hope, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:  218 West 3rd Street
  Hope, AR 71801

- The Tennis Shoppe, Inc. – Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:  8212 Cantrell Road
  Little Rock, AR 72227

# A1519

- The Grady Corporation d/b/a Whole Hog Barbeque (Northwest Arkansas) – Bentonville, Arkansas

> Taxpayer ID Number: XXXX
> Business Locations:   1400 SE Walton Boulevard
> Bentonville, AR 72712

- The Grady Corporation II d/b/a Whole Hog Barbeque (Northwest Arkansas) – Fayetteville, Arkansas

> Taxpayer ID Number: XXXX
> Business Locations:   3009 North College
> Fayetteville, AR 72703

- Coulson Oil Company – North Little Rock, Arkansas

> Taxpayer ID Number: XXXX
> Business Locations:   1434 Pike Avenue
> North Little Rock, AR 72114
>
> *      Please see attached spreadsheet for individual location information

- Diamond State Oil LLC – North Little Rock, Arkansas

> Taxpayer ID Number: XXXX
> Business Locations:   1434 Pike Avenue
> North Little Rock, AR 72114
>
> *      Please see attached spreadsheet for individual location information

- Superstop Stores, LLC – North Little Rock, Arkansas

> Taxpayer ID Number: XXXX
> Business Locations:   1434 Pike Avenue
> North Little Rock, AR 72114
>
> *      Please see attached spreadsheet for individual location information

- PetroPlus, LLC – North Little Rock, Arkansas

> Taxpayer ID Number: XXXX
> Business Locations:   1434 Pike Avenue
> North Little Rock, AR 72114
>
> *      Please see attached spreadsheet for individual location information

8

# A1520

- Port Cities Oil, LLC – North Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   1434 Pike Avenue
                        North Little Rock, AR 72114

  \*      Please see attached spreadsheet for individual location information

- New Mercury, LLC – North Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   1434 Pike Avenue
                        North Little Rock, AR 72114

  \*      Please see attached spreadsheet for individual location information

- New Vista, LLC – North Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   1434 Pike Avenue
                        North Little Rock, AR 72114

  \*      Please see attached spreadsheet for individual location information

- New Neptune, LLC – North Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   1434 Pike Avenue
                        North Little Rock, AR 72114

  \*      Please see attached spreadsheet for individual location information

- RR #1 TX, LLC – Texarkana, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   1434 Pike Avenue
                        North Little Rock, AR 72114

  \*      Please see attached spreadsheet for individual location information

- SVI Security Solutions – Olive Branch, Mississippi

  Taxpayer ID Number: XXXX
  Business Locations:   9065 Goodman Road
                        Olive Branch, MS 38654

9

# A1521

- AIMCO Equipm2ent Company, LLC – Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   10001 Colonel Glenn Road
  Little Rock, AR 72204

- Park Hill Collections, LLC – Little Rock, Arkansas

  Taxpayer ID Number: XXXX
  Business Locations:   4717 Asher Avenue
  Little Rock, AR 72204

- Riverbike of Tennessee, Inc. – Nashville, Tennessee

  Taxpayer ID Number: XXXX

  Business Locations:   401 Fesslers Lane
  Nashville, TN 37210

  Boswell's Harley-Davidson
  401 Fesslers Lane
  Nashville, TN 37210

  Ring of Fire Harley-Davidson
  2200 Gallatin Pike N.
  Madison, TN 37115

  Boswell's Harley-Davidson of Cookeville
  1424 Interstate Drive
  Cookeville, TN 38502

  Boswell's Music City Harley-Davidson
  180 Second Avenue N.
  Nashville, TN 37201

- Par's Custom Cycle, Inc. – Oklahoma City, Oklahoma

  Taxpayer ID Number: XXXX

  Business Locations:   6904 West Reno Avenue
  Oklahoma City, OK 73127

  Harley-Davidson World
  6904 W. Reno Avenue
  Oklahoma City, OK 73127

10

**A1522**

Harley-Davidson World Shop
3433 S. Broadway
Edmond, OK 73013

- V.I.P. Motor Cars Ltd. – Palm Springs, California

    Taxpayer ID Number: XXXX

    Business Locations:   3737 East Palm Canyon Drive
    Palm Springs, CA 92264

    Mercedes Benz of Palm Springs
    4095 E. Palm Canyon Drive
    Palm Springs, CA 92264

    BMW of Palm Springs
    3737 E. Palm Canyon Drive
    Palm Springs, CA 92264

    Palm Springs Infiniti
    4057 E. Palm Canyon Drive
    Palm Springs, CA 92264

    Palm Springs Hyundai
    3919 E. Palm Canyon Drive
    Palm Springs, CA 92264

We are authorized to file opt-outs for exclusion from the Rule 23(b)(3) Settlement Class for the businesses identified in this Notice, and our personal information it as follows:

Name: Thomas P. Thrash, Esq.                   Name: Philip Duncan, Esq.
Position: Attorney                             Position: Attorney
Name of Merchants: See above                   Name of Merchants: See above
Phone No.: (501) 374-1058                       Phone No.: (501) 228-7600
Address: 1101 Garland Street                    Address: 900 S. Shackleford, Suite 725
        Little Rock, AR 72201                          Little Rock, AR 72211

Name: Jay L.T. Breakstone, Esq.
Position: Attorney
Name of Merchants: See above
Phone No.: (516) 723-4620
Address: 6 Harbor Park Drive
        Port Washington, NY 11050

Our position at the businesses that gives us authority to exclude them from the Cash Settlement Class is as follows: Legal counsel for all businesses opting out via this Notice. The telephone numbers for each Class Member is Counsel's telephone numbers above.

11

# A1523

Respectfully Submitted,

*/s/ Jerrold S. Parker*
Jerrold S. Parker
Jay L.T. Breakstone
**Parker Waichman, LLP**
6 Harbor Park Drive
Port Washington, NY 11050
Telephone:  (516)-723-4620
jbreakstone@yourlawyer.com
jerry@yourlawyer.com

Thomas P. Thrash, ABN #80147
Marcus N. Bozeman, ABN #95287
**Thrash Law Firm, P.A.**
1101 Garland Street
Little Rock, Arkansas 72201
Telephone: 501-374-1058
Facsimile: 501-374-2222
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

Phillip Duncan
Richard Quintus
**Duncan Firm, P.A.**
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

## <u>CERTIFICATE OF SERVICE</u>

On this 24th day of May, the above and foregoing has been sent by United States mail to the following:

Payment Card Interchange Fee Settlement
P.O. Box 2530
Portland, OR 97208-2530

Alexandra S. Bernay
Bonny E. Sweeney
**Robbins, Geller, Rudman & Dowd, LLP**
655 W. Broadway, Suite 1900
San Diego, CA 92101

Wesley R. Powell
**Wilkie, Farr & Gallagher, LLP**
787 Seventh Ave.
New York, NY 10019

K. Craig Wildfang
**Robins, Kaplan, Miller & Ciresi, LLP**
2800 LaSalle Plaza
800 LaSalle Ave.
Minneapolis, MN 55402

H. Laddie Montague, Jr.
**Berger & Montague, P.C.**
1622 Locust Street
Philadelphia, PA 19103

Matthew A. Einstein
**Arnold & Porter, LLP**
555 Twelfth Street NW
Washington, DC 20004

Peter E. Greene
**Skadden, Arps, Slate**
   **Meagher & Flom, LLP**
4 Times Square
New York, NY 10036

/s/ Jerrold S. Parker
Jerrold S. Parker

13

# A1525

Case 1:05-md-01720-JG-JO   Document 2422   Filed 05/24/13   Page 14 of 16 PageID #: 50893

**COULSON OIL** — 4/15/2013

| # | Phone 1 | Phone 2 | | | Type | Address | Store Name | Contact Phone | Contact Name | Zip | City | County |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 870-234-3101 | 870-836-9416 | C | S | COC | 307 HWY 79 | JK Gas Station Corp. | 714-271-1157 | Lydia Kim | 71753 | Magnolia | Columbia |
| 2 | 870-836-9416 | 870-887-8425 | C | S | COC | 1390 Hwy 4 By-Pass | Camden Shell Popeyes | 501-951-0817 | Sam E.smail | 71701 | Camden | Ouachita |
| 3 | 870-887-8425 | 870-887-8425 | C | S | COC | 105 East Main | Prescott Shell Superstop | 727-421-2927 | Fred Dharamsi | 71857 | Prescott | Nevada |
| 8 | 870-246-7984 | 870-246-8516 | C | S | COC | 3111 Pine Street (G SHINES) | Stuckey's Shell | 870-230-2112 | Carol Gilis | 71923 | Arkadahbia | Clark |
| 10 | 501-223-2220 | 501-519-2350 | C | S | SSS | 12524 Chenal Parkway | Chenal Superstop | 501-960-3405 | Nick Siddique | 72212 | Little Rock | Pulaski |
| 15 | 501-372-1403 | 501-375-3530 | C | S | SSS | 800 S Broadway | Downtown Shell | 960-3405 | Nick Siddique | 72202 | Little Rock | Pulaski |
| 18 | 501-399-9316 | 501-562-1101 | C | S | SSS | 721 E. 9th | 9th Street Shell | 960-3405 | Nick Siddique | 72202 | Little Rock | Pulaski |
| 21 | 501-223-3052 | 501-223-3056 | C | OP | SSS | 1200 South Shackleford | Road Runner #21 | 501-786-2464 | Valiabhai Bandrapalli (V)501-307-9532 / Lynne Sheridan | 72211 | Little Rock | Pulaski |
| 22 | 501-562-0033 | 501-907-0639 | C | S | COC | 10105 I-30 (Baseline) | Baseline Shell | 952-3536 | Mohammed Qassas | 72209 | Little Rock | Pulaski |
| 23 | 501-562-0152 | 501-568-4920 | C | S | COC | 8000 Geyer Springs | Geyer Springs Shell | 347-3685 | Maurice Mahoud | 72209 | Little Rock | Pulaski |
| 26 | 501-666-5056 | 501-296-9144 | C | S | COC | 7400 Cantrell | Cantrell Shell | 960-3405 | Nick Siddique | 72217 | Little Rock | Pulaski |
| 27 | 501-219-1364 | 501-219-1364 | C | S | SSS | 11401 Cantrell | Woodland Heights Shell | 501-219-1364 | Tom Atchison | 72212 | Little Rock | Pulaski |
| 29 | 501-219-8749 | 501-219-8749 | C | S | COC | 1400 Barrow Road | Barrow Shell | 501-612-3636 | Chang ho Lee | 72204 | Little Rock | Pulaski |
| 34 | 501-224-9780 | n/a | C | S | COC | 9718 Rodney Parham Rd. | Shell Superstop #34 | 501-807-5299 | Jason Han | 72207 | Little Rock | Pulaski |
| 38 | 501-455-4224 | 501-455-2573 | C | CP | COC | 13400 I-30 | County Line Shell | Mj350-3227 | Toby White / Valinda Ma | 72209 | Little Rock | Pulaski |
| 44 | 501-851-4091 | n/a | C | CP | PCO | 18820 MacArthur (I-40 & Morgan) | Morgan Phillip 66 | 690-5050 | Majid Kameli | 72118 | NLR | Pulaski |
| 45 | 501-753-7726 | n/a | C | C | COC | 2701 MacArthur (Scenic Hill) | Pike Ave Shell | 690-9-6263 | Severns & Timmons | 72118 | NLR | Pulaski |
| 48 | 501-835-8364 | 501-835-8364 | C | S | COC | 8604 Sylvan Hills Hwy. | Shell Superstop#48 | 501-249-1702 | Asif Sied Siddiqui | 72116 | NLR | Pulaski |
| 50 | 501-376-1339 | 501-376-1339 | SPLIT | SSS | PCO | 1424 Locust | Superstop 50 | 501-240-0989 | Mike Lashbrook | 72114 | NLR | Pulaski |
| 51 | 501-833-0377 | 501-833-0377 | C | C | COC | 14508 Hwy 107 | Zone Mart | 501-352-1909 | Jung Oh (OZ Industry In) | 72076 | Jacksonville | Pulaski |
| 52 | 501-835-7549 | 501-835-7543 | C | CP | PCO | 2428 Wildwood Avenue | Zone Mart | 960-5794 | Hassan Hanarmand | 72120 | Sherwood | Pulaski |
| 53 | 501-758-9408 | 501-758-9408 | C | S | COC | 3100 JFK Blvd | Parkhill Shell | 501-472-5047 | Mohammed Tasneem | 72116 | NLR | Pulaski |
| 55 | 501-327-0751 | n/a | C | S | PCO | 545 Hwy 65N | Hwy 65 Shell | 501-960-4568 | Donnie Miller | 72032 | Conway | Faulkner |
| 67 | 870-672-7250 | 501-672-7250 | C | CP | PCO | 902 North Buerkle | Stuttgart Shell #67 | 501-960-4568 | Jason Han / Jackie. cont | 72160 | Stuttgart | Arkansas |
| 80 | 501-332-2111 | 501-223-2800 | C | S | COC | 1885 Hwy 270 N | Malvern Shell | 407-616-6468 | Ike Mandani | 72104 | Malvern | Hot Spring |
| 81 | 870-245-2322 | 870-245-2322 | C | S | COC | 180 Valley Street/Jordan's Kwik Stop III) | Jordan's | 870-243-6243 | Jackie McClure | 71923 | Arkadahbia | Clark |
| 83 | 870-777-2700 | 870-777-2700 | C | S | PCO | 1201 North Harvey (I-30 & Hwy 4) | Superstop 83 | 501-613-8386 | Adam Mubarak | 71801 | Hope | Hempstead |
| 84 | 870-777-5881 | n/a | C | S | COC | 2605 Hazel | Triple J J | 870-766-6573 | Ashok Thakar | 71801 | Hope | |
| 88 | 870-255-3519 | 870-255-3749 | C | S | SSS | 4369 Hwy 63N | All Star Travel Plaza | 405-206-1283 | Mohammed (Abass) Mia | 72064 | Hazen | Prairie |
| 90 | 479-967-2200 | 479-880-1552 | C | U | PCO | 2704 N. Arkansas Ave. | Superstop #90 | 501-472-5047 | Donnie Miller | 72801 | Russellville | Pope |
| 99 | 479-632-5614 | 479-632-5614 | C | S | PCO | 510 Hwy 71 N (POB 167) | Alma Shell | 479-632-1608 | Keith Wheeler | 72921 | Alma | Crawford |
| 102 | 479-621-0441 | 479-621-0441 | C | S | PCO | 1845 South 8th Street | Rogers Shell | 479-366-0663 | Tariq Atzal | 72757 | Rogers | Benton |
| 109 | 479-643-3277 | 479-643-3065 | C | S | PCO | 2001 N. Center | Elkins Shell | 479-466-1098 | Tariq Atzal | 72727 | Elkins | Washington |
| 123 | 501-767-6317 | 501-767-5456 | C | OP | SSS | 3039 Albert Pike | Road Runner #123 | 501-249-7440 | Candida Longram | 71913 | Hot Springs | Garland |
| 124 | 501-625-7617 | 501-624-7790 | C | S | COC | 1600 Malvern | Malvern Avenue Shell | 501-276-3342 | Arun Doshi | 71901 | Hot Springs | Garland |
| 127 | 501-624-2743 | 501-525-9999 | C | S | COC | 2224 Malvern | Golf Links Shell | 501-282-1287 | Harvey Couch | 71901 | Hot Springs | Garland |
| 130 | 501-984-5075 | 501-984-5076 | C | S | COC | 4401 Hwy 7 N. | Top Of The Mountains Shell | 501-884-5839 | Sherry / Jim Yarbrough | 71901 | Hot Springs | Garland |
| 132 | 870-230-1253 | 870-230-1253 | C | CP | COC | 147 E. Valley | Superstop #132 | 727-421-8673 | Amy & Fred Dhardmsi | 71923 | Arkadahbia | Clark |
| 142 | 501-767-6310 | 501-760-6887 | C | S | COC | 5704 Albert Pike | Royal Shell | 501-844-5839 | Sherry / Jim Yarbrough | 71968 | Royal | Garland |
| 144 | 501-623-0064 | 501-623-3619 | C | CP | COC | 100 Hwy. 7 N | Fountain Lake 66 | 501-282-1287 | Harvey Couch | 71901 | Hot Springs | Garland |
| 147 | 501-767-1485 | 501-627-1921 | C | V | DSO | 2070 Airport Rd (AB&C Gro) | Lake Hamilton Superstop | 501-993-6263 | Severns & Timmons | 71913 | Hot Springs | Garland |
| 148 | 501-321-0042 | 501-525-9999 | C | S | COC | 3636 Central Avenue | Lien's Shell | 501-282-1287 | Harvey Couch | 71913 | Hot Springs | Garland |

# A1526

Case 1:05-md-01720-JG-JO   Document 2422   Filed 05/24/13   Page 15 of 16 PageID #: 50894

| ID | | | Code | Address | Phone 1 | Phone 2 | Name | Zip | City | Phone 3 | Store Name | County |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 150 | C | S | COC | 866 Park Avenue | 501-624-5754 | 501-624-5754 | Majid Kameli | 71901 | Hot Springs | 501-690-5050 | Shell Superstop #150 | Garland |
| 155 | C | S | PCO | 1609 Higdon Ferry Road | 501-525-9999 | 501-525-9999 | Harvey Couch | 71913 | Hot Springs | 501-282-1287 | Higdon Ferry Superstop | Garland |
| 161 | C | CP | PCO | 1600 Elmira | 479-498-2230 | n/a | Donnie Miller | 72801 | Russellville | 501-472-5047 | Russellville Superstop 161 | Pope |
| 326 | C | S | SSS | 1830 Hwy 9 | n/a | 501-354-1365 | Severns & Timmons | 72110 | Morrilton | 501-993-6263 | Morrilton Shell | Conway |
| 350 | C | V | DSO | 605 E. Broadway | 501-374-2880 | 501-375-3776 | Majid Kameli | 72114 | NLR | 501-690-5050 | Superstop 350 | Pulaski |
| 404 | C | S | PCO | 1201 North Hwy 49 | 870-589-2012 | n/a | Jason Hani / Jackie.. cont | 72021 | Brinkley | 501-960-4568 | Brinkley Shell | Monroe |
| 411 | C | S | COC | 100 Holiday Drive | 870-630-9898 | | Mohammed Qassas | 72335 | Forrest City | 601-613-8908 | Forrest City Superstop | St. Francis |
| 412 | C | S | COC | 3702 S. Division | 870-762-5300 | 870-762-0300 | Waqar Salim | 72315 | Blytheville | | | Mississippi |
| 433 | C | S | SSS | 4622 Camp Robinson | 501-753-5221 | 501-851-6494 | Jason Hani / Jackie.. cont | 72118 | NLR | 501-851-6815 | B & J Superstop | Pulaski |
| 461 | C | V | DSO | 775 Cash Road SW | 870-836-6655 | 870-836-8110 | Lydia Kim | 71701 | Camden | 714-271-1179 | Valero Superstop#461 | Ouachita |
| 462 | C | V | DSO | 375 East Oak | 501-327-2087 | n/a | Donnie Miller | 72032 | Conway | 501-472-5047 | Oak Street Valero | Faulkner |
| 463 | C | V | DSO | 357 N. College | 479-521-6574 | 479-521-6574 | Tariq Afzal | 72701 | Fayetteville | 479-336-0663 | Fayetteville Valero | Washington |
| 464 | C | V | DSO | 5727 Kelly Hwy | 479-783-4800 | 479-366-0663 | Donnie Miller | 72901 | Fort Smith | 501-472-5047 | Kelley Hwy Valero | Sebastian |
| 465 | C | V | DSO | 6320 Rogers Highway | 479-478-6585 | n/a | Michael Ritchey | 72901 | Fort Smith | 479-806-4199 | Rogers Hwy Valero | Sebastian |
| 466 | C | V | DSO | 2112 N Hazel | 870-722-6622 | 870-777-8210 | Ashok Thakar | 71801 | Hope | 870-768-5573 | Superstop #466 | Hempstead |
| 467 | C | V | DSO | 3228 Central Avenue | 501-623-2134 | 501-609-9189 | Harvey Couch | 71901 | Hot Springs | 501-282-1287 | Central Valero | Garland |
| 468 | C | V | DSO | 2215 Ninth 1st | 501-982-1157 | 501-851-6494 | Jacqui Sturba | 72076 | Jacksonville | 501-851-6815 | J & J Superstop | Pulaski |
| 469 | C | CP | PCO | 8824 Fourche Dam Pike | 501-490-0554 | 501-490-0554 | Syed Shah | 72206 | Little Rock | 870-292-9858 | Fourche Dam Phillips 66 | Pulaski |
| 471 | C | V | DSO | 18823 MacArthur | 501-851-7100 | 501-851-1657 | Toby White | 72118 | NLR | 350-3227 | Morgan Valero | Pulaski |
| 472 | C | V | DSO | 3000 E. Harding | 870-541-9399 | 870-541-9399 | Mario Hyon | 71601 | Pine Bluff | 501-944-2169 | Harding Street Valero | Jefferson |
| 473 | C | V | DSO | 101 N. Blake Street | 870-534-4457 | 870-534-4457 | Harpreet Singh | 71601 | Pine Bluff | 845-283-5299 | Superstop #473 | Jefferson |
| 474 | C | CP | PCO | 1100 N. Arkansas | 479-968-2591 | 479-968-2591 | Larry Bryant | 72801 | Russellville | 479-857-9709 | Superstop #474 | Pope |
| 475 | C | V | DSO | 901 N. Buerkle | 870-672-7120 | 870-672-7120 | Jason Hani / Jackie.. cont | 72160 | Stuttgart | 501-960-4568 | Stuttgart Valero | Arkansas |
| 661 | C | CP | PCO | 4601 North Hills Blvd. | 501-753-2429 | 501-758-7537 | Donnie Miller | 72116 | NLR | 501-472-5047 | North Hills Phillips | Pulaski |
| 662 | C | CP | PCO | 4300 McCain Blvd. | 501-945-6108 | 501-945-5233 | Hassan Hanammand | 72117 | NLR | 501-352-1909 | Zone Mart II | Pulaski |
| 663 | C | CP | PCO | 11615 Cantrell Road | 501-227-5452 | 501-227-8392 | V Bandrapalli | 72212 | Little Rock | 501-307-9532 | Cantrell Shell | Pulaski |
| 664 | C | CP | PCO | 1306 Albert Pike | 501-624-7790 | 501-624-7790 | Arun Doshi | 71913 | Little Rock | 501-276-3342 | Albert Pike 66 | Garland |
| 667 | C | CP | PCO | 1202A Vimy Ridge | n/a | n/a | Rick Severns d/b/a Seve | 72002 | Alexander | 501-993-6263 | Vimy 66 | Saline |
| 678 | C | V | DSO | 1827 Hwy 9 North | 501-477-2925 | 501-477-2925 | Severns & Timmons | 72110 | Morrilton | 501-993-6263 | Morrilton Valero | Conway |
| 679 | C | S | DSO | 1221 Rogers | 479-754-6231 | 479-754-6231 | Chuck Patton | 72830 | Clarksville | 479-754-0045 | Clarksville Valero | Johnson |
| 760 | C | CP | COC | 1500 Bypass Road | 501-206-0269 | 501-206-0269 | Malisa Dyer | 72543 | Heber Springs | 501-993-6263 | Superstop 66 | Cleburne |
| 1007 | C | OP | NV | 1200 S University | 501-663-1022 | 501-663-1022 | Seung Chan Yang | 72204 | Little Rock | 501-412-2609 | Max Mart | Pulaski |
| 1009 | C | S | NV | 16900 Cantrell | 501-868-1322 | n/a | Jason Han | 72223 | Little Rock | 501-960-4568 | The Ranch Shell | Pulaski |
| 1012 | C | S | NV | 8701 Fourche Dam Pike | 501-490-0917 | 501-490-4153 | Harry Hyon | 72206 | Little Rock | 501-749-4848 | Fourche Dam Shell | Pulaski |
| 1014 | C | S | NV | 16800 Chenal Parkway | 501-821-2551 | n/a | Harry Eid | 72223 | Little Rock | 501-240-6879 | Chenal Shell | Pulaski |
| 1015 | C | S | NV | 3185 Hwy 367 South | 501-843-4577 | 501-843-4577 | Larry Davison | 72023 | Cabot | 501-772-1436 | MaxMart 1015 | Pulaski |
| 1016 | C | S | NN | 350 E. Oak | 501-329-5922 | n/a | Donnie Miller | 72032 | Conway | 501-472-5047 | Oak Street Shell | Pulaski |
| 1026 | C | S | NN | 1820 Hwy 64 West | 501-796-8644 | n/a | Donnie Miller | 72045 | El Paso | 213-249-2661 | El Paso Shell | Pulaski |
| 1027 | C | S | NN | 3220 N Reynolds | 501-847-7775 | 800-506-0836 | M K Lee | 72022 | Bryant | 501-519-4597 | | Pulaski |
| 1028 | C | S | NN | 19500 Cantrell | 501-868-5232 | n/a | Harry Eid | 72223 | Little Rock | 501-240-6879 | Hwy 10 Shell | Pulaski |
| 1030 | C | S | NM | 6915 JFK Blvd | 501-835-6227 | n/a | Yeong Lee (Paragon, In | 72116 | NLR | 501-247-6737 | Indian Hills Shell | Pulaski |
| 1031 | C | S | NM | 2429 Wildwood | 501-835-7062 | 501-835-7044 | Kyung Un Hyen (Mario) | 72120 | Sherwood | 501-944-2169 | Wildwood Shell | Pulaski |
| 1032 | C | S | NM | 20615 Hwy 365 N | 501-851-6815 | 501-851-6494 | Jason Han / Jackie..cont | 72113 | Morgan | 501-960-4568 | Morgan Shell | Pulaski |
| 1038 | C | S | NM | 4400 McCain | 501-955-9096 | 501-955-9096 | Yeong Lee | 72117 | NLR | 501-773-8666 | Shell 1038 | Pulaski |

# A1527

Case 1:05-md-01720-JG-JO   Document 2422   Filed 05/24/13   Page 16 of 16 PageID #: 50895

| ID | Phone 1 | Phone 2 | | Type | Code | Address | Op | City | Zip | Contact | Phone 3 | Name | Region |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1039 | 501-985-1051 | 501-985-1051 | | C | S | 1527 Main | NM | Jacksonville | 72076 | Kelly Gold | 501-366-3837 | Gold Express | Pulaski |
| 1040 | 501-223-3499 | 501-851-6494 | | C | S | 10100 Rodney Parham | NV | Little Rock | 72227 | Jason Han / Jackie. cont | 501-851-6815 | Sturbridge Shell | Pulaski |
| 1042 | 501-565-0142 | n/a | | C | S | 4111 S University | NV | Little Rock | 72204 | Charles Hwang | 501-786-3350 | Shell Max Mart | Pulaski |
| 1043 | 501-847-4707 | 501-851-6494 | | C | SS | 23190 I 30 | NV | Bryant | 72022 | Jason Han / Jackie. cont | 501-851-6815 | Bryant Superstop | Pulaski |
| 1044 | 501-296-9625 | 501-296-9625 | | C | S | 4100 W Markham | NV | Little Rock | 72005 | Harry Eid | 501-240-6879 | Markham Shell | Pulaski |
| 1045 | 501-661-0942 | n/a | | C | CP | 3723 Cantrell | NV | Little Rock | 72202 | Donnie Miller | 501-472-5047 | Hwy 10 Shell | Pulaski |
| 1058 | 501-753-7475 | n/a | | C | S | 5919 Crystal Hill Road | NM | NLR | 72118 | Majid Kamelli | 501-690-5050 | Crystal Hill Shell | Pulaski |
| 1068 | 501-882-2323 | n/a | | C | S | 2415 W Center | NN | Beebe | 72012 | David Stokes | | Beebe Shell | Pulaski |
| 1069 | 501-945-0507 | n/a | | C | S | 2522 Hwy 161 | NM | NLR | 72117 | Yeong or Sara Lee | 501-773-8666 | Shell Hope Mart | Pulaski |
| 1075 | 501-565-3864 | n/a | | C | S | 2620 65th Street | NV | Little Rock | 72209 | Charles Hwang | 501-952-5983 | 65th Street Shell | Pulaski |
| 1078 | 501-372-7822 | n/a | | C | S | 700 E Roosevelt | NV | Little Rock | 72206 | Yap Ryan | 501-912-3155 | Roosevelt Shell | Pulaski |
| 1079 | 501-455-3511 | n/a | | C | CP | 8900 Stagecoach Road | NV | Little Rock | 72209 | Harry Eid | 501-240-6879 | Stagecoach Phillips 66 | Pulaski |
| 1080 | 501-562-6116 | 501-562-6116 | | C | S | 3200 S University | NV | Little Rock | 72205 | John Kim | 412-4612 / John | UALR Shell | Pulaski |
| 1092 | 501-753-5600 | 501-851-6494 | | C | S | 4800 MacArthur Drive | NM | NLR | 72118 | Yong Kim | 501-920-3279 | Mac Arthur Shell | Pulaski |
| 1101 | 903-223-9676 | 903-223-9776 | | OP | RR | 4101 North Kings Highway | RR1 TX, LLC | Texarkana, TX | 75503 | Randall Brian | 903-691-8873 | Road Runner #1101 | |
| 1102 | 870-774-8055 | 870-774-8062 | | OP | RR | 5720 Four States Parkway | PP | Texarkana, AR | 71854 | Elsie Washington | 903-691-8105 | Road Runner #1102 | |
| 1103 | 501-329-1809 | 501-329-1809 | | OP | RR | 801 Hogan Lane | PP | Conway | 72034 | Bill Connell | 501-269-2616 | Road Runner #1103 | |

| | | | | | SS | Superstop |
| | | | | | CP | ConocoPhillips |
| | | | | | S | Shell |
| | | | | | pp | Petro Plus |
| | | | | | V | Valero |
| | | | | | Shm | Shamrock |

BRAND

| | | | | | RR | Roadrunner |
| | | | | | OP | |

# A1528

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------- X

**In re PAYMENT CARD INTERCHANGE**        :
**FEE AND MERCHANT DISCOUNT**
**ANTITRUST LITIGATION**                  :

                                      :

This Document Relates To:                 :      MDL No. 1720 (JG) (JO)

       ALL CLASS ACTIONS.         :

                                      :
                                      :
                                      :
                                      :

------------------------------------- X

**OBJECTIONS OF FIRST DATA CORPORATION, FIRST DATA MERCHANT
SERVICES, TASQ TECHNOLOGY, INC., TRS RECOVERY SERVICES INC.,
FIRST DATA GOVERNMENT SOLUTIONS, AND TELECHECK SERVICES INC. TO
FINAL APPROVAL OF DEFINITIVE CLASS SETTLEMENT AGREEMENT**

**ORAL ARGUMENT REQUESTED**

# A1529

Courts should be "even more scrupulous than usual" in considering whether to approve settlements where no class has formally been certified. *In re Gen. Motors Prods. Liab. Litig.*, 55 F.3d 768, 805 (1995); *see also Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681 (7th Cir. 1987) ("[W]hen class certification is deferred, a more careful scrutiny of the fairness of the settlement is required."); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("[D]istrict judges who decide to employ such a procedure are bound to scrutinize the fairness of the settlement agreement with even more than the usual care."). "It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *In re American Bank Note Holographics*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001).

## IV.    ARGUMENT

The Court should not approve the proposed Settlement Agreement on the following grounds:  (1) the Settlement Agreement's failure to afford opt-out rights to the (b)(2) class violates FDC's Due Process rights; (2) the (b)(2) class cannot be certified in this case, even for settlement purposes only, because the proposed class does not meet the requirements of certification; (3) class plaintiffs and class counsel did not adequately represent class members and parties bound by the release; and (4) the claims released are far too broad, making the settlement agreement unfair and unreasonable.

### A.    The Settlement Agreement's Failure to Afford Opt-Out Rights to Rule 23(b)(2) Class Members Violates Due Process

The settlement agreement deprives FDC of fundamental due process by virtue of its mandatory 23(b)(2) class settlement that forces class members to release all manner of future claims against defendants with no right to opt out.  Such mandatory class action lawsuits are inherently problematic because absent class members are not given the right to abstain from a

-9-

# A1530

court's decision "regardless either of their consent, or, in a class with objectors, their express wish to the contrary." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846-47 (1999). For this precise reason, notice and opt-out rights were added to the Federal Rules in 1966. Fed. R. Civ. P. 23 Advisory Committee Note (1966); *see also* Stephen B. Burank, *The Class Action Fairness Act of 2005 in Historical Context: A Preliminary View*, 156 U. Pa. L. Rev. 1439, 1488 (2008) ("The Advisory Committee settled on notice and opt-out rights to meet the expressed concern that (b)(3) classes might be used by class counsel, in league with the defendants, to force those with substantial individual claims into group litigation inimical to their interests.

Certification of a mandatory class under Rule 23(b)(2) in this case would violate FDC's due process rights because it would force FDC – which has interests and issues often at odds with class plaintiffs and their counsel – to accept an illusory settlement with no right to be heard or to opt out. Here, the mandatory settlement even forces class members to release future **monetary damages** claims against Defendants, with no right to opt out. This outcome is untenable. In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Supreme Court rejected a settlement agreement and highlighted the "serious constitutional concerns raised by the mandatory class resolution of individual legal claims, especially where a case seeks to resolve future liability in a settlement only action." 527 U.S. at 842. Courts since have recognized the "growing concern regarding the constitutionality of certifying mandatory classes when damages are at issue." *Molski v. Gleich*, 318 F.3d 937, 948-49 (9th Cir. 2003) (A release of damages claims without the right to opt-out violates the Due Process clause of the Constitution.).

Defendants attempt to lull the Court into a false sense of security by suggesting that their proposed settlement with separate Rule 23(b)(2) and 23(b)(3) classes is consistent with the practice of other judges in this Circuit, even after *Dukes*:

# A1531

> For example, in *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167
> (S.D.N.Y. 2011), Judge McMahon approved certification of a
> Rule 23(b)(2) class for injunctive relief and a Rule 23(b)(3) class
> for damages.  She reasoned that "*Dukes* . . . was concerned with
> Rule 23(b)(2) classes that sought both injunctive and monetary
> relief.  In this case, by contrast, I have certified a class both under
> Rule 23(b)(2) and under Rule 23(b)(3) . . . . . [U]nlike *Dukes*, a
> (b)(2) class is not seeking monetary relief, but only an injunction
> against further statutory violations.  It is a separately certified
> (b)(3) class that seeks money damages.

(Defendants' Motion for Final Approval at 19.)

What the parties fail to state is that the Rule 23(b)(2) Settlement Class in Jermyn

explicitly did "***not release any claims for monetary relief against Best Buy***," but instead only

released "all claims for classwide injunctive and declaratory relief."  (Settlement Agreement

¶¶ 17-18, Ex. A to Declaration of David S. Stellings in Support of Motion for Approval of Class

Action Settlement and Award of Attorneys' Fees, *Jermyn v. Best Buy Co.*, No. 08-cv-0214

(S.D.N.Y. May 23, 2012), ECF No. 271-1.).  Similarly, in *Vitamin C Antitrust Litigation*,

Judge Hagan granted preliminary approval to a class settlement, after certifying a (b)(2) and

(b)(3) settlement class, but the release for the (b)(2) settlement class (called "Injunction

Releasors") released only "their claims related to injunctive relief against Settling Defendants."

*Vitamin C Antitrust Litigation*, No. 06-MD1738, (E.D.N.Y., April 3, 2013) ECF No. 678, 679-3

¶23.[4]

Unlike the Settlement Agreements in *Jermyn* and *Vitamin C Antitrust Litigation*, this

Settlement Agreement violates FDC's Due Process rights because it forces FDC to relinquish

---

[4] The parties have cited other cases as well but not one supports their claim that absent (b)(2) class members may be forced to relinquish their claims to monetary relief in a class settlement.  The Class Action Settlement Agreement in *All Star Costs Vehicles, Inc. v. BFI Canada Income Fund, et al.*, No. 08-CV-1816 (E.D.N.Y.; March 19, 2013) ECF No. 306-1 ¶5 allowed settlement class members to opt out of the class.  With respect to the remaining cases cited by the parties, *Stinson v. The City of New York*, No. 1:01-cv-04228 (S.D.N.Y.), *Easterling v. State of Connecticut Dep't of Corrections*, No. 3:08-CV-00826 (D. CT) and *Sykes v. Mel S. Harris and Associates LLC*, No. 1:09-CV-08486 (S.D.N.Y.), no class settlement agreement had been filed with Court as of May 22, 2013.

# A1532

future claims to monetary relief and defenses to claims that have yet to accrue.[5]  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997); *Stephenson v. Dow Chemical Co.*, 273 F.3d 249, 259-61 (2d Cir. 2001) *aff'd in part by divided court and vacated in part*, 539 U.S. 111 (2003) (settlement violated class members' rights to due process by purporting to relinquish their unaccrued future claims); *Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003) ("Because the consent decree released almost all of the absent class members' claims with little or no compensation, the settlement agreement was unfair and did not adequately protect the interests of the absent class members."). *Foster v. Bechtel Power Corp.*, 89 F.R.D. 624, 626-27 (E.D. Ark. 1981) (future claims cannot satisfy Rule 23(a)'s typicality, commonality, or adequacy of representation requirements). *Res judicata* normally applies to judgments in class actions, but it does not bind class members "where to do so would violate due process." *Stephenson*, 273 F.3d at 260.

Due process and the Federal Rules also prohibit binding absent class members to a judgment where their claims are not "typical" or "common" to those of the class representative. Fed. R. Civ. P. 23(a).  Courts are required to ensure that claims prosecuted by named plaintiffs do not differ from the claims of absent class members. *In re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 796 (3d Cir. 1995); *see also Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir. 1992), *cert. granted, judgment vacated as moot*, 509 U.S. 918, (1993) (Overbroad framing of 23(b)(2) class was so unfair to dissimilar, absent members not provided opt-out rights as to approach deprivation of due process).  The "mandatory" nature of the settlement was one of the rationales underlying the Supreme Court's rejection of a global asbestos settlement in the *Ortiz* litigation. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842-43

---

[5] Because due process forbids resolving unaccrued future claims by settlement with no opt-out rights, First Data does not waive its right to bring future lawsuits against defendants even if the settlement agreement is approved.

# A1533

(1999) (adopting a limiting construction of the Rule 23(b)(1)(B) mandatory class in order to avoid "serious constitutional concerns raised by the mandatory class resolution of individual legal claims").  In fact, a determination "that the situation of [absent class members] was distinguishable from that of the general class provides a sound reason for authorizing" discretionary opt-outs has been recognized by federal courts.  *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1154 (11th Cir. 1983); see also *Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982); *O'Brien v. Nat'l. Prop. Analysts Partners*, 739 F. Supp. 896, 901 (S.D.N.Y. 1990); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 482 (S.D.N.Y. 1998) ("The fact that the scope of the release has been fully disclosed in the Class Notice with opportunity for opting out strongly supports the scope of the releases."); *see also* Newberg & Conte, 5 Newberg on Class Actions § 16.17 (4th ed. 2012) (courts authorized under discretionary power to grant opt-out rights).

Any settlement agreement the Court approves must meet the non-statutory requirement of "coherence" for mandatory classes, emulating the predominance and superiority requirements explicitly set forth in Rule 23(b)(3).  *See, e.g., Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999).  The "mandatory" nature of the settlement was one of the rationales underlying the Supreme Court's rejection of a global asbestos settlement in the *Ortiz* litigation.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842-43 (1999) (adopting a limiting construction of the Rule 23(b)(1)(B) mandatory class in order to avoid "serious constitutional concerns raised by the mandatory class resolution of individual legal claims").  Here, however, even a "coherence" requirement does not resolve all the serious due process violations that occur.

As explained above, FDC and its affiliates are involved in many different facets of the payments industry and are wholly unlike the merchant settlement class representatives. In addition to accepting Visa- and MasterCard-branded credit cards, like the named and represented class plaintiffs, FDC and its affiliates provide internet and mobile payment solutions, acquiring and processing services, credit, debit, private-label, gift, payroll and other prepaid card solutions, and fraud protection and authentication. Through its STAR network, FDC also provides PIN-secured debit acceptance at retail and ATM locations. As a result, waiver of all future antitrust claims against Visa and MasterCard – which is what the releases amount to – means something very different for FDC than it does for the merchant class members. Settlement of litigation on interchange fees should not affect the legal relationship between entities like FDC and the defendants with respect to the numerous other issues in the payments industry that were simply not covered by the claims in this case. More fundamentally, as explained fully below, the proposed settlement agreement gives FDC *no consideration* separate from what it provides to merchants, whose interests would, at least in theory, have been advocated for fully by class counsel who represent them. Class action settlement should not be used to accomplish such a grossly unfair outcome.

**B.      The Settlement does not Meet Rule 23(b)(2) Requirements for Certification**

Even if this Court could ignore the serious due process violations inherent in the proposed settlement – which it cannot – there should be no certification of a 23(b)(2) class in this case because the inclusion of FDC indicates that there is no cohesion among class members. The purpose of classes certified under Rule 23(b)(2) is to provide injunctive or declaratory relief for class members with indivisible or homogenous interests. Fed. R. Civ. P. 23(b)(2) ("[T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

-14-

whole."). There must be cohesion amongst class members and plaintiffs cannot manufacture

cohesion by converting heterogeneous damage class actions into mandatory class actions. *See*

*Fleetwood Enterprises, Inc. v. McManus*, 320 F.3d 545, 552-54 (5th Cir. 2003). Claims brought

under subsection 23(b)(2) contemplate that class members' interests are homogenous; that is,

their rights or claims do not involve individual differences. William Moore, et al, 5 Moore's

Federal Practice 23.41(2)(b).

The primary reason that classes certified under 23(b)(2) do not automatically require

notice and opt-out rights and do not need to meet the predominance and superiority requirements

of Rule 23(b)(3) is because the classes in such cases are supposed to be inherently cohesive in

nature. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557, 180 L. Ed. 2d 374 (2011). Courts

have repeatedly held that the presence of individualized facts and issues among class members

undermines and defeats class certification because of a lack of cohesiveness among class

members. *See, e.g., Barnes v. American Tobacco Co.*, 61 F.3d 127, 143, 149 (3d Cir. 1998).

The only circumstance appropriate for class certification under Rule 23(b)(2) is "when a

single injunction or declaratory judgment would provide relief to each member of the class.

[Rule 23(b)(2)] does not authorize class certification when each individual class member would

be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it

does not authorize class certification when each class member would be entitled to an

individualized award of monetary damages." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

2557, 180 L. Ed. 2d 374 (2011); *see also* Richard A. Nagareda, *Class Certification in the Age of*

*Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) (Key to (b)(2) classes is "the indivisible

nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such

that it can be enjoined or declared unlawful only as to all of the class members or as to none of

them."). The Second Circuit has further stated that paradigmatic 23(b)(2) classes seek "classwide structural relief that would clearly redound equally to the *benefit of each class member.*" *Marcera v. Chinlund*, 559 F.2d 1231, 1240 (2d Cir. 1979); *see also* Notes of Advisory Committee on Rules, 39 F.R.D. 69, 102 (1966).

Here, no single injunction or declaratory judgment would provide relief to each member of the class, because FDC is not similar – much less identical – to other class members. Class members hail from different states with varying statutes or regulations on the ability of merchants and others to surcharge customers or not. Further, class members like FDC have different core interests from the merchants. For that reason, no settlement provision barring defendants from some conduct with regard to surcharging fees could affect each class member in the same meaningful way.

The injunctive relief to be granted if the 23(b)(2) class settlement is finally approved consists primarily of two parts: (1) allowing merchants to form "buying groups" to negotiate with Visa and MasterCard; and (2) allowing merchants to surcharge or charge higher prices on consumer transactions paid with a credit card.

First, as early as 1985, the Supreme Court in *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985), and later in 1996 both the Department of Justice and Federal Trade Commission recognized that merchants may form buyers' groups to negotiate with vendors like Visa and MasterCard.[6] Second, the relief related to surcharging has no value to FDC. FDC accepts Visa- and MasterCard-branded credit cards in eleven states[7] that have

---

[6] The Department of Justice and Federal Trade Commission issued Statements of Antitrust Enforcement Policy in Health Care in August 1996 that clarified their position that joint purchasing agreements do not raise antitrust concerns: "Such collaborative activities typically allow the participants to achieve efficiencies that will benefit consumers." The DOJ's Guidelines for Collaborations Among Competitors also stated: "Many such [buying collaborations] do not raise antitrust concerns and indeed may be procompetitive." P. 14, August 2000.

[7] The following states prohibit retailers from surcharging consumers who pay with credit cards: *California* (Cal. Civ. Code § 1748.1(a)); *Colorado* (Colo. Rev. Stat. Ann. § 5-2-212(1)); *Connecticut* (Conn. Gen. Stat. Ann. § 42-

# A1537

laws prohibiting the passing of fees onto consumers for use of credit cards which accounts for over 77% of FDC's credit card transactions.[8]  (*See* Korpady Decl. ¶ 16.)  (Additionally, seventeen other states are considering similar laws.[9])  Class members in these eleven states-- including FDC – are legally prohibited from accepting the injunctive relief granted in this settlement and FDC would receive literally no injunctive relief in exchange for releases of claims in the 23(b)(2) settlement.  Therefore it cannot pass on fees for 77% of its transactions as a result of accepting transactions in those states.

Further, the settlement agreement contemplates that merchants that accept competitor credit cards (*e.g.*, American Express) also cannot pass interchange fees onto consumers if the competitor card does not allow such surcharging.  See Settlement Agreement, ¶¶ 42(a)-(b); 55(a)-(b).  FDC also accepts competitor credit cards including American Express.  (Korpady Decl. ¶ 9a.)

Therefore, given its operations in the 11 states that ban passing on surcharges coupled with its acceptance of American Express, FDC cannot pass on fees on the transactions it accepts on Visa- or MasterCard-branded cards.  (Korpady Decl. ¶ 18.)

**C.    The Proposed Settlement Should Not Be Approved Because Class Counsel and the Named Class Representatives Have Not Adequately Represented Entities like FDC**

Class representatives in this case consist of retail merchants.  None is an acquirer, processor, or competitor network.  This alone provides reason to allow FDC to opt out because

---

133ff(a)); *Florida* (Fla. Stat. Ann. § 501.0117(1)); *Kansas* (Kan. Stat. Ann. § 16a-2-403); *Maine* (Maine Rev. Stat. Ann. tit. 9-A, § 8-303(2)); *Massachusetts* (Mass. Gen. Laws Ann. ch. 140D, § 28A(a)(2)); *New York* (N.Y. Gen. Bus. Law § 518); *Oklahoma* (Okla. Stat. Ann. tit. 14A, §§ 2-211, -417); and *Texas* (Tex. Fin. Code Ann. § 339.001(a)); *Utah* (Utah Code § 13-38a-302).
[8] Michelle Crouch, *Credit Card Surcharges?  No Way, Poll Says*, FoxBusiness.com, Aug. 20, 2012, http://www.foxbusiness.com/personal-finance/2012/08/16/credit-card-surcharges-no-way-poll-says.
[9] Kevin Wack, *18 States Considering Bans on Credit Card Surcharges*, AmericanBanker.com, Mar. 28, 2013, http://www.americanbanker.com/issues/178_61/18-states-considering-bans-on-credit-card-surcharges-1057901-1.html

-17-

# A1538

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE   :
FEE AND MERCHANT DISCOUNT      :      MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION               :
                                   :      **OBJECTION OF ALDO**
                                   :      **US INC. TO FINAL**
                                   :      **APPROVAL OF THE**
                                   :      **PROPOSED SETTLEMENT**
------------------------------------------------------------x

### DECLARATION OF ALDO US INC., d/b/a ALDO AND CALL IT SPRING

ROBERT RAVEN hereby declares pursuant to 28 U.S.C. § 1746:

1.    I am currently Vice President, Treasurer and Assistant Secretary at Aldo US Inc.,

a privately held Delaware corporation doing business as Aldo and Call It Spring. Aldo US Inc.

is a subsidiary of The Aldo Group Inc. (together, with Aldo US Inc., "Aldo"), a privately held

Canadian corporation. I have held this position since 1991. I submit this declaration on behalf

of Aldo to object to the proposed settlement in the interchange case and in support of the

opposition to the motion for final approval.

2.    I am responsible for all treasury functions in the company, including capital-

raising, bank and rating agency relationships, cash management and payment acceptance. I have

also been involved with The Retail Council of Canada on Payment card issues.

3.    I am knowledgeable about Aldo's acceptance of debit and credit card transactions

running on all payment networks, including Visa and MasterCard, and payment of interchange

fees for transactions completed over those networks.

4.    Aldo, through its U.S. banners Aldo and Call it Spring, and through its additional

Canadian banners Little Burgundy, and Globo, is a worldwide retailer of shoes and accessories.

The company operates 418 Aldo Stores and 30 Call it Spring Stores in the United States. Aldo

1

**A1539**

something that Aldo cannot realistically do. American Express currently accounts for 7.8% of

our payment card sales. Dropping American Express is not a viable business proposition for

Aldo. In addition, if merchants drop American Express or PayPal (which has a similar non-

discrimination rule and is listed in the settlement as a Competitive Card Brand), this would only

further increase the market power of Visa and MasterCard. Mandatory rules changes that appear

to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and

MasterCard to coordinate adopting identical surcharging rules – is an odd result at the end of this

eight-year antitrust case.

        16.     Because Aldo, like most merchants, accepts American Express, the effect of the

Competitive Card Brand limitation is to keep the prohibition against surcharging MasterCard and

Visa credit card transactions in effect.

### 2.    Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

        17.     As of the end of 2012, Aldo did business at 448 stores in 41 states and the

Districts of Columbia and Puerto Rico[1]. Surcharging is illegal in 11 states – Maine (2 stores),

Oklahoma (3 stores), California (73 stores), Colorado (5 stores), Connecticut (8 stores), Florida

(40 stores), Kansas (1 store), Massachusetts (20 stores), New York (52 stores), Texas (36 stores),

and Utah (3 stores). Those states cumulatively hold 54.2% of our U.S. locations and account for

59.4% of our U.S. sales (including both retail store sales and internet sales), which means that

surcharging credit transactions is illegal over a large portion of our operations.

        18.     I am aware that 20 other states have introduced bills that would ban credit card

---

[1] Please note that we have sales in 50 states because of our Internet sales (despite the fact that we do not have stores in all said 50 states. Here is a list of the states in which we sell without having a store presence: Alaska, Isaho, Mississippi, Montana, North Dakota, South Dakota, Vermont, West Virginia amd Wyoming.

# A1540

surcharges.  These include states where many of Aldo's stores are located, including Arkansas (2 stores), Hawaii (3 stores), Illinois (23 stores), Indiana (6 stores), Kentucky (2 stores), Maryland (10 stores), Michigan (11 stores), Missouri (6 stores), Nevada (9 stores), New Hampshire (3 stores), New Jersey (24 stores), New Mexico (2 stores), Pennsylvania (14 stores), Rhode Island (2 stores), South Carolina (2 stores), Tennessee (5 stores), and Washington (6 stores).  Combined with states that already ban surcharging, these states account for 85.3% of our U.S. locations and 83.3 % of our U.S. sales.  Even if Aldo were inclined to surcharge, the mere fact that these states have undertaken measures to begin the process of banning surcharging would chill any efforts to surcharge in these states.

19.    The fact that surcharging is currently legally permitted in less than half of our stores is problematic in and of itself.  For operational, training, and customer service reasons, we would not implement surcharging in 39 states, but not in the 11 that prohibit surcharging.

20.    For Internet sales, application of the various no-surcharge laws is uncertain and complex.  Many of these laws prohibit retailers, wherever they are located, from surcharging customers located in a no-surcharge state, and, likewise, merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

**B.    The Other Relief in the Settlement Is of No Value to Aldo**

21.    The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  As noted above, Aldo operates under the Aldo, Call It Spring, Little Burgundy, and Globo trade names.  Nevertheless, this relief is of no value to Aldo.  Aldo has no intention of varying its payment card acceptance practices across brand names.  Aldo would not

6

# A1541

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE    :
FEE AND MERCHANT DISCOUNT         :     MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION              :
                                  :
                                  :
                                  :     **OBJECTION OF**
This Document Relates To:         :     **BJ'S WHOLESALE CLUB, INC.**
                                  :     **TO FINAL APPROVAL**
ALL CLASS ACTIONS.                :     **OF THE SETTLEMENT**
                                  :
--------------------------------------------------------x

## DECLARATION IN SUPPORT OF OBJECTION OF
## BJ'S WHOLESALE CLUB, INC.

Carol Stone hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am Senior Vice President of Finance for BJ's Wholesale Club, Inc. ("BJ's"). I

have held this position since January 2011, and have worked for BJ's since January 2010. I

submit this declaration on behalf of BJ's to object to the proposed settlement in the interchange

case and in support of the opposition to the motion for preliminary approval.

2.      I am responsible for financial operations in the company, including: accounting,

credit, financial reporting, financial systems, payroll and payables. My responsibilities include

oversight of certain large financial relationships.

3.      I am knowledgeable about BJ's acceptance of debit and credit card transactions

running on all payment networks, including Visa and MasterCard, and payment of interchange

fees for transactions completed over those networks.

4.      BJ's is headquartered in Westborough, Massachusetts, and is a leading operator of

membership warehouse clubs in the Eastern United States. BJ's operates 199 Clubs in 15 states

from Maine to Florida, and employs more than 24,000 team members. BJ's also sells goods over

the internet at www.BJs.com.

1

266102 1

A1542

merchant would be required to surcharge American Express transactions. American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

14.      In addition, surcharging debit cards would not even be permissible under the Proposed Settlement, which only allows surcharging on credit cards. Recently debit card transactions (including both pin and swipe debit transactions) have grown to represent approximately 52% of total MasterCard and Visa transactions.

15.      The only theoretical alternative would be to stop accepting American Express – something that BJ's cannot realistically do. American Express currently accounts for approximately 10% of our major payment card sales. Dropping American Express is not a viable business proposition for BJ's -- and in any event would only increase the market share of Visa and MasterCard.

16.      The Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for BJ's.

17.      BJ's does business at 199 Clubs in 15 states. Surcharging is illegal in 11 states – Maine (2 Clubs), Oklahoma, California, Colorado, Connecticut (13 Clubs), Florida (28 Clubs), Kansas, Massachusetts (25 Clubs), New York (40 Clubs), Texas, and Utah – which are the states in which the majority of our Clubs are located. Those states cumulatively hold fifty-four percent (54%) of our U.S. locations.

18.    I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many BJ's Clubs are located, including Maryland (10 Clubs), New Hampshire (6 Clubs), New Jersey (21 Clubs), Pennsylvania (15 Clubs), and Rhode Island (3 Clubs). Combined with states that already ban surcharging, these states account for eighty-two percent (82%) of our U.S. locations.

19.    The fact that such a substantial additional percentage of our volume may be covered by state prohibitions reinforces the conclusion that the surcharging relief in the settlement is of no value to our company. We would not invest in making changes to our POS and accounting systems and invest in training our sales staff when additional state prohibitions may be implemented at any time in the future. Additional bans and regulatory uncertainty further weaken any potential benefit from the proposed settlement. Considering that few if any merchants have actually surcharged any transactions following the rules changes that took effect in January, the legislative response in these many new states is notable.

20.    The fact that surcharging is legally permitted in some but not all of our Clubs is problematic in and of itself. For operational, staff training, and customer service reasons, we would not implement surcharging in states where it is permitted while it is prohibited in others. Even if the American Express limitation did not exist and we were otherwise inclined to surcharge, we would not want to engage in a practice that would not be applicable across all of our Clubs.

**B.    The Other Relief in the Settlement Is of No Value to BJ's**

21.    The settlement allows merchants to vary their acceptance practices in different lines of business operating under different trade names. However, this was not prohibited by any prior rules, and BJ's operates under one trade name.

22.    Instead, BJ's might benefit from the ability to test any changes to acceptance

5

266102.1

# A1544

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION     :  :  :  :  : | MDL No. 1720 (JG)(JO) <br><br>**OBJECTION OF DAVID'S BRIDAL TO FINAL APPROVAL OF THE PROPOSED SETTLEMENT** |

---------------------------------------------------------------x

## DECLARATION OF DAVID'S BRIDAL, INC., DBD INC., AND DAVID'S BRIDAL CANADA INC.

Phil Galbo hereby declares:

1.    I am Senior Vice President and Treasurer of David's Bridal, Inc., a Florida corporation, DBD Inc., a Delaware corporation, David's Bridal Canada Inc., a Canadian national corporation (collectively, "David's Bridal"). This declaration sets forth the reasons that David's Bridal objects to the proposed settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* (MDL 1720).

2.    I have worked at David's Bridal and its related companies for a total of six (6) years. I oversee capital market activities, cash management operations, and tender type card programs. In this capacity, I am responsible for customer-facing credit card and debit card processing arrangements, banking operations, and relations within the payment industry. I am knowledgeable about payment matters and have personal knowledge of the financial information contained herein.

1

265518.2

# A1545

3.    I am knowledgeable about David's Bridal's acceptance of debit and credit card transactions for all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed on those networks.

4.    David's Bridal is the largest bridal retailer in the world, with over 330 stores in the United States, Puerto Rico and Canada.  David's Bridal operates in 49 states, and is expanding into the United Kingdom in fall 2013.  David's Bridal also sells goods over the internet through the website www.davidsbridal.com.

5.    In the United States, David's Bridal currently accepts Visa and MasterCard credit and debit cards, as well as Discover and American Express credit cards and PayPal.

## I.    INTERCHANGE FEES AND DAVID'S BRIDAL'S ACCEPTANCE OF PAYMENT CARDS

6.    From January 2004 until November 2012, David's Bridal paid approximately $42.5 million in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks (23,383,629 2004-mid 2008 ESTIMATE)(19,144,820 mid 2008-2012 ACTUAL).  Since December 1, 2012, and on an ongoing basis, David's Bridal has continued to pay an average of $465,691.00 of dollars in interchange fees each month.

7.    Third party credit and debit card transactions currently make up approximately 71% of David's Bridal's Gross Receipts.  Visa and MasterCard transactions make up the largest portion of this percentage.  Even though Visa and MasterCard interchange fees are one of our largest expenses, David's Bridal cannot negotiate the interchange rates set by Visa and MasterCard.  Visa and MasterCard can, and do, raise rates on a regular basis.  David's Bridal's

265518.2

only real recourse is to stop accepting Visa and MasterCard branded cards; however, David's Bridal cannot feasibly discontinue acceptance of Visa and MasterCard credit or debit products without losing an unacceptable number of sales.

**II.    THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION**

8.    I have reviewed the proposed settlement.  Neither I nor anyone else at David's Bridal, nor any counsel working on our behalf, had any involvement in the negotiations leading up to the settlement.

**A.    The Surcharging Rule Changes Do Not Give David's Bridal the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

9.    The proposed settlement effectively maintains the prohibitions against surcharging.  We cannot surcharge Visa and MasterCard *debit card* transactions at all, and the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit card transactions as well.

10.    The rule changes in the proposed settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brands – primarily American Express and PayPal.

11.    If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions.  American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit

3

# A1547

cards and brands or card-products with lower acceptance costs.  Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

12.    The only theoretical alternative would be to stop accepting American Express – something which would not increase competition in the industry.  Dropping American Express is not a viable business proposition for David's Bridal.

13.    This same issue occurs with PayPal, which David's Bridal accepts on www.davidsbridal.com.  Because PayPal prohibits surcharging and is more expensive than Visa and MasterCard, under the Proposed Settlement, David's Bridal cannot surcharge Visa and MasterCard credit card transactions at www.davidsbridal.com unless we also surcharge PayPal transactions, which we cannot do.

14.    Alternatively, David's Bridal could stop accepting PayPal, which, again, would reduce competition.  This further reinforces our concerns about the Proposed Settlement.

15.    Significantly, surcharging debit cards would not even be permissible under the proposed settlement, which only allows surcharging of credit cards.  Consequently, a proportion of our Visa and MasterCard transactions would not even be eligible for a surcharge.

16.    In addition, David's Bridal does business in 49 U.S. states, a number of which ban surcharging or have proposed legislation to ban surcharging.

4

265518.2

# A1548

17.     Surcharging is illegal in 11 states and Puerto Rico, including some of the most populous states and where a large proportion of David's Bridal's stores are located. The states of California (31 locations), Colorado (6 locations), Connecticut (3 locations), Florida (18 locations), Kansas (4 locations), Massachusetts (6 locations), New York (15 locations), Texas (26 locations), and Utah (3 locations), and Puerto Rico (1 location), currently account for 35% of our U.S. locations. The aggregate sales from these states represent our largest revenue by far.

18.     I am aware that 18 other states have introduced bills that would ban credit card surcharges. These include states where many David's Bridal stores are located, including Arkansas (4 locations), Hawaii (1 location), Illinois (13 locations), Kentucky (5 locations), Maryland (5 locations), Michigan (11 locations), Mississippi (4 locations), Missouri (8 locations), Nevada (4 locations), New Hampshire   (1 location), New Jersey (9 locations), New Mexico (1 location), Pennsylvania (13 locations), Rhode Island (1 location), South Carolina (5 locations), Tennessee (8 locations), Vermont (1 location), and Washington (7 locations). Combined with states that already ban surcharging, these states account for 67% of our U.S. locations.

19.     The fact that surcharging is legally permitted in only a portion of our stores is problematic itself. Acceptance practices that vary state by state would only add to the confusion and inconvenience for customers, our sales staff, and our point-of-sale systems. Even if we were inclined to surcharge, we would be hesitant to engage in a practice that would not be applicable across all of our stores.

5

# A1549

20.     This is particularly true because we have purchased a new point-of-sale system that will be implemented in all of our stores this fall.  This system has already been developed and programmed without the capability to surcharge.  We cannot change this system to add surcharging without significant expense because it has already been configured.

21.     The fact that such a substantial additional percentage of our volume may be covered by state prohibitions reinforces the conclusion that the surcharging relief in the settlement is of no value to our company.  We would not invest in making changes to our systems and training our sales staff when additional state prohibitions may be implemented at any time.  Additional bans and regulatory uncertainty further weaken any potential benefit from the proposed settlement.  Considering that few if any merchants have actually surcharged after the rule changes that took effect in January, the legislation in these new states is notable.

22.     Further, the negative impact on customer relations makes it unlikely that David's Bridal would surcharge.  The purchase of wedding-related products and services is a very emotional experience for our customers.  Not only does every dollar count for our customers when purchasing for their weddings, the treatment they receive at our stores is part of their overall, personal wedding experience.  It would not be good practice for us to nickel-and-dime our customers during this important life event based on excessive rates imposed upon us by Visa and MasterCard.  David's Bridal also has a very active social media presence, and negative experiences during the wedding products and services buying process reported online would have a snowball effect that would be unacceptable.

6

# A1550

23.     These facts negate any value surcharging might offer to David's Bridal, and David's Bridal would not surcharge under these terms.

**B.     The Other Relief in the Settlement Is of No Value to David's Bridal**

24.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names. This was not prohibited by any prior rules. Like most merchants, however, David's Bridal only operates under a single trade name or banner, and therefore this provision provides no benefit.

25.     We also understand that Visa and MasterCard did not have rules against group buying prior to this settlement. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. This provision is of no value to our company.

**C.     The Settlement Release is Overbroad**

26.     David's Bridal also objects to the release set forth in the settlement as overbroad. Specifically, the settlement appears to release the defendants from virtually all past, present, and future claims. The release covers interchange and any other fees imposed by networks, issuers, and acquirers, the Honor All Cards rules, routing limitations, and a host of other restrictive rules, including any substantially similar rules adopted in the future. In addition, the settlement seems to treat mobile devices the same as payment cards by including a "mobile telephone" and other devices in the definition of credit and debit cards. This reinforces our concerns about releasing

7

# A1551

claims concerning the Honor All Cards rules because the release might be used by Visa and MasterCard to argue that their current or future rules cover their mobile payment products and force acceptance of them or even the implementation of hardware that might be necessary to accept them. We are concerned about any appearance that we are releasing rights to challenge rules that could impact the future of payments in this settlement.

27.     The release also extends outside the jurisdiction of the United States and purports to release Visa, MasterCard, and others from their actions anywhere on the globe. David's Bridal operates nine locations in Canada and is expanding into the United Kingdom in fall 2013. Visa and MasterCard may argue that the release bars David's Bridal from seeking relief for conduct in any of those countries – and in any country we may expand into in the future. There is no basis for including foreign conduct or foreign affiliates of class members in this settlement.

*          *          *          *

28.     Based on the proposed settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of David's Bridal.

29.     David's Bridal is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

8

265518.2

**A1552**

30.     David's Bridal joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for David's Bridal's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 17, 2013

Phil Galbo
SVP, Treasurer
David's Bridal, Inc., DBD, Inc., and David's
Bridal Canada Inc.

9

265518 2

# A1553

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE  :
FEE AND MERCHANT DISCOUNT       :        MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION            :
                                :        **OBJECTION OF**
                                :        **DILLARD'S, INC.**
                                :        **TO FINAL APPROVAL OF THE**
                                :        **PROPOSED SETTLEMENT**
                                :
                                :
-----------------------------------------------------------x

## DECLARATION OF DILLARD'S, INC.

Sherrill E Wise hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently Vice President & Treasurer at Dillard's, Inc. ("Dillard's"), a

Delaware corporation with its principal place of business in Little Rock, Arkansas.  I have held

this position since October 2002, and have worked for Dillard's since October 2002.  I submit

this declaration on behalf of Dillard's to object to the proposed settlement in the interchange case

and in support of the opposition to the motion for final approval.

2.      I am responsible for Treasury, Accounts Payable, Risk Management and Benefits.

3.      I am knowledgeable about Dillard's acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks.

4.      Dillard's was founded in 1938 by William T. Dillard, and currently ranks among

the nation's largest fashion apparel, cosmetics and home furnishing retailers.  We operate 301

Dillard's stores, including 18 clearance centers.  We offer a wide selection of merchandise

including fashion apparel for women, men and children, accessories, cosmetics, home

furnishings and other consumer goods.  Out stores are located in 29 states, primarily in the

1

**A1554**

regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording. They also likely will argue that substantially similar rules and conduct going forward will be released. We find it deeply unfair we have no ability to opt out of such a release.

27.     Dillard's is also concerned that the release will bar any legal challenge in the event that Visa and MasterCard use their Honor All Cards rules to become "Honor All Devices" rules to force merchants to accept Visa and MasterCard mobile products. The Proposed Settlement includes mobile and any other new technology by defining "credit card" to include "any other current or future code, device, or service . . . ." Proposed Settlement ¶ 1(u), (v). Because Visa and MasterCard do not have significant volumes in mobile payments, this area presents a unique, opportunity for merchants to see new competition and avoid having mobile transactions trapped in the current system. We want the right to freely choose when to accept mobile products, and we do not want to be forced to do so under Visa's and MasterCard's Honor All Cards rules.

\*        \*        \*        \*

28.     Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of Dillard's.

29.     Dillard's is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

30.     Dillard's joins in the opposition to the motion for final approval being filed by the

8

# A1555

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE PAYMENT CARD INTERCHANGE | ) | MDL Docket No. 1720 (JG) (JO) |
| FEE AND MERCHANT DISCOUNT | ) | |
| ANTITRUST LITIGATION | ) | |
| | ) | Civil Action No. 05-5075 (JG) (JO) |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

**DECLARATION OF JOHN R. MANNA,**
**VICE PRESIDENT OPERATIONAL CONTROLLER,**
**LOWE'S COMPANIES, INC.**

John R. Manna hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am Vice President Operational Controller for Lowe's Companies, Inc.  I have held this position since 2008.  From 1998 to 2008, I held the position of Vice President Corporate Controller.   This declaration sets forth the reasons that Lowe's Companies, Inc., on behalf of itself and its affiliates and subsidiaries, objects to the proposed settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* (MDL 1720).

2.      In my current and previous roles as described above, I have been responsible for all aspects of bank card processing within the company.  This includes overall responsibility for developing the company's bank card acceptance strategy, managing relationships with bank card processors and card brands and implementing operational improvements to minimize credit card acceptance costs and credit card chargebacks.  I also have an additional 6 years of payment processing experience in previous roles, bringing my total payment acceptance and processing experience to 20 years.  I am also currently a member of the Discover Merchant Advisory

Council, a member of the Merchant Advisory Group, and a member of the Business and

Consumer Payments Advisory Council of the Federal Reserve Bank of Richmond.

3.      Lowe's Home Centers, Inc. ("LHC") and Lowe's HIW, Inc. ("LHIW"), both

wholly-owned subsidiaries of Lowe's Companies, Inc., operate 1,752 home improvement retail

stores in the United States.  I am knowledgeable about LHC's and LHIW's acceptance of debit

and credit card transactions running on all payment networks, including Visa and MasterCard,

and payment of interchange fees for transactions completed over those networks.  LHC and

LHIW accept debit and credit cards across most aspects of their businesses.

4.      Although LHC and LHIW are separate legal entities, customers are most familiar

with the trade name "Lowe's" and the gable design[*] used by both operating subsidiaries' stores.

Moreover, the companies' retail operations and payment card acceptance practices are

substantially identical.  Accordingly, in this Declaration, I will use the trade name "Lowe's" to

refer jointly to LHC and LHIW stores.

5.      Lowe's operates 1,752 home improvement retail stores in all 50 States.  Lowe's

Companies, Inc. and Lowe's employ more than 250,000 people in the United States.  All Lowe's

stores accept Visa and MasterCard debit and credit cards, along with American Express and

Discover.

6.      Lowe's also conducts business over the Internet at the web site www.lowes.com.

For transactions conducted over the Internet at the www.lowes.com web site, Lowe's accepts

Visa and MasterCard debit and credit cards, along with American Express and Discover.

7.      I am also knowledgeable about Lowe's operating subsidiaries' and affiliates'

acceptance of debit and credit card transactions running on all payment networks, including Visa

---

[*] Lowe's and the gable design are registered trademarks of LF, LLC.

and MasterCard, and payment of interchange fees for transactions completed over those networks.

8.      Allied Trade Group, Inc. ("ATG"), a wholly owned subsidiary of LHC, conducts business over the Internet at a wide variety of home lighting, home fixtures, home furniture, home hardware, outdoor furniture and accessories, home flooring, home décor, luggage and travel supplies, sporting goods equipment, hand and power tools, apparel, auto parts, bedding and linen, home appliances, toys and children's furniture, party supplies, pet supplies, kitchenware, and baby supplies retail web sites including, to name just a few, www.atgstores.com, www.allbeddingshowroom.com, www.arearuguniverse.com, www.babygearuniverse.com, www.carandautopartsonline.com, www.fixtureuniverse.com, www.homefurnitureshowroom.com, www.knobsandhardware.com, www.lightinguniverse.com, www.newbabysupply.com, www.outdoorlivingshowroom.com, www.partysupplyuniverse.com, www.petsupplyshowroom.com, and www.sportinggoodscentral.com.  On all of its web sites, ATG accepts Visa and MasterCard debit and credit cards, along with American Express and Discover.  ATG also accepts payment through PayPal.

9.      In this Declaration, when I refer to "we," "us," or "our," I am referring collectively to Lowe's and ATG.

## I.      INTERCHANGE FEES AND LOWE'S ACCEPTANCE OF PAYMENT CARDS

10.      Visa and MasterCard interchange fees are among Lowe's largest expenses, and yet these interchange rates are largely beyond Lowe's control.  Since 2004, Lowe's total Visa and MasterCard interchange expenses have been approximately $2.5 billion.  Since December 1, 2012, and on an ongoing basis, Lowe's has continued to pay approximately $22 million in interchange fees each month to Visa and MasterCard.  Unlike any vendor relationship, the fact that Lowe's operations encompass over 1,700 U.S. stores and extensive Internet-based sales,

# A1558

thereby consuming substantial payment card services, makes little difference in our ability to negotiate with Visa and MasterCard and affect acceptance costs on these networks. We cannot drop Visa and MasterCard products (credit and signature and PIN debit) without losing an unacceptable number of sales. That gives Visa and MasterCard the power to raise interchange rates to Lowe's.

11.     Interchange fees, like other business expenses, are passed on to Lowe's customers, resulting in higher prices for consumers. These costs are hidden from the consumer. All customers, including those paying with cash, pay for these fees regardless of the payment form used.

## II.     THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

12.     I have reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"). Neither I nor anyone else at Lowe's Companies, Inc. or any of its affiliates or subsidiaries, nor any counsel engaged on behalf of Lowe's Companies Inc. or any of its affiliates or subsidiaries, had any involvement in the negotiations leading up to the Proposed Settlement.

13.     In my view, the Proposed Settlement has serious shortcomings for Lowe's, for Lowe's affiliates such as ATG, and for the merchant community. The Proposed Settlement will not change the ways that Visa, MasterCard, and banks limit competition in the current payment marketplace, including how Visa and MasterCard fix interchange rates for the banks, require merchants to "honor all cards" from all issuers, and/or limit network routing choices for credit cards, among other things.

### A.     Surcharging Rule Changes Will Have Little or No Effect on Our Business

14.     The Proposed Settlement provides merchants an extremely limited ability to surcharge their customers based on the brand or type of credit card used. Surcharging would

pose a daunting challenge to Lowe's point of sale operations, especially in the high-volume

home improvement retail store environment.  Maintaining acceptable levels of customer service,

customer loyalty, and the costs and manpower required to comply with the complex surcharging

rules would be impractical.

15.     Rather than the complex and burdensome requirements of the Proposed

Settlement, we believe that merchants should have the unrestricted right to impose surcharges on

payment cards if they choose to do so after weighing the costs and benefits and the needs of their

own businesses.  The rules changes in the Proposed Settlement, however, do not provide

merchants with a meaningful surcharge right.

> **1.      The Settlement Provisions Defeat the Purpose of Surcharging Because
> They Conflict with American Express and PayPal Rules**

16.     The modest rule changes in the Proposed Settlement only allow merchants to

surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is

allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as

expensive as, or more expensive than, Visa or MasterCard.  This limitation effectively

incorporates the surcharging limitations of the more expensive Competitive Card Brands –

primarily American Express and PayPal, which are usually more expensive than Visa and

MasterCard.

17.     American Express Rule 3.2 provides, "Merchants must not:  indicate or imply that

they prefer, directly or indirectly, any Other Payment Products over our Card[;] try to dissuade

Cardmembers from using the Card . . . [; or] impose any restrictions, conditions, disadvantages

or fees when the Card is accepted that are not imposed equally on all Other Payment Products,

except for electronic funds transfer, cash, and checks . . . ."

18.     If a merchant wished to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions.  American Express Rule 3.2 would then require the merchant to surcharge equally all payment card transactions, including transactions using debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, because the purposes of surcharging are supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

19.     In addition, surcharging debit card transactions would not even be permissible under the Proposed Settlement, which only allows surcharging on credit card transactions.  Debit card transactions account for 46% of Lowe's electronic bank card payments.

20.     The only theoretical alternative would be to stop accepting American Express – something that Lowe's cannot realistically do.  American Express currently accounts for 9% of Lowe's bank card transactions.  Dropping American Express is not a viable business proposition for Lowe's or ATG, and would only increase the market power of Visa and MasterCard.

21.     This same interaction of rules occurs with PayPal, which ATG accepts on its wide variety of web sites.  Because PayPal is more expensive than Visa and MasterCard, under the settlement, ATG cannot surcharge Visa and MasterCard credit card transactions at ATG's family of web sites unless ATG also surcharges PayPal transactions.  However, ATG would be unable to comply with PayPal's rules – which like those of American Express do not allow discrimination against PayPal in favor of other card brands – unless ATG were to surcharge equally all payment card transactions, thereby eliminating any benefit to surcharging.

22.     Alternatively, ATG could stop accepting PayPal on its numerous web sites, which would harm one of the few competitors to emerge against Visa and MasterCard.  Either way,

6

Visa and MasterCard win.  This virtually certain result further reinforces our concerns about the Proposed Settlement.

23.     The interaction of the Proposed Settlement and American Express and PayPal rules negates any value surcharging might offer to us, and we would not surcharge under these terms.

**2.     The Surcharging Rules Concerning Disclosure and Surcharging by Brand or Product Are Unworkable**

24.     Other aspects of the surcharging rules in the Proposed Settlement are problematic. Lowe's store sales environment depends upon high-volume and fast-paced transactions, and surcharging would cause costly delays in the checkout lane.  While Lowe's strives to maintain quality and uniformity throughout all Lowe's stores, training Lowe's hourly employees on the intricacies of the Proposed Settlement would be difficult.

25.     Most importantly, if we were to consider surcharging customers, we would need to control the message to our customers, especially at the point of sale.  No vendor should tell us how to set and communicate our pricing and how to interact with our customers.  The Proposed Settlement, however, puts complicated disclosure rules from Visa and MasterCard between us and our customers, including a requirement that merchants make "a statement that the surcharge is being imposed by the *merchant*."  Proposed Settlement ¶¶ 42(c)(iii), 55(c)(iii).  The message that we – rather than Visa, MasterCard, and the banks – are responsible for interchange and the need for surcharging is false.  Visa and MasterCard have caused the need for surcharging with their supra-competitive pricing; if they priced competitively, merchants likely would not surcharge.  Forcing merchants to tell customers that the surcharge is coming from the merchant will maximize the likelihood of unhappy customers and lost sales and will chill merchants' willingness to surcharge.

**3.      Surcharging Alone Cannot Fix the Problems in the Payments Market**

26.      Lowe's operates home improvement retail stores in all 50 states.  Surcharging is illegal in 11 states.  The states of Maine, Oklahoma, California, Colorado, Connecticut, Florida, Kansas, Massachusetts, New York, Texas, and Utah currently account for 32.9% of Lowe's U.S. stores (577 stores) and 34% of Lowe's U.S. sales.

27.      I am aware that 20 other states have introduced bills that would ban surcharges on credit card transactions.  These include states where Lowe's stores are located, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Washington, and West Virginia.  Combined with states that already ban surcharging, these states account for 69% of our U.S. locations (1,206 stores) and 71% of our U.S. sales.  We would not consider surcharging in states where it may soon be prohibited.

28.      The fact that surcharging is legally permitted in potentially only 31% of Lowe's stores is problematic in and of itself.  It is not Lowe's practice to have differential acceptance policies, as this would only add to the confusion and inconvenience of customers, our sales staff, and our point-of-sale systems.  Even if Lowe's were inclined to surcharge credit card transactions, we would be hesitant to engage in a practice that would not be applicable across all of our stores.

29.      In addition, Lowe's sell products over the Internet at www.lowes.com, and ATG sells products over the Internet at its wide variety of websites.  For Internet sales, application of the various no-surcharge laws is uncertain and complex.  Many of these laws prohibit retailers, wherever they are located, from surcharging customers located in a no-surcharge state, and,

8

likewise, merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

**B.      The All Outlets Provision Does Not Provide Any Material Benefit to Merchants**

30.      The Proposed Settlement supposedly allows merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was prohibited by previous rules.  In any event, most merchants do not operate under other trade names, and therefore this provision provides no benefit.

31.      Instead, Lowe's might benefit from the ability to test any changes to acceptance practices on a store-by-store basis, not across locations operated under different trade names. The all outlets provision in the settlement, therefore, does not provide Lowe's and other merchants what they really need – the ability to test new acceptance practices at a small number of stores within a distinct trade name.  In any event, Lowe's only operates home improvement retail stores under the single trade name "Lowe's."

**C.      The Release Is Far Too Broad**

32.      We are very concerned by the broad release in the Proposed Settlement, which we cannot opt out of and which releases all of the defendants from virtually all past, present, and future claims.  The release covers interchange and any other fees imposed by networks, issuers, and acquirers, the Honor All Cards rules, routing limitations, and a host of other restrictive rules, including any substantially similar rules adopted in the future.

33.      The Proposed Settlement seems to treat mobile devices the same as payment cards by including a "mobile telephone" in the definition of credit and debit cards.  We are concerned about this because we see mobile payments as a distinct product, with potentially different – and much more merchant-friendly – economics, than traditional payment card payments.  The

Proposed Settlement's inclusion of mobile devices in the definition of credit and debit cards reinforces our concerns about releasing claims concerning the Honor All Cards rules because the release could be used by Visa and MasterCard to argue that their current or future rules cover their mobile payment products and force acceptance of them or even the implementation of hardware that might be necessary to accept them.  We want the freedom to make such decisions without being forced to do so by Visa and MasterCard, under the Honor All Cards rules or other rules, and we are concerned about releasing all rights to challenge rules that could affect the future of payments.

34.    The release also extends outside the jurisdiction of the United States and purports to release Visa, MasterCard, and others from their actions anywhere on the globe.  Foreign operating affiliates of Lowe's operate thirty-nine (39) retail locations in Canada and Mexico. Visa and MasterCard may argue that the release bars Lowe's and its affiliates from seeking relief for conduct in any of those countries – and in any country we may expand into in the future. There is no basis for including foreign conduct or foreign affiliates of class members in this settlement.

*       *       *       *

35.    Based on the Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of Lowe's or any of its affiliates including ATG.

36.    Lowe's Companies, Inc., Lowe's, and ATG are represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

10

# A1565

37.     Lowe's Companies, Inc., Lowe's, and ATG join in the opposition to the motion

for final approval being filed by the Objecting Plaintiffs and absent class members represented

by Constantine Cannon LLP, setting forth additional legal and factual grounds for Lowe's

objection to final approval of the Proposed Settlement.


        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.


        Executed on May 23, 2013

                                        John R. Manna
                                        Vice President Operational Controller
                                        Lowe's Companies, Inc.
                                        1000 Lowe's Boulevard
                                        Mooresville, North Carolina  28117

# A1566

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE　　:
FEE AND MERCHANT DISCOUNT　　　　 :　　 MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION　　　　　　　 :
　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　 :　　 **OBJECTION OF RACETRAC**
　　　　　　　　　　　　　　　　　　 :　　 　**PETROLEUM, INC. TO FINAL**
　　　　　　　　　　　　　　　　　　 :　　 **APPROVAL OF THE**
　　　　　　　　　　　　　　　　　　 :　　 **PROPOSED SETTLEMENT**
-----------------------------------------------------------x

## DECLARATION OF RACETRAC PETROLEUM, INC.

Allison B. Moran hereby declares pursuant to 28 U.S.C. § 1746:

1.　　I am the Chief Executive Officer of RaceTrac Petroleum, Inc. ("RaceTrac").  I have been employed by RaceTrac since 1994.  I submit this declaration on behalf of RaceTrac to object to the proposed settlement in the interchange case and in support of the opposition to the motion for final approval.

2.　　I am ultimately responsible for oversight of all issues related to the acceptance of credit and debit card transactions running on the Visa and MasterCard networks and ensuring payment for interchange fees over those networks.

3.　　Founded in 1934, RaceTrac had over $8.8 billion  in sales in 2012.  RaceTrac owns and/or operates more than 625 retail gasoline convenience stores in 12 southeastern states under the RaceTrac (company-operated) and RaceWay (contract operator) brand names.

4.　　Our stores process approximately 84 million Visa and MasterCard transactions annually.  Visa and MasterCard interchange fees are our largest operating cost outside of cost of sales and payroll.  Yet these interchange fees are among the fastest growing and least controllable expenses we have.  Unlike any vendor relationship, the fact that we are a large company and a significant consumer of payment card services makes little difference in our

1

# A1567

ability to negotiate with Visa and MasterCard and affect our acceptance costs on these networks. As approximately 33% of our sales volume is made using Visa and MasterCard cards, RaceTrac cannot discontinue its acceptance of Visa and MasterCard products without losing an unacceptable number of sales. That gives Visa and MasterCard the power to raise interchange prices or network fees to RaceTrac without risk. This practice has continued following Visa's and MasterCard's IPOs. From January 2004 until November 2012, RaceTrac paid approximately $350 million in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks (including PIN debit). We now pay over $50 million annually in Visa and MasterCard interchange fees (including PIN debit).

## THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

5. We have reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website. Neither I nor anyone else at RaceTrac, nor any counsel engaged on our behalf, had any involvement in the negotiations leading up to the Proposed Settlement. In my view, the Proposed Settlement has serious shortcomings for RaceTrac.

6. The proposed settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case. The proposed settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that RaceTrac and its customers have no choice but to pay. RaceTrac's portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

7. Instead of addressing the core claims in the case, the settlement merely provides

2

# A1568

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE          :
FEE AND MERCHANT DISCOUNT               :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                    :
                                        :          **OBJECTION OF**
                                        :          **ROUNDY'S SUPERMARKETS,**
                                        :          **INC. TO FINAL**
                                        :          **APPROVAL OF THE**
                                        :          **PROPOSED SETTLEMENT**

----------------------------------------------------------x

### DECLARATION OF ROUNDY'S SUPERMARKETS, INC., d/b/a PICK 'N SAVE, RAINBOW, COPPS, METRO MARKET, AND MARIANO'S

Edward G. Kitz hereby declares pursuant to 28 U.S.C. § 1746:

1.     I am currently Group Vice President – Legal, Risk & Treasury at Roundy's Supermarkets, Inc. ("Roundy's"), a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin, doing business as Pick 'n Save, Rainbow, Copps, Metro Market, and Mariano's.  I have held this position since 2002.  I submit this declaration on behalf of Roundy's to object to the proposed settlement in the interchange case and in support of the opposition to the motion for final approval.

2.     I am responsible for overseeing all aspects of the legal, risk and cash functions of Roundy's.

3.     I am knowledgeable about Roundy's acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks.

4.     Roundy's, through its retail banners Pick 'n Save, Rainbow, Copps, Metro Market, and Mariano's, is a leading Midwest supermarket chain with a 141-year operating history.  The company currently operates 93 Pick 'n Save stores, 29 Rainbow stores, 25 Copps

1

# A1569

the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. This provision is of no value to our company.

**D.      The Release Is Far Too Broad**

20.      The Proposed Settlement's release is deeply concerning to Roundy's. The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices. And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us.

21.      The Proposed Settlement requires that Roundy's release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards." Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording. They also likely will argue that substantially similar rules and conduct going forward will be released. We find it deeply unfair we have no ability to opt out of such a release.

22.      Roundy's is also concerned that the release will bar any legal challenge in the event that Visa and MasterCard change or re-interpret their Honor All Cards rules to "Honor All Devices" rules to force merchants to accept all mobile transactions from Visa and MasterCard networks. The Proposed Settlement includes mobile and any other new technology by defining "credit card" to include "any other current or future code, device, or service . . . ." Proposed Settlement ¶ 1(u), (v). Because Visa and MasterCard do not currently have significant volumes

**A1570**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE     :
FEE AND MERCHANT DISCOUNT          :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION               :
                                   :          **OBJECTION OF FAMILY**
                                   :          **DOLLAR STORES, INC.**
                                   :          **TO FINAL APPROVAL OF**
                                   :          **THE PROPOSED SETTLEMENT**
                                   :
-----------------------------------------------------------x

### DECLARATION OF FAMILY DOLLAR STORES, INC.

C. J. Childers hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently Senior Counsel at Family Dollar Stores, Inc. ("Family Dollar"), a

Delaware corporation with its principal place of business in Matthews, North Carolina. I have

held this position since 2008, and have worked for Family Dollar since 2006. I submit this

declaration on behalf of Family Dollar to object to the proposed settlement in the interchange

case and in support of the opposition to the motion for final approval.

2.      I am responsible for all aspects of Family Dollar's Commercial Litigation

including, but not limited to, research and investigation of company information and pertinent

financial data involved with this litigation.

3.      I am knowledgeable about Family Dollar's acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks.

4.      Family Dollar operates a chain of more than 7,400 general merchandise retail

discount stores in 45 states, providing value-conscious consumers with a selection of

competitively priced merchandise in convenient neighborhood stores. Our merchandise

assortment includes Consumables, Home Products, Apparel and Accessories, and Seasonal and

1

# A1571

interchange rates for the banks, the subject of the core claims in the case. The proposed settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that Family Dollar and its customers have no choice but to pay. Family Dollar's portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

9.      Instead of addressing the core claims in the case, the settlement merely provides Family Dollar with limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to us. Moreover, the Proposed Settlement deprives Family Dollar of the ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and MasterCard's interchange fees impose on merchants.

### A.      The Surcharging Rule Changes Do Not Give Family Dollar the Ability to Surcharge Visa and MasterCard Credit Card Transactions

10.      As an initial matter, Family Dollar has no current intention to impose surcharges on customers. If Family Dollar were to consider implementing such a program, however, it is clear that the rules changes in the settlement offer no practical ability to surcharge, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

#### 1.      The Competitive Card Brand Limitation Makes Surcharging Impossible for Family Dollar

11.      The rule changes in the Proposed Settlement only allow Family Dollar to surcharge Visa or MasterCard credit card transactions under the same terms as we are allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more

3

# A1572

expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand -- primarily American Express.

12. If Family Dollar wanted to surcharge as provided under the Proposed Settlement, we would be required to surcharge American Express transactions. American Express Rule 3.2 would then require us to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

13. Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Debit card transactions (including both PIN and signature) represent approximately 30.3% of Family Dollar's total Visa and MasterCard transactions.

14. The only theoretical alternative would be to stop accepting American Express -- something that Family Dollar cannot realistically do. American Express currently accounts for approximately 3% of our payment card sales. Dropping American Express is not a viable business proposition for us. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard -- while allowing Visa and MasterCard to coordinate adopting identical surcharging rules -- is an inappropriate result of this eight-year antitrust case.

4

# A1573

15.     The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for Family Dollar.

### 2.     Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

16.     As of the end of 2012, Family Dollar did business at over 7,400 stores in 45 states and the District of Columbia.  Surcharging is illegal in 11 states – California 105 stores, Colorado (133 stores), Connecticut (58 stores), Florida (561 stores), Kansas (50 stores), Maine (71 stores), Massachusetts (110 stores), New York (336 stores), Oklahoma (131 stores), Texas (993 stores), and Utah (65 stores).  Those states cumulatively hold 33% of our U.S. locations and account for approximately 33.2% of our U.S. sales.

17.     I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include states where many of our stores are located, including Arkansas (109 stores), Illinois (244 stores), Indiana (207 stores), Kentucky (207 stores), Maryland (103 stores), Michigan (408 stores), Mississippi (151 stores), Missouri (114 stores), Nevada (32 stores), New Hampshire (33 stores), New Jersey (113 stores), New Mexico (109 stores), Pennsylvania (302 stores), Rhode Island (28 stores), South Carolina (219 stores), Tennessee (246 stores), Vermont (16 stores), and West Virginia (120 stores).  Combined with states that already ban surcharging, these states account for 68% of our U.S. locations and approximately 68.6 % of our U.S. sales. Even if Family Dollar were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill any efforts to surcharge in these states.

18.     The fact that surcharging is currently legally permitted in approximately one-third of our stores is problematic in and of itself.  For operational, training, and customer service reasons, we would not implement surcharging in 39 states, but not in the 11 that prohibit

5

surcharging.

**B.   The Other Relief in the Settlement Is of No Value to Family Dollar**

19.   The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  Family Dollar operates under one trade name, and therefore this relief is of no value to Family Dollar.

20.   Family Dollar also understands that Visa and MasterCard did not have rules against group buying prior to this settlement.  We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to our company.

**C.   The Release Is Far Too Broad**

21.   The Proposed Settlement's release is deeply concerning to Family Dollar.  The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices.  And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us.

22.   The Proposed Settlement requires that Family Dollar release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards."  Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card

6

**A1575**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE  :
FEE AND MERCHANT DISCOUNT       :     MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION            :
                                :     **OBJECTION OF**
This Document Relates To:       :     **7-ELEVEN, INC.**
                                :     **TO FINAL APPROVAL OF**
ALL CLASS ACTIONS.              :     **THE PROPOSED SETTLEMENT**
                                :
---------------------------------------------------------x

## DECLARATION OF 7-ELEVEN, INC.

David Seltzer hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently Vice President and Treasurer at 7-Eleven, Inc. ("7-Eleven"). I have held this position since April 2009. I submit this declaration to object to the proposed settlement in the interchange case and in support of the opposition to the motion for final approval.

2.      I am responsible for all treasury and insurance functions in the company, including capital-raising, bank and rating agency relationships, cash management, payment acceptance, insurance and risk management. I am an active participant in the Dallas Federal Reserve Corporate Payments Council and the Discover Merchant Advisory Council.

3.      7-Eleven operates, franchises, or licenses approximately 8,150 convenience stores in the United States. There are approximately 50,500 7-Eleven stores in 16 countries. Of this total, our parent company operates or franchises approximately 15,300 7-Eleven stores in Japan.

4.      I am knowledgeable about 7-Eleven's acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks.

5.      7-Eleven accepts payment cards across all of its lines of business. 7-Eleven

1

# A1576

shortcomings for 7-Eleven and for the merchant community.

9.      The proposed settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case.  The proposed settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that merchants and their customers have no choice but to pay.  7-Eleven's portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

10.      Instead of addressing the core claims in the case, the settlement merely provides merchants with limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to 7-Eleven.  Moreover, the Proposed Settlement deprives 7-Eleven of the ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and MasterCard's interchange fees impose on 7-Eleven.

### A.      The Surcharging Rule Changes Do Not Give 7-Eleven the Ability to Surcharge Visa and MasterCard Credit Card Transactions

11.      7-Eleven believes that merchants should have the unrestricted right to impose surcharges on payment cards if they choose to do so after weighing the costs and benefits and the needs of their own businesses. The rule changes in the Proposed Settlement, however, do not provide merchants with a meaningful surcharge right.

12.      As an initial matter, 7-Eleven does not intend to impose surcharges on customers. If 7-Eleven were to consider implementing such a program, however, it is clear that the rule changes in the settlement offer no practical ability to surcharge, and actually maintain prohibitions against surcharging.  Merchants cannot surcharge Visa and MasterCard debit transactions.  And the limitations in the settlement effectively maintain the prohibition against

3

# A1577

Visa and MasterCard credit transactions as well.

## 1.   The Competitive Card Brand Limitation Makes Surcharging Impossible for 7-Eleven

13.     The rule changes in the Proposed Settlement only allow merchants to surcharge

Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to

surcharge transactions under the rules of any "Competitive Card Brand" that is as or more

expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of

the more expensive Competitive Card Brand – primarily American Express.

14.     If a merchant wanted to surcharge as provided under the Proposed Settlement, the

merchant would be required to surcharge American Express transactions.  American Express

Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit

cards and brands or card-products with lower acceptance costs.  Doing that makes no sense, as

the point of surcharging is supposed to be to encourage customers to use less expensive forms of

payment and to play one card brand against the other to introduce price competition in the

industry.

15.     The only theoretical alternative would be to stop accepting American Express –

something that 7-Eleven cannot realistically do.  American Express accounted for 5% of our

payment card sales dollars in 2012.  Dropping American Express is not a viable business

proposition for 7-Eleven.  In addition, if merchants drop American Express, this would only

further increase the market power of Visa and MasterCard.  Mandatory rule changes that appear

to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and

MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result at the

end of this eight-year antitrust case.

4

# A1578

16.      Because 7-Eleven, like most merchants, accepts American Express, the effect of the Competitive Card Brand limitation is to keep the prohibition against surcharging MasterCard and Visa credit card transactions in effect.

17.      Moreover, following the passage of the Durbin Amendment to the Dodd-Frank Wall Street Reform Act, interchange fees on small ticket debit card transactions increased. Surcharging debit cards, however, is not permissible under the Proposed Settlement, which only allows surcharging on credit cards.  MasterCard (Maestro) and Visa (Interlink) Debit card transactions represented 57% of 7-Eleven's total MasterCard and Visa transactions in the first quarter of 2013.

## 2.      Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

18.      7-Eleven does business at 7,723stores located in 35 states and the District of Columbia.   This excludes licensed locations where 7-Eleven is not responsible for interchange fees and other operating expenses. Surcharging is illegal in 11 states – California (1,538 stores), Colorado (309 stores), Connecticut (50 stores), Massachusetts (163 stores), New York (532 stores), Texas (729 stores), Florida (794 stores), Kansas (21 stores), Oklahoma (0 stores), Maine (13 stores), and Utah (154 stores).  These states account for over 55% of our locations, which means that surcharging credit transactions is illegal over a large portion of our operations.

19.      I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include states where many 7-Eleven stores are located, including Illinois (372 locations), Indiana (33locations), Maryland (385locations), Michigan (167 locations), Missouri (57locations), Nevada (218 locations), New Hampshire   (23 locations), New Jersey (334 locations), Pennsylvania (254 locations), Rhode Island (21 locations), South Carolina (50 locations),  Vermont (3 locations), West Virginia (84 locations), and Washington (248 locations).

5

# A1579

Combined with states that already ban surcharging, these states account for nearly 85% of our U.S. locations. Even if 7-Eleven were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill efforts to surcharge in these states.

20.     The fact that surcharging is currently legally permitted in less than half of our stores is problematic in and of itself. For operational, training, and customer service reasons, we would not implement surcharging in 39 states, but not in the 11 that currently prohibit surcharging.

21.     7-Eleven would not institute surcharging for the additional reason that the Proposed Settlement's surcharging disclosure requirements represent another layer of regulation at the point of sale, which is already the subject of government scrutiny. Each year merchants are the subject of class action lawsuits concerning requirements at or near the point of sale, and surcharging under a complex regulatory scheme could expose merchants to similar liability.

**B.     The Other Relief in the Settlement Is of No Value to 7-Eleven**

22.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules. Like most merchants, 7-Eleven only operates under a single trade name or banner, and therefore this provision provides no benefit.

23.     Instead, 7-Eleven might benefit from the ability to test any changes to acceptance practices on a store-by-store basis, not across locations operated under different trade names. The all outlets provision in the settlement, therefore, does not provide 7-Eleven and other merchants what they really need – the ability to test new acceptance practices at a small number of stores within a distinct trade name.

6

**A1580**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE    :
FEE AND MERCHANT DISCOUNT       :      MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION              :
                                       :      **OBJECTION OF**
                                       :      **THE NATIONAL RAILROAD**
                                       :      **PASSENGER CORPORATION**
                                       :      **TO FINAL APPROVAL OF**
                                       :      **THE PROPOSED SETTLEMENT**
----------------------------------------------------------x

**DECLARATION OF THE NATIONAL RAILROAD PASSENGER CORPORATION,
d/b/a AMTRAK**

        Daniel R. Pehrson hereby declares pursuant to 28 U.S.C. § 1746:

        1.      I am currently Acting Director – Payment Cards at the National Railroad

Passenger Corporation, d/b/a Amtrak ("Amtrak"). I have held this position since February 1,

2013, and have worked at Amtrak in a substantially similar capacity since October 2008. I have

over 20 years of experience in the payment card industry, including working for a payment

network (Discover Card for 7 years), credit card issuer (Advanta Bank Corporation for 3 years),

and merchant acceptance (Sinclair Oil Corporation for 7 years and Amtrak for 4 years). I submit

this declaration in support of Amtrak's objection to the proposed settlement in the interchange

case (the "Proposed Settlement") and in support of the opposition to the motion for final

approval.

        2.      As the Acting Director – Payment Cards, I am responsible for managing the

overall payment card acceptance practices and operations for Amtrak.

        3.      I am knowledgeable about all aspects of Amtrak's acceptance of debit and credit

card transactions running on all payment networks, including Visa and MasterCard, and the

payment of interchange fees for transactions completed over those networks.

1

# A1581

4.      Amtrak is incorporated under the District of Columbia Business Corporation Act in accordance with the provisions of the Rail Passenger Service Act of 1970.  The company is operated and managed as a for-profit corporation providing intercity rail passenger transportation as its principal business. The United States Congress created Amtrak in 1970 to take over, and independently operate, the nation's intercity rail passenger services.  During fiscal year 2012, Amtrak reached a new all-time ridership record, carrying 31.2 million passengers.  Amtrak operates more than 300 daily intercity trains over more than 21,000 route miles, serving more than 500 destinations in 46 states and the District of Columbia within the United States.  During fiscal year 2012, Amtrak recorded ticket revenues of approximately $2.0 billion.

5.      Amtrak accepts payment cards at its ticket counters and kiosks, over the telephone, online at amtrak.com, on its mobile device applications, and via handheld devices for tickets and food and beverage purchases on its trains.  Amtrak currently accepts Visa and MasterCard debit and credit cards, along with American Express, Discover, and UATP cards. Amtrak is a member of both the Cash Settlement Class and the Rule Changes Settlement Class because it accepted Visa-branded cards and MasterCard-branded cards from January 1, 2004 through and including the date of preliminary approval of the Proposed Settlement.  Amtrak objects to the Proposed Settlement for the reasons stated in this Declaration.

## I.      INTERCHANGE FEES AND AMTRAK'S ACCEPTANCE OF PAYMENT CARDS

6.      Visa and MasterCard interchange fees are a significant expense to Amtrak, as the majority of its ticket, food, and beverage sales are paid for by Visa and MasterCard products. From January 2004 until November 2012, Amtrak paid more than $183,000,000 in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks.  Since December 1, 2012, and on an ongoing basis, Amtrak has continued to pay millions of dollars in

# A1582

interchange fees each month.

7.      The interchange rates Amtrak pays Visa, and to a lesser extent MasterCard, are to a large extent non-negotiable.  Not only are these rates high (and would be higher still without the effect of the Durbin Amendment), but they are typically revised upward twice annually on a regular basis.  Visa and MasterCard are only able to maintain these high and ever-escalating fees because of their immense combined market power and their importance to merchants like Amtrak.  Amtrak is concerned that this conduct, which may be subject to mandatory release and immune from challenge if the Proposed Settlement is approved, will only continue unabated.

8.      An example of the exercise of Visa's and MasterCard's market power on Amtrak's business is the interchange rate for internet sales.  The interchange rates for internet sales, which constitute card-not-present ("CNP") transactions, are much higher than for in-person ticket counter sales.  I have heard of no valid justification for the excessive CNP interchange rates because, unlike bricks-and-mortar merchants, merchants conducting business online bear most of the fraud and chargeback risks associated with CNP transactions.  Nevertheless, Amtrak must accept Visa and MasterCard for internet transactions, or else forgo a substantial portion of its ticket sales.

## II.    THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

9.      With the assistance of counsel, I have reviewed the Proposed Settlement.  Neither I nor anyone else at Amtrak, nor any counsel engaged on our behalf, had any involvement in the negotiations leading up to the Proposed Settlement.  In my view, the Proposed Settlement is not in the best interests of Amtrak.

10.     In Amtrak's view, the Proposed Settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case, but actually validates that practice, enabling Visa and MasterCard to continue to illegally

3

# A1583

fix fees for the banks that merchants and their customers have no choice but to pay. Although Amtrak has not been provided with sufficient information to allow it to compute the recovery for which it would be eligible under the Proposed Settlement as a member of the Cash Settlement Class, Amtrak believes that its portion of the compensatory relief would amount to only a very small fraction of what it pays in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

11.     Instead of addressing the core claims in the case, the Proposed Settlement purports to provide merchants with other "concessions," which I view as providing little to no material or additional benefit to Amtrak.

**A.      The Proposed Surcharging Rule Changes Do Not, As A Practical Matter, Give Amtrak the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

12.     Regardless of whether or not Amtrak might wish to impose surcharges on customers (which it does not currently do), the rule changes in the Proposed Settlement offer no practical ability to do so, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the Proposed Settlement effectively maintain the prohibition against surcharges on Visa and MasterCard credit transactions as well.

**1.      The Competitive Card Brand Limitation Makes Surcharging Effectively Impossible for Amtrak**

13.     The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

4

# A1584

14.     If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions. American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card products with lower acceptance costs. This makes no sense. It defeats the purpose of surcharging, which is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

15.     Surcharging debit cards, moreover, is not permissible at all under the Proposed Settlement, which only allows surcharging on credit cards. A substantial amount of Amtrak ticket sales are purchased through debit cards, which Amtrak expects to continue growing year over year.

16.     The only theoretical alternative that would permit Amtrak to take advantage of the surcharging "concession" would be to stop accepting American Express – something that Amtrak cannot realistically do. Since more passengers buy tickets using American Express credit cards than either Visa or MasterCard credit cards, dropping American Express is not a viable business option for Amtrak. In any event, dropping American Express would only further increase the market power of Visa and MasterCard. The adoption of mandatory rule changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate outcome in this antitrust case and should not be sanctioned by this Court.

# A1585

17.     Because Amtrak, like most merchants, accepts American Express, the effect of the Competitive Card Brand limitation is to keep the prohibition against surcharging MasterCard and Visa credit card transactions in effect.

> **2.     The Ban On Surcharging In A Growing Number of States Makes Surcharging Effectively Impossible for Amtrak**

18.     I am informed that surcharging is currently illegal in 11 states, many of which are located along Amtrak's busy Northeast Corridor and account for a significant percentage of Amtrak credit card sales (for example, New York, Connecticut, and Massachusetts).  I am also informed that 20 other states are or may be considering bills to ban credit card surcharges.  Given that Amtrak does business at over 500 locations in 46 states and the District of Columbia, surcharging credit transactions is illegal over a large portion of its operations.

19.     Even if Amtrak were inclined to surcharge, the mere fact that there are or may soon be laws on the books of 31 states makes this "benefit" of the Proposed Settlement virtually worthless to Amtrak.

20.     For Internet sales, application of the various state no-surcharge laws is uncertain and complex.  I am informed that many of these state laws prohibit retailers, wherever they are located, from surcharging customers located in a no-surcharge state, and, likewise, merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.  Application of the various no-surcharge laws may be even more complex for sales made through Amtrak's mobile applications, which sales account for an increasing percentage of ticket sales.

> **B.     The Other "Relief" in the Settlement Is of No Value to Amtrak**

21.     The Proposed Settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was

6

# A1586

not prohibited by any prior rules. However, since Amtrak only operates under a single trade name, this provision provides no benefit to Amtrak.

22.     Instead, Amtrak might benefit from the ability to test any changes to acceptance practices on a location-by-location basis, rather than across locations operated under different trade names. The "all outlets" provision in the Proposed Settlement, therefore, does not provide Amtrak what it really needs – the ability to test new acceptance practices at a small number of locations and/or segments within the Amtrak system.

23.     I also understand that Visa and MasterCard did not have rules against group buying prior to this Proposed Settlement. Amtrak has never engaged in group buying, but if Amtrak were to consider doing so the provisions of the Proposed Settlement make that a worse option for Amtrak rather than better, and do not provide an effective counter against Visa and MasterCard's market power. For example, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" makes it even less likely that group buying will ever be a feature in this market. This provision is therefore of no value to Amtrak.

### C.     The Release Is Far Too Broad

24.     The Proposed Settlement's release is deeply concerning to Amtrak. Visa and MasterCard will likely argue that the release covers all of their rules and conduct given its broad wording, along with substantially similar rules and conduct going forward. Furthermore, Visa and MasterCard likely will assert that the release bars claims relating to Visa and MasterCard's other pass-through fees. Indeed, the release in the Proposed Settlement is so broad that it appears to give Visa and MasterCard free rein in the future to contend that it means whatever they wish it to mean.

25.     Amtrak is also concerned that the release may be used to attempt to bar legal

7

# A1587

challenges in the event that Visa and MasterCard change their Honor All Cards rules to "Honor

All Devices" rules to force merchants to accept all mobile transactions from Visa and

MasterCard networks. This litigation should not conclude with a release that potentially stifles

innovation in this space.

*     *     *     *

26.     For the reasons given above, it is my opinion that the Proposed Settlement does

not adequately represent the interests of Amtrak.

27.     Amtrak is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

28.     Amtrak joins in the opposition to the motion for final approval being filed by the

Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting

forth additional legal and factual grounds for Amtrak's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on May 23, 2013

Daniel R. Pehrson
Acting Director – Payment Cards
National Railroad Passenger Corporation

60 Massachusetts Avenue, N.E.
Washington, D.C. 20002

8

# A1588

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE        :    MDL No. 1720 (JG)(JO)
FEE AND MERCHANT DISCOUNT             :
ANTITRUST LITIGATION                  :    OBJECTION OF
                                      :    BEST BUY STORES, L.P. TO
                                      :    FINAL APPROVAL
                                      :    OF THE SETTLEMENT

---------------------------------------------------------------x

### DECLARATION IN SUPPORT OF OBJECTION OF BEST BUY STORES, L.P.

Dee O'Malley hereby declares:

1.    I am currently Sr. Director, Payment Acceptance for Best Buy Stores, L.P. and its

domestic affiliates ("Best Buy"). I have prepared this declaration in support of Best Buy's

opposition to the Proposed Settlement in *In re Payment Card Interchange Fee & Merchant*

*Discount Antitrust Litigation* (MDL 1720) ("Proposed Settlement").

2.    Prior to my current role, I held the position of Director, Financial Services from

2008 to 2012, and I have been at Best Buy for almost 20 years. I provide U.S.-centric payment

industry expertise, strategies, solutions, and programs to the Best Buy Enterprise. I am

responsible for integrating payment capabilities with the company's broader efforts. In addition,

I ensure the U.S.-based enterprise remains current with respect to payment industry matters

including regulation, compliance, and technology trends, products, and solutions.

3.    I was the inaugural Chairman of the Board and one of the founding members for

the Merchant Advisory Group. I am a current board member of the Merchant Advisory Group.

The group is comprised of large merchants across several industries and aims to establish a

1

265744.2

# A1589

collaborative relationship between all parties involved in the payments industry to drive positive change in payment acceptance.

4.    I am knowledgeable about Best Buy's acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks.

5.    Best Buy is the world's largest multi-channel consumer electronics retailer with 165,000 employees and operations in the U.S., Canada, Mexico, and China. In the U.S., we operate more than 1,000 Best Buy stores and more than 400 stand-alone Best Buy Mobile stores selling mobile phone hardware, accessories, and cellular network services.

6.    We also sell goods and services online at www.BestBuy.com, which is among the top ten retail websites in the United States. In addition, we sell goods and services – via both online and physical stores – using other (non-Best Buy branded) trade names.

7.    In our Best Buy and Best Buy Mobile stores, we accept our private-label and co-branded credit cards, Visa, MasterCard, Discover, JCB, Diner's Club and American Express credit cards, signature and PIN debit cards from Visa and MasterCard, and most major PIN debit networks. On www.BestBuy.com, we also accept PayPal.

## I.  INTERCHANGE FEES AND BEST BUY'S ACCEPTANCE OF PAYMENT CARDS

8.    From January 2004 until November 2012, Best Buy paid more than $1.8 billion in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks for various retail channels in the United States (including Puerto Rico).

2

2657442

# A1590

9.  Since December 1, 2012, and on an ongoing basis, Best Buy has continued to pay interchange and network fees on Visa and MasterCard branded cards. Even though Visa and MasterCard interchange fees are one of our largest expenses, Best Buy has limited opportunity to negotiate the interchange rates determined by Visa and MasterCard. This differs from all other vendor relationships where we are able to have a business-to-business negotiation regarding rates and terms.

10.  Since Visa and MasterCard went public, in 2006 (for MasterCard) and 2008 (for Visa), Best Buy's interchange rates and network fees with both of them have continued to increase.

11.  Visa and MasterCard change rates and fees on a regular basis, and merchants are left with a "take it or leave it" proposition. Best Buy cannot drop Visa and MasterCard credit or debit products without losing an unacceptable number of sales.

## II.   THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

12.  I have reviewed the Proposed Settlement. No one at Best Buy, nor any counsel working on our behalf, had any involvement in the negotiations leading up to the settlement.

13.  In my view, the Proposed Settlement does not offer Best Buy and the broader merchant community anything of value that could help fix the lack of competition in this industry. Best Buy strongly believes in the importance of a free market where prices and other aspects of commercial relationships are determined via negotiation of the participating parties. The Proposed Settlement does not facilitate the payments market in meeting this goal. Instead, it

3

265741.2

0000000000 Best Buy 000000000 12:51 PM May-22-2013

# A1591

is possible that the Proposed Settlement could empower Visa and MasterCard going forward, and enable them to continue engaging in their "take it or leave it" practices. For these reasons, Best Buy opposes the terms of the Proposed Settlement.

14.    The Proposed Settlement does not fundamentally change the ways that Visa, MasterCard, and banks limit competition in the current payment marketplace, including how, among other things, Visa and MasterCard fix interchange rates for the banks, require merchants to "honor all cards" regardless of the product type and its associated cost, and/or limit network routing choices for credit cards.

15.    The primary relief that is offered – limited changes to the no-surcharging rules – is inadequate, burdensome, and temporary. In addition, the broad, forward-looking release of claims will affect all merchants, even future merchants, with no ability to opt-out. Given the rapidity of change in the marketplace due to technological and other pressures, the payment industry's future is unpredictable; Best Buy is deeply concerned about the unknown effects on the payment industry of that broad release of claims. Visa and MasterCard (and the issuing banks) might attempt in the future to take advantage of the broad immunity the release appears to give them, with potentially detrimental impacts on innovation within the payments industry.

16.    While our principal objection concerns the lack of meaningful injunctive relief, we note that the monetary payments referenced in the Proposed Settlement represent only a small portion of overall interchange fees paid by merchants annually. These payments could be

4

263744.2

recouped very quickly through interchange increases, which the Proposed Settlement does not prohibit.

17.     More important than damages is the opportunity to meaningfully change the interchange system going forward, or failing that, to give merchants the tools to introduce some competitive discipline into the system. The Proposed Settlement misses this opportunity and instead further strengthens the current system by providing an overly broad, forward-looking release of claims concerning interchange and rules associated with the acceptance of Visa and MasterCard products.

A.     **The Surcharging Rule Changes Do Not Adequately Give Best Buy the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

18.     The Proposed Settlement provides merchants an extremely limited ability to surcharge their customers based on the brand or type of credit card used. Rather than the complex and burdensome requirements of the Proposed Settlement, Best Buy believes that an individual merchant should have the right to impose surcharges on payment cards if it determines that is the right thing to do for its business, without interference by Visa, MasterCard, and the issuing banks. Rather than providing for the simple ability to surcharge, the rule changes in the Proposed Settlement are overly burdensome and impractical for businesses to implement.

19.     We cannot surcharge Visa and MasterCard *debit card* transactions, and the limitations in the Proposed Settlement effectively maintain the prohibition against Visa and MasterCard credit card transactions as well.

5

# A1593

20.     The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brands.  This is an especially narrow provision and significantly minimizes a merchant's ability to have meaningful negotiations regarding acceptance fees.

21.     Surcharging debit cards would not even be permissible under the Proposed Settlement, which only allows surcharging of credit cards.  Visa and MasterCard debit card transactions account for a significant portion of Best Buy's overall Visa and MasterCard volume.  Consequently, a significant number of our Visa and MasterCard credit and debit card transactions would not even be eligible for a surcharge.

22.     In addition, Best Buy does business in all 50 U.S. states, a number of which ban surcharging or have proposed legislation to ban surcharging.

23.     Surcharging is currently illegal in 11 states and Puerto Rico, including some of the most populous states and where a large proportion of Best Buy's stores are located.  In addition to Puerto Rico, the states that do not allow surcharging are:  California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and Utah.  These states represent 42% of Best Buy's store locations and 45% of our U.S. sales. I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include

6

265744.2

# A1594

states where many Best Buy stores are located, including: Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Washington, and West Virginia. Combined with states that already ban surcharging, these states account for 72% of Best Buy's store locations and 73% of our U.S. sales.

24.    The fact that surcharging is legally permitted in only a portion of our stores is problematic itself. Acceptance practices that vary state-by-state would only add to the confusion and inconvenience for customers, our sales staff, and our point-of-sale systems. Even if we were inclined to surcharge, we would be hesitant to engage in a practice that would not be applicable across all of our stores.

25.    The fact that such a substantial additional percentage of our volume may be covered by state prohibitions reinforces the conclusion that the surcharging relief in the settlement is of no value to our company. We would not invest in making changes to our systems and training our sales staff when additional state prohibitions may be implemented at any time. Additional bans and regulatory uncertainty further weaken any potential benefit from the Proposed Settlement. Considering that few, if any, merchants have actually surcharged after the rules changes that took effect in January, the legislation in these new states is notable.

26.    Additional states may also ban surcharging, thereby further diminishing the effectiveness of surcharging. Visa, MasterCard, and issuing banks have been actively involved in the passage of anti-surcharging laws in the past, and we expect it is likely that they will lobby

7

265744.2

# A1595

to pass similar laws in other states, further weakening any potential relief in the Proposed Settlement.

27.     Other aspects of the surcharging rules in the Proposed Settlement are problematic. One of the most objectionable is that Visa and MasterCard dictate the manner in which merchants disclose to consumers their surcharging practices. The networks should not take the role of a regulatory or legal body to dictate how merchants must set and communicate pricing and otherwise interact with customers. There are already a number of state and local laws governing consumer disclosures – the requirements of the Proposed Settlement merely add to this already regulated area.

28.     The Proposed Settlement gives merchants a choice between surcharging across brand or product. If we were to surcharge any payment card product, we would want to surcharge rewards cards with high interchange rates and encourage lower priced forms of payment. We would also want the ability not to surcharge our own Best Buy Reward Zone MasterCard credit card, even though it may be in the same/similar product category to cards that we do wish to surcharge.

29.     To surcharge effectively, Best Buy would need the ability to cost-effectively and consistently distinguish the various Visa and MasterCard card types at point of sale. The Proposed Settlement offers no practical solution to this issue. Unlike the clear labels which must appear on a debit card to distinguish it from a credit card, neither our checkout personnel nor our customers would have a reliable ability to visually distinguish between card types. Card products

8

2657442

# A1596

(and the associated interchange rates) can change without the reissuance of a card, and they have no standardized appearance.

30.     For these reasons, any solution to the issue of interchange cannot rely solely on surcharging. Even without the problematic restrictions on surcharging in the settlement – the Competitive Card Brand limitation and the disclosure requirements – the fact that numerous merchants cannot surcharge because of the 11 states that prohibit it, and the strong possibility that more states will pass such laws, renders surcharging an insufficient remedy to the issue of interchange.

**B. The Other Relief in the Settlement Is of Little or No Value to Best Buy**

31.     The Proposed Settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names. This provision is not helpful to us with respect to surcharging because, before surcharging, we would want the ability to test various surcharging and disclosure methods in a single or small number of stores, as surcharging could prove to be highly disruptive to our business. Visa and MasterCard rules, however, will require surcharging across all of a merchant's locations operating under a trade name. The revisions to the all outlets rule in the proposed settlement, therefore, do not provide Best Buy with what we really need. To effectively determine the most viable acceptance strategies, and to most effectively negotiate acceptance costs, Best Buy needs the ability to have different acceptance practices at different locations across our organization.

9

265744.2

32.     We also understand that Visa and MasterCard did not have rules against group buying prior to this Proposed Settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view, the Proposed Settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. Merchants may very well view the group buying option as low value (due to skepticism about the likelihood that Visa and MasterCard will meaningfully participate in negotiations) and high-risk (given the type of relief available to merchants and the risk of having to pay Visa and MasterCard's legal fees and expenses).

## C.  The Settlement Release is Overbroad

33.     In exchange for limited monetary damages and ineffective and temporary rule changes, the Proposed Settlement appears to require that all merchants (including future merchants) broadly release all of the defendants from past, present, and future claims relating to Visa or MasterCard rules or conduct, or any similar rules in the future.

34.     After final approval, Visa and MasterCard will likely argue that their entire rulebooks – in existence at the time of preliminary approval – are immune from challenge in the future, along with any similar rule or course of conduct, despite the fact that there is no relief provided concerning these rules.

10

265744.2

# A1598

35.     Most importantly, the Proposed Settlement provides no relief on interchange – the central wrong alleged in this case – yet Visa and MasterCard will argue that these claims are released forever.  Visa and MasterCard will believe themselves free to raise interchange rates, and the broad language of the release may serve to foreclose challenges from merchants in relation to those increases.

36.     The settlement provides no relief on the Honor All Cards rules, also central to the case and to Visa and MasterCard's power over merchants, yet Visa and MasterCard will argue that claims concerning these rules are released forever.  This may allow Visa and MasterCard to use these rules in a variety of problematic ways including through potential extensions to cover future technologies, which are discussed below.

37.     The Proposed Settlement provides no relief on PIN debit rules or interchange rates, yet Visa and MasterCard will argue that claims concerning these rules are released because "Visa-Branded Card" and "MasterCard-Brand Card" are defined in the Proposed Settlement to include cards bearing the marks of the debit networks Interlink and Maestro.  Proposed Settlement ¶ 1(bb), (bbb); ¶ 68(a).

38.     The Proposed Settlement provides no relief for prepaid card rules, yet Visa and MasterCard may argue that claims concerning these rules are released because they are incorporated under the definition of "debit card." Proposed Settlement ¶1(v).

39.     The release covers future rules or conduct which are "substantially similar" to any existing rules or course of conduct, which may result in Visa and MasterCard writing a host of

11

265744.2

other rules in the future that they will argue are immune from challenge. These rules may cover areas such as card technology new to the U.S. such as EMV (chip cards), or rules on rapidly changing subjects such as data security, identity protection, biometrics, and new forms of non-card payment technologies.

40. We are very concerned that Visa and MasterCard, in response to this release, might use their Honor All Cards rules to effectively force merchants to accept all "devices" that are enabled on the Visa and MasterCard networks. We want the right to freely choose when and how to accept new products.

41. The Proposed Settlement states that it does not serve to release any claim that is based on "a claim seeking only injunctive relief against only the Visa Defendants regarding the legality of Visa's Fixed Acquirer Network Fee." Proposed Settlement ¶ 72(d). We believe that Visa's Fixed Acquirer Network Fee should be excluded from both the injunctive relief portion of the Proposed Settlement as well as the monetary relief portion of the Proposed Settlement. Visa's Fixed Acquirer Network Fee is a relatively new fee structure; to include it within this Proposed Settlement is problematic given that we have not yet determined the full and comprehensive impact of Visa's Fixed Acquirer Network Fee on our business.

42. MasterCard has recently implemented an acquirer fee, which is being passed on to merchants by the acquirers; thus, we are concerned that MasterCard will argue that claims in relation to that fee are released by the Proposed Settlement given that the Proposed Settlement

12

265744.2

# A1600

does not specify that any MasterCard fee that is similar to Visa's Fixed Acquirer Network Fee is also excluded from, at minimum, the injunctive relief portion of the Proposed Settlement.

43.    Finally, the release is mandatory, as merchants have no right to opt out. Best Buy believes this is deeply unfair. Our interests were not represented in this Proposed Settlement, and we should have a right to opt out of the injunctive relief.

*    *    *    *

44.    Best Buy is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

45.    Best Buy joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for Best Buy's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 21, 2013

Dee O'Malley
Sr. Director, Payment Acceptance
Best Buy Enterprise Services, Inc.

13

265744.2

# A1601

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : | MDL No. 1720 (JG)(JO) |
| FEE AND MERCHANT DISCOUNT | : | |
| ANTITRUST LITIGATION | : | **OBJECTION OF** |
| | : | **CARTER'S TO** |
| | : | **FINAL APPROVAL OF** |
| | : | **THE SETTLEMENT** |

------------------------------------------------------------x

## DECLARATION IN SUPPORT OF OBJECTION OF
## THE WILLIAM CARTER COMPANY

Sean McHugh hereby declares:

1.        I am Vice President of Investor Relations and Treasury at The William Carter

Company, which directly, or through its subsidiaries, owns the brands *Carter's* and *OshKosh*

*B'gosh* (together with its subsidiaries, "Carter's").  This declaration sets forth the reasons that

Carter's objects to the proposed settlement in *In re Payment Card Interchange Fee & Merchant*

*Discount Antitrust Litigation* (MDL 1720).

2.        I have worked at Carter's for 2 years.  I am responsible for all treasury functions,

including bank relationships, cash management and payment acceptance.  I am knowledgeable

about Carter's acceptance of debit and credit card transactions for all payment networks,

including Visa and MasterCard, and payment of interchange fees for transactions completed on

those networks.

3.        Carter's is a leading provider of apparel and related products exclusively for

babies and young children, with history dating back to 1865.  Headquartered in Atlanta, the

1

266185.3

# A1602

**A.      The Surcharging Rule Changes Do Not Give Carter's the Ability to
Surcharge Visa and MasterCard Credit Card Transactions**

7.      The proposed settlement effectively maintains the prohibitions against
surcharging.  We cannot surcharge Visa and MasterCard *debit card* transactions, and the
limitations in the settlement effectively maintain the prohibition against Visa and MasterCard
credit card transactions as well.

8.      The rule changes in the proposed settlement only allow merchants to surcharge
Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to
surcharge transactions under the rules of any "Competitive Card Brand" that is as, or more,
expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of
the more expensive Competitive Card Brands – primarily American Express.

9.      If a merchant wanted to surcharge as provided under the Proposed Settlement, the
merchant would be required to surcharge American Express transactions.  American Express
Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit
cards and brands or card-products with lower acceptance costs.  Doing that makes no sense, as
the point of surcharging is supposed to be to encourage customers to use less expensive forms of
payment and to play one card brand against the other to introduce price competition in the
industry.

10.      The only theoretical alternative would be to stop accepting American Express,
which would only decrease competition in the industry.  Dropping American Express is not a
viable business proposition for Carter's.

3

266185.3

# A1603

11.     Significantly, surcharging debit cards would not even be permissible under the proposed settlement, which only allows surcharging of credit cards.  Consequently, a significant number of our Visa and MasterCard transactions would not even be eligible for a surcharge.

12.     In addition, Carter's does business in 48 states, a number of which ban surcharging or have proposed legislation to ban surcharging.

13.     Surcharging is illegal in 11 states and Puerto Rico, including some of the most populous states and where a large proportion of Carter's stores are located.  The states of California (70 locations), Colorado (10 locations), Connecticut (11 locations), Florida (33 locations), Kansas (6 locations), Maine (4 locations), Massachusetts (19 locations), New York (32 locations), Oklahoma (4 locations), Texas (56 locations), Utah (10 locations), and Puerto Rico (11 locations), currently account for 44% of our U.S. locations.  These states represent many of our largest revenue states.

14.     I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include states where many Carter's stores are located, including Arkansas (3 locations), Hawaii (2 locations), Illinois (27 locations), Indiana (9 locations), Kentucky (1 location), Maryland (12 locations), Michigan (17 locations), Mississippi (6 locations), Missouri (7 locations), Nevada (8 locations), New Hampshire (6 locations), New Jersey (30 locations), New Mexico (2 locations), Pennsylvania (24 locations), Rhode Island (1 location), South Carolina (11 locations), Tennessee (12 locations), Vermont (4 locations), Washington (14

4

266185.3

# A1604

locations), and West Virginia (1 location). Combined with states that already ban surcharging, these states account for 77% of our U.S. locations.

15.     The fact that surcharging is legally permitted in only a portion of our stores is problematic itself. Acceptance practices that vary state by state would only add to the confusion and inconvenience for customers, our sales staff, and our point-of-sale systems. Even if we were inclined to surcharge, we would be hesitant to engage in a practice that would not be applicable across all of our stores.

16.     The fact that such a substantial additional percentage of our volume may be covered by state prohibitions reinforces the conclusion that the surcharging relief in the settlement is of no value to our company. We would not invest in making changes to our POS systems and training our sales staff when additional state prohibitions may be implemented at any time. Additional bans and regulatory uncertainty further weaken any potential benefit from the proposed settlement. Considering that few if any merchants have actually surcharged after the rules changes that took effect in January, the legislation in these new states is notable.

17.     In addition, we sell products over the Internet at www.carters.com and www.oshkoshbgosh.com. For Internet sales, application of the various no-surcharge laws is complex. Many of these laws prohibit retailers, wherever they are located, from surcharging customers located in a no-surcharge state, and, likewise, merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

5

266185.3

# A1605

18.     These facts negate any value surcharging might offer to Carter's, and Carter's would not surcharge under these terms.

**B.      The Other Relief in the Settlement Is of No Value to Carter's**

19.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names.  While Carter's has two principal brands, this is not helpful to us because we would not accept some cards at certain stores and not others.  We will only accept cards across all brands.  This was not prohibited by any prior rules, however, so the settlement offers no new benefits.

20.     We also understand that Visa and MasterCard did not have rules against group buying prior to this settlement.  We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view, the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to our company.

**C.      The Settlement Release is Overbroad**

21.     Carter's also objects to the release set forth in the settlement as overbroad. Specifically, the settlement purports to release the defendants from virtually all past, present, and future claims.  The release covers interchange and any other fees imposed by networks, issuers, and acquirers, the Honor All Cards rules, routing limitations, and a host of other restrictive rules,

6

# A1606

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE        :
FEE AND MERCHANT DISCOUNT             :        MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                  :
                                      :        **OBJECTION OF**
                                      :        **COBORN'S INCORPORATED**
                                      :        **TO FINAL APPROVAL OF THE**
                                      :        **PROPOSED SETTLEMENT**
                                      :
                                      :
---------------------------------------------------------x

## DECLARATION OF COBORN'S INCORPORATED

Chris Coborn hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am President and Chief Executive Officer of Coborn's Incorporated

("Coborn's"). I have held this position since July 19, 2007. I submit this declaration on behalf

of Coborn's to object to the proposed settlement in the interchange case and in support of the

opposition to the motion for final approval.

2.      Coborn's operates 90 stores and is a member of the National Grocers Association.

Coborn's is a named plaintiff in the *In re Payment Card Interchange Fee and Merchant*

*Discount Antitrust Litigation.*

3.      I am knowledgeable about Coborn's acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks. Coborn's accepts payment

cards across most aspects of its business. Coborn's accepts Visa and MasterCard debit and credit

cards, along with American Express, and Discover.

4.      Coborn's also makes substantial retail sales via the Internet at

www.cobornsdelivers.com. The interchange rates for Internet sales, which constitute card-not-

present ("CNP") transactions, is much higher than for sales made through traditional brick-and-

1

266276.1

# A1607

mortar stores. There is no valid justification for the excessive CNP interchange rates because, unlike with brick-and-mortar merchants, merchants bear most of the fraud and chargeback risks associated with CNP transactions. Nevertheless, we must accept Visa and MasterCard for Internet transactions, or else forgo a substantial portion of our retail sales. This is another example of the market power exercised by these brands which may be immune from merchant challenge going forward if the settlement is approved.

5.      Since 2004, Coborn's has paid thousands of dollars in interchange fees for payment card transactions running on the Visa and MasterCard networks. These interchange fees are one of the fastest-growing and least-controllable expenses that we have. These fees impact our ability to hire new employees, to invest in our business, and they cause us to raise prices on consumers.

## II.     THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

6.      I reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website.

7.      Despite Class Counsel's and the mediators' assertions that by February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement through the processes laid out by the mediators and the Court," neither I nor anyone else at Coborn's agreed to the Proposed Settlement. Given the confidentiality agreement protecting discussions during the mediation process, I can only describe the events of that process in generalized terms. However, even in generalized terms, it is clear that Coborn's concerns about the mediators' proposals were not only not welcomed by Class Counsel, but also ignored.

8.      The mediation that ultimately resulted in the Proposed Settlement began in 2008.

9.      In late November 2011, however, Coborn's discovered that Class Counsel had

2

266276.1

made proposals to Visa and MasterCard, through the mediators, without Coborn's knowledge or consent. Coborn's believed that the proposals made without its knowledge severely compromised the negotiating position of the class to the point that Coborn's would not have agreed to them. Coborn's also learned that Class Counsel had received an offer of settlement from the defendants that had not been disclosed to Coborn's. In that same month, Class Counsel again submitted a mediation statement that included detailed proposals without first receiving authority to do so from Coborn's.

10.   In January 2012, Class Counsel accepted the mediators' proposals over the objections of Coborn's and several other named plaintiffs. Coborn's, in fact, and several other named plaintiffs registered their opposition to the proposals and Class Counsel's acceptance of them.

11.   Even though it dissented from the mediators' proposals, Coborn's nonetheless continued to work constructively within the mediation process to try to salvage something of value from the emerging settlement. Coborn's did so with the understanding that it maintained the right to oppose the settlement at a preliminary approval or final fairness hearing if a settlement that ultimately resulted from the discussions was not acceptable to Coborn's.

12.   When the Proposed Settlement agreement was filed with the Court on July 13, 2012, Coborn's had not seen the final text including the final release. The filed document appeared to indicate that Coborn's agreed with the Proposed Settlement, but that was not the case.

13.   Coborn's is opposed to the Proposed Settlement because it has serious shortcomings for Coborn's. It does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case. The Proposed

3

266276.1

# A1609

Settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that Coborn's has no choice but to pay. Coborn's portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates or network fees in the future.

14.     Instead of addressing the core claims in the case, the settlement merely provides Coborn's with limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to Coborn's. Moreover, the Proposed Settlement deprives Coborn's of the ability to opt-out and bring claims for damages resulting from the ongoing harm imposed by Visa and MasterCard's interchange fees.

### A.     The Surcharging Rule Changes Do Not Give Coborn's the Ability to Surcharge Visa and MasterCard Credit Card Transactions

15.     As a general matter, surcharging is not a realistic option for Coborn's. In the extremely competitive retail marketplace, a retailer that surcharges its customers will quickly lose those customers to other retailers that choose not to surcharge. Coborn's made the unimportance of surcharging clear to Class Counsel during the settlement mediation process, but the Class Counsel ignored Coborn's statements.

16.     It is clear that the rules changes in the settlement offer Coborn's no practical ability to surcharge, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

17.     The rule changes in the Proposed Settlement only allow Coborn's to surcharge Visa or MasterCard credit card transactions under the same terms as Coborn's is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more

4                                                                                    266276.1

# A1610

expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

18.    If Coborn's wanted to surcharge as provided under the Proposed Settlement, we would be required to surcharge American Express transactions. American Express Rule 3.2 would then require us to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

19.    Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Debit card transactions (including both PIN and signature) represent a substantial portion of Coborn's total Visa and MasterCard transactions.

20.    The only theoretical alternative would be to stop accepting American Express – something that Coborn's cannot realistically do. American Express currently accounts for a significant amount of our payment card sales. Dropping American Express is not a viable business proposition for Coborn's. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result of this eight-year antitrust case.

21.    The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for Coborn's.

    **B.    The Other Relief in the Settlement Is of No Value to Coborn's**

5

# A1611

22.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules. Like most merchants, Coborn's generally operates under a single trade name or banner, and therefore this provision provides no benefit.

23.     I also understand that Visa and MasterCard did not have rules against group buying prior to this settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. This provision is of no value to Coborn's.

**C.     The Release Is Far Too Broad**

24.     The Proposed Settlement's release is deeply concerning to Coborn's. The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices. And the release purports to cover those rules and practices forever, which we find deeply concerning given Visa's and MasterCard's market power over us.

25.     The Proposed Settlement requires that Coborn's release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards." Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording. They also likely will argue that

6

266276.1

# A1612

substantially similar rules and conduct going forward will be released. We find it deeply unfair we have no ability to opt out of such a release.

*    *    *    *

26.    Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of Coborn's.

27.    Coborn's is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

28.    Coborn's joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for Coborn's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 21, 2013

_Chris Coborn_
Chris Coborn
President and Chief Executive Officer
Coborn's Incorporated
1445 E. Hwy 23
St. Cloud, MN 56304

7

266276.1

# A1613

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE      :
FEE AND MERCHANT DISCOUNT           :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                :
                                    :          **OBJECTION OF COSTCO**
                                    :          **WHOLESALE CORPORATION**
                                    :          **TO FINAL APPROVAL OF THE**
                                    :          **PROPOSED SETTLEMENT**
--------------------------------------------------------x

## DECLARATION OF COSTCO WHOLESALE CORPORATION

Rue A. Jenkins hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am Assistant Treasurer and an Assistant Vice President of Costco Wholesale

Corp. ("Costco"), a Washington corporation with its principal place of business in Issaquah,

Washington.  I have been with Costco for over twenty years.  I submit this declaration on behalf

of Costco to object to the proposed settlement and in opposition to the motion for final approval.

2.      My responsibilities include U.S. treasury management and investment/borrowing

activities, bank relationships and foreign exchange.  Under my direction, the Costco Treasury

department has been responsible for credit card and debit card processing arrangements since

1997.  I am knowledgeable about Costco's acceptance of debit and credit card transactions

running on all payment networks, including Visa and MasterCard, and payment of interchange

fees for transactions completed over those networks.  For the past six years I have served on the

Payments Advisory Group of the Association for Financial Professionals, including serving as

chairman for two years, and since 2012 have participated on the Corporate Payments Advisory

Group which is sponsored by the Retail Payments Office of the Federal Reserve Bank of Atlanta.

3.      Costco's chain of membership warehouse stores began operations in 1983 in

Seattle, Washington.  In 2012, Costco had over $97 billion in sales across its chain of 622

1

266277.1

that already ban surcharging, these states account for 77% of our U.S. locations and 80 % of our U.S. sales. Even if Costco were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill any efforts to introduce surcharge in these states.

18.    The fact that surcharging is currently legally permitted only in 52% of our warehouses is problematic in and of itself. For operational, training, and customer service reasons, we would not implement surcharging in only half of our locations.

19.    For Internet sales, we would need to consider the laws of the states of a customer's billing and shipping addresses. New York's state law, for example, provides that "No seller…may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check or similar means…" N.Y. Gen. Bus. Law § 518. This provision appears to apply a New York retailer, and perhaps any transactions taking place in New York. The application of this law to Internet sales is particularly unclear. The complexity of these rules will make it even more unlikely that we would implement surcharging.

### B.    The Other "Relief" in the Proposed Settlement Is of No Value to Costco

20.    The proposed settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules. Costco already varies Visa and MasterCard card acceptance across our lines of business and I am not aware of any existing Visa or MasterCard rule prohibiting this practice. As noted, we accept Visa and MasterCard credit cards only on Costco.com and Costco Travel and we accept Visa and MasterCard signature debit only in the pharmacy, optical, and hearing aid departments of our warehouses.

21.    Costco also understands that Visa and MasterCard did not have rules against

266277.1

# A1615

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE   :
FEE AND MERCHANT DISCOUNT   :   MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION   :
   :
   :   **OBJECTION OF D'AGOSTINO**
This Document Relates To:   :   **SUPERMARKETS, INC.**
   :   **TO FINAL APPROVAL**
ALL CLASS ACTIONS.   :   **OF THE SETTLEMENT**
   :
---------------------------------------------------------x

## DECLARATION OF D'AGOSTINO SUPERMARKETS, INC.

Nicholas D'Agostino hereby declares pursuant to 28 U.S.C. § 1746:

1.    I am President and Chief Executive Officer of D'Agostino Supermarkets, Inc.

("D'Agostino").  I have held this position since 2005.  I submit this declaration to object to the

proposed settlement in the interchange case ("Proposed Settlement").

2.    I am responsible for all treasury functions in the company, including capital-

raising, bank and rating agency relationships, cash management and payment acceptance.

3.    I am a member of the Board of Directors of the National Grocers Association, and

serve as its Secretary.  I also sit on the Board of the Food Industry Alliance of New York State.

4.    D'Agostino is a family-owned company of 14 grocery stores operating in the

New York City area, and on www.dagnyc.com.

5.    I have been involved in D'Agostino's payments operations since the early 1980s.

I am knowledgeable about D'Agostino's acceptance of debit and credit card transactions running

on all payment networks, including Visa and MasterCard, and payment of interchange fees for

transactions completed over those networks.  All D'Agostino locations accept Visa and

MasterCard debit and credit cards, along with American Express and Discover.

1

6.      From January 2008 until November 2012, D'Agostino paid approximately $6 million in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks.  Since December 1, 2012, and on an ongoing basis, D'Agostino has continued to pay approximately $70,000 in interchange fees for Visa and MasterCard branded cards each month.

7.      D'Agostino is a named plaintiff in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* (MDL 1720).  This proposed settlement falls short of achieving the true and lasting reform we hoped to bring about when we signed on to this action. It allows payment card networks to continue to exploit retailers and consumers without risk of repercussion.

     **A.**    **Proposals to resolve this litigation were not "accepted by all parties"**

8.      In their motion for preliminary approval, Class Counsel represented that the mediators' December 2011 proposals to resolve this litigation "were accepted by all parties" (Prelim. App. Mot. at 9).  This not true because some named plaintiffs opposed them.  In their submission in support of final approval, Class Counsel now asserts that by February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement through the processes laid out by the mediators and the Court."  (Final App. Mot. at 4-5).  Despite this claim, neither I nor anyone else at D'Agostino agreed to the Proposed Settlement.  Given the confidentiality agreement protecting discussions during the mediation process, I can only describe the events of that process in generalized terms.  However, even in generalized terms, it is clear that some named plaintiffs' concerns about the mediators' proposals were ignored by Class Counsel.

9.      The mediation that ultimately resulted in the Proposed Settlement began in 2008.

2

266210.3

# A1617

In late November 2011, however, D'Agostino discovered that Class Counsel had made proposals to Visa and MasterCard, through the mediators, without D'Agostino's knowledge or consent. D'Agostino also learned that Class Counsel had received an offer of settlement from the defendants that had not been disclosed to D'Agostino.  In that same month, Class Counsel again submitted a mediation statement that included detailed proposals without first receiving authority to do so from D'Agostino.

10.	In January 2012, Class Counsel accepted the mediators' proposals over the objections of several named plaintiffs.  Several named plaintiffs registered their opposition to the proposals and Class Counsel's acceptance of them.  D'Agostino did not register its opposition at that time because Class Counsel had assured it that the named plaintiffs would be consulted again before the details of a settlement were hammered out and they would have an opportunity to review the terms of any settlement agreement before it was submitted to the Court for approval.  However, that did not occur.

11.	When the Proposed Settlement agreement was filed with the Court on July 13, 2012, D'Agostino had not seen the final text including the final release.  The filed document appeared to indicate that D'Agostino agreed with the Proposed Settlement, but that was not the case.

12.	D'Agostino is opposed to the Proposed Settlement because it has serious shortcomings for D'Agostino, including failing to address the core claims in this case.  Most importantly, the Proposed Settlement will not change the ways that Visa and MasterCard limit competition in the current payment marketplace, including how Visa and MasterCard fix interchange rates for the banks, require merchants to "honor all cards" from all issuers, and/or limit network routing choices for credit cards, among other things.

3

266210.3

**B.      The Settlement Will Not Allow Us to Surcharge**

13.      Surcharging is illegal in New York, where all of our stores are located.

Therefore, surcharging provides no benefit to us.

14.      Even if it were not illegal in all of our stores, the Proposed Settlement effectively

maintains the prohibitions against surcharging.  We cannot surcharge Visa and MasterCard debit

transactions.  Over the past two years, Visa and MasterCard debit card transactions have

accounted for an average 26% of D'Agostino's overall Visa and MasterCard transactions.

Consequently, a significant number of our Visa and MasterCard transactions would not even be

eligible for a surcharge.

15.      The limitations in the settlement effectively maintain the prohibition against Visa

and MasterCard credit transactions as well.

16.      The rule changes in the Proposed Settlement only allow merchants to surcharge

Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to

surcharge transactions under the rules of any "Competitive Card Brand" that is as or more

expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of

the more expensive Competitive Card Brand – primarily American Express, which is usually

more expensive than Visa and MasterCard.

17.      If a merchant wanted to surcharge as provided under the Proposed Settlement, the

merchant would be required to surcharge American Express transactions.  American Express

Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit

cards and brands or card-products with lower acceptance costs.  Surcharging debit cards would

not even be permissible under the Proposed Settlement, which only allows surcharging on credit

cards.  Surcharging this way does not make sense, as the point of surcharging is supposed to be

to encourage customers to use less expensive forms of payment and to play one card brand

4

266210.3

against the other to introduce price competition in the industry.

18.    The only theoretical alternative would be to stop accepting American Express – something that is not a viable business proposition for D'Agostino, and we would not surcharge under these terms.

### C.    The Release Is Too Broad

19.    The mandatory release is deeply concerning to us because Visa and MasterCard likely will argue that the release covers their entire rule books and conduct up to preliminary approval given its broad wording, which includes interchange and any other fees imposed by networks, issuers, and acquirers, the Honor All Cards rules, routing limitations, and a host of other restrictive rules.  Visa and MasterCard will also argue that substantially similar rules and conduct in the future will be released.  We find it deeply unfair that this release will go into effect, even before the settlement has been fully scrutinized by the court, and we have no ability to opt out.  Even one year of Visa and MasterCard operating under this release could have serious consequences for the merchant community.

20.    In addition, the settlement seems to treat mobile devices the same as payment cards by including a "mobile telephone" and other devices in the definition of credit and debit cards.  This reinforces our concerns about releasing claims concerning the Honor All Cards rules because the release might be used by Visa and MasterCard to argue that their current or future rules cover their mobile payment products and force acceptance of them or even the implementation of hardware that might be necessary to accept them.  We are increasingly interested in mobile payments, and we currently allow customers to use Google Wallet as a form of mobile payment in all of our stores.  We are particularly concerned about any appearance that we are releasing rights to challenge rules that could impact the future of payments in this settlement.

5

266210.3

# A1620

\*    \*    \*    \*

21.    Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of D'Agostino.

22.    D'Agostino is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

23.    D'Agostino joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for D'Agostino's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2013

Nicholas D'Agostino

1385 Boston Post Road

Larchmont, NY 10538

(914) 833-4000

6

360210.3

# A1621

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :          MDL No. 1720 (JG)(JO)
FEE AND MERCHANT DISCOUNT               :
ANTITRUST LITIGATION                    :          **OBJECTION OF**
                                        :          **ALON USA, LP**
                                        :          **TO FINAL APPROVAL OF**
                                        :          **THE PROPOSED SETTLEMENT**
------------------------------------------------------------x

## DECLARATION OF ALON USA, LP

Tim Patterson hereby declares:

1.        I am currently General Manager, Payment Cards & Retail Services at Alon USA

GP, LLC, and have responsibility for the branded business of Alon USA, LP.  (For the purposes

of this Objection, Alon USA, LP is referred to interchangeably herein as "Alon USA, LP" and

"Alon Brands.")  I have held this position since 2011.  I previously held the position of General

Manager, Credit Card & Marketing Programs from 2008 to 2011.  From 2002 to 2008, I held the

title of Manager, Marketing Support.

2.        I have been responsible for all payment card contracts and processing at Alon

Brands for the last 9 years.  Also during the last 9 years, I have been a member of the Advisory

Board of Wright Express Corporation, a provider of fleet card processing services.  Since 2011, I

have served as a Member Director of the Merchant Advisory Group, a merchant member-based

trade association focused on the payments industry.  From February 2004 to October 2004, I was

a member of a credit card subcommittee of the Society of Independent Gasoline Marketers

Association (SIGMA), an industry trade association for oil & gas marketers.  This subcommittee

disbanded shortly after it was formed because its members concluded that they lacked the ability

to bring about any meaningful changes to Visa and MasterCard's fees and rules.

3.        At Alon Brands, I am responsible for managing all payment cards operations and

1

# A1622

14.     Far more important than damages is the opportunity to meaningfully change the interchange system going forward, or failing that, to give merchants the tools to introduce some competitive discipline into the system.  The Proposed Settlement misses this opportunity and instead further strengthens the current system by providing a sweeping, forward-looking release of claims concerning interchange and existing rules and policies that are detrimental to merchants.

### A.     Surcharging Rule Changes Will Have Little or No Effect on Our Business

15.     The Proposed Settlement provides merchants an extremely limited ability to surcharge their customers based on the brand or type of credit card used.  Surcharging would pose a challenge to our high level of customer service and customer loyalty.  Unless surcharging was implemented across the entire industry, we would likely lose a significant amount of business to any of our competitors who did not implement surcharging.

16.     Alon Brands believes that merchants should have the right to impose surcharges on payment cards if they choose to do so after weighing the costs and benefits and the needs of their own businesses.  The rules changes in the Proposed Settlement, however, do not provide merchants with a meaningful surcharge right.

#### 1.     Surcharging Alone Cannot Fix the Problems in the Payments Market

17.     Our Retail Locations are in Texas and New Mexico.  Surcharging is illegal in 11 states, including one of the most populous in the U.S., Texas, where a large proportion of our stores are located.  Texas currently account for 90% of our locations and 75% of our sales.  Because surcharging is legally permitted in only 10 % of our stores, the settlement provisions allowing surcharging offer no meaningful relief to Alon Brands.

18.     In addition, our stores in Texas and New Mexico share the same network, therefore it would be a significant technological challenge for us to implement surcharging in our

5

# A1623

New Mexico stores without implementing it in Texas as well. Second, differential acceptance practices would create confusion and complexity for our customers, our sales staff (some 1,800 employees), and our POS systems. Even if we were inclined to surcharge in New Mexico, we would be extremely hesitant to engage in a practice that would not be applicable across all of our stores. Such a practice would be particularly damaging to our customer relations. It would defeat the considerable costs we invest in creating as uniform an experience as possible to our customers.

19. Furthermore, it is my understanding that legislation to prohibit surcharging has been proposed in numerous states that, at present, permit it, including New Mexico. As such, even if we determined it worthwhile financially to overcome the issues address above to surcharge in New Mexico, there is a possibility that at some point in the future we would be prohibited from doing so anyway, and we would not consider surcharging with that uncertainty.

## 2. The Settlement Provisions Interact with American Express Rules to Defeat the Point of Surcharging

20. The modest rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express, which for Alon Brands is more expensive than Visa and MasterCard.

21. American Express Rule 3.2 provides that "Merchants must not: indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card[;] try to dissuade Cardmembers from using the Card . . . [; or] impose any restrictions, conditions, disadvantages or fees when the Card is accepted that are not imposed equally on all Other

6

Payment Products, except for electronic funds transfer, cash, and checks . . . ."

22.     If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions.  American Express Rule 3.2 rule would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs.  This would completely defeat the point of surcharging, which would be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

23.     In addition, surcharging debit cards would not even be permissible under the Proposed Settlement, which only allows surcharging on credit cards.

24.     The only theoretical alternative would be not to accept American Express.  Alon Brands will not do this, as it would only further limit payment card competition and perpetuate the virtual monopoly on the payment card system that Visa and MasterCard already enjoy.  We already accept American Express ("AmEx"), and as AmEx cardholders are among our most valuable customers, eliminating its acceptance could damage our brand and our customer base.

### 3.     The Surcharging Rules Concerning Disclosure and Surcharging by Brand or Product Are Unworkable

25.     Other aspects of the surcharging rules in the Proposed Settlement are problematic.

26.     For example, if Alon Brands decided to surcharge customers, we would need to control the message to our consumers, especially at the point of sale.  The proposed rule modifications, however, require merchants to give advance notice of surcharging to Visa and MasterCard, and request their approval of the messaging.

27.     Most objectionable is the requirement that merchants make "a statement that the surcharge is being imposed by the *merchant*."  Proposed Settlement ¶¶ 42(c)(iii), 55(c)(iii).  No

7

# A1625

vendor should tell us how to set and communicate our pricing and how to interact with our customers. In addition, the message that Alon Brands, rather than Visa, MasterCard, and the banks, is responsible for interchange and the need for surcharging is false. Visa and MasterCard have caused the need for surcharging with their non-competitive pricing; if they priced competitively, merchants likely would not surcharge. In any event, forcing merchants to tell customers that the surcharge is coming from the merchant will maximize the likelihood of unhappy customers and lost sales and will significantly reduce merchants' willingness to surcharge. This is of particular concern to Alon Brands as a gasoline retailer. Our customers would not accept being charged a higher price than the one posted on the prominent signs outside our filling stations, which would cause irreversible damage to our brand image and considerable loss of business.

28.     The Proposed Settlement gives merchants a choice between surcharging across brand or product. If we were to surcharge any payment cards, we would want to surcharge rewards cards with high interchange rates and encourage lower priced forms of payment.

29.     To do so effectively, we would need the ability to cost-effectively and consistently distinguish Visa and MasterCard rewards cards from Visa and MasterCard vanilla credit cards. The Proposed Settlement offers no practical solution to this issue. Unlike the clear labels which must appear on a debit card to distinguish it from a credit card, our checkout personnel would have no reliable ability to visually distinguish between rewards and basic cards, or any of the dozens of other Visa and MasterCard products. These products (and the associated interchange rates) can change, and they have no standardized appearance.

30.     Merchants need a way to immediately know the interchange rates associated with a particular card before a transaction begins, and the Proposed Settlement does not provide such

8

# A1626

a method.

31.     The "Visa Product Eligibility Service" and the "MasterCard Product Validation Service" will not help merchants solve this problem.  As an initial matter, they involve a call out to our processor.  This will incur a processing fee from our acquiring bank, who will not be bound by Visa's and MasterCard's commitment to maintain the services at no cost – until 2021, when they too may add a fee, and when they may also re-impose a full ban on surcharging.

32.     Most importantly, to use this service, the sales clerk or customer may have to swipe a card more than once, and potentially more than one payment card.  The prospect of a customer swiping twice or swiping several payment cards in an effort to determine the amount of a surcharge on each card would be totally unacceptable to Alon Brands.

33.     For these reasons, any solution to the issue of interchange cannot rely solely on surcharging.  Even without the problematic restrictions on surcharging in the settlement – the Competitive Card Brand limitation and the disclosure requirements – the fact that numerous merchants cannot surcharge because of the 11 states that prohibit it, and the possibility that more states will pass such laws, renders surcharging an insufficient remedy, standing alone, to the issue of interchange.

## B.     The All Outlets Rule Provides No Significant Benefit to Merchants

34.     Before surcharging, we would also want the ability to test various surcharging and disclosure methods in a single or small number of stores, as surcharging would be highly disruptive to our business.  Visa and MasterCard rules, however, will require surcharging across all of a merchant's locations.  The revisions to the all outlets rules in the settlement, therefore, do not provide Alon Brands and other merchants what they really need – the ability to test new acceptance practices at a small number of stores.

9

# A1627

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE       :
FEE AND MERCHANT DISCOUNT            :      MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                 :
                                     :      **OBJECTION OF**
                                     :      **BARNES & NOBLE, INC.**
                                     :      **TO FINAL APPROVAL OF THE**
                                     :      **PROPOSED SETTLEMENT**
-----------------------------------------------------------x

## DECLARATION OF BARNES & NOBLE, INC.

Mike Rahn hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently Vice President, Retail Controller at Barnes & Noble, Inc. ("Barnes

& Noble"), a Delaware corporation with its principal place of business in New York, New York.

I have held this position since July 2003, and have worked for Barnes & Noble since July 1990.

I submit this declaration on behalf of Barnes & Noble to object to the proposed settlement in the

interchange case and in support of the opposition to the motion for final approval.

2.      I am responsible for general accounting, store finance, occupancy accounting, gift

card accounting, fixed asset accounting, sales audit, bank reconciliation, and credit card

reconciliations. I am also point of contact with our third party payment processor and the card

networks.

3.      I am knowledgeable about Barnes & Noble's acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks.

4.      Barnes & Noble is one of the nation's largest booksellers and a leading content,

commerce, and technology company providing customers easy and convenient access to books,

magazines, newspapers and other content across its multi-channel distribution platform.  We

266301 3

# A1628

ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and MasterCard's interchange fees impose on merchants.

**B.     The Surcharging Rule Changes Do Not Give Barnes & Noble the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

11.     As an initial matter, Barnes & Noble has no current intention to impose surcharges on customers. We believe that raising the cost of purchase based on the customer's chosen method of payment would create a terrible experience for the customer. If Barnes & Noble were to consider implementing such a program, however, it is clear that the rules changes in the settlement offer no practical ability to surcharge, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

**2.     The Competitive Card Brand Limitation Makes Surcharging Impossible for Barnes & Noble**

12.     The rule changes in the Proposed Settlement only allow Barnes & Noble to surcharge Visa or MasterCard credit card transactions under the same terms as we are allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

13.     If Barnes & Noble wanted to surcharge as provided under the Proposed Settlement, we would be required to surcharge American Express transactions. American Express Rule 3.2 would then require us to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of

4

266301.3

payment and to play one card brand against the other to introduce price competition in the industry.

14.      Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Debit card transactions (including both PIN and signature) represent 58% of Barnes & Noble's total Visa and MasterCard transactions.

15.      The only theoretical alternative would be to stop accepting American Express – something that Barnes & Noble cannot realistically do. American Express currently accounts for 10% of our payment card sales. Dropping American Express is not a viable business proposition for Barnes & Noble. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result of this eight-year antitrust case.

16.      The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for Barnes & Noble.

### 3.      Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

17.      Barnes & Noble currently does business at 675 stores under the Barnes & Noble Booksellers banner in 50 states and the District of Columbia. Surcharging is illegal in 11 states – California (77 stores), Colorado (16 stores), Connecticut (13 stores), Florida (43 stores), Kansas (4 stores), Maine (1 store), Massachusetts (18 stores), New York (43 stores), Oklahoma (5 stores), Texas (53 stores), and Utah (10 stores). Those states cumulatively hold 42% of our U.S. locations and account for 44% of our U.S. retail store sales.

5

266201 1

18.     I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many of our Barnes & Noble Booksellers stores are located, including Arkansas (5 stores), Hawaii (3 stores), Illinois (29 stores), Indiana (12 stores). Kentucky (7 stores), Maryland (13 stores), Michigan (21 stores). Mississippi (3 stores). Missouri (13 stores), Nevada (4 stores), New Hampshire (4 stores), New Jersey (24 stores), New Mexico (3 stores). Pennsylvania (26 stores), Rhode Island (3 stores), South Carolina (11 stores). Tennessee (8 stores), Vermont (1 stores), West Virginia (1 stores), and Washington (18 stores). Combined with states that already ban surcharging, these states account for 73% of our U.S. Barnes & Noble Booksellers locations and 74% of our U.S. retail store sales. Even if Barnes & Noble were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill any efforts to surcharge in these states.

19.     The fact that surcharging is currently legally permitted in more than half of our stores is problematic in and of itself. For operational, training, and customer service reasons, we would not implement surcharging in 39 states, but not in the 11 that prohibit surcharging.

20.     For Internet sales, we would need to consider the laws of our home state of New York, *and* the laws of the states of a customer's billing and shipping addresses. Florida's state law, for example, provides that "A seller…may not impose a surcharge on the buyer…for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller…accepts payment by credit card…." Fla. Stat. Ann § 501.0117(1). This provision appears to apply a Florida retailer, and perhaps any consumer transactions taking place in Florida. The complexity of these rules will make it even more unlikely that we would implement surcharging.

**C.     The Other Relief in the Settlement Is of No Value to Barnes & Noble**

6

266301.3

# A1631

21.    The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules. Barnes & Noble operates under one trade name, and therefore this relief is of no value to Barnes & Noble.

22.    Barnes & Noble also understands that Visa and MasterCard did not have rules against group buying prior to this settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. This provision is of no value to our company.

### D.    The Release Is Far Too Broad

23.    The Proposed Settlement's release is deeply concerning to Barnes & Noble. The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices. And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us.

24.    The Proposed Settlement requires that Barnes & Noble release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards." Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording. They also likely will argue that

7

2663013

# A1632

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :
FEE AND MERCHANT DISCOUNT               :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                    :
                                        :          **OBJECTION OF IKEA US**
                                        :          **TO FINAL APPROVAL OF**
                                        :          **THE PROPOSED SETTLEMENT**
--------------------------------------------------------x

## DECLARATION OF IKEA US

John Robinson hereby declares:

1.      I am Treasurer for IKEA's United States operations ("IKEA US"). I have worked

at IKEA US for 24 years, have served as Treasurer for over 10 years, and am involved in a broad

range of activities related to corporate governance, risk management, cost management,

corporate compliance and business development. These activities cover all aspects of payment

acceptance at IKEA US.

2.      I am directly responsible for a wide range of Treasury activities for IKEA US, and

these responsibilities include liquidity and cash management, financing and borrowing activities,

real estate financing, bank relationships, armored transport and other financial services. Under

my direction, the IKEA US Treasury function also oversees credit card and debit card processing

and manages all merchant processing relationships for IKEA US. I have personal knowledge

about IKEA US's acceptance of debit and credit card transactions running on all payment

networks, including Visa and MasterCard, and payment of interchange fees for transactions

completed over those networks.

3.      The IKEA Group is a global retailer whose stated vision and business idea is

"…to create a better everyday life for the many people by offering a wide range of well-

designed, functional home furnishing products **at prices so low** that as many people as possible

1

will be able to afford them." IKEA US's retail operations are an extension of the global brand created in Europe, and operate according to the same guiding principles of low price and low cost. IKEA US began operations in the United States in 1985 with the opening of its first US store, and IKEA US currently operates 38 stores in the United States along with a US call center that processes phone and Internet sales for its US customers. As a low price retailer, the realization of a low cost operating structure is of critical importance in making our business idea a reality. Realizing operational efficiencies and managing costs effectively are extremely critical focuses for IKEA US as it operates here in the United States in the most competitive retail market in the world. IKEA US currently has annual sales in excess of $4 billion.

## I.    INTERCHANGE FEES AND IKEA'S ACCEPTANCE OF PAYMENT CARDS

4.      Visa and MasterCard interchange fees are one of IKEA US's largest operating expenses, and yet these interchange rates are largely beyond our control. Credit and debit card interchange represents IKEA US's third largest non staff-related store expense after the cost of rent and publicity/advertising. A concept central to our business model, and supported through our global experience, is that volume brings efficiencies to the cost of operating our business. In every area of our business in the United States – except for credit and debit card acceptance – IKEA US has been able to realize cost efficiencies as a result of opening more stores and increasing the average sales per store. Rent costs as a % of sales have gone down, and the cost of publicity and advertising as a % of sales has gone down as well. Some of these gains stem from being able to allocate or amortize fixed costs over greater volumes, reducing the effective cost to operate, while some of the gains result from being able to negotiate and secure lower costs of doing business as the result of being able to deliver greater volumes and operating efficiencies to our suppliers.

5.      Despite tripling the number of stores open in the last ten years and increasing

average sales volume per location, the cost of credit and debit card acceptance at IKEA US has

not shown the same efficiencies like the cost of rent and publicity and advertising.  Contrary and

opposite to our experience with rent costs and the costs of publicity and advertising, there have

been no improvements in the cost of credit and debit card acceptance.  Despite tripling the

number of stores open in the last ten years and significantly increasing average sales volume per

location, the effective cost of credit and debit card acceptance at IKEA US has actually increased

over time.  Despite increasing the average number of credit and debit card transactions processed

each day, despite increasing the average value of a transaction, and despite increasing both the

number of transactions included in and the average settlement value of a credit and debit card

batch requiring settlement with Visa or MasterCard, all of which are facts that should allow Visa

or MasterCard to realize processing and settlement efficiencies, IKEA US has seen no reduction

in its effective credit and debit card acceptance costs.  Attempts to discuss or negotiate reduced

rates with Visa and MasterCard have been unsuccessful, largely due to non-response from Visa

or MasterCard.  In the largest and most competitive retail market on earth, IKEA US has not

been able to realize efficiencies reflective of its volume development over time.  Given IKEA

US's growth and development over the last ten years, the inability to realize any cost efficiencies

is a signal that the United States credit and debit card markets dominated by Visa and

MasterCard are broken.  This stark reality is best highlighted by the relationship that for the

fiscal year ended August 31, 2012, while IKEA US accounted for 26% of the worldwide credit

card volumes processed within the IKEA Group globally, it accounted for 40% of the worldwide

credit card interchange fees incurred by the IKEA Group for the same period.

     6.    IKEA US accepts American Express in addition to Visa and MasterCard.  The

American Express volumes at IKEA US are high enough (currently in excess of 10% of sales)

3

that dropping or not accepting American Express is not a viable option for IKEA US to consider.

## II.  IKEA US HAS PAID $ 247 MILLION IN DEBIT AND CREDIT CARD INTERCHANGE

7.     From January 1, 2004 through November 27, 2012, IKEA US has paid approximately $247 million dollars in interchange fees for payment card transactions running on the Visa and MasterCard networks.

8.     These fees include $181 million in interchange fees for Visa and MasterCard credit cards; $35 million for Visa and MasterCard signature debit cards; and $31 million for Interlink and Maestro transactions.  IKEA US continues to pay these interchange fees on an ongoing basis.

## III.   THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

9.     I have reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement").  Neither I nor anyone else at IKEA US, nor any counsel working on our behalf had any involvement in the negotiations leading up to the Proposed Settlement.

10.     In my view, the Proposed Settlement has very serious limitations.  The Proposed Settlement will not change the ways that Visa, MasterCard, and banks limit competition in the current payment marketplace, including how Visa and MasterCard set interchange rates, require merchants to "honor all cards" from all issuers, and/or limit network routing choices for credit and debit cards.  The Proposed Settlement expressly validates continued default setting of interchange.

11.     Over decades of operation, Visa and MasterCard have divided the US payments environment by any factor possible to allow them to maximize interchange.  Interchange pricing to merchants is determined by a variety of factors – industry sector, Merchant Category Code (MCC), whether a credit/debit card is present at the point of sale or not, the type of card being

processed (rewards, corporate, commercial, etc.), the time between authorization of a transaction

and actual settlement between merchant and issuer, what data is included in the settlement

transmission – these are just some of the factors put in place to allow them to maximize

interchange and issuer revenue. Processing equivalent payment transactions still leads to wildly

different costs for different retailers, depending on the unique facts of their operational and

processing set-up. The Proposed Settlement allows Visa and MasterCard to continue to set

interchange in this arbitrary and increasingly complex fashion, yet offers only a simplistic

approach to injunctive relief that lacks substance and does not match the complexity of the US

interchange model in operation today. That operating conditions vary so much between

merchants raises serious questions as to whether the remedies offered merchants under terms of

the Proposed Settlement meet the standards of fairness, adequacy, and reasonableness that must

be met for a class action settlement, especially one that is mandatory on all current and future

merchants.

      12.    IKEA US also does not agree with the structure of the Proposed Settlement that

does not give merchants a choice to opt out of the Rule 23(b)(2) Settlement Class injunctive

relief that has been proposed, especially with respect to its claims for monetary damages. If a

merchant such as IKEA US processes Visa or MasterCard as of the Settlement Preliminary

Approval Date, the merchant will be automatically be bound by the terms of the Settlement

Agreement, if approved, and forced to give up all rights to seek remedy or relief in the courts for

any acts from which it suffers injury or losses. By virtue of this structure, IKEA US is being

denied its rights of due process. Class Counsel purports to know what form of relief would be in

IKEA US's best interests without any contact or discussion with IKEA US, yet has proposed an

agreement where IKEA US is restricted and unable to choose the course of action that is

ultimately in its best interest.

13.     IKEA US further objects to the inclusion of Paragraphs 34 and 69 under terms of
the injunctive relief in the Proposed Settlement Agreement.  The language waiving any rights
that a Rule 23(b)(2) Settlement Class Releasing Party might have under California Civil Code
Section 1542 or similar laws of any other state or jurisdiction would disallow any rights available
to seek relief for even deliberately hidden or deliberately concealed acts of the defendants.  With
a statement in the Proposed Settlement that over 50 million pages of discovery has been
reviewed, and a presumption that all requests for discovery in this case have been addressed with
reasonable, good faith efforts by all parties, there should be no need for the language of
paragraphs 34 and 69 to be included in the Proposed Settlement.  Therefore, the  waiver of rights
under California Civil Code Section 1542 or similar laws of any other state or jurisdiction that
would include even deliberately hidden or deliberately concealed acts is totally unacceptable to
IKEA US, does not represent our interests and is impermissibly broad.

14.     There is inadequate balance between the primary relief offered merchants and the
broad release of claims offered the defendants that will affect all merchants, even future
merchants, without the ability to opt-out.  The primary relief offered merchants – limited changes
to the no-surcharging rules – is structurally flawed, operationally impractical (if not impossible)
to administer,  and will  expire relatively soon, in 2021.  The primary relief offered the
defendants is in the form of releases that are not time-limited but go on forever, include
international Visa and MasterCard affiliates that lack connection to the underlying facts of this
case and have no presence in the United States payment markets.  The releases also
unreasonably extend the definition of what is a credit card and what is a debit card to make any
and all emerging payment technologies automatically subject to Visa and MasterCard operating

rules in the future without Visa and MasterCard having to demonstrate that the rules should apply to these new technologies. Given that one cannot predict the future, let alone how Visa and MasterCard could take advantage of the sweeping immunity the release appears to give them, the long-term effects of the forward-looking aspects of the release are very troubling and deeply concern IKEA US.

15.     While our principal objection concerns the lack of meaningful injunctive relief, the monetary payments referenced in the Proposed Settlement will likely represent only a small portion of overall interchange fees paid by merchants annually. IKEA US's damages in the Visa Check/Master Money Antitrust Litigation amounted to approximately 2 basis points when measured against the total combined Visa/MasterCard volumes processed by IKEA US for the period under litigation in that action. IKEA US believes that its proportionate share of the monetary payments referenced in the Proposed Settlement for this matter would again be small and not meaningful when measured against the total Visa/MasterCard volumes processed by IKEA US during the damages period covered by the Proposed Settlement.

16.     Far more important than monetary damages is the opportunity to meaningfully change the interchange system going forward, or failing that, to give merchants the tools to introduce some competitive discipline into the system. The Proposed Settlement misses this opportunity and instead further strengthens the current system by providing a sweeping, never-ending, forward-looking release of claims concerning interchange.

   **A.     Surcharging Rule Changes Will Have Little or No Net Benefits For IKEA US's Business**

16.     The Proposed Settlement provides merchants an extremely limited ability to surcharge their customers based on the brand or type of credit card used. IKEA US does not currently surcharge any payment cards in the U.S. Based on the experience of international

affiliates of IKEA US operating outside the United States, the decision to surcharge is complicated and very sensitive, as it is an action that has very high (mostly negative) customer goodwill ramifications.  However, IKEA US believes that merchants should have the right to impose surcharges on payment cards if they choose to do so after weighing the costs and benefits associated with surcharging, the needs of their own businesses, and the terms of the Proposed Settlement Agreement.  There are many different business models for retailers, reflecting on differences in products offered, and differences in operational set-ups.  However, in our opinion, the rule changes in the Proposed Settlement do not provide merchants with a meaningful surcharge right.  The limited changes in the Proposed Settlement provide no clear benefits for several reasons:  1) due to conflicts between the Proposed Settlement and the American Express operating regulations that any merchant accepting American Express must comply with, 2) due to the excessively cumbersome and restrictive conditions under which surcharging could be done, 3) due to conflicts between the Proposed Settlement and existing laws in 11 states that currently ban surcharging on credit card transactions, and the resultant extra costs that would be incurred by a merchant that operates in both surcharge-allowable and surcharge-restricted states and 4) the negative customer service issues that would be experienced by a merchant.

> **1.    IKEA US Accepts American Express, Whose Surcharging Restrictions Conflict With the Preliminary Settlement**

17.    One of the most severe limitations of the surcharging rule changes is the requirement to surcharge other "Competitive Credit Card Brands" with the same or higher acceptance costs.  This means that the only way IKEA US would be able to surcharge Visa and MasterCard credit card transactions would be to surcharge American Express.

18.    American Express rules prohibit surcharging its cards unless all payment cards are treated equally.  American Express Rule 3.2 provides that **"Merchants must not:  indicate or**

imply that they prefer, directly or indirectly, any Other Payment Products over our Card[;] try to dissuade Cardmembers from using the Card . . . [; or] impose any restrictions, conditions, disadvantages or fees when the Card is accepted that are not imposed equally on all Other Payment Products, except for electronic funds transfer, cash, and checks . . . .".  This means that in order to comply with the American Express rules, a merchant that accepts American Express and wanted to surcharge would be required to surcharge lesser-expensive forms of payment, including debit.  However, both Visa and MasterCard's current operating procedures expressly forbid the surcharging of debit transactions, thus making it impossible for a merchant that accepts American Express to surcharge credit card transactions as allowed by the Preliminary Settlement and be in simultaneous compliance with American Express, Visa and MasterCard operating rules and regulations.

19.    IKEA US accepts American Express in all of our locations.  American Express currently accounts for more than 10% of our payment card transactions.  Therefore, dropping American Express is not a viable business proposition for IKEA US to take advantage of the surcharging relief provisions of the Preliminary Settlement.

20.    For this reason, the surcharging provisions in the settlement are of no value to IKEA US.  The ability to take advantage of surcharging relief under terms of the Proposed Settlement will also be an issue for any other merchant that accepts American Express.  Since there is a high level of acceptance of American Express in the United States retail market, the surcharging aspect of the Proposed Settlement lacks meaningful substance and the conflict that exists between the Proposed Settlement, the American Express rules, and the continuing ban on debit surcharging by Visa and MasterCard is a major structural flaw in the Proposed Settlement.

### 2. The Surcharging Rules Concerning Disclosure and Surcharging by Brand or Product Are Impractical, Intrusive and Unworkable

9

21.     Other aspects of the surcharging rules in the Proposed Settlement are problematic. For example, if the conflicts about surcharging and American Express acceptance did not exist, then if IKEA US decided to surcharge customers, we would want to control the message to our consumers, especially at the point of sale.  Other provisions of the Proposed Settlement would require IKEA US to post a notice at the point of entry into the store, which is a critical point of communication with our customers.  This requirement for point of entry communication is also unreasonably intrusive and burdensome on IKEA US, and would conflict, interfere and detract from other forms of commercial communication that IKEA utilizes at its store entrances.

22.     Most objectionable is the requirement that merchants make "a statement that the surcharge is being imposed by the *merchant*."  Proposed Settlement ¶¶ 42(c)(iii), 55(c)(iii); *see also* Visa website, http://usa.visa.com/download/merchants/surcharging-faq-by-merchants.pdf: Merchants must "Disclose the surcharge as a merchant fee . . . ."  No vendor should tell us how to set and communicate our pricing and how to interact with our customers.  In addition, the message that IKEA US, rather than Visa, MasterCard, and the banks, is responsible for interchange is false.  Visa and MasterCard have caused the need for the surcharge with their supra-competitive pricing; if they priced competitively, merchants likely would not surcharge. In any event, forcing merchants to tell customers that the surcharge is coming from the merchant will only increase and maximize the likelihood of lost sales.

23.     The Proposed Settlement gives merchants a choice between surcharging across brand or product.  If we were to surcharge any payment cards, we would want to surcharge rewards cards or corporate cards with high interchange rates while encouraging the use of plain vanilla Visa and MasterCard cards with comparatively lower interchange rates.

24.     To do so effectively, we would need the ability to cost-effectively and

consistently distinguish Visa and MasterCard rewards and corporate cards from Visa and

MasterCard vanilla credit cards. The Proposed Settlement offers no practical solution to this

issue. Unlike the clear labels which must appear on a debit card to distinguish it from a credit

card, our checkout personnel would have no reliable ability to visually distinguish between

rewards, corporate and basic cards, or any of the dozens of other Visa and MasterCard products.

These products (and the associated interchange rates) can change, and they have no standardized

appearance.

      25.    Merchants need a way to immediately know the interchange rates associated with

a particular card before a transaction begins, and the Proposed Settlement does not provide such

a method.

      26.    The "Visa Product Eligibility Service" and the "MasterCard Product Validation

Service" will not help merchants solve this problem. As an initial matter, they involve a call out

to our processor. This will incur a processing fee from our acquiring bank, who will not be

bound by Visa's and MasterCard's commitment to provide the services at no cost. Even then,

the commitment by Visa and MasterCard to provide the services at no cost exists only until

2021, when they too could add a fee, and when they could also re-impose a full ban on

surcharging.

      27.    Most importantly, to use this service, the sales clerk or customer may have to

swipe more than one payment card. The prospect of a customer swiping several payment cards

in an effort to determine the amount of a surcharge on each card and the resulting delays in the

checkout lane would be totally unacceptable to IKEA US. Even minor delays at checkout would

eliminate any potential benefit from surcharging because of increased costs, inconvenience,

consumer dissatisfaction, and lost productivity.

    **3.**     **Surcharging Is Illegal in 20 of Our Stores, and the Proposed Settlement Allows Lobbying in Additional States**

28.     Surcharging is illegal in 11 states, including some of the most populous.  In the 11 states in which surcharging is illegal – Maine, Oklahoma, California, Colorado, Connecticut, Florida, Kansas, Massachusetts, New York, Texas, and Utah – IKEA US has 20 store locations that account for account for 53% of our U.S. locations and 53%  of our U.S. sales, over $2 billion in sales.

29.     The fact that surcharging is legally permitted in only half of our stores is very problematic.  IKEA US, as a low-price, low-cost retailer, has developed standardized operating routines for our stores in order to maximize efficiencies within our operations.  Card acceptance practices that vary by store location, depending on whether surcharging was permitted or not, would add to the confusion and inconvenience of customers and our sales staff.  Having to split and then manage what would effectively become two different POS processes (one programmed for no surcharging, and one programmed to support surcharging) would be prohibitively expensive and ultimately unworkable.  Even if we were inclined to surcharge, we would be not be able to do so.

30.     Many additional states are considering instituting new restrictions on surcharging, in direct response to the public announcement of the Proposed Settlement, and even before any merchants actually started surcharging.  Visa, MasterCard, and issuing banks have been actively involved in the passage of anti-surcharging laws in the past, and we expect that they will lobby to pass similar laws in other states, further weakening any potential relief in the Proposed Settlement.

    **4. Negative Customer Service Implications Associated with Surcharging**

31.     Based on the experience of the IKEA Group in the United Kingdom, where

# A1644

surcharging was tried and eventually stopped, the view of IKEA US is that the ability to surcharge is a remedy with very limited benefits at best in the United States market.  While an unrestricted ability to surcharge to transfer the costs of payment acceptance in a transparent way may theoretically have some impact on the choice of payment used, any initial short-term cost benefits will be offset by more negative, longer-term implications.  Surcharging the customer in the form of an additional amount not included in the base retail price will give the appearance the merchant is simply charging an extra cost to the customer, no matter the efforts to inform and educate them.  It (surcharging) will increase customer dissatisfaction with the merchant, and over time, possibly cause that customer to leave that merchant in favor of another merchant who does not surcharge, but simply covers the costs of credit card acceptance in its general mark-up for profit included in the base price.  Surcharging will negatively influence long-term sales growth, and interfere with brand development, brand positioning and brand messaging by a merchant. All of these factors were real issues and real concerns for the IKEA Group in the United Kingdom.  The IKEA Group's experience with surcharging in the United Kingdom confirmed that over time, surcharging led to increased customer complaints and customer dissatisfaction, and increased negative conversations at the check-outs with customers unaware of the surcharge until their payment had been processed.  These increased levels of negative conversations detracted from the customer's store experience, caused them to look at IKEA in a negative light, and created operational inefficiencies at the check-outs by forcing more time to be spent discussing and explaining the practice of surcharging, thus slowing down the lines and throughput capacity.  Benefits received in the form of reimbursements received through surcharging were offset by lower levels of customer satisfaction, and reduced operating efficiencies due to the delays experienced at the checkouts.  The risk of alienating or losing

13

customers as a result of surcharging was a real concern for IKEA UK, since they were the only

major retailer to surcharge in that market, and this concern ultimately contributed to the eventual

decision to stop surcharging. I would expect most US merchants that operate in highly

competitive industries like we do to be sensitive to these types of pressures when they consider

the idea of surcharging. IKEA US operates in a highly competitive environment where a small

number of lost sales due to surcharging will render the practice cost ineffective to IKEA US.

32.     In addition to the experience of the IKEA Group in the United Kingdom, the

claim that surcharging will provide significant relief to merchants is also refuted by the reaction

of the American consumer to the Bank of America decision in 2012 to institute monthly debit

card fees, which were quickly reversed under enormous consumer outcry. The customer

backlash in the United States would be enormous, extremely negative and damaging to any

merchant who introduced surcharging.

33.     In summary, for all of these reasons, any solution to the issue of interchange

cannot rely solely on surcharging. Even if surcharging were not illegal in many states and

prohibited by American Express rules, the combination of the technical problems in identifying

which cards should be subject to a surcharge, the additional significant extra operational costs

that would have to be incurred to support POS functionality requiring two logical methods (if it

could even be done), the control Visa and MasterCard will exert over the surcharging process

and the negative customer service consequences make the primary relief in the Proposed

Settlement of very little use to IKEA US.

**B.     The All Outlets Provision Provides No Benefit to Merchants Such As IKEA**

34.     The Proposed Settlement also supposedly relaxes a Visa and MasterCard policy

that would more readily allow merchants to vary their acceptance practices in different lines of

business operating under different trade names. Like most merchants, this provision – which did

14

not even involve a rule change – affords no relief to IKEA US, which does not operate under other trade names.  Instead, IKEA US would benefit from the ability to test any changes to acceptance practices on a store by store basis, not across outlets operated under different trade names, which the Proposed Settlement does not provide.

**C.    The Group Buying Provision Is Not A Real Benefit And Provides No Value To Merchants Such As IKEA**

35.    IKEA US also understands that Visa and MasterCard did not have rules against group buying prior to the Proposed Settlement. IKEA US does not consider group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the Proposed Settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the sole and unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to IKEA US.

**D.    The Scope of the Release Is Far Too Broad**

36.    In exchange for limited monetary damages and ineffective rule changes, the Proposed Settlement requires that all merchants (including future merchants) release all of the defendants from virtually all past, present, and future claims relating to any Visa or MasterCard rule or conduct, or any similar rules in the future.  This includes any claim concerning interchange, even though the settlement does not provide any relief to merchants on interchange.

37.    Because "Visa-Branded Card" and "MasterCard-Brand Card" are defined in the settlement to include cards bearing the marks of the debit networks Interlink and Maestro, respectively, the release appears to cover claims concerning these rules, even though the case had very little to do with them.  Proposed Settlement ¶ 1(bb), (bbb); ¶ 68(a).

38.    The release appears to cover Visa's and MasterCard's Honor All Cards rules, even

15

though there is no relief regarding these claims.

39.     We are very concerned that Visa and MasterCard, under this release, could amend their Honor All Cards rule to force merchants to accept mobile transactions from these networks, or to otherwise pay fees to these networks for mobile transactions that have no connection to them.  Mobile commerce is an emerging technology, with many possibilities competing right now for acceptance and critical mass in today's market.  We want the right to freely choose <u>when</u> to accept mobile products from our customers, <u>what</u> equipment we will use to accept mobile products, <u>how</u> we will process transactions involving a mobile device, <u>what</u> network we might process those transactions on and <u>how</u> we will financially settle those transactions.  We do not want to have these decisions made for us and be forced to do so under Visa and MasterCard's Honor All Cards rules.  The Proposed Settlement seems to treat mobile devices the same as payment cards by including all devices including a "mobile telephone" in the definition of credit and debit cards.  Proposed Settlement ¶ 1(u), (v).  This expansion of the definition of credit and debit cards is extremely troubling because it leaves open the possibility that Visa and MasterCard could a) extend their Honor All Cards rules to cover mobile payments and require merchants to accept mobile transactions under these rules, b) force us to do so on a technical platform determined by Visa or MasterCard, and c) force us to do so utilizing equipment not of our choosing, without fear of a merchant lawsuit.

40.     Equally troubling is the language in ¶ 1(u), (v) that extends the definitional boundaries of a credit or debit card to include *"...any other current or future device by which a person, business, or other entity can pay for goods or services...."* Proposed Settlement ¶ 1(u), (v).  The expansion of the definition of credit and debit card in the Proposed Settlement to include other existing payment solutions that are not cards or future solutions that are not yet

invented is impermissibly broad and unacceptable to IKEA.  With a market standard in the area

of mobile commerce not yet established in the United States payments market, with the existence

of current payment solutions that do not involve cards, and with the future likely to bring

continuing evolution and development in the area of payments, we are very concerned with these

definitional changes of what constitutes a credit card or a debit card. We are extremely troubled

that the release in the Proposed Settlement might allow unknown and not yet defined future

technological innovation to be subject to the Honor All Cards rules, and the likely imposition of

fees and costs from Visa and MasterCard, perhaps with no basis or support in fact for doing so.

We are equally troubled that the release language in the Proposed Settlement would result in

IKEA (or any merchant) surrendering all rights to challenge these rule changes or the imposition

of other rules that could impact the future of payments.

   41.  Given the overly broad and sweeping nature of the releases, including the impact

of the definitional changes noted in Proposed Settlement ¶ 1(u), (v), it is also of great concern to

IKEA US that the Proposed Settlement includes in the listing of released parties various

international affiliates of Visa and MasterCard who do not operate in the United States and were

not parties to the original action filed in this case.  Proposed Settlement ¶ 32(a), 32(b), 67(a),

67(b).  IKEA US is the United States subsidiary of a large international retailer that operates

globally, and non-United States affiliates of IKEA US deal directly with Visa and MasterCard

affiliates in those other, non-US markets.  Extending the scope of the releases of the Proposed

Settlement to include the international affiliates of Visa and MasterCard is troublesome because

it opens the door to the possibility that the international affiliates of Visa and MasterCard could

then try to use the releases in defense of potential anti-competitive practices in other, non-US

markets.  This is unacceptable to IKEA US.

17

  
# A1649

\*    \*    \*    \*

42.    Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of IKEA US.

43.    IKEA US is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

44.    IKEA US joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for IKEA US's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 22, 2013

_John Robinson_
John Robinson
Treasurer, IKEA North
  America Services, LLC
420 Alan Wood Road
Conshohocken, PA 19428

18

## A1650

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE    :
FEE AND MERCHANT DISCOUNT      :     MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION              :

                                       :     **OBJECTION OF**
                                       :     **JETRO HOLDINGS, LLC**
                                       :     **TO FINAL APPROVAL OF THE**
                                       :     **PROPOSED SETTLEMENT**

-------------------------------------------------------------x

### DECLARATION OF JETRO HOLDINGS, LLC, d/b/a JETRO AND RESTAURANT DEPOT

Richard Kirschner hereby declares pursuant to 28 U.S.C. § 1746:

1.    I am currently the President of Jetro Holdings, LLC, d/b/a Jetro and Restaurant Depot ("Jetro"). I have held this position since 2008. I submit this declaration on behalf of Jetro to object to the proposed settlement in the interchange case and in support of the opposition to the motion for final approval.

2.    I am responsible for the overall management of the Company, which includes making decisions on forms of payments accepted.

3.    Jetro is a cash and carry wholesaler of perishable and non-perishable food products, household goods, equipment, supplies, and related goods for grocery retailers and restaurants. Jetro operates a total of 99 stores across 28 states through both its Jetro and Restaurant Depot banners.

4.    I am knowledgeable about Jetro's acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks. All Jetro locations accept Visa and MasterCard debit and credit cards, as well as American Express and Discover.

1

266244.3

# A1651

## I.   INTERCHANGE FEES AND JETRO'S ACCEPTANCE OF PAYMENT CARDS

5.      Visa and MasterCard interchange fees are one of our largest retail expenses.  Yet Visa's and MasterCard's interchange rates are beyond our control.  Unlike any vendor relationship, the fact that we are a large company and a significant consumer of payment card services makes little difference in our ability to negotiate with Visa and MasterCard and affect our acceptance costs on these networks.  As approximately 37% of our sales volume is made using Visa and MasterCard cards, Jetro cannot drop Visa and MasterCard products without losing an unacceptable number of sales.  That gives Visa and MasterCard the power to raise interchange prices or network fees to Jetro.  These credit card raises have continued following Visa's and MasterCard's IPOs.  From January 2007 through December 2012, Jetro paid more than $160 million in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks.  Since then, and on an ongoing basis, Jetro has continued to pay approximately $2.3 million in interchange fees each month.

## II.   THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

6.      In their motion for preliminary approval, Class Counsel represented that the mediators' December 2011 proposals to resolve this litigation "were accepted by all parties" (Prelim. App. Mot. at 9).  This is not true because Jetro and other named plaintiffs opposed them. In their submission in support of final approval, Class Counsel now asserts that by February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement through the processes laid out by the mediators and the Court."  (Final App. Mot. at 4-5). Despite this claim, neither I nor anyone else at Jetro agreed to the Proposed Settlement.

7.      Jetro is opposed to the Proposed Settlement because it has serious shortcomings for Jetro.  It does not address Visa's and MasterCard's price-fixing of interchange rates for the

2

266244.3

**A1652**

banks, the subject of the core claims in the case. The Proposed Settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that Jetro and its customers have no choice but to pay. Jetro's portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

8.      Instead of addressing the core claims in the case, the settlement merely provides Jetro with limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to Jetro. Moreover, the Proposed Settlement deprives Jetro of the ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and MasterCard's interchange fees imposes on Jetro.

> **A.      The Surcharging Rule Changes Do Not Give Jetro the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

9.      As an initial matter, Jetro has no plans to currently implement surcharges, under any set of rules, due to competitive forces in the market. Jetro competes for customers on price, and the imposition of a surcharge could eviscerate that competitive advantage. If Jetro were to consider implementing a surcharging program, however, it could not reasonably implement such a program

10.     As of the end of May 2013, Jetro did business at 99 stores in 28 states under its Jetro and Restaurant Depot trade banners. Surcharging is illegal in 11 states – California (17 stores, Colorado (2 stores), Connecticut (2 stores), Florida (9 stores), Kansas, Maine, Massachusetts (2 stores), New York (13 stores), Oklahoma (1 store to open in the Q3-2013), Texas (7 stores), and Utah (1 store to open in Q4-2013). Those states cumulatively hold more than half of our U.S. locations and accounted for 60% of our U.S. sales in 2012.

3

266244.3

11.    I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many of our Jetro and Restaurant Depot stores are located, including Illinois (4 stores), Indiana (1 store), Kentucky (1 store), Maryland (2 stores), Michigan (2 stores), , Missouri (2 stores), Nevada (1 stores), New Jersey (8 stores), Pennsylvania (4 stores), Rhode Island (1 store), Tennessee (2 stores), and Washington (3 stores). Combined with states that already ban surcharging, these states account for 84% of our U.S. locations and 89% of our 2012 U.S. sales. Even if Jetro were inclined to surcharge, the mere fact that these states have undertaken measures to begin the process of banning surcharging would chill any efforts to surcharge in these states.

12.    For operational, training, and customer service reasons, it would be extremely difficult to surcharge in some states but not others.

**B.    The Other Relief in the Settlement Is of No Value to Jetro**

13.    The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules. As noted above, Jetro operates under the Jetro and Restaurant Depot trade names. Nevertheless, this relief is of no value to Jetro. Over 90% of the Company's stores are under the Restaurant Depot banner, and the remaining Jetro stores are located in states that prohibit surcharging.

14.    Jetro also understands that Visa and MasterCard did not have rules against group buying prior to this settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties"

4

266244.3

will make it even less likely that group buying will ever be a feature in this market.  This provision as written is of no value to our company.

**C.     The Release Is Far Too Broad**

15.     The Proposed Settlement's release is deeply concerning to Jetro.  The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices.  And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us.

16.     The Proposed Settlement requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards."  Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."  Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording.  They also likely will argue that substantially similar rules and conduct going forward will be released.  We find it deeply unfair we have no ability to opt out of such a release.

*        *        *        *

17.     Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of Jetro.

18.     Jetro is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

5

266244.3

19. Jetro joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for Jetro's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2013

Richard Kirschner
President
Jetro Holdings, LLC
1524 132nd Street
Flushing, NY 11356

266244.3

6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :          MDL No. 1720 (JG)(JO)
FEE AND MERCHANT DISCOUNT               :
ANTITRUST LITIGATION                    :          **OBJECTION OF**
                                        :          **MICHAELS STORES, INC.**
                                        :          **TO FINAL APPROVAL OF**
                                        :          **THE PROPOSED SETTLEMENT**
------------------------------------------------------------x

## DECLARATION OF THOMAS A. MELITO

Thomas A. Melito hereby declares:

1.       I am currently Vice President and Treasurer at Michaels Stores, Inc.  I have held

this position since March 6, 2009.  This declaration sets forth the reasons that Michaels objects to

the proposed settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust*

*Litigation* (MDL 1720) ("Proposed Settlement").

2.       I am responsible for all treasury functions in the company, including capital

raising, bank and rating agency relationships, cash management and payment acceptance.  I have

participated in Chase Merchant Services' Merchant Advisory Group and served on the

committee establishing the group's independence from Chase Merchant Services.

3.       With over $4.4 billion in sales in fiscal 2012, Michaels Stores, Inc., together with

its subsidiaries, is the largest arts and crafts specialty retailer in North America providing

materials, project ideas and education for creative activities.  Michaels Stores, Inc. was

incorporated in Delaware in 1983, and as of March 13, 2013, we operate 1,106 Michaels retail

stores in 49 U.S. states and in Canada, as well 123 Aaron Brothers stores in nine U.S. states.  In

2011, Michaels launched MiDesign@Michaels, a multi-channel complement to our stores, which

# A1657

play one card brand against the other to introduce price competition in the industry. Because Visa and MasterCard have adopted identical surcharging rules through the Proposed Settlement, we cannot play these brands off against each other.

12.     The only theoretical alternative would be to stop accepting American Express. This is not a viable business proposition for Michaels – American Express accounts for 6.66% of our sales – and would only decrease competition in the payments industry.

13.     Even if the Competitive Card Brand limitation was not a part of the new rules, surcharging is illegal in a number of states. This fact is problematic itself. Acceptance practices that vary state by state would only add to the confusion and inconvenience for customers, our sales staff, and our point-of-sale systems. Even if the American Express limitation did not exist and we were otherwise inclined to surcharge, we would not want to engage in a practice that would not be applicable across all of our stores.

14.     Currently, surcharging is illegal in 11 states and Puerto Rico, including some of the most populous states. The states of California (130 locations), Colorado (21 locations), Connecticut (15 locations), Florida (75 locations), Kansas (8 locations), Massachusetts (26 locations), New York (52 locations), Texas (77 locations), and Utah (12 locations) currently account for 37.6% of Michaels' U.S. locations and 43.4% of Michaels' U.S. sales.

15.     I am aware that 18 other states have introduced bills that would ban credit card surcharges. These include states where many Michaels locations are located, including Arkansas (4 locations), Illinois (38 locations), Kentucky (10 locations), Maryland (23 locations), Michigan (35 locations), Mississippi (6 locations), Missouri (21 locations), Nevada (10 locations), New

Hampshire      (8 locations), New Jersey (29 locations), New Mexico (3 locations), Pennsylvania

(47 locations), Rhode Island (3 locations), South Carolina (12 locations), Tennessee (14

locations), Vermont (2 locations), and Washington (22 locations).  Combined with states that

already ban surcharging, these states account for 25.5% of Michaels' U.S. locations and 27.9 %

of Michaels' U.S. sales.

16.     The fact that such a substantial additional percentage of our volume may be

covered by state prohibitions reinforces the conclusion that the surcharging relief in the

settlement is of no value to our company.  We would not invest in making changes to our POS

and accounting systems and invent in training our sales staff when additional state prohibitions

may be implemented at any time in the future.  Additional bans and regulatory uncertainty

further weaken any potential benefit from the proposed settlement.  Considering that few if any

merchants have actually surcharged any transactions following the rules changes that took effect

in January, the legislation in these many new states is notable.

17.     These facts negate any value surcharging might offer to Michaels, and it is

extremely unlikely that Michaels would surcharge under these terms.

**B.     The Other Relief in the Settlement Is of No Value to Michaels**

18.     The settlement appears to allow merchants to vary their acceptance practices in

different lines of business operating under different trade names, although this was not prohibited

by any prior rules.  Even though Michaels does operate under a few separate trade names, this

relief is of no value because Michaels has no intention of varying acceptance practices –

including changes to the company's POS system and staff training – across its brands.

# A1659

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE     :
FEE AND MERCHANT DISCOUNT     :     MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION     :

                     :     **OBJECTION OF**

                     :     **NATSO INC. TO FINAL**

                     :     **APPROVAL OF THE**

                     :     **PROPOSED SETTLEMENT**

                     :

--------------------------------------------------------x

## DECLARATION OF NATSO INC.

Lisa Mullings hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am the President and Chief Executive Officer of NATSO Inc. ("NATSO"). I have served in this position since 2004. Prior to this appointment, I held various positions within the association, including Vice President of Public Affairs and General Counsel. Before joining NATSO in January 1995, I was the communications and government affairs manager for the National Association of Chemical Recyclers. Prior to that, I served for five years as a staff member on the House of Representatives Committee on Public Works and Transportation (now Transportation and Infrastructure Committee). I submit this declaration on behalf of NATSO to object to the proposed settlement in the interchange case and in support of the opposition to the motion for final approval.

2.      NATSO was founded in 1960 as the National Association of Truckstop Operators. Today, NATSO is the only national trade association representing the travel plaza and truckstop industry. It represents 1,230 travel plazas and truckstops nationwide, owned by 185 corporate entities. NATSO's mission is to advance the success of truckstop and travel plaza members by delivering solutions to members' challenges, and by achieving the public policy goals of the truckstop and travel plaza industry.

266310.1

# A1660

3.      The majority of payments for goods and services sold at truckstops involve payment card transactions. Because of the sheer volume of payment card transactions at truckstops and travel plazas nationwide, and the merchant's inability to control these costs, interchange fees have been identified in NATSO member surveys as our members' top concern.

4.      In my role as President and CEO of NATSO, I am knowledgeable about our members' acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks. Interchange and other card acceptance fees are cited by our members as their third largest store-level cash expense, and their least controllable expense. There appears to be no effective check on the ability of credit card companies' formulation of their interchange rates. Equally as troubling is the fact that merchants are unaware of the specific interchange rate applicable to a given transaction, with respect to a particular credit card, until well after the transaction occurs. As a result, our members feel particularly helpless in controlling this aspect of their businesses, which, as stated above, represents their third-highest expense item.

5.      It is for these reasons that NATSO joined as a named plaintiff in this case and devoted considerable attention to the manner in which the attorneys for the plaintiffs and credit card companies have attempted to reach a settlement.

## II.      THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

6.      In their motion for preliminary approval, Class Counsel represented that the mediators' December 2011 proposals to resolve this litigation "were accepted by all parties" (Prelim. App. Mot. at 9). This is not true; NATSO and other named plaintiffs opposed them. In their submission in support of final approval, Class Counsel now asserts that by February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement

2                                            266310.1

# A1661

through the processes laid out by the mediators and the Court." (Final App. Mot. at 4-5).
Despite this claim, neither I nor anyone else at NATSO agreed to the Proposed Settlement.
Given the confidentiality agreement protecting discussions during the mediation process, I can
only describe the events of that process in generalized terms. However, even in generalized
terms, it is clear that NATSO's concerns about the mediators' proposals were unwelcome and
ignored.

7.      The mediation that ultimately resulted in the Proposed Settlement began in 2008.

8.      In late November 2011, however, NATSO discovered that Class Counsel had
made proposals to Visa and MasterCard, through the mediators, without NATSO's knowledge or
consent.  NATSO believed that the proposals made without its knowledge severely compromised
the negotiating position of the class to the point that NATSO would not have agreed to them.
NATSO also learned that Class Counsel had received an offer of settlement from the defendants
that had not been disclosed to NATSO.  In that same month, Class Counsel again submitted a
mediation statement that included detailed proposals without first receiving authority to do so
from NATSO.

9.      In January 2012, Class Counsel accepted the mediators' proposals over the
objections of NATSO and several other named plaintiffs.  In fact, NATSO and several other
named plaintiffs registered their opposition to the proposals and Class Counsel's acceptance of
them.

10.     Even though it dissented from the mediators' proposals, NATSO nonetheless
continued to work constructively within the mediation process to try to salvage something of
value from the emerging settlement.  NATSO did so with the understanding that it maintained
the right to oppose the settlement at a preliminary approval or final fairness hearing if a

3                                                  266310.1

# A1662

settlement that ultimately resulted from the discussions was not acceptable to NATSO.

11.     When the Proposed Settlement agreement was filed with the Court on July 13, 2012, NATSO had not seen the final text including the final release. The filed document appeared to indicate that NATSO agreed with the Proposed Settlement, but that was not the case.

12.     NATSO is opposed to the Proposed Settlement because it has serious shortcomings for NATSO and its members. It does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case. The Proposed Settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that our members have no choice but to pay. NATSO members' portion of the compensatory relief amounts to only a fraction of what they pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

13.     Instead of addressing the core claims in the case, the settlement merely provides NATSO's members with limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to NATSO's members. Moreover, the Proposed Settlement deprives NATSO's members of the ability to opt out and bring claims for damages resulting from the ongoing harm imposed by Visa and MasterCard's interchange fees.

**A.      The Surcharging Rule Changes Do Not Give NATSO's Members the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

14.     It is clear that the rules changes in the settlement offer NATSO's members no practical ability to surcharge, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

**1.      The Competitive Card Brand Limitation Makes Surcharging**

266310.1

# A1663

### Impossible for NATSO's Members

15.    The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand American Express. Likewise, all NATSO members accept credit cards used by the trucking industry, so-called fleet cards. I am aware that certain fleet cards are more expensive than Visa and MasterCard for some merchants and under certain conditions.

16.    If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions. American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

17.    Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Debit card transactions (including both PIN and signature) represent a substantial portion of NATSO's members' total MasterCard and Visa transactions.

18.    The only theoretical alternative would be to stop accepting American Express – something that NATSO's members cannot realistically do. American Express currently accounts for a significant amount of our and our members' payment card sales. Dropping American

5

266310 1

# A1664

Express is not a viable business proposition for our members. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result of this eight-year antitrust case.

19.     The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for NATSO's members.

### 2. Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

20.     Surcharging is illegal in California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and Utah, and would subject our members to consumer complaints, fines, and action by consumers and/or the Attorney General. Twenty-six percent of our members' locations are located in these states.

21.     I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many of our members are located, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, West Virginia, and Washington. Approximately 65 percent of NATSO's member locations are located in states that either ban surcharging or are considering a ban. Even if our members were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill any efforts to surcharge in these states.

### B. The Other Relief in the Settlement Is of No Value to NATSO's Members

22.     The settlement appears to allow merchants to vary their acceptance practices in

6

266310.1

# A1665

different lines of business operating under different trade names, although this was not prohibited by any prior rules. Like most merchants, our members generally operate under a single trade name or banner, and therefore this provision provides no benefit.

23.    NATSO also understands that Visa and MasterCard did not have rules against group buying prior to this settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. This provision is of no value to us or our members.

### C.    The Release Is Far Too Broad

24.    The Proposed Settlement's release is deeply concerning to NATSO. The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor-All-Cards rules -- even though the settlement does not change those practices. And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us and our members.

25.    The Proposed Settlement requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards." Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording. They also likely will argue that

266310.1

# A1666

substantially similar rules and conduct going forward will be released.  We find it deeply unfair that our members have no ability to opt out of such a release.

*      *      *      *

26.     Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of NATSO or its members.

27.     NATSO is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

28.     NATSO joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for NATSO's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2013

Lisa Mullings
NATSO Inc.
1737 King Street, suite 200
Alexandria, VA 22314

266310.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :
FEE AND MERCHANT DISCOUNT               :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                    :
                                        :          **OBJECTION OF**
                                        :          **NATIONAL RESTAURANT**
                                        :          **ASSOCIATION TO FINAL**
                                        :          **APPROVAL OF THE**
                                        :          **PROPOSED SETTLEMENT**
----------------------------------------------------------x

**DECLARATION OF NATIONAL RESTAURANT ASSOCIATION**

Peter G. Kilgore hereby declares pursuant to 28 U.S.C. § 1746:

**I.      BACKGROUND**

1.      I am Senior Vice President, General Counsel and Corporate Secretary of the

National Restaurant Association ("NRA").

2.      I have been the General Counsel of the NRA since May 1995.  I have also been

the acting President and Chief Executive Officer of the NRA on two occasions, including from

June to July 1999 and from January to September 2007.  I have also been the acting President of

the National Restaurant Association Educational Foundation for the period of July to December

2001.  In my role as General Counsel of the NRA, I am aware from both direct conversations

with NRA members and staff employees about our members' acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks.

3.      NRA research indicates that NRA represents more than 380,000 businesses,

including restaurants, suppliers, educators, and non-profits.  In 2012, the restaurant industry

generated over $650 billion in sales (4 percent of U.S. GDP) and employed over 13 million

people (10 percent of the U.S. workforce) in nearly one million locations.  In 2011, the

1

average American household spent $2,620 on food away from home.

4.      The NRA is a named plaintiff in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*.

5.      Interchange and other card acceptance fees are of great concern to our members, who, according to NRA research, generally cite these fees as their second or third fastest growing restaurant-level operating expense and one of their top five greatest expenses overall. None of the named plaintiffs are restaurants to our knowledge.

## II.    THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

6.      I reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website.

7.      In their motion for preliminary approval of the Proposed Settlement, Class Counsel represented that the mediators' December 2011 proposals to resolve this litigation "were accepted by all parties." (Prelim. App. Mot. at 9). While this statement is literally accurate as to NRA, it does not reflect NRA's position as to the final Proposed Settlement. Neither I nor anyone else at NRA made a commitment or agreed to any final settlement agreement, including the Proposed Settlement, which was not formulated until late June 2012 or even fully completed until a few months thereafter. Thus, focus on acceptance of the mediators' proposal months preceding the drafting and completion of the Proposed Settlement is misplaced

8.      Indeed, Class Counsel's reference to agreement with the mediators' proposal fails to put that approval in the proper context. NRA joined other named class plaintiffs and initially objected in writing to the mediators' proposal to Class Counsel in January 2012. Although NRA authorized class counsel to later accept the mediators' proposal as a basis for negotiation of the Proposed Settlement, Class Counsel was asked to try to see if some if not all of the objections to

the mediators' proposal could be addressed in negotiations and included as part of a settlement agreement. Unfortunately, the Proposed Settlement failed to address these concerns. In addition, other concerns (e.g., scope of the release) arose as to the Proposed Settlement after NRA's authorization to Class Counsel to accept the mediators' proposal. Thus, while NRA continued to work constructively in the negotiation process to try to include its objections in any yet to be drafted full settlement agreement, NRA did so with the understanding that it maintained the right to oppose any drafted settlement agreement, including the final Proposed Settlement that eventually was drafted and presented to the Court on July 13, 2012, and at the preliminary approval stage in November 2012.

9.      The Proposed Settlement preliminarily approved by the Court in November 2012 is objectionable from NRA's standpoint. It has serious shortcomings for NRA's members; does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case; and it imposes no inhibition on Visa and MasterCard to discontinue fixing fees for the banks, with NRA's members having little choice but to pay. Furthermore, the compensatory relief in the Proposed Settlement amounts to only a fraction of what merchants pay in interchange fees, and given that Visa and MasterCard can continue to fix and raise interchange fees, it appears that they can recoup the settlement amount by raising interchange rates in the future or coming up with new fees.

10.      Instead of addressing the core claims in the case, the Proposed Settlement merely provides certain and limited MasterCard and Visa contract rule restrictions, which is of little value. Moreover, the Rule 23(b)(2) portion of the Proposed Settlement deprives NRA's members of the ability to bring claims to stop the ongoing harm imposed under Visa and MasterCard's non-negotiable network rules.

3

A.      **Cash Settlement Fund and Interchange Fund**

11.      The Cash Settlement Fund of $6.05 billion plus the cash equivalent of a 10-basis-point interchange fee reduction for 8 months, estimated at $1.2 billion, the Interchange Fund, when combined equals a total of approximately $7.25 billion.  While this amount itself is nominally large, it nevertheless is grossly inadequate.  First, $7.25 billion appears to amount to only perhaps up to 3 months of interchange fees, and even then, it will be reduced by attorneys' fees, expenses, etc.  Second, whatever net amount remains, it will be divided among a large class of merchants, with estimates in the 7-8 million range.  Third, the Cash Settlement Fund will also be reduced by the level of opt-outs up to 25% of the total Fund.

B.      **The Surcharging Rule Changes Do Not Give NRA's Members the Ability to Surcharge Visa and MasterCard Transactions**

12.      It is clear that the rules' changes in the Proposed Settlement will have little impact on the market or materially lessen the antitrust issues raised in this case.  For example, as to the relaxation of the restrictive surcharging rules, the Proposed Settlement offers NRA's members little or no practical ability to surcharge, and it actually maintains certain prohibitions against surcharging.  Merchants cannot surcharge Visa and MasterCard <u>debit</u> transactions.  Moreover, even as to credit cards, the limitations in the Proposed Settlement <u>effectively</u> maintain surcharge prohibitions against Visa and MasterCard credit transactions as well.

2.      **The Complexity of the Proposed Settlement's Surcharging Rules Will Foreclose Most of Our Members from Reaping Any Benefit**

13.      NRA research indicates that seven out of ten eating-and-drinking place establishments are single-unit operations.  The majority of our members in these establishments likely do not have the resources or the ability to understand or adhere to the Proposed Settlement's complex surcharging rules.  For example, the Proposed Settlement requires

4

# A1671

merchants to know the interchange rates associated with a particular card before a transaction begins, but the Proposed Settlement does not provide any guidance how to accomplish that daunting task, especially in the context of a restaurant where the customer typically orders from a menu with prices before presenting their method of payment.  In other words, it will be extremely difficult for most NRA members to comply with these rules, and the burdens imposed by attempted compliance will detract our members from doing what they do best: running their businesses.  Moreover, single-unit operators will be reluctant to even try surcharging due to the very real fear that they could inadvertently violate the rules, which could lead to severe penalties. In short, compliance with the surcharging rules will likely render the Proposed Settlement's surcharging provisions largely unused and worthless.

> **3.      The Competitive Card Brand Limitation Makes Surcharging Impossible for NRA's Members**

14.      The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of any more expensive Competitive Card Brand.  For example, it is my understanding that American Express is a more expensive credit card brand.  American Express Rule 3.2 would appear to then require members that allow customers to use both American Express cards and Visa and/or MasterCard cards to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs.  Yet, doing that apparently is prohibited by existing Visa and MasterCard network rules, and makes no business sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

5

15.     Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards.  It is my understanding from discussions with NRA members that debit card transactions (including both PIN and signature) represent a substantial and growing part of NRA's members' total MasterCard and Visa transactions.

16.     The only theoretical alternative would be to stop accepting other credit cards that impose higher surcharges – something we believe NRA's members most likely and realistically will not do.  In addition, if merchants drop other credit cards, this would only further increase the market power of Visa and MasterCard.  Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – seems an inappropriate result of this eight-year antitrust case.

17.     The effect of the Competitive Card Brand limitation effectively appears to maintain the prohibition against surcharging MasterCard and Visa credit card transactions for NRA's members.

### 4.     Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

18.     Surcharging credit cards is illegal in 11 states: California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and most recently Utah.  Of our 380,000 member locations, many are in one or more of these 11 states, and would be subject to their surcharging prohibitions.  NRA estimates that the restaurant industry generated over $200 billion in sales in those states in 2012, accounting for approximately one-third of the restaurant industry's sales.

19.     It has also been brought to my attention by the NRA legislative department that over 20 other states have introduced bills that would ban credit card surcharges.  These include

states where many of our members are located, including, but not limited to, Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, West Virginia, and Washington.  Combined with states that already ban surcharging, these states account for a vast part of our members' locations and sales.  Even if NRA's members were inclined to surcharge, the mere fact that these states have or are undertaking measures to ban surcharging would chill any efforts to surcharge in these states.

### C.  The Other Relief in the Proposed Settlement Is of No Value to NRA's Members

20.      The Proposed Settlement also appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names.  However, it is my understanding that this was not prohibited by any prior rules.  Moreover, like many merchants, most NRA members generally operate under a single trade name or banner, and therefore this provision provides no benefit to them.

21.      NRA understands that Visa and MasterCard did not have rules against group buying prior to this settlement.  We are skeptical if group buying is a realistic approach to be used in the restaurant and foodservice industry.  First, the use is subject to Department of Justice guidelines on collective action (Proposed Settlement at paragraphs 43 and 56).  Merchants will have to retain legal counsel to determine if they may engage in group buying, and the legal issue could provide MasterCard and Visa a basis to refuse to deal.  Second, group buying does not appear to likely counteract Visa and MasterCard's market power, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" seems to make it even less likely that group buying will ever be a feature in the restaurant and foodservice market.  This provision seems to have little value to

our members.

**D.      The Release Is Far Too Broad**

22.      The Proposed Settlement's release is deeply concerning to NRA.  The release

appears to cover claims concerning the core practices at issue in this case -- the default-

interchange rules, the setting of interchange fees, and the Honor All Cards rules, even though the

settlement does not change those practices.  The release also purports to cover those rules and

practices, forever, which we find particularly troublesome given Visa's and MasterCard's market

power over our members.

23.      The Proposed Settlement and the release appear to cover related and affiliated

entities of merchants, i.e., all merchants, including their parents, subsidiaries, divisions and

affiliates (Proposed Settlement at Paragraphs 31 and 66).  Moreover, the release requires all of

them to release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded

Cards or any MasterCard-Branded Cards."  Rule is defined to "mean[] any rule, by-law, policy,

standard, guideline, operating regulation, practice, procedure, activity, or course of conduct

relating to any Visa-Branded Card or any MasterCard-Branded Card."  Visa and MasterCard

likely will likely argue that the release covers all of their rules and conduct given its broad

wording.  They also will seemingly argue that substantially similar rules and conduct going

forward will also be released, covering virtually everything they do.  We find it deeply unfair

that our members have no ability to opt out of such a broad release as a Rule 23(b)(2) class

member.

24.      NRA is also concerned that the release will bar any legal challenge in the event

that Visa and MasterCard use their Honor All Cards rules to force merchants to accept all mobile

transactions from Visa and MasterCard networks.  The Proposed Settlement appears to include

mobile and any other new technology by defining "credit card" to include "any other current or future code, device, or service . . . ."  Settlement ¶ 1(u), (v).  NRA staff has informed me that according to a recent survey, almost a majority of consumers would use a restaurant's smartphone app, and almost half of restaurants believe smartphone apps will become more popular.  Because Visa and MasterCard do not appear to have significant volumes in mobile payments, this area presents a unique opportunity for merchants to see new competition and avoid having mobile transactions trapped in the current system.  Our members likely desire the right to freely choose when to accept mobile card products, and are worried that they will be forced to do so under Visa's and MasterCard's Honor All Cards rules and the restrictions imposed in the Proposed Settlement, if it is approved.

25.     We believe that this overbroad release allowing for the an expansion of the definition of "credit card" when there is no ability to "opt-out" of the Rule 23(b)(2) portion of the Proposed Settlement is inappropriate. It is an extremely tenuous time in the development of the mobile payments marketplace to provide Visa and MasterCard broad immunity, potentially applicable to the mobile phone credit card payments market, from any substantially similar rules and conduct going forward.  This could hinder competition and innovation.

26.     The Proposed Settlement also leaves the "honor-all-cards" rules untouched (Proposed Settlement, paragraphs 40 and 53).  If NRA members are forced to honor all cards, if they continue to accept Visa and MasterCard plastic credit cards, and the release is construed to apply to mobile phone credit cards, NRA members could be forced to make costly and unnecessary infrastructure point-of-sale or point-of-interaction investments that may not be in the best interest of their business, and ultimately customers.

27.     The release is also overbroad because Visa and MasterCard may attempt to

9

# A1676

construe the release to include the Payment Card Industry Data Security Standards ("PCI DSS"), which have been adopted by Visa and MasterCard into their operating rules.  These rules, and fees and fines associated with these rules, are not at issue in this case and should not be a part of any release under the Proposed Settlement.  At the least, NRA believes the release language and scope need to be clarified.

*        *        *        *

28.     The Proposed Settlement does not adequately protect or enhance the interests of NRA or its members.  This litigation has centered on reforming the interchange fee system to open up competition and benefit consumers.  The Proposed Settlement not only fails to achieve meaningful change, it leaves intact a system at the mercy of the credit card companies and essentially insulated from future attack.

29.     NRA is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

10

30.    NRA joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for NRA's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Executed on May 23, 2013

_____

Peter G. Kilgore
Senior Vice President, General Counsel and
Corporate Secretary
National Restaurant Association
2055 L St., NW
Washington, DC 20036

11

**A1678**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :
FEE AND MERCHANT DISCOUNT               :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                    :
                                        :          **OBJECTION OF**
                                        :          **PANERA BREAD COMPANY**
                                        :          **TO FINAL APPROVAL OF THE**
                                        :          **PROPOSED SETTLEMENT**
------------------------------------------------------------x

### DECLARATION OF PANERA BREAD COMPANY

I, Kelley Basta, hereby declare pursuant to 28 U.S.C. § 1746:

1.    I am currently Vice President of Shared Services, Associate Controller at Panera,

LLC, a wholly owned operating subsidiary of Panera Bread Company (NASDAQ: PNRA)

(collectively, "Panera"), a Delaware corporation with its principal place of business in St. Louis,

Missouri. I have held this position since January 2012 and have worked for Panera since May

2010. I submit this declaration on behalf of Panera to object to the proposed settlement in the

interchange case and in support of the opposition to the motion for final approval.

2.    I am responsible for managing Panera's financial shared service activities, which

include accounts payable, accounts receivable, revenue collection, cash management, and

payroll.

3.    I am knowledgeable about Panera's acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks.

4.    Panera is a national bakery-cafe concept with over 1,600 company-owned and

franchise-operated bakery-cafe locations in 44 states, the District of Columbia, and Ontario,

Canada. We have grown from serving approximately 60 customers per day at our first bakery-

1

# A1679

of our payment card sales.  Dropping American Express is not a viable business proposition for Panera.  In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard.  Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result of this eight-year antitrust case.

16.     The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for Panera.

## 2.     Surcharging Is Prohibited by Law in 11 States, and a Growing List of States May Also Ban the Practice

17.     As of the end of 2012, Panera did business at over 1,600 stores in 44 states and the District of Columbia.  Surcharging is illegal in 11 states  – California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and Utah.  Panera operates bakery-café locations in many of these states, including California (approximately 65 locations), Connecticut (approximately 15 locations), Florida (approximately 55 locations), Massachusetts (approximately 30 locations), New York (approximately 45 locations), and Texas (approximately 20 locations).  Sales occurring in those states account for a substantial portion of our business.  In addition, our franchisees operate bakery-café locations in some of these jurisdictions and would be prohibited by law from surcharging.

18.     I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include states where many of our bakery-cafés are located, including Illinois (approximately 75 locations), Indiana (approximately 40 locations), Kentucky (approximately 20 locations), Michigan (approximately 50 locations), Missouri (approximately 50 locations), New

# A1680

Jersey (approximately 40 locations), New Mexico (approximately 5 locations), Pennsylvania (approximately 30 locations), South Carolina (approximately 10 locations), Tennessee (approximately 15 locations), Vermont (approximately 5 location), and Washington (approximately 25 locations).  Combined with states that already ban surcharging, these states account for over 50% of our U.S. locations and the majority of our U.S. sales.  Even if Panera were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill any efforts to surcharge in these states.

19.     The fact that surcharging is currently legally permitted in states where some bakery-cafes are operated, but not in others, is problematic in and of itself.  For operational, training and customer service reasons, we would not implement surcharging in some but not all states.

**B.     The Other Relief in the Settlement Is of No Value to Panera**

20.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  As noted above, Panera operates under the Panera Bread, Saint Louis Bread Co., and Paradise Bakery & Cafe trade names.  Nevertheless, this relief is of no value to Panera.  We have no intention of varying our payment card acceptance practices across brand names.  Panera would not accept some cards at certain branded stores and not others.

21.     Panera also understands that Visa and MasterCard did not have rules against group buying prior to this settlement.  We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties"

6

# A1681

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE   :
FEE AND MERCHANT DISCOUNT      :    MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION               :
                                        :    **OBJECTION OF**
                                        :    **PETSMART, INC. TO**
                                        :    **FINAL APPROVAL OF**
                                        :    **THE PROPOSED SETTLEMENT**
-------------------------------------------------------x

## DECLARATION OF PETSMART, INC.

Brently G. Baxter hereby declares pursuant to 28 U.S.C. § 1746:

1.     I am currently Vice President – Accounting, Treasury and Corporate Controller at

PetSmart, Inc. ("PetSmart"), a Delaware corporation with its principal place of business in

Phoenix, Arizona. I have held this position since February 1, 2012, and have worked for

PetSmart since November 26, 2006. On behalf of PetSmart, I submit this declaration to object

to the proposed settlement in the interchange case and in support of the opposition to the motion

for final approval.

2.     I am responsible for PetSmart's compliance with Generally Accepted Accounting

Principles, external financial reporting, Sarbanes Oxley compliance, accounting operations, and

treasury functions.

3.     I am knowledgeable about PetSmart's acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks.

4.     PetSmart is a specialty pet retailer of services and solutions for the lifetime needs

of pets. As of the date of our most recently filed 10-K, we operated 1,278 stores and more than

196 in-store PetSmart PetsHotel dog and cat boarding facilities in the United States, Canada and

1

# A1682

Puerto Rico.  We provide a broad range of competitively priced pet products and in-store services including pet adoption, boarding, grooming and training.  Our stores are stocked with more than 10,000 products, and we are a leading online provider of pet supplies and pet care (http://www.petsmart.com).

     5.    PetSmart accepts payment cards across all of its lines of business.  PetSmart currently accepts Visa and MasterCard debit and credit cards, along with American Express and Discover, as well as PayPal for online transactions.

## I.    INTERCHANGE FEES AND PETSMART'S ACCEPTANCE OF PAYMENT CARDS

     6.    Visa and MasterCard interchange fees are a significant expense for PetSmart, materially impacting the company's bottom line.  Like other specialty retailers, PetSmart faces tremendous competition from bricks-and-mortar retailers, online retailers, and other companies that, like PetSmart, operate both physical and online stores.  As a result, our product margins and net profitability are under constant pressure.  PetSmart's fiscal year 2012 net income was approximately $390 million.  By comparison, interchange fees PetSmart paid for Visa and MasterCard transactions last year were just shy of $50 million.  As approximately 75% of our retail product sales are through payment cards, PetSmart cannot drop Visa and MasterCard products without losing an unacceptable number of sales.  That gives Visa and MasterCard the power to raise interchange prices to PetSmart.

     7.    The interchange rates PetSmart pays Visa and MasterCard are largely non-negotiable.  Unlike a typical vendor relationship, in which PetSmart would have some genuine bargaining power, the relationships with Visa and MasterCard are essentially ones of adhesion.  Even as a large user of payment card services, PetSmart has no ability to negotiate

2

with Visa and MasterCard. Twice per year, Visa and MasterCard update their interchange profiles. PetSmart has no practical choice but to accept the profiles as delivered because the services Visa and MasterCard provide are so essential to conducting business that PetSmart could not drop Visa or MasterCard credit and debit products without risking the loss of an unacceptable number of sales. When Visa and MasterCard raise interchange prices via their semi-annual profile updates, PetSmart must simply pay those higher rates.

8.        Approximately 0.5 % of PetSmart's retail sales are made via the Internet. Of those sales, approximately 64% are made by consumers using a Visa or MasterCard payment card. The interchange rates for Internet sales, which constitute card-not-present ("CNP") transactions, is much higher than for sales made through traditional bricks-and-mortar stores. There is no valid justification for the excessive CNP interchange rates because, unlike with bricks-and-mortar merchants, on-line merchants bear most of the fraud and chargeback risks associated with CNP transactions. Nevertheless, we must accept Visa and MasterCard for Internet transactions, or else forgo a substantial portion of our on-line retail sales. This is another example of the market power exercised by these brands, and conduct that may be subject to mandatory release in this case and immune from challenge going forward if the settlement is approved.

## II.    THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

9.        With the assistance of counsel, I have reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"). Neither I nor anyone else at PetSmart, nor any counsel engaged on our behalf, had any involvement in the negotiations leading up to the Proposed Settlement. In my view, the Proposed Settlement has serious shortcomings for PetSmart and for the merchant community.

3

265760 2

# A1684

**A.    The Surcharging Rule Changes Do Not Give PetSmart the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

10.    Merchants should have the unrestricted right to impose surcharges on payment cards if they choose to do so after weighing the costs and benefits and the needs of their own businesses.  The rule changes in the Proposed Settlement, however, do not provide merchants with a meaningful surcharge right.

11.    As an initial matter, PetSmart does not intend to impose surcharges on customers. If PetSmart were to consider implementing such a program, however, it is clear that the rule changes in the settlement offer no practical ability to surcharge, and actually maintain prohibitions against surcharging.  Merchants cannot surcharge Visa and MasterCard debit transactions.  And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

**1.    The Competitive Card Brand Limitation Makes Surcharging Impossible for PetSmart**

12.    The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant surcharges transactions for any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

13.    If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions.  American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs.  Doing that makes no sense, as

4

265760 2

# A1685

the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

14.     Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Debit card transactions (including both pin and swipe debit transactions) represent 72% of PetSmart's total MasterCard and Visa transactions.

15.     The only theoretical alternative would be to stop accepting American Express – something that PetSmart cannot realistically do. American Express currently accounts for 5.2% of our payment card sales. Dropping American Express is not a viable business proposition for PetSmart. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rule changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an odd result at the end of this eight-year antitrust case.

16.     Because PetSmart, like most merchants, accepts American Express, the effect of the Competitive Card Brand limitation is to keep the prohibition against surcharging MasterCard and Visa credit card transactions in effect.

### 2.     Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

17.     As of our most recent fiscal year-end, PetSmart did business at 1,198 stores located in 48 states, the District of Columbia and Puerto Rico. Surcharging is illegal in 11 states and Puerto Rico – California (133 stores), Colorado (32 stores), Connecticut (10 stores), Massachusetts (19 stores), New York (51 stores), Texas (118 stores), Florida (74 stores), Kansas (7 stores), Oklahoma (15 stores), Maine (3 stores), and Utah (14 stores). These states account for

5

3657603

# A1686

over 39.7% of our locations, which means that surcharging credit transactions is illegal over a large portion of our operations.

18.    I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many PetSmart stores are located, including Arkansas (8 locations), Illinois (53 locations), Indiana (24 locations), Kentucky (9 locations), Maryland (30 locations), Michigan (35 locations), Mississippi (8 locations), Missouri (22 locations), Nevada (17 locations), New Hampshire (6 locations), New Jersey (41 locations), New Mexico (6 locations), Pennsylvania (51 locations), Rhode Island (2 locations), South Carolina (21 locations), Tennessee (21 locations), Vermont (1 location), West Virginia (3 locations), and Washington (25 locations). Combined with states that already ban surcharging, these states accounted in fiscal year 2012 for 71.7% of our U.S. locations and 68.4% of our U.S. sales.

19.    Even if PetSmart were inclined to surcharge, the mere fact that these states have undertaken measures to begin the process of banning surcharging would chill efforts to surcharge, especially in these states.

20.    The fact that surcharging is currently legally permitted in roughly 60.3% of our stores is problematic in and of itself. For operational, training, and customer service reasons, it would be logistically difficult and unpalatable to implement surcharges in 39 states, but not in the 11 that prohibit surcharging.

21.    For Internet sales, application of the various no-surcharge laws is uncertain and complex. Many of these laws prohibit retailers, wherever they are located, from surcharging customers located in a no-surcharge state, and, likewise, merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

6

265760 2

# A1687

**B.    The Other Relief in the Settlement Is of No Value to PetSmart**

22.    The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  Like most merchants, PetSmart only operates under a single trade name or banner, and therefore this provision provides no benefit.

23.    Instead, PetSmart might benefit from the ability to test any changes to acceptance practices on a store-by-store basis, not across locations operated under different trade names. The all-outlets provision in the settlement, therefore, does not provide PetSmart and other merchants what they really need -- the ability to test new acceptance practices at a small number of stores within a distinct trade name.

24.    PetSmart also understands that Visa and MasterCard did not have rules against group buying prior to this settlement.  We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to our company.

**C.    The Release Is Far Too Broad**

25.    The Proposed Settlement's release is deeply concerning to PetSmart.  Visa and MasterCard likely will be able to argue that the release covers all of their rules and conduct given its broad wording, along with substantially similar rules and conduct going forward.  It is unfair that we have no ability to opt out of such a release.

26.    PetSmart is also concerned that the release will bar any legal challenge in the event that Visa and MasterCard change their Honor All Cards rules to "Honor All Devices" rules

7

265760.2

to force merchants to accept all mobile transactions from Visa and MasterCard networks. The Proposed Settlement includes mobile and any other new technology by defining "credit card" to include "any other current or future code, device, or service . . . ." Proposed Settlement ¶ 1(u), (v). Because Visa and MasterCard do not currently have significant volumes in mobile payments, this area presents a unique opportunity for merchants to see new competition and avoid having mobile transactions trapped in the current system. The release may stifle innovation and competition in this space. We want the right to freely choose when to accept mobile products, and we do not want to be forced to do so under Visa's and MasterCard's Honor All Cards rules.

27.    The release even purports to extend outside the jurisdiction of the United States, releasing Visa and MasterCard and their affiliates from their actions anywhere on the globe, and including foreign affiliates of class members as releasors. The possibility that the release would cover claims by PetSmart concerning on our operations in Canada, where we operate 80 stores, demonstrates the unacceptable scope of the release.

\*       \*       \*       \*

28.    Based on the current Proposed Settlement, the lawyers who negotiated the settlement did not adequately represent the interests of PetSmart.

29.    PetSmart is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

30.    PetSmart joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting

8                                                          265760.2

# A1689

forth additional legal and factual grounds for PetSmart's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 21, 2013

Brently G. Baxter
Vice President – Accounting, Treasury and
Corporate Controller
PetSmart, Inc.
19601 N. 27th Avenue
Phoenix, AZ 85027

265760 2

# A1690

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : |  |
| FEE AND MERCHANT DISCOUNT | : | MDL No. 1720(JG)(JO) |
| ANTITRUST LITIGATION | : |  |
|  | : |  |
|  | : | **OBJECTION OF RETAIL** |
| This Document Relates To: | : | **INDUSTRY LEADERS** |
| ALL CLASS ACTIONS. | : | **ASSOCIATION TO FINAL** |
|  | : | **APPROVAL OF THE** |

---------------------------------------------------------x **SETTLEMENT**

## DECLARATION OF SANDRA L. KENNEDY

Sandra L. Kennedy hereby declares:

1.        I am President of the Retail Industry Leaders Association ("RILA"), a position I

have held since 2002.  Immediately prior to joining RILA, I served as director of the Leadership

Dialogue Series for Accenture, a global management consulting and technology services

company.  From 1993 to 2000, I was senior vice president of membership services for the

National Retail Federation ("NRF").  I have also worked for the Electronic Funds Transfer

Association and the National Automated Clearing House Association.  In my current position, I

work closely with the RILA Board of Directors, the CEOs of America's largest retailers, to

ensure that the operational and public policy interests of RILA members are effectively

promoted to ensure the retail industry continues to grow and prosper.  I am also a member of the

White House Advisory Committee for Trade Policy and Negotiations.

2.        RILA is the trade association of the world's largest and most innovative retail

companies.  RILA members include more than 200 retailers, product manufacturers, and service

suppliers, which together account for more than $1.5 trillion in annual sales, millions of

American jobs, and more than 100,000 stores, manufacturing facilities, and distribution centers

domestically and abroad.

1

# A1691

3.      RILA counts nine of the top 10 U.S. retailers as members.  RILA members also hold the top spot among key retail segments including:  apparel, consumer electronics, department stores, home improvement, large format and small format, demonstrating that RILA is truly the association for 'retail leaders.'  In fact, no trade association represents more top retailers than RILA.

4.      RILA represents:

- 9 of the top 10 U.S. Retailers (2010 Chain Store Age magazine);
- 4 of the top 10 Global Retail Leaders (Deloitte 2010 Global Powers of Retailing)
- 6 of the top 10 Importers (Journal of Commerce Top 100 Importers and Exporters Special Report)
- 11 of the Top 50 Companies for Diversity (DiversityInc)
- 9 members on Fortune's 100 Best Companies to Work For
- 7 of the Top 10 Retail Brands (Interbrand's Best Retail Brands 2011)

5.      In my role as President of RILA, I am generally knowledgeable about our members' acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks.

6.      RILA members process millions of payment card transactions each year, and hundreds of billions of dollars in sales volume.  Interchange and other card acceptance fees are of great concern to our members, who generally cite these fees as their second or third largest store-level operating expense, following payroll and leasing, as well as their least controllable expense.

7.      I am also knowledgeable about RILA's own acceptance of these payment cards, which are used by our members to pay for various membership activities, such as conference registration, membership dues, certifications, and web seminars.

2

8.      RILA currently accepts Visa and MasterCard credit and debit cards, as well as Discover and American Express credit cards.

9.      Visa and MasterCard credit and debit card transactions currently make up approximately 54% of RILA's card transactions, which represent between 15% and 25% of revenues received each month by RILA.

10.     I have reviewed the Proposed Settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation (MDL 1720)* with counsel. After reviewing the Proposed Settlement with our members, we concluded that the Proposed Settlement of the class action is insufficient and that accepting it would not be in the best interest of merchants that RILA represents.

11.     I note that not all members of RILA oppose the settlement. Specifically, some RILA members are Individual Plaintiffs who have filed suit apart from the class action in MDL 1720. This declaration is not made by or on behalf of any such members. To my knowledge, no RILA member who is not an Individual Plaintiff supports the Proposed Settlement.

**A.      Nearly All of Our Members Do Business in At Least One of the 11 States That Currently Prohibit Surcharging or the 20 States Where No-Surcharge Legislation Has Been Introduced**

12.     Taken together, RILA members do business in all of the 11 states (and Puerto Rico) that currently ban surcharging. Viewed individually, more than ninety percent of our members have operations within at least one state that bans surcharging.

13.     The state bans on surcharging cover retailers *and* customers located within each of these 11 states. The fact that merchants doing business in 11 states amounting to more than 40% of the population are prohibited from surcharging will dramatically limit any potential for surcharging to make meaningful market change for merchants.

14.     Many RILA members sell products over the Internet, including RILA itself. For

3

Internet sales, this means that merchants, wherever they are located, may not be able to surcharge customers located in a no-surcharge state, and merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

15.     In addition, I am aware that 20 other states have introduced bills that would ban credit card surcharges.  RILA members do business in all of the 20 states that have proposed legislation to ban surcharging.  Taken together, nearly all of our members have operations within at least one state that bans surcharging or has legislation to ban surcharging.

16.     Visa, MasterCard and issuing banks have been actively involved in the passage of anti-surcharging laws in the past, and nothing in the Proposed Settlement restricts them from doing so in the future.  We expect that they will lobby to pass laws in other states, further weakening any potential relief in the Proposed Settlement.

**B.      The Settlement Provisions Combine with American Express and PayPal Rules to Make Surcharging Impossible, Even Where Not Illegal**

17.     Should our members choose to introduce surcharges, under the Proposed Settlement surcharges must also be applied to other payment networks with higher acceptance costs, such as American Express and PayPal.  These brands require any surcharging to be imposed on all payment cards equally, including debit cards, and card-brands or card-products with lower acceptance costs.  This would completely defeat the point of surcharging, which would be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

18.     Dropping American Express is not a viable option for most of our members, and dropping PayPal would harm one of the few competitors to emerge against Visa and MasterCard. More than 90 % of our members accept American Express, including RILA, and would therefore get no meaningful ability to surcharge under the Proposed Settlement.  Approximately

4

# A1694

one-third of our members accept PayPal for Internet sales.

### C.   The Group Buying Provision Offers No Benefits to Merchants

19.   Before the settlement, Visa and MasterCard had not prohibited group buying, as far as I am aware.  Group buying has never been seen as a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view, the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  Moreover, any disputes are subject only to review for declaratory relief in this Court, and the prevailing party is entitled to attorneys' fees.  This provision is of no value to our members, and arguably is worse than before the settlement.

### D.   The "All Outlets" Provision Gives No Benefit to Most Merchants

20.   The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names.  As far as we know, this was not prohibited by any prior rules, however, so this provision of the settlement offers no new benefits.  Approximately 45% of our members operate under a single trade name and therefore would get no benefit from the all outlets provision in the Proposed Settlement.  Of our members that do operate multiple brands, none have suggested that they would benefit from declining to accept Visa or MasterCard cards at one banner over another.  Such an approach would add inconsistency for their sales staff, POS systems, and customers.

### E.   The Release Is Far Too Broad

21.   Despite the fact that this proposal does little to reform a badly broken system, the settlement may prevent merchants from taking any future action against the credit card companies by releasing virtually all claims that matter to merchants going forward.  The release

5

appears to cover all claims concerning interchange and any other fees from networks or banks,

Honor All Cards rules, and even international issues (which potentially affects the more than half

of the RILA members that have international operations or affiliates).  Of great concern to our

members is that the release would allow Visa and MasterCard to use their Honor All Cards rules

to force merchants to accept transactions from mobile devices or other new technologies from

Visa and MasterCard networks.  Eventually, all retailers are expected to accept mobile

transactions, an area where Visa and MasterCard currently have no significant volumes.

*     *     *     *

22.     Based on the current Proposed Settlement and all of the above, it is clear to me

that the lawyers who negotiated the settlement did not adequately represent the interests of RILA

or our members.

23.     RILA is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

24.     RILA joins in the opposition to the motion for final approval being filed by the

Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting

forth additional legal and factual grounds for RILA's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on _5-21_ , 2013

_Sandra L. Kennedy_
Sandra L. Kennedy

6

**A1696**

Retail Industry Leaders
 Association
1700 N. Moore Street
Suite 2250
Arlington, VA 22209

**A1697**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :          MDL No. 1720 (JG)(JO)
FEE AND MERCHANT DISCOUNT               :
ANTITRUST LITIGATION                    :
                                        :          **OBJECTION OF**
                                        :          **SEARS HOLDINGS CORP.**
                                        :          **TO FINAL APPROVAL OF**
                                        :          **THE PROPOSED SETTLEMENT**
-----------------------------------------------------------------x

## OBJECTION OF SEARS HOLDINGS CORPORATION

Jai Holtz hereby declares:

1.      I am Vice President, Financial Services of Sears Holdings Corporation, which

includes Sears, Roebuck and Co., Kmart Corporation, Sears Home Improvement Products, Inc.,

Lands' End, Inc., and other affiliated entities (together, "Sears"). This declaration sets forth the

reasons that Sears objects to the proposed settlement in *In re Payment Card Interchange Fee &*

*Merchant Discount Antitrust Litigation* (MDL 1720).

2.      I have worked at Sears and its related companies for 17 years. I oversee all

Financial Service products for Sears. These include: third party credit and debit card

acceptance, management of the Sears card and Sears MasterCard programs, Layaway, Gift Card

and Pre-paid programs. I am knowledgeable about Sears' acceptance of debit and credit card

transactions for all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed on those networks.

3.      Sears is a leading integrated retailer with more than 2,500 full-line and specialty

retail stores in the United States and Canada. Sears is the leading home appliance retailer as well

as a leader in tools, lawn and garden, fitness equipment and automotive repair and maintenance.

Key proprietary brands include Kenmore, Craftsman and DieHard, with a broad apparel offering,

including such well-known labels as Lands' End, the Kardashian Kollection, Jaclyn Smith and

1

# A1698

– rather than Visa, MasterCard, and the banks – is responsible for interchange and the need for surcharging is false. Visa and MasterCard have caused the need for surcharging with their supra-competitive pricing; if they priced competitively, merchants likely would not surcharge. Forcing merchants to tell customers that the surcharge is coming from the merchant will maximize the likelihood of unhappy customers and lost sales and will decrease merchants' willingness to surcharge.

22.     Further, Sears operates in all 50 states. Surcharging is currently prohibited by statute in 11 states. Our operations in the states of Maine, Oklahoma, California, Colorado, Connecticut, Florida, Kansas, Massachusetts, New York, Texas, and Utah account for a significant percentage of Sears' sales.

23.     I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where Sears stores are located, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Washington, and West Virginia.

24.     The fact that surcharging is not legally permitted in some states and under consideration for prohibition in many other states is problematic in and of itself. It is not Sears' practice to have different acceptance policies, as this would only add to the confusion and inconvenience of customers, Sears' sales staff, and Sears' POS systems. Even if Sears were inclined to surcharge, Sears would be hesitant to engage in a practice that would not be applicable across all of Sears' stores.

25.     In addition, Sears sells products over the Internet at www.sears.com, www.kmart.com, and a number of other websites. For Internet sales, application of the various

# A1699

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE    :    MDL No. 1720 (JG)(JO)
FEE AND MERCHANT DISCOUNT    :
ANTITRUST LITIGATION    :    **OBJECTION OF**
:    **THE WET SEAL, INC. TO**
:    **FINAL APPROVAL OF**
:    **THE SETTLEMENT**

------------------------------------------------------------x

### DECLARATION IN SUPPORT OF OBJECTION OF THE WET SEAL, INC. d/b/a WET SEAL AND ARDEN B.

I, Steven H. Benrubi hereby declare:

1.    I am Executive Vice President and Chief Financial Officer of The Wet Seal, Inc.,

a corporation which includes the brands Wet Seal and Arden B. (together, "Wet Seal"). This

declaration sets forth the reasons that Wet Seal objects to the proposed settlement in *In re*

*Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* (MDL 1720).

2.    I have worked at Wet Seal and its related companies for eight years. I oversee all

of Wet Seal's finances, including cash and debt management operations, and tender type card

programs. I am knowledgeable about Wet Seal's acceptance of debit and credit card transactions

for all payment networks, including Visa and MasterCard, and payment of interchange fees for

transactions completed on those networks.

3.    Headquartered in Foothill Ranch, California, Wet Seal is a leading specialty

retailer of fashionable and contemporary apparel and accessory items. As of May 4, 2013, Wet

Seal operates a total of 526 stores in 47 states and Puerto Rico, including 464 Wet Seal stores

1

266086.1

# A1700

payment and to play one card brand against the other to introduce price competition in the industry.

11.     The only theoretical alternative would be to stop accepting American Express – or PayPal, which has similar no-surcharging rules – which would only decrease competition in the industry.  Dropping American Express is not a viable business proposition for Wet Seal.

12.     Significantly, surcharging debit cards would not even be permissible under the proposed settlement, which only allows surcharging of credit cards.  A significant number of Wet Seal's customer transactions are via Visa and MasterCard debit cards.  Consequently, a significant number of our Visa and MasterCard credit and debit card transactions would not even be eligible for a surcharge.

13.     In addition, Wet Seal does business in 47 states and Puerto Rico, and a number of these ban surcharging or have proposed legislation to ban surcharging.

14.     Surcharging is illegal in 11 states and Puerto Rico, including some of the most populous states and where a large proportion of Wet Seal's stores are located.  The states of California (68 locations), Colorado (5 locations), Connecticut (5 locations), Florida (40 locations), Kansas (7 locations), Maine (0 locations), Massachusetts (20 locations), New York (19 locations), Oklahoma (3 locations), Texas (44 locations), and Utah (5 locations), and Puerto Rico (3 locations), currently account for 42% of our U.S. locations and 42% of our U.S. sales.  These states represent our largest revenue states by far.

4

266086.1

# A1701

15.     I am aware that 20 other states have introduced bills that would ban credit card

surcharges.  These include states where many Wet Seal stores are located, including Arkansas (3

locations), Hawaii (4 locations), Illinois (20 locations), Indiana (12 locations), Kentucky (7

locations), Maryland (12 locations), Michigan (16 locations), Mississippi (3 locations), Missouri

(11 locations), Nevada (6 locations), New Hampshire (3 locations), New Jersey (20 locations),

New Mexico (4 locations), Pennsylvania (24 locations), Rhode Island (4 locations), South

Carolina (8 locations), Tennessee (8 locations), Vermont (0 locations), Washington (13

locations), and West Virginia (2 locations). Combined with states that already ban surcharging,

these states account for 76% of our U.S. locations and 75 % of our U.S. sales.

16.     The fact that surcharging is legally permitted in only a portion of our stores is

problematic itself.  Acceptance practices that vary state by state would only add to the confusion

and inconvenience for customers, our sales staff, and our point-of-sale systems.  Even if we were

inclined to surcharge, we would be hesitant to engage in a practice that would not be applicable

across all of our stores.

17.     The fact that such a substantial additional percentage of our volume may be

covered by state prohibitions reinforces the conclusion that the surcharging relief in the

settlement is of no value to our company.  We would not invest in making changes to our

systems and training our sales staff when additional state prohibitions may be implemented at

any time.  Additional bans and regulatory uncertainty further weaken any potential benefit from

5

# A1702

the proposed settlement. Considering that few if any merchants have actually surcharged after the rules changes that took effect in January, the legislation in these new states is notable.

18.     In addition, we sell products over the Internet at www.wetseal.com and www.ardenb.com. For Internet sales, application of the various no-surcharge laws is complex. Many of these laws prohibit retailers, wherever they are located, from surcharging customers located in a no-surcharge state, and, likewise, merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

19.     These facts negate any value surcharging might offer to Wet Seal, and Wet Seal would not surcharge under these terms.

**B.     The Other Relief in the Settlement Is of No Value to Wet Seal**

20.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names. While Wet Seal has two brands, this is not helpful to us because we would not accept some cards at certain stores and not others. We will only accept cards across all brands. This was not prohibited by any prior rules, however, so the settlement offers no new benefits.

21.     We also understand that Visa and MasterCard did not have rules against group buying prior to this settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard

6

# A1703

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : | MDL No. 1720 (JG)(JO) |
| FEE AND MERCHANT DISCOUNT | : | |
| ANTITRUST LITIGATION | : | **OBJECTION OF THE** |
| | : | **WENDY'S COMPANY** |
| | : | **TO FINAL APPROVAL OF** |
| | : | **THE PROPOSED SETTLEMENT** |
| | : | |

------------------------------------------------------------x

## DECLARATION OF GAVIN P. WAUGH

Gavin Waugh hereby declares:

1.      I am Vice President and Assistant Treasurer of The Wendy's Company ("Wendy's"). This declaration sets forth the reasons that Wendy's objects to the proposed settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* (MDL 1720).

2.      I have worked at Wendy's and its successor or related companies for 15 years. I oversee Wendy's capital market activities, cash management operations, and tender type card programs. In this capacity, I am responsible for customer-facing credit card and debit card processing arrangements, banking operations, and relations within the payment industry. I currently serve on the Association for Financial Professionals Treasury Advisory Group, a Treasury and payments advisory committee composed of corporate Treasury professionals, attorneys and bankers whose goal is to monitor, interpret and influence the development of payment systems and delivery methods in the United States. I have been a Certified Treasury

1

265256.2

# A1704

8.      Credit and debit card transactions currently make up approximately 43% of Wendy's sales, and that percentage is increasing on an absolute basis by 2% to 5% annually. Even though Visa and MasterCard interchange fees are one of our largest expenses, Wendy's cannot negotiate the interchange rates set by Visa and MasterCard.  Visa and MasterCard can, and do, raise rates on a regular basis.  Wendy's only real recourse is to stop accepting Visa and MasterCard branded cards; however, Wendy's cannot feasibly discontinue acceptance of Visa and MasterCard credit or debit products without losing an unacceptable number of sales.

## II.      THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

9.      I have reviewed the proposed settlement.  Neither I nor anyone else at Wendy's, nor any counsel working on our behalf, had any involvement in the negotiations leading up to the settlement.

### A.      Although Wendy's Objects that the Cash Settlement Is Inadequate, Wendy's Is Not Opting Out

10.      Wendy's is not opting out to assert past damages claims because prosecuting such a case against large companies like Visa and MasterCard is not a realistic option for our company.  We are a comparatively small company that lacks the financial and human resources to sue much larger companies such as Visa and MasterCard, especially when the only issue we are permitted to press under the settlement is past damages.  Our calculation concerning the value of opting out may have been different had we been permitted to challenge the ongoing imposition of interchange on Wendy's, as the going forward implications of this continuing damage is more important to our company than past damages.

3

265256.2

# A1705

16.    Significantly, surcharging debit cards would not even be permissible under the proposed settlement, which only allows surcharging of credit cards. Visa and MasterCard debit card transactions account for approximately 83% of Wendy's Visa and MasterCard credit and debit card transactions. Consequently, the vast majority of our Visa and MasterCard credit and debit card transactions would not even be eligible for a surcharge. In addition, the majority of transactions at Wendy's are "small ticket" purchases. Because Visa and MasterCard raised their per-transaction fees to the maximum allowed by rules adopted under the Durbin Amendment, interchange fees on small ticket debit purchases have actually increased. The Durbin Amendment debit card capped rate of $0.22 per-transaction is in excess of 25% higher than Wendy's average debit card per-transaction fee prior to the Durbin Amendment.

17.    Further, Wendy's does business in many U.S. states, a number of which ban surcharging. The fact that surcharging is legally permitted in only a portion of our restaurants is problematic itself. Acceptance practices that vary state by state would only add to the confusion and inconvenience for customers, our sales staff, and our point-of-sale systems. Even if we were inclined to surcharge, we would be hesitant to engage in a practice that would not be applicable across all of our restaurants.

18.    Surcharging is illegal in 11 states and Puerto Rico, including some of the most populous states and where a large proportion of Wendy's restaurants are located. The states of California (51 restaurants), Colorado (47 restaurants), Connecticut (5 restaurants), Florida (182

6

# A1706

restaurants), Kansas (10 restaurants), Massachusetts (80 restaurants), New York (63 restaurants), Texas (104 restaurants), and Utah (54 restaurants) currently account for 46% of our U.S. sales.

19.     I am aware that 18 other states have introduced bills that would ban credit card surcharges. These include states where many Wendy's restaurants are located, including, Hawaii (8 restaurants), Illinois (101 restaurants), Kentucky (3 restaurants), Michigan (20 restaurants), Missouri (39 restaurants), New Hampshire (4 restaurants), New Jersey (14 restaurants), New Mexico (24 restaurants), Pennsylvania (79 restaurants), Rhode Island (9 restaurants), and Washington (30 restaurants). Combined with states that already ban surcharging, these states account for 72% of our U.S. sales.

20.     The fact that such a substantial additional percentage of our volume may be covered by state prohibitions reinforces our conclusion that the surcharging relief in the settlement is of no value to our company. We would not invest in making changes to our systems and training our sales staff when additional state prohibitions are likely to be implemented in the foreseeable future. Additional bans and regulatory uncertainty further weaken any potential benefit from the proposed settlement. Considering that few if any merchants have actually surcharged following the rules changes that took effect in January, the legislation in these new states is notable.

21.     These facts negate any value surcharging might offer to Wendy's, and it is extremely unlikely that Wendy's would surcharge under these terms.

265256.2

# A1707

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | | |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : | |
| FEE AND MERCHANT DISCOUNT | : | MDL No. 1720(JG)(JO) |
| ANTITRUST LITIGATION | : | |
| | : | **OBJECTION OF** |
| | : | **NATIONAL GROCERS** |
| | : | **ASSOCIATION TO FINAL** |
| | : | **APPROVAL OF THE** |
| | : | **PROPOSED SETTLEMENT** |

---------------------------------------------------------x

### DECLARATION OF NATIONAL GROCERS ASSOCIATION

Thomas F. Wenning hereby declares pursuant to 28 U.S.C. § 1746:

1.     I am the Executive Vice President and General Counsel of the National Grocers
Association ("NGA"). I have held this position since October 1, 1982. I submit this declaration
on behalf of NGA to object to the proposed settlement in the interchange case and in support of
the opposition to the motion for final approval.

2.     I have knowledge of the issues related to the acceptance of credit card
transactions running on the Visa and MasterCard networks and the payment of interchange fees
over those networks.

3.     NGA is the national trade association representing the retail and wholesale
grocers that comprise the independent sector of the food distribution industry. An
independent retailer is a privately owned or controlled food retail company operating a variety
of formats. Most independent operators are serviced by wholesale distributors, while others
may be partially or fully self-distributing. Some are publicly traded but with controlling
shares held by the family and others are employee owned. NGA accepts and processes Visa,
MasterCard, American Express and Discover credit card transactions that are submitted for
payments.

1

266254.1

4.      NGA is a named plaintiff in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.*

5.      Our members generally cite interchange and other payment card acceptance fees as one of their fastest-growing and least-controllable expenses.  Since 2004, NGA and its members have paid millions of dollars, if not more, in interchange fees for payment card transactions running on the Visa and MasterCard networks, and continue to incur these fees on an ongoing basis.  These fees impact NGA's members' ability to hire new employees, to invest in their businesses, and cause higher prices for consumers, especially those who do not use credit cards.  Nevertheless, as a substantial number of our members' retail customers make their purchases with payment cards, our members cannot drop Visa and MasterCard products without losing an unacceptable number of sales.  That gives Visa and MasterCard the power to raise interchange prices or network fees to our members.

6.      I reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website, and have drawn the conclusions set forth below.

## II.     THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

7.      Despite Class Counsel's and the mediators' assertions that by February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement through the processes laid out by the mediators and the Court," neither I nor anyone else at NGA agreed to the Proposed Settlement.  Given the confidentiality agreement protecting discussions during the mediation process, I can only describe the events of that process in generalized terms.  However, even in generalized terms, it is clear that NGA's concerns about the mediators' proposals were not only not welcomed by Class Counsel, but also ignored.

2

266254 1

# A1709

8.      The mediation that ultimately resulted in the Proposed Settlement began in 2008.

9.      In late November 2011, however, NGA discovered that Class Counsel had made proposals to Visa and MasterCard, through the mediators, without NGA's knowledge or consent. NGA believed that the proposals made without its knowledge severely compromised the negotiating position of the class to the point that NGA would not have agreed to them.  NGA also learned that Class Counsel had received an offer of settlement from the defendants that had not been disclosed to NGA.  In that same month, Class Counsel again submitted a mediation statement that included detailed proposals without first receiving authority to do so from NGA.

10.      In January 2012, Class Counsel accepted the mediators' proposals over the objections of NGA and several other named plaintiffs.  NGA, in fact, and several other named plaintiffs registered their opposition to the proposals and Class Counsel's acceptance of them.

11.      Even though it dissented from the mediators' proposals, NGA nonetheless continued to work constructively within the mediation process to try to salvage something of value from the emerging settlement.  NGA did so with the understanding that it maintained the right to oppose the settlement at a preliminary approval or final fairness hearing if a settlement that ultimately resulted from the discussions was not acceptable to NGA.

12.      When the Proposed Settlement agreement was filed with the Court on July 13, 2012, NGA had not seen the final text including the final release.  The filed document appeared to indicate that NGA agreed with the Proposed Settlement, but that was not the case.

13.      NGA is opposed to the Proposed Settlement because it has serious shortcomings for NGA's members.  It does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case.  The Proposed Settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the

266254.1

# A1710

banks that NGA and its members have no choice but to pay. NGA's members' portion of the compensatory relief amounts to only a fraction of what they pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

14.     Instead of addressing the core claims in the case, the settlement merely provides NGA and its members with limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to NGA or its members. Moreover, the Proposed Settlement deprives NGA and its members of the ability to opt-out and bring claims for damages resulting from the ongoing harm imposed by Visa and MasterCard's interchange fees.

### A.     The Surcharging Rule Changes Do Not Give NGA and Its Members the Ability to Surcharge Visa and MasterCard Credit Card Transactions

15.     It is clear that the rules changes in the settlement offer NGA and its members no practical ability to surcharge, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

### 1.     The Complexity of the Proposed Settlement's Surcharging Rules Will Foreclose Most of Our Members from Reaping Any Benefit

16.     NGA represents independent grocery stores, and many of our members do not have the resources or the ability to comply with the Proposed Settlement's complex surcharging rules. Our members' expertise lies in running grocery stores, not in interpreting complex surcharging rules and provisions. Moreover, some of our members will be reluctant to even try surcharging due to the expected consumer backlash that would result in the loss of patronage to merchants who do not surcharge. In addition, our members could inadvertently violate a complex rule that is 10 pages in length, which could result in serious financial

4

penalties. Compliance with the surcharging rules would be a risk and burdensome task for many of NGA's members, and would render the Proposed Settlement's surcharging provisions worthless.

### 2. The Competitive Card Brand Limitation Makes Surcharging Impossible for NGA and Its Members

17.     The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

18.     If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions. American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

19.     Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Debit card transactions (including both PIN and signature) represent a substantial portion of NGA's and its members' total MasterCard and Visa transactions.

20.     The only theoretical alternative would be to stop accepting American Express – something that NGA and its members cannot realistically do. American Express currently accounts for a significant amount of our and our members' payment card sales. Dropping

266254.1

American Express is not a viable business proposition for NGA and its members. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result of this eight-year antitrust case.

21.     The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for NGA and its members.

### 3.     Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

22.     As of the end of 2012, NGA's members did business in the 11 states where surcharging is illegal: California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and Utah. Those states cumulatively account for a significant amount of our members' sales.

23.     I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many of our members are located, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, West Virginia, and Washington. Combined with states that already ban surcharging, these states account for the majority of our members' locations and sales. Even if NGA's members were inclined to surcharge, the mere fact that these states have undertaken measures to begin the process of banning surcharging would chill any efforts to surcharge in these states.

### B.     The Other Relief in the Settlement Is of No Value to NGA's Members

24.     The settlement appears to allow merchants to vary their acceptance practices in

266254 1

different lines of business operating under different trade names, although this was not prohibited by any prior rules. Like most merchants, our members generally operate under a single trade name or banner, and therefore this provision provides no benefit.

25.     NGA also understands that Visa and MasterCard did not have rules against group buying prior to this settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. This provision is of no value to us or our members.

C.     **The Release Is Far Too Broad**

26.     The Proposed Settlement's release is deeply concerning to NGA. The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices. And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us and our members.

27.     The Proposed Settlement requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards." Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording. They also likely will argue that

7

266254.1

# A1714

substantially similar rules and conduct going forward will be released. We find it deeply unfair we have no ability to opt out of such a release.

*     *     *     *

28.    Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of NGA.

29.    NGA is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

30.    NGA joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for NGA's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 22, 2013

Thomas F. Wenning
Executive Vice President and General Counsel
National Grocers Association
1005 N. Glebe Road, Suite 250
Arlington, VA 22201-5758

8

266254.1

# A1715

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :       MDL No. 1720(JG)(JO)
FEE AND MERCHANT DISCOUNT               :
ANTITRUST LITIGATION                    :       **OBJECTION OF**
                                        :       **PETCO ANIMAL**
                                        :       **SUPPLIES, INC. TO**
                                        :       **FINAL APPROVAL OF**
                                        :       **THE PROPOSED SETTLEMENT**
----------------------------------------------------------x

### DECLARATION OF PETCO ANIMAL SUPPLIES, INC.

Patricia Ward hereby declares pursuant to 28 U.S.C. § 1746:

1.       I am currently Vice President Finance and Controller at Petco Animal Supplies,

Inc. ("Petco"). I have held this position since 2009. On behalf of Petco, I submit this declaration

to object to the proposed settlement in the interchange case and in support of the opposition to

the motion for final approval.

2.       I lead the group responsible for all treasury functions at Petco, including capital-

raising, bank and rating agency relationships, cash management, and payment acceptance. I

have held a similar position in other U.S. and foreign retailers.

3.       Petco is a national specialty retailer of premium pet food, supplies, and services

with over 1,200 stores in the United States. We conduct business through our store chain and

over the Internet at www.petco.com.

4.       I am knowledgeable about Petco's acceptance of debit and credit card transactions

running on all payment networks, including Visa and MasterCard, and payment of interchange

fees for transactions completed over those networks.

5.       Petco accepts payment cards across most of its lines of business. Petco currently

accepts Visa and MasterCard debit and credit cards, along with American Express and Discover,

1

as well as PayPal for online transactions.

## I.   INTERCHANGE FEES AND PETCO'S ACCEPTANCE OF PAYMENT CARDS

6.     Like other specialty retailers, Petco faces tremendous competition from bricks-and-mortar concerns, from online vendors, and from other companies that, like Petco, operate both physical and online stores.  As a result, our product margins and net profitability are under constant pressure.

7.     Visa and MasterCard interchange fees are one of our largest retail expenses.  Yet Visa's and MasterCard's interchange rates are largely beyond our control.  Unlike any vendor relationship, the fact that we are a large company and a significant consumer of payment card services makes little difference in our ability to negotiate with Visa and MasterCard and affect our acceptance costs on these networks.  As approximately 70% of our sales volume is made using Visa and MasterCard payment cards, Petco cannot drop Visa and MasterCard products without losing an unacceptable number of sales.  That gives Visa and MasterCard the power to raise interchange prices or network fees to Petco.  These raises continued following Visa's and MasterCard's IPOs.  From January 2004 until November 2012, Petco paid more than $257 million in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks.  Since December 1, 2012, and on an ongoing basis, Petco has continued to pay more than $3.6 million in interchange fees each month for Visa and Mastercard transactions.

8.     A substantial portion of Petco's retail sales are made via the Internet.  Of those Internet sales, most are made by consumers using a Visa or MasterCard payment card.  The interchange rates for Internet sales, which constitute card-not-present ("CNP") transactions, is much higher than for sales made through traditional bricks-and-mortar stores.  There is no valid justification for the excessive CNP interchange rates because, unlike with bricks-and-mortar merchants, merchants bear most of the fraud and chargeback risks associated with CNP

transactions.  Nevertheless, we must accept Visa and MasterCard for Internet transactions, or else forgo a substantial portion of our retail sales.  This is another example of the market power exercised by these brands, and conduct which may be subject to mandatory release in this case and immune from merchant challenge going forward if the settlement is approved.

## II.   THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

9.    I reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website.  Neither I nor anyone else at Petco, nor any counsel engaged on our behalf, had any involvement in the negotiations leading up to the Proposed Settlement.  In my view, the Proposed Settlement has serious shortcomings for Petco.

10.    The Proposed Settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case.  The Proposed Settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that Petco and our customers have no choice but to pay.  Petco's portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

11.    Instead of addressing the core claims in the case, the settlement merely provides merchants with limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to Petco.  Moreover, the Proposed Settlement deprives Petco of the ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and MasterCard's interchange fees impose on the company.

### A.   The Surcharging Rule Changes Do Not Give Petco the Ability to Surcharge Visa and MasterCard Credit Card Transactions

# A1718

12.     Petco believes that merchants should have the unrestricted right to impose surcharges on payment cards if they choose to do so after weighing the costs and benefits and the needs of their own businesses.  The rule changes in the Proposed Settlement, however, do not provide Petco with a meaningful surcharge right.

13.     As an initial matter, Petco does not intend to impose surcharges on customers.  If Petco were to consider implementing such a program, however, it is clear that the rules changes in the settlement offer no practical ability to surcharge, and actually maintain prohibitions against surcharging.  Petco cannot surcharge Visa and MasterCard debit transactions.  And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.  Surcharging is impractical for the additional reason that it would require Petco to modify our point-of-sale systems at a very high cost to Petco.

## 1.     The Competitive Card Brand Limitation Makes Surcharging Impossible for Petco

14.     The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

15.     If Petco wanted to surcharge as provided under the Proposed Settlement, we would be required to surcharge American Express transactions.  American Express Rule 3.2 would then require us to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs.  Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

4

16.    Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards.  Debit card transactions (including both PIN and signature debit) represent 73% of Petco's total MasterCard and Visa transactions.

17.    The only theoretical alternative would be to stop accepting American Express – something that Petco cannot realistically do.  American Express currently accounts for 15% of our payment card sales.  Dropping American Express is not a viable business proposition for Petco. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard.  Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result at the end of this eight-year antitrust case.

18.    Because Petco accepts American Express, the effect of the Competitive Card Brand limitation is to keep the prohibition against surcharging MasterCard and Visa credit card transactions in effect.

### 2.    Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

19.    Petco does business at 1,251 stores located in 49 states, the District of Columbia, and Puerto Rico.  Surcharging is illegal in 11 states and Puerto Rico – California, Colorado, Connecticut, Massachusetts, New York, Texas, Florida, Kansas, Oklahoma, Maine, and Utah. These states account for over 47% of our locations, which means that surcharging credit transactions is illegal over a large portion of our operations.

20.    I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include states where many Petco stores are located, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New

# A1720

Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, West Virginia, and Washington. Combined with states that already ban surcharging, these states account for 79% of our U.S. locations.

21.     Even if Petco were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill efforts to surcharge, especially in these states.

22.     The fact that surcharging is currently legally permitted in roughly 53% of our stores is problematic in and of itself.  For operational, training, and customer service reasons, we would not implement surcharging in 39 states, but not in the 11 that prohibit surcharging.

23.     For Internet sales, retailers may also need to consider both the surcharging laws of the states where they are located, and where their customers are located (and potentially the customer's billing, shipping, or buying location) in a given transaction.  The complexity of these rules will make it even more unlikely that we would implement surcharging.

**B.     The Other Relief in the Settlement Is of No Value to Petco**

24.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  Petco only operates under a single trade name or banner, and therefore this provision provides no benefit.

25.     Instead, Petco might benefit from the ability to test any changes to acceptance practices on a store-by-store basis, not across locations operated under different trade names. The all outlets provision in the settlement, therefore, does not provide Petco what we really need

6

– the ability to test new acceptance practices at a small number of stores within a distinct trade name.

26.     Petco also understands that Visa and MasterCard did not have rules against group buying prior to this settlement.  We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to our company.

**C.     The Release Is Far Too Broad**

27.     The Proposed Settlement's release is deeply concerning to Petco.  The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices.  And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us.

28.     The Proposed Settlement requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards."  Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."  Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording.  They also likely will argue that substantially similar rules and conduct going forward will be released.  We find it deeply unfair we have no ability to opt out of such a release.

29.     Petco is also concerned that the release will bar any legal challenge in the event

7

# A1722

that Visa and MasterCard use their Honor All Cards rules as "Honor All Devices" rules to force

merchants to accept all mobile transactions from Visa and MasterCard networks. The Proposed

Settlement includes mobile and any other new technology by defining "credit card" to include

"any other current or future code, device, or service . . . ." Settlement ¶ 1(u), (v). Because Visa

and MasterCard do not currently have significant volumes in mobile payments, this area presents

a unique opportunity for merchants to see new competition and avoid having mobile transactions

trapped in the current system. The release may stifle innovation in this space. We want the right

to freely choose when to accept mobile products, and we do not want to be forced to do so under

Visa's and MasterCard's Honor All Cards rules.

*    *    *    *

30.     Based on the current Proposed Settlement, it is clear to me that the lawyers who

negotiated the settlement did not adequately represent the interests of Petco.

31.     Petco is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

# A1723

32.     Petco joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for Petco's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May *24*, 2013

*Patty Ward* _____
Patricia Ward
Vice-President, Finance and Controller
Petco Animal Supplies, Inc.
9125 Rehco Road
San Diego, CA 92121

9

**A1724**

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1:05-md-1720-JG-JO |

### STATEMENT OF OBJECTIONS

WellPoint, Inc.; Anthem Blue Cross Life and Health Insurance Company; 1-800 CONTACTS, Inc.; Anthem Health Plans of Maine, Inc.; Anthem Health Plans of Kentucky, Inc.; Anthem Health Insurance Company of Nevada; Anthem Health Plans, Inc.; Anthem Health Plans of Virginia, Inc.; Anthem Health Plans of New Hampshire, Inc.; Anthem Life Insurance Company; Anthem Life & Disability Insurance Company; Anthem Insurance Companies, Inc.; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross of California Partnership Plan, Inc.; Blue Cross Blue Shield of Wisconsin; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Blue Cross of California; CareMore Health Plan of Colorado, Inc.; CareMore Health Plan of Arizona, Inc.; CareMore Health Plan of Nevada; CareMore Health Plan of Georgia, Inc.; Community Insurance Company; Claim Management Services, Inc.; CareMore Health Plan; DeCare Dental Networks, LLC; DeCare Dental Health International, LLC; Compcare Health Services Insurance Corporation; Empire HealthChoice HMO, Inc.; Empire HealthChoice Assurance, Inc.; Greater Georgia Life Insurance Company, Inc.; Golden West Health Plan, Inc.; HealthKeepers, Inc.; HMO Colorado, Inc.; Healthy Alliance Life Insurance Company; HealthLink HMO, Inc.; Matthew Thornton Health Plan, Inc.; HMO Missouri,

# A1725

Inc.; Rayant Insurance Company of New York; One Nation Insurance Company; Meridan Resource Company, LLC; Rocky Mountain Hospital and Medical Service, Inc.; RightCHOICE Insurance Company; UniCare Health Plan of Kansas, Inc.; UniCare Health Insurance Company of the Midwest; UniCare Health Plans of the Midwest, Inc.; UniCare Health Plans of Texas, Inc.; UniCare Health Plan of West Virginia, Inc.; WellPoint Insurance Services, Inc.; and UniCare Life & Health Insurance Company; (collectively "WellPoint") are members of the putative Rule Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.* WellPoint has opted out of the Cash Settlement Class.

WellPoint is a Class Member because it will accept Visa-Branded Cards and/or MasterCard Branded Cards in the United States in the future.

WellPoint objects to the settlement in this lawsuit. WellPoint objects to certification of the Rule Changes Settlement Class, and the proposed settlement for the Rule Changes Settlement Class. WellPoint's reasons for objecting, and the laws and evidence that support each objection, are set forth in the Memorandum In Support attached hereto.

My personal information is:
Name: Anthem Blue Cross Life and Health Insurance Company
Address: 21555 Oxnard Street, Woodland Hills, CA 91367
Phone Number: (414) 459-6510

Name: 1-800 Contacts, Inc.
Address: 66 E. Wadsworth Park Drive, Draper, UT 84020
Phone Number: (414) 459-6510

Name: Anthem Health Plans of Maine, Inc.
Address: 2 Gannett Drive, South Portland, ME 04106-6911
Phone Number: (414) 459-6510

Name: Anthem Health Plans of Kentucky, Inc.

# A1726

Address: 13550 Triton Boulevard, Louisville, KY 40223
Phone Number: (414) 459-6510

Name: Anthem Health Insurance Company of Nevada
Address: 700 Broadway, Denver, CO 80273
Phone Number: (414) 459-6510

Name: Anthem Health Plans, Inc.
Address: 370 Bassett Road, North Haven, CT 06473
Phone Number: (414) 459-6510

Name: Anthem Health Plans of Virginia, Inc.
Address: 2015 Staples Mill Road, Richmond, VA 23230
Phone Number: (414) 459-6510

Name: Anthem Health Plans of New Hampshire, Inc.
Address: 3000 Goffs Falls Road, Manchester, NH 03111-0001
Phone Number: (414) 459-6510

Name: Anthem Life Insurance Company
Address: 6740 North High Street, Worthington, OH 43085
Phone Number: (414) 459-6510

Name: Anthem Life & Disability Insurance Company
Address: 1 Liberty Plaza, 165 Broadway, New York, NY 10006
Phone Number: (414) 459-6510

Name: Anthem Insurance Companies, Inc.
Address: 120 Monument Circle, Indianapolis, IN 46204
Phone Number: (414) 459-6510

Name: Blue Cross and Blue Shield of Georgia, Inc.
Address: 3350 Peachtree Road, N.E., Atlanta, GA 30326
Phone Number: (414) 459-6510

Name: Blue Cross of California Partnership Plan, Inc.
Address: 21555 Oxnard Street, Woodland Hills, CA 91367
Phone Number: (414) 459-6510

Name: Blue Cross Blue Shield of Wisconsin
Address: N17 W34340 Riverwood, Waukesha, WI 53188
Phone Number: (414) 459-6510

Name: Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
Address: 3350 Peachtree Road, N.E., Atlanta, GA 30326
Phone Number: (414) 459-6510

# A1727

Name:  Blue Cross of California
Address: 21555 Oxnard Street, Woodland Hills, CA 91367
Phone Number: (414) 459-6510

Name: CareMore Health Plan of Colorado, Inc.
Address: 12900 Park Plaza Drive, Suite 150, Cerritos, CA 90703
Phone Number: (414) 459-6510

Name: CareMore Health Plan of Arizona, Inc.
Address: 12900 Park Plaza Drive, Suite 150, Cerritos, CA 90703
Phone Number: (414) 459-6510

Name: CareMore Health Plan of Nevada
Address: 12900 Park Plaza Drive, Suite 150, Cerritos, CA 90703
Phone Number: (414) 459-6510

Name: CareMore Health Plan of Georgia, Inc.
Address: 3350 Peachtree Road, N.E., Atlanta, GA 30326
Phone Number: (414) 459-6510

Name: Community Insurance Company
Address: 4361 Irwin-Simpson Road, Mason, OH 45040
Phone Number: (414) 459-6510

Name: Claim Management Services, Inc.
Address: 120 Monument Circle, Indianapolis, IN 46204
Phone Number: (414) 459-6510

Name: CareMore Health Plan
Address: 12900 Park Plaza Drive, Suite 150, Cerritos, CA 90703
Phone Number: (414) 459-6510

Name: DeCare Dental Networks, LLC
Address: 3560 Delta Dental Drive, Egan, MN 55122
Phone Number: (414) 459-6510

Name: DeCare Dental Health International, LLC
Address: 3560 Delta Dental Drive, Egan, MN 55122
Phone Number: (414) 459-6510

Name: Compcare Health Services Insurance Corporation
Address: N17 W24340 Riverwood, Waukesha, WI 53188
Phone Number: (414) 459-6510

Name: Empire HealthChoice HMO, Inc.

# A1728

Address: 1 Liberty Plaza, 165 Broadway, New York, NY 10006
Phone Number: (414) 459-6510

Name: Empire HealthChoice Assurance, Inc.
Address: 1 Liberty Plaza, 165 Broadway, New York, NY 10006
Phone Number: (414) 459-6510

Name: Greater Georgia Life Insurance Company, Inc.
Address: 3350 Peachtree Road, N.E., Atlanta, GA 30326
Phone Number: (414) 459-6510

Name: Golden West Health Plan, Inc.
Address: 21555 Oxnard Street, Woodland Hills, CA 91367
Phone Number: (414) 459-6510

Name: HealthKeepers, Inc.
Address: 2015 Staples Mill Road, Richmond, VA 23230
Phone Number: (414) 459-6510

Name: HMO Colorado, Inc.
Address: 700 Broadway, Denver, CO 80273
Phone Number: (414) 459-6510

Name: Health Alliance Life Insurance Company
Address: 1831 Chestnut Street, St. Louis, MO 63103
Phone Number: (414) 459-6510

Name HealthLink HMO, Inc.
Address: 1831 Chestnut Street, St. Louis, MO 63103
Phone Number: (414) 459-6510

Name: Matthew Thornton Health Plan, Inc.
Address: 3000 Goffs Falls Road, Manchester, NH 03111-001
Phone Number: (414) 459-6510

Name: HMO Missouri, Inc.
Address: 1831 Chestnut Street, St. Louis, MO 63103
Phone Number: (414) 459-6510

Name: Rayant Insurance Company of New York
Address: 1 Liberty Plaza, 165 Broadway, New York, NY 10006
Phone Number: (414) 459-6510

Name: OneNation Insurance Company
Address: 120 Monument Circle, Indianapolis, IN 46204
Phone Number: (414) 459-6510

**A1729**

Name: Meridian Resource Company, LLC
Address: 120 Monument Circle, Indianapolis, IN 46204
Phone Number: (414) 459-6510

Name: Rocky Mountain Hospital and Medical Service, Inc.
Address: 700 Broadway, Denver, CO 80273
Phone Number: (414) 459-6510

Name: RightCHOICE Insurance Company
Address: 1831 Chestnut Street, St. Louis, MO 63103
Phone Number: (414) 459-6510

Name: UniCare Health Plan of Kansas, Inc.
Address: 1 WeePoint Way, Thousand Oaks, CA 91362
Phone Number: (414) 459-6510

Name: UniCare Health Insurance Company of the Midwest
Address: 233 South Wacker Street, Suite 3700, Chicago, IL 60606
Phone Number: (414) 459-6510

Name: UniCare Health Plans of the Midwest, Inc.
Address: 233 South Wacker Street, Suite 3700, Chicago, IL 60606
Phone Number: (414) 459-6510

Name: UniCare Health Plans of Texas, Inc.
Address: 233 South Wacker Street, Suite 3700, Chicago, IL 60606
Phone Number: (414) 459-6510

Name: UniCare Health Plan of West Virginia, Inc.
Address: 1 WellPoint Way, Thousand Oaks, CA 91362
Phone Number: (414) 459-6510

Name: WellPoint Insurance Services, Inc.
Address: c/o Arthur Gallagher, Captive Services Hawaii, 1132 Bishop Street, 16th
        Fl., Honolulu, HI 96813
Phone Number: (414) 459-6510

Name: UniCare Life & Health Insurance Company
Address: 233 South Wacker Street, Suite 3700, Chicago, IL 60606
Phone Number: (414) 459-6510

Name: WellPoint, Inc.
Address: 120 Monument Circle, Indianapolis, IN 46204
Phone Number: (414) 459-6510

# A1730

The contact information for WellPoint's lawyers in this matter is:

Gregory A. Clarick
Clarick Gueron Reisbaum LLP
40 West 25th Street
New York, New York 10010
(212) 633-4310
gclarick@cgr-law.com

Robert N. Webner
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
rnwebner@vors.com

Kenneth J. Rubin
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
kjrubin@vorys.com

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By:  /s/ Gregory Clarick
     Gregory A. Clarick
     40 West 25th Street
     New York, New York 10010
     (212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

     Robert N. Webner
     Kenneth J. Rubin
     52 East Gay Street
     Columbus, Ohio 43215
     (614) 464-6400

*Attorneys for Anthem Blue Cross Life and Health Insurance Company; 1-800 CONTACTS, Inc.; Anthem Health Plans of Maine, Inc.; Anthem Health Plans of Kentucky, Inc.; Anthem Health Insurance Company of Nevada; Anthem Health Plans, Inc.; Anthem Health Plans of Virginia, Inc.; Anthem Health Plans of New Hampshire, Inc.; Anthem Life Insurance Company; Anthem Life & Disability Insurance Company; Anthem Insurance Companies, Inc.; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross of California Partnership Plan, Inc.; Blue Cross Blue Shield of Wisconsin; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Blue Cross of California; CareMore Health Plan of Colorado, Inc.; CareMore Health Plan of Arizona, Inc.; CareMore Health Plan of Nevada; CareMore Health Plan of Georgia, Inc.; Community Insurance Company; Claim Management Services, Inc.; CareMore Health Plan; DeCare Dental Networks, LLC; DeCare Dental Health International, LLC; Compcare Health Services Insurance Corporation; Empire HealthChoice HMO, Inc.; Empire HealthChoice Assurance, Inc.; Greater Georgia Life Insurance Company, Inc.; Golden West Health Plan, Inc.; HealthKeepers, Inc.; HMO Colorado, Inc.; Healthy Alliance Life Insurance Company; HealthLink HMO, Inc.; Matthew Thornton Health Plan, Inc.; HMO Missouri, Inc.; Rayant Insurance Company of New York; One Nation Insurance Company; Meridan Resource Company, LLC; Rocky Mountain Hospital and Medical Service, Inc.; RightCHOICE Insurance Company; UniCare Health Plan of Kansas, Inc.; UniCare Health Insurance Company of the Midwest; UniCare Health Plans of the Midwest, Inc.; UniCare Health Plans of Texas, Inc.; UniCare Health Plan of West Virginia, Inc.; WellPoint Insurance*

**A1732**

*Services, Inc.; UniCare Life & Health Insurance Company; and WellPoint, Inc.*

# A1733

**CERTIFICATE OF SERVICE**

I, Gregory A. Clarick, hereby certify that on May 27, 2013, I caused a true and correct copy of the foregoing STATEMENT OF OBJECTIONS to be electronically filed with the Clerk of the Court in accordance with the Eastern District's Rules on Electronic Service, and served via U.S. mail upon Class Counsel, Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, and Counsel for the Defendants, Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019

/s/Gregory Clarick
Gregory A. Clarick

# A1734

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

---

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:  ALL ACTIONS

MDL Docket No. 1:05-md-1720-JG-JO

---

**MEMORANDUM IN SUPPORT OF OBJECTIONS
OF PUTATIVE RULE 23(b)(2) CLASS MEMBERS
WELLPOINT, INC., 1-800 CONTACTS, INC., ANTHEM BLUE CROSS LIFE AND
HEALTH INSURANCE COMPANY, ANTHEM HEALTH INSURANCE COMPANY OF
NEVADA, ANTHEM HEALTH PLANS, INC., ANTHEM HEALTH PLANS OF
KENTUCKY, INC., ANTHEM HEALTH PLANS OF MAINE, INC., ANTHEM HEALTH
PLANS OF NEW HAMPSHIRE, INC., ANTHEM HEALTH PLANS OF VIRGINIA,
INC., ANTHEM INSURANCE COMPANIES, INC., ANTHEM LIFE & DISABILITY
INSURANCE COMPANY, ANTHEM LIFE INSURANCE COMPANY, BLUE CROSS
AND BLUE SHIELD OF GEORGIA, INC., BLUE CROSS BLUE SHIELD
HEALTHCARE PLAN OF GEORGIA, INC., BLUE CROSS BLUE SHIELD OF
WISCONSIN, BLUE CROSS OF CALIFORNIA, BLUE CROSS OF CALIFORNIA
PARTNERSHIP PLAN, INC., CAREMORE HEALTH PLAN, CAREMORE HEALTH
PLAN OF ARIZONA, INC., CAREMORE HEALTH PLAN OF COLORADO, INC.,
CAREMORE HEALTH PLAN OF GEORGIA, INC., CAREMORE HEALTH PLAN OF
NEVADA, CLAIM MANAGEMENT SERVICES, INC., COMMUNITY INSURANCE
COMPANY, COMPCARE HEALTH SERVICES INSURANCE CORPORATION,
DECARE DENTAL HEALTH INTERNATIONAL, LLC, DECARE DENTAL
NETWORKS, LLC, EMPIRE HEALTHCHOICE ASSURANCE, INC., EMPIRE
HEALTHCHOICE HMO, INC., GREATER GEORGIA LIFE INSURANCE COMPANY,
INC., GOLDEN WEST HEALTH PLAN, INC., HEALTHLINK HMO, INC.,
HEALTHKEEPERS, INC., HEALTHY ALLIANCE LIFE INSURANCE COMPANY,
HMO COLORADO, INC., HMO MISSOURI, INC., MERIDIAN RESOURCE
COMPANY, LLC, MATTHEW THORNTON HEALTH PLAN, INC., ONENATION
INSURANCE COMPANY, RAYANT INSURANCE COMPANY OF NEW YORK,
RIGHTCHOICE INSURANCE COMPANY, ROCKY MOUNTAIN HOSPITAL AND
MEDICAL SERVICE, INC., UNICARE HEALTH INSURANCE COMPANY OF THE
MIDWEST, UNICARE HEALTH PLAN OF KANSAS, INC., UNICARE HEALTH
PLANS OF THE MIDWEST, INC., UNICARE HEALTH PLANS OF TEXAS, INC.,
UNICARE HEALTH PLAN OF WEST VIRGINIA, INC., UNICARE LIFE AND
HEALTH INSURANCE COMPANY, AND WELLPOINT INSURANCE SERVICES,
INC. TO THE PROPOSED RULE 23(b)(2) SETTLEMENT AGREEMENT**

---

# A1735

## I.      PRELIMINARY STATEMENT

The Rule 23(b)(2) class in this case is broadly defined to include "all persons, businesses, and other entities" that have accepted, or will in the future accept, "Visa-Branded Cards and/or MasterCard-Branded Cards in the United States."  Many WellPoint, Inc. subsidiaries (the "WellPoint Objectors") fall within that definition because they now accept, and expect to continue to accept in the future, credit card payments.

Many of the WellPoint Objectors offer health insurance coverage for individuals.  Those entities are differently situated than the millions of retail merchants in the putative Rule 23(b)(2) class, and have a different interest in interchange fees, because health insurers are subject to special regulation under the Patient Protection and Affordable Care Act (the "Act") and state law.  The WellPoint Objectors object to the proposed Rule 23(b)(2) settlement because it does not allow them to opt out and preserve their ability to protect themselves from Visa's and MasterCard's setting of interchange fees that may have a special impact on health insurers.

By virtue of the "individual mandate" and other provisions of the Act, it is likely that, in the future, health insurance increasingly will be purchased by individuals – some of whom will want to use credit cards to make payments for such insurance.  The potential for increased future use of credit cards in buying and paying for health insurance has dramatic consequences for the WellPoint Objectors, because the Act's "Medical Loss Ratio" strictly limits the amounts insurers can spend on matters other than clinical care and health care quality improvement activities.  Federal regulations indicate that interchange fees, and other fees imposed by MasterCard and

2

Visa on credit card transactions, do not fall into either category for purposes of Medical Loss Ratio calculations. Rather, they are administrative costs that would expose the WellPoint Objectors to increased risk of the rebate payments that are imposed by federal law if Medical Loss Ratio requirements are not met.

The WellPoint Objectors therefore cannot afford to agree to a sweeping, permanent Rule 23(b)(2) release that binds their hands and prevents them from later taking action to protect against unlawful increases in credit card interchange fees by Visa and MasterCard. They object to the proposed Rule 23(b)(2) settlement because no non-opt-out class can be certified under Rule 23(b)(2) and because the proposed settlement – and its singular impact on health insurers – is not fair, reasonable, or adequate without opt-out rights being afforded. They therefore urge this Court to modify the proposed Rule 23(b)(2) settlement to allow them to opt out.

## II. FACTUAL AND REGULATORY BACKGROUND

Many of WellPoint, Inc.'s subsidiaries are engaged in the business of providing health care insurance and related administrative services to employers and individuals. *See* Decl. of David Kretschmer ¶2.[1] For example, the WellPoint Objectors provide Blue Cross and Blue

---

[1] The WellPoint Objectors are WellPoint, Inc., 1-800 CONTACTS, Inc., Anthem Blue Cross Life and Health Insurance Company, Anthem Health Insurance Company of Nevada, Anthem Health Plans, Inc., Anthem Health Plans of Kentucky, Inc., Anthem Health Plans of Maine, Inc., Anthem Health Plans of New Hampshire, Inc., Anthem Health Plans of Virginia, Inc., Anthem Insurance Companies, Inc., Anthem Life & Disability Insurance Company, Anthem Life Insurance Company, Blue Cross and Blue Shield of Georgia, Inc., Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., Blue Cross Blue Shield of Wisconsin, Blue Cross of California, Blue Cross of California Partnership Plan, Inc., CareMore Health Plan, CareMore Health Plan of Arizona, Inc., CareMore Health Plan of Colorado, Inc., CareMore Health Plan of Georgia, Inc., CareMore Health Plan of Nevada, Claim Management Services, Inc., Community Insurance Company, CompCare Health Services Insurance Corporation., DeCare Dental Health International, LLC, DeCare Dental Networks, LLC, Empire HealthChoice Assurance, Inc., Empire HealthChoice HMO, Inc., Greater Georgia Life Insurance Company, Inc., Golden West Health Plan, Inc., HealthLink HMO, Inc., HealthKeepers, Inc., Healthy Alliance Life Insurance Company, HMO Colorado, Inc., HMO Missouri, Inc., Meridian Resource Company, LLC, Matthew Thornton Health Plan, Inc., OneNation Insurance Company, Rayant Insurance Company of New York, RightCHOICE Insurance Company, Rocky Mountain Hospital and Medical Service, Inc., UniCare Health Insurance Company of the Midwest, UniCare Health Plan of Kansas, Inc., UniCare Health Plans of the Midwest, Inc., UniCare Health Plans of Texas, Inc., UniCare Health Plan of West Virginia, Inc., Unicare Life & Health Insurance Company, and WellPoint Insurance Services, Inc.

Many of the entities listed above do business in the health insurance area, but some, such as 1-800-CONTACTS, do not. WellPoint, Inc. and the subsidiaries listed above have opted out of the Rule 23(b)(3) class and

3

Shield-branded products and services in 14 states (Colorado, Nevada, Connecticut, Indiana, Kentucky, Maine, Missouri, New Hampshire, Ohio, Virginia, Wisconsin, California, New York, and Georgia), offer UniCare-branded products across the country, and provide other health plan services in certain markets through the CareMore subsidiaries.  *Id.*

The WellPoint Objectors are in the proposed Rule 23(b)(3) and Rule 23(b)(2) classes because they have accepted, and will accept, "Visa-Branded Cards and/or MasterCard-Branded Cards in the United States."   Definitive Class Settlement Agreement ("DCSA"), ¶ 2(a), (b), ECF No. 1656-1.  At present, due to concerns about high costs, including the cost of interchange fees, the WellPoint Objectors that offer health insurance only accept an individual's credit card payments for initial premium payments and payments made by telephone.  *See*  Kretschmer Decl. ¶3.

However, there is significant industry uncertainty about what may happen in the future due to the Patient Protection and Affordable Care Act (the "Act").  *Id.* ¶4.  The Act and its "individual mandate" that requires currently uninsured persons to obtain health insurance, *see* 26 U.S.C. § 5000A,[2] are expected by many to cause a fundamental shift in the means by which Americans obtain health insurance, from the current employer-based model to one in which individuals buy insurance for themselves and their families.  *See* Kretschmer Decl. ¶4.

 The expected expansion of the individual market is likely to lead to an increase in the number of health insurance premium payments that WellPoint Objectors will receive by credit card.  Kretschmer Decl. ¶5.  In addition, state regulators that are developing the rules to be

---

object to the Rule 23(b)(2) settlement on the grounds that a mandatory Rule 23(b)(2) class cannot be certified under that rule pursuant to *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), and that the Rule 23(b)(2) settlement is not fair, reasonable, or adequate without opt-out rights being afforded.  This brief is offered to focus specifically on the unique impact of the Rule 23(b)(2) settlement on the WellPoint Objectors who provide health insurance, as a result of the regulations imposed upon health insurers by the Patient Protection and Affordable Care Act.

 [2] The "individual mandate" provisions are described in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012).

applied to the health care exchanges and other aspects of the Act may require health insurers, as a matter of state law or as a condition of participation in state or federally sponsored health insurance exchanges, to accept premiums from individual consumers through credit cards. *Id.* ¶6. As a result, the shift to individual purchases of health insurance also is expected to produce a shift to increasing payments by credit cards. *Id.* ¶7.

That expected increase in individual purchases of health insurance through use of credit cards will have a special impact on health insurance companies as a result of the Act's creation of the Medical Loss Ratio ("MLR"). Kretschmer Decl. ¶8. The MLR requires health insurers to submit data on the proportion of premium revenues (after certain limited exclusions and adjustments)[3] spent each year on clinical services for enrollees and certain qualifying health care quality improvement activities, and to issue rebates to certain eligible enrollees if the resulting percentage falls below specified standards. *Id.*; *see also* 42 U.S.C. § 300gg-18(a), (b); 45 C.F.R. § 158.140. For individual policies, the MLR requires insurers to spend at least 80 percent of premium dollars on clinical services and health care quality improvement activities and to make rebate payments if they do not meet that requirement. *See* Kretschmer Dec. ¶9; *see also* 42 U.S.C. § 300gg-18(b)(1)(A)(ii).

As a result of the margin pressures exerted by the MLR and the rebate requirement, the WellPoint Objectors, along with other health insurers, are incentivized to reduce any cost items that would not be categorized as involving clinical services or health care quality improvement activities for purposes of calculating the MLR. *See* Kretschmer Decl. ¶10; *cf.* 42 U.S.C. § 300gg-18(a)(3).

---

[3] The regulations define "earned premium" as "all monies paid by a policyholder or subscriber as a condition of receiving coverage from the issuer, including any fees or other contributions associated with the health plan." 45 C.F.R. § 158.130(a).

5

# A1739

The regulations promulgated under the Act indicate that interchange fees would be viewed as administrative costs that would not count as clinical services or health care quality improvement activities. *See* Kretschmer Decl. ¶11; *see also* 45 C.F.R. § 158.140(b)(3); *id.* § 158.150(c); *id.* § 158.160(b). Accordingly, every dollar spent on interchange fees would, for purposes of the Act's MLR formula, count against the WellPoint Objectors that offer individual health insurance. More specifically, if the payment of the interchange fees were to cause the WellPoint Objectors not to meet their 80 percent MLR requirement in a given year and therefore were to create a rebate obligation for the WellPoint Objectors, those WellPoint Objectors in effect would be paying twice for interchange fees – once when an individual enrollee used a credit card to make his or her payment, and again when a rebate payment to the enrollee is made. Kretschmer Decl. ¶11.

Because of the anticipated increase in purchases of health insurance by individuals using credit cards, and because of the enormous pressures on margins for the entire health insurance industry created by the MLR, the WellPoint Objectors view interchange fees on credit cards as potentially a very material cost item. Kretschmer Decl. ¶12. The WellPoint Objectors therefore do not want to release any claims they may have in the future concerning interchange fees or other fees that Visa and MasterCard may impose on credit card payments for health insurance. *Id.* ¶13. The WellPoint Objectors want to maintain their ability to deal flexibly with interchange fee issues as the federal and state regulatory requirements are developed and as the impact of interchange fees on the WellPoint Objectors and the MLR requirements are clarified in the future. *Id.* The WellPoint Objectors therefore have opted out of the Rule 23(b)(3) settlement and object to the Rule 23(b)(2) settlement because it does not allow them to opt out. *Id.*

## III.   ARGUMENT

6

# A1740

The Rule 23(b)(2) settlement gives no apparent consideration to how it might affect health insurers or the devastating interplay of the settlement release, the Patient Protection and Affordable Care Act, and the Medical Loss Ratio.  That unfortunate reality is not surprising, because none of the named plaintiffs who support the Rule 23(b)(2) settlement are involved in the health insurance field.  *See* Mem. in Supp. of Class Pls' Joint Mot. for Award of Atty. Fees, Expenses, and Class Pls' Awards, at 24-25 nn. 21, 22 & Exs. 6-15, ECF No. 2113.

Nevertheless, the broad Rule 23(b)(2) class and settlement, if approved, would have a profound potential impact on the WellPoint Objectors and other health insurers.  It not only would eliminate their interchange fee claims, it would prevent them from ever challenging MasterCard and Visa rules and practices with respect to interchange fees and other charges – even after the Act and related state regulations are fully implemented, and even if skyrocketing interchange fee costs make the WellPoint Objectors subject to potentially crippling rebate payments.  *See* DCSA ¶¶ 68-71.  Amazingly, it also would <u>affirmatively enjoin</u> the WellPoint Objectors from asserting such claims against Visa and MasterCard in the future.  *Id.* ¶ 95(j).

This Court should decline to certify the Rule 23(b)(2) class as a mandatory, non-opt out class because the putative class does not comply with *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), and should hold that the WellPoint Objectors may opt out of the Rule 23(b)(2) class. The Court also should conclude that, because of its unique and potentially devastating impact on the WellPoint Objectors, the mandatory Rule 23(b)(2) class settlement is not fair, reasonable, and adequate and must be modified to permit the WellPoint Objectors to opt out.

> **A.   The Rule 23(b)(2) Class May Not Be Certified Because The Proposed
> <u>Settlement Does Not Benefit All Putative Class Members</u>**

7

# A1741

This Court must first evaluate whether the proposed class can be certified as a non-opt-out class under Rule 23(b)(2). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-22 (1997). It cannot, for reasons stated in *Dukes*.

In *Dukes*, the Supreme Court noted that "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or to none of them." 131 S. Ct. at 2557 (internal quotation marks omitted). Rule 23(b)(2) therefore presupposes unified, similarly situated classes such as exist, for example, in cases in which all members of the class are subject to the same discrimination that is remediable by a single classwide order. *Id.* at 2557-58.

In this case, in contrast, the Act and the developing state regulations ensure that health insurers are not, and will not be, similarly situated to other putative Rule 23(b)(2) class members. By requiring a broad release and including language that seemingly locks in the ability of Visa and MasterCard to set whatever interchange rates they desire, a settlement that is supposed to benefit class members is likely to instead punish health insurers by exposing them to rebate payments pursuant to the Act's MLR requirements and stripping them of any ability to remedy that ongoing exposure.

Moreover, the proposed Rule 23(b)(2) settlement does not satisfy the requirement that, in a Rule 23(b)(2) class, "the relief sought must perforce affect the entire class at once." *Dukes*, 131 S. Ct. at 2558. The surcharging option that is the principal element of the "consideration" provided to Rule 23(b)(2) class members, *see* DCSA ¶¶ 42, 48, 55, 61, would not positively affect the WellPoint Objectors for several reasons. Certain of the WellPoint Objectors that provide health insurance do business in five states in which surcharging is barred by law –

8

California, New York, Connecticut, Colorado, and Maine[4] – and those states collectively represent a significant portion of the headcount of persons insured by the WellPoint Objectors. *See* Kretschmer Decl. ¶14.  Insurance regulators in other states ultimately may decide to prohibit health insurers from exacting surcharges on individual enrollees who want to pay by credit card. *Id.* ¶16.  Moreover, the notice and reporting requirements that the Rule 23(b)(2) settlement imposes on businesses that elect to surcharge would increase administrative costs -- and those additional costs would have a further adverse impact on the ability of the WellPoint Objectors that offer individual health insurance to satisfy the MLR requirements.  *Id.* ¶15.

Due process considerations lie at the core of the *Dukes* Court's evaluation of the proper scope of Rule 23(b)(2), *see* 131 S. Ct. at 2559, and they also form the heart of the WellPoint Objectors' objection to the proposed Rule 23(b)(2) settlement in this case.  No one apparently considered or represented the unique interests of health insurers when the proposed Rule 23(b)(2) settlement was reached.  As a result, the WellPoint Objectors that are health insurers are confronted with a mandatory release, negotiated by lawyers they did not authorize to act on their behalf, that would deprive them of their ability to contest fees and other charges that may be set by Visa and MasterCard and that could leave them subject to enormous, ongoing liabilities under a federal law that does not apply to the vast majority of the putative Rule 23(b)(2) class.

Such as result does not comport with due process.  This Court therefore should hold that the proposed Rule 23(b)(2) settlement must be modified to give the WellPoint Objectors opt-out rights that satisfy due process requirements and to allow them to preserve their rights to take

---

[4] *See* Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. Ann. § 5-2-212(1); Conn. Gen. Stat. Ann. § 42-133ff(a); Maine Rev. Stat. Ann. Tit. 9-A, § 8-303(2); N.Y. Gen. Bus. Law § 518.  In addition, proposals to ban surcharging are pending in four other states in which the WellPoint Objectors provide Blue Cross or Blue Shield-branded products and services  *See* Kretschmer Aff. ¶2; *see also* Kevin Wack, *18 States Considering Bans on Credit Card Surcharges*, AM BANKER, March 28, 2013 (proposals to outlaw surcharging pending in Indiana, Kentucky, Missouri, Nevada, and a number of other states).

9

# A1743

action in the future concerning the interchange fee-setting practices of Visa and MasterCard.  *Cf. Dukes*, 131 S. Ct. at 2558-59; *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

> **B.      The Proposed Rule 23(b)(2) Class Settlement Should Be Rejected Because It
> Is Not Fair, Reasonable, Or Adequate To The WellPoint Objectors**

This Court also should reject the proposed Rule 23(b)(2) settlement because, without also allowing the WellPoint Objectors to opt out, its terms are not fair, reasonable, and adequate to class members.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).

In evaluating the fairness, reasonableness, and adequacy of the settlement, this Court must first review the negotiating process that led to the settlement and consider whether plaintiffs' counsel "'possessed the [necessary] experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'"  *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) (alteration in original) (quoting *D'Amato*, 236 F.3d at 85).  Here, it does not appear that class plaintiffs' counsel had the information, experience, or knowledge that would have allowed them to properly represent the interests of health insurers in negotiating the terms of the Rule 23(b)(2) settlement.  The proof of that pudding is in the tasting – the proposed Rule 23(b)(2) settlement provides no meaningful relief to the WellPoint Objectors and instead would extinguish their ability to avoid material administrative costs imposed by Visa and MasterCard that may expose the WellPoint Objectors to rebate obligations under a targeted federal statute.

Nor is the proposed Rule 23(b)(2) settlement substantively fair.  There is no reason why the WellPoint Objectors that offer health insurance, with their unique interests and regulatory concerns, should be included in a mandatory class that consists primarily of retail merchants. The settlement provides no material benefit to the WellPoint Objectors that provide health

# A1744

insurance because their approach to credit card payments differs significantly from the approaches of retail merchants.

Even more important, the likely future of health insurers – to be governed by the Act, the MLR, and federal and state regulations that have yet to be fully finalized or applied – is certain to be dramatically different from the likely future of retail merchants. As a result, the overbroad release that will be imposed on members of the putative Rule 23(b)(2) class will have a profoundly different impact on health insurers than on retail merchants. If health insurers cannot challenge Visa's and MasterCard's abilities to charge whatever they wish as interchange fees or as other fees, they may be consigned to a future of ongoing MLR rebate penalties that, under federal law, are of no concern to the overwhelming majority of the purported Rule 23(b)(2) class.

A proposed settlement that has such a disparate and inequitable impact on different members of the putative Rule 23(b)(2) class cannot be deemed fair, reasonable, or adequate. *See, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858-59 (1999); *Amchem*, 521 U.S. at 627; *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir. 1981). This Court therefore should modify the proposed Rule 23(b)(2) settlement to allow the WellPoint Objectors to opt out and preserve their ability to protect their unique interests with respect to the setting of interchange fees by Visa and MasterCard.

## IV.    CONCLUSION

A non-opt-out class may not be certified under Rule 23(b)(2) because the relief provided does not benefit all class members and, instead, would operate to disadvantage the WellPoint Objectors and other health insurers that are subject to the Patient Protection and Affordable Care Act and its Medical Loss Ratio requirements. The mandatory release of potential future claims of health insurers against Visa and MasterCard – which would render the WellPoint Objectors that provide health insurance unable to protect themselves from the setting of interchange fees

11

# A1745

that may subject them to special rebate penalties that cannot be imposed on the vast majority of the putative class – also demonstrates that a non-opt-out settlement is not fair, reasonable, or adequate.  This Court should modify the proposed Rule 23(b)(2) settlement to allow the WellPoint Objectors to opt out and to preserve their ability to deal with their potential future claims related to interchange fees set by MasterCard and Visa.

Respectfully Submitted,

CLARICK GUERON REISBAUM LLP
By:   /s/Gregory A. Clarick
        Gregory A. Clarick
        40 West 25th Street
        New York, New York 10010
        (212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

        Robert N. Webner
        Kenneth J. Rubin
        52 East Gay Street
        Columbus, Ohio 43215
        (614) 464-6400

*Attorneys for WellPoint Objectors*

12

# A1746

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Relates To:  ALL ACTIONS | MDL Docket No. 1:05-md-1720-JG-JO |

## <u>DECLARATION OF DAVID KRETSCHMER</u>

I, David Kretschmer, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am Senior Vice President, Treasurer, and Chief Investment Officer of WellPoint, Inc.  In that capacity, I am responsible for addressing issues related to the payment methods that WellPoint, Inc. and its subsidiaries (collectively, the "WellPoint companies") will accept for their products and services.  I am of lawful age and make this declaration upon personal knowledge and in support of the Objections of WellPoint, Inc. and its subsidiary companies to the proposed Rule 23(b)(2) class and settlement agreement.

2.      Many of the WellPoint companies are engaged in the business of providing health care insurance and related administrative services to employers and individuals.  For example, the WellPoint companies provide Blue Cross and/or Blue Shield-branded products and services within 14 states (Colorado, Nevada, Connecticut, Indiana, Kentucky, Maine, Missouri, New Hampshire, Ohio, Virginia, Wisconsin, California, New York, and Georgia), offer UniCare-branded products across the country, and provide other health plan services in certain markets through the CareMore subsidiaries.

# A1747

3.      Many of the WellPoint companies are included in the Rule 23(b)(2) and Rule 23(b)(3) classes in this case because they have accepted, and will in the future accept, Visa-Branded Cards and MasterCard-Branded Cards for certain types of payments from their customers.  However, payments by credit card currently represent a small percentage of the total payments for health care premium received by the WellPoint companies.  At present, the WellPoint companies that offer health care insurance only accept credit card payments by individuals for their initial premium payments and for payments made by telephone.  This limited approach to acceptance of credit cards is primarily attributable to the high cost of this payment method, including the payment of interchange fees.

4.      However, there is significant industry uncertainty about what may happen in the future due to the Patient Protection and Affordable Care Act (the "Act").  The "individual mandate" that requires currently uninsured individuals to obtain health insurance, and other provisions of the Act, are expected by many to cause a fundamental shift in the means by which Americans become covered by health insurance, from the current employer-based model, in which most insured Americans receive health care coverage through their employers, to an individual-based model, in which Americans purchase insurance for themselves and their families through health insurance exchanges established by the states or the federal government or through other means.

5.      The expected expansion of the individual market is likely to lead to an increase in the number of health insurance premium payments that WellPoint companies will receive by credit card, given that a certain percentage of individual consumers that already have health coverage appear to prefer that method of payment.  In addition, due to that apparent customer preference for credit cards, there may be increased competitive pressure on health insurance

2

# A1748

companies to accept credit cards in the future as the method for making all manner of payments due under health insurance plans.

6.    Health insurance also is subject to significant regulation at the state level.  The WellPoint companies anticipate that, as a matter of state law or as a condition of participation in state or federally sponsored exchanges, health insurers may be required to accept premium payments from individual consumers through credit cards.  Although the rules to be applied to the exchanges, and to other aspects of the Act, are still in the process of being developed and finalized in many states, regulators who are involved in that process in some states have begun inquiring into what payment channels insurers will accept.

7.    As a result of these considerations, the shift to individual purchases of health insurance is expected to produce a shift to increasing payments by credit cards.

8.    The expected increase in individual purchases of health insurance through use of credit cards will have a special impact on health insurance companies as a result of the Act's creation of a medical loss ratio requirement (the "Medical Loss Ratio").  The Medical Loss Ratio requires health insurance issuers to submit data on the proportion of premium revenues (after certain limited exclusions and adjustments) spent each year on clinical services for enrollees and certain qualifying health care quality improvement activities (collectively, the "Qualifying Expenditures"), and to issue rebates to certain eligible enrollees if the resulting percentage falls below specified standards.

9.    For individual policies, the Medical Loss Ratio requires insurance companies to spend at least 80 percent of premium dollars on the Qualifying Expenditures.  Generally speaking, if an insurance company were for example to pay in a given year 78 percent of the adjusted premium dollars it collected for individual policies on Qualifying Expenditures, the

# A1749

insurance company would be required under the Act to rebate the 2 percent difference between the 78 percent and the 80 percent Medical Loss Ratio amount back to certain eligible enrollees.

10.      As a result of the margin pressures exerted by the Medical Loss Ratio and the rebate requirement, the WellPoint companies, along with other health insurers, are incentivized to reduce any cost items that would not be categorized as Qualifying Expenditures.

11.      The regulations promulgated under the Act indicate that interchange fees would be viewed as administrative costs that would not count as Qualifying Expenditures. Accordingly, every dollar spent on interchange fees would for purposes of the Act's Medical Loss Ratio formula count against the WellPoint companies that offer individual health insurance. More specifically, if the payment of the interchange fees were to cause the WellPoint companies not to meet their Medical Loss Ratio requirement in a given year and therefore were to create a rebate obligation for the WellPoint companies, those WellPoint companies in effect would be paying twice for interchange fees – once when an individual enrollee used a credit card to make his or her payment, and again when a rebate payment to the enrollee is made.

12.      Because of the anticipated increase in purchases of health insurance by individuals using credit cards, and because of the enormous pressures on margins for the entire health insurance industry created by the Medical Loss Ratio, the WellPoint companies view interchange fees on credit cards as potentially a very material cost item.

13.      The WellPoint companies do not want to release any claims that they may have in the future concerning interchange fees or other fees that Visa and MasterCard may impose on individual credit or debit card transactions involved in the purchase of health insurance.  The WellPoint companies want to maintain their ability to deal flexibly with interchange fee issues as the federal and state regulatory requirements are developed and as the impact of interchange fees

4

# A1750

on the WellPoint companies and the Medical Loss Ratio requirements are clarified in the future. The WellPoint companies therefore object to the proposed Rule 23(b)(2) settlement in this action and have opted out of the Rule 23(b)(3) settlement so as to avoid any argument that they have released their current or potential claims concerning interchange fees and related rules.

14.     The surcharging option established by the proposed Rule 23(b)(2) settlement is not a viable option for the WellPoint companies.  Certain WellPoint companies offer health insurance in five of the states in which surcharging is generally prohibited as a matter of state law:  California, New York, Connecticut, Colorado, and Maine.  These are some of the states in which the WellPoint companies have the most members, and they collectively represent a significant portion of the total headcount of persons enrolled in health care plans insured or administered by the WellPoint companies.  Further, the fact that the WellPoint companies do business in some states that ban surcharging also means that the WellPoint companies could not establish a consistent enterprise-wide policy on surcharging for health insurance payments and realize the administrative efficiencies that come from following such a uniform approach.

15.     In addition, the nature of the surcharging remedy, including the notice and reporting requirements established by the proposed Rule 23(b)(2) settlement, would impose additional administrative costs on WellPoint companies that offer health insurance, and those additional costs would have an adverse impact on the ability of those companies to satisfy the Medical Loss Ratio requirements.

16.     It also is possible that state and/or federal insurance regulators may not permit health insurers to impose surcharges on enrollees.  Furthermore, any health insurance company that imposed surcharges on enrollees who paid with credit cards would be at a competitive disadvantage in marketing their health insurance products to consumers.  Consumers tend to be

5

# A1751

extremely cost-sensitive in their decision-making on purchasing health insurance products and have, in the past, resisted the imposition of add-on fees related to such payments.

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  Indianapolis, Indiana
        May 17, 2013

_____
David Kretschmer

5/15/2013 16604340

JOINT DEFERRED APPENDIX CONTINUED
IN FOLLOWING VOLUME