# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),
13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON),
14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON),
14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON),
14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),
14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON)
14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON),
14-530-cv(CON), 14-567-cv(CON),14-584-cv(CON), 14-606-cv(CON),
14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

_____

*On Appeal from the United States District Court
for the Eastern District of New York*

## JOINT DEFERRED APPENDIX
## VOLUME VIII OF XXII
## Pages A1752 to A2000

*Submitted on Behalf of All Parties*

# **Table of Contents**

**Page**

## **Volume I**

District Court Docket Entries ................................................................. A1

## **Volume II**

District Court Docket Entries (cont'd) ................................................. A251

## **Volume III**

District Court Docket Entries (cont'd) ................................................. A501

## **Volume IV**

District Court Docket Entries (cont'd) ................................................. A751

Transfer Order, dated October 20, 2005 [Docket No. 2] ...................... A822

Excerpts of First Consolidated Amended Class Action Complaint,
    dated April 24, 2006 [Docket No. 317] ......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238, dated July 21, 2006
    [Docket No. 455-4] ........................................................................ A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238,
    dated July 21, 2006 [Docket No. 455-5] ........................................ A850

Excerpts of First Amended Supplemental Class Action Complaint
    (redacted), dated February 20, 2009 [Docket No. 1152] ............... A856

Excerpts of Second Consolidated Amended Class Action
    Complaint (redacted), dated February 20, 2009
    [Docket No. 1153] ........................................................................ A858

i

**Table of Contents**
**(continued)**

**Page**

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154] ................ A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ........................................... A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] ......................................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533] ................ A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536] ........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ........................................................... A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ................................ A945

**Volume V**

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545] ................ A1011

# **Table of Contents**
## (continued)

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
    Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
    Rule 56.1(b) (redacted), dated October 21, 2011
    [Docket No. 1550] ........................................................ A1014

Excerpts of Network Defendants' Memorandum in Opposition to
    the Individual Plaintiffs' Motion for Summary Judgment
    (redacted), dated October 21, 2011 [Docket No. 1551]................. A1030

Excerpts of European Commission Notification Pursuant to Article
    254 of the EC Treaty (redacted), dated November 23, 2011
    [Docket No. 1573-3] ....................................................... A1032

Notice of Filing of Memorandum of Understanding,
    dated July 13, 2012 [Docket No. 1587] ......................................... A1042

Memorandum of Understanding, dated July 13, 2012
    [Docket No. 1588] ......................................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
    [Docket No. 1588-1] ....................................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
    dated August 21, 2012 [Docket No. 1616-3]................................. A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
    Approval, dated October 19, 2012 [Docket No. 1656].................. A1086

Excerpts of Appendices to Definitive Class Settlement
    Agreement,dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
    Honorable John Gleeson, US District Judge,
    dated November 9, 2012 [Docket No. 1732]................................ A1096

**Table of Contents**
**(continued)**

**Page**

Excerpts of Revised Appendix F2: Notice of Class Action
    Settlement Authorized by the U.S. District Court, Eastern
    District of New York, dated November 26, 2012
    [Docket No. 1740-2] ....................................................................  A1098

Class Settlement Preliminary Approval Order,
    dated November 27, 2012 [Docket No. 1745]...............................  A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
    Plaintiffs' Motion to Stay Class Settlement Preliminary
    Approval Order, dated November 29, 2012 [Docket No. 1751] ...  A1111

Letter from Class Counsel to Judge Orenstein,
    dated December 10, 2012 [Docket No. 1760] ...............................  A1114

Excerpts of Defendants' Memorandum in Support of Final
    Approval of Definitive Class Settlement Agreement,
    dated April 11, 2013 [Docket No. 2110] .......................................  A1118

Excerpts of Memorandum in Support of Class Plaintiffs'
Motion
    for Final Approval of Settlement, dated April 11, 2013
    [Docket No. 2111-1] .....................................................................  A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
    of Class Plaintiffs' Motion for Final Approval of Settlement,
    dated April 11, 2013 [Docket No. 2111-2]....................................  A1131

Declaration of Eric D. Green, dated April 11, 2013
    [Docket No. 2111-3] .....................................................................  A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
    Class Settlement, dated April 11, 2013 [Docket No. 2111-5] .......  A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
    Administrator's Implementation of Settlement Notice Plan,
    dated April 11, 2013 [Docket No. 2111-6]....................................  A1200

iv

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
    Implementation and Adequacy of Settlement Notice Program,
    dated April 11, 2013 [Docket No. 2113-7].................................... A1215

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
    Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........ A1238

**Volume VI**

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
    Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
    (Cont'd)............................................................................................ A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
    Plaintiffs' Motion for Final Approval of Settlement and Class
    Plaintiffs' Joint Motion for Award of Attorneys' Fees,
    Expenses and Class Plaintiffs' Awards,
    dated April 11, 2013 [Docket No. 2113-6].................................... A1296

Excerpts of Objection of City of Oakland to Final Approval of
    Proposed Settlement, dated May 15, 2013 [Docket No. 2279] ..... A1434

Retailers and Merchants' Objection to Final Approval of the Class
    Action Definitive Settlement Agreement, dated May 15, 2013
    [Docket No. 2281] ......................................................................... A1437

Objection of U.S. Public Interest Research Group to Final
    Approval of Proposed Class Settlement, dated May 23, 2013
    [Docket No. 2361] ......................................................................... A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
    dated May 23, 2013 [Docket No. 2364] ........................................ A1476

Statement of Objections of B & H Foto Electronics Corp.,
    d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........ A1480

**Table of Contents**
**(continued)**

**Page**

Excerpts of Statement of Objections by Boscov's,
      dated May 24, 2013 [Docket No. 2411] ........................................   A1483

Retailers and Merchants' Objection to Final Approval of the Class
      Action Definitive Settlement Agreement, dated May 24, 2013
      [Docket No. 2421] ........................................................   A1486

**Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
      Action Definitive Settlement Agreement, dated May 24, 2013
      [Docket No. 2421] (cont'd) ...........................................   A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] ..............   A1512

Excerpts of Objections of First Data Corporation, First Data
      Merchant Services, TASQ Technology, Inc., TRS Recovery
      Services Inc., First Data Government Solutions, and TeleCheck
      Services Inc. to Final Approval of Definitive Class Settlement
      Agreement, dated May 24, 2013 [Docket No. 2427] ....................   A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
      Proposed Settlement, dated May 24, 2013 [Docket No. 2432] .....   A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
      Approval of the Settlement, dated May 24, 2013
      [Docket No. 2433] ........................................................   A1541

Excerpts of Objection of David's Bridal to Final Approval of the
      Proposed Settlement, dated May 24, 2013 [Docket No. 2434] .....   A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
      Proposed Settlement, dated May 24, 2013 [Docket No. 2435] .....   A1553

Declaration of John R. Manna, Vice President Operational
      Controller, Lowe's Companies, Inc., dated May 24, 2013
      [Docket No. 2437] ........................................................   A1555

**Table of Contents**
(continued)

**Page**

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2438] ........................................................... A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2439] ........................................................... A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2441] ........................................................... A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
    Final Approval of the Proposed Settlement, dated May 25,
    2013 [Docket No. 2444] ................................................. A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2445] ..................... A1588

Excerpts of Objection of Carter's to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2446] ..................... A1601

Objection of Coborn's Incorporated to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
    Final Approval of the Proposed Settlement,
    dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
    the Settlement, dated May 25, 2013 [Docket No. 2449] .............. A1615

Objection of Alon USA, LP to Final Approval of the Proposed
    Settlement, dated May 25, 2013 [Docket No. 2450] ..................... A1621

# **Table of Contents**
## (continued)

**Page**

Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2451] ........................................................................  A1627

Objection of IKEA US to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2458] ....................  A1632

Objection of Jetro Holdings, LLC to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2459] .....  A1650

Objection of Michaels Stores, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2460] .....  A1656

Objection of NATSO Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2461] ....................  A1659

Objection of National Restaurant Association to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2464] ........................................................................  A1667

Objection of Panera Bread Company to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2466] .....  A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2467] ....................  A1681

Objection of Retail Industry Leaders Association to Final Approval
of the Settlement, dated May 25, 2013 [Docket No. 2469]...........  A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2470] ........................................................................  A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2471] ..............  A1699

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of The Wendy's Company to Final Approval
    of the Proposed Settlement, dated May 25, 2013
    [Docket No. 2473] ........................................................ A1703

Objection of National Grocers Association to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
    [Docket No. 2493] ........................................................ A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
    Class Members WellPoint, Inc., etc., to the Proposed Rule
    23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2493-1] ...................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
    Objections of WellPoint Entities, dated May 17, 2013
    [Docket No. 2493-2] ...................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
    Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
    [Docket No. 2495] ........................................................ A1752

**Table of Contents**
(continued)

**Page**

Excerpts of Memorandum in Support of Objections of Absent
    Putative Rule 23(b)(2) Class Members Target Corporation,
    Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
    Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
    L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
    Ross Company, Closeout Distribution, Inc., Ascena Retail
    Group, Inc., Abercrombie & FitchCo., OfficeMax
    Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
    Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
    American Signature, Inc. to the Proposed Rule 23(b)(2) Class
    and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2495-1] ....................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,*
    *v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
    dated May 27, 2013 [Docket No. 2495-2] ..................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
    [Docket No. 2509] .......................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
    Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
    Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
    Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
    Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517] ........... A1828

Statement of Objections of Office Depot, Inc., Viking Office
    Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
    and Solutions4Sure.com, Inc., dated May 27, 2013
    [Docket No. 2519] .......................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
    Superstore East, Inc., Staples the Office Superstore, LLC,
    Staples Contract & Commercial, Inc., Quill Corporation, Quill
    Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
    Thrive Networks, Inc., and SchoolKidz.com,
    dated May 27, 2013 [Docket No. 2525] ......................................... A1836

x

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Michael S. Weisbach,
dated May 27, 2013 [Docket No. 2533-2]......................................A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
Settlement, dated May 27, 2013 [Docket No. 2534].....................A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
Settlement, dated May 27, 2013 [Docket No. 2536].....................A1847

Objections to Final Approval of Proposed Class Action Settlement
and Notice of Intent to Appear of The Iron Barley Restaurant,
Homestead Restaurant (Historical Homestead, Inc.), The Feral
Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
(d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
dated May 28, 2013 [Docket No. 2537].........................................A1850

National Retail Federation Statement of Objection to Final
Approval of the Proposed Rule 23(B)(2) Agreement,
dated May 28, 2013 [Docket No. 2538].........................................A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2].......A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
dated May 28, 2013 [Docket No. 2538-20]..................................A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
[Docket No. 2538-21]..................................................................A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
[Docket No. 2540] ........................................................................A1924

Objection of National Cooperative Grocers Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2546] ........................................................................A1926

xi

**Table of Contents**
**(continued)**

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
  Proposed Settlement, dated May 28, 2013 [Docket No. 2559] ..... A1934

Objection of National Association of Convenience Stores to Final
  Approval of Proposed Settlement, dated May 28, 2013
  [Docket No. 2561] ....................................................................... A1942

Objection of Affiliated Foods Midwest to Final Approval of the
  Proposed Settlement, dated May 28, 2013 [Docket No. 2563] ..... A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
  Settlement, dated May 28, 2013 [Docket No. 2587] .................... A1963

The Home Depot's Statement of Objections to the Proposed Class
  Settlement and Memorandum in Support, dated May 28, 2013
  [Docket No. 2591] ....................................................................... A1973

**Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
  Settlement and Memorandum in Support, dated May 28, 2013
  [Docket No. 2591] (Cont'd) ......................................................... A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
  Home Depot's Objection to the Proposed Class Settlement,
  dated May 28, 2013 [Docket No. 2591-2]..................................... A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
  Settlement, dated May 28, 2013 [Docket No. 2592] .................... A2028

Objection of Consumers Union of United States, Inc. to Final
  Approval of Proposed Class Settlement, dated May 28, 2013
  [Docket No. 2598] ....................................................................... A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
  Settlement, dated May 28, 2013 [Docket No. 2605] .................... A2040

# **Table of Contents**
## (continued)

**Page**

Excerpts of Objection of Starbucks to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2606] ..... A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
Partners LLC, dated May 28, 2013 [Docket No. 2613]................. A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
dated May 28, 2013 [Docket No. 2613-1].................................... A2075

Objection of National Community Pharmacists Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2619] ......................................................................... A2107

Statement of Objections and Amici Curiae Brief of States to Final
Approval of the Settlement, dated May 28, 2013
[Docket No. 2623] ......................................................................... A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643] .................... A2147

Excerpts of Declaration of David Cote in Support of BlueCross
BlueShield of South Carolina Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-3]................. A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
and Blue Shield of Arizona, Inc. Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-4]................. A2180

Excerpts of Declaration of Matthew Brolly in Support of
Independence Blue Cross Objections to Proposed Settlement,
dated May 28, 2013 [Docket No. 2643-6].................................... A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
Cross of Northeastern Pennsylvania Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-7]................. A2184

xiii

## Table of Contents
### (continued)

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28,
2013 [Docket No. 2644] ................................................................. A2186

Excerpts of Objection of American Express Company, American
Express Travel Related Services Company, Inc., Travel
Impressions, Ltd., American Express Publishing Corp., Serve
Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee,
USA, Amex Assurance Company, and Accertify, Inc. to the
Class Settlement Agreement, dated May 28, 2013 [Docket No.
2648] ........................................................................................... A2213

Declaration of Stephen B. McCurdy in Support of Objections of
American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

### Volume X

Notice of Motion of DFS Services LLC and Discover Bank to
Intervene, dated May 28, 2013 [Docket No. 2655] ...................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013
[Docket No. 2657-6] ...................................................................... A2252

Objection of DFS Services LLC, Discover Loans, Inc., and
Discover Bank to Final Approval of Proposed Settlement,
dated May 28, 2013 [Docket No. 2659] ....................................... A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule
23(b)(3) Damages Case, dated May 28, 2013
[Docket No. 2663] ........................................................................ A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in
Opposition to Motion for Final Approval of Settlement, dated
May 28, 2013 [Docket No. 2670] ................................................. A2278

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Jeffrey I. Shinder in Support of
    Opposition to Class Plaintiffs' Motion for Final Approval of
    the Proposed Class Settlement, dated May 28, 2013
    [Docket No. 2670-1].................................................................... A2300

Excerpts of Report of Professor Jerry Hausman,
    dated May 28, 2013 [Docket No. 2670-5].................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: "Industry Facts Concerning Debit Card Regulation
    Under Section 920," by Stephen Craig Mott,
    BetterBuyDesigns, on Behalf of the Merchants Payments
    Coalition, submitted to Federal Reserve System, October 29,
    2010; Attachment F: "2011 Interchange Fee Revenue, Covered
    Issuer Costs, and Covered Issuer and Merchant Fraud Losses
    Related to Debit Card Transactions," Board of Governors of
    the Federal Reserve System, March 5, 2013
    [Docket No. 2670-6].................................................................... A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
    Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
    - Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
    Reactions to Credit Card Settlement", by Maria Aspan and
    Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
    Analysis of the Proposed Interchange Fee Litigation
    Settlement," by Adam J. Levitin, Georgetown Law and
    Economics Research Paper No. 12-033, August 21, 2012; Ex.
    70: The Nilson Report, February 2013, Issue 1,011; American
    Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
    "Merchant Surcharging – Understanding Payment Card
    Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
    to Support the U.S. Merchant Litigation Settlement," Visa,
    2013; Ex, 77: "Notice of MasterCard Rule Changes,"
    MasterCard Worldwide, December 2012; Ex. 78:
    Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
    Territories, regarding Merchant Class Action Litigation
    Settlement – Important Changes to Merchant Acceptance

**Table of Contents**
(continued)

Page

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses
Q2 2012 Results - Earnings Call Transcript," Visa, May 20,
2013; Ex. 84: "New Visa, MasterCard fees stir debate within
industry," The Green Sheet Online, March 12, 2013; Ex. 94:
MasterCard Incorporated Management Discusses Q2 2012
Results - Earnings Call Transcript, May 20, 2013; Ex. 95:
MasterCard's CEO Discusses Q4 2012 Results - Earnings Call
Transcript, May 20, 2013 [Docket No. 2670-8] ........................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder:
Ex. 97: "Reform of Australia's Payments System: Preliminary
Conclusions of the 2007/08 Review," Reserve Bank of Australia,
April, 2008; Ex. 108: Amended and Restated Global Restructuring
Agreement [Docket No. 2670-9] .................................................. A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed
Class Settlement Agreement, dated June 5, 2013
[Docket No. 3074] ....................................................................... A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013
[Docket No. 3755] ....................................................................... A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed
Class Settlement Agreement, dated June 6, 2013
[Docket No. 4237] ....................................................................... A2405

Excerpts of Statement of Objections of the Society of Independent
Gasoline Marketers of America, dated June 7, 2013
[Docket No. 4640] ....................................................................... A2407

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated June 7, 2013 [Docket No. 4654] ...................... A2415

**Table of Contents**
**(continued)**

Page

Statement of Objections of Life Time Fitness, Inc.,
    dated June 11, 2013 [Docket No. 5385] ........................................ A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
    dated June 11, 2013 [Docket No. 5406] ...................................... A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
    [Docket No. 5651] ........................................................................ A2434

Excerpts of Defendants' Reply Memorandum in Support of
    Final Approval of Definitive Class Settlement Agreement,
    dated August 16, 2013 [Docket No. 5937].................................... A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
    Further Support of Settlement Final Approval,
    dated August 16, 2013 [Docket No. 5939] ................................... A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
    [Docket No. 5939-3] ..................................................................... A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
    to the Proposed Class Settlement (redacted),
    dated August 16, 2013 [Docket No. 5939-5]................................ A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
    Plaintiffs' Motion for Final Approval of the Proposed Class
    Settlement, dated August 16, 2013 [Docket No. 5939-6].............. A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
    Joint Motion for Award of Attorneys' Fees, Expenses and
    Class Plaintiffs' Awards, dated August 16, 2013
    [Docket No. 5940] ........................................................................ A2471

Excerpts of Reply Memorandum in Support of FDC's
    Motion to Opt Out of Rule 23(b)(2) Class Settlement,
    dated August 23, 2013 [Docket No. 5957] ................................... A2473

xvii

**Table of Contents**
**(continued)**

**Page**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] ................................... A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] (Cont'd) .................... A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
Report of Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5978] ........................................................................ A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5982] ........................................................................ A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
Correct Misstatements in Supplemental Declaration of
Craig Wildfang and in Opposition to Final Approval,
dated September 10, 2013 [Docket No. 6006-1] ........................... A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-2] ..................................................................... A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-3] ..................................................................... A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-4] ..................................................................... A2553

**Table of Contents**
**(continued)**

Page

Excerpts of Transcript of Fairness Heating before the
    Honorable John Gleeson, U.S. District Court Judge,
        dated September 12, 2013 [Docket No. 6094]............................... A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
        dated December 13, 2013 [Docket No. 6125] ............................... A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
        dated December 13, 2013 [Docket No. 6126] ............................... A2588

Notice of Appeal of Target Group Objectors,
        dated December 13, 2013 [Docket No. 6128] ............................... A2589

Notice of Appeal of National Retail Federation,
        dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
        [Docket No. 6175] ......................................................................... A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
    WellPoint Objectors, dated January 10, 2014
        [Docket No. 6176] ......................................................................... A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
        [Docket No. 6178] ......................................................................... A2602

Notice of Appeal of First Data Corporation, First Data Merchant
    Services, TASQ Technology, Inc., TRS Recovery Services,
    Inc., First Data Government Solutions, and Telecheck Services,
    Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
    Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
    Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
    Tousled Hair Studio), and Kristina Newman – Hair,
        dated January 10, 2014 [Docket No. 6182] .................................. A2606

## **Table of Contents**
### **(continued)**

**Page**

Notice of Appeal of U.S. PIRG, dated January 13, 2014
    [Docket No. 6189] ........................................................ A2608

Notice of Appeal of Consumers Union of United States, Inc.,
    dated January 13, 2014 [Docket No. 6190] ................................ A2609

Amended Notice of Appeal of Target Group Objectors,
    dated January 21, 2014 [Docket No. 6212] ................................ A2610

Amended Notice of Appeal of Temple Eagle,
    dated January 13, 2014 [Docket No. 6227] ................................ A2611

Notice of Appeal of National Federation of Independent Business,
    dated February 7, 2014 [Docket No. 6234] ................................ A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
    Objectors and WellPoint Objectors, dated February 7, 2014
    [Docket No. 6238] ........................................................ A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
    Homestead Restaurant (Historical Homestead, Inc.), The Feral
    Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
    (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
    dated February 13, 2014 [Docket No. 6245] ................................ A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
    (Amending Notice Of Appeal Filed December 13, 2013),
    dated February 13, 2014 [Docket No. 6248] ................................ A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
    Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
    dated February 13, 2014 [Docket No. 6251] ................................ A2625

# **Table of Contents**
## (continued)

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
LLC and Temple Eagle Partners LLC, dated February 18, 2014
[Docket No. 6257] ........................................................................ A2626

Amended Notice of Appeal of R & M Objectors,
dated February 25, 2014 [Docket No. 6263] ................................ A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
dated June 25, 2009 ...................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
Credit Cards: *Rising Interchange Fees Have Increased Costs
for Merchants, but Options for Reducing Fees Pose
Challenges*, dated 11/2009 ........................................................... A2638

Final Judgment as to Defendants MasterCard International
Incorporated and Visa Inc., *U.S. v. American Express Co*.,
CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
CV-4996 DE 143]........................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

## **Volume XII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd).................................................. A2751

## **Volume XIII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd).................................................. A3001

## **Volume XIV**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd).................................................. A3251

# **Table of Contents**
## (continued)

**Page**

### **Volume XV**

Visa International Operating Regulations,
  dated October 15, 2012 (Cont'd) ................................... A3501

### **Volume XVI**

Visa International Operating Regulations,
  dated October 15, 2012 (Cont'd) ................................... A3751

### **Volume XVII**

Interlink Network, Inc. Operating Regulations,
  dated November 15, 2012 ............................................. A4009

### **Volume XVIII**

MasterCard Rules, dated April 11, 2012 ............................... A4259

### **Volume XIX**

MasterCard Rules, dated April 11, 2012 (Cont'd) .............................. A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
  Case T-111/08, Judgment of the General Court
  (Seventh Chamber), dated May 24, 2012 ...................... A4614

Minute Order deeming all pending motions for relief withdrawn
  without prejudice to reinstatement if the settlement is not
  consummated, dated July 17, 2012................................. A4616

Minute Order upholding Judge Orenstein's order denying
  disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

**Table of Contents**
**(continued)**

**Page**

Excerpts of Class Settlement Agreement, *In re Am. Express
Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2].............................................   A4623

**Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express
Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2] (Cont'd).............................   A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for
Final Approval of Class Action Settlement, *In re: American
Express Anti-Steering Rules Antitrust Litig*., 11-md-2221
(NGG)(RER), (Redacted - Public Version), dated April 15,
2014 [Docket No. 11-md-2221 DE 362] ......................................   A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American
Express Anti-Steering Rules Antitrust Litig*., 11-md-02221
(NGG)(RER) (redacted), dated April 15, 2014
[Docket No. 11-md-2221 DE 370] ................................................   A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee
and Merchant Discount Antitrust Litig*., No. 14-md-1720
(JG)(JO), dated July 18, 2014
[Docket No. 14-md-1720 DE 104] ................................................   A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card
Interchange Fee and Merchant Discount Antitrust Litig*.,
No. 14-md-1720 (JG)(JO), dated July 18, 2014
 [Docket No. 14-md-1720 DE 105] ...............................................   A4836

**Table of Contents**
**(continued)**

**Page**

### Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
    Judgment of the Court (Third Chamber),
    dated September 11, 2014.............................................................. A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.*
    *Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
    dated September 26, 2014 [Docket No. 13-cv-5746 DE 41]......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
    No. 13-4537 ................................................................................. A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
    Education ..................................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
    U.S. District Court, Eastern District of New York ...................... A5090

### Volume XXII

*Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
    (filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
    to Individual Plaintiffs' Statement of Undisputed Facts,
    Pursuant to Local Rule 56.1(b) (filed under seal),
    dated May 6, 2011 [Docket No. 1477-7]....................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
    There is No Genuine Issue to be Tried (filed under seal), dated
    February 11, 2011 [Docket No. 1478-4] ....................................... A5125

**Table of Contents**
**(continued)**

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
  dated July 2, 2009 [Docket No. 2088]............................................. A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
  under seal), dated December 14, 2009 [Docket No. 2088]........... A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
  seal), dated December 14, 2009 [Docket No. 2088]...................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
  dated May 3, 2011 [Docket No. 2088] .......................................... A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
  dated May 3, 2011 [Docket No. 2088] .......................................... A5191

Memorandum of Law in Support of Motion to Intervene of DFS
  Services LLC and Discover Bank (filed under seal), dated May
  28, 2013 [Docket No. 2657-1]........................................................ A5200

Declaration of Jennifer M. Selendy (filed under seal),
  dated May 28, 2013 [Docket No. 2657-3].................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
  dated May 28, 2013 [Docket No. 2657-4].................................... A5231

Declaration of Roger Hochschild (filed under seal),
  dated May 28, 2013 [Docket No. 2657-5].................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
  Notice of Class Action Settlement Authorized by the U.S.
  District Court, Eastern District of New York (filed under seal)
  [Docket No. 2657-7]....................................................................... A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
  dated July 2, 2009 ......................................................................... A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
  dated December 15, 2009 .............................................................. A5295

xxv

**<u>Table of Contents</u>**
**(continued)**

**<u>Page</u>**

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
    dated June 22, 2010 ....................................................................... A5297

# A1752

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD
INTERCHANGE FEE AND MERCHANT
DISCOUNT ANTITRUST LITIGATION

MDL Docket No. 1:05-md-1720-JG-JO

### STATEMENT OF OBJECTIONS

Target Corporation, Target Commercial Interiors, Inc., and TCC Cooking Co. (collectively "Target") are members of the putative Rule Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.* Target has opted out of the Cash Settlement Class.

Target is a Class Member because it will accept Visa Branded Cards and/or MasterCard Branded Cards in the United States in the future.

Target objects to the settlement in this lawsuit. Target objects to certification of the Rule Changes Settlement Class, and the proposed settlement for the Rule Changes Settlement Class. Target's reasons for objecting, and the laws and evidence that support each objection, are set forth in the Memorandum In Support attached hereto.

My personal information is:

Name: Target Corporation
Address: 1000 Nicollet Mall, Minneapolis, MN 55403
Telephone Number: 612-304-6073

Name: Target Commercial Interiors, Inc.
Address: 81 South Ninth Street, Suite #350, Minneapolis, MN 55402
Telephone Number: 612-304-6073

PAGE INTENTIONALLY LEFT BLANK

Name: TCC Cooking Co. (f/k/a Pikes Peak Direct Marketing Inc.)
Address: 5700 Centennial Blvd., Colorado Springs, CO 80919
Telephone Number: 719-272-2600

The contact information for the lawyers representing Target in this matter is:

Gregory A. Clarick
Clarick Gueron Reisbaum LLP
40 West 25th Street
New York, New York 10010
(212) 633-4310
gclarick@cgr-law.com

Michael J. Canter
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
mjcanter@vorys.com

Robert N. Webner
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
rnwebner@vorys.com

Kenneth J. Rubin
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
kjrubin@vorys.com

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By:  /s/ Gregory Clarick
Gregory A. Clarick
40 West 25th Street
New York, New York 10010
(212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

Michael J. Canter
Robert N. Webner
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400

*Attorneys for Target Corporation, Target Commercial Interiors, Inc., and TCC Cooking Co.*

# A1755

**CERTIFICATE OF SERVICE**

I, Gregory A. Clarick, hereby certify that on May 27, 2013, I caused a true and correct copy of the foregoing STATEMENT OF OBJECTIONS to be electronically filed with the Clerk of the Court in accordance with the Eastern District's Rules on Electronic Service, and served via U.S. mail upon Class Counsel, Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, and Counsel for the Defendants, Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019.


/s/Gregory Clarick
Gregory A. Clarick

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION <br><br> This Document Relates To:  ALL ACTIONS | MDL Docket No. 1:05-md-1720-JG-JO |

## MEMORANDUM IN SUPPORT OF OBJECTIONS
## OF
## ABSENT PUTATIVE RULE 23(b)(2) CLASS MEMBERS
## TARGET CORPORATION, MACY'S, INC., KOHL'S CORPORATION, THE TJX COMPANIES, INC., STAPLES, INC., J.C. PENNEY CORPORATION, INC., OFFICE DEPOT, INC., L BRANDS, INC., BIG LOTS STORES, INC., PNS STORES, INC., C.S. ROSS COMPANY, CLOSEOUT DISTRIBUTION, INC., ASCENA RETAIL GROUP, INC., ABERCROMBIE & FITCH CO., OFFICEMAX INCORPORATED, SAKS INCORPORATED, THE BON-TON STORES, INC., CHICO'S FAS, INC., LUXOTTICA U.S. HOLDINGS CORP., AND AMERICAN SIGNATURE, INC.
## TO
## THE PROPOSED RULE 23(b)(2) CLASS
## AND
## RULE 23(b)(2) SETTLEMENT AGREEMENT

A.     **The Proposed Rule 23(b)(2) Settlement Class May Not Be Certified**

*Wal-Mart Stores v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541 (2011), sets forth clear rules to govern certification under Rule 23(b)(2).  This settlement violates those rules in two ways:  it does not provide uniform, indivisible, immediate relief to all class members, and the "consideration" it offers to the class is, in reality, future monetary relief that is not incidental to any injunctive relief.  This Court therefore cannot approve the settlement class under Rule 23(b)(2) and should modify the settlement to allow the Target Objectors to opt out.

1.     **The Rule 23(b)(2) Class Cannot Be Certified Because The Relief Provided Admittedly Does Not Apply Equally To All Class Members**

Rule 23(b)(2) applies only in narrow circumstances that are not found in this case.  *Dukes* teaches that "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" 131 S. Ct. at 2557 (internal quotation marks omitted).  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*  Thus, in a Rule 23(b)(2) class, "the relief sought must perforce affect the entire class at once." *Id.* at 2558.

The Rule 23(b)(2) settlement provides *no* injunctive relief or declaratory relief against Visa and MasterCard.  That reality, alone, precludes certification of a settlement class under Rule 23(b)(2).  Class plaintiffs have simply agreed that Visa and MasterCard may make substantively identical changes to their rules that will allow limited surcharging, through which retailers may attempt to recoup future interchange fees from their customers who use debit or credit cards to make purchases.  *See* DCSA ¶¶ 42, 48, 55, 61.  The relief provided by the surcharging scheme

7

# A1758

therefore not only is not injunctive or declaratory, it is not even relief that will be obtained from Visa and MasterCard.  In effect, innocent retail customers would be paying what are in reality future damages caused by Visa's and MasterCard's anticompetitive conduct.

Furthermore, the principal "relief" the settlement provides – the opportunity for class members to surcharge their customers – does not qualify for Rule 23(b)(2) treatment because it will not provide relief uniformly, indivisibly, and immediately to the entire putative class.  Class plaintiffs concede that the surcharging scheme does *not* uniformly apply to the class.  *See* Class Pls' Mem., 37.  Surcharging is barred by law in 11 states.[5]  Retailers in those states thus will receive no "relief" from that settlement provision.  Moreover, the "level playing field" provision of the settlement precludes surcharging Visa and MasterCard transactions if, for example, a retailer accepts American Express, which does not allow surcharging. *See* DCSA ¶¶ 42(a)(iv), 55(a)(iv).  Class plaintiffs estimate that *6 million* putative class members that accept American Express cards – that is, *half of the class* – will not be allowed to surcharge notwithstanding the provisions of the settlement.  Class Pls' Mem. 33 n.36, 37-38.  In addition, the settlement allows Visa and MasterCard to discriminate among members of the putative class by buying off the surcharge rights of particular merchants, further balkanizing what is supposed to be a uniformly affected class.  DCSA ¶¶ 42(f), 55(f).  Finally, merchants that are otherwise eligible to surcharge may decline to do so due to concerns about losing customers or for other individualized reasons.[6]

---

[5] *See* Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. Ann. 5-2-212(1); Conn. Gen. Stat. Ann. §. 42-133ff(a); Fla. Stat. Ann. § 501.0117(1); Kan. Stat. Ann. § 16a-2-403; Maine Rev. Stat. Ann. tit. 9-A, § 8-303(2); Mass. Gen. Laws Ann. ch. 140D, § 28A(a)(2); N.Y. Gen. Bus. Law § 518; Okla Stat. Ann. tit. 14A, § 2-417; Tex. Fin. Code Ann. § 339.001(a); Utah Code Ann. § 13-38a-302.  Legislation creating similar bans is pending in another 17 states. *See* Kevin Wack, *18 States Considering Bans on Credit Card Surcharges* AM. BANKER March 28, 2013 (proposals to outlaw surcharging pending in Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Nevada, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Vermont, and West Virginia). After the *American Banker* article was published, Utah enacted its statute.

[6] Class plaintiffs' expert, Alan Frankel, concedes that "consumers react differently (and more strongly) to surcharges than they react to discounts," that prior surcharging in the United States caused a "public backlash," and that consumers perceive surcharges as "penalties." Frankel Decl. ¶¶ 29, 36 & n.38, 48, ECF N. 2111-5.  Visa itself

In short, the changes to the no-surcharge rule will *not* provide uniform, indivisible relief to members of the putative Rule 23(b)(2) class, because most members will not immediately benefit from the surcharging remedy.  Accordingly, even if the absence of an injunction or declaratory relief were not disqualifying, the settlement does not provide the uniform, indivisible, and immediate classwide relief that Rule 23(b)(2) requires.  Therefore, a mandatory, non-opt-out Rule 23(b)(2) class cannot be certified.[7]

**2.     The Rule 23(b)(2) Class Should Not Be Certified Because It Provides "Monetary Relief" That Is Not Incidental To Any Injunctive Relief**

*Dukes* also held that claims for "monetary relief" may not be certified under Rule 23(b)(2) where "the monetary relief is not incidental to the injunctive or declaratory relief" sought by the action and that "claims for *individualized* relief (like the backpay at issue here) do not satisfy the Rule."  131 S. Ct. at 2557.  The Court was motivated by due process concerns and a desire to avoid scenarios where "individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from."  *Id.* at 2559.  That possibility "underscores the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone – a choice Rule 23(b)(2) does not ensure that they have."  *Id.*; *cf. Ortiz,* 527 U.S. at 842, 844 (suggesting that application of Rule 23(b)(3) protections "avoids serious constitutional concerns raised by

---

has admitted that when surcharging occurs, consumers will "shop for the good or service at a competing store."  *Id.* ¶ 42 (quoting Visa U.S.A. White Paper, VUSAMD1-09042437, at 5). Merchants also may decline to surcharge because surcharging would be governed by a complicated set of rules, with claimed violations punishable by Visa and MasterCard.  *See* DCSA ¶¶ 42, 48, 55, 61.

[7] *See also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 263 (3d Cir. 2011) (concluding that class could not be certified under Rule 23(b)(2) because medical monitoring relief was not a single injunction that would provide relief to each member of putative class); *Grovatt v. St. Jude Med. (In re St. Jude Med., Inc. Silzone Heart Valve Prods. Liab. Litig.)*, 425 F.3d 1116, 1122 (8th Cir. 2005) (rejecting Rule 23(b)(2) certification where "each plaintiff's need (or lack of need)" for proposed prospective relief was "highly individualized"); *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 897–98 (7th Cir. 1999) ("Rule 23(b)(2) is designed for all-or-none cases in which 'final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate.'") (quoting Rule 23(b)(2) Advisory Committee's Note (1966)); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (denying 23(b)(2) certification because "no single declaration or injunction" would benefit all members of class that included both current and former vehicle owners).

# A1760

mandatory class resolution of individual legal claims, especially where a class seeks to resolve future liability in a settlement-only action"); *Hecht v. United Collection Bur., Inc.*, 691 F.3d 218, 222 (2d Cir. 2012) ("Absent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is 'predominantly' for money damages.").

<b>a.     The Analysis Of Whether Monetary Relief Is Incidental<br>Should Consider All Relief Provided By The Settlement</b>

In this case, Visa and MasterCard clearly want to receive a broad, forward-looking release that would apply to all merchants for all time. They cannot achieve that result under Rule 23(b)(3), because the right to opt out guaranteed by that rule allows class members to avoid such a release. As a result, Visa and MasterCard have turned to Rule 23(b)(2) because that rule does not, on its face, require that class members be given opt-out rights.

Visa and MasterCard also recognize that, if the case were treated as a single class action, it could never be certified under Rule 23(b)(2) because the more than $6 billion to be paid to class members pursuant to the plan of distribution, *see* DCSA, App. I, is inconsistent with the limitations of the Rule as described in *Dukes*. Accordingly, the settlement attempts to divide a single class into two artificial halves in order to impose a mandatory release, from which no opt-out is permitted, that will forever shield Visa and MasterCard from future lawsuits. That effort is consciously designed to evade the import of *Dukes* and must be rejected by this Court.

As *Dukes* instructs, when a putative class action seeks monetary relief that is other than "incidental" to injunctive relief, it should be certified only pursuant to Rule 23(b)(3) and absent class members must be afforded a full opportunity to opt out. In *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc. (In re Visa Check/MasterMoney Antitrust Litig.,)*, 280 F.3d 124, 147 (2d Cir. 2001), *overruled in part on other ground by Miles v. Merrill Lynch & Co. (In re Initial Publ. Offering Sec. Litig.),* 471 F.3d 24, 42 (2s Cir. 2006), the Second Circuit noted that "the primary concern

# A1761

about certifying a class with significant damages under Rule 23(b)(2) is the absence of mandatory notice and opt-out rights" and found that once a court determines that Rule 23(b)(3) certification is proper, it should defer to that rule.  The Second Circuit further observed that "when a district court certifies a class under both Rule 23(b)(2) and (b)(3), major problems can arise . . . where different procedural consequences attach depending upon the subsection used." *Id.* (alteration in original) (internal quotation marks omitted).

This Court must follow *Dukes* and *Visa Check* and reject the attempt to artificially divide this case for settlement purposes.  This case must be treated as one involving a single class of merchants that accept Visa and MasterCard.  That unitary class cannot be certified under Rule 23(b)(2) because the monetary relief component of the settlement is not "incidental" to injunctive relief.  *Dukes*, 131 S. Ct. at 2560.  The class thus can only be certified under Rule 23(b)(3), and all class members must be allowed to opt out pursuant to that Rule.  *See Sheppard v. Consol. Edison Co. of NY, Inc.,* No. 94-CV-0403, 2002 U.S. Dist. LEXIS 16314, at *4 (E.D.N.Y. Aug. 1, 2002) (Gleeson, J.) (approving Rule 23 (b)(3) settlement class that included damages and "significant injunctive relief"); *see also Brown v. Yellow Transp.*, *Inc.*, No. 08 C 5908, 2011 U.S. Dist. LEXIS 52345, at *22-23 (N.D. Ill. May 11, 2011) (request for substantial damages precluded dual certification under both Rule 23(b)(2) and (b)(3)); *Hamilton v. Am. Corrective Counseling Servs., Inc.*, No. 3:05-CV-434RM, 2007 U.S. Dist. LEXIS 11488, at *24 (N.D. Ind. Feb. 14, 2007) (Rule 23(b)(3) certification only was more appropriate than divided certification because request for substantial damages was focus of action).

**b.**      **The Relief Provided To The Rule 23(b)(2) Class Is Direct** <u>**"Monetary Relief" That Is Not Incidental To Injunctive Relief**</u>

Even if this Court were to focus exclusively on the "relief" allocated to the purported Rule 23(b)(2) settlement class, it still must hold that the settlement involves "monetary relief"

11

# A1762

that is not "incidental" to injunctive relief.  Apart from the fact that no injunction will be imposed on Visa and MasterCard, the very purpose of the surcharging scheme and other relief embodied in the proposed Rule 23(b)(2) settlement is to provide merchants with the opportunity to obtain direct "monetary relief."  There is no question that the settlement contemplates future transfers of money – the only question is from whom merchants will collect that money.

The whole point of the surcharging scheme is "monetary relief" that class counsel speculate will be worth tens of billions of dollars to merchants.  Those merchants who fall within the fraction of the class that is eligible to surcharge, and that elect to surcharge, will be paid *more money* from customers who use Visa or MasterCard.  Class plaintiffs therefore claim that surcharging will "allow merchants to recover the full amount of the costs they incur."  Class Pls' Mem. 26.  Surcharging thus is designed to provide precisely the kind of direct, individualized "monetary relief" that *Dukes* declared to be antithetical to Rule 23(b)(2) certification.  *See Cholakyan*, 281 F.R.D. at 561 ("[T]he rule has long been that [a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money.") (second alteration in original) (internal quotation marks omitted).

Nor is the surcharging regime the only thinly disguised, individualized monetary relief provided by the Rule 23(b)(2) settlement.  The provision that allows MasterCard and Visa to discriminate among class members by contracting with some, but not with others, and provide "Independent Consideration" to convince those class members to refrain from surcharging also involves individualized future "monetary relief," but in that instance the money will come directly from Visa and MasterCard rather than customers.  In addition, the provision that allows class members to form "bona fide buying groups" in an effort to strike a better deal with Visa and MasterCard, *see* DCSA ¶¶ 43, 56, contemplates that the buying groups will be able to

12

achieve lower fees and concomitant cost savings, and therefore obtain direct "monetary relief" from Visa and MasterCard.  *See* Class Pls' Mem. 30 ("buying groups" allow smaller merchants "to attempt to negotiate better rates").

Class plaintiffs also argue that the Rule 23(b)(2) settlement would provide *indirect* monetary relief.  They claim that surcharging that may occur in the future may cause Visa and MasterCard to at some point reduce their interchange rates for all retailers, and they argue, on the basis of Dr. Frankel's declaration, "that the ability to surcharge could save merchants between $26.4 and $62.8 billion over the next decade."  *See* Class. Pls' Mem. 26.  Dr. Frankel could not provide an actual estimate of future reductions in interchange fees; instead, he purports only to "illustrate" how such potential savings might be calculated. He does not opine that the potential savings are calculated to a reasonable degree of economic certainty, and he admits that "estimating the aggregate dollar value to U.S. merchants" from surcharging is "difficult" and is contingent upon a host of "parameters and conditions," variables, and "other factors."  Frankel Decl. ¶ 65 & n. 82; *see id.* ¶¶ 71 & Table 1, 73 & Table 2.  The Target Objectors submit that Dr. Frankel's savings forecast is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and will file a motion *in limine* on that ground.  The fact that Dr. Frankel focuses on dollars, however, is further confirmation that surcharging is intended to provide *monetary relief*, rather than injunctive relief or a declaratory judgment against MasterCard and Visa.  It therefore cannot support certification of a Rule 23(b)(2) settlement class under *Dukes*.

The release and covenant not to sue required by the settlement, which waive any claims for "any damages or other monetary relief," DCSA ¶ 68, also plainly implicate future monetary claims.  But for the release, covenant, and injunction that the Rule 23(b)(2) settlement would impose, the Target Objectors would have the continued right to seek to recover damages from

# A1764

Visa and MasterCard arising from their continuing unlawful interchange fee practices.  If the Rule 23(b)(2) settlement is approved in its current form, the Target Objectors will lose their ability to pursue those damages claims in the future and will be barred from pursuing what substantively are Rule 23(b)(3) claims.

Indeed, because the settlement provides that all claims for damages are cut off as of the date of the Class Settlement Preliminary Approval Order, the Target Objectors *already* have lost the ability to seek monetary relief for damages that have accrued due to Visa's and MasterCard's interchange fee practices since November 28, 2012.  In that regard, the Target Objectors *already* have experienced the precise scenario that *Dukes* sought to prevent, where "individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from."  131 S. Ct. at 2559.[8]

All of these "monetary relief" components of the Rule 23(b)(2) settlement stand in sharp contrast to the civil rights cases that are "'prime examples' of what [Rule 23](b)(2) is meant to capture."  *Dukes*, 131 S. Ct. at 2557 (quoting *Amchem*, 521 U.S. at 614).  In those cases, a "single classwide order" enjoins the defendant from engaging in unlawful discrimination.  *Id*. at 2558.  Here, however, there is no such classwide order.  As Visa and MasterCard emphasize, the settlement "does not modify the Visa and MasterCard default interchange rules or mandate a reduction in interchange rates."  Defs' Mem. in Supp. of Final Approval of Definitive Class Settlement Agreement ("Defs' Br."), at 17.

Rather than an actual injunction *against* MasterCard and Visa, the proposed Rule 23(b)(2) settlement in this case substitutes highly structured, quasi-regulatory regimes in which

---

[8] Various objectors sought to appeal the injunction included in the Class Settlement Preliminary Approval Order, and the Second Circuit ordered that briefing on the appeal be deferred until after this Court rules on the motion for final approval of the settlement.  *See* Order, *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, Nos. 12-4671, 12-4708, 12-4765 (2d Cir. Dec. 10, 2012), ECF No. 83.

14

# A1765

merchant compliance is enforceable *by* Visa and MasterCard.  That perverse result is not what Rule 23(b)(2) is intended to accomplish.[9]  *Dukes* does not authorize approval of a private agreement that provides no injunctive relief to the class – indeed, one that imposes an injunction only *against* the absent class members – and that would extinguish the monetary claims of class members without affording them the opportunity to opt out that due process requires.

Equally important, the "monetary relief" provided by the Rule 23(b)(2) settlement is not "incidental" to any injunctive relief.  Monetary relief is "incidental" to injunctive relief when it flows *directly from* that relief, does not require individualized determinations to which jury trial rights would attach, and can be determined by mechanical computation.  *See Dukes*, 131 S. Ct. at 2560.[10]  In this case, not only is there no injunctive relief for the Rule 23(b)(2) settlement class, but the amount of money that class members may obtain under the different components of the Rule 23(b)(2) settlement also will be contingent upon many individualized fact questions.

The surcharging regime will have the potential to benefit only those putative class members that do business in states where surcharging is permitted, that do not accept cards such as American Express, and that elect to surcharge at the risk of losing their customers to non-surcharging competitors.  In addition, Visa and MasterCard may make the benefit of surcharging even more individualized by discriminating among merchants and buying off the surcharging rights of some merchants but not others.  The "buying group" relief, on the other hand, is

---

[9] The proposed Rule 23(b)(2) relief is similar in character to the Rule 23(b)(3) relief obtained by the class in the *VisaCheck* case.  In *VisaCheck*, Visa and MasterCard agreed to pay the Rule 23(b)(3) class $3 billion, but to pay that amount in installments over a period extending for ten years.  *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d at 508. The fact that the monetary relief that purportedly will be realized from the Rule 23(b)(2) settlement in this case will be obtained by class members in the future similarly does not change the essential character of that relief or convert it into injunctive relief.

[10] *See also Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011) (Rule 23(b)(2) certification is permissible "only when the primary relief sought is injunctive" and "monetary relief, if sought at all[, is] mechanically computable."); *accord Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012).

15

# A1766

contingent upon merchants forming such groups *and* Visa and MasterCard deciding to provide a lower interchange rate if they deem it in their commercial interest to do so.

None of the monetary relief provided by the Rule 23(b)(2) settlement flows directly from an injunction or can be calculated with the mechanical ease and precision required by *Dukes*. This Court should reject certification of a mandatory Rule 23(b)(2) settlement class for those reasons as well.  *See Dukes*, 131 S. Ct. at 2560; *see Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012) (remanding case certified under Rule 23(b)(2) because process of determining separate monetary recoveries on disgorgement claim "would require the type of non-incidental, individualized proceedings for monetary award that [*Dukes*] rejected under Rule 23(b)(2)"); *Wu v. Pearson Educ., Inc.*, 277 F.R.D. 255, 276-77 (S.D.N.Y. 2011) (denying certification under Rule 23(b)(2) because copyright damages sought were not incidental to injunctive relief); *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 263 (3d Cir. 2011) (questioning whether medical monitoring claim involving future payments for medical screening could be certified under Rule 23(b)(2) after *Dukes* because "class members' regimes of medical screenings and the corresponding cost will vary individual by individual").

### 3.    The Rule 23(b)(2) Settlement Class Should Not Be Certified Unless The Settlement Is Modified To Allow Objectors To Opt Out

As the Supreme Court has noted, mandatory class actions, such as a Rule 23(b)(2) class, have constitutional implications under the Fifth Amendment Due Process Clause and the Seventh Amendment right to trial by jury.  *See Dukes*, 131 S. Ct. at 2559; *Ortiz*, 527 U.S. at 846-47; *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  If such non-opt-out classes are not evaluated in careful conformity with the terms of Rule 23, they may deprive absent class members of their due process rights to control their own claims and their related right to receive a trial by jury on those claims.

16

# A1767

Those constitutional concerns squarely apply to this proposed Rule 23(b)(2) settlement class.  The anti-competitive interchange fee practices of Visa and MasterCard have created, and will continue to create, money damages.  Each Target Objector has a due process right to decide for itself whether to resolve those damages claims now, to bring an action that aims to end or modify such interchange fee practices, or to wait and sue for damages at some later point.

By placing the Target Objectors in a putative Rule 23(b)(2) settlement class that does not conform to the requirements of the Rule, Visa and MasterCard are attempting to deprive the Target Objectors of their due process rights – a result that *Dukes* does not permit.[11]  This Court should decline to approve the Rule 23(b)(2) settlement in its current form and should rule that members of the Rule 23(b)(2) class must, at minimum, be given opt-out rights that satisfy due process requirements. *See Dukes*, 131 S. Ct. at 2558-59.  Other courts insist that Rule 23(b)(2) classes receive opt-out rights in appropriate cases,[12] and this is just such a case.

**B.      The Proposed Rule 23(b)(2) Class Settlement Should Be Rejected Because It Is Not Fair, Reasonable, Or Adequate To Absent Class Members**

This Court also "must carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness" and must review both "the negotiating process leading up to the settlement as well as the settlement's substantive terms. *D'Amato*, 236 F.3d at 85.  When a settlement is negotiated prior to class certification, "it is subject to a higher degree of scrutiny in assessing its

---

[11] *Cf. Molski v. Gleich*, 318 F.3d 937, 956 (9th Cir. 2003) (reversing approval of Rule 23(b)(2) class settlement when court did not afford notice and right to opt out of classwide releases of actual and treble damages claims), *overruled in part on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2004); *Fresco v. Auto. Directions, Inc.*, No. 03-CIV-61063, 2009 U.S. Dist. LEXIS 125233, at *13 (S.D. Fla. Jan. 16, 2009) (certifying injunctive settlement class because settlement "preserve[d] any individual claims that class plaintiffs may have for actual damages, claims which might otherwise have precluded certification under Rule 23(b)(2)") (footnote omitted).

[12] *See McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) ("The right of a class member to opt-out in Rule 23(b)(1) and (b)(2) actions is not obvious on the face of the rule; however,'the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions." (internal quotation marks omitted)); *see also Johnson*, 702 F.3d at 370-71; *Jefferson*, 195 F.3d at 898; *Eubanks v. Billington*, 110 F.3d 87, 93-95 (D.C. Cir. 1997); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1152, 1159 (11th Cir. 1983).

17

**A1768**

JUDGE ABRAMS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK       *13* CV *3477*

Target Corporation, Target Commercial Interiors,
Inc.; TCC Cooking Co.; Macy's, Inc.; Macy's
Retail Holdings, Inc.; Macy's West Stores Inc.;
Macy's Florida Stores, LLC; Macy's Puerto Rico,
Inc.; Macys.com, Inc.; Bloomingdales, Inc.;
Bloomingdale's By Mail, Ltd.; Bloomingdale's
The Outlet Store, Inc.; The TJX Companies, Inc.;
Concord Buying Group Inc.; Marshalls of MA,
Inc.; Marshalls of Matteson, IL., Inc.; Marshalls of
Richfield, MN., Inc.; Marshalls of Calumet City,
IL., Inc.; Marshalls of Beacon, VA., Inc.;
Marmaxx Operating Corp.; HomeGoods, Inc.;
Marshalls of Laredo, TX., Inc.; Marshalls of
Chicago-Clark, IL., Inc.; Marshalls of CA, LLC;
Marshalls of IL, LLC; T.J. Maxx of CA, LLC; T.J.
Maxx of IL, LLC; Marshalls of Elizabeth, NJ, Inc.;
Marshalls of Glen Burnie, MD., Inc.; Newton
Buying Company of CA, Inc.; TJX Incentive
Sales, Inc.; Derailed, LLC; New York Department
Stores de Puerto Rico, Inc.; Sierra Trading Post,
Inc.; Kohl's Corporation; Kohl's Department
Stores, Inc.; Kohl's Value Services, Inc.; Kohl's
Illinois, Inc.; Kohl's Michigan, L.P.; Kohl's
Indiana L.P.; Staples, Inc.; Staples the Office
Superstore East, Inc.; Staples the Office
Superstore, LLC; Staples Contract & Commercial,
Inc.; Quill Corporation; Quill Lincolnshire, Inc.;
Medical Arts Press, Inc.; SmileMakers, Inc.;
Thrive Networks, Inc.; SchoolKidz.com, LLC; J.C.
Penney Corporation, Inc.; Office Depot, Inc.;
Viking Office Products, Inc.; 4sure.com, Inc.;
Computers4sure.com, Inc.; Solutions4sure.com,
Inc.; L Brands, Inc. f/k/a Limited Brands, Inc.;
Henri Bendel, Inc.; Victoria's Secret Stores, LLC;
Victoria's Secret Stores Puerto Rico, LLC; Bath &
Body Works LLC; Limited Brands Direct
Fulfillment, Inc. d/b/a Victoria's Secret Direct;
Bath & Body Works Direct, Inc.; OfficeMax
Incorporated; OfficeMax North America, Inc.;
BizMart, Inc.; BizMart (Texas), Inc.; Big Lots
Stores, Inc.; C.S. Ross Company; Closeout
Distribution, Inc.; PNS Stores, Inc.; Abercrombie
& Fitch Co.; Abercrombie & Fitch Stores, Inc.;

Civil Action No.

ECF CASE



RECEIVED

MAY 23 2013

U.S.D.C. S.D.N.Y.
CASHIERS

J.M. Hollister, LLC; RUEHL No. 925, LLC; Gilly
Hicks, LLC; Ascena Retail Group, Inc.; The Dress
Barn, Inc.; Maurices Incorporated; Tween Brands,
Inc.; Tween Brands Direct, LLC; Charming Direct,
Inc.; Figi's, Inc.; Catherines of California, Inc.;
Catherines of Pennsylvania, Inc.; Catherines
Partners – Indiana, L.L.P.; Catherines Partners –
Washington, G.P.; Catherines Stores Corporation;
Catherines Woman Michigan, Inc.; Catherines,
Inc.; Charming Shoppes Outlet Stores, LLC; Lane
Bryant, Inc.; Catherines of Nevada, Inc.;
Catherines Partners-Texas, L.P., Catherines
Woman Delaware, Inc.; Outlet Division Store Co.
Inc.; Saks Incorporated; Saks & Company; Saks
Fifth Avenue Texas, LLC; Saks Fifth Avenue,
Inc.; SCCA Store Holdings, Inc.; Saks Direct,
LLC; Club Libby Lu, Inc.; The Bon-Ton Stores,
Inc.; The Bon-Ton Department Stores, Inc.;
McRIL, LLC; Carson Pirie Scott II, Inc.; Bon-Ton
Distribution, Inc.; The Bon-Ton Stores of
Lancaster, Inc.; Chico's FAS, Inc.; White
House|Black Market, Inc.; Soma Intimates, LLC;
Boston Proper, Inc.; Luxottica U.S. Holdings
Corp.; Luxottica USA LLC; Luxottica Retail
North America Inc.; Rays Houston; LensCrafters
International, Inc.; Air Sun; EYEXAM of
California, Inc.; Sunglass Hut Trading, LLC;
Pearle VisionCare, Inc.; The Optical Shop of
Aspen; MY-OP (NY) LLC; Lunettes, Inc.;
Lunettes California, Inc.; Oliver Peoples, Inc.;
Oakley, Inc.; Oakley Sales Corp.; Oakley Air; Eye
Safety Systems, Inc.; Cole Vision Services, Inc.;
EyeMed Vision Care LLC; Luxottica North
America Distribution LLC; American Signature,
Inc.; and The Door Store, LLC

Plaintiffs,

v.

Visa Inc., Visa U.S.A. Inc., Visa International
Service Association, MasterCard Incorporated, and
MasterCard International Incorporated

Defendants.

-2-

# A1770

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs for their Complaint against Defendants Visa, Inc., Visa U.S.A., Inc., Visa International Service Association, MasterCard Incorporated, and MasterCard International Incorporated aver and allege as follows:

## INTRODUCTION

1.      This action is brought against Visa, Inc., Visa U.S.A., Inc., and Visa International Service Association (collectively "Visa") and MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard").  Visa and MasterCard each has in the past and continues to manage, coordinate, and govern a combination in restraint of trade within the meaning of the Sherman Antitrust Act, 15 U.S.C. § 1.  Each combination has as its members the overwhelming majority of banks or financial institutions that issue credit and debit cards in the United States.  The vast majority of the banks and financial institutions that are members of Visa are also members of MasterCard, and issue both Visa-branded and MasterCard-branded credit and debit cards.  These issuing banks are independently owned and managed banks and financial institutions that compete to issue credit and debit cards to consumers.  However, through their membership and agreement to abide by the rules of Visa and MasterCard, each issuing bank has agreed not to compete for merchant acceptance of the credit and debit cards that it issues.

2.      There are two main categories of payment cards: credit (including charge) cards and debit cards.  Credit cards are payment cards that allow consumers to make purchases on credit.  Charge cards are similar to credit cards, but require that the full balance be paid upon receipt of the billing statement.  Debit cards are linked to a consumer's demand account or are prepaid.

-3-

# A1771

3.      Banks earn income on credit (and charge) cards through fees and charges to the cardholder, including interest on the account balance, and from the fees and penalties that come with late payment on card balances.  Banks earn income on debit cards through the opportunity to use the funds a consumer maintains in his or her account and on various fees associated with those accounts.  Banks also earn income on credit and debit cards through the interchange fees paid by merchants.  Interchange fees are imposed on merchants by Visa and MasterCard for the privilege of accepting the issuing bank's card from a consumer as a means of payment, and are collected from the merchant and paid to the issuer of the card.  The profitability to issuing banks of credit and debit cards directly increases with the size and frequency of transactions in which the cards are used.

4.      Banks issuing credit and debit cards compete with one another to issue cards to consumers (sometimes referred to hereafter as "cardholders") who use those cards to purchase goods and services from merchants.  Issuing banks that are members of Visa and MasterCard compete with each other in the issuance of credit and debit cards to consumers.  For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash back rewards, points, and other features to compete for cardholders and to induce cardholders to use their cards.

5.      Visa and MasterCard have adopted nearly identical rules, which are agreed to by their member banks and imposed on merchants that accept cards issued by those banks.  These rules, or Competitive Restraints, eliminate competition among their member issuing banks for merchant acceptance of credit cards and merchant acceptance of debit cards.  As a consequence of having as members nearly all card issuers in the United States, and as a consequence of those card issuers having agreed to rules that preclude them from independently competing for

merchant acceptance, Visa and MasterCard and their members have obtained and maintained market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards in the United States. The exercise of this market power has led merchants to pay excessive interchange fees. In this manner, Visa and MasterCard have unlawfully restrained and continue to unlawfully restrain competition in these markets.

6.      The principal rules that constitute the Competitive Restraints are the setting of "default" interchange fees, the Honor All Cards Rules, the All Outlets Rules, the No Discount Rules, and the No Surcharge Rules. These rules, individually and in combination, preclude merchants from gaining the benefits of competition as to the terms, including a fee (if any), for the acceptance of cards of particular issuing banks and preclude card issuers from competing for merchant acceptance of their cards. As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at a supracompetitive level. Plaintiffs have paid and continue to pay significantly higher costs to accept Visa-branded and MasterCard-branded credit and debit cards than they would if the banks issuing such cards competed for merchant acceptance.

7.      Because of their participation in the Competitive Restraints through their membership in Visa and MasterCard, issuing banks do not compete for transaction volume by independently competing for merchant acceptance.

8.      Visa and MasterCard, on behalf of their member issuing banks, have exploited their market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards by creating interchange fee schedules designed to increase the amount of interchange issuing banks are able to obtain from merchants. While Visa and MasterCard nominally refer to these schedules as "default" interchange fee schedules, suggesting

it is possible for issuing banks and merchants to gain different interchange rates by entering acceptance agreements between themselves, the Competitive Restraints prevent such agreements. The Competitive Restraints also eliminate the features of Visa and MasterCard to compete for merchant acceptance through setting low "default" interchange fees. By setting and enforcing supracompetitive interchange fees applicable to all merchants that accept cards issued by their members, Visa and MasterCard act as agents of their members for the purposes of exercising the market power gained by their combinations.

9.     Over the past decade, judicial efforts to curb the exercise of market power by the Visa and MasterCard combinations have been ineffective. In 2003, the exclusivity rules of both combinations, which prohibited member banks from issuing cards competing on American Express or Discover networks, were declared unlawful. In that same year, in a class action settlement, Visa and MasterCard agreed to cease using the Honor All Cards Rules to tie credit card acceptance and debit card acceptance. Those actions did not diminish Visa's and MasterCard's power to dictate price and prevent competition. Immediately after those actions, both combinations increased the credit card interchange fees extracted from merchants. The debit card interchange fees they were imposing after these judicial actions were subsequently found by the Federal Reserve Board to be significantly above cost.

10.     In 2008, in response to a U.S. Department of Justice investigation, Visa withdrew its rule limiting merchants' ability to accept PIN debit cards. Two years later, in a settlement with the Department of Justice, the Visa and MasterCard combinations both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed. These changes did not diminish the combinations' market power or lead to a reduction in interchange fees paid by merchants. Instead, interchange fees continue to increase.

-6-

# A1774

11.     In 2011, as mandated by the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 1693o–2, the Federal Reserve Board set a maximum level of interchange fees that large banks could levy on debit card transactions and eliminated any distinction between signature debit (which carried interchange rates comparable to credit interchange rates) and PIN debit interchange.  This maximum fee was set significantly below the then-existing interchange fee levels set by Visa and MasterCard for debit card transactions.  The Federal Reserve Board action did not apply to the approximately one-third of debit cards issued by smaller, non-regulated banks, nor did it apply to credit cards.  The Federal Reserve Board did not prohibit debit or credit interchange fees from being set below this maximum level.

12.     If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks and merchants would operate in competitive markets for merchant acceptance of credit cards and merchant acceptance of debit cards and benefit from competition among issuing banks as to interchange fees.  Collectively set interchange fees do not protect merchants such as Plaintiffs, but rather allow issuing banks to charge interchange fees far in excess of the issuing banks' costs.  In competitive markets, interchange fees would move to competitive levels, and the interchange fees paid by Plaintiffs would be substantially below the amounts they have paid since January 1, 2004.  If merchants had the ability to use competitive strategies with respect to their acceptance of the cards of individual issuers, they would induce competition among issuing banks that would lead to lower interchange fees.

13.     Plaintiffs collectively paid more than $1 billion in their last fiscal year in credit and debit interchange fees to issuing banks that are members of Visa and MasterCard.  Interchange fees are generally one of a merchant's largest operating expense items.  Elimination

of the Competitive Restraints and restoration of competitive markets for merchant acceptance would substantially reduce interchange fees, allowing Plaintiffs to operate more efficiently and at lower costs, to the benefit of consumers.  Plaintiffs operate in intensely competitive markets and would use the savings from a reduction in their interchange costs to increase their competitiveness by enhancing the value their customers receive.

### JURISDICTION AND VENUE

14.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

15.    Venue is proper in the United States District Court for the Southern District of New York because Defendants reside in, are found in, have agents in, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

16.    This Court has personal jurisdiction over Defendants because, inter alia, they: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts with the United States, including in this District; and/or (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### DEFINITIONS

17.    For purposes of this Complaint, the following definitions apply.

18.    "Credit cards" are payment cards enabling the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards.  The credit cards at issue here are general purpose payment cards, as distinguished from private label cards, which can only be used at a single merchant.  Payment to a merchant for the goods or services purchased using a credit card is made by the issuing bank of the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the issuing bank and the cardholder.  Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer.  Credit card issuers compete for consumers by offering a variety of terms and types of cards, which vary by level of rewards that are intended to induce consumers to use their cards.  Cards with a higher level of rewards are often referred to as "premium" cards and carry higher interchange fees, though they afford no additional benefits to merchants.  Credit cards include charge cards, which allow the cardholder to obtain goods or services with a grace period before the cardholder is required to pay his or her full balance.

19.    "Debit cards" are payment cards that allow holders of accounts at a bank to pay for goods or services or to obtain cash by directly accessing their accounts.  They also include pre-paid cards, which require a prepayment of the amount that can be drawn by the user of the card.  There are two methods of authenticating debit cards.  PIN debit cards require the cardholder to enter a four-digit personal identification number (PIN) to authenticate the cardholder.  Signature debit cards usually require the cardholder's signature at the time of the transaction.  In the past, some PIN debit cards did not carry interchange fees or were subject to reverse interchange — where the merchant received a fee for card acceptance.  Signature debit cards generally carried higher interchange fees, some of which equaled the interchange fees charged for credit card transactions.  In 2011, pursuant to the Durbin Amendment, Federal

-9-

Reserve Board regulations set the maximum interchange fee for regulated issuers at $.21 plus 0.05% (plus an additional $.01 for fraud prevention for eligible issuers), or an average of $.23-.24 per debit transaction.  In contrast, the signature debit interchange fees previously set by Visa and MasterCard average $.58 and $.59, respectively, for the same issuers.

20.     An "issuing bank" is a member of Visa or MasterCard that issues general purpose credit or debit cards to cardholders.  The majority of issuing banks are members of both Visa and MasterCard and compete with one another to issue cards to potential cardholders and to encourage the use of their cards by cardholders.

21.     An "acquiring bank" is a member of Visa or MasterCard that acquires purchase transactions from merchants.  All acquiring banks are members of Visa and MasterCard.  As member banks, acquiring banks act as gatekeepers, ensuring that card transactions are routed over the Visa or MasterCard networks, that interchange fees set by Visa and MasterCard are paid on all transactions, and that merchants abide by the rules imposed by Visa and MasterCard. Acquiring banks compete with one another for the acquisition business of merchants.

22.     "Network services" include, among other things, the services of authorization, clearance, and settlement of payment card transactions that the members of Visa and MasterCard have delegated to the networks to provide on the members' behalf.  Authorization, clearance, and settlement refers to the process by which payment card transactions are completed.

23.     "Interchange fee" is the fee that issuing banks receive and merchants pay when they accept a credit card or debit card issued by a member of the Visa or MasterCard combinations.  Under the agreements by and among Visa and its member banks and MasterCard and its member banks, the so-called "default" interchange fees are set by Visa and MasterCard,

respectively, and the payment on interchange and other rules are enforced through the acquiring banks.

24.    "Merchant discount" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount, reflecting a merchant's incremental cost of acceptance.  The merchant discount includes the interchange fee.

## THE PARTIES

### PLAINTIFFS

25.    Plaintiffs Target Corporation, Target Commercial Interiors, Inc., TCC Cooking Co. (collectively "Target") are Minnesota corporations with their principal places of business in Minneapolis, Minnesota.  Target operates more than 1,700 retail stores throughout the United States and also engages in internet sales via Target.com.  Target had more than $71 billion in retail sales in 2012.  Target accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.    Accordingly, Target has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Target, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

26.    Plaintiff Macy's, Inc. is a Delaware corporation with its principal places of business in Cincinnati, Ohio and New York, New York.  Macy's, Inc. is an omnichannel retailer, with fiscal 2012 sales of $27.7 billion.  Macy's, Inc. through its subsidiaries, plaintiffs, Macy's Retail Holdings, Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC, Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's, Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The Outlet Store, Inc. (collectively "Macy's"), operates the Macy's and Bloomingdale's brands with nearly 840 stores in 45 states, the District of Columbia, Guam, and

# A1779

Puerto Rico under the names of Macy's and Bloomingdale's; the Macys.com and Bloomingdales.com websites, and 12 Bloomingdale's Outlet stores. Macy's accepts credit cards and debit cards for payment in its stores and online, including both Visa and MasterCard debit and credit cards. Accordingly, Macy's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Macy's, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

27.     Plaintiff The TJX Companies, Inc. is a Delaware corporation with its principal place of business in Framingham, Massachusetts. The TJX Companies, Inc. is a global off-price apparel and home fashions retailer with approximately $19.7 billion in net sales in the United States in the fiscal year ending February 2, 2013. The TJX Companies, Inc., on its own behalf and through its subsidiaries, plaintiffs Concord Buying Group Inc.; Marshalls of MA, Inc.; Marshalls of Matteson, IL., Inc.; Marshalls of Richfield, MN., Inc.; Marshalls of Calumet City, IL., Inc.; Marshalls of Beacon, VA., Inc.; Marmaxx Operating Corp.; HomeGoods, Inc.; Marshalls of Laredo, TX., Inc.; Marshalls of Chicago-Clark, IL., Inc.; Marshalls of CA, LLC; Marshalls of IL, LLC; T.J. Maxx of CA, LLC; T.J. Maxx of IL, LLC; Marshalls of Elizabeth, NJ, Inc.; Marshalls of Glen Burnie, MD., Inc.; Newton Buying Company of CA, Inc.; TJX Incentive Sales, Inc.; Derailed, LLC; New York Department Stores de Puerto Rico, Inc.; and Sierra Trading Post, Inc. (collectively "TJX"), operates more than 2,000 Marshalls, T.J. Maxx, HomeGoods, and Sierra Trading Post stores in the United States. TJX accepts both Visa and MasterCard debit and credit cards for payment in its stores, and for online and catalog sales currently made primarily through Sierra Trading Post. Accordingly, TJX has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive

-12-

Restraints.  TJX, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

28.     Plaintiff Kohl's Corporation is a Wisconsin corporation with its principal place of business in Menomonee Falls, Wisconsin.  Kohl's Corporation, through its subsidiaries, plaintiffs, Kohl's Department Stores, Inc., Kohl's Value Services, Inc., Kohl's Illinois, Inc., Kohl's Michigan, L.P., and Kohl's Indiana L.P. (collectively "Kohl's"), operates more than 1,100 Kohl's stores in 49 states.  It also engages in internet sales.  In fiscal year 2012, Kohl's had sales of more than $19 billion.  Kohl's accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Kohl's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Kohl's, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

29.     Plaintiff Staples, Inc. ("Staples") is a Delaware corporation with its principal place of business in Framingham, Massachusetts.  Staples, Inc., through and with its subsidiaries, plaintiffs Staples the Office Superstore East, Inc., Staples the Office Superstore, LLC, Staples Contract & Commercial, Inc., Quill Corporation, Quill Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc., Thrive Networks, Inc., and SchoolKidz.com, LLC (collectively "Staples"), operates more than 1,500 stores in the United States and also is engaged in e-commerce and delivery sales.  Staples had net sales of more than $16 billion in the 2012 fiscal year.  Staples accepts both Visa and MasterCard debit and credit cards for payment in its retail, online, and delivery channels.  Accordingly, Staples has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Staples,

-13-

# A1781

therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

30.     Plaintiff J. C. Penney Corporation, Inc. ("JCPenney") is a Delaware corporation with its principal place of business in Plano, Texas.  JCPenney operates approximately 1,100 stores in the United States and Puerto Rico, engages in e-commerce, and during part of the relevant time period, also engaged in a significant catalog business. JCPenney accepts both Visa and MasterCard credit and debit cards for payment in its stores and online.  Accordingly, JCPenney has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  JCPenney, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

31.     Plaintiffs Office Depot, Inc., Viking Office Products, Inc., 4sure.com, Inc., Computers4sure.com, Inc., and Solutions4sure.com, Inc. (collectively "Office Depot") are Delaware corporations with their principal place of business in Boca Raton, Florida.  Office Depot is a supplier of office supplies and services with $10.7 billion in sales in fiscal 2012.  At the end of 2012, Office Depot operated approximately 1,100 retail stores and also engaged in internet sales.  Office Depot accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Office Depot has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Office Depot, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

32.     Plaintiff L Brands, Inc. (f/k/a Limited Brands, Inc.) is a Delaware corporation with its principal place of business in Columbus, Ohio.  L Brands, formerly known as Limited Brands, Inc., through its subsidiaries, plaintiffs, Henri Bendel, Inc., Victoria's Secret Stores,

LLC, Victoria's Secret Stores Puerto Rico, LLC, Bath & Body Works LLC, Limited Brands Direct Fulfillment, Inc. d/b/a Victoria's Secret Direct ("VSD"), and Bath & Body Works Direct, Inc. ("BBWD") (collectively "L Brands"), operates approximately 2,800 specialty retail stores in the United States.  L Brands, through VSD, engages in internet and catalog sales within the United States.  L Brands, through BBWD, engages in internet sales within the United States. During the fiscal year ended in February 2013, L Brands had more than $10 billion in net sales. L Brands accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, L Brands has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  L Brands, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

33.    Plaintiffs OfficeMax Incorporated, OfficeMax North America, Inc., BizMart, Inc., and BizMart (Texas), Inc. (collectively "OfficeMax") are Delaware corporations with their principal places of business in Naperville, Illinois.  OfficeMax provides products, solutions, and services for the workplace, whether for business or at home.  OfficeMax customers are served through e-commerce, more than 800 stores in the United States, and direct sales and catalogs.  In fiscal 2012, OfficeMax had net sales of approximately $6.9 billion.  OfficeMax accepts, inter alia, both Visa and MasterCard credit and debit cards for payment.  Accordingly, OfficeMax has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  OfficeMax, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

34.    Plaintiffs Big Lots Stores, Inc., C.S. Ross Company, Closeout Distribution, Inc., and PNS Stores, Inc. (collectively "Big Lots") are incorporated in Ohio, Ohio, Pennsylvania, and California, respectively, with their principal places of business in Columbus, Ohio.  Big Lots

operates approximately 1,500 stores in 48 states.  In fiscal 2012, Big Lots had net sales of $5.4 billion.  Big Lots accepts both Visa and MasterCard debit and credit cards for payment in its stores.  Accordingly, Big Lots has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Big Lots, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

35.    Plaintiff Abercrombie & Fitch Co. is a Delaware corporation with its principal place of business in New Albany, Ohio.  Abercrombie & Fitch Co., through its subsidiaries, plaintiffs, Abercrombie & Fitch Stores, Inc., J.M. Hollister, LLC, RUEHL No. 925, LLC, and Gilly Hicks, LLC (collectively "Abercrombie"), sells and has sold clothing and accessories at approximately 900 retail stores in the United States and also engages in internet sales. Abercrombie & Fitch had net sales of approximately $4.5 billion in fiscal 2012.  Abercrombie & Fitch accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Abercrombie & Fitch has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Abercrombie & Fitch, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

36.    Plaintiff Ascena Retail Group, Inc. is a Delaware corporation with its principal place of business in Suffern, New York.  Ascena Retail Group, Inc. is a specialty retailer that offers clothing, shoes, and accessories for missy and plus-size women through its Lane Bryant, Cacique, maurices, dressbarn, and Catherine subsidiary brands; and for tween girls and boys through its subsidiary brands Tween Brands, Inc. d/b/a Justice and Brothers, respectively (collectively "Ascena").  Ascena operates approximately 3,800 stores through its subsidiaries The Dress Barn, Inc.; Maurices Incorporated; Tween Brands, Inc.; Tween Brands Direct, LLC;

Charming Direct, Inc.; Figi's, Inc.; Catherines of California, Inc.; Catherines of Pennsylvania, Inc.; Catherines Partners – Indiana, L.L.P.; Catherines Partners – Washington, G.P.; Catherines Stores Corporation; Catherines Woman Michigan, Inc.; Catherines, Inc.; Charming Shoppes Outlet Stores, LLC; Lane Bryant, Inc. on behalf of itself and its assignors (these assignors are identified in the attached Exhibit A); Catherines of Nevada, Inc.; Catherines of Pennsylvania, Inc.; Catherines Partners-Texas, L.P.; Catherines Woman Delaware, Inc.; Outlet Division Store Co. Inc., throughout the United States and Puerto Rico.  Ascena also engages through its subsidiaries in e-commerce.  In fiscal year 2012, Ascena had net retail sales of over $3.3 billion. Ascena through its subsidiaries accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Ascena through its subsidiaries has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Ascena, through its subsidiaries, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

37.     Plaintiff Saks Incorporated is a Tennessee corporation with its principal place of business in New York, New York.  Saks Incorporated, through its subsidiaries Saks & Company; Saks Fifth Avenue Texas, LLC; Saks Fifth Avenue, Inc.; SCCA Store Holdings, Inc.; Saks Direct, LLC; and Club Libby Lu, Inc. (collectively "Saks"), operates 42 Saks Fifth Avenue and 66 Saks Fifth Avenue OFF 5th retail stores in the United States and also engages in internet sales.  In fiscal year ended February 2, 2013, Saks had net sales of $3.148 billion.  Saks accepts both Visa and MasterCard debit and credit cards for payment in its stores and online. Accordingly, Saks has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Saks, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

-17-

# A1785

38.     Plaintiff The Bon-Ton Stores, Inc. is a Pennsylvania corporation with its principal place of business in York, Pennsylvania.  The Bon-Ton Stores, Inc., through its subsidiaries, plaintiffs, The Bon-Ton Department Stores, Inc., McRIL, LLC, Carson Pirie Scott II, Inc., Bon-Ton Distribution, Inc., and The Bon-Ton Stores of Lancaster, Inc. (collectively "Bon-Ton") operates 272 Bon-Ton, Bergner's, Boston Store, Carson's, Elder-Beerman, Herberger's, Carson Pirie Scott, and Younkers stores in the United States and also engages in internet sales.  Bon-Ton had net sales of approximately $2.9 billion in fiscal 2012.  Bon-Ton accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Bon-Ton has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Bon-Ton, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

39.     Plaintiff Chico's FAS, Inc. is a Florida corporation with its principal place of business in Fort Myers, Florida.  Chico's FAS, Inc. is a specialty retailer of women's apparel.  Chico's FAS, Inc., on its own behalf and through its subsidiaries, plaintiffs, White House|Black Market, Inc., Soma Intimates, LLC, and Boston Proper, Inc. (collectively "Chico's"), operates more than 1,397 stores in 48 states, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico.  It also engages in internet and catalog sales.  Chico's had net sales of more than $2.5 billion in fiscal year 2012.  Chico's accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Chico's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Chico's, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

-18-

40.    Plaintiff Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business in Port Washington, New York.  Luxottica U.S. Holdings Corp. and its direct and indirect subsidiaries and affiliates Luxottica USA LLC; Luxottica Retail North America Inc.; Rays Houston; LensCrafters International, Inc.; Air Sun; EYEXAM of California, Inc.; Sunglass Hut Trading, LLC; Pearle VisionCare, Inc.; The Optical Shop of Aspen; MY-OP (NY) LLC; Lunettes, Inc.; Lunettes California, Inc., Oliver Peoples, Inc.; Oakley, Inc.; Oakley Sales Corp.; Oakley Air; Eye Safety Systems, Inc.; Cole Vision Services, Inc.; EyeMed Vision Care LLC; and Luxottica North America Distribution LLC (collectively "Luxottica") are wholesalers and retailers of iconic sun and prescription eyewear, among other activities, and operate more than 4,000 retail stores in the United States, including LensCrafters, Pearle Vision, Sunglass Hut, and Oakley.  Luxottica's net sales in fiscal 2012 are not reported.  Luxottica accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Luxottica has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Luxottica, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

41.    Plaintiff American Signature, Inc. and its subsidiary The Door Store, LLC (collectively "American Signature") are privately held companies with their principal place of business in Columbus, Ohio.  American Signature operates approximately 130 American Signature Furniture, and Value City Furniture stores in the United States.  The Door Store, LLC ceased operating stores in 2011.  American Signature is privately held and does not report its income.  American Signature accepts both Visa and MasterCard debit and credit cards for payment in its stores and, just recently, online.  Accordingly, American Signature has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants'

-19-

Competitive Restraints.  American Signature, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

42.     The Plaintiffs have timely opted out of the Rule 23(b)(3) settlement class preliminarily approved by the court on November 28, 2012 in the case captioned: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720-JG-JO, United States District Court for the Eastern District of New York.  If Plaintiffs were allowed, they would also opt out of the Rule 23(b)(2) settlement class in that litigation.

## **DEFENDANTS**

43.     Until the corporate restructuring and initial public offering described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California.  Defendant Visa U.S.A., Inc. was a group-member of Visa International Service Association and was also a non-stock Delaware corporation.  Visa U.S.A., Inc. had its principal place of business in San Francisco, California.  Visa U.S.A., Inc.'s members were the financial institutions acting as issuing banks and acquiring banks in the Visa system.

44.     Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Visa Inc. was created through a corporate reorganization in or around October 2007.  Visa U.S.A. Inc.'s member banks were the initial shareholders of Visa, Inc.

45.     Defendants Visa Inc., Visa U.S.A., Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

46.     Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May 2001.  Its principal place of business is in Purchase, New York.

-20-

47.     Defendant MasterCard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing banks and acquiring banks.   Prior to the initial public offering described below, MasterCard International Incorporated was the principal operating subsidiary of MasterCard Incorporated.

48.     Defendants MasterCard International Incorporated and MasterCard Incorporated are referred to collectively as "MasterCard" in this Complaint.

## ALLEGATIONS

## THE PAYMENT CARD INDUSTRY IN GENERAL

49.     The payment card industry involves two categories of general purpose payment cards:  (1) credit (including charge) cards and (2) debit cards.  As explained more fully below, credit cards constitute a separate product market from debit cards.

50.     Card issuers earn income when card users select and use their cards and when merchants accept their cards.  Issuing banks compete to have cardholders carry and use payment cards that they issue.  By agreeing to the Competitive Restraints, issuing banks have agreed not to compete among themselves for merchant acceptance of payment cards.

51.     Credit cards (other than charge cards) permit consumers to borrow the money for a purchase from the card issuer and to repay that debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuing bank.  Charge cards provide an interest-free loan during a grace period.

52.     Issuing banks compete for cardholders and card usage by offering numerous credit card products, some of which offer features such as cash back rebates, low interest rates, low or no annual fees, and rewards programs tied to usage.  Cards that offer cash-back, airline miles or other usage benefits are often referred to as "rewards cards."  Those rewards cards that

offer the highest levels of rewards are referred to as "premium cards" and include cards such as Visa Signature Preferred and MasterCard World Elite.  Standard or "traditional" credit cards, which do not offer the same array of features to cardholders, include products such as Visa Traditional and the MasterCard Core Value card.  Interchange fees for premium credit cards are higher than the interchange fees merchants are charged on other rewards cards, which in turn are higher than those charged on standard credit card transactions.  Merchants such as Plaintiffs receive no additional benefits from the higher interchange fees they must pay on transactions in which those cards are used.  Nevertheless, merchants do not have the ability to refuse to accept rewards cards.

53.    Debit cards are one means for demand deposit account holders to access the money in their accounts.  Pre-paid debit cards allow cardholders to access the funds deposited on the card when it was purchased.  There are two primary forms of authentication in use for debit cards in the United States.  One is signature-based, in which the cardholder's signature is usually (but not always) obtained at the time of the transaction.  The other is PIN-based, in which the cardholder enters a four-digit PIN to authenticate the cardholder.

54.    Because debit card transactions promptly withdraw funds from the cardholder's account or from the card balance, rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers.  These differences underlay the court's determination in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), that credit card transactions comprised a separate market from the market for debit card transactions.

## THE COMBINATIONS

55.    Visa and MasterCard until recently were organized as joint ventures of their member issuing banks and acquiring banks.  As members of the joint ventures, the member banks agreed to a collection of restrictive rules, referred to herein as the Competitive Restraints, and to impose those Competitive Restraints on merchants that accept Visa-branded and MasterCard-branded cards.  Among the Competitive Restraints are "default" interchange fees that merchants are required to pay for the privilege of accepting Visa-branded and MasterCard-branded cards.  "Default" interchange fee rates are set by Visa and MasterCard for the benefit of their member issuing banks.  As a result of the Competitive Restraints, the "default" interchange fees are made binding.

56.    Through these joint ventures, Visa, MasterCard, and their respective issuing banks collectively have gained market power in the payment card market.  The Competitive Restraints have eliminated competition among issuing banks for merchant acceptance and eliminated any possibility that competition between the issuing banks could enable separate terms of acceptance for the cards of each issuing bank.  These Competitive Restraints have eliminated the development of competitive markets for merchant acceptance.

57.    The Competitive Restraints enforced by Visa and MasterCard, and the actions taken in furtherance of these restraints, constituted and continue to constitute combinations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

58.    In 2006 and 2008, respectively, MasterCard and Visa each changed their ownership structures through initial public offerings ("IPOs") wherein the member banks partially divested their ownership of Visa and MasterCard.  But the IPOs did not change the essential character of their combinations or the Competitive Restraints.  The motivation for these

# A1791

IPOs was to limit the appearance that Visa and MasterCard were controlled by their member banks.  According to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard.  In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers — or member financial institutions — own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

59.     After the IPOs, neither Visa, MasterCard, nor any of the member banks took any affirmative action to withdraw from the respective combinations.  To the contrary, even after the IPOs, the member banks of Visa and MasterCard continued to agree to and to enforce and adhere to the Competitive Restraints that eliminate competition among issuing banks for merchant acceptance.  Visa and MasterCard have continued to set "default" interchange fees for the benefit of their issuing bank members.  Thus, even after the IPOs, Visa's and MasterCard's members maintained and enforced the Competitive Restraints ensuring that they would not compete for merchant acceptance.

60.     After the IPOs, as before, Visa and MasterCard serve as facilitators and coordinators of horizontal agreements among their member banks to continue to adhere to and enforce "default" interchange fees and the Competitive Restraints.  It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks also to impose and adhere to those restraints.  Visa and MasterCard, by acting as the managers of their respective combinations and coordinating agreements to continue imposing and adhering to the Competitive Restraints,

-24-

eliminate competition for merchant acceptance among their respective issuing banks. But for the arrangements facilitated by Visa and MasterCard, the member banks would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

61.   Each issuing bank is an independently owned and independently managed business. Each issuing bank is a separate economic actor pursuing separate economic interests. In other aspects of their businesses, the member banks compete against one another. For example, the banks compete with one another for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will make their payment cards more attractive than those offered by other issuing banks. As found in *United States v. Visa U.S.A., Inc.*, cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protection programs." 163 F. Supp. 2d at 334. These facts continue to be true today.

62.   However, the member banks do not compete for merchant acceptance of the cards they issue. Instead, both before and after the Visa and MasterCard IPOs, the member banks have ceded to Visa and MasterCard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue. By continuing to agree to and adhere to the Competitive Restraints and default interchange fees, the member banks have deprived the marketplace of independent centers of decision-making and, therefore, of actual or potential competition.

**A1793**

## THE RELEVANT PRODUCT MARKETS

63.     The relevant product markets are the market for merchant acceptance of general purpose credit (including charge) cards and the market for merchant acceptance of debit cards. Credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender.

64.     Banks issuing credit and debit cards compete with one another to issue their cards to consumers (cardholders) who use those cards to purchase goods and services from merchants. This competition occurs in the markets for the issuance of credit and debit cards. Absent the Competitive Restraints, banks issuing such cards would seek access to merchants that are willing to accept their cards as payment for the goods and services the merchants sell to consumers. As a result, absent the Competitive Restraints at issue in this case, issuing banks would compete over the terms of acceptance of their cards by merchants.

65.     Merchant acceptance of general purpose credit cards is a relevant product market. A credit card is not interchangeable with a debit card or other form of tender. Many cardholders desire the ability to access a line of credit, defer payment, or other features offered by the credit cards. For this reason, Plaintiffs and other merchants cannot discontinue acceptance of credit cards, even in the face of high or increasing interchange fees, without losing sales. Visa and MasterCard and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

66.     Merchant acceptance of debit cards is also a relevant product market. Debit cards are not reasonably interchangeable with credit cards and other forms of tender. Debit cards differ from credit cards in significant ways. Debit cards must be tied to a bank account, or pre-

-26-

# A1794

paid, unlike credit cards.   When a debit card is used, the funds are withdrawn from the cardholder's account either the same day or within a few days.  Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks on their person, and not all merchants accept checks.  Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options.  Thus, merchants cannot discontinue acceptance of debit cards.

67.   Debit cards are also regulated separately and differently from credit cards.  In 2011, pursuant to the Durbin Amendment, the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks.  The legislation did not mandate that Federal Reserve Board regulate interchange fees charged in connection with credit card transactions.

68.   Visa, MasterCard, and their debit card issuing members are not constrained in the charges they impose on merchants for debit card acceptance by the availability of credit cards or other forms of tender as a payment option.

## RELEVANT GEOGRAPHIC MARKET

69.   The relevant geographic market is the United States and its territories.

70.   The default interchange fees are set by Visa and MasterCard, respectively, on a national basis.  Similarly, the Competitive Restraints are specific to the United States and its territories.

71.   Plaintiffs, along with many other merchants, operate throughout the United States. The Competitive Restraints imposed on them require that they accept all cards of all issuing banks who are members of Visa or of MasterCard at "default" interchange fees at all of their outlets throughout the United States.

# A1795

72.     Visa and MasterCard, and their largest issuing banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole.

## THE COMPETITIVE RESTRAINTS

73.     On behalf of the issuing banks that are their members, Visa and MasterCard each have adopted and imposed supracompetitive "default" interchange fees and other Competitive Restraints on Plaintiffs that eliminate competition.   These Competitive Restraints prevent competition among the issuing banks for transaction volume from merchants.   As a result, the Competitive Restraints cause Plaintiffs' costs of acceptance to be higher than would prevail in a competitive market.

74.     Collective Setting of Interchange:   Visa and MasterCard set so-called "default" interchange fees on credit card and debit card transactions that merchants are required to pay to their issuing banks.   The setting of "default" interchange fees and other Competitive Restraints constitute the fixing of prices within the meaning of the Sherman Act.

75.     Visa and MasterCard each have established complex "default" interchange fee schedules.   In setting the interchange fees that are paid to their member banks, Visa and MasterCard each acts as the manager of its respective combination, setting the price that merchants pay for card acceptance.   Interchange fees account for the largest portion of merchant costs for accepting such cards.

76.     Interchange fees are not set to recover Visa's or MasterCard's costs of providing network services.   Interchange is a fee that Visa and MasterCard, respectively, acting in combination with the issuing banks, require merchants to pay to the issuing banks.

77.     Visa purports to set non-binding "default" interchange fees.  Visa Core Principle No. 10.3 provides that "[i]nterchange reimbursement fees are determined by Visa . . . or may be

-28-

# A1796

customized where members have set their own financial terms for the interchange of a Visa transaction or Visa has entered into business agreements to promote acceptance and card usage."

78.    MasterCard also purports to set non-binding "default" interchange fees. MasterCard Rule 9.4 provides: "[a] transaction or cash disbursement cleared and settled between Customers gives rise to the payment of the appropriate interchange fee or service fee, as applicable.  The Corporation has the right to establish default interchange fees and default service fees (hereafter referred to as 'interchange fees' and 'service fees,' or collectively, 'fees'), it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two Customers in place. . . .  Unless an applicable bilateral interchange fee or service fee agreement between two Customers is in place, any intraregional or interregional fees established by the Corporation are binding on all Customers."

79.    Acquiring banks that do not deduct the applicable interchange fee when submitting a transaction for authorization, clearance, and settlement are subject to fines assessed by Visa and MasterCard.  Both Visa's and MasterCard's rules, quoted above, fix interchange, because the other Competitive Restraints remove any independent competition among issuing banks in the setting of interchange fees.

80.    Absent the Competitive Restraints, Plaintiffs would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks for merchant acceptance. In the cartelized markets created by the Visa and MasterCard combinations, Visa and MasterCard, acting for their member banks, establish interchange fee schedules for their member banks.  Plaintiffs are among the merchants injured by this collective setting of interchange fees by Visa and MasterCard.

-29-

# A1797

81.    Honor All Cards Rules:  These rules require in relevant part that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, no matter which bank issued the card or the card type. Similarly, a merchant that accepts Visa-branded or MasterCard-branded debit cards, must accept all Visa-branded or MasterCard-branded debit cards, no matter the issuing bank.  Because of the Honor All Cards Rules, Plaintiffs cannot reject any or all of the types of cards issued by any particular issuing bank.  Thus, Plaintiffs are precluded from gaining the benefits of competition as to the terms upon which they will accept or reject the cards of any issuing bank that is a member of Visa or MasterCard.  As a result, the "default" interchange fees become binding on Plaintiffs.

82.    All Outlets Rules:  The All Outlets Rules require merchants who accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations.  A merchant is not permitted to accept the cards at some stores but not others.  These rules preclude merchants from gaining the benefits of competition as to the terms of acceptance by location (for example, by region of the country).

83.    Prior to January 27, 2013, the All Outlets Rules required merchants that operated under multiple banners (e.g., trade names or name plates) and that accepted Visa-branded or MasterCard-branded payment cards to accept those cards at all of their banners.  This rule precluded merchants from gaining the benefits of competition as to the terms of acceptance with issuing banks by banner or by locations within a banner.  As a result, Plaintiffs could not indicate they would terminate acceptance of the cards of a particular issuing bank at some of their banners in order to promote competition as to fees.

-30-

# A1798

84.     Changes that Visa and MasterCard made to their All Outlets Rules implemented after January 27, 2013, do not diminish the anticompetitive effects or the injuries Plaintiffs continue to suffer.  The All Outlets Rules still require that if a merchant elects to accept Visa-branded or MasterCard-branded cards at one of its banners, it must accept all such cards at all locations of that banner, and it must accept all such cards no matter the card issuer.  Merchants also cannot accept the cards of some issuers but not others at a particular location.

85.     No Discount Rules:  Under the No Discount Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a payment card.  However, pursuant to a settlement with the United States Department of Justice, as of July 20, 2011, Visa and MasterCard changed their rules to allow merchants to offer discounts to consumers in some limited circumstances.  These changes to the No Discount Rules have not significantly diminished the anticompetitive effects of the Competitive Restraints.  While Visa and MasterCard now allow merchants more discounting options, merchants still are prohibited from offering discounts to consumers for using the cards issued by particular issuing banks.  A merchant's ability to utilize issuer-specific discounts would be an important tool for gaining the benefits of competition as to the terms of acceptance with an issuing bank.

86.     No Surcharge Rules:   The No Surcharge Rules prohibit Plaintiffs from surcharging transactions in which a consumer used a Visa-branded card or a MasterCard-branded card.  These rules eliminate a merchant's ability to utilize surcharging as a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank.  Absent the rules, a merchant could surcharge a transaction in which the consumer uses the card of a particular issuing bank, such as one that demanded a high interchange fee.  As of January 27, 2013, Visa and MasterCard altered their No Surcharge Rules to permit merchants to surcharge credit card

-31-

customers under limited circumstances. Debit card transactions still may not be surcharged under the rule modification. Changes to the No Surcharge Rules for credit cards implemented after January 27, 2013 do not eliminate their anticompetitive effects or the injuries Plaintiffs continue to suffer. Even as modified, the No Surcharge Rules prohibit a merchant from surcharging based on the identity of the card issuer.

87.    The Competitive Restraints, individually and in combination, eliminate issuing bank competition for merchant acceptance. In the absence of these rules, the market for merchant acceptance would be competitive. Plaintiffs and the issuing banks would be able to gain the benefits of competition as to the terms under which Plaintiffs would accept an issuing bank's cards, including the amount of interchange fees — if any — Plaintiffs would pay on transactions involving an issuing bank's cards. Competition among issuing banks for merchant acceptance would result in lower interchange fees for Plaintiffs and allow them to enhance the value their customers receive.

88.    The Honor All Cards Rules, the No Discount Rules, the No Surcharges Rules, and the All Outlets Rules, individually and in combination, eliminate the incentives for Visa and MasterCard to compete for merchant acceptance through setting lower "default" interchange fees.

89.    In addition to the Competitive Restraints, a variety of other rules and regulations (often not publicly disclosed) enforced by Visa and MasterCard and their member banks also operate to support the anticompetitive effects of the Competitive Restraints and imposition of "default" interchange fees on Plaintiffs.

90.    The Competitive Restraints, including the collective setting of "default" interchange fees, are not reasonably necessary to accomplish any legitimate efficiency-

generating objectives of the Visa and MasterCard combinations.  Furthermore, there exist numerous alternative means that are less harmful to competition by which any such objectives could be accomplished.

## MARKET POWER

91.     Visa and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States and its territories.

92.     In 2001, in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court found that Visa had market power in the market for credit card network services with a 47% share of the dollar volume of credit card transactions in the United States.  In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court reaffirmed that Visa had market power in the credit card market based on a finding that its market share fluctuated between 43% and 47%, as well as the barriers to entering the relevant product market.  Visa's share of the credit card market has not changed significantly since these two holdings.  The prior judicial findings of market power demonstrate that Visa has market power in the general purpose credit card market.

93.     There are significant barriers to entry into the market for general purpose credit cards.  Indeed, the court in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), specifically found that there are high barriers to entry into the general purpose credit card market.  Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion.  Both AT&T and Citibank conducted entry analyses, but decided it would be unprofitable to attempt to start a competing general purpose credit card business.

# A1801

94.     The difficulties associated with entering the network market are exemplified by the fact that no company has entered since Discover did so in 1985.  Discover has never achieved more than a 7% share of the general purpose credit card market and its current share is approximately 5%.

95.     Visa's conduct is direct evidence of its market power and that of its issuing banks. Interchange fees are set by Visa on behalf of its issuing banks.  Visa promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, Visa's credit card issuing banks would gain the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

96.     Visa's "default" credit interchange fees demonstrate Visa's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen. Despite these increases, merchants have not stopped accepting Visa credit cards.  Further, Visa's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

97.     Visa's market power in credit cards is also demonstrated by the fact that when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few if any merchants chose to stop accepting Visa credit cards, and Visa did not reduce its credit card interchange fees.  In 2012, the first full year after implementation of reduced interchange fees on debit transactions, Visa credit card transactions and purchase volume increased.

# A1802

98.     Competition with MasterCard does not eliminate Visa's exercise of market power in the market for merchant acceptance of general purpose credit cards.  During the period that Visa and MasterCard were both joint ventures consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance.  After their respective IPOs, Visa's and MasterCard's membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

99.     MasterCard and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States.

100.     In *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court held that MasterCard's 26% share of dollar volume of credit and charge card transactions was sufficient to demonstrate that it had market power in the market for credit card network services.  In *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court held that MasterCard's 26% to 28% share of the credit card market was sufficiently high to go to a jury on the question of MasterCard's market power.  MasterCard's share of the credit card market has not changed significantly since those decisions.

101.     MasterCard's conduct is direct evidence of its market power and that of its issuing banks.  Interchange fees are set by MasterCard on behalf of its issuing banks.  MasterCard also promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, MasterCard's credit card issuing banks would gain the benefits of competition as to the terms of merchant

acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

102.    MasterCard's "default" credit interchange fees demonstrate MasterCard's market power.  Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting MasterCard credit cards.  Further, MasterCard's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

103.    Competition with Visa does not eliminate MasterCard's exercise of market power in the market for merchant acceptance of general purpose credit cards either.  During the period that Visa and MasterCard were joint ventures consisting of their member banks, they adopted rules that limited competition for merchant acceptance.  After their respective IPOs, Visa's and MasterCard's membership, rules, and most importantly power to obtain high interchange fees from merchants did not change and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

104.    As alleged above, there are significant barriers to entry into the market for the provision of general purpose payment card network services to merchants.

105.    The debit card market is dominated by Visa and MasterCard.  Combined, Visa and MasterCard comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today.  Only Visa, MasterCard, and Discover allow signature authorization of debit transactions.

# A1804

106.    Visa, jointly with its issuing banks, and MasterCard, jointly with its issuing banks, each exercise market power in the market for merchant acceptance of debit cards.

107.    Visa and its issuing banks jointly have market power in the market for acceptance of debit cards.  Visa participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa-branded debit cards.  This combination of issuing banks combined with the Competitive Restraints gives Visa market power.  Visa has exercised and continues to exercise market power by requiring Plaintiffs to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

108.    Visa's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept Visa debit cards as a condition of accepting Visa credit cards was dropped in 2003, there is no evidence that merchants were able to stop accepting Visa debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that Visa's debit interchange rates were significantly above cost.  Because of Visa's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

109.    MasterCard and its issuing banks jointly have market power in the market for acceptance of debit cards.  MasterCard participates in and manages a combination comprised of a significant fraction of all issuers of debit cards, such that merchants are unable to refuse to accept MasterCard-branded debit cards.  This combination of issuing banks combined with the Competitive Restraints gives MasterCard market power.  MasterCard has exercised and continues to exercise market power by requiring Plaintiffs to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

110.    MasterCard's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept MasterCard debit cards as a condition of accepting MasterCard credit cards was dropped in 2003, few or no merchants stopped accepting MasterCard debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that MasterCard's debit interchange rates were significantly above cost.  Because of MasterCard's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

## COMPETITIVE INJURY

111.    Visa and MasterCard use their market power to impose "default" interchange fees and the Competitive Restraints on Plaintiffs.

112.    The Competitive Restraints make it impossible for the Plaintiffs to gain the benefits of competition as to the terms of acceptance, including lower interchange fees with individual issuing banks.  The Competitive Restraints provide a mechanism for issuing banks to avoid competing for acceptance.  Absent the supracompetitive "default" interchange fees and the other Competitive Restraints, Plaintiffs would be able to gain the benefits of competition as to interchange fees, which would reduce them to a competitive level.  The changes to the Competitive Restraints that were instituted as a result of prior settlements and enforcement actions have not eliminated the market power of the combinations and have not curtailed the level or rise in effective interchange fees being paid by merchants.  Since 2004, Plaintiffs' total interchange fees paid on transactions utilizing cards issued by members of Visa and MasterCard have risen faster than the rate of increase in retail sales.

113.    Each Plaintiff has been harmed by the actions of the Visa and MasterCard combinations.  The amount of interchange fees paid by each Plaintiff is supracompetitive.  The

-38-

high interchange fees levied on Plaintiffs lead to increased merchandise prices for consumers or otherwise diminish the value their customers receive. Thus, consumers, as well as merchants such as Plaintiffs, are harmed by the combinations' anticompetitive conduct, including the imposition of "default" interchange fees.

114.    But for the Competitive Restraints, competition among issuing banks for merchant acceptance would result in lower interchange fees. Each Plaintiff would have the opportunity to use the strategies it uses in other parts of its business to obtain competitive acceptance terms. As a result of the Competitive Restraints, card acceptance is a significant cost to Plaintiffs' businesses and they have no ability to gain lower costs in a competitive market.

115.    From 2004 to the present, Target has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Target has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

116.    From 2004 to the present, Macy's has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Macy's has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

117.    From 2004 to the present, TJX has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, TJX has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

118.    From 2004 to the present, Kohl's has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Kohl's has been forced to abide by Visa's and

MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

119.    From 2004 to the present, Staples has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Staples has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

120.    From 2004 to the present, JCPenney has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, JCPenney has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

121.    From 2004 to the present, Office Depot has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Office Depot has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

122.    From 2004 to the present, L Brands has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, L Brands has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

123.    From 2004 to the present, OfficeMax has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, OfficeMax has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

# A1808

124.    From 2004 to the present, Big Lots has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Big Lots has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

125.    From 2004 to the present, Abercrombie & Fitch has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Abercrombie & Fitch has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

126.    From 2004 to the present, Ascena through its subsidiaries has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Ascena through its subsidiaries has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

127.    From 2004 to the present, Saks has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Saks has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

128.    From 2004 to the present, Bon-Ton has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Bon-Ton has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

129.    From 2004 to the present, Chico's has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Chico's has been forced to abide by Visa's and

MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

130.    From 2004 to the present, Luxottica has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Luxottica has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

131.    From 2004 to the present, American Signature has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, American Signature has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

## CLAIMS FOR RELIEF

### Count 1:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Credit Cards

132.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 131 as if fully rewritten herein.

133.    The use of credit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

134.    Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Visa members.  Accordingly, by these arrangements, Visa has facilitated and

-42-

# A1810

continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

135.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn.  In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

136.    Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

137.    As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

138.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of Section 1 of the Sherman Act.

139.    Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing

# A1811

banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

140.    Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks.  This further eliminates merchant acceptance as one of the areas of competition among issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

141.    Visa's setting of "default" interchange fees for the acceptance of Visa-branded credit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.  Instead, Visa's supracompetitive interchange fees are set collectively by Visa in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default interchange" fees for Visa-

branded credit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuer.

142.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and decreased consumer welfare.

## Count 2:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Debit Cards

143.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 142 as if fully rewritten herein.

144.    The use of debit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

145.    Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the manager of a combination that limits competition between the bank members of the combination through the rules governing debit cards agreed to by Visa members.  Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant

acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

146.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn.  In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rule and agreements.

147.    Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

148.    As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of debit cards.

149.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

150.    Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the

-46-

# A1814

issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

151.  Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

152.  Visa's setting of "default" interchange fees for the acceptance of Visa-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.  Instead, Visa's supracompetitive interchange fees have been set collectively by Visa in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default" interchange fees for Visa-branded debit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

-47-

153.    The maximum debit interchange fees enacted by the Federal Reserve as a result of

the Durbin Amendment have not eliminated the anticompetitive effects of Visa's setting of

"default" interchange fees.  While the damages suffered by Plaintiffs because of the imposition

of supracompetitive debit interchange fees may be reduced by the regulatory maximums, the

interchange fees being levied on Plaintiffs by the combination are still higher than they would be

if there were active competition for merchant acceptance.  Accordingly, even after the enactment

of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being

forced to pay supracompetitive interchange fees on Visa debit card transactions.

154.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal

restraints on the costs charged for acceptance of debit cards by merchants, which are the result of

Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of

acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers

through higher costs and increased prices.

**Count 3:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by
MasterCard's Competitive Restraints Governing Credit Cards**

155.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 154 as if fully rewritten herein.

156.    The use of credit cards issued by members of MasterCard and the rules governing

the use of such cards occur in and have a substantial anticompetitive effect on interstate

commerce.

157.    MasterCard and its member banks are a combination within the meaning of

Section 1 of the Sherman Act.  MasterCard's rules and related contracts constitute agreements

within the meaning of Section 1 of the Sherman Act.  MasterCard's Competitive Restraints, as

defined above, constitute horizontal agreements among MasterCard and its members both prior

-48-

# A1816

to and after MasterCard's IPO.  MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by MasterCard members.  Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, similarly not to compete.

158.    In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn.  In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

159.    Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

160.    As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

161.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of MasterCard-branded credit cards and to prevent the

operation of and interfere with the competitive process with respect to the acceptance of credit cards, in violation of Section 1 of the Sherman Act.

162.   MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the cost of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

163.   MasterCard's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

164.   MasterCard's setting of "default" interchange fees for the acceptance of MasterCard-branded credit cards further prevents the cost of acceptance from being determined

between each Plaintiff and the various individual issuing banks in a competitive market. Instead, MasterCard's supracompetitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for MasterCard-branded credit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

165.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of MasterCard's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

**Count 4:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by MasterCard's Competitive Restraints Governing Debit Cards**

166.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 165 as if fully rewritten herein.

167.    The use of debit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

168.    MasterCard and its member banks are a combination within the meaning of Section 1 of the Sherman Act. MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the

-51-

# A1819

rules governing debit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, to similarly not compete.

169.    In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn. In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

170.    Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

171.    As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of debit cards.

172.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix price of acceptance of MasterCard-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

173.    MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept MasterCard-branded cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the prices of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

174.    MasterCard's Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

175.    MasterCard's setting of default interchange fees for the acceptance of MasterCard-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.  Instead, MasterCard's supracompetitive interchange fees are set collectively by MasterCard in

conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for MasterCard-branded debit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

176.    The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of MasterCard's setting of "default" interchange fees. While the damages suffered by Plaintiffs because of the imposition of supracompetitive debit interchange fees may be reduced by regulatory maximums, the interchange fees being levied on Plaintiffs by the combination are still higher than they would be if there were active competition for merchant acceptance. Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being forced to pay supracompetitive interchange fees on MasterCard debit card transactions.

177.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of MasterCard's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Judgment in favor of each Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      An award of the cost of the suit, including a reasonable attorney's fee; and

-54-

**A1822**

C.      Such other and further relief as the Court deems just, equitable, and proper.

CLARICK GUERON REISBAUM LLP

By:  _____

Gregory A. Clarick
Nicole Gueron
Isaac Zaur
40 West 25th Street
New York, New York 10010
(212) 633-4310


VORYS, SATER, SEYMOUR AND PEASE LLP

Michael J. Canter
Robert N. Webner
James A. Wilson
Douglas R. Matthews
Kimberly Weber Herlihy
Alycia N. Broz
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400


*Attorneys for Plaintiffs*

-55-

# A1823

**JURY DEMAND**

Plaintiffs demand trial by jury of all issues so triable.


CLARICK GUERON REISBAUM LLP

By: _____

Gregory A. Clarick
Nicole Gueron
Isaac Zaur
40 West 25th Street
New York, New York 10010
(212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

Michael J. Canter
Robert N. Webner
James A. Wilson
Douglas R. Matthews
Kimberly Weber Herlihy
Alycia N. Broz
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400

*Attorneys for Plaintiffs*

-56-

**A1824**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1:05-md-1720-JG-JO |

## STATEMENT OF OBJECTIONS

J. C. Penney Corporation, Inc. ("J. C. Penney") is a member of the putative Rule Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.* J. C. Penney has opted out of the Cash Settlement Class.

J. C. Penney is a Class Member because it will accept Visa Branded Cards and/or MasterCard Branded Cards in the United States in the future.

J. C. Penney objects to the settlement in this lawsuit. J. C. Penney objects to certification of the Rule Changes Settlement Class, and the proposed settlement for the Rule Changes Settlement Class. J. C. Penney's reasons for objecting, and the laws and evidence that support each objection, are set forth in the Memorandum In Support attached hereto.

My personal information is:

Name: J. C. Penney Corporation, Inc.
Address: 6501 Legacy Dr., Plano, TX 75024
Telephone Number: (972) 431-1000

# A1825

The contact information for the lawyers representing J. C. Penney in this matter

is:

Gregory A. Clarick
Clarick Gueron Reisbaum LLP
40 West 25th Street
New York, New York 10010
(212) 633-4310
gclarick@cgr-law.com

Michael J. Canter
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
mjcanter@vorys.com

Robert N. Webner
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
rnwebner@vorys.com

Kenneth J. Rubin
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
kjrubin@vorys.com

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By:  /s/ Gregory Clarick
        Gregory A. Clarick
        40 West 25th Street
        New York, New York 10010
        (212) 633-4310

**A1826**

VORYS, SATER, SEYMOUR AND PEASE LLP

Michael J. Canter
Robert N. Webner
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400

*Attorneys for J. C. Penney Corporation, Inc.*

**A1827**

## CERTIFICATE OF SERVICE

I, Gregory A. Clarick, hereby certify that on May 27, 2013, I caused a true and correct copy of the foregoing STATEMENT OF OBJECTIONS to be electronically filed with the Clerk of the Court in accordance with the Eastern District's Rules on Electronic Service, and served via U.S. mail upon Class Counsel, Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, and Counsel for the Defendants, Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019.


/s/Gregory Clarick
Gregory A. Clarick

# A1828

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD
INTERCHANGE FEE AND MERCHANT      No. 1:05-MD-1720-JG-JO
DISCOUNT ANTITRUST LITIGATION

## STATEMENT OF OBJECTIONS

Macy's, Inc., Macy's Retail Holdings, Inc., Macy's West Stores Inc., Macy's
Florida Stores, LLC, Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's, Inc.,
Bloomingdale's By Mail, Ltd., and Bloomingdale's The Outlet Store, Inc. (collectively
"Macy's") are members of the putative Rule Changes Settlement Class in the case called
*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.*
Macy's has opted out of the Cash Settlement Class.

Macy's is a Class Member because it will accept Visa Branded Cards and/or
MasterCard Branded Cards in the United States in the future.

Macy's objects to the settlement in this lawsuit. Macy's objects to certification of
the Rule Changes Settlement Class, and the proposed settlement for the Rule Changes
Settlement Class. Macy's reasons for objecting, and the laws and evidence that support
each objection, are set forth in the Memorandum In Support attached hereto.

My personal information is:

Name: Macy's, Inc.
Address: 7 West Seventh Street, Cincinnati, Ohio 45040; and
          151 West 34th Street, New York, New York 10001
Telephone Number: 513-579-7000

# A1829

Name: Macy's Retail Holdings, Inc.
Address: 7 West Seventh Street, Cincinnati, Ohio 45040
Telephone Number: 513-579-7000

Name: Macy's West Stores Inc.
Address: 7 West Seventh Street, Cincinnati, Ohio 45040
Telephone Number: 513-579-7000

Name: Macy's Florida Stores, LLC
Address: 22 East Flager Street, Miami, FL 33131
Telephone Number: 513-579-7000

Name: Macy's Puerto Rico, Inc.
Address: 22 East Flager Street, Miami, FL 33131
Telephone Number: 513-579-7000

Name: Macys.com, Inc.
Address: 685 Market Street, 8th Floor, San Francisco, CA 94105
Telephone Number: 513-579-7000

Name: Bloomingdale's, Inc.
Address: 1000 Third Avenue, New York, NY 10022
Telephone Number: 513-579-7000

Name: Bloomingdale's By Mail, Ltd.
Address: 919 Third Avenue, 9th Floor, New York, NY 10022
Telephone Number: 513-579-7000

Name: Bloomingdale's The Outlet Store, Inc.
Address: 155 E. 60th Street, 6th Floor, New York, NY 10022
Telephone Number: 513-579-7000


The contact information for the lawyers representing Macy's in this matter is:

Gregory A. Clarick
Clarick Gueron Reisbaum LLP
40 West 25th Street
New York, New York 10010
(212) 633-4310
gclarick@cgr-law.com

# A1830

Michael J. Canter
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
mjcanter@vorys.com

Robert N. Webner
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
rnwebner@vorys.com

Kenneth J. Rubin
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
kjrubin@vorys.com

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By:  /s/ Gregory Clarick
   Gregory A. Clarick
   40 West 25th Street
   New York, New York 10010
   (212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

   Michael J. Canter
   Robert N. Webner
   Kenneth J. Rubin
   52 East Gay Street
   Columbus, Ohio 43215
   (614) 464-6400

   *Attorneys for Macy's, Inc., Macy's Retail
   Holdings, Inc., Macy's West Stores Inc.,
   Macy's Florida Stores, LLC, Macy's Puerto
   Rico, Inc., Macys.com, Inc., Bloomingdale's,
   Inc., Bloomingdale's By Mail, Ltd., and
   Bloomingdale's The Outlet Store, Inc.*

**A1831**

**CERTIFICATE OF SERVICE**

I, Gregory A. Clarick, hereby certify that on May 27, 2013, I caused a true and correct copy of the foregoing STATEMENT OF OBJECTIONS to be electronically filed with the Clerk of the Court in accordance with the Eastern District's Rules on Electronic Service, and served via U.S. mail upon Class Counsel, Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, and Counsel for the Defendants, Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019

/s/Gregory Clarick
Gregory A. Clarick

**A1832**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | No. 1:05-MD-1720-JG-JO |

## STATEMENT OF OBJECTIONS

Office Depot, Inc.; Viking Office Products, Inc.; 4Sure.com, Inc.; Computers4Sure.com, Inc.; and Solutions4Sure.com, Inc. (collectively "Office Depot") are members of the putative Rule Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.* Office Depot has opted out of the Cash Settlement Class.

Office Depot is a Class Member because it will accept Visa Branded Cards and/or MasterCard Branded Cards in the United States in the future.

Office Depot objects to the settlement in this lawsuit. Office Depot objects to certification of the Rule Changes Settlement Class, and the proposed settlement for the Rule Changes Settlement Class. Office Depot's reasons for objecting, and the laws and evidence that support each objection, are set forth in the Memorandum In Support attached hereto.

My personal information is:

Name: Office Depot, Inc.
Address: 6600 North Military Trail, Boca Raton, FL 33496
Telephone Number: 561-438-4800

# A1833

Name: Viking Office Products, Inc.
Address: 6600 North Military Trail, Boca Raton, FL 33496
Telephone Number: 561-438-4800

Name: 4Sure.com, Inc.
Address: 55 Corporate Drive, Trumbull, CT 06611
Telephone Number: 561-438-4800

Name: Compters4Sure, Inc.
Address: 55 Corporate Drive, Trumbull, CT 06611
Telephone Number: 561-438-4800

Name: Solutions4Sure.com, Inc.
Address: 55 Corporate Drive, Trumbull, CT 06611
Telephone Number: 561-438-4800

The contact information for the lawyers representing Office Depot in this matter

is:

Gregory A. Clarick
Clarick Gueron Reisbaum LLP
40 West 25th Street
New York, New York 10010
(212) 633-4310
gclarick@cgr-law.com

Michael J. Canter
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
mjcanter@vorys.com

Robert N. Webner
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
rnwebner@vorys.com

Kenneth J. Rubin
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
kjrubin@vorys.com

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By: /s/ Gregory Clarick
        Gregory A. Clarick
        40 West 25th Street
        New York, New York 10010
        (212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

        Michael J. Canter
        Robert N. Webner
        Kenneth J. Rubin
        52 East Gay Street
        Columbus, Ohio 43215
        (614) 464-6400

        *Attorneys for Office Depot, Inc.; Viking
        Office Products, Inc.; 4Sure.com, Inc.;
        Computers4Sure.com, Inc.; and
        Solutions4Sure.com, Inc.*

**CERTIFICATE OF SERVICE**

I, Gregory A. Clarick, hereby certify that on May 27, 2013, I caused a true and correct copy of the foregoing STATEMENT OF OBJECTIONS to be electronically filed with the Clerk of the Court in accordance with the Eastern District's Rules on Electronic Service, and served via U.S. mail upon Class Counsel, Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, and Counsel for the Defendants, Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019

/s/Gregory Clarick
Gregory A. Clarick

# A1836

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1:05-md-1720-JG-JO |

## STATEMENT OF OBJECTIONS

Staples, Inc.; Staples the Office Superstore East, Inc.; Staples the Office Superstore, LLC; Staples Contract & Commercial, Inc.; Quill Corporation; Quill Lincolnshire, Inc.; Medical Arts Press, Inc.; SmileMakers, Inc.; Thrive Networks, Inc.; and SchoolKidz.com, LLC (collectively "Staples") are members of the putative Rule Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*. Staples has opted out of the Cash Settlement Class.

Staples is a Class Member because it will accept Visa Branded Cards and/or MasterCard Branded Cards in the United States in the future.

Staples objects to the settlement in this lawsuit. Staples objects to certification of the Rule Changes Settlement Class, and the proposed settlement for the Rule Changes Settlement Class. Staples' reasons for objecting, and the laws and evidence that support each objection, are set forth in the Memorandum In Support attached hereto.

My personal information is:

Name: Staples, Inc.
Address: 500 Staples Drive, Framingham, MA 01702
Telephone Number: 508-253-5000

# A1837

Name: Staples the Office Superstore East, Inc.
Address: 500 Staples Drive, Framingham, MA 01702
Telephone Number: 508-253-5000

Name: Staples the Office Superstore, LLC
Address: 500 Staples Drive, Framingham, MA 01702
Telephone Number: 508-253-5000

Name: Staples Contract & Commercial, Inc.
Address: 500 Staples Drive, Framingham, MA 01702
Telephone Number: 508-253-5000

Name: Quill Corporation
Address: 100 Schelter Road, Lincolnshire, IL 60069
Telephone Number: 508-253-5000

Name: Quill Lincolnshire, Inc.
Address: 100 Schelter Road, Lincolnshire, IL 60069
Telephone Number: 508-253-5000

Name: Medical Arts Press, Inc.
Address: 8500 Wyoming Ave. N, Minneapolis, MN 55445
Telephone Number: 508-253-5000

Name: SmileMakers, Inc.
Address: 425 Sha Lane, Spartanburg, SC 29307
Telephone Number: 508-253-5000

Name: Thrive Networks, Inc.
Address: 655 Andover Street, Floor 3, Lawrence, MA 01843
Telephone Number: 508-253-5000

Name: SchoolKidz.com, LLC
Address: 11210 Katherine's Crossing, Suite #500, Woodridge, IL 60517
Telephone Number: 508-253-5000

The contact information for the lawyers representing Staples in this matter is:

Gregory A. Clarick
Clarick Gueron Reisbaum LLP
40 West 25th Street
New York, New York 10010
(212) 633-4310
gclarick@cgr-law.com

Michael J. Canter
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
mjcanter@vorys.com

Robert N. Webner
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
rnwebner@vorys.com

Kenneth J. Rubin
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400
kjrubin@vorys.com


Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By:  /s/ Gregory Clarick
        Gregory A. Clarick
        40 West 25th Street
        New York, New York 10010
        (212) 633-4310

**A1839**

VORYS, SATER, SEYMOUR AND PEASE LLP

Michael J. Canter
Robert N. Webner
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400

*Attorneys for Staples, Inc.; Staples the
Office Superstore East, Inc.; Staples the
Office Superstore, LLC; Staples Contract &
Commercial, Inc.; Quill Corporation; Quill
Lincolnshire, Inc.; Medical Arts Press, Inc.;
SmileMakers, Inc.; Thrive Networks, Inc.;
and SchoolKidz.com, LLC*

# A1840

**CERTIFICATE OF SERVICE**

I, Gregory A. Clarick, hereby certify that on May 27, 2013, I caused a true and correct copy of the foregoing STATEMENT OF OBJECTIONS to be electronically filed with the Clerk of the Court in accordance with the Eastern District's Rules on Electronic Service, and served via U.S. mail upon Class Counsel, Alexandra S. Bernay, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, and Counsel for the Defendants, Wesley R. Powell, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019.


/s/Gregory Clarick
Gregory A. Clarick

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This Document Relates To: ALL ACTIONS

MDL Docket No. 1:05-md-1720-JG-JO

**DECLARATION OF MICHAEL S. WEISBACH**

Pursuant to 28 U.S.C. § 1746, the undersigned, Michael S. Weisbach, declares the following:

#### A. Introduction

1.     I am the Ralph Kurtz Chair and Professor of Finance at The Ohio State University. I have taught corporate finance, economics, and other related classes over the last twenty-six years at five business schools: the Simon School of the University of Rochester; the Eller School of the University of Arizona; the College of Business of the University of Illinois; the Booth School of Business of the University of Chicago; and the Fisher School of The Ohio State University. I have published forty-one articles in finance, accounting, economics and law journals and, according to *Google Scholar*, these articles (and others that have yet to be published) have been cited over 17,000 times in academic journals. The majority of these papers were both peer-reviewed and empirical, and presume an expert's knowledge of estimation and forecasting. Many of the papers explicitly use financial estimation or forecasting techniques. I also regularly have taught on these topics to doctoral students at a number of different universities. I am an editor of the Review of Financial Studies, which is generally considered one of the top three academic journals in finance. In addition, I have been on the editorial boards of four other journals and am a Research Associate of the National Bureau of Economic

# A1842

75% discount in Table 2 to the calculations in Table 1 does not redeem the flaws in Table 1, or make Dr. Frankel's "illustrations" any more "conservative".

## F. Summary

41.     The "illustrations" provided by Dr. Frankel in Tables 1 and 2 of his declaration do not meet the standards for a reliable forecast.  I reach this conclusion because Dr. Frankel's calculations are based on speculative numbers that were not chosen through any scientific process. The choice of these numbers has an extremely large effect on his calculations, yet there is no reason to believe that any of these numbers correspond to what is likely to happen in the U.S. credit card market should surcharging be permitted as stated in the settlement. Equally important is the fact that a number of states have already opted out of surcharging and the fact that retailers that carry American Express cannot surcharge at all.  Finally, the "illustrations" improperly do not account for many factors that could affect the calculations, including those Dr. Frankel himself has identified as important.   Overall, there are many reasons why the "illustrations" in Dr. Frankel's declaration are not calculations that yield anything close to the expected savings to merchants from allowing them to surcharge credit cards, which means that we cannot consider it a reliable forecast.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 24, 2013.

_____
Michael S. Weisbach

**A1843**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE      :
FEE AND MERCHANT DISCOUNT            :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                 :
                                     :
                                     :          OBJECTION OF
This Document Relates To:            :          CRATE & BARREL
                                     :          TO FINAL APPROVAL
ALL CLASS ACTIONS.                   :          OF THE SETTLEMENT
                                     :
-------------------------------------------------------x

### DECLARATION IN SUPPORT OF OBJECTION OF EUROMARKET DESIGNS, INC., d/b/a CRATE & BARREL and CB2, AND MEADOWBROOK L.L.C., d/b/a THE LAND OF NOD

Frank Bruno hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently Treasury Director for Euromarket Designs, Inc., an Illinois corporation doing business as Crate & Barrel and CB2, in which position I also have responsibility of Treasury activities for Meadowbrook L.L.C., an Illinois limited liability company doing business as The Land of Nod (each of those two entities are collectively referenced herein as "*Crate*"). I have held this position since December 2012, and have worked for Crate since September 2000. I submit this declaration on behalf of Crate to object to the proposed settlement in the interchange case and in support of the opposition to the motion for preliminary approval.

2.      I am responsible for treasury and risk management operations in the company, including: credit, banking, cash management, insurance, and oversight of certain large financial relationships.

3.      I am knowledgeable about Crate's acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange

1

# A1844

merchant would be required to surcharge American Express transactions as well. American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is intended to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

12.     Perhaps more importantly, surcharging debit cards would not even be permissible under the Proposed Settlement, which only allows surcharging on credit cards. Last fiscal year, debit card transactions (including both pin and swipe debit transactions) have grown to represent approximately thirty percent (30%) of total MasterCard and Visa sales.

13.     The only theoretical alternative would be to stop accepting American Express – something that Crate cannot realistically do, for many of the same reasons as it would be practically impossible for Crate to stop accepting Visa or MasterCard brand cards. American Express currently accounts for approximately twenty-six percent (26%) of our major payment card sales. Given that volume, dropping American Express is not a viable business proposition for Crate – and, in any event, would only increase the market share of Visa and MasterCard.

14.     To that end, the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for Crate.

15.     As of the end of its last fiscal year, Crate did business at 101 stores in 27 states and the District of Columbia. Surcharging is illegal in 11 states – Maine, Oklahoma, California, Colorado, Connecticut, Florida, Kansas, Massachusetts, New York, Texas, and Utah – which are the states in which about half of our stores are located. Those states cumulatively hold fifty

4

percent (50%) of our U.S. locations and account for approximately fifty-four percent (54%) of our U.S. sales (including both retail store sales and internet sales).

16.     I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many Crate locations are located, including Illinois (14 locations), Indiana (1 location), Maryland (2 locations), Michigan (1 location), Missouri (1 location), New Jersey (5 locations), Pennsylvania (2 locations), Rhode Island (1 location), and Washington (3 locations). Combined with states that already ban surcharging, these states account for 78% of our U.S. locations and approximately 80 % of our U.S. sales.

17.     The fact that such a substantial additional percentage of our volume may be covered by state prohibitions reinforces the conclusion that the surcharging relief in the settlement is of no value to our company. We would not invest in making changes to our POS and accounting systems and invest in training our sales staff when additional state prohibitions may be implemented at any time in the future. Additional bans and regulatory uncertainty further weaken any potential benefit from the proposed settlement. Considering that few if any merchants have actually surcharged any transactions following the rules changes that took effect in January, the legislative response in these many new states is notable.

18.     The fact that surcharging is legally permitted in some but not all of our stores is problematic in and of itself. For operational, staff training, and customer service reasons, we would not implement surcharging in states where it is permitted while it is prohibited in others. Even if the American Express limitation did not exist and we were otherwise inclined to surcharge, we would not want to, and it would be costly both financially and practically to, engage in a practice that would not be applicable across all of our stores.

19.     These facts negate any value surcharging might offer to Crate, and it is extremely

5

# A1846

unlikely that Crate would surcharge under these terms.

**B.      The Other Relief in the Settlement Is of No Value to Crate**

20.      The settlement allows merchants to vary their acceptance practices in different lines of business operating under different trade names.  However, this was not prohibited by any prior rules.  Even though Crate operates under separate banners, this relief is of no value because Crate has no intention of varying acceptance practices – including changes to the company's POS system and staff training – across its brands.

21.      Instead, Crate might benefit from the ability to test any changes to acceptance practices on a store-by-store basis, not across locations operated under different trade names. The all outlets provision in the settlement, therefore, does not provide Crate and other merchants what they really need – the ability to test new acceptance practices at a small number of stores within a distinct trade name.

22.      We also understand that Visa and MasterCard did not have rules against group buying prior to this settlement.  We have never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to our company.

**C.      The Release in the Proposed Settlement Is Too Broad**

23.      Crate objects to the scope of the release set forth in the settlement for both the (b)(2) and (b)(3) classes as overbroad.  Specifically, the settlement appears to release the defendants from virtually all past, present, and future claims.  The release covers interchange and any other fees imposed by networks, issuers, and acquirers, the Honor All Cards rules, routing

6

# A1847

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE     :     MDL No. 1720 (JG)(JO)
FEE AND MERCHANT DISCOUNT         :
ANTITRUST LITIGATION                   :     **OBJECTION OF**
                                            :     **GAP INC. TO FINAL**
                                            :     **APPROVAL OF**
                                            :     **THE SETTLEMENT**

-----------------------------------------------------------------x

### DECLARATION IN SUPPORT OF OBJECTION OF GAP INC. d/b/a GAP, GAP OUTLET, BANANA REPUBLIC, BANANA REPUBLIC FACTORY STORES, OLD NAVY, PIPERLIME, ATHLETA, AND INTERMIX

Roger Chelemedos hereby declares:

1.      I am Senior Vice President, Corporate Finance, Treasurer and Controller of Gap Inc., a Delaware corporation. Gap Inc.'s brands include Gap (including Gap, GapKids, babyGap, GapMaternity and GapBody), Gap Outlet, Banana Republic, BR Factory Stores, Old Navy, Piperlime, Athleta and Intermix (together, "Gap"). This declaration sets forth the reasons that Gap objects to the proposed settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* (MDL 1720).

2.      I have worked at Gap and its related companies for approximately 2 years. Prior to Gap, I worked at a Fortune 500 retailer for 6 years, also as Senior Vice President Finance, Controller and Treasurer. I oversee treasury, corporate controllership, including our global finance shared service center and our tax department. As Treasurer, among other things, I

1

# A1848

not a viable business proposition for Gap. American Express volume is substantially less than Visa and Mastercard volume/penetration.

14.    Significantly, surcharging debit cards would not even be permissible under the proposed settlement, which only allows surcharging of credit cards. Visa and MasterCard debit card transactions account for over 50% of Gap's Visa and MasterCard credit and debit card transactions. Consequently, a significant number of our Visa and MasterCard credit and debit card transactions are not eligible for a surcharge if a retailer truly thought this was a viable option.

15.    In addition, Gap does business in all 50 U.S. states, a number of which ban surcharging or have proposed legislation to ban surcharging.

16.    Surcharging is illegal in 11 states and Puerto Rico, including some of the most populous states and where a large proportion of Gap's stores are located. The states of California (298 locations), Colorado (40 locations), Connecticut (42 locations), Florida (141 locations), Kansas (20 locations), Maine (13 locations), Massachusetts (81 locations), New York (187 locations), Oklahoma (24 locations), Texas (185 locations), and Utah (27 locations), and Puerto Rico (12 locations). These states represent some of our largest revenue states.

17.    I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many Gap stores are located, including Arkansas (18 locations), Hawaii (10 locations), Illinois (99 locations), Indiana (38 locations), Kentucky (21 locations), Maryland (46 locations), Michigan (56 locations), Mississippi (17 locations),

5

265617.2

Missouri (39 locations), Nevada (28 locations), New Hampshire (19 locations), New Jersey (100 locations), New Mexico (6 locations), Pennsylvania (112 locations), Rhode Island (11 locations), South Carolina (35 locations), Tennessee (45 locations), Vermont (8 locations), West Virginia (8 locations), and Washington (50 locations). Combined with states that already ban surcharging, these states account for (a large majority) of our U.S. locations and sales.

18. The fact that surcharging is legally permitted in only a portion of our stores is problematic itself. Acceptance practices that vary state by state would only add to the confusion and inconvenience for customers, our sales staff, and our point-of-sale systems. Even if we were inclined to surcharge at some unforeseen time in the future, we would be hesitant to engage in a practice that would not be applicable across all of our stores.

19. The fact that such a substantial additional percentage of our volume may be covered by state prohibitions reinforces the conclusion that the surcharging relief in the settlement is of no value to our company. We would not invest in making changes to our systems and training our sales staff when additional state prohibitions may be implemented at any time. Additional bans and regulatory uncertainty further weaken any potential benefit from the proposed settlement. Considering that few if any merchants have actually surcharged after the rules changes that took effect in January 2013, the legislation in these new states is notable.

20. These facts positively demonstrate that this is no value to the surcharging rule proposal in the settlement. Even if we were inclined to surcharge, which we are not, Gap could not reasonably surcharge under these terms.

# A1850

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Applies to: All Cases.** | **No. 05-MD-1720-(JG)(JO)** |

---

## OBJECTIONS TO FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR

STATEMENT OF OBJECTIONS OF:

The Iron Barley Restaurant
5510 Virginia Ave.
Saint Louis, MO 63111-1939
Ph. (314) 351-4500
*Accepted Visa or MasterCard cards since 2004*

Homestead Restaurant (Historical Homestead, Inc.)
12018 U.S. 250
North Milan, OH 44846
Ph. (440) 823-5534
*Accepted Visa or MasterCard cards since 2009*

The Feral Pig (KP Group LLC)
3501 Rice St.
Suite 103
Lihue, HI 96766
Ph. (808) 246-1100
*Accepted Visa or MasterCard cards since 2011*

Paris Beauty Salon
5390 E. 66th Way
Commerce City, CO 80022-2430
Ph. (303) 623-4222
*Accepted Visa or MasterCard cards since 2011*

Rachel Mustoe (dba Tousled Hair Studio)
1680 Champa St.
Denver, CO 80202-2703
Ph. (303) 623-4222
*Accepted Visa or MasterCard cards since 2004*

Kristina Newman – Hair
1680 Champa St.
Denver, CO 80202-2703
Ph. (303) 623-4222
*Accepted Visa or MasterCard cards since 2007*

1

We are members of the Cash Settlement Class and/or the Rule Changes

Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant*

*Discount Antitrust Litigation.*  We are class members because each of us received

notification by mail that we are class members (see attached Legal Notice address pages).

We are represented by counsel below and object to the following aspects of this

settlement set forth below, including Class Counsel's requests for attorneys' fees,

expenses and money awards to Class Plaintiffs, and the law and evidence that support

each objection are set forth below.  Our counsel will appear and speak for us at the

Fairness Hearing.

**I.     This Settlement should be denied by the Court, as the Class Plaintiffs do not satisfy the adequacy requirement, as a conflict of interest exists between the named class representatives and the putative class because each Class Plaintiff is paid $200,000 for not challenging or contesting the settlement, while the parties Settlement Agreement forbids the Class Plaintiffs from challenging any aspects of the Settlement with this Court.**

Class Plaintiffs are scheduled to receive "up to $200,000 per Class Plaintiff in

service awards for their efforts on behalf of the classes." (FAQ's -18.-How much will the

lawyers and Class Plaintiffs be paid?).  Not surprisingly, given the number of opt outs

and objections received thus far, Class Counsel has resorted to manipulation of the Class

Plaintiffs, after a number of these entities jumped ship and decided it was better to opt out

of this litigation or object (see www.merchantsobject.com).

How certain can this Court be that this litigation is actually controlled by the

attorneys and not the Class Plaintiffs?  What evidence exists that shows that the approval

of the Class Plaintiffs of the proposed settlement was obtained involuntarily, or by means

of quid pro quo?  The parties Settlement Agreement demonstrates that the Class Plaintiffs

are not in control of this litigation, as demonstrated by this important paragraph:

2

# A1852

5. The Class Plaintiffs agree that they (a) will not seek to become Opt Outs or otherwise exclude themselves from the Rule 23(b)(3) Settlement Class, or in any way, by class definition or otherwise, seek to exclude themselves from the Rule 23(b)(2) Settlement Class, and (b) will not object to the Court's preliminary or final approval of this Class Settlement Agreement. The Class Plaintiffs will seek, and on the basis of and in reliance on this commitment the Defendants will not oppose, the Court's appointment of the Class Plaintiffs as the representative members of the Rule 23(b)(3) Settlement Class and the Rule 23(b)(2) Settlement Class.

(Stlmt Agrmt. Doc #1656-1, p. 23, par. 5). Here, in exchange for payment of $200,000 to

each and every remaining Class Plaintiff, they in turn have agreed and are now

contractually obligated not to opt out, exclude themselves, and will not object to the

Court's approval-preliminary or otherwise-of this Settlement. These Class Plaintiffs are

no longer adequate to protect the interests of the class. They each signed the Settlement

Agreement, with full knowledge of the contents. They each knew that they were in effect

walking away from the class members, and turning their collective backs on them at the

most critical time- settlement.

  This Settlement cannot be approved, given the obvious conflict of interest.

"Among the prerequisites to the maintenance of a class action is the requirement of Rule

23(a)(4) that the class representatives `will fairly and adequately protect the interests of

the class.'" _London v. Wal-Mart Stores, Inc.,_ 340 F.3d 1246, 1253 (11th Cir., 2003);

_Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan,_ 221 F.3d 1235, 1253 (11th

_Cir., 2000)._ This mandatory requirement not only applies to the named plaintiffs, but also

to class counsel. _Amchem Prods., Inc. v. Windsor,_ 521 U.S. 591, 626 (1997); _Baffa v._

_Dorfinger,_ 222 F.3d 52, 60 (2nd Cir., 1999). The "incentives" of the class representatives

must "align with those of absent class members so as to assure that the absentees'

interests will be fairly represented." _London,_ 340 F.3d at 1253; _Prado v. Bush,_ 221 F.3d

3

# A1853

*1266, 1279 (11th Cir. 2000)*. Here, the Class Plaintiffs cannot demonstrate that they will protect the absentee class members interests, and that they are "fairly represented" since the Class Plaintiffs are contractually obligated to not dissent or oppose any aspect of the settlement. Furthermore, the Class Plaintiffs receive a more than generous economic settlement for agreeing to remain silent and permit Class Counsel to manipulate the litigation as they see fit.

The party seeking certification, or approval of settlement bears the burden of establishing that class representatives are adequate. *Berger v. Compaq Computer Corp., 257 F.3d 475, 481 (5th Cir. 2001)*. The contractual obligations of Class Plaintiffs are the resounding death bell heard throughout this case, prohibiting this Court from approving this Settlement when the independence of the Class Plaintiffs is no longer disputed:

> In most cases, the financial benefit to counsel far exceeds the individual benefit to class members. Therefore, independence from class counsel is imperative, since an obvious function of the class action representative is to act as a check on the attorneys, as an additional assurance that in any settlement or other disposition the interests of the members of the class will take precedence over those of the attorneys. This would seem to require that the class representative shall have some measure of independence from the attorneys, or at least not be the alter ego of the attorneys.

*Brissenden v. Time Warner,25 Misc. 3d 1084, 1093, 885 N.Y. S.2d 879 (N.Y. Sup. Ct., 2009); Meachum v. Outdoor World Corp., 654 N.Y.S2d 240, 252 (N.Y. Sup. 1996); Tanzer v. Turbodyne Corp., 68 A.D.2d 614, 620 (1st Dept. 1979)*. Here, the Class Plaintiffs are contractually obligated to approve the settlement-no matter what the contents. In fact the only "check" performed by the Class Plaintiffs is making sure that they each receive their respective checks for $200,000.

This lack of independence is fatal to any further proceedings under these conditions-with these Class Plaintiffs. Not surprisingly, this "Lack of independence of the

4

# A1854

class representative from counsel increases the potential for impropriety, since "in any class action there is always the temptation for the attorney for the class to recommend settlement on terms less favorable to his clients because a large fee is part of the bargain." *Graybeal v. American Sav. & Loan Assn.*, 59 F.R.D. 7, 13 (D.D.C. 1973); *accord - Meachum*, 654 N.Y.S2d at 255.

Here, it is unquestioned that Class Counsel seeks to pull in over 700 Million in attorneys' fees, agreeing to seek no more than "11.5% of the Cash Settlement Fund of $6.05 billion and 11.5% of the Interchange Fund estimated to be $1.2 billion to compensate all of the lawyers and their law firms that have worked on the class case." (FAQ's-18-How much will the lawyers and Class Plaintiffs be paid?). That the fee sought is large is not in question. Combining the incredible cash recovery of the attorneys with the lack of independence of the Class Plaintiffs, as agreed upon by the parties in the Settlement Agreement is fatal according to the courts discussed above and the prevailing rules in the majority of courts.

Such issues involving inadequate named plaintiffs are not foreign to class counsel, who has seen similar issues raised in another case they were involved in, *In re Imax Securities Litigation*, No. 06 Civ. 6128 (NRB), United States District Court, S.D. New York, December 20, 2010. In that case, Class Counsel Robbins Geller found their class plaintiff did not meet the adequacy requirement due to a conflict of interest involving another law firm that was not disclosed to the court that also apparently represented the named plaintiff. In that case, the court learned that the named plaintiff, Snow and undisclosed attorney, Yates had been friend and neighbors for between 20 and 25 years. In refusing to certify the class action with Snow as the named plaintiff, the trial court

5

noted that "given that there was a wealth of disinterested investors who could serve as class representatives . . . the Court deemed it proper to eliminate any possible conflict of interest between the named plaintiffs and the class."  In *Imax Securities Litigation*, it was the "possibility of inadequacy and appearance of impropriety" that made it sufficient to deny certification of a class with Snow Capital as its representative.

Likewise, given that this Court has before it the Settlement Agreement that prohibits Class Plaintiffs from opting out, objecting or voicing their disproval to any aspect of this settlement requires this Court to reject the settlement.

The monetary recovery of the Class Plaintiffs, at $200,000 each or more aptly described as "hush money" to ensure their silence and aquiescence to the terms of the settlement is also fatal to approval of this settlement.  Tying payment of service awards to class plaintiffs who then agree to settlement of the class action results in remand to trial court. *Rodriguez v. West Publishing Corp., 563 F.3d 948, 960 (9th Cir., 2009)*. Class Counsel who have a conflict of interest forefeit their attorneys' fees. *Rodriguez v. Disner, 688 F.3d 645, 652 (9th Cir., 2012)*. A court has broad equitable power to deny attorney's fees when an attorney represents clients with conflicting interests. *Silbiger v. Prudence Bonds Corp., 180 F.2d 917, 920 (2nd Cir., 1950); accord Rodriguez II, 563 F.3d at 653.* Here, the Class Plaintiffs are provided with a financial incentive to "look the other way" during the settlement of this action, and for those that want the money and might change their mind, they have the binding Settlement Agreement they each signed that reminds them of their "obligation."

This Court determines the adequacy of the class representatives "independently of the general fairness review of the settlement; the fact that the settlement may have overall

6

# A1856

benefits for all class members is not the "focus". *Denney v. Deutsche Bank Ag, 443 F.3d 253, 268 (2nd Cir., 2006)*. In the 2nd Circuit, adequacy is a twofold analysis: "the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney, 443 F.3d at 268*; *Baffa v. Donaldson, 222 F.3d 52, 60 (2nd Cir., 2000)*; *Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 170 (2nd Cir., 2001)*.

While it is acknowledged that a conflict or potential conflict will not defeat certification of the classes- a conflict that is "fundamental", will destroy the class action. *In re Visa Check/Master Money Antitrust Litig., 280 F.3d 124, 145 (2nd Cir. 2001)*; *accord Denney, 443 F.3d at 268*. To be a "fundamental" conflict, it must be more than mere speculative or hypothetical. *Id.* Here, the Class Plaintiffs bargained away their ability to question, or determine the outcome of these proceedings, agreeing they would not opt out, object or challenge the settlement, or any aspects of the preliminary or final approval. This is explained fully in the Settlement Agreement they each signed. Further, it is without question that each Class Plaintiff receives $200,000 for their "service" to the class.

Under this backdrop, this Court should deny the Settlement, and deny class counsel their attorneys' fees. This Court should further order that the new class representatives be appointed with new counsel.

**II.    The Settlement should be denied as it is unfair to the class members as Class Counsel seeks to create a cy pres fund with unknown parameters concerning who or what entities would be beneficiaries and what the stated purpose is for establishing such a fund, when establishment of such cy pres fund is unnecessary when the monetary relief can be provided to the class members in question.**

Not unlike the buy-out given to the Class Plaintiffs in exchange for their

7

# A1857

contractual silence on the fairness of the Settlement, Class Counsel also fails to disclose the existence of the cy pres provision that purportedly will "benefit" the Rule 23(b)(3) Settlement Class. No beneficiaries are identified, or any purpose, or even a hint at what amount would be used to establish such cy pres fund (Stlmt Agrmt., Doc#1656-1, p. 34, par. 30). The only thing that the is known is that " . . . Class Counsel shall make an application to the Court, with notice to Defendants, for such sums to be used to make cy pres payments for the benefit of members of the Rule 23(b)(3) Settlement Class. Defendants may comment upon and/or object to any such application." Id.

 Why not provide the funds directly to the merchants they purport to represent? Many of the objections filed to date complain of the inadequacy of the recovery. Why the need for a cy pres? Under these circumstances, this court cannot approve the settlement, and must deny it at this time.

 In the 2nd Circuit, "the District Court should bear in mind that the purpose of Cy Pres distribution is to put the unclaimed fund to the next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2nd Cir., 2007). Courts utilize the Cy Pres distribution "where class members are difficult to identify, or where they change constantly, or where there are unclaimed funds." *Id.* The 2nd Circuit follows their "sister circuit" in the determination and analysis that approval of cy pres benefits occurs "where the proof of individual claims would be burdensome or distribution of damages costly." *Masters, 473 F. 3d at 436,* quoting *Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1305 (9th Cir. 1990). Indeed, the progeny of *Six (6) Mexican Workers,* and the test employed by the courts concerning when to invoke cy pres weigh heavily against

8

approval of the Settlement.

A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," and must not benefit a group "too remote from the plaintiff class," _Dennis v. Kellogg Co,_ 697 F.3d 858, 865 (9th Cir.2012); _Six Mexican Workers v. Arizona Citrus Growers,_ 904 F.2d 1301, 1308 (9th Cir., 1990). It is a fundamental principal that "Appellate review of a settlement agreement is generally extremely limited", but where class counsel has negotiated a settlement before certification has occurred requires that courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations". _Kellogg Co.,_ 697 F.3rd at 864, citing _In re Bluetooth Headset Prods. Liab. Litig.,_ 654 F.3d 935, 947 (9th Cir. 2011). Therefore, in order to approve a settlement "requires a higher standard of fairness" along with "a more probing inquiry than may normally be required under Rule 23(e)." _Kellogg Co.,_ 697 F.3rd at 864. Surviving appellate review under these circumstances requires that "the district court must show it has explored comprehensively all factors" and must give a "reasoned response" to all non-frivolous objections. _Id._

Ultimately, the cy pre provision will fail, unless Class Counsel can show that such an award will qualify as "the next best distribution" to giving the funds directly to class members. _Kellogg Co.,_ 697 F.3rd at 865; _Six Mexican Workers,_ 904 F.2d at 1309. This rigorous test of "whether the distribution of the approved class settlement complies with our standards governing cy pres awards" is applied in addition to the trial court "asking

whether the class settlement, taken as a whole, is fair, reasonable, and adequate to all

concerned." _Kellog Co., 697 F.3rd at 865._

An extended analysis of the proposed cy pres distribution is not possible at this

time, due to Class Counsels' failure to provide additional information concerning who or

what the beneficiaries of such cy pres distribution would be and not providing this Court

with information concerning the reasoning, or rationale behind such distribution, along

with disclosing how such distribution satisfies the test employed by _Six Mexican Workers_

and its progeny.  Objectors specifically retain such right to supplement their objections on

this issue when, and if, Class Counsel informs this Court and the class as to how they

intend to implement the proposed cy pres distribution.

**III.   The Release is too broad, and therefore the Settlement is unfair to the class members as class members purportedly release any and all claims that they may have in the future against Defendants that arise on or after the Settlement Preliminary Approval Date that accept any Visa-Branded Cards and/or MasterCard-Branded Cards.**

The Rule 23(b)(2) Settlement Class is prospective in nature, or includes "all

persons, businesses, and other entities" that accept Visa/Mastercard as of the time of the

Preliminary Approval Date or "in the future." (Stlmt Agrmt., Doc#1656-1, p. 22, par.

2.(b)).  Not only do they not receive any economic recovery, they release claims (Stlmt.

Agrmt., Doc #1656-01, p. 43, par. 39).  Apparently, not only do they not receive any

money, but they also waive any future claims these class members may have against

Visa/Mastercard (Doc# 1656-1, p. 73, par. 68) (". . . hereby expressly and irrevocably

waive, and fully, finally, and forever settle, discharge, and release . . .relating to the

period after the date of the Court's entry of the Class Settlement Preliminary Approval

Order, regardless of when such claims accrue. . .").

10

# A1860

The Release is a win-win for the Defendants, as they continue to maintain the ability to abuse the merchants with excessive fees while prohibiting the class members, including those who were paid some sum of money, from litigating their claims against Defendants. What happens to a class member that has a grievance with Visa two years from now?  Answer: nothing.  Because the class member has waived its legal rights to pursue redress against the Defendant in question.

In a class action context, plaintiffs "may release claims that were or could have been pled in exchange for settlement relief. Plaintiffs' authority to release claims is limited by the "identical factual predicate" and "adequacy of representation" doctrines". _Wal-Mart Stores, Inc., v. Visa U.S.A., Inc._, 396 F.3d 96, 106 (2nd Cir. 2005).  As discussed previously in Part I, the contractual obligation of the Class Plaintiffs' to participate in the proceedings and not opt out, or object is violating the "adequacy of representation doctrine".  Indeed, the Class Plaintiffs' "release claims that share the same integral facts as settled claims, provided that the released claims are adequately represented prior to settlement." _Id._  Nothing about this litigation would suggest that "adequate representation" consists of the Class Plaintiffs' who sold out the class for $200,000 each, and are contractually obligated to sit on the sidelines and not object, or opt out to the settlement in question. In the 2nd Circuit, "adequate representation" is established by "showing an alignment of interests between class members, not by proving vigorous pursuit of that claim." _Id._ Here, the interests between the class members and the Class Plaintiffs has diverged, as the Class Plaintiffs not only cannot properly represent the interests of the class, they are contractually obligated from taking a position contrary

11

# A1861

to that asserted by the parties in this action. And the Class Plaintiffs receive $200,000 for remaining silent while the settlement is presented to the Court.

Meanwhile, the class members in the 23(b)(2) class are releasing all their claims, including future acts, without receiving any consideration.

Because the Settlement's release provisions are overly broad, this Settlement should be rejected. And because the Class Plaintiffs are not adequately representing the class members, the release is invalid and the settlement must be denied.

**IV.   The Settlement is unfair as the attorneys' fees sought are excessive and do not correspond to awards approved in the 2nd Circuit.**

Class Counsel appears to have been intimately involved in the lobbying the federal government in an effort to regulate interchange fees, touting the passage of the Durbin Amendment to the Dodd-Frank Act "which for the first time capped debit interchange fees based on Defendants' cost in processing debit card transactions." (Doc # 3113-1, p. 14). However, Senator Dick Durbin has even voiced his opinion that the offered settlement is not in the best interests of the class members, calling the proposed Settlement " a stunning giveaway to Visa and Mastercard." (www.forbes.com, August 7, 2012 "Sen. Dick Durbin Hates the $7 Billion Visa, Mastercard Settlement").

Just what kind of settlement is this, anyway? According to Senator Durbin, "I believe this proposed settlement represents a capitulation to the Wall Street banks and credit card giants. It is a sweetheart deal for them and a bad deal for merchants and for consumers." Nevertheless, Class Counsel "seeks fees totaling approximately 10 percent of the estimated value of the cash funds", in this case the "cash portion" is $7.25 Million (Doc # 2113-1, p. 8).

12

However, the standard in the 2nd Circuit is nowhere near 10%, and is at best 3% to 6 %. The preferred method in the 2nd Circuit is the "percentage of the fund" method, as opposed to the "lodestar" method. *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2nd Cir. 2005). While courts in megafund cases may award higher percentages of class funds as fees, "the sheer size of the instant fund makes a smaller percentage appropriate." *Id.* at 123. In *Wal-Mart*, a very similar case involving Visa, the attorneys sought fees of over $609,012,000- approximately 18% of the value of the Settlement's compensatory relief of 3.05 Billion Dollars. The trial court reduced the fees to $220,290,160.44. ("Were the Fund not so large, dwarfing the funds in all of the cases Lead Counsel have cited, a larger percentage might be appropriate."). *Id. at 122.*

The amount of fees should be at best 400 Million, staying within the parameters established by the Court of Appeals in *Wal-Mart*.

**CONCLUSION:**

This Court should deny the Settlement at this time, and order new class plaintiffs to be appointed along with new counsel of record for the class plaintiffs. The Court should make a finding that the Class Plaintiffs are inadequate to represent the interests of the class members. The Court should deny any cy pres relief as proposed by Class Counsel. The Releases should be stricken as overbroad as it applies to the all future acts involving the class members and is without consideration. And the Court should reduce the attorneys' fees award under the standards promulgated by the Court of Appeals in *Wal-Mart.* Objectors adopt all other objections that are relevant as if incorporated directly herein.

13

WHEREFORE, Objectors pray that this Court:

1) Refuses to allow Class Plaintiffs to receive their service awards in the amount of $200,000 each;

2) Refuse to certify this class action with the Class Plaintiffs identified at this time as they are contractually obligated to accept the terms of the proposed Settlement without having the ability to opt out or object to such settlement;

3) Order that class counsel be removed from this case and new class counsel be appointed that does not have the conflict of interest involving the named Plaintiffs as identified in Section I above;

4) Deny Class Counsel's application for attorneys' fees due to the conflict of interest addressed in Section I above;

5) Permit other attorneys to produce other proposed class plaintiffs that have not signed the Settlement Agreement restricting their ability to oppose, object or opt out of the Settlement;

6) Deny any cy pres relief proposed by Plaintiffs or Defendants, instead ordering that all funds be paid out to the class members;

7) Strike the release language as overbroad, in that it pertains to future acts for which the parties have received no consideration and the class plaintiffs making such release are not adequate class plaintiffs and as a matter of law cannot release such claims;

8) If attorney's fees are awarded, reduce such award to an amount below 400 Million Dollars in accordance with the standards promulgated in the 2nd Circuit concerning mega fund cases;

14

9)   And any other relief this Court deems necessary within the premises.


Respectfully submitted,

s/Steve A. Miller
STEVE A. MILLER (CO Bar No. 8758)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

JOHN C. KRESS (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO 63111
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com

MAUREEN CONNORS (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
Phone: (216) 640-9860
Fax: (216) 504-4049
Email: maureenconnors@maureenconnorslaw.com

JONATHAN E. FORTMAN (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax: (314) 524-1519
Email: jef@fortmanlaw.com

J. SCOTT KESSINGER (9429HI)
3-2600 Kaumualii Highway
Suite 1300, #325
Lihue, HI 96746
Phone: (808) 635-2924
Fax: 314.754.8370
jscottkessinger@ gmail.com

**CERTIFICATE OF SERVICE**

On this 28th day of May, 2013 this document was filed with the Clerk of Court and was emailed to counsel below:

United States District Court for the Eastern District of New York
Clerk of Court
225 Cadman Plaza
Brooklyn, New York 11201

**Designated Class Counsel:**
Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Email: xanb@rgrdlaw.com

**Designated Defendants' Counsel:**
Wesley R. Powell
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Email: wpowell@willkie.com

<u>s/Steve A. Miller</u>

16

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

*Si desea leer este aviso en español, llámenos o visite nuestro sitio web*

若要阅读本通知的中文版，请致电或访问本公司的网站

このお知らせを日本語でお読みになりたい方は、当社までお電話をいただくか、
または当社ウェブサイトをご覧ください

한국어로 보시려면 전화를 주시거나 저희 웹사이트를 방문해 주십시오

*Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi*

ในการอ่านประกาศนี้ในภาษาไทยให้โทรหรือเยี่ยมชมเว็บไซต์ของเรา

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

## www.PaymentCardSettlement.com • 1-800-625-6440

SAINT LOUIS MO 63111-1939
5510 VIRGINIA AVE
IRON BARLEY
00032-001388 ***************AUTO**3-DIGIT 631


4719-0307SS83-8

## Legal Notice about a class action settlement.

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
TWIN CITIES, MN
PERMIT NO. 6506

# A1867

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
**PAID**
TWIN CITIES, MN
PERMIT NO. 6006

## Legal Notice about a class action settlement.

 4719-19750031-6

00010-000451 *************AUTO**3-DIGIT 441
HOMESTEAD RESTAURANT
PO BOX 360604
STRONGSVILLE OH  44136-0011

**www.PaymentCardSettlement.com • 1-800-625-6440**

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

โปรดอ่านประกาศนี้เป็นภาษาไทยโทรหาเราหรือเข้าเยี่ยมชมเว็บไซต์ของเรา

Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi

한국어로 이 통지를 읽으려면 저희에게 전화를 하시거나 웹사이트를 방문해 주십시오

本通知を日本語でお読みになりたい方は、弊社までお電話をいただくか、

弊社のウェブサイトにアクセスしてご覧ください

若需图读本通知的中文版，请致电或访问本公司的网站

Si desea leer este aviso en español, llámenos o visite nuestro sitio web

## A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

# A1868

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

*Si desea leer este aviso en español, llámenos o visite nuestro sitio web*

若要閱讀本通知的中文版，請致电或访问本公司的网站

このお知らせを日本語でお読みになりたい方は、当社までお電話をいただくか、または当社ウェブサイトをご覧ください

한국어로 보시려면 전화를 주시거나 저희 웹사이트를 방문해 주십시오

*Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi*

ในการอ่านประกาศนี้ในภาษาไทยโปรดโทรศัพท์ถึงเราหรือเยี่ยมชมเว็บไซต์ของเรา

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

## www.PaymentCardSettlement.com • 1-800-625-6440

0009-00166      •••••••••••••AUTO**3-DIGIT 441
HOMESTEAD RESTAURANT
PO BOX 360604
STRONGSVILLE OH 44136-0011

4719-0721-4065-6



## Legal Notice about a class action settlement.

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
TWIN CITIES, MN
PERMIT NO. 6006

# A1869

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

*Si desea leer este aviso en español, llámenos o visite nuestro sitio web*

若要阅读本通知的中文版，请致电或访问本公司的网站

このお知らせを日本語でお読みになりたい方は、当社までお電話をいただくか、
または当社ウェブサイトをご覧ください

한국어로 보시려면 전화를 주시거나 저희 웹사이트를 방문해 주십시오

*Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi*

ในกรณีอ่านประกาศนี้ในภาษาไทยโปรดติดต่อสอบถามมาได้ทาง

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

## www.PaymentCardSettlement.com • 1-800-625-6440





4719-13055519-7

**Legal Notice about a class action settlement.**

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
TWIN CITIES, MN
PERMIT NO. 6006

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

A1870

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

*Si desea leer este aviso en español, llámenos o visite nuestro sitio web*

若要阅读本通知的中文版,请致电或访问本公司的网站

このお知らせを日本語でお読みになりたい方は、当社までお電話をいただくか、
または当社ウェブサイトをご覧ください

한국어로 보시려면 전화를 주시거나 저희 웹사이트를 방문해 주십시오

*Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi*

ในการอ่านประกาศนี้ในภาษาไทยให้โทรหรือเยี่ยมชมเวปไซต์ของเรา

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

## www.PaymentCardSettlement.com • 1-800-625-6440

0002\3-000993 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*AUTO\*\*3-DIGIT 800
PARIS BEAUTY SALON
5390 E 66TH WAY
COMMERCE CITY CO 80022-2430

4719-1375856\33-0



## Legal Notice about a class action settlement.

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
TWIN CITIES, MN
PERMIT NO. 4006

# A1871

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
**PAID**
TWIN CITIES, MN
PERMIT NO. 6006

## Legal Notice about a class action settlement.



4719-10620180-9

00027-001206  *******AUTO**SCH 5-DIGIT 80202
RACHEL ANN MARIE MUSTOE
1680 CHAMPA ST
DENVER CO  80202-2703

**www.PaymentCardSettlement.com • 1-800-625-6440**

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

โปรดอ่านประกาศนี้เป็นภาษาไทยโปรดโทรหาเราหรือเยี่ยมชมเว็บไซต์ของเรา

Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi

이 안내문을 한국어로 읽으시려면 저희에게 전화 하시거나 저희 웹 사이트를 방문해 주십시오.

本通知書の日本語版をお読みになりたい方は、当社までお電話をお掛け下さいか。

这份通知若要阅读中文文本，请致电我们或浏览本公司网站

Si desea leer este aviso en español, llámenos o visite nuestro sitio web

## A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

# A1872

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
**PAID**
TWIN CITIES, MN
PERMIT NO. 6006

# Legal Notice about a class action settlement.



4719-20554767-9

00021-000916   *************AUTO**3-DIGIT 802
RACHEL ANN MARIE MUSTOE
RACHEL MUSTOE
1648 WASHINGTON ST
DENVER CO  80203-1407

## www.PaymentCardSettlement.com • 1-800-625-6440

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

[Thai text]

Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi

[Korean text] 한국어로 이 통지 내용을 읽고 싶으시면 저희 전화로 연락 하시거나 웹사이트를 방문해 주십시오

[Japanese text] この通知を日本語でお読みになりたい方は、当社までお電話くださいか、
または当社ウェブサイトをご覧ください。

[Chinese text] 若需阅读本通知的中文版，请致电我方或访问我方公司网站

*Si desea leer este aviso en español, llámenos o visite nuestro sitio web*

## A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

# A1873

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
**PAID**
TWIN CITIES, MN
PERMIT NO. 6006

## Legal Notice about a class action settlement.



4719-08157599-1

00028-001166  *******AUTO**SCH 5-DIGIT 80202
KRISTINA NEWMAN- HAIR
1680 CHAMPA ST
DENVER CO  80202-2703

**www.PaymentCardSettlement.com • 1-800-625-6440**

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

กรุณาอ่านประกาศนี้เป็นภาษาไทยโดยเข้าไปที่เว็บไซต์หรือโทรศัพท์ติดต่อเรา

Để đọc thông báo này bằng tiếng Việt, xin gọi lại hoặc viếng trang mạng của chúng tôi

본 안내문을 한국어로 읽으시려면 저희 사이트를 방문하시거나 전화하십시오

本通知は日本語でもご覧いただけます。当社までお電話またはホームページをご覧ください。

この案内を日本語でお読みになりたい方は、当社までお電話またはホームページをご覧ください。

如需阅读本通知的中文版，请浏览我们的网站或致电本公司咨询热线

Si desea leer este aviso en español, llámenos o visite nuestro sitio web

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

# A1874

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

*Si desea leer este aviso en español, llámenos o visite nuestro sitio web*

若要阅读本通知的中文版，请致电或访问本公司的网站

このお知らせを日本語でお読みになりたい方は、当社までお電話をいただくか、
または当社ウェブサイトをご覧ください

한국어로 보시려면 전화를 주시거나 저희 웹사이트를 방문해 주십시오

*Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi*

ในการอ่านประกาศนี้ในภาษาไทยให้โทรหรือเยี่ยมชมเวบไซต์ของเรา

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

## www.PaymentCardSettlement.com • 1-800-625-6440

00021-0009z0 AUTO**3-DIGIT 802

KRISTINA K NEWMAN
KRISTINA NEWMAN
5161 STUART ST.
DENVER CO 80212-2910

4719-1997878734-3



## Legal Notice about a class action settlement.

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
TWIN CITIES, MN
PERMIT NO. 6006

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD
INTERCHANGE FEE AND
MERCHANT DISCOUNT
ANTITRUST LITIGATION

MDL Docket No. 1720

MASTER FILE NO.
1:05-md-1720-JG-JO

**NATIONAL RETAIL FEDERATION STATEMENT OF OBJECTION
TO FINAL APPROVAL OF THE PROPOSED RULE 23(B)(2) AGREEMENT**

EMERY CELLI BRINCKERHOFF AND ABADY LLP
Andrew G. Celli, Jr.
Diane L. Houk
Adam R. Pulver
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000

*Attorneys for National Retail Federation*

DATED:  May 28, 2013

# A1876

### TABLE OF CONTENTS

**PAGE NO(s).**

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ........................................................................6

I.    The Proposed Settlement Does Nothing to Alter Visa's and
MasterCard's Dominance in the Credit Card Acceptance Market ............ 8

II.    The Proposed Settlement Fails To Address the High Cost
of Interchange ........................................................... 11

III.    The Rule 23(b)(2) Release Improperly Immunizes the Networks............ 13

IV.    The "Consideration" Afforded to the Rule 23(b)(2) Class
Is Illusory and Thus, Inadequate...................................... 15

        A.    The Surcharging Provision ..........................................16

        B.    The All-Outlets Provision.............................................20

        C.    The Bona Fide Purchasing Group Provision ...............................22

CONCLUSION...........................................................25

EXHIBITS

Declaration of Steven I. Sadove, Chairman of the Board of Directors of the
National Retail Federation
Dated May 24, 2013......................................................Exhibit 1

Declaration of Mallory Duncan, Senior Vice-President and General Counsel
of the National Retail Federation
Dated May 23, 2013......................................................Exhibit 2

Declaration of Neiman Marcus, Inc.
Dated May 21, 2013......................................................Exhibit 3

Declaration of Brooks Brothers Group, Inc.
Dated May 22, 2013......................................................Exhibit 4

Declaration of Talbots, Inc.
Dated May 21, 2013......................................................Exhibit 5

Declaration of Gap Inc. d/b/a Gap, Gap Outlet, Banana Republic, Banana
Republic Factory Stores, Old Navy, Piperlime, Athleta, and Intermix
Dated May 20, 2013......................................................Exhibit 6

i

**A1877**

Declaration of Tiffany & Company
    Dated May 21, 2013 ................................................................Exhibit 7

Declaration of Estée Lauder Companies Inc.
    Dated May 20, 2013 ................................................................Exhibit 8

Declaration of Euromarket Designs, Inc., d/b/a Crate & Barrel and CB2, and
    Meadowbrook LLC, d/b/a The Land of Nod
    Dated May 21, 2013 ................................................................Exhibit 9

Declaration of J. Crew Group, Inc.
    Dated May 22, 2013 ................................................................Exhibit 10

Declaration of Domino's Pizza LLC
    Dated May 16, 2013 ................................................................Exhibit 11

Declaration of New York & Company, Inc.
    Dated May 22, 2013 ................................................................Exhibit 12

Declaration of Express, Inc.
    Dated May 22, 2013 ................................................................Exhibit 13

Declaration of Sonic Corp.
    Dated May 17, 2013 ................................................................Exhibit 14

Declaration of Brookstone Company, Inc.
    Dated May 20, 2013 ................................................................Exhibit 15

Declaration of Belk, Inc.
    Dated May 14, 2013 ................................................................Exhibit 16

Declaration of rue21, Inc.
    Dated May 20, 2013 ................................................................Exhibit 17

Declaration of Destination XL Group, Inc.
    Dated May 16, 2013 ................................................................Exhibit 18

Declaration of Pacific Sunwear of California, Inc.
    Dated May 17, 2013 ................................................................Exhibit 19

Declaration of Dave's Pet City
    Dated May 22, 2013 ................................................................Exhibit 20

Declaration of Lipert International Inc. d/b/a Keith Lipert Gallery
    Dated May 21, 2013 ................................................................Exhibit 21

# A1878

## PRELIMINARY STATEMENT

The National Retail Federation ("NRF") is the nation's largest retail trade association. The NRF represents merchants of all types and sizes, from large department store chains, to small Main Street single-location operations.[1] As the voice of retailers large and small, and the umbrella organization for segment-specific retail trade associations across the United States, the NRF develops and articulates policy positions on behalf of the industry through education, advocacy, and litigation efforts.

Like the millions of retailers it represents, the National Retail Federation is a merchant and a member of the Rule 23(b)(2) class.[2] It accepts credit card and debit card transactions and is itself subject to the rules, restrictions, and interchange rates that are imposed on retailers by Visa and MasterCard. The National Retail Federation opposes all aspects of the proposed Class Settlement Agreement and has opted out of the Rule 23(b)(3) portion of the Agreement. However, like its constituent members, it nonetheless will be bound by the proposed Rule 23(b)(2) Class Settlement (the "Settlement") if the Court approves it. The splitting of the overall settlement into two classes – one for relief under Rule 23(b)(2) and one for relief under Rule 23(b)(3) – is an artifice designed to protect the credit card companies on all fronts, and leave the class with no means of escape from the most onerous terms of the Settlement. Pursuant to the direction of its Executive Committee and Board, which is comprised of the CEOs of thirty-six American retail businesses, the National Retail Federation submits this Objection to the Settlement.

---

[1] The NRF's membership includes traditional department stores, specialty, apparel, grocery, quick-service restaurants, discount stores, online, independent, and chain establishments, among others. Ex. 2, ¶2.

[2] The NRF is located at 325 7th Street, N.W., Suite 1100, Washington DC, 20004, 202-783-7971.

Illustrative of the scope of opposition to the Settlement from all segments of the industry, twenty retailers, all NRF members, have submitted declarations in support of this Objection. The supporting declarants represent a cross-section of the American retail industry, from iconic national department store chains and apparel outlets, to specialty shops and restaurants.  Merely to list these declarants is to illustrate the breadth of opposition to the Settlement:  Neiman Marcus, Brooks Brothers, Talbots, The Gap, Tiffany & Company, Estée Lauder, Crate & Barrel, J. Crew, Domino's Pizza, New York & Company, Express, Sonic Drive-In Restaurants, Brookstone, Belk Stores, rue21, Destination XL, and Pacific Sunwear.  Also attached are declarations from the Chief Executive Officer of one of the best-known department stores in the United States – Saks Fifth Avenue – and the proprietors of two small retail businesses, Dave's Soda and Pet City of Agawam, Massachusetts, and The Keith Lipert Gallery of Washington, D.C.  Like the NRF itself, these supporting declarants firmly believe that the proposed Settlement, in all of its aspects, is profoundly inimical to the well being of their businesses, and to the proper functioning of the retail industry as a whole.[3]

The National Retail Federation objects to the proposed Settlement on three fundamental and interconnected grounds.

First, and most importantly, the Settlement fails to address the core evil that motivated this class action, and that continues to plague the industry:  the outsized economic power of, and the manipulation of interchange rates by, Visa, MasterCard, and their constituent banks.   For many years, Visa and MasterCard, in coordination with the banks, set and enforced interchange rates in lockstep fashion.  Rather than competing for

_____

[3]So committed are they to the proposition that the proposed Class Action Settlement Agreement is contrary to their interests, each and every one of the supporting declarants have both objected to the Settlement, and opted out of the Rule 23(b)(3) monetary settlement as well.

retailer acceptance of their credit and debit cards based on the price of interchange, as they would in a competitive market, Visa and MasterCard, and each of their member banks, have instead virtually consistently raised rates across the board.  Moreover, the networks have insulated themselves and their banks from competitive pressures by forcing retailers to abide by dozens of artificial "acceptance rules" from which there is no escape.  These actions have accorded MasterCard and Visa unprecedented market power.  By the very conservative estimate of the Kansas City Federal Reserve Bank, Visa and MasterCard control approximately 80% of the credit card market.  *See* footnote 6, *infra*; Declaration of Mallory Duncan ("Ex. 2"), ¶13.  The overwhelming majority of merchants have no choice but to accept both forms of payment – or risk devastating consumer rejection.  *See* Section I, *infra*.

       Against this backdrop, the proposed Settlement offers *no* relief on the core issue of collusion over interchange.  Unlike settlements and orders in other price-fixing cases, this Settlement makes no pretense at eliminating communication or price coordination between and among competitors alleged to have been in collusion.  Neither does it constrain the credit card companies and their bank partners in when, how, or at what level they can set interchange.  Rather, the Settlement imposes on retail merchants a mandatory, industry-wide scheme – without the benefit of even a word of legislative, executive, or regulatory-authority input – that, instead of controlling interchange rates, ratifies the networks' pricing practices for all time.  *See* Section II, *infra*.

       Through the mechanism of the mandatory Rule 23(b)(2) release and covenant not to sue (all, the "Release"), the Settlement would entrench MasterCard's and Visa's duopoly position by immunizing them from damages claims *going forward*.  This

3

is the second principal reason that the NRF objects to the Settlement – and it is the single most prevalent complaint voiced to the NRF by its members.  Retailers simply cannot understand how the American system of justice can permit class action lawyers whom they have never met and who know nothing about their business to craft a "settlement" that will preclude them forevermore from seeking redress on future losses, without so much as offering them the opportunity to opt out.  The Release is, in fact, unprecedented and contrary to established law.  But, at a business level, one can certainly understand why MasterCard and Visa would want it:  it gives the credit card networks *carte blanche* to set and manipulate interchange rates going forward without fear of future private suits.  *See* Section III, *infra*.  There is nothing that the credit card networks could give that is worth this unbridled loss of control over retailers' front-of-store operations.

Especially in light of the structure of the retail industry and the entrenched status of Visa and MasterCard, the two "rules reforms" and the "promise to negotiate" that are touted as "consideration" for the Release in fact offer retailers little or nothing of value.  This constitutes the NRF's third core objection to the Settlement.  As the supporting declarations make plain, the Settlement's promise of relief through tweaks to the No-Surcharging and the All-Outlets Rules, and the so-called Bona Fide Purchasing Groups Provision, is a hollow one.  *See* Section I.D.1-3, *infra*.  All three forms of "consideration" are illusory.

First, it is not a solution to price-fixing to suggest that a fixed, supra-competitive price be passed onto consumers; that is precisely what the Settlement's Surcharging Provision purports to do.  Far from putting a brake on high interchange rates, the Surcharging Provision simply passes along the costs—with no direct or discernible

4

impact on interchange itself.  Moreover, as a practical matter, most retailers will not be able to surcharge, regardless of the Settlement.  For instance, millions of small retailers (like Dave's Soda and Pet City of Massachusetts) operate solely in jurisdictions where credit card surcharging is prohibited by state law.  For them, Visa and MasterCard's agreement to permit limited surcharging offers no relief at all.  For most retailers operating in many states, surcharging under the Settlement is effectively impossible for other reasons.  In order to surcharge, retailers must be willing to sacrifice their business relationship with American Express – which few if any can afford to do.  Even then, surcharging could occur only in states where it is not banned by state law, and only at the risk of widespread customer dissatisfaction.  Put simply, this Settlement will *not* result in widespread surcharging, and will have *no* meaningful impact on the status quo.  *See* Section IV(A), *infra*.

Likewise, the Settlement's All-Outlets Provision merely tinkers with the credit card companies' long standing All-Outlets Rule, and would have little practical impact.  Although the Provision would allow a retailer to choose to accept or decline credit card products at different "banner" stores under its ownership, for the vast majority of American retailers, who operate under a *single* "banner," this is a nicety, not a real change.  For them, the Settlement's All-Outlets Provision is every bit as restrictive and anti-competitive as the pre-settlement Rule.  And for that minority of retailers who do operate under multiple "banners," the prospect of eliminating acceptance of one major credit card at one "banner" but not at other "banners" is a mirage.  MasterCard and Visa's raw market power *mandates* that retailers accept both cards, and, to make matters worse, the new rule as written does not permit the type of market testing necessary to determine

whether it would be possible for retailers to survive without one or the other.  *See* Section IV(B), *infra*.

Finally, the Settlement's Bona Fide Purchasing Group Provision is an empty promise.  So deeply embedded is the culture of monopoly in this industry that Visa and MasterCard seem to expect retailers to stand up and applaud at their newfound willingness to sit down and negotiate in good faith.   And that is all that the Bona Fide Purchasing Group provision requires.  Under the Bona Fide Purchasing Group Provision, MasterCard and Visa need not yield an inch on interchange, or on any other restrictive rule, in their talks with retailers.  Nor would they have the slightest incentive to do so.  With perpetual immunity from suit, and unchallenged dominance of the credit card payment market, Visa and MasterCard can be expected to behave the same in a post-Rule 23(b)(2) Settlement world as they behaved in the pre-settlement one – or maybe worse.  *See* Section IV(C), *infra*.

For these reasons and more, the National Retail Federation objects to the preliminary Class Action Settlement Agreement in its entirety and provides this Statement of Objection to the Rule 23(b)(2) Settlement.  The National Retail Federation respectfully asks this Court to find that the Rule 23(b)(2) Settlement is not lawful, fair, or adequate.

## ARGUMENT

The district court may not approve a class action settlement unless it finds that the proposed settlement is "substantively fair."  *See, e.g.*, *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 674 (S.D.N.Y. 2011); *Blessing v. Sirius XM Radio Inc.*, No. 11-3696-CV, 2012 WL 6684572 (2d Cir. Dec. 20, 2012).  In reviewing a proposed settlement, the Court is acting as a fiduciary of the class, and "is subject therefore to the

high duty of care that the law requires of fiduciaries."  *Reynolds v. Beneficial Nat. Bank*,

288 F.3d 277, 280 (7th Cir. 2002); *see also Grant v. Bethlehem Steel Corp.*, 823 F.2d 20,

22 (2d Cir. 1987).  "When a settlement is negotiated prior to class certification, as is the

case here, it is subject to a higher degree of scrutiny in assessing its fairness." *D'Amato v.*

*Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citations omitted); *see also In re*

*Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011); *Karvaly v.*

*eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007).[4]

       While it is true, as a general matter, that public policy favors settlement,

"class actions that are essentially hollow should be avoided so that the public retains or

grows its confidence in class actions and the legal system." *City of Livonia Employees'*

*Ret. Sys. v. Hanson*, 238 F.R.D. 476, 482 (D.S.D. 2006).  The Rule 23(b)(2) Settlement

here is hollow indeed.  At its core, it fails to address the most problematic practice at

issue in the case – i.e., the fixing of interchange rates; it cuts off class members' forward-

looking rights to address that practice and its effects through private litigation; and it

offers members of the Rule 23(b)(2) class limited or no relief at all in return.  *Parker v.*

*Time Warner Entm't Co., L.P.*, 239 F.R.D. 318, 337 (E.D.N.Y. 2007) ("a total lack of

value exchanged for a release of claims is a strong indicator that a settlement is unfair, at

least with respect to those disadvantaged members of the class").

---

[4]On a motion for approval of a settlement, "the burden is on the settlement proponents to persuade the court that the agreement is fair, reasonable, and adequate for the absent class members who are to be bound by the settlement."  *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196 (5th Cir. 2010) (citing 4 Newberg on Class Actions § 11:42 at 118).  The fact that a court preliminarily approved a settlement, as the Court has here, *see* Doc. No. 1745, does not preclude a finding that the settlement is unfair or otherwise deficient on a motion for final approval, as "[t]he standards for preliminary approval of a class settlement are not as stringent as those applied for final approval."  *In re Motor Fuel Temperature Sales Practices Litig.*, MDL 1840, 2011 WL 4431090, at *5 (D. Kan. Sept. 22, 2011) (citing *Karvaly*, 245 F.R.D. at 86). The Court explicitly acknowledged this at the Preliminary Approval Hearing.  *See* Trans. at 61:9-62:23.

From the perspective of the National Retail Federation, what the Class Plaintiffs have agreed to is not a settlement; it is surrender. The proposed Rule 23(b)(2) Settlement is not fair, reasonable, or adequate. This Court, as a fiduciary of the absent class members, should reject it.

## I.     The Proposed Settlement Does Nothing to Alter Visa's and MasterCard's Dominance in the Credit Card Acceptance Market

The National Retail Federation's Objection to the Settlement is grounded in the practical experience of America's retailers. For decades, retailers have been forced to operate in an environment where two major credit card networks controlled by the nation's largest banks have dominated the U.S. card market. The Settlement will effectively ratify that dominance for all time, while offering retailers virtually nothing of practical significance in return.

The market for credit card acceptance in the United States is marked by three immutable features: *first*, that Visa and MasterCard dominate the market; *second*, that interchange – the fees that merchants pay to issuing banks on each credit card transaction – which is set by Visa and MasterCard, has consistently risen over time for no discernible reason other than that they have the power to raise it; and, *third*, that as interchange has risen, Visa and MasterCard have resisted the efforts of retailers to negotiate for lower rates, and worked to enforce a raft of rules that restrict retailer choice. Whether these and other factors amount to an anti-trust violation is not the focus of this

# A1886

Objection; that these conditions *exist*, and will *persist* unchecked under the Settlement's quasi-regulatory regime, is.[5]

      The status of Visa and MasterCard as dominant forces in the U.S. credit card market is beyond cavil.  Reliable studies show that approximately 80% of all credit card transactions that take place in this country are conducted with plastic cards bearing the logo of one of the two credit card giants.[6]  Payment card acceptance is a huge business – consumers spent more than a trillion dollars on credit cards in 2012 – and the impact of interchange rates upon retailers is immense.  Using the average interchange rate of 2% per transaction, in the last year alone, retailers paid more than $40 billion in interchange fees.  Declaration of Stephen I. Sadove ("Ex. 1"), ¶6; Ex. 2, ¶11.[7] Historically, interchange fees represent one of the largest, often the second or third largest, operating expenses for U.S. retailers after payroll.  Ex. 1, ¶6; Ex. 2, ¶11; Declaration of Keith Lipert Gallery ("Ex. 21"), ¶2.

      High interchange is not an outlier phenomenon.  Interchange rates in the United States have consistently risen over time.[8]  With rare exceptions over the last

---

[5]Moreover, there is a lack of transparency built into the very process of charging interchange which is done per transaction with more than a dozen various applicable rates that are only disclosed to the merchant after interchange fees have been charged to the retailer's bank account. Ex. 21, ¶5.

[6] Shy, Ozy and Zhy Wang, *Why Do Payment Card Networks Charge Proportional Fees?,* Federal Reserve Bank of Kansas City, n. 5 (revised January 2010).

[7] *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, But Options for Reducing Fees Pose Challenges*, U.S. Government Accountability Office, Nov. 2000, at 16 (showing that Visa and MasterCard interchange rate rose, for different card types, from 22% to 82% during the period 1991 to 2009).

[8]Interestingly, in Australia where regulatory authorities have directly regulated interchange, such rates have declined over time.  Ex. 2, ¶14.

# A1887

decade, the average amount of interchange collected by Visa and MasterCard has increased 15% annually.   Rising interchange is inexorable.  Ex. 2, ¶14.

As interchange rates have risen, Visa and MasterCard have reinforced their dominant market position by enforcing various rules that restrict retailers' freedom. For example, as a condition of acceptance, these two networks have required retailers to adhere to the Honor All Cards Rules, Regular Price Rules, Non-Discrimination Rules, All-Outlets Rules, and the No-Surcharge Rules.[9]  These Rules make it impossible for retailers to pick and choose among cards depending on interchange rates, to decline to accept particular credit cards in some, but not all, of their locations based on customer demand, or to steer consumers based on the cost of card acceptance.  Such Rules have deprived the retail industry of the very optionality, choice, and freedom to act – or not act – that is the hallmark of a competitive market.  Ex. 2, ¶15.

Lastly, and not surprisingly, having established their position as the must-accept payment method for American retailers, and having reinforced that position through a cartel of banks, Visa and MasterCard, along with  the banks, have refused to deviate from the published interchange rates.  Negotiation over interchange is all but unheard of.  In its place, the networks' conduct and Rules create a Hobson's choice for retailers: accept Visa's and MasterCard's interchange rates as published from every bank in the country, for all locations, or be shut out of the market.  Dr. Dean Baker, an economist and the Co-Director of the Center for Economic and Policy Research, said

---

[9]Further reflective of their market power, Visa and MasterCard have radically altered their interpretation of Rules to further expand their impact, and further restrict retailers.  For example, whereas Honor All Cards once meant that a retailer was compelled to accept all cards of one or the other brand, irrespective of the issuing bank, today it means that the retailer must accept all *types* of cards, including the high-interchange "rewards" cards that the networks so heavily promote.

# A1888

"We have two credit companies, Visa and MasterCard, who comprise almost the entire market. This gives them substantial bargaining power. Few retailers could stay in business if they did not accept both cards." Dean Baker, *How Credit Card Companies Want to Debit You,* The Guardian, Mar. 30, 2011. *See also* U.S. Government Accountability Office (November, 2009) *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants but Options for Reducing Fees Pose Challenges* (Publication No. GAO-10-45) ("As more consumers demand to use Visa and MasterCard cards, merchants feel limited in their ability to refuse these cards even as interchange fee rates rise or as consumers increasingly use rewards cards that have higher interchange rates.").

## II. The Proposed Settlement Fails To Address the High Cost of Interchange

Against this backdrop, the Settlement's failure to address the problem of high interchange rates is inexplicable. As the history set forth above makes clear, for years, retailers have suffered under the yoke of increasing and oppressive interchange rates. This class action, purportedly brought on behalf of all American retailers, was aimed at precisely that evil; its very purpose was to address this endemic problem. But the proposed injunctive relief in the Settlement does nothing at all to control interchange. Ex. 1, ¶5. [10] It does not require Visa and MasterCard to lower rates, or to offer discounts or special arrangements, even for a limited period. And it does not address the kinds of conduct – price signaling and coordination, communications between the networks and their bank partners, etc. – that are at the core of any price-fixing conspiracy. Indeed, the Settlement goes to the opposite extreme, expressly disavowing any control over the credit

---

[10] While the Rule 23(b)(3) monetary settlement class will obtain *some* relief for past damages, that relatively modest payment should not be considered when analyzing whether the Rule 23(b)(2) Settlement is fair and adequate.

card networks' most onerous practice: "Nothing in this Class Settlement Agreement," it reads, "shall limit the ability of any [Visa or MasterCard] Defendant to set interchange rates, whether default rates or rates applicable (either by rule or negotiated agreement) to individual merchants, groups of merchants, or merchants trade associations."  Settlement, ¶¶51 and 64.

It did not have to be this way.  Class actions and government enforcement proceedings aimed at price-fixing routinely result in injunctive relief directly aimed at the conduct at issue, or at least at its immediate effects.  Specifically, courts regularly impose injunctions against price-fixing generally, or against specific forms of communication and coordination among competitors.  *See, e.g., In re Elec. Books Antitrust Litig.*, No. 11-md-02293, Dkt. No. 278 (S.D.N.Y. Feb. 2, 2013) (injunction entered by court prohibiting defendants from, *inter alia*, coordinating prices or limiting sellers' ability to set prices); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. Dec. 23, 2011) (settlement agreement approved by court, enjoining defendants from, *inter alia*, "price fixing, market allocation, [or] bid rigging", including by meeting with other manufacturers to discuss pricing); *Sullivan v. DB Invs., Inc.*, No. 2:04-CV-02819-SRC-TJB, Dkt. No. 122 (E.D. Pa. May 31, 2006) (stipulated settlement approved by court, prohibiting defendant from, *inter alia*, entering into range of exclusivity agreements with third-party producers, or setting or fixing the prices of diamonds sold by third-party producers.)[11]  None of those remedies, and nothing like them, appears in this Settlement.

---

[11]*See, also, In re Currency Conversion Fee Antitrust Litig.*, No. 01-MD-1409-WHP, (S.D.N.Y. Aug. 15, 2006), available at http://www.ccfsettlement.com/documents/mdl_1409_settlement_agreement1384141.pdf, (settlement agreement, approved by court, under which defendants agree not to "contract, combine or conspire in violation of United States antitrust laws regarding Foreign Transaction Fees"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, No. 2:03-md-01532-DBH,

The problem that most directly plagues American retailers is inflated interchange rates caused by the lack of competition.  The cartel-like behavior of Visa, MasterCard, and the banks results in U.S. retailers and customers paying the highest interchange fees in the industrialized world.  It is at the center of all of the retailers' complaints about the payment system in the United States.  The Settlement's failure to engender competition among the banks or to offer retailers any protection from high interchange renders it deeply objectionable to the National Retail Federation, and to the industry as a whole.  Ex. 2, ¶17.

### III.     The Rule 23(b)(2) Release Improperly Immunizes the Networks

In contrast to its failure to protect retailers from high interchange, the Settlement is expansive in its protection of Visa and MasterCard from retailers.  In a Release consuming nearly ten pages of text, Defendants' Counsel, with the acquiescence of nominal Class Counsel, carefully articulates the many respects in which the credit networks and the banks are relieved of liability, for conduct both in the past and into the future.  It is to this aspect of the Settlement – the Release – that the NRF's members have objected most loudly and consistently.  Ex. 1, ¶5.

The core of the objection is found at Paragraphs 68(a), (g) and (h) of the Settlement, which expressly provides that all members of the Rule 23(b)(2) class – which means, *all* retailers, including those not yet in existence who have no capacity to object – are barred from suing Visa and MasterCard for the "future effects" of the credit networks' past and future conduct with respect to "interchange rules, interchange fees, or interchange rates."  This is permanent immunity for the card networks and their bank

---

Dkt. Nos. 353-5 and 353-6 (D. Me. Apr. 25, 2006) (settlement agreement, approved by court, under which defendants agreed not to form any agreements that violate the Sherman Act).

partners.  Since the Release is the only provision in the Settlement where interchange is

even mentioned in the context of forward-looking injunctive relief, there is a certain cruel

irony to this.  Far from constraining Visa and MasterCard in their price-fixing activities,

the Settlement only acts as a restraint on the *retailers*, who are precluded from bringing

suit with respect to these matters – *forever*.  Such a provision, if implemented, would

allow Visa and MasterCard to engage in the very conduct that precipitated this class

action in the first place, without fear of reprisals.  It is deeply unfair and more than the

NRF and its members should be asked to bear.[12]

Worse yet, the Release purports to immunize Visa and MasterCard from

claims involving not only interchange, but virtually *every* network-created rule set forth

in the hundreds of pages that govern the relationship between merchants on the one hand,

and the banks and/or MasterCard and Visa on the other.  Settlement, ¶ 68. Plainly, the

Release reaches matters far beyond the "*identical* factual predicate" of the claims

brought, i.e., the fixing of interchange,[13] and, in that sense, it violates applicable law.  *In*

*re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011)

(quoting *TBK Partners,* 675 F.2d 456, 460 (2d Cir. 1982)).  Because claims involving

everything from the networks' No-Discrimination Rules, to their No-Bypass Rules – and

even any "similar" rules, s*ee* Settlement, Para. 68(c) and (h) – would undoubtedly require

---

[12] *See* Declaration of Neiman Marcus ("Ex. 3"), ¶14; Declaration of Brooks Brothers ("Ex. 4"),
¶11; Declaration of Talbots ("Ex. 5"), ¶10; Declaration of The Gap ("Ex. 6"), ¶23; Declaration of
Tiffany & Company ("Ex. 7"), ¶14; Declaration of Estée Lauder ("Ex. 8"), ¶15; Declaration of
Crate & Barrel ("Ex. 9"), ¶23; Declaration of J. Crew ("Ex. 10"), ¶24; Declaration of Domino's
Pizza ("Ex. 11"), ¶13; Declaration of New York & Company ("Ex. 12"), ¶12; Declaration of
Express ("Ex. 13"), ¶12; Declaration of Sonic Drive-In Restaurants ("Ex. 14"), ¶13; Declaration
of Brookstone ("Ex. 15"), ¶13; Declaration of Belk Stores ("Ex. 16"), ¶13; Declaration of rue21
("Ex. 17"), ¶13; Declaration of Destination XL ("Ex. 18"), ¶13; Declaration of Pacific Sunwear
("Ex. 19"), ¶12; Declaration of Dave's Pet City ("Ex. 20"), ¶10; Ex. 21, ¶18.

[13] *In Re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, No. 05-MD-1720,
Class Settlement Agreement, pp. 1-3 (July 13, 2012).

"proof of further facts" than the facts underlying the settled claim, such claims cannot be released as a matter of law. *TBK Partners*, 675 F.2d at 462. *See also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 577 (E.D. Pa. 2001) (refusing to approve settlement of antitrust class action that included release of claims as to practices that "were not at the core of this class action"). And yet, this is precisely what the Release envisions. So broad a release would present an insuperable obstacle to the future vindication of whatever rights retailers may still have left. For this reason as well, the Release cannot support the Settlement.

Of course, even if a broad release is *permissible*, it must be supported by adequate consideration. *See, e.g., Karvaly,* 245 F.R.D. at 87 (denying approval of settlement, finding that compliance with pre-existing duty insufficient consideration for general release); *Schwartz*, 157 F. Supp. 2d at 578 (finding broad release not justified by limited benefits conferred by settlement). As set out in detail below, the hollow, illusory injunctive relief provided by the Settlement does not even approach such adequacy.

## IV.   The "Consideration" Afforded to the Rule 23(b)(2) Class Is Illusory and Thus, Inadequate

As "consideration" for the Release, the Settlement articulates two "rules changes" and a promise which Defendants' Counsel and nominal Class Counsel contend will benefit the class in both the near and long term. For a host of practical reasons, however, these "reforms" are either useless or unavailable to the great majority of the members of the class. As such, they cannot serve as fair consideration for the very real rights the Rule 23(b)(2) class would be forced to surrender.

15

A.      **The Surcharging Provision**

The first "rules change" is a limited modification of Visa and

MasterCard's longstanding ban on surcharging.  Under the Settlement's Surcharging

Provision, retailers would be allowed to surcharge credit card transactions, under certain,

tightly-controlled conditions. Settlement, ¶¶ 42(a) and 55(a).  Class Counsel argues that

this change will benefit the class because it will allow retailers to pass on the (high) cost

of interchange to their customers.

But, in the fiercely competitive and un-concentrated retail market, where

margins average just 2% and a lost customer today usually means a lost customer forever,

retailers at every level of the industry have uniformly expressed profound reluctance –

indeed, an unwillingness – to risk customer backlash and the attendant lost sales by

surcharging.  Ex. 2, ¶20; Ex. 3, ¶5; Ex. 4, ¶5; Ex. 7, ¶5; Ex. 8, ¶10; Ex. 10, ¶21; Ex. 12,

¶5; Ex. 13, ¶5; Ex. 15, ¶5; Ex. 16, ¶5; Ex. 17, ¶5; Ex. 19, ¶5; Ex. 20, ¶5; Ex. 21, ¶10.  Not

a single one of the nineteen declarant retailers, who hail from a variety of segments and

states, is considering or will consider surcharging; *all* affirm that it is highly unlikely that

they will surcharge.  Ex. 3, ¶9; Ex. 4, ¶8; Ex. 5, ¶7; Ex. 6, ¶¶10, 20; Ex. 7, ¶9; Ex. 8, ¶¶9-

10; Ex. 9, ¶19; Ex. 10, ¶¶9, 21; Ex. 11, ¶5; Ex. 12, ¶5; Ex. 13, ¶7; Ex. 14, ¶7; Ex. 15, ¶7;

Ex. 16, ¶7; Ex. 17, ¶7; Ex. 18, ¶7; Ex. 19, ¶7; Ex. 20, ¶7; Ex. 21, ¶13.

Even if retailers were willing to surcharge, in large swaths of the country,

they are not allowed to do so.  As of May 2013, eleven states – including the four most

populous ones – prohibit the surcharging of credit card transactions as a matter of state

law:  California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New

York, Oklahoma, Texas, and Utah.[14]  An additional seventeen states have indicated that

they are considering similar bans, now and in the future.  *See, e.g.*, K. Wack, "18 States

Considering Bans on Credit Card Surchargers," *American Banker*, Mar. 28, 2013.[15]  Ex.

2, ¶20.  The fact that so many state legislatures have expressed their antipathy toward

surcharging cannot be ignored.  In all events, it is indisputable that retailers operating in

no-surcharging states will derive *no* benefit from the Surcharging Provision of the

Settlement.

     Hardest hit by these state-law bans are exactly the sorts of merchants this

Court should be most concerned to protect: small and regional retailers who operate

exclusively in no-surcharging states.  Take Dave Ratner, for example.  Thirty-eight years

ago, Mr. Ratner founded Dave's Soda and Pet City, a small store carrying,

unsurprisingly, soda pop and pet supplies.  Today, he is the sole proprietor of a "mini-

chain" with seven locations in Massachusetts and Connecticut.  Ex. 20, ¶2.  Like many

other small retailers, Dave's Pet City will never surcharge its customers for credit card

use – because he cannot.  Both Massachusetts and Connecticut have outlawed the

practice.  Ex. 20, ¶¶5-6.  For Mr. Ratner, and the millions of others like him, the

Settlement's surcharging "relief" is no relief at all.  Ex. 2, ¶¶20-21.

---

[14]*See* Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. Ann. § 5-2-212(1); Conn. Gen. Stat. Ann. § 42-133ff(a); Fla Stat. Ann. § 501.0117(1); Kan. Stat. Ann. § 16a-2-403; Maine Rev. Stat. Ann. tit. 9-A § 8-303(2); Mass. Gen. Laws Ann. ch. 140D, §28A(a)(2); N.Y. Gen. Bus. Law § 518; Okla. Stat. Ann. tit. 14A, §§ 2-417; Tex. Fin. Code Ann. § 339.001(a); Utah Code Ann. 13-38a-302 (enacted  April 2013). Mississippi has also recently passed a statute prohibiting the imposition of surcharges on purchases made using state-issued credit or other purchasing cards. *See* Miss. H.B. No. 964.

[15]Available at http://www.americanbanker.com/ issues/178_61/18-states-considering-bans-on-credit-card-surcharges-1057901-1.html (written prior to Utah's adoption of ban).

The state-law prohibitions significantly impact larger merchants as well. The eleven no-surcharging states represent more than 40% of the U.S. population, and a huge quantum of credit card transactions – certainly millions of transactions worth billions of dollars annually – occur in those states.  Ex. 2, ¶21.  Whether it is Neiman Marcus or Domino's, Brooks Brothers or Pacific Sunwear, Express or Estée Lauder, multi-state retailers doing business in those states where state law forbids surcharging will not be able to take advantage of the Surcharging Provision on any of those transactions.[16]  Ex. 3, ¶¶5-6; Ex. 4, ¶6; Ex. 5, ¶6; Ex. 6, ¶¶15-19; Ex. 7, ¶6; Ex. 8, ¶7; Ex. 9, ¶¶15-17; Ex. 10, ¶¶16-19; Ex. 11, ¶6; Ex. 12, ¶6; Ex. 13, ¶6; Ex. 14, ¶6; Ex. 15, ¶6; Ex. 16, ¶6; Ex. 17, ¶6; Ex. 18, ¶6; Ex. 19, ¶6; Ex. 20, ¶6.

There is a further limitation on surcharging that undermines any benefit that the Surcharging Provision might afford to merchants.  The Surcharging Provision requires merchants who impose surcharges on Visa and MasterCard transactions to surcharge "Competitive Credit Card Brands" whose interchange rates are the same or higher than Visa's or Mastercard's.  *See* Settlement ¶¶ 42(a)(iv); 42(b)(iv); 55(a)(iv); 55(b)(iv).  This means that, in order to surcharge Visa or MasterCard, merchants who also accept American Express, the third largest credit card network in the U.S., must also surcharge American Express according to its surcharging rules.  *Those* rules, in turn, require that the merchants who wish to surcharge American Express transactions must also surcharge all other non-cash/non-check payment methods.  American Express Merchant Reference Guide (April 2013), ¶ 3.2.  This *includes* general-purpose debit

---

[16]The implicit suggestion that surcharging in *some* states will drive down interchange in *all* states rests on the false premise that Visa and MasterCard will always rely on *national* interchange tables.  There is nothing in the Settlement, or in the law, that mandates national tables, and nothing that forbids state-by-state tables that would effectively isolate the impact on surcharge to those few states where it might occur.

# A1896

products.  Retailers have been particularly reluctant to surcharge debit, which is the cheapest form of payment card and one that retailers seek to encourage.  Ex. 2, ¶22.

      For the millions of merchants who accept both American Express and one or both of the two dominant credit networks, the interplay of the Settlement's artfully drafted terms and American Express' rules presents them with a stark choice: drop American Express (to avoid *its* rules) in order to surcharge Visa and MasterCard credit (but not debit), or keep American Express and forgo surcharging altogether.  As a practical matter, it's an easy choice.  As the supporting declarants attest, retailers "need" to accept American Express, which represents up to 30% of their credit card transactions, and will forgo surcharging entirely in order to do so.  Ex. 3, ¶7; Ex. 4, ¶7; Ex. 5, ¶7; Ex. 6, ¶¶11-13; Ex. 7, ¶7; Ex. 8, ¶8; Ex. 9, ¶¶11-13; Ex. 10, ¶¶11-12; Ex. 11, ¶7; Ex. 12, ¶7; Ex. 13, ¶7; Ex. 14, ¶7; Ex. 15, ¶7; Ex. 16, ¶7; Ex. 17, ¶7; Ex. 18, ¶7; Ex. 19, ¶7; Ex. 21, ¶13.

      Lastly, even the administrative rules surrounding the Surcharging Provision create unreasonable barriers to surcharging.  Pursuant to Paragraphs 42(c) and 55(c) of the Settlement, a retailer wishing to surcharge credit cards must notify the relevant card network, Visa or MasterCard, in writing, thirty days before imposing a surcharge.  This thirty-day delay sharply inhibits a retailer's flexibility in the marketplace, where, despite the best-laid plans, market conditions may dictate changes in pricing on a weekly or daily basis, and in some markets, on a per-transaction basis.  Ex. 2, ¶24; Ex. 21, ¶10.   There is no conceivable neutral justification for the 30-day notice

rule; it is simply another way in which the consideration afforded retailers under the Settlement is rendered less valuable in the real world.[17]

Put simply, the Surcharging Provisions of the Settlement are an empty promise.  In the first place, surcharging is no remedy to the millions of retailers who operate in one or more of the eleven no-surcharging states, and as many as seventeen more.  To be sure, in those states where surcharging is allowed, a handful of competitively-protected merchants – like doctors' offices or departments of motor vehicles – may surcharge.   But, because surcharging carries such a stigma with customers, and imposes so high a cost on retailers (in part because it would disqualify American Express acceptance, and in part because of the pointless but mandatory delay associated with providing 30-days notice to the networks of a retailer's intent to surcharge), it does not represent meaningful consideration for the Settlement overall.

### B.        The All-Outlets Provision

Like the Surcharging Provision, the Settlement's modification of Visa's and MasterCard's All-Outlets Rules is of virtually no utility in the real world. Historically, under the networks' All-Outlets Rule, retailers were forced to accept Visa-branded or MasterCard-branded cards at *every* location ("all outlets") operated by the same enterprise or at none at all.  Whatever else might be said of the All-Outlets Rules, they plainly restrained retailer choice.  Retailers simply were not permitted to accept a credit card in one outlet, but decline to accept the same brand in another.

---

[17]Adding insult to injury, Suntrust Bank has already notified its retailer customers that if the Settlement is approved by the Court and the retailer should decide to surcharge which according to the settlement obligates the retailer to clearly disclose the surcharge amount on each transaction receipt, Suntrust will not implement support for this "enhancement" due to the complexity and cost of implementing an electronic infrastructure that complies with the Settlement's requirements. Ex. 21, ¶12.

# A1898

The Settlement represents a crack in the former rule, but one that hardly any members of the class can meaningfully exploit.  The Settlement's All-Outlets Provision states that a retailer who operates stores under different trade names or "banners" may accept a credit card at stores under one of its "banners," while declining to accept the same card at stores under a different "banner."  Settlement, ¶¶ 41and 54.  Of course, the vast majority of retailers – as large and as well known as Brooks Brothers or Domino's Pizza, and as small and as local as Dave's Pet City and the Keith Lipert Gallery – are ineligible for banner-level partial acceptance by its terms, because either they have only one location, or because all of their locations operate under the same "banner."  Ex. 2, ¶26; Ex. 4, ¶9; Ex. 7, ¶11; Ex. 11, ¶10; Ex. 14, ¶10; Ex. 15, ¶10; Ex. 16, ¶10; Ex. 17, ¶10; Ex. 18, ¶10; Ex. 19, ¶9; Ex. 20, ¶8; Ex. 21, ¶15.  Most retailers operate under a single brand or "banner;" in fact, they spend many millions in advertising dollars to create customer loyalty to a particular store brand.  For the overwhelming majority of retailers, unless they are willing to abandon that time-honored and highly effective strategy and change the trade names of some of their outlets, which are unlikely, they are no better off with the Settlement, than without it.  Ex. 2, ¶26; Ex. 4, ¶9.

For those retailers who do operate under more than one "banner," the All-Outlets Provision is of negligible value.   In a market environment where MasterCard and Visa are the dominant players, capturing approximately 80% of transactions annually, partial acceptance, ultimately, is not a viable option.  Ex. 2, ¶13; Ex. 3, ¶11; Ex. 6, ¶21; Ex. 8, ¶12; Ex. 9, ¶20; Ex. 10, ¶22; Ex. 12, ¶10; Ex. 13, ¶9.  Neiman Marcus and Estée Lauder, both of whom operate stores under more than one trade name, attest to the phenomenon; given customer expectations and Visa and MasterCard's continuing market

21

power, they say, "we *must* accept their cards at *all* of our trade names." Ex. 3, ¶11; Ex. 8, ¶12 (emphases added).

      More prosaically, even if there were multi-bannered retailers inclined to consider partial acceptance as a strategy, the All-Outlets Provision would not afford them the flexibility necessary to test whether such an approach could work in the real world. At the "banner" level, the All-Outlets Provision, like the Rule itself, is an all-or-nothing proposition: the retailer must accept a network's cards in all of its same-bannered outlets or in none at all. The Provision does not permit a retailer to decline to accept a particular credit card brand in just one or two stores within the banner. Testing a new idea in limited locations is a widely accepted method for retailers to gauge the reaction of real-life customers to an important change in practices, such as payment acceptance. In light of consumer expectations, testing is critically important if a card brand is to be dropped by a merchant.

      For these and other reasons, testing is essential to innovation and change – and the All-Outlets Provision forbids it. Absent the ability to test, partial acceptance of the sort theoretically permitted under the Settlement is unlikely ever to become a reality. Ex. 2, ¶27; Ex. 3, ¶¶10, 12; Ex. 7, ¶10; Ex. 8, ¶11; Ex. 9, ¶21; Ex. 11, ¶9; Ex. 12, ¶9; Ex. 13, ¶8; Ex. 14, ¶9; Ex. 15, ¶9; Ex. 16, ¶9; Ex. 17, ¶9; Ex. 18, ¶9; Ex. 19, ¶10; Ex. 20, ¶9. The class action lawyers who negotiated this Settlement plainly did not understand that.

      **C.**     **The Bona Fide Purchasing Group Provision**

      The Bona Fide Purchasing Group Provision is a fig leaf designed to cover the Settlement's most profound deficiencies. Settlement, ¶¶ 43 and 56. Nominal Class Counsel contends that, while the Settlement imposes no direct control over interchange,

# A1900

merchants can achieve relief through the Bona Fide Purchasing Group Provision.[18]
Likewise, they say, where the Settlement fails to protect merchants from more onerous
Visa and MasterCard rule changes after 2021, the Bona Fide Purchasing Group Provision
is there as a safety net.  For whatever oppressive tactics or dangers the retail industry may
encounter, it would seem, the answer can be found in the newly-won ability of retailers to
organize into purchasing groups and negotiate with the credit card giants.

   Of course, the concept of negotiating through groups of retailers is hardly
a new idea.  The only thing that stood in the way of group negotiations historically was
MasterCard and Visa's self-imposed and anti-competitive refusal to engage in them.  Ex.
3, ¶13; Ex. 4, ¶10; Ex. 5, ¶9; Ex. 7, ¶13; Ex. 8, ¶14; Ex. 9, ¶22; Ex. 10, ¶23; Ex. 11, ¶12;
Ex. 13, ¶11; Ex. 14, ¶12; Ex. 15, ¶12; Ex. 16, ¶12; Ex. 17, ¶12; Ex. 18, ¶12; Ex. 19, ¶11;
Ex. 21, ¶16.  That refusal was based on the networks' market power – a power that will
remain unchallenged (and unchallengeable) should the Settlement be approved.  Thus,
even as Visa and MasterCard say they are ready to accept the *idea* of negotiating with
groups of merchants, the Settlement leaves in place the condition that renders such
negotiations pointless: Visa and MasterCard's ability to dictate interchange rates.  If there
was any doubt as to the credit card networks' intentions going forward on this critical
issue, Paragraphs 51 and 64 of the Settlement would put it to rest:  "Nothing . . . shall
limit the ability of any [Visa and MasterCard] Defendant to set interchange rates."
Indeed.

   Even de-contextualized from market conditions, and taken on its own
terms, the Bona Fide Purchasing Group Provision offers cold comfort to retailers.  To be

---

[18]  Memorandum in Support of Class Plaintiff's Motion for Final Approval of Settlement, pp. 34-
35 (April 11, 2013).

sure, the networks' willingness to entertain a negotiation is a promised departure from past practice, where such group negotiations almost never occurred. But, far from creating a process or environment that requires real compromise, the Provision emphasizes the networks' "discretion" to "reject" any proposal made in negotiations. Settlement, ¶¶ 43 and 56. The Settlement contains no minimum criteria, conditions, or standards for the networks' behavior or substantive flexibility in negotiations, and it is bounded only by the elastic principle of the networks' "good faith." *Id*. Having afforded Visa and MasterCard broad "discretion" on whether to agree to *anything*, the Bona Fide Purchasing Group Provision offers retailers nothing of substance. It is, to use the word found in the case law, a hollow provision.

Finally, and not surprisingly, the Provision lacks an enforcement mechanism sufficient to bring the networks to heel. Instead of allowing retailers who believe they have been trifled with to sue for damages in a court convenient to them – the customary process and remedy for a contract breach – the Settlement limits the merchants to seeking "declaratory relief" from this Court and only as to whether the network negotiated in good faith. Settlement, ¶¶ 43 and 56. Creating a further disincentive for retailers to enforce what meager rights this Provision grants, the Settlement permits fee-shifting against the merchants in the event they sue for declaratory relief in court and lose. *Id*. With no damage award to gain, and the risk of crippling attorneys' fees hanging over their heads, one can hardly imagine a small group of retailers seriously contemplating a proceeding to enforce this Provision.

24

# A1902

The Bona Fide Purchasing Group Provision, on its own or in combination with the two "rules changes," is not sufficient consideration for the Release that is at the center of the Settlement.

## CONCLUSION

For the reasons set forth above and in the accompanying declarations, and for those reasons raised by the other Objectors, the National Retail Federation respectfully requests the Court deny final approval of the Rule 23(b)(2) Settlement.

Dated:  May __, 2013
        New York, New York

EMERY CELLI BRINCKERHOFF & ABADY LLP


_____/s/_____
Andrew G. Celli, Jr.
Diane L. Houk
Adam R. Pulver
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

*Attorneys for the National Retail Federation*

25

# A1903

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

|  |  |
|---|---|
| IN RE PAYMENT CARD | : |
| INTERCHANGE FEE AND | :   MDL Docket No. 1720 |
| MERCHANT DISCOUNT | : |
| ANTITRUST LITIGATION | :   MASTER FILE NO. |
|  | :   1:05-md-1720-JG-JO |

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

## DECLARATION OF MALLORY DUNCAN
## MADE PURSUANT TO 28 U.S.C. § 1746

1.      My name is Mallory Duncan.  I am of majority age, competent to testify, and have personal knowledge of the information stated herein.  I am the Senior Vice-President and General Counsel of the National Retail Federation (the "NRF"), where I am responsible for coordinating strategic legislative and regulatory issues for the organization within the realm of financial services.  I have worked as a lawyer and/or lobbyist in the retail industry for nearly thirty years.  I testify and present before Congress and other venues on matters affecting the retail industry, and, as part of my work, I study and report on trends in the field.   Prior to joining the NRF almost 19 years ago, I served as corporate counsel at J.C. Penney Company, Inc., and before that, I was an attorney advisor at the Federal Trade Commission, where my work involved, among other matters, retail- and consumer-related issues.  I am authorized to make this declaration on behalf of the National Retail Federation, in support of its objection urging the Court not to grant final approval of the Definitive Settlement Agreement dated July 13, 2012, and specifically to the Rule 23(b)(2) Class Settlement (the "Settlement").

2.      The National Retail Federation is the Nation's largest retail trade association.  The NRF represents merchants of all types and sizes, from large department store chains, to

# A1904

independent Main Street single-location operations. The NRF's membership includes traditional department stores, specialty, apparel, grocery, quick-service restaurants, discount stores, online, independent, and chain establishments, among others.

3. We are the voice of retailers large and small, and the umbrella organization for segment-specific retail trade associations across the United States, such as Jewelers of America, International Music Products Association, and the Association of Golf Merchandisers, among others. In those capacities, the NRF advances policy positions on behalf of the industry through education, advocacy, and litigation efforts.

4. Like the millions of retailers we represent, the National Retail Federation is also a merchant and a member of the Rule 23(b)(2) class. It accepts credit and debit card transactions and is itself subject to the rules, restrictions, and interchange rates that are imposed on retailers by Visa, MasterCard, and their banks.

5. The National Retail Federation opposes all aspects of the Definitive Settlement Agreement and has opted out of the Rule 23(b)(3) portion. However, like its constituent members, it nonetheless will be bound by the proposed Rule 23(b)(2) Class Settlement if it is approved. NRF, like most sophisticated merchants, views this settlement as a whole. The splitting of the overall settlement into two classes – one for relief under Rule 23(b)(2) and one for relief under Rule 23(b)(3) – is an artifice designed to protect the credit card companies on all fronts, and leave the class with no means of escape from the most onerous terms of the Settlement. Pursuant to the direction of its Executive Committee and Board, which is comprised of the CEOs of thirty-six American retail businesses, the National Retail Federation is submitting an Objection to the Settlement, along with this declaration and the declaration of Chairman of the NRF Board of Directors, Stephen I. Sadove, in further support.

2

the look-out for a slightly better value proposition around the corner.  Merchants who do not

appreciate this phenomenon don't survive in the marketplace.

        9.     Layered on to the competitive nature of retailing are the low profit margins

discussed above.  The low profit margins associated with the retail business mean that there is

very little room for error.  Losing just one or two customers out of every 100 – whether because

a retailer cannot offer low enough prices, or because there is something about the shopping

experience that is not fully consistent with the customers' expectations (like a retailer not

accepting the most common types of  payment methods)  -- can take a retailer from profitability

into the red.

        10.    For the same reason, innovation in retailing must be carefully managed.  If, as a

retailer, one attempts to innovate in any customer-interfacing aspect of the business on any

widespread basis, and that innovation fails, it could mean serious adverse consequences for the

business.   As a result most segments of the industry are marked by a generally cautious attitude:

the fear of lost sales is a primary driver of decisions on issues like payment card acceptance.[1]

        11.    Lastly, credit card interchange costs have a huge impact on retailers' cost

structures – which is one reason why there is so much interest in this Settlement within our

industry.  Today, credit card interchange costs are approximately 2% per transaction.

Interchange fees (also known as "swipe fees") typically represent the second or third largest

operating expense for U.S. retailers. They are a very significant brake on retailer profitability.

---

[1]  When retailers do attempt to innovate, they typically first *test* the innovation for a limited period in one or two stores only to see how it will be accepted – or not.  This way, if the innovation fails, the retailer can limit the damage and change course before too much of that very low profitability has been expended.

# A1906

**The Market For Credit Card Acceptance in the United States**

12.     The impact of payment cards on retailers is gigantic.   In 2012 alone, consumers spent more than a trillion dollars using credit cards.  Even allowing an average interchange rate of just under 2% per transaction, in the last year alone, retailers approximately paid more than $40 billion in swipe fees, of which the overwhelming majority is credit card interchange.

13.     In the U.S. credit card market, Visa and MasterCard are *the* dominant forces. Approximately 80% of all credit card transactions that take place in this country are conducted with plastic cards bearing the logo of one of these two credit card giants.  Visa and MasterCard, which for decades were associations of their constituent banks, are in fact convenient credit marketing mechanisms for America's major banks.   The top ten banks in particular do the vast majority of Visa and MasterCard credit business.

14.     Additionally, swipe fees in the United States have consistently risen over time. With rare exceptions over the last decade, the average annual amount of interchange collected by Visa and MasterCard for their banks has increased 15%.  Rising interchange has been inexorable, except, briefly, for debit interchange rates immediately after the passage of the Durbin Amendment.  While the card companies claim this high interchange is necessary for system to function, in Australia, where regulatory authorities have directly regulated interchange, such rates have declined dramatically without adversely affecting card penetration and use.

15.     Even as swipe fees have risen, Visa and MasterCard have secured their dominant market position by enforcing various rules that restrict retailers' freedom.  For example, as a condition of acceptance, these two networks have required retailers to adhere to Honor All Cards Rules, Regular Price Rules, Non-Discrimination Rules, All-Outlets Rules, and No-Surcharge Rules.  These Rules, by themselves or in conjunction with the card companies' lack of

5

transparency and, still other rules, have made it impossible for retailers to pick and choose among cards depending on interchange rates, to decline to accept particular credit cards in some, but not all, of their locations on the basis of competitive markets, or to steer consumers based on the cost of card acceptance. The panoply of card company Rules, interpretations, and the general opacity of the system have deprived the retail industry of the very optionality, choice and freedom to act -- or not act -- that is the hallmark of a competitive market.

16.    Lastly, and not surprisingly, having firmly established their position as the must-accept payment method for American commerce, Visa, MasterCard and the banks have refused to deviate from their published rates of interchange. Negotiation over interchange is all but unheard of, and the networks' conduct and their Rules create a Hobson's choice for retailers: accept Visa's and MasterCard's swipe fees as published, for all locations, or be shut out of the overwhelming majority of the payment card market.

17.    The problem that most directly plagues American retailers is this lack of competition. This cartel-like behavior by MasterCard, Visa, and their banks results in U.S. retailers and their customers suffering from the highest swipe fees in the industrial world. This is at the center of all of the retailers' complaints about the payment card system in the United States. The Settlement's failure to engender competition among the banks – and thus providing no protection at all from escalating interchange -- renders it deeply objectionable to the National Retail Federation, and to the industry as a whole.

**Supporting Declarations and Details**

18.    Attached to the NRF's Objection as Exhibits 3-21 are nineteen declarations in further support of the NRF's Objection to the Settlement (the "Supporting Declarations"). The companies and individuals who have submitted these declarations represent a cross-section of the

6

retail industry.  They are also all NRF members.  The Supporting Declarations speak volumes about the ongoing state of the credit card payment market in the U.S., and the practical impact of the Settlement on retailers.

19.     The companies providing supporting declarations are Neiman Marcus, Inc.; Brooks Brothers Group, Inc.; Talbots, Inc.; Gap Inc.; Tiffany & Company; Estée Lauder Companies Inc.; Euromarket Designs, Inc.; J. Crew Group, Inc.; Domino's Pizza LLC; New York & Company, Inc.; Express, Inc.; Sonic Corp.; Brookstone Company, Inc.; Belk, Inc.; rue21, Inc.; Destination XL Group, Inc.; Pacific Sunwear of California, Inc.; Dave's Pet City; and Lipert International Inc.  I should note that The Gap, J. Crew, and Crate & Barrel have authorized NRF to submit the declarations that they have prepared in support of their own objections as further support of the National Retail Federation's Objection.

**Surcharging**

20.     For example, the Supporting Declarations describe the crippling obstacles to surcharging created by market conditions, state law, and the terms of the Settlement itself.  Based on my experience, the vast majority of retailers in the United States will not surcharge credit cards because they will justifiably fear customer backlash.  Moreover, even if retailers were willing to surcharge, in large swaths of the country they would not be allowed to do so.  As of May 2013, eleven states – including the four most populous ones – prohibit the surcharging of credit card transactions as a matter of state law:  California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and Utah.[2]  An additional

---

[2]*See* Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. Ann. § 5-2-212(1); Conn. Gen. Stat. Ann. § 42-133ff(a); Fla Stat. Ann. § 501.0117(1); Kan. Stat. Ann. § 16a-2-403; Maine Rev. Stat. Ann. tit. 9-A § 8-303(2); Mass. Gen. Laws Ann. ch. 140D, §28A(a)(2); N.Y. Gen. Bus. Law § 518; Okla. Stat. Ann. tit. 14A, §§ 2-417; Tex. Fin. Code Ann. § 339.001(a); Utah Code Ann. 13-38a-302 (enacted April 2013). Mississippi has also recently passed a statute

# A1909

seventeen states have indicated that they are considering similar bans, which could be enacted

now or in the future.  *See, e.g.*, K. Wack, "18 States Considering Bans on Credit Card

Surchargers," *American Banker*, Mar. 28, 2013.[3]

> 21.     I understand that the eleven no-surcharging states represent more than 40% of the
>
> U.S. population, and that a huge quantum of credit card transactions – certainly millions of
>
> transactions worth billions of dollars annually – occur in those states.  Whether it is Neiman
>
> Marcus or Domino's, Brooks Brothers or Pacific Sunwear, Express or Estée Lauder, multi-state
>
> retailers doing business in those states where state law forbids surcharging will not be able to
>
> take advantage of the Surcharging Provision on any of those transactions.

> 22.     Another impediment to the widespread adoption of surcharging is the way the
>
> Settlement requires merchants who impose surcharges on Visa and MasterCard transactions to
>
> surcharge "Competitive Credit Card Brands" whose interchange rates are the same or higher than
>
> Visa's or Mastercard's.  *See* Settlement ¶¶ 42(a)(iv); 42(b)(iv); 55(a)(iv); 55(b)(iv).  The effect
>
> of this condition is that, in order to surcharge Visa or MasterCard, merchants who also accept
>
> American Express, the third largest credit card network in the U.S., must also surcharge
>
> American Express and abide by American Express' surcharging rules.  *Those* rules, in turn,
>
> require that the merchants who wish to surcharge American Express transactions must also
>
> surcharge other general-purpose payment cards.  This *includes* general-purpose debit products.
>
> In generally, retailers are particularly reluctant to surcharge debit, which is the cheapest form of
>
> payment card; it is the one payment card method most retailers seek to encourage.

---

prohibiting the imposition of surcharges on purchases made using state-issued credit or other purchasing cards. *See* Miss. H.B. No. 964.

[3]Available at http://www.americanbanker.com/ issues/178_61/18-states-considering-bans-on-credit-card-surcharges-1057901-1.html (written prior to Utah's adoption of ban)

23.     For the millions of merchants who accept both American Express and one or both of the two dominant credit networks, the interplay of the Settlement and the American Express rules presents them with a stark choice: drop American Express (to avoid *its* rules) in order to surcharge Visa and MasterCard credit (but not debit), or keep American Express and forgo surcharging altogether.   As a practical matter, it's an easy choice.  Many retailers "need" to accept American Express, and will forgo surcharging entirely in order to preserve American Express acceptance.  Consequently, even in the 39 states where surcharging is ostensibly allowed, for many retailers, the Settlement's Surcharging Provision is essentially meaningless.

24.     Lastly, even the administrative rules surrounding the Surcharging Provision create unreasonable barriers to surcharging.  Pursuant to Paragraphs 42(c) and 55(c) of the Settlement, a retailer wishing to surcharge credit cards must notify the relevant card network, Visa or MasterCard, in writing, thirty days before imposing a surcharge.  This thirty-day delay sharply inhibits a retailer's flexibility in the marketplace, where, despite the best laid plans, market conditions may dictate changes in pricing practices on a weekly or daily basis, and in some markets, on a per-transaction basis.  There is no conceivable neutral justification for this restriction; it is simply yet another way in which the consideration afforded retailers under the Rule 23(b)(2) Settlement renders an already unwanted remedy even less valuable in the real world.

**The All-Outlets Provision**

25.     The Settlement also tweaks what is called the All-Outlets Rule, a rule set by Visa and MasterCard that required retailers to accept Visa-branded or MasterCard-branded cards at *every* location ("all outlets") operated by the same enterprise or at none at all.   The Settlement provides that, going forward, a retailer who operates stores under different trade names or

9

# A1911

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE PAYMENT CARD | : | |
| INTERCHANGE FEE AND | : | MDL Docket No. 1720 |
| MERCHANT DISCOUNT | : | |
| ANTITRUST LITIGATION | : | MASTER FILE NO. |
| | : | 1:05-md-1720-JG-JO |

### DECLARATION OF DAVE'S PET CITY
### MADE PURSUANT TO 28 U.S.C. § 1746

1.      My name is Dave Ratner. I am of majority age, competent to testify, and have

first-hand knowledge of the information stated herein. I am the Owner and Chief Instigating

Officer of Dave's Retail Trust LLC d/b/a Dave's Soda and Pet City ("Dave's Pet City"). I am

authorized to make this declaration on behalf of Dave's Pet City, in support of the objection

being filed by the National Retail Federation ("NRF") urging the Court not to grant final

approval of the proposed Settlement.

2.      Dave's Pet City operates seven stores, six in Massachusetts and one in

Connecticut. Dave's Pet City sells non-alcoholic beverages, pet supplies and small pets.   Last

fiscal year, we reported gross revenues on continuing operations in the range of $18 million.

3.      Dave's Pet City is a member of the proposed class and will be bound by Fed. R.

Civ. P. Rule 23(b)(2) portion of the Settlement if the proposed Settlement is approved. By way

of further background, Dave's Pet City was also a member of the Rule 23(b)(3) class for

monetary relief in this action, but has elected to formally opt out of that class. Dave's Pet City

also is a member of the National Retail Federation.

1

# A1912

Overall Settlement

4.      Dave's Pet City opposes the proposed Settlement.  The Settlement is unfair because it does not address Visa's or MasterCard's price fixing of interchange rates for the banks which were the subject of the core claims in this case.  In fact, the Settlement all but validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that merchants such as my company and, ultimately, our customers must pay.  Rather than directly confronting the fixing of interchange rates, the Settlement purports to seek to influence interchange rates indirectly through certain "changes" to Visa's and MasterCard's rules for merchants.  Because these so-called "rules changes" will only apply in narrowly circumscribed circumstances, and because my company will not be able to take advantage of them by their own terms, the Settlement overall provides little or no benefit to my company, as described below.  In addition, under the Settlement, Visa and MasterCard reserve the right to alter the rules or their interpretations of the rules over time, making any *possible* benefit ultimately illusory.

Surcharge Rules

5.      The proposed changes in the Settlement to Visa's and MasterCard's "no surcharge" rules are minor and of little or no value to Dave's Pet City.  In the first place, *all* of our sales occur in states where surcharging in banned by state law.  Moreover, in our view, in a highly competitive market segment like ours, even if we could surcharge our customers' card transactions, doing so would, we believe, alienate customers and drive down sales and profits.

6.      Massachusetts and Connecticut are two of the states that ban surcharging.  Six of our stores are in Massachusetts, and one is in Connecticut.  Given this, we *cannot* legally surcharge card transactions– which means that the principal relief provided by the Settlement is of *no* value to this company.

2

7.    The fact is, Dave's Pet City is not now considering surcharging on credit transactions and is highly unlikely to do so in the future.  Our inability to do so under state laws, and the hugely detrimental effect surcharging would have on our customers and our business, simply make surcharging not a viable option for our company.

"All Outlets" Rule Change

8.    In this litigation, Visa and MasterCard's so-called "all outlets" rule was alleged to be anti-competitive.  It provided that, if a retailer accepted Visa or MasterCard at one of its outlets, it must also accept the same card at all of its outlets.  The "rules change" effectuated by the Settlement in this regard is set forth at Paragraphs 41 and 54 of the proposed Settlement. There, the Settlement provides that, as before, merchants *must* accept Visa and MasterCard cards at all outlets that operate under the same trade name or banner in the United States, but it allows merchants to decline to accept those cards at outlets which, although owned by the same retailer, operate under a different trade name or banner.   The proposed changes to the "all outlets" rule have no value to Dave's Pet City because we operate under only one trade name in all of our locations – thus we will be forced to continue to accept all cards in all of our outlets.

9.    Moreover, as left in place, the "all-outlets" rule effectively precludes experimentation with surcharging, which is supposed to be the primary "benefit' achieved by this Settlement.  Were my company to consider surcharging on payment card use, we would need to test that concept in fewer than all of our store locations.  The "reformed" "all-outlets" rule simply does not permit that, and thus we would not have sufficient knowledge or experience of the impacts of so radical a change to institute surcharging at all of our locations at the same time.

Release of Claims

3

# A1914

10.     Dave's Pet City most strenuously objects to that portion of the Settlement that would force it, against its will and with no ability to refuse or opt-out, to give Visa and MasterCard a perpetual release and covenant not to sue that would preclude Dave's Pet City, either alone or as part of a group, from ever challenging Visa's and MasterCard's rules, monopoly power, or exorbitant interchange no matter how high they set their interchange rates. The release purports to cover all Visa and MasterCard rules and conduct that were in place upon preliminary approval of the Settlement, as well as all future rules and conduct that are substantially similar to (as opposed to identical to) rules and conduct in place at the preliminary approval stage.  When combined with the fact that the Settlement's rule changes are only in effect to 2021, but the release is *perpetual*, my company will be unable to legally challenge rule changes by Visa and MasterCard imposed after 2021.

11.     Dave's Pet City also objects to the application of the release to not-yet-existing merchants and current merchants who start accepting Visa and MasterCard credit cards after 2021.

4

# A1915

I declare under penalty of perjury that the foregoing is true and correct.

Executed on [ 5/22/2013

X _____
Dave Ratner

# A1916

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | : : : : : : |

MDL Docket No. 1720

MASTER FILE NO.
1:05-md-1720-JG-JO

### DECLARATION OF LIPERT INTERNATIONAL INC.
### d/b/a KEITH LIPERT GALLERY
### MADE PURSUANT TO 28 U.S.C. § 1746

1.       My name is Keith Lipert.  I am of majority age, competent to testify, and have

first-hand knowledge of the information stated herein.  I am sole owner of Lipert International

Inc., d/b/a Keith Lipert Gallery ("the Keith Lipert Gallery").  I am authorized to make this

declaration on behalf of Keith Lipert Gallery, in support of the objection being filed by the

National Retail Federation ("NRF") urging the Court not to grant final approval of the proposed

Settlement.

2.       The Keith Lipert Gallery has been in the business of selling decorative arts and

fashion jewelry for nearly twenty years.   My sole store is located in the Georgetown

neighborhood of Washington D.C.  The Keith Lipert Gallery has annual gross sales of over $1

million.  Credit card interchange fees vie with healthcare costs as the third highest expense for

my store after rent and salaries.  The Keith Lipert Gallery and other small stores do not receive

promotional assistance from Visa or MasterCard, as these two companies provide regularly to

large retail chains to offset these fees.

1

# A1917

3.      The Keith Lipert Gallery is a member of the proposed class and will be bound by Fed. R. Civ. P. Rule 23(b)(2) portion of the Settlement if the proposed Settlement is approved. By way of further background, the Keith Lipert Gallery was a member of the Rule 23(b)(3) class for monetary relief in this action, but has elected to formally opt out of that class. The Keith Lipert Gallery also is a member of the National Retail Federation and I have served on the NRF Board of Directors for nine years.

Overall Settlement

4.      The Keith Lipert Gallery opposes the proposed Settlement. The Settlement is unfair because it does not address Visa's or MasterCard's price fixing of interchange rates for the banks which were the subject of the core claims in this case. In fact, the Settlement all but validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that merchants such as my company and, ultimately, our customers must pay. Rather than directly confronting the fixing of interchange rates, the Settlement purports to seek to influence interchange rates indirectly through certain "changes" to Visa's and MasterCard's rules for merchants. Because these so-called "rules changes" will only apply in narrowly circumscribed circumstances, and because Keith Lipert Gallery will not be able to take advantage of them by their own terms, the Settlement overall provides no benefit to my business, as described below. In addition, under the Settlement, Visa and MasterCard reserve the right to alter the rules or their interpretations of the rules over time, making any *possible* benefit ultimately illusory.

5.      The Settlement leaves a smaller merchant such as the Keith Lipert Gallery at the complete mercy of Visa and MasterCard. Before the Settlement, Visa and MasterCard varied the amount of interchange charged from one transaction to another without any advance notice to me. It is as if Visa and MasterCard have been an "invisible hand" going into my bank account at

2

# A1918

the end of each month to withdraw a percent of my sales in an arbitrary manner unrelated to the actual cost of the service being provided. Nothing in the Settlement will change this basically unfair and non-transparent structure which enables Visa and MasterCard to become uninvited business partners that never leave.

6.      Currently MasterCard has eight different interchange card categories with rates ranging from 1.58% to 2.85%; Visa has thirteen categories ranging from 1.51% to 2.95%. MasterCard and Visa do not disclose to the merchant why one rate applies to one type of transaction as opposed to another. Within the general category of interchange fees, the Keith Lipert Gallery typically pays on a monthly basis a variety of types of interchange fees to Visa and Mastercard including, assessment fees, access fees, CPS/Rewards, signature preferred retail, domestic merit III, worldcard merit III, corporate card standard, enhanced merit III base, electronic fee, and US regulated fee. In addition to these interchange charges, both companies charge my store additional fees called authorization fees, service fees, network fees, and transaction integrity fee.

7.      To add insult to injury, Visa and MasterCard charge an interchange fee not only on the price of the goods I sell, but on the sales tax for each transaction which I am obligated to collect by law.

8.      By reading business news reports I have learned that retailers operating outside the United States are charged, in some instances, less than one-half the interchange rate that Visa and MasterCard charge retailers in this country for the same service.

9.      While I have no objection to paying Visa and MasterCard a reasonable price related to the actual cost of the service they provide to process electronic forms of currency, the prospect of fairness and transparency in my company's relationship with Visa and MasterCard

3

# A1919

only fades further away with the Settlement, particularly for a smaller merchant such as the Keith Lipert Gallery.

Surcharge Rules

10.     The proposed changes in the Settlement to Visa's and MasterCard's "no surcharge" rules are minor and of no value to the Keith Lipert Gallery. When operating a store such as mine, it is not uncommon for customers to request, and for my store to negotiate, discounts on a per transaction basis at the time of sale. If I were to tell my customers that in addition to the sales price we have just negotiated, I am going to charge you an additional fee if you use a credit card, the fee will vary depending on what card you use and I don't know in advance what the actual fee will be, I expect they would laugh in my face before leaving to shop at a different store.

11.     Additionally, the Settlement would require me to notify Visa and MasterCard at least 30 days before surcharging any customer and then to surcharge each and every transaction. At the same time, Visa and MasterCard will continue to be under no obligation to provide me of any prior notice of the amount of interchange they will charge for each and every transaction. In effect, I would have to set my surcharging rate in advance without knowing what the interchange fees will actually be until after I receive my next monthly bank statement. Such requirements are no consideration for my release of all past and future legal claims regarding the credit card companies' interchange practices.

12.     This past week I received a notice from my bank, a large national bank, that it has been informed that Visa and MasterCard may change their rules due to the Settlement and permit merchants to surcharge. The notice stated that if the Keith Lipert Gallery were to surcharge, then "the surcharge must be clearly disclosed on the transaction receipt." The notice stated further,

4

# A1920

[f]or a variety of factors, including, the number of states currently or looking to prohibit surcharging, as well as the complexity and cost to implement the infrastructure across our platforms and POS environments, we have decided not to implement support for this enhancement.

In short, if I continue to use this bank, I will not be able to print receipts for customers that show the amount of any surcharge fee I might charge customers. I cannot understand why I should be required to bear the costs of changing financial institutions for my business in order to accommodate Visa's and Mastercard's continued absolute control over my store with no financial consideration.

13.      The Keith Lipert Gallery accepts American Express which represents 40 to 45% of our annual credit transactions. I cannot realistically discontinue accepting American Express without serious detriment to my business. Under the proposed Settlement, merchants who accept competitive credit card brands, such as American Express, are allowed to surcharge only if the competitive credit card brands allow surcharging within certain defined parameters. *See* Settlement, Paragraphs 42(a)(iv) and 55(a)(iv). American Express's rules effectively prohibit surcharging because they mandate that I surcharge *all other payment cards* if I surcharge American Express. Thus, because the Keith Lipert Gallery accepts American Express, if I wanted to surcharge Visa and MasterCard credit transactions, I also would have to surcharge Visa and MasterCard labeled *debit* cards, thus discouraging consumers from using debit, even though debit is a massively cheaper form of payment. The Keith Lipert Gallery needs to be able to accept American Express and *not* surcharge debit cards. Accordingly, it is highly unlikely that I would surcharge Visa or MasterCard credit cards under the terms of the Settlement.

14.      The interplay between the Settlement's provisions "allowing" surcharging (if they were to result in surcharging at all, which I doubt) and American Express rules yield the perverse

5

# A1921

result of requiring across-the-board surcharging thereby creating inaccurate price cues to consumers. This would defeat the very purpose for which the lawsuit allegedly was brought: to undo the anti-competitive constraints the card networks have imposed on this market. Consequently, the surcharging provisions in the Settlement are not only of limited or no value to the Keith Lipert Gallery; they would make us worse off than we are currently.

"All Outlets" Rule Change

15.     In this litigation, Visa and MasterCard's so-called "all outlets" rule was alleged to be anti-competitive. It provided that, if a retailer accepted Visa or MasterCard at one of its outlets, it must also accept the same card at all of its outlets. The "rules change" effectuated by the Settlement in this regard is set forth at Paragraphs 41 and 54 of the proposed Settlement. There, the Settlement provides, as before, merchants must accept Visa and MasterCard cards at all outlets that operate under the same trade name or banner in the United States, but it allows merchants to decline to accept those cards at outlets which, although owned by the same retailer, operate under a different trade name or banner.   Proposed changes to the "all outlets" rule have no value to the Keith Lipert Gallery because I operate only one store under one trade name.

Bona-Fide Purchasing Groups

16.     The Settlement permits "bona fide purchasing groups," theoretically, to negotiate lower interchange rates with Visa and MasterCard with no minimum criteria, conditions, or standards. In fact, the Settlement states that Visa and MasterCard retain discretion whether to negotiate, and agree to exercise that discretion "in good faith" and only if they believe that a proposal "provides reasonable commercial benefits" to the credit card company. *See* Settlement, Paragraphs 43 and 56. Since neither Visa nor MasterCard has ever been precluded from contracting with a buying group in the past or present, this Settlement term provides no

6

# A1922

additional benefit to any company; it simply re-states the status quo. Without the Settlement containing any terms defining when and how Visa and MasterCard are required to negotiate or what constitutes a "bona fide purchasing group," this Settlement provision is illusory and leaves any possibility of negotiating lower interchange rates solely within the discretion of Visa and MasterCard.

17.    Moreover, as the owner of a single store, I simply do not have a significant enough market share to negotiate lower interchange rates with Visa or MasterCard.

Release of Claims

18.    The Keith Lipert Gallery most strenuously objects to that portion of the Settlement that would force it, against its will and with no ability to refuse or opt-out, to give Visa and MasterCard a perpetual release and covenant not to sue that would preclude the Keith Lipert Gallery, either alone or as part of a group, from ever challenging Visa's and MasterCard's rules, monopoly power, or exorbitant interchange no matter how high they set their interchange rates. The release purports to cover all Visa and MasterCard rules and conduct that were in place upon preliminary approval of the Settlement, as well as all future rules and conduct that are substantially similar to (as opposed to identical to) rules and conduct in place at the preliminary approval stage. When combined with the fact that the Settlement's rule changes are only in effect to 2021, but the release is *perpetual*, my company will be unable to legally challenge rule changes by Visa and MasterCard imposed after 2021.

19.    The Keith Lipert Gallery also objects to the application of the release to not-yet-existing merchants and current merchants who start accepting Visa and MasterCard credit cards after 2021.

7

# A1923

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May __21__, 2013

_____
Keith Lipert

# A1924

STATEMENT OF OBJECTIONS   FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

★ MAY 2 3 2013 ★

-------------------------------------------------------- x

In re PAYMENT CARD INTERCHANGE   :
FEE AND MERCHANT DISCOUNT          :      No. 05-MD-01720 (JG) (JO)
ANTITRUST LITIGATION                      :

BROOKLYN OFFICE

--------------------------------------------------------x

Wawa, Inc. ("Wawa") is a member of the plaintiff class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*. Wawa is a New Jersey corporation having a place of business at 260 West Baltimore Pike, Wawa, Pennsylvania 19063. Wawa is a class member because it operates approximately 600 convenience stores in Delaware, Florida, Maryland, New Jersey, Pennsylvania, and Virginia, and Wawa has accepted Visa and MasterCard from 1996 until the present.

Wawa objects to the settlement in this lawsuit. Our reasons for objecting are:

1. The proposed settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case. The proposed settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that merchants and their customers have no choice but to pay. Our portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

2. Instead of addressing the core claims in the case, the settlement merely provides merchants with a limited ability to surcharge Visa and MasterCard credit card transactions that is of little value to us.

3. We operate stores in the state of Florida, which prohibits surcharging of credit card transactions. Because of this law, the principal relief is of no value to us.

4. We accept American Express transactions. The settlement limits our ability to surcharge Visa and MasterCard credit card transactions because under its proposed terms we can only surcharge Visa and MasterCard transactions if we also surcharge American Express transactions. However, we cannot surcharge American Express transactions under our contract with American Express. Since we cannot realistically drop American Express to avoid this limitation, this is another reason why we cannot take advantage of the surcharging relief in the settlement.

5. The proposed settlement includes unacceptable obligations, such as requiring us to disclose to customers at the point of sale that we are imposing the surcharge, when in fact the only reason we would charge such fees is the onerous fees set by Visa and MasterCard. The settlement also requires us to disclose to Visa and MasterCard that we are imposing the surcharge, which is an effort to intimidate us.

{W0007319.3}

# A1925

6. The release will not allow us to protect against mistreatment by Visa/MasterCard. It purports to cover all Visa and MasterCard rules and conduct that were in place upon preliminary approval, and all future rules and future conduct that are substantially similar to rules and conduct in place at preliminary approval. These rules are unfair and cause problems for Wawa's business.

7. Based on the outcome of the settlement, we do not believe the lawyers who negotiated it represented our best interests.

My personal information is:

James P. Morey
Senior Vice President - Chief Financial Officer
Wawa, Inc.
260 West Baltimore Pike
Wawa, PA 19063

The contact information for Wawa's in-house counsel on this matter is:

Katherine J. Dickinson, Esq.
Associate General Counsel
Wawa, Inc.
260 West Baltimore Pike
Wawa, PA 19063
610-358-8291 (Phone)
610-358-8852 (Fax)
katherine.dickinson@wawa.com

Dated: _____ 5/20/13 _____

Signed: _____

*Printed name*: James P. Morey

Merchant name and Address:
Wawa, Inc.
260 West Baltimore Pike
Wawa, PA 19063

{W0007319.3}

# A1926

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | | |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : | |
| FEE AND MERCHANT DISCOUNT | : | MDL No. 1720(JG)(JO) |
| ANTITRUST LITIGATION | : | |
| | : | **OBJECTION OF** |
| | : | **NATIONAL COOPERATIVE** |
| | : | **GROCERS ASSOCIATION** |
| | : | **TO FINAL APPROVAL OF** |
| | : | **THE PROPOSED SETTLEMENT** |
| | : | |

--------------------------------------------------------x

**DECLARATION OF NATIONAL COOPERATIVE GROCERS ASSOCIATION**

Robynn Shrader hereby declares pursuant to 28 U.S.C. § 1746:

1.       I am currently the Chief Executive Officer of National Cooperative Grocers

Association ("NCGA") and I have held this position since 2006. From 2000 to 2004 I was the

founding executive director of NCGA and thereafter served as NCGA's director of marketing for

18 months before accepting my current position. I have more than 20 years experience in

marketing, brand management and organizational development.

2.       NCGA is a business services cooperative serving member consumer-owned retail

food cooperatives located throughout the United States.  NCGA is composed of 134 member

food cooperatives operating 170 stores in 36 states with combined annual sales of over $1.5

billion and over 1.3 million consumer-owners.  NCGA helps retail food co-ops to optimize

operational and marketing resources and strengthen purchasing power, and, as a result, offer

greater value to retail food co-op owners and shoppers in the United States.

3.       I am knowledgeable about our members' acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and payment of

interchange fees for transactions completed over those networks.  I believe interchange and other

1

card acceptance fees are of great concern to our members who generally cite these fees as a material store-level operating expense.

4.      NCGA member grocer cooperatives process payment card transactions amounting to approximately 60% of total sales volume.  NCGA member grocer cooperatives have paid approximately $47 million in interchange fees alone, in addition to credit and debit card processing fees since 2004.  I believe our members cannot drop Visa and MasterCard products without losing an unacceptable number of sales, and, as a result, Visa and MasterCard maintain the power to raise interchange prices or network fees to our members.

5.      NCGA is a named plaintiff in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*.  When NCGA signed onto this action, we did so in the interest of consumer fairness and in support of industry transparency.  I believe the proposed settlement falls short of providing true reform in the system by continuing to allow credit card issuers and credit card networks to exploit retailers and consumers without risk of repercussion.

6.      I reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website, and based on my experience have drawn the conclusions set forth below.

## II.     THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

7.      Despite Class Counsel's and the mediators' assertions that by February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement through the processes laid out by the mediators and the Court," neither I nor anyone else at NCGA agreed to the Proposed Settlement.

8.      NCGA is opposed to the Proposed Settlement because we believe it has serious shortcomings for NCGA's members and their consumer owners.  A core claim in the litigation is

Visa's and MasterCard's price-fixing of interchange rates. The Proposed Settlement validates that practice, enabling Visa and MasterCard to continue to illegally fix fees that NCGA's members have no meaningful choice but to pay. Our members' portion of the compensatory relief amounts to only a fraction of the interchange paid, and Visa and MasterCard can recoup the settlement amount by raising interchange rates in the future.

9.     Instead of addressing the core claims in the case, the settlement merely provides NCGA's members with limited (and illusory) ability to surcharge Visa and MasterCard credit card transactions that I believe is of no value to our members. Moreover, the Proposed Settlement deprives NCGA's members of the ability to opt-out and bring claims for damages resulting from the ongoing harm imposed by Visa and MasterCard's interchange fees.

> **A.     The Surcharging Rule Changes Do Not Give NCGA's Members the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

10.     The proposed settlement would nominally permit individual retailers to surcharge consumers who wish to use Visa and MasterCard credit cards. NCGA believes that our members would reject collecting non-competitive fees from consumers. In my opinion and based on my experience, a local consumer-owned cooperative grocery store cannot effectively implement surcharging on alternative payment card products. Surcharging requires constantly fluctuating prices on thousands of small ticket goods and transactions. I believe it would be unreasonable for entry level staff clerks at a locally owned grocery store to implement and monitor such a complex regime.

11.     The practice of surcharging is an inadequate solution to the broader problem of swipe fees. In our industry, inflation in the cost of groceries is a serious concern for all consumers and is experienced most acutely by lower income consumers. The settlement also does not limit credit card issuers and credit card networks from hiking related fees in the future,

3

and if accepted, would protect credit card networks and issuers from future lawsuits.

12.     Even if NCGA's members were inclined to surcharge, the rules changes in the settlement offer our members no practical ability to surcharge.  The limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions and merchants cannot surcharge Visa and MasterCard debit transactions.

### 2.     The Competitive Card Brand Limitation Makes Surcharging Impossible for NCGA and Its Members

13.     The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

14.     If an NCGA member wanted to surcharge as provided under the Proposed Settlement, the member would be required to surcharge American Express transactions. American Express Rule 3.2 would then require the member to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Surcharging is thus rendered self-defeating, as the point of surcharging is to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

15.     The only alternative would be to stop accepting American Express.  American Express currently accounts for a material amount of our members' payment card sales, and dropping this payment method is not a viable business proposition for NCGA's members. Moreover, dropping American Express would have a deleterious impact on competition by only further increasing the market power of Visa and MasterCard.

4

16.    The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for NCGA and its members.

17.    Surcharging debit cards is not permissible under the Proposed Settlement.  Debit card transactions (including both PIN and signature) represent a substantial portion of NCGA's members' total Visa and MasterCard transactions.

### 3.    Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

18.    Surcharging is currently illegal in 11 states: California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and Utah.  Of our 134 members, 31 operate principally or entirely within these states that ban surcharging, and would thus be subject to the surcharging prohibition.  For these members, the surcharging prohibition will dramatically limit any potential for surcharging to make meaningful market change for merchants.

19.    I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include states where many of our members are located, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, West Virginia, and Washington.  Combined with states that already ban surcharging, these states account for the majority of our members' locations and sales.  Even if NCGA's members were inclined to surcharge, the mere fact that so many states have undertaken measures to begin the process of banning surcharging would have a chilling effect upon efforts to surcharge.

20.    In my opinion and based on my experience, even in states where surcharging is

5

# A1931

permitted, our cooperative members would not choose to surcharge customers who have come to depend on the use of payment cards because it would place the grocer cooperatives at a competitive disadvantage.  Similarly, I believe that in the highly competitive and low-margin grocery retail business, our member cooperatives would view a decision to refuse to accept payment cards as a severe competitive disadvantage. The use of credit and debit cards is widespread and if a retailer refused to accept them, consumers would simply patronize one who did.  Since it is commercially impractical for grocer cooperatives to surcharge or refuse payment cards, even if the proposed settlement is adopted, I believe our member grocer cooperatives will still effectively be compelled to absorb the interchange fee without transparency or public scrutiny.

**B.      The Other Relief in the Settlement is of No Value to NCGA'S Members**

21.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  All of our 134 members operate under a single trade name and therefore would get nothing from the "all outlets" relief in the Proposed Settlement.

22.     I understand group buying activity was never prohibited by any Visa or MasterCard rule.  Despite this, I am not aware of any group buying entities forming in the past among our members even though NCGA's core function is to aggregate purchasing power for member cooperatives.  In light of Visa and Master Card's extraordinary market power I believe the previously permitted but unused group buying opportunity is insufficient to foster an enhanced negotiating position and fails to provide meaningful relief to NCGA members.  In fact, the Proposed Settlement gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group

6

buying will ever be a feature in this market.

### C.    The Release Is Far Too Broad

23.    The Proposed Settlement's release is deeply concerning to NCGA.  The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices.  The release purports to cover those rules and practices forever, and for alternative technologies and/or payment methods, which we find deeply concerning given Visa's and MasterCard's market power over our members.

24.    The Proposed Settlement requires that our members release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards."  Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."  Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording.  They also likely will argue that substantially similar rules and conduct going forward will be released.  This could cover virtually everything they do.  We find it deeply unfair our members have no ability to opt out of such a release.

25.    Based on a review of the current Proposed Settlement, NCGA concludes that the lawyers who negotiated the settlement did not adequately represent the interests of NCGA or its members.

26.    A majority of our members chose to object and opt out of the Proposed Settlement, and I am familiar with their perspective.  I believe that they did so understanding the distinction between objecting and opting-out, including that by opting-out they were giving up

7

# A1933

their right to participate in any monetary distributions.

27.     NCGA is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

28.     NCGA joins in the opposition to the motion for final approval being filed by the

Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting

forth additional legal and factual grounds for NCGA's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on May 28, 2013

Robynn Shrader
Chief Executive Officer
National Cooperative Grocers Association
14 S. Linn Street
Iowa City, Iowa 52240

8

# A1934

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE     :
FEE AND MERCHANT DISCOUNT          :      MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION               :
                                   :
                                   :      **OBJECTION OF**
                                   :      **WHOLE FOODS MARKET**
                                   :      **ENTITIES TO FINAL**
                                   :      **APPROVAL OF THE**
                                   :      **PROPOSED SETTLEMENT**
                                   :
----------------------------------------------------------x

## DECLARATION OF WHOLE FOODS MARKET ENTITIES

Jay Warren hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently Global Litigation Counsel with Whole Foods Market Services, Inc.

("WFMS"), a Delaware corporation with its principal place of business in Austin, Texas.

WFMS is a subsidiary of Whole Foods Market, Inc. ("Whole Foods") and provides

administrative support, including banking and legal services, to the operating companies that

own and operate Whole Foods Market stores, and which are objecting to final approval of the

proposed settlement.[1]  I have held this position since 2011, and have worked for WFMS since

2011. I submit this declaration on behalf of Whole Foods to object to the proposed settlement in

the interchange case and in support of the opposition to the motion for final approval.

2.      I am responsible for overseeing and participating in litigation involving Whole

Foods including, but not limited to, providing legal advice to Whole Foods' leadership related to

various legal and litigation matters, and actively participating in all phases of litigated cases

including trial and appeal.

---

[1] The companies that own and operate Whole Foods Market stores and that are participating in this objection are: Whole Foods Market Group, Inc., Whole Foods Market Rocky Mountain/Southwest, L.P., Whole Foods Market California, Inc., Mrs. Gooch's Natural Foods Market, Inc., Whole Food Company, Whole Foods Market Pacific Northwest, Inc., WFM-WO, Inc., WFM Northern Nevada, Inc., WFM Hawaii, LLC, WFM Southern Nevada, Inc. (collectively referred to herein as "Whole Foods").

1

266400.1

# A1935

3.    I have knowledge regarding Whole Foods' acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks.

4.    Whole Foods is the world's leading retailer of natural and organic foods and America's first national "Certified Organic" grocer.  Our Company mission is to promote the vitality and well-being of all individuals by supplying the highest quality, most wholesome foods available. Since the purity of our food and the health of our bodies are directly related to the purity and health of our environment, our core mission is devoted to the promotion of organically grown foods, healthy eating, and the sustainability of our entire ecosystem. Through our growth, we have had a significant and positive impact on the natural and organic foods movement throughout the United States, helping lead the industry to nationwide acceptance over the last 32 years.

5.    We are the largest retailer of natural and organic foods in the U.S. and the 11th largest food retailer overall.  We currently operate 350 stores in the United States, Canada, and the United Kingdom.

6.    Whole Foods accepts payment cards across all of its brands and in all aspects of its business.  Whole Foods currently accepts Visa and MasterCard debit and credit cards, along with American Express and Discover.

## J.    INTERCHANGE FEES AND WHOLE FOODS' ACCEPTANCE OF PAYMENT CARDS

7.    Visa and MasterCard interchange fees are one of our largest retail expenses.  Yet Visa's and MasterCard's interchange rates are beyond our control.  Unlike any vendor relationship, the fact that we are a large company and a significant consumer of payment card services makes little difference in our ability to negotiate with Visa and MasterCard and affect

266400 1

# A1936

our acceptance costs on these networks.  As approximately 40% of our sales volume is made using Visa and MasterCard cards, Whole Foods cannot drop Visa and MasterCard products without losing an unacceptable number of sales.  That gives Visa and MasterCard the power to raise interchange prices or network fees to Whole Foods.  This practice has continued following Visa's and MasterCard's IPOs.  In the last year alone, Whole Foods has paid $66,964,756.80 in interchange fees for purchases made by Visa and Mastercard.

## II.     THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

8.      I reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website.  Neither I nor anyone else at Whole Foods, nor any counsel engaged on our behalf, had any involvement in the negotiations leading up to the Proposed Settlement.  In my view, the Proposed Settlement has serious shortcomings for Whole Foods.

9.      The proposed settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case.  The proposed settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that Whole Foods and its customers have no choice but to pay.  Whole Foods' portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future.

10.     Instead of addressing the core claims in the case, the settlement merely provides Whole Foods with a limited ability to surcharge Visa and MasterCard credit card transactions that is of no value to us.  Moreover, the Proposed Settlement deprives Whole Foods of the ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and

3

# A1937

MasterCard's interchange fees impose on merchants.

A. **The Surcharging Rule Changes Do Not Give Whole Foods the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

11. As an initial matter, Whole Foods has no current intention to impose surcharges on customers. If Whole Foods were to consider implementing such a program, however, it is clear that the rules changes in the settlement offer no practical ability to surcharge, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

1. **The Competitive Card Brand Limitation Makes Surcharging Impossible for Whole Foods**

12. The rule changes in the Proposed Settlement only allow Whole Foods to surcharge Visa or MasterCard credit card transactions under the same terms as we are allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

13. If Whole Foods wanted to surcharge as provided under the Proposed Settlement, we would be required to surcharge American Express transactions. American Express Rule 3.2 would then require us to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

14. Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Debit card transactions (including both PIN and

4

266400 1

# A1938

signature) represent 84% of Whole Foods' total Visa and MasterCard transactions.

15.     The only theoretical alternative would be to stop accepting American Express – something that Whole Foods cannot realistically do. American Express currently accounts for 14% of our payment card sales. Dropping American Express is not a viable business proposition for Whole Foods. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard -- while allowing Visa and MasterCard to coordinate adopting identical surcharging rules -- is an inappropriate result of this eight-year antitrust case.

16.     The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for Whole Foods.

### 2.     Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

17.     As of the end of 2012, Whole Foods did business at 341 stores in 40 states, and the District of Columbia. Surcharging is illegal in 11 states – California (71 stores), Colorado (19 stores), Connecticut (9 stores), Florida (19 stores), Kansas (2 stores), Maine (1 store), Massachusetts (22 stores), New York (12 stores), Oklahoma (2 stores), Texas (21 stores), and Utah (4 stores). Those states cumulatively hold 52% of our current U.S. locations and account for a large proportion of our U.S. sales.

18.     I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many of our stores are located, including Arkansas (1 store), Hawaii (3 stores), Illinois (18 stores), Indiana (3 stores), Kentucky (2 stores), Maryland (8 stores), Michigan (5 stores), Mississippi currently no stores, Missouri (2 stores), Nevada (5

266400.1

stores), New Hampshire  (currently no stores), New Jersey (10 stores), New Mexico (4 stores), Pennsylvania (10 stores), Rhode Island (3 stores), South Carolina (3 stores), Tennessee (4 stores), Vermont (currently no stores), West Virginia (currently no stores), and Washington (7 stores).  Combined with states that already ban surcharging, these states account for 25% of our U.S. locations and approximately 27 % of our U.S. sales.  Even if Whole Foods were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill any efforts to surcharge in these states.

19.    The fact that surcharging is currently legally permitted in over half of our stores is problematic in and of itself.  For operational, training, and customer service reasons, we would not implement surcharging in some states, but not in others.

**B.    The Other Relief in the Settlement Is of No Value to Whole Foods**

20.    The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  Whole Foods stores do not operate under multiple trade banners, and therefore, this relief is of no value to us.

21.    Whole Foods also understands that Visa and MasterCard did not have rules against group buying prior to this settlement.  We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to our company.

**C.    The Release Is Far Too Broad**

6

# A1940

22.     The Proposed Settlement's release is deeply concerning to Whole Foods.  The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices.  And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us.

23.     The Proposed Settlement requires that Whole Foods release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards."  Rule is defined to "mean any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."  Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording.  They also likely will argue that substantially similar rules and conduct going forward will be released.  We find it deeply unfair we have no ability to opt out of such a release.

24.     Whole Foods is also concerned that the release will bar any legal challenge in the event that Visa and MasterCard use their Honor All Cards rules as "Honor All Devices" rules to force merchants to accept all mobile transactions from Visa and MasterCard networks.  The Proposed Settlement includes mobile and any other new technology by defining "credit card" to include "any other current or future code, device, or service . . . ."  Settlement ¶ 1(u), (v).  Because Visa and MasterCard do not have significant volumes in mobile payments, this area presents a unique opportunity for merchants to see new competition and avoid having mobile transactions trapped in the current system.  We want the right to freely choose when to accept mobile products, and we do not want to be forced to do so under Visa's and MasterCard's Honor All Cards rules.

7

25. The release even purports to extend outside the jurisdiction of the United States, releasing Visa and MasterCard and their affiliates from their actions anywhere on the globe, and including foreign affiliates of class members as releasors. The possibility that the release would cover claims by Whole Foods concerning our extensive international operations demonstrates the unacceptable scope of the release.

\*      \*      \*      \*

26. Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of Whole Foods.

27. Whole Foods is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

28. Whole Foods joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for Whole Foods' Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28th, 2013

Jay Warren
Global Litigation Counsel
Whole Foods Market Services, Inc.
550 Bowie Street
Austin, Texas 78703

266400.1

# A1942

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720(JG)(JO)<br><br>OBJECTION OF NATIONAL ASSOCIATION OF CONVENIENCE STORES TO FINAL APPROVAL OF PROPOSED SETTLEMENT |

**OBJECTION OF NATIONAL ASSOCIATION OF CONVENIENCE STORES**

1. I, Henry Ogden Armour, am the President and Chief Executive Officer of National Association of Convenience Stores ("NACS"), of the, a named member of the plaintiff class in the case *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*. As such, I am NACS' designated representative in this matter.

2. NACS' business address is 1600 Duke Street, Alexandria, VA 22314.

3. NACS funds its operations partly with dues and payments from its members. NACS has accepted payment for these services by Visa and MasterCard credit and debit cards since at least January 1, 2004 until the present.

4. From the beginning of this litigation, our principal concern has been to obtain meaningful reforms of the rules set by Visa and MasterCard. This was made clear to Class Counsel before their representation of NACS began and was reiterated on multiple occasions during the course of the litigation. As a trade association, our role is to work on behalf of the industry as a whole and not to advocate individual companies' interests.

5. NACS members accept payment cards including Visa and MasterCard debit and credit cards, along with American Express, PayPal, and Discover.

# A1943

6.   NACS has advocated for its members and the merchant community as a whole on the subject of interchange fees since the early 2000s.  During that time, I and other NACS staffers have had thousands of conversations with merchants to understand their concerns about interchange fees, and I have reviewed numerous articles on the subject.  The overriding concern of most merchants has been and remains the anti-competitive nature of the system of interchange fees and the need for changes to that system.  The vast majority of merchants realize that monetary compensation is temporary and cannot substitute for achieving a fair, competitive market for interchange fees.

## INTERCHANGE FEES AND NACS MEMBERS' ACCEPTANCE OF PAYMENT CARDS

7.   Payment card fees - of which interchange is the largest component - are the convenience and fuel retailing industry's top pain point.  In 2006, convenience stores for the first time made less money - $4.8 billion - than they paid in credit and debit card fees to accept payments - $6.6 billion.  This situation has continued in every year since that time.  In 2012, the industry reported profits of $7.2 billion, but paid credit and debit card fees of $11.2 billion.

8.   These fees are, on average, the second largest operating expense our members have, trailing only labor but more than rent.  The fees are the fastest-growing expense our members have, rising even faster than, for example, health care costs.  Unlike any vendor relationship, even our largest members have little ability to negotiate with Visa and MasterCard.  Payment cards are especially important in the fast-paced fuel supply and convenience store environment.

# A1944

9. Members cannot realistically drop Visa and MasterCard products without facing the loss of an unacceptable amount of sales. This gives Visa and MasterCard the power to raise interchange prices to NACS members.

10. Interchange fees, like other business expenses, are passed on to customers, resulting in higher prices for consumers. These costs are hidden from the consumer. All customers, including those paying with cash, pay for these fees regardless of the payment form used.

## THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

### A. Concerns Regarding the Settlement Mediation Process

11. NACS and other named plaintiffs opposed the mediators' proposals that were put forward during the mediation process. Class Counsels' representation at preliminary approval that the mediators' proposals "were accepted by all Parties" (Prelim. App. Mot. At 9) is not accurate. NACS' concerns about the mediators' proposals not only were not welcomed by Class Counsel, but were ignored. And, as a result, NACS never agreed to the Proposed Settlement.

12. The mediation that ultimately resulted in this settlement began in 2008.

13. In late November 2011, NACS discovered that Class Counsel had made proposals to Visa and MasterCard, through the mediators, without NACS' knowledge or consent. NACS believed that the proposals made without its knowledge severely compromised the negotiating position of the class to the point that NACS would not have accepted the proposals made by Class Counsel if they had been proposed by the defendants. In fact, items were compromised in Class Counsels' Proposals that NACS had in the past advised should not be compromised. It appears clear that these proposals, and even the fact that proposals were being made, were not shared with NACS and other named plaintiffs because Class Counsel was aware that NACS and other

# A1945

named plaintiffs would disagree with them.  NACS also learned that Class Counsel had received

an offer of settlement from the defendants that had not been disclosed to NACS.

14. In fact, NACS specifically requested a draft of Class Counsel's November 2011

submission to the mediators and a chance to provide NACS' views on it before its submission.

Class Counsel promised to consult with NACS prior to such submission but then misled NACS

about the timing of the submission and did not provide a copy to NACS until one week after it

had been submitted to the mediators.

15. In January 2012, Class Counsel accepted the mediators' proposals over the objections of

NACS and several other named plaintiffs.  NACS and several other named plaintiffs registered

their opposition to the proposals and Class Counsel's acceptance of them.  Class Counsel was not

authorized to accept the mediators' proposals because it did not have authorization from its

clients to do so.  Class Counsel did so anyway in contravention of the Court's order appointing

them as Class Counsel.

16. Even though NACS dissented from the mediators' proposals, NACS nonetheless

continued to work constructively within the mediation process to try to salvage something of

value from the emerging settlement.  NACS did so in reliance on the representations of Class

Counsel that, in doing so, it maintained the right to oppose the settlement at a preliminary

approval or final fairness hearing if a settlement that ultimately resulted from the discussions was

not acceptable to NACS.

17. When the Proposed Settlement agreement was filed with the Court on July 13, 2012,

NACS had not seen the final text including the final release.  NACS requested that its name be

removed from the settlement document that was to be filed with the Court because the Proposed

Settlement agreement was not addressing the core reason why NACS filed its suit.  Class

# A1946

Counsel advised that named plaintiffs who left their names on the Proposed Settlement when it was filed would still have the opportunity to decide whether to accept it or oppose it after it was filed, but NACS was not comfortable with having its name on a document it had not had the opportunity to see. The parts of the settlement NACS had reviewed raised grave concerns.

18. And NACS was informed that the Settlement would have new problems, including the treatment of truck fleet cards as credit cards which NACS believed had been resolved differently during the last negotiating session at which NACS was present. This and other changes, including changes to the surcharging language in the agreement, made the Proposed Settlement materially worse for the class of plaintiffs than the understanding of the emerging agreement that NACS and other named plaintiffs had during the last negotiating session at which named plaintiffs were present.

19. Class Counsel attempted to convince NACS and other named plaintiffs to accept the Proposed Settlement including by referencing incentive awards that would be requested by Class Counsel as part of the settlement process. Class Counsel made clear that only named plaintiffs who agreed with the Proposed Settlement would receive incentive awards. Named plaintiffs that disagreed with the Settlement would not receive incentive awards, even though those named plaintiffs represented the Class and bore the costs and inconveniences of the litigation every bit as much as the named plaintiffs that ultimately accepted the Proposed Settlement. The only criterion, then, determining whether a named plaintiff received an incentive payment was whether or not the named plaintiff was willing to accept the Proposed Settlement. And the named plaintiffs were advised of that sole criterion before deciding whether or not to accept the Proposed Settlement.

# A1947

20. The decision to oppose the Proposed Settlement was made by NACS' Board which is made up of 30 executives of retail companies within NACS' membership. The Board voted unanimously to reject the Proposed Settlement. The Proposed Settlement has serious shortcomings for NACS and its members.

21. Most importantly, the Proposed Settlement will not change the ways that Visa, MasterCard, and banks limit competition in the current payment marketplace, including how Visa and MasterCard fix interchange rates for the banks, require merchants to "honor all cards" from all issuers, and/or limit network routing choices for credit cards, among other things.

22. All of these concerns were expressed to Class Counsel, but Class Counsel nonetheless substituted its judgment for that of NACS and other named plaintiffs in the litigation and accepted the Proposed Settlement. NACS is part of a majority (ten of the nineteen) of the named plaintiffs representing the class that opposes the Proposed Settlement.

### B. Surcharging Provides No Meaningful Relief

23. The Proposed Settlement provides NACS members with an extremely limited ability to surcharge their customers based on the brand or type of credit card used. Surcharging would pose a daunting challenge to our members' point of sale operations, especially in the high-volume convenience store environment.

24. Rather than the complex and burdensome requirements of the Proposed Settlement, NACS believes that Visa and MasterCard should have no involvement in the way that merchants price their products and communicate their prices to their customers. Rather than doing this, the Proposed Settlement reinforces the roles of Visa and MasterCard in overseeing how merchants

# A1948

run their businesses and communicate with their customers and allows anticompetitive practices to continue.

### 1.    The Settlement Provisions Conflict with American Express and PayPal Rules to Defeat the Point of Surcharging

25. The modest rule changes in the Proposed Settlement allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand - primarily American Express, which is usually more expensive than Visa and MasterCard.

26. If a merchant that accepted American Express wanted to surcharge as provided under the Proposed Settlement, in most cases that merchant would be required to surcharge American Express transactions.  American Express rules would then require the merchant to surcharge all payment cards equally, including debit cards and brands of card-products with lower acceptance costs.  Doing that makes no sense, as the point of surcharging, in theory, is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand or product against the other, to introduce price competition in the industry.  In addition, surcharging debit cards would not even be permissible under the Proposed Settlement, which only allows surcharging on credit cards.

27. The only theoretical alternative would be to stop accepting American Express - something that NACS members cannot realistically do.  The majority of NACS members accept American Express, which accounts for a significant volume of payment card transactions.  Many NACS members are franchisees who are obligated to take American Express by the terms of

# A1949

their franchise agreements.  Approximately 65 percent of the gasoline retail industry is contractually bound to accept American Express by the major oil companies that supply them motor fuel.  All of the major oil brands require their branded retail outlets to accept American Express (as well as Visa and MasterCard).  Dropping American Express would be impossible for most NACS members, who would risk the commercial relationship by which they obtain their most-frequently purchased product, and would risk their customer relationships.

2.       **Surcharging Alone Cannot Fix the Problems in the Payments Market**

28. NACS members do business in all 50 states and surcharging is illegal in 11 states.

29. According to NACS' records, those 11 states—Maine, Oklahoma, California, Colorado, Connecticut, Florida, Kansas, Massachusetts, New York, Texas and Utah—currently account for more than 37% of total U.S. convenience stores by store count..  Moreover, in the aftermath of the Proposed Settlement, at least 20 additional states have proposed legislation that would bar surcharging thus potentially reducing the value of the ability to surcharge even further.

30. In fact, if merchants were to begin to surcharge in any significant numbers, it is highly likely that many if not all of the 20 states with proposed legislation and additional states would pass laws banning the practice.

31.  The fact that surcharging is not legally permitted for over a third of convenience stores is problematic in and of itself.  The Proposed Settlement therefore offers absolutely no relief to over a third of U.S. convenience stores.

# A1950

### 3.    Surcharging Is Wholly Impractical to Implement

32. Even if a retail station decides to brave the surcharging waters, they must comply with a laundry list of requirements in order to do so.  Such retail stations must, among other things: 1) provide Visa, MasterCard, and their acquirer with no less than 30 days' advance written notice that they intend to impose surcharges at the brand or product level; 2) disclose clearly to customers at the point of store entry that the retail station imposes a surcharge that does not exceed the applicable Merchant Discount Rate for Visa or MasterCard Credit Card Transactions; 3) disclose the retail station's surcharging practices at the point of interaction or sale with the customer, including (a) the amount of any retail station-imposed surcharge, (b) a statement that the retail station is imposing the surcharge, (c) a statement that the station's surcharge does not exceed the applicable Merchant Discount Rate; and 4) identify the specific dollar amount of the surcharge on the customer's transaction receipt.

33. Compounding the issue is the inherent complexity of how interchange fees are calculated and administered.  First, over 6,000 banks and financial institutions issue payment cards under the umbrella of Visa and MasterCard under a plethora of different brand names.  Interchange fees vary based on a host of factors including whether a signature is required and whether the card is physically present for the transaction.  The result is over 300 different categories of interchange fees, depending on the card used by the individual customer.  This byzantine structure makes it practically impossible for convenience stores to determine which interchange fees apply to specific transactions until the fees are deducted from store bank accounts following settlement.  Given this patent complexity, it would be extremely complicated, if not downright impossible, to tailor surcharges to the actual costs incurred in a transaction.  While that is not

# A1951

required, not doing so may cause negative reactions from customers in addition to the negative reaction to paying any surcharge.

34. Furthermore, the type of signage that must be displayed in conjunction with surcharges could potentially cost millions of dollars—especially when coupled with the potential requirement to modify such signs every time surcharges are increased or modified. If surcharges are to keep pace with changes in interchange fees, they would need to be changed on a regular basis. This requirement would be particularly onerous on smaller retail station owners who already operate on razor-thin profit margins.

35. Finally, NACS recognizes that surcharging is simply "bad business." Many consumers will simply take their business elsewhere if a retail station imposes a credit card surcharge.

36. Consumers do not like surcharges. NACS has commissioned survey research finding that merchants imposing a surcharge would suffer large losses of business and reputation due to negative consumer reactions. This survey research was shared with Class Counsel before Class Counsel accepted the mediators' proposal and negotiated the Proposed Settlement. Class Counsel did not change their position or seek to modify the settlement in any way in response to this survey research.

37. As of January 27th, Visa and MasterCard changed their rules to allow surcharging consistent with the Proposed Settlement. NACS is not aware of a single one of its members or another merchant in the United States utilizing those rules changes to surcharge consistent with the new rules.

# A1952

**C.  The Release Is Too Broad**

38. NACS is also very concerned by the broad release in the Proposed Settlement, which its members cannot opt out of (at least to obtain the purpose of the litigation which is injunctive relief) and which releases all of the defendants from virtually all past, present, and future claims. The release covers interchange and any other fees imposed by networks, issuers, and acquirers, the Honor All Cards rules, routing limitations, and a host of other restrictive rules, including any substantially similar rules adopted in the future.

39. Both Visa and MasterCard have repeatedly expanded their Honor All Cards requirements to new and upcoming payment methods.  For example, these requirements apply pre-paid debit cards, gift cards, government benefit cards and health care cards.  As such, NACS is extremely concerned by the Proposed Settlement's implications for newer payment systems (and even those not yet in existence).  The Proposed Settlement, for example, appears to treat mobile devices the same as payment cards by including the term "mobile telephone" in the definition of credit and debit cards.

40. Aside from offering viable alternatives to traditional physical payment card mechanisms, NACS believes that the extension of the Honor All Card requirements to cutting-edge payment systems like a mobile device would not only stifle commercial innovation, but would also harm consumers that would benefit from reduced transaction costs.  If the card networks require merchants to accept their mobile payment solutions, it will require costly new infrastructure investments in technology to process those systems at the point-of-sale.  For most NACS members, that is likely to require replacement of all of the gasoline pumps at their stations costing tens of thousands of dollars per location.  It therefore remains crucial that merchants keep the ability to freely choose when and how to accept mobile payment products, rather than being

# A1953

forced to do so under the burdens of Visa's and MasterCard's Honor All Cards rules. As such, NACS is concerned that the Proposed Settlement, which releases all legal rights to challenge the imposition of such rules on future payment methods, will seriously harm the otherwise bright future of the payment methods marketplace.

### D. Merchant Questions

41. Following preliminary approval of the Proposed Settlement, NACS was inundated with questions from its members regarding the Litigation and the process. These questions increased after notice was sent to the Class.

42. Notice to the Class did not provide NACS members with adequate information. NACS members who received notice still had questions about how to submit a claim, how to opt out, how to object and the benefits and risks of each approach. For many merchants, the notice left unanswered questions even about the basic instructions for opting out or objecting.

43. NACS members join the association in part to receive guidance from NACS on a range of issues affecting the industry. Interchange fees have been chief among these issues for years. NACS members sought NACS' views on the Proposed Settlement's merits.

44. In order to efficiently provide NACS members with information on the Proposed Settlement, NACS communicated in many of the ways that are customary for trade associations including industry publications, e-mails and its website.

45. NACS found that other trade associations were facing similar questions from their members and, in response, started the website www.merchantsobject.com. The site was designed to provide a less cumbersome way for merchants to opt-out and object.

# A1954

46. During the time period that merchantsobject.com was accepting opt-outs and objections prior to displaying the Court ordered banner on the website, an average of 12.6 merchants per day opted out using the site.  During the time period the banner ordered by the Court was displayed, an average of 23.2 merchants per day opted out using the site.  In total, 1,337 merchants opted out through merchantsobject.com.

47. These responses are consistent with the sentiment NACS has heard from its members around the country.  The vast majority of NACS members thinks the Settlement is a bad deal for them and wants the Court to reject it.

48. For the foregoing reasons, NACS objects to the Proposed Settlement.


Dated:  May 28, 2013

Alexandria,Virginia

Henry Ogden Armour
NACS
1600 Duke Street
Alexandria, VA 22314

# A1955

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE          :
FEE AND MERCHANT DISCOUNT               :          MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION                    :
                                        :
                                        :          **OBJECTION OF AFFILIATED**
                                        :          **FOODS MIDWEST TO FINAL**
                                        :          **APPROVAL OF THE**
                                        :          **PROPOSED SETTLEMENT**
                                        :
----------------------------------------------------------x

## DECLARATION OF AFFILIATED FOODS MIDWEST

Duane Severson hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently the Chief Financial Officer and Vice President of Affiliated Foods

Midwest ("AFM").  I have held this position since 2005 and have also held the positions of

Controller and Treasurer in the more than 21 years of employment with AFM.  I submit this

declaration on behalf of AFM to object to the proposed settlement in the interchange case and in

support of the opposition to the motion for final approval.

2.      I am responsible for overseeing AFM's finance and accounting functions.  I have

knowledge about our members' acceptance of debit and credit card transactions running on all

payment networks, including Visa and MasterCard, and payment of interchange fees for

transactions completed over those networks.

3.      Begun in 1931, AFM is a retailers' cooperative that owns and operates three

distribution centers, located in Nebraska, Kansas, and Wisconsin, totaling 2,130,000 square feet.

AFM services 850 grocery stores located in 16 states in the Midwest region of the United States.

Those grocery stores are members and/or owners of AFM.  Most of the members of AFM accept

payment by Visa and/or MasterCard credit and debit cards.

4.      AFM is a named plaintiff in *In re Payment Card Interchange Fee and Merchant*

# A1956

*Discount Antitrust Litigation.* Moreover, hundreds of our members have assigned AFM all of their rights related to claims against the defendants in this case related to interchange fee overcharges.

## I.   INTERCHANGE FEES AND AFM'S MEMBERS' ACCEPTANCE OF PAYMENT CARDS

5.      Interchange and other card acceptance fees are of great concern to our members. AFM members frequently cite Visa and MasterCard interchange fees as one of their largest retail expenses. Yet these interchange rates are beyond our members' control. As grocery stores, our members' profit margins are narrow even before accounting for interchange fees.

6.      Unlike any vendor relationship, the fact that we are a large cooperative makes little difference in our members' ability to negotiate with Visa and MasterCard and affect their acceptance costs on these networks. As a substantial number of our members' retail customers make their purchases with payment cards, our members cannot drop Visa and MasterCard products without losing an unacceptable number of sales. That gives Visa and MasterCard the power to raise interchange prices or network fees to our members. Visa and MasterCard have continued this practice following their IPOs.

## II.   THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

7.      I reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website, and have drawn the conclusions set forth below. Despite Class Counsel's and the mediators' assertions that by February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement through the processes laid out by the mediators and the Court," neither I nor anyone else at AFM agreed to the proposed settlement. AFM, as well as other named plaintiffs, also

2

# A1957

opposed the mediators' December 2011 proposals to resolve this litigation. In my view, the
Proposed Settlement has serious shortcomings for AFM and its members.

8.      The proposed settlement does not address Visa's and MasterCard's price-fixing of
interchange rates for the banks, the subject of the core claims in the case. The proposed
settlement actually validates that practice, enabling Visa and MasterCard to continue to fix fees
for the banks that merchants and their customers have no choice but to pay. AFM's members'
portion of the compensatory relief amounts to only a fraction of what they pay in interchange,
and given that Visa and MasterCard can continue to fix interchange, they can recoup the
settlement amount by raising interchange rates in the future. The Proposed Settlement will not
change other ways that Visa, MasterCard, and the banks limit competition in the current
electronic payments marketplace such as by requiring merchants to "honor all cards" from all
issuers, and/or limiting network routing choices for credit cards, among other things.

9.      Instead of addressing the core claims in the case, the settlement merely provides
merchants with limited ability to surcharge Visa and MasterCard credit card transactions that is
of little value to AFM's members. Moreover, the Proposed Settlement deprives merchants of the
ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and
MasterCard's interchange fees impose on merchants.

**A.      The Surcharging Rule Changes Do Not Give AFM's Members the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

10.     In general, AFM's membership finds little value in surcharging because grocery
stores operate on thin margins and in a highly-competitive requirement. Accordingly, even if
surcharging was realistic, which it is not for a variety of reasons, our members would be very
unlikely to surcharge their customers due to the vigorous competition in the marketplace.

# A1958

11.     Even if the realities of the marketplace were different, the majority of our members would not attempt to implement surcharging because of its complexity. AFM's membership primarily consists of small businesses and independent grocers that do not have the resources to study the intricate details of the Proposed Settlement's surcharging rules. It will be extremely difficult for most AFM members to comply with these rules, and the burdens imposed by attempted compliance will distract our members from running their small businesses. Moreover, our members will be reluctant to attempt surcharging due to the very real fear that they could inadvertently violate the rules, which could lead to severe penalties.

> **1.    The Competitive Card Brand Limitation Makes Surcharging Impossible for AFM's Members**

12.     The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

13.     If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions. American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards, and card-brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

14.     Surcharging debit cards is not permissible under the Proposed Settlement, which

4

# A1959

only allows surcharging on credit cards. Debit card transactions are a substantial portion of AFM's members' total MasterCard and Visa transactions.

15.     The only theoretical alternative would be to stop accepting American Express – something that AFM's members cannot realistically do. Dropping American Express is not a viable business proposition for our members. In addition, if merchants drop American Express, this would only further increase the market power of Visa and MasterCard. Mandatory rule changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result at the end of this eight-year antitrust case.

16.     Because AFM's members, like most merchants, accept American Express, the effect of the Competitive Card Brand limitation is to keep the prohibition against surcharging MasterCard and Visa credit card transactions in effect.

## 2.     Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

17.     AFM's members do business at 850 stores located in 16 states. Surcharging is illegal in 11 states – California, Colorado, Connecticut, Massachusetts, New York, Texas, Florida, Kansas, Oklahoma, Maine, and Utah. Of our 850 members, approximately 17% operate business in one or more of these states, and would be subject to their surcharging prohibitions.

18.     I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many AFM members' stores are located, including Arkansas (6 locations), Illinois (26 locations), Indiana (2 locations), Kentucky (1 location), Michigan (31 locations), Missouri (50 locations). Combined with states that already ban surcharging, these states account for 32% of our members' U.S. locations. Even if our members

5

# A1960

were inclined to surcharge, the mere fact that these states have undertaken measures to begin the process of banning surcharging would chill efforts to surcharge in these states.

19.     The fact that surcharging is currently legally permitted in 83% of our members' stores is problematic in and of itself.  For operational, training, and customer service reasons, our members with stores in multiple states would not implement surcharging in 39 states, but not in the 11 that currently prohibit surcharging.

**B.     The Other Relief in the Settlement Is of No Value to AFM's Members**

20.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules.  Like most merchants, our members generally operate under a single trade name or banner, and therefore this provision provides no benefit.

21.     AFM also understands that Visa and MasterCard did not have rules against group buying prior to this settlement.  We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons.  In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market.  This provision is of no value to our members.

**C.     The Release Is Far Too Broad**

22.     The Proposed Settlement's release is deeply concerning to AFM.  The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices.  And the release purports to cover those rules and practices, forever,

6

# A1961

which we find deeply concerning given Visa's and MasterCard's market power over our members.

23.     The Proposed Settlement requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards." Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording. They also likely will argue that substantially similar rules and conduct going forward will be released. We find it deeply unfair that we and our members have no ability to opt out of such a release.

24.     AFM is also concerned that the release will bar any legal challenge in the event that Visa and MasterCard change or re-interpret their Honor All Cards rules to "Honor All Devices" rules to force merchants to accept all mobile transactions from Visa and MasterCard networks. The Proposed Settlement includes mobile and any other new technology by defining "credit card" to include "any other current or future code, device, or service . . . ." Proposed Settlement ¶ 1(u), (v). Because Visa and MasterCard do not currently have significant volumes in mobile payments, this area presents a unique opportunity for merchants to see new competition and avoid having mobile transactions trapped in the current system. We want the right to freely choose when to accept mobile products, and we do not want to be forced to do so under Visa's and MasterCard's Honor All Cards rules.

\*        \*        \*        \*

7

# A1962

25.     Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of AFM or its members.

26.     AFM is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

27.     AFM joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for AFM's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 28, 2013

Duane Severson
VP/Chief Financial Officer
Affiliated Foods Midwest
1301 West Omaha Avenue
Norfolk, NE 68702-1067

8

# A1963

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE    :
FEE AND MERCHANT DISCOUNT         :      MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION              :
                                  :      **OBJECTION OF FOOT**
                                  :      **LOCKER, INC. TO FINAL**
                                  :      **APPROVAL OF THE**
                                  :      **PROPOSED SETTLEMENT**
                                  :
----------------------------------------------------------x

## DECLARATION OF FOOT LOCKER, INC.

GIOVANNA CIPRIANO hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am currently Senior Vice President, Chief Accounting Officer at Foot

Locker, Inc. I have held this position since May 2009. I submit this declaration on

behalf of Foot Locker, Inc. to object to the proposed settlement in the interchange case

and in support of the opposition to the motion for final approval.

2.      I am responsible for all matters concerning accounting and taxation.

3.      I am knowledgeable about the acceptance of debit and credit card

transactions running on all payment networks, including Visa and MasterCard, and

payment of interchange fees for transactions completed over those networks by Foot

Locker, Inc., through its U.S. and International banners Foot Locker, Kids Foot Locker,

Lady Foot Locker, Footaction, Champs Sports, CCS, Footlocker.com, Eastbay and

Eastbay.com ("Foot Locker").

4.      Foot Locker Inc. is a worldwide retailer of shoes and apparel. As of

February 2, 2013, the company operated 2,484 Stores in the United States. Foot Locker,

1

## A1964

Inc.. through its wholly owned subsidiaries, also operated as of February 2, 2013, 851 stores in other countries, including but not limited to, the United Kingdom, Italy, Germany, France, Spain, Netherlands, Canada, Australia and New Zealand.  Foot Locker also sells goods over the Internet to U.S. consumers through the following websites: www.footlocker.com, www.kidsfootlocker.com, www.ladyfootlocker.com, www.champssports.com, www.footaction.com, www.eastbay.com, www.final-score.com. www.eastbayteamservices.com, www.ccs.com

5.     Foot Locker accepts payment cards across all of its brands and in all aspects of its business.  Foot Locker currently accepts Visa and MasterCard debit and credit cards. along with American Express, Discover, PayPal and others.

## I.     INTERCHANGE FEES AND FOOT LOCKER'S ACCEPTANCE OF PAYMENT CARDS

6.     Visa and MasterCard interchange fees are one of our most significant expenses.  Yet these interchange rates are largely beyond our control.  Visa and MasterCard interchange for the U.S. business represents approximately $21 million per year.

7.     As approximately 54% of our U.S. store business customers purchase our products through payment cards, Foot Locker cannot drop Visa and MasterCard products without losing an unacceptable number of sales.  That gives Visa and MasterCard the power to raise interchange prices to Foot Locker.

2

## A1965

8.      In addition these rates and changes are not even contracted with Foot

Locker, as merchants normally have no direct contract with Visa or MC.  Merchants

normally contract with a processor who has in turn contracts with the card brands.

Merchants are routinely forced into a contract of adhesion with the card brands via

clauses in their processor contracts binding them to adhere to all card brand rules both

known and unknown at the date of signing.

9.      The interchange rates for Internet sales, which constitute so called card-not-

present ("CNP") transactions, are much higher than for sales made through traditional

brick-and-mortar stores.  There is no valid justification for the excessive CNP

interchange rates because, unlike with brick-and-mortar merchants, merchants bear most

of the fraud and charge-back risks associated with CNP transactions.  Nevertheless, we

must accept Visa and MasterCard for Internet transactions, or else forgo a substantial

portion of our retail sales.  This is another example of the market power exercised by

these brands, and conduct that may be subject to mandatory release in this case and

immune from challenge going forward if the settlement is approved.

**II.     THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION**

10.     With the assistance of counsel, I have reviewed the proposed settlement

agreement of the interchange class action (the "Proposed Settlement").  Neither I nor

anyone else at Foot Locker, nor any counsel engaged on our behalf, had any involvement

in the negotiations leading up to the Proposed Settlement.  In my view, the Proposed

Settlement has serious shortcomings for Foot Locker.

3

### A. The Surcharging Rule Changes Do Not Give Foot Locker the Ability to Surcharge Visa and MasterCard Credit Card Transactions

11.     As an initial matter, Foot Locker does not intend to impose surcharges on customers. If Foot Locker were to consider implementing such a program, however, it is clear that the rules changes in the settlement offer no practical ability to surcharge, and actually maintain prohibitions against surcharging. Merchants cannot surcharge Visa and MasterCard debit transactions. And the limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

#### 1. The Competitive Card Brand Limitation Makes Surcharging Impossible for Foot Locker.

12.     The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard. This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.

13.     If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions. American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs. Doing that makes no sense, as the point of surcharging is supposed to be to

4

# A1967

encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

14. Surcharging debit cards is not permissible under the Proposed Settlement, which only allows surcharging on credit cards. Recently debit card transactions, both signature and Pin, have grown to represent 62% of Foot Locker's total U.S. volume of MasterCard and Visa transactions.

15. The only theoretical alternative would be to stop accepting American Express – something that Foot Locker cannot realistically do. American Express currently accounts for approximately 17% of our U.S. credit card sales. Dropping American Express is not a viable business proposition for Foot Locker. In addition, if merchants drop American Express or PayPal (which has a similar non-discrimination rule and is listed in the settlement as a Competitive Card Brand), this would only further increase the market power of Visa and MasterCard. Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an odd result at the end of this eight-year antitrust case.

16. Because Foot Locker, like most merchants, accepts American Express, the effect of the Competitive Card Brand limitation is to keep the prohibition against surcharging MasterCard and Visa credit card transactions in effect.

5

# A1968

### 2.   Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

17.    As of November 28, 2012, Foot Locker did business at 2,546 stores in 50 states and the Districts of Columbia, Puerto Rico, Virgin Islands and Guam. Surcharging is illegal in 11 states and Puerto Rico– Maine (2 stores), Oklahoma (20 stores), California (253 stores), Colorado (24 stores), Connecticut (31 stores), Florida (217 stores). Kansas (17 store), Massachusetts (44 stores), New York (167 stores), Texas (243 stores). Utah (13 stores) and Puerto Rico (65 stores). Those states cumulatively hold 43% of our U.S. locations as of November 28, 2012 and account for approximately 48% of our U.S. sales (includes only retail store sales for our Fiscal Year ending February 2, 2013), which means that surcharging credit transactions is illegal over a large portion of our operations.

18.    I am aware that 20 other states have introduced bills that would ban credit card surcharges. These include states where many of Foot Locker's stores are located, including Arkansas (13 stores), Hawaii (17 stores), Illinois (109 stores), Indiana (41 stores). Kentucky (19 stores), Maryland (76 stores), Michigan (91 stores), Missouri (42 stores). Nevada (21 stores), New Hampshire (7 stores), New Jersey (104 stores). New Mexico (27 stores), Pennsylvania (120 stores), Rhode Island (8 stores), South Carolina (49 stores), Tennessee (34 stores), and Washington (43 stores). Combined with states and U.S. Territories that already ban surcharging, these states and U.S. Territories as of November 28, 2012 account for 75% of our U.S. locations and approximately 78% of our

6

# A1969

U.S. sales (includes only retail store sales for our Fiscal Year ending February 2, 2013). Even if Foot Locker were inclined to surcharge, the mere fact that these states have undertaken measures to begin the process of banning surcharging would chill any efforts to surcharge in these states.

19.     The fact that surcharging is currently legally permitted in less than half of our stores is problematic in and of itself.  For operational, training, and customer service reasons, we would not implement surcharging in 39 states, but not in the 11 that prohibit surcharging.   Furthermore, if implemented, these proposed surcharge rules/restrictions and disclosure requirements will encourage consumer confusion, taint shopper experience and negatively impact a healthy consumer credit resurgence.

20.     For Internet sales, application of the various no-surcharge laws is uncertain and complex.  Many of these laws prohibit retailers, wherever they are located, from surcharging customers located in a no-surcharge state, and, likewise, merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

**B.     The Other Relief in the Settlement Is of No Value to Foot Locker.**

21.     The settlement appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, although this was not prohibited by any prior rules. Nevertheless, this relief is of no value to Foot Locker.  Foot Locker has no intention of varying its payment card acceptance practices across brick-and-mortar store brand names.  Foot Locker would not accept some cards at

7

certain branded stores and not others.

22.     Foot Locker also understands that Visa and MasterCard did not have rules against group buying prior to this settlement. We never considered group buying to be a realistic way to counteract Visa and MasterCard's market power for a host of practical reasons. In our view the settlement does nothing to change that, and in fact, the language that gives Visa and MasterCard the unilateral power to determine whether an offer provides "commercial benefits to the parties" will make it even less likely that group buying will ever be a feature in this market. This provision is of no value to our company.

C.     **The Release Is Far Too Broad**

23.     The Proposed Settlement's release is deeply concerning to Foot Locker. Visa and MasterCard likely will attempt to argue that the release covers all of their rules and conduct given its broad wording, along with substantially similar rules and conduct going forward, even if the rules and conduct have nothing to do with the matter at issue in this litigation. We find it deeply unfair we have no ability to opt out of a release that, as worded, could enable Visa and MasterCard to attempt such an argument.

24.     Foot Locker is also concerned that the release will bar any legal challenge in the event that Visa and MasterCard change their Honor All Cards rules to "Honor All Devices" rules to force merchants to accept all mobile transactions from Visa and MasterCard networks. The Proposed Settlement includes emerging form factors such as a mobile telephone, a fob, or "any other current or future code, device or service by

8

**A1971**

which a person, business. or other entity can pay for goods or services…" Proposed Settlement ¶ 1(u), (v).   These inclusions in conjunction with the overreaching and broad future liability release, effectively provides Visa and MasterCard the muscle to dictate market/customer adoption, immunity of Big Data use, require merchant acceptance and continue a price-fixing revenue racket.  Furthermore, because Visa and MasterCard do not currently have significant volumes in mobile payments, this area presents a unique opportunity for merchants to see new competition and avoid having mobile transactions trapped in the current system.  We want the right to freely choose when to accept mobile products, and we do not want to be forced to do so under Visa's and MasterCard's Honor All Cards rules.

25.    The release even purports to extend outside the jurisdiction of the United States. releasing Visa and MasterCard and their affiliates from their actions anywhere on the globe, and including foreign affiliates of class members as releasors.  The possibility that the defendants could argue that the release would cover claims by Foot Locker concerning our extensive international operations demonstrates the unacceptable scope of the release.

**A1972**

26.     The settlement is contradicting and evident stating the current "no

discounting" and "non-discrimination" rules detailed in the Final Judgment July 20, 2011

expiring on July 20, 2021 vs. the proposed liability release in perpetuity.

27.     Based on the current Proposed Settlement, it is clear to me that the lawyers

who negotiated the settlement did not adequately represent the interests of Foot Locker.

28.     Foot Locker is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

29.     Foot Locker joins in the opposition to the motion for final approval being

filed by the Objecting Plaintiffs and absent class members represented by Constantine

Cannon LLP, setting forth additional legal and factual grounds for Foot Locker's

Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed on May 22, 2013

Giovanna Cipriano
Senior Vice President, Chief Accounting Officer
Foot Locker, Inc.

10

# A1973

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **MDL Docket No. 1720** |
| | **MASTER FILE NO. 1:05-md-1720-JG-JO** |
| **This Document Relates To:** | |
| **ALL CLASS ACTIONS** | |

**THE HOME DEPOT'S STATEMENT OF OBJECTIONS TO**
**THE PROPOSED CLASS SETTLEMENT AND MEMORANDUM IN SUPPORT**

# A1974

## TABLE OF CONTENTS

Page

OVERVIEW OF THE HOME DEPOT'S OBJECTION ........................................................1

FACTUAL BACKGROUND ...........................................................................................7

A.    The Home Depot and Defendants' Interchange-Fee Practices ...........................7

B.    The Proposed Settlement ..................................................................................9

C.    The Scope of the Forward-Looking Release ...................................................10

ARGUMENT ................................................................................................................13

I.     STANDARDS FOR FINAL APPROVAL ......................................................13

II.    THE PROPOSED MANDATORY SETTLEMENT CLASS CANNOT BE CERTIFIED CONSISTENT WITH DUE PROCESS OR RULE 23...............................15

    A.    A Mandatory Settlement Class Cannot Release Damages Claims. ......................15

    B.    Using A Mandatory Settlement Class To Release Damages Claims Would Impermissibly Intrude Upon The Home Depot's Right To Opt Out Of The Rule 23(b)(3) Damages Class. ..............................................................................17

    C.    A Mandatory Settlement Class Is Only Appropriate In The Exceptional Circumstance Of A High Degree Of Group Cohesion And Unity Such That An Indivisible Remedy Is Warranted. ............................................................19

    D.    The Standards For A Mandatory Settlement Class Under Rule 23(b)(2) Are Not Satisfied.............................................................................................20

           1.    The requisite high degree of cohesion and unity is absent here. ..............21

           2.    The injunctive relief in this case is not indivisible. ...................................24

    E.    The Proposed Settlement Improperly Extends to Mobile And Other New Payment Technologies Never Addressed In the Case. ..........................................27

III.   THE RULE 23(B)(2) RELEASE UNLAWFULLY EXEMPTS UNRIPE FUTURE CONDUCT FROM ANTITRUST LIABILITY. ...............................................30

    A.    The Release Would Unlawfully Extinguish Claims That Could Not Have Been Brought In This Litigation..........................................................................30

    B.    The Release Of Prospective Antitrust Claims Violates Public Policy..................33

i

IV.     THE PURPORTED BENEFITS OF THE SETTLEMENT ARE
        INSIGNIFICANT IN LIGHT OF THE STRENGTH OF THE CLAIMS. .......................37

        A.     The Limited Surcharging Changes Have Minimal Value.....................................38

        B.     The Monetary Payment Is Inadequate. ..................................................................43

        C.     The Case Is Strong On The Merits. .......................................................................45

CONCLUSION .............................................................................................................................45

**A1976**

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

<u>**Cases**</u>

*Amchem Prods., Inc. v. Windsor,*
 521 U.S. 591 (1997) ................................................................... 4, 14, 22, 23

*In re Am. Express Fin. Advisors Sec. Litig.,*
 672 F.3d 113 (2d Cir. 2011) ................................................................. 4, 32

*In re Am. Express Merchs. Litig.,*
 634 F.3d 187 (2d Cir. 2011) ................................................................. 6, 33

*In re Auction Houses Antitrust Litig.,*
 No. 00 Civ. 0648, 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) ........................ 19

*The Authors Guild v. Google, Inc.,*
 770 F. Supp. 2d 666 (S.D.N.Y. 2011) ............................................... 9, 13, 33

*Berkman v. City of New York,*
 705 F.2d 584 (2d Cir. 1983) ................................................................... 13

*Cohen v. Viray,*
 622 F.3d 188 (2d Cir. 2010) ................................................................... 13

*Comer v. Cisneros,*
 37 F.3d 775 (2d Cir. 1994) ..................................................................... 23

*County of Suffolk v. Long Island Lighting Co.,*
 907 F.2d 1295 (2d Cir. 1990) ................................................................. 14

*D'Amato v. Deutsche Bank,*
 236 F.3d 78 (2d Cir. 2001) ..................................................................... 14

*Dunlop v. Pan Am. World Airways, Inc.,*
 672 F.2d 1044 (2d Cir. 1982) ................................................................. 33

*Easterling v. State Dep't of Corr.,*
 278 F.R.D. 41 (D. Conn. 2011) ............................................................... 16

*Engwiller v. Pine Plains Cent. Sch. Dist.,*
 199 F.R.D. 127 (S.D.N.Y. 2001) ............................................................. 23

*Fox Midwest Theatres v. Means,*
 221 F.2d 173 (8th Cir. 1955) ................................................................. 34

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
 55 F.3d 768 (3d Cir. 1995) ....................................................................... 9

*Gooch v. Life Investors Ins. Co. of Am.,*
 672 F.3d 402 (6th Cir. 2012) ................................................................. 17

# A1977

*Hansberry v. Lee*,
  311 U.S. 32 (1940) ................................................................... 19

*Honorable v. Easy Life Real Estate Sys., Inc.*,
  182 F.R.D. 553 (N.D. Ill. 1998) ............................................... 23

*Jefferson v. Ingersoll Int'l Inc.*,
  195 F.3d 894 (7th Cir. 1999) .................................................... 19

*Jermyn v. Best Buy Stores, L.P.*,
  276 F.R.D. 167 (S.D.N.Y. 2011) ............................................. 16

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000) ...................................................... 13

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) .................................................... 13

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322 (1955) ................................................................. 33

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ................................. 6, 17, 29, 30, 31

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982) ............................................................. 2, 16

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
  No. 07 CV 8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) .............. 36, 37

*Martin v. Wilks*,
  490 U.S. 755 (1989) ................................................................. 19

*M.D. ex rel. Stukenberg v. Perry*,
  675 F.3d 832 (5th Cir. 2012) .................................................... 21

*Mktg. Assistance Plan, Inc. v. Assoc. Milk Producers, Inc.*,
  338 F. Supp. 1019 (S.D. Tex. 1972) ......................................... 34

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
  660 F.2d 9 (2d Cir. 1981) .................................................... 30, 33

*Ortiz v. Fireboard Corp.*,
  527 U.S. 815 (1999) ...................................................... 4, 14, 19, 22

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*,
  No. 05-MD-1720 (JG)(JO), 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) .............. 5

*Pettco Enters., Inc. v. White*,
  162 F.R.D. 151 (M.D. Ala. 1995) ............................................. 23

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ......................................................... passim

iv

# A1978

*Potts v. Flax*,
    313 F.2d 284 (5th Cir. 1963) ................................................................................ 20, 25

*Redel's Inc. v. Gen. Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) .......................................................................................... 33

*Richards v. Jefferson County*,
    517 U.S. 793 (1996) ...................................................................................................... 19

*Robertson v. Nat'l Basketball Ass'n*,
    556 F.2d 682 (2d Cir. 1977) ................................................................................... 35, 36

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001) ............................................................................... 3, 16, 20

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
    157 F. Supp. 2d 561 (E.D. Pa. 2001) .........................................................................34

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
    No. CIV.A. 97–5184, 2001 WL 1689714 (E.D. Pa. Nov. 21, 2001) ...............................34

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    130 S. Ct. 1431 (2010) ................................................................................................27

*Stinson v. City of New York*,
    282 F.R.D. 360 (S.D.N.Y. 2012) ................................................................................. 17

*TBK Partners, Ltd. v. W. Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ................................................................................... 9, 30

*Three Rivers Motors Co. v. Ford Motor Co.*,
    522 F.2d 885 (3d Cir. 1975) ....................................................................................... 34

*Turpen v. City of Corvallis*,
    26 F.3d 978 (9th Cir. 1994) ....................................................................................... 27

*UniSuper Ltd. v. News Corp.*,
    898 A.2d 344 (Del. Ch. 2006) ................................................................................... 30

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ......................................................................... 9

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ................................................................................. 16

*VKK Corp. v. NFL*,
    244 F.3d 114 (2d Cir. 2001) ....................................................................................... 36

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ........................................................................................ passim

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................................................... 29, 30

# A1979

*Xerox Corp. v. Media Scis., Inc.*,
    609 F. Supp. 2d 319 (S.D.N.Y. 2009)................................................................ 36


## **STATUTES**

15 U.S.C. § 26.............................................................................................................27

28 U.S.C. § 2072.........................................................................................................27

Fed. R. Civ. P. 23 ................................................................................................ passim


## **OTHER AUTHORITIES**

18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449 (1981).............. 19

James Grimmelmann, *Future Conduct and the Limits of Class Action Settlements*, 91
    N.C. L. Rev. 387 (2013) .......................................................... 4, 15, 31, 35, 36

Reserve Bank of Australia, *A Variation to the Surcharging Standards, Final Reforms and
    Regulation Impact Statement* (June 2012) ................................................ 39, 41

Reserve Bank of Australia, *Reforms to Payment Card Surcharging* (Mar. 2013) ...................... 40

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.
    Rev. 97 (2009) ......................................................................................................... 4

Robin A. Prager et al., *Interchange Fees and Payment Card Networks:  Economics,
    Industry Developments, and Policy Issues* (2009) ........................................... 43

Steven Semeraro, *Taming Credit Card Fees by Requiring the Biggest Banks to Compete
    for Merchant Acceptance:  An Inter-Bank Competitive Model*, T. Jefferson School
    of Law Research Paper No. 2223518 (Feb. 2013) ..................................... passim

Terri Bradford et al., *Developments in Interchange Fees in the United States and Abroad*
    (Apr. 2008) ........................................................................................................... 43

Samuel Issacharoff, *Class Action Conflicts*, 30 U.C. Davis L. Rev. 805 (1997)..........................14

# A1980

Home Depot U.S.A., Inc. ("The Home Depot") respectfully submits this memorandum in support of its objection to the Proposed "Definitive Class Settlement Agreement" filed with this Court on October 19, 2012 (the "Proposed Settlement"), and preliminarily approved by the Court on November 27, 2012.[1]

## <u>OVERVIEW OF THE HOME DEPOT'S OBJECTION</u>

The Home Depot – the nation's sixth-largest retail merchant – respectfully submits that the Proposed Settlement cannot be approved in its current form consistent with the constitutional guarantee of due process or other governing law.  Most notably, the Proposed Settlement employs a mandatory Rule 23(b)(2) class, with no opt-out rights, to bind members of that class to a sweeping release of claims – including damages claims – regarding Defendants' future conduct.  Separately and together, these provisions violate settled principles of due process (*see, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)) and Rule 23 as interpreted by the Supreme Court.

It is self evident that the settling parties here reached a single settlement agreement in which the broad mandatory release applying to Defendants' future conduct was a part of the *quid pro quo* for the planned monetary payments to the class.  As lead class counsel acknowledged at the preliminary approval hearing: "The negotiations before the mediators were always – one issue was monetary, the other issue was equitable relief.  *One was not going to be reached without reaching the other.*"  Transcript of Hearing (Nov. 9, 2012) (Dkt. 1732), at 9:12-15 (emphasis added).  Yet the settlement provisions have been split artificially between two classes: one, a Rule 23(b)(3) class, with opt-out rights, to which the monetary payments will be made; and the other, a mandatory Rule 23(b)(2) class, with no opt-out rights, as to which injunctive

---

[1]   Attached as Exhibit A to this memorandum is The Home Depot's Statement of Objections setting forth the information requested by the Notice.

relief (*i.e.*, certain changes to Visa and MasterCard rules) will apply and which will be bound by the forward-looking release.

This artificial structure means that merchants can opt out of the monetary relief under Rule 23(b)(3) and bring their own claims for *past* damages (*i.e.*, damages that accrued on or before the date of preliminary approval), but even those merchants that opt out will remain irrevocably bound by the forward-looking release applicable to the mandatory Rule 23(b)(2) class. That the forward-looking release constitutes consideration for the monetary relief is confirmed by the inclusion of a virtually identical forward-looking release in the Rule 23(b)(3) portion of the settlement structure. Again, however, even a merchant that opts out of the Rule 23(b)(3) class cannot avoid that forward-looking release because the release has been included in the mandatory Rule 23(b)(2) portion of the settlement as well. This structure improperly limits the value of the opt-out right to The Home Depot and other class members.

Using Rule 23(b)(2) to force upon merchants a mandatory release of future damages claims violates the Constitution's Due Process Clause. The Supreme Court has held that "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court" before that plaintiff's "claim for money damages or similar relief at law" can be extinguished. *Shutts*, 472 U.S. at 811-12; *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the . . . Due Process Clause."). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), drawing on this precedent, confirmed that a mandatory Rule 23(b)(2) class may not be used to resolve monetary damages claims that are not purely incidental to the injunctive relief. *Id.* at 2557. Here, the release applicable to the Rule 23(b)(2) class extends to compensatory damages, which, by definition,

2

# A1982

cannot be characterized as incidental.  *See id.* (holding that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages").

The proposed Rule 23(b)(2) class also lacks the cohesion and unity that are predicates for mandatory participation on a class-wide basis.  *See generally Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 165 (2d Cir. 2001) ("Where class-wide injunctive or declaratory relief is sought in a (b)(2) class action for an alleged group harm, there is a presumption of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process.").  Rule 23(b)(2) mandatory classes can be justified only when, as in the racial-discrimination context, the class is sufficiently cohesive that the applicable injunctive remedies will necessarily provide "relief to each member of the class" and "affect the entire class at once."  *Dukes*, 131 S. Ct. at 2557-58.

Here, the extraordinary opposition to the Proposed Settlement (including by many of the named plaintiffs) confirms the profound lack of cohesion and unity among the more than nine million merchants that would be part of the (b)(2) class.  Moreover, the mandatory class applies not only to existing merchants, but also to merchants that will be created in the future.  The interests of the existing merchants and those that will exist in the future inherently conflict with respect to the Rule 23(b)(2) portion of the settlement.  The injunctive relief provisions require Visa and MasterCard only to implement rule and practice changes for eight years, but the release of future claims lasts indefinitely.  Thus, a merchant established more than eight years after the settlement will be burdened by the release, but unlike existing merchants, will not have received any benefits during the injunction period.  Thus, in this respect, the mandatory Rule 23(b)(2)

3

class not only lacks necessary cohesion, but also fails to satisfy Rule 23(a)(4)'s requirement that its class representatives "fairly and adequately protect" all class members.  *See, e.g.*, *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 858-59 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626-27 (1997) (discussing the adequacy of representation requirement under Rule 23(a)(4)).

The Rule 23(b)(2) injunctive relief provisions also are fundamentally flawed for the independent reasons that they fail to affect class members in an indivisible manner.  *See Dukes*, 131 S. Ct. at 2557 ("The key to the (b)(2) class . . . is 'the indivisible nature of the injunctive . . . remedy warranted – the notion that the conduct is such that it can be enjoined . . . only as to all of the class members or as to none of them.'") (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  The supposed cornerstone of the (b)(2) relief here involves changes to Visa and MasterCard's "surcharging" rules.  A large portion of the proposed class, however, including The Home Depot, will either remain prohibited from surcharging as a result of state laws or existing contracts with third parties or have no interest in surcharging for customer-service reasons.  In addition, the settlement itself provides that Visa and MasterCard can individually negotiate with merchants about the surcharging rules that will apply.

The forward-looking mandatory release also exceeds the Court's jurisdiction because it would bar all forms of relief concerning a host of future conduct that could not have been addressed in this litigation.  *See In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011) ("It is elementary that a settlement agreement cannot release claims that the parties were not authorized to release.").[2]  On its face, the forward-looking release covers *any*

---

[2]   As explained in a recent law review article, *see* James Grimmelmann, *Future Conduct and the Limits of Class Action Settlements*, 91 N.C. L. Rev. 387, 387 (2013) (hereinafter, "Grimmelmann, *Future Conduct*"), future-conduct releases of the type presented here are

4

payment-card rule or practice by the Defendants in the future that is the same as or "similar" to any payment-card rule and practice in effect today.[3]  The release thus would cover claims regarding Defendants' existing payment-card rules and practices, and "similar" rules and practices in the future, notwithstanding that this litigation is not capable of determining for all time whether such rules and practices, or any variations that may be adopted in the future, satisfy federal antitrust law or other provisions.  This release could bar claims regarding unlawful Visa and MasterCard interchange-fee increases in the future, for example, so long as the fees were set using practices similar to today's practices.[4]  The release would also bar claims regarding the future application of existing payment-card rules that had no role in this litigation and may appear innocuous today but later produce patently anticompetitive effects.  This is all the more problematic given that Visa and MasterCard rules that were a core focus of the litigation when filed – such as the Honor All Cards rules – are not even addressed in the injunctive relief provisions of the settlement.

Furthermore, the release purports to reach subject matters that were never at issue in this litigation, such as wireless phones and mobile-payment technology, and does so in a way that threatens to thwart future innovation.  The mandatory release purports to allow Visa and MasterCard to apply all of their existing rules and practices to these innovative payment

---

"unusually dangerous to class members and to the public," posing "severe informational problems for class members and for courts"; they create "moral hazard for the defendant, give it concentrated power, and thrust courts into a prospective planning role they are ill-equipped to handle."  *Id.*

[3]  *See* Proposed Settlement, at ¶¶ 68(g), 68(h), 71.

[4]  Any assurances that such increases are unlikely to happen provide cold comfort, particularly given the fact that Visa and MasterCard have a history of raising fees after settling litigation.  *See, e.g.*, *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2008 WL 115104, at *6 (E.D.N.Y. Jan. 8, 2008) (noting that Visa and MasterCard significantly increased interchange fees for credit card transactions, effective August 2003, just two months after the *Visa Check* settlement was signed).

# A1985

technologies, and even to "future devices" that have not yet been created.  This could potentially mean that Visa and MasterCard could force merchants to accept Visa and MasterCard mobile transactions or implement technologies required to accept them, and thereby bypass what had been ongoing negotiations over these technologies with individual merchants, such as The Home Depot.  The coverage of  wireless phones and mobile-payment technology in the Proposed Settlement suggests "the selling out of one category of claim for another," *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251-52 (2d Cir. 2011), benefiting merchants who seek only to accept traditional payment cards at the expense of those who seek to pursue alternative means of electronic payments.  That the proposed class representatives are willing to trade away any potential for future innovations in payment technology, a valuable property right which The Home Depot would never concede in an individual negotiation, demonstrates a fundamental conflict within the class that defeats adequacy and violates the due-process rights of absent class members.

The release also violates "the firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy." *In re Am. Express Merchs.' Litig.*, 634 F.3d 187, 197 (2d Cir. 2011).  The release would effectively confer a judicially created zone of antitrust immunity for Visa and MasterCard (but not their competitors) with far-reaching and complex, yet unpredictable, consequences for U.S. merchants, present and future.  Visa and MasterCard cannot use a settlement to purchase such immunity from antitrust liability.  Notably, Class Plaintiffs themselves argued in their opposition to summary judgment that "[r]eleases that would effectively immunize defendants from future antitrust liability are unenforceable for public-

6

# A1986

policy reasons." (Class Plaintiffs' Mem. of Law in Opp. to Defs.' Mot. for Summ. J., May 6, 2011 (Dkt. 1533) at 20.)[5]

Accordingly, The Home Depot respectfully submits that the Proposed Settlement cannot be approved consistent with governing law.

## FACTUAL BACKGROUND

### A.   The Home Depot and Defendants' Interchange-Fee Practices

The Home Depot is the sixth largest retailer in the United States, and the world's largest home-improvement specialty retailer, with more than 2,200 retail stores throughout the U.S. and elsewhere.  Through these stores and its website, The Home Depot sells to consumers and professionals a wide assortment of building materials, home-improvement products, and lawn and garden products.  At each of its retail outlets, The Home Depot accepts a variety of payment methods, including Visa and MasterCard credit and debit payment cards, as well as cash and checks.[6]  The Home Depot also accepts payments through its private-label credit-card program, and has recently launched a program allowing in-store customers to use alternative payment options such as PayPal.  (*See* Declaration of Dwaine Kimmet ("Kimmet Decl."), at ¶¶ 2-7.)

The interchange-fee-related practices that had been challenged in this litigation impose a tremendous burden on The Home Depot's business and, correspondingly, its customers.  The Home Depot's bank-card acceptance costs are approximately $600 million per year, and

---

[5]   These flaws are not academic.  The settlement's use of a mandatory settlement class to extinguish merchants' antitrust claims concerning future conduct would entrench the very practices of Visa and MasterCard – including the "Honor-All-Cards" and "On-Us" rules, discussed below, along with Defendants' practices for setting and enforcing interchange fees – that cause U.S. merchants to pay among the highest interchange fees in the world and prevent even a large merchant like The Home Depot from being able meaningfully to negotiate these rates.

[6]   The Home Depot has routinely accepted these cards at retail outlets in the United States since before January 1, 2004, and will continue to do so in the future.  (*See* Declaration of Dwaine Kimmet at ¶ 7.)

7

represent The Home Depot's third highest core operating cost — as of 2011, behind only payroll and real-estate-related expenses.  (*See id.* ¶ 9.)  Visa and MasterCard set and increase their interchange and related fees at what appear to be their whims, and The Home Depot, notwithstanding its size, has been powerless to negotiate any meaningful reductions in these fees. (*See id*. ¶ 10.)  Interchange and related fees are exceedingly complex[7] and have been increased or changed as many as four times a year, with new fees regularly introduced, some of which are not only arbitrary, but irrational.[8]

Two of Visa's and MasterCard's rules and practices in particular leave The Home Depot largely unable to create economically rational incentives for customers to use lower-cost cards. (*See id.* ¶¶ 13-17.)  First is the so-called "Honor All Cards" rule, which requires merchants that accept Visa and/or MasterCard credit cards to accept all credit cards issued on the same networks, regardless of the issuer and the interchange fee associated with the issuer's card. Second is the rule that issuing banks charge the interchange fees established by Visa and MasterCard for so-called "On Us" transactions, even though both the issuing and acquiring banks are the same on those transactions – meaning the banks use their own processing services (or a third party processor), rather than Visa or MasterCard network services.  These rules are made all the more oppressive by the practice of all issuing banks to adhere to the interchange fees set by Visa and MasterCard.

---

[7]   More than six-thousand banks and financial institutions issue payment cards over the Visa and MasterCard networks, under different brand names, and it is often impossible to tell what interchange fees apply to transactions until the fees are deducted from The Home Depot's account at the end of each month.  (*See id*. ¶ 11.)

[8]   MasterCard, for example, imposes a "volume assessment," which consists of a 0.01% fee imposed on transactions greater than or equal to $1,000.  In 2012, despite The Home Depot's longstanding relationship with both companies, Visa and MasterCard introduced new fees known as "Fixed Network Fees" and "License and Registration Fees."  These fees are to be imposed annually and will cost The Home Depot millions of dollars a year.  (*See id*. ¶ 12.)

8

The Proposed Settlement does *nothing* to change these rules and practices.[9]  Instead, it would exempt these and similar practices from all future civil liability under the antitrust laws – even if events transpire in the future making the anticompetitive nature of these rules and practices even more apparent than it is today.

**B.      The Proposed Settlement**

The instant case, *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-MD-1720-JG-JO (E.D.N.Y.), commenced in 2005 and has three operative class-action complaints.  On July 13, 2012, Class Counsel, on behalf of only a minority of the original named Plaintiffs, filed a preliminary version of the Proposed Settlement, and then, on October 19, 2012, a "definitive" version making minor changes.  This Court granted preliminary approval of the Proposed Settlement on November 27, 2012, over objections filed by numerous class-member merchants, large and small, including The Home Depot.  (*See* Class Settlement Preliminary Approval Order (Dkt. 1745) ¶ 3.)[10]

The Proposed Settlement provides that Visa and MasterCard will pay a total of $6.05 billion, an amount to be reduced before distribution to account for various costs and attorneys'

---

[9]  *See* The Home Depot's Objection To Preliminary Approval of Proposed Class Settlement, Oct. 31, 2012 (Dkt. 1676) at 20-27.  The Home Depot hereby incorporates this submission in its entirety.

[10]  The number and nature of the objections here – from many of the nation's largest retailers – speak volumes about merchants' views of this settlement.  *See The Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 676 (S.D.N.Y. 2011) (explaining that "the number and vociferousness of the objectors" is a factor to consider in determining the reasonableness of a proposed settlement) (quoting *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785, 812 (3d Cir. 1995)).  Significant objection "tends to indicate that the settlement may not be adequate since class members presumably know what is in their own best interests."  *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982).  In *Visa Check*, this Court observed that "the reaction of the class . . . may be the most significant factor" regarding the substantive fairness of a settlement, while noting the "extremely small number of objectors" in that case "heavily favors approval."  *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003).

9

fees and expenses, and the extent to which members of the proposed Rule 23(b)(3) settlement opt out.[11]  Visa and MasterCard will also give merchants that have not opted out of the Rule 23(b)(3) settlement class an estimated ten-basis-point reduction of interchange fees for eight months.  In addition, the Proposed Settlement calls for Visa and MasterCard to make certain rules modifications, which began on February 28, 2013, and expire on July 20, 2021.

Absent from the Proposed Settlement, however, is any agreement by Visa, MasterCard, or their member banks to modify the practices for setting excessive interchange and related fees – the practices that have been the primary subject matter of this litigation.  To the contrary, the Proposed Settlement expressly states it does *not* "limit the ability of any [Visa or MasterCard] Defendant to set interchange rates, whether default rates or rates applicable (either by rule or negotiated agreement) to individual merchants, groups of merchants, or merchant trade associations."[12]  Nor does the Proposed Settlement call for any changes to the "Honor All Cards" or "On Us" rules.

Instead, the Proposed Settlement leaves these rules, and all other practices for the setting of interchange and related fees, largely intact while immunizing them from challenge for the indefinite future.  This is the result of the extraordinarily broad scope of the forward-looking release.

## C.    The Scope of the Forward-Looking Release

The scope of the forward-looking release for the (b)(2) class, for which opt outs are not permitted, is summarized in paragraph 71:

> For purposes of clarity, it is specifically intended for the release and covenant not to sue provisions of Paragraphs 66-70 above to preclude all members of the Rule 23(b)(2) Settlement Class from seeking or obtaining any form of declaratory,

---

[11]   *See* Proposed Settlement ¶¶ 2(a), 9-10, 25.

[12]   Proposed Settlement ¶¶ 51, 64.

> injunctive, or equitable relief, or damages or other monetary relief *relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order* with respect to any Rule of any Visa Defendant or any MasterCard Defendant, and the compliance by any Bank Defendant with any such Rule, as it is alleged to exist, now exists, may be modified in the manner provided in Paragraphs 40-45 and 53-57 above, *or may in the future exist in the same or substantially similar form thereto.*[13]

Thus, on its face, the release applies to future conduct by Visa and MasterCard, including future application of all existing "Rules," as well as application of all future "Rules" that are "substantially similar," and to antitrust claims for any sort of relief, including monetary damages. The release applies, without opt-out rights, to all current and future merchants that accept Visa and MasterCard, and it applies in perpetuity, with no temporal limitation.

In turn, "Rule" is defined by the settlement to encompass much more than what that term is commonly understood to mean. Given that Visa and MasterCard have as many as sixteen massive rulebooks relating to payment cards, this would be a sweeping release if it applied to rules *qua* rules alone. But here, "Rule" covers, without limitation, "any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."[14] Thus, on its face, the release encompasses virtually everything Visa, MasterCard, and their member banks do regarding payment methods, whether or not the conduct played any role in this litigation. It would bar all antitrust claims in perpetuity that involve future rules, practices, or conduct relating to payment methods that are the same or similar to the rules, practices, or conduct existing before the settlement.

In an apparent effort to protect the settlement from scrutiny, Class Plaintiffs have suggested the release has a much narrower scope. At the preliminary approval hearing, for

---

[13]   Proposed Settlement ¶ 71 (emphasis added).

[14]   Proposed Settlement ¶ 1(mm).

11

# A1991

example, Class Counsel asserted that "there is nothing in the settlement that releases claims based on those sixteen rule books that you see cited frequently in the objections.  Rather, *it's just the rules that were the predicate for this action*."  (Transcript of Hearing (Nov. 9, 2012) (Dkt. 1732), at 15:6-10 (emphasis added).)  Similarly, in their final approval brief, Class Plaintiffs state that the release "simply prevents members of the settlement classes from challenging *the rules and rule modifications put in place by reason of the settlement*."  (Memorandum in Support of Class Plaintiffs' Motion for Final Approval of Settlement, Apr. 11, 2013 ("Final Approval Br.") at 48.)  Class Plaintiffs also assert that the release would *not* cover a future "*reversion to the old rules* which are modified or eliminated by the settlement."  (Final Approval Br. at 52.) (emphasis added).

These assertions cannot be reconciled with the plain language of the release.  On its face, the release extends beyond the rules that were the predicate for this action or that were put in place by the settlement.  The release expressly covers all Visa and MasterCard payment-card rules and practices, including those that had nothing to do with this litigation or its settlement.[15] Defendants notably do not concede that the release is limited in the manner Class Plaintiffs have suggested.[16]

---

[15]   *See, e.g.*, Steven Semeraro, *Taming Credit Card Fees by Requiring the Biggest Banks to Compete for Merchant Acceptance: An Inter-Bank Competitive Model*, T. Jefferson School of Law Research Paper No. 2223518, at 23 (Feb. 2013) (hereinafter "Semeraro, *Taming Credit Card Fees*"), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2223518 ("The settlement also defines the term 'rule' expansively to cover everything governing the Visa and MasterCard systems, even if the rule played no role whatsoever in the on-going litigation.  This expansiveness is demonstrably an intended aspect of the settlement . . . .").

[16]   Defendants, for example, state that the release would cover rules adopted in the future that are similar to "Visa or MasterCard network rules" that exist today.  (*See* Defs' Mem. Supp. Final Approval of Definitive Class Settlement Agreement, Apr. 11, 2011 ("Defs' Final Approval Br.") at 28.)

12

The release also applies to any rules adopted by Visa or MasterCard in the future that are the same as or similar to any rule that existed before the settlement.  Thus, Paragraph 71 provides that the release would bar all claims in the future "with respect to any Rule of any Visa Defendant or any MasterCard Defendant . . . as it . . . may in the future exist in the same or substantially similar form thereto [*i.e.*, in the same or substantially similar form as it now exists]."  Paragraphs 68 (g) and (h) further indicate that the release would apply to the future reversion to the same Rules the settlement was supposed to change.  Paragraph 68(h), for example, releases claims about the "future effects" of any future Rule that is "substantially similar" to any Rule that was in effect before the settlement.

## ARGUMENT

## I.   STANDARDS FOR FINAL APPROVAL

As a general matter, a court may not approve a settlement under Fed. R. Civ. P. 23(e) unless it determines the settlement is "fair, adequate, and reasonable, and not a product of collusion."  *Authors Guild*, 770 F. Supp. 2d at 676 (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000) (internal quotation marks omitted)).

When a settlement contains provisions that are unlawful, however, the settlement is necessarily inadequate and cannot be approved.  *See Cohen v. Viray*, 622 F.3d 188, 194 (2d Cir. 2010) (holding that district court erred in approving settlement's release and indemnification provisions that were unlawful and against public policy); *Berkman v. City of New York*, 705 F.2d 584, 597 (2d Cir. 1983) (explaining that courts should not approve a settlement when "it contains provisions that are unreasonable, unlawful, or against public policy").

In the context of a settlement, the interests of class counsel and the defendants can become aligned in ways that may prejudice absent class members.  *See generally Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).  Thus, as the Supreme Court has explained,

13

# A1993

the components of Rule 23 "designed to protect absentees by blocking unwarranted or overbroad class definitions" demand heightened attention when a court is "[c]onfronted with a request for settlement-only class certification," and "[s]uch attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem*, 521 U.S. at 619. *See also Ortiz*, 527 U.S. at 848-49 ("When a district court, as here, certifies for class action settlement only, the moment of certification requires 'heightened attention.'") (alterations omitted) (quoting *Amchem*, 521 U.S. at 620)); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("When a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness.").[17]

Here, the settling parties' effort to obtain a sweeping release for Defendants through the use of a mandatory Rule 23(b)(2) settlement class, without opt-out rights, demands heightened scrutiny. As an article quoted by the Supreme Court observes, a mandatory settlement class "provides tremendous strategic incentives for collusion" between class counsel and defendants, and "the capacity to trade off future claims of unrepresented individuals provides an overwhelming temptation to engage in collusion and should . . . defeat any presumption of deference normally accorded settling parties." Samuel Issacharoff, *Class Action Conflicts*, 30 U.C. Davis L. Rev. 805, 821-22 (1997), *cited in Ortiz*, 527 U.S. at 849 n.27.

But whether collusion exists or not, the settling parties' decision to apply this mandatory release to future conduct warrants close scrutiny: "The risks of future-conduct releases to class members are substantially greater than the risks of past-conduct releases, so that they require a

---

[17]   *See also County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir. 1990) ("A preferred settlement that is in large part negotiated prior to certification of the class – as occurred herein – is subject to a higher degree of scrutiny than is usual in assessing a settlement's fairness.").

correspondingly greater scrutiny by courts." Grimmelmann, *Future Conduct*, at 416. Such

releases pose several dangers: "To summarize: there is more at stake in future-conduct releases,

they are harder to understand, they create unique design problems, the aggregation of rights is

itself dangerous, and courts are the wrong institutions to be making such decisions." *Id.* at 418.

## II. THE PROPOSED MANDATORY SETTLEMENT CLASS CANNOT BE CERTIFIED CONSISTENT WITH DUE PROCESS OR RULE 23.

The settling parties have chosen to structure the Proposed Settlement in an artificial

manner to include a separate and mandatory Rule 23(b)(2) Settlement Class, with no opt-out

rights, which includes a sweeping waiver of claims, including damages claims, involving future

conduct. This structure cannot be approved, because the certification of such a mandatory

settlement class in this case would violate the Due Process Clause by unjustifiably depriving

merchants of the property rights inherent in the claims that they would be forced to give up. The

damages release is also a highly improper use of a mandatory Rule 23(b)(2) class, in direct

contravention of governing Supreme Court authority.

### A. A Mandatory Settlement Class Cannot Release Damages Claims.

As an initial matter, the settling parties' attempt to require the mandatory Rule 23(b)(2)

class to relinquish prospective *damages* claims, without opt-out rights, is impermissible.

In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985), the Supreme Court held

that "due process requires at a minimum that an absent plaintiff be provided with an opportunity

to remove himself from the class by executing and returning an 'opt out' or 'request for

exclusion' form to the court" before that absent plaintiff's "claim for money damages or similar

relief at law" can be extinguished. The Supreme Court recently applied this holding in *Wal-Mart

Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), where the Court made clear that claims for

15

monetary relief may not be certified under Rule 23(b)(2), except where, unlike here, the monetary relief is "incidental to the injunctive or declaratory relief." *Dukes*, 131 S. Ct. at 2557.

As the Supreme Court also has explained, "[a] cause of action is a species of property protected by the . . . Due Process Clause." *Logan*, 455 U.S. at 428. *See also Dukes*, 131 S. Ct. at 2559 (explaining that there is a "serious possibility" that the "absence of notice and opt-out violates due process" in class actions seeking injunctive relief even where, unlike here, monetary claims do not predominate); *Robinson*, 267 F.3d at 166 (noting that "certification of a claim for non-incidental damages under Rule 23(b)(2) poses a due process risk because this provision does not expressly afford the procedural protections of notice and opt out").

Here, The Home Depot's future damages claims alone would easily amount to hundreds of millions of dollars. Thus, the claims for monetary relief that the Rule 23(b)(2) class would be forced to release are in no way incidental to injunctive relief; rather, they are the type of individualized damages claims *Dukes* holds cannot be addressed through the vehicle of a Rule 23(b)(2) class. *Dukes*, 131 S. Ct. at 2557; *see also In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 115 (E.D.N.Y. 2012) ("Damages claims usually require individualized analyses of class members' circumstances and thus tend to destroy class certification under Rule 23(b)(2).").

Class Plaintiffs ignore *Shutts* and do not cite a single case where a court approved a release of compensatory damages claims in a Rule 23(b)(2) class – let alone where the release, as here, reaches future conduct.[18] Defendants premise their support for the damages release on a

---

[18]   None of the cases Class Plaintiffs cite support their ability to use a Rule 23(b)(2) class as a mechanism to resolve individualized *damages* claims. For instance, although this Court certified both a damages class and an injunction class in *In re Vitamin C Antitrust Litigation*, 279 F.R.D. 90, 115 (E.D.N.Y. 2012), it expressly noted that members of the injunction class could pursue damages claims in the future. The other cases cited by Class Plaintiffs are similarly distinguishable. *See Easterling v. State Dep't of Corr.*, 278 F.R.D. 41, 47 (D. Conn. 2011) (modifying the existing class into a hybrid class in light of *Dukes*); *Jermyn v. Best Buy Stores,*

*non sequitur*, namely that because the (b)(2) class receives only *injunctive* relief, it is somehow appropriate to mandatorily eliminate its right to future *damages*. No authority is cited for this absurd proposition.[19] Defendants further argue that *Shutts* is inapplicable because the Court was addressing damages claims brought under Rule 23(b)(3) classes, as if due process is concerned with form rather than substance. But *Dukes* eliminates any doubt that the principles in *Shutts* apply equally to mandatory classes under Rule 23(b)(2). Indeed, such a mandatory class is where the due-process concerns articulated in *Shutts* are most directly implicated given the absence of opt-out rights under Rule 23(b)(2).

**B. Using A Mandatory Settlement Class To Release Damages Claims Would Impermissibly Intrude Upon The Home Depot's Right To Opt Out Of The Rule 23(b)(3) Damages Class.**

The settling parties cannot deny that, under *Shutts* and other precedent, The Home Depot and other merchants must be given the right to opt out of the Rule 23(b)(3) Settlement Class in order to pursue their own, individualized damages claims. Class Plaintiffs state, for example, that "members of the Rule 23(b)(3) Settlement Class remain free to opt-out of the Rule 23(b)(3) Settlement Class and pursue their damages claims even though they are still members of the mandatory Rule 23(b)(2) Settlement Class." (Final Approval Br. at 43.) Similarly, Defendants acknowledge that "the right to opt out" must be provided in order "'to bind an absent plaintiff

---

*L.P.*, 276 F.R.D. 167, 173-74 (S.D.N.Y. 2011) (involving a (b)(2) class that was not seeking monetary relief and a (b)(3) class that was); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 428 (6th Cir. 2012) (same); *Stinson v. City of New York*, 282 F.R.D. 360, 381 (S.D.N.Y. 2012) (same).

[19] Defendants rely on *Literary Works* to defend the release. (*See* Defs' Final Approval Br. at 29.) But, quite unlike the release in this case, the settlement in *Literary Works* expressly provided that a "class member *may choose to opt out of the release for future use* and only grant a release for past use." *Literary Works*, 654 F.3d at 246 (emphasis added). Indeed, a class member could "either opt[] out of the Settlement altogether or exercise[] his right to bar future use." *Id.* at 247. Thus, the *Literary Works* settlement and release bear no resemblance to those at issue here.

concerning a claim for money damages or similar relief at law.'" (Defs' Final Approval Br. at 21) (quoting *Shutts*, 472 U.S. at 811).

Leaving aside the propriety of the release of future damages claims in the Rule (b)(3) class (and there are a number of compelling arguments against the scope of that release), even the settling parties acknowledge that to comport with due process that release must allow for the right to opt out. The settling parties fail to acknowledge, however, that the Proposed Settlement would intrude upon the rights to opt out of the Rule 23(b)(3) class, because the settlement imposes on the mandatory Rule 23(b)(2) class, with no opt-out rights, a virtually identical release of damages claims related to Defendants' future conduct. Thus, even a party opting out of that release as a member of the Rule 23(b)(3) class would remain bound by the virtually identical release being imposed on the Rule 23(b)(2) class – thereby rendering that aspect of the Rule 23(b)(3) opt out meaningless. This limit on The Home Depot's right to pursue its own damages claims violates the very principle the settling parties have acknowledged: in the absence of an opt-out right, merchants cannot be bound to a release that restricts the right to bring damages claims.

The due-process rights identified in *Shutts* and its progeny can only be protected if the consideration paid by Defendants for the release of damages claims, *and the release of damages claims itself*, are addressed through a settlement class with opt-out rights permitting class members to opt out of the release completely.

Accordingly, The Home Depot respectfully submits that the Proposed Settlement can only be approved, consistent with due process, if that approval is conditioned on amending the Rule 23(b)(2) portion of the settlement either to remove the release of damages claims arising from the Defendants' future conduct, or to give class members the option to opt out of that

# A1998

release.  *See In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648,  2001 WL 170792, at *13 (S.D.N.Y. Feb. 22, 2001) (approving settlement conditioned on parties' modification of release to remove "objectionable feature[s]" and conform language to specific requirements set by the court), *aff'd*, 42 F. App'x 511 (2d Cir. 2002).

> ### C.   A Mandatory Settlement Class Is Only Appropriate In The Exceptional Circumstance Of A High Degree Of Group Cohesion And Unity Such That An Indivisible Remedy Is Warranted.

Mandatory classes under Rule 23(b)(2) are an exception to the deeply ingrained principle that an aggrieved party is entitled to its own day in court.  Thus, they

> implicate the due process "principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process," *Hansberry v. Lee,* 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940), it being "our 'deep-rooted historic tradition that everyone should have his own day in court,' " *Martin v. Wilks,* 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)); see *Richards v. Jefferson County,* 517 U.S. 793, 798–799, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996).

*Ortiz*, 527 U.S. at 846.  The proponent of such a class bears "the burden of justification" for invoking this "exception," and must demonstrate that the class representative has "the same interests" in the litigation as all absent class members.  *Id.*

Classes appropriate for certification under Rule 23(b)(2) seek the kind of injunctive or declaratory relief that would be "appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).[20]  A mandatory class can only even arguably be justified when the court can presume such a high degree of "cohesion and unity between absent class members and the class

---

[20]   "Rule 23(b)(2) is designed for *all-or-none cases* in which 'final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate.'"  *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 897-98 (7th Cir. 1999) (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendments) (emphasis added).

19

representatives such that adequate representation will generally safeguard absent class members'

interests and thereby satisfy the strictures of due process." *Robinson*, 267 F.3d at 165. *See also*

*Dukes*, 131. S. Ct. at 2558 (noting that "(b)(2) does not require that class members be given

notice and opt-out rights, presumably because it is thought (rightly or wrongly) that notice has no

purpose when the class is mandatory, and that depriving people of their right to sue in this

manner complies with the Due Process Clause").

The paradigm cases for mandatory Rule 23(b)(2) classes are "actions in the civil rights

field where a party is charged with discriminating unlawfully against a class," Fed. R. Civ. P.

23(b)(2) (advisory committee's note to 1966 amendments):

> By the very nature of the controversy, the attack is on the unconstitutional
> practice of racial discrimination. Once that is found to exist, the Court must order
> that it be discontinued. Such a decree, of course, might name the successful
> plaintiff as the party not to be discriminated against. But that decree may not—
> either expressly or impliedly—affirmatively authorize continued discrimination
> by reason of race against others.

*Potts v. Flax*, 313 F.2d 284, 289 (5th Cir. 1963) (cited with approval in 1966 advisory

committee's note). *See also Dukes*, 131 S. Ct. at 2558 (observing that "the Rule reflects a series

of decisions involving challenges to racial segregation"). Such cases inherently involve a

"group-wide injury," *Robinson*, 267 F.3d at 162, where a group tied together by some trait such

as race seeks to end discrimination against the group based on that trait.

**D.     The Standards For A Mandatory Settlement Class Under Rule 23(b)(2) Are
         Not Satisfied.**

The proposed Rule 23(b)(2) settlement class lacks the high degree of cohesion and unity

sufficient to certify a mandatory class, and the injunctive relief applicable to the class does not

affect all class members in the same way.

20

# A2000

### 1.    The requisite high degree of cohesion and unity is absent here.

The more than nine-million existing merchants that are to be included in the mandatory Rule 23(b)(2) settlement class range from small mom-and-pop stores to the largest retailers in the world.  By definition, they do not share any unity of interest.  In fact, the proposed (b)(2) class here is significantly more diverse than the class that failed to achieve certification in *Dukes*.  The Home Depot is far from the only major merchant that vigorously opposes the settlement.  A majority of the original named plaintiffs feel the same way.  Such disunity alone distinguishes this case from cases where Rule 23(b)(2) is appropriate, such as those challenging racially discriminatory practices.  *See, e.g.*, *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 846 (5th Cir. 2012) (vacating certification order as failing to comply with Rule 23(b)(2), where the district court had improperly found it irrelevant that some of the class's requested relief would not apply to every class member and improperly reasoned that because the proposed class alleged that "systemic deficiencies" in the state's policies violated the constitutional rights of every class member, "all of the class members will benefit" from the relief).

Moreover, the lack of cohesion and unity here is all the more pronounced given that the proposed class would also encompass every merchant that will ever in the future accept Visa and MasterCard.  These future merchants do not share a unified interest with present merchants.  This is because, pursuant to the Proposed Settlement, future merchants – and especially those coming into existence after July 2021, when Visa's and MasterCard's obligations under the settlement will have expired – will be subject to the release of future claims, without having received any benefits from the settlement.[21]

---

[21]   *See* Proposed Settlement ¶¶ 45, 58.

21