# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON), 13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON), 14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON), 14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON), 14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON), 14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON) 14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON), 14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON), 14-663-cv(CON), 14-837-cv(CON)**

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

_On Appeal from the United States District Court
for the Eastern District of New York_

## JOINT DEFERRED APPENDIX
## VOLUME IX OF XXII
## Pages A2001 to A2248

_Submitted on Behalf of All Parties_

# **Table of Contents**

**Page**

### **Volume I**

District Court Docket Entries ................................................................... A1

### **Volume II**

District Court Docket Entries (cont'd) ................................................. A251

### **Volume III**

District Court Docket Entries (cont'd) ................................................. A501

### **Volume IV**

District Court Docket Entries (cont'd) ................................................. A751

Transfer Order, dated October 20, 2005 [Docket No. 2]....................... A822

Excerpts of First Consolidated Amended Class Action Complaint,
    dated April 24, 2006 [Docket No. 317] .......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
    Antitrust Litigation*, CV-96-5238, dated July 21, 2006
    [Docket No. 455-4] ......................................................................... A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
    Antitrust Litigation*, CV-96-5238,
    dated July 21, 2006 [Docket No. 455-5]......................................... A850

Excerpts of First Amended Supplemental Class Action Complaint
    (redacted), dated February 20, 2009 [Docket No. 1152]............... A856

Excerpts of Second Consolidated Amended Class Action
    Complaint (redacted), dated February 20, 2009
    [Docket No. 1153] .......................................................................... A858

i

# Table of Contents
## (continued)

**Page**

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154] ................ A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ............................................ A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] .......................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533] ................. A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536] ........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ............................................ A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ................................ A945

### Volume V

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545] ................. A1011

# Table of Contents
## (continued)

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
    Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
    Rule 56.1(b) (redacted), dated October 21, 2011
    [Docket No. 1550] ........................................................ A1014

Excerpts of Network Defendants' Memorandum in Opposition to
    the Individual Plaintiffs' Motion for Summary Judgment
    (redacted), dated October 21, 2011 [Docket No. 1551]................. A1030

Excerpts of European Commission Notification Pursuant to Article
    254 of the EC Treaty (redacted), dated November 23, 2011
    [Docket No. 1573-3] ...................................................... A1032

Notice of Filing of Memorandum of Understanding,
    dated July 13, 2012 [Docket No. 1587]......................... A1042

Memorandum of Understanding, dated July 13, 2012
    [Docket No. 1588] .......................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
    [Docket No. 1588-1] ....................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
    dated August 21, 2012 [Docket No. 1616-3]................ A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
    Approval, dated October 19, 2012 [Docket No. 1656]................. A1086

Excerpts of Appendices to Definitive Class Settlement
    Agreement, dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
    Honorable John Gleeson, US District Judge,
    dated November 9, 2012 [Docket No. 1732]................ A1096

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Revised Appendix F2: Notice of Class Action
    Settlement Authorized by the U.S. District Court, Eastern
    District of New York, dated November 26, 2012
    [Docket No. 1740-2] ...................................................................... A1098

Class Settlement Preliminary Approval Order,
    dated November 27, 2012 [Docket No. 1745] ............................... A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
    Plaintiffs' Motion to Stay Class Settlement Preliminary
    Approval Order, dated November 29, 2012 [Docket No. 1751] ... A1111

Letter from Class Counsel to Judge Orenstein,
    dated December 10, 2012 [Docket No. 1760] ............................... A1114

Excerpts of Defendants' Memorandum in Support of Final
    Approval of Definitive Class Settlement Agreement,
    dated April 11, 2013 [Docket No. 2110] ....................................... A1118

Excerpts of Memorandum in Support of Class Plaintiffs'
    Motion for Final Approval of Settlement, dated April 11, 2013
    [Docket No. 2111-1] ....................................................................... A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
    of Class Plaintiffs' Motion for Final Approval of Settlement,
    dated April 11, 2013 [Docket No. 2111-2] .................................... A1131

Declaration of Eric D. Green, dated April 11, 2013
    [Docket No. 2111-3] ....................................................................... A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
    Class Settlement, dated April 11, 2013 [Docket No. 2111-5] ....... A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
    Administrator's Implementation of Settlement Notice Plan,
    dated April 11, 2013 [Docket No. 2111-6] .................................... A1200

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
Implementation and Adequacy of Settlement Notice Program,
dated April 11, 2013 [Docket No. 2113-7].................................... A1215

Declaration of Professor Charles Silver Concerning the
Reasonableness of Class Counsel's Request for an Award of
Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........ A1238

**Volume VI**

Declaration of Professor Charles Silver Concerning the
Reasonableness of Class Counsel's Request for an Award of
Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
(Cont'd)............................................................................................. A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
Plaintiffs' Motion for Final Approval of Settlement and Class
Plaintiffs' Joint Motion for Award of Attorneys' Fees,
Expenses and Class Plaintiffs' Awards,
dated April 11, 2013 [Docket No. 2113-6].................................... A1296

Excerpts of Objection of City of Oakland to Final Approval of
Proposed Settlement, dated May 15, 2013 [Docket No. 2279] ..... A1434

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 15, 2013
[Docket No. 2281] ......................................................................... A1437

Objection of U.S. Public Interest Research Group to Final
Approval of Proposed Class Settlement, dated May 23, 2013
[Docket No. 2361] ......................................................................... A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
dated May 23, 2013 [Docket No. 2364] ........................................ A1476

Statement of Objections of B & H Foto Electronics Corp.,
d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........ A1480

## **Table of Contents**
### (continued)

**Page**

Excerpts of Statement of Objections by Boscov's,
dated May 24, 2013 [Docket No. 2411] ........................................ A1483

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] ......................................................... A1486

### **Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] (cont'd) ............................................... A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] .............. A1512

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated May 24, 2013 [Docket No. 2427] .................... A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2432] ..... A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
Approval of the Settlement, dated May 24, 2013
[Docket No. 2433] ......................................................... A1541

Excerpts of Objection of David's Bridal to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2434] ..... A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2435] ..... A1553

Declaration of John R. Manna, Vice President Operational
Controller, Lowe's Companies, Inc., dated May 24, 2013
[Docket No. 2437] ......................................................... A1555

**Table of Contents**
(continued)

Page

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2438] ........................................................................ A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2439] ........................................................................ A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2441] ........................................................................ A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
Final Approval of the Proposed Settlement, dated May 25,
2013 [Docket No. 2444] ................................................................ A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2445] ..................... A1588

Excerpts of Objection of Carter's to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2446] ..................... A1601

Objection of Coborn's Incorporated to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
Final Approval of the Proposed Settlement,
dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2449] ............... A1615

Objection of Alon USA, LP to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2450] ..................... A1621

# **Table of Contents**
## (continued)

**Page**

Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
 the Proposed Settlement, dated May 25, 2013
 [Docket No. 2451] .........................................................................   A1627

Objection of IKEA US to Final Approval of the Proposed
 Settlement, dated May 25, 2013 [Docket No. 2458] .....................   A1632

Objection of Jetro Holdings, LLC to Final Approval of the
 Proposed Settlement, dated May 25, 2013 [Docket No. 2459] .....   A1650

Objection of Michaels Stores, Inc. to Final Approval of the
 Proposed Settlement, dated May 25, 2013 [Docket No. 2460] .....   A1656

Objection of NATSO Inc. to Final Approval of the Proposed
 Settlement, dated May 25, 2013 [Docket No. 2461] .....................   A1659

Objection of National Restaurant Association to Final Approval of
 the Proposed Settlement, dated May 25, 2013
 [Docket No. 2464] .........................................................................   A1667

Objection of Panera Bread Company to Final Approval of the
 Proposed Settlement, dated May 25, 2013 [Docket No. 2466] .....   A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
 Settlement, dated May 25, 2013 [Docket No. 2467] .....................   A1681

Objection of Retail Industry Leaders Association to Final Approval
 of the Settlement, dated May 25, 2013 [Docket No. 2469] ...........   A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
 the Proposed Settlement, dated May 25, 2013
 [Docket No. 2470] .........................................................................   A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
 the Settlement, dated May 25, 2013 [Docket No. 2471] ...............   A1699

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of The Wendy's Company to Final Approval
of the Proposed Settlement, dated May 25, 2013
[Docket No. 2473] ........................................................................ A1703

Objection of National Grocers Association to Final Approval of the
Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
[Docket No. 2493] ........................................................................ A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
Class Members WellPoint, Inc., etc., to the Proposed Rule
23(b)(2) Settlement Agreement, dated May 27, 2013
[Docket No. 2493-1] ..................................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
Objections of WellPoint Entities, dated May 17, 2013
[Docket No. 2493-2] ..................................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
[Docket No. 2495] ........................................................................ A1752

**Table of Contents**
**(continued)**

Page

Excerpts of Memorandum in Support of Objections of Absent
    Putative Rule 23(b)(2) Class Members Target Corporation,
    Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
    Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
    L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
    Ross Company, Closeout Distribution, Inc., Ascena Retail
    Group, Inc., Abercrombie & FitchCo., OfficeMax
    Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
    Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
    American Signature, Inc. to the Proposed Rule 23(b)(2) Class
    and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2495-1] ....................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,*
    *v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
    dated May 27, 2013 [Docket No. 2495-2] ...................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
    [Docket No. 2509] .......................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
    Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
    Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
    Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
    Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517] ........... A1828

Statement of Objections of Office Depot, Inc., Viking Office
    Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
    and Solutions4Sure.com, Inc., dated May 27, 2013
    [Docket No. 2519] .......................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
    Superstore East, Inc., Staples the Office Superstore, LLC,
    Staples Contract & Commercial, Inc., Quill Corporation, Quill
    Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
    Thrive Networks, Inc., and SchoolKidz.com,
    dated May 27, 2013 [Docket No. 2525] ......................................... A1836

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Michael S. Weisbach,
    dated May 27, 2013 [Docket No. 2533-2].....................................  A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
    Settlement, dated May 27, 2013 [Docket No. 2534] .....................  A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
    Settlement, dated May 27, 2013 [Docket No. 2536] .....................  A1847

Objections to Final Approval of Proposed Class Action Settlement
    and Notice of Intent to Appear of The Iron Barley Restaurant,
    Homestead Restaurant (Historical Homestead, Inc.), The Feral
    Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
    (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
    dated May 28, 2013 [Docket No. 2537] .........................................  A1850

National Retail Federation Statement of Objection to Final
    Approval of the Proposed Rule 23(B)(2) Agreement,
    dated May 28, 2013 [Docket No. 2538] .........................................  A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
    28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2] .......  A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
    dated May 28, 2013 [Docket No. 2538-20]....................................  A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
    Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
    [Docket No. 2538-21]...................................................................  A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
    [Docket No. 2540] ........................................................................  A1924

Objection of National Cooperative Grocers Association to Final
    Approval of the Proposed Settlement, dated May 28, 2013
    [Docket No. 2546] .........................................................................  A1926

## **Table of Contents**
### (continued)

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2559] ..... A1934

Objection of National Association of Convenience Stores to Final
Approval of Proposed Settlement, dated May 28, 2013
[Docket No. 2561] ........................................................................ A1942

Objection of Affiliated Foods Midwest to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2563] ..... A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
Settlement, dated May 28, 2013 [Docket No. 2587] .................... A1963

The Home Depot's Statement of Objections to the Proposed Class
Settlement and Memorandum in Support, dated May 28, 2013
[Docket No. 2591] ........................................................................ A1973

### **Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
Settlement and Memorandum in Support, dated May 28, 2013
[Docket No. 2591] (Cont'd) .......................................................... A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
Home Depot's Objection to the Proposed Class Settlement,
dated May 28, 2013 [Docket No. 2591-2] ..................................... A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
Settlement, dated May 28, 2013 [Docket No. 2592] .................... A2028

Objection of Consumers Union of United States, Inc. to Final
Approval of Proposed Class Settlement, dated May 28, 2013
[Docket No. 2598] ........................................................................ A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
Settlement, dated May 28, 2013 [Docket No. 2605] .................... A2040

## **Table of Contents**
### (continued)

**Page**

Excerpts of Objection of Starbucks to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2606] .....    A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
Partners LLC, dated May 28, 2013 [Docket No. 2613]................    A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
dated May 28, 2013 [Docket No. 2613-1]....................................    A2075

Objection of National Community Pharmacists Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2619] ........................................................................    A2107

Statement of Objections and Amici Curiae Brief of States to Final
Approval of the Settlement, dated May 28, 2013
[Docket No. 2623] ........................................................................    A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643] ....................    A2147

Excerpts of Declaration of David Cote in Support of BlueCross
BlueShield of South Carolina Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-3].................    A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
and Blue Shield of Arizona, Inc. Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-4].................    A2180

Excerpts of Declaration of Matthew Brolly in Support of
Independence Blue Cross Objections to Proposed Settlement,
dated May 28, 2013 [Docket No. 2643-6]....................................    A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
Cross of Northeastern Pennsylvania Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-7].................    A2184

xiii

**Table of Contents**
**(continued)**

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28,
2013 [Docket No. 2644] .................................................................. A2186

Excerpts of Objection of American Express Company, American
Express Travel Related Services Company, Inc., Travel
Impressions, Ltd., American Express Publishing Corp., Serve
Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee,
USA, Amex Assurance Company, and Accertify, Inc. to the
Class Settlement Agreement, dated May 28, 2013 [Docket No.
2648] ......................................................................................... A2213

Declaration of Stephen B. McCurdy in Support of Objections of
American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

**Volume X**

Notice of Motion of DFS Services LLC and Discover Bank to
Intervene, dated May 28, 2013 [Docket No. 2655] ...................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013
[Docket No. 2657-6] ...................................................................... A2252

Objection of DFS Services LLC, Discover Loans, Inc., and
Discover Bank to Final Approval of Proposed Settlement,
dated May 28, 2013 [Docket No. 2659] ....................................... A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule
23(b)(3) Damages Case, dated May 28, 2013
[Docket No. 2663] ....................................................................... A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in
Opposition to Motion for Final Approval of Settlement, dated
May 28, 2013 [Docket No. 2670] ................................................. A2278

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Jeffrey I. Shinder in Support of
   Opposition to Class Plaintiffs' Motion for Final Approval of
   the Proposed Class Settlement, dated May 28, 2013
   [Docket No. 2670-1]...................................................... A2300

Excerpts of Report of Professor Jerry Hausman,
   dated May 28, 2013 [Docket No. 2670-5]..................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
   Shinder: "Industry Facts Concerning Debit Card Regulation
   Under Section 920," by Stephen Craig Mott,
   BetterBuyDesigns, on Behalf of the Merchants Payments
   Coalition, submitted to Federal Reserve System, October 29,
   2010; Attachment F: "2011 Interchange Fee Revenue, Covered
   Issuer Costs, and Covered Issuer and Merchant Fraud Losses
   Related to Debit Card Transactions," Board of Governors of
   the Federal Reserve System, March 5, 2013
   [Docket No. 2670-6]...................................................... A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
   Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
   - Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
   Reactions to Credit Card Settlement", by Maria Aspan and
   Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
   Analysis of the Proposed Interchange Fee Litigation
   Settlement," by Adam J. Levitin, Georgetown Law and
   Economics Research Paper No. 12-033, August 21, 2012; Ex.
   70: The Nilson Report, February 2013, Issue 1,011; American
   Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
   "Merchant Surcharging – Understanding Payment Card
   Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
   to Support the U.S. Merchant Litigation Settlement," Visa,
   2013; Ex, 77: "Notice of MasterCard Rule Changes,"
   MasterCard Worldwide, December 2012; Ex. 78:
   Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
   Territories, regarding Merchant Class Action Litigation
   Settlement – Important Changes to Merchant Acceptance

**Table of Contents**
(continued)

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses
Q2 2012 Results - Earnings Call Transcript," Visa, May 20,
2013; Ex. 84: "New Visa, MasterCard fees stir debate within
industry," The Green Sheet Online, March 12, 2013; Ex. 94:
MasterCard Incorporated Management Discusses Q2 2012
Results - Earnings Call Transcript, May 20, 2013; Ex. 95:
MasterCard's CEO Discusses Q4 2012 Results - Earnings Call
Transcript, May 20, 2013 [Docket No. 2670-8] ........................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder:
Ex. 97: "Reform of Australia's Payments System: Preliminary
Conclusions of the 2007/08 Review," Reserve Bank of Australia,
April, 2008; Ex. 108: Amended and Restated Global Restructuring
Agreement [Docket No. 2670-9] ................................................... A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed
Class Settlement Agreement, dated June 5, 2013
[Docket No. 3074] ......................................................................... A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013
[Docket No. 3755] ......................................................................... A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed
Class Settlement Agreement, dated June 6, 2013
[Docket No. 4237] ......................................................................... A2405

Excerpts of Statement of Objections of the Society of Independent
Gasoline Marketers of America, dated June 7, 2013
[Docket No. 4640] ......................................................................... A2407

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated June 7, 2013 [Docket No. 4654] ...................... A2415

**Table of Contents**
**(continued)**

**Page**

Statement of Objections of Life Time Fitness, Inc.,
dated June 11, 2013 [Docket No. 5385] ......................................... A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
dated June 11, 2013 [Docket No. 5406] ....................................... A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
[Docket No. 5651] ......................................................................... A2434

Excerpts of Defendants' Reply Memorandum in Support of
Final Approval of Definitive Class Settlement Agreement,
dated August 16, 2013 [Docket No. 5937] ................................... A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
Further Support of Settlement Final Approval,
dated August 16, 2013 [Docket No. 5939] ................................... A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
[Docket No. 5939-3] ....................................................................... A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
to the Proposed Class Settlement (redacted),
dated August 16, 2013 [Docket No. 5939-5] ................................. A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
Plaintiffs' Motion for Final Approval of the Proposed Class
Settlement, dated August 16, 2013 [Docket No. 5939-6] .............. A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
Joint Motion for Award of Attorneys' Fees, Expenses and
Class Plaintiffs' Awards, dated August 16, 2013
[Docket No. 5940] ......................................................................... A2471

Excerpts of Reply Memorandum in Support of FDC's
Motion to Opt Out of Rule 23(b)(2) Class Settlement,
dated August 23, 2013 [Docket No. 5957] ................................... A2473

**Table of Contents**
**(continued)**

**Page**

Report from Court appointed expert Professor Alan O. Sykes,
  dated August 28, 2013 [Docket No. 5965] .................................... A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
  dated August 28, 2013 [Docket No. 5965] (Cont'd) .................... A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
  Report of Professor Alan O. Sykes, dated September 4, 2013
  [Docket No. 5978] ......................................................... A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
  Professor Alan O. Sykes, dated September 4, 2013
  [Docket No. 5982] ......................................................... A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
  Correct Misstatements in Supplemental Declaration of
  Craig Wildfang and in Opposition to Final Approval,
  dated September 10, 2013 [Docket No. 6006-1] .......................... A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-2] ...................................................... A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-3] ...................................................... A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-4] ...................................................... A2553

**Table of Contents**
(continued)

Page

Excerpts of Transcript of Fairness Heating before the
    Honorable John Gleeson, U.S. District Court Judge,
    dated September 12, 2013 [Docket No. 6094]............................... A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
    dated December 13, 2013 [Docket No. 6125] ............................... A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
    dated December 13, 2013 [Docket No. 6126] ............................... A2588

Notice of Appeal of Target Group Objectors,
    dated December 13, 2013 [Docket No. 6128] ............................... A2589

Notice of Appeal of National Retail Federation,
    dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
    [Docket No. 6175] ........................................................................ A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
    WellPoint Objectors, dated January 10, 2014
    [Docket No. 6176] ........................................................................ A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
    [Docket No. 6178] ........................................................................ A2602

Notice of Appeal of First Data Corporation, First Data Merchant
    Services, TASQ Technology, Inc., TRS Recovery Services,
    Inc., First Data Government Solutions, and Telecheck Services,
    Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
    Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
    Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
    Tousled Hair Studio), and Kristina Newman – Hair,
    dated January 10, 2014 [Docket No. 6182] ................................... A2606

xix

# **Table of Contents**
### (continued)

**Page**

Notice of Appeal of U.S. PIRG, dated January 13, 2014
    [Docket No. 6189] .......................................................... A2608

Notice of Appeal of Consumers Union of United States, Inc.,
    dated January 13, 2014 [Docket No. 6190] .................................. A2609

Amended Notice of Appeal of Target Group Objectors,
    dated January 21, 2014 [Docket No. 6212] .................................. A2610

Amended Notice of Appeal of Temple Eagle,
    dated January 13, 2014 [Docket No. 6227] .................................. A2611

Notice of Appeal of National Federation of Independent Business,
    dated February 7, 2014 [Docket No. 6234] .................................. A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
    Objectors and WellPoint Objectors, dated February 7, 2014
    [Docket No. 6238] .......................................................... A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
    Homestead Restaurant (Historical Homestead, Inc.), The Feral
    Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
    (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
    dated February 13, 2014 [Docket No. 6245] ................................ A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
    (Amending Notice Of Appeal Filed December 13, 2013),
    dated February 13, 2014 [Docket No. 6248] ................................ A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
    Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
    dated February 13, 2014 [Docket No. 6251] ................................ A2625

## **Table of Contents**
### **(continued)**

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
LLC and Temple Eagle Partners LLC, dated February 18, 2014
[Docket No. 6257] ........................................................................ A2626

Amended Notice of Appeal of R & M Objectors,
dated February 25, 2014 [Docket No. 6263] ................................ A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
dated June 25, 2009 ...................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
Credit Cards: *Rising Interchange Fees Have Increased Costs
for Merchants, but Options for Reducing Fees Pose
Challenges*, dated 11/2009 ............................................................ A2638

Final Judgment as to Defendants MasterCard International
Incorporated and Visa Inc., *U.S. v. American Express Co*.,
CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
CV-4996 DE 143].......................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

**Volume XII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) .................................................. A2751

**Volume XIII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) .................................................. A3001

**Volume XIV**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) .................................................. A3251

# **Table of Contents**
## **(continued)**

**Page**

### **Volume XV**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3501

### **Volume XVI**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3751

### **Volume XVII**

Interlink Network, Inc. Operating Regulations,
    dated November 15, 2012 ............................................................ A4009

### **Volume XVIII**

MasterCard Rules, dated April 11, 2012 ............................................. A4259

### **Volume XIX**

MasterCard Rules, dated April 11, 2012 (Cont'd) .............................. A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
    Case T-111/08, Judgment of the General Court
    (Seventh Chamber), dated May 24, 2012 ...................................... A4614

Minute Order deeming all pending motions for relief withdrawn
    without prejudice to reinstatement if the settlement is not
    consummated, dated July 17, 2012................................................ A4616

Minute Order upholding Judge Orenstein's order denying
    disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

**Table of Contents**
**(continued)**

**Page**

Excerpts of Class Settlement Agreement, *In re Am. Express*
    *Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
    No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
    [Docket No. 11-md-2221 DE 306-2]............................................ A4623

**Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express*
    *Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
    No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
    [Docket No. 11-md-2221 DE 306-2] (Cont'd) .............................. A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for
    Final Approval of Class Action Settlement, *In re: American*
    *Express Anti-Steering Rules Antitrust Litig*., 11-md-2221
    (NGG)(RER), (Redacted - Public Version), dated April 15,
    2014 [Docket No. 11-md-2221 DE 362] ...................................... A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American*
    *Express Anti-Steering Rules Antitrust Litig*., 11-md-02221
    (NGG)(RER) (redacted), dated April 15, 2014
    [Docket No. 11-md-2221 DE 370] ................................................ A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee*
    *and Merchant Discount Antitrust Litig*., No. 14-md-1720
    (JG)(JO), dated July 18, 2014
    [Docket No. 14-md-1720 DE 104] ................................................ A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card*
    *Interchange Fee and Merchant Discount Antitrust Litig*.,
    No. 14-md-1720 (JG)(JO), dated July 18, 2014
    [Docket No. 14-md-1720 DE 105] ................................................ A4836

# Table of Contents
## (continued)

**Page**

## Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
Judgment of the Court (Third Chamber),
dated September 11, 2014.............................................................. A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.
Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
dated September 26, 2014 [Docket No. 13-cv-5746 DE 41]......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
No. 13-4537 .......................................................................... A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
Education ....................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
U.S. District Court, Eastern District of New York ...................... A5090

## Volume XXII

### *Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
(filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
to Individual Plaintiffs' Statement of Undisputed Facts,
Pursuant to Local Rule 56.1(b) (filed under seal),
dated May 6, 2011 [Docket No. 1477-7]....................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
There is No Genuine Issue to be Tried (filed under seal), dated
February 11, 2011 [Docket No. 1478-4] ....................................... A5125

**Table of Contents**
**(continued)**

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
dated July 2, 2009 [Docket No. 2088]............................................ A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
under seal), dated December 14, 2009 [Docket No. 2088]............ A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
seal), dated December 14, 2009 [Docket No. 2088]....................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
dated May 3, 2011 [Docket No. 2088] ............................................ A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
dated May 3, 2011 [Docket No. 2088] ............................................ A5191

Memorandum of Law in Support of Motion to Intervene of DFS
Services LLC and Discover Bank (filed under seal), dated May
28, 2013 [Docket No. 2657-1]......................................................... A5200

Declaration of Jennifer M. Selendy (filed under seal),
dated May 28, 2013 [Docket No. 2657-3]...................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
dated May 28, 2013 [Docket No. 2657-4]...................................... A5231

Declaration of Roger Hochschild (filed under seal),
dated May 28, 2013 [Docket No. 2657-5]...................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
Notice of Class Action Settlement Authorized by the U.S.
District Court, Eastern District of New York (filed under seal)
[Docket No. 2657-7]........................................................................ A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
dated July 2, 2009 .......................................................................... A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
dated December 15, 2009 ............................................................... A5295

## **Table of Contents**
### **(continued)**

**Page**

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
  dated June 22, 2010 ....................................................... A5297

**A2001**

This clear divergence of interests among members of the proposed Rule 23(b)(2) class means that certification of a single mandatory class is prohibited not only under Rule 23(b)(2) itself, but also under Rule 23(a)(4), which requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Supreme Court authority is on point. In *Amchem*, the plaintiffs sought class-action certification under Rule 23(b)(3) to settle current and future asbestos-related claims. The Court held that the class failed to satisfy Rule 23(a)(4) and Rule 23(b)(3) given a conflict of interest between the "currently injured" plaintiffs, whose goal was to receive "generous immediate payments," and "exposure-only" plaintiffs (future claimants), who would be interested in ensuring an "inflation-protected fund for the future" and "causation provisions that [could] keep pace with changing science and medicine, rather than freezing in place the science of 1993." *Amchem*, 521 U.S. at 611-612, 626. The Supreme Court's *Ortiz* decision similarly involved a class action prompted by the mass of asbestos cases. Plaintiffs sought certification for settlement purposes of a mandatory Rule 23(b)(1) class comprising present and future claimants. The Court held that, under Rules 23(a) and (b), the class required division into homogeneous subclasses, with separate representation to eliminate adverse interests, and that this flaw in the certified class prevented approval of the settlement regardless of its other terms. *See Ortiz*, 527 U.S. at 858 ("Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at postcertification fairness review under subdivision (e) that any settlement is fair in an overriding sense.").

As in *Amchem* and *Ortiz*, the Proposed Settlement here provides "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*,

22

# A2002

521 U.S. at 627.  Given that the Proposed Settlement would exchange temporally limited injunctive relief – relief which has very little if any value for The Home Depot – for a perpetual release from liability, Class Plaintiffs have clearly demonstrated that they care less about provisions most important to future members and have instead decided to "trade them" in for current benefits.  *Id.* at 611.  Indeed, as discussed further below, by blithely allowing the settlement's release provisions to extend to mobile payments, for example, the Class Plaintiffs have demonstrated their inability to even represent the interests of all current merchants.

Class Plaintiffs assert that all current and future merchants have the same interest in obtaining injunctive relief (which Class Plaintiffs call "systematic institutional reform") with respect to the Visa and MasterCard rules and conduct that are alleged to be anticompetitive. (Final Approval Br. at 51.)  But this ignores the fact that Defendants' limited obligations under the settlement expire after a modest duration, while the releases extend forever.[22]  Thus, Visa and MasterCard will not owe a thing to merchants that come into existence after 2021, but will reap a windfall release from such merchants.  Class Plaintiffs' cases – none of which involve injunctions of *limited temporal duration* – are thus inapposite.[23]

---

[22]   *See* Semeraro, *Taming Credit Card Fees*, 61-62 ("[T]he settlement would appear to fail because it makes no permanent structural changes that would ensure that competitive forces would govern interchange fee setting.  All of the injunctive provisions expire in 2021, permitting the defendants to re-impose the rules that are modified by the settlement.").

[23]   The injunctive relief sought in *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994), a racial discrimination case, was not temporally limited, as is the injunctive relief here, and therefore future class members were appropriately included so they too could benefit from being forever free from the discriminatory practices at issue.  The injunctive relief sought in *Engwiller v. Pine Plains Cent. Sch. Dist.*, 199 F.R.D. 127 (S.D.N.Y. 2001) similarly did not have an expiration date.  The court in *Pettco Enters., Inc. v. White*, 162 F.R.D. 151 (M.D. Ala. 1995), held that there was a conflict between the named plaintiffs, whose claims were pending, and class members whose claims had already been processed, and therefore altered the class definition to include future members that will be injured by the defendants' policy.  *Id*. at 159.  Named plaintiffs' interests were more aligned with future holders than those presently in the class, unlike this case. In *Honorable v. Easy Life Real Estate Sys., Inc.*, 182 F.R.D. 553 (N.D. Ill. 1998), the court

**2.      The injunctive relief in this case is not indivisible.**

The nature of the so-called "remedies" provided by the settlement here are further evidence that certification of the proposed (b)(2) settlement class is unwarranted.  As noted above, Rule 23(b)(2) is only warranted when the injunctive remedy applicable to the class is indivisible.  *See Dukes*, 131 S. Ct. at 2557.  Put differently, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class," and where the "relief sought must perforce affect the entire class at once."  *Id.* at 2557-58.

In this case, the injunctive remedies provided by the settlement are not indivisible, and they certainly do not provide "relief" to each class member "at once."  *Id.*  Rather, the supposed cornerstone of the injunctive relief offered here – *i.e.*, some limited changes to Visa's and MasterCard's surcharging rules – can and will apply to different class members in different ways, with some class members, such as The Home Depot, not meaningfully affected by these changes at all.

First, Visa's and MasterCard's surcharging rules do not necessarily apply to class members on an all-or-nothing basis.  Visa and MasterCard could, for example, individually bargain with merchants regarding surcharging practices, even while applying a different (or even a default) rule to other class members.  The settlement confirms this fact, by expressly providing that, even after the settlement, Visa and MasterCard *can individually contract with merchants regarding surcharging*:

---

certified a class consisting of present and future class members where the class sought injunctive relief – the protection of racial minority homebuyers from discrimination – not to benefit only the presently injured, but rather to "protect persons who might otherwise be injured in the future if the defendants are permitted to continue their alleged unlawful conduct." *Id*. at 560.  The common thread underlying all of these cases was the guarantee that future persons, who had interests identical to those of the current class members, would benefit from the *permanent* injunctive relief in each case.

> Nothing in this Class Settlement Agreement shall prevent the Visa Defendants from contracting with merchants not to surcharge Visa-Branded Credit Cards or any Product type of Visa-Branded Credit Card as long as (i) the agreement is for a fixed duration, (ii) is not subject to an evergreen clause, (iii) is individually negotiated with the merchant or merchants organized in accordance with the provisions of Paragraph 43 below and is not a standard agreement or part of a standard agreement generally by the Visa Defendants, and (iv) any such agreement or waiver is supported by Independent Consideration . . . .

¶ 42(f); *see also* ¶ 55(f).[24]

Second, in practice, the surcharging rules changes directed by the settlement will not provide relief to all class members at once. Most of the proposed class will not receive any direct benefit from these changes. These include: (i) companies like The Home Depot, for whom the limited surcharging allowed by the settlement would be impractical and inconsistent with their business model; (ii) companies in the many states where surcharging is prohibited by state law;[25] and (iii) companies that are prohibited from surcharging by what Class Plaintiffs call a "level-playing-field provision" arising from the fact that, since they also accept American Express, they cannot surcharge Visa or MasterCard even under the settlement.[26]

Even Class Plaintiffs acknowledge that, with the rule changes, there may only be "a *modest number* of surcharging merchants." (Final Approval Br. at 36) (emphasis added). In

---

[24]   Contrast this with the type of case for which 23(b)(2) was intended to apply: it would make no sense, for example, for a company to agree to not engage in racial discrimination, while reserving the right to discriminate against an individual on the basis of that individual's race. *See, e.g.*, *Potts*, 313 F.2d at 289.

[25]   The Home Depot has expressed a concern that, under the settlement, nationwide merchants may be barred under the settlement from surcharging anywhere, because they cannot surcharge everywhere, given that the settlement only permits surcharging where the "merchant adds *the same surcharge to all* [Visa or MasterCard] Credit Card transactions." (Proposed Settlement ¶¶ 42(a)(i), 42(b)(i), 55(a)(i), 55(b)(i) (emphasis added).) Class Plaintiffs purport to set The Home Depot's mind at ease by pointing to statements made in "the notice." (Final Approval Br. at 36.) But Class Plaintiffs nowhere explain how a merchant that does business in any of the states that prohibit surcharging can impose surcharges anywhere in the United States consistent with the provisions in the settlement identified above.

[26]   *See* Proposed Settlement ¶¶ 42, 55.

25

fact, this number will be less than one-third of the class, since Class Plaintiffs further

acknowledge that *over two-thirds of the class* may be prevented from surcharging by the so-

called "level-playing-field provision" alone.  (*Id.* at 38.)[27]  The remaining class members – *i.e.*,

those not subject to the level-playing–field provision – must then be reduced by at least one fifth,

to account for the eleven states that prohibit surcharging today, including the four most populous

states (with potentially more on the way).  This means that the rule changes regarding

surcharging would at most directly affect only a little more than one-fourth of class members –

and that is before that number is further reduced to account for merchants, such as The Home

Depot, for whom the limited surcharging permitted by the settlement is impractical or

impossible.

Class Plaintiffs speculate that the great majority of the class that will not directly benefit

from the rule changes may nonetheless one day experience some *indirect* benefits.  But this only

confirms that the rule changes will affect different class members differently and will not provide

cohesive "relief" to all class members "at once."  *Dukes*, 131 S. Ct. at 2558.  Class Plaintiffs'

expert, Alan S. Frankel, admits that the few merchants that can actually surcharge "will realize

the greatest savings" and that any effect on other merchants is both derivative and speculative.

(Declaration of Alan S. Frankel, Apr. 10, 2013 ("Frankel Decl."), ¶¶ 68, 73.)  Moreover, those

---

[27]   Class Plaintiffs suggest that the 6.2 million merchants that also accept American
Express can take advantage of the surcharge relief, despite the "level-playing-field" provision, if
they "choose to ignore American Express's anticompetitive rules."  (Final Approval Br. at 38.)
But the fact that Class Plaintiffs must resort to urging merchants to violate their contracts with
American Express to take advantage of the rules changes only demonstrates the poverty of the
so-called "relief" offered by the settlement.  It is also remarkable that Class Plaintiffs label
American Express's no-surcharging rules "anticompetitive," when, under the settlement, Visa
and MasterCard could revert to those same no-surcharging rules as early as August 2021 (while
all class members will have been forced to forgo in perpetuity any right to challenge those rules).

# A2006

speculative indirect benefits would take years to be realized, to the extent they are realized at all.[28]

The divisible character of the other elements of the proposed injunctive "relief" is also clear.  Class Plaintiffs concede, for example, that the "buying group provision" will apply, if at all, only to "smaller merchants."  (Final Approval Br. at 30.)  Similarly, the changes to the "all outlets" rule will obviously only affect merchants that operate under multiple trade names.  Again, neither of these changes will meaningfully affect The Home Depot, given that it is a large merchant that conducts the vast majority of its business under one trade name.

Accordingly, the proposed Rule 23(b)(2) settlement class at issue here fails under Rule 23 and violates the Due Process Clause.[29]

### E.     The Proposed Settlement Improperly Extends to Mobile And Other New Payment Technologies Never Addressed In the Case.

Class Plaintiffs have not even attempted to justify the extension of the terms of the Proposed Settlement, including the release provisions, to wireless phones and mobile payments, which were not the subject of the claims at issue in this case.  (*See* Second Consolidated

---

[28]   Dr. Frankel's assertion that *any* merchant will obtain significant benefits from the surcharging "relief" relies on ignoring the significant (and unexplained) limitations placed on the surcharging rights, as explained further below.  *See* Section IV.A. *infra*.

[29]   The Proposed Settlement would deprive The Home Depot of its rights under the Clayton Act "to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws," 15 U.S.C. § 26, or otherwise to recover future damages suffered as a result of the rules that are in effect today or similar rules that may be in effect in the future.  These substantial claims constitute "property" protected by the Due Process Clause.  *See Turpen v. City of Corvallis*, 26 F.3d 978 (9th Cir. 1994) (plaintiffs had a property right under the Fourteenth Amendment in a cause of action for injunctive relief).  In addition, the Rules Enabling Act provides that the rules promulgated pursuant to the Act, including Rule 23, "shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1442 (2010) (plurality opinion) (Enabling Act applies to Rule 23); *Dukes*, 131 S. Ct. at 2561 ("Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.") (internal citations omitted).

27

Amended Class Action Complaint, Feb. 20, 2009, at ¶ 8(h) (emphasis added).)[30]  Absent from

the claims at issue in this case are devices that are not issued by the entities that provide credit,

such as mobile phones and payment services that are not connected to any device.

The Proposed Settlement includes novel and expansive definitions of "Credit Card" and

"Debit Card" designed to encompass mobile and other payment methods, including as-yet-

unknown devices that may be developed in the future.  The definitions in the Proposed

Settlement include "mobile telephone[s]," "fob[s]," and "codes," that do not need to be issued by

the credit provider, and the definition of Credit Card further includes "service[s], *even where no

physical card is issued.*"[31]  The rules changes in the Proposed Settlement, along with the releases

and other provisions, therefore purport to apply to emerging mobile and other card-free

electronic payment systems, despite the absence of those systems from the case.

Even more egregiously, the definition of Credit Card extends to "any . . . *future code,

device, or service* by which a person, business, or other entity can pay for goods or services –

that is issued or approved for use through a payment network and that may be used to defer

payment of debt or incur debt and defer its payment."[32]  Thus, Class Plaintiffs, without

explanation, have agreed to a release that would apply to any innovative form of payment-

technology developed in the future and would allow Defendants for all time to apply their

existing rules and practices – no matter how outdated they become – to that future innovative

technology.  This term alone demonstrates the inability of Class Plaintiffs to adequately represent

---

[30] The operative complaints define "Debit Card" as "an access device, usually a Payment Card, enabling the holder, among other things, to effect a cash withdrawal from the holder's depository bank account, either at an Automated Teller Machine ("ATM") or a point of sale." (Second Consolidated Amended Class Action Complaint, Feb. 20, 2009, at ¶ 8(i).)

[31] Proposed Settlement ¶¶ 1(u), (v) (emphasis added).

[32] Proposed Settlement ¶ 1(u) (emphasis added).  *See also id.* at ¶ 1(v).

28

# A2008

the interests of current and future merchants, and it alone means the settlement cannot be approved.

Claims based on conduct and rules involving mobile and other card-free electronic payment systems necessarily do not arise out of the same factual predicate as those pleaded in the case and accordingly cannot be released as part of the Proposed Settlement. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108 (2d Cir. 2005) (explaining that a class-action release can permissibly include unpleaded claims only to the extent they arise out of the same factual predicate as settled class claims). Certainly, claims based on conduct involving future innovative technologies that do not yet exist could not have been brought in this case.

Class Plaintiffs, who assert claims based on conduct involving traditional payment-card access devices as defined in the operative complaints, cannot and do not adequately represent plaintiffs with claims involving mobile and other card-free electronic payment systems. Indeed, the inclusion of these systems in the Proposed Settlement but not the complaints strongly suggests "the selling out of one category of claim for another," to benefit merchants that seek only to accept traditional payment cards at the expense of those that seek to pursue alternative electronic payments. *See Literary Works*, 654 F.3d at 251-52.

Mobile and other card-free electronic payment systems are in their infancy, and would ordinarily be expected to develop through competition in the marketplace and contracts negotiated by individual merchants and other market participants. But the practical effect of the Proposed Settlement's expansive definitions of Credit Card and Debit Card is to set Visa and MasterCard's rules governing these systems by court order and then immunize them from litigation. And that order would come not only before these card-free electronic systems had a

chance to fully develop in the marketplace, but also in the absence of any discovery, litigation, or adversarial process, because these systems were not part of the claims at issue in this case.

## III. THE RULE 23(B)(2) RELEASE UNLAWFULLY EXEMPTS UNRIPE FUTURE CONDUCT FROM ANTITRUST LIABILITY.

The Rule 23(b)(2) portion of the settlement should not be approved for the independent reason that the mandatory release of future claims is legally overbroad and would force current and future merchants to release in perpetuity all antitrust claims against Visa, MasterCard, and dozens of banks to the extent those claims involve future rules, practices, or conduct that are the same or similar to rules, practices, or conduct existing today.[33]  Such an extraordinary release exceeds the Court's jurisdiction by purporting to resolve claims not properly before the Court, and would violate the public policy against the prospective waiver of antitrust claims.[34]

### A. The Release Would Unlawfully Extinguish Claims That Could Not Have Been Brought In This Litigation.

The Rule 23(b)(2) release would unlawfully bar claims concerning future conduct that the class could not have brought in the litigation.  Under the "identical factual predicate" doctrine, class releases must be limited to claims arising out of past conduct, in addition to the limited set of claims involving future conduct that would be barred by issue preclusion.[35]  Thus, "[w]here an

---

[33]   *See* Proposed Settlement ¶¶ 66-74.

[34]   *See* Semeraro, *Taming Credit Card Fees*, at 66 (concluding that the scope of the release is "breathtaking" and "[n]o class settlement has gone this far").

[35]   The principle underlying this rule is that "[i]f a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either."  *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981).  The Second Circuit has recognized only a narrow exception to this rule, permitting the release of claims that, while not specifically alleged in the litigation, share an "identical factual predicate" with the claims.  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d at 107.  But this means that "[a]ny released claims not presented directly in [a class action] complaint . . . must be 'based on the identical factual predicate as that underlying the claims in the settled class action.'"  *Literary Works*, 654 F.3d at 248 (quoting *TBK Partners*, 675 F.2d at 460).  *See also UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006) ("A

essential issue really could have been resolved against the class and really would operate as a bar [on] a future-conduct claim, the class can properly release that claim in settlement." Grimmelmann, *Future Conduct*, at 443.  Releases that extend beyond this limited scope cannot be approved because they would apply to claims outside the court's jurisdiction.  *Id.* at 397 (explaining that "future-conduct claims that could not be precluded in the litigation are categorically unripe").  *See also Literary Works*, 654 F.3d at 247 (class release may not extend beyond "claims that were or could have been pled").

Here, while the release would immunize Defendants' existing rules and practices, and "similar" rules and practices, for all time, this litigation could *not* resolve the merits of antitrust claims regarding such rules and practices for all time.  Antitrust claims examine the impact of conduct on competition in light of the particular market conditions prevailing at a given point in time.  The issues that may arise – market definition, market conditions, market power – are not static; they change over time.  Thus, a determination, for example, of whether Visa's practice (reflected in the "Honor All Cards" rule) of requiring merchants that accept *any* Visa credit card to accept *all* Visa credit cards, regardless of the issuer, violates the antitrust laws *in 2012*, would not suffice to resolve whether a similar practice by Visa violates the antitrust laws in 2022 or 2052 or 2082.  Such a practice may well have a different effect on competition in the future. Therefore, such claims (*e.g.*, that the same or a similar practice violates the antitrust laws in 2022) would be unripe now and could not be lost in this litigation – and thus cannot properly be released as part of the settlement of this litigation.

The same is true for Visa's and MasterCard's practices regarding "On Us" transactions, where both the issuing and acquiring banks are the same on those transactions.  The same is also

---

settlement . . . can only release claims that are based on the 'same identical factual predicate' or the 'same set of operative facts' as the underlying action.").

# A2011

true for Visa's and MasterCard's future practices related to interchange fees, the antitrust impact of which by definition has not yet occurred and thus could not have been litigated in this case. Such practices might not be objectionable under the antitrust laws if, for example, the fees were a few cents and bore a reasonable relationship to costs, as hard as that is to imagine. The situation would be much different if the same "practices" led to hugely increased fees years from now that were set at obviously inflated levels. Since this litigation cannot determine for all time the competitive consequences of these or other rules and practices, a settlement of this litigation cannot release antitrust liability for such practices for all time. *See In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d at 135 ("[A] settlement agreement cannot release claims that the parties were not authorized to release.").

Class Plaintiffs defend the scope of the release by pointing to boilerplate language that purports to limit the released claims to claims "that are alleged or which could have been alleged" in the action. (Proposed Settlement, ¶68.) But this language does not narrow the release, because the settlement expressly defines what claims are covered by that language. (*See id.* ("and it is expressly agreed, for purposes of clarity . . . that any claims based on or relating to (a)-(i) above are claims that were or could have been alleged in this Action").) And the specified claims covered by the release would include the types of unripe future claims identified above, which could *not* have been properly alleged in this action (such as claims about future application of the Honor-All-Cards rule or future interchange fees).[36] The settlement then states that all class members are forced by the settlement to waive legal arguments in future cases that would otherwise "limit the extent or effect of the release." (*Id.* ¶ 69.)

---

[36] *See* Semeraro, *Taming Credit Card Fees*, at 24 (noting that the settlement defines claims that could have been alleged in the action to include claims that clearly, in fact, could not have been alleged in the action).

32

# A2012

Confronted with a similar inconsistency in *Authors Guild*, Judge Chin recognized that a clause purporting to release only those claims that could have been brought in the instant action is impermissible if it erroneously defines "claims that could have been brought in the instant action" so as to include claims for future conduct.  770 F. Supp. 2d at 676-77 (settlement agreement that released defendants from liability for certain future conduct could not be approved under Rule 23).[37]  This settlement cannot be approved for the same reason.

Nor may a court approve a settlement while reserving a determination of the legality of the settlement's release for another day.  The Second Circuit has squarely rejected a "wait-and-see" approach that would leave the scope of a release to be addressed in future litigation.  *See Super Spuds*, 660 F.2d at 16-21 (holding that the district court should not have approved a settlement containing an overbroad release).  *See also Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1050-51 (2d Cir. 1982) (finding court has an even more compelling reason to determine propriety of release when class members have no opportunity to opt out of settlement).

### B.    <u>The Release Of Prospective Antitrust Claims Violates Public Policy.</u>

The release in question also would violate the "firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy."  *In re Am. Express Merchs.' Litig.*, 634 F.3d at 197.  Such a release would confer on defendants a "partial immunity from civil liability for future violations," which is not "consistent with . . . the antitrust laws."  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955); *see also Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974)

---

[37]    As here, the settlement agreement in *Authors Guild* defined the released claims as "each and every Claim of every Rightsholder that has been or could have been asserted in the Action" which, in turn, was defined to include several claims based on future acts.  *Id.* (citing ASA, Dkt. 770, §§ 10.1(f), 10.1(g), 10.2(a)).

33

# A2013

("Releases may not be executed which absolve a party from liability for future violations of our antitrust laws.").

As the court in *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955), explained:

> Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy.  This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well.  Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract 'in restraint of trade.'

(internal citations omitted); *see also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 575-78 (E.D. Pa. 2001) (rejecting proposed class settlement on grounds that public policy prohibited release of antitrust claims based on practices of unsettled legality)[38]; *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975) (a release may include antitrust claims "provided that the release does not seek to waive damages from future violations of antitrust laws"); *Mktg. Assistance Plan, Inc. v. Assoc. Milk Producers, Inc.*, 338 F. Supp. 1019, 1022 (S.D. Tex. 1972) (release "could not settle disputes which had not yet arisen or

---

[38]   Defendants' attempt to distinguish *Schwartz* underscores the breadth of the release. The court in *Schwartz* rejected the initial proposed settlement precisely because "the release barred claims on future conduct" and "the release applied to claims arising from broadcast television, cable television, and the Internet, despite the fact that the allegations in the complaint deal almost exclusively with satellite television."  No. CIV.A. 97–5184, 2001 WL 1689714, at *2 (E.D. Pa. Nov. 21, 2001).  Only after these problems were corrected did the court approve the settlement.  *Id.* (approving settlement only after release was modified to "limit[] the scope of the [] release to current and past policies, practices, conduct or provisions of the NFL Constitution and Bylaws (a continuation of such policies, practices, contracts, conduct or provisions) related to the marketing, pricing, sale, implementation or distribution of NFL football games on satellite television [only]").  *Schwartz*, moreover, did not squarely address the issues presented here.

34

serve as a license to engage in unlawful monopoly activities against the releasors.  Such an

absolution would violate public policy.").[39]

      If Defendants are to obtain a prospective exemption from the antitrust laws, this must

occur through legislation, not a private arrangement, particularly where a significant number of

the class members do not agree with the terms agreed to by the remaining class representatives.

In this regard, antitrust claims are like anti-discrimination claims, which also are not subject to

prospective release for public policy reasons:

> The key question—albeit one that is not made explicit in the case law—appears to
> be whether the area of law has a public policy against private ordering.  Anti-
> discrimination law obviously does:  even if a particular individual were willing to
> be subjected to invidious discrimination, it would still be against public policy
> because it would tend to lock in a system of subordination and stereotyping that
> would harm others.  So does antitrust law:  its *raison d'etre* is to prohibit forms of
> private ordering that have serious negative effects for competition and consumers.

Grimmelmann, *Future Conduct*, at 409-10.

      Class Plaintiffs argue that they are entitled to release antitrust claims regarding the future

effects of ongoing conduct, so long as "no court has ever found the challenged practices illegal."

(Final Approval Br. at 48.)  In support of this "not previously found illegal" rule, they rely on

*Robertson v. National Basketball Ass'n*, 556 F.2d 682 (2d Cir. 1977), but no such rule can be

found in that or any other case.  In *Robertson*, the objectors argued that a settlement that

"radically modified" the challenged practices failed to eliminate one of those practices fast

enough – by allowing it to be eliminated over a ten-year period.  *Id.* at 686.  Here, the settlement

---

    [39]  Class Plaintiffs, who now favor the Proposed Settlement, themselves argued in their
opposition to summary judgment that "[r]eleases that would effectively immunize defendants
from future antitrust liability are unenforceable for public-policy reasons."  (Class Plaintiffs'
Mem. of Law in Opp. to Defs.' Mot. for Summary Judgment, May 6, 2011 (Dkt. No. 1533), at
20.)  They further argued:  "If Defendants were granted perpetual antitrust immunity, they would
be permitted to continue to harm merchants and consumers by collectively setting interchange
fees and imposing restrictions on merchants that effectively eliminate price competition."  (*Id.* at
22.)

# A2015

instead would authorize Defendants to adopt in the future the very same rules that were supposed to be changed by the settlement, while freeing Defendants in perpetuity from civil antitrust liability for their payment-card practices.  Neither *Robertson* nor any other case authorizes such a result.[40]  Moreover, this phantom "not previously found illegal" rule would be prone to great misuse: a defendant facing liability could merely settle the first case challenging novel alleged anticompetitive conduct, securing a release for all time from antitrust liability, and thwarting courts from ever reaching the legality of the conduct.

Defendants rely upon the unpublished decision in *Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008), to defend the settlement's prospective release of antitrust claims.[41]  (Defs' Final Approval Br. 30-32.)  But *Madison Square Garden* considered whether the enforcement of an agreement among represented parties under particular circumstances would violate public policy, not whether a class-wide release should be approved.  *Id.* at *7.  *See* Grimmelmann, *Future Conduct*, at 411 ("Releases by classes are categorically different than releases by individuals.  The legal system

---

[40]  Class Plaintiffs rely on *VKK Corp. v. NFL*, 244 F.3d 114 (2d Cir. 2001), but *VKK* did not address the propriety of a release of future claims.  Rather, the plaintiffs in *VKK* were seeking to invoke the "part and parcel" doctrine to invalidate a release, the very execution of which was alleged to be part of an ongoing conspiracy.  *VKK*, 244 F.3d at 121-26.  Similarly, *Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009), was retroactively examining the enforceability of a consensual *contractual* release rather than a prospective release of claims by absent parties.

[41]  As with the Class Plaintiffs, Defendants have changed their tune about the propriety of prospective antitrust releases.  During the hearing on Defendants' motion to dismiss the claims for pre-2004 damages, this Court remarked on the "extraordinary proposition" that the use of the phrase "conduct prior to 2004" in a release "would also extinguish claims . . . about conduct that also happens later."  (*See* Tr. of Proceedings, Nov. 21, 2006, at 32 (Dkt. No. 738).)  Defense counsel responded: "Let's assume that there's an alleged price fix in August of 2003.  I am not suggesting that we could defend—and that price fix continues into 2005, 2006, 2007, that agreement continues—I'm not suggesting that we could cut off damages for 2005, six and seven because you have an agreement reached in 2003 that continued into 2005, six and seven, *I'm not suggesting that because that would be continuing illegal conduct in 2005, 2006, 2007*."  (*Id.* at 32-33 (emphasis added).)

36

already leaves individuals to make their bargains, for good or for ill."). The court ultimately concluded the release could be enforced because the claims in question went to the very "structure of the joint venture" – and thus focused on conduct that occurred primarily in the past. *Madison Square Garden*, 2008 WL 4547518, at *7. Even under those circumstances, the court recognized that the question of whether public policy prohibited enforcement of the release was a "difficult" one. *Id.* The case thus hardly blesses the sweeping, class-wide release of prospective antitrust claims at issue here.

## IV. THE PURPORTED BENEFITS OF THE SETTLEMENT ARE INSIGNIFICANT IN LIGHT OF THE STRENGTH OF THE CLAIMS.

The fundamental legal problems discussed above should be dispositive. Nevertheless, even if approval turned on the discretionary factors applied in other cases, The Home Depot respectfully submits that the Proposed Settlement is not fair, reasonable, nor adequate. The Home Depot has previously detailed why the rule changes contemplated by the settlement have limited or no value and incorporates those papers by reference. (*See* The Home Depot's Objection to Preliminary Approval of Proposed Class Settlement, Oct. 31, 2012, at 20-25 (Dkt. 1676).) The Home Depot notes that scholars have agreed that the rule changes in the Proposed Settlement are very limited and are, in fact, most "notable for what is not provided." Semeraro, *Taming Credit Card Fees*, at 18. As Professor Semeraro observes:

> Nothing in the settlement addresses the core concerns in the complaint about (1) the collective setting of a default interchange fee; (2) the rule prohibiting merchants from rejecting the cards of, surcharging the card transactions of, or otherwise discriminating against some card issuing banks, but not others; or (3) the rules making it impossible for merchants to route transactions over the least expensive networks.

*Id.* at 18-19.

Class Plaintiffs have not cited any independent analyses to the contrary.  Since Class Plaintiffs have focused on the changes to the surcharging rules and the monetary payments, The Home Depot writes briefly to address those provisions here.

### A.   <u>The Limited Surcharging Changes Have Minimal Value</u>.

Class Plaintiffs assert that surcharging is a valuable right, and attach a declaration by their expert, Alan S. Frankel, offering a projection that surcharging will yield billions of dollars in savings.  Dr. Frankel's projection, which he admits is speculative,[42] should be given little weight, particularly given the fact that it has not been subjected to an adversarial process.  While The Home Depot does not question Dr. Frankel's professionalism, the reality is that the conclusions he offers serve the interests of Class Plaintiffs at this stage, and neither The Home Depot nor other objectors have been given the opportunity to probe Dr. Frankel's methodology or conclusions.

Notably, scholars have expressed significant doubt that the limited right to surcharge under the Proposed Settlement will provide any lasting or significant relief for merchants, and these doubts have been expressed by those who have different views on the value of surcharging in general.  Professor Semeraro, for example, has written that the Proposed Settlement fails to allow competition to have a significant effect on interchange fees:

> As a first step, the settlement would appear to fail because it makes no permanent structural changes that would ensure that competitive forces would govern interchange fee setting.  All of the injunctive provisions expire in 2021, permitting the defendants to re-impose the rules that are modified by the settlement.

---

[42]   *See, e.g.*, Frankel Decl. ¶65 ("Unlike a damages calculation, which is retrospective in nature, this prospective value depends on forecasting a number of parameters and conditions."); *id.* ¶70 (acknowledging "these factors cannot be predicted with precision"); *id.* ¶73 ("Exactly how these factors will affect the magnitude of the benefits to merchants is difficult to predict . . . ."); *id.* ¶74 (acknowledging "it is difficult to quantify how much merchants will save as a result of the relief contained in the Proposed Settlement . . .").

> Perhaps one could argue that if card-acceptance-fee markets were set right, Visa and MasterCard would be unable to return to the restrictive practices of the past. That argument will be a challenging one, however, because *the proposed injunctive relief does not come close to setting things right.* Ignoring the fundamental source of restrained competition – default interchange and the merchants' inability to discriminate among issuers – the settlement's drafters essentially put all of their eggs in the surcharging basket. Experts have debated whether surcharging if optimally structured could effectively counteract the anticompetitive effects in the merchant card acceptance market. *Despite their disagreements, those experts will likely agree that the surcharging nominally permitted by the proposed settlement will prove insufficient to make a significant impact on interchange fees.*

Semeraro, *Taming Credit Card Fees*, at 61-62 (emphasis added).

Class Plaintiffs and Dr. Frankel rely heavily on data from Australia to support their assertion that the rule changes will "permit merchants to recover their costs of acceptance and, over time, will cause the networks to reduce interchange and other network fees, resulting in lower costs for merchants and lower prices for consumers." (Final Approval Br. at 26.) But their assertions gloss over significant differences between what happened in Australia and what would happen in the U.S. under the Proposed Settlement.

In 2003, the Reserve Bank of Australia began a series of reforms to the credit-card systems in Australia, when it required Visa and MasterCard to eliminate their credit-card no-surcharge rules.[43] American Express also voluntarily eliminated its equivalent rules in Australia.[44] Dr. Frankel asserts that if the same pattern that American Express merchant fees have followed for the past three years in Australia "is repeated here for MasterCard and Visa credit card interchange fee rates" it will generate $26.4-$62.8 billion over the next ten years. (Frankel Decl. ¶¶ 71, 73.) Class Plaintiffs cite this assumption in support of their contention that

---

[43]   Reserve Bank of Australia, *A Variation to the Surcharging Standards:  Final Reforms and Regulation Impact Statement* (June, 2012), available at http://www.rba.gov.au/payments-system/reforms/cards/201206-var-surcharging-stnds-fin-ref-ris/background.html.

[44]   *Id.*

39

# A2019

"the ability to surcharge could save merchants between $26.4 and $62.8 billion over the next decade."  (Final Approval Br. at 26.)

The irony of Class Plaintiffs' reliance on Dr. Frankel's assumption is that instead of identifying the value that the Proposed Settlement confers, the assumption underscores the skepticism expressed by independent scholars and highlights the value that the Proposed Settlement *fails to achieve* because of its restrictions.  Surcharging standards imposed by the Reserve Bank of Australia during the years from which Dr. Frankel provided his conclusions[45] forbade rules prohibiting "a merchant from charging a credit cardholder *any fee or surcharge* for a credit card transaction"[46] – *i.e.*, merchants could surcharge in excess of the interchange fee. The Proposed Settlement explicitly prohibits such conduct here.[47]  Thus, the comparison between the Australian experience and what could be expected under the Proposed Settlement fails at the outset.  Indeed, as detailed in The Home Depot's Objection to Preliminary Approval, the Proposed Settlement imposes a host of limitations on surcharging by merchants.  (*See* The Home Depot's Objection to Preliminary Approval of Proposed Class Settlement, Oct. 31, 2012, at 20-25 (Dkt. 1676).)  Neither Dr. Frankel nor Class Plaintiffs have identified any evidence that the competitive landscape under the limitations imposed by the Proposed Settlement would be comparable to the landscape in Australia under the surcharging standards imposed by the Reserve Bank.  Yet Dr. Frankel's calculations are based on the assumption that the pattern

---

[45]   Recently, on March 18, 2013, "a number of changes to the Reserve Bank's Standards relating to merchant surcharging took effect[,]" including standards permitting limits on surcharges to the merchant's reasonable cost of acceptance.  Reserve Bank of Australia, Reforms *to Payment Card Surcharging* (Mar. 2013), available at http://www.rba.gov.au/payments-system/surcharging/index.html.

[46]   *Id.* (emphasis added).

[47]   Proposed Settlement ¶¶ 42(a) and (b), 55(a) and (b).

observed in Australia would be repeated in the United States without any adjustments for the limitations imposed by the Proposed Settlement.[48]

Dr. Frankel's calculations thus, at best, suggest the potential value rules changes *might create* if, like those imposed in Australia, they "provided merchants with the freedom to set surcharges without constraint."[49]  But, as Professor Semeraro has noted, even proponents of surcharging as a means of promoting interchange-fee competition have been critical of the Proposed Settlement, which provides merchants with no such freedom:

> Adam Levitin has most vigorously advanced surcharging as a counter to competitive restraints in card-acceptance markets . . . .  Yet, Levitin is critical of the settlement's surcharging provisions.  He points out that merchants would have to either (1) surcharge all credit cards within a brand (high cost and low cost alike) or (2) bear considerable expense in trying to identify particular card products.  In addition, the proposed settlement's all-or-nothing requirement will prevent merchants from testing surcharging in a few locations to gauge its effectiveness before undertaking the full range of notice and system adjustments that would be needed to surcharge at all outlets.  Without the ability to test the competitive impact of surcharging schemes, merchants are likely to be reluctant to use them.  Finally, Levitin believes that (1) continuing state law prohibitions on surcharging; (2) the settlement's restrictions when merchants accept the higher-cost American Express card; and (3) the likelihood that Visa and MasterCard will use the notice provisions to attempt to thwart surcharging efforts, *will prevent the settlement from creating a meaningful competitive check on interchange fees.*

Semeraro, *Taming Credit Card Fees*, at 62-63 (emphasis added).[50]

---

[48]  Dr. Frankel does purport to consider the effect that American Express's non-discrimination policy and state statutes prohibiting surcharging may have on the ability of merchants to surcharge, but acknowledges that "exactly how these factors will affect the magnitude of the benefits to merchants is difficult to predict."  (Frankel Decl. ¶ 73.)

[49]  Reserve Bank of Australia, *A Variation to the Surcharging Standards, Final Reforms and Regulation Impact Statement* (June 2012), available at http://www.rba.gov.au/payments-system/reforms/cards/201206-var-surcharging-stnds-fin-ref-ris/background.html.

[50]  Professor Semeraro also identifies a number of other differences between the Australian experience and what can be expected to result from the Proposed Settlement:

> The proponents of the settlement are likely to counter that when surcharging was permitted in Australia, card acceptance fees decreased.  The Australian government, however, mandated a permanent 50 percent interchange fee cut

Indeed, Defendants appear to have inserted the restrictions in the Proposed Settlement in the light of their experience in other jurisdictions and in order to mitigate any significant effects on their bottom line from merchant surcharging.  Ajaypal S. Banga, MasterCard's Chief Executive Officer, described why he insisted on these restrictions when discussing the settlement:

> We believe the best thing to do was looking at our experience of surcharging in other markets where, frankly, it didn't really lead to a great deal of actual surcharges being placed other than in a couple of kinds of areas where cash isn't quite able to compete. . . .  So when I think about that here, in this agreement, we have also managed to get in some of those protections, the cap and what they could charge, the declaration to the consumer with clarity, both on the receipt and in the store, the level playing field concept that we think we've got in there.  All these were attempted as a way to sort of try and box the issue while moving forward. . . .  That's kind of how I approached it . . . .  And so it is friction. I don't like the friction but I'm trying to minimize it with as much lubricant as I can put in the system.[51]

Thus, the limited surcharging provisions in the Proposed Settlement confer very little value on members of the Rule 23(b)(2) class, and when combined with the broad releases that indefinitely immunize these provisions from antitrust and other challenges, may well do more to preserve the anticompetitive features of Defendants' rules than would the status quo.  Class Plaintiffs and their experts have failed to demonstrate otherwise.

---

coincident with the introduction of the right to surcharge.  The proposed settlement's ten basis point eight-month reduction with no prohibition on future rate increases would be a far cry from the Australian experience.

Moreover, Australian merchants imposed surcharges at levels, according to the Reserve Bank of Australia, "well in excess of acceptance costs."  The caps in the proposed settlement would enable Visa and MasterCard to prohibit surcharging at such high levels.  *The Australian experience is thus unlikely to be replicated in the United States if the proposed settlement is adopted.*

Semeraro, *Taming Credit Card Fees*, at 63-64 (emphasis added).

[51]  MasterCard Incorporated (MA) Q2 2012 Earnings Call (Transcript), Aug. 1, 2012, available at http://seekingalpha.com/article/770641-mastercard-incorporated-management-discusses-q2-2012-results-earnings-call-transcript (emphasis added).

42

# A2022

**B.**     **The Monetary Payment Is Inadequate.**

In seeking approval, Class Plaintiffs rely heavily on the fact that Defendants have agreed to pay over $6 billion in compensation.[52]  But this figure provides no compensation whatsoever to members of the Rule 23(b)(2) class, even though all of those members are forced to confer enormously broad and valuable releases upon Visa and MasterCard.  The monetary payment is also relatively small compared to the revenue Visa and MasterCard obtained annually throughout the period for which it is supposed to provide compensation.  Although Visa and MasterCard do not make their interchange-fee revenue figures public, it has been estimated that the Visa and MasterCard networks and issuers received $30 billion in U.S. interchange revenue in 2006[53] and $35 to $45 billion in 2007.[54]  Class Plaintiffs have estimated the ongoing harm from Defendants' conduct amounts to over $40 billion per year.[55]  In the fiscal year ending January 2012, The Home Depot itself paid the Visa and MasterCard networks interchange and related fees totaling approximately $370 million.  (*See* Kimmet Decl. ¶ 9.)

The settlement figure is even smaller when compared to the hundreds of billions of dollars Visa and MasterCard would collect in perpetuity by engaging in practices affirmatively protected by the settlement.  Nothing in the Proposed Settlement would impede Visa and

---

[52]  Of course, even a large retailer like The Home Depot could expect to receive only a small fraction of the $6 billion, which will be subject to significant reductions before distribution on a *pro rata* basis.  The Home Depot's recovery would likely not cover more than two years of increases in interchange and related fees charged by the Visa and MasterCard networks.  (*See* Kimmet Decl. ¶ 9.)

[53]  *See* Terri Bradford et al., *Developments in Interchange Fees in the United States and Abroad*, at 1 (Apr. 2008), available at http://www.kansascityfed.org/publicat/psr/briefings/psr-briefingApr08.pdf.

[54]  *See* Robin A. Prager et al., *Interchange Fees and Payment Card Networks: Economics, Industry Developments, and Policy Issues*, at 6 n.3 (2009), available at http://www.federalreserve.gov/pubs/feds/2009/200923/200923pap.pdf.

[55]  *See* Class Plaintiffs' Mem. of Law in Opp. to Defendants' Motion for Summary Judgment, May 6, 2011, at 21 (Dkt. No. 1533).

# A2023

MasterCard from raising interchange and related fees to The Home Depot and other merchants to recoup far more than the amounts to be paid to class members.  Merchants already paying the highest interchange and related fees in the world could be made to pay even more.  To the extent the risk of antitrust liability provides any check on Visa and MasterCard interchange-fee rates or practices today, that check evaporates under the settlement's release.

One way to view the monetary aspect of the settlement is that Visa and MasterCard are willing to pay a substantial amount of money to achieve a prospective exemption from the antitrust laws, effectively immunizing in perpetuity all of their payment-card practices from civil liability.  This willingness is perhaps unsurprising, and Visa and MasterCard may well have been willing to enter into such an arrangement absent the massive exposure they face in this lawsuit.  But such a *quid pro quo* is not permissible as a matter of public policy.

The tragedy of the settlement is that, by paying a relatively modest amount of money, Visa and MasterCard would be able to embed the practices that lead to ever escalating interchange fees on U.S. merchants.  As The Home Depot has explained, despite its size, it is relatively powerless to negotiate the exorbitant interchange and related fees that Visa and MasterCard impose with little or no explanation.  When new products are added, Visa and MasterCard simply dictate the fees that will apply.  The settlement does nothing that would change this.  Instead, the settlement embeds the pernicious Honor-All-Cards Rule that prevents The Home Depot from even making the threat that it would not accept a new payment card with inflated fees, and it does absolutely nothing to reform the manner in which interchange fees are set and unilaterally imposed on U.S. merchants, resulting in fees that are far higher than they are in many other countries.  For all of these reasons, approval of the settlement would, in The Home

44

Depot's view, be a coup for Defendants and a major blow to American businesses and consumers.

**C.      The Case Is Strong On The Merits.**

Finally, The Home Depot notes that while this case, like any complex antitrust action, has legal hurdles, the existence of these hurdles should not mask the fact that this case raises very substantial legal claims that are incredibly important to millions of U.S. merchants and that at least some of these claims, affecting billions of dollars of commerce, are likely to succeed.  The pressure is, or should be, overwhelmingly on Defendants here, who appear to be determined not to let there be a final word on the legality of the practices that make Defendants huge profits, while placing an onerous tax on U.S. businesses, large and small, as well as consumers.

The Home Depot agrees with Professor Semeraro, who concludes that Defendants' arguments should be insufficient to justify the limited relief provided by the settlement, particularly in light of its flaws:

> [T]he defendants . . . contend that in the 1990s debit card litigation, the merchants released all of their claims.  Next, they assert that as indirect payers of the interchange fee (the acquiring bank, defendants argue, is the direct payer), the merchants lack standing to sue for damages.  Then, the defendants challenge every element of the antitrust claim.  On any particular issue, a judge might conceivably rule for either party based on existing legal precedent.  *But considering the case globally from the perspective of a court assessing the impact of the defendants' rules on competition, the presiding judge is likely to find that the merchants' chances of prevailing through litigation would be high.*

Semeraro, *Taming Credit Card Fees*, at 36 (emphasis added).

## CONCLUSION

For the foregoing reasons, The Home Depot respectfully submits that the Proposed Settlement should not be approved.  In the alternative, this Court should exercise its authority to condition approval on:  (a) providing opt-out rights to members of the proposed Rule 23(b)(2) settlement class; (b) eliminating the Rule 23(b)(2) settlement class altogether and including all

# A2025

provisions of the settlement within the purview of the Rule 23(b)(3) settlement class, which

already has opt-out rights; or (c) restricting the scope of the Rule 23(b)(2) release so that claims

for damages arising from future conduct are preserved.

DATED:    New York, New York                Respectfully submitted,
          May 28, 2013
                                            QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP


                                            By:/s/ Stephen R. Neuwirth
                                               Stephen R. Neuwirth
                                               Deborah K. Brown
                                               Steig D. Olson

                                            51 Madison Avenue, 22nd Floor, New York,
                                            New York  10010-1601
                                            (212) 849-7000

                                            Attorneys for Objector
                                            HOME DEPOT U.S.A., INC.

46

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 |
| This Document Relates To: | MASTER FILE NO. 1:05-md-1720-JG-JO |
| ALL CLASS ACTIONS | |

### DECLARATION OF DWAINE KIMMET IN SUPPORT OF THE HOME DEPOT'S OBJECTION TO THE PROPOSED CLASS SETTLEMENT

I, Dwaine Kimmet, declare pursuant to 28 U.S.C. § 1746:

1.      I am the Treasurer and Vice President - Financial Services, for The Home Depot, positions I have held since 2010 and 2007, respectively.  I submit this declaration, based on personal knowledge, in support of the Objection of Home Depot U.S.A., Inc. ("The Home Depot") to the Proposed Class Settlement in the above-captioned matter.

**The Home Depot**

2.      The Home Depot is the world's largest home improvement specialty retailer, with more than 2,200 retail stores in the United States and elsewhere.  Approximately 2,000 of these stores are located in the United States.  The Home Depot is the sixth largest retailer in the United States.

3.      Through its stores and its website, homedepot.com, The Home Depot sells to consumers and professionals a wide assortment of building materials, home improvement products, and lawn and garden products.

4.      The Home Depot also operates Home Decorators Collection, which offers an extensive selection of furniture, area rugs, and accessories through its website,

Home Depot's account through the acquiring bank.  Related fees, such as access fees, are also charged by the networks.

9.      In recent years, The Home Depot's spend on interchange and related fees for the Visa and MasterCard networks has been in the range of $300 - $400 million per year.  For example, in the fiscal year ending January 2012, The Home Depot paid approximately $370 million in interchange fees and related fees on transactions with Visa- and MasterCard-branded payment cards.  The Home Depot's overall spend on bank-card acceptance costs (interchange, access fees, etc.) is approximately $600 million per year.  These costs increase year after year. In fact, based on historical increases, The Home Depot estimates that its portion of the $6 billion settlement fund will approximate only the *increases* alone in interchange and related fees by the Visa and MasterCard networks over the next two years if the historical trend of price increases continues.  As a whole, as of fiscal year 2011, interchange and related fees represent The Home Depot's third-largest core operating cost, behind payroll and real-estate-related expenses.

10.      Visa and MasterCard interchange and related fees are regularly increased, as many as four times a year.  As a general matter, The Home Depot has been unable to meaningfully negotiate the amounts of these fees with Visa or MasterCard and their member banks.

11.      More than six-thousand banks and financial institutions issue payment cards over the Visa and MasterCard networks, under different brand names, and it is currently impossible for The Home Depot to tell which interchange fees apply to transactions until the fees are deducted from The Home Depot's account upon settlement, at the end of each month.  At any one time, The Home Depot can pay more than three-hundred different categories of interchange fees, depending on the cards used by its customers.  Given this complexity, it would be very

**A2028**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| |
IN RE PAYMENT CARD INTERCHANGE |  MDL Docket No. 1:05-md-1720-JG-JO
FEE AND MERCHANT DISCOUNT | 
ANTITRUST LITIGATION | 
 | 
This Document Relates to All Actions | 

---

**DELL INC.'S STATEMENT OF OBJECTION TO
FINAL APPROVAL OF SETTLEMENT**

V.     **The broad releases, including future claims of the Rule 23(b)(2) and Rule 23(b)(3) Classes, render the Settlement unfair, inadequate and incompatible with due process.**

The extensive objections to both preliminary and final approval of the Settlement have outlined numerous and fatal flaws in the Settlement. Rather than repeat these arguments in their entirety, Dell wishes to emphasize a few points concerning the scope of the releases provided by the Rule 23(b)(2) and Rule 23(b)(3) Classes.

First, this Settlement is subject to heightened scrutiny on a number of different levels that collectively place a heavy burden on the proponents of the Settlement. Of course, whenever a settlement is negotiated prior to class certification, heightened scrutiny of the class is required. *See, e.g., Oritz*, 527 U.S. 848-49; *Amchem*, 521 U.S. at 620.

These concerns are heightened when future claims of class members are released. *Ortiz*, 527 U.S. at 856-57; *Amchem*, 521 U.S. at 625. There are a number of reasons for this added level of concern with the release of future claims. Such claims raise unique conflicts between the class representatives, who have a present interest in the case, and those who might suffer a future injury, who cannot protect their interests and whose claims therefore can be compromised with less scrutiny. *Ortiz*, 527 U.S. at 856-57. These independent grounds for heightened scrutiny of the Settlement is multiplied by the fact that Class Members cannot opt out of the Rule 23(b)(2) Class. *Ortiz*, 527 U.S. at 845-46.

With these general concerns in mind, it is readily apparent that the releases contained in the Settlement are fatally overbroad. First, the releases include any present or future claims relating to any "Rule" as defined in the Agreement. Settlement ¶¶ 33, 62. "Rule" again is defined as including any "rule, by-law, policy standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-

# A2030

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
                                                    :
In re PAYMENT CARD INTERCHANGE     :        MDL No. 1720(JG)(JO)
FEE AND MERCHANT DISCOUNT          :
ANTITRUST LITIGATION               :
                                                    :
----------------------------------------------------------x

### OBJECTION OF CONSUMERS UNION OF UNITED STATES, INC.
### TO FINAL APPROVAL OF PROPOSED CLASS SETTLEMENT

Consumers Union of United States, Inc., d/b/a Consumer Reports, submits this

Objection to the proposed settlement in the Rule Changes Settlement Class (Rule

23(b)(2) Settlement Class) (the "Proposed Settlement"), from which it is not permitted to

opt out. The reasons supporting this Objection are set forth below, and apply equally to

the proposed settlement in the Cash Settlement Class (Rule 23(b)(3) Settlement Class),

from which Consumer Reports is opting out.

### CONSUMER REPORTS' INTEREST IN THE PROPOSED SETTLEMENT

Consumer Reports, the 77-year old, non-profit publisher of *Consumer Reports*

and *ShopSmart* magazines, as well as *Consumer Reports.org*, is the nation's largest

independent consumer protection and advocacy organization. The organization is

included in the two merchant classes in this litigation due to the fact that it has in the past

accepted, and continues to accept, MasterCard and Visa credit card payments from its

subscribers and donors. Consumer Reports accepts neither commercial advertising nor

commercial donations. Instead it relies on individual donations and subscriptions to

support its work and thus has little choice but to accept Visa and MasterCard payments,

despite high interchange rates. The organization estimates that it has paid more than $15

1

# A2031

million in Visa and MasterCard interchange fees during the 9-year period at issue in this litigation. Neither those fees nor any other processing fees are passed on to subscribers and donors, in whole or part. As a result, the fees directly affect the organization's bottom line and its ability to fulfill its mission.

Indeed, Consumer Reports' adherence to its mission is the primary reason for this Objection, and also forms the basis for its decision to opt out of the Cash Settlement Class. That mission is to work for a fair, just, and safe marketplace for all consumers and to empower consumers to protect themselves. With over eight million subscribers to its print, online and mobile offerings, Consumer Reports publishes one of the nation's largest general interest magazines and one of the largest subscription-based websites in the country that declines advertising. In addition to its No Advertising and No Commercial Donations policies, Consumer Reports also guards its independence by refusing to accept free test samples of any of the four thousand or more products it tests annually. Among its publications are the Consumer Reports *Money Adviser* newsletter, which like the flagship *Consumer Reports* magazine, has covered personal finance, including credit and debit card issues, since its inception.

In addition to its publications, testing and surveys, Consumer Reports has a robust policy and advocacy program. The organization has a deep level of expertise and a long commitment to helping consumers on financial services matters. The financial services advocacy team works closely with editorial staff to educate consumers about hidden fees associated with credit and debit cards and other personal finance vehicles. It has paid

2

**A2032**

particular attention to the effects of new mobile technologies on fees associated with consumer purchases.  Advocacy efforts have focused not just on legislative or regulatory reform, but also on public education for underserved communities, including many Spanish-speaking communities.  Consumer Reports also engages in marketplace reform efforts, seeking to directly influence the behavior of commercial actors, such as banks and retailers.  For example, Consumer Reports waged a mini-campaign in the fall of 2011 that targeted Bank of America's decision to charge many of its checking account customers a $5 monthly fee for debit purchases even if they made such purchases only once a month.  After weeks of consumer protests, Bank of America dropped the plan.  During the same week's period, JP Morgan Chase, Wells Fargo, SunTrust Bank, and Regions Financial Corp. also backed away from plans to charge monthly fees for debit card purchases.

Consumer Reports played an important role in the passage of the landmark Credit Card Accountability Responsibility and Disclosure Act of 2009, as well in fighting for consumer protection provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, particularly those that established the Consumer Financial Protection Bureau.  The organization is currently engaged in a campaign to ensure that consumers obtain accurate and reliable credit scores.  Those scores can impact the cost consumers pay for credit borrowing, among other things.  In addition, Consumer Reports is working on a Payments Project, which evaluates and educates on new payment methods, including prepaid cards and mobile platforms, where consumers do not yet have the protections accorded credit cards.  With a repository of close to 20,000 stories from

**A2033**

cardholders that are used to put a human face on the issues of credit card debt and unfair practices, Consumer Reports generally focuses on the lack of transparency and unfair fees in financial services transactions.  It is often the go-to organization for media and lawmakers, as well as consumers, seeking to evaluate credit cards, new fees and new payment methods.  See, e.g., http://defendyourdollars.org/blog.

Historically, neither retailers nor card companies and issuing banks have looked after consumers' interests, despite the fact that some merchants in the plaintiff class have cited the harm done to consumers in this litigation and in their objections to the proposed settlements.  As Consumer Reports has long reported, though, once certain avenues of hidden and/or excessive charges are closed off, banks will seek other ways in which to impose more and different fees on consumers -- new fees that retailers are unlikely to challenge as they themselves are no longer impacted.  This is what occurred after passage of the Durbin Amendment last year.  That legislation capped at 21 to 24 cents the fees banks could charge retailers each time a consumer swiped a debit card.  Prior to that, the average fee had been twice as high.  In the wake of the Durbin Amendment, however, banks went looking for new ways to charge consumers.  See, e.g., http://www.consumerreports.org/cro/money/credit-loan/watch-for-new-bank-fees/overview/index.htm.

In the case of credit card interchange fees at issue here, the non-negotiable fees set by Visa and MasterCard for issuing banks ultimately result in higher charges for consumers, whether they pay by card or in cash.  The proposed settlements, however, do

4

not sufficiently address illegal behavior, compensate parties that were harmed, or facilitate more competition in the interchange market, competition that Consumer Reports believes would ultimately benefit consumers. The contours of these settlements and the broad mandatory release will affect hundreds of millions of American consumers, as well as the merchants bound by them.

Consumer Reports believes itself to be in a particularly good, and largely unique position, to assist the Court in evaluating the fairness of the Proposed Settlement. Although it is opting out of the Cash Settlement Class, thereby risking the permanent loss of any compensation for economic injury done it, the organization remains in the Rule Changes Settlement Class. As such, it would appreciate the opportunity to appear at any fairness hearing, and to further explain its Objection.

## BASES OF OBJECTION

### I.   THE PROPOSED SETTLEMENT FAILS TO MEANINGFULLY CHANGE THE SYSTEM OF SETTING INTERCHANGE FEES FOR CREDIT CARD PURCHASES SO AS TO ALLEVIATE THE HARM TO CONSUMERS

The Proposed Settlement explicitly permits Visa and MasterCard to continue to fix interchange fees for their issuing banks. This validates in perpetuity a method by which defendants can engage in the anticompetitive fixing of prices and can continue to charge excessively high fees that are hidden from, but ultimately injure, consumers. Excessively high credit card swipe fees will continue to be passed down to consumers in the form of higher prices for goods and services. The fees themselves serve only to increase profits for Visa and MasterCard member banks and to subsidize rewards cards. Moreover, because merchants cannot or will not charge higher prices to consumers

paying with Visa and MasterCard credit cards rather than cash (or rather than other credit cards), the higher charges end up being passed through to all consumers, regardless of whether they pay with cash or payment cards. The fees remain anti-competitive, unfair to consumers, and hidden -- aspects of payment card fees that Consumer Reports has long opposed.

## II.    THE FAILURE OF THE PROPOSED SETTLEMENT TO INCLUDE MEANINGFUL RELIEF NOT ONLY PERPETUATES THE INJURY TO THE PLAINTIFF CLASS, BUT ALSO WILL CONTINUE TO HARM CONSUMERS

The proposed settlements provide pyrrhic relief to merchants in the form of allowing a limited ability to surcharge Visa and MasterCard transactions. This does not address in any way the fundamental problem of the anticompetitive fixing of the interchange rates. For its part, Consumer Reports will not surcharge its donors and subscribers (both as a matter of principle and of practical necessity). Nor will many other merchants. It seems clear that any surcharging that does take place is likely to be too little and too isolated to put any effective downward pressure on overall interchange fees, not to mention on the prices of consumer goods and services. Moreover, the breathtakingly broad release provides incredible insulation for Visa and MasterCard and the issuing banks, potentially tantamount to a blanket immunity for a wide array of present and future anticompetitive behavior.

California, New York, Florida and Texas -- the most populous states in the country -- are among the states that currently prohibit surcharging. In fact, the states that ban surcharging represent some 40% of the population, consumers who will not get any

**A2036**

relief, directly or indirectly, as the settlement does not override state laws. Still more state legislatures are looking at similar anti-surcharging laws in the wake of the Visa and MasterCard rule changes. (While some have cited these laws as being pro-consumer, the fact remains that this state legislative trend undermines the argument that allowing the ability, in limited circumstances, to surcharge Visa and MasterCard transactions will end up providing relief to merchants or an incentive to lower prices.) This only serves to emphasize the illusory nature of relief provided by the new ability to surcharge.

Moreover, the new rules only allow the surcharging of Visa or MasterCard credit cards transactions to the same extent as are allowed by any "Competitive Card Brand" that is as or more expensive as Visa or MasterCard. That effectively incorporates the surcharging limitations of cards such as American Express. Any ability to set one card off against another – even if Consumer Reports were not for other reasons disinclined (or legally precluded) from doing so – is largely if not wholly mooted. In short, the limited ability to surcharge offers no widespread meaningful relief to the plaintiff class or to consumers.

### III.    THE MANDATORY RELEASE IS ANTI-COMPETITIVE, INADEQUATE,  AND A VIOLATION OF DUE PROCESS IN THAT IT IS UNFAIR, APPLIES TO ISSUES BEYOND THOSE RAISED IN THIS LITIGATION AND APPLIES TO ALL FUTURE MERCHANTS

Under the Proposed Settlement Visa and MasterCard are forever released from liability for any rules or conduct currently in place (including the current anticompetitive interchange rates) and any "substantially similar rule" instituted or conduct engaged in at any time in the future. This is a windfall for Visa and MasterCard. Certainly Visa and

7

## A2037

MasterCard see it that way. As Visa General Counsel Joshua Floum stated to investors, the release covers "all of Visa and MasterCard's rules in existence as of the time of approval." *Visa Management Discusses Q3 2012 Results - Earnings Call Transcript*, Seeking Alpha (July 25, 2012). Duncan MacDonald, currently an independent consultant and formerly General Counsel for Citigroup's North American and European card businesses, has noted, "The 'release' is a breathtaking success for the bankcard industry. It is about as comprehensive as any I've ever seen. It should end the industry's antitrust wars for years to come." Maria Aspan & Victoria Finkle, *'We Won' vs. 'You Lost': Reactions to Credit Card Settlement*, American Banker (Jul. 16, 2012).


Like USPIRG, Consumer Reports is particularly concerned that this broad insulation from litigation may give these dominant market players the ability to dominate future mobile payment technologies or other new payment technologies, to the detriment of new market entrants and to the detriment of consumers. MasterCard and Visa could potentially use their rules, and the virtual immunity those rules are provided under the mandatory release in the Proposed Settlement, to give their own mobile payment platforms an unfair advantage over emerging competitors. At the very least, the cost of the litigation that would almost certainly be brought by Visa and MasterCard in an attempt to protect and extend the already comprehensive scope of the relief would pose a significant obstacle to entry by would-be competitors. The prospect of costly litigation would also serve as a potent chilling factor to organizations such as Consumer Reports that may wish to seek organizational standing as consumer advocates to challenge present or future anticompetitive behavior.

8

**A2038**

Consumer Reports has opposed overbroad releases in other contexts and would never advise consumers to agree to a term in a contract or settlement that would provide for such a broad future release of rights, whether before or after an economic (or any) injury arose. We would opt out of the Rule Changes Settlement Class if we could, as the release is for all practical purposes, identical to that in the Cash Settlement Class. Endorsing or even appearing to endorse such a release is contrary to our mission, and inimical to the work in which Consumer Reports engages as an independent consumer protection organization and a watchdog for consumers.

The lawyers who negotiated the settlement did not adequately represent

Consumer Reports' interests.  For these reasons, we respectfully object to the Settlement

Proposal, and have simultaneously opted out of the Cash Settlement Class.


Consumer Reports is represented in this matter by:

Robert L. Begleiter
Schlam Stone & Dolan LLP
26 Broadway
New York, NY 10004
Phone: 212-344-5400
Fax: 212-344-7677
rbegleiter@schlamstone.com

Dated: New York, New York
     May 28, 2013


               SCHLAM STONE & DOLAN LLP


               By: _____/s_____
                  Robert L. Begleiter
               26 Broadway
               New York, NY 10004
               Phone: 212-344-5400
               Fax:    212-344-7677
               rbegleiter@schlamstone.com

               *Attorney for Consumer Reports*

10

# A2040

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE    :
FEE AND MERCHANT DISCOUNT       :     MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION              :
                                             :
                                           :     **OBJECTION OF**
                                         :     **AMAZON.COM, INC.**
                                         :     **TO FINAL APPROVAL OF**
                                         :     **THE PROPOSED SETTLEMENT**
--------------------------------------------------------x

### DECLARATION OF AMAZON.COM, INC.

Mary Kay Bowman hereby declares pursuant to 28 U.S.C. § 1746:

      1.     I am currently a Director, Product Management Global Payment Services at Amazon.com, Inc ("Amazon"). Amazon is a Delaware corporation with its principal place of business in Seattle, Washington. I have held this position since April 2007 prior to which I was the Senior Manager, Product Management Global Payment Services. I have worked for Amazon since March 2004. I submit this declaration on behalf of Amazon to object to the proposed settlement in the interchange case and in support of the opposition to the motion for final approval.

      2.     I am responsible for building and managing payment products for Amazon, which includes managing relationships with vendors, including financial service providers.

      3.     I am knowledgeable about Amazon's acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks.

      4.     Amazon, a Fortune 500 company, seeks to be the world's most customer-centric company, where customers can find and discover anything they might want to buy online, and

1

# A2041

endeavors to offer its customers the lowest possible prices. Amazon had net sales of $61.093 billion in year ended December 31, 2012 and has more than 209 million active customer accounts (an active customer account is one that has made at least one purchase in the last 12 months).

## I.   INTERCHANGE FEES AND AMAZON'S ACCEPTANCE OF PAYMENT CARDS

5.      Customers can use credit or debit cards to pay for orders on Amazon.com. Amazon accepts the following credit and debit cards as payment: Visa; MasterCard; American Express; Discover; Diner's Club; JCB; NYCE; STAR; China UnionPay (credit card only); Visa, MasterCard, or American Express pre-paid credit or gift cards; and the Amazon Store Card.

6.      Virtually all of Amazon's sales are made over the Internet. The interchange rates for those payment card transactions – card-not-present ("CNP") transactions – are much higher than for sales made through traditional brick-and-mortar stores. There is no rationale for the excessive CNP interchange rates because CNP merchants bear all of the fraud risk and cost associated with CNP transactions. The networks can charge these excessive rates for CNP transactions because of their power in the payment card market. Internet merchants have paid millions in excessive interchange fees over recent years, and current rates can be more than double brick-and-mortar rates.   This ongoing conduct, which has continued following Visa's and MasterCard's IPOs, may be immune from merchant challenge going forward if the Proposed Settlement is approved.

## II.   THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

7.      I have reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"), the Court-approved notice, and the case website. The Proposed Settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the

266270.2

# A2042

banks, the subject of the core claims in the case. The Proposed Settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that merchants and their customers have no choice but to pay. Amazon's portion of the compensatory relief amounts to only a fraction of what we pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can and likely will readily recoup the settlement amount by raising interchange rates in the future.

8.     Instead of addressing the core claims in the case, the Proposed Settlement merely provides merchants with limited ability to surcharge Visa and MasterCard credit card transactions that is of little value to Amazon. Moreover, the Proposed Settlement deprives Amazon of its rights by denying us the ability to opt-out and bring claims for damages resulting from the ongoing harm that Visa and MasterCard's interchange fees impose on merchants.

### A.     Other Relief in the Settlement Is of Little Value to Amazon

9.     While Amazon believes that it should have the flexibility to surcharge, whatever value that may have is outweighed substantially by the failure of the settlement to meaningfully address interchange.

10.     The Proposed Settlement also appears to allow merchants to vary their acceptance practices in different lines of business operating under different trade names, but Amazon understands that this was not prohibited by any prior rules.

11.     Amazon also understands that Visa and MasterCard did not have rules against group buying prior to this Proposed Settlement, so this provision is also of no value.

### B.     The Release is Far Too Broad

12.     The Proposed Settlement's release is a serious concern to Amazon. The release covers claims concerning the core practices at issue in this case – the default-interchange rules,

3

266270.2

the setting of interchange fees, and the Honor All Cards rules – even though the Proposed Settlement does not change those practices.  And the release purports to cover those rules and practices forever, which we find troubling given Visa's and MasterCard's market power.  Equally troubling is that fact that in exchange for limited and temporary rules changes, the Proposed Settlement purports to require that merchants release nearly all claims (past, present, or future) relating to any of Visa's or MasterCard's rules or conduct, or even future rules or conduct that are "substantially similar" to present rules or conduct.

13.    The Proposed Settlement also requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards."  Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."

14.    Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording, and therefore that their entire rulebooks, as they existed at the time of preliminary approval, are immune from challenge.  This broad definition could cover claims concerning not only interchange or Honor All Cards rules, but also claims concerning data security, authentication and fraud prevention, and settlement, to name a few.  Yet despite the broad reach of the release, no injunctive relief is provided with respect to these rules.  In fact, Visa and MasterCard maintain 16 sets of rulebooks.  Merchants only have full access to *three* of those.  The remaining 13 rulebooks are extensive (over 5000 pages).  The release could then cover claims regarding rules merchants do not even have access to in their full form.  Also, Visa and MasterCard interpret their rules with no uninterested party involved in that interpretation, so even if merchants had access to all of the rules, the release could potentially cover a new

4

# A2044

interpretation of those rules never contemplated by any party.

15.     The approval of a release with such broad wording likely will embolden Visa and MasterCard in future negotiations, making it even harder for Amazon to challenge Visa's or MasterCard's rules or their interpretations of such rules. The limited injunctive relief, which does not address any of the serious problems in the Visa and MasterCard Rules, is an unreasonable exchange for such an overbroad release.

16.     In addition, the release covers claims based on or related to the "future effect . . . of the continued imposition of or adherence to any Rule" in effect as of the preliminary approval date, or the "future effect" of any "Rule" or conduct that is "substantially similar" to "the foregoing Rules" or conduct.

17.     Visa and MasterCard likely will argue that new rules or new conduct are "substantially similar" to the Rules and conduct as defined in the release, and therefore covered by the release. We find it deeply unfair we have no ability to opt out of such a broad release. Moreover, the release's language likely will lead to increased litigation concerning whether a future rule or future conduct is "substantially similar" to a current rule or current conduct.

18.     We understand that Class Counsel claims that the future scope of the release is not problematic because the terms "substantially similar" will be limited to non-material changes to the current rules. However, Class Counsel's interpretation misunderstands the industry. In our experience, even seemingly small changes to Visa's or MasterCard's rules or the interpretations of those rules can have substantial consequences in the marketplace. For example, in the recent past, Visa reclassified in the neighborhood of 40 million cards from a standard card to a premium/rewards card overnight by simply reclassifying the BINs. Customers

5

# A2045

did not even have to get rewards or premium benefits from these cards – it was simply a technical change to the BIN classification done unilaterally by Visa.  This resulted in merchants paying more for transactions from those cards (higher interchange), while customers did not necessarily receive any additional benefit or rewards for using those cards.

19.     Similarly, in the future, Visa or MasterCard could unilaterally change the rules regarding transaction settlement or funding, using nearly any rule interpretation, which could require merchants to change technology and could impair merchants' access to funds.  Yet that change would arguably be covered by the release in this case.

20.     The release even purports to extend outside the jurisdiction of the United States, releasing Visa and MasterCard and their affiliates from their actions anywhere on the globe, and including class members' foreign affiliates as releasers.  The possibility that the release could conceivably cover claims by Amazon concerning our international operations demonstrates the unacceptable scope of the release.

*     *     *     *

21.     Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the Proposed Settlement did not adequately represent the interests of Amazon.

22.     Amazon is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

23.     Amazon joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting

6

2662702

**A2046**

forth additional legal and factual grounds for Amazon's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on May 28, 2013

Mary Kay Bowman
Director, Product Management Global Payment
Systems
Amazon.com, Inc.
P.O. Box 81226
Seattle, WA 98108-1226

7

266270.2

# A2047

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE :
FEE AND MERCHANT DISCOUNT :         MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION :
                                     :
                                     :       **OBJECTION OF STARBUCKS
                                     :       TO FINAL APPROVAL OF THE
                                     :       PROPOSED SETTLEMENT**
                                     :
--------------------------------------------------------------x

## DECLARATION OF STARBUCKS CORPORATION

Richard Lautch hereby declares:

1.      I am treasurer at Starbucks Corporation ("Starbucks").  I have held this position

since 2001.  This declaration sets forth the reasons that Starbucks objects to the proposed

settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*

(MDL 1720).

2.      I am responsible for a wide range of treasury and cash management activities, and

my responsibilities include all U.S. treasury management and investment/borrowing activities,

bank relationships, and foreign exchange.

3.      Under my direction, the Starbucks treasury department is responsible for all

banking operations, including credit card and debit card processing arrangements.  I am

knowledgeable about Starbucks' acceptance of debit and credit card transactions running on all

payment networks, including Visa and MasterCard, and payment of interchange fees for

transactions completed over those networks.

4.      In Fiscal Year 2012 (which ended October 2, 2012), our global revenues reached

$13.3 billion, and we ended the year with over 17,600 stores in 59 countries.  Focusing on the

United States, Starbucks accepts payment cards across most aspects of its business, including at

1

266217.1

nearly 11,000 company-owned or licensed stores. In addition, we sell products over the Internet at Starbucks.com, where customers can also re-load their Starbucks cards, including by using Visa and MasterCard debit and credit cards, along with American Express, Discover, and PayPal.

5. Starbucks is a leader in mobile payments because it offers a closed loop mobile payment application that consumers can use with their smartphones, and millions of customers use our mobile apps.

## I. INTERCHANGES FEES AND STARBUCKS' ACCEPTANCE OF PAYMENT CARDS

6. Visa and MasterCard interchange fees are among our largest expenses, and yet interchange rates are largely beyond our control. From January 2004 until November 2012, Starbucks has paid more than $540 million in interchange fees for credit and debit card transactions running on the Visa and MasterCard networks. Since December 1, 2012, and on an ongoing basis, Starbucks has continued to pay millions of dollars in interchange fees each month.

7. Visa and MasterCard credit and debit card transactions currently make up approximately 35% of the tender at Starbucks' stores. As a small-ticket merchant with a majority of credit and debit transactions under $10, our effective interchange rates can reach extremely high levels. Yet Starbucks cannot drop Visa and MasterCard products (credit and signature and PIN debit) without losing an unacceptable number of sales.

## II. THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

8. I have reviewed the proposed settlement agreement of the interchange class action (the "Proposed Settlement"). Neither I nor anyone else at Starbucks, nor any counsel working on our behalf, had any involvement in the negotiations leading up to the Proposed Settlement.

### A. The Principal Remedy Offered by the Settlement, the Ability to Surcharge, Is Unworkable

2

266217.1

# A2049

9.      For Starbucks, the only reason to even contemplate implementing a surcharge would be as a measure to recover excessive interchange costs in the absence of a functioning, competitive market.  The Proposed Settlement introduces a series of hurdles that make any surcharge difficult, if not impossible, to accomplish.

10.     The Proposed Settlement maintains the prohibitions against surcharging.  We cannot surcharge Visa and MasterCard debit transactions.  Debit transactions under $10 comprise the bulk of Starbucks Visa and MasterCard transactions and, post-Durbin, are subject to a high effective interchange rate that is not addressed by the Proposed Settlement. Consequently, a significant number of our Visa and MasterCard transactions would not even be eligible for a surcharge.

11.     Moreover, the limitations in the settlement effectively maintain the prohibition against surcharges for Visa and MasterCard credit transactions as well through the "level playing field" provisions.  The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  Rather than provide a way to play one card brand off another to introduce price competition in the industry, this provision incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express, which is usually more expensive than Visa and MasterCard.

12.     If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions.  American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards and brands or card-products with lower acceptance costs.  But, surcharging debit cards

3

266217 1

# A2050

would not even be permissible under the Proposed Settlement, which only allows surcharging on credit cards.  Surcharging this way does not make sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

13.  Thus the only practical way to allow for surcharging Visa and MasterCard transactions would be to stop accepting American Express.  Dropping American Express would inconvenience our customers and would only decrease competition in the payments industry.

14.  The interaction of the Proposed Settlement and American Express rules negates any value surcharging might offer to Starbucks, and Starbucks would not surcharge under these terms.

15.  Starbucks does business in all 50 U.S. states.  Surcharging is currently illegal in 11 states, including Maine, Oklahoma, California, Colorado, Connecticut, Florida, Kansas, Massachusetts, New York, Texas, and Utah, and Puerto Rico.  These areas contain over 50% of our US retail company-owned locations.

16.  Legislation to ban surcharging has been proposed in 20 states, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Washington, and West Virginia.  In total, this accounts for approximately 35% of our US retail company-owned locations.

17.  In addition, we sell products over the Internet at www.starbucks.com.  For Internet sales, application of the various no-surcharge laws is complex.  Many of these laws prohibit retailers, wherever they are located, from surcharging customers.  It is unclear whether these laws would also apply to customers located in a no-surcharge state, and, likewise,

4

266217 1

# A2051

merchants located in a no-surcharge state may not be able to surcharge customers at all, regardless of where these customers are located.

18.     Operationally, it would be next to impossible to surcharge in some states and not others, and would incur substantial costs for staff training and POS system costs. We will not surcharge under these circumstances.

**B.     The Release Is Far Too Broad**

19.     The Proposed Settlement purports to treat mobile devices the same as payment cards by including a "mobile telephone" in the definition of credit and debit cards. We are concerned about this because we see mobile payments as a new product distinct from, traditional physical payment cards, and one that offers the potential for reduced costs and a better experience for customers. This reinforces our concerns about releasing claims about past or future revisions to the Honor All Cards rules because Visa and MasterCard could argue that the release bars claims based upon interpretations of the Honor All Cards rules that force acceptance of new products, including mobile payments, or which force acceptance of the hardware necessary to accept such products.

20.     The release also purports to extend outside the jurisdiction of the United States and purports to release Visa, MasterCard, and others from their actions anywhere on the globe. Starbucks operates in 59 countries. Visa and MasterCard may argue that the release bars Starbucks from seeking relief for conduct in any of those countries – and in any country we may expand into in the future. There is no basis for including foreign conduct or foreign affiliates of class members in this settlement.

*     *     *     *

21.     Based on the current Proposed Settlement, it is clear to me that the lawyers who

5

# A2052

negotiated the settlement did not adequately represent the interests of Starbucks.

22.    Starbucks is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

23.    Starbucks joins in the opposition to the motion for final approval being filed by

the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP,

setting forth additional legal and factual grounds for Starbucks' Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on May 28, 2013

Richard Lautch
Starbucks Corporation
2401 Utah Avenue South
Seattle, Washington 98134

6

266217.1

David Stein
Samuel and Stein
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dstein@samuelandstein.com (DS-2119)

*Attorneys for Objectors/Class Members*
*Rick Bandas and Daniel Hall*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD AND MERCHANT DISCOUNT ANTITRUST LITIGATION. | MDL Docket No. 1720<br><br>MASTER FILE NO.<br>1:05-md-1720-JG-JO |

## OBJECTION OF
## 1001 PROPERTY SOLUTIONS LLC AND TEMPLE EAGLE PARTNERS LLC

# A2054

## TABLE OF CONTENTS

**TABLE OF CONTENTS**............................................................................................I

**TABLE OF AUTHORITIES**...................................................................................II

**INTRODUCTION** ................................................................................................ 1

I.    1001 Property Solutions LLC and Temple Eagle Partners LLC are class members. ......... 1

II.    A court owes a fiduciary duty to unnamed class members................................................. 2

III.    The settlement waiver is impermissibly overbroad. .......................................................... 3

IV.    The relief is illusory, making the settlement self-dealing under *Bluetooth*. ..................... 4

V.    The 23(b)(2) class cannot be certified because it impermissibly settles damages claims and lacks a homogeneity of interests. ................................................................................ 5

A.    The 23(b)(2) class cannot be certified because it is unbounded. ....................................... 6

B.    The 23(b)(2) class cannot be certified because it impermissibly settles damages claims. . 7

C.    The 23(b)(2) class cannot be certified because there is no unity of interests. ................. 10

VI.    Internal conflicts of interest mean that certification of a single settlement class without separate subclassing and representation violates Rule 23(a)(4). ..................................... 10

VII.    The class plaintiffs' awards require settlement rejection................................................. 11

VIII.    The attorneys' fees are too high...................................................................................... 12

IX.    The unprecedented reaction of the class—and class representatives—requires rejection.14

**CONCLUSION** ................................................................................................ **15**

### TABLE OF AUTHORITIES

**Cases**

*In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216 (2d Cir. 1987) ...........................................2

*Alaniz v. Saginaw Count.*, No. 05-10323, 2009 U.S. Dist. LEXIS 43340 (E.D. Mich. May 21, 2009).............................................................................................................................7

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998) ...........................................8

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ...................................................... 2-3

*In re American Express Merchants' Litig.*, 667 F.3d 204 (2d Cir. 2012) ........................................3

*In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp 1190 (N.D. Ill. 1996)...............................12

*Anderson v. Beland*, 672 F.3d 113, 138 (2d Cir. 2011) ................................................3

*Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001) ...............7

*In re Auction Houses Antitrust Litig.*, 42 Fed. Appx. 511 (2d Cir. 2002) ...........................4

*In re Auction Houses Antitrust Litigation*, 197 F.R.D. 71 (S.D.N.Y. 2000) ................................12

*Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011) .............................3

*Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471 (S.D. Ohio 2004) ...............................6

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................................1, 4

*Clarke v. Advanced Private Networks, Inc.*, 173 F.R.D. 521, 522 (D. Nev. 1997) .......................3

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)...................................................13

*Cobell v. Salazar*, 679 F.3d 909 (D.C. Cir. 2012) .....................................................12

*Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002) ...........................8

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) .................................13

*In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-cv-05295 (C.D. Cal. Mar. 4, 2011) ............12

*Crawford v. Equifax Payment Servs.*, 201 F.3d 877 (7th Cir. 2000) ...............................9

# A2056

*Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050 2009 U.S. Dist. LEXIS 62817 (N.D. Cal. July 2, 2009)…………………… …………………………………………………………………….7

*In re Dynegy, Inc. Sec. Litig.,* No. 02-cv-01571 (S.D. Tex. 2005) …………………………..…12

*Fox Midwest Theatres v. Means*, 221 F.2d 173 (8th Cir. 1955)  ...................................................3

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)................13

*Gonzalez v. S. Wine & Spirits of Am., Inc.*, No. 11-cv-5849, 2012 U.S. Dist. LEXIS 46401 (C.D. Cal. Mar. 29, 2012) ...................................................................................................13

*Grant v. Bethlehem Steel Corp.,* 823 F.2d 20 (2d Cir. 1987) ...........................................................2

*Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218 (2d Cir. 2012) ..........................................7

*Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322 (1955)  .........................................................3

*In re Literary Works*, 654 F.3d 242 (2d Cir. 2012)....................................................................4, 10

*In re Merrill Lynch & Co., Inc. Sec., Deriv. & ERISA Litig.,* No. 07-cv-09633 (S.D.N.Y. 2009)

*Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*, 1997 WL 166497 (S.D.N.Y. Apr. 9, 1997)  .....3

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ......................................................2

*Monreal v. Potter*, 367 F.3d 1224 (10th Cir. 2004) …………………………………..………..9

*Moulton v. United States Steel Corp.,* 581 F.3d 344 (6th Cir. 2009) ……………………………4

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006).......................................................5

*Mueller v. CBS, Inc*., 200 F.R.D. 227 (W.D. Pa. 2001) ……………………………………….3

*Nat'l Super-Spuds, Inc. v. New York Merchantile Exch.*, 660 F.2d 9, 18-19 (2d Cir. 1981)……..4

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)  .........................................................................3

*Perdue v. Kenny A.,* 130 S. Ct. 1662 (2010)...............................................................................13

*In re Pet Food Prods. Liab. Litig*., 629 F.3d 333, 361 (3d Cir. 2010)  …………………………13

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) …………………………………………..7

Objection
Case No: 1:05-md-1720-JG-JO              iii

*Radcliffe v. Experian Info. Solutions, Inc.*, Nos. 11-56376, 11-56387, 11-56389, 11-56397, 11-56400, 11-56482 (9th Cir. May 2, 2013) ……………………………………………………………..11

*In re Raytheon Co. Sec. Litig.*, No. 99-cv-12142 (D. Mass. 2004) ……………………………..12

*Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639 (6th Cir. 2006) ………………………5, 8, 9

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ....................................................

*Richards v. Delta Air Lines, Inc.*, 453 F.3d 525 (D.C. Cir. 2006) ………………………………..9

*Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281 (W.D. Mich. 2001) …………………………7

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602–03 (3d Cir. 2009) ………………7

*Shults v. Champion Int'l Corp.*, 821 F. Supp. 520 (E.D. Tenn. 1993) …………………………...3

*Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992)................................................................................2

*In re Southeastern Milk Antitrust Litig.*, No. 2:07-CV-208, 2010 U.S. Dist. LEXIS 94223 (E.D. Tenn. Sept. 7, 2010) …………………………………………………………………………...3

*In re Telectronics Pacing Sys. Inc.*, 221 F.3d 870 (6th Cir. 2000)………………………………..8

*Ticor Title Ins. Co. v. Brown*, 511 U.S. 117 (1994)……………………………………………….7

*Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 U.S. Dist. LEXIS 88866 (E.D. Tenn. Dec. 3, 2007)……………………………………………………………………………………….7

*In re United Health Group Inc. PSLRA Lit.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009)……12

*USW v. Cooper Tire & Rubber Co.*, 474 F.3d 271 (6th Cir. 2007) …………………………..9

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 436 Fed. Appx. 496 (6th Cir. 2011)…………..13

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 503, 521 (E.D.N.Y. 2003)……....12

*Wal-Mart v. Visa USA, Inc.*, 396 F.3d 96, 106-09 (2d Cir. 2005) …………………………....4

*Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011) …………………………..........5

*In re Wal-Mart Stores, Inc.*,  No. 06-02069, 2008 U.S. Dist. LEXIS 109446 (N.D. Cal. May 2, 2008)…………………….........………………………….........……………………….........6

Objection
Case No: 1:05-md-1720-JG-JO          iv

# A2058

*Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011) ........................................................................................................................13

*Wike v. Vertrue, Inc.*, No. 3:06-00204, 2010 U.S. Dist. LEXIS 96700 (M.D. Tenn. Sept. 15, 2010) ……………………………………………………………………………..7

## Rules and Statutes

28 U.S.C. § 1713 .................................................................................................................4

Fed. R. Civ. Proc. 23(a)(4) ........................................................................................10, 11

Fed. R. Civ. Proc. 23(h) ...................................................................................................13

Fed. R. Civ. Proc. 23(b) ..................................................................................1, 3, 5, 6, 7. 8. 9

## Other Authorities

*American Law Institute Principles of Aggregate Litigation* § 3.05 comment *a* at 206 ................14

Isaacharoff, Samuel,
   *Preclusion, Due Process, and the Right to Opt Out of Class Actions,*, 77 Notre Dame L. Rev. 1057 (2011) ……………………………………………………………………….3

Leslie, Christopher R.,
   *The Significance of Silence: Collective Action Problems and Class Action Settlements*,
   59 FLA. L. REV. 71 (2007) ...........................................................................................14

*Newberg on Class Actions,* § 8.04 ………………………………………………….. ..6

Wright, Charles Alan et al., *Federal Practice and Procedure,* § 1787 at 220 (2d ed.1986)……...6

**A2059**

## INTRODUCTION

This settlement has generated an unprecedented level of objections, and for many good reasons. First, the release is overbroad as a matter of law. Second, the relief is illusory and designed only to rationalize attorneys' fees: while the defendants agree to temporarily reduce interchange fees, they impose a sweeping waiver of rights to sue them under the antitrust laws, thus permitting them to exercise their monopoly power and recoup any reduction by reraising interchange fees once the injunction expires. This makes the settlement impermissibly self-dealing under *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). Third, the Rule 23(b)(2) class cannot be certified because it is unbounded. Fourth, in violation of the Federal Rules and Supreme Court precedent, the settlement creates an impermissible Rule 23(b)(2) class to settle damages claims. Fifth, Rule 23(a) is not met, because the class's the internal conflicts of interest are not resolved with separate subclasses with separate representation. Sixth, the settlement cannot be approved under *Radcliffe v. Experian*, because what limited support of class representatives for the settlement has been improperly purchased with incentive awards of six digits available only for the class representatives who support the settlement. Seventh, the attorneys' fees request is excessive for a mega-settlement, as this Court has previously held.

**I.      1001 Property Solutions LLC and Temple Eagle Partners LLC are class members.**

1001 Property Solutions LLC and Temple Eagle Partners LLC (collectively "Objectors") object to this settlement for the reasons stated in this brief.

1001 Property Solutions LLC is a class member that accepted Visa- and MasterCard-Branded Cards during the class period and will do so in the future. *See* Declaration of Daniel Hall. Its  address is 1001 Harbor Lights Dr., Corpus Christi, TX 78412, and phone number is (361) 510-4981.

Temple Eagle Partners LLC is also a class member that accepted Visa- and MasterCard-

Objection
Case No: 1:05-md-1720-JG-JO          1

# A2060

Branded Cards during the class period and will do so in the future. *See* Declaration of Rick Bandas. Its address is 2427 W. Adams Ave., Temple, TX 76504, and its phone number is 254-774-8778.

Rick Bandas is authorized to file this Objection on behalf of Temple Eagle, Ltd. d/b/a Eagle Self Storage as a duly authorized officer of Bandas Family, Ltd. and TEXAS RJB, LLC, which own Temple Eagle, Ltd.

Objectors join the objection of any other class member that is not inconsistent with their objection. They reserve the right to cross-examine any witnesses introduced at the fairness hearing.

## II.    A court owes a fiduciary duty to unnamed class members.

A "district court ha[s] a fiduciary responsibility to the silent class members." *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). "The concern is not necessarily in isolating instances of major abuse, but rather is for those situations short of actual abuse, in which the client's interests are somewhat encroached upon by the attorney's interests." *In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216, 224 (2d Cir. 1987) (internal citation omitted).

Class actions poised for settlement "demand undiluted, even heightened, attention" and the "safeguards provided by the Rule 23(a) and (b) class-qualifying criteria . . . serve to inhibit appraisals of the chancellor's foot kind – class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness." *Amchem Prods. v. Windsor*,

---

Objection
Case No: 1:05-md-1720-JG-JO            2

# A2061

521 U.S. 591, 620, 621 (1997). This is all the more critical where, as here, the proposed settlement class is mandatory. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999).

### III.   The settlement waiver is impermissibly overbroad.

The settlement waiver is void on its face for multiple independent reasons.

First, the settlement agreement bars future antitrust claims. Settlement ¶68. But "an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy." *In re American Express Merchants' Litig.*, 667 F.3d 204, 214 (2d Cir. 2012), *cert. granted, American Express v. Italian Colors*; *cf. also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n. 19 (1985); *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 329 (1955). Such a release to permit a restraint of trade is the sort of contract in restraint of trade barred by Section 1 of the Sherman Act. *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955); *Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*, 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997).

Second, the proposed release impermissibly extends to unaccrued claims and future conduct. SA ¶¶ 68, 71 (release precludes "relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order"). But "to the extent that [the claims] involve conduct occurring after the Class Period, [they] cannot be Released Claims." *Anderson v. Beland*, 672 F.3d 113, 138 (2d Cir. 2011); *accord Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 676-77 (S.D.N.Y. 2011); *Shults v. Champion Int'l Corp.*, 821 F. Supp. 520, 524 (E.D. Tenn. 1993). In a (b)(2) class settlement, a release should confine itself to future claims for injunctive relief, not encroach on absent class members' rights to bring claims for non-incidental (*i.e.*, individualized) monetary relief in the future. Mandatory settlements that purport to release claims for monetary relief should be held unfair as a matter of law. *Clarke v. Advanced Private Networks, Inc.*, 173 F.R.D. 521, 522 (D. Nev. 1997); *see also* Isaacharoff, *Preclusion, Due Process, and the Right to Opt Out of Class Actions*, 77 Notre Dame L. Rev. 1057, 1081(2002) ("If the parties, particularly in the settlement context, try to cheat by compromising the ability to

# A2062

opt out and by short-circuiting the more exacting Rule 23(b)(3) certification standards, then they should be limited in their claim to have achieved finality.").

Third, the proposed release extends beyond the scope of the complaint. This is wrong: a class action release must be limited to the factual predicate underlying the core class action claims. *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011); *Wal-Mart v. Visa USA, Inc.*, 396 F.3d 96, 106-09 (2d Cir. 2005); *Nat'l Super-Spuds, Inc. v. New York Merchantile Exch.*, 660 F.2d 9, 18-19 (2d Cir. 1981); *Moulton v. United States Steel Corp.,* 581 F.3d 344, 349 (6th Cir. 2009); *In re Auction Houses Antitrust Litig.*, 42 Fed. Appx. 511, 519 (2d Cir. 2002).

## IV.    **The relief is illusory, making the settlement self-dealing under *Bluetooth*.**

The relief temporarily lowers the basis rate charged to class members for some (but not all) transactions, and pays them a token $6 billion for an alleged $400 billion of damages (which, when trebled, would be $1.2 trillion)—but at the same time precludes class members from challenging future antitrust violations. As a result, it is entirely illusory, rendering the settlement unfair; class members in the mandatory class are *worse off* because of this settlement, making it impermissible under the Class Action Fairness Act. 28 U.S.C. § 1713. A ten-point basis decrease in 2014 can be entirely offset and then some by a 25-point basis increase in 2015. The Class Complaint alleges that anticompetitive conduct permits ultracompetitive pricing; the settlement will protect such overpricing, and any temporary price decrease—a small fraction of the damages alleged—can easily be offset with future price increases endorsed by the settlement. *See generally* Dkt. 1676 at 20-28. As such, the absence of meaningful long-term relief to the class renders the settlement unfair. The class gets nothing of permanent value; the attorneys ask for $720 million. Meanwhile, the defendants agree not to challenge the fee request. The combination of the disproportion between the attorney fee and the class relief with the clear sailing clause is exactly the sort of self-dealing condemned by the Ninth Circuit in *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947-49 (9th Cir. 2011).

Objection
Case No: 1:05-md-1720-JG-JO                    4

# A2063

The lack of meaningful class relief shows that the attorney fee is unfair, as well. Plaintiffs brought a $1.2 trillion class action, but have settled for less than a penny on the dollar—even if one pretends that the monopolist defendants won't use the release to raise prices to more than recoup any payments. If the plaintiffs have more than a 1% chance of success, this means they are unfairly settling on the cheap at the expense of the class; if they have less than a 1% chance of success, it is unconscionable that they should collect a multiple of lodestar just because they brought a large case. *Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006). Either way, the settlement and fee request cannot be approved.

**V.      The 23(b)(2) class cannot be certified because it impermissibly settles damages claims and lacks a homogeneity of interests.**

Although a court certifying a settlement-only class need not consider the manageability problems that a trial would present, the "other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Fed. R. Civ. Proc. 23(b)(2) lacks a paramount procedural protection that is afforded to absent class members in a (b)(3) class: the right to exclude oneself. Given this state of affairs, courts should be even more vigilant in their enforcement of the prerequisites of (b)(2), which protect absent class members against "unwarranted or overbroad class definitions." The most forceful textual protection is the requirement that "final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole." Fed. R. Civ. Proc. 23(b)(2).

*Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639 (6th Cir. 2006), explains this requirement. First, (b)(2) classes may not be certified when they assert non-incidental claims for monetary damages because "such individual claims for money damages will always predominate over requested injunctive or declaratory relief." *Id.* at 641. *Accord Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011). Second, a properly certified (b)(2) class must have a "homogeneity of interests" that justifies mandatory class treatment. *Reeb*, 435 F.3d at 649;

# A2064

*accord Wal-Mart*, 131 S.Ct. at 2557. This putative settlement class fails to meet either requirement; for these two independent reasons, it should not be certified as a matter of law.

## A.     The 23(b)(2) class cannot be certified because it is unbounded.

The mandatory class is defined to include class members who have not yet used Branded Cards but will do so in the future. This is an impermissible violation of due process as a matter of law, precluding certification.

Fed. R. Civ. Proc. 23(e)(1) requires the court to direct reasonable notice of the settlement to all members of the class who would be bound by it. Such notice lets class members assess the strengths and weaknesses of the case and the merits and demerits of the settlement in deciding whether to object or opt-out—when that right is available. 7B Charles Alan Wright et al., *Federal Practice and Procedure,* § 1787 at 220 (2d ed.1986); 2 *Newberg on Class Actions,* § 8.04 at 8–17 ("[T]he purpose [of notice is] allowing the parties to make conscious choices that affect their rights in a litigation context."). Unless future customers of the defendants are permitted to reopen this settlement and challenge it, and unless the objection deadline is extended for those class members who joined the class after the preliminary approval date (or, indeed, after the objection deadline), Rule 23(e)(1) and Rule 23(e)(5) cannot be satisfied because many class members will have had no opportunity to object. Were this proceeding merely a class certification and litigation to final judgment under 23(b)(2), there would be no concomitant statutory right to notice or objection—but as a 23(e) settlement, the class members have those rights and the class definition effectively obliterated that right for a substantial subclass.

A threshold requirement in any potential Rule 23 certification is that the named plaintiffs constitute an identifiable, unambiguous class. *In re Southeastern Milk Antitrust Litig.*, No. 2:07-CV-208, 2010 U.S. Dist. LEXIS 94223, at *14–15 (E.D. Tenn. Sept. 7, 2010) (citing *Reid v. White Motor Corp.,* 886 F.2d 1462, 1471 (6th Cir.1989)).

This means that every class definition should include at least: (1) a specification of a particular group at a particular time frame and location who were harmed in a particular way;

Objection
Case No: 1:05-md-1720-JG-JO                    6

and (2) a method of definition that allows the court to ascertain its membership. *Bentley v. Honeywell Int'l, Inc*., 223 F.R.D. 471, 477 (S.D. Ohio 2004). A class definition without definite end date violates these principles.

The vast majority of courts that have rigorously analyzed the issue reached the same conclusion: proposed classes with no fixed end date must be denied certification. *See In re Wal-Mart Stores, Inc.*,  No. 06-02069, 2008 U.S. Dist. LEXIS 109446, at * 15–16 (N.D. Cal. May 2, 2008); *Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 U.S. Dist. LEXIS 88866, at *8–11 (E.D. Tenn. Dec. 3, 2007); *Saur v. Snappy Apple Farms, Inc*., 203 F.R.D. 281, 285–86 (W.D. Mich. 2001); *Alaniz v. Saginaw Count.*, No. 05-10323, 2009 U.S. Dist. LEXIS 43340, at *5 (E.D. Mich. May 21, 2009); *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050 2009 U.S. Dist. LEXIS 62817, at *3–5 (N.D. Cal. July 2, 2009); *Wike v. Vertrue, Inc*., No. 3:06-00204, 2010 U.S. Dist. LEXIS 96700, at *11–12 (M.D. Tenn. Sept. 15, 2010); *Mueller v. CBS, Inc*., 200 F.R.D. 227, 236 (W.D. Pa. 2001); *Ansoumana v. Gristede's Operating Corp*., 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001). *Cf. also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602–03 (3d Cir. 2009).

## B.    The 23(b)(2) class cannot be certified because it impermissibly settles damages claims.

Here, the mandatory class purports to release future damages claims. Settlement ¶68(g), (h). This violates *Dukes*, which holds that opt-out rights are required when individualized monetary relief is more than incidental. 131 S.Ct. at 2557-59. The Second Circuit agrees. *Hecht v. United Collection Bureau, Inc*., 691 F.3d 218, 222 (2d Cir. 2012).

When *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985), held that absent class members have a due process right to opt-out from class actions involving predominantly money damages, it conspicuously left one question undecided: namely, whether due process compelled the right of opt-out in actions which did not seek primarily money damages. *Id.* at 811–12 n.3. Since *Shutts*, the Supreme Court has repeatedly suggested that due process demands the right of

# A2066

opt-out in any action containing any claim, even a non-predominant one, for monetary relief. In *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117 (1994), in dismissing certiorari as improvidently granted, the Court declared that there is "at least a substantial possibility" that "in actions seeking [any] monetary damages, classes can only be certified under 23(b)(3), which permits opt out." *Id.* at 121. Five years later, the Court warned again that certifying a mandatory class that includes money damages might compromise the Seventh Amendment and the due process rights of absent class members. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–46 (1999).

Most significantly and most recently, the Court determined in *Wal-Mart* that the "serious possibility that [the inclusion of monetary claims without a right to opt out would violate due process] provides an additional reason not to read Rule 23(b)(2) to include the monetary claims here." 131 S.Ct. at 2559. The Court reasoned that

> The mere "predominance" of a proper (b)(2) injunctive claim does nothing to justify elimination of Rule 23(b)(3)'s procedural protections: It neither establishes the superiority of *class* adjudication over *individual* adjudication nor cures the notice and opt-out problems. We fail to see why the Rule should be read to nullify these protections whenever a plaintiff class, at its option, combines its monetary claims with a request—even a "predominating request"—for an injunction. [*Id.*]

Both *Wal-Mart* and *Ortiz* were decisions driven by the canon of constitutional avoidance, which counsels that courts should steer clear of any statutory interpretation that might create a constitutional problem. Thus, whenever a class action seeks monetary relief on the basis of individualized aggregated claims, as opposed to a unitary group claim, Rule 23 is best read as demanding 23(b)(3) certification. "[S]uch individual claims for money damages will always predominate over requested injunctive or declaratory relief." *Reeb*, 435 F.3d at 641. This standard, much like the "incidental damages" standard of *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), effectively harmonizes the Supreme Court's recurrent constitutional concerns with the idea that (b)(2) certifications should go forward when money damages do not "predominate." *See also Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 447 (6th Cir.

2002); *In re Telectronics Pacing Sys. Inc.*, 221 F.3d 870, 881 (6th Cir. 2000) ("principles of sound judicial management and constitutional considerations of due process and the right to jury trial all lead to the conclusion that in an action for money damages class members are entitled to personal notice and an opportunity to opt out.").

Even if monetary claims could be included in a (b)(2) action where incidental, they predominate in this case. The proper approach in the *Allison* regime is to pinpoint the monetary relief sought and ask whether it is "incidental" (i.e., flowing directly from liability to the class as a whole without individualized determinations). 151 F.3d at 415. If it is not, then monetary relief predominates. Plaintiffs allege over a trillion dollars in monetary damages. "If recovery of damages is at the heart of the complaint, individual class members must have a chance to opt out of the class and go it alone—or not at all." *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530 (D.C. Cir. 2006); *see also Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004); *Crawford v. Equifax Payment Servs.*, 201 F.3d 877, 882 (7th Cir. 2000).

Furthermore, a thorough (b)(2) analysis must examine the preclusive effects that the settling parties intend to foist upon absent class members. *See USW v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 282–83 (6th Cir. 2007) (rejecting certification of union dispute that would have preclusive effect on class members' ERISA claims); Samuel Issacharoff, *Preclusion, Due Process, and the Right to Opt Out of Class Actions*, 77 Notre Dame L. Rev. 1057, 1068–73 (2002). Determining the preclusive effects is easier in the settlement context, because the agreement describes the scope of the released claims—and includes claims for monetary and non-injunctive relief. As the Supreme Court recently emphasized in *Wal-Mart*, the proper division in the (b)(2) analysis is not between "equitable" claims and "legal" remedies but between "injunctive" and "monetary" ones. *Wal-Mart*, 131 S.Ct. at 2560. A bar on future "equitable" claims bars absent class members from seeking individualized monetary relief in the form of restitution for or rescission of the transactions with P&G.

Here, monetary claims predominate for two independent reasons: they predominate from both the perspective of the complaint and the release. The results of this inquiry are not trumped by the subjective desires of class counsel or representatives. Thus, the monetary claims cannot be held incidental and certification is inappropriate under *Reeb, Allison*, or their progeny. Under any standard, monetary damages "predominate" over requested injunctive or declaratory relief. The Rule 23(b)(2) class cannot be certified.

**C.      The 23(b)(2) class cannot be certified because there is no unity of interests.**

Rule 23(b)(2) certification requires that the class display a "homogeneity of interests." *Reeb*, 435 F.3d at 649. The validity of a (b)(2) class depends on whether "final injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole*." *Dukes,* 131 S.Ct. at 2560. Those overlapping interests must make appropriate the granting of final injunctive or corresponding declaratory relief. As documented by multiple other objections, this unity of interests is absent here, preventing certification. Objectors adopt these arguments by reference.

**VI.     Internal conflicts of interest mean that certification of a single settlement class without separate subclassing and representation violates Rule 23(a)(4).**

There are multiple subclasses that are affected differently by the settlement. While the settlement permits blanket credit-card surcharges by merchants (Settlement ¶¶42, 55), this is no relief for the uncertified subclass of merchants that operate in states that prohibit surcharging. The Competitive Card Brand limitation means that an uncertified subclass of five million class members that accept American Express may not surcharge Visa and MasterCard credit cards.[1] And the settlement provides no relief for the uncertified subclass of class members who wish to surcharge debit card transactions. As a result, though there is a single settlement class, there are conflicts of interest in the negotiation of relief that favor credit-intensive merchants who do not do business in states that prohibit surcharging and do not take American Express at the expense

---

[1] Indeed, this clause, by penalizing merchants that do business with defendants' competitor American Express, arguably violates Section 2 of the Sherman Act.

Objection
Case No: 1:05-md-1720-JG-JO          10

# A2069

of other class members. When a single class gets different types of relief, subclassing and separate representation is required in the Second Circuit.

In *In re Literary Works*, 654 F.3d 242 (2d Cir. 2011), the Second Circuit rejected a settlement that created three classes of relief for a single settlement class—even though there was no dispute that the different subgroups in the class had claims of differing legal quality. It was not enough for a single class counsel to allocate values to the differing-quality claims; the subclasses must be separately certified and separately represented, even if it would be more administratively convenient to have a single party negotiating on behalf of all of the subgroups. *Id.*

If Rule 23(a)(4) is violated because an identifiable subgroup with lower-quality claims might *hypothetically* be disadvantaged, as in *Literary Works*, it is certainly true where, as here, an identifiable subgroup with identical-quality claims is *actually* disadvantaged and entirely frozen out of the benefits of injunctive relief.

## VII.   The class plaintiffs' awards require settlement rejection.

The settlement provides payment of $1.8 million to the class plaintiffs who support the settlement, but nothing to the class plaintiffs who reject the settlement. Settlement ¶ 1(m). This creates an inherent conflict of interest between the class representatives and the class that requires class decertification, because they are given financial incentive to support a settlement that is not in the best interest of the class. *Radcliffe v. Experian Info. Solutions, Inc.*, Nos. 11-56376, 11-56387, 11-56389, 11-56397, 11-56400, 11-56482 (9th Cir. May 2, 2013). Indeed, given the financial payments of hundreds of thousands of dollars to class representatives who support the settlement, it is extraordinary—and telling—that ten out of nineteen class representatives oppose the settlement.

**VIII.   The attorneys' fees are too high.**

The request for nearly 10% of the $7.25 billion settlement fund is excessive. *First*, "class counsel's compensation must be proportioned to the incremental benefits they confer on the class." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 286 (7th Cir. 2002). Here, the incremental benefits of $7.25 billion must be offset by the billions of dollars of price increases that the settlement permits the defendants to impose with impunity. The denominator of any percentage-of-the-fund calculation should include this offset—especially since the settlement will make many class members that continue to do business with the defendants worse off. 28 U.S.C. §1713. When these offsets of expected price increases are included, the $720 million request exceeds the value of the class benefit.

*Second*, even if the settlement is valued at $7.25 billion, this is a megafund, and fee percentages should go down as a consequence as a matter of law. It is not 1000 times more difficult to try a $7 billion case as a $7 million case. Thus, it is typical for courts to reduce the fees on a sliding scale when settlement sizes increase. *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 503, 521 (E.D.N.Y. 2003). Indeed, settlements in the $500 million range are usually awarded single-digit-percentage fees less than what plaintiffs are asking here. *E.g., In re Countrywide Fin. Corp. Sec. Litig.,* No. 07-cv-05295 (C.D. Cal. Mar. 4, 2011) (7.73% of $601 million); *In re Merrill Lynch & Co., Inc. Sec., Deriv. & ERISA Litig.,* No. 07-cv-09633 (S.D.N.Y. 2009) (7.8% of $475 million); *In re United Health Group Inc. PSLRA Lit.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) (7% of $925 million); *In re Dynegy, Inc. Sec. Litig.,* No. 02-cv-01571 (S.D. Tex. 2005) (8.72% of $474 million); *In re Raytheon Co. Sec. Litig.*, No. 99-cv-12142 (D. Mass. 2004) (9% of $460 million). Ten percent is excessive for a multi-billion fund. *Visa Check/Mastermoney Antitrust Litig., supra*. Even half of that figure, 5%, would be excessive given the size of this settlement. *E.g., id.* (awarding 6.5% of $3 billion fund, and

noting that percentages should go down as size of settlement goes up); *Cobell v. Salazar*, 679 F.3d 909, 914-16 & n.5 (D.C. Cir. 2012) (fee of less than 3% of $3.4 billion settlement).[2]

*Third*, the class has been unfairly disadvantaged in the selection of lead class counsel. There were multiple highly-qualified antitrust firms competing for the role of class counsel. Normally, when a client has a large supply of potential attorneys, it can use these competitive pressures to reduce the price charged. But the Court's MDL selection process made no effort to benefit the class by insisting on a reduced rate. When district court judges put class counsel status in complex cases up for competitive bid, they find high-quality class counsel such as Boies Schiller willing to work for a contingency fee of ***less than ten percent***. *In re Auction Houses Antitrust Litigation*, 197 F.R.D. 71 (S.D.N.Y. 2000); *see also In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp 1190 (N.D. Ill. 1996). Given the trillion-dollar size of this case, it is certain that had this Court conducted competitive bidding on price, a highly-qualified low bidder would have asked for a fraction of what class counsel does here. Indeed, judging by the objections of many representative plaintiffs, the only auction that has taken place here is a reverse auction.

*Fourth*, even assuming the accuracy of class counsel's lodestar representations, the multiplier of 4.5 is excessive under federal law. "[T]here is a strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Perdue v. Kenny A*, 130 S. Ct. 1662, 1669 (2010). A lodestar enhancement is only justified in "rare and exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee would not have been adequate to attract competent counsel." *Id.* at 1674. *Kenny A*'s limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but there's little justification for claiming that "reasonable" in § 1988 means something different than

---

[2] The complexity of this case doesn't justify more than 5%, either. *Cobell*, where the attorneys received less than 3%, not only involved 24 written opinions and multiple appeals to the D.C. Circuit on unprecedented complex cutting-edge issues of Indian law and sovereign immunity, but required Congressional legislation before the settlement could be approved; the case lasted from 1996 to 2012, over twice as long as this case.

"reasonable" in class action fee awards made under Fed. R. Civ. P. 23(h). *See e.g.*, *Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 436 Fed. Appx. 496, 500 (6th Cir. 2011); *Gonzalez v. S. Wine & Spirits of Am., Inc.*, No. 11-cv-5849,2012 U.S. Dist. LEXIS 46401, at *12-*16 (C.D. Cal. Mar. 29, 2012) (citing *Kenny A* and denying enhancement multiplier of 1.5); *Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *129-*135 & n.157 (C.D. Cal. Nov. 23, 2011) (citing *Kenny A* and finding "little basis for an application of a multiplier" when calculating lodestar cross-check); *cf. also In re Pet Food Prods. Liab. Litig*., 629 F.3d 333, 361 (3d Cir. 2010) (Weis, J. concurring/dissenting) (referring to *Perdue* as an "analogous statutory fee-shifting case."). Plaintiffs rely on *Goldberger*, but that case predated *Kenny A*, which they fail to distinguish or even mention.

## IX.   The unprecedented reaction of the class—and class representatives—requires rejection.

*Grinnell I* asks courts to consider the class's reaction to the settlement. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). But a court should not infer anything from the relatively low number of objectors. Silence is simply *not* consent. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re GMC Pick-Up Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) . "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*,

# A2073

59 FLA. L. REV. 71, 73 (2007). The Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *GM Pick-Up Trucks*, 55 F.3d at 812-13; *American Law Institute Principles of Aggregate Litigation* § 3.05 comment *a* at 206.

Indeed, though one can normally expect a low number of objectors, the number and scope of the objections here is unprecedented in the Second Circuit. Even a number of lead plaintiffs have objected to the settlement. If this *Grinnell* factor is to mean anything, the number of objections here militates against settlement approval; otherwise, no settlement could ever obtain enough objections for this factor to distinguish between good settlements and bad settlements.

## CONCLUSION

For the above mentioned reasons, the class cannot be certified, and the settlement must be rejected. If the settlement is approved, the fee request should not be above lodestar.

Dated: May 28, 2013                  Respectfully submitted,

David Stein
Samuel and Stein
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dstein@samuelandstein.com

*Attorneys for Objectors/Class Members*
*Rick Bandas and Daniel Hall*

**Certificate of Service**

The undersigned certifies that today he filed the foregoing objection and associated declarations on ECF which will send electronic notification to all attorneys registered for ECF-filing.

The undersigned further certifies he caused to be served via USPS First Class Mail, postage prepaid, a copy of this Objection and associated declarations upon the following.

United States District Court for the Eastern District of New York
Clerk of Court
225 Cadman Plaza
Brooklyn, NY 11201

Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Wesley R. Powell
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

David Stein

**A2075**

# EXHIBIT A

# A2076

**DECLARATION OF RICK BANDAS IN SUPPORT OF**
**OBJECTION TO SETTLEMENT IN**
*IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT*
*ANTITRUST LITIGATION*

Comes now RICK BANDAS and states the following under oath and under penalty of perjury in support of his objection:

"My name is Rick Bandas.  I am over the age of eighteen (18) years.  I have never been convicted of a felony.  I am qualified and competent to make this affidavit. The facts stated herein are within my personal knowledge.

"My business address and business phone number is Temple Eagle Partners, Ltd., 2427 W. Adams Avenue in Temple, Texas 76504, (254) 774-8778.

"I have accepted Mastercard-branded and VISA-branded cards in the United States from January 1, 2004 to the present at the above mentioned business and I shall continue to do.

"I object to the proposed settlement of *IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION* for the reasons stated in my objection.

"I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this the 28th day of May 2013, at Temple, Texas."

Rick Bandas

**A2077**

# EXHIBIT B

# A2078

## DECLARATION OF DANIEL HALL IN SUPPORT OF
## OBJECTION TO SETTLEMENT IN
### *IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT*
### *ANTITRUST LITIGATION*

Comes now DANIEL HALL and states the following under oath and under penalty of

perjury in support of his objection:

"My name is Daniel Hall.  I am over the age of eighteen (18) years.  I have never

been convicted of a felony.  I am qualified and competent to make this affidavit.

The facts stated herein are within my personal knowledge.

"My business address and business phone number are 1001 Property Solutions, LLC,

1001 Harbor Lights Drive in Corpus Christi, Texas 78412, (361) 882-1483.

"I have accepted Mastercard-branded and VISA-branded cards in the United States from

2007 to the present at the above mentioned business and I shall continue to do.

"I received a settlement notice in the *In Re Payment Card Interchange Fee and*

*Merchant Discount Antitrust Litigation* case at my business address listed above

(attached as Exhibit C).

"I object to the proposed settlement of *In Re Payment Card Interchange Fee and*

*Merchant Discount Antitrust Litigation* for the reasons stated in my objection.

"I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct. Executed this the 28th day of May

2013, at Corpus Christi, Texas."

Daniel Hall

# EXHIBIT C

**A2080**

Payment Card Interchange Fee Settlement
PO Box 2530
Portland OR 97208-2530

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
TWIN CITIES, MN
PERMIT NO. 6006

# Legal Notice about a class action settlement.

4719-12777838-1

00116-005723  ************AUTO**3-DIGIT 784
DANIELHALLCBNDENTRPRS
1001 HARBOR LIGHTS DR
CORPUS CHRISTI TX  78412-5342

www.PaymentCardSettlement.com • 1-800-625-6440

Для того, чтобы прочитать это сообщение на русском языке, позвоните нам или посетите наш веб-сайт

โปรดติดต่อเราทางโทรศัพท์หรือเว็บไซต์เพื่ออ่านข่าวสารนี้เป็นภาษาไทย

Để đọc thông báo này bằng tiếng Việt, xin gọi hoặc viếng trang mạng của chúng tôi

한국어로 이 공지사항 내용을 보시려면 저희에게 전화 주시거나 웹 사이트를 방문해 주십시오

本通知の日本語での要約は当社のウェブサイトをご覧になるか、お電話でお問い合わせください。

若您希望以中文阅读本通知的摘要，请致电或浏览本公司的网站

Si desea leer este aviso en español, llámenos o visite nuestro sitio web

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

# A2081

| LEGAL RIGHTS AND OPTIONS | |
|---|---|
| **MERCHANTS IN THIS CASH SETTLEMENT CLASS (RULE 23(B)(3) SETTLEMENT CLASS) MAY:** | |
| **FILE A CLAIM** | This is the only way to get money from the settlement. |
| **EXCLUDE YOURSELF** | This is the only way you can be part of another lawsuit that asks for money for claims in this case. You will *not* get payment from this settlement. |
| **OBJECT** | If you do not agree with any part of this settlement, you do not agree with the requested award of attorneys' fees, or both you may: <br>• Write to the court to say why, or <br>• Ask to speak at the Court hearing about either the fairness of this settlement or about the requested attorneys' fees or both. |
| **DO NOTHING** | You will not get money.  You give up your rights to sue about the claims in this case. |
| **DEADLINES** | See pages 9-17 for more information about rights and options and all deadlines. |

**Merchants in the Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class):**

- You automatically benefit from the Visa and MasterCard rule changes described below. You do not have to file any forms.
- You cannot exclude yourself from the Rules Changes Settlement Class.
- You may object to any part of the settlement.

The Court has given its preliminary approval to this settlement.  The Court has not yet given its final approval.

**Read this Notice to learn more about the case.**

# A2082

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**...........................................................................................................**PAGE 4**
    1. Why did I get this Notice?
    2. What is this lawsuit about?
    3. What is an interchange fee?
    4. Why is this a class action?
    5. Why is there a settlement?
    6. Am I part of this settlement?

**SETTLEMENT BENEFITS**........................................................................................................**PAGE 6**
    7. How much money will be provided for in this settlement?
    8. How do I ask for money from this settlement?
    9. What do the members of the Rule Changes Settlement Class get?

**HOW TO FILE A CLAIM FORM**................................................................................................**PAGE 9**
    10. How do I file a claim?
    11. Am I giving up anything by filing a claim or not filing a claim?
    12. How do I opt-out of the Cash Settlement Class of this settlement?
    13. If I exclude myself from the Cash Settlement Class, can I still get money from this settlement?
    14. If I do not exclude myself from the Cash Settlement Class, can I sue these Defendants for
        damages for past conduct later?

**HOW TO DISAGREE WITH THE SETTLEMENT** ......................................................................**PAGE 12**
    15. What if I disagree with the settlement?
    16. Is objecting the same as being excluded?

**THE LAWYERS REPRESENTING YOU**....................................................................................**PAGE 14**
    17. Who are the lawyers that represent the Classes?
    18. How much will the lawyers and Class Plaintiffs be paid?
    19. How do I disagree with the requested attorneys' fees, expenses or awards to Class Plaintiffs?

**THE COURT'S FAIRNESS HEARING**.......................................................................................**PAGE 16**
    20. When and where will the Court decide whether to approve the settlement?
    21. Do I have to come to the hearing to get my money?
    22. What if I want to speak at the hearing?

**IF YOU DO NOTHING** ............................................................................................................**PAGE 17**
    23. What happens if I do nothing?

**GETTING MORE INFORMATION** .............................................................................................**PAGE 17**
    24. How do I get more information?

**THE FULL TEXT OF THE RELEASES** .....................................................................................**PAGE 18**
    25. What is the full text of the Release for the Cash Settlement Class?
    26. What is the full text of the Release for the Rule Changes Settlement Class?

**QUESTIONS? CALL 1-800-625-6440 OR VISIT WWW.PAYMENTCARDSETTLEMENT.COM**

3

# A2083

## BASIC INFORMATION

### 1. Why did I get this Notice?

This Notice tells you about your rights and options in a class action lawsuit in the U.S. District Court for the Eastern District of New York. Judge John Gleeson is overseeing this class action, which is called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (JG)(JO). This Notice also explains the lawsuit, the proposed settlement, the benefits available, eligibility for those benefits, and how to get them.

The companies or entities who started this case are called the "Plaintiffs." The companies they are suing are the "Defendants."

This case has been brought on behalf of merchants. The specific merchants that filed the case are the Class Plaintiffs and the Court has authorized them to act on behalf of all merchants in the classes described below in connection with the proposed settlement of this case. The Class Plaintiffs are:

Photos Etc. Corporation; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS Inc.; Crystal Rock LLC; Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless ShoeSource, Inc.

The companies that the plaintiffs have been suing are the "Defendants." Defendants are:

- "Visa Defendants": Visa U.S.A. Inc., Visa International Service Association, and Visa Inc.;

- "MasterCard Defendants": MasterCard International Incorporated and MasterCard Incorporated; and

- "Bank Defendants": Bank of America, N.A.; BA Merchant Services LLC (formerly known as National Processing, Inc.); Bank of America Corporation; MBNA America Bank, N.A.; Barclays Bank plc; Barclays Bank Delaware; Barclays Financial Corp.; Capital One Bank (USA), N.A.; Capital One F.S.B.; Capital One Financial Corporation; Chase Bank USA, N.A.; Chase Manhattan Bank USA, N.A.; Chase Paymentech Solutions, LLC; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; Bank One Corporation; Bank One Delaware, N.A.; Citibank (South Dakota), N.A.; Citibank N.A.; Citigroup Inc.; Citicorp; Fifth Third Bancorp; First National Bank of Omaha; HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; HSBC Bank plc; National City Corporation; National City Bank of Kentucky; SunTrust Banks, Inc.; SunTrust Bank; Texas Independent Bancshares, Inc.; Wachovia Bank, N.A.; Wachovia Corporation; Washington Mutual, Inc.; Washington Mutual Bank; Providian National Bank (also known as Washington Mutual Card Services, Inc.); Providian Financial Corporation; Wells Fargo Bank, N.A. and Wells Fargo & Company.

### 2. What is this lawsuit about?

This lawsuit is about:

- The interchange fees attributable to merchants that accepted Visa or MasterCard credit or debit cards between January 1, 2004 and November 28, 2012, and

- Visa's and MasterCard's rules for merchants that accept their cards.

The Class Plaintiffs claim that:

- Visa, MasterCard, and their respective member banks, including the Bank Defendants, violated the law because they set interchange fees.

# A2084

- Visa, MasterCard, and their respective member banks, including the Bank Defendants, violated the law because they imposed and enforced rules that limited merchants from steering their customers to other payment methods. Doing so insulated them from competitive pressure to lower the interchange fees.

- Visa and MasterCard conspired together about some of the business practices challenged.

- Visa and MasterCard and their respective member banks continued in those activities despite that Visa and MasterCard changed their corporate structure and became publicly owned corporations after this case was filed.

- The Defendants' conduct caused the merchants to pay excessive fees for accepting Visa and MasterCard cards.

- But for Defendants' conduct there would have been no interchange fee or those fees would have been lower.

The Defendants say they have done nothing wrong. They claim their business practices are legal, justified, the result of independent competition and have benefitted merchants and consumers.

### 3. What is an interchange fee?

When a cardholder makes a purchase with a credit or debit card, there is an interchange fee attributable to those transactions, which is usually 1% to 2% of the purchase price. Interchange fees typically account for the greatest part of the fees paid by merchants for accepting Visa and MasterCard cards.

Visa and MasterCard set interchange fee rates for different kinds of transactions and publish them on their websites, usually twice a year.

### 4. Why is this a class action?

In a class action, a very small number of people or businesses sue not only for themselves, but also on behalf of other people or businesses with similar legal claims and interests. Together all of these people or businesses with similar claims and interests form a class, and are class members.

When a court decides a case or approves a settlement, it is applicable to all members of the class (except class members who exclude themselves). In this case, the Court has given its preliminary approval to the settlement and the two classes defined below in Question 6.

### 5. Why is there a settlement?

The Court has not decided which side was wrong or if any laws were violated. Instead, both sides agreed to settle the case and avoid the cost and risk of trial and appeals that would follow a trial.

In this case, the settlement is the product of extensive negotiations, including court-supervised mediation with two experienced mediators, chosen by the parties. Settling this case allows class members to receive payments and other benefits. The Class Plaintiffs and their lawyers believe the settlement is best for all class members.

The parties agreed to settle this case only after seven years of extensive litigation. At the time of settlement, discovery was complete and the parties had exchanged expert reports. During discovery, Class Plaintiffs reviewed more than 50 million pages of documents and deposed more than 400 witnesses, including Defendants' experts. Also, at the time of settlement, motions to dismiss, motions for summary judgment, motions to exclude expert testimony, and the motion for class certification had been fully briefed and argued, and were pending before the court.

# A2085

## 6. Am I part of this settlement?

**If this Notice was mailed to you, the Defendants' records show that you are probably in the:**

Cash Settlement Class (Rule 23(b)(3) Settlement Class) "consisting of all persons, businesses, or other entities that accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that this Class does not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date, or the United States government."

Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class) "consisting of all persons, businesses or other entities that as of the Settlement Preliminary Approval Date, or in the future accept any Visa-Branded Cards and/or MasterCard-Branded Cards in the United States, except that this Class shall not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time since January 1, 2004, or do so in the future, or the United States government."

The Settlement Preliminary Approval Date referenced in these class definitions is November 28, 2012.

If you are not sure whether you are part of this settlement, contact the Class Administrator at:

    Call the toll-free number: 1-800-625-6440
    Visit:           www.PaymentCardSettlement.com
    Write to:      Payment Card Interchange Fee Settlement
                     P.O. Box 2530
                     Portland, OR 97208-2530
    Email:        info@PaymentCardSettlement.com

## SETTLEMENT BENEFITS

## 7. How much money will be provided for in this settlement?

Under the settlement, Visa, MasterCard and the bank defendants have agreed to make payments to two funds:

- **Cash Settlement Fund:** Every merchant in the Cash Settlement Class that does not exclude itself from the class by the deadline described below and files a valid claim ("Authorized Cash Claimant") will get money from the $6.05 billion Cash Fund. This fund will be reduced by an amount not to exceed 25% of the Cash Fund to account for merchants who exclude themselves from the Cash Settlement Class. The money in this fund after the reduction for excluded merchants will also be used to pay:

    - The cost of settlement administration and notice, as approved by the Court,
    - Money awards for Class Plaintiffs as approved by the Court, and
    - Attorneys' fees and expenses, as approved by the Court.

    The money in this fund will only be distributed if the Court finally approves the settlement.

- **Interchange Fund:** The money for this fund is estimated to be up to $1.2 billion and will be equivalent to 10 basis points (i.e. one-tenth of 1%) of transaction volume attributable to Cash Settlement Class members that accept Visa or MasterCard credit cards during an eight-month period starting by July 29, 2013. Every merchant in the Cash Settlement Class that does not exclude itself from the class by the deadline described below and that accepted Visa or

# A2086

MasterCard credit cards during that eight-month period and files a valid claim ("Authorized Interchange Claimant") will get money from the Interchange Fund. The money in this fund will also be used to pay:

- The cost of settlement administration and notice, as approved by the Court, and
- Any attorneys' fees and expenses that may be approved by the Court.

The money in this fund will not be returned to Defendants, even if the settlement is terminated. If this settlement is terminated, the Court will decide how to distribute this fund.

## 8. How do I ask for money from this settlement?

You must file a valid claim to get money from this settlement. If the Court finally approves the settlement, and you do not exclude yourself from the Cash Settlement Class, you will receive a claim form in the mail or by email. You may also get a claim form at: www.PaymentCardSettlement.com, or call: 1-800-625-6440.

**How much money will I get?**

It is anticipated that the amount paid from the Cash Settlement Fund will be based on your actual or estimated interchange fees attributable to Visa and MasterCard transactions from January 1, 2004 through November 28, 2012.

The amount paid from the Interchange Fund will based on one-tenth of 1% of the merchant's Visa and MasterCard credit card transaction volume during the eight-month period to begin by July 29, 2013.

Valid claims will be paid from the Cash Settlement Fund and/or the Interchange Fund. The amount of money each eligible claimant will receive from the Cash Settlement Fund depends on the money available to pay all claims, the total dollar value of all valid claims filed, the deduction described above not to exceed 25% of the Cash Settlement Fund, the cost of class administration and notice, money awards to Class Plaintiffs, and attorneys' fees and expenses approved by the Court. The amount of money each eligible claimant will receive from the Interchange Fund depends on the money available to pay all claims, the total dollar value of all valid claims filed, the cost of class administration and notice, and attorneys' fees and expenses approved by the Court. Each claimant's payment will be paid in proportion to all claimants' payments.

Details about how all claims are calculated will be available at www.PaymentCardSettlement.com starting no later than April 11, 2013.

## 9. What do the members of the Rule Changes Settlement Class get?

If the Court approves the settlement, Visa and MasterCard will make changes to their rules and practices. These changes will benefit the Rule Changes Settlement Class.

The rule changes, which will start no later than January 27, 2013, are summarized below. To see a detailed description of the rule changes, including other rules not listed here, see the Class Settlement Agreement, paragraphs 40–65.

**Brand Surcharge Rules on Credit (not Debit) Cards**

Merchants will be able to charge an extra fee to all customers who pay with Visa or MasterCard branded credit cards. This is called a brand-level surcharge; and it is allowed if the surcharge:

- is the same for all Visa credit cards or all MasterCard credit cards;
- is not more than the merchant's average Visa or MasterCard merchant discount rate (calculated historically or based on the previous month); and

- is not more than the maximum surcharge cap, which will be posted on Visa's and MasterCard's websites (if a cap is set).

For merchants that accept other brands of credit cards, such as American Express, Discover, or PayPal, there are other requirements that depend on the costs of those brands to the merchant and those brands' surcharge restrictions.

- If the merchant accepts a competing brand of credit card that is as or more expensive than Visa or MasterCard, and that limits the merchant's ability to surcharge, the merchant may surcharge Visa or MasterCard cards only in the same way as the merchant would be allowed to surcharge the competing brand's cards or on the terms on which the merchant actually surcharges the competing brand's cards.

- If the merchant accepts a competing brand of credit card that prohibits or effectively prohibits the merchant from surcharging in a particular channel of commerce, the merchant may not surcharge Visa or MasterCard cards unless it also surcharges the competing brand's cards regardless of the cost of that brand to the merchant. The amount of the surcharge must equal whichever is less: the cost to accept the competing brand or the surcharge imposed on Visa or MasterCard cards.

*Exception:* A merchant may individually negotiate an agreement with the competing brand to waive or limit its ability to surcharge that brand, if that agreement fulfills the terms of the Class Settlement Agreement.

**Product Surcharge Rules on Credit (not Debit) Cards**

A merchant may impose a surcharge on a particular Visa or MasterCard credit card product, such as Visa Signature. The amount of the surcharge must not be more than the merchant's cost to accept the particular Visa or MasterCard credit card product, minus the Durbin Amendment's cap on debit-card interchange fees. The surcharge must be the same for all transactions on the particular Visa or MasterCard credit card product, regardless of the card's issuer.

For merchants that accept credit cards issued by competing brands (e.g., American Express, Discover, or PayPal), there are requirements similar to the brand level surcharge rules summarized above.

Nothing in the settlement affects a merchant's obligations to comply with all applicable state or federal laws, including state laws regarding surcharging of credit or debit card transactions and federal and state laws regarding deceptive or misleading disclosures. However, the fact that a merchant's ability to surcharge may be restricted under the laws of one or more states is not intended to limit that merchant's ability under the settlement to surcharge Visa or MasterCard credit cards where permitted by state law.

**Discount Rule:** Merchants may offer discounts or other financial incentives at the point of sale to customers who do not pay with Visa or MasterCard cards.

**All-Outlets:** Merchants may accept Visa or MasterCard at fewer than all of the merchant's "trade names" or "banners" if the merchant operates multiple businesses under different trade names or banners. For stores operating under the same "trade name" or "banner," however, merchants must accept or decline a network's cards at all of its stores operating under the same "trade name" or "banner."

**Buying Groups:** Merchants that form buying groups that meet certain criteria may make proposals to Visa and MasterCard about card acceptance on behalf of the group's members. If Visa or MasterCard believe that the group's proposal "provides reasonable commercial benefits to the parties," it must negotiate with the buying group and decide, in "good faith," whether or not to make an agreement with the group.

# A2088

**$10 Minimum Rule**: This rule, which allows merchants to set a $10 minimum purchase for Visa and MasterCard credit cards, will not change even if the requirements of the Dodd-Frank Wall Street Reform Act end.

All these rule changes are set forth in full in the Settlement Agreement, which appears on the website: www.PaymentCardSettlement.com.

## HOW TO FILE A CLAIM FORM

### 10. How do I file a claim?

If the Court approves the settlement (see "The Court's Fairness Hearing" below), the Court will approve a Claim Form and set a deadline for Cash Settlement Class members to submit claims. In order to receive a payment, you must submit a Claim Form.

If you received this Notice in the mail, a Claim Form will be mailed or emailed to you automatically. The Claim Form will also be posted on the website and available by calling the toll free number shown below. Class members will be able to submit claims electronically using this website or by returning a paper Claim Form.

**Who decides the value of my claim?**

The Class Administrator is obtaining data from Visa, MasterCard, certain Bank Defendants, and other entities which it expects will permit it to estimate the total value of interchange fees attributable to each Authorized Cash Claimant on its Visa and MasterCard card transactions during the period from January 1, 2004 to November 28, 2012 with no netting or reductions based on rebates, market support, or promotional payments, or otherwise ("Interchange Fees Paid"). It is the current intention to utilize this data to the extent possible, to estimate the interchange fees attributable to class members. For any calendar year, or part thereof, in which an Authorized Cash Claimant had an agreement with Visa or MasterCard under which the merchant received customized interchange rates, such Claimant may elect to have its Visa or MasterCard Interchange Fees Paid estimated, in lieu of the Interchange Fees Paid amounts shown in the data utilized by the Class Administrator, by multiplying its relevant Visa or MasterCard credit, signature debit, and PIN debit transaction volume by the respective average effective credit, signature debit, and PIN debit interchange rates across the merchant's applicable merchant category (or merchant categories) for that time period. In order for a Claimant to qualify for such an election, the Class Administrator must confirm with Visa or MasterCard that the Claimant had an agreement with Visa or MasterCard in which it received customized interchange rates, for such time period.

Where the necessary data is not reasonably available or if the Interchange Fees Paid claim value established by the Class Administrator is disputed by the class member, class members will be required to submit information in support of its claim. This information will include, to the extent known, Interchange Fees Paid attributable to the class member, merchant discount fees paid, the class member's merchant category code and/or a description of the class member's business, total Visa and MasterCard transaction volume and/or total sales volume. Based on these data, the Interchange Fees Paid attributable to the class member will be estimated for each known Cash Settlement Class member.

The Class Administrator will calculate the value of claims to the Interchange Fund as a percentage of sales volume on Visa- and MasterCard-Branded credit card transactions during the eight-month period. To the extent that available data explicitly specify a particular claimant's sales volume on Visa- and MasterCard-Branded credit card transactions during the eight-month period, these data will be utilized directly in the valuation of that claim.

# A2089

Claimants whose dollar sales transaction volume is not available from the Defendants and/or third parties will be asked to submit payment card transaction volume for the eight-month period to the Class Administrator or, if payment card transaction volume information is not available to the class member, sales transaction information from which payment card transaction volume may be estimated. The Class Administrator will make what it judges to be the best reasonably accurate estimate of such sales volume based on available data, and will make available to such Authorized Interchange Claimants the estimate of such sales volumes. Such estimates may be provided in a subsequent mailing or email to the Authorized Interchange Claimant and/or may be made accessible over a secure website operated by the Class Administrator.

The Class Administrator also expects to provide class members the ability to access the Claims website with a unique code to permit it to view the manner in which its claim value was calculated and may also provide this information on a pre-populated claim form. Class members may accept or disagree with data on the claim form or the website. The claim form and website will explain how to challenge the data.

More details about how all claims are calculated will be available at www.PaymentCardSettlement.com starting no later than April 11, 2013.

### Claim Preregistration Form

Class members with more than one location or a franchise that accepts Visa or MasterCard cards may also fill out a pre-registration form at the website. You do not have to pre-register but doing so may be helpful, and does not impact your rights in this case.

### What if the Class Administrator doesn't have my data?

The claim form also allows class members for whom no financial data is available or who were not identified as class members to file a claim. Those merchants will have to fill out and sign a claim form and return it by the deadline.

### Can anyone else file a claim for me?

There are specialized companies that may offer to fill out and file your claim in return for a percentage of the value of your claim. Before you sign a contract with one of these companies, you should examine the claim-filing process provided here and decide whether it is worth the cost. You can always seek help from the Class Administrator or Class Counsel.

### 11. Am I giving up anything by filing a claim or not filing a claim?

If the Court finally approves the settlement, members of the Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class) cannot be excluded from the Rule Changes Settlement Class. They will be bound by the terms of that settlement, including releasing all claims that were or could have been alleged in this case against any of the released parties identified in Paragraph 67 of the Class Settlement Agreement.

Members of the Cash Settlement Class (Rule 23(b)(3) Settlement Class) (who do not exclude themselves by the deadline) whether or not they file a claim for payment, will be bound by the terms of that settlement, which include agreeing not to file a claim against any of the released parties identified in Paragraph 32 of the Class Settlement Agreement.

In general, the settlement will resolve and release all claims by persons, businesses and other entities that arise from or relate to their capacity as merchants that accept Visa-Branded Cards and/or MasterCard-Branded Cards in the United States against Visa, MasterCard or banks that were or could have been alleged in the lawsuit, including any claims about interchange or other fees, no-surcharge rules, no-discounting rules, honor-all-cards rules and other rules.

# A2090

The settlement will also resolve any merchant claims based upon the future effect in the United States of:

- any Visa or MasterCard rules, as of November 27, 2012, that are not to be modified pursuant to the settlement,
- the modified rules provided for in the settlement, or
- any other rules substantially similar to any such rules.

The releases will not bar claims involving new conduct or rules in the future that are not substantially similar to either existing conduct or rules or conduct or rules modified by the settlement (e.g. imposition of a new rule not substantially similar to existing rules or rules modified by the settlement, or reversion to the old rules modified by the settlement). The releases also will not bar claims involving certain specified standard commercial disputes arising in the ordinary course of business.

**The full text of the Releases for both the Cash Settlement Class (Rule 23(b)(3) Settlement Class) and Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class) is set forth at pages 18 to 27 of this Notice. The Releases describe the released claims in legal language. You should carefully read the Releases and if you have questions about them, you may:**

- Call Class Counsel listed in Question 17 at no charge,
- Talk to a lawyer, at your own expense, about the releases and what they mean to you. The complete Settlement Agreement may also be viewed on the website.

**Important!** If you want to keep your right to be part of any other lawsuit that asks for money based on similar claims, you must opt-out (exclude yourself) from the Cash Settlement Class of this settlement. You cannot be excluded from the Rule Changes Settlement Class.

## 12. How do I opt-out of the Cash Settlement Class of this settlement?

To opt-out (exclude yourself) from the Cash Settlement Class (Rule 23(b)(3) Settlement Class) of this Settlement, send a letter to:

Payment Card Interchange Fee Settlement
P.O. Box 2530
Portland, OR 97208-2530

Your letter must be postmarked by **May 28, 2013**. You cannot exclude yourself by phone, fax, email or online.

**Should I send my letter by regular mail?**

Yes. Send your letter by first-class mail and pay for the postage. Keep a copy for your records.

**What should my letter say?**

Your letter must be signed by a person authorized to do so and state as follows:

- I want to exclude [name of merchant] from the Cash Settlement Class of the settlement in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.*
- My personal information is:

  Name (first, middle, last):
  Position:
  Name of Merchant:

**QUESTIONS? CALL 1-800-625-6440 OR VISIT WWW.PAYMENTCARDSETTLEMENT.COM**

# A2091

Address:

Phone No.:

Merchant's taxpayer identification number:

- The business names, brand names, and addresses of the stores or sales locations that I want to exclude from the Cash Settlement Class are:

    (list all businesses and addresses of each store or sales location)

- My position at the business that gives me the authority to exclude it from the Cash Settlement Class is as follows:

**Warning!** If your letter is sent after the deadline it will be considered invalid. If this happens, you won't be excluded from the Cash Settlement Class, and you will still be part of the settlement and will be bound by all of its terms.

### 13. If I exclude myself from the Cash Settlement Class, can I still get money from this settlement?

No. If you exclude yourself from the Cash Settlement Class (Rule 23(b)(3) Settlement Class):

- You cannot get money from this settlement, and

- You cannot object to the Cash Settlement (but you can still object to the Rule Changes).

The deadline to exclude yourself is: **May 28, 2013**. To do this, see: www.PaymentCardSettlement.com.

*Important!* If you exclude yourself, do not file a claim form asking for payment.

**Can I exclude myself from the Rule Changes Settlement Class?**

No. You cannot be excluded from the Rule Changes Settlement Class. But you may object to the Rule Changes Settlement, if you want to.

### 14. If I do not exclude myself from the Cash Settlement Class, can I sue these Defendants for damages for past conduct later?

No. If you do not exclude yourself, you give up your right to sue any of the released parties described in the Class Settlement Agreement for damages for past conduct.

## HOW TO DISAGREE WITH THE SETTLEMENT

### 15. What if I disagree with the settlement?

You may tell the Court you object to (disagree with) the settlement for the Rule Changes Settlement Class. You may also object to the settlement for the Cash Settlement Class if you do not exclude yourself. The Court will consider your objection(s) when it decides whether or not to finally approve the settlement.

**How do I tell the Court I disagree with the settlement?**

You must file a Statement of Objections with the Court at this address:

United States District Court for the Eastern District of New York
Clerk of Court
225 Cadman Plaza
Brooklyn, NY 11201

**QUESTIONS? CALL 1-800-625-6440 OR VISIT WWW.PAYMENTCARDSETTLEMENT.COM**

# A2092

You must also send a copy of your Statement of Objections to Class Counsel and Counsel for the Defendants at the following addresses:

| DESIGNATED CLASS COUNSEL | DESIGNATED DEFENDANTS' COUNSEL |
|---|---|
| Alexandra S. Bernay<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101 | Wesley R. Powell<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019 |

You must send your Statement of Objections postmarked no later than **May 28, 2013**.

**What should my Statement of Objections say?**

Your Statement of Objections must contain the following information:

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re Payment Card Interchange Fee and<br>Merchant Discount Antitrust Litigation | : | No. 05-MD-01720 (JG)(JO) |
| | : | |

Statement of Objections

I am a member of the Cash Settlement Class [and/or] the Rule Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.*

I am a Class member because [*List information that will prove you are a class member, such as your business name and address, and how long you have accepted Visa or MasterCard cards*].

I object to the settlement in this lawsuit. I object to *(list what part(s) of the Settlement you disagree with, e.g. the settlement for the Cash Settlement Class, Rule Changes Settlement Class, Allocation Plan, notice procedures, other features.)* [Note that you may also object to any requests for attorneys' fees and expenses as part of the same objection, or as part of a separate objection described below].

My reasons for objecting are:

The laws and evidence that support each of my objections are:

My personal information is:

Name (first, middle, last):

Address:

Phone No.:

The contact information for my lawyer (if any) is:

**Can I call the Court or the Judge's office about my objections?**

No. If you have questions, you may visit the website for the settlement or call the Class Administrator:

www.PaymentCardSettlement.com
1-800-625-6440

# A2093

## 16. Is objecting the same as being excluded?

No. **Objecting** means you tell the Court which part(s) of the settlement you disagree with (including the plan for distributing the cash benefits, request for attorneys' fees and expenses or awards for Class Plaintiffs).

Being excluded (also called opting-out) means you tell the Court you do not want to be part of the Cash Settlement Class (Rule 23(b)(3) Settlement Class).

## THE LAWYERS REPRESENTING YOU

## 17. Who are the lawyers that represent the Classes?

The Court has appointed the lawyers listed below to represent you. These lawyers are called Class Counsel. Many other lawyers have also worked with Class Counsel to represent you in this case. Because you are a class member, you do not have to pay any of these lawyers. They will be paid from the settlement funds.

| K. Craig Wildfang | H. Laddie Montague, Jr. | Bonny E. Sweeney |
|---|---|---|
| Robins, Kaplan, Miller & Ciresi L.L.P. | Berger & Montague, P.C. | Robbins Geller Rudman & Dowd LLP |
| 2800 LaSalle Plaza | 1622 Locust Street | 655 West Broadway, Suite 1900 |
| 800 LaSalle Avenue | Philadelphia, PA 19103 | San Diego, CA 92101 |
| Minneapolis, MN 55402 | | |

**Should I hire my own lawyer?**

You do not have to hire your own lawyer. But you can if you want to, at your own cost.

If you hire your own lawyer to appear in this case, you must tell the Court and send a copy of your notice to Class Counsel at any of the addresses above.

## 18. How much will the lawyers and Class Plaintiffs be paid?

For work done through final approval of the settlement by the district court, the lawyers for the class members (called Class Counsel) will ask the Court for an amount that is a reasonable proportion of the Cash Settlement Fund, not to exceed 11.5% of the Cash Settlement Fund of $6.05 billion and 11.5% of the Interchange Fund estimated to be $1.2 billion to compensate all of the lawyers and their law firms that have worked on the class case. For additional work to administer the settlement, distribute both funds, and through any appeals, Class Counsel may seek reimbursement at their normal hourly rates, not to exceed an additional 1% of the Cash Settlement Fund of $6.05 billion and an additional 1% of the Interchange Fund estimated to be $1.2 billion.

Class Counsel will also request reimbursement of their expenses (not including the administrative costs of settlement or notice), not to exceed $40 million and up to $200,000 per Class Plaintiff in service awards for their efforts on behalf of the classes.

Class Counsel may also seek reimbursement of fees and expenses from class members that opt out of the Cash Settlement Class, to the extent those class members rely on the record compiled in this case. Any monies that Class Counsel successfully recover from opt-outs will be deposited into the Cash Settlement Fund if the Court finally approves the settlement.

The amounts to be awarded as attorneys' fees, reimbursement of expenses, and Class Plaintiffs' Awards **must** be approved by the Court. Class Counsel must file their requests for fees and expenses and other

# A2094

costs to the Court by April 11, 2013. You can object to the requests for attorneys' fees in compliance with the instructions in Question 19 below.

Copies of the lawyers' requests for payment, reimbursement, and other costs will be posted at the settlement website the same day they are filed, which will be no later than April 11, 2013.

> ### 19. How do I disagree with the requested attorneys' fees, expenses or awards to Class Plaintiffs?

You may tell the Court you object to (disagree with) any request for attorneys' fees and expenses or awards to Class Plaintiffs. You may do so if you do not exclude yourself from the Cash Settlement Class and/or if you are a member of the Rule Changes Settlement Class. The Court will consider your objection(s) when it evaluates any request for attorneys' fees and expenses and/or awards to Class Plaintiffs in connection with its decision on final approval of the settlement.

To file an objection, you must file a Statement of Objections with the Court at this address:

United States District Court for the Eastern District of New York
Clerk of Court
225 Cadman Plaza
Brooklyn, NY 11201

You must also send a copy of your Statement of Objections to Class Counsel and Counsel for the Defendants at the following addresses:

| DESIGNATED CLASS COUNSEL | DESIGNATED DEFENDANTS' COUNSEL |
| --- | --- |
| Alexandra S. Bernay<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101 | Wesley R. Powell<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019 |

The Clerk of Court, the attorneys for the class and defendants must receive your letter by **May 28, 2013**.

**What should my Statement of Objections say?**

Your Statement of Objections must contain the following information:

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| In re Payment Card Interchange Fee and<br>Merchant Discount Antitrust Litigation | : | No. 05-MD-01720 (JG)(JO) |
| --- | --- | --- |
| | : | |

Statement of Objections

I am a member of the Cash Settlement Class [and/or] the Rules Changes Settlement Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.*

I am a Class member because [*List information that will prove you are a class member, such as your business name and address, and how long you have accepted Visa or MasterCard cards*].

I object to class counsel's request for attorneys' fees and expenses and/or to the request for money awards to Class Plaintiffs.

My reasons for objecting are:

# A2095

The laws and evidence that support each of my objections are:

My personal information is:

Name (first, middle, last):

Address:

Phone No.:

The contact information for my lawyer (if any) is:

**Can I call the Court or the Judge's office about my objections?**

No. If you have questions, you may visit the website for the settlement or call the Class Administrator:

> www.PaymentCardSettlement.com
> 1-800-625-6440

## THE COURT'S FAIRNESS HEARING

### 20. When and where will the Court decide whether to approve the settlement?

There will be a Fairness Hearing at 10:00 a.m. on September 12, 2013. The hearing will take place at:

> United States District Court for the Eastern District of New York
> 225 Cadman Plaza
> Brooklyn, NY 11201

We do not know how long the Court will take to make its decision.

*Important!* The time and date of this hearing may change without additional mailed or published notice. For updated information on the hearing, visit: www.PaymentCardSettlement.com.

**Why is there a hearing?**

The hearing is about whether or not the settlement is fair, adequate, and reasonable.

The Court will consider any objections and listen to class members who have asked to speak at the hearing.

The Court will also decide whether it should give its final approval of the Plaintiffs' requests for attorneys' fees and expenses, service awards, and other costs.

### 21. Do I have to come to the hearing to get my money?

No. You do not have to go to the hearing, even if you sent the Court an objection. But, you can go to the hearing or hire a lawyer to go the hearing if you want to, at your own expense.

### 22. What if I want to speak at the hearing?

You must file a Notice of Intention to Appear with the Court at this address:

> United States District Court for the Eastern District of New York
> Clerk of Court
> 225 Cadman Plaza
> Brooklyn, NY 11201

Your Notice of Intention to Appear must be filed by **May 28, 2013**. You must also mail a copy of your letter to Class Counsel and Counsel for the Defendants at the addresses listed in Question 15.

**QUESTIONS? CALL 1-800-625-6440 OR VISIT WWW.PAYMENTCARDSETTLEMENT.COM**

# A2096

**What should my Notice of Intention to Appear say?**

Your Notice of Intention to Appear must be signed and contain the following information:

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | : : : | No. 05-MD-01720 (JG)(JO) |

- Notice of Intention to Appear
- I want to speak at the Fairness Hearing for the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,*
- My personal information is:
- Name (first, middle, last):
- Address:
- Phone No.:
- Personal information for other people (including lawyers) who want to speak at the hearing:

## IF YOU DO NOTHING

### 23. What happens if I do nothing?

If you do not file a claim, you cannot get money from this settlement.

If you do not exclude yourself from the Cash Settlement Class (Rule 23(b)(3) Settlement Class), you cannot be part of any other lawsuit against Defendants and other released parties listed in the Class Settlement Agreement for damages for past conduct. You will be bound by the Cash Settlement Class (Rule 23(b)(3) Class) Release.

## GETTING MORE INFORMATION

### 24. How do I get more information?

There are several ways to get more information about the settlement.

You will find the following information at: www.PaymentCardSettlement.com:

- The complete Class Settlement Agreement, including all attachments, and
- Other documents related to this lawsuit.

# A2097

To receive a copy of the Class Settlement Agreement or other documents related to this lawsuit, you may:

| | |
|---|---|
| Visit: | www.PaymentCardSettlement.com |
| Write to: | Payment Card Interchange Fee Settlement |
| | P.O. Box 2530 |
| | Portland OR 97208-2530 |
| Email: | info@PaymentCardSettlement.com |
| Call: | 1-800-625-6440 – *toll-free* |

If you do not get a Claim Form in the mail or by email, you may download one at: www.PaymentCardSettlement.com, or call: 1-800-625-6440.

**Please do not attempt to contact Judge Gleeson or the Clerk of Court with any questions.**

## THE FULL TEXT OF THE RELEASES

### 25. What is the full text of the Release for the Cash Settlement Class?

31. The "Rule 23(b)(3) Settlement Class Releasing Parties" are the Class Plaintiffs, each and every member of the Rule 23(b)(3) Settlement Class that does not become an Opt Out, and any of their respective past, present, or future: officers and directors; stockholders, agents, employees, legal representatives, partners, and associates (in their capacities as stockholders, agents, employees, legal representatives, partners, and associates of a member of the Rule 23(b)(3) Settlement Class only); and trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns — whether or not they object to this Class Settlement Agreement, and whether or not they make a claim for payment from the Class Settlement Cash Escrow Account(s) or the Class Settlement Interchange Escrow Account(s), whether directly, representatively, derivatively, or in any other capacity.

32. The "Rule 23(b)(3) Settlement Class Released Parties" are all of the following:

(a) Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Asia Pacific Region, Visa Canada Association, Visa Central & Eastern Europe, Middle East & Africa Region, Visa Europe, Visa Europe Limited, Visa Latin America & Caribbean Region, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any Visa-Branded Cards or to acquire any Visa-Branded Card transactions.

(b) MasterCard International Incorporated, MasterCard Incorporated, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any MasterCard-Branded Cards or to acquire any MasterCard-Branded Card transactions.

(c) Bank of America, N.A.; BA Merchant Services LLC (formerly known as National Processing, Inc.); Bank of America Corporation; MBNA America Bank, N.A., and FIA Card Services, N.A.

(d) Barclays Bank plc; Barclays Bank Delaware; and Barclays Financial Corp.

(e) Capital One Bank (USA), N.A.; Capital One F.S.B.; and Capital One Financial Corporation.

# A2098

(f) Chase Bank USA, N.A.; Chase Manhattan Bank USA, N.A.; Chase Paymentech Solutions, LLC; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; Bank One Corporation; and Bank One Delaware, N.A.

(g) Citibank (South Dakota), N.A.; Citibank N.A.; Citigroup Inc.; and Citicorp.

(h) Fifth Third Bancorp.

(i) First National Bank of Omaha.

(j) HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; and HSBC Bank plc.

(k) National City Corporation and National City Bank of Kentucky.

(l) SunTrust Banks, Inc. and SunTrust Bank.

(m) Texas Independent Bancshares, Inc.

(n) Wachovia Bank, N.A. and Wachovia Corporation.

(o) Washington Mutual, Inc.; Washington Mutual Bank; Providian National Bank (also known as Washington Mutual Card Services, Inc.); and Providian Financial Corporation.

(p) Wells Fargo & Company and Wells Fargo Bank, N.A.

(q) Each and every entity or person alleged to be a co-conspirator of any Defendant in any of the Operative Class Complaints or any of the Class Actions.

(r) Each of the past, present, or future member or customer financial institutions of Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Europe, Visa Europe Limited, MasterCard International Incorporated, or MasterCard Incorporated.

(s) For each of the entities or persons in Paragraphs 32(a)-(r) above, each of their respective past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, affiliates, and associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), or any other entity in which more than 50% of the equity interests are held.

(t) For each of the entities or persons in Paragraphs 32(a)-(s) above, each of their respective past, present, and future predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of any of the Defendants to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(3) Settlement Class Released Parties as defined in Paragraphs 32(a)-(s) above).

(u) For each of the entities or persons in Paragraphs 32(a)-(t) above, each of their respective past, present, and future principals, trustees, partners, officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, shareholders, advisors, predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of each of the foregoing entities to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(3) Settlement Class Released Parties as defined in Paragraphs 32(a)-(t) above).

# A2099

33. This release applies solely to the Rule 23(b)(3) Settlement Class Releasing Parties. In addition to the effect of the Class Settlement Order and Final Judgment entered in accordance with this Class Settlement Agreement, including but not limited to any *res judicata* effect, the Rule 23(b)(3) Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Rule 23(b)(3) Settlement Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, *parens patriae*, or otherwise in nature, for damages, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, regardless of when such claims accrue, whether known or unknown, suspected or unsuspected, in law or in equity that any Rule 23(b)(3) Settlement Class Releasing Party ever had, now has, or hereafter can, shall, or may in the future have, arising out of or relating in any way to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party that are alleged or which could have been alleged from the beginning of time until the date of the Court's entry of the Class Settlement Preliminary Approval Order in any of the Operative Class Complaints or Class Action complaints, or in any amendments to the Operative Class Complaints or Class Action complaints, including but not limited to any claims based on or relating to:

(a) any interchange rules, interchange fees, or interchange rates, or any other Rule of any Visa Defendant or MasterCard Defendant, or any agreement involving any Visa Defendant or any MasterCard Defendant and any other Rule 23(b)(3) Settlement Class Released Party, and/or any merchant arising out of or relating to interchange rules, interchange fees, or interchange rates, card issuance, or card acceptance with respect to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

(b) any Merchant Fee of any Rule 23(b)(3) Settlement Released Party relating to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

(c) any actual or alleged "no surcharge" rules, "honor all cards" rules, "no minimum purchase" rules, "no discounting" rules, "non-discrimination" rules, "anti-steering" rules, Rules that limit merchants in favoring or steering customers to use certain payment systems, "all outlets" rules, "no bypass" rules, or "no multi-issuer" rules, or any other actual or alleged Rule of any Rule 23(b)(3) Settlement Class Released Party relating to any Visa-Branded Cards or any MasterCard-Branded Cards, or a merchant's point of sale practices relating to any Visa-Branded Cards or any MasterCard-Branded Cards;

(d) any actual or alleged agreement (i) between or among any Visa Defendant and any MasterCard Defendant, (ii) between or among any Visa Defendant or MasterCard Defendant and any other Rule 23(b)(3) Settlement Class Released Party or Parties, or (iii) between or among any Visa Defendant, MasterCard Defendant, or any other Rule 23(b)(3) Settlement Class Released Party or Parties relating to conduct or Rules of any Visa Defendant or any MasterCard Defendant;

(e) any reorganization, restructuring, initial or other public offering, or other corporate structuring of any Visa Defendant or MasterCard Defendant;

(f) any service of an employee or agent of any Rule 23(b)(3) Settlement Class Released Party on any board or committee of any Visa Defendant or MasterCard Defendant;

(g) the future effect in the United States of the continued imposition of or adherence to any Rule of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order,

# A2100

any Rule modified or to be modified pursuant to this Class Settlement Agreement, or any Rule that is substantially similar to any Rule in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order or any Rule modified or to be modified pursuant to this Class Settlement Agreement;

(h) the future effect in the United States of any conduct of any Rule 23(b)(3) Settlement Class Released Party substantially similar to the conduct of any Rule 23(b)(3) Settlement Class Released Party related to or arising out of interchange rules, interchange fees, or interchange rates, any Rule of any Visa Defendant or MasterCard Defendant modified or to be modified pursuant to this Class Settlement Agreement, any other Rule of any Visa Defendant or any MasterCard Defendant in effect as of the date of the Court's entry of the Class Settlement Preliminary Approval Order, or any Rule substantially similar to any of the foregoing Rules;

(i) any conduct of this Action, including without limitation any settlement discussions relating to this Action, the negotiation of and agreement to this Class Settlement Agreement by the Defendants or any member or customer financial institution of the Visa Defendants or the MasterCard Defendants, or any terms or effect of this Class Settlement Agreement (other than claims to enforce this Class Settlement Agreement), including any changes in the Rule 23(b)(3) Settlement Class Released Parties' Rules as a result of this Class Settlement Agreement;

and it is expressly agreed, for purposes of clarity, without expanding or limiting the foregoing, that any claims based on or relating to (a)-(i) above are claims that were or could have been alleged in this Action.

34. Each Rule 23(b)(3) Settlement Class Releasing Party further expressly and irrevocably waives, and fully, finally, and forever settles and releases, any and all defenses, rights, and benefits that the Rule 23(b)(3) Settlement Class Releasing Party may have or that may be derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the release contained in the preceding Paragraphs 31-33. Without limiting the generality of the foregoing, each Rule 23(b)(3) Settlement Class Releasing Party expressly and irrevocably waives and releases any and all defenses, rights, and benefits that the Rule 23(b)(3) Settlement Class Releasing Party might otherwise have in relation to the release by virtue of the provisions of California Civil Code Section 1542 or similar laws of any other state or jurisdiction. SECTION 1542 PROVIDES: "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." In addition, although each Rule 23(b)(3) Settlement Class Releasing Party may hereafter discover facts other than, different from, or in addition to those that it or he or she knows or believes to be true with respect to any claims released in the preceding Paragraphs 31-33, each Rule 23(b)(3) Settlement Class Releasing Party hereby expressly waives, and fully, finally, and forever settles, discharges, and releases, any known or unknown, suspected or unsuspected, contingent or non-contingent claims within the scope of the preceding Paragraphs 31-33, whether or not concealed or hidden, and without regard to the subsequent discovery or existence of such other, different, or additional facts. Class Plaintiffs acknowledge, and the members of the Rule 23(b)(3) Settlement Class shall be deemed by operation of the Class Settlement Order and Final Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of this Class Settlement Agreement.

35. Each Rule 23(b)(3) Settlement Class Releasing Party covenants and agrees that it shall not, hereafter, seek to establish, or permit another to act for it in a representative capacity to seek to

establish, liability against any of the Rule 23(b)(3) Settlement Class Released Parties based, in whole or in part, upon any conduct covered by any of the claims released in Paragraphs 31-34 above.

36. For avoidance of doubt, no other provision of this Class Settlement Agreement releases any claim of a Rule 23(b)(3) Settlement Class Releasing Party that is based on:

(a) breach of this Class Settlement Agreement;

(b) standard commercial disputes arising in the ordinary course of business under contracts or commercial relations regarding loans, lines of credit, or other related banking or credit relations, individual chargeback disputes, products liability, breach of warranty, misappropriation of cardholder data or invasion of privacy, compliance with technical specifications for a merchant's acceptance of Credit Cards or Debit Cards, and any other dispute arising out of a breach of any contract between any of the Rule 23(b)(3) Settlement Class Releasing Parties and any of the Rule 23(b)(3) Settlement Class Released Parties; provided, however, that Paragraphs 31-35 [of the Class Settlement Agreement] and not this Paragraph shall control in the event that any such claim challenges the legality of interchange rules, interchange rates, or interchange fees, or any other Rule fee, charge, or other conduct covered by any of the claims released in Paragraphs 31-35 above; or

(c) the claims alleged in the currently operative complaints against the current defendants in (i) *NACS, et al. v. Board of Governors of the Federal Reserve System,* No. 11-CV-02075-RJL (D.D.C.), and (ii) *In re ATM Fee Antitrust Litigation,* No. 04-CV-02676-CRB (N.D. Cal) (including claims that have been asserted to have been alleged in the Second Amended and Third Amended Complaints against Bank of America, N.A.).

37. Each Rule 23(b)(3) Settlement Class Releasing Party further releases each of the Visa Defendants, MasterCard Defendants, and Bank Defendants and their counsel and experts in this Action from any claims relating to the defense of this Action, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement. Each Visa Defendant, MasterCard Defendant, and Bank Defendant releases the Class Plaintiffs, the other plaintiffs in the Class Actions, Class Counsel, Class Plaintiffs' other counsel who have participated in any settlement conferences before the Court for a Class Plaintiff that executes this Class Settlement Agreement, and their respective experts in the Class Actions, from any claims relating to their institution or prosecution of the Class Actions, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement.

38. In the event that this Class Settlement Agreement is terminated pursuant to Paragraphs 96-98 below, or any condition for the Settlement Final Approval Date is not satisfied, the release and covenant not to sue provisions of Paragraphs 31-37 above shall be null and void and unenforceable.

### 26. What is the full text of the Release for the Rule Changes Settlement Class?

66. The "Rule 23(b)(2) Settlement Class Releasing Parties" are the Class Plaintiffs, each and every member of the Rule 23(b)(2) Settlement Class, and any of their respective past, present, or future: officers and directors; stockholders, agents, employees, legal representatives, partners, and associates (in their capacities as stockholders, agents, employees, legal representatives, partners, and associates of a member of the Rule 23(b)(2) Settlement Class only); and trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns — whether or not they object to this Class Settlement Agreement, and whether or not they exercise any

# A2102

benefit provided under the Class Settlement Agreement, whether directly, representatively, derivatively, or in any other capacity.

67. The "Rule 23(b)(2) Settlement Class Released Parties" are all of the following:

(a) Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Asia Pacific Region, Visa Canada Association, Visa Central & Eastern Europe, Middle East & Africa Region, Visa Europe, Visa Europe Limited, Visa Latin America & Caribbean Region, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any Visa-Branded Cards or to acquire any Visa-Branded Card transactions.

(b) MasterCard International Incorporated, MasterCard Incorporated, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any MasterCard-Branded Cards or to acquire any MasterCard-Branded Card transactions.

(c) Bank of America, N.A.; BA Merchant Services LLC (formerly known as National Processing, Inc.); Bank of America Corporation; MBNA America Bank, N.A., and FIA Card Services, N.A.

(d) Barclays Bank plc; Barclays Bank Delaware; and Barclays Financial Corp.

(e) Capital One Bank (USA), N.A.; Capital One F.S.B.; and Capital One Financial Corporation.

(f) Chase Bank USA, N.A.; Chase Manhattan Bank USA, N.A.; Chase Paymentech Solutions, LLC; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; Bank One Corporation; and Bank One Delaware, N.A.

(g) Citibank (South Dakota), N.A.; Citibank N.A.; Citigroup Inc.; and Citicorp.

(h) Fifth Third Bancorp.

(i) First National Bank of Omaha.

(j) HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; and HSBC Bank plc.

(k) National City Corporation and National City Bank of Kentucky.

(l) SunTrust Banks, Inc. and SunTrust Bank.

(m) Texas Independent Bancshares, Inc.

(n) Wachovia Bank, N.A. and Wachovia Corporation.

(o) Washington Mutual, Inc.; Washington Mutual Bank; Providian National Bank (also known as Washington Mutual Card Services, Inc.); and Providian Financial Corporation.

(p) Wells Fargo & Company and Wells Fargo Bank, N.A.

(q) Each and every entity or person alleged to be a co-conspirator of any Defendant in any of the Operative Class Complaints or any of the Class Actions.

# A2103

(r). Each of the past, present, or future member or customer financial institutions of Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Europe, Visa Europe Limited, MasterCard International Incorporated, or MasterCard Incorporated.

(s) For each of the entities or persons in Paragraphs 67(a)-(r) above, each of their respective past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, affiliates, and associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), or any other entity in which more than 50% of the equity interests are held.

(t) For each of the entities or persons in Paragraphs 67(a)-(s) above, each of their respective past, present, and future predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of any of the Defendants to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(2) Settlement Class Released Parties as defined in Paragraphs 67(a)-(s) above).

(u) For each of the entities or persons in Paragraphs 67(a)-(t) above, each of their respective past, present, and future principals, trustees, partners, officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, shareholders, advisors, predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of each of the foregoing entities to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(2) Settlement Class Released Parties as defined in Paragraphs 67(a)-(t) above).

68. This release applies solely to the Rule 23(b)(2) Settlement Class Releasing Parties. In addition to the effect of the Class Settlement Order and Final Judgment entered in accordance with this Class Settlement Agreement, including but not limited to any *res judicata* effect, the Rule 23(b)(2) Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Rule 23(b)(2) Settlement Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, *parens patriae*, or otherwise in nature, for any form of declaratory, injunctive, or equitable relief, or any damages or other monetary relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order, regardless of when such claims accrue, whether known or unknown, suspected or unsuspected, in law or in equity that any Rule 23(b)(2) Settlement Class Releasing Party now has, or hereafter can, shall, or may in the future have, arising out of or relating in any way to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(2) Settlement Class Released Party that are alleged or which could have been alleged from the beginning of time until the date of the Court's entry of the Class Settlement Preliminary Approval Order in any of the Operative Class Complaints or Class Action complaints, or in any amendments to the Operative Class Complaints or Class Action complaints, including but not limited to any claims based on or relating to:

(a) any interchange rules, interchange fees, or interchange rates, or any other Rule of any Visa Defendant or MasterCard Defendant, or any agreement involving any Visa Defendant or any MasterCard Defendant and any other Rule 23(b)(2) Settlement Class Released Party, and/or any merchant arising out of or relating to interchange rules, interchange fees, or interchange rates, card issuance, or card acceptance with respect to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

(b) any Merchant Fee of any Rule 23(b)(2) Settlement Released Party relating to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

(c) any actual or alleged "no surcharge" rules, "honor all cards" rules, "no minimum purchase" rules, "no discounting" rules, "non-discrimination" rules, "anti-steering" rules, Rules that limit merchants in favoring or steering customers to use certain payment systems, "all outlets" rules, "no bypass" rules, or "no multi-issuer" rules, or any other actual or alleged Rule of any Rule 23(b)(2) Settlement Class Released Party relating to any Visa-Branded Cards or any MasterCard-Branded Cards, or a merchant's point of sale practices relating to any Visa-Branded Cards or any MasterCard-Branded Cards;

(d) any actual or alleged agreement (i) between or among any Visa Defendant and any MasterCard Defendant, (ii) between or among any Visa Defendant or MasterCard Defendant and any other Rule 23(b)(2) Settlement Class Released Party or Parties, or (iii) between or among any Visa Defendant, MasterCard Defendant, or any other Rule 23(b)(2) Settlement Class Released Party or Parties relating to conduct or Rules of any Visa Defendant or any MasterCard Defendant;

(e) any reorganization, restructuring, initial or other public offering, or other corporate structuring of any Visa Defendant or MasterCard Defendant;

(f) any service of an employee or agent of any Rule 23(b)(2) Settlement Class Released Party on any board or committee of any Visa Defendant or MasterCard Defendant;

(g) the future effect in the United States of the continued imposition of or adherence to any Rule of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order, any Rule modified or to be modified pursuant to this Class Settlement Agreement, or any Rule that is substantially similar to any Rule in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order or any Rule modified or to be modified pursuant to this Class Settlement Agreement;

(h) the future effect in the United States of any conduct of any Rule 23(b)(2) Settlement Class Released Party substantially similar to the conduct of any Rule 23(b)(2) Settlement Class Released Party related to or arising out of interchange rules, interchange fees, or interchange rates, any Rule of any Visa Defendant or MasterCard Defendant modified or to be modified pursuant to this Class Settlement Agreement, any other Rule of any Visa Defendant or any MasterCard Defendant in effect as of the date of the Court's entry of the Class Settlement Preliminary Approval Order, or any Rule substantially similar to any of the foregoing Rules;

(i) any conduct of this Action, including without limitation any settlement discussions relating to this Action, the negotiation of and agreement to this Class Settlement Agreement by the Defendants or any member or customer financial institution of the Visa Defendants or the MasterCard Defendants, or any terms or effect of this Class Settlement Agreement (other than claims to enforce this Class Settlement Agreement), including any changes in the Rule 23(b)(2) Settlement Class Released Parties' Rules as a result of this Class Settlement Agreement;

and it is expressly agreed, for purposes of clarity, without expanding or limiting the foregoing, that any claims based on or relating to (a)-(i) above are claims that were or could have been alleged in this Action.

Provided, however, that any Opt Out that is also a member of the Rule 23(b)(2) Settlement Class shall not be deemed to have released any claims for damages based on

# A2105

any Rules or other conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party prior to the date of the Court's entry of the Class Settlement Preliminary Approval Order.

69. Each Rule 23(b)(2) Settlement Class Releasing Party further expressly and irrevocably waives, and fully, finally, and forever settles and releases, any and all defenses, rights, and benefits that the Rule 23(b)(2) Settlement Class Releasing Party may have or that may be derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the release contained in the preceding Paragraphs 66-68. Without limiting the generality of the foregoing, each Rule 23(b)(2) Settlement Class Releasing Party expressly and irrevocably waives and releases any and all defenses, rights, and benefits that the Rule 23(b)(2) Settlement Class Releasing Party might otherwise have in relation to the release by virtue of the provisions of California Civil Code Section 1542 or similar laws of any other state or jurisdiction. SECTION 1542 PROVIDES: "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." In addition, although each Rule 23(b)(2) Settlement Class Releasing Party may hereafter discover facts other than, different from, or in addition to those that it or he or she knows or believes to be true with respect to any claims released in the preceding Paragraphs 66-68, each Rule 23(b)(2) Settlement Class Releasing Party hereby expressly waives, and fully, finally, and forever settles, discharges, and releases, any known or unknown, suspected or unsuspected, contingent or non-contingent claims within the scope of the preceding Paragraphs 66-68, whether or not concealed or hidden, and without regard to the subsequent discovery or existence of such other, different, or additional facts. Class Plaintiffs acknowledge, and the members of the Rule 23(b)(2) Settlement Class shall be deemed by operation of the Class Settlement Order and Final Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of this Class Settlement Agreement.

70. Each Rule 23(b)(2) Settlement Class Releasing Party covenants and agrees that it shall not, hereafter, seek to establish, or permit another to act for it in a representative capacity to seek to establish, liability against any of the Rule 23(b)(2) Settlement Class Released Parties based, in whole or in part, upon any conduct covered by any of the claims released in Paragraphs 66-69 above.

71. For purposes of clarity, it is specifically intended for the release and covenant not to sue provisions of Paragraphs 66-70 above to preclude all members of the Rule 23(b)(2) Settlement Class from seeking or obtaining any form of declaratory, injunctive, or equitable relief, or damages or other monetary relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order with respect to any Rule of any Visa Defendant or any MasterCard Defendant, and the compliance by any Bank Defendant with any such Rule, as it is alleged to exist, now exists, may be modified in the manner provided in Paragraphs 40-45 and 53-57 above, or may in the future exist in the same or substantially similar form thereto.

72. For avoidance of doubt, no other provision of this Class Settlement Agreement releases any claim of a Rule 23(b)(2) Settlement Class Releasing Party that is based on:

(a) breach of this Class Settlement Agreement;

(b) standard commercial disputes arising in the ordinary course of business under contracts or commercial relations regarding loans, lines of credit, or other related banking or credit relations, individual chargeback disputes, products liability, breach of warranty, misappropriation of cardholder data or invasion of privacy, compliance with technical specifications for a merchant's acceptance of Credit Cards or Debit Cards, and any other

dispute arising out of a breach of any contract between any of the Rule 23(b)(2) Settlement Class Releasing Parties and any of the Rule 23(b)(2) Settlement Class Released Parties; provided, however, that Paragraphs 66-71 above and not this Paragraph shall control in the event that any such claim challenges the legality of interchange rules, interchange rates, or interchange fees, or any other Rule, fee, charge, or other conduct covered by any of the claims released in Paragraphs 66-71 above;

(c) the claims alleged in the currently operative complaints against the current defendants in (i) *NACS, et al. v. Board of Governors of the Federal Reserve System*, No. 11-CV-02075-RJL (D.D.C.), and (ii) *In re ATM Fee Antitrust Litigation*, No. 04-CV-02676-CRB (N.D. Cal) (including claims that have been asserted to have been alleged in the Second Amended or Third Amended Complaints against Bank of America, N.A.); or

(d) a claim seeking only injunctive relief against only the Visa Defendants regarding the legality of Visa's Fixed Acquirer Network Fee.

73. Each Rule 23(b)(2) Settlement Class Releasing Party further releases each of the Visa Defendants, MasterCard Defendants, and Bank Defendants and their counsel and experts in this Action from any claims relating to the defense of this Action, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement. Each Visa Defendant, MasterCard Defendant, and Bank Defendant releases the Class Plaintiffs, other plaintiffs in the Class Actions, Class Counsel, Class Plaintiffs' other counsel who have participated in any settlement conferences before the Court for a Class Plaintiff that executes this Class Settlement Agreement, and their respective experts in the Class Actions, from any claims relating to their institution or prosecution of the Class Actions, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement.

74. In the event that this Class Settlement Agreement is terminated pursuant to Paragraphs 96-98 below, or any condition for the Settlement Final Approval Date is not satisfied, the release and covenant not to sue provisions of Paragraphs 66-73 above shall be null and void and unenforceable.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

| | | |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : | |
| FEE AND MERCHANT DISCOUNT | : | MDL No. 1720(JG)(JO) |
| ANTITRUST LITIGATION | : | |
| | : | **OBJECTION OF** |
| | : | **NATIONAL COMMUNITY** |
| | : | **PHARMACISTS ASSOCIATION** |
| | : | **TO FINAL APPROVAL OF THE** |
| | : | **PROPOSED SETTLEMENT** |

-----------------------------------------------------------x

**DECLARATION OF NATIONAL COMMUNITY PHARMACISTS ASSOCIATION**

B. Douglas Hoey hereby declares pursuant to 28 U.S.C. § 1746:

1.     I am the Chief Executive Officer of the National Community Pharmacists Association ("NCPA").  I have spent more than twenty years working in and representing community pharmacies.  I submit this declaration on behalf of NCPA to object to the proposed settlement in the interchange case and in support of the opposition to the motion for final approval.

2.     I am a licensed pharmacist in Oklahoma, Virginia, and Texas and practiced for five years in community and Long Term Care settings contributing to the development of expansions into durable medical equipment and home infusion. For five years, I also developed and taught pharmacology courses at George Washington University and Marymount universities. I am a member of the Board of Directors for SureScripts, Mirixa, Pharmacy e-Health Information Technology, the Pharmacy Compounding Accreditation Board, and the Pharmacy Quality Alliance.

3.     I have held the position of CEO since 2011.  I was hired by NCPA in October 1996 as Associate Director and later Director of Student Affairs.  I was promoted to Vice President of Practice Affairs in 2001 and then Senior Vice President in July 2003.  In September

2005, I became Chief Operating Officer.

4.      In my role as CEO of NCPA and my prior role as COO, I am knowledgeable about independent pharmacies' acceptance of debit and credit card transactions running on all payment networks, including Visa and MasterCard, and payment of interchange fees for transactions completed over those networks.  Interchange and other card acceptance fees are of great concern to independent pharmacies, which generally cite these fees as a significant operating expense that is one of their least controllable costs.

5.      NCPA, founded in 1898, represents the interests of America's community pharmacists, including the owners, managers, and employees of more than 23,000 independent community pharmacies across the United States.  Together independent pharmacies represent an almost $90 billion health care marketplace, dispense nearly 40 percent of all retail prescriptions, and employ more than 315,000 people, including 62,400 pharmacists.

6.      Independent pharmacies process millions of payment card transactions each year, representing as much as $1 million per store in sales volume.  Depending on the pharmacy's location, customers, and payment mix, a significant percentage of revenues are derived through credit card transactions.  Independent pharmacies have paid hundreds of millions of dollars in credit and debit card interchange fees since 2004.

7.      NCPA is a named plaintiff in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*.  After closely reviewing the Proposed Settlement, NCPA's board unanimously concluded that the settlement is insufficient and that accepting it would not be in the best interest of merchants and the independent community pharmacy owners that NCPA represents.

8.      NCPA joined this lawsuit to achieve meaningful, long-term reforms to the current

swipe fee system. This proposed settlement came woefully short by not imposing necessary fundamental changes to the structure of the industry and the rules affecting merchants, particularly small business community pharmacies.

9.      Several specific provisions illustrate how the proposed settlement falls short. First, while the settlement appears to offer merchants the ability to pass along some excessive credit card fees to their customers in order to incentivize consumers to use alternative, lower-cost methods of payment, enough strings are attached and existing barriers exist to effectively eliminate this as an option.

10.     Second, despite the fact that this proposal does little to reform a badly broken system, the settlement broadly curtails pharmacies and other merchants from taking any future action against the credit card companies by releasing any and all claims for all Visa and MasterCard rules going forward.

11.     Finally, nothing in this agreement restrains the credit card companies from imposing significantly higher fees for years to come, effectively wiping out the monetary component of the settlement.

12.     NCPA believes that a revised settlement should hold credit card networks and issuers accountable, ensure competition in the market, and encourage innovation in payment systems.

## II.      THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

13.     In their motion for preliminary approval, Class Counsel represented that the mediators' December 2011 proposals to resolve this litigation "were accepted by all parties" (Prelim. App. Mot. at 9). This is not true because NCPA and other named plaintiffs opposed them. In their submission in support of final approval, Class Counsel now asserts that by

3

February 21, 2012, the class representatives "had agreed to negotiate toward a final settlement agreement through the processes laid out by the mediators and the Court." (Final App. Mot. at 4-5). Despite this claim, neither I nor anyone else at NCPA agreed to the Proposed Settlement. Given the confidentiality agreement protecting discussions during the mediation process, I can only describe the events of that process in generalized terms. However, even in generalized terms, it is clear that NCPA's concerns about the mediators' proposals were not only not welcomed by Class Counsel, but also ignored.

14.     The mediation that ultimately resulted in the Proposed Settlement began in 2008.

15.     In late November 2011, however, NCPA discovered that Class Counsel had made proposals to Visa and MasterCard, through the mediators, without NCPA's knowledge or consent. NCPA believed that the proposals made without its knowledge severely compromised the negotiating position of the class to the point that NCPA would not have agreed to them. NCPA understands that Class Counsel had received an offer of settlement from the defendants that had not been disclosed to NCPA. In that same month, Class Counsel again submitted a mediation statement that included detailed proposals without first receiving authority to do so from NCPA.

16.     In January 2012, Class Counsel accepted the mediators' proposals over the objections of NCPA and several other named plaintiffs. NCPA, in fact, and several other named plaintiffs registered their opposition to the proposals and Class Counsel's acceptance of them.

17.     Even though it dissented from the mediators' proposals, NCPA nonetheless continued to work constructively within the mediation process to try to salvage something of value from the emerging settlement. NCPA did so with the understanding that it maintained the right to oppose the settlement at a preliminary approval or final fairness hearing if a settlement

that ultimately resulted from the discussions was not acceptable to NCPA.

18.     When the Proposed Settlement agreement was filed with the Court on July 13, 2012, NCPA had not seen the final text including the final release.  The filed document appeared to indicate that NCPA agreed with the Proposed Settlement, but that was not the case.

19.     NCPA is opposed to the Proposed Settlement because it has serious shortcomings for NCPA and its members.  It does not address Visa's and MasterCard's price-fixing of interchange rates for the banks, the subject of the core claims in the case.  The Proposed Settlement actually validates that practice, enabling Visa and MasterCard to continue to illegally fix fees for the banks that our members have no choice but to pay.  NCPA and its  members' portion of the compensatory relief amounts to only a small fraction of what they pay in interchange, and given that Visa and MasterCard can continue to fix interchange, they can recoup the settlement amount by raising interchange rates in the future as they have done with past settlements.

20.     Instead of addressing the core claims in the case, the settlement merely provides NCPA and its members with limited ability to surcharge Visa and MasterCard credit card transactions that is of little or no value to NCPA or its members.  Moreover, the Proposed Settlement deprives NCPA and its members of the ability to bring claims for damages resulting from the ongoing harm imposed by Visa and MasterCard's interchange fees.

   **A.     The Surcharging Rule Changes Do Not Give NCPA's Members the Ability to Surcharge Visa and MasterCard Credit Card Transactions**

21.     It is clear that the rules changes in the settlement offer NCPA's members no practical ability to surcharge, and actually maintain prohibitions against surcharging.  Merchants cannot surcharge Visa and MasterCard debit transactions, which often comprise a substantial percentage of our members' Visa and MasterCard transactions.  From a practical standpoint, the

limitations in the settlement effectively maintain the prohibition against Visa and MasterCard credit transactions as well.

### 2. Pharmacies Face Unique Constraints on Their Ability to Surcharge

22.    Pharmacies may be explicitly prohibited from surcharging customers in their contracts for services with health insurers and pharmacy benefit managers.  Moreover, surcharging is at best questionable under the Centers for Medicare & Medicaid Services' regulations.  Given these prohibitions and uncertainty, pharmacies do not have any realistic ability nor would they take the risk of violating a contract or regulation to use surcharging to create market pricing pressure.

### 3. The Competitive Card Brand Limitation Makes Surcharging Impossible for NCPA and Many of NCPA's Members

23.    The rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is as or more expensive than Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brand – primarily American Express.  If a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would be required to surcharge American Express transactions.  American Express Rule 3.2 would then require the merchant to surcharge all payment cards equally, including debit cards (which may represent a significant portion of NCPA's members' total MasterCard and Visa transactions) and brands or card-products with lower acceptance costs.  Doing that makes no sense, as the point of surcharging is supposed to be to encourage customers to use less expensive forms of payment and to play one card brand against the other to introduce price competition in the industry.

24.    The only theoretical alternative would be to stop accepting American Express –

something that many of NCPA's members cannot realistically do as it often accounts for a significant portion our members' payment card sales.  For NCPA, American Express represents as much as 45% of credit card revenues in some months.  Dropping American Express is not a viable business proposition for NCPA or many of our members.

25.     If merchants drop American Express, this would only further increase the market power of Visa and MasterCard.  Mandatory rules changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate result of this eight-year antitrust case.

26.     The effect of the Competitive Card Brand limitation concerning American Express effectively maintains the prohibition against surcharging MasterCard and Visa credit card transactions for NCPA's members.

### 4.     Surcharging Is Prohibited by Law in 11 States and Puerto Rico, and a Growing List of States May Also Ban the Practice

27.     NCPA's members do business in every one of the 11 states where surcharging is illegal: California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, Texas, and Utah.

28.     Of the approximately 23,000 independent pharmacies in the United States, over 8,700 operate principally or entirely within states that ban surcharging and would be subject to the surcharging prohibition.  These independent pharmacies would get virtually nothing from the settlement.

29.     I am aware that 20 other states have introduced bills that would ban credit card surcharges.  These include states where many of our members are located, including Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee,

Vermont, West Virginia, and Washington.  Combined with states that already ban surcharging, approximately 78% of our members operate principally or entirely within these states.  Even if our members were inclined to surcharge, the mere fact that these states have considered measures to ban surcharging would chill any efforts to surcharge in these states.

### B.    The Release Is Far Too Broad

30.    The Proposed Settlement's release is extremely concerning to NCPA.  The release covers claims concerning the core practices at issue in this case -- the default-interchange rules, the setting of interchange fees, and the Honor All Cards rules -- even though the settlement does not change those practices.  And the release purports to cover those rules and practices, forever, which we find deeply concerning given Visa's and MasterCard's market power over us and our members.

31.    The Proposed Settlement requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards."  Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."  Visa and MasterCard likely will argue that the release covers all of their rules and conduct given its broad wording.  They also likely will argue that substantially similar rules and conduct going forward will be released.  This could cover virtually everything Visa and MasterCard do going forward.  We find it deeply unfair that we have no ability to opt out of such a release.

*       *       *       *

32.     Based on the current Proposed Settlement, it is clear to me that the lawyers who negotiated the settlement did not adequately represent the interests of NCPA or its members.

33.     NCPA is represented in this matter by:

Jeffrey I. Shinder
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700
jshinder@constantinecannon.com

34.     NCPA joins in the opposition to the motion for final approval being filed by the Objecting Plaintiffs and absent class members represented by Constantine Cannon LLP, setting forth additional legal and factual grounds for NCPA's Objection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28, 2013

B. Douglas Hoey
Chief Executive Officer
National Community Pharmacists Association
100 Daingerfield Road
Alexandria, VA 22314

# A2116

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | | |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : | |
| FEE AND MERCHANT DISCOUNT | : | MDL No. 1720(JG)(JO) |
| ANTITRUST LITIGATION | : | |
| | : | **STATEMENT OF** |
| | : | **OBJECTIONS AND AMICI** |
| This Document Relates To: | : | **CURIAE BRIEF OF STATES** |
| | : | **TO FINAL APPROVAL OF** |
| ALL CLASS ACTIONS. | : | **THE SETTLEMENT** |
| | : | |

-------------------------------------------------------------x

## I.    INTRODUCTION AND SUMMARY OF OBJECTIONS

The States of Ohio, Alaska, Arizona, California, Georgia, Indiana, Maryland, Virginia, and Wisconsin, through their attorneys general ("Objecting States"),[1] file this statement of objections to final approval of the MDL 1720 Visa and MasterCard Settlement.   Additionally, the States of Ohio, New York, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming through their attorneys general ("Amici States"), file this amici curiae brief in support of the objections raised by the Objecting States.   (Collectively, the Objecting States and the Amici States shall be referred to as "the Objecting/Amici States.")

---

[1] For purposes of these Objections, the Attorneys General of the Objecting States represent numerous governmental entities that may be members of either or both settlement classes provided for in the proposed settlement.  The Objecting States identify certain specific class members on the attached Addendum 1in accordance with the requirements of Paragraph 20 of the Preliminary Approval Order, Dkt. No. 1745.

The parties to this action have negotiated a settlement agreement (the "Settlement Agreement") in which the parties attempt to release *parens patriae* and other claims for various forms of relief including damages and "fines, civil or other penalties." *Parens patriae* claims, however, belong uniquely and exclusively to the states acting (usually) through their attorneys general, and cannot be brought or released through private class actions. Similarly, "fines, civil or other penalties" are governmental remedies that are not available in a private class action, either as a claim or as an element of a negotiated release.

While the Objecting/Amici States are always concerned about overreach, our concern is magnified because the Settlement Class Releasing Parties[2] may include state governmental units and related entities that accept credit cards. As drafted, the Settlement Agreement opens the door for Defendants to assert settlement releases against attorneys general or other law enforcement agencies in future law enforcement actions related to the payment card industry, through creative arguments that state attorneys general and the States themselves are, *e.g.,* the "legal representatives," "agents," "affiliates" or "parents" of state government-related, credit card-accepting entities that fall within the definition of "Settlement Class Releasing Parties." Read plainly, the settlement agreement purports to release claims that are uniquely and exclusively claims belonging to the States as sovereigns.[3]

Defendants are not entitled to, and Class Plaintiffs cannot provide, a release encompassing state law enforcement or *parens patriae* claims. All references to *parens patriae,* and to fines and civil or other penalties, must be deleted from the release language, and the

---

[2] Unless otherwise noted, capitalized terms have the same meaning as in the Definitive Class Settlement Agreement, Dkt. No. 1656-1.

[3] References to the States as sovereign must be qualified with respect to the District of Columbia, which is not itself sovereign but does have governmental claims based on its "quasi-sovereign interest in the . . . well-being . . . of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982) (applying analysis to Puerto Rico).

Settlement Agreement should state expressly that no state or local governmental entity or official (including state attorneys general) that acts in a law enforcement or *parens patriae* capacity is a Settlement Class Releasing Party.  Only claims that arise solely from a state or local government entity's activities as a merchant may be released, and then only if that entity elects to remain in the (b)(3) class.

The Objecting/Amici States have alerted the settling parties to the issue raised here, and have met with Defense counsel, as well as communicated with all parties' counsel on several occasions.  Because they are unwilling to modify the release language in the Settlement Agreement to exclude *parens patriae* references, we submit this Statement of Objections and Amici Curiae Brief.

## II.    INTEREST OF AMICI CURIAE

Objecting/Amici States, through their Attorneys General – the chief law enforcement officers of their States – have a duty to enforce the law and protect their States and citizens. States are authorized to bring suit under federal law in their *parens patriae* capacity to protect their general economies and their citizens. *See Georgia v. Pennsylvania R.R.,* 324 U.S. 439, 446-47 (1945).  The attorneys general are empowered to "secure monetary relief" on behalf of "natural persons residing" in their states under the Clayton Act, 15 U.S.C. § 15c.  Many states are also authorized under state statutory and common law to proceed as *parens patriae* to enforce state and federal antitrust laws on behalf of their citizens and their general economies.  Those state authorizations often go beyond Clayton Act *parens patriae,* to authorize suits related to downstream purchasers as well as direct purchasers, and businesses as well as natural persons. This is in addition to the attorneys general's representation of government entities, state agencies, municipalities, and political subdivisions that can be harmed by antitrust violations and

other unlawful acts and practices. Attorneys General have enforcement rights accorded sovereigns, which are different and distinct from the rights accorded class representatives.

The Objecting/Amici States have a strong interest in preserving the rights and powers that are integral to the performance of their duty to protect their states' economies and their citizens. For this reason, the Objecting States object to the proposed settlement and the Amici States submit this amici curiae brief to protect their sovereignty and the law enforcement authority granted attorneys general.

## III.   THE ALLEGATIONS OF THE CASE

Plaintiffs in this litigation challenge Visa's and MasterCard's Honor All Cards rules, default interchange rules, anti-steering rules and initial public offerings ("IPOs"). The Honor All Cards rules allegedly require merchants to accept all Visa/MasterCard credit cards or all Visa/MasterCard debit cards regardless of issuer. The default-interchange rules allegedly force merchants to pay supracompetitive interchange fees on all Visa and MasterCard transactions – credit or debit. The anti-steering rules allegedly are illegal restraints on trade. *See, e.g.*, Dkt. No. 1153 at ¶¶ 4, 8(c), (d), (s), (v), (w), (x), (y), 190-99, 247, 288, 308(h); Dkt. No. 1538 at 5-6. Visa's and MasterCard's IPOs allegedly in and of themselves violated Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 7 of the Clayton Act, 15 U.S.C. §18.

## IV.   THE PROPOSED SETTLEMENT

### A.   The Settlement Classes

The proposed settlement sets forth two settlement classes: a damages settlement class (the "(b)(3) class") that includes "all persons, businesses, and other entities" that accepted Visa-Branded Cards and MasterCard-Branded Cards from January 1, 2004 to November 28, 2012 (Dkt No. 1656-1 at ¶ 2(a)), and a mandatory injunctive settlement class (the "(b)(2) class") that includes "all persons, businesses, and other entities" that accepted Visa-Branded Cards and

MasterCard-Branded Cards at the time the settlement was preliminarily approved or that do so at any time in the future. Dkt. No. 1656-1 at ¶ 2(b).

### B.    Damages

The settlement includes a cash recovery of up to $6.05 billion payable after the settlement is finally approved as compensation for past harm to members of the putative (b)(3) class that do not opt out.  Dkt. No. 1656-1 at ¶¶ 9-10, 28-30.  It also provides for payments of about $1.2 billion to members of the putative (b)(3) class for Visa and MasterCard credit card transactions occurring after final approval.

### C.    The Releases

The settlement contemplates two releases:  a (b)(3) class release from which putative class members may opt out,[4] and a mandatory (b)(2) class release – with nearly identical provisions – from which opt outs are not permitted.[5]  Thus, even if a governmental entity opts out of the (b)(3) class for damages, that entity would remain subject to the release because the proposed settlement provides it no ability to opt out of the (b)(2) class.

The States object to the proposed settlement and the settlement releases because they reach or purport to reach state law enforcement claims and other claims that may be brought only by States in their *parens patriae* capacities.  The settlement *expressly* releases *parens patriae* claims and claims for fines and penalties.  Paragraph 33 of the proposed settlement agreement provides in relevant part:

> Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the . . . Settlement Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action,

---

[4] If (b)(3) class members elect to object or opt out, they must do so by May 28, 2013.

[5] Some state entities appear to be members of the (b)(3) class to the extent that they are "entities" that accept credit cards.  State entities also appear to be members of the (b)(2) class to the extent that they accept Visa or MasterCard now or in the future.

# A2121

> whether individual, class, representative, *parens patriae,* or otherwise in nature, for damages, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred . . . .

Dkt. No. 1656-1 at ¶ 33 (emphasis added); *see also* ¶ 68 (while the release given by the (b)(2) class does not release fines and penalties, it does purport to release "parens patriae" claims).

The releases to be provided by members of both classes are exceedingly broad. They extend to claims of absent members of the putative classes along with their "agents, employees, legal representatives" and "parents, subsidiaries, divisions and affiliates" as Releasing Parties. Dkt. No. 1656-1 at ¶¶ 31, 66. This language could be interpreted to include an entire sovereign state and any local government body, such as a city or county. As discussed below, the releases invite the mischievous and overreaching argument that they bar law enforcement actions by state and local governmental law enforcers, such as a city or county prosecutor or a state attorney general's office. If given credence, such an argument would undermine law enforcement authority, both now and as to future claims.

The parties improperly have attempted to immunize the Settlement Class Released Parties (including the Visa and MasterCard Defendants) from liability in law enforcement actions. Accordingly, the States seek to limit the exceedingly broad language of the releases and also seek an express statement that the settlement and the releases do not extend to quasi-sovereign or sovereign claims, even if governmental entities for which the Attorneys General may or may not provide counsel are members of the (b)(3) and (b)(2) classes as merchants.[6]

---

[6] As long as the Defendants eliminate overbroad and vague language and reduce the scope of the release language, those changes do not require additional notice to the class members. The proposed changes would "bind" the Defendants but otherwise not impose additional burdens upon the class members who could only benefit from changes that make the releases less restrictive.

## V.    ARGUMENT

**A.    The Parties' Attempt to Release State Law Enforcement Claims Is Contrary to the Requirements of Article III Standing, the Class Standing Doctrine and Rule 23**

Under *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982), "a State has a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents in general." *Id.* at 607.  Under the antitrust laws, the States are authorized to bring suit in their *parens patriae* capacity to protect their general economies, *see Georgia v. Pennsylvania R.R.,* 324 U.S. at 446-47, to "secure monetary relief" on behalf of the "natural persons residing" in their states, 15 U.S.C. § 15c, and to represent government entities, state agencies, municipalities, and political subdivisions that can be harmed by antitrust violations. Additionally, state law gives attorneys general different and often broader authority to represent the state, governmental entities and its consumers in a *parens patriae* or other representative capacity.  *See, e.g., In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 386-87 (D.D.C. 2002) (surveying authority).

Final approval of the proposed settlement as currently drafted must be denied because the proposed settlement improperly attempts to release claims brought in States' *parens patriae* capacities, and, if a governmental enforcement entity is deemed to be a member of the class or otherwise a Releasing Party under the settlement, all state law enforcement claims pertaining to consumer protection, antitrust and other matters as well.  The proposed settlement makes express reference to *parens patriae* claims and would release "any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, *parens patriae*, or otherwise in nature" and also refers expressly to claims for "fines [and] civil or other penalties[.]"  Dkt. No. 1656-1 at ¶¶ 33, 68.

To represent absent class members in a federal class action, a class representative must satisfy Article III standing requirements, class standing requirements and the requirements of Rule 23 of the Federal Rules of Civil Procedure.  All Class Plaintiffs are non-governmental entities and cannot satisfy these requirements as to claims brought by States in their quasi-sovereign or sovereign capacities, including their *parens patriae* capacities.  Final approval of the proposed settlement must therefore be denied.

> **1.  Class Plaintiffs Lack Article III Standing to Assert or Release *Parens Patriae* Claims**

To demonstrate constitutional standing, a plaintiff must satisfy the Article III minima of injury-in-fact, causation and redressability.  *See Mahon v. Ticor Title Ins. Co*., 683 F.3d 59, 62 (2d Cir. 2012).  Article III standing requirements must be satisfied in every federal action, but are particularly important here because of the effect the proposed settlement would have on state law enforcement authority.  "The law of Article III standing . . . is built on separation-of-powers principles."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013).  It "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id*.  The parties in this case are attempting to use the Court's authority under Rule 23(e) of the Federal Rules of Civil Procedure to foreclose state law enforcement actions authorized by state legislatures and prosecuted by elected officials.  Such an attempt should be of special concern to this Court.  One purpose of Article III is to limit the reach of judicial power into such areas.  *See Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009) ("[A]llowing courts to oversee legislative or executive action would significantly alter the allocation of power . . . away from a democratic form of government." (quotations and citations omitted)).

Here, Class Plaintiffs lack standing with regard to *parens patriae* claims because they cannot satisfy the injury-in-fact requirement of Article III.  Under the *parens patriae* doctrine,[7] "'States litigate to protect 'quasi-sovereign' interests.'" *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013), quoting *Connecticut v. Cahill,* 217 F.3d. 93, 97 (2d Cir. 2000).  A State's quasi-sovereign interests are "distinct from the interests of particular private parties" and include a State's "interest in the health and well-being — both physical and economic — of its residents in general." *Id.*, quoting *Alfred L. Snapp & Son, Inc.,* 458 U.S. at 607.[8]   In a *parens patriae* action, a State satisfies the injury-in-fact requirement of Article III by demonstrating an injury to its quasi-sovereign interests. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601 ("[T]o have . . . standing the State must assert an injury to . . . a 'quasi-sovereign' interest.").

As private parties, Class Plaintiffs have no quasi-sovereign interests.  By definition, quasi-sovereign interests are "distinct from the interests of particular private parties[.]" *See Purdue Pharma L.P.*, 704 F.3d at 215.  Because they have no quasi-sovereign interests, Class Plaintiffs cannot demonstrate any injury-in-fact to those interests.  Class Plaintiffs therefore have no Article III standing with regard to the States' *parens patriae* claims.

Class Plaintiffs cannot remedy their lack of Article III standing to bring *parens patriae* claims by showing injury-in-fact for other claims.  "It is well established that a plaintiff must demonstrate standing for each claim [s]he seeks to press. . . . *[W]ith respect to each asserted*

---

[7] States may also pursue litigation in other capacities. *See Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013), quoting *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000): "States generally file suit in federal court in one of three capacities: (1) proprietary suits in which the State sues much like a private party suffering a direct, tangible injury; (2) sovereignty suits requesting adjudication of boundary disputes or water rights; or (3) *parens patriae* suits in which States litigate to protect quasi-sovereign interests.").

[8] *See also generally Purdue Pharma L.P.*, 704 F.3d at 215, quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 257 (1972) ("'The *parens patriae* (i.e., "parent of the country") doctrine has its antecedent in the common-law concept of the "royal prerogative," that is, the king's inherent power to act as the guardian for those under legal disabilities to act for themselves.'")

*claim*, [a] plaintiff must always have suffered a distinct and palpable injury to [her]self."  *Mahon*, 683 F.3d at 64 (emphasis in original; quotations and citations omitted).  Even if there is an arguable basis for *parens patriae* standing for putative class members (such as, for example, certain governmental entities that have accepted the payment cards at issue in the litigation), that fact would not establish Article III standing.  Class Plaintiffs *themselves* must have Article III standing and injury-in-fact.  *Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996): "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  (citations and quotations omitted)).  *See Cent. States SE. & SW. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005) (quoting *Allee v. Medrano*, 416 U.S. 802, 828-29 (1974) (Burger, C.J., concurring and dissenting): "[A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share.  Standing cannot be acquired through the back door of a class action.").

In sum, Article III "[s]tanding is a federal jurisdictional question determining the power of the court to entertain the suit.  [A] plaintiff must demonstrate standing for each claim and form of relief sought." *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) (quotations and citations omitted).  Where, as here, class representatives attempt to invoke the power of a court through the class action settlement mechanism to release claims that the class representatives have no standing to assert, the proposed settlement must be rejected.  *See, e.g., Ass'n for Disabled Americans, Inc. v. 7-Eleven, Inc.*, No. CIV. 3:01-CV-0230-H, 2002 WL 546478, at *5

10

n.4 (N.D. Tex. Apr. 10, 2002) (concluding that the Court was not authorized "to release claims by way of a settlement that the plaintiffs would have no standing to raise in any court").  As the Supreme Court has recently emphasized, "[i]n an era of frequent litigation, class actions, sweeping injunctions with prospective effect, and continuing jurisdiction to enforce judicial remedies, courts must be more careful to insist on the formal rules of standing, not less so." *Arizona Christian Sch. Tuition Org. v. Winn,* 131 S. Ct. 1436, 1449 (2011).  To approve the proposed settlement in this litigation would permit the Parties to use releases to circumvent standing requirements that Class Plaintiffs fail to meet and that prevent them from pursuing claims in federal court.  *Ass'n For Disabled Americans,* 2002 WL 546478 at *5 n.4 (allowing parties to release claims they have no standing to bring "would essentially allow the parties to adjudicate claims through the release clause of a class settlement that Article III precludes them from adjudicating before the Court.")

### 2.  Class Plaintiffs Lack Class Standing to Assert or Release *Parens Patriae* Claims

In addition to Article III requirements, a plaintiff seeking to "assert claims on behalf of" others must demonstrate that it has "class standing" under a two-factor test.  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co*., 693 F.3d 145, 158 (2d Cir. 2012) (emphasis omitted).  First, the plaintiff must "'personally ha[ve] suffered some actual . . .  injury as a result of the putatively illegal conduct of the defendant[s]."  *Id.* at 162 (citation omitted; quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)).  Second, the defendants' conduct must "implicat[e] 'the same set of concerns' as the conduct alleged to have caused injury to other members of the

putative class by the same defendants . . . ." *Id.* (citation omitted; quoting *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)).[9]

Here, Class Plaintiffs cannot meet the second requirement of the class standing test for the *parens patriae* claims. Although a class representative's circumstances need not be identical to those of absent class members, they cannot "raise . . . a 'fundamentally different set of concerns[.]'" *Id.* at 164 (quoting *Gratz*, 539 U.S. at 264). As discussed above, *parens patriae* claims are fundamentally different from the claims of non-governmental parties, such as Class Plaintiffs. *Parens patriae* claims are based on quasi-sovereign interests, such as the States' interests in the health and well-being of their residents in general, which are distinct from the interests of non-governmental parties. *See Purdue Pharma L.P.*, 704 F.3d at 215 (a State's quasi-sovereign interests are distinct from those of individual residents). Class Plaintiffs' claims in this action do not implicate "the same set of concerns" as *parens patriae* claims of the States because Class Plaintiffs, as non-governmental parties, have no quasi-sovereign interests. *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 162. Thus, Class Plaintiffs lack class standing for *parens patriae* claims and cannot proceed on behalf of others with regard to such claims. *See generally Nat'l Super Spuds, Inc. v. New York Mercantile Exch.,* 660 F.2d 9, 16 (2d Cir. 1981) ("The most fundamental principles underlying class actions limit the powers of the representative parties to the claims they possess in common with other members of the class."). *Parens patriae* claims belong only to the sovereign, and only the sovereign can assert and release them. Therefore, final approval of the proposed settlement in its current form must be denied.

---

[9] While they involve tests that include similar factors (such as an analysis of the injury suffered by the plaintiff), class standing is distinct from both Article III standing and the requirements of Rule 23(a). *See NECA-IBEW Health & Welfare Fund*, 693 F.3d at 158, 159 n.9.

12

**3.  Class Plaintiffs Cannot Satisfy Rule 23(a)(4) Adequacy Requirements as to the States' *Parens Patriae* Claims**

Finally, Class Plaintiffs cannot satisfy Rule 23(a)(4) adequacy requirements as to *parens patriae* claims for the same reason they lack standing with regard to those claims:  because Class Plaintiffs are non-governmental parties, they do not have any quasi-sovereign interests and therefore cannot have not suffered any injury to such interests.  *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("To satisfy Rule 23(a)(4), the named plaintiffs must possess the same interest[s] and suffer the same injur[ies] as the class members." (quotations and citations omitted)); 1 Newberg on Class Actions § 3:59 (5th ed. 2012)  ("If a court finds that standing is lacking, then adequacy will be as well, for a plaintiff cannot be an adequate representative for claims she does not have standing to pursue.").

Class Plaintiffs cannot rely on any purported overall fairness of the proposed settlement to overcome Rule 23(a)(4) inadequacy.  *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d. at 254 ("[A]dequacy of representation cannot be determined solely by finding that the settlement meets the aggregate interests of the class or 'fairly' compensates the different types of claims at issue.")  The Second Circuit has held that it is necessary to inquire "independently whether the interests of all class members were adequately represented."  *Id.* at 254.  Where, as here, the requirements of Rule 23(a)(4) are not met, final approval of the proposed settlement must be denied.  *See id.* at 245.

**B.  Release of States' *Parens Patriae* or Law Enforcement Claims Through a Private Class Action Settlement is Contrary to Public Policy**

State attorneys general are responsible for the legal business of their states.  Along with other state and local officials such as district or county attorneys, attorneys general are charged with enforcing numerous state laws and regulations for the protection of the public.  By defining the (b)(3) and (b)(2) classes as excluding the United States government, but otherwise

"consisting of all persons, businesses and other entities that have accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States," the parties provide Defendants with a means to argue in the future that this settlement releases not only the monetary claims of the government-related merchants who have "accepted" these credit cards, but also present and future law enforcement claims and *parens patriae* claims of state and local law enforcement bodies within the same state.  No state is a class representative in this litigation and no state has participated in negotiations leading to the settlement.  No Class Plaintiff is a governmental entity or enforcer. Including government enforcers and other governmental entities in the putative class presents unique complications that must be addressed before the settlement can be approved. Allowing imprecise and ambiguous language in settlements to jeopardize future law enforcement efforts is contrary to sound public policy.

Objecting/Amici States expect that the ambiguities explained below are curable without significantly altering the goals and intent of the settlement.  Moreover, the changes suggested by Objecting/Amici States will have no negative impact on either the relief afforded to other class members or the finality reasonably expected by the Defendants as to the claims asserted in this litigation.  Unfortunately, Objecting/Amici States have been unable to secure the necessary commitments and clarifications from the parties to address these concerns despite several months of discussions.

The Objecting States object to the proposed settlement, in part, due to the ambiguity inherent in the class definitions.  It is unclear exactly which state entities are class members and in what capacity.  State and local governmental entities functioning as merchants are covered by the class definition. Yet, they may also be considered class members in their capacities as sovereigns.  This ambiguity portends a future defense effort to assert the release against a state

enforcer (potentially including a state itself) on the ground that the enforcer is a "legal representative," "agent," or even a "parent, subsidiar[y], division or affiliate" of the releasing governmental merchant.  Even in settlements that have not included governmental entities as class members but have purported to "release" *parens patriae* claims that could be brought on behalf of class members, defendants have tried to use releases to halt future governmental enforcement actions.  *See Spinelli v. Capital One Bank,* 2012 WL 3609028 (M.D. Fla.) (defendant's motion to enjoin a future enforcement action brought by the Attorneys General of Mississippi and Hawaii based on a private class's release of claims denied on the basis that the States of Mississippi and Hawaii were not parties to the class settlement).[10]  The same could be said of the release in this action.  It is no stretch to imagine a defense argument that the inclusion of some governmental entities in the release would also reach those entities and officials who enforce the states' laws.

The question of what constitutes "agents, legal representatives, parents, subsidiaries, divisions, affiliates" in the context of a governmental or public entity is left unanswered by the proposed settlement, and thus the phrase is susceptible to multiple, and perhaps murky, interpretations of the reach of the release over the States in particular.  Consider the following scenarios:

- A public agency, with local offices that accept credit cards for payment of fees, whose director is an appointee of a State's governor or which is governed by a board of such appointees or which relies significantly upon State-budgeted funds for its operations;

---

[10] The class settlement had released the claims of natural person class members along with "all those who claim through them or who assert claims on their behalf (including the government in its capacity in *parens patriae*)." *Spinelli,* 2012 WL 3609028 at *1.

- The registrar for professional fundraisers, housed within the State Attorney General's office, that accepts payment of annual registration fees through the use of credit cards;

- A governmental agency that accepts payments through credit cards only because another agency or, perhaps, a separate State official such as the State's treasurer, has established a master contract with a third party vendor who processes any credit card transactions in return for the consumer's payment of a "convenience fee," or

- A governmental entity or elected official that has entered into a prime vendor contract with a third party processor that enables residents to pay fees and taxes to various state agencies with their credit cards.

These examples illustrate the common connections and inter-dependencies that exist among governmental and public entities. As the proposed settlement is currently drafted, the acceptance of credit cards by a single agency – such as a division overseeing state parks and the rental of campsites – risks pulling all of a State's governmental operations into the definition of "Settlement Class Releasing Parties" under the inexact language of the Settlement Agreement. The settlement's release arguably includes entities who only "accept" payment through credit cards that are entirely processed through a third party vendor that has the actual relationship with a credit card network. To prevent overreaching, the Settlement Agreement should be clear that governmental entity claims are released *only* with respect to the entity's capacity as an actual card-accepting merchant, and that no law enforcement or *parens patriae* claims of that entity or any other governmental entity are released, regardless of any relationship between the releasor and the other entity.

Regardless of whether a state enforcer, including an attorney general's office, is deemed to be a member of a class as that class is defined, a private settlement cannot release law

enforcement or *parens patriae* claims.  *See Hathorn v. Lovorn,* 457 U.S. 255, 269 (1982) (private party resolution of claims under the Voting Rights Act do not bind the Attorney General where he was not a party to the private litigation); *Herman v. South Carolina National Bank,* 140 F.3d 1413, 1425 (11th Cir. 1998) (despite a $12 million settlement and the approval by a court at a "fairness" hearing, "government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests"); *Spinelli,* 2012 WL 3609028 (court approval of private settlement did not bind the states of Mississippi and Hawaii because their Attorneys General did not participate in the litigation); *see also Durfee v. Duke*, 375 U.S. 106, 116 (1963) (private litigation over title to land cannot bind the state as to its sovereignty over the land in question).

Moreover, the claims of law enforcement and sovereigns in general *should not* be compromised in this way.  Courts have recognized the distinct and broader role of law enforcement compared to non-governmental actions, even when a non-governmental action may obtain restitution or other relief for private parties. *See, e.g., Commodity Futures Trading Comm'n v. Commercial Hedge Servs., Inc.,* 422 F. Supp. 2d 1057, 1061 (D. Neb. 2006) (concluding that prior private settlement did not bar the CFTC from seeking restitution from defendants: "[W]hen private parties settle their disputes without the approval or consent of the Commission, those settlements cannot preclude the Commission from later seeking additional or more full restitution or any other remedy."). Non-governmental parties' dispute resolution practices are not equivalent to the distinct deterrence function reserved to law enforcement.

As currently drafted, the proposed settlement seeks to release claims typically brought by government enforcers asserting that a business practice violates state or federal law and regulations – including actions when the enforcer seeks recovery of monies wrongfully obtained

through an unlawful practice, such as monetary relief based on *parens patriae* standing. Government enforcers bring many actions that seek to end illegal practices through injunctions and other equitable remedies, as well as civil penalties and other ancillary relief, such as their own litigation costs. Government enforcers also bring criminal actions for fines and other relief. The parties should not be permitted to use their private settlement to place Defendants beyond the reach of state law enforcement.

Objecting/Amici States request that the Settlement be rejected unless all law enforcement or *parens patriae* claims of governmental enforcers, including governmental entities authorized to enforce any state or federal law or regulation, are expressly carved out from the entirety of the release, including from the definitions of "Releasing Party" in paragraphs 31 and 66. Some courts have remedied similarly problematic settlements by rejecting the settlement unless the parties remove all governmental entities entirely from the settlement class. *See, e.g., In re Chocolate Confectionery Antitrust Litigation,* 2011 WL 6981200*1 (M.D. Pa.) (settlement agreement modified to exclude "governmental entities"; court further clarified that "[n]either the Cadbury Settlement nor this Order is intended to or shall limit the rights of any state attorney general"). Objecting/Amici States do not seek such a draconian remedy here. Rather, Objecting/Amici States seek to limit the scope of any government claims that might be subject to compromise to those which arise solely in a merchant capacity, thus preserving *parens patriae* and enforcement claims to their rightful owners. While the Defendants' and Plaintiffs' counsel have represented to the Objecting/Amici States that the parties intend that the release be so construed, that statement of intention by itself is not sufficient.

18

## VI.    CONCLUSION

The parties to this action have negotiated a Settlement Agreement in which the Settlement Class Releasing Parties purport to release *parens patriae* claims seeking various forms of relief including damages, as well as claims seeking relief in the form of "fines, civil or other penalties." *Parens patriae* claims belong uniquely and exclusively to the states acting through their attorneys general, and cannot be brought or released through private class actions. Similarly, "fines, civil or other penalties" are governmental remedies that are not available in a private class action, either as a claim or as an element of a negotiated release.

For these reasons, the Objecting/Amici States urge the Court to reject the Settlement Agreement unless revised to prevent the overbroad release from improperly restraining the exercise of law enforcement and *parens patriae* authority by state and local law enforcement agencies, including state attorneys general.

DATED:  May 28, 2013                    BY:    _____/s/  Robert L. Hubbard___
                                        Robert L. Hubbard (**RH3821**)
                                        Assistant Attorney General
                                        Antitrust Bureau
                                        New York State Office of the
                                            Attorney General
                                        120 Broadway, 26th Floor
                                        New York, NY  10271
                                        Tel: (212) 416-8267
                                        Fax: (212) 416-6015
                                        Robert.Hubbard@ag.ny.gov

MICHAEL DEWINE
Attorney General of Ohio
Jennifer L. Pratt, Section Chief
Mitchell L. Gentile, Principal Attorney
Antitrust Section
Office of Ohio Attorney General Mike DeWine
Office number: 614-466-4328
Fax number: 866-471-2742
Mitchell.Gentile@OhioAttorneyGeneral.gov

# A2135

LUTHER STRANGE
Attorney General State of Alabama
501 Washington Avenue
Montgomery, Alabama 36130


MICHAEL C. GERAGHTY
Attorney General of Alaska
P.O. Box 110300
Juneau, Alaska 99811
(907) 269-5169


THOMAS C. HORNE
Attorney General of Arizona
Nancy M. Bonnell
Antitrust Unit Chief
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, Arizona 85007
Phone:  602-542-7728
Fax:  602-542-9088
Email: nancy.bonnell@azag.gov


STATE OF ARKANSAS
DUSTIN MCDANIEL
Attorney General
Kevin Wells
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street
Suite 500
Little Rock, Arkansas 72201
Phone: (501) 682-8063
Fax:    (501) 682-1513
Email: kevin.wells@arkansasag.gov


The State of California and the State of California Department of Justice
KAMALA D. HARRIS
Attorney General of the State of California
455 Golden Gate Ave., Suite 14000
San Francisco, CA  94102

# A2136

(415) 703-5500

JOHN W. SUTHERS
Colorado Attorney General
Jan Michael Zavislan
Deputy Attorney General for Consumer Protection
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO  80203
(720) 508-6206


GEORGE JEPSEN
Attorney General
State of Connecticut
55 Elm St.
Hartford, CT 06106


JOSEPH R. BIDEN, III
Attorney General of Delaware
Michael A. Undorf
Deputy Attorney General
Delaware Department of Justice
Office number: 302-577-8924
Fax number: 302-577-6499
Michael.Undorf@state.de.us


IRVIN B. NATHAN
Attorney General
District of Columbia
John A. Wislon Building, Ste 409
1350 Pennsylvania Ave., NW
Washington, DC 20009


PAMELA JO BONDI
Attorney General
State of Florida
Patricia A. Conners
Associate Deputy Attorney General
Antitrust Division
Lizabeth A. Brady
Chief, Multistate Antitrust Enforcement
PL-01, The Capitol

# A2137

Tallahassee, Florida 32399-1050
(Phone)  850-414-3300
(Fax) 850-488-9134


STATE OF GEORGIA
SAMUEL S. OLENS
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 656-4190


DAVID M. LOUIE
Attorney General of Hawaii
425 Queen Street
Honolulu, HI 96813
(808) 586-1500


LAWRENCE G. WASDEN
Idaho Attorney General
P.O. Box 83720
Boise, ID 83720-0010


LISA MADIGAN
Attorney General of Illinois
Robert W. Pratt, Antitrust Bureau Chief
Chadwick O. Brooker, Assistant Attorney General
Antitrust Bureau
Office of Illinois Attorney General Lisa Madigan
Office number: 312-814-3722
Fax number: 312-814-4209
rpratt@atg.state.il.us


GREGORY F. ZOELLER
Attorney General of Indiana
Jeremy R. Comeau
Deputy Attorney General
302 W. Washington Street
IGC-South, Fifth Floor
Indianapolis, Indiana 46204
317.232.6317

# A2138

THOMAS J. MILLER
Attorney General of Iowa
1305 E. Walnut Street, 2nd Floor
Des Moines, IA 50319


DEREK SCHMIDT
Attorney General
State of Kansas
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Tel: (785) 296-2215


JACK CONWAY
Attorney General of Kentucky
700 Capital Avenue, Suite 118
Frankfort, Kentucky  40601


JAMES D. "BUDDY" CALDWELL
Attorney General
Louisiana Department of Justice
PO Box 94005
Baton Rouge, LA 70804
(225) 326-6400


JANET T. MILLS
Attorney General of Maine
Christina M. Moylan
Assistant Attorney General
Office of Attorney General
6 State House Station
Augusta, ME 04333-0006


DOUGLAS F. GANSLER
Attorney General of Maryland
Ellen S. Cooper
Assistant Attorney General and
Chief, Antitrust Division
Gary Honick
Assistant Attorney General
200 Saint Paul Place
Baltimore MD 21202

# A2139

(410) 576-6470


MARTHA COAKLEY
Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
617.727.2200


BILL SCHUETTE
Michigan Attorney General
P. O. Box 30212
Lansing, MI  48909


LORI SWANSON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155-1609


BRIDGETTE W. WIGGINS
Special Assistant Attorney General
Mississippi Attorney General's Office
Post Office Box 22947
Jackson, MS  39225-2947
Tel.:    601-359-4279
Fax:    601-359-4231


CHRIS KOSTER
Attorney General of Missouri
Anne E. Schneider, Assistant Attorney General
Tyler B. McCormick, Assistant Attorney General
Consumer Protection Division
Missouri Attorney General's Office
P. O. Box 899
Jefferson City, MO 65102
(573) 751-7445
(573) 751-2041 (facsimile)
Anne.Schneider@ago.mo.gov

TIMOTHY C. FOX
Attorney General of Montana
Chuck Munson
Assistant Attorney General
Montana Department of Justice
215 N. Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
(406) 444-3549 FAX
cmunson@mt.gov


JON BRUNING
Attorney General of Nebraska
Abigail M. Stempson, Section Chief, Assistant Attorney General
Greg Walklin, Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Nebraska Attorney General Jon Bruning
Office number: 402-471-3833
Fax number: 402-471-4725
abigail.stempson@nebraska.gov
greg.walklin@nebraska.gov


CATHERINE CORTEZ MASTO
Attorney General of Nevada
Eric Witkoski
Chief Deputy Attorney General and Consumer Advocate
Brian Armstrong
Senior Deputy Attorney General
State of Nevada Office of the Attorney General
Bureau of Consumer Protection
Telephone: (702) 486-3420
Fax: (702) 486-3283
antitrust@ag.nv.gov


JOSEPH A. FOSTER
Attorney General of New Hampshire
David A. Rienzo, Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office number: 603-271-7987
Fax number: 603-223-6239
david.rienzo@doj.nh.gov

GARY K. KING
New Mexico Attorney General
Nicholas M. Sydow
Assistant Attorney General
Litigation Division
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Tel.: (505) 827-6021
Fax: (505) 827-6036
email: nsydow@nmag.gov


ERIC T. SCHNEIDERMAN
Attorney General
Office of the New York Attorney General
120 Broadway, 25th Floor
New York, NY 10271


ROY COOPER
Attorney General of North Carolina
K. D. Sturgis
Special Deputy Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Tel. 919-716-6011
ksturgis@ncdoj.gov


WAYNE STENEHJEM
Attorney General of North Dakota
600 E. Boulevard Avenue
Bismarck, ND 58505-0040
Telephone: 701-328-2210
Facsimile: 701-328-2226


E. SCOTT PRUITT
Attorney General of Oklahoma
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105-4894
(405) 521-3921

KATHLEEN G. KANE
Attorney General
Tracy W. Wertz
Acting Chief Deputy Attorney General
Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA  17120
Telephone:  (717) 787-4530
Facsimile:  (717) 787-1190
E-mail:  twertz@attorneygeneral.gov


PETER F. KILMARTIN
Attorney General, State of Rhode Island
150 S. Main St.
Providence, RI 02903


ROBERT D. COOK
Solicitor General
Clyde Havird Jones. Jr.
Assistant Deputy Attorney General
Office of the South Carolina Attorney General
State of South Carolina
PO Box 11549
Columbia, SC 29211


MARTY J. JACKLEY
Attorney General
Bethanna M. Feist, Assistant Attorney General
Consumer Protection Division
South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
Bethanna.Feist@state.sd.us


ROBERT E. COOPER, JR.
Tennessee Attorney General & Reporter
Victor J. Domen, Jr.
Senior Antitrust Counsel
Tennessee Attorney General's Office
425 Fifth Avenue North

# A2143

Nashville, TN  37202
(615) 253-3327
Fax (615) 532-6951
Vic.Domen@ag.tn.gov


State of Texas
GREG ABBOTT
Attorney General
Bret Fulkerson
Assistant Attorney General
Office of the Attorney General of Texas
Antitrust Section
300 W. 15th St., 7th Floor
Austin, TX 78701


JOHN E. SWALLOW
Utah Attorney General
Utah State Capitol, Suite 230
P.O. Box 142320
Salt Lake City, Utah 84114-0320


STATE OF VERMONT
WILLIAM H. SORRELL
Attorney General
Jill S. Abrams
Assistant Attorney General
109 State Street
Montpelier, VT  05609


KENNETH T. CUCCINELLI, II
Attorney General of Virginia
Sarah Oxenham Allen, Assistant Attorney General
Matthew R. Hull, Assistant Attorney General
Consumer Protection Section
Office of the Attorney General of Virginia
Office number: 804-371-2084
Fax number: 804-786-0122
mhull@oag.state.va.us


ROBERT W. FERGUSON
Attorney General of Washington

1125 Washington Street SE
PO Box 40100
Olympia, WA   98504-0100
360-753-6200


PATRICK MORRISEY
Attorney General of West Virginia
Elbert Lin
Solicitor General
Office of the West Virginia Attorney General
1900 Kanawha Boulevard, East Room 26-E
Charleston, WV  25305
Phone:  304-558-2021
Fax:      304-558-0140


J.B. VAN HOLLEN
Attorney General of Wisconsin
Gwendolyn J. Cooley
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
17 W. Main St.
Madison, WI 53707-7857
(608) 261-5810
(608) 267-2778 (fax)


GREGORY A. PHILLIPS
Attorney General of Wyoming
123 State Capitol
Cheyenne, WY 82002

**Addendum 1**

**List of Certain Class Members Provided in Compliance with Paragraph 20 of
Preliminary Approval Order, Dkt. No. 1745**

The Alaska Attorney General objects to the Settlement, particularly the Release
Language, as a purported member of the B(2) class.

The Arizona Attorney General objects to the Settlement, particularly the Release
Language, as a purported member of the B(2) class.

The Attorney General of the State of California objects to the proposed settlement in In re
Payment Card Interchange Fee and Merchant Discount Antitrust Litigation on behalf of the State
of California Department of Justice for all of the reasons stated in this Statement of Objections
and Amici Curiae Brief of States to Final Approval of the Settlement.

The Georgia Attorney General objects to the Settlement, particularly the Release
Language, as a purported member of the B(2) class.

The Indiana Attorney General objects to the Settlement, particularly the Release
Language, as a purported member of the B(2) class.

The Maryland Attorney General objects to the Settlement, particularly the Release
Language, as a purported member of the B(2) class.

The Ohio Attorney General objects to the Settlement, particularly the Release Language,
as a purported member of the B(2) class.

The Virginia Attorney General objects on behalf of the Office of Consumer
Affairs/Office of Charitable and Regulatory Programs, Virginia Department of Agriculture and
Consumer Services, Oliver Hill Building, 102 Governor Street, Richmond, Virginia 23219,

**A2146**

objects to the Settlement, particularly the Release Language, as a purported member of the B(3) class.

The Wisconsin Attorney General objects to the Settlement, particularly the Release Language, as a purported member of the B(2) class.

The Wisconsin Attorney General objects on behalf of the Wisconsin Department of Administration, 624 East Main St., Madison, WI 53703, objects to the Settlement, particularly the Release Language, as a purported member of the B(3) class.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Relates To:  ALL CASES | No. 1:05-MD-1720 (JG) (JO) |

**BLUE CROSS AND BLUE SHIELD ENTITIES'**
**OBJECTIONS TO PROPOSED SETTLEMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND ...............................................................................................4

      A.     The Allegations and Proposed Settlement in This Case ..........................4

      B.     The Patient Protection and Affordable Care Act's Effect on
             Interchange Fees, on the Proposed Settlement, and on the Blues
             Entities ..................................................................................................9

             1.     The Medical Loss Ratio ...............................................................9

             2.     The Creation of Health Benefit Exchanges in 2014 ...................12

ARGUMENT ..................................................................................................14

    I.     THE PROPOSED SETTLEMENT IS NOT FAIR, REASONABLE,
         AND ADEQUATE FOR THE BLUES ENTITIES ...................................14

    II.    THE CLASS PLAINTIFFS CANNOT AND DID NOT
         ADEQUATELY REPRESENT THE INTERESTS OF THE BLUES
         ENTITIES ..................................................................................16

      A.     The Rule 23(b)(2) Class Fails to Meet the Requirements of Rule
             23(a) Because the Class Plaintiffs are Inadequate Representatives
             of the Blues Entities ................................................................16

      B.     The Proposed Settlement Should Be Rejected Under Rule 23(e)
             Because the Class Plaintiffs Inadequately Represented the Blues
             Entities ................................................................................21

    III.   THE RULE 23(b)(2) RELEASE IS IMPERMISSIBLY BROAD ...................22

    IV.   EVEN IF THE COURT APPROVES THE PROPOSED
         SETTLEMENT, IT SHOULD GRANT ALTERNATIVE RELIEF TO
         AVOID AN UNFAIR IMPACT ON THE BLUES ENTITIES .......................25

CONCLUSION ................................................................................................25

## TABLE OF AUTHORITIES

                                                                                   **Page(s)**

**Cases**

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
    No. C 04-1511, 2007 U.S. Dist. LEXIS 44459 (N.D. Cal. June 11, 2007) ............................24

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................. *passim*

*In re Bankamerica Corp. Secs. Litig.*,
    210 F.R.D. 694 (E.D. Mo. 2002) ........................................................................16

*Berardinelli v. Gen. Am. Life Ins. Co. (In re Gen. Am. Life Ins. Co. Sales Practices Litig.)*,
    357 F.3d 800 (8th Cir. 2004) ..........................................................................19

*Comer v. Cisneros*,
    37 F.3d 775 (2d Cir. 1994) ............................................................................24

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
    431 U.S. 395 (1977) ..................................................................................17

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ..................................................................................20

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ............................................................................16

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. Mo. 1975) ......................................................................16

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000) ..........................................................................24

*Karvaly v. E-bay, Inc.*,
    245 F.R.D. 71 (E.D.N.Y. 2007) ....................................................................21, 23

*Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*,
    654 F.3d 242 (2d Cir. 2011) ......................................................................19, 24

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
    660 F.2d 9 (2d Cir. 1981) ............................................................................21

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ..................................................................20

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993) .................................................................................24

*Scarver v. Litscher*,
   371 F. Supp. 2d 986 (W.D. Wis. 2005), *aff'd on other grounds*,
   434 F.3d 972 (7th Cir. 2006) ...............................................................................25

*Schreiber v. NCAA*,
   167 F.R.D. 169 (D. Kan. 1996) ............................................................................24

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
   157 F. Supp. 2d 561 (E.D. Pa. 2001) ...................................................................25

*Shane v. Humana Inc. (In re Managed Care Litig.)*,
   No. 00-MD-1334, 2010 U.S. Dist. LEXIS 142863 (S.D. Fla. Aug. 15, 2010) .......................25

*Smith v. DADA Entm't, LLC*,
   No. 11 Civ 7066, 2012 U.S. Dist. LEXIS 143961 (S.D.N.Y. Sept. 27, 2012) .......................24

*Stephenson v. Dow Chem. Co.*,
   273 F.3d 249 (2d Cir. 2001), *vacated in part on other grounds by*,
   *Dow Chem. Co. v. Stephenson*, 539 U.S. 111 (2003) ..................................................16, 18, 22

*TBK Partners, Ltd. v. W. Union Corp.*,
   675 F.2d 456 (2d Cir. 1982) ...........................................................................21, 22, 24

*Tiggs v. Berge*,
   No. 01-C-171-C, 2002 WL 32342678 (W.D. Wis. Nov. 14, 2002) .......................................25

*United States v. American Express Co.*,
   No. 10-CV-04496 (E.D.N.Y.) .................................................................................7, 15

*Wal-Mart Stores, Inc. v. Visa USA, Inc.*,
   396 F.3d 96 (2d Cir. 2005) ..................................................................................22, 23

**Statutes**

26 U.S.C. § 5000A ...................................................................................................12

42 U.S.C. § 300gg-18 .............................................................................................9, 10

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148, 124 Stat. 119 (2010) ..................................................... *passim*

N.C. Gen Stat. § 58-3-145 ........................................................................................15

iii

# A2151

**Other Authorities**

Prop. Treas. Reg. §§ 1.5000A-0 through 1.5000A-5,
78 Fed. Reg. 7314, 7323-31 (Feb. 1, 2013) ..............................................................12

45 C.F.R. Part 158, Subpart B ............................................................................................9

45 C.F.R. § 155.110 ...........................................................................................................12

45 C.F.R. § 155.205 ...........................................................................................................13

45 C.F.R. § 155.240 .....................................................................................................10, 13

45 C.F.R. § 155.700 ...........................................................................................................12

45 C.F.R. § 155.705 ...........................................................................................................12

45 C.F.R. § 155.1020 .........................................................................................................14

45 C.F.R. § 156.210 ...........................................................................................................14

45 C.F.R. § 158.110-.170 ...................................................................................................10

45 C.F.R. § 158.130 ...........................................................................................................11

45 C.F.R. § 158.140 ...........................................................................................................11

45 C.F.R. § 158.150 ...........................................................................................................11

45 C.F.R. § 158.160 ...........................................................................................................11

45 C.F.R. § 158.210 ...........................................................................................................10

45 C.F.R. § 158.221 ...........................................................................................................10

45 C.F.R. § 158.242 ...........................................................................................................10

45 C.F.R. § 158.301 ...........................................................................................................10

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

State Request for MLR Adjustments,
http://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-
Reforms/state_mlr_adj_requests.html ...............................................................................10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:  ALL CASES

No. 1:05-MD-1720 (JG) (JO)

---

**BLUE CROSS AND BLUE SHIELD ENTITIES'**
**OBJECTIONS TO PROPOSED SETTLEMENT**

The Blue Cross and Blue Shield entities identified below ("Blues Entities")[1] respectfully

object to the proposed class settlement in this case.

**<u>Introduction</u>**

The Blues Entities are health insurance companies located in specific states or regions

throughout the country.  They are all independent licensees of the Blue Cross and Blue Shield

Association.  The Blues Entities generally agree with the objections submitted by the numerous

other large companies that have objected to the proposed settlement.  Instead of repeating those

arguments, the Blues Entities focus these Objections on the specific reasons the proposed

---

[1] The Blues Entities filing these Objections are Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona, Inc.; Blue Cross and Blue Shield of Kansas; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Minnesota (BCBSM, Inc.); Blue Cross and Blue Shield of Nebraska; Blue Cross and Blue Shield of North Carolina; Blue Cross and Blue Shield of South Carolina; Blue Cross Blue Shield of Michigan; Blue Cross of Idaho Health Service, Inc.; Blue Cross of Northeastern Pennsylvania; BlueCross BlueShield of Tennessee, Inc.; California Physicians' Service, d/b/a Blue Shield of California; Cambia Health Solutions, Inc.; Capital Blue Cross; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; Health Care Service Corporation; HealthNow New York Inc.; Highmark Inc.; Horizon Healthcare Services, Inc.; Independence Blue Cross; Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana; Premera Blue Cross; USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield; and certain subsidiaries of these entities.  The Blues Entities are more fully identified in Appendix A. Appendix B compiles objection forms containing the identifying and other information specified in the class notice.

settlement is fundamentally unfair to them and, presumably, to other health insurers.

Whatever else might be said about the proposed settlement, it is clear that neither the Class Plaintiffs nor Defendants gave any thought as to how the settlement would affect health insurers. Two major aspects of the Patient Protection and Affordable Care Act of 2010 mean that the proposed settlement would have a vastly different, and more detrimental, impact on health insurers as compared to a typical merchant.

First, the Act creates, and imposes requirements regarding, what is known as a "medical loss ratio" or "MLR." The MLR is the percentage of a health insurer's revenue that is spent on healthcare costs such as health benefits claims. For individual insurance, the Act requires an MLR of 80 percent. If an insurance company fails to meet that requirement, it must rebate the difference to its customers. As a result, health insurers in the individual market have at most only 20 percent of their revenue available to cover all administrative costs and profit. This significantly impacts the effects of the proposed settlement on health insurance companies. Health insurers that cannot meet the MLR requirement receive no benefit from the proposed changes in the "surcharging" rules, because any surcharge would have to be returned to the customers in the form of an MLR rebate. Further, the MLR requirement means that insurance companies might have to pay interchange fees twice – once to the credit card companies and again to its customers through a rebate.

Second, the Patient Protection and Affordable Care Act creates internet-based "Health Benefit Exchanges" that, starting in 2014, will offer health insurance to individuals and small groups. Not surprisingly, most health insurers – including most if not all of the Blues Entities – will be accepting credit cards on the Exchanges. Thus, the Blues Entities expect to accept large volumes of credit card payments beginning in 2014. Traditionally, however, health insurers like

2

the Blues Entities have not accepted credit cards at all or have done so only infrequently.  As a result, most of the Blues Entities are either not eligible to be in the Rule 23(b)(3) class or will be opting out of it because it would offer them only nominal financial benefits.

These two factors make the proposed settlement particularly objectionable to health insurers.  For them, the settlement is not "fair, reasonable, and adequate" within the meaning of Rule 23(e)(2).  Despite the fact that the Blues Entities would, by virtue of being in the Rule 23(b)(2) class, be required to waive their future claims, they receive little or no benefit under the proposed settlement.  Most are either ineligible for a cash settlement because they do not yet accept credit cards, or would receive only nominal amounts because their current volume of credit card transactions is low.  And due to the MLR requirements and other aspects of the health insurance industry, the purported injunctive relief for the Rule 23(b)(2) class is even less meaningful for the Blues Entities than it is for typical merchants.

Furthermore, the Class Plaintiffs have not and cannot adequately represent the Blues Entities' interests so as to meet the requirements of Rule 23(a)(4) and Rule 23(e).  Unlike the Blues Entities, all of the Class Plaintiffs are squarely in both the Rule 23(b)(2) and the Rule 23(b)(3) classes.  They will each receive substantial cash payments, which the Blues Entities will not.  Because the broad release in the Rule 23(b)(3) class is similar in scope to the Rule 23(b)(2) class release, the Class Plaintiffs have no incentive to minimize the reach of the Rule 23(b)(2) release, which is the only release that will apply to most of the Blues Entities.  The Class Plaintiffs' failure to represent the Blues Entities' interests is also starkly seen in the way the Class Plaintiffs negotiated the $1.2 billion Interchange Fund.  That fund will be distributed to Rule 23(b)(3) merchants in proportion to the amount of Visa and MasterCard interchange fees those merchants pay during the eight month period beginning on July 29, 2013.  Given that this

3

timeframe extends into 2014, Blues Entities might have significant credit card transactions during the latter portion of that period (with the onset of the Exchanges) and might, as a result, pay substantial interchange fees. However, because of the way the settlement is structured, Blues Entities that did not accept credit cards in the past will not be in the Rule 23(b)(3) class and thus cannot receive any of the Interchange Fund – even if they pay substantial interchange fees during the relevant Interchange Fund period. The Class Plaintiffs failed to take into account the interest of companies in this position.

Finally, the release in the Rule 23(b)(2) settlement is unfair. As noted above, it is as broad as the Rule 23(b)(3) release in terms of extinguishing future claims. Moreover, it applies to an unknown set of future merchants who are not adequately represented by the Class Plaintiffs but who cannot opt out. Significantly, merchants with future claims who did not accept credit cards in the past were excluded from the relevant class definitions in the operative complaints from the time the case was first filed until the time the proposed settlement was preliminarily approved late last year. Adding them now is inappropriate – basic notions of fairness and due process dictate that such a broad release of future claims should not apply to such merchants, who have not until now been even purportedly represented by Class Counsel and whose interests are entirely ignored in the proposed settlement.

## Background

### A.     The Allegations and Proposed Settlement in This Case

There are three operative complaints in this case. The thrust of each is that the Defendants violated state and federal antitrust laws by fixing the interchange fees imposed on merchants in processing Visa and MasterCard transactions, and further by imposing rules that

effectively prevented merchants from fairly protecting themselves against those fees.[2]  *See*

Second Consol. Am. Class Action Compl., Dkt. 1153 ¶ 1.

The Operative Complaints describe a number of harmful rules and practices underlying

these alleged antitrust violations.  First are what the Class Plaintiffs refer to as "Anti-Steering"

restraints, a broad category meant to include the "No-Bypass Rule," the "No-Surcharge Rule,"

the "No-Minimum-Purchase Rule," and the "anti-discrimination rules."  *Id.* ¶ 8(d).  Plaintiffs

allege that these rules are designed to prohibit merchants from providing incentives to customers

to use payment methods with lower – or no – interchange fees, and that these rules have a

"profound inflationary effect on retail goods and services."  *Id.* ¶¶ 8(d), 194.

Similarly, the Operative Complaints challenge the Defendants' "Honor All Cards" rule,

which requires merchants that accept any Visa or MasterCard credit cards to accept all credit

cards issued on the network, regardless of the issuing bank.  *Id.* ¶ 8(m).  Plaintiffs assert that

"[b]y enacting and enforcing the 'Honor All Cards' and Interchange Fee payment rules noted

above, the Defendants have created a situation in which the payment of an Interchange Fee is

required on all transactions, regardless of the Issuing Bank."  *Id.* ¶ 244.  This in turn "harms

competition by imposing large and ever-increasing Interchange Fees, which thereby elevates

---

[2] The three operative complaints (the "Operative Complaints") are: (1) the Second Consolidated
Amended Class Action Complaint (Dkt. 1138, 1153); (2) the First Amended Supplemental Class Action
Complaint (Dkt. 1140, 1152); and (3) the Second Supplemental Class Action Complaint (Dkt. 1139,
1154).  All of the Operative Complaints were filed on Feb. 20, 2009.  While Defendants' conduct with
regard to setting interchange fees and imposing rules related to those fees is at the heart of all of the
Operative Complaints, the Second Supplemental Class Action Complaint is "directed at the conduct of
MasterCard and its Member Banks in events leading up to and culminating in its Initial Public Offering
("IPO") on May 25, 2006," Dkt. 1152 ¶ 1, and the Second Supplemental Class Action Complaint is
directed at "the conduct of Visa and its Member Banks in the events leading up to" its IPO on March 18,
2008.  Dkt. 1154 ¶ 1.

Merchant-Discount Fees to supracompetitive levels." *Id.* ¶ 246.[3]

The proposed settlement would not redress the principal grievances identified in the Operative Complaints, *i.e.*, the setting of interchange fees and the rules that the Defendants rely on to propagate those fees. Indeed, with respect to the setting of interchange fees, the proposed settlement expressly states that it does not "limit the ability of any [Visa or MasterCard] Defendant to set interchange rates, whether default rates or rates applicable (either by rule or negotiated agreement) to individual merchants, groups of merchants, or merchant trade associations." Proposed Settlement Agreement ("Proposed Settlement"), Dkt. 1656-1 ¶¶ 51, 64. Nor would the Proposed Settlement require any meaningful changes to the rules describe above. Indeed, the opposite is true. The Proposed Settlement would allow to remain in place indefinitely rules that "harm[] competition by imposing large and ever-increasing Interchange Fees," Dkt. 1153 ¶ 246, by giving Defendants broad releases with respect to any Visa or MasterCard rule "as it is alleged to exist, now exists, may be modified in the manner provided [in the Proposed Settlement], or may in the future exist in the same or substantially similar form thereto." Proposed Settlement, Dkt. 1656-1 ¶ 71. If the Proposed Settlement is given final approval, this lawsuit will result in a court-approved imprimatur to practices the suit was originally brought to prevent, and would force every merchant that has been, or ever will be in the future, harmed by these rules to abandon their rights to challenge those practices, regardless of whether the practices violate anti-trust laws.

The Proposed Settlement would set up two classes, a "damages" class pursuant to Rule 23(b)(3) and a "rule changes" class under Rule 23(b)(2). The Rule 23(b)(3) class contemplates

---

[3] The Operative Complaints also challenge "On-Us Transactions" (transactions in which the acquiring bank is required to charge merchants an Interchange Fee even though the issuing and acquiring banks are the same entity), Dkt. 1153 ¶ 8(cc) and the "No-Multi-Issuer Rule" (a rule of Visa and MasterCard networks that prohibits covered transactions from being processed over other networks), *id.* ¶ 8(x).

monetary compensation through two funds – the $6.05 billion Cash Fund (which will be distributed to merchants based on the amount of interchange fees they paid during the roughly nine-year Class Period of January 1, 2004, to November 28, 2012) and the $1.2 billion Interchange Fund (which will be distributed to merchants based on interchange fees they pay during the eight-month period between July 29, 2013, and March 29, 2014). Therefore, the monetary relief contemplated by the Proposed Settlement is heavily weighted in favor of merchants who paid large volumes of interchange fees during the Rule 23(b)(3) Class Period (or will do so for the eight months starting on July 29, 2013), and has much less value to merchants who paid comparatively small interchange fees during those periods, even if they will pay significant interchange fees in the future. Any merchant can opt out of the Rule 23(b)(3) class.

Unlike the Rule 23(b)(3) class, which covers merchants that accepted Visa or MasterCard during the Class Period and from which opt-out is permitted, the Rule 23(b)(2) class permits no opt-outs, and would include merchants that accept *or will ever accept* a Visa or MasterCard branded card. *See* Proposed Settlement, Dkt. 1656-1, ¶ 2(b) (emphasis added).

The Proposed Settlement purports to offer several types of injunctive relief to Rule 23(b)(2) class members. First, it would maintain, until at least July 20, 2021, changes to Visa and MasterCard's "no discounting" and "non-discrimination" rules ordered pursuant to previous litigation in *United States v. American Express Co.*, No. 10-CV-04496 (E.D.N.Y.). *See* Proposed Settlement, Dkt. 1656-1 ¶¶ 40, 53. Pursuant to the ruling in that case, Visa and MasterCard were required to eliminate certain restrictions on merchants' ability to encourage the use of non-Visa or non-MasterCard branded cards. That ruling already covers the period through July 20, 2021, so the Proposed Settlement adds little if anything on this front.

Second, the Settlement Proposal would modify the "all outlets" rule thereby allowing

merchants to accept Visa and MasterCard at some of its sales outlets while declining to do so at other sales outlets. *See* Proposed Settlement, Dkt. 1656-1 ¶¶ 41, 54. By definition, this rule change will only benefit merchants with multiple outlets.

Third, the Proposed Settlement would modify the "no surcharge" rules of Visa and MasterCard, such that merchants would be allowed to surcharge at either the "Brand Level" or the "Product Level," ostensibly so as to be able to pass on the costs of interchange fees directly to consumers.[4] *See* Proposed Settlement, Dkt. 1656-1 ¶¶ 42, 55. However, the potential right to surcharge comes with certain significant restrictions that make the imposition of surcharges by some merchants – including those in any of the ten states that have outlawed surcharging – difficult if not impossible. As discussed below, the Blues Entities are subject to additional restrictions on their ability to surcharge.

Fourth and finally, Visa and MasterCard would be required to modify their rules so as to eliminate some of the restrictions they currently have in place regarding the ability of merchants to organize *bona fide* buying groups. Presumably, this provision was designed to benefit small merchants who might have increased negotiating power if they banded together. The use of *bona fide* buying groups is limited to situations where Visa or MasterCard "believe[]" that a proposal "provides reasonable commercial benefits to the parties." *Id.* ¶¶ 43, 56. In other words, the use of this mechanism will remain entirely in Visa and MasterCard's control.

The Proposed Settlement contemplates broad releases being made by all members in either class, with the scope of the releases for the two classes being largely the same. Under the Rule 23(b)(3) release, class members are required to waive "any and all manner of claims," both

---

[4] Brand Level surcharging is surcharging by a merchant such that the same surcharge is applied to all Visa or all MasterCard branded cards, or both. Product Level surcharging means the merchant imposes the same surcharge on all cards of the same type. *See* Proposed Settlement, Dkt. 1656-1 ¶¶ 42(a)(iv)-(v), 55(a)(iv)-(v).

injunctive and monetary, "whenever incurred," either now or arising in the future, "relating in any way" to conduct that was or could have been alleged in the Operative Complaints, and specifically covering allegations related to the various rules challenged in the Operative Complaints.   Proposed Settlement, Dkt. 1656-1 ¶ 33.  Similarly, the Rule 23(b)(2) class members are required to waive "any and all manner of claims," both injunctive and monetary, arising in the future, "relating in any way" to conduct that was or could have been alleged in the Operative Complaints, and specifically covering allegations related to the various rules challenged in the Operative Complaints.  *Id*. ¶ 68.  The only difference in the two releases is that the Rule 23(b)(2) release does not cover already-accrued claims belonging to Rule 23(b)(3) class members.  These similarities mean that those receiving a cash settlement and giving the Rule 23(b)(3) release will not be releasing any additional claims by virtue of the Rule 23(b)(2) release.

     **B.**    **The Patient Protection and Affordable Care Act's Effect on Interchange Fees, on the Proposed Settlement, and on the Blues Entities**

          **1.**    **The Medical Loss Ratio**

The medical loss ratio, or MLR, provisions in section 2718 of the Public Health Service Act ("PHSA"), enacted under section 10101(f) of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, 885 (2010) ("ACA"), require health insurers that offer individual (or group) health insurance coverage to spend a specified minimum percentage of their premium revenue for a calendar year (less federal and state taxes, and licensing and regulatory fees) on enrollees' medical claims and expenditures that improve health care quality, or else they will be required to distribute annual rebates to their customers.  42 U.S.C. § 300gg-18(b); 45 C.F.R. Part 158, Subpart B.

A health insurer's MLR is calculated and reported to the U.S. Department of Health and Human Services ("HHS") each year as a fraction:  the numerator consists of enrollee medical

claims and expenditures that improve health care quality (including specified expenses related to health information technology and meaningful use requirements), and the denominator consists of the insurer's earned premium revenue less certain federal and state taxes and licensing and regulatory fees.  42 U.S.C. § 300gg-18(a) (enacted by ACA §§ 1001(5), 10101(f)); 45 C.F.R. §§ 158.110-.170, 158.221.  For the individual health insurance market, if the result of the fraction is less than 80 percent, the insurer will be required to issue rebates to each of its subscribers in that market to account for that shortfall.[5]  *See* 45 C.F.R. §§ 158.240(c), 158.242(a).  Stated another way, the MLR provisions prohibit a health insurer's "non-claims costs" (other than health quality improvement expenditures) attributable to individual health insurance policies for a given year from exceeding 20 percent of the insurer's premium revenue (less specified taxes and fees) for that year.[6]  Some of the Blues Entities were below the required MLR threshold for 2011 (the most recent MLR reporting period).  *See, e.g.*, Decl. of Garrett Calissi ¶ 7; Decl. of David Cote ¶ 6.

Interchange fees a health insurer pays constitute non-claims costs that count toward the annual 20 percent limit associated with the individual-market MLR.  The applicable regulations state that such non-claims costs essentially include any administrative expenses that do not

---

[5] This 80 percent threshold for individual health insurance policies could be subject to a downward adjustment in certain states, if the state has applied to HHS for such adjustment and if HHS has determined that imposing the 80 percent threshold may destabilize the individual market in that state.  42 U.S.C. § 300gg-18(b)(1)(A)(ii); 45 C.F.R. §§ 158.210(c), 158.301.  HHS has approved such downward adjustments for either a one-year, two-year, or three-year period, in seven states:  Georgia, Iowa, Kentucky, Maine, Nevada, New Hampshire, and North Carolina.  *See* http://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/state_mlr_adj_requests.html.  However, even under these adjustments, the general 80 percent threshold will apply in those seven states by no later than the 2014 calendar year.

[6] A health insurer's MLR must be calculated separately for its collective individual health insurance policies, group health insurance policies sold to "small employers," and group health insurance policies sold to "large employers," respectively.  The applicable MLR threshold for small employer policies is 80 percent (the same threshold as for individual health insurance policies), while the threshold for large employer policies is 85 percent.  42 U.S.C. § 300gg-18(b)(1)(A)(i)-(ii).

constitute adjustments to a health insurer's earned premium revenue, enrollee medical claim costs, expenditures that improve health care quality, or federal and state taxes or licensing or regulatory fees. *See* 45 C.F.R. § 158.160(a), (b)(1). Credit card interchange fees do not constitute any of these types of expenditures, but rather fall within the "general and administrative expenses" category of non-claims costs. *See* 45 C.F.R. §§ 158.130(b), 158.140(b)(3), 158.150, 158.160(b)(2)(v). Therefore, if a health insurer is already below the required MLR threshold or if additional interchange fees cause a health insurer to fall below that threshold, the insurer effectively would be required to pay some or all interchange fees twice: once as interchange fees in connection with the actual credit card payment transaction, and again when the insurer distributes an MLR rebate to its customers for the year.

The MLR rules could also have a substantial impact on a health insurer's ability to pass on the costs of interchange fees through a "surcharge" to its customers. Although not addressed directly in the regulations, if a health insurer accepts premium payments by credit card, but charges an additional amount to its customers who choose to pay their premiums via credit card (to cover all or a portion of the applicable interchange fees), then those additional amounts may need to be added to the insurer's earned premium revenue for MLR purposes. Specifically, where a health insurer's customers who pay their premiums with a credit card are required to pay the additional amounts "as a condition of receiving coverage," the additional amount may constitute "fees or other contributions associated with the health plan" that must be added to the denominator of the MLR formula, thus ultimately reducing the insurer's MLR for the year. *See* 45 C.F.R. § 158.130(a). In other words, for a health insurer that is otherwise exactly at the 80 percent threshold, only 20 percent of the amounts collected through a surcharge could be spent for administrative costs such as interchange fees, or else the amounts would have to be rebated to

11

the customers.  Moreover, if a health insurer is *under* the 80 percent threshold, none of the

additionally collected surcharges could be used to cover interchange fees or other administrative

costs; they would all have to be used for enrollees' health-related expenses or health care quality

improvement expenditures, or would have to be returned to the customers in the form of a rebate.

### 2.    The Creation of Health Benefit Exchanges in 2014

As a result of ACA's "individual mandate" and Health Benefit Exchanges

("Exchanges"), the number of Americans expected to purchase individual health insurance

policies, and pay their premiums electronically by credit card, will increase significantly in 2014

and future years.  First of all, the number of enrollees in individual health insurance coverage is

expected to increase dramatically beginning in 2014, due to the implementation of ACA's

individual mandate provisions that require most individuals either to obtain qualifying coverage

for themselves and their dependents or to pay a penalty.  26 U.S.C. § 5000A; Prop. Treas. Reg.

§§ 1.5000A-0 through 1.5000A-5, 78 Fed. Reg. 7314, 7323-31 (Feb. 1, 2013).

In addition, it is anticipated that many, if not most, individual health insurance policies in

2014 and future years will be purchased through the Exchanges, which are internet-based

marketplaces that will facilitate the purchase of individual and small employer policies.[7]  *See*

ACA §§ 1311, 1321.  Although the structure of a particular Exchange may vary from state to

state, each Exchange must comply with certain minimum federal standards, including a

---

[7] In addition to the Exchanges for individual insurance coverage, the ACA provides for the establishment of Small Business Health Options Program ("SHOP") Exchanges, to facilitate small employers in purchasing and enrolling their employees in qualified small group health insurance coverage.  ACA § 1311(b)(1)(B); 45 C.F.R. § 155.700.  SHOP Exchanges may be operated separately from, or merged with, the Exchanges through which individual health insurance policies are offered for a given state.  ACA § 1311(b)(2); 45 C.F.R. § 155.110(e).  Large employers, which are generally defined as those that have more than 100 employees (or in some states, for plan years beginning prior to January 1, 2016, more than 50 employees), will not be eligible to purchase health insurance coverage through a SHOP Exchange until at least 2017.  *See* ACA § 1312(f)(2)(B); 45 C.F.R. § 155.705(b)(9).

requirement to maintain a robust internet website that, in part, provides extensive information on available coverage options, allows for the Exchange to determine an individual's eligibility for coverage, and permits an eligible individual to purchase a particular health insurance policy offered through the Exchange.  ACA § 1311(c)(5)(B), (d)(4)(C), (G); 45 C.F.R. § 155.205(b).  An Exchange may establish a process to facilitate the collection and payment of an individual's premiums by electronic means, *e.g.*, by credit card.  45 C.F.R. § 155.240(c).  Moreover, a particular Exchange could choose to mandate, as a condition of participating in the Exchange, that a health insurer accept credit cards for the payment of individual health insurance premiums.

Most if not all of the Blues Entities will be accepting credit cards on the Exchanges when they come online in 2014.  *See, e.g.*, Decl. of William J. Farrell ¶ 5; Decl. of Garrett Calissi ¶ 6; Decl. of David Cote ¶ 5; Decl. of Matthew Brolly ¶ 5.  Due to the anticipated increased number of enrollees in individual health insurance coverage – the majority of which are expected to purchase coverage through internet-based Exchanges – it is anticipated that the amount of health insurance premium payments made by credit card in 2014 and future years will increase significantly as compared to prior periods.  *See, e.g.*, Decl. of William J. Farrell ¶ 5; Decl. of Garrett Calissi ¶ 6; Decl. of David Cote ¶ 5; Decl. of Matthew Brolly ¶ 5.

In periods prior to 2014, however, health insurance companies such as the Blues Entities accepted credit cards rarely, if at all.  Some Blues Entities have never accepted credit cards in the past and thus are not eligible to be in the Rule 23(b)(3) class.  *See, e.g.*, Decl. of Matthew Brolly ¶ 4.  Others have only recently begun to accept credit cards in anticipation of the Exchanges coming online, and have very low volumes of credit card transactions.  *See, e.g.*, Decl. of William J. Farrell ¶ 6.  Even those Blues Entities that have historically accepted credit cards have done so only infrequently.  *See, e.g.*, Decl. of Garrett Calissi ¶¶ 4-5; Decl. of David Cote ¶ 4.

13

The creation of Exchanges in 2014 will also make it more difficult for health insurers to change their premium rates so as to be able to recoup any rise in interchange rates or other administrative costs.  Specifically, health insurers offering individual health insurance coverage through an Exchange must file their premium rates several months prior to the effective date of coverage (January 1 of each year) and must guarantee those rates for the entire calendar year.  45 C.F.R. §§ 155.1020(c), 156.210(a), (b).  Due to these requirements, health insurers are unable to immediately adjust premiums to account for an increase in interchange fees and could potentially suffer financial losses if sufficient advance notice of a change in fees is not provided.  *See, e.g.*, Decl. of Kathryn A. Galarneau ¶ 5.

<u>Argument</u>

**I.     THE PROPOSED SETTLEMENT IS NOT FAIR, REASONABLE, AND ADEQUATE FOR THE BLUES ENTITIES**

To approve the Proposed Settlement under Rule 23(e), the Court must find that it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Proposed Settlement fails in that regard because the Blues Entities (and other health insurers) receive very little, if any, meaningful benefit from the five categories of purported consideration offered to the class.

First, most of the Blues Entities will receive little or no cash settlement.  They will receive little if anything from the Cash Fund, because they either had very limited credit card transactions during the Class Period or had none at all.  The same goes for the Interchange Fund because the real increase in credit card payments for the Blues Entities will not come until the Exchanges are up and running in 2014, when the period for the Interchange Fund will be more than half over.  To the extent that the Blues Entities do incur significant interchange fees during the eight-month Interchange Fund period, an even larger injustice potentially awaits them.  That is because only merchants that accepted Visa and MasterCard before the Class Period ended on

14

November 28, 2012, are eligible to be in the Rule 23(b)(3) class and to receive payments from either the Cash Fund or the Interchange Fund. Proposed Settlement, Dkt. 1656-1 ¶¶ 12-13, 29. Thus, for example, a Blues Entity like Independence Blue Cross that has to date never accepted credit cards (*see* Decl. of Matthew Brolly ¶ 4) is ineligible to receive any cash settlement, even if it incurs enormous interchange fees during the Interchange Fund period.

Second, and as numerous other objecting class members have pointed out, the re-affirmation of the relief awarded in *United States v. American Express Co.*, No. 10-CV-04496 (E.D.N.Y.), is of little if any added value to any class member, including the Blues Entities.

Third, and as also noted by numerous other objectors, the modification of the "all outlets" rule is of no value to the Blues Entities, which have no retail stores and will be making essentially all of their credit card sales through the web-based Exchanges run by each state (or by the federal government in states that choose not to run their own Exchange).

Fourth, the modifications to the "no surcharging" rule is also of limited or no value to the Blues Entities. As many objectors have demonstrated, given the restrictions that remain and the fact that ten states have outlawed surcharging, the changes in the "no surcharging" rule are of limited value even to the typical merchant. Such changes are of even less value to the Blues Entities because they are bound by the MLR rules that other merchants are not. Thus, as discussed above, Blues Entities at or below the 80 percent MLR threshold will not be able to surcharge. In addition, some states impose surcharging restrictions that apply only to insurance companies. *See, e.g*, N.C. Gen Stat. § 58-3-145.

Fifth, permitting *bona fide* buying groups is also of little or no value to the Blues Entities. As other objectors have noted, this is of no benefit to large, sophisticated companies.

In sum, the Blue Entities would receive very little, if any, actual benefit under the

Proposed Settlement, and it is therefore not fair, reasonable, and adequate as to them.  *See Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. Mo. 1975) ("The charge that the benefits of the settlement to the class are illusory calls into question the overall adequacy of the settlement."); *see also Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260 (2d Cir. 2001) (holding that Plaintiffs could not be bound by a settlement where "[n]o provision was made" for their claims in the class action), *vacated in part on other grounds by*, *Dow Chem. Co. v. Stephenson*, 539 U.S. 111, 112 (2003); *In re Bankamerica Corp. Secs. Litig.*, 210 F.R.D. 694, 709 (E.D. Mo. 2002) (rejecting settlement where a portion of the class would not "share in the settlement recovery"); *accord In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 808 (3d Cir. 1995).

The Proposed Settlement is designed to favor merchants in the Rule 23(b)(3) class that currently accept credit cards (though even the consideration they receive is inadequate, as many objectors have argued).  By contrast, the Proposed Settlement offers next to nothing for members of the Rule 23(b)(2) class that did not accept credit cards during the Class Period (or accepted them only in small volumes), while forcing them to give the same broad prospective release of claims given by members of the Rule 23(b)(3) class who will, unlike the Rule 23(b)(2) class members, receive cash payments.  Such a settlement is simply not fair, reasonable, and adequate and should be rejected as such under Rule 23(e).

## II.    THE CLASS PLAINTIFFS CANNOT AND DID NOT ADEQUATELY REPRESENT THE INTERESTS OF THE BLUES ENTITIES

### A.    The Rule 23(b)(2) Class Fails to Meet the Requirements of Rule 23(a) Because the Class Plaintiffs are Inadequate Representatives of the Blues Entities

In the context of settlement, the Court must ensure that the class is properly certified under Rule 23(a).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622 (1997).  "The adequacy

16

# A2168

inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625.  To meet Rule 23(a)(4)'s requirements "[a] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 625-26 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Here, because the Class Plaintiffs do not adequately represent the interests of class members such as the Blue Entities, certification of the Rule 23(b)(2) class is improper.  The Class Plaintiffs have vastly different interests than do health insurers.  Not one of the Class Plaintiffs is a member solely of the Rule 23(b)(2) class, but not the Rule 23(b)(3) class.  The Class Plaintiffs all allege that they "have accepted Visa and MasterCard Credit Cards, Offline Debit Cards."  Second Consol. Am. Class Action Compl., Dkt. 1153 ¶ 1.  Thus, the Class Plaintiffs have already been injured by Defendants alleged antitrust violations and are members of both classes.  Proposed Settlement, Dkt. 1656-1 at 1; *id.* ¶ 1(m) (defining Class Plaintiffs).

The Class Plaintiffs are unlike most of the Blues Entities (and presumably other health insurers), that either accepted only a small number of credit card transactions in the past or, in some cases, never accepted any at all.  Many of the Blues Entities are either not in the Rule 23(b)(3) class or will be eligible for only nominal cash settlement amounts (and will therefore opt out of the Rule 23(b)(3) class).[8]  The Blues Entities' interests also diverge from the Class Plaintiffs in that the Blues Entities anticipate accepting credit card payments with much greater frequency in 2014 than they did in the past.  Thus, unlike the Class Plaintiffs, the Blues Entities

---

[8] A few of the Blues Entities have not opted out of the Rule 23(b)(3) class.  However, their position remains that the Proposed Settlement should be rejected or that health insurers should be excluded from the class definitions (*see infra* p. 25).  In the event the Court were to reject that position and adopts the Proposed Settlement (which it should not), these Blues Entities protectively seek to preserve their rights in the Rule 23(b)(3) class.

care almost exclusively about future periods. The Class Plaintiffs, on the other hand, will receive meaningful cash payments as Rule 23(b)(3) class members solely in connection with past periods (and a short period into the future). In exchange, Rule 23(b)(3) class members will give broad releases that include waivers of future claims. Because they are already releasing future claims by virtue of being in the Rule 23(b)(3) class, the Class Plaintiffs have no incentive to attempt to negotiate a narrower release for the Rule 23(b)(2) class. In addition, the Class Plaintiffs have every incentive to maximize the cash payment offered to the Rule 23(b)(3) class, even at the expense of features of the Rule 23(b)(2) class settlement.

Further, the Class Plaintiffs are not impacted by the MLR and Exchange rules like the Blues Entities are. For example, the Class Plaintiffs can recover the interchange fees they have to pay by raising prices, subject only to general market forces. The Exchange rules will make it impossible for the Blues Entities to do that until an extended period of time has transpired. The MLR rules will prevent some of the Blues Entities from increasing rates at all. Likewise, the MLR rules hinder the Blues Entities' ability to enjoy the Proposed Settlement's changes to the surcharging rules to the same extent as the Class Plaintiffs.

The Blues Entities are like the class members in *Amchem* who had been exposed to asbestos but had not yet shown injuries from such exposure. The class plaintiffs – who had already suffered from asbestos-related injuries – proposed a settlement favoring those who had such injuries. In *Amchem*, the divergence of interest led to the settling parties reaching "a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627. The Supreme Court held that interests of plaintiffs who were already suffering from asbestos-related injuries were not aligned with those whose injuries might manifest at a later date. *Id.* at 626; *see also Stephenson v. Dow*

18

*Chem. Co.*, 273 F.3d 249, 261 (2d Cir. 2001) (plaintiffs were "inadequately represented in the prior litigation" where they received no recovery because their injuries manifested themselves at a later date than the class plaintiffs); *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 251 (2d Cir. 2011) (where two categories of claims were "more valuable" than a third category, class members with all three categories of claims had "disparate interests" than those with only the third category, because the former group could choose to "sacrifice" the shared claims) (citations omitted).

Defendants here try to distinguish cases such as *Amchem* by arguing that "because the Rule 23(b)(2) Settlement Class is seeking only injunctive relief, it differs from the classes in which courts have found current and future claimants had conflicting interests in monetary awards from a settlement fund."  Defs.' Mem. in Support of Final Approval of Definitive Class Settlement Agreement ("Defs.' Mem. in Support of Final Approval"), Dkt. 2110 at 23-24 (Apr. 11, 2013).  The factual premise of that argument is wrong because the Proposed Settlement plainly involves a settlement fund.  It makes no difference that this case involves two separate classes because, in class settlements, "[n]o part of the consideration on either side is keyed to any specific consideration of the other . . . .  This is the way settlements usually work."  *Berardinelli v. Gen. Am. Life Ins. Co. (In re Gen. Am. Life Ins. Co. Sales Practices Litig.)*, 357 F.3d 800, 805 (8th Cir. 2004).  Further, the only difference between this case and *Amchem* is that here, members of the Rule 23(b)(2) class are not entitled to any of the settlement fund.  Under Defendants' logic, *Amchem* would only be applicable here if some of the Cash Fund or the Interchange Fund were set aside and reserved for those who will suffer injuries only in future periods because of the subject interchange rules, such as those Blues Entities that did not accept

credit cards in the past but will in the future.[9]  Yet, as compared to that scenario, those Blues

Entities are even worse off under the Proposed Settlement because *none* of the Cash Fund or the

Interchange Fund is reserved for them.

On this basis, the reasoning in *Amchem* is fully applicable here.  If anything, the Blues

Entities – some of which will receive none of the cash settlement – have been less adequately

represented than were the class members in *Amchem*.  The deal struck in the Proposed Settlement

certainly indicates as much.

For similar reasons, the Class Plaintiffs' interests in monetary relief also means they

cannot meet Rule 23(a)(3)'s typicality requirement.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S.

147, 158 (1982) ("The commonality and typicality requirements . . . tend to merge with the

adequacy-of-representation requirement.").  The Blues Entities recognize that "[d]ifferences in

the damages sustained by individual class members does not preclude a showing of typicality,

nor defeat class certification," *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242

(E.D.N.Y. 1998), and that claims in antitrust price-fixing cases can satisfy Rule 23(a)(3)'s

typicality requirement even if members purchase different quantities and pay different prices.

*See id.* at 241.  In this case, however, most of the Blues Entities have not yet been injured or have

been injured only in a nominal amount, and thus will never receive any meaningful monetary

benefit.  Because of the difference in the time when the Class Plaintiffs' claims became ripe as

compared to those of the Blues Entities – and because of substantial disparity in consideration

being offered to the two groups as a result of that difference – the Class Plaintiffs' claims are not

---

[9] Of course, the Class Plaintiffs did negotiate for the Interchange Fund that will provide compensation for
certain future injuries.  However, Rule 23(b)(2) class members that did not accept credit cards during the
Class Period are ineligible to receive any of that fund, even if they incur interchange fees during the
Interchange Fund period.  The fact that the Class Plaintiffs have, with respect to merchants who are in the
Rule 23(b)(2) class but not in the Rule 23(b)(3) class, cut those merchants out of the cash settlement
makes the settlement more objectionable than the one in *Amchem*, not less so.

typical of the Blues Entities' claims.  *See, e.g., Karvaly v. E-bay, Inc.*, 245 F.R.D. 71, 82-83

(E.D.N.Y. 2007) ("The proposed class representatives lack the necessary typicality because,

while the great majority of Class Members stand to receive only equitable relief in the form of

alterations to [defendant's] website, each of the named plaintiffs is a member of the much

smaller group of Eligible Class Members who stand to gain a share of the Settlement Fund.").

Because the requirements of Rule 23(a) have not been met, the Court should refuse to

certify the Rule 23(b)(2) class and should, as a result, reject the Proposed Settlement.

> **B.     The Proposed Settlement Should Be Rejected Under Rule 23(e) Because
> the Class Plaintiffs Inadequately Represented the Blues Entities**

Because the Class Plaintiffs cannot adequately represent the interests of other class

members, the Proposed Settlement should be rejected under Rule 23(e).  It is inherently unfair to

force the Blues Entities – some of which have not yet been injured by Defendants' alleged

antitrust violations – to release their future claims, just so a global settlement can be reached and

the Class Plaintiffs (but not most of the Blues Entities) can collect their cash settlements.  The

Second Circuit has recognized that:

> in fulfilling the court's responsibility to scrutinize the fairness of a class action as
> required by Fed. R. Civ. P. 23(e), special care must be taken to ensure that the
> release of a claim not asserted within a class action or not shared alike by all class
> members does not represent an "advantage to the class . . . by the uncompensated
> sacrifice of claims of members, whether few or many."

*TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982) (quoting *Nat'l Super*

*Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir. 1981)).

> At the heart of [this] concern [i]s the danger that a class representative not sharing
> common interests with other class members would "endeavor[] to obtain a better
> settlement by sacrificing the claims of others at no cost to themselves" by
> throwing the others' claims "to the winds."

*Id.* at 462 (quoting *Super Spuds*, 660 F.2d at 17 n.6, 19 n.10).  While the Second Circuit has

ruled that this concern is not implicated "where the released claim[s] rest on the same factual

predicate as the class action claim," *id.*, it has also ruled that the release of others' future claims

is limited by the "'adequacy of representation" doctrine. *Wal-Mart Stores, Inc. v. Visa USA, Inc.*,

396 F.3d 96, 106 (2d Cir. 2005). "Claims arising from a shared set of facts will not be precluded

where class plaintiffs have not adequately represented the interests of class members." *Id.* at

109.

   As discussed above, Class Plaintiffs' interests are not aligned with the interests of the

Blues Entities. This led the Class Plaintiffs to negotiate a settlement in which the Blues Entities

receive little if any consideration but must release all of their future claims, while the Class

Plaintiffs give a similar release but also receive cash settlements. This is precisely the scenario

in which a settlement agreement should not be permitted to bind absent class members. *See*

*Stephenson*, 273 F.3d at 261.

## III.   THE RULE 23(b)(2) RELEASE IS IMPERMISSIBLY BROAD

   There are several reasons why the Rule 23(b)(2) release in the Proposed Settlement is too

broad to be approved. First, the Rule 23(b)(2) release violates the rule in this Circuit that

unrepresented claims may only be released where they are "based on the identical factual

predicate as that underlying the claims in the settled class action." *TBK Partners*, 675 F.2d at

460. The factual predicate of this lawsuit pertains to anti-competitive conduct growing out of

Visa's and MasterCard's interchange rates and rules. *See, e.g.*, Second Consol. Am. Class

Action Compl., Dkt. 1153 ¶¶ 3, 4, 8(c), (d), (s), (v), (w), (x), (y), 190-99, 244, 247, 288, 308(h).

This suit also relates to claims contending that Visa's and MasterCard's IPOs were themselves

violations of Section 1 and Section 7 of the Sherman Act. However, the Rule 23(b)(2) class

release is much broader than the subject-matter of these claims. It releases claims "relating to

the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order . . . that are alleged or which could have been alleged from the beginning of time until the date of the Court's entry of the Class Settlement Preliminary Approval Order." Proposed Settlement, Dkt. 1656-1 ¶ 68. The Proposed Settlement broadly releases future claims based upon the Defendants' interchange rules. *Id*. ¶¶ 68(a), 68(c). More problematically, it goes on to release claims based upon the "future effect[s]" of any "Rule" in effect at the time of the Court's Preliminary Approval Order or any rule that is "substantially similar" to such rules. *Id*. ¶ 68(h).

Hence, the release is not limited to claims arising out of anti-competitive conduct by Visa and MasterCard nor is it limited to the claims arising from the rules that were complained of in the Operative Complaints. The above-stated language shows that the release extends to any rules in effect at the time this Court entered the Preliminary Approval Order and any rules that are substantially similar to these rules. Such a release cannot be approved as it goes beyond the factual predicate found in the Complaint. *See Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 88-89 (E.D.N.Y. 2007) (refusing to certify "a general release that purports to strip millions of individuals of their rights to sue the defendants upon a wide range of offenses that have nothing to do with the misconduct alleged in the . . . action").

In support of this release, Defendants argue that this Circuit has found that: "Plaintiffs in a class action may release claims that were or could have been pled in exchange for settlement relief." *Wal-Mart Stores, Inc*. 396 F.3d at 106. But Defendants leave out the limiting principle that such released claims must have an "identical factual predicate" to the claims at issue in the case. *Id*. That is not the case here, where the Proposed Settlement broadly releases future claims based on interchange rules that might not even exist yet.

In addition, the Proposed Settlement's broad release of future claims of as-of-yet

23

uninjured, unrepresented future class members violates the rights of these parties.  Defendants

claim that such releases are not problematic because courts within this Circuit routinely approve

classes containing future plaintiffs.  *See* Defs.' Mem. in Support of Final Approval, Dkt. 2110 at

22-25  The cases cited by Defendants, however, pertain to class action certifications and do not

touch on the permissibility of releases of future claims.  *See Robidoux v. Celani*, 987 F.2d 931,

933 (2d Cir. 1993); *Comer v. Cisneros*, 37 F.3d 775, 796-97 (2d Cir. 1994); *Schreiber v. NCAA*,

167 F.R.D. 169, 177 (D. Kan. 1996); *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. C 04-1511,

2007 U.S. Dist. LEXIS 44459, at *1 (N.D. Cal. June 11, 2007).  And in the one Second Circuit

case cited by Defendants in which a settlement containing releases of future class members'

claims was approved, the releases were much more limited in scope than those found in the

current litigation.  *See Joel A. v. Giuliani,* 218 F.3d 132, 142 (2d Cir. 2000) ("[T]he sole effect of

the release is to prohibit, [for two years], class action suits asserting equitable claims that are

related to the claims asserted by the . . . class and seek systemic relief.  The release explicitly

preserves the right of an individual plaintiff [to sue] for damages or equitable relief tailored

solely to the specific circumstances of that individual plaintiff.").

Most of the other cases cited by Defendants in which releases based upon future conduct

were approved did not include releases by as-of-yet uninjured, future class members.[10]  The

cases mainly deal with releases by those who had already been injured.  *See Literary Works in*

*Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 247 (2d Cir. 2011) (defining

class members as authors whose work "*has been* reproduced, displayed, adapted, licensed, sold

and/or distributed in any electronic or digital format") (emphasis added); *Smith v. DADA Entm't*,

---

[10] *TBK Partners*, cited by Defendants, is inapposite because that case dealt with the release of state law claims with respect to appraisal rights and not the release of claims based upon future conduct.  *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982).

*LLC*, No. 11 Civ 7066, 2012 U.S. Dist. LEXIS 143961, at *7 (S.D.N.Y. Sept. 27, 2012) (class

included "[a]ll current and former Wireless Subscribers in the United States and its territories

who, at any time until thirty (30) days after preliminary approval is entered, *were charged* for

Mobile Content . . . .") (emphasis added); *Shane  v. Humana Inc. (In re Managed Care Litig.)*,

No. 00-MD-1334, 2010 U.S. Dist. LEXIS 142863, at *38 (S.D. Fla. Aug. 15, 2010) (provider

class contained physicians "*who provided* Covered Services . . . by a plan offered or

administered by any Person named as a defendant in the Complaints . . .  from August 4, 1990

through the Preliminary Approval Date") (emphasis added); *Schwartz v. Dallas Cowboys

Football Club*, *Ltd*., 157 F. Supp. 2d 561, 566 (E.D. Pa. 2001) (class was comprised of all

persons in the United States "*who have purchased* one or more residential subscriptions to NFL

Sunday Ticket") (emphasis added); *but see Scarver v. Litscher*, 371 F. Supp. 2d 986, 997 (W.D.

Wis. 2005), *aff'd on other grounds*, 434 F.3d 972 (7th Cir. 2006); *Tiggs v. Berge*, No. 01-C-171-

C, 2002 WL 32342678, at *2 (W.D. Wis. Nov. 14, 2002).

 Thus, the Blues Entities should not be saddled with broad releases of their future claims.

## IV. EVEN IF THE COURT APPROVES THE PROPOSED SETTLEMENT, IT SHOULD GRANT ALTERNATIVE RELIEF TO AVOID AN UNFAIR IMPACT ON THE BLUES ENTITIES

 If the Court is not inclined to reject the Proposed Settlement, the Blues Entities request

that the Court take alternative action to protect their interests.  The Court should simply carve out

health insurers from the class definitions.

**Conclusion**

 For these reasons, the Court should reject the Proposed Settlement.  In the alternative, the

Court should limit the Proposed Settlement's harm on the Blues Entities by excluding health

insurers from the class definitions.

25

Dated:  May 28, 2013

Respectfully submitted,

BINDER & SCHWARTZ LLP


   /s/ Wendy H. Schwartz
Wendy H. Schwartz
BINDER & SCHWARTZ LLP
28 West 44th Street
New York, NY 10036
Phone: 347-334-5082
Facsimile: 347-772-3072
E-mail: wschwartz@binderschwartz.com


Anthony F. Shelley (pro hac vice motion pending)
Adam P. Feinberg (pro hac vice motion pending)
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington, DC 20005
Phone: 202-626-5800
Facsimile: 202-626-5801
E-mail: ashelley@milchev.com
E-mail: afeinberg@milchev.com

*Attorneys for the Blues Entities*

# A2178

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Relates To:  ALL CASES | No. 1:05-MD-1720 (JG) (JO) |

## DECLARATION OF DAVID COTE

I, David Cote, hereby declare as follows:

1.     I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2.     I am currently employed by BlueCross BlueShield of South Carolina ("BCBS-SC") in Columbia, South Carolina.  My current title is Assistant Treasurer.

3.     BCBS-SC is an independent licensee of the Blue Cross and Blue Shield Association.

4.     BCBS-SC currently accepts credit card payments, but those payments account for a very small portion of the total payments received from BCBS-SC's customers.  For example, in 2012, BCBS-SC received Visa and MasterCard payments totaling roughly $33.6 million, which represents less than 5% of BCBS-SC's total annual revenue.  Those Visa and MasterCard transactions in 2012 resulted in interchange and associated Visa and MasterCard fees of approximately $612,000.

5.     Because of the internet-based Health Benefit Exchanges created by the Patient Protection and Affordable Care Act, BCBS-SC's management has decided to accept credit cards

1

for payment of premiums on the Exchange when it begins in 2014. BCBS-SC's management believes that it would be difficult to participate in South Carolina's Health Benefit Exchange unless BCBS-SC accepts credit cards for purchases of insurance products sold on the Exchange. For these reasons, BCBS-SC anticipates that an increasing portion of its premiums will be collected through credit card transactions starting in 2014 and into the foreseeable future.

6.      BCBS-SC reported Medical Loss Ratios to the U.S. Department of Health and Human Services for both individual and small group markets that were below the 80% threshold for 2011 (the most recent year for which BCBS-SC has reported Medical Loss Ratios).


I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of May, 2013.

David Cote

# A2180

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | No. 1:05-MD-1720 (JG) (JO) |
| This Document Relates To:  ALL CASES | |

## DECLARATION OF GARRETT CALISSI

I, Garrett Calissi, hereby declare as follows:

1.    I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2.    I am currently employed by the Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ") in Phoenix, Arizona.  My current title is Senior Manager of Financial Planning and Analysis/Purchasing.

3.    BCBS-AZ is a not-for-profit health insurance company and is an independent licensee of the Blue Cross and Blue Shield Association.

4.    BCBS-AZ does not currently accept credit cards for any purposes and has not done so since 2009.

5.    From 2004 to 2009, BCBS-AZ accepted credit cards, but only for application fees for individual insurance.  From 2004 to 2009, credit card transactions represented only a tiny fraction of BCBS-AZ's revenue.  BCBA-AZ has never accepted credit cards for premiums that it collects from its customers.

6.      Because of the internet-based Health Benefit Exchanges created by the Patient Protection and Affordable Care Act, BCBS-AZ's management has decided to accept credit cards for premiums (and other charges) beginning on or before January 1, 2014. BCBS-AZ believes that it would be at a distinct competitive disadvantage in Arizona's Health Benefit Exchange unless BCBS-AZ accepts credit cards for its insurance products sold on the Exchange. For these reasons, BCBS-AZ anticipates that a substantial portion of its premiums will be collected through credit card transactions starting in 2014 and into the foreseeable future.

7.      BCBS-AZ's Medical Loss Ratio for the individual market for 2011 was 77.9%. For the small group market it also was 77.9%.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 23rd day of May, 2013.

_Garrett Calise_
Garrett Calise

1335182.1

# A2182

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

No. 1:05-MD-1720 (JG) (JO)

This Document Relates To:  ALL CASES

## DECLARATION OF MATTHEW BROLLY

I, Matthew Brolly, hereby declare as follows:

1.     I am over the age of 18 years and competent to testify to the following facts, of

which I have personal knowledge.

2.     I am currently employed by Independence Blue Cross ("IBC") in Philadelphia,

Pennsylvania.  My current title is Director Accounting Operations. I have worked in the

Accounting Operations Department at IBC since 2010.

3.     IBC serves the health insurance needs of Philadelphia and southeastern

Pennsylvania and is an independent licensee of the Blue Cross and Blue Shield Association.

4.     IBC does not currently accept credit cards for any purposes and has not done so

from 2004 to the present.

5.     Because of the internet-based Health Benefit Exchanges created by the Patient

Protection and Affordable Care Act, IBC's management has decided to accept credit cards for

payment of premiums on the Exchange starting in 2014.  At first, IBC will accept credit cards

only for the first premium payment, but in the future IBC could decide to accept credit cards for

subsequent premium payments also.  IBC's management believes that it would be difficult, if not

# A2183

impossible, to participate in Pennsylvania's Health Benefit Exchange unless IBC accepts credit cards for purchases for initial payments of insurance products sold on the Exchange. For these reasons, IBC anticipates that a considerable portion of its premiums will be collected through credit card transactions starting in 2014 and into the foreseeable future.

     I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of May, 2013.

Matthew Brolly

# A2184

Case 1:05-md-01720-JG-JO   Document 2643-7   Filed 05/28/13   Page 1 of 2 PageID #: 54475

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:  ALL CASES

No. 1:05-MD-1720 (JG) (JO)

### DECLARATION OF William J. Farrell

I, William J. Farrell, hereby declare as follows:

1.     I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2.     I am currently employed by Blue Cross of Northeastern Pennsylvania ("BCNEPA") in Wilkes Barre, Pennsylvania.  My current title is Senior Vice President, Chief Financial Officer and Treasurer.

3.     BCNEPA serves the health insurance needs of Bradford, Carbon, Clinton, Lackawanna, Luzerne, Lycoming, Monroe, Pike, Sullivan, Susquehanna, Tioga, Wayne and Wyoming Counties in Pennsylvania.  BCNEPA is an independent licensee of the Blue Cross and Blue Shield Association.

4.     BCNEPA did not accept credit cards for any purposes prior to very late in 2011.

5.     Because of the internet-based Health Benefit Exchanges created by the Patient Protection and Affordable Care Act, BCNEPA's management has decided to accept credit cards for payment of premiums on the Exchange when it begins in 2014.  BCNEPA's management believes that it would be difficult, if not impossible, to participate in Pennsylvania's Health

# A2185

Case 1:05-md-01720-JG-JO   Document 2643-7   Filed 05/28/13   Page 2 of 2 PageID #: 54476

Benefit Exchange unless BCNEPA accepts credit cards for purchases of insurance products sold on the Exchange.  For these reasons, BCNEPA anticipates that a significant portion of its premiums will be collected through credit card transactions starting in 2014 and into the foreseeable future.  BCNEPA expects credit cards to be the dominant payment vehicle for its products sold on the Exchange.

6.    In anticipation of accepting credit cards on the Exchange, BCNEPA began accepting credit cards in very late 2011.  BCNEPA accepted less than $600 in Visa and MasterCard credit card payments in 2011, which resulted in interchange fees of less than $10.  In 2012, BCNEPA accepted less than $650,000 in Visa and MasterCard credit card payments, which resulted in interchange fees of less than $11,000.  In total, from 2004 through 2012, BCNEPA paid less than $11,000 in Visa and MasterCard interchange fees.

7.    Although BCNEPA's Medical Loss Ratio ("MLR") is currently above the 80% threshold for the individual market, it is possible that BCNEPA's MLR might be below that threshold in the future due to an increase in credit card interchange fees or other administrative costs, or for any number of other reasons.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 23rd day of May, 2013.

William J. Farrell

# A2186

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE : 
FEE AND MERCHANT DISCOUNT :     MDL No. 1720(JG)(JO)
ANTITRUST LITIGATION :
  :
  :     **WALMART'S OBJECTION**
This Document Relates To: :     **TO THE PROPOSED**
ALL CLASS ACTIONS. :     **SETTLEMENT**
  :

--------------------------------------------------------------x

### DECLARATION OF MICHAEL A. COOK, WAL-MART STORES, INC.

Michael A. Cook hereby declares:

1.     I am Senior Vice President and Assistant Treasurer at Wal-Mart Stores, Inc.

("Walmart"). I have been with Walmart for more than 20 years.

2.     I am responsible for the long-term strategic direction for Walmart's global

treasury operations function. I lead a highly specialized team that develops strategies and

initiatives involving global payment acceptance, and I evaluate cash management and payment

innovations for functional viability within Walmart's complex operating systems, considering

both existing and emerging technologies. I am knowledgeable about Walmart's acceptance of

debit and credit card transactions on all payment networks, including Visa and MasterCard, and

payment of interchange fees for transactions completed over those networks

3.     I have significant experience outside of Walmart that allows me to be well-versed

in multiple aspects of the payments industry. I began my career with the Office of the

Comptroller of the Currency, where I participated in safety and soundness examinations and

compliance reviews of nationally chartered banks. From 2005-2008, I served on the Consumer

Advisory Council of the Federal Reserve Board. I currently serve on the board of directors for

the Little Rock Branch of the Federal Reserve Bank of St. Louis. I have served on the Board of

1

Advisors for the Payment Card Industry Data Security Standards Council since 2007.

## I. INTERCHANGE FEES AND WALMART'S ACCEPTANCE OF PAYMENT CARDS

4.      Walmart, the world's largest retailer, operates more than 10,000 retail units under 69 banners in 27 countries.  Walmart employs 2.2 million associates worldwide — 1.4 million in the United States alone, and operates approximately 4,000 stores and 600 SAM's CLUB locations in the United States.  Walmart also sells goods over the internet at walmart.com and samsclub.com.  Each year, Walmart accepts customer payments for merchandise totaling nearly half a trillion dollars – more than ten billion transactions – across all tender types worldwide.

5.      Walmart accepts Visa credit and debit (signature and PIN via both Visa's PIN debit network, Interlink and PIN Authenticated Visa Debit) and MasterCard credit and debit (signature and PIN, through MasterCard's PIN debit network, Maestro) at Walmart stores in the United States.  Walmart accepted Visa credit and debit transactions (signature and PIN) and MasterCard credit transactions at all times between January 1, 2004 and the present.  Walmart declined to accept MasterCard debit for a period of time in 2004, and subsequent to that, Walmart has accepted MasterCard debit transactions, signature and PIN, at all times to the present.  In addition, Walmart's fleet of automated teller machines participates in Visa's Plus ATM network and MasterCard's Cirrus ATM network. While Walmart has long believed that although the cost of accepting Visa and MasterCard transactions, credit and debit, is far too high, Walmart cannot stop accepting Visa and MasterCard transactions, credit or debit, without losing unacceptable sales volume.

6.      Visa and MasterCard interchange fees are among Walmart's largest expenses.

7.      Since January 1, 2004, Walmart has paid approximately $5.6 billion in interchange fees for payment card transactions on the Visa and MasterCard networks.  Since

2

# A2188

November 28, 2012, Walmart has continued to pay millions in interchange fees each month. Yet claims for ongoing damages flowing from these payments are purportedly subject to the mandatory release in the settlement, in violation of Walmart's due process rights.

## II.      THE PROPOSED SETTLEMENT OF THE INTERCHANGE LITIGATION

8.      Walmart has long felt that, because of the way Visa and MasterCard operate, the payments industry suffers from a virtually complete lack of competition for merchants. In Walmart's view, Visa and MasterCard and the banks do not compete for merchant acceptance in a truly free market; rather, Visa and MasterCard centrally fix the interchange rates that merchants must pay for every Visa and MasterCard transaction. They did so as membership associations and they continue to do so today even after becoming publicly-traded companies. In fact, nothing regarding the way Visa and MasterCard operate, including their propensity to exploit their power over merchants with new fees and arbitrary rules, has changed since the restructurings. Their longstanding price-fixing, when combined with Honor All Cards rules and no-bypass rules, prevents competition for both merchant acceptance among issuing banks and transaction volume among networks. (Honor All Cards rules require merchants to accept all Visa and MasterCard cards that are defined by the networks as "credit" or "debit," regardless of cost or issuing bank; no-bypass rules prevent competition between issuing banks or from alternative networks.) Unfortunately, the proposed settlement of the interchange class action (the "Proposed Settlement") fails to provide the industry-wide solution that is needed for this fundamental problem.

9.      I have reviewed the purported agreement that sets forth the terms of the Proposed Settlement. Neither I nor anyone else at Walmart, nor any counsel working on Walmart's behalf, had any involvement in the negotiations leading up to the Proposed Settlement. I had one or two conversations with Class Counsel, Mr. Wildfang, about the interchange class action in which I

3

# A2189

gave him my views on settlement terms that might be effective, but my thoughts and suggestions are not reflected in the Proposed Settlement.

10.     In my view, the Proposed Settlement lacks real-world solutions to the problems it purports to address.  The Proposed Settlement will not change the tactics Visa, MasterCard, and the banks use to squelch competition in the current payment marketplace, including how Visa and MasterCard fix interchange rates for the banks, require merchants to "honor all cards" from all issuers, and/or limit network routing choices for credit cards, among other things.  What is worse, due to the breadth of the release, the Proposed Settlement could actually strengthen and institutionalize Visa's and MasterCard's anti-competitive practices for generations to come.

11.     The primary relief offered – limited changes to the no-surcharging rules – is flawed in concept and execution.  The modest rule changes are also temporary, expiring in 2021. The broad and permanent release of claims will affect all merchants, even merchants not yet in existence, without giving them the ability to opt out of the settlement.  Given that one cannot predict the future, let alone how Visa and MasterCard might take advantage of the sweeping immunity the release purports to give them, the uncertain effects of the forward-looking aspects of the release deeply concern Walmart.  Far more important than damages is the opportunity to meaningfully change the interchange system going forward, or failing that, to give merchants the tools to introduce some competitive discipline into the system.  The Proposed Settlement misses this opportunity and instead threatens to further entrench the current system by providing a sweeping, forward-looking release of claims concerning interchange as well as other anticompetitive rules.  Nothing in the settlement will prevent Visa, MasterCard and the banks from raising prices further to quickly recover the monetary costs of the settlement.

A.      **Surcharging Rule Changes Will Have Little or No Effect on Walmart's Business**

4

12.     The Proposed Settlement provides merchants an extremely limited ability to surcharge their customers based on the brand or type of credit card used.  Even though Walmart does not believe that surcharging, in and of itself, will solve the competitive issues in the payment industry, Walmart does believe that merchants should have the right to surcharge without limitations, if they so desire.  Unfortunately, the Proposed Settlement does not provide such an unlimited right.

### 1.     The Settlement Provisions Interact with American Express Rules to Effectively Prevent Surcharging

13.     The modest rule changes in the Proposed Settlement only allow merchants to surcharge Visa or MasterCard credit card transactions under the same terms as the merchant is allowed to surcharge transactions under the rules of any "Competitive Card Brand" that is at least as expensive as Visa or MasterCard.  This effectively incorporates the surcharging limitations of the more expensive Competitive Card Brands.

14.     American Express Rule 3.2 provides that "Merchants must not:  indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card[;] try to dissuade Cardmembers from using the Card . . . [; or] impose any restrictions, conditions, disadvantages or fees when the Card is accepted that are not imposed equally on all Other Payment Products, except for electronic funds transfer, cash, and checks . . . ."

15.     As a consequence, if a merchant wanted to surcharge as provided under the Proposed Settlement, the merchant would (a) also be required to surcharge American Express transactions; and (b) according to American Express Rule 3.2, would then be required to surcharge all payment cards equally, including cards and brands or card products with lower acceptance costs.  This would completely defeat the original point of surcharging, to give customers true price transparency so that they can make an informed choice about which tender

5

to use at the register and thus introduce price competition into the industry.

16.    Adding to the complexity is the fact that American Express Rule 3.2 encompasses all card products – debit and credit – including Visa and MasterCard signature debit, which are excluded from the surcharging provisions of the proposed settlement.  Thus to prevent merchants from implementing the surcharging provisions of the settlement and realizing any benefit from these provisions, Visa and MasterCard need only maintain their debit card surcharging prohibitions.

17.    The only theoretical alternative would be to stop accepting American Express – a result which can hardly be seen to increase competition in the industry.  American Express currently accounts for 11% of Walmart's credit card transactions.  Dropping American Express is not a practical business proposition for Walmart and would only further consolidate the market power of Visa and MasterCard.

18.    This same confluence of rules occurs with PayPal, which Walmart accepts on walmart.com.  Because PayPal prohibits surcharging and if a merchant's cost of accepting PayPal is the same or more expensive than Visa and MasterCard, then under the Proposed Settlement, the merchant cannot surcharge Visa and MasterCard credit card transactions at locations where the merchant accepts PayPal unless it also surcharges PayPal transactions, which would require it to surcharge all brands—which would eliminate any benefit to surcharging.

19.    Alternatively, if a merchant chose to stop accepting PayPal, competition in the payments space would be reduced.  Either way, Visa and MasterCard further consolidate their market power.  This further reinforces Walmart's concerns about the Proposed Settlement.

20.    The interaction of the Proposed Settlement and American Express or PayPal rules negates any value surcharging might offer to Walmart, and it is extremely unlikely that Walmart

6

would surcharge under these terms.  Based on my experience in the industry, I expect virtually all merchants that accept American Express or PayPal and are subject to their rules will have the same reaction.  In their brief supporting the Proposed Settlement, Class Counsel acknowledged that the vast majority of merchants (69%) would not be able to benefit from the surcharge provision because they also accept American Express.  When one adds those merchants who do not accept American Express but operate in no-surcharge states, potentially 80% of merchants will not be able to surcharge and will see no benefit from this settlement provision.

### 2.       The Surcharging Rules Concerning Disclosure and Surcharging by Brand or Product Are Unworkable

21.      Other aspects of the surcharging rules in the Proposed Settlement are problematic.

22.      For example, if Walmart decided to surcharge cardholders, Walmart would want to control the message to its customers, especially at the point of sale.  The Proposed Settlement and subsequent rule modifications, however, allow Visa and MasterCard to govern this messaging.

23.      Most objectionable is the requirement that merchants make "a statement that the surcharge is being imposed by the *merchant.*"  Proposed Settlement ¶¶ 42(c)(iii), 55(c)(iii).  According to Visa, under the settlement "U.S. merchants that intend to surcharge are required to: . . . Disclose the surcharge as a merchant fee . . . ."

http://usa.visa.com/download/merchants/surcharging-faq-by-merchants.pdf

24.      No non-governmental agency should dictate how merchants set and communicate pricing or how to interact with customers.  In addition, the implied message that Walmart, rather than Visa, MasterCard, and the banks, is responsible for interchange and created the need for surcharging is false.  Visa's and MasterCard's supra-competitive pricing has necessitated

7

surcharging; if interchange prices were set through market competition, merchants likely would not need to surcharge. In any event, forcing merchants to tell customers that the merchant is assessing the surcharge will focus customer ire on merchants rather than the networks and lead to lost sales and fewer merchants willing to surcharge.

25.     The Proposed Settlement gives merchants a choice between surcharging across brand or product. If a merchant were to surcharge any payment cards, it would choose to surcharge rewards cards with high interchange rates and encourage lower-priced forms of payment.

26.     To do so effectively, merchants would need a cost-effective and consistent method to distinguish among Visa rewards cards, MasterCard rewards cards, standard Visa cards and standard MasterCard cards—but such a method does not exist. In fact, Visa and MasterCard have the ability to change the rewards status of an account without reissuing a card, meaning it is virtually impossible to know what rewards category the card falls in at the time it is presented. The Proposed Settlement offers no practical solution to this problem. In contrast to the clear labels which must appear on a debit card to distinguish it from a credit card, there is nothing on credit cards in use today that gives a merchant's cashiers a reliable ability to visually or electronically distinguish between rewards and basic cards, or any of the dozens of other Visa and MasterCard products. These products (and the associated interchange rates) can change, and they have no standardized appearance—which could also confuse customers as to whether their card is subject to a surcharge.

27.     Merchants would need a way to identify the interchange rates associated with a particular card before a transaction begins so that they can effectively communicate these surcharges to their customers, and the Proposed Settlement does not provide such a method.

8

# A2194

Visa and MasterCard interchange rates vary widely across dozens of products types and dozens of different interchange rate schedules with Visa having more than 70 different rate categories and MasterCard having more than 240 different rate categories.

28.     If a merchant attempting to surcharge makes a mistake amidst this complexity, Visa has added "Improperly Assessed Surcharge" as a source of compliance violations for acquirers to impose, including the following rules:

• U.S. Credit Card Surcharge amount exceeds the applicable U.S. Credit Card Surcharge amount as specified in "U.S. Credit Card Surcharge Maximum Amount – AP Region, LAC Region, and U.S. Region"

• U.S. Credit Card Surcharge was assessed on a Transaction in a manner that does not comply with "Similar Treatment of Visa Transactions – AP Region, LAC Region, and U.S. Region"

• U.S. Credit Card Surcharge was assessed on a Transaction type where surcharging is not permitted

• U.S. Credit Card Surcharge was assessed by a third party

• U.S. Credit Card Surcharge was not disclosed as specified in "U.S. Credit Card Surcharge Disclosure Requirements – AP Region, LAC Region and U.S. Region"

• U.S. Credit Card Surcharge amount did not appear on the Transaction Receipt as specified in "U.S. Credit Card Surcharge Transaction Receipt Requirements – AP Region, LAC Region, and U.S. Region"

• U.S. Credit Card Surcharge amount was not refunded as specified in "Credit and Refund Restrictions"

9

# A2195

• For a Dynamic Currency Conversion Transaction, U.S. Credit Card Surcharge

amount was not included in the conversion

• Convenience Fee, Service Fee, currency conversion fee, commission, or Wire

Transfer Money Order service fee was applied on a Transaction that included a U.S.

Credit Card Surcharge

29.     The "Visa Product Eligibility Service" and the "MasterCard Product Validation

Service" will not help merchants solve this problem.  First, they require a nonfinancial

transaction via the merchant's processor, who will not be bound by Visa's and MasterCard's

commitment to maintain the services at no cost until 2021.  Of course, after 2021, Visa and

MasterCard may add an additional fee for these services, or simply re-impose a full ban on

surcharging. Nothing in the Proposed Settlement would allow a merchant like Walmart to recoup

any fee assessed for use of the Visa Product Eligibility Service or the MasterCard Product

Validation Service. Under the terms of the Proposed Settlement, Visa and MasterCard could

collect fees for these services that would completely offset any allowable surcharge amount.

30.     Most importantly, however, these services would slow down the checkout process

and create a negative shopping experience for customers rendering them impractical and totally

unacceptable to Walmart.  The cashier or customer might have to swipe the same card twice or

swipe more than one payment card to determine the applicable surcharge on each card.

31.     Even minor delays at checkout would eliminate any potential benefit from

surcharging because of increased costs, inconvenience, consumer dissatisfaction, and lost

productivity.  Walmart has calculated that every additional second added to the average

transaction at U.S. stores costs an estimated $12 million in cashier wages alone.  [see

10

# A2196

http://www.technologyreview.com/news/427358/the-most-powerful-man-in-payments/]  Using
that calculation, adding thirty seconds (the length of time Walmart estimates surcharging would
add to a transaction), to 10% of Walmart's transactions would cost the company more than $35
million annually.  Assuming a 1% surcharge, this would mean that the first $3.5 billion in
surcharged sales would be conducted simply to offset the incremental wage costs of
surcharging—this is before offsetting even one penny of the actual cost of accepting Visa and
MasterCard credit cards.

32.     Further adding to the complexity of product level surcharging, MasterCard
recently announced a rate schedule that will result in varying interchange levels depending upon
the amount spent by the cardholder, regardless of where that spend occurred.  The same card,
presented at a retailer might be subject to two different interchange rates on consecutive
transactions.  This change completely defeats the ability of a merchant to assess product-level
surcharges, assuming the merchant could surmount the identification issues set forth above.
Moreover, given the breadth of the release, as discussed below, a change like this is almost
certainly covered by the release and could not be challenged by Walmart or any other merchant –
and yet it could completely negate any benefit from this settlement provision.

### 3.     Surcharging Alone Cannot Fix the Problems in the Payments Market

33.     Walmart operates stores in all 50 states, and operates SAM's CLUB locations in
47 states.  The 12 states that ban surcharging include some of Walmart's most concentrated areas
of operations, including Texas (477 units), Florida (299), and California (250); and Walmart has
significant operations in the other states, including Oklahoma (113), New York (114), Colorado
(93), Kansas (76), Mississippi [1] (73), Utah (52), Massachusetts (49), Connecticut (36) and Maine

---

[1] In 2013, Mississippi passed a statute prohibiting surcharging of state procurement cards. Because merchants have
no mechanism to identify those cards in particular, this will effectively prohibit surcharging in Mississippi.

11

# A2197

(25).  Together, these 12 states, along with Puerto Rico, which also bans surcharging, account for 37% of U.S. locations and 37% of U.S. sales.

34.      Additional states may also ban surcharging.  In addition to recent laws passed in Utah and Mississippi, 19 other states have introduced bills that would restrict credit card surcharges.  These include states where many Walmart stores are located, including Arkansas (103 stores), Hawaii (11 stores), Illinois (187 stores), Indiana (120 stores), Kentucky (100 stores), Maryland (59 stores), Michigan (117 stores), Missouri (140 stores), Nevada (50 stores), New Hampshire (31 stores), New Jersey (67 stores), New Mexico (46 stores), Pennsylvania (156 stores), Rhode Island (9 stores), South Carolina (87 stores), Tennessee (132 stores), Vermont (4 stores), Washington (61 stores), and West Virginia (43 stores).  Combined with states that already ban surcharging, these states account for 69% of Walmart's U.S. locations (3,236 stores) and 70% of U.S. sales.  Walmart would not consider surcharging in states where it may soon be prohibited.

35.      The fact that surcharging is currently legally permitted in less than 2/3 of Walmart's stores is problematic in and of itself.  Card acceptance practices that vary state by state would only add to the confusion and inconvenience for Walmart's customers, sales staff, and point-of-sale systems.  Even if Walmart was inclined to surcharge, it would be hesitant to engage in a practice that would not be applicable across all of its stores. Walmart strives to provide a consistent experience across Walmart's nationwide chain of stores. Walmart has learned that a consistent, customer-oriented experience is essential for efficient operations. Many of Walmart's customers shop multiple stores in different states, relying on Walmart when on vacation or traveling on business. The introduction of a fundamentally different payment acceptance fee in some stores would undermine that consistency.

12

# A2198

36.     Visa, MasterCard, and issuing banks have been actively involved in the passage of anti-surcharging laws in the past, and I expect that they will lobby to pass similar laws in other states, or even seek a federal ban.  Consider the fact that merchants have never engaged in surcharging on a broad scale, yet nearly one in four states already bans the practice.  Since Preliminary Approval, two additional states (Utah and Mississippi) have passed credit card surcharge bans.  Additional bans would further weaken any potential relief in the Proposed Settlement.  I have heard anecdotally that representatives of the Defendants, via their trade associations, have assisted and supported efforts to promote additional state surcharge prohibitions since Preliminary Approval.

37.     Additionally, Visa's and MasterCard's rules continue to require that a merchant's acceptance policies be the same in all stores operating under the same banner.  In fact, the settlement requires that all Visa or MasterCard credit cards be surcharged (by brand or product) if any are surcharged. Further, while the current Visa and MasterCard Rules permit differential surcharging by state, the text of the settlement does not. Upon Final Approval, Visa and MasterCard might be free to change their rules to prevent differential surcharging by state. This would mean a merchant that operates in one of the no- surcharge states must either eschew surcharging altogether or operate those locations under a different brand.  Again, this is an untenable situation for merchants.

38.     First Data, Walmart's payments processor and the largest processor in the United States, recently announced that "First Data has decided not to implement global support for [surcharging]….nor will First Data owned terminal or advanced product solutions be updated for surcharge."  I understand that they made that announcement because enabling surcharging requires expensive technical changes at First Data and the meager merchant interest in

13

surcharging -- almost no interest to date -- did not support implementing such changes. Even the largest payments processor in the United States has not seen sufficient demand to justify development of surcharge functionality.

39.    For these reasons, any solution to the interchange issue cannot rely solely on surcharging. Even without the problematic restrictions on surcharging in the settlement -- such as the Competitive Card Brand limitation and the disclosure requirements -- the fact that numerous merchants cannot surcharge because 12 states prohibit it, and the possibility that more states will prohibit it in the future, renders surcharging, standing alone, an insufficient remedy to the interchange problem.

**B.    The All Outlets Provision Provides No Significant Benefit to Merchants**

40.    If Walmart elects to implement surcharging, it would want the ability to test various surcharging and disclosure methods in a single or small number of stores. Visa and MasterCard rules, however, would require surcharging across all of a merchant's locations. The supposed revisions to the all outlets rule in the settlement, therefore, do not provide Walmart and other merchants what they would really need -- the ability to test new acceptance practices at a small number of stores under the same banner.

41.    The supposed revision to the all outlets rules to permit different acceptance practices if a merchant operates under more than one trade name is, in fact, not a revision at all. Since the Visa Check settlement, Walmart has accepted Visa credit cards in Walmart stores, but not in SAM's CLUB locations. No Visa rules or volume-discount programs impeded Walmart's ability to do that and no variance or waiver of their rules was necessary, as far as I know, to implement differential acceptance at SAM's.

**C.    Group Buying Offers Nothing to Merchants**

42.    The Proposed Settlement's provisions allowing merchants to form buying groups

14

# A2200

offer nothing to merchants. Merchants have never been prohibited from forming these groups, and in my 20+ years in the industry, I have never been aware of any such restriction or the formation of such buying groups. In addition, unless these "buying groups" have the ability to act in concert, they will lack the ability to successfully leverage this provision to reduce their mutual cost of acceptance.

### D.    The Release Is Far Too Broad

43.    In exchange for ineffective and temporary rule changes, the Proposed Settlement requires that all merchants (including merchants that do not yet exist) release all of the defendants from virtually all past, present, and future claims relating to any Visa or MasterCard rule or conduct, including claims based on any "substantially similar" rules or conduct in the future. Unfortunately, the release's vague language is very likely to lead to more litigation over whether a future rule, or conduct based on such future rule, is "substantially similar" to a rule or conduct that exists today. The unfairness and overly broad scope of the release is already being demonstrated by the Defendants' public statements. According to Duncan MacDonald, independent consultant and former General Counsel for Citi's North American and European card business, "The 'release' is a breathtaking success for the bankcard industry. It is about as comprehensive as any I've ever seen."[2]

44.    The Proposed Settlement requires that all merchants release claims relating to any "actual or alleged Rule . . . relating to any Visa-Branded Cards or any MasterCard-Branded Cards." Rule is defined to "mean[] any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card." Based upon my experience, I would expect Visa and

---

[2] "'We Won' vs. 'You Lost': Reactions to Credit Card Settlement," *American Banker*, 16 July 2012

15

MasterCard to argue that the release encompasses all current or future rules relating to any Visa or MasterCard-branded card.

45.     As a result, Visa and MasterCard will argue that the entire rulebooks of Visa and MasterCard, as they existed up until preliminary approval, are immune from challenge in the future, as will be any substantially similar rule, course of conduct, or activity despite the fact that, other than the deficient surcharging rights discussed above, there is no relief provided concerning these rules.  Further, Walmart is concerned that Visa and MasterCard will argue that claims related to all rules have been released despite the fact that merchants do not have access to many of the issuer, acquirer, or ATM rules propagated by Visa and MasterCard.

46.     Most troubling, the settlement provides no relief on interchange – the central wrong alleged in this case – yet claims related to interchange are released forever.  Visa and MasterCard will be free to raise interchange rates without any fear of legal challenge from merchants in the future. In fact, since preliminary approval was granted, MasterCard has increased many of its interchange rates, despite the fact that the Proposed Settlement was supposed to result in a decrease in interchange. The Proposed Settlement provides no constraint on MasterCard's and Visa's ability to raise interchange even further in the future.

47.     Also following Preliminary Approval, MasterCard introduced a new "Staged Digital Wallet" fee that will increase costs for those who use MasterCard's systems to load funds for later use in mobile payments. This is a clear example of MasterCard's intention to expand its footprint into mobile, the prospects of which are enhanced by the Proposed Settlement.

48.     The settlement provides no relief on Visa's and MasterCard's Honor All Cards rules, which are also central to the case and to Visa's and MasterCard's power over merchants, yet claims concerning these rules are released forever.  This will allow Visa and MasterCard to

16

# A2202

use these rules in a variety of problematic ways including extensions to cover future technologies, which are discussed below.

49.     The Honor All Cards rules have consistently been used by Visa and MasterCard to force merchants to accept new products and thereby give Visa and MasterCard the ability to foreclose competition regarding those products.  Visa and MasterCard did just that in using the Honor All Cards rules to tie debit card acceptance to credit card acceptance, a practice Walmart (working with other merchants) challenged successfully in the Visa Check case.  Since the Visa Check settlement, which rescinded the credit/debit tie, they have used their Honor All Cards rules to force acceptance of new products in the debit category (pre-paid cards, gift cards, Flexible Spending Account cards, Health Savings Account Cards, Health Reimbursement Arrangement cards, Electronic Benefit Cards to name a few) and in the credit category (corporate cards, fleet cards, rewards cards, commercial debit cards).

50.     The Honor All Cards rules are harmful to competition in another respect – they prevent the banks that issue Visa and MasterCard products, credit or debit, from competing for merchant acceptance.  Since merchants must accept all issuers' cards under Honor All Cards, the banks have no incentive to compete for merchants.  Walmart has tried to get the banks to compete for its business, but because of the impact of this rule, Walmart's overtures have never been successful.  Given the importance of the Honor All Cards rules to Visa's and MasterCard's strategy to dominate virtually all payment markets, and to prevent the emergence of bank competition for merchants, it would be deeply concerning to release merchants' ability to challenge these rules going forward.

51.     The settlement also releases claims against the defendants related to any "Merchant Fees," which are defined to include any funds deducted from a transaction, including

17

any network fee or assessment, or acquirer, issuer, or processor fee.  Fees charged to merchants

by their acquirer processors were not a part of the allegations in the class action and no relief for

those fees exists within the settlement, yet merchants who use Chase Paymentech or Bank of

America Merchant Services could be barred from challenging those vendors' fees in court.

52.     The Proposed Settlement provides no relief for rules or interchange rates on PIN

debit transactions, yet claims concerning these rules are released because "Visa-Branded Card"

and "MasterCard-Branded Card" are defined in the settlement to include cards bearing the marks

of the debit networks Interlink and Maestro.  Proposed Settlement ¶ 1(bb), (bbb); ¶ 68(a).

53.     The settlement provides no relief for pre-paid card rules, yet claims concerning

these rules could be released because they are incorporated under the definition of "Debit Card"

and Visa- or MasterCard-branded cards.  Proposed Settlement ¶1(v), (bb), (bbb).

54.     The settlement provides no relief on a host of other restrictive rules, such as those

limiting credit card network routing, yet all claims concerning these rules are released.

55.     The release covers future rules or conduct that are "substantially similar" to any

existing rules or course of conduct, and this will allow Visa and MasterCard to write a host of

other rules in the future that will be immune from challenge.  These rules may cover areas such

as card technology new to the U.S. such as EMV (chip cards), or rules for rapidly changing

topics such as data security, identity protection, biometrics, and new forms of non-card payment

technologies. It is entirely possible that, in advance of preliminary approval, Visa and

MasterCard created new rules that have yet to be published.  I understand that Visa and

MasterCard were only obligated to provide Class Counsel with the rules changes that were

mandated by the settlement.  Thus, the attorneys who purported to represent Walmart's (and the

rest of the putative class's interests) had no visibility into all of the rules of Visa and MasterCard

18

# A2204

that were in effect at preliminary approval, even though they agreed to language that says claims concerning all rules and conduct in place as of that time were to be released. I find this deeply troubling and a further confirmation that the lawyers who negotiated this settlement did not adequately represent Walmart's interests or the interests of the class they claim to represent.

56.    The release purportedly extends outside the jurisdiction of the United States and purports to release Visa, MasterCard, and others from their actions anywhere on the globe. Today, Walmart operates in 26 countries outside of the United States and Visa and MasterCard may argue that the release bars Walmart from seeking relief in any of those countries—and in any country Walmart may expand into in the future. This is a broad overreach of jurisdictional authority that was never contemplated by the original plaintiffs.

57.    Walmart is specifically put at risk in the United Kingdom by the breadth of this global release. In 2007, the European Union's antitrust agency ruled MasterCard's fees for cross-border card payments violated antitrust rules resulting in interchange fees that were unfairly inflated. In May 2012, MasterCard lost its appeal on this ruling in the European Union's General Court. Subsequently, ASDA, Walmart's wholly-owned subsidiary in the United Kingdom, filed a suit against MasterCard claiming at least $154 million in damages. Due to the breadth of the release here, MasterCard might argue that at least some of ASDA's claims in the United Kingdom are barred.

58.    In July 2012, the same European regulators who prosecuted the case against MasterCard filed a complaint against Visa Europe saying that their multi-lateral interchange fees "harm competition between acquiring banks, inflate the cost of payment card acceptance for merchants and ultimately increase consumer prices." ASDA's processing volume for Visa exceeds its processing volume for MasterCard. If the European courts' decisions are consistent with their earlier decisions in the MasterCard case, ASDA would likely file claims

19

against Visa Europe claiming damages in excess of those in the MasterCard lawsuit. Due to the breadth of the release here, Visa could also argue that ASDA's claims in the United Kingdom are barred.

59.    The Competition Bureau of Canada recently brought a case against Visa and MasterCard arguing that both networks' anticompetitive rules had allowed credit card interchange fees to be unlawfully inflated. While the case is currently awaiting a ruling, if the Tribunal finds Visa and MasterCard at fault, Walmart and other merchants could seek damages. Visa and MasterCard might also try to use the release here to prevent Walmart from making claims and seeking judicial relief in Canada.

60.    The release is so broad that it could institutionalize Visa and MasterCard as the de facto global regulators of electronic payments, despite the fact that they are for-profit entities that are motivated by their own profits when imposing their "regulations" on merchants. The problematic breadth of the release is most apparent in the language that covers Visa's and MasterCard's entire rulebooks, and all activities, practices, or courses of conduct related to those rules, incorporated by the definition of "Rule." Proposed Settlement ¶ 1(mm). Visa and MasterCard regularly abuse their market power by mandating merchant operating rules which they call "enhancements," that saddle merchants with either unnecessary or disproportionately burdensome costs and liabilities. Based on my experience in the industry, Visa and MasterCard would likely argue that all of the below examples are captured by the broad language in the release.

(A)    In July 2009, Visa made effective a rule ("Zero Floor Limit Fee") that penalizes merchants who "stand in" for a transaction that is settled without an authorization. More often than not, such circumstances arise because the issuer's or network's

system is unavailable – and not because there is a problem with the merchant's own registers. Yet, in an effort to provide a great customer experience, and despite a merchant's willingness to assume settlement risk, they are forced to bear an even greater financial burden for the networks' or issuer's failure in the form of a per-item fee for "standing-in" as well as the financial risk of a potential chargeback.

(B)   In October 2007, Visa enforced a "Business Enhancement" that required merchants to complete technical changes to provide data that was already available to the parties that supposedly needed it. This enhancement is known as F62.23, the Product Code Identifier Data Requirement. It allows Visa and the relevant issuers to identify card products that have been upgraded to high-cost rewards cards without re-issuing cards to the consumers. Additionally, this practice makes product level surcharging nearly impossible. Visa threatened to impose significant fines on the merchants for non-compliance.

(C)   Also in 2007, Visa and MasterCard forced the acceptance of Flexible Spending Account (FSA) cards by classifying them as a debit product, which is protected by their respective Honor All Cards rules. This lack of choice was costly for merchants who were obligated to upgrade registers in order to substantiate that the customer was actually purchasing FSA-eligible consumer goods. If a merchant chooses to forgo this costly upgrade, the merchant is still required to attempt to accept the FSA card under the Honor All Cards rule, but the transaction will be declined by the issuer. The merchant will incur a fee for this decline, and frustrate the customer with this bad experience.

21

# A2207

(D)     Visa's operating rules regarding the use of signatures to validate a cardholder's

identity are arbitrary, self-contradictory and completely ineffective in preventing

fraud.  Despite the fact that virtually any signature can be forged and merchants

do not train their cashiers to be handwriting experts, Visa continues to require that

merchants capture and store signatures for transactions over $50, a process which

is costly for merchants and does nothing to stop fraud.  Visa operating rules

require that merchants validate that the signature on a receipt matches the

signature on the back of a card, but for the vast majority of transactions today,

cashiers never touch the card and never even see the signature on the back.

Consider gas stations where customers insert their card at the pump, there is no

human interaction at all and no signature is captured.  Consider sit-down

restaurants where the waiter returns to the table after processing the card and the

customer signs the receipt, returns the card to his wallet and exits the restaurant

before the waiter can verify that the signatures match.  Consider fast food

restaurants, grocery stores, home improvement stores, discount retailers,

pharmacies and department stores that have customer-facing signature devices on

which customers swipe their own cards and then return the cards to their wallets

without cashiers ever touching the card — much less verifying the signature.

Visa rules state that a card is not "valid" until it has been signed on the back.

Merchants, however, can successfully process these invalid cards and receive

authorizations for purchases for these invalid cards.  Visa rules require merchants

that discover unsigned, invalid cards to instruct the cardholders to sign the card,

but this rarely occurs because merchants rarely touch the cards themselves.  At the

# A2208

same time, Visa operating rules state if the signature on the card does not match the name embossed on the card, the merchant still must accept the card. Visa operating rules go on to say that a merchant must process a card for payment even if the "Merchant is suspicious of a specific Transaction" or if the "signature panel is blank." By mandating that merchants process suspicious transactions, transactions conducted with cards that are unsigned and transactions conducted when the customer does not even have the card, Visa is in effect acknowledging that signatures are a worthless form of authentication. Even banks understand that signature is a poor form of authentication, as evidenced by the requirement that customers enter a PIN at ATMs rather than simply signing a signature pad. Many banks never collect a cardholder signature to use for comparative purposes.

(E)     The results of these ill-conceived operating rules are three-fold. First, merchants must absorb the costs of capturing, storing and retrieving signatures whenever the networks request them. For large merchants, the expense of installing and maintaining signature capture devices is in the tens of millions of dollars. Second, merchants face the additional risk of being charged back by the networks for failing to comply with the rules or in cases where they are unable to present a copy of the signature. For small merchants, this often means searching through shoeboxes filled with paper receipts, looking for a specific signed receipt from six months earlier. Finally, merchants are exposed to fines and penalties for noncompliance with the operating rules. For example, merchants are at risk of being fined for "intentionally" submitting fraudulent transactions, but Visa operating rules require that merchants process suspicious transactions. According

23

# A2209

to Visa operating rules, merchants cannot use a driver's license to validate a customer's identity. If a customer walks into a store with a stack of fifty credit cards, the cashier may ask to see that customer's driver's license, but if the name on the credit card is different from the name on the driver's license, the merchant must still accept the credit card for payment—despite the high likelihood of fraud and chargeback. The problem Visa's operating rules create is obvious.

(F)    Visa and MasterCard continue to perpetuate a fraud-prone system that uses an "Excessive Chargeback Program" to penalize merchants who do not have the tools to mitigate the related risk. Foremost, Visa and MasterCard perpetuate the use of the magnetic stripe and, like other networks, have been slow to adopt more secure technologies like EMV (Chip & PIN) in the United States. This stance protects the interchange revenue enjoyed by the issuers. Meanwhile fraud is migrating from overseas to the United States. Ultimately, merchants bear the losses from chargebacks for that fraud which merchants cannot prevent or control.

(G)    The networks comprise the Executive Committee of the PCI (Payment Card Industry) Council that is responsible for the development, management, education, and awareness of the security standards to "protect" cardholder data. Currently, these standards apply to merchants and third-party processors but not to the entire value chain — the issuers, issuer processors and the networks themselves are exempted. Merchants spend billions of dollars each year to maintain compliance, and face very aggressive fees and fines for non-compliance

24

that often is uncorroborated.[3]

(H)    Similarly, the networks sit on the Board of EMVCo LLC, a public corporation

that defines and manages standards for chip and PIN transactions.  The networks

mandate the hardware that merchants must purchase and the procedures that

merchants must follow.

(I)    As the market has evolved over time, the networks have created a system in

which the networks became the de facto regulator of the payments industry.  The

networks were previously owned by the banks, and they still set rules that allow

them to collect fees from merchants and redistribute the money to banks as

revenue.  These same networks institute arbitrary network rules that disadvantage

merchants and favor banks.  They then put in technical requirements that cost

merchants billions of dollars in compliance costs without placing similar

requirements on the banks.

61.    The release in the Proposed Settlement is so broad that it could insulate all of the

above activities from challenge, leaving merchants with no hope of relief.  These arcane,

draconian rules cost merchants tens of billions of dollars every year.

62.    I am concerned that Visa and MasterCard, under this release, could amend or re-

interpret their Honor All Cards rules to force merchants to accept all mobile transactions from

Visa and MasterCard.  Implementing the technology necessary to accept mobile payments is an

incredibly expensive proposition for merchants, so it is vital that merchants retain the right to

freely choose when to accept mobile payment products, rather than being forced to do so under

---

[3] "Rare Legal Fight Takes On Credit Card Company Security Standards and Fines," *Wired Magazine*, January 11, 2012

Visa's and MasterCard's Honor All Cards rules. The Proposed Settlement treats mobile devices the same as payment cards by lumping all devices including "mobile telephone," "fob," "device" and "service" in the definition of credit and debit cards. Visa and MasterCard could attempt to use this approach to extend their Honor All Cards rules to an "honor all devices" rule that would cover mobile payments by phone or near-field communication device, or any other future technology. *See* Proposed Settlement ¶ 1(u), (v) (defining "Credit Card" to include "any other current or future code, device, or service"). Walmart is concerned that releasing all rights to challenge such a change or the imposition of other similar rules could harm the future of payments. Because the proposed settlement prevents merchants from challenging any new rule that is substantially similar to an existing rule, Walmart is concerned with the possibility that Visa and MasterCard could successfully force acceptance of any new technology by arguing that such new rule is substantially similar to a rule that existed prior to preliminary approval of this settlement. Such an outcome would significantly chill nascent competition in mobile payments and cement, once again, Visa and MasterCard as the dominant, entrenched market leaders.

63.     I understand that Class Counsel claims that the future reach of the release will not be problematic because the term "substantially similar" will be limited to non-material changes to the current rules. This view reflects their failure to grapple with the way Visa and MasterCard operate. In my experience, seemingly innocuous changes to the rules, or how they are interpreted, can have dramatic consequences in the marketplace. An example:

  a.     Flexible spending accounts: Visa and MasterCard both introduced new products in support of employer health care programs. These cards require merchants to ensure that only approved healthcare-related items are purchased. Despite the fact that this is a wholly

26

# A2212

new product, Visa and MasterCard mandated that merchants accept it as part of their debit honor all cards rule. Meanwhile, issuers are free to decline such transactions from these same merchants that do not support the additional requirements.

64.    Finally, the release is mandatory, as merchants have no right to opt out.  Walmart believes this proposed settlement is deeply unfair.  Walmart's interests were not represented in this process and merchants should not be forced to live with the consequences of this release.

\*       \*       \*       \*

65.    Based on the current Proposed Settlement, it is clear that the lawyers who negotiated the settlement did not adequately represent the interests of Walmart.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief as of this 28th day of May, 2013.

Michael A. Cook
Sr. Vice President and Asst.
 Treasurer
Wal-Mart Stores, Inc.
702 S.W. 8th Street
Bentonville, Arkansas  72716

27

# A2213

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

In re: PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

This Document Relates To:
ALL CLASS ACTIONS

MDL Docket No. 1720 (JG) (JO)

Civil No. 05-5075 (JG) (JO)

**OBJECTION OF AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC., TRAVEL IMPRESSIONS, LTD.,
AMERICAN EXPRESS PUBLISHING CORP., SERVE VIRTUAL ENTERPRISES, INC.,
ANCA 7 LLC d/b/a VENTE PRIVEE, USA, AMEX ASSURANCE COMPANY, AND
ACCERTIFY, INC. TO THE CLASS SETTLEMENT AGREEMENT**

# A2214

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 3

    American Express, Its Operations, and Its Defense of Its Non-Discrimination Provisions. .... 3

    The Terms of the Proposed Settlement Agreement ................................................. 5

    Preliminary Approval and Subsequent Proceedings................................................ 8

ARGUMENT ........................................................................................................ 10

  I.  A Fundamental Conflict Between the Class Representatives and American Express Prevents Certification of the Rule 23(b)(2) Proposed Settlement Class......................... 10

    **A.**  Rule 23 Requires an Absence of Antagonism between Absent Class Members and the Class Representatives................................................................ 10

    **B.**  The Class Has Interests Antagonistic to, and Cannot Represent, American Express and Thus Cannot Be Certified............................................... 12

  II.  American Express Would Be Prejudiced If Bound to the Settlement Negotiated By the Class Representatives....................................................................... 16

    **A.**  Defendants May Try to Use the Release Negotiated by Class Representatives to Shield Themselves From Liability for Anticompetitive Conduct Directed At a Primary Competitor. .............................................................. 17

    **B.**  The Settlement Proponents Fail to Correct or Address the Prejudice to American Express ............................................................................ 19

  III.  The Court Should Either Permit American Express to Opt Out of the Injunctive Class or Not Approve the Settlement Agreement.......................................... 22

  CONCLUSION..................................................................................................... 26

i

# A2215

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Allen v. Dairy Farmers of America, Inc.*,
   279 F.R.D. 257 (D. Vt. 2011) ............................................................................ 15

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ........................................................................... 11, 13, 23

*Authors Guild v. Google Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011) ............................................................ 19, 20

*Bieneman v. City of Chicago*,
   864 F.2d 463 (7th Cir. 1988) ............................................................................ 14

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010) ................................................................... 10, 11, 12

*Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco
   Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) ................................................................. 11, 13, 23

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ............................................................................ 12

*Eubanks v. Billington*,
   110 F.3d 87 (D.C. Cir. 1997) ............................................................................ 24

*Gen. Tel. Co. of Southwest v. Falcon*,
   457 U.S. 147 (1982) ........................................................................................ 16

*In re Auction Houses Antitrust Litig.*,
   42 Fed. Appx. 511, 2002 WL 1758897 (2d Cir. July 30, 2002) ............................ 20

*In re Auction Houses Antitrust Litig.*,
   No. 00 Civ. 0648, 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) ............................ 23

*In re Joint Eastern and Southern Dist. Asbestos Litig.*,
   982 F.2d 721 (2d Cir. 1992) ....................................................................... 10, 15

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) ............................................................. 11, 12, 13, 23

*In re Natural Gas Commodities Litig.*,
   231 F.R.D. 171 (S.D.N.Y. 2005) ................................................................. 23, 24

*Karvaly v. eBay, Inc.*,
   245 F.R.D. 71 (E.D.N.Y. 2007) ................................................................... 18, 19

# A2216

*Marisol A. v. Giuliani,*
  126 F.3d 372 (2d Cir. 1997) ................................................................ 11

*Martens v. Smith Barney, Inc.,*
  181 F.R.D. 243 (S.D.N.Y. 1998) ..................................................... 19, 24

*Nat'l Super Spuds, Inc. v. New York Mercantile Exchange,*
  660 F.2d 9 (2d Cir. 1981) ........................................................ 18, 20, 21

*Newsome v. Up-To-Date Laundry, Inc.,*
  219 F.R.D. 356 (D. Md. 2004) ............................................................ 24

*Pickett v. Iowa Beef Processors,*
  209 F.3d 1276 (11th Cir. 2000) ........................................................... 15

*Powers v. Hamilton County Pub. Defender Comm'n,*
  501 F.3d 592 (6th Cir. 2007) .............................................................. 22

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.,*
  No. CV-04-2195(CPS), 2006 WL 3681138 (E.D.N.Y. Dec. 11, 2006) ................... 21

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir. 1993) ............................................................... 22

*Rosado v. Wyman,*
  322 F. Supp. 1173 (E.D.N.Y. 1970),
  *aff'd*, 437 F.2d 619 (2d Cir. 1970),
  *aff'd mem.*, 402 U.S. 991 (1971) ......................................................... 18

*Schorsch v. Hewlett-Packard Co.,*
  417 F.3d 748 (7th Cir. 2005) .............................................................. 22

*Spano v. The Boeing Co.,*
  633 F.3d 574 (7th Cir. 2011) .............................................................. 14

*TBK Partners, Ltd. v. Western Union Corp.,*
  675 F.2d 456 (2d Cir. 1982) ............................................................... 18

*Telecomm Tech. Servs. v. Siemans Rolm Commc'ns., Inc.,*
  172 F.R.D. 532 (N.D. Ga. 1997) .......................................................... 14

*United States v. Visa U.S.A., Inc.,*
  163 F. Supp. 2d 322 (S.D.N.Y. 2001) ...................................................... 7

*United States v. Visa U.S.A., Inc.,*
  344 F.3d 229 (2d Cir. 2003) ................................................................ 7

iii

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)............................................................................... 11, 16, 24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ............................................................................. 18

**<u>Rules</u>**

Federal Rules of Civil Procedure 23(a) ............................................... passim

Federal Rules of Civil Procedure 23(b) ............................................... passim

Federal Rules of Civil Procedure 23(c) ...................................................... 22

Federal Rules of Civil Procedure 23(e) ...................................................... 11

American Express Company ("American Express Co."), American Express Travel Related Services Company, Inc. ("TRS"), Travel Impressions, Ltd., American Express Publishing Corp., Serve Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee, USA, AMEX Assurance Company, and Accertify, Inc., including on behalf of themselves and their parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns (collectively, "American Express" or "Amex"), respectfully submit this objection to the Class Settlement Agreement respectfully requesting that the Court either (i) deny approval of the settlement agreement since the class cannot be certified because it is suing and antagonistic to (rather than representative of) American Express or (ii) allow Amex to opt out of the injunctive relief class or redefine the class to exclude Amex.

**PRELIMINARY STATEMENT**

American Express competes vigorously with the dominant firms Visa and MasterCard, as well as the other defendants in this action that act as issuing and acquiring banks. American Express generates tens of billions of dollars in annual revenue in competition with these entities as a payment card network, issuer, merchant acquirer, and transaction processor. The millions of merchants to which American Express provides its merchant services are among the merchants that form the class of plaintiffs in this action. In a small, separate part of its business, American Express and its subsidiaries act as merchants that accept Visa and MasterCard cards for travel, publishing, prepaid, insurance, and other services.

In order for the proposed class settlement agreement here to be approved, the class that is to be bound to the settlement and its release (without the ability to opt out of the Rule 23(b)(2) class) must be certified in conformance with Rule 23(a). The Class Representatives, however, are not capable of being representative of American Express given its primary business as a competitor of defendants and as a provider of services to millions of the merchants in the class.

1

Indeed, the Class Representatives are part of an overlapping putative class of merchants suing American Express asserting some of the same claims against Amex that the class here proposes to settle against defendants.  That lawsuit by itself establishes that the Class Representatives are affirmatively antagonistic to American Express.

Contrary to Class Representatives desires, American Express as a matter of policy seeks to protect customers who choose to use American Express cards from being discriminated against because of their choice to use such cards. American Express would thus never enter into a settlement agreement with Visa and MasterCard that encourages merchants to engage in this type of discriminatory behavior, which is exactly what the Class Representatives, who purport to represent American Express, have done.  Because a fundamental conflict exists between American Express and the Class Representatives, the proposed class here cannot be certified so long as it includes American Express and the settlement thus cannot be approved.

The conflict between the Class Representatives (and nearly every one of the millions of class members) and American Express is readily apparent from the proceedings currently before this Court.   Since preliminary approval, Class Plaintiffs have told this Court that:

- One of the "significant benefits" of the proposed settlement is that it "exposes" American Express's non-discrimination provisions to "new competitive pressures" (D.E. 1760 at 3);

- Merchants may take greater advantage of the alleged benefits of the settlement agreement if they "choose to ignore" the non-discrimination provisions in their contracts with American Express (D.E. 2111-1 at 38); and

- Merchants can take greater advantage of the alleged benefits of the settlement agreement if they "choose to discontinue accepting American Express." (*Id.*)

These positions and the lawsuit they are part of against American Express make clear that Class Representatives cannot have adequately represented American Express under

Rule 23(a)(4) when they agreed to a settlement that provides incentives for merchants that accept American Express cards to breach their contracts or cancel them all together.

American Express is further prejudiced by the release negotiated by the Class. The terms of that release leave open the possibility that American Express's competitors, the defendants here, could assert that American Express has released even claims that American Express has as a competitor against Visa, MasterCard, and the other defendants. The terms of the release purport to include claims that Amex may have against defendants—even claims similar to those that American Express brought against at least several of these defendants in the recent past leading to a multi-billion dollar settlement. Class Representatives have stated in their motion papers that the release should only apply to claims that arise in class members' capacities as merchants. Yet defendants, who are the beneficiaries of the release and thus the parties who would potentially invoke the release in the future, have not agreed to such a limitation, and even if they had, the plain language of the agreement's release is to the contrary.

So long as American Express remains a member of the proposed injunctive relief class, the class cannot be certified and the settlement agreement cannot be approved on the current terms. The Court should grant American Express opt-out rights or condition final approval upon modification of the definition of the Rule 23(b)(2) class to carve out American Express and its related entities.

## BACKGROUND

**American Express, Its Operations, and Its Defense of Its Non-Discrimination Provisions.**

American Express is a global services company and a world leader in providing charge and credit cards to consumers, small businesses, and corporations. In its core business, in which American Express acts as a payment card network, issuer, merchant acquirer, and transaction

processor, American Express competes with, among others, Visa and MasterCard as well as defendants that are Visa's and MasterCard's issuers and acquirers.  (*See* Declaration of Stephen B. McCurdy, dated May 23, 2013 ("McCurdy Decl.") ¶ 3.)  The vast bulk of American Express's revenues comes from this core business.  (*Id.* ¶ 11.)

In a small part of its business, American Express and its subsidiaries act as merchants that accept Visa and MasterCard cards for travel, publishing, prepaid, insurance, and other services. For example, American Express operates a wholesale tour operator through Travel Impressions, Ltd., a wholly-owned subsidiary of TRS, which is American Express Company's principal operating subsidiary.  (*Id.* ¶ 6.)  Similarly, through American Express Publishing Corp., American Express produces, among other products and services, a number of high end magazines.  (*Id.* ¶ 7.)  Travel Impressions, Ltd. and American Express Publishing Corp. accept Visa and MasterCard cards.[1]  Less than two percent of American Express's world-wide revenue comes from sales processed using Visa and/or MasterCard cards in the United States.  (*Id.* ¶ 11.)

In ongoing litigation initiated by an overlapping putative class of merchants, American Express is defending its right under the antitrust laws to maintain contract provisions that prevent merchants who choose to accept American Express cards from steering customers away from using these cards or from differentially surcharging Amex transactions at a rate higher than that applied to other networks' credit, charge and debit cards.  *See American Express Anti-Steering Rules Antitrust Litigation,* MDL No. 2221 (NGG)(RER) (E.D.N.Y); *see also United States v. American Express, et al.*, 10-CV-4496 (NGG)(RER) (E.D.N.Y.).  Among other defenses, American Express maintains that its contract provisions with merchants are procompetitive.  As

---

[1]      Further details concerning the identities of American Express subsidiaries that accept Visa or MasterCard cards are contained in the McCurdy Declaration at Paragraphs 5 to 10.  The full names, addresses, and telephone numbers of the Amex objectors are listed in the addendum to this Objection.

a matter of policy, American Express seeks to prevent discriminatory treatment and discriminatory surcharging against American Express cards, not to encourage it.  This policy extends to the entire American Express organization, including the operations in which American Express and/or its subsidiaries act as merchants.  (McCurdy Decl. ¶¶ 12-13.)

### The Terms of the Proposed Settlement Agreement

The Settlement Agreement proposes that the Court certify two classes for settlement purposes:  one under Rule 23(b)(2) (the injunctive relief class) and one under Rule 23(b)(3) (the damages class).  (Settlement Agreement ¶ 2.)  The 23(b)(2) class is defined to consist of "all persons, businesses and other entities" that accept Visa and MasterCard as of the date of preliminary approval "or in the future."  (*Id.* ¶ 2(b).)  The Settlement Agreement states that, unlike the Rule 23(b)(3) class, exclusions from the 23(b)(2) class "shall not be permitted."  (*Id.* ¶ 2(b).)  Class members may not opt out of the proposed 23(b)(2) class, as American Express has done from the 23(b)(3) class.

The Settlement Agreement defines the parties that will be bound by the release to be granted by the 23(b)(2) class (the "Rule 23(b)(2) Settlement Class Releasing Parties") as "each and every member of the Rule 23(b)(2) Settlement Class . . .  whether or not they object to this Class Settlement Agreement, and whether or not they exercise any benefit provided under the Class Settlement Agreement."  (*Id.* ¶ 66.)  In addition to the class members themselves, the Rule 23(b)(2) Settlement Class Releasing Parties include "each and every member of the Rule 23(b)(2) Settlement Class, and any of their respective past, present, or future . . . *parents, subsidiaries, divisions, affiliates*, . . . predecessors, successors, and assigns".  (*Id.* ¶ 66 (emphasis added).)

The Rule 23(b)(2) Settlement Class Releasing Parties will grant an expansive release to Visa and MasterCard and the other defendants.  (*See generally id.* ¶¶ 66-70.)  The Settlement

5

# A2223

Agreement states that all members of the Rule 23(b)(2) class shall release Visa and MasterCard, among others, from:

> "*any and all manner of claims*, demands, actions, suits, and causes of action, whether individual, class, representative, *parens patriae*, or otherwise in nature, for any form of declaratory, injunctive, or equitable relief, or any damages or other monetary relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order, regardless of when such claims accrue, *whether known or unknown, suspected or unsuspected*, in law or in equity that any Rule 23(b)(2) Settlement Class Releasing Party *now has, or hereafter can, shall, or may in the future have*, arising out of or relating in any way to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(2) Settlement Class Released Party *that are alleged or which could have been alleged* from the beginning of time until the date of the Court's entry of the Class Settlement Preliminary Approval Order in any of the Operative Class Complaints or Class Action complaints, or in any amendments to the Operative Class Complaints or Class Action complaints, *including but not limited to any claims based on or relating to . . .*"

(*Id.* ¶ 68 emphasis added).)  The Settlement Agreement then identifies a non-exhaustive list of nine broad subcategories of conduct (¶ 68(a)-(i)) and, referring to these subcategories, concludes: "it is expressly agreed, for purposes of clarity, without expanding or limiting the foregoing, that *any claims based on or relating to (a)-(i) above are claims that were or could have been alleged in this Action.*" (*Id.* (emphasis added).)

The conduct described in subparagraphs 68(a)-(i) is expansive.  In addition to conduct related to interchange rules, merchant fees, and rules regarding surcharging (¶ 68(a)-(c)), it also covers any actual or alleged agreement between or among Visa, MasterCard, and any MDL 1720 defendant relating to "conduct or Rules of any Visa Defendant or any MasterCard defendant." (*Id.* ¶ 68(d).)  "Rule" is a defined term, meaning "any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."  (*Id.* ¶ 1(mm).)   The definition of "Rule" thus extends to any action by Visa or MasterCard.  Similarly, Paragraph 68(g) purports to release claims based on the "future effect" or the continued imposition of or adherence to any existing

6

# A2224

Rule or any Rule to be modified by the Settlement Agreement, as well as "any Rule that is substantially similar" to either an existing Rule or a Rule to be modified by the Settlement Agreement.  (*Id.* ¶ 68(g).)  By way of example, the terms of the release would at least arguably cover the types of claims that American Express successfully asserted against many of the same defendants here, resulting in Amex recovering billions of dollars in settlement proceeds.[2] Moreover, the expansive definitions of "Visa Defendants" and "MasterCard Defendants" in the Settlement Agreement are so broad that they would appear to prohibit a future challenge to conduct by the defendants outside of the United States.  (*Id.* ¶¶ 1(cc), (ccc).)

The Settlement Agreement further states,

"For purposes of clarity, it is specifically intended for the release and covenant not to sue provisions of Paragraphs 66-70 above to preclude all members of the Rule 23(b)(2) Settlement Class from seeking or obtaining any form of declaratory, injunctive, or equitable relief, or damages or other monetary relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order with respect to any Rule of any Visa Defendant or any MasterCard Defendant, and the compliance by any Bank Defendant with any such Rule, as it is alleged to exist, now exists, may be modified in the manner provided in Paragraphs 40-45 and 53-57 above, or may in the future exist in the same or substantially similar form thereto."  (*Id.* ¶ 71.)

Even though a very small portion of American Express's revenue comes from sales processed on Visa and MasterCard cards, each of the American Express entities that accept Visa and MasterCard cards are thus members of the proposed Rule 23(b)(2) class.  Each of those entities' "parents" and "affiliates" are also defined to be included in the proposed Rule 23(b)(2) Settlement Class Releasing Parties.  (*See* Settlement Agreement ¶ 66).  Thus, the Settlement Agreement contemplates that all of American Express Co. would be bound by the release.

---

[2]     *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 329 (S.D.N.Y. 2001) (finding that Visa's and MasterCard's exclusionary rules weakened competition and harmed American Express); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003); Visa 2008 Form 10K at 81-82 ($2.25 billion settlement between Amex and the Visa defendants resolving Amex's private suit); MasterCard 2009 Form 10K at 121-122 ($1.8 billion settlement between Amex and the MasterCard defendants resolving Amex's private suit).

The terms of the Settlement Agreement make no distinction between the claims released by class members in their capacities as merchants that accept Visa and MasterCard branded cards and claims of a class member like American Express that is a network competitor of Visa and MasterCard and a card-issuing and merchant acquiring competitor to the MDL 1720 defendant banks.  None of the Class Representatives are merchants that, like American Express, also compete with defendants.  Indeed, there are only a handful of class members who can assert they compete with defendants in providing card services to consumers and other class members compared to the several million merchants who are class members.[3]  And Amex is aware of no other class member like Amex that is being sued by other class members asserting claims similar to those the Settlement Agreement here purports to compromise.

### Preliminary Approval and Subsequent Proceedings

American Express objected to preliminary approval of the Settlement Agreement.  (*See* American Express Objection to Preliminary Approval (D.E. 1680).)  At the preliminary approval hearing, Class Plaintiffs stated that they cannot and did not assert claims against defendants on behalf of competitors and that such claims should not be barred by the release.  (*See* Nov. 9, 2012 Hearing Tr. at 19:2-20:2.)  Nonetheless, Class Plaintiffs maintained that the release does waive claims by American Express that arise in its capacity as a merchant.  (*Id.*)

After obtaining preliminary approval, Class Plaintiffs further made clear that even they recognize that Amex is in a different position than the many millions of other members of the class.  In December, 2012, Class Plaintiffs sought to renew a motion to compel American Express to produce certain documents allegedly responsive to a subpoena issued in 2007.  (*See*

---

[3]      First Data and PayPal objected to preliminary approval on the ground that they compete at least to some extent with the defendants and that the Class Representatives do not.  (*See* D.E.1693 and 1717.)  By contrast, the Rule 23(b)(2) class likely consists of over 12 million merchants.  (Class Brief at 33, n.6.).

# A2226

December 10, 2012 letter from K. Craig Wildfang to Hon. James Orenstein (D.E. 1760).)  Class Plaintiffs contended, among other arguments, that Amex should not be entitled to protections afforded a "quintessential disinterested bystander" because "American Express has rules similar to those being reformed in MDL 1720, which are the subject of coordinated proceedings before Judge Garaufis."  (*Id.* at 3.)  Class Plaintiffs made clear that, in their opinion, American Express benefited from Visa's and MasterCard's nondiscrimination rules and that "One of the significant benefits" of the proposed settlement is that it "exposes" American Express to "new competitive pressures."  (*Id.*)

In their motion for final approval, Class Plaintiffs again state that the Rule 23(b)(2) release is limited to claims brought in class members' capacity as merchants.  (*See* Class Plaintiffs' Final Approval Motion (D.E. 2111-1) ("Class Brief") at 45, 48.)  Defendants assert that American Express must be a member of the class and state only that the *notice* was revised to make clear that the release, the language of which was unchanged, would not apply to competitor claims.  (*See* Defendants' Brief in Support of Final Approval (D.E. 2110) ("Defendants' Brief") at 22, n.6.)

Class Plaintiffs also responded to objections from certain class members that the Settlement Agreement's "level-playing-field" provisions, in combination with other rules by Visa and MasterCard, make it impossible for merchants who accept American Express to surcharge Visa and MasterCard transactions.  (Class Brief at 37-38.)  Class Plaintiffs made three arguments in response.  First, they argued that approximately one third (or almost 3 million) merchants do not accept American Express.  (*Id.*)  Second, they argued that merchants "that want to surcharge Visa and MasterCard may choose to ignore American Express's" non-

9

discrimination provisions.  (*Id.* at 38.)  Third, they argued that those merchants "may choose to discontinue accepting American Express."  (*Id.*)

## ARGUMENT

**I.**   **A Fundamental Conflict Between the Class Representatives and American Express Prevents Certification of the Rule 23(b)(2) Proposed Settlement Class.**

The injunctive relief class proposed by the settlement agreement cannot be certified because the Class Representatives, and indeed essentially the entire class, are antagonistic to, rather than representative of, American Express with respect to the particular claims at issue in this action.  *See In re Joint Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721, 739 (2d Cir. 1992) (finding an "overwhelming" conflict where a mandatory non-opt-out class included both health claimants who were exposed to asbestos and co-defendant manufacturers of asbestos).  As long as American Express remains a class member, the proposed class violates the adequacy of representation requirement under Rule 23(a)(4) and cannot be certified.  Thus, the settlement agreement as presented cannot be approved because there is no certifiable Rule 23(b)(2) class to be bound by the settlement.

**A.**   **Rule 23 Requires an Absence of Antagonism between Absent Class Members and the Class Representatives.**

"Under Rule 23(b)(2), '[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *Brown v. Kelly*, 609 F.3d 467, 477 (2d Cir. 2010) (quoting Fed. R. Civ. P. 23(b)(2)) (emphasis removed; ellipsis and modification in original).  In order to protect absent class members, Rule 23(a) requires that that the class satisfies four threshold requirements: "(1) numerosity ('the class is so numerous that joinder of all members is impracticable'), (2) commonality ('there are questions of law or fact common to the class'), (3) typicality ('the

claims or defenses of the representative parties are typical of the claims or defenses of the class'), and (4) adequacy of representation ('the representative parties will fairly and adequately protect the interests of the class')." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (quoting Fed. R. Civ. P. 23(a)). Rule 23(a) "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011).

"When a court is asked to certify a class and approve its settlement in one proceeding, the Rule 23(a) requirements designed to protect absent class members 'demand undiluted, even heightened, attention." *Literary Works*, 654 F.3d at 249 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)).[4] To satisfy the adequacy of representation requirement under Rule 23(a)(4), "the named plaintiffs must possess the same interest[s] and suffer the same injur[ies] as the class members." *Id.* (quoting *Amchem*, 521 U.S. at 625-26 (modifications in original)). This inquiry "serves to uncover conflicts of interests between named parties and the class they seek to represent." *Id.* at 249 (quoting *Amchem*, 521 U.S. at 625)); *see also Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) ("In determining whether the representative parties will fairly and adequately protect the interests of the class, a district court must determine whether plaintiff's interests are antagonistic to the interest of the other members of the class.") (quotations omitted).

---

[4]      Satisfaction of the Rule 23(a) factors is required in every class action, and the analysis of those factors is the same regardless of the Rule 23(b) subsection under which the class seeks certification. *See Brown*, 609 F.3d at 479-82 (relying on Rule 23(b)(3) cases to determine whether proposed Rule 23(b)(2) class satisfied the requirements of Rule 23(a)); *Marisol A. v. Giuliani*, 126 F.3d 372, 375-78 (2d Cir. 1997) (same).

"Adequacy is twofold:  the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (emphasis added); *Brown*, 609 F.3d at 479 ("The class members must not have interests that are antagonistic to one another.") (citation omitted).  Finally, when reviewing a proposed class settlement, Rule 23(e)(2) further requires that a district court examine the substance of the settlement and conclude that it is "fair, reasonable, and adequate." *Literary Works*, 654 F.3d at 249 (quoting Fed. R. Civ. P. 23(e)(2)).

**B.     The Class Has Interests Antagonistic to, and Cannot Represent, American Express and Thus Cannot Be Certified.**

The proposed injunctive relief class as currently defined violates Rule 23(a)(4) because the Class Plaintiffs and their counsel cannot simultaneously represent the interests of merchants whose primary business is selling goods or services for which they accept Visa and/or MasterCard cards and entities like American Express whose fundamental role is to operate a network, issuing, acquiring, and transaction processing business that competes with Visa, MasterCard, and their member banks.  First, there is an inherent tension because American Express sits across the table from millions of members of the injunctive relief class.  The merchant-only class members may be interested in relief that permits merchants to surcharge credit and charge transactions in ways that some merchants argue will benefit their businesses. By contrast, American Express's primary interest, which extends throughout its corporate structure, is to protect its ability to compete effectively against Visa and MasterCard in the payments industry by, among other things, shielding its cardmembers from discriminatory treatment imposed by merchants (including discriminatory surcharges)—a position antithetical to the claims being settled by the Rule 23(b)(2) class.  Second, this fundamental conflict is

12

underscored by the fact that many of the merchant plaintiffs in MDL 1720 (represented by the same counsel) are pursuing separate lawsuits against American Express to give them complete freedom to discriminate against consumers who wish to use Amex's payment cards.[5]  Finally, American Express would never seek to remedy the conduct challenged in this suit by agreeing with Visa and MasterCard to rule changes that encourage merchants to engage in discriminatory treatment of customers who choose to use American Express cards.

Courts have made clear that a class should not be certified if some of its members' interests are antagonistic to the interests of other members of the class.  *See, e.g.*, *Amchem*, 521 U.S. at  625-29 (class including both presently injured asbestos victims who would prefer more immediate payments, and exposure-only asbestos victims who were interested in ensuring an ample, inflation-protected fund for the future, could not be certified); *Literary Works*, 654 F.3d at 254-58 (vacating judgment certifying class where class representatives held copyright claims based on both registered and unregistered works—which were valued differently under the proposed settlement—and certain class members held claims based solely on unregistered works); *Central States*, 504 F.3d at 246 (Rule 23(a)(4) not satisfied where class included all employee welfare plans that contracted with defendant, regardless of whether those plans were

---

[5]      Indeed, at the preliminary approval hearing, a proponent of the settlement who also represents clients suing American Express in MDL 2221 argued: "we started this battle seven years ago.  We've looked at the industry and decided what was needed in this industry.  There were three problems: American Express, Visa, and MasterCard. . . .  In the filing of this lawsuit we had planned, always, to bring American Express into the case once we were comfortable. . . . [W]e knew seven years ago unless you solved the problem of American Express, Visa, and MasterCard, there's no possibility of the rates going down in this industry."  (Nov. 9, 2012 Hearing Tr. at 26:10-23.)

self-funded, insured, or capitated, because self-funded plans may have suffered greater injury and deserved separate representation).[6]

There can be no dispute that the interests of the Class Plaintiffs and their counsel are antagonistic to the interests of American Express. First, the Class Plaintiffs are members of a class which is suing Amex on claims similar to those being settled against defendants here. Likewise, far from vindicating any of American Express's rights in this action, the settlement endorsed by Class Plaintiffs—in their own words—allegedly "exposes American Express' policies to new competitive pressures". (D.E. 1760 at 3.) They assert that this exposure is "One of the significant benefits of the rules reforms obtained by Class Plaintiffs." (*Id.*) Indeed, in defending the Visa/MasterCard rule changes in the settlement, Class Plaintiffs have made clear that merchants that choose to accept American Express have an incentive to "ignore" (in other words breach) provisions in their Amex contracts regarding non-discrimination of Amex card transactions or to "discontinue accepting American Express". (*See* Class Brief at 38.) The settlement also "locks in" the terms of the DOJ's consent judgment with Visa and MasterCard (*id.* at 30), while American Express continues to vigorously contest the DOJ's claims.[7] These conflicts prevent the Class Plaintiffs from being able to represent American Express in releasing

---

[6]    *See also Spano v. The Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011) (refusing to certify class where some employees may have benefited from the challenged conduct while others may have been harmed); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (denying certification because "the class includes those who claim harm from the very same acts from which other members of the class have benefited"); *Bieneman v. City of Chicago*, 864 F.2d 463, 465-66 (7th Cir. 1988) (same); *Telecomm Tech. Servs. v. Siemans Rolm Commc'ns., Inc.*, 172 F.R.D. 532, 545-46 (N.D. Ga. 1997) (same).

[7]    In their motion for fees, Class Plaintiffs take credit for the DOJ's suit. They state that "as a result" of having "unfettered access to Class Plaintiffs' document and deposition databases and additional work product" from MDL 1720, the DOJ filed antitrust claims against American Express, Visa, and MasterCard. (*See* Class Plaintiffs' Motion for Fees (D.E. 2113-1) at 7-8; *see also* Declaration of K. Craig Wildfang (D.E. 2113-6) ¶¶ 118-127.)

14

*any* claims (regardless of whether those claims arise in its capacity as a merchant, a competitor, or otherwise) or otherwise acting on behalf of Amex.

The conflict between Class Plaintiffs and American Express is precisely the type of conflict that courts have considered fundamental.  In *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 982 F.2d at 739, the Second Circuit held that the inclusion of both health claimants and asbestos manufacturers—who "have been adversaries for many years in thousands of lawsuits in courts throughout the country"—in a single Rule 23(b)(2) non-opt out settlement class violated the typicality and adequacy of representation requirement of Rule 23(a)(3) and (4). The court found that the interests of these two groups were "profoundly adverse to each other" and that the conflict was "overwhelming."  *Id.*  Similarly, in *Allen v. Dairy Farmers of America, Inc.*, 279 F.R.D. 257, 274 (D. Vt. 2011), plaintiffs sought to certify a class that included all dairy farmers during the relevant period, regardless of whether those farmers were members of the defendant dairy cooperatives that allegedly engaged in unlawful price fixing.  The court found that the class representatives could not adequately represent absent class members who were members of the defendant cooperatives: "Certainly those members of DFA and DMS who contend that their organizations engaged in lawful and beneficial activities on their behalf cannot be said to have their interests adequately represented by parties that seek to financially recover from, punish, and prohibit those very same activities."  *Id.*  The court recognized this as a "fundamental conflict" and denied class certification.  *Id.  See also Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1281 (11th Cir. 2000) (reversing class certification of opt-out class where "the class includes those who claim harm from the very same acts from which other members of the class have benefited.").  To be clear, American Express does not consider itself to be a beneficiary of any of the conduct challenged in this action; however, the fact that Class

Plaintiffs, who would owe a fiduciary duty to American Express as an absent class member, have endorsed a settlement that provides incentives to merchants to breach contractual provisions of, or to stop doing business with, American Express shows that Class Plaintiffs cannot adequately represent American Express in *any* capacity.

In addition to violating Rule 23(a)(4), Class Plaintiffs' failure to adequately represent the interests of "multiple role" class members like American Express also violates the related commonality and typicality requirements of Rule 23(a)(2) and (3). As the Supreme Court recently explained: "The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Dukes,* 131 S.Ct. at 2551 n.5 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58 n.13 (1982)).

## II.   <u>American Express Would Be Prejudiced If Bound to the Settlement Negotiated By the Class Representatives.</u>

The inability of the Class Representatives adequately to represent American Express's interests is exemplified in the scope of the proposed release in the Settlement Agreement. The Class Plaintiffs have negotiated a release that Visa and MasterCard and the other defendants may try to rely on to continue to engage in anticompetitive conduct designed to harm their rival, American Express, claiming they are absolved of any liability because American Express happens to act as a merchant in a small part of its business. In other words, the terms of the release create a dangerous situation where Visa and MasterCard could assert a release of a key

competitor's actual and prospective claims, in exchange for resolving the merchant claims that the Class Representatives actually brought, in violation of established Second Circuit authority. In an industry characterized by a history of vigorous litigation (and multi-billion dollar settlements paid by Visa and MasterCard to resolve claims by their competitors), the prejudice to American Express is potentially enormous and not shared by the Class Plaintiffs or the rest of the merchant class.

A.   **Defendants May Try to Use the Release Negotiated by Class Representatives to Shield Themselves From Liability for Anticompetitive Conduct Directed At a Primary Competitor.**

On its face, the release is susceptible to the interpretation that it applies to all claims relating to, among other things, horizontal agreements between or among Visa, MasterCard, and their member banks, or indeed any other conduct by these entities, regardless of whether the claim arises in the class members' capacity as a merchant.  The release on its face makes no distinction between merchant claims and competitor claims, and the settlement proponents have agreed that all such claims were claims that "could have been" alleged in the operative complaints (and are therefore released).  While Class Plaintiffs have disavowed the interpretation that the release applies to competitor claims, Defendants have made no such statement.  (*See* Nov. 9, 2012 Hearing Tr. at 19:2-20:2; Class Brief at 45, 48; Defendants' Brief at 22, n.6.) Regardless of any such interpretation, the broad language of the release has not been changed.

While one can understand why Visa and MasterCard would want such a release from American Express, Rule 23 does not permit such a result.  "The Second Circuit has recognized that when reviewing the fairness of a proposed class action settlement, the court must take 'special care . . . to ensure that the release of a claim not asserted within a class action or not shared by all class members does not represent 'an advantage to the class . . . [bought] by the uncompensated sacrifice of claims of members, whether few or many.'"  *Karvaly v. eBay, Inc.*,

17

# A2235

245 F.R.D. 71, 89 (E.D.N.Y. 2007) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982) (ellipses and modification in original)).  Thus, although "Plaintiffs in a class action may release claims that were or could have been pled in exchange for settlement relief," they are limited in doing so by the "adequacy of representation" and "identical factual predicate" doctrines.  *Wal-Mart Stores*, *Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005).

"As Judge Weinstein has observed, '[t]he theory is that if the claims and defenses are typical then there will be every reason for the representatives to support their own claim and so advance the claims of others in a like position.'  This justification for permitting the representatives to sue on behalf of the class has no application to claims of class members in which the representatives have no interest and which, as shown here, they are willing to throw to the winds in order to settle their own claims."  *Nat'l Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 17 n.6 (2d Cir. 1981) (quoting *Rosado v. Wyman*, 322 F. Supp. 1173, 1193 (E.D.N.Y. 1970), *aff'd*, 437 F.2d 619 (2d Cir. 1970), *aff'd mem.*, 402 U.S. 991 (1971)).

In *National Super Spuds*, the Second Circuit observed that "named plaintiffs in a class action cannot represent a class of whom they are not a part, and can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class."  *Id.*, 660 F.2d at 17 (citation omitted).  The Second Circuit in *National Super Spuds* rejected a settlement agreement that purported to release claims held by absent class members based on both liquidated and unliquidated contracts where the Class Representatives were only parties to liquidated contracts.  *Id.* at 17-18.  The Court found that the "inadequacy of representation provided by the named plaintiffs is apparent from examination of the settlement itself," which set recovery for both types of claims on the basis of class members' liquidated contracts.

Courts assessing settlement agreements that purported to waive claims of certain class members in exchange for benefits to the rest of the class have rejected class settlements on this basis.  For example, in *Karvaly v. eBay, Inc.*, 245 F.R.D. 71 (E.D.N.Y. 2007), Judge Glasser denied preliminary approval of a settlement involving a class of PayPal users because the proposed releases in the settlements extended to millions of PayPal users but only a small subset of those users would actually be entitled to the monetary relief.  Finding that the proposed settlement violated due process, Judge Glasser stated that this "Court, which owes a 'fiduciary duty to the non-representative class members who were not party to the settlement agreement,' will not permit the Eligible Class Members to bargain away the rights of other Class Members to assert legal claims unrelated to the present action against eBay and PayPal for the sake of the Eligible Class Members' own pecuniary interests."  *Id.* at 89-90 (quoting *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 262 (S.D.N.Y. 1998)).  Similarly, in *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011), Judge Chin, sitting by designation, declined to approve a proposed class action settlement involving Google's efforts to digitize copyrighted literature for public access because, *inter alia*, "the class plaintiffs have not adequately represented the interests of at least certain class members."  *Id.* at 679 (noting, among other conflicts, that academic author objectors had "interests and values" which differed from the named plaintiffs, the Authors Guild and the Association of American Publishers, who "are institutionally committed to maximizing profits").

**B.     The Settlement Proponents Fail to Correct or Address the Prejudice to American Express**

Despite the fact that American Express previously objected on the ground that the fundamental conflict between American Express and Class Plaintiffs prevents the Class Plaintiffs from representing American Express in any capacity, *see* D.E. 1680 at 2-3, the settlement

# A2237

proponents ignore this argument in their final approval papers.  Class Plaintiffs instead argue that the release relates only to class members' claims as merchants.  Defendants make no such statement but both Defendants and Class Plaintiffs argue that the release of claims that were or could have been alleged in this matter is consistent with the identical factual predicate doctrine. (Defendants' Brief at 25-27; Class Plaintiffs' Brief at 44-46.)

American Express believes it is clear that competitor claims cannot arise from the "identical factual predicate" of this case, which is intended to resolve <u>merchants'</u> antitrust claims against Visa and MasterCard.  Competitor claims have nothing to do with this lawsuit and could not have been brought by the Class Representatives.  A court properly applying the identical factual predicate doctrine should thus ultimately bar the application of the release to any of American Express's competitor claims.

As the Second Circuit has observed, "In the twenty-one years since *Super Spuds*, we have never affirmed the approval of a class action settlement which included the uncompensated impairment of non-class claims unless the non-class claims were based on the *identical* factual predicate as the class claims."  *In re Auction Houses Antitrust Litig.*, 42 Fed. Appx. 511, 518, 2002 WL 1758897, at *7 (2d Cir. July 30, 2002) (emphasis in original).  Courts in the Second Circuit have rejected settlement agreements that purport on their face to release claims beyond the identical factual predicate.  *See id.* (affirming lower court's rejection of settlement agreement that released foreign auction claims  that "although based on the same conspiracy to fix prices, do not rest upon the identical factual predicate as the United States auction claims"); *Authors Guild*, 770 F. Supp. 2d at 679 (rejecting final approval where "the released conduct would not arise out of the 'identical factual predicate' as the conduct that is the subject of the settled claims."); *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, No. CV-04-2195(CPS), 2006 WL

20

# A2238

3681138, at *11 (E.D.N.Y. Dec. 11, 2006) (stating that "the release must be modified to be limited to claims involving 'identical factual predicate' and granting final approval only upon such modification).  While the identical factual predicate doctrine would prevent the release from barring Amex's claims as a competitor, the release as drafted only invites future litigation and subjects American Express to unnecessary risk.[8]  Of course, if Defendants agree with Class Plaintiffs that competitor claims are outside the scope of the release, there is no reason why, at a minimum, the releases themselves should not reflect this limitation, but they do not.

To the extent that the settlement proponents argue that approving the release as presented is harmless because they assert it does not cover competitor claims and because a subsequent court may conclude that competitor claims are not within the scope of the release, this argument must be rejected for the same reasons it was rejected by the Second Circuit in *National Super Spuds*.  There, the settlement proponents argued that approval may be harmless because another court may ultimately find that the release did not bar the objector's claims regarding unliquidated contracts.  The Court disagreed:

> "While it is true that actual decision on this issue will rest with the New York courts, we must assume that they will interpret the settlement to mean what it says.  Experienced counsel knew precisely what they wanted to achieve and drafted appropriate language to that end.  The only plausible basis on which a New York court could hold the language did not have its intended and clearly stated effect would be if it found that the district court had no power to approve a settlement of a class action that barred claims of class members not within the description of the class.  A federal court should determine for itself whether it has that power and may properly exercise it not pass over the question because a state court may assume the unenviable task of deciding that its act was a nullity."

---

[8]      Indeed, as the Court is well aware, one of Visa's and MasterCard's primary arguments to avoid liability in this action is the application of the releases from *In re Visa Check* to the class's claims.  Class Plaintiffs themselves cited the risk associated with this argument as a factor weighing in favor of settling their claims.  (Class Brief at 18-19.)

21

*Id.* at 16.  The Second Circuit reversed the order approving the settlement agreement, even though the class representatives stated they did not represent absent class members with claims based on unliquidated contracts and offered to testify to that effect in opposition to any motion to dismiss asserting that such claims were barred under the settlement.  *Id.* at 14-15.

Finally, Defendants argue in their papers that American Express must be a member of the Rule 23(b)(2) class because the Visa and MasterCard rules "apply generally to" American Express, citing Rule 23(b)(2).  (Defendants' Brief at 22.)  The settlement, however, must separately satisfy the adequacy of representation requirement under Rule 23(a)(4), in addition to Rule 23(b)(2), which it fails to do for the reasons discussed above.

### III.   The Court Should Either Permit American Express to Opt Out of the Injunctive Class or Not Approve the Settlement Agreement.

For the reasons discussed above, the Rule 23(b)(2) class cannot be certified so long as American Express and/or its subsidiaries are in the class.  The Court should therefore permit American Express to opt out of the class or condition final approval on a modification of the definition of the Rule 23(b)(2) class and releasing parties that excludes American Express.

The Court has discretion in the context of class certification to restructure the proposed class in order to protect the interests of all parties.  *See* Fed. R. Civ. P. 23(c); *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("courts must be vigilant to ensure that a certified class is properly constituted" and "have broad discretion to modify class definitions"); *Schorsch v. Hewlett-Packard Co.,* 417 F.3d 748, 750 (7th Cir. 2005) (noting, "Litigants and judges regularly modify class definitions"); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint"; rather than dismissing the action because of an overbroad class, a court may "define the class as comprising persons" whose claims were "typical of those of the class"); *In re Natural Gas*

22

# A2240

*Commodities Litig.*, 231 F.R.D. 171, 179-80 (S.D.N.Y. 2005) ("The Court will therefore *sua sponte* modify the proposed class definition . . . In the remainder of this decision, any references to the proposed class will be a reference to the class definition as modified by the Court.").

For example, in *Amchem*, *Literary Works*, and *Central States*, the Supreme Court and the Second Circuit issued remand orders directing the district court to fashion subclasses so that the interests of objecting class members would be adequately represented.  *Amchem*, 521 U.S. at 625-29; *Literary Works*, 654 F.3d at 254-58; *Central States*, 504 F.3d at 246-47.  Courts clearly have discretion to condition final approval on modification to the terms of a class action release.  *See, e.g., McReynolds v. Richards-Cantave,* 588 F.3d 790, 803 (2d Cir. 2009) (remanding and directing district court "to require the parties to clarify the language of the release provision in order to reflect their stated understanding that plaintiffs are allowed to pursue subsequent actions for damages."); *In re Auction Houses Antitrust Litig.,* No. 00 Civ. 0648, 2001 WL 170792, at *12-13, 18 (S.D.N.Y. Feb. 22, 2001) (approving a proposed class action settlement subject to parties narrowing proposed releases that would have barred class members from suing in U.S. court for damages sustained in foreign auctions where the claims being settled related only to domestic auctions).

Amex is aware of few if any other such "multiple role" class members with interests congruent with American Express (and is not aware of any other class member that, like American Express, is being sued by other class members on theories similar to those brought in this case) to justify the creation of a subclass.  Moreover, since the relief sought here is solely for the benefit of merchants, and fundamentally at odds with the interests of competitors such as American Express, there is no basis to include American Express in the class definition at all.  Accordingly, the Court should exercise its discretion to exclude American Express from the class

# A2241

definition.  *See, e.g.*, *Natural Gas Commodities*, 231 F.R.D. at 179-80 (modifying class definition *sua sponte* so that proposed class satisfied Rule 23(a)(1)).

Alternatively, the Court could address American Express's due process and adequacy of representation concerns by requiring that American Express be permitted to opt out of the injunctive relief class.  "The right of a class member to opt-in in Rule 23(b)(1) and (b)(2) actions is not obvious on the face of the rule; however, 'the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.'"  *McReynolds*, 588 F.3d at 800 (quoting *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997)); *see also Martens*, 181 F.R.D. at 261 ("because equitable remedies are flexible, they may take a shape that makes opt-out feasible, non-prejudicial to class members and appropriate toward the goal of protecting the rights of non-representative claimants."); *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 364 (D. Md. 2004) ("the Court has discretion to order that notice and opt-out rights be given to a (b)(2) class to . . . give class members the opportunity to appear through their own counsel or remove themselves from the action entirely.").  The Supreme Court itself recently recognized that circumstances may exist in which due process requires that members of an injunctive relief class be granted the opportunity to opt out.  *Dukes*, 131 S. Ct. at 2559 (noting the "serious possibility" that due process requires giving class members opt out rights even where monetary claims do not predominate).  Under these principles, if American Express is not excluded from the class definition entirely, the Court should at least require that American Express be permitted opt-out rights to ensure that the failure of the class representatives to adequately represent American Express's interests will not prejudice American Express's due process rights.

# A2242

Defendants argue that settlement could be undermined if a single merchant is permitted to opt-out of the Rule 23(b)(2) class.  (Defendants' Brief at 20-21.)  Defendants ignore that the Rule 23(b)(2) class, by definition, already excludes "the United States government" (SA ¶ 2(b)) and, therefore, any merchant operated by the United States government, of which there are numerous.  (*See* Declaration of Nicole Hamann (D.E. No. 2111-6) ¶ 15 (discussing efforts to exclude entities associated with the United States government, as well as the named defendants and financial institutions that issued Visa or MasterCard cards, from the class notice mailing).)

Similarly, the Rule 23(b)(2) class, also by definition, expressly excludes the "named Defendants, their directors, officers, or members of their families" and further excludes "financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions".  (Settlement Agreement ¶ 2(b).)  Defendants do not and cannot adequately argue why the definition of the Rule 23(b)(2) class could not be modified also to exclude any entity that would otherwise be a member of the class and that at the time the settlement agreement was being negotiated was a defendant, or was under common ownership and control of any defendant, in any suit brought by other members of the class on grounds similar to any claims asserted here.  This narrow exclusion would ensure that the class did not include any obvious antagonism internal in the class as a result of related suits between class members such as the action pending against Amex before Judge Garaufis.

Finally, the fact that recognition of American Express's due process rights to have adequate representation in this class action may imperil Defendants' willingness to settle is no justification for the violation of those rights.

25

# A2243

## CONCLUSION

For the reasons set forth above, American Express respectfully objects to the proposed

Settlement Agreement.

Dated: New York, New York
       May 28, 2013

                    BOIES, SCHILLER & FLEXNER LLP

          By      /s/ Philip C. Korologos
                  Donald L. Flexner
                  Philip C. Korologos
                  Eric J. Brenner
                  John F. LaSalle
                  575 Lexington Avenue
                  New York, NY 10022
                  Tel. (212) 446-2300
                  Fax (212) 446-2350
                  Email: pkorologos@bsfllp.com

                  *Attorneys for Objectors American Express
                  Co., American Express Travel Related
                  Services, Inc., Travel Impressions, Ltd.,
                  American Express Publishing Co., Serve
                  Virtual Enterprises, Inc., ANCA 7 LLC d/b/a
                  Vente Privee, USA, AMEX Assurance
                  Company, and Accertify, Inc.*

## <u>ADDENDUM</u>

The full names, addresses, and telephone numbers of the objectors are listed below:

American Express Company
200 Vesey Street
New York, New York 10285
1-800-528-4800

Accertify, Inc.,
1075 Hawthorn Drive
Itasca, Illinois 60143
855-539-3560

American Express Publishing Corporation
1120 Avenue of the Americas
New York, New York 10036
212-382-5600

American Express Travel Related Services Company, Inc.
200 Vesey Street
New York, New York 10285
1-800-528-4800

AMEX Assurance Company
20022 N. 31st Avenue
Phoenix, Arizona 85027
1-888-533-4085

ANCA 7 LLC d/b/a Vente Privee, USA
345 Hudson Street
New York, New York 10014
1-877-453-3909

Serve Virtual Enterprises, Inc.
200 Vesey Street
New York, New York 10285
1-800-954-0559

Travel Impressions, Ltd.
465 Smith Street
Farmingdale, New York 11735
1-800-528-4800

1

# A2245

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

In re: PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

MDL Docket No. 1720 (JG) (JO)

This Document Relates To:
ALL CLASS ACTIONS

Civil No. 05-5075 (JG) (JO)

**Declaration of Stephen B. McCurdy in Support of Objections of American Express
Company, American Express Travel Related Services Company, Inc., Travel Impressions,
Ltd., American Express Publishing Corp., Serve Virtual Enterprises, Inc., ANCA 7 LLC
d/b/a Vente Privee, USA, AMEX Assurance Company, and Accertify, Inc. to Final
Approval of the Class Settlement**

I, Stephen B. McCurdy, declare as follows:

1.      I am the Senior Vice President of American Express Travel Related Services

Company, Inc.  I am responsible for development and implementation of business strategies

related to American Express' merchant services business.   I make this declaration in support of

the Objections to Final Approval of the Class Settlement submitted by American Express

Company, American Express Travel Related Services Company, Inc., Travel Impressions, Ltd.,

American Express Publishing Corp., Serve Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente

Privee, USA, AMEX Assurance Company, and Accertify, Inc.  If called upon, I could and would

competently testify as to the matters stated herein on behalf of American Express.

2.      American Express Company, together with its consolidated subsidiaries

(collectively, "American Express"), is a global service company and a world leader in providing

charge and credit cards to consumers, small businesses, and corporations.  These cards include

1

# A2246

cards issued by American Express as well as cards issued by third-party banks and other institutions that are accepted by merchants on the American Express network.

3.      In its core business, American Express competes with, among others, Visa and MasterCard, as well as their issuers and acquirers, as a payment card network, issuer, merchant acquirer, and transaction processor.

4.      In a small part of its business, certain subsidiaries of American Express act as merchants that accept Visa and MasterCard cards for travel, publishing, prepaid, insurance, and other services.

5.      American Express Travel Related Services Company, Inc. ("TRS") is American Express Company's principal operating subsidiary.  TRS accepts Visa and MasterCard cards.

6.      American Express operates a wholesale tour operator business in the United States through Travel Impressions, Ltd. ("Travel Impressions"), a wholly-owned subsidiary of TRS.  Travel Impressions accepts Visa and MasterCard cards.

7.      American Express Publishing Corp. ("American Express Publishing"), a wholly-owned subsidiary of TRS, produces, among other products and services, a number of high end magazines.  American Express Publishing accepts Visa and MasterCard cards.

8.      Serve Virtual Enterprises, Inc. ("Serve"), formerly known as Revolution Money, is a wholly-owned subsidiary of TRS.  Serve offers a digital prepaid account that can be funded by, among other payment forms, Visa and MasterCard cards.

9.      ANCA, 7 LLC d/b/a Vente Privee, USA ("Vente Privee USA") is a joint venture between American Express Services (a wholly-owned subsidiary of TRS) and Vente-privee.com, Europe's leader in online private sales of luxury goods.  Vente Privee USA accepts Visa and MasterCard cards.

2

# A2247

10. AMEX Assurance Company is a wholly-owned subsidiary of American Express. AMEX Assurance Company underwrites insurance products, which are sold by TRS. Through TRS, customers can pay for AMEX Assurance Company products by using Visa or MasterCard cards.

11. The vast bulk of American Express's world-wide revenue comes from its core business in which it competes with Visa and MasterCard, among others. We estimate that less than two percent of American Express' world-wide revenue in 2012 came from sales processed using Visa and/or MasterCard cards in the United States.

12. In ongoing litigation initiated by an overlapping putative class of merchants, American Express is defending its right under the antitrust laws to maintain contract provisions that prevent merchants who choose to accept American Express Cards from steering against American Express Cards or surcharging transactions with such Cards by amounts higher than the amounts applied to transactions using other networks' charge, credit, or debit cards. Those actions are captioned *American Express Anti-Steering Rules Antitrust Litigation*, MDL No. 2221 (NGG)(RER) (E.D.N.Y) and *United States v. American Express, et al.*, 10-CV-4496 (NGG)(RER) (E.D.N.Y.).

13. American Express maintains that its contract provisions with merchants are procompetitive under the antitrust laws. It is the policy of American Express to prevent discriminatory treatment of American Express Cardmembers and discriminatory surcharging of consumers who wish to use the American Express Card, not to encourage it. This policy extends to the entire American Express organization, including the operations in which American Express and/or its subsidiaries act as merchants.

3

# A2248

14.    All American Express entities that accepted Visa or MasterCard at any point between January 1, 2004 and November 27, 2012 have opted out, or by the deadline will opt out, of the proposed Rule 23(b)(3) class identified in the proposed settlement agreement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: May 23, 2013

*Stephen B. McCurdy*

Stephen B. McCurdy

4