# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON), 13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON), 14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON), 14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON), 14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON), 14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON) 14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON), 14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON), 14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

―――――――――――

*On Appeal from the United States District Court
for the Eastern District of New York*

### JOINT DEFERRED APPENDIX
### VOLUME XI OF XXII
### Pages A2501 to A2750

*Submitted on Behalf of All Parties*

# **Table of Contents**

**Page**

## **Volume I**

District Court Docket Entries .................................................................. A1

## **Volume II**

District Court Docket Entries (cont'd) .................................................... A251

## **Volume III**

District Court Docket Entries (cont'd) .................................................... A501

## **Volume IV**

District Court Docket Entries (cont'd) .................................................... A751

Transfer Order, dated October 20, 2005 [Docket No. 2]........................ A822

Excerpts of First Consolidated Amended Class Action Complaint,
    dated April 24, 2006 [Docket No. 317] .......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
    Antitrust Litigation*, CV-96-5238, dated July 21, 2006
    [Docket No. 455-4] ........................................................................ A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
    Antitrust Litigation*, CV-96-5238,
    dated July 21, 2006 [Docket No. 455-5]......................................... A850

Excerpts of First Amended Supplemental Class Action Complaint
    (redacted), dated February 20, 2009 [Docket No. 1152]............... A856

Excerpts of Second Consolidated Amended Class Action
    Complaint (redacted), dated February 20, 2009
    [Docket No. 1153] ......................................................................... A858

i

## **Table of Contents**
### **(continued)**

**Page**

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154]................ A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ........................................... A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] ......................................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533]................. A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536]........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ........................................................... A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ................................ A945

### **Volume V**

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545]................. A1011

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
Rule 56.1(b) (redacted), dated October 21, 2011
[Docket No. 1550] ....................................................................... A1014

Excerpts of Network Defendants' Memorandum in Opposition to
the Individual Plaintiffs' Motion for Summary Judgment
(redacted), dated October 21, 2011 [Docket No. 1551]................. A1030

Excerpts of European Commission Notification Pursuant to Article
254 of the EC Treaty (redacted), dated November 23, 2011
[Docket No. 1573-3] ...................................................................... A1032

Notice of Filing of Memorandum of Understanding,
dated July 13, 2012 [Docket No. 1587]......................................... A1042

Memorandum of Understanding, dated July 13, 2012
[Docket No. 1588] .......................................................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
[Docket No. 1588-1] ....................................................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
dated August 21, 2012 [Docket No. 1616-3]................................. A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
Approval, dated October 19, 2012 [Docket No. 1656].................. A1086

Excerpts of Appendices to Definitive Class Settlement
Agreement,dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
Honorable John Gleeson, US District Judge,
dated November 9, 2012 [Docket No. 1732]................................. A1096

# Table of Contents
## (continued)

**Page**

Excerpts of Revised Appendix F2: Notice of Class Action
    Settlement Authorized by the U.S. District Court, Eastern
    District of New York, dated November 26, 2012
    [Docket No. 1740-2].................................................................... A1098

Class Settlement Preliminary Approval Order,
    dated November 27, 2012 [Docket No. 1745]............................... A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
    Plaintiffs' Motion to Stay Class Settlement Preliminary
    Approval Order, dated November 29, 2012 [Docket No. 1751] ... A1111

Letter from Class Counsel to Judge Orenstein,
    dated December 10, 2012 [Docket No. 1760] ............................... A1114

Excerpts of Defendants' Memorandum in Support of Final
    Approval of Definitive Class Settlement Agreement,
    dated April 11, 2013 [Docket No. 2110] ...................................... A1118

Excerpts of Memorandum in Support of Class Plaintiffs'
    Motion for Final Approval of Settlement, dated April 11, 2013
    [Docket No. 2111-1]..................................................................... A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
    of Class Plaintiffs' Motion for Final Approval of Settlement,
    dated April 11, 2013 [Docket No. 2111-2]................................... A1131

Declaration of Eric D. Green, dated April 11, 2013
    [Docket No. 2111-3]..................................................................... A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
    Class Settlement, dated April 11, 2013 [Docket No. 2111-5]....... A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
    Administrator's Implementation of Settlement Notice Plan,
    dated April 11, 2013 [Docket No. 2111-6].................................. A1200

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
   Implementation and Adequacy of Settlement Notice Program,
      dated April 11, 2013 [Docket No. 2113-7].................................   A1215

Declaration of Professor Charles Silver Concerning the
   Reasonableness of Class Counsel's Request for an Award of
   Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........   A1238

**Volume VI**

Declaration of Professor Charles Silver Concerning the
   Reasonableness of Class Counsel's Request for an Award of
   Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
   (Cont'd)...........................................................................................   A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
   Plaintiffs' Motion for Final Approval of Settlement and Class
   Plaintiffs' Joint Motion for Award of Attorneys' Fees,
   Expenses and Class Plaintiffs' Awards,
      dated April 11, 2013 [Docket No. 2113-6]...................................   A1296

Excerpts of Objection of City of Oakland to Final Approval of
   Proposed Settlement, dated May 15, 2013 [Docket No. 2279] .....   A1434

Retailers and Merchants' Objection to Final Approval of the Class
   Action Definitive Settlement Agreement, dated May 15, 2013
   [Docket No. 2281] .........................................................................   A1437

Objection of U.S. Public Interest Research Group to Final
   Approval of Proposed Class Settlement, dated May 23, 2013
   [Docket No. 2361] .........................................................................   A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
      dated May 23, 2013 [Docket No. 2364] .........................................   A1476

Statement of Objections of B & H Foto Electronics Corp.,
   d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........   A1480

## **Table of Contents**
### **(continued)**

**Page**

Excerpts of Statement of Objections by Boscov's,
dated May 24, 2013 [Docket No. 2411] ........................................ A1483

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] ........................................................................ A1486

### **Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] (cont'd) ........................................................... A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] .............. A1512

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated May 24, 2013 [Docket No. 2427] .................... A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2432] ..... A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
Approval of the Settlement, dated May 24, 2013
[Docket No. 2433] ........................................................................ A1541

Excerpts of Objection of David's Bridal to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2434] ..... A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2435] ..... A1553

Declaration of John R. Manna, Vice President Operational
Controller, Lowe's Companies, Inc., dated May 24, 2013
[Docket No. 2437] ........................................................................ A1555

**Table of Contents**
**(continued)**

Page

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2438] ......................................................................... A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2439] ......................................................................... A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
Approval of the Proposed Settlement, dated May 24, 2013
[Docket No. 2441] ......................................................................... A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
Final Approval of the Proposed Settlement, dated May 25,
2013 [Docket No. 2444] ................................................................ A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2445] ..................... A1588

Excerpts of Objection of Carter's to Final Approval of the
Settlement, dated May 25, 2013 [Docket No. 2446] ..................... A1601

Objection of Coborn's Incorporated to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
Final Approval of the Proposed Settlement,
dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2449] ............... A1615

Objection of Alon USA, LP to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2450] ..................... A1621

# Table of Contents
## (continued)

**Page**

Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2451] ........................................................................ A1627

Objection of IKEA US to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2458] .................... A1632

Objection of Jetro Holdings, LLC to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2459] ..... A1650

Objection of Michaels Stores, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2460] ..... A1656

Objection of NATSO Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2461] .................... A1659

Objection of National Restaurant Association to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2464] ........................................................................ A1667

Objection of Panera Bread Company to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2466] ..... A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2467] .................... A1681

Objection of Retail Industry Leaders Association to Final Approval
of the Settlement, dated May 25, 2013 [Docket No. 2469] ........... A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2470] ........................................................................ A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2471] ............... A1699

## Table of Contents
### (continued)

                                                                    **Page**

Excerpts of Objection of The Wendy's Company to Final Approval
of the Proposed Settlement, dated May 25, 2013
[Docket No. 2473] ........................................................ A1703

Objection of National Grocers Association to Final Approval of the
Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
[Docket No. 2493] ........................................................ A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
Class Members WellPoint, Inc., etc., to the Proposed Rule
23(b)(2) Settlement Agreement, dated May 27, 2013
[Docket No. 2493-1] ..................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
Objections of WellPoint Entities, dated May 17, 2013
[Docket No. 2493-2] ..................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
[Docket No. 2495] ........................................................ A1752

**Table of Contents**
**(continued)**

Page

Excerpts of Memorandum in Support of Objections of Absent
Putative Rule 23(b)(2) Class Members Target Corporation,
Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
Ross Company, Closeout Distribution, Inc., Ascena Retail
Group, Inc., Abercrombie & FitchCo., OfficeMax
Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
American Signature, Inc. to the Proposed Rule 23(b)(2) Class
and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
[Docket No. 2495-1] ....................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,
v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
dated May 27, 2013 [Docket No. 2495-2] ...................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
[Docket No. 2509] .......................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517]........... A1828

Statement of Objections of Office Depot, Inc., Viking Office
Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
and Solutions4Sure.com, Inc., dated May 27, 2013
[Docket No. 2519] .......................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
Superstore East, Inc., Staples the Office Superstore, LLC,
Staples Contract & Commercial, Inc., Quill Corporation, Quill
Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
Thrive Networks, Inc., and SchoolKidz.com,
dated May 27, 2013 [Docket No. 2525] ........................................ A1836

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Michael S. Weisbach,
dated May 27, 2013 [Docket No. 2533-2].....................................   A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
Settlement, dated May 27, 2013 [Docket No. 2534] .....................   A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
Settlement, dated May 27, 2013 [Docket No. 2536] .....................   A1847

Objections to Final Approval of Proposed Class Action Settlement
and Notice of Intent to Appear of The Iron Barley Restaurant,
Homestead Restaurant (Historical Homestead, Inc.), The Feral
Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
(d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
dated May 28, 2013 [Docket No. 2537] ........................................   A1850

National Retail Federation Statement of Objection to Final
Approval of the Proposed Rule 23(B)(2) Agreement,
dated May 28, 2013 [Docket No. 2538] ........................................   A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2] .......   A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
dated May 28, 2013 [Docket No. 2538-20]...................................   A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
[Docket No. 2538-21].....................................................................   A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
[Docket No. 2540] ..........................................................................   A1924

Objection of National Cooperative Grocers Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2546] ..........................................................................   A1926

**Table of Contents**
**(continued)**

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2559] .....   A1934

Objection of National Association of Convenience Stores to Final
Approval of Proposed Settlement, dated May 28, 2013
[Docket No. 2561] ........................................................................   A1942

Objection of Affiliated Foods Midwest to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2563] .....   A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
Settlement, dated May 28, 2013 [Docket No. 2587] ....................   A1963

The Home Depot's Statement of Objections to the Proposed Class
Settlement and Memorandum in Support, dated May 28, 2013
[Docket No. 2591] ........................................................................   A1973

**Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
Settlement and Memorandum in Support, dated May 28, 2013
[Docket No. 2591] (Cont'd) ..........................................................   A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
Home Depot's Objection to the Proposed Class Settlement,
dated May 28, 2013 [Docket No. 2591-2] .....................................   A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
Settlement, dated May 28, 2013 [Docket No. 2592] ....................   A2028

Objection of Consumers Union of United States, Inc. to Final
Approval of Proposed Class Settlement, dated May 28, 2013
[Docket No. 2598] ........................................................................   A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
Settlement, dated May 28, 2013 [Docket No. 2605] ....................   A2040

## **Table of Contents**
### (continued)

**Page**

Excerpts of Objection of Starbucks to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2606] ..... A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
Partners LLC, dated May 28, 2013 [Docket No. 2613]................. A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
dated May 28, 2013 [Docket No. 2613-1]..................................... A2075

Objection of National Community Pharmacists Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2619] ......................................................................... A2107

Statement of Objections and Amici Curiae Brief of States to Final
Approval of the Settlement, dated May 28, 2013
[Docket No. 2623] ......................................................................... A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643] .................... A2147

Excerpts of Declaration of David Cote in Support of BlueCross
BlueShield of South Carolina Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-3]................. A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
and Blue Shield of Arizona, Inc. Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-4]................. A2180

Excerpts of Declaration of Matthew Brolly in Support of
Independence Blue Cross Objections to Proposed Settlement,
dated May 28, 2013 [Docket No. 2643-6]..................................... A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
Cross of Northeastern Pennsylvania Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-7]................. A2184

# Table of Contents
## (continued)

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28, 2013 [Docket No. 2644] ................................................................. A2186

Excerpts of Objection of American Express Company, American Express Travel Related Services Company, Inc., Travel Impressions, Ltd., American Express Publishing Corp., Serve Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee, USA, Amex Assurance Company, and Accertify, Inc. to the Class Settlement Agreement, dated May 28, 2013 [Docket No. 2648] ........................................................................................ A2213

Declaration of Stephen B. McCurdy in Support of Objections of American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

## Volume X

Notice of Motion of DFS Services LLC and Discover Bank to Intervene, dated May 28, 2013 [Docket No. 2655] ...................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013 [Docket No. 2657-6] ........................................................ A2252

Objection of DFS Services LLC, Discover Loans, Inc., and Discover Bank to Final Approval of Proposed Settlement, dated May 28, 2013 [Docket No. 2659] ........................................ A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule 23(b)(3) Damages Case, dated May 28, 2013 [Docket No. 2663] ........................................................ A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in Opposition to Motion for Final Approval of Settlement, dated May 28, 2013 [Docket No. 2670] ................................................. A2278

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Jeffrey I. Shinder in Support of
  Opposition to Class Plaintiffs' Motion for Final Approval of
  the Proposed Class Settlement, dated May 28, 2013
  [Docket No. 2670-1]...................................................... A2300

Excerpts of Report of Professor Jerry Hausman,
  dated May 28, 2013 [Docket No. 2670-5].................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
  Shinder: "Industry Facts Concerning Debit Card Regulation
  Under Section 920," by Stephen Craig Mott,
  BetterBuyDesigns, on Behalf of the Merchants Payments
  Coalition, submitted to Federal Reserve System, October 29,
  2010; Attachment F: "2011 Interchange Fee Revenue, Covered
  Issuer Costs, and Covered Issuer and Merchant Fraud Losses
  Related to Debit Card Transactions," Board of Governors of
  the Federal Reserve System, March 5, 2013
  [Docket No. 2670-6]...................................................... A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
  Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
  - Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
  Reactions to Credit Card Settlement", by Maria Aspan and
  Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
  Analysis of the Proposed Interchange Fee Litigation
  Settlement," by Adam J. Levitin, Georgetown Law and
  Economics Research Paper No. 12-033, August 21, 2012; Ex.
  70: The Nilson Report, February 2013, Issue 1,011; American
  Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
  "Merchant Surcharging – Understanding Payment Card
  Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
  to Support the U.S. Merchant Litigation Settlement," Visa,
  2013; Ex, 77: "Notice of MasterCard Rule Changes,"
  MasterCard Worldwide, December 2012; Ex. 78:
  Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
  Territories, regarding Merchant Class Action Litigation
  Settlement – Important Changes to Merchant Acceptance

**Table of Contents**
(continued)

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses
Q2 2012 Results - Earnings Call Transcript," Visa, May 20,
2013; Ex. 84: "New Visa, MasterCard fees stir debate within
industry," The Green Sheet Online, March 12, 2013; Ex. 94:
MasterCard Incorporated Management Discusses Q2 2012
Results - Earnings Call Transcript, May 20, 2013; Ex. 95:
MasterCard's CEO Discusses Q4 2012 Results - Earnings Call
Transcript, May 20, 2013 [Docket No. 2670-8] ........................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder:
Ex. 97: "Reform of Australia's Payments System: Preliminary
Conclusions of the 2007/08 Review," Reserve Bank of Australia,
April, 2008; Ex. 108: Amended and Restated Global Restructuring
Agreement [Docket No. 2670-9] ................................... A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed
Class Settlement Agreement, dated June 5, 2013
[Docket No. 3074] ......................................................... A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013
[Docket No. 3755] ......................................................... A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed
Class Settlement Agreement, dated June 6, 2013
[Docket No. 4237] ......................................................... A2405

Excerpts of Statement of Objections of the Society of Independent
Gasoline Marketers of America, dated June 7, 2013
[Docket No. 4640] ......................................................... A2407

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated June 7, 2013 [Docket No. 4654] ...................... A2415

# Table of Contents
## (continued)

**Page**

Statement of Objections of Life Time Fitness, Inc.,
    dated June 11, 2013 [Docket No. 5385] ........................................ A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
    dated June 11, 2013 [Docket No. 5406] ....................................... A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
    [Docket No. 5651] ......................................................................... A2434

Excerpts of Defendants' Reply Memorandum in Support of
    Final Approval of Definitive Class Settlement Agreement,
    dated August 16, 2013 [Docket No. 5937] .................................... A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
    Further Support of Settlement Final Approval,
    dated August 16, 2013 [Docket No. 5939] .................................... A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
    [Docket No. 5939-3] ....................................................................... A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
    to the Proposed Class Settlement (redacted),
    dated August 16, 2013 [Docket No. 5939-5] ................................. A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
    Plaintiffs' Motion for Final Approval of the Proposed Class
    Settlement, dated August 16, 2013 [Docket No. 5939-6].............. A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
    Joint Motion for Award of Attorneys' Fees, Expenses and
    Class Plaintiffs' Awards, dated August 16, 2013
    [Docket No. 5940] ......................................................................... A2471

Excerpts of Reply Memorandum in Support of FDC's
    Motion to Opt Out of Rule 23(b)(2) Class Settlement,
    dated August 23, 2013 [Docket No. 5957] .................................... A2473

**Table of Contents**
**(continued)**

**Page**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] .................................... A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] (Cont'd) .................... A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
Report of Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5978] ........................................................................ A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5982] ........................................................................ A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
Correct Misstatements in Supplemental Declaration of
Craig Wildfang and in Opposition to Final Approval,
dated September 10, 2013 [Docket No. 6006-1] .......................... A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-2] .................................................................... A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-3] .................................................................... A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-4] .................................................................... A2553

**Table of Contents**
**(continued)**

**Page**

Excerpts of Transcript of Fairness Heating before the
Honorable John Gleeson, U.S. District Court Judge,
dated September 12, 2013 [Docket No. 6094]............................... A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
dated December 13, 2013 [Docket No. 6125] ............................... A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
dated December 13, 2013 [Docket No. 6126] ............................... A2588

Notice of Appeal of Target Group Objectors,
dated December 13, 2013 [Docket No. 6128] ............................... A2589

Notice of Appeal of National Retail Federation,
dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
[Docket No. 6175] ......................................................... A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
WellPoint Objectors, dated January 10, 2014
[Docket No. 6176] ......................................................... A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
[Docket No. 6178] ......................................................... A2602

Notice of Appeal of First Data Corporation, First Data Merchant
Services, TASQ Technology, Inc., TRS Recovery Services,
Inc., First Data Government Solutions, and Telecheck Services,
Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
Tousled Hair Studio), and Kristina Newman – Hair,
dated January 10, 2014 [Docket No. 6182] .................................. A2606

**Table of Contents**
**(continued)**

Page

Notice of Appeal of U.S. PIRG, dated January 13, 2014
    [Docket No. 6189] .......................................................... A2608

Notice of Appeal of Consumers Union of United States, Inc.,
    dated January 13, 2014 [Docket No. 6190] ................................. A2609

Amended Notice of Appeal of Target Group Objectors,
    dated January 21, 2014 [Docket No. 6212] ................................. A2610

Amended Notice of Appeal of Temple Eagle,
    dated January 13, 2014 [Docket No. 6227] ................................. A2611

Notice of Appeal of National Federation of Independent Business,
    dated February 7, 2014 [Docket No. 6234] ................................. A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
    Objectors and WellPoint Objectors, dated February 7, 2014
    [Docket No. 6238] .......................................................... A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
    Homestead Restaurant (Historical Homestead, Inc.), The Feral
    Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
    (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
    dated February 13, 2014 [Docket No. 6245] ................................ A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
    (Amending Notice Of Appeal Filed December 13, 2013),
    dated February 13, 2014 [Docket No. 6248] ................................ A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
    Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
    dated February 13, 2014 [Docket No. 6251] ................................ A2625

**Table of Contents**
**(continued)**

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
    LLC and Temple Eagle Partners LLC, dated February 18, 2014
    [Docket No. 6257] ........................................................................ A2626

Amended Notice of Appeal of R & M Objectors,
    dated February 25, 2014 [Docket No. 6263] ................................ A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
    dated June 25, 2009 ...................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
    Credit Cards: *Rising Interchange Fees Have Increased Costs*
    *for Merchants, but Options for Reducing Fees Pose*
    *Challenges*, dated 11/2009 ........................................................... A2638

Final Judgment as to Defendants MasterCard International
    Incorporated and Visa Inc., *U.S. v. American Express Co*.,
    CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
    CV-4996 DE 143].......................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

**Volume XII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................. A2751

**Volume XIII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................. A3001

**Volume XIV**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................. A3251

# **Table of Contents**
## (continued)

**Page**

### **Volume XV**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................... A3501

### **Volume XVI**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................... A3751

### **Volume XVII**

Interlink Network, Inc. Operating Regulations,
    dated November 15, 2012 ............................................................. A4009

### **Volume XVIII**

MasterCard Rules, dated April 11, 2012 ............................................. A4259

### **Volume XIX**

MasterCard Rules, dated April 11, 2012 (Cont'd) ............................... A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
    Case T-111/08, Judgment of the General Court
    (Seventh Chamber), dated May 24, 2012 ...................................... A4614

Minute Order deeming all pending motions for relief withdrawn
    without prejudice to reinstatement if the settlement is not
    consummated, dated July 17, 2012 ............................................... A4616

Minute Order upholding Judge Orenstein's order denying
    disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

**Table of Contents**
**(continued)**

Page

Excerpts of Class Settlement Agreement, *In re Am. Express
Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2]............................................. A4623

**Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express
Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
[Docket No. 11-md-2221 DE 306-2] (Cont'd) .............................. A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for
Final Approval of Class Action Settlement, *In re: American
Express Anti-Steering Rules Antitrust Litig*., 11-md-2221
(NGG)(RER), (Redacted - Public Version), dated April 15,
2014 [Docket No. 11-md-2221 DE 362] ...................................... A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American
Express Anti-Steering Rules Antitrust Litig*., 11-md-02221
(NGG)(RER) (redacted), dated April 15, 2014
[Docket No. 11-md-2221 DE 370] ................................................ A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee
and Merchant Discount Antitrust Litig*., No. 14-md-1720
(JG)(JO), dated July 18, 2014
[Docket No. 14-md-1720 DE 104] ................................................ A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card
Interchange Fee and Merchant Discount Antitrust Litig*.,
No. 14-md-1720 (JG)(JO), dated July 18, 2014
 [Docket No. 14-md-1720 DE 105] ................................................ A4836

# Table of Contents
## (continued)

**Page**

## Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
Judgment of the Court (Third Chamber),
dated September 11, 2014................................................................ A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.
Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
dated September 26, 2014 [Docket No. 13-cv-5746 DE 41]......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
No. 13-4537 ..................................................................... A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
Education ..................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
U.S. District Court, Eastern District of New York ...................... A5090

## Volume XXII

### *Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
(filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
to Individual Plaintiffs' Statement of Undisputed Facts,
Pursuant to Local Rule 56.1(b) (filed under seal),
dated May 6, 2011 [Docket No. 1477-7]....................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
There is No Genuine Issue to be Tried (filed under seal), dated
February 11, 2011 [Docket No. 1478-4] ...................................... A5125

**Table of Contents**
**(continued)**

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
 dated July 2, 2009 [Docket No. 2088]............................................. A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
 under seal), dated December 14, 2009 [Docket No. 2088]............ A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
 seal), dated December 14, 2009 [Docket No. 2088]...................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
 dated May 3, 2011 [Docket No. 2088] .......................................... A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
 dated May 3, 2011 [Docket No. 2088] .......................................... A5191

Memorandum of Law in Support of Motion to Intervene of DFS
 Services LLC and Discover Bank (filed under seal), dated May
 28, 2013 [Docket No. 2657-1]........................................................ A5200

Declaration of Jennifer M. Selendy (filed under seal),
 dated May 28, 2013 [Docket No. 2657-3].................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
 dated May 28, 2013 [Docket No. 2657-4].................................... A5231

Declaration of Roger Hochschild (filed under seal),
 dated May 28, 2013 [Docket No. 2657-5].................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
 Notice of Class Action Settlement Authorized by the U.S.
 District Court, Eastern District of New York (filed under seal)
 [Docket No. 2657-7]....................................................................... A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
 dated July 2, 2009 ......................................................................... A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
 dated December 15, 2009 ............................................................... A5295

xxv

## **<u>Table of Contents</u>**
### **(continued)**

**<u>Page</u>**

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
dated June 22, 2010 ........................................................................ A5297

# A2501

### 3.  The Indirect Purchaser Issue

Defendants argue that plaintiffs cannot recover damages in this action[17] because merchants are indirect purchasers of the services provided by the defendants and their member issuers (following cases such as Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977)).  Interchange fees are paid by acquiring banks to issuing banks, the argument runs, and are at most passed along to merchants as indirect purchasers. Plaintiffs argue that the indirect purchaser doctrine does not apply because interchange fees are effectively paid by merchants rather than acquirers, and because many acquirers are also members of the Mastercard and Visa networks as issuers, falling within an exception to the indirect purchaser doctrine.

The question whether the indirect purchaser doctrine applies to the facts in this case is fundamentally a legal question on which I offer no opinion.  It is my understanding, however, that other cases have invoked the indirect purchaser doctrine to bar damages claims by merchants or other bank customers in arguably analogous situations.[18]  Plaintiffs argue that these cases are distinguishable and/or incorrectly decided.

To the degree that economic analysis has any relevance the applicability of the indirect purchaser doctrine, one might bring it to bear in relation to the policy rationale behind *Illinois Brick* and related cases.  My understanding of the indirect purchaser doctrine is that it stems initially from a concern about the possibility of multiple recoveries.  If each purchaser at each point in a chain of transactions (e.g., wholesaler, retailer, consumer) could sue to recover the full monopoly overcharge (trebled under the antitrust laws), total damages would become excessive.  To avoid this outcome, some manner of apportionment might be used -- one might attempt to

---

[17] It is my understanding that the indirect purchaser doctrine would not bar the plaintiffs from securing injunctive relief.

[18] Paycom Billing Svcs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283 (2d Cir. 2006); Kendall v. Visa USA, 518 F.3d 1042 (9th Cir. 2008); In Re ATM Fee Antitrust Litigation, 686 F.3d 741 (9th Cir. 2012).

# A2502

compute the amount of harm borne by the wholesaler and separate it from the overcharges passed on to the retailer, do the same at the retail level, and so on.  But this apportionment problem would be complex in many cases and subject to error. See *Illinois Brick,* 431 U.S. at 737.   To avoid such issues, the indirect purchaser doctrine provides that the direct purchaser can recover the full overcharge with no deduction for amounts passed downstream, while indirect purchasers are barred from recovery.

If the rationale for the indirect purchaser doctrine is the avoidance of a costly and error prone apportionment problem, it has less force when apportionment is straightforward because contractual arrangements allow a court easily to ascertain what portion of a monopoly overcharge is passed along the chain of distribution (as in the possible "cost-plus" exception to *Illinois Brick,* see 431 U.S. at 736).  It also has less force when direct purchasers may be disinclined to sue, perhaps because they have an economic interest in maintaining the anticompetitive overcharge.  Plaintiffs in this litigation can perhaps appeal to these policy considerations, arguing that acquirer fees are easily separated from interchange fees that are paid to issuers and passed along to merchants (regardless of who "pays" interchange as a formal matter), and that some acquirers are also issuers and thus directly or indirectly benefit from any anticompetitive practices.  Whether these considerations would be sufficient to overcome the past tendency of courts to apply the indirect purchaser doctrine strictly, however, is unclear.[19]

In sum, I conclude that plaintiffs face significant uncertainty associated with the indirect purchaser doctrine given potentially adverse precedents.   Policy considerations may offer a reasonable basis for distinguishing the present case from a typical indirect purchaser situation, but it is difficult to predict how the issue would ultimately be resolved.

---

[19] See, e.g, Kansas v. Utilicorp United, Inc., 497 U.S. 199 (1990)(rejecting exception to indirect purchaser doctrine where overcharges allegedly passed on in full to utility customers).

4.  Class Certification

The prospects for recovery of damages also depend on the question of class certification.  Time constraints have prevented me from evaluating in any depth the economic issues raised in this connection, as has the fact that my legal knowledge on matters of class certification and civil procedure is scant, leaving me less confidence in my ability to ascertain which economic issues are especially important.

I am mindful of the fact that this Court certified a merchant class in prior litigation involving alleged anticompetitive practices by defendants, In Re Visa Check/Master Money Antitrust Litigation, 198 F.R.D. 68 (E.D. NY 2000)("Visa Check"), a decision that was affirmed on appeal.  I am also mindful of the fact that the issues relating to liability and damages are somewhat different in the present case, and that Supreme Court decisions in the past few years have tightened the requirements for class certification importantly.  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011)(requiring plaintiffs to prove that the requirements of Rule 23 are met before class can be certified); Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013)(before certifying a class, court must conduct a rigorous analysis to determine whether class-wide damages case comports with antitrust liability case). These developments suggest that at least a modest degree of uncertainty remains as to whether the plaintiffs can obtain and maintain class certification.

5.  Visa Check Release

Defendants argue that the settlement release in the above-noted Visa Check litigation bars some or all of plaintiffs' claims in the present litigation, because such claims relate to business practices in place at the time of the Visa Check settlement. Plaintiffs argue that the present claims relate to subsequent conduct to which the release is inapplicable. The proper construction of the Visa Check release is a legal

question on which I offer no opinion, but this issue does appear to present an additional source of uncertainty for the plaintiffs.

D.  Litigation Costs

Continued litigation inevitably imposes additional costs on all parties in the form of litigation costs.  Nothing in the materials submitted to me, however, affords a basis for assessing this factor quantitatively.  From a qualitative perspective, future litigation costs are less to the degree that discovery is complete and briefing on the key substantive issues has already occurred.  Depending on the outcome of pending summary judgment motions, future litigation costs at the trial court level might prove small, but they might also be substantial if complex issues remain for trial.  Appellate litigation is also perhaps quite likely in a case of this magnitude.  The possibility arises, therefore, that substantial costs remain to be incurred at trial or on appeal.

E.  Summary

On the assumption that the originally alleged inter-network conspiracy to fix prices is no longer seriously at issue, it is my opinion that the plaintiffs face a substantial and perhaps rather large probability of eventual failure in litigation both as to liability and as to the prospects of significant monetary and injunctive relief.  A substantial and perhaps high probability exists that the issues will be analyzed under the rule of reason, and a review of the economic issues in the case suggests that the plaintiffs will have difficulty establishing that the intra-network practices are on balance anticompetitive.  The plaintiffs also face considerable difficulty in establishing a persuasive counterfactual for the computation of damages, assuming that they can overcome obstacles to liability, as well as significant potential risk under the indirect purchaser doctrine.  Related considerations along with prudential factors raise further doubts about the likelihood of any injunctive relief going significantly beyond the terms of the proposed settlement.  Still other issues appear

to raise further legal uncertainty, and the cumulative probability of failure on *some* issue(s) of critical importance to the plaintiffs appears to be quite substantial. The litigation costs of further litigation may be substantial.

III. The Value to Plaintiffs of the Settlement

This section contains an assessment of the value to plaintiffs of the rules changes and damages components of the settlement, as well as brief discussion relating to the scope of the proposed release. I again emphasize economic issues and do not address at all a number of legal concerns raised by the objectors, such as whether the settlement and release comport with requirements of due process, whether the certification of damages and injunctive relief classes is proper under Rule 23, whether notice to class members of the proposed settlement has been adequate, whether the interaction between the proposed settlement and the Affordable Care Act pose special difficulties for certain health care entities, and various other matters.

A. Rules Changes

The proposed settlement embodies a number of commitments by the defendants, including modification of the no-surcharge rules, a commitment to abide by terms of recent legislation and a recent settlement of litigation with the Department of Justice even if the legislation is repealed or the settlement terms modified, an agreement to modify "all outlets" rules to permit merchants to maintain different card acceptance policies at outlets with different "banners," and a commitment to negotiate in good faith with group buying associations. Although each of these commitments no doubt has *some* potential value to plaintiffs, it is difficult to estimate how much and I find no convincing basis in the expert reports for any reliable quantitative estimates. Most of the debate among the economic experts relates to the value of surcharging.

31

# A2506

1. Surcharging

Class plaintiffs' expert Dr. Frankel has taken the lead in arguing that surcharging will provide substantial benefits to plaintiffs. I refer to his statement in support of the proposed settlement as the Frankel Settlement Declaration, to be distinguished from the previously mentioned Frankel Report (Frankel Rep.) and Frankel Rebuttal Report (Frankel Rebuttal Rep.) relating to liability and damages. His position on the value of surcharging stands in contrast to the analysis offered by certain defendants' experts, who argued that surcharging by merchants would be uncommon or of little consequence if it were permitted. See Klein Rep. ¶¶82-102; Topel Rep. ¶¶57-76. I have received two economic reports from objectors criticizing Dr. Frankel's analysis of these issues – one by Prof. Hausman and one by Prof. Weisbach – along with a reply from Dr. Frankel that I will refer to as the Frankel Settlement Reply Declaration, and a further reply declaration from Prof. Weisbach.

a. Summary of Expert Positions on the Value of Surcharging Pursuant to the Settlement

Dr. Frankel argues that surcharging benefits merchants in three ways – by recovering the costs of transactions with high-cost payment methods that are surcharged, by inducing some significant numbers of consumers to switch to less expensive payment methods, and by placing downward pressure on interchange fees. Frankel Settlement Dec. ¶32. He argues further that merchants will be willing to impose surcharges, pointing to factors such as the convenience fees already imposed by certain domestic entities that are exempt from no-surcharging rules, as well as the experience in other countries where surcharging has been permitted for some time. He suggests that merchant fees are presently high enough in the United States to make surcharging attractive, and that empirical evidence (much of it from abroad) supports the proposition that surcharges will induce consumers to switch to less costly payment methods in significant numbers. Id. ¶¶33-43. He contends

# A2507

that the ability to surcharge (or even to make a credible threat to surcharge) can and has exerted downward pressure on interchange fees, pointing to the Australian experience.  Id. ¶¶44-47.  He also argues that surcharging is a more effective steering method than discounting, because consumers react differently to surcharging for reasons suggested by the behavioral economics literature. Id. ¶¶48-51.  He acknowledges that state anti-surcharging statutes may limit the extent of surcharging, as may the aspect of the settlement that prohibits merchants from surcharging unless they also surcharge other more expensive payment products. Because of the latter provision, merchants will not be able to surcharge Visa and Mastercard transactions if they accept American Express cards due to the fact that American Express cards have higher merchant fees and American Express imposes a no surcharge rule.  Dr. Frankel notes, however, that the American Express policy has been challenged in ongoing litigation with the Department of Justice.  While acknowledging these issues relating to state anti-surcharging statutes and American Express rules, Dr. Frankel argues that they diminish but do not eliminate the benefits of surcharging to plaintiffs.  Id. ¶¶ 58-64.

Finally, Dr. Frankel provides an "illustration" of the benefits from surcharging, based on a variety of assumptions about its extent, the downward pressure that it will produce on interchange, the growth over time in credit transactions, and other factors.  Id. ¶¶65-73.  His illustration assumes that interchange fees will fall by 4 basis points per year (and thus 40 basis points in 10 years), that credit charge volume will grow at 8.5% per year, that the percentage of merchants surcharging transactions will increase by 2% per year for ten years (to 20%), that each surcharged transaction recoups 1% of its total value through surcharge revenue or reduced cost due to an alternative payment mechanism, and that 1% of consumers per year switch from credit to debit cards at non-surcharging merchants.  The total savings over ten years are then computed at over $94 billion. If state anti-surcharging statutes and American Express rules "are assumed" to reduce key parameters by 75%, the illustrative benefits fall to $26 billion. Id. ¶73.

Profs. Hausman and Weisbach take issue with many aspects of Dr. Frankel's analysis. Prof. Weisbach focuses on Dr. Frankel's quantitative illustration of the benefits from surcharging. He argues that Dr. Frankel's illustration does not meet the standards for a reliable forecast or estimation of merchant benefits. Dr. Frankel does not adjust for risk or the time value of money, and does not compute expected cash flows based on a probability distribution of possible outcomes. Prof. Weisbach questions the 8.5% growth assumption made by Dr. Frankel, arguing that it is based on an unrepresentative period, questions his assumptions about the revenue recouped through surcharging, suggests that various differences between the U.S. and Australian economies may render the Australian experience inapt for predicting interchange fee reductions and the percentage of transactions to be surcharged in the United States, and questions whether the Australian experience is relevant given the caps on surcharging in the proposed settlement, the state anti-surcharging statutes in the United States and the American Express no-surcharge rule. He criticizes Dr. Frankel for neglecting to estimate and deduct the costs to merchants of implementing surcharge systems.

Prof. Hausman reiterates aspects of the plaintiffs' economic case on liability, and argues that the settlement fails to address satisfactorily the anticompetitive consequences of practices such as default interchange and honor all cards rules. He questions the utility of surcharging, in significant part because of state anti-surcharging statutes and American Express rules. He further questions the effect of surcharging in foreign settings such as Australia and the United Kingdom, arguing that surcharging is relatively uncommon and has not reduced interchange rates there significantly, attributing any observed reductions in interchange to other factors such as regulation in Australia. Regarding Dr. Frankel's illustration of benefits to merchants, Prof. Hausman argues (like Prof. Weisbach) that the assumptions in the illustration lack a firm economic basis. He makes a few additional points not mentioned by Prof. Weisbach, such as suggesting that Dr. Frankel significantly overestimates the extent of surcharging in Australia, and that

34

he does not properly consider the loss of sales to merchants who surcharge and lose customers.

Dr. Frankel's reply statement emphasizes that his "illustration" was not meant to be a serious forecast that meets the standards for econometric estimation and prediction, but merely a possible illustration of benefits to merchants based on assumptions that he considers plausible in light of the experience with surcharging abroad and his interpretation of the evidence regarding its effects. He quarrels with Profs. Hausman and Weisbach on many other particulars of their critique, and offers a detailed point-by-point rebuttal that I will not undertake to summarize here. Rather, I will bring out important points from Dr. Frankel's reply declaration in the discussion to follow.

b. Discussion

After reviewing the parties' submissions and the expert commentaries, I reach the following specific conclusions about surcharging:

(i). Dr. Frankel's elucidation of the *potential* benefits to merchants from surcharging, as a matter of economic theory, seems broadly correct. To the degree that surcharging takes hold, it might reduce interchange fees, and it would benefit merchants by allowing them to collect surcharge fees or by inducing some consumers to switch to less costly payment mechanisms. To be sure, if the merchant sector is competitive, any benefits to merchants along these lines may be competed away if merchants reduce prices (Dr. Frankel himself has argued, for example, that interchange fees affect marginal costs and cause merchant prices to rise, other things being equal. Frankel Rebuttal Rep. ¶¶148-51, 194. Presumably the logic applies in reverse.). Accordingly, any additional revenues from surcharging could be significantly larger than the additional profit from surcharging.

# A2510

Regarding the question of offsets to the potential benefits, I concur with the experts for objectors that one must deduct the direct costs to merchants of implementing a surcharge mechanism, although the magnitude of these costs is unclear.  The potential transaction costs of product-level surcharging, in particular, may be high or the technology may not be readily available.  Hausman Rep. ¶100.

An interesting issue arises as to whether the loss of sales by merchants who surcharge should be the basis for an offset – Dr. Frankel argues against such an offset on the grounds that sales lost by one merchant are gained by another, so that as a first approximation the class of merchants as a whole is not injured when one merchant loses sales to another due to surcharging.  Frankel Settlement Reply Dec. at 57.  This argument strikes me as correct if one assumes that a sale lost by any merchant that surcharges is offset one-to-one by another sale by a member of the plaintiff class.  But that assumption may not be entirely correct – sales may be lost to merchants who do not accept credit cards, for example, and the net impact of reduced credit card usage on the overall level of consumer spending and consumer prices is a matter of controversy among the experts.

 (ii).  The fact that there are potential benefits from surcharging does not establish that significant benefits will arise in practice.  All experts seem to agree that merchants will often be hesitant to impose surcharges because of the fear of losing sales to merchants who do not.  Prof. Hausman argues, for example, that average retail profit margins per transaction are much higher than potential surcharge revenue, so that a prospect of only modest numbers of lost sales will make surcharging appear unprofitable to merchants.  Hausman Rep. ¶73.  This problem is more acute for the "first-movers," i.e., the first to impose surcharges.  If the market somehow evolves so that surcharging becomes common, the disincentive to additional surcharging diminishes.  But it is difficult to predict how many merchants will wish to surcharge initially, or how quickly the practice of surcharging will grow (if indeed it will).  The experience in other countries can be somewhat instructive on this front, but there can be differences across countries

# A2511

that make comparisons misleading (more on this point below).  Likewise, although it is true that some entities have in the past been exempted from no-surcharge rules in the United States and have taken advantage of such exemptions to charge "convenience fees" for credit card acceptance (such as colleges and universities, see Frankel Rep. ¶162), such entities may not face the same concerns as typical merchants.  Colleges and universities, for example, probably need not seriously worry that a convenience fee will cause a student to drop out or pursue education elsewhere.

(iii).  The experts by and large seem to agree that surcharging may be a more effective strategy for steering consumers than discounting, which is already allowed under the Visa/Mastercard settlement with the Department of Justice as I understand it.  The claim that surcharging is more effective turns on findings in the behavioral economics literature to the effect that consumers react differently to practices that impose costs or losses on them than to practices that offer them incentives or benefits.  See, e.g., Ariely Report.  The difference in perception also seems to be confirmed to a degree by the fact that political opposition to surcharging has surfaced in many states, while (to my knowledge) political opposition to discounting has not arisen to the same degree.   The fact that discounting is allowed even without the proposed settlement, however, raises some question in my mind as to the incremental value of surcharging given that the two practices can be, as Dr. Frankel put it, "algebraically equivalent."  Frankel Settlement Dec. ¶48.

Moreover, assuming that surcharging is indeed a more potent device for inducing consumers to change behavior, it is something of a double-edged sword in this context.  The greater the extent that consumers may be expected to react to it, the more merchants may be fearful of using it and losing sales, especially as "first-movers."

# A2512

(iv).  Dr. Frankel relies heavily on the Australian experience for his opinion that surcharging will create significant downward pressure on interchange rates. Frankel Settlement Dec. ¶¶34-47.   He observes that the gap between Visa/Mastercard and American Express merchant fees in Australia has declined by 4 basis points per year over a recent three-year period during which surcharging was allowed. This observation apparently forms a basis for the assumption in his illustration that surcharging in the United States will reduce interchange rates by 4 basis points a year for ten years. Id. ¶71.

To his credit, Dr. Frankel frames his quantitative analysis as an "illustration" rather than a serious forecast.  The decline in American Express fees in Australia over a recent three-year period is a shaky basis for imagining that surcharging in the United States under the terms of the proposed settlement would lead to a 4 basis point or any other particular reduction in U.S. Mastercard and Visa interchange rates per year over time.  It is possible, as Profs. Hausman and Weisbach argue, that reductions in American Express merchant fees in the Australian market are substantially attributable to the fact that Visa and Mastercard interchange fees in Australia became subject to regulation, leading to a lagged response from American Express over time, or to the fact that surcharging there was not capped.   See Hausman Rep. ¶¶83-85; Weisbach Reply Dec. ¶5.[20]  It is also clear that Australia does not have the equivalent of state anti-surcharging statutes or the constraints imposed on merchants in the United States under the proposed settlement by American Express rules.  The experience in Australia over a particular *three*-year period also seems a questionable basis for projecting a steady *ten*-year trend in the United States.  See Weisbach Reply Dec. ¶6.

---

[20] It is also interesting that Diner's Club fees have apparently not tracked the decline in American Express fees in Australia despite surcharging.  Dr. Frankel suggests that this is because Diner's Club is a "niche brand" and because of the small number of transactions with Diner's Club it "gains the benefits of some of American Express's fee reductions...without itself having to reduce its rates as much."  Frankel Settlement Reply Dec. p. 54; see also pp. 36-37. This claim strikes me as plausible but conjectural.

38

It is also fair to note that the assumed 4 basis point per year reduction in interchange fees accounts for roughly two-thirds of the merchant benefits from surcharging in Dr. Frankel's illustration ($62.8 billion versus $31.5 billion from other sources). Frankel Settlement Dec. p. 42, Table 1. Of that total, much of the benefit arises in later years of the ten-year hypothetical window due to the assumed growth in transactions and the steady per-year increase in the decline of interchange fees.

(v). In addition to the data on declining American Express merchant fees in Australia following the introduction of surcharging, Dr. Frankel offers some anecdotal evidence that surcharging has played an important role in producing downward pressure on American Express merchant fees in Australia. For example, he suggests that a large retailer (Woolworth's) was able to negotiate favorable fees with American Express by threatening to surcharge. Frankel Settlement Dec. pp. 26-27; Frankel Settlement Reply Dec. pp. 30-32. In the course of this discussion, he emphasizes that Woolworth's apparently threatened to surcharge but not drop American Express cards, a fact that he believes shows the incremental value of surcharging relative to an environment in which the merchant's only credible threat is to drop the card altogether. The Woolworth's experience and similar instances of negotiation may well have some predictive value, but one must be cautious in interpreting them. One cannot assume that the effects of a threat to surcharge in a negotiation over merchant fees with a large retailer will necessarily mirror the effects of actual surcharging by some modest percentage of smaller retailers. Further, large retailers have considerable leverage in negotiation with or without a threat to surcharge, and despite the anecdotal account of a particular negotiation it is difficult to know how the negotiation would have turned out without the threat to surcharge.

(vi). Dr. Frankel points to the proposition that countries that allow surcharging tend to have lower interchange fees than in the United States and other

# A2514

countries that do not allow surcharging, even if one excludes Australia where Visa/Mastercard interchange fees are regulated, citing data developed by Dr. Wecker. Frankel Settlement Reply Dec. pp. 40-42. These data are suggestive, but it is always possible that other differences across these countries explain the interchange differentials. I can only speculate on what those differences might be, and will not do so. I simply note that there is no indication in the Frankel declaration that Dr. Wecker considered the possibility of other differences or attempted to control for any.

(vii). Prof. Hausman states that 41% of U.S. commerce occurs within states that prohibit surcharging, and that 70% of U.S. commerce would be located in no-surcharging states if currently pending anti-surcharge legislation in other states passes. Hausman Rep. ¶¶57-58. Dr. Frankel acknowledges that state anti-surcharging statutes would reduce the benefits to merchants of surcharging, but insists that some benefits will arise for all merchants because of the surcharging that is allowed in many states. He argues that these benefits will flow to merchants in no-surcharging states because interchange fees are set at the national level. Prof. Hausman replies that if Mastercard and Visa reduce interchange fees at all, they may instead set differential interchange fees, lower for surcharging states, so that merchants in non-surcharging states derive no benefit from surcharging. Hausman Rep. ¶62. Dr. Frankel believes that outcome to be unlikely because geographic price discrimination has not occurred in the past. I have no basis for offering a judgment as to who is right.

Dr. Frankel also argues that some anti-surcharging statutes may be interpreted in a way that allows the equivalent of surcharging, such as in New York. Frankel Settlement Reply Dec. pp. 42-43. Class plaintiffs elaborate, suggesting that statutes in New York and California may be interpreted to allow surcharging as long as merchants provide proper disclosure, and noting further that state anti-surcharging statutes are subject to constitutional challenge. Class Plaintiff's Reply Memorandum in Support of Settlement pp. 25-28. It is unclear to me, however,

# A2515

whether the possible interpretation of anti-surcharging statutes noted by class plaintiffs allows "surcharging" or simply a disclosed two-price policy that could be interpreted as "discounting," and that merchants could put in place even absent the proposed settlement.  To the degree that this distinction has marketplace importance because of the behavioral economics findings that suggest a difference between "surcharging" and "discounting," some clarification would be valuable.  In any case, it is seems uncertain how state anti-surcharging statutes will ultimately be interpreted, or whether any constitutional challenges to them will ultimately succeed.

Dr. Frankel also makes the point that the advent of greater surcharging under the proposed settlement may affect the political equilibrium that has led to the passage of no-surcharging statutes.  His suggestion is that merchants in no-surcharging states may feel themselves disadvantaged, and secure the repeal of the anti-surcharging statutes.  Frankel Settlement Dec. ¶60.  He raises a logical possibility, but it is also possible that the advent of greater surcharging will invigorate anti-surcharging political forces, leading to the passage of more anti-surcharging statutes where they are now pending or may later be introduced.  Likewise, the fear of new anti-surcharging statutes may discourage some merchants from experimenting with surcharging.  I cannot assess the likelihood of these scenarios.

Plainly, considerable economic and political uncertainties are associated with anti-surcharging statutes.  Experts on both sides advance logically coherent arguments as to their possible impact, but I see no basis for evaluating their likely quantitative impact beyond a crude inference based on statistics indicating the percentage of commerce affected by them.

(viii).   Dr. Frankel acknowledges that the settlement would restrict surcharging by merchants who accept American Express as long as the current American Express rules remain in effect.  Prof. Hausman notes that merchant

41

# A2516

acceptance of American Express is "now about 90% (or higher) by credit card volume." Hausman Rep. ¶65. Dr. Frankel downplays the importance of this fact for three reasons: (i) If merchants can surcharge Visa and Mastercard transactions, they may drop American Express in order to do so; (b) a significant number of merchants do not take American Express in any event; and (c) American Express may change its rules in response to pending litigation against it by the Department of Justice.

The American Express policy is likely to have a substantial effect on the potential value of surcharging to plaintiffs as long as American Express retains its current rules, although I see no basis for any quantitative estimates of this impact. I offer only a few qualitative points in addition to the points already noted by the experts on both sides. First, in light of the widespread acceptance of American Express cards, even the merchants who do not take American Express cards may be reluctant to surcharge Visa and Mastercard transactions because they know that competitors who take American Express will not match any surcharges – the American Express issue exacerbates the "first-mover" disadvantage. Second, Dr. Frankel's suggestion that merchants may drop American Express to take advantage of the opportunity to surcharge is certainly a logical possibility, but runs up against the arguments put forward earlier in the case by the plaintiffs regarding the anti-competitive effects of various network rules. A number of experts for the plaintiffs, including Dr. Frankel, argued that these rules leave merchants no choice in the face of higher interchange rates but to drop a card brand altogether, an option that is simply too costly. Perhaps American Express is less essential than Visa and Mastercard in the view of the merchants who now accept it, and they would be more willing to drop it altogether, but I am not aware of any evidence to that effect other than perhaps the somewhat smaller market share of American Express. Finally, I have no basis for offering a judgment about the likelihood that the current Department of Justice litigation against American Express will ultimately result in an end to its no-surcharging policy.

# A2517

Dr. Frankel suggests that he takes both the existence of state anti-surcharging statutes and American Express rules into account when he adjusts key parameters downward by 75% for his second illustration.  See Frankel Settlement Dec.  ¶73 and Table 2.  This adjustment is essentially arbitrary, however, and I see no basis for imagining that the collective effect of these factors will be to reduce key parameters by 75% or any other particular amount.

c.  Summary and Implications

I conclude that the value of surcharging to plaintiffs is highly uncertain and may be small.  Dr. Frankel's illustration succeeds in making the point that *if* surcharging takes hold in the United States and becomes a significant source of revenue to merchants, and *if* the result is significant downward pressure on interchange rates for Visa and Mastercard, then the dollar increment in revenue to merchants could run into billions of dollars over time.  The illustration is of no value for the purpose of assessing whether these assumptions are correct, however, and support for them must be found elsewhere.

One cannot predict with confidence to what degree surcharging will actually occur, and it may prove uncommon as the objectors contend.  Likewise, one cannot predict with confidence the extent to which surcharging will exert downward pressure on interchange rates.  The experiences in other countries such as Australia are suggestive but any inferences are greatly complicated by the fact that circumstances in other countries are significantly different from those in the United States.  The most glaring differences relate to the existence of state anti-surcharging statutes in the United States, the limitations on surcharging under the proposed settlement for any merchant that accepts American Express, and substantially different regulatory environments (especially in Australia, the country that has received by far the most attention as a basis for comparison).

The fact that the analysis of surcharging offered by the proponents of settlement is subject to substantial criticism, however, does not prove that surcharging would be of little or no value to merchants in the United States. We simply do not know.

## 2. Other Rules Changes

The proposed settlement locks in changes to the rules of Visa and Mastercard relating to discounting and certain other practices that encourage consumers to use lower cost payment mechanisms. These changes resulted from the Dodd-Frank Wall Street Reform and Consumer Protection Act and from the recent settlement between the Department of Justice and Visa/Mastercard in United States et. al. v. American Express et. al. The proposed settlement also permits "product" level surcharging, eliminates penalties for merchants that maintain different card acceptance policies at different "banner" stores, and requires Visa and Mastercard to negotiate in good faith with group buying associations.

None of the economic experts devote much attention to these provisions beyond a few paragraphs in the Frankel declaration suggesting that they all have value to merchants, and a few statements in the Hausman report suggesting that product-level surcharging is unlikely and that group buying associations are unlikely to have much impact. None of the experts attempt any quantitative estimates regarding these provisions.

The provisions that lock in aspects of the Dodd-Frank Act and the DOJ settlement have value only to the degree that the underlying legislation and settlement agreement may be eliminated or modified in the future. I have no basis for assessing the likelihood of such developments. Moreover, it is not clear how valuable these rule changes are to merchants in the first place. All of them are of recent vintage (the Dodd-Frank Act in 2010 and the approval of the DOJ settlement in 2011), and it is surely too soon for any confident assessment of their marketplace

44

impact.  I was struck, however, by the absence of any significant discussion as to how much these rule changes have affected merchant practices thus far.

The possibility of product level surcharging raises many of the issues discussed above, such as the question whether merchants will surcharge to any significant degree at all.  It also raises a question about the capacity of merchants to distinguish more expensive products accurately at the point of sale or otherwise in online or other types of transactions.  Dr. Frankel simply notes that the settlement creates the option of product level surcharging, and suggests that merchants may take advantage of it to steer consumers away from the use of cards with particularly high interchange fees.  He does not offer any forecast or analysis of its likely extent, however, or discuss evidence concerning product level surcharging in other countries.   Frankel Settlement Dec. pp. 32-33. Prof. Hausman emphasizes the difficulties that merchants may have in identifying high interchange cards and implementing differential surcharges, observing that a large number of different types of cards exist with different fees in the United States, and that product level surcharging has not arisen in the United Kingdom even though "surcharging has been permitted for 20 years."  Hausman Rep. ¶100.

Regarding the opportunity to vary card acceptance policies across stores with different banners while retaining the benefits of Visa's volume discounts, Dr. Frankel simply notes that some merchants are in a position to take advantage of this provision by restricting card acceptance at discount outlets or banners.  Frankel Settlement Dec. pp. 33-34.  No effort is undertaken to quantify this effect.

Finally, regarding group buying associations, it is my understanding that such associations could have been established in the past.  See Hausman Rep. ¶102.  If transaction costs or antitrust concerns have previously impeded the formation of group buying associations, those problems remain.  Co-counsel for class plaintiffs suggests, however, that it was the practice (although not a formal rule) for Visa and Mastercard to refuse to negotiate with merchant buying groups in the past (see

Wildfang Supp. Decl. ¶61).  If so, this practice may have discouraged the formation of buying associations. A duty to negotiate with such groups in good faith may then alter the negotiating landscape importantly if it is effectively policed, but without more information as to the history of any negotiations between Visa/Mastercard and group buying associations, I cannot assess the importance of this duty.

That said, it is surely correct as a matter of economics that groups of merchants banding together with a common negotiating position may in theory gain more leverage and achieve a better negotiating outcome than individual members of the group on their own.  For a group to do better in negotiations, however, the group members collectively must be able to threaten the counterparty in negotiations with a worse outcome than they could threaten individually if the counterparty refuses to offer a better deal than the group members could obtain individually.   Prof. Hausman argues that buying groups would not have a credible threat in this regard, because "I do not think merchants can credibly threaten to stop accepting [Visa/Mastercard] credit cards."   Hausman Rep. ¶101.   Prof. Hausman perhaps overlooks one new source of leverage for group buying associations under the terms of the proposed settlement – the group could threaten to *surcharge* Visa and Mastercard transactions.  Group threats to surcharge might overcome some of the "first-mover" disadvantage that individual merchants face if they surcharge and their competitors do not.  To be sure, such threats are infeasible for buying groups in states that prohibit surcharging or for groups whose members are prevented from surcharging by current American Express rules.  It is nonetheless plausible that coordinated activity among merchants, through group buying associations, might overcome some of the merchant resistance to surcharging (or threatening to surcharge) that prevails when merchants do not act as a group.

B. Damages

The monetary component of the proposed settlement, totaling over $7 billion, has been widely touted as the largest settlement in antitrust history.

46

# A2521

Objectors nevertheless emphasize that the amount per merchant is small when divided by the vast number of merchants who accepted Visa and Mastercard during the relevant time period, and that the total amount represents only a few months of interchange fee collections by the two networks.  All of these statements appear to be correct, but none of them are conclusive regarding the reasonableness of the settlement.

From an economic point of view, the question is how the monetary settlement compares to the expected recovery in continued litigation.  The fact that the settlement is large in absolute terms does not make it reasonable if the expected recovery is considerably larger.  Likewise, the fact that the amount per merchant is modest and represents only a few months of interchange fees is of little significance if the expected recovery per merchant from continued litigation is even smaller.

For the reasons given in Section II of this memorandum, I believe that plaintiffs face a substantial probability of failure in continued litigation with respect to issues of both liability and damages.  I cannot, however, quantify these probabilities with any precision, and I do not find any basis for a confident assessment of the likely dollar value of a damages recovery should the plaintiffs overcome all of the potential obstacles to such a recovery.  Accordingly, I do not find any convincing basis for estimating quantitatively the expected recovery from continued litigation.  Given what I believe to be a substantial probability that plaintiffs may recover nothing through continued litigation, however, and the substantial value of the settlement in absolute terms, I also find no convincing basis for concluding that the settlement amount is unreasonable in relation to the expected recovery in litigation.  In assessing the reasonableness of the settlement amount in the face of such uncertainty, it may be appropriate to consider the question of who has the burden of proof in establishing that the settlement is reasonable or unreasonable, an issue on which I offer no opinion.

47

# A2522

C.  The Release

Virtually all of the objectors argue that aspects of the release (for the 23(b)(2) class, the 23(b)(3) class, or both) are overbroad.  The objections include the suggestion that the release should not foreclose causes of action for future conduct that violates the antitrust laws, that it should not release claims for future damages, that it should not release claims for entities not yet in existence, that it should not release claims based on network rules that are not known or ripe at time of settlement, that the "substantially similar" language in the release sweeps too broadly, and various others.  The proponents of settlement dispute these claims, arguing that the scope of the release is appropriate, although defendants offer some clarifying language on a few narrow issues.

The proper construction of the language in the release, and the impact of any constraints on its approval or future interpretation imposed by pertinent case law, involve legal questions.  I have no comparative advantage in addressing such matters and will not attempt to address them.  I offer only a few observations from the economic perspective.

Defendants have a legitimate interest in securing litigation peace through settlements, and indeed a prospect of re-litigating the same or similar issues in the future can destroy any willingness to settle.  It is appropriate to allow settlements to extinguish claims that could have been brought in the existing litigation, and to exclude the possibility that trivial changes to a defendant's conduct or practices will open the door to re-litigating issues that are ostensibly settled.

Nevertheless, litigation "peace" need not include protection from liability for new and different violations of the law.  Proponents of the proposed settlement argue that the release is proper in this regard.  They suggest that its language excludes claims for anticompetitive conduct that is new or different from that at issue in this litigation, and that certain principles of construction (such as the

48

identical factual predicate doctrine) will serve to rein in any overbroad claims based on the language of the release alone.  These are legal arguments and I will not opine on their merits.

Certain objectors raise a related concern, however, that may require further reflection. Just as plaintiffs argue that the challenged practices of Visa and Mastercard have become anticompetitive over time as the industry has "matured," it is possible that certain existing or "substantially similar" rules or conduct may have future anticompetitive effects that are not apparent presently, particularly as to their effects on new and emerging payments technologies.  Prof. Hausman offers an example concerning the possible application of an existing or "substantially similar" honor all cards rule to Visa and Mastercard applications on smartphones or other emerging mobile payment technologies.   Hausman Rep. ¶¶103-09.   Certain objectors also offer the report of Mr. Mott, who argues that existing Visa and Mastercard rules, or slight modifications of them – including "card not present rules," rules concerning liability for fraud, a "BIN licensing Agreement," "must carry rules," and others, could significantly disadvantage a number of emerging competitors including providers of competing mobile and other "contactless" payment mechanisms.  See generally, Mott Rep. ¶¶29-57.

Class plaintiffs dispute these claims, and broadly assert that "claims based on emerging technologies are not released."  Class Plaintiff's Reply Memorandum in Support of Settlement, p. 60.  They suggest that existing rules do not cover new technologies, and that and rules modifications that extend to them would represent "new conduct or a new rule not covered by the release."  Id. p. 62.  They also offer a supplemental report by Mr. McCormack, who broadly contests the analysis of Mr. Mott.

Defendants seem to offer a somewhat different view: "Objectors also hypothesize that even if the current Visa and Mastercard network rules as modified in the settlement are lawful today, at some point in the future those rules might

# A2524

develop some potential anticompetitive effect, based on currently unforeseeable changes in market conditions, such as in developing payments technologies...But such risks are entirely speculative and part of the bargain inherent in any antitrust settlement..." Defendants' Reply Memorandum in Support of Final Approval of Definitive Class Settlement Agreement, pp.28-29.  An accompanying footnote adds: "Visa and Mastercard network rules governing payment card acceptance...have for years encompassed a wide variety of card, mobile phone, other contactless, and other payment and access devices and technologies...Determination of whether the application of the network rules to payment technologies developed in the future would be removed from the scope of the release is premature, as it is hypothetical and speculative, and would depend on the character of the rules as applied to the nature of such new technologies, and should properly be addressed only when and if an actual issue arises." Id. note 8.

In short, class plaintiffs suggest that future claims regarding any anticompetitive impact of network policies on new and emerging payments technologies are generally preserved under the release. Defendants suggest that they must be evaluated on an individual basis in light of network rules that "for years have encompassed a wide variety" of payment technologies, including mobile and contactless technologies that may become considerably more important over time.

I am not in a position to assess the likelihood and importance of the scenario envisioned by Prof. Hausman, or to arbitrate the debate between Mr. Mott and Mr. McCormack.  I do concur with the concern expressed by Prof. Hausman, however, that a release covering the future effects of all existing or "substantially similar" conduct or rules raises a danger of adverse, unintended consequences in a technologically dynamic industry, consequences that are inevitably somewhat speculative at this time.  The parties and the Court might usefully consider whether modifications to the release or guidance regarding its construction might be

# A2525

desirable in relation to the effects of the release on possible future antitrust claims involving new and emerging payments technologies.

Respectfully submitted,

Alan O. Sykes
Robert A. Kindler Professor of Law
New York University

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

K. Craig Wildfang
KCWildfang@rkmc.com
612-349-8554

September 4, 2013

The Honorable Judge John Gleeson                    *Via ECF*
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* Case No. 1:05-MD-1720 (JG)(JO)

Dear Judge Gleeson:

Class Plaintiffs write in response to the report of the Court's appointed economics expert Professor Alan O. Sykes. Professor Sykes was given a daunting and unenviable task. He reviewed and analyzed a substantial set of materials consisting principally of the parties' and objectors' voluminous submissions in connection with Class Plaintiffs' motion for final approval of the proposed settlement, as well as many of the parties' expert reports previously exchanged in the litigation. Although these materials were complex and voluminous, they nonetheless represent a relatively small portion of the record compiled in this case.

Class Plaintiffs agree with Professor Sykes' overall conclusion: "I find no basis for concluding that the overall value of the settlement in terms of monetary and injunctive relief is unreasonable in light of the substantial risks associated with establishing liability and obtaining substantial damages or injunctive relief through continued litigation." Sykes Rpt. at 4-5.

Professor Sykes' report is fairly read as endorsing the proposition that the securing of injunctive relief achieved in this case, the substantial modification of a major restraint on steering to lower cost payment methods (*i.e.* the no- surcharge rule) was the only substantial business practice change which this litigation might have realistically achieved. He appears to be firmly of the view that a winning economic case could not have been made for the elimination of either the "honor all cards" or default interchange rules. Thus, it bears emphasis that it is the failure to achieve what Professor Sykes believes to be un-achievable which is at the heart of many of the objections. Further, while Professor Sykes focuses on questions

84146618.3

September 4, 2013
Page 6                                                                                    *Via ECF*

supports a plausible inference that "Federal enforcers regard the economic issues
with respect to these practices as complex, and the potential net benefits of any
challenge to them as uncertain given the present state of economic knowledge."
Sykes Rpt. at 22. There is a considerable body of economic literature regarding
what economists call "revealed preference analysis," which is based on the concept
that an economist can confidently draw inferences from observing the behavior of
market participants and other economic actors. Professor Sykes appears to be
applying a form of revealed preference analysis in reaching his conclusion
regarding the likely inference from the absence of enforcement actions by the
Department of Justice.

Class Counsel believe that applying "revealed preference analysis" to the
behavior of the market participants is relevant here - Visa, MasterCard, American
Express; large, sophisticated merchants who are plaintiffs in this action and are
familiar with the record; and merchants and merchant organizations statements
and other fora - would support the inference that obtaining the ability to
surcharge is believed by these market participants to have considerable value to
merchants. We believe these facts and this analysis provide ample reason to be
much less skeptical about the likelihood of surcharging and the value to
merchants of obtaining the ability to surcharge than is expressed by Professor
Sykes.

With respect to the weight of the Australia evidence, one source of Professor
Sykes' skepticism is his belief that in Australia there exists a "substantially
different regulatory environment" from that in the United States. Sykes Rpt. at 43.
Class Counsel submit that, even if that assertion were ever correct, it no longer is.
In Australia, the Reserve Bank of Australia (that country's central-bank with
responsibilities similar to the United States Federal Reserve Bank) imposed limits
on the interchange fees that could be imposed on some, but not all, payment card
transactions resulting in many cards with lower, regulated rates – Visa and
MasterCard credit cards – and others with higher, unregulated rates – American
Express. The Reserve Bank also adopted regulations prohibiting some, but not all,
payment card networks from enforcing no surcharge rules.[2]

---

[2] The RBA regulation prohibiting no surcharge rules applied only to four party networks,
that is Visa and MasterCard, but not to three party networks such as American Express
and Diners Club. However, American Express voluntarily eliminated its
nondiscrimination rule because it wanted to avoid the possibility that might otherwise
come under regulation in the future.

# A2528

September 4, 2013
Page 7                                                              *Via ECF*

A similar regulatory scheme, with similar outcomes, will prevail in the United States if the settlement is approved. Pursuant to the authority delegated to it under the Dodd-Frank Act, the United States Federal Reserve Bank adopted regulations reducing debit interchange fees by about 50%. These regulations have been the subject of a successful challenge by merchants, in which the United States District Court for the District of Columbia found that the Federal Reserve Board regulations improperly included certain bank costs that led the resulting debit interchange fees to be substantially higher than Congress intended. *NACS v. Bd. of Governors of the Fed. Reserve Sys.*, Civ. No. 11-02075, 2013 U.S. Dist. LEXIS 107581 (D.D.C. July 31, 2013). The result of the court's ruling, unless overturned on appeal, will be that the already low regulated debit card interchange fees will be slashed even further.[3]

Thus, if the settlement is approved, U. S. merchants will see payment card markets in which, as in Australia, there are many payment cards (debit) with very low, regulated rates, and many payment cards with higher, unregulated rates (Visa, MasterCard, Discover credit cards and American Express charge cards). And, as in Australia, if the settlement is approved merchants will also have the ability to surcharge Visa and MasterCard credit cards, and use other efforts to steer customers to the use of debit cards and cash rather than credit cards.[4]

As Professor Sykes correctly notes, there are some limitations on merchants' ability to impose surcharges, specifically referring to certain state statutes and the rules of American Express. However, in the opinion of class counsel, Professor Sykes ascribes too much importance to these limitations. As Class Counsel have described in prior submissions, these limitations are under serious attack and may not survive. Both the Class and the individual plaintiffs in the American Express litigation believe that the settlement of MDL 1720 will help both of them and the Department of Justice to prevail in that litigation. If the plaintiffs and Department of Justice do prevail, and American Express' nondiscrimination rule is eliminated,

---

[3] "The Federal Reserve Board in its final rule that was recently overturned set a maximum debit rate of 21 cents plus 5 basis points per transaction. The Federal Reserve Board's initial finding of an appropriate maximum "safe harbor" rate was 12 cents per transaction."

[4] In recent years, for the first time in the United States, debit card transactions began to exceed credit card transactions.

# A2529

September 4, 2013
Page 8                                                                                      *Via ECF*

and merchants are free to surcharge American Express transactions, one of the limitations about which Professor Sykes is concerned will be gone.

However, even if the American Express rule is not eliminated soon, or even ever, there remain millions of merchants in the United States who do not accept American Express cards, and therefore are not subject to the level playing field limitation. Indeed, there may be many more merchants who elect to terminate their acceptance of American Express in order to be able to surcharge Visa and MasterCard credit cards.

Although the merchants who accept only Visa and MasterCard may account for only approximately 10% of card transaction volume, the sheer number of such merchants may create momentum toward surcharging.[5] In addition, the actual impact of the various state statutes is highly questionable because these statutes are now facing attack on First Amendment grounds, and the recent development in New York is very encouraging to merchants.[6] For these reasons, the limitations on merchants ability to surcharge about which Professor Sykes is concerned, almost certainly will have less impact than he fears.

With respect to the value of the injunctive relief to merchants, Class Counsel agree with Professor Sykes' conclusion with respect to the ability to form buying groups that "[a] duty to negotiate with such groups in good faith may then alter the negotiating landscape importantly if it is effectively policed ...." Since it is this Court which is charged under the settlement with resolving disputes regarding the parties compliance with its terms, Class Counsel are confident that the networks' duty to negotiate in good faith with merchant buying groups will be "effectively policed." And, as we have pointed out elsewhere, the experience with buying groups in other industries, notably healthcare, suggests that large buying groups can exert a significant downward pressure on prices.

Professor Sykes devotes little analysis to the settlement's lock-in of benefits achieved from Dodd-Frank and the Department of Justice consent decree. He questions the utility of the reforms in part because of their recent implementation and the inability to quantify the likelihood of a reversal of those provisions by a

---

[5] Anecdotally, it is Class Counsel's understanding that surcharges on ATM transactions, and certain airline fees primarily baggage fees began with small market participants, and later spread to the market generally.

[6] *Expressions Hair Design v. Schneiderman,* No. 1:13-cv-03775 (S.D.N.Y.) Jun. 4, 2013).

September 4, 2013
Page 9                                                                    *Via ECF*

subsequent Congress or administration.  While both are fair points to a degree, one can infer from Department of Justice and Congressional action which was spurred by merchant activism that the changes brought about in those reforms are deemed to be valuable by antitrust enforcers and the merchant community, much in the same way as Professor Sykes draws inferences from Department of Justice inaction in another portion of his report.  They are reforms which were originally sought in this litigation. These "lock-in" provisions are in the nature of an insurance policy against changing political winds in the Congress and the administration.

<u>Professor Sykes' Concerns about the Release</u>

Professor Sykes notes that virtually all of the objectors argue that aspects of the release (for the 23(b)(2) class, the 23(b)(3) class or both) are overbroad.  In analyzing the release Professor Sykes concurs with defendants' view that defendants have a legitimate interest in securing litigation peace.  Nevertheless, Professor Sykes notes this "peace" need not include protection from liability for new and different violations of the law.  Professor Sykes cites the apparent differences between the parties in interpreting the impact of the release on new and emerging technologies, and his concern that a release covering the future effects of all existing or substantially similar conduct or rules raises the danger of adverse unintended consequences.  We suggest that the identical factual predicate doctrine, when applied, would lessen any uncertainty. Class Plaintiffs note that Professor Sykes invites the parties and the Court to consider whether modification of the release or guidance regarding its construction desirable in relation to the effects of the release on possible new antitrust claims involving new and emerging payment technologies.  Class Plaintiffs remain willing and ready to engage in this dialogue.

<u>Conclusion</u>

As we noted in the opening paragraphs, Class Plaintiffs believe that, fairly read, Professor Sykes' report strongly supports the granting of final approval. Our primary disagreement with his report is that we believe he undervalued the relief obtained, as we have discussed hereinabove. To the extent we may disagree with his assessment of the merits of Class Plaintiffs' claims, the fact that Professor Sykes concludes that it is unlikely we could prevail on those claims by continued litigation is simply more evidence of the great risks Class Plaintiffs faced in this litigation. If the record we have assembled, in particular our expert reports, could

# A2531

**Response by Professor Jerry Hausman to the**
**Report of Professor Alan O. Sykes**

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*

September 4, 2013

# A2532

1.  I submitted an expert report on May 28, 2013 ("Report") assessing the competitive effects of the proposed Class Settlement Agreement in this case and assessing the reliability of the conclusions of Class Plaintiffs' economist Dr. Alan S. Frankel.[1]  In this report I respond to the Memorandum from Professor Alan O. Sykes to The Honorable John Gleeson dated August 28, 2013 ("Sykes Report") which among other things discusses my Report and Dr. Frankel's Report.  I do not respond to all the points in the Sykes Report, given the limited time for this Response and the redactions in the materials to which I have had access and in the materials to which Professor Sykes has had access. I also do not address the legal issues that Professor Sykes addresses in his Report because as an economist I am not qualified to render expert opinions on legal issues.

## I.        Summary of Conclusions

2.  I agree with Professor Sykes's conclusion that "the value of surcharging to plaintiffs is highly uncertain and may be small."[2]  This is consistent with my conclusion in my Report that surcharging in the US would "have no effect, or at most a very small effect, on interchange rates and VMC [Visa and MasterCard] networks fees."[3]  Moreover, Professor Sykes accepts two facts I cited in my Report as demonstrating that the vast majority of merchants in the US by credit card transaction volume would not be able to surcharge under the proposed settlement:  (i) merchants that currently accept American Express ("AMEX") cards represent 90% of total credit card transaction volume in the US and are effectively prohibited by the proposed settlement from surcharging VMC credit cards

---

[1] Report of Professor Jerry Hausman, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-md-1720 (E.D.N.Y. May 28, 2013) ("*Interchange MDL*") [Dkt. Entry 2670-5] ("Hausman Report").

[2] Sykes Report, p. 43.

[3] Hausman Report, ¶ 54.

274849.2

1

# A2533

because they accept AMEX cards; and (ii) certain states' laws in the US prohibit surcharging.[4]  Class Plaintiffs' economist Dr. Frankel also does not dispute these facts. Professor Sykes further confirms that even the 10% of merchants that theoretically can surcharge are not likely to do so, because they will risk losing sales to competing non-surcharging merchants.[5]  This outcome is likely to be especially true for small merchants.

3.  I agree with Professor Sykes that Dr. Frankel's "illustration" of the supposed class-wide financial benefits of surcharging, including surcharging's supposed reduction of Visa and MasterCard interchange, "is of no value."[6]  Dr. Frankel's assumptions about future surcharging and its effects in the US are contradicted by economic data that he either does not dispute or that he relies upon himself for these assumptions.  First, Dr. Frankel assumes that surcharging will reduce VMC interchange in the US by 4 basis points (0.04%) per year because surcharging AMEX and Diners Club cards in Australia has reduced AMEX and Diners Club rates there.  But according to Dr. Frankel's own data, the gap between AMEX and VMC pricing in Australia has not significantly changed since surcharging was permitted in Australia and, as I pointed out in my Report and not disputed by Dr. Frankel, the gap between Diners Club and VMC pricing has actually increased since surcharging was permitted.  The AMEX and Diners price gaps have persisted while AMEX and Diners have gained market share versus VMC, showing that surcharging has had no effect in Australia.  I thus concur with Professor Sykes's observation that "[t]he decline in American Express fees in Australia over a recent three-

---

[4] Sykes Report, pp. 40-42.

[5] Sykes Report, p. 42.

[6] Sykes Report, p. 43.

274849.2

2

6. Given Professor Sykes's and my conclusions that surcharging has little or no value to US merchants and given that Dr. Frankel fails to show otherwise, if surcharging would have any benefit at all it would likely be to only larger merchants that neither accept AMEX nor reside in states prohibiting surcharging. Small merchants in particular are not likely to benefit from surcharging, even if they can surcharge, because they will lose sales to the large number of competing merchants that cannot or will not surcharge.

7. Visa and MasterCard have substantial market power in the market for credit card network services. I share Professor Sykes's concern that certain of the proposed settlement's provisions, including the proposed releases of future claims, risk retarding future competition from technological innovation. In so doing, these settlement provisions may actually help maintain VMC's substantial market power. I note further that Dr. Frankel does not rebut these conclusions.[9]

## II.     Surcharging in the US Will Have No Effect, or at Most a Very Small Effect, on VMC's Interchange Rates in the US

8. In my Report, I concluded that surcharging in the US would "have no effect, or at most a very small effect, on interchange rates and VMC networks fees."[10] Similarly, Professor Sykes concludes that "the value of surcharging to plaintiffs is highly uncertain and may be small."[11] Dr. Frankel concludes differently from Professor Sykes and me. However,

---

[9] Reply Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed Class Settlement, *Interchange MDL* (E.D.N.Y. Aug. 16, 2013) ("Frankel Reply") [Dkt. Entry 5939-5].

[10] Hausman Report, ¶ 54.

[11] Sykes Report, p. 43.

274849.2

4

my conclusion in my Report was based on four reasons, none of which Dr. Frankel has

disputed and the validity of which Professor Sykes largely has acknowledged.

9. First, 11 states in the US currently prohibit surcharging, representing approximately 41%

of US commerce.  Dr. Frankel does not dispute this, instead claiming—contrary to his

own report—that merchants in these states may obtain outcomes equal to surcharging by

offering discounts for cash or debit.[12]  If it is true that discounting and surcharging are

functionally the same, then the proposed settlement adds nothing of value that the U.S.

Department of Justice did not achieve two years ago in its enforcement action against

VMC.  Professor Sykes also recognizes this fact.[13]

10. Second, I estimated in my Report that AMEX merchant acceptance in the US is now

about 90% (or higher) by credit card volume.[14]  Professor Sykes accepts this fact and Dr.

Frankel does not dispute my estimate.[15]  The proposed settlement's Competitive Credit

Card Brand limitation on surcharging ("CCCB limitation") allows surcharging of VMC

credit cards if the merchant accepts "Competitive Credit Card Brands," including AMEX,

only if the merchant surcharges VMC credit cards on the same terms that the Competitive

Credit Card Brand permits surcharging of its cards.[16]  AMEX's terms prohibit

---

[12] Frankel Reply, ¶¶ 69-70; see also Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed Settlement, ¶¶ 48-51, 60, *Interchange MDL*, (E.D.N.Y. Apr. 11, 2013) [Dkt. Entry 2111-5 ] ("Frankel Decl.").

[13] Sykes Report, p. 37 ("The fact that discounting is allowed even without the proposed settlement, however, raises some question in my mind as to the incremental value of surcharging given that the two practices can be, as Dr. Frankel put it, 'algebraically equivalent.'").

[14] Hausman Report, ¶ 65.  See also Amended Complaint, ¶¶ 64-65, *United States v. American Express Co.*, No. 10-cv-4496, (E.D.N.Y., Dec. 21, 2010) ("*U.S. v. AMEX* Complaint") [Dkt. Entry 57].  An AMEX executive is quoted as also using the 90% figure.

[15] Sykes Report, pp. 41-42.

[16] Definitive Class Settlement Agreement, ¶¶ 42(a)(iv) (Visa), 55(a)(iv) (MasterCard), *Interchange MDL* (E.D.N.Y. Oct. 19, 2012) [Dkt. Entry 1656-1].

274849.2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720(JG)(JO)<br><br>**DECLARATION OF HENRY OGDEN ARMOUR TO CORRECT MISSTATEMENTS IN SUPPLEMENTAL DECLARATION OF CRAIG WILDFANG AND IN OPPOSITION TO FINAL APPROVAL** |

## DECLARATION OF HENRY OGDEN ARMOUR

I, Henry Ogden Armour, declare pursuant to 28 U.S.C. § 1746 that:

1.     I am the President and Chief Executive Officer of National Association of Convenience Stores ("NACS"), a named member of the plaintiff class in the case *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* ("Litigation").  As such, I am NACS' designated representative in this matter.

2.     Founded in 1961, NACS is an international trade association representing more than 2,200 retail and 1,600 supplier company members.  NACS member companies do business in nearly 50 countries worldwide, with the majority based in the United States.  The U.S. convenience store industry, with more than 148,000 stores across the country, posted $700.3 billion in total sales in 2012, of which $501 billion were motor fuels sales.  NACS' business address is 1600 Duke Street, Alexandria, VA 22314.

3.     NACS funds its operations partly with dues and payments from its members. NACS has accepted payment for these services by Visa and MasterCard credit and debit cards from at least January 1, 2004, through the present.

1

# A2537

4.     I submit this declaration to correct certain misstatements of fact, about which I have personal knowledge, and that are contained in the Supplemental Declaration of K. Craig Wildfang in Further Support of Approval of Final Settlement ("Wildfang Declaration") filed August 16, 2013, Docket No. 5939-1.

### As Plaintiffs, NACS Did Not Receive Important Settlement Offers and Proposals from Class Counsel

5.     Class Counsel did not promptly inform Plaintiff NACS of material developments related to settlement of the Litigation.  According to Paragraphs 20 and 23 of the Wildfang Declaration, settlement documents were exchanged, including settlement outlines, terms sheets, and proposals, between Class Counsel and Defendants beginning in the spring of 2011.  But, in truth, neither the existence nor substance of offers of settlement made by Class Counsel in spring 2011 and August 2011 were communicated to class representatives until November 29, 2011.  And, the existence and substance of a draft proposed settlement agreement provided by Defendants in October 2011 was not communicated to class representatives until after the mediators in the case made their proposals on December 22, 2011.  The Wildfang Declaration does not dispute this.

6.     Paragraph 23 of the Wildfang Declaration describes meetings with class representatives in early November during which Mr. Wildfang "also shared with [class representatives] the term sheets that had been exchanged and the settlement proposal statements that Class Counsel was submitting pursuant to the settlement conference."  In fact, as evidenced by Exhibit 1 to this Declaration, the first time class representatives were even made aware that the term sheets existed was November 29, 2011.  In fact, Mr. Wildfang did not share the settlement proposal statements that were submitted to the court for *in camera* review on

2

November 22, 2011 until November 29, 2011. That is in spite of the fact that I specifically asked him to provide me with his proposed offer and strategy prior to our raising these issues with the mediators and Defendants. It was only after I sent an email to Mr. Wildfang reminding him of his November 17, 2011 promise to send the documents that he shared them with me on November 29.

7.      As Mr. Wildfang admits, he "also repeatedly told the class representatives that Class Counsel would not make settlement offers to the Defendants, but rather would give Defendants only an indication of what Class Counsel would agree to recommend to the Class as a fair, reasonable and adequate settlement." Wildfang Dec. ¶ 20.

8.      It is now evident that these statements to the class representatives were not accurate, and that Class Counsel was indeed making offers of settlement throughout the entire year, using Class Counsel's notion of fiduciary duty to the class as a shield against having to inform the class representatives of any material settlement discussions. Wildfang Dec. ¶¶ 7, 27 n. 5. Class Counsel reserved to itself the ability to accept offers on behalf of the class – there was no recommendation to class representatives and that means that class counsel was indeed making offers of settlement. The offers throughout 2011 culminated in a mediation statement submitted to the Court before any class representative had seen a settlement outline, proposal or term sheet.

9.      In July 2012, Class Counsel did not provide the finalized Settlement Agreement and MOU to NACS before it was publically filed. Paragraph 37 of the Wildfang Declaration states that drafts of the settlement were provided to Objecting Plaintiffs on July 11, 2012 and July 13, 2012. The Wildfang Declaration suggests that this renders the NACS Declaration filed on May 28, 2013, inaccurate. However, as the e-mail communications attached to the Wildfang

3

# A2539

Declaration demonstrate, no one from NACS received the two e-mail communications Mr.

Wildfang asserts were sent to Objecting Plaintiffs.  Wildfang Dec. Exs. 1-2.

### Class Counsel's Characterization of Class Representatives' Express Disagreement with the Settlement Are Inaccurate

10.     The Wildfang Declaration states, "We did not achieve unanimity among the class

representatives in early January, but a <u>majority</u> of them were in favor of accepting the mediators'

proposals and going forward."  Wildfang Dec. ¶ 26 (emphasis added).  That is not accurate.

11.     In fact, a document compiled by Class Counsel and distributed to class

representatives on January 12, 2012, showed that nine (9) class representatives opposed the

mediators' proposal, nine (9) class representatives supported the mediators' proposal, and one (1)

class representative was uncertain.  The one class representative listed as uncertain by class

counsel decided to oppose the mediators' proposal and is an objector to the final settlement.  *See*

"Class Reps Response to MP 12 January 2012," listing Class Representatives that supported or

rejected the mediator's proposal as of 12:00 PM EST 01/12/12.

12.     NACS is part of a majority (ten of the nineteen) of the named plaintiffs

representing the class that opposes final approval of the settlement.

13.     Mr. Wildfang also mischaracterizes class representatives' "agreement" to proceed

with settlement negotiations, stating "that all 19 of the class representatives had 'agreed' to the

mediators' proposals and to proceed with negotiations based on them."  Wildfang Dec. ¶ 29.

The Objecting Plaintiffs did not agree to the proposals.  In fact, the February 21, 2012

submission that Class Counsel refers to, which is signed by Mr. Wildfang, makes clear the

Objecting Plaintiffs' were "endorsing the mediators' proposals <u>as the basis for negotiations</u>,

hopefully leading to a final settlement" but not agreeing to the terms of the proposals.  *See* Letter

4

from C. Wildfang to Hon. J. Gleeson and Hon. J. Orenstein, dated Feb. 21, 2012, at 1 (emphasis added).  Attachment 1 to this submission underscores this point, "the undersigned class representatives have asked class counsel to continue to represent us and to negotiate toward a final settlement with the defendants through the process laid out by the mediators and the court in this matter." *See* Feb. 21, 2012 Letter at 3 (emphasis added).   The February 21 letter was only written after Class Counsel advised Objecting Plaintiffs' that the final settlement would be different than the mediators' proposals, that there would be opportunities in the negotiation process to make trade-offs and changes to the principles in the mediators' proposals, and that negotiating toward a settlement did not prejudice any class representative to agree to the results.  This was untrue, in fact, as most of the terms about which we had substantial objection ended up in the Final Settlement.

14.     At no time did NACS state that it agreed with the substance of the mediators' proposals.  As we have consistently made clear, NACS and other class representatives had principled disagreements with the settlement proposals, but we were committed to work through the process to reach settlement.  Class Counsel assured class representatives that we would have the opportunity to review any settlement that resulted from the negotiation process and decide whether or not to accept it.  The Wildfang Declaration implies that either agreeing to negotiate in good faith or accepting the mediators' proposals should prevent the class representatives from making judgments about the final settlement agreement and disagreeing with its terms.  That is inconsistent with the representations Class Counsel made to class representatives in February 2012.

15.     In Paragraph 34, the Wildfang Declaration misstates our disagreement at the June 2012 mediation session claiming, "The only class representative to show any significant level of

5

consternation with the agreement on major terms was NACS.  None of the NACS

representatives, Mr. Armour, Mr. Beckwith, or its outside counsel, Mr. Kantor, who were in

attendance and participate in the negotiations, raised any objection to the Court at that time."

That is not accurate.  I witnessed multiple class representatives, including but not limited to

NACS, raising serious concerns about the agreement during the course of the mediation session

with Class Counsel, the mediators and the Court in June 2012.

16.     Paragraph 35 of the Wildfang Declaration states that Mr. Wildfang has "been told

by several knowledgeable people that the trade associations' decisions to now oppose the

settlement were driven by their government relations/lobbying staff, and not by their lawyers."

While I cannot speak to how Mr. Wildfang chooses to view events, the decision of NACS to

oppose the settlement was based upon the merits of the settlement and was made by the business

executives on NACS's board of directors.  NACS' Board is made up of 30 executives of retail

companies within NACS' membership.  The Board voted unanimously to reject the Settlement

because of its serious shortcomings for NACS and its members.

**The DOJ Investigation Included Sources Outside of MDL 1720**

17.     In Paragraph 18, the Wildfang Declaration states, "The DOJ based its

investigation exclusively on the discovery record developed in MDL 1720."

18.     Contrary to the Wildfang Declaration, the experience of NACS indicates that the

DOJ investigation was not based "exclusively" on the MDL 1720 record, but on numerous other

sources.

6

275004.1

19.     In fact, NACS representatives met with DOJ attorneys and staff numerous times during the course of the DOJ's investigation, and provided facts and information about Visa, MasterCard and American Express which informed the DOJ's October 2010 consent judgment.

20.     We also facilitated conference calls between the DOJ and merchant-members, who provided direct evidence regarding their experiences with the card networks for the investigation.

21.     In addition, NACS is a member of the Merchants Payments Coalition ("MPC") whose members include more than 20 national and 80 state associations working together on payment card interchange issues.  I am aware that multiple members of the MPC met directly with the DOJ in order to provide information relevant to its investigation and facilitated conferences between DOJ and members of their associations.

22.     Given the above experiences of NACS, Mr. Wildfang's statement that the October 2010 consent judgment between defendants and the DOJ was based "exclusively" on the record of this Litigation is not true.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on:     September 9, 2013

                 Alexandria, Virginia


Henry Ogden Armour
NACS
1600 Duke Street
Alexandria, VA 22314

7

275004.1

# A2543

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

In re PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

MDL No. 1720(JG)(JO)

**DECLARATION OF ROBYNN
SHRADER TO CORRECT
MISSTATEMENTS IN
SUPPLEMENTAL
DECLARATION OF CRAIG
WILDFANG AND IN
OPPOSITION TO FINAL
APPROVAL**

### DECLARATION OF ROBYNN SHRADER

Robynn Shrader hereby declares pursuant to 28 U.S.C. § 1746 that:

1.      I am the Chief Executive Officer of the National Cooperative Grocers Association

("NCGA") and I have held this position since 2006.

2.      NCGA is a business services cooperative serving member consumer-owned retail

food cooperatives located throughout the United States.  NCGA is composed of 134 member

food cooperatives operating 170 stores in 36 states with combined annual sales of over $1.5

billion and over 1.3 million consumer-owners.  NCGA helps retail food co-ops to optimize

operational and marketing resources and strengthen purchasing power, and, as a result, offer

greater value to retail food co-op owners and shoppers in the United States.

3.      NCGA is a named member of the plaintiff class in the case *In re Payment Card

Interchange Fee and Merchant Discount Antitrust Litigation* ("Litigation").  I am knowledgeable

about our members' acceptance of debit and credit card transactions running on all payment

networks, including Visa and MasterCard, and payment of interchange fees for transactions

completed over those networks.  As such, I am NCGA's designated representative in this matter.

1

# A2544

4.      I submit this declaration to correct certain misstatements of fact, about which I have personal knowledge, and that are contained in the Supplemental Declaration of K. Craig Wildfang in Further Support of Approval of Final Settlement ("Wildfang Declaration") filed August 16, 2013, Docket No. 5939-1.

**NCGA Did Not Receive Important Settlement
Offers and Proposals From Class Counsel**

5.      Class Counsel did not promptly inform Plaintiff NCGA of material developments related to settlement of the Litigation.  According to Paragraphs 20 and 23 of the Wildfang Declaration, settlement documents were exchanged, including settlement outlines, terms sheets, and proposals, between Class Counsel and Defendants beginning in spring of 2011 and all throughout that year.  Yet class representatives were kept in the dark for much of the year, and were not informed of this until late November 2011, and after Class Counsel's proposals were submitted to the mediators and the Court.

6.      Mr. Wildfang does not dispute this, and describes the settlement-negotiation disclosures to the class representatives throughout 2011 as "regular[] discuss[ions] [of] ongoing mediation efforts and settlement strategy in this case."  Wildfang Dec. ¶ 19.  This stops far short of asserting that class representatives were told of or provided any copies of the settlement outlines, terms sheets, and proposals.

7.      Mr. Wildfang also admits that Class Counsel "did not immediately provide [Defendants' October 2011 settlement proposal] to the class representatives" and "did not immediately set up a meeting with the class representatives" to discuss it because they would be meeting with class representatives on December 2 and 3, 2011.  Wildfang Dec. ¶ 23.

8.      In paragraph 23 of his declaration, Mr. Wildfang describes meetings with class

2

# A2545

representatives in early November during which he claims to have "shared with [class representatives] the term sheets that had been exchanged and the settlement proposal statements that Class Counsel was submitting pursuant to the settlement conference." Once again, this statement is not accurate. NCGA did not receive these documents until late November.

9.      As Mr. Wildfang admits, he "also repeatedly told the class representatives that Class Counsel would not make settlement offers to the Defendants, but rather would give Defendants only an indication of what Class Counsel would agree to recommend to the Class as a fair, reasonable and adequate settlement." Wildfang Dec. ¶ 20.

10.      It is now evident that these statements to the class representatives were not accurate, and that Class Counsel was indeed making offers of settlement throughout the entire year, using Class Counsel's notion of fiduciary duty to the class as a shield against having to inform the class representatives of any material settlement discussions. Wildfang Dec. ¶¶ 7, 27 n. 5. The offers throughout 2011 culminated in a mediation statement submitted to the Court before any class representative had seen a settlement outline, proposal or term sheet.

### Class Counsel's Characterizations of NCGA's Express Disagreement with the Settlement Are Inaccurate

11.      Class Counsel has repeatedly made the inaccurate statement that a majority of class representatives approved the settlement. In describing the parties' positions in January 2012, Mr. Wildfang states that "We did not achieve unanimity among the class representatives in early January, but a majority of them were in favor of accepting the mediators' proposals and going forward." Wildfang Dec. ¶ 26 (emphasis added). That is not accurate.

12.      In a document compiled by Class Counsel and distributed to class representatives on January 12, 2012, nine of the 19 class representatives opposed the mediators' proposal, nine

3

# A2546

class representatives supported the mediators' proposal, and one class representative was undecided.  NCGA was the class representative listed as undecided.  NCGA communicated its opposition to Class Counsel shortly thereafter, and well before Class Counsel accepted the proposal.  *See* "Class Reps Response to MP 12 January 2012," listing Class Representatives that supported or rejected the mediator's proposal as of 12:00 PM EST 01/12/12.

13.     NCGA is part of a majority (10 of the nineteen) of named plaintiffs that are opposing final approval of the settlement.

14.     Mr. Wildfang also mischaracterizes class representatives' "agreement" to proceed with mediation negotiations, stating "that all 19 of the class representatives had 'agreed' to the mediators' proposals and to proceed with negotiations based on them."  Wildfang Dec. ¶ 29. The Objecting Plaintiffs did not agree to the proposals.  In fact, the February 21, 2012 submission that Class Counsel refers to, which is signed by Mr. Wildfang, makes clear the Objecting Plaintiffs' were "endorsing the mediators' proposals <u>as the basis for negotiations</u>, hopefully leading to a final settlement…" but not agreeing to the terms of the proposals.  *See* Letter from C. Wildfang to Hon. J. Gleeson and Hon. J. Orenstein, dated Feb. 21, 2012, at 1 (emphasis added).  Attachment 1 to this submission underscores this point, "the undersigned class representatives have asked class counsel to continue to represent us and to negotiate toward a final settlement with the defendants <u>through the process laid out</u> by the mediators and the court in this matter."  *See* Feb. 21, 2012 Letter at 3 (emphasis added).

15.     At no time did NCGA state that they agreed with the substance of the mediators' proposals.  As we have consistently tried to make clear, NCGA and other class representatives had principled disagreements with the settlement proposals, but we were committed to work through the process to reach settlement.  Class Counsel is now using that commitment against us,

4

saying that we reneged on an agreement to settle on these terms, which we never agreed to.

16.     The February 21 letter was, in fact, only written after Class Counsel advised Objecting Plaintiffs' that the final settlement would be different than the mediators' proposals, that there would be opportunities in the negotiation process to make trade-offs and changes to the principles in the mediators' proposals, and that negotiating toward a settlement did not prejudice any class representative to agree to the results.  These statements by Class Counsel were not accurate.  In fact, most of the terms about which we had substantial objections are in the Final Settlement.

17.     In paragraph 34 of his declaration, Mr. Wildfang inaccurately describes our continued level of disagreement in June 2012 by claiming that "The only class representative to show any significant level of consternation with the agreement on major terms was NACS." That is not accurate.  NCGA and others resisted so strongly that negotiations continued well into the night during that mediation session.  From NCGA's perspective, the settlement is an incredibly expensive "compromise" where nobody gets anything.

18.     Finally, in paragraph 35 of his declaration, Mr. Wildfang states that he has "been told by several knowledgeable people that the trade associations' decisions to now oppose the settlement were driven by their government relations/lobbying staff, and not by their lawyers."  I have no idea who expressed this opinion to Mr. Wildfang, but NCGA has never taken a position regarding this issue on Capitol Hill and has never engaged in lobbying activities about it.  NCGA held a board of directors meeting on August 1, 2012, where the board decided unanimously to oppose the settlement for business reasons, and with no influence from other trade organizations, lobbyists, or outside interests.

275005.1

# A2548

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on September 10, 2013

Robynn Shrader
National Cooperative Grocers
 Association
14 S Linn Street
Iowa City, Iowa 52240

6

275005.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

In re PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

MDL No. 1720(JG)(JO)

**DECLARATION OF JENNIFER T. MALLON TO CORRECT MISSTATEMENTS IN SUPPLEMENTAL DECLARATION OF CRAIG WILDFANG AND IN OPPOSITION TO FINAL APPROVAL**

### DECLARATION OF JENNIFER T. MALLON

Jennifer T. Mallon hereby declares pursuant to 28 U.S.C. § 1746 that:

1.    I am Vice President and General Counsel of the National Community Pharmacists Association ("NCPA") and I have held this position since August 2011.

2.    NCPA, founded in 1898, represents the interests of America's community pharmacists, including the owners, managers, and employees of more than 23,000 independent community pharmacies across the United States.  Together, independent pharmacies represent an almost $90 billion health care marketplace, dispense nearly 40 percent of all retail prescriptions, and employ more than 315,000 people, including 62,400 pharmacists.

3.    Independent pharmacies process millions of payment card transactions each year, representing as much as $1 million per store in sales volume.  Depending on the pharmacy's location, customers, and payment mix, a significant percentage of revenues are derived through credit card transactions.  Independent pharmacies have paid hundreds of millions of dollars in credit and debit card interchange fees since 2004.

4.    NCPA is a named member of the plaintiff class in the case *In re Payment Card*

1

*Interchange Fee and Merchant Discount Antitrust Litigation* ("Litigation").  I am knowledgeable

about our members' acceptance of debit and credit card transactions running on all payment

networks, including Visa and MasterCard, and payment of interchange fees for transactions

completed over those networks.

5.      I submit this declaration to correct certain misstatements of fact, about which I

have personal knowledge, and that are contained in the Supplemental Declaration of K. Craig

Wildfang in Further Support of Approval of Final Settlement ("Wildfang Declaration") filed

August 16, 2013, Docket No. 5939-1.

**NCPA Did Not Receive Important Settlement**
**Offers and Proposals From Class Counsel**

6.      Class Counsel did not promptly inform Plaintiff NCPA of material developments

related to settlement of the Litigation.  According to Paragraphs 20 and 23 of the Wildfang

Declaration, settlement documents were exchanged, including settlement outlines, terms sheets,

and proposals, between Class Counsel and Defendants beginning in spring of 2011 and all

throughout that year.  Yet NCPA was not informed of this until December 2011, after Class

Counsel's proposals were submitted to the mediators and the Court.

7.      Mr. Wildfang does not dispute this, and describes the settlement-negotiation

disclosures to the class representatives throughout 2011 as "regular[] discuss[ions] [of] ongoing

mediation efforts and settlement strategy in this case."  Wildfang Dec. ¶ 19.  This stops far short

of asserting that class representatives were told of or provided any copies of the settlement

outlines, terms sheets, and proposals.

8.      Mr. Wildfang admits that Class Counsel "did not immediately provide

[Defendants' October 2011 settlement proposal] to the class representatives" and "did not

2

# A2551

immediately set up a meeting with the class representatives" to discuss it because they would be meeting with class representatives on December 2 and 3, 2011.  Wildfang Dec. ¶ 23.

9.      On November 16, 2011, Mr. Wildfang traveled to NCPA's offices to brief me on the background and status of the litigation since I was new to the case, having recently been hired as NCPA's General Counsel.

10.      At no time during the meeting on November 16, 2011 did Mr. Wildfang disclose any settlement term sheets or proposals, including the October 2011 settlement proposal that he received from Defendants.  Mr. Wildfang only told me that he was "hopeful for a settlement."  I consulted my notes from this meeting, and Mr. Wildfang described the broad injunctive and monetary relief that plaintiffs were seeking.  He did not, however, state that any specific terms or proposals had been shared with or by Defendants.

11.      In paragraph 23 of his declaration, Mr. Wildfang describes meetings with class representatives in early November during which he claims to have "shared with [class representatives] the term sheets that had been exchanged and the settlement proposal statements that Class Counsel was submitting pursuant to the settlement conference."  As described in paragraphs 9 and 10 above, despite the opportunity to disclose such information and materials to me during our meeting on November 16, 2011, Mr. Wildfang did not do so.

12.      As Mr. Wildfang admits, he "also repeatedly told the class representatives that Class Counsel would not make settlement offers to the Defendants, but rather would give Defendants only an indication of what Class Counsel would agree to recommend to the Class as a fair, reasonable and adequate settlement."  Wildfang Dec. ¶ 20.

13.      It is now evident that these statements to the class representatives were not accurate, and that Class Counsel made offers of settlement, using Class Counsel's notion of

3

275026.1

fiduciary duty to the class as a shield against having to inform the class representatives of any

material settlement discussions.  Wildfang Dec. ¶¶ 7, 27 n. 5.  The offers throughout 2011

culminated in a mediation statement submitted to the Court before NCPA had seen a settlement

outline, proposal or term sheet.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on September 10, 2013

Jennifer T. Mallon
National Community
 Pharmacists Association
100 Daingerfield Road
Alexandria, VA 22314

4

275011.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

In re PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

MDL No. 1720(JG)(JO)

**DECLARATION OF PETER J.
LARKIN TO CORRECT
MISSTATEMENTS IN
SUPPLEMENTAL
DECLARATION OF CRAIG
WILDFANG AND IN
OPPOSITION TO FINAL
APPROVAL**

## DECLARATION OF PETER J. LARKIN

Peter J. Larkin hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am the President of the National Grocers Association ("NGA").  I have held this

position since July 1, 2010.

2.      I submit this declaration based on my personal knowledge to correct certain

misstatements of fact contained in the Supplemental Declaration of K. Craig Wildfang in Further

Support of Approval of Final Settlement ("Wildfang Declaration") filed August 16, 2013,

Docket No. 5939-1.

3.      NGA is a named plaintiff (also referred to in the Wildfang Declaration as a "class

representative") in *In re Payment Card Interchange Fee and Merchant Discount Antitrust*

*Litigation* ("Litigation").

4.      NGA is the national trade association representing the retail and wholesale

grocers that comprise the independent sector of the food distribution industry.  An

independent retailer is a privately-owned or –controlled food retail company operating a

variety of formats.  Most independent operators are serviced by wholesale distributors, while

1

others may be partially or fully self-distributing.  Some are publicly traded but with

controlling shares held by the family, and others are employee owned.  NGA accepts and

processes Visa, MasterCard, American Express, and Discover credit card transactions that are

submitted for payments.

**Class Counsel's Characterizations of NGA's Express**
**Disagreement with the Settlement Are Inaccurate**

5.      Class Counsel has repeatedly made the inaccurate statement that a majority of

class representatives approved the settlement.  In describing the parties' positions in January

2012, Mr. Wildfang states that "[w]e did not achieve unanimity among the class representatives

in early January, but a majority of them were in favor of accepting the mediators' proposals and

going forward."  Wildfang Dec. ¶ 26 (emphasis added).

6.      This statement is incorrect.  In a document compiled by Class Counsel and

distributed to class representatives on January 12, 2012, nine of the 19 class representatives

opposed the mediators' proposal, nine class representatives supported the mediators' proposal,

and one class representative was uncertain.  The one class representative listed as uncertain by

Class Counsel decided to oppose the mediators' proposal and is an objector to the final

settlement.  *See* "Class Reps Response to MP 12 January 2012," listing Class Representatives

that supported or rejected the mediator's proposal as of 12:00 PM EST 01/12/12.  NGA is

therefore part of a majority (10 of the nineteen) of named plaintiffs that are opposing final

approval of the settlement.

7.      At no time did NGA state that they agreed with the substance of the mediators'

proposals.  As we have consistently tried to make clear, NGA and Objecting Plaintiffs had

principled disagreements with the mediators' proposed terms, but we were committed to work

2

275000.1

through the mediation process to reach settlement.  Class Counsel is now using that commitment

against us, wrongfully accusing us of reneging on an agreement to settle on those proposed

terms.

        8.     Mr. Wildfang also mischaracterizes class representatives' "agreement" to proceed

with mediation negotiations, stating "that all 19 of the class representatives had 'agreed' to the

mediators' proposals and to proceed with negotiations based on them."  Wildfang Dec. ¶ 29.

The Objecting Plaintiffs did not agree to the proposals.  In fact, the February 21, 2012

submission that class counsel refers to, which is signed by Mr. Wildfang, makes clear the

Objecting Plaintiffs' were "endorsing the mediators' proposals as the basis for negotiations,

hopefully leading to a final settlement," but not agreeing to the terms of the proposals.  *See*

Letter from C. Wildfang to Hon. J. Gleeson and Hon. J. Orenstein, dated Feb. 21, 2012, at 1

(emphasis added).  Attachment 1 to this submission underscores this point: "the undersigned

class representatives have asked class counsel to continue to represent us and to negotiate toward

a final settlement with the defendants through the process laid out by the mediators and the court

in this matter."  *See* Feb. 21, 2012 Letter at 3 (emphasis added).

        9.     This February 21 letter, in fact, was written only after Class Counsel advised

Objecting Plaintiffs that the final settlement would be different than the mediators' proposals,

that there would be opportunities in the negotiation process to make trade-offs and changes to the

principles in the mediators' proposals, and that negotiating toward a settlement did not prejudice

any class representative to agree to the results.  Most of the terms about which we had substantial

objections, however, were ultimately included in the Final Settlement.

       10.    Mr. Wildfang also inaccurately describes our continued level of disagreement in

June 2012 by claiming that "The only class representative to show any significant level of

consternation with the agreement on major terms was NACS." Wildfang Dec. ¶ 34. This is not accurate. NGA raised serious concerns about the agreement during the course of the mediation session with Class Counsel, the mediators and the Court in June 2012.

11.     The Wildfang Declaration also attributes statements to me that I did not say. Mr. Wildfang asserts that "shortly before we concluded the June 21[, 2012] session and acknowledged to the Court that an agreement in principle had been reached, Peter Larkin, the President of NGA, told me, 'Good job! We're behind you all the way!'" Wildfang Dec. ¶ 35. This is false, as I made no such statement. On June 21, I spoke with Mr. Wildfang regarding our discussion about aggregation language, language that we assumed would be included in the preliminary settlement, but was not. Moreover, on June 20 and 21, NGA made it clear to Mr. Wildfang that we did not support the position he was taking on a number of important settlement issues.

12.     Mr. Wildfang further states that "[o]n Friday morning, July 27, 2012, Peter Larkin called me and said NGA had now decided to oppose the settlement. He was apologetic, but said he and his members had received a lot of pressure from 'Hank [Armour of NACS] and others.'" Wildfang Dec. ¶ 35. This statement is inaccurate. In fact, during my phone conversation with Mr. Wildfang, I told him that NGA would oppose the settlement for several reasons. I explained that the NGA Board and Executive Committee had met to discuss the proposed settlement, and unanimously agreed that it did not achieve any of the objectives we originally set out to achieve. Mr. Wildfang asked me if we were pressured by Mr. Armour or anyone else at NACS, and I informed him that we received no such pressure.

13.     Mr. Wildfang also states that he has "been told by several knowledgeable people that the trade associations' decisions to now oppose the settlement were driven by their

4

275000.1

government relations/lobbying staff, and not by their lawyers." Wildfang Dec. ¶ 35. I have no idea who expressed this opinion to Mr. Wildfang, but, as stated above, NGA's board of directors made this unanimous decision based on the business needs of our members.

**NGA Did Not Receive Important Settlement
Offers and Proposals From Class Counsel**

14.  Class Counsel did not promptly inform NGA of material developments related to settlement of this litigation. Mr. Wildfang states that settlement documents were exchanged, including settlement outlines, terms sheets, and proposals, between Class Counsel and Defendants beginning in spring of 2011 and all throughout that year. Wildfang Dec. ¶¶ 20, 23. Yet class representatives were kept in the dark for much of the year, and were not informed of these exchanges until November 29, 2011, a week after Class Counsel's proposals were submitted to the mediators and the Court.

15.  Mr. Wildfang does not dispute this, and describes the settlement-negotiation disclosures to the class representatives throughout 2011 as "regular[] discuss[ions] [of] ongoing mediation efforts and settlement strategy in this case." Wildfang Dec. ¶ 19. This stops far short of asserting that class representatives were told of or provided any copies of the settlement outlines, terms sheets, and proposals. Mr. Wildfang admits that class counsel "did not immediately provide [Defendants' October 2011 settlement proposal] to the class representatives" and "did not immediately set up a meeting with the class representatives" to discuss it because they would be meeting with class representatives on December 2 and 3, 2011. Wildfang Dec. ¶ 23.

16.  Mr. Wildfang also describes meetings with class representatives in early November during which he incorrectly claims to have "shared with [class representatives] the

5

## A2558

term sheets that had been exchanged and the settlement proposal statements that Class Counsel was submitting pursuant to the settlement conference." Wildfang Dec. ¶ 23. In fact, as evidenced by Exhibit 1, attached hereto, the first time class representatives received these documents was November 29, 2011 – seven days <u>after</u> the settlement proposal statements were submitted to the court for *in camera* review.

17. As Mr. Wildfang admits, he "also repeatedly told the class representatives that Class Counsel would not make settlement offers to the Defendants, but rather would give Defendants only an indication of what Class Counsel would agree to recommend to the Class as a fair, reasonable and adequate settlement." Wildfang Dec. ¶ 20. It is now evident, however, that these statements to the class representatives were not accurate, and that Class Counsel was indeed making offers of settlement throughout the entire year, using Class Counsel's notion of fiduciary duty to the class as a shield against having to inform the class representatives of any material settlement discussions. *See* Wildfang Dec. ¶¶ 7, 27 n. 5. The offers throughout 2011 culminated in a mediation statement submitted to the Court before any class representative had seen a settlement outline, proposal or term sheet.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 9, 2013

Peter J. Larkin
President
National Grocers Association
1005 N. Glebe Road, Suite 250
Arlington, VA 22201-5758

6

275000.1

# A2559

1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   -------------------------------------x
    IN RE PAYMENT CARD INTERCHANGE FEE
3   AND MERCHANT DISCOUNT ANTITRUST
    LITIGATION
4                           MDL No. 1720 (JG)(JO)
                            UNITED STATES DISTRICT COURT
5                           BROOKLYN, NEW YORK
    -------------------------------------x
6                           September 12, 2013
                            9:30 A.M.
7

8            TRANSCRIPT OF FAIRNESS HEARING
           BEFORE THE HONORABLE JOHN GLEESON,
9          UNITED STATES DISTRICT COURT JUDGE

10

11           A P P E A R A N C E S :

12

    ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
13  2800 LaSalle Plaza
    800 LaSalle Avenue
14  Minneapolis, MN 55402-2015
    BY:  K. CRAIG WILDFANG, ESQ.
15

    BERGER & MONTAGUE, P.C.
16  1622 Locust Street
    Philadelphia, PA 19103
17  BY:  MICHAEL J. KANE, ESQ.
         H. LADDIE MONTAGUE,JR., ESQ.
18       BART D. COHEN, ESQ.'s

19  ROBBINS GELLER RUDMAN & DOWD LLP
    655 W Broadway, Suite 1900
20  San Diego, CA 92101
    BY: BONNY E. SWEENEY, ESQ.
21

    BEGER & MONTAGUE, P.C.
22  1622 Locust Street
    Philadelphia, PA 19103
23  BY: MERRILL DAVIDOFF, ESQ.
        MICHAEL J. KANE, ESQ.
24      BART D. COHEN, ESQ.

25

# A2560

Fairness Hearing – Mr. Wildfang

1  an extraordinarily small number.

2          Now, the objectors say well, the big merchants all

3  object.  Well, slightly less than 19 percent of transaction

4  volume are merchants who objected.  And I'm not going to tell

5  you, your Honor, that that's insignificant.  But I don't see

6  why the views of Wal-Mart should be worth 10,000 times the

7  views of a small merchant.  I think there are two ways of

8  looking at this.  But certainly the fact that only .05 percent

9  of merchants objected is an indication that the merchant

10  community in general is satisfied with the settlement.

11          Now, I think given the campaign we've seen over the

12  last year, which we believe contained a lot of misinformation,

13  the fact that only a little over 4,000 merchants objected

14  seems to me to indicate that even with that kind of a campaign

15  the vast majority of merchants are satisfied with the

16  settlement.

17          I did a little looking at data from our claims

18  administrator to see what big merchants were doing, saying in

19  the suit.  Of the top 60 opt outs by volume, 27 of them did

20  not object.  I asked for a list of the top 25 convenience

21  store chains.  And of course your Honor knows that the

22  National Association of Convenient Stores was leading the

23  campaign I talked about.  Fifteen of the top 25 convenient

24  stores did not object.

25          THE COURT:  That's by volume?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2561

Fairness Hearing – Mr. Wildfang

1        MR. WILDFANG:  Yes.

2        THE COURT:  You mean 15 of the top 25 convenient

3 stores that opted out did not object?

4        MR. WILDFANG:  No, some of those didn't opt out

5 either.

6        THE COURT:  I see.

7        MR. WILDFANG:  Five of the 25 neither objected nor

8 opted out.

9        THE COURT:  Let's go back to the top 60 opt outs by

10 volume.  You said 27 didn't object.  So what accounts for

11 that?

12        MR. WILDFANG:  Well, your Honor ––

13        THE COURT:  In your view.

14        MR. WILDFANG:  I'm not sure that one could

15 confidently say that a single inference arises from that.  But

16 I noted that among those 27 are virtually all of the major

17 airlines.

18        And we know from other markets, like Australia and

19 Europe, that airlines are among the early adopters of

20 surcharges.  We know that there is at least one airline in the

21 United States that is already utilizing different prices for

22 debit versus other cards.

23        So I think, at least as to airlines, I think it's a

24 reasonable inference that they're looking forward to using the

25 surcharging tool.  As to others, I don't know.  But it

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2562

1  legislators are supposed to do, it could hardly keep up with

2  this.  And I have a concern.  I think there's a well-grounded

3  concern here that this release places the line of scrimmage in

4  that future dispute as an antitrust claim that's based on the

5  application of these rules to a new technology, places that

6  line of scrimmage in the wrong spot.

7       MR. WILDFANG:  Your Honor, fortunately my time has

8  run out.  So I'm going to let Mr. Gallo answer that question.

9       THE COURT:  I'll give you a couple of minutes.

10      MR. WILDFANG:  I should have seen that one coming.

11      The language of the release was vigorously

12  negotiated.  The class, if we had had our way it would have

13  had fewer words and tried to make it more clear.  I think we

14  may have failed to make it more clear by adding more words.

15  We think that the future line would not apply to, for example,

16  new technology, that because it's a change in the factual

17  predicate.  And case law is crystal clear that -- and courts

18  use the term "identical factual predicate" intentionally. Is

19  it identical or not?

20      THE COURT:  Right.

21      MR. WILDFANG:  And so if there is a, you know, a

22  material change in some factor that affects how a court is

23  going to look at an antitrust claim in the future, if that's a

24  material change, I think that's an argument that is not

25  protected by the release.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2563

Fairness Hearing – Mr. Gallo

1    THE COURT:  All right, thank you.

2    Hello, Mr. Gallo.

3    MR. GALLO:  Good morning, your Honor.

4    THE COURT:  How are you?

5    MR. GALLO:  I'm great.  I appreciate the opportunity

6  to be heard.

7    THE COURT:  You're welcome.

8    MR. GALLO:  Your Honor, I am going to go out of

9  order.  I had planned to do three things and do the release

10  last.  So the argument may not be quite as eloquent as I would

11  like it to be.  But given your question, I would like to go to

12  the release issue and I will return to the other two points.

13    This release is designed to end litigation to the

14  full extent of the law.  No more than that and no less than

15  that.  It's necessary to do it.  This industry between the two

16  cases you've handled and NaBaCo has been litigated for 24

17  years over the structure of these very issues.  It's got to

18  come to an end sometime.  This is a social goal.

19    THE COURT:  Is this ever going to come to an end

20  without comprehensive legislature?

21    THE DEFENDANT:  I think it's going to come to an end

22  on these two issues, and that's the point of the release.  So

23  let me describe what the release does, what it doesn't do.

24  And to answer your question, what's the legal framework to

25  determine about future technology, and I'll address future

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2564

Fairness Hearing – Mr. Gallo

1    technology.

2              The release does one thing that nobody thinks is

3    controversial.  It says:  Any claim that was asserted here or

4    could have been asserted here is released.  No problem with

5    that.

6              Number two, it says:  Claims in the future that

7    arise out of continued adherence to the rules and policies in

8    place as of the time of your preliminary approval order ––

9              THE COURT:  Slowdown.

10             MR. GALLO:  Claims in the future that arise out of

11   continued adherence ––

12             THE COURT:  Where are you?  What paragraph?

13             MR. GALLO:  It's in either G or H.  I wasn't

14   quoting, I was just paraphrasing.  But it's in paragraph 33G,

15   I think it is.  If I recall correctly.

16             THE COURT:  Okay.  I'm sorry to keep interrupting

17   you.

18             MR. GALLO:  No, that's fine.  No, the concept is ––

19   and I wasn't actually trying to quote the language.  But I

20   don't think there's any dispute about the concept.  The

21   concept is that claims in the future that arise out of a

22   defendants' continued adherence to the rules that are in place

23   and the policies that are in place, as of the date of your

24   preliminary approval order, that cannot give rise to a claim

25   in the future.  And we believe that's proper.  And we cited to

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

**A2565**

Fairness Hearing – Mr. Gallo

1   you the In Re:  Literary case, which was a (b)(3) class, and

2   it did exactly that.  There was a settlement of copyright

3   claims.  There was licensing provisions that were settled.

4            And the court said, licensing, according to those

5   terms in the future, is properly released.  And it said, it's

6   necessary because otherwise the defendant couldn't settle the

7   case, because they would get sued for doing the very thing

8   they just agreed to do as part of the settlement.  That's a

9   (b)(3) class.

10           We cite to you the Madison Square Garden case, an

11  antitrust claim, where the Madison Square Garden brought a

12  case against the NHL.  As part of the settlement the NHL

13  agreed to abide by certain policies.

14           Judge Preska said, a claim based on those same

15  policies in the future is released; otherwise, the NHL

16  couldn't settle a case.  You can't settle.  Say we're going to

17  do X and then get sued on the same thing, or the defendants

18  would have no motivation to settle.  That's an antitrust case.

19  And we cited a (b)(2) case, the Savage case, a district court

20  case that said it's appropriate.

21           (Continued on the next page.)

22

23

24

25

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

# A2566

Fairness Hearing – Mr. Gallo

1          MR. GALLO:  And its appropriate where parties seek

2  injunctive relief because, for example, if they seek

3  injunctive relief we agree to an injunction.  If the very next

4  day we can get sued for doing the very thing that we agree to

5  do as part of the settlement then we can't very well settle

6  the case.

7          Now, here's where the rubber meets the road.  What

8  the objectors say is, yes, but there's no limit on this

9  release.  It will go into a perpetuity, it will continue, and

10  cover every rule, for example, they say in the Master Card

11  rule book or cover future technology.  That is wrong.

12         THE COURT:  Why don't we just say that.

13         MR. GALLO:  Well, I think we should say it.  I'm

14  going to say it right now, its wrong.

15         THE COURT:  You need a release.

16         MR. GALLO:  We could put in the release, or your

17  final approval order what I'm about to say which is, the

18  release is limited by the Identical Factual Predicate Doctrine

19  which is the law of the Second Circuit.  Nobody is proposing

20  that the release be construed beyond the Identical Factual

21  Predicate Doctrine which is the law of the Second Circuit.

22         And if it would be useful to put this that into the

23  final approval order, I would have no problem with that.  But

24  we all agree on that, too, by the way.

25         THE COURT:  Its like a Long Arm Statute that says to

# A2567

Fairness Hearing – Mr. Gallo

1    the extent of the jurisdiction or to the maximum extent

2    permitted by the Due Process Clause.

3            MR. GALLO:  Right.

4            And so, let me put some meat on the bones because

5    its not —— its exactly the right approach to this case because

6    when you've got an industry that's been in litigation for

7    24 years, and defendants that can't settle unless they know

8    what they're settling, we want protection to the full extent

9    of the law.

10           So the Literary Works case and the TBK case, which

11   we cite to you, lay out some of the criteria.  How does a

12   future court know whether something is released or not under

13   the Identical Factual Predicate Test.

14           The court in TBK said you look at the identity and

15   the scope of the issues in the old case and in the new case.

16   You look at the extent to which the issue arose in the prior

17   case or the extent to which similar rights were determined in

18   the prior case.  You look to whether the new claim is

19   reasonably foreseeable.  You look to whether there is an

20   analogous whether the claim is sufficiently analogous to the

21   prior case.

22           So, in this case, the identical factual —— the

23   factual predicate of this case probably could be expressed in

24   different ways, but the way I think about is what was attacked

25   are the rules and policies and conduct of the defendants to

# A2568

Fairness Hearing – Mr. Gallo

1   the extent they adversely affect merchants that accept

2   Master Card and Visa.

3           Now, you can break that down with a lot of

4   subissues, are All Cards included, the structure of the

5   Association; but in the conceptual sense, the rules, policies,

6   and conduct that adversely affect merchants that accept

7   Master Card and Visa.

8           So the objectors say, they say, "Well that means

9   that every rule in the Master Card rule book is going to be

10  forever subject to antitrust immunity," its not true.

11          If somebody brings a claim and cites a Master Card

12  rule, and a merchant brings a claim, the court that sees that

13  claim is going to apply the principles of TBK and is going to

14  say, "Now, does that claim, does that rule, and does the

15  nature of the claim fall within the factual predicate of the

16  prior case," which was directed at the rules that hurt

17  merchants that accept Master Card and Visa, and maybe you'd go

18  on, tend to increase their prices or does it not?

19          THE COURT:  I understand what you're saying but, you

20  know, I have 8 million merchants out there.  I want to know

21  whether or not in three years people come in and they pay by

22  flashing their phone in front of a reader whether the

23  application of these rules to the new technology is a claim

24  that they want to complain about that's already been released.

25          MR. GALLO:  Let me address that right now.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

# A2569

Fairness Hearing – Mr. Gallo

1    THE COURT:  Good.  That's why I'm asking.

2    MR. GALLO:  Its absolutely clear in this record that

3  right now, and there's been some misstatements in the briefs

4  with this, candidly, that the Master Card and Visa

5  Honor-all-Cards Rules apply to both cards but also to other

6  devices including contact list devices.  There's a lot of

7  transactions done today without cards.  There's transactions

8  done with the little the gray fobs that open doors, you do it,

9  that is applied to the Honor-all-Cards Rule.  Mobile phone

10  transactions are done today, they are governed by the

11  Honor-all-Cards Rule.  A mobile phone transaction, in my

12  judgment, is clearly released.

13          Now, lets go to another example.

14          Lets say that same technology that's in a mobile

15  phone is put in a wrist watch or put into your Google Glasses

16  and somebody brings a case, right?

17          I would say —

18          THE COURT:  These are not Google Glasses let's be

19  clear.

20          MR. GALLO:  I thought they were.

21          I would say that's pretty easily covered by the

22  Identical Factual Predicate Test.  If its the same technology

23  and it just moves from your phone to your wrist then its

24  currently covered by the Honor-all-Cards Rule and a claim has

25  been you brought.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

# A2570

Fairness Hearing – Mr. Gallo

1    Now, the hard part is, I can't give you an answer

2   that satisfies every question.  There may be technology in the

3   future that I am incapable of thinking of, I don't know what

4   its going to be.  There may be a new product that actually is

5   really different.  And then a court is going to have to make a

6   judgment, and the Court is going to look at what that new

7   product is and its going to compare it to what the products

8   were that are here today and that's going to be one factor

9   that's going to be considered under the TBK test.

10    THE COURT:  By definition, that escapes release

11  because of the identical factual predicate?

12    MR. GALLO:  I don't think so, your Honor.  I think

13  its more subtle than that.  I think that's why we don't give

14  advisory opinions in courts.  But I think its more subtle than

15  that.

16    On the other hand, what if it was the exact same

17  theory and what if the difference in the product was really

18  quite de minimus and made no difference in the application of

19  the Honor-all-Cards Rule.  I just don't -- I can't answer

20  every question.  What I can say is we have a legal framework

21  that answers these questions and this problem is true in any

22  release and its true in any release that gives peace for

23  current policies and conduct.  Its not unique to this case.

24  And I understand Professor Sykes expressed concern about it as

25  a matter of economics, we don't want to block new products.

# A2571

Fairness Hearing – Mr. Shinder

1    January 1, 2004.

2         Another way to illustrate the differences between

3    the two settlements is to examine the two fairness hearings.

4    Ten years ago we convened before your Honor in a virtually

5    empty courtroom due to the almost complete absence of

6    substantive objections to that settlement.  Today the room is

7    packed.

8         And after me you're going to be hearing from counsel

9    for other merchants, merchants themselves, merchant trade

10   associations, consumer groups, the National Federation of

11   Independent Business, virtually all of Visa and MasterCard

12   competitors and 48 of the 50 states.

13        Over 25 percent of the punitive class opted out.

14   And surely the percentage that object to the settlement is

15   much greater, particularly since many merchants that object to

16   the settlement did not opt out because of the limited opt-out

17   rights provided in the settlement.

18        How can this be approved through a mandatory class

19   no less over such an outpouring of opposition?  Counsel for

20   the punitive classes' best answer, it seems, is that the case

21   was risky; it could not have gotten better.

22        But putting aside our disagreements on that

23   conclusion, risk cannot justify putting the merchants in a

24   worse position through an impermissibly broad release than

25   they would have been had they lost in the case.  And risk,

# A2572

Fairness Hearing – Mr. Armour

1  broad relief, release of claims for future bad conduct.  This

2  settlement is worse than losing at trial.

3          Losing would not bar the courthouse door to merchant

4  challenges to future unfair carting district practices,

5  including bad practices being applied to new technologies like

6  mobile payments.

7          In fact, Mr. Gallo's comments today indicated their

8  intent to do that exactly.  And I might add, as far as I'm

9  aware, all of the payment technologies that Mr. Gallo

10  referenced this morning did not exist when this case was first

11  logged.

12          The settlement provides nothing of any real value

13  beyond the money, and the scope of the release will allow the

14  defendants to raise rates and recoupe the money before it's

15  even distributed to the merchants, which is precisely what

16  happened in the Visa Check case.  We strongly urge the court

17  to reject this settlement.

18          Thank you, your Honor.

19          THE COURT:  Thank you, Mr. Armour.  Who's next?

20          MR. COOK:  Your Honor, I'm Michael Cook with

21  Wal-Mart stores.  I appreciate the opportunity to present in

22  front of the court. I'm responsible for Wal-Mart's acceptance

23  of Visa and MasterCard products.  I've been involved in retail

24  payments for more than 20 years.

25          Let me begin by saying that Wal-Mart believes that

# A2573

Fairness Hearing – Mr. Armour

1    substantially similar language the defendants make a small

2    rule change that requires Wal-Mart to submit transaction dated

3    to the networks, such as items, specific data of the

4    customer's purchases.  This could invade customer privacy and

5    undermine the trust relationship between the merchant and the

6    consumer.

7            Each year Visa and MasterCard publishes dozens of

8    rules.  Which of those new rules will be deemed substantially

9    similar to the nearly 6,000 pages of rules that exist today?

10           Finally, we're troubled by the potential that the

11   release will hinder Wal-Mart's ability to pursue claims in

12   foreign markets, such as our ongoing claim against Visa and

13   MasterCard for anticompetitive behavior in the UK.  If the

14   proposed settlement is approved, the defendants will no doubt

15   argue that foreign claims are released, even though behavior

16   outside the United States clearly was not at issue in this

17   case.

18           In trying to refute this point, class counsel argued

19   that certain provisions of the release are limited to claims

20   in the United States.  However, in the future Visa and

21   MasterCard may argue that paragraphs 68C through -I are not

22   limited to the United States.  Any settlement that fails to

23   specifically exclude foreign claims would be unfair and

24   inappropriate.

25           Clearly the class including Wal-Mart was not

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2574

Fairness Hearing – Mr. Korologos

1    those who had dual claims -- foreign claims and U.S. claims.

2    Just as American Express opposes in this motion here.  That in

3    and of itself is enough to show, as Judge Kaplan held, that

4    there is too much antagonism for that portion of the release

5    to be included and he declined to approve that settlement once

6    that aspect of the release was taken out.

7            That's similar to the antagonism here.  That

8    direction, however, can't exist for American Express because

9    the changes that we've sent, tiny little steps from the

10   defendants along the way here, do not correct the prejudice to

11   American Express.  They're never going to correct the fact

12   that we're being sued and that there is an antagonism that

13   prevents class certification of any class that includes

14   American Express.

15           They have, first, taken the tiny step of changing

16   the notice back when we objected at the preliminary approval

17   stage, but that doesn't change the release.

18           Next, the little step they took when they wrote in

19   their reply papers here without addressing it with

20   American Express first to change the order in a small way to

21   say, It doesn't cover claims that include an injury for

22   network competitors or words to that effect.

23           First of all, that, again, doesn't change the

24   release.  They're clearly trying to get something more than

25   they're entitled to.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

# A2575

Fairness Hearing – Mr. Korologos

1       The second, it doesn't address nearly everything

2  that American Express deals with, and some defendants may even

3  claim it doesn't address them at all because they're not a

4  network, only Visa and Master Card are networks.  And while

5  American Express is a network, it also is an acquirer, it also

6  is an issuer, it is also a transaction processor.  None of

7  those are included in the exclusion.

8       And in addition the change that was suggested today

9  by Mr. Gallo has circularity problems in it in that, as

10  Mr. Shinder pointed out, at the end of Paragraph 68 they

11  expressly identify paragraphs A through I as claims that could

12  have been brought in this litigation and it's the

13  expansiveness of that list that creates problems.

14       But let me again emphasize, your Honor,

15  American Express's issues and the concerns it has of being

16  included in this class do not stop with the release.  They

17  instead go far beyond that.  And its the antagonism that

18  exists between American Express and members of the class

19  including the class representatives here that prevent any

20  proper certification of a class that includes American Express

21  and does respectfully request that we be given either an

22  opportunity to opt-out or to have a class redefined by your

23  Honor to exclude at least all parties that would otherwise be

24  part of the class that were being sued by members of the class

25  on similar grounds at the time that the settlement was being

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

# A2576

Fairness Hearing – Mr. Keller

1    negotiated.

2               Thank you, your Honor.

3               THE COURT:  Thank you.

4               MR. SHINDER:  Do you want one more, your Honor?

5               THE COURT:  Lets go to quarter of.  Whoever is left

6    on your list, Mr. Shinder, needs to be prepared.

7               I'm going to ask Natasha to go down and see if we've

8    got any I know there's at least one who is vocal about it.

9               Any other folks who want to address the Court, Ill

10   report back to you at 2:00 o'clock as to where we are with

11   that.  But those folks may eat into as much as 25 minutes of

12   your time.

13              All right?

14              MR. SHINDER:  Okay.

15              THE COURT:  So you may need to consult with one

16   another on the fly and adapt to a shortened period than the

17   allocated time of Mr. Shinder's list, its up to you.  Who.

18              Who are you again?

19              MR. KELLER:  Good afternoon, your Honor, I'm Michael

20   Keller and I am the General Counsel Cardtronics.

21              THE COURT:  Good afternoon.

22              MR. KELLER:  Cardtronics is the leading ATM service

23   provider service in the nation.  We own or operate more than

24   80,000 ATMs in five different countries.

25              Cardtronics is both an owner and an operator of

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

# A2577

Ms. Selendy

1    THE COURT:  Okay, let me repeat what I mentioned

2 before the court reporter came back.  I was down here a couple

3 of minutes early.  I'm going to hear continued argument from

4 objectors on Mr. Shinder's list until 2:45, then I'm going to

5 hear from Thomas Wenning, David Seltzer, Debra White,

6 David Wagner, Virginia Danoti, Liz Garner, Clay Lambert, and

7 Ftema, F-t-e-m-a, Raysor, R-a-y-s-o-r, beginning at 2:45.

8    To the extent those folks aren't in the room, they

9 should come up from where they are.

10    THE CLERK:  They're outside, judge.  They're right

11 outside the courtroom.

12    THE COURT:  Oh, they're there already?

13    THE CLERK:  Some of them.

14    THE COURT:  All right.  I hate to keep them waiting

15 out there.  As many as will fit in the jury box, you can

16 invite in.

17    THE CLERK:  Okay.

18    THE COURT:  And then, Ilene, I see some spots here

19 on the benches, inside the swinging doors.  Why don't we use

20 that space.  If we can fit them all in here, I prefer that.

21 Thank you.

22    Okay, who's up next?

23    MS. SELENDY:  Good afternoon, your Honor.

24    Jennifer Selendy, on behalf of Discover.  In light

25 of what you heard this morning, I want to make a couple of

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2578

Ms. Selendy

1  preliminary points to orient your Honor to where I'm going and

2  where I'm not going.  So first of all, Discover objected to

3  the release.

4       I think you've heard an awful lot about the relief

5  already today.  And our objections are set forth in our brief,

6  and they overlap substantially with the objections that you've

7  heard from other competitors, like First Data and American

8  Express.  We are not only a network competitor, we compete as

9  an issuer, we compete as an acquirer.  We want out.  So I'm

10 not going to go over that ground again.

11      Secondly, you've also heard a great deal about

12 whether or not surcharging is going to be an effective means

13 of merchants driving price competition between networks.

14 We've heard a lot of argument from the objectors that that's

15 not going to happen, that that's not realistic.  You've got

16 the Amex rules.  There are a lots of things that I know you

17 have heard.

18      But what I want to say is that Discover's position

19 really flows from an assumption.  And it is an assumption, and

20 we think it's a big one.  It's an assumption that the

21 merchants are going to do exactly what they say they're going

22 to do in terms of using surcharging to drive price competition

23 between the networks.  Because, in fact, my clients have heard

24 from some merchants and that has given rise to our issues with

25 the level plainfield provisions in the agreement.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2579

Ms. Selendy

1  Discover that they're going to drop the acceptance of

2  Discover, or unless discovery repeals any rule that is

3  perceived to impair their ability to drive this price

4  competition between Visa and MasterCard.

5           It's our position, your Honor --

6           THE COURT:  You're assuming that Discover's

7  interchange rate would be triggered by the level plainfield.

8  That it's high enough.  That it would be triggered by that

9  level plainfield provision?

10          MS. SELENDY:  It would apply whether or not -- the

11  only thing that matters to make them apply is whether they

12  believe the merchant or Visa/MasterCard believe that we have

13  any rule on the books that limit surcharges.  And even if we

14  don't believe we have that rule because, by the way, we

15  repealed our no-surcharge rule at the merchant's request some

16  time ago.  So in a minute I'll get to the exception that the

17  defendants believe exists, but it's really no exception at

18  all.

19          And our position is that Discover should not have to

20  change the way it competes, including by dropping rules that

21  it needs in order to be a competitive network so that dominant

22  networks, Visa and MasterCard, can have some supposed

23  protection against Discover that they have made and can make

24  no showing that they actually need.

25          You may recall at preliminary approval that

# A2580

Ms. Selendy

1    plaintiffs' counsel stood up here and said there were three

2    problems in the industry:  Visa, MasterCard, and American

3    Express.  I think the reason they didn't mention Discover is

4    because we dropped our no-surcharge rule and we do not have

5    the market power to maintain rules that merchants oppose.

6         Discover has been in favor of merchants' ability to

7    steer to lower cost networks from the day we opened our doors

8    and the we would welcome any true reform in the industry that

9    provided that type of price competition.  The parties,

10   however, have offered no justification for including Discover

11   in the settlement agreement, and there is none.

12        Visa and MasterCard contend in their reply brief

13   that the level plainfield provisions are designed to ensure

14   that they, the dominant networks, are not disadvantaged

15   vis-a-vis a higher priced competitive credit card brand.  But

16   Discover is not a higher priced brand and Discover has no

17   ability to price -- no ability to price above the market that

18   is set and always has been set by Visa and MasterCard.

19        If Discover were to try to raise its prices above

20   competitive levels or impose a no-surcharge rule against the

21   rule of merchants, then merchants would simply stop accepting

22   Discover branded cards.  Because unlike Visa and MasterCard we

23   are not a must-have to merchants.

24        Because the market disciplines Discover, and that

25   is, after all, how it's supposed to work, discover cannot

# A2581

Fairness Hearing - Mr. Gallo

1    THE COURT:  No, before you get to that.  Another

2  question is, because your argument almost sounds like you're

3  arguing the motion to dismiss the future case.

4    MR. GALLO:  No.  I'm sorry.

5    THE COURT:  But if you're right about the breadth of

6  the release, given the overwhelming adverse reaction from a

7  substantial part of the class, why shouldn't I refuse to

8  approve it?

9    MR. GALLO:  I don't mean to be arguing to dismiss a

10  future case.  All I was trying to suggest was there was some

11  language this morning.

12    THE COURT:  I understand it.

13    MR. GALLO:  I suggested.

14    THE COURT:  My concern on the part of whether the

15  release would cover those forms of payment devices and you're

16  saying its clear that it does; right?

17    MR. GALLO:  Through what's out there today, right.

18    THE COURT:  So accepting that at face value, given

19  that its clear that it does if you're right about that, why

20  doesn't that counsel in favor of not approving the settlement

21  because so many people are so pointedly concerned about that

22  in the class.

23    MR. GALLO:  Well, some people are concerned about it

24  but I think it goes back to where I ended my comments this

25  morning.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

**A2582**

Fairness Hearing – Mr. Gallo

1    objections.

2            The competitor objections, I don't know what to say

3    other than the defendants have tried to make it as clear as

4    they possibly can make it that the competitors, "competitors,"

5    in their role as competitors are not bound by this settlement.

6    They might incidentally also accept a MasterCard card and,

7    therefore, be a total merchant.

8            THE COURT:  Why aren't they just out of the class?

9            MR. GALLO:  Well, because, in fact, they do to, you

10   know, small degrees, I don't know what small is in the world

11   of American Express, but they do accept cards.

12           THE COURT:  Yeah, so?  It just seems so anomalous to

13   me that they're part of the class.

14           MR. GALLO:  Your Honor, I don't know if they were

15   out of the class that means that they can bring a claim in the

16   capacity a merchant.  I mean, here we go again.  That's why,

17   that's the truth, that's why.

18           With respect to Discover the points I would make are

19   these.

20           Number one, respectfully, I think Discover's counsel

21   is incorrect.  If Discover is less expensive than MasterCard

22   and Visa, whichever one is applicable in that case, then the

23   level playing field doesn't apply.  And so, it's not always

24   applicable, its only applicable where they're more expensive.

25           Number two, Discover has this in their control in a

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

**A2583**

Fairness Hearing – Mr. Gallo

1    second way.  The level playing doesn't apply if Discover

2    doesn't restrict surcharging.  You heard Discover doesn't have

3    a, "No Surcharge Rule."  It actually has a rule that is far

4    more restrictive than the rules that is being complained about

5    in this settlement agreement.  It has what is called an,

6    "Equal Treatment Rule," which says, in essence, "To the extent

7    that you surcharge Discover, you got to surcharge every other

8    card because it says we can't be treated differently.

9            So in that case, MasterCard would have to be

10   surcharged even if MasterCard was cheaper in order to comply

11   with the Discover rule.  So Discover has a way out by being

12   cheaper.  Discover has a way out by getting rid of their Equal

13   Treatment Rule.  Discover has a way out of by negotiating with

14   merchants not to surcharge.  This is in their control.

15           (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2584

Ms. Raysor

228

1  is here.  And I'm making a record for the statement as a small

2  business owner, but not any more because I have a multi

3  corporation which is music, fashion and film.  But at the end

4  of the day, your Honor, justice needs to be served.  And I'm a

5  regular gal.  And I'm here in New York City.  And I really

6  feel that, you know, this is not fair what is going on and I

7  would like for you to do something about it, sir.  That's all.

8         THE COURT:  Thank you.

9         MS. RAYSOR:  Thank you.

10         THE COURT:  You left something out?

11         MS. RAYSOR:  You've been poshed.

12         THE COURT:  All right, where were we?  Are the

13  proponents done?

14         MR. WILDFANG:  We are done on the --

15         THE COURT:  I have a question about the release.  In

16  the reply brief for the class plaintiffs on page 56 there's a

17  list of things of future claims that would not be barred by

18  the release, and the list is Visa, the list of things,

19  complaints about which would not be released consists of the

20  following:  Visa and MasterCard agree to fix interchange

21  rates.

22         Visa or MasterCard and the bank defendants jointly

23  agree to the interchange rates to be charged on Visa or

24  MasterCard credit card transactions.

25         Visa or MasterCard adopts a new anticompetitive rule

# A2585

Mr. Davidoff

1   or engages in new allegedly anticompetitive conduct that

2   causes interchange rates to be artificially inflated.

3         Visa or MasterCard expresses a new interpretation or

4   somehow apply their Honor-All-Cards rules in a new way that

5   may be anticompetitive.

6         Visa or MasterCard revert to the old rules, which

7   are modified or eliminated by the settlement.  And then

8   standard commercial disputes between a merchant and Visa,

9   MasterCard or defendant bank.  All of those things are not

10  released.  Correct?

11        MR. WILDFANG:  That's correct, your Honor.

12        THE COURT:  Okay.  And I take it you're in agreement

13  with that, Mr. Gallo?  Where is Mr. Gallo.

14        MR. GALLO:  Yes, your Honor.

15        THE COURT:  All right, anything further by anybody?

16        MR. WILDFANG:  Mr. Davidoff is going to argue the

17  fee issue.

18        THE COURT:  Okay.

19        MR. DAVIDOFF:  Your Honor, just -- does your Honor

20  still have his book in front of him.  The last two tabs there,

21  20 and 21 relate to what I'm going to present.  I hope

22  mercifully short and in very short order.

23        THE COURT:  I don't have a 21.

24        MR. WILDFANG:  They're both under 20.

25        MR. DAVIDOFF:  I'm sorry.  They're both under tab

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2586

Mr. Davidoff

230

1   20.  There should be two slides or two Power Points, your

2   Honor.

3           THE COURT:  Okay.

4           MR. DAVIDOFF:  We've already heard from several

5   professional objectors, people who were lawyers who are in the

6   business of objecting to the class action fees, the fees

7   request, the incentive reward request in this case.  We

8   haven't heard from any of the major merchants that have raised

9   concerns about the settlement, and there's been considerable

10  discussion of the Goldberger case and so called Goldberger

11  factors.

12          Well, first of all, what the Goldberger case stands

13  for, and I think your Honor is very well aware of this, is

14  that the Second Circuit of Appeals defers to a trial judge's

15  discretion in applying the Goldberger factors because it is

16  the trial judge who knows what went on in the courtroom before

17  him or her.

18          And the six factors, and I'm going to list them

19  because there are three that I don't even think I need to

20  discuss at length.  One is the time and labor expended by

21  counsel.  I'd like to come back to that, because I think that

22  is very relevant in this case.

23          Second is the magnitude and complexities of the

24  litigation.  I don't think I need to spend any time on that.

25  This is a litigation of incredible magnitude and incredible

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

# A2587

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE | : | |
| FEE AND MERCHANT DISCOUNT | : | 05-md-1720 (JG)(JO) |
| ANTITRUST LITIGATION | : | |
| | : | <u>NOTICE OF APPEAL</u> |
| This Document Relates To: | : | |
| | : | |
| ALL CLASS ACTIONS. | : | |
| | : | |

-------------------------------------------------------x

Notice is hereby given that Objecting Plaintiffs and Objectors[1] appeal to the United States

Court of Appeals for the Second Circuit from the order entered on December 13, 2013 granting

final approval of the class action settlement, Docket No. 6124.

DATED:  New York, New York
          December 13, 2013

                                         CONSTANTINE CANNON LLP
                                         By: _____/s_____
                                            Jeffrey I. Shinder
                                       335 Madison Avenue, 9th Floor
                                       New York, New York 10017
                                       Telephone: (212) 350-2700
                                       Facsimile:  (212) 350-2701
                                       Email: jshinder@constantinecannon.com
                                       *Attorneys for Objecting Plaintiffs and Objectors*

---

[1] The Objecting Plaintiffs are the following ten named plaintiffs: Coborn's Incorporated; D'Agostino Supermarkets, Inc.; Jetro Holdings, LLC; Affiliated Foods Midwest Cooperative, Inc.; National Association of Convenience Stores (NACS); National Community Pharmacists Association (NCPA); National Cooperative Grocers Association (NCGA); National Grocers Association (NGA); National Restaurant Association (NRA); and NATSO Inc. The Objectors are the following 53 absent class members: 7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports Outdoors; Aldo US Inc. d/b/a Aldo and Call It Spring; Alon USA, LP (Alon Brands); Amazon.com, Inc.; American Eagle Outfitters, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC; Best Buy Stores, L.P.; BJ's Wholesale Club, Inc.; The William Carter Company (Carter's); Costco Wholesale Corporation; Crate & Barrel Holdings, Inc.; Darden Restaurants, Inc.; David's Bridal, Inc., DBD Inc. and David's Bridal Canada Inc.; Dick's Sporting Goods, Inc.; Dillard's, Inc.; Family Dollar Stores, Inc.; Drury Hotels Company, LLC; Foot Locker, Inc.; Gap Inc.; GNC Holdings, Inc. (General Nutrition Corporation); Genesco Inc.; The Gymboree Corporation; HMSHost Corporation; IKEA North America Services, LLC; J. Crew Group, Inc.; Kwik Trip, Inc.; Lowe's Companies, Inc.; Marathon Petroleum LP; Martin's Super Markets, Inc.; Michaels Stores, Inc.; National Railroad Passenger Corporation d/b/a Amtrak; Nike, Inc.; Panda Restaurant Group, Inc.; Panera Bread Company; P.C. Richard & Son, Inc.; PETCO Animal Supplies, Inc.; PetSmart, Inc.; RaceTrac Petroleum, Inc.; Recreational Equipment, Inc. (REI); Retail Industry Leaders Association (RILA); Roundy's Supermarkets, Inc. d/b/a Pick 'N Save, Rainbow, Copps, Metro Market and Mariano's; Sears Holdings Corporation; Speedway LLC; Starbucks Corporation; Stein Mart, Inc.; Thermo Fisher Scientific Inc.; Wal-Mart Stores, Inc.; The Wendy's Company; The Wet Seal, Inc.; Whole Foods Market, Inc.; and Zappos.com, Inc.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **MDL Docket No. 1720** |
| **This Document Relates To:** | **MASTER FILE NO. 1:05-md-1720-JG-JO** |
| **ALL CLASS ACTIONS** | |

<u>**NOTICE OF APPEAL BY HOME DEPOT U.S.A., INC.**</u>

NOTICE IS HEREBY GIVEN that Objector Home Depot U.S.A., Inc. appeals to the

United States Court of Appeals for the Second Circuit from the Order entered December 13,

2013 (Docket No. 6124), attached hereto as Exhibit A, which grants final approval of the

settlement of this matter over the objections of Home Depot U.S.A., Inc., and from each and

every part thereof.

DATED:   New York, New York
         December 13, 2013

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:   /s/ Stephen R. Neuwirth
      Stephen R. Neuwirth
      Deborah K. Brown
      Steig D. Olson
      *stephenneuwirth@quinnemanuel.com*
      *deborahbrown@quinnemanuel.com*
      *steigolson@quinnemanuel.com*

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

Attorneys for Objector
HOME DEPOT U.S.A., INC.

# A2589

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Relates To: ALL ACTIONS | 05-md-1720 (JG) (JO)<br><br>NOTICE OF APPEAL |

Notice is hereby given that Objectors[1] appeal to the United States Court of Appeals for the

Second Circuit from the order entered on December 13, 2013, granting final approval of the class

action settlement, Docket No. 6124.

DATED: New York, New York
        December 13, 2013

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By:   /s/ Gregory A. Clarick
       Gregory A. Clarick
       Nicole Gueron
40 West 25th Street
New York, New York
(212) 633-4310

*Attorneys for Objectors*

---

[1] The Objectors are the following 21 absent class members: Target Corporation, Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc., Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc., L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S. Ross Company, Closeout Distribution, Inc., Ascena Retail Group, Inc., Abercrombie & Fitch Co., OfficeMax Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc., Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and American Signature, Inc., on behalf of themselves and their operating subsidiaries.

# A2590

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD
INTERCHANGE FEE AND
MERCHANT DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:
ALL CLASS ACTIONS.

MDL Docket No. 1720

MASTER FILE NO.
1:05-md-1720-JG-JO

**<u>NOTICE OF APPEAL</u>**

 Notice is hereby given that Objector the National Retail Federation

appeals to the United States Court of Appeals for the Second Circuit from the order

entered on December 13, 2013 granting final approval of the class action settlement,

Docket No. 6124.

Dated:  January 2, 2014
          New York, New York

 EMERY CELLI BRINCKERHOFF & ABADY LLP

 _____/s/_____
 Andrew G. Celli, Jr.
 Diane L. Houk
 75 Rockefeller Plaza, 20th Floor
 New York, New York 10019
 (212) 763-5000

 *Attorneys for Objector the National Retail Federation*

# A2591

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br>Master Case No.05-md-1720 [JG] [JO] |

## NOTICE OF APPEAL

Notice is hereby given that the following retailers and merchants (collectively referred to as "R&M Objectors") hereby appeal to the United States Court of Appeals for the Second Circuit from the order entered on December 13, 2013, granting Class Plaintiffs' Motion for Final Approval of Settlement, Docket # 6124, and from each and every part thereof:

1. Landers McLarty Bentonville, LLC d/b/a Landers McLarty Ford Dodge Chyrsler Jeep – Bentonville, Arkansas

2. Landers McLarty Bentonville Nissan, LLC d/b/a Landers McLarty Nissan, LLC – Bentonville, Arkansas

3. Bessemer AL Automotive, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Bessemer, Alabama

4. Shreveport Dodge, LLC d/b/a Landers Dodge – Bossier City Louisana

5. RML Branson MO, LLC d/b/a Tri Lakes Motors – Branson, Missouri

6. RML Burleson TX, LLC d/b/a Burleson Nissan – Burleson, Texas

7. RML Bel Air, LLC d/b/a Bel Air Honda – Falston, Maryland

8. Landers McLarty Fayetteville TN, LLC d/b/a Landers McLarty Toyota – Fayetteville, Tennessee

9. RML Ft. Worth TX, LLC d/b/a Nissan Ft. Worth – Fort Worth, Texas

10. RML Huntsville Chevrolet, LLC d/b/a Landers McLarty Chevrolet – Huntsville, Alabama

11.     RML Huntsville AL, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Huntsville, Alabama

12.     RML Huntsville AL Automotive, LLC d/b/a Mercedes Benz of Huntsville – Huntsville, Alabama

13.     RML Huntsville Nissan, LLC d/b/a Landers McLarty Nissan – Huntsville, Alabama

14.     RML Huntsville, AL, LLC d/b/a Landers McLarty Subaru – Huntsville, Alabama

15.     Landers McLarty Lee's Summit MO, LLC d/b/a Lee's Summit Chrysler Jeep Dodge – Lee's Summit, Missouri

16.     RML Lee's Summit MO, LLC d/b/a Lee's Summit Nissan – Lee Summit, Missouri

17.     RML Olathe II, LLC d/b/a Olathe Dodge Chrysler Jeep – Olathe, Kansas

18.     RML Waxahachie Dodge, LLC d/b/a Waxahachie-Dodge Chrysler Jeep – Waxahachie, Texas

19.     RML Waxahachie Ford, LLC d/b/a Waxahachie Ford Mercury – Waxahachie, Texas

20.     RML Little Rock, Inc. d/b/a Landers Harley Davidson – Little Rock, Arkansas

21.     RML Little Rock, Inc. d/b/a Landers Harley Davidson – Hot Springs, Arkansas

22.     RML Little Rock, Inc. d/b/a Landers Harley Davidson – Conway, Arkansas

23.     Landers Auto Group No. 1 d/b/a Landers Scion – Little Rock, Arkansas

24.     Landers Auto Group No. 1 d/b/a Landers Toyota – Little Rock, Arkansas

25.     Landers Auto Group No. 1 d/b/a The Boutique at Landers Toyota – Little Rock, Arkansas

26.     Landers CDJ, Inc. – Little Rock, Arkansas

27.     Landers CDJ, Inc. d/b/a Steve Landers Chrysler Dodge Jeep – Little Rock, Arkansas

28.     Landers of Hazelwood, Inc. – Hazelwood, Missouri

# A2593

29.    A&D Wine Corp. – New York, New York

30.    A&Z Restaurant Corp. – New York, New York

31.    105 Degrees, LLC – Oklahoma City, Oklahoma

32.    The Pantry Restaurant Group, LLC – Little Rock, Arkansas

33.    PPT Inc., d/b/a Graffiti's Restaurant – Little Rock, Arkansas

34.    Sansole's Tanning Salon – Little Rock, Arkansas

35.    Greenhaw's, Inc. – Little Rock, Arkansas

36.    Roberson's Fine Jewelry, Inc. – Little Rock, Arkansas

37.    Don's Pharmacy, Inc. – Little Rock, Arkansas

38.    Gossett Motor Cars, Inc. – Memphis, Tennessee

39.    Gossett Motor Cars, Inc. – Atlanta, Georgia

40.    JB Cook, LLC. d/b/a Downtown Oil & Lube – Hope, Arkansas

41.    Storage World Limited Partnership, LLC – Little Rock, Arkansas

42.    Leisure Landing RV Park – Hot Springs, Arkansas

43.    Pinnacle Valley Liquor Store, Inc. – Little Rock, Arkansas

44.    The Tennis Shoppe, Inc. – Little Rock, Arkansas

45.    The Grady Corporation d/b/a Whole Hog Barbeque (Northwest Arkansas) – Bentonville, Arkansas

46.    The Grady Corporation II d/b/a Whole Hog Barbeque (Northwest Arkansas) – Fayetteville, Arkansas

47.    Coulson Oil Company – North Little Rock, Arkansas

48.    Diamond State Oil LLC – North Little Rock, Arkansas

49.    Superstop Stores, LLC – North Little Rock, Arkansas

50.    PetroPlus, LLC – North Little Rock, Arkansas

51.    Port Cities Oil, LLC – North Little Rock, Arkansas

52.    New Mercury, LLC – North Little Rock, Arkansas

# A2594

53.     New Vista, LLC – North Little Rock, Arkansas

54.     New Neptune, LLC – North Little Rock, Arkansas

55.     SVI Security Solutions – Olive Branch, Mississippi

56.     Shepherd's Flock – Townshend, Vermont

57.     AIMCO Equipment Company, LLC – Little Rock, Arkansas

58.     Desert European Motorcars, Ltd. – Rancho Mirage California

59.     Newport European Motorcars, Ltd. – Newport Beach, California

60.     San Diego European Motorcars, Ltd. – San Diego, California

61.     Park Hill Collections, LLC – Little Rock, Arkansas

62.     Riverbike of Tennessee, Inc. – Nashville, Tennessee

63.     Par's Custom Cycle, Inc. – Oklahoma City, Oklahoma

64.     V.I.P. Motor Cars Ltd. – Palm Springs, California

65.     RR #1 TX, LLC – Texarkana, AR

Dated:  January 10, 2014

Respectfully Submitted,

By:     *s/ Jerrold S. Parker*
        Jerrold S. Parker
        Jay L.T. Breakstone
        **Parker Waichman, LLP**
        6 Harbor Park Drive
        Port Washington, NY 11050
        Telephone:  (516)-723-4620
        jerry@yourlawyer.com
        jbreakstone@yourlawyer.com

        Phillip Duncan
        Richard Quintus
        **Duncan Firm, P.A.**
        900 S. Shackleford, Suite 725
        Little Rock, AR 72211
        Telephone:  (501) 228-7600

4

**A2595**

phillip@duncanfirm.com
richard@duncanfirm.com

Thomas P. Thrash, ABN #80147
Marcus N. Bozeman, ABN #95287
**Thrash Law Firm, P.A.**
1101 Garland Street
Little Rock, Arkansas 72201
Telephone: 501-374-1058
Facsimile: 501-374-2222
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

5

**A2596**

**CERTIFICATE OF SERVICE**

I, Jerrold S. Parker, hereby certify that on January 10, 2014, I electronically filed the foregoing Notice of Appeal with the Clerk of the Court for the U.S. District Court, Eastern District of New York by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.

*s/ Jerrold S. Parker*
Jerrold S. Parker

# A2597

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

No. 1:05-MD-1720 (JG) (JO)

This Document Relates To:  ALL CASES

---

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that the below-listed "Blue Cross and Blue Shield Objectors" and the below-listed "WellPoint Objectors" appeal to the United States Court of Appeals for the Second Circuit from the Memorandum and Order (Docket No. 6124) entered on December 13, 2013 granting final approval of the class settlement.

The "Blue Cross and Blue Shield Objectors" filing this Notice of Appeal are:

> Blue Cross and Blue Shield of Arizona, Inc.
> Blue Cross and Blue Shield of Kansas
> Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana
> HMO Louisiana, Inc.
> Blue Cross and Blue Shield of Minnesota (BCBSM, Inc.)
> MII Life, Inc.
> HMO Minnesota
> Blue Cross and Blue Shield of Nebraska
> Blue Cross and Blue Shield of North Carolina
> Blue Cross and Blue Shield of South Carolina
> Blue Cross and Blue Shield of Kansas City
> Blue Cross Blue Shield of Michigan
> Blue Care Network
> California Physicians' Service, d/b/a Blue Shield of California
> Blue Shield of California Life and Health Insurance Company
> Capital BlueCross
> Capital Advantage Insurance Company
> Capital Advantage Assurance Company
> Consolidated Benefits, Inc.
> Keystone Health Plan Central, Inc.
> Avalon Insurance Company

A2598

Geneia Holding LLC
Geneia Clinical Care Solutions LLC
Dominion Dental USA, Inc.
Dominion Dental Services, Inc.
Dominion Dental Services USA, Inc.
Dominion Dental Services of New Jersey, Inc.
Health Care Service Corporation
HealthNow New York Inc.
Highmark Inc.
Highmark d/b/a Highmark Health Services
Highmark West Virginia, Inc.
HM Health Insurance Company
Keystone Health Plan West, Inc.
HM Life Insurance Company
HM Life Insurance Company of New York
United Concordia Companies, Inc.
Horizon Healthcare Services, Inc.
Independence Blue Cross
QCC Insurance Company
Keystone Health Plan East, Inc.
AmeriHealth Health Insurance Company of New Jersey
AmeriHealth HMO, Inc.
AmeriHealth Administrators, Inc.
CompServices, Inc.
AmeriHealth Casualty Insurance Company
CSI Services, Inc.
Self Funded Benefits, Inc. d/b/a Insurance Design Administrators
Inter-County Hospitalization Plan, Inc.
Inter-County Health Plan, Inc.
Keystone Family Health Plan
AmeriHealth Caritas Health Plan
AmeriHealth Caritas Louisiana, Inc.
Select Health of South Carolina, Inc.
AmeriHealth Caritas Georgia, Inc.
AmeriHealth Northeast, LLC
AmeriHealth District of Columbia, Inc.
AmeriHealth Caritas Indiana, LLC
PerformRx, LLC, Perform Rx of NY, LLC
AmeriHealth Nebraska, Inc.
Florida True Health, Inc.
AmeriHealth Michigan, Inc.
ACHP Holdings Corp.
Community Behavioral Healthcare Network of Pennsylvania, Inc.
CBHNP Services, Inc.
Premera Blue Cross
LifeWise Health Plan of Washington, Inc.

2

LifeWise Health Plan of Oregon, Inc.
LifeWise Assurance Company
BlueCross BlueShield of Tennessee, Inc.
BeneVive, Inc.
Golden Security Insurance Co.
Group Insurance Services, Inc.
Onlife Health, Inc.
RiverTrust Solutions, Inc.
Riverbend Government Administrative Services, Inc.
Security Care of Tennessee, Inc.
Shared Health, Inc.
Southern Diversified Business Services, Inc.
Tennessee Health Foundation, Inc.
Volunteer State Health Plan, Inc.
Blue Cross and Blue Shield of Alabama
CareFirst of Maryland, Inc.
CareFirst BlueChoice, Inc.
Group Hospitalization and Medical Services, Inc.
USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield
USAble Corporation
HMO Partners, Inc.
Pinnacle Business Solutions, Inc.
Blue Cross of Idaho Health Service, Inc.
Blue Cross of Idaho Care Plus, Inc.
Peak1 Administration, LLC

The "WellPoint Objectors" filing this Notice of Appeal are:

WellPoint, Inc.
1-800-CONTACTS, Inc.
Anthem Blue Cross Life and Health Insurance Co.
Anthem Health Insurance Co. of Nevada
Anthem Health Plans, Inc.
Anthem Health Plans of Kentucky, Inc.
Anthem Health Plans of Maine, Inc.
Anthem Health Plans of New Hampshire, Inc.
Anthem Health Plans of Virginia, Inc.
Anthem Insurance Cos., Inc.
Anthem Life & Disability Insurance Co.
Anthem Life Insurance Co.
Blue Cross and Blue Shield of Georgia, Inc.
Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
Blue Cross Blue Shield of Wisconsin
Blue Cross of California
Blue Cross of California Partnership Plan, Inc.
CareMore Health Plan

# A2600

CareMore Health Plan of Arizona, Inc.
CareMore Health Plan of Colorado, Inc.
CareMore Health Plan of Georgia, Inc.
CareMore Health Plan of Nevada, Claim Management Services, Inc.
Community Insurance Co.
CompCare Health Services Insurance Corp.
DeCare Dental Health International, LLC
DeCare Dental Networks, LLC
Empire HealthChoice Assurance, Inc.
Empire HealthChoice HMO, Inc.
Greater Georgia Life Insurance Co., Inc.
Golden West Health Plan, Inc.
HealthLink HMO, Inc.
HealthKeepers, Inc.
Healthy Alliance Life Insurance Co.
HMO Colorado, Inc.
HMO Missouri, Inc.
Meridian Resource Co., LLC
Matthew Thornton Health Plan, Inc.
OneNation Insurance Co.
Rayant Insurance Co. of New York
RightCHOICE Insurance Co.
Rocky Mountain Hospital and Medical Service, Inc.
UniCare Health Insurance Co. of the Midwest
UniCare Health Plan of Kansas, Inc.
UniCare Health Plans of the Midwest, Inc.
UniCare Health Plans of Texas, Inc.
UniCare Health Plan of West Virginia, Inc.
Unicare Life & Health Insurance Co.
WellPoint Insurance Services, Inc.

Dated: January 10, 2014

Respectfully submitted,

BINDER & SCHWARTZ LLP

  /s/ Wendy H. Schwartz
Wendy H. Schwartz
28 West 44th Street
New York, NY 10036
Phone: 347-334-5082
Facsimile: 347-772-3072
E-mail: wschwartz@binderschwartz.com

Anthony F. Shelley
Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington, DC 20005
Phone: 202-626-5800
Facsimile: 202-626-5801
E-mail: ashelley@milchev.com
E-mail: afeinberg@milchev.com

*Attorneys for the Blue Cross and Blue Shield
Objectors*


VORYS, SATER, SEYMOUR AND PEASE LLP

  /s/ Robert N. Webner
Robert N. Webner
Kenneth J. Rubin
52 E Gay Street
Columbus, OH 43215
Phone:  614-464-8243
Facsimile: 614-719-5083
E-mail: rnwebner@vorys.com
E-mail: kjrubin@vorys.com

*Attorneys for the WellPoint Objectors*

5

# A2602

1
2
3
4
David Stein
Samuel and Stein
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563)-9870
Email: dstein@samuelandstein.com (DS-2119)

5
6
*Attorneys for Objectors/Class Members*
*Rick Bandas and Daniel Hall*

7

8       **UNITED STATES DISTRICT COURT**

9       **EASTERN DISTRICT OF NEW YORK**

10

11
12
13
14
IN RE PAYMENT CARD AND MERCHANT
DISCOUNT ANTITRUST LITIGATION.

MDL Docket No. 1720

MASTER FILE NO.
1:05-md-1720-JG-JO

15

16

17       **NOTICE OF APPEAL**

18

19
20      TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21      NOTICE IS HEREBY GIVEN that Objectors/Appellants Rick Bandas and Daniel Hall

22      hereby appeal the Memorandum and Order dated December 13, 2013 (Dkt. # 6124) granting

23      Motion for Settlement (Dkt. #2111) and the Memorandum and Order dated January 10, 2014

24      (Dkt. #6169) granting Motion for Attorney Fees (Dkt. #2113) and any other order or judgment

25      granting approval of the settlement and/or attorneys' fees and/or expenses in this matter.

26      This appeal is to the Second Circuit Court of Appeals. A copy of said judgments or orders are

27      attached hereto. (See Exhibit "A" and Exhibit "B")

28

**A2603**

1

Dated: January 10, 2013                          Respectfully submitted,

2

3                                          By:

David Stein
4                                                Samuel and Stein
                                                 38 West 32nd Street, Suite 1110
5                                                New York, NY 10001
                                                 Phone: (212) 563-9884
6                                                Fax: (212) 563)-9870
                                                 Email: dstein@samuelandstein.com (DS-2119)
7
                                                 *Attorneys for Objectors/Class Members*
8                                                *Rick Bandas and Daniel Hall*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# A2604

## CERTIFICATE OF SERVICE

The undersigned certifies that today he filed the foregoing Notice of Appeal on ECF which will send electronic notification to all attorneys registered for ECF-filing.

The undersigned further certifies he caused to be served via USPS First Class Mail, postage prepaid, a copy of this Notice of Appeal upon the following:

DATED this January 10, 2014.

Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Wesley R. Powell
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

David Stein

**A2605**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------- X

In re PAYMENT CARD INTERCHANGE    :
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION              :

                                         MDL No. 1720 (JG) (JO)

                           : MASTER FILE NO.
                              1:05-md-1720-JG-JO
This Document Relates To:

                  ALL CLASS ACTIONS.    :

                              NOTICE OF APPEAL
                           :

                           :
                           :
                           :
                           :

-------------------------------------- X

       NOTICE IS HEREBY GIVEN that Intervenors and Objectors First Data Corporation,

First Data Merchant Services, TASQ Technology, Inc., TRS Recovery Services Inc., First Data

Government Solutions, Telecheck Services Inc., and their affiliates (collectively referred to as

"FDC") appeal to the United States Court of Appeals for the Second Circuit from the Order

entered December 13, 2013 (Docket Entry No. 6124) granting Class Plaintiffs' Motion for Final

Approval of Settlement over FDC's objections and motion to opt out of the Rule 23(b)(2) class.

Dated: San Francisco, California.            Respectfully submitted,
       January 10, 2014

                                   PERKINS COIE LLP
                                   Four Embarcadero Center, Suite 2400
                                   San Francisco, CA  94111-4131
                                   Telephone:  415.344.7000

                                 By:     /s/ Jason A. Yurasek
                                        Jason A. Yurasek

                                 Attorneys for First Data Corporation; First Data
                                 Merchant Services; TASQ Technology, Inc.;
                                 TRS Recovery Services Inc.; First Data
                                 Government Solutions; Telecheck Services Inc.

# A2606

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **No. 05-MD-1720-(JG)(JO)** <br><br> **NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that Objectors The Iron Barley Restaurant,

Homestead Restaurant (Historical Homestead, Inc.), The Feral Pig (KP Group LLC),

Paris Beauty Salon, Rachel Mustoe (dba Tousled Hair Studio), and Kristina Newman –

Hair, appeal to the United States Court of Appeals for the Second Circuit from the Order

entered on December 13, 2013 (Doc. 6124) granting final approval of the class action

settlement in the above-captioned matter and from the Memorandum and Order entered

on January 10, 2014 (Doc.6169) awarding attorneys' fees, costs and expenses.

Respectfully submitted,

s/Steve A. Miller
STEVE A. MILLER (CO Bar No. 8758)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925

JOHN C. KRESS (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO  63111
Ph.#:  (314) 631-3883
Fax:  (314) 332-1534

1

# A2607

MAUREEN CONNORS (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
Phone: (216) 640-9860
Fax: (216) 504-4049

JONATHAN E. FORTMAN (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax:  (314) 524-1519

J. SCOTT KESSINGER (9429HI)
3-2600 Kaumualii Highway
Suite 1300, #325
Lihue, HI 96746
Phone: (808) 635-2924
Fax: 314.754.8370

## CERTIFICATE OF SERVICE

I certify that on this 10th day of January, 2014 this document was filed and served via the USDC EDNY ECF Filing System:

s/Steve A. Miller

2

# A2608

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE      :
FEE AND MERCHANT DISCOUNT            :          05-md-1720 (JG)(JO)
ANTITRUST LITIGATION                     :
                                                  :          NOTICE OF APPEAL
                                                  :          _____
This Document Relates To:              :
                                                  :
ALL CLASS ACTIONS.                      :
                                                  :
------------------------------------------------------x

      Notice is hereby given that the United States Public Interest Research Group ("U.S.

PIRG") appeals to the United States Court of Appeals for the Second Circuit from the order of the

District Court entered on December 13, 2013 granting final approval of the class action settlement,

Docket No. 6124, and from the Class Settlement and Final Judgment Order to be entered by this

Court.

DATED:  New York, New York
            January 13, 2014


                                   SCHLAM STONE & DOLAN LLP

                                   By: _____/s_____
                                     Robert L. Begleiter
                                 26 Broadway
                                 New York, NY  10004
                                 Phone: 212-344-5400
                                 Fax: 212-344-7677
                                 rbegleiter@schlamstone.com
                                 *Attorneys for U.S. PIRG*

287925.1

# A2609

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

In re PAYMENT CARD INTERCHANGE  :
FEE AND MERCHANT DISCOUNT        :     05-md-1720 (JG)(JO)
ANTITRUST LITIGATION             :
                                 :     NOTICE OF APPEAL
                                 :
This Document Relates To:        :
                                 :
ALL CLASS ACTIONS.               :
                                 :
------------------------------------------------------x

     Notice is hereby given that Consumers Union of United States, Inc., d/b/a Consumer

Reports appeals to the United States Court of Appeals for the Second Circuit from the order of the

District Court entered on December 13, 2013 granting final approval of the class action settlement,

Docket No. 6124, and from the Class Settlement and Final Judgment Order to be entered by this

Court.

DATED:  New York, New York
         January 13, 2014

                             SCHLAM STONE & DOLAN LLP

                             By: _____/s_____
                                 Robert L. Begleiter
                             26 Broadway
                             New York, NY  10004
                             Phone: 212-344-5400
                             Fax: 212-344-7677
                             rbegleiter@schlamstone.com
                             *Attorneys for Consumers Union*

288433.1

# A2610

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | 05-md-1720 (JG) (JO) |
| | <u>AMENDED NOTICE OF APPEAL</u> |
| This Document Relates To: ALL ACTIONS | |

Notice is hereby given that Objectors[1] appeal to the United States Court of Appeals for the Second Circuit from the Class Settlement Order and Final Judgment entered on January 14, 2014, ECF No. 6199, as well as the orders and decisions merged into that judgment.  Such orders and decisions include, but are not limited to, the following:

1.      The December 13, 2013 Memorandum and Order granting final approval of the class settlement, ECF No. 6124; and

2.      The January 13, 2014 Order denying the Objectors' motion in limine to exclude a portion of the declaration of Dr. Alan Frankel.

DATED:   New York, New York
              January 21, 2014

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By:  _/s/ Gregory A. Clarick_____
       Gregory A. Clarick
       Nicole Gueron
       40 West 25th Street
       New York, New York
       (212) 633-4310

*Attorneys for Objectors*

---

[1] The Objectors are: Target Corporation, Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc., Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc., L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S. Ross Company, Closeout Distribution, Inc., Ascena Retail Group, Inc., Abercrombie & Fitch Co., OfficeMax Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc., Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and American Signature, Inc., on behalf of themselves and their operating subsidiaries.

# A2611

1   David Stein
    Samuel and Stein
2   38 West 32nd Street, Suite 1110
    New York, NY  10001
3   Phone: (212) 563-9884
    Fax: (212) 563-9870
4   Email: dstein@samuelandstein.com (DS-2119)

5   *Attorneys for Objectors/Class Members*
    *Rick Bandas and Daniel Hall*

6

7

8   **UNITED STATES DISTRICT COURT**

9   **EASTERN DISTRICT OF NEW YORK**

10

11  IN RE PAYMENT CARD AND MERCHANT         MDL Docket No. 1720
    DISCOUNT ANTITRUST LITIGATION.
12                                          MASTER FILE NO.
                                            1:05-md-1720-JG-JO
13

14

15

16

17  **AMENDED NOTICE OF APPEAL**

18

19

20      TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21      NOTICE IS HEREBY GIVEN that Objectors/Appellants Rick Bandas and Daniel Hall

22  hereby amends their Notice of Appeal (Dkt. #6178) filed on January 10, 2014, currently

23  docketed at the United States Court of Appeals for the Second Circuit as Cause No. 14-32.  In

24  addition to the already pending appeal from the Memorandum and Order dated December 13,

25  2013 (Dkt. # 6124) granting Motion for Settlement (Dkt. #2111) and the Memorandum and

26  Order dated January 10, 2014 (Dkt. #6169) granting Motion for Attorney Fees (Dkt. #2113), Mr.

27

28

# A2612

1  Bandas and Mr. Hall are also appealing from the Court's Final Judgment Awarding Attorneys'

2  Fees (Dkt. #6197), entered on January 14, 2014, the Court's Final Judgment Awarding Expenses

3  (Dkt. 6198), entered on January 14, 2014, the Court's Class Settlement Order and Final

4  Judgment (Dkt. 6199), entered on January 14, 2014, and any other order or judgment granting

5  approval of the settlement and/or attorneys' fees and/or expenses in this matter.  This appeal is to

6  the Second Circuit Court of Appeals.  Copies of said judgments or orders are attached hereto.

7  (See Exhibits "1" (Dkt. #6197), "2" (Dkt. #6198), "3" (Dkt. #6199), "4" (Dkt. 6199-1), "5" (Dkt.

8

9  6199-2 and "6" (Dkt. 6124)).

10  Dated: January 30, 2013                    Respectfully submitted,

11

12                                    By:   _David Stein_

13                                          _____
                                            David Stein
14                                          Samuel and Stein
                                            38 West 32nd Street, Suite 1110
15                                          New York, NY  10001
                                            Phone: (212) 563-9884
16                                          Fax: (212) 563)-9870
                                            Email:  dstein@samuelandstein.com (DS-2119)
17
                                            *Attorneys for Objectors/Class Members*
18                                          *Rick Bandas and Daniel Hall*

19

20

21

22

23

24

25

26

27

28
AMENDED NOTICE OF APPEAL
1:05-MD-1720-JG-JO
                                                                        Page 2

# A2613

1

**CERTIFICATE OF SERVICE**

2    The undersigned certifies that today he filed the foregoing Notice of Appeal on ECF

3 which will send electronic notification to all attorneys registered for ECF-filing.

4    The undersigned further certifies he caused to be served via USPS First Class Mail,

5 postage prepaid, a copy of this Notice of Appeal upon the following:

6 DATED this January 31, 2014.

7

8 Alexandra S. Bernay
 Robbins Geller Rudman & Dowd LLP

9 655 West Broadway, Suite 1900
 San Diego, CA 92101

10

11 Wesley R. Powell
 Willkie Farr & Gallagher LLP

12 787 Seventh Avenue
 New York, NY 10019

13

14

15          David Stein

16

17

18

19

20

21

22

23

24

25

26

27

28 AMENDED NOTICE OF APPEAL
 1:05-MD-1720-JG-JO

# A2614

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE    :
FEE AND MERCHANT DISCOUNT          :        05-md-1720 (JG)(JO)
ANTITRUST LITIGATION               :
                                   :        NOTICE OF APPEAL
This Document Relates To:          :
                                   :
ALL CLASS ACTIONS.                 :
                                   :
-------------------------------------------------------x

Notice is hereby given that, on behalf of its members, National Federation of Independent

Business ("NFIB") appeals to the United States Court of Appeals for the Second Circuit from the

Class Settlement Order and Final Judgment entered by this Court on January 14, 2014, ECF

Docket No. 6199.

DATED:  New York, New York
        February 5, 2014

                                SCHLAM STONE & DOLAN LLP

                                By: _____/s_____
                                      Robert L. Begleiter
                                    26 Broadway
                                    New York, NY 10004
                                    Phone: 212-344-5400
                                    Fax: 212-344-7677
                                    rbegleiter@schlamstone.com
                                    *Counsel for NFIB*

**A2615**

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

No. 1:05-MD-1720 (JG) (JO)

This Document Relates To:  ALL CASES

<u>**SUBSEQUENT NOTICE OF APPEAL**</u>

Notice is hereby given that the below-listed "Blue Cross and Blue Shield Objectors" and the below-listed "WellPoint Objectors" appeal to the United States Court of Appeals for the Second Circuit from the Class Settlement Order and Final Judgment (Docket No. 6199) entered on January 14, 2014, as well as the orders and decisions merged into that judgment, including the December 13, 2013 Memorandum and Order granting final approval of the class settlement (Docket No. 6124).

The Blue Cross and Blue Shield Objectors filing this Notice of Appeal are:

Blue Cross and Blue Shield of Arizona, Inc.
Blue Cross and Blue Shield of Kansas
Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana
HMO Louisiana, Inc.
Blue Cross and Blue Shield of Minnesota (BCBSM, Inc.)
MII Life, Inc.
HMO Minnesota
Blue Cross and Blue Shield of Nebraska
Blue Cross and Blue Shield of North Carolina
Blue Cross and Blue Shield of South Carolina
Blue Cross and Blue Shield of Kansas City
Blue Cross Blue Shield of Michigan
Blue Care Network
California Physicians' Service, d/b/a Blue Shield of California
Blue Shield of California Life and Health Insurance Company
Capital BlueCross

# A2616

Capital Advantage Insurance Company
Capital Advantage Assurance Company
Consolidated Benefits, Inc.
Keystone Health Plan Central, Inc.
Avalon Insurance Company
Geneia Holding LLC
Geneia Clinical Care Solutions LLC
Dominion Dental USA, Inc.
Dominion Dental Services, Inc.
Dominion Dental Services USA, Inc.
Dominion Dental Services of New Jersey, Inc.
Health Care Service Corporation
HealthNow New York Inc.
Highmark Inc.
Highmark d/b/a Highmark Health Services
Highmark West Virginia, Inc.
HM Health Insurance Company
Keystone Health Plan West, Inc.
HM Life Insurance Company
HM Life Insurance Company of New York
United Concordia Companies, Inc.
Horizon Healthcare Services, Inc.
Independence Blue Cross
QCC Insurance Company
Keystone Health Plan East, Inc.
AmeriHealth Health Insurance Company of New Jersey
AmeriHealth HMO, Inc.
AmeriHealth Administrators, Inc.
CompServices, Inc.
AmeriHealth Casualty Insurance Company
CSI Services, Inc.
Self Funded Benefits, Inc. d/b/a Insurance Design Administrators
Inter-County Hospitalization Plan, Inc.
Inter-County Health Plan, Inc.
Keystone Family Health Plan
AmeriHealth Caritas Health Plan
AmeriHealth Caritas Louisiana, Inc.
Select Health of South Carolina, Inc.
AmeriHealth Caritas Georgia, Inc.
AmeriHealth Northeast, LLC
AmeriHealth District of Columbia, Inc.
AmeriHealth Caritas Indiana, LLC
PerformRx, LLC, Perform Rx of NY, LLC
AmeriHealth Nebraska, Inc.
Florida True Health, Inc.
AmeriHealth Michigan, Inc.

2

ACHP Holdings Corp.
Community Behavioral Healthcare Network of Pennsylvania, Inc.
CBHNP Services, Inc.
Premera Blue Cross
LifeWise Health Plan of Washington, Inc.
LifeWise Health Plan of Oregon, Inc.
LifeWise Assurance Company
BlueCross BlueShield of Tennessee, Inc.
BeneVive, Inc.
Golden Security Insurance Co.
Group Insurance Services, Inc.
Onlife Health, Inc.
RiverTrust Solutions, Inc.
Riverbend Government Administrative Services, Inc.
Security Care of Tennessee, Inc.
Shared Health, Inc.
Southern Diversified Business Services, Inc.
Tennessee Health Foundation, Inc.
Volunteer State Health Plan, Inc.
Blue Cross and Blue Shield of Alabama
CareFirst of Maryland, Inc.
CareFirst BlueChoice, Inc.
Group Hospitalization and Medical Services, Inc.
USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield
USAble Corporation
HMO Partners, Inc.
Pinnacle Business Solutions, Inc.
Blue Cross of Idaho Health Service, Inc.
Blue Cross of Idaho Care Plus, Inc.
Peak1 Administration, LLC

  The WellPoint Objectors filing this Notice of Appeal are:

WellPoint, Inc.
1-800-CONTACTS, Inc.
Anthem Blue Cross Life and Health Insurance Co.
Anthem Health Insurance Co. of Nevada
Anthem Health Plans, Inc.
Anthem Health Plans of Kentucky, Inc.
Anthem Health Plans of Maine, Inc.
Anthem Health Plans of New Hampshire, Inc.
Anthem Health Plans of Virginia, Inc.
Anthem Insurance Cos., Inc.
Anthem Life & Disability Insurance Co.
Anthem Life Insurance Co.
Blue Cross and Blue Shield of Georgia, Inc.

3

**A2618**

Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
Blue Cross Blue Shield of Wisconsin
Blue Cross of California
Blue Cross of California Partnership Plan, Inc.
CareMore Health Plan
CareMore Health Plan of Arizona, Inc.
CareMore Health Plan of Colorado, Inc.
CareMore Health Plan of Georgia, Inc.
CareMore Health Plan of Nevada, Claim Management Services, Inc.
Community Insurance Co.
CompCare Health Services Insurance Corp.
DeCare Dental Health International, LLC
DeCare Dental Networks, LLC
Empire HealthChoice Assurance, Inc.
Empire HealthChoice HMO, Inc.
Greater Georgia Life Insurance Co., Inc.
Golden West Health Plan, Inc.
HealthLink HMO, Inc.
HealthKeepers, Inc.
Healthy Alliance Life Insurance Co.
HMO Colorado, Inc.
HMO Missouri, Inc.
Meridian Resource Co., LLC
Matthew Thornton Health Plan, Inc.
OneNation Insurance Co.
Rayant Insurance Co. of New York
RightCHOICE Insurance Co.
Rocky Mountain Hospital and Medical Service, Inc.
UniCare Health Insurance Co. of the Midwest
UniCare Health Plan of Kansas, Inc.
UniCare Health Plans of the Midwest, Inc.
UniCare Health Plans of Texas, Inc.
UniCare Health Plan of West Virginia, Inc.
Unicare Life & Health Insurance Co.
WellPoint Insurance Services, Inc.

4

February 7, 2014                     Respectfully submitted,


                                      /s/ Anthony F. Shelley
                                     Anthony F. Shelley
                                     Adam P. Feinberg
                                     MILLER & CHEVALIER CHARTERED
                                     655 15th Street, NW, Suite 900
                                     Washington, DC 20005
                                     Phone: 202-626-5800
                                     Facsimile: 202-626-5801
                                     E-mail: ashelley@milchev.com
                                     E-mail: afeinberg@milchev.com

                                     *Attorneys for the Blue Cross and Blue Shield
                                     Objectors*


                                     VORYS, SATER, SEYMOUR AND PEASE LLP

                                      /s/ Robert N. Webner
                                     Robert N. Webner
                                     Kenneth J. Rubin
                                     VORYS, SATER, SEYMOUR AND PEASE LLP
                                     52 E Gay Street
                                     Columbus, OH 43215
                                     Phone:  614-464-8243
                                     Facsimile: 614-719-5083
                                     E-mail: rnwebner@vorys.com
                                     E-mail: kjrubin@vorys.com

                                     *Attorneys for the WellPoint Objectors*

# A2620

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **No. 05-MD-1720-(JG)(JO)**<br><br>**AMENDED NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that Objectors The Iron Barley Restaurant,

Homestead Restaurant (Historical Homestead, Inc.), The Feral Pig (KP Group LLC),

Paris Beauty Salon, Rachel Mustoe (dba Tousled Hair Studio), and Kristina Newman –

Hair, amend their Notice of Appeal to the United States Court of Appeals for the Second

Circuit filed on January 10, 2014 (Doc. 6182) to include the Final Judgment Awarding

Attorneys' Fees (Doc. 6197) entered on January 14, 2014 and the Class Action

Settlement Order and Final Judgment (Doc. 6199) entered on January 14, 2014.

Respectfully submitted,

s/Steve A. Miller
STEVE A. MILLER (CO Bar No. 8758)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925

JOHN C. KRESS (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO 63111
Ph.#: (314) 631-3883
Fax: (314) 332-1534

1

# A2621

MAUREEN CONNORS (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
Phone: (216) 640-9860
Fax: (216) 504-4049

JONATHAN E. FORTMAN (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax:  (314) 524-1519

J. SCOTT KESSINGER (9429HI)
3-2600 Kaumualii Highway
Suite 1300, #325
Lihue, HI 96746
Phone: (808) 635-2924
Fax: 314.754.8370

## CERTIFICATE OF SERVICE

I certify that on this 13th day of February, 2014 this document was filed and served via the USDC EDNY ECF Filing System:

s/Steve A. Miller

# A2622

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION**

**This Document Relates To:**

**ALL CLASS ACTIONS**

---

**MDL Docket No. 1720**

**MASTER FILE NO.
1:05-md-1720-JG-JO**

---

### AMENDED NOTICE OF APPEAL BY HOME DEPOT U.S.A., INC.
### (Amending Notice Of Appeal Filed December 13, 2013)

To the clerk of the court and all parties of record:

NOTICE IS HEREBY GIVEN that Plaintiff-Objector Home Depot U.S.A., Inc., hereby

appeals to the United States Court of Appeals for the Second Circuit from the final judgment

entered in this action on the 14th day of January, 2014. A copy of that final judgment is attached

hereto as Exhibit A.

DATED:   New York, New York
February 13, 2014

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:  /s/ Stephen R. Neuwirth
        Stephen R. Neuwirth
        Deborah K. Brown
        Steig D. Olson
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

Attorneys for Plaintiff-Objector
HOME DEPOT U.S.A., INC.

# A2623

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re PAYMENT CARD INTERCHANGE     :
FEE AND MERCHANT DISCOUNT          :     05-md-1720 (JG)(JO)
ANTITRUST LITIGATION               :
                                   :     AMENDED NOTICE OF APPEAL
This Document Relates To:          :
                                   :
ALL CLASS ACTIONS.                 :
                                   :
-------------------------------------------------------x

Notice is hereby given that the Objecting Plaintiffs and Objectors listed below appeal to

the United States Court of Appeals for the Second Circuit from the Class Action Settlement Order

and Final Judgment (Docket No. 6199) entered on January 14, 2014, as well as the order entered

on December 13, 2013 granting final approval of the class action settlement (Docket No. 6124).

Objecting Plaintiffs are the following ten named plaintiffs:

Coborn's Incorporated; D'Agostino Supermarkets, Inc.; Jetro Holdings, LLC; Affiliated
Foods Midwest Cooperative, Inc.; National Association of Convenience Stores (NACS); National
Community Pharmacists Association (NCPA); National Cooperative Grocers Association
(NCGA); National Grocers Association (NGA); National Restaurant Association (NRA); and
NATSO Inc.

The Objectors are the following absent class members:

7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports Outdoors; Aldo US Inc. d/b/a Aldo
and Call It Spring; Alon USA, LP (Alon Brands); Amazon.com, Inc.; American Eagle Outfitters,
Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC; Best Buy Stores, L.P.;
BJ's Wholesale Club, Inc.; The William Carter Company (Carter's); Costco Wholesale
Corporation; Crate & Barrel Holdings, Inc.; Darden Restaurants, Inc.; David's Bridal, Inc., DBD
Inc. and David's Bridal Canada Inc.; Dick's Sporting Goods, Inc.; Dillard's, Inc.; Family Dollar
Stores, Inc.; Drury Hotels Company, LLC; Foot Locker, Inc.; Gap Inc.; GNC Holdings, Inc.
(General Nutrition Corporation); Genesco Inc.; The Gymboree Corporation; HMSHost
Corporation; IKEA North America Services, LLC; J. Crew Group, Inc.; Kwik Trip, Inc.; Lowe's
Companies, Inc.; Marathon Petroleum LP; Martin's Super Markets, Inc.; Michaels Stores, Inc.;
National Railroad Passenger Corporation d/b/a Amtrak; Nike, Inc.; Panda Restaurant Group, Inc.;
Panera Bread Company; P.C. Richard & Son, Inc.; PETCO Animal Supplies, Inc.; PetSmart, Inc.;
RaceTrac Petroleum, Inc.; Recreational Equipment, Inc. (REI); Roundy's Supermarkets, Inc. d/b/a
Pick 'N Save, Rainbow, Copps, Metro Market and Mariano's; Sears Holdings Corporation;
Speedway LLC; Starbucks Corporation; Stein Mart, Inc.; Thermo Fisher Scientific Inc.; The
Wendy's Company; The Wet Seal, Inc.; Whole Foods Market, Inc.; Zappos.com, Inc.; Fleet

289335.1

# A2624

Wholesale Supply Co., Inc., Mills Motor, Inc., Mills Auto Enterprises, Inc., Willmar Motors, LLC, Mills Auto Center, Inc., Fleet and Farm of Alexandria, Inc., Fleet Wholesale Supply of Fergus Falls, Inc., Fleet and Farm of Green Bay, Inc., Fleet and Farm of Menomonie, Inc., Mills Fleet Farm, Inc., Fleet and Farm of Manitowoc, Inc., Fleet and Farm of Plymouth, Inc., Fleet and Farm Supply Company of West Bend, Inc., Fleet and Farm of Waupaca, Inc., Mills E-Commerce Enterprises, Inc., Brainerd Lively Auto, LLC; Ashley Furniture Industries Inc.; Beall's, Inc., Boscov's, Inc., The Buckle, Inc., Buc-ee's Ltd., The Children's Place Retail Stores, Inc.; Cracker Barrel Old Country Store, Inc., Cumberland Farms, Inc., Express, LLC, Family Express Corporation, New York & Company, Inc., Republic Services, Inc., Swarovski U.S. Holding Limited, The Talbots, Inc.

DATED:  New York, New York
            February 13, 2014

CONSTANTINE CANNON LLP
By: _____/s_____
        Jeffrey I. Shinder
335 Madison Avenue, 9th Floor
New York, New York 10017
Telephone: (212) 350-2700
Facsimile:  (212) 350-2701
Email: jshinder@constantinecannon.com
*Attorneys for Objecting Plaintiffs and Objectors*

289335.1

# A2625

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | 05-MD-1720 (JG)(JO) |
| This Document Relates To: | **NOTICE OF APPEAL** |
| ALL CLASS ACTIONS | |

Notice is hereby given that Retail Industry Leaders Association appeal to the United States Court of Appeals for the Second Circuit from the Class Settlement Order and Final Judgment entered on January 14, 2014 (Docket No. 6199), as well as the Memorandum and Order entered on December 13, 2013 granting final approval of the class action settlement (Docket No. 6124).

DATED:  New York, New York
         February 13, 2014

**RAKOWER LUPKIN PLLC**

By _____

Michael C. Rakower

488 Madison Avenue, 18th Floor
New York, New York 10022
(212) 660-5550 (main)
(212) 660-5551 (fax)
mrakower@rakowerlupkin.com

*Attorneys for Retail Industry Leaders Association*

# A2626

1  David Stein
   Samuel and Stein
2  38 West 32nd Street, Suite 1110
   New York, NY  10001
3  Phone: (212) 563-9884
   Fax: (212) 563-9870
4  Email:  dstein@samuelandstein.com (DS-2119)

5  *Attorneys for Objectors/Class Members*
   *1001 Property Solutions LLC and*
6  *Temple Eagle Partners LLC*

7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF NEW YORK**

10

11  IN RE PAYMENT CARD AND MERCHANT        MDL Docket No. 1720
    DISCOUNT ANTITRUST LITIGATION.
12                                          MASTER FILE NO.
                                            1:05-md-1720-JG-JO
13

14

15

16

17      **SECOND AMENDED NOTICE OF APPEAL OF 1001 PROPERTY**
18        **SOLUTIONS LLC AND TEMPLE EAGLE PARTNERS LLC**

19

20      TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21      NOTICE IS HEREBY GIVEN that Objectors/Appellants 1001 Property Solutions LLC

22  and Temple Eagle Partners LLC hereby amend their Amended Notice of Appeal (Dkt. #6227)

23  filed on January 31, 2014, currently docketed at the United States Court of Appeals for the

24

25  Second Circuit as Cause No. 14-32.

26      Objectors/Appellants 1001 Property Solutions LLC and Temple Eagle Partners LLC filed

27  their Objection to the Proposed Settlement on May 28, 2013 (Dkt. 2613).  Attached to the

28

1  Objection was the Declaration of Rick Bandas and Declaration of Daniel Hall (Dkt 2613-1).

2  Rick Bandas was authorized to file the Objection on behalf of Temple Eagle, Ltd., d/b/a Eagle

3  Self Storage as a duly authorized officer of Bandas Family, Ltd. And TEXAS RJB, LLC, which

4  own Temple Eagle, Ltd.  Daniel Hall was authorized to file the Objection as Registered Agent

5  and Member of 1001 Property Solutions LLC.  On January 10, 2013 a Notice of Appeal was

6  filed (Dkt. #6178) regarding the Memorandum and Order dated December 13, 2013 (Dkt. #6124)

7  granting Motion for Settlement and the Memorandum and Order dated January 10, 2014 (Dkt.#

8  6169) granting Motion for Attorneys' Fees.  On January 31, 2014 an Amended Notice of Appeal

9

10  was filed (Dkt. #6227) regarding the Court's Final Judgment Awarding Attorneys' Fees dated

11  January 14, 2014 (Dkt. #6197), the Court's Final Judgment Awarding Expenses dated January

12  14, 2014 (Dkt. #6198) and the Court's Class Settlement Order and Final Judgment dated January

13  14, 2014 (Dkt. #6199).   These appeals were filed on behalf of "Objectors/Appellants" but

14  incorrectly names "Rick Bandas and Daniel Hall" as the Appellants with no specific mention of

15  1001 Property Solutions LLC or Temple Eagle Partners LLC, the actual Objectors in the District

16

17  Court.  The appeals should have named 1001 Property Solutions LLC and Temple Eagle Partners

18  LLC as the Objectors/Appellants and they respectfully request that they be substituted as the

19  correct "Objectors/Appellants" in place of Rick Bandas and Daniel Hall.  See Rule 3(c)(4) of the

20  Federal Rules of Appellate Procedure ("An appeal must not be dismissed for informality of form

21  or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise

22  clear from the notice.").

23

24        This appeal is to the Second Circuit Court of Appeals.   Copies of said Notice and

25  Amended Notice of Appeal are attached hereto. (See Exhibits "1" (Dkt. #2613), "2" (Dkt.

26  #2613-1) "3" (Dkt. #6178), "4" (Dkt. #6227)).

27
SECOND AMENDED NOTICE OF APPEAL
28
OF 1001 PROPERTY SOLUTIONS LLC
AND TEMPLE EAGLE PARTNERS LLC
1:05-MD-1720-JG-JO

# A2628

1    Dated: February 18, 2014         Respectfully submitted,

2

3                       By

4                      David Stein

5                      Samuel and Stein
                        38 West 32nd Street, Suite 1110

6                      New York, NY  10001
                      Phone: (212) 563-9884

7                      Fax: (212) 563)-9870
                      Email:  dstein@samuelandstein.com (DS-2119)

8                      *Attorneys for Objectors/Class Members*
                      *1001 Property Solutions LLC and*

9                      *Temple Eagle Partners LLC*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    SECOND AMENDED NOTICE OF APPEAL
      OF 1001 PROPERTY SOLUTIONS LLC
      AND TEMPLE EAGLE PARTNERS LLC
      1:05-MD-1720-JG-JO

1

**CERTIFICATE OF SERVICE**

2        The undersigned certifies that today he filed the foregoing Notice of Appeal on ECF

3   which will send electronic notification to all attorneys registered for ECF-filing.

4        The undersigned further certifies he caused to be served via USPS First Class Mail,

5   postage prepaid, a copy of this Notice of Appeal upon the following:

6   DATED this February 18, 2014.

7

8   Alexandra S. Bernay
    Robbins Geller Rudman & Dowd LLP
9   655 West Broadway, Suite 1900
    San Diego, CA 92101

10

    Wesley R. Powell
11  Willkie Farr & Gallagher LLP
    787 Seventh Avenue
12  New York, NY 10019

13

14

15   _____

16   David Stein

17

18

19

20

21

22

23

24

25

26

27

28  SECOND AMENDED NOTICE OF APPEAL
    OF 1001 PROPERTY SOLUTIONS LLC
    AND TEMPLE EAGLE PARTNERS LLC
    1:05-MD-1720-JG-JO

Page 4

# A2630

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720 <br> Master Case No.05-md-1720 [JG] [JO] |

## AMENDED NOTICE OF APPEAL

Notice is hereby given that the following retailers and merchants (collectively referred to as "R&M Objectors") hereby appeal to the United States Court of Appeals for the Second Circuit from the Class Settlement Order and Final Judgment entered by this Court on January 14, 2014, granting Class Plaintiffs' Motion for Final Approval of Settlement, Docket No. 6199, and from each and every part thereof:

1.  Landers McLarty Bentonville, LLC d/b/a Landers McLarty Ford Dodge Chyrsler Jeep – Bentonville, Arkansas

2.  Landers McLarty Bentonville Nissan, LLC d/b/a Landers McLarty Nissan, LLC – Bentonville, Arkansas

3.  Bessemer AL Automotive, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Bessemer, Alabama

4.  Shreveport Dodge, LLC d/b/a Landers Dodge – Bossier City Louisana

5.  RML Branson MO, LLC d/b/a Tri Lakes Motors – Branson, Missouri

6.  RML Burleson TX, LLC d/b/a Burleson Nissan – Burleson, Texas

7.  RML Bel Air, LLC d/b/a Bel Air Honda – Falston, Maryland

8.  Landers McLarty Fayetteville TN, LLC d/b/a Landers McLarty Toyota – Fayetteville, Tennessee

9.  RML Ft. Worth TX, LLC d/b/a Nissan Ft. Worth – Fort Worth, Texas

10. RML Huntsville Chevrolet, LLC d/b/a Landers McLarty Chevrolet – Huntsville, Alabama

# A2631

11.    RML Huntsville AL, LLC d/b/a Landers McLarty Dodge Chrysler Jeep – Huntsville, Alabama

12.    RML Huntsville AL Automotive, LLC d/b/a Mercedes Benz of Huntsville – Huntsville, Alabama

13.    RML Huntsville Nissan, LLC d/b/a Landers McLarty Nissan – Huntsville, Alabama

14.    RML Huntsville, AL, LLC d/b/a Landers McLarty Subaru – Huntsville, Alabama

15.    Landers McLarty Lee's Summit MO, LLC d/b/a Lee's Summit Chrysler Jeep Dodge – Lee's Summit, Missouri

16.    RML Lee's Summit MO, LLC d/b/a Lee's Summit Nissan – Lee Summit, Missouri

17.    RML Olathe II, LLC d/b/a Olathe Dodge Chrysler Jeep – Olathe, Kansas

18.    RML Waxahachie Dodge, LLC d/b/a Waxahachie-Dodge Chrysler Jeep – Waxahachie, Texas

19.    RML Waxahachie Ford, LLC d/b/a Waxahachie Ford Mercury – Waxahachie, Texas

20.    RML Little Rock, Inc. d/b/a Landers Harley Davidson – Little Rock, Arkansas

21.    RML Little Rock, Inc. d/b/a Landers Harley Davidson – Hot Springs, Arkansas

22.    RML Little Rock, Inc. d/b/a Landers Harley Davidson – Conway, Arkansas

23.    Landers Auto Group No. 1 d/b/a Landers Scion – Little Rock, Arkansas

24.    Landers Auto Group No. 1 d/b/a Landers Toyota – Little Rock, Arkansas

25.    Landers Auto Group No. 1 d/b/a The Boutique at Landers Toyota – Little Rock, Arkansas

26.    Landers CDJ, Inc. – Little Rock, Arkansas

27.    Landers CDJ, Inc. d/b/a Steve Landers Chrysler Dodge Jeep – Little Rock, Arkansas

28.    Landers of Hazelwood, Inc. – Hazelwood, Missouri

# A2632

29.     A&D Wine Corp. – New York, New York

30.     A&Z Restaurant Corp. – New York, New York

31.     105 Degrees, LLC – Oklahoma City, Oklahoma

32.     The Pantry Restaurant Group, LLC – Little Rock, Arkansas

33.     PPT Inc., d/b/a Graffiti's Restaurant – Little Rock, Arkansas

34.     Sansole's Tanning Salon – Little Rock, Arkansas

35.     Greenhaw's, Inc. – Little Rock, Arkansas

36.     Roberson's Fine Jewelry, Inc. – Little Rock, Arkansas

37.     Don's Pharmacy, Inc. – Little Rock, Arkansas

38.     Gossett Motor Cars, Inc. – Memphis, Tennessee

39.     Gossett Motor Cars, Inc. – Atlanta, Georgia

40.     JB Cook, LLC. d/b/a Downtown Oil & Lube – Hope, Arkansas

41.     Storage World Limited Partnership, LLC – Little Rock, Arkansas

42.     Leisure Landing RV Park – Hot Springs, Arkansas

43.     Pinnacle Valley Liquor Store, Inc. – Little Rock, Arkansas

44.     The Tennis Shoppe, Inc. – Little Rock, Arkansas

45.     The Grady Corporation d/b/a Whole Hog Barbeque (Northwest Arkansas) – Bentonville, Arkansas

46.     The Grady Corporation II d/b/a Whole Hog Barbeque (Northwest Arkansas) – Fayetteville, Arkansas

47.     Coulson Oil Company – North Little Rock, Arkansas

48.     Diamond State Oil LLC – North Little Rock, Arkansas

49.     Superstop Stores, LLC – North Little Rock, Arkansas

50.     PetroPlus, LLC – North Little Rock, Arkansas

51.     Port Cities Oil, LLC – North Little Rock, Arkansas

52.     New Mercury, LLC – North Little Rock, Arkansas

# A2633

53.     New Vista, LLC – North Little Rock, Arkansas

54.     New Neptune, LLC – North Little Rock, Arkansas

55.     SVI Security Solutions – Olive Branch, Mississippi

56.     Shepherd's Flock – Townshend, Vermont

57.     AIMCO Equipment Company, LLC – Little Rock, Arkansas

58.     Desert European Motorcars, Ltd. – Rancho Mirage California

59.     Newport European Motorcars, Ltd. – Newport Beach, California

60.     San Diego European Motorcars, Ltd. – San Diego, California

61.     Park Hill Collections, LLC – Little Rock, Arkansas

62.     Riverbike of Tennessee, Inc. – Nashville, Tennessee

63.     Par's Custom Cycle, Inc. – Oklahoma City, Oklahoma

64.     V.I.P. Motor Cars Ltd. – Palm Springs, California

65.     RR #1 TX, LLC – Texarkana, AR

Dated:  February 25, 2014

Respectfully Submitted,

By:     *s/ Jerrold S. Parker*
        Jerrold S. Parker
        Jay L.T. Breakstone
        **Parker Waichman, LLP**
        6 Harbor Park Drive
        Port Washington, NY 11050
        Telephone:  (516)-723-4620
        jerry@yourlawyer.com
        jbreakstone@yourlawyer.com

        Phillip Duncan
        Richard Quintus
        **Duncan Firm, P.A.**
        900 S. Shackleford, Suite 725
        Little Rock, AR 72211
        Telephone:  (501) 228-7600

4

A2634

phillip@duncanfirm.com
richard@duncanfirm.com

Thomas P. Thrash, ABN #80147
Marcus N. Bozeman, ABN #95287
**Thrash Law Firm, P.A.**
1101 Garland Street
Little Rock, Arkansas 72201
Telephone: 501-374-1058
Facsimile: 501-374-2222
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

**CERTIFICATE OF SERVICE**

       I, Jerrold S. Parker, hereby certify that on February 25, 2014, I electronically filed the foregoing Amended Notice of Appeal with the Clerk of the Court for the U.S. District Court, Eastern District of New York by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.

                        *s/ Jerrold S. Parker*
                        Jerrold S. Parker

A2636

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

IN RE: PAYMENT CARD INTERCHANGE
FEE AND MERCHANT ANTITRUST
LITIGATION

MASTER FILE NO. 05-MD-1720

| This Document Relates to: | : |
| All Individual Plaintiff Actions | : |
| 1:05-CV-04677 | : |
| 1:05-CV-03925 | : |
| 1:05-CV-04131 | : |
| 1:05-CV-04650 | : |
| 1:05-CV-04799 | : |
| 1:05-CV-05078 | : |
| 1:05-CV-05352 | : |
| 1:06-CV-00039 | : |
| 1:06-CV-00078 | : |
| 1:06-CV-02532 | : |
| 1:06-CV-02534 | : |
| 1:06-CV-05765 | : |
| 1:07-CV-00592 | : |
| | : |

# Expert Report
## of
# Joseph Stiglitz, Ph.D.

**June 25, 2009**

## A2637

*Highly Confidential*
*Subject to Protective Order*

- The impairment of the transfer to buyers of any excess profits made by issuing banks on the extension of credit to cardholders;

- The shielding of price increases from federal regulations specifically designed to improve price transparency and thereby improve the functioning of the market;

- The creation of barriers to entry or expansion by competitors; and

- The partial dissipation of monopoly rents through inefficient solicitations of cardholders and granting of "rewards" (*e.g.,* airline miles) for card use.

8.   Of course, interference with price signals is only *presumptively* anticompetitive, and perhaps the Defendants could show that these significant anticompetitive effects are outweighed by other, procompetitive effects.  But I have read and analyzed the presentations that Visa and MasterCard made to the Reserve Bank of Australia and to the European Commission, and have also reviewed journal articles and expert reports written by economists sponsored by Visa and MasterCard.  In these presentations, articles, and reports, I have found no convincing economic arguments or facts to support significant procompetitive benefits.

9.   Instead, the "network effects" justification points decidedly in the opposite direction.  The Visa and MasterCard credit card systems are mature in that essentially every credit-worthy U.S. buyer has at least one credit card (and perhaps millions of buyers who are not credit-worthy also have them) and the vast majority of U.S. merchants accept the cards.  Any impediment to expansion of the networks of cardholders and card-accepting merchants is not an inability to recruit more cardholders, but an inability to recruit more merchants.  And a clear impediment to the recruitment of more merchants is the high interchange fees that result from the Merchant Restraints.

10.     In addition to the above, I have reached the opinions explained in this report, including the following:

> A.     A system of payment can increase economic efficiency by lowering the costs of transacting.  The means of payment is not

4

A2638

**United States Government Accountability Office**

# GAO

Report to Congressional Addressees

November 2009

# CREDIT CARDS

# Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges



**GAO**

Accountability * Integrity * Reliability

GAO-10-45

# A2639



Highlights of GAO-10-45, a report to congressional addressees

November 2009

## CREDIT CARDS

### Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges

## Why GAO Did This Study

When a consumer uses a credit card to make a purchase, the merchant does not receive the full purchase amount because a certain portion of the sale is deducted to compensate the merchant's bank, the bank that issued the card, and the card network that processes the transaction. The level and growth of these fees have become increasingly controversial. The 2009 Credit Card Accountability, Responsibility, and Disclosure Act directed GAO to review (1) how the fees merchants pay have changed over time and the factors affecting the competitiveness of the credit card market, (2) how credit card competition has affected consumers, (3) the benefits and costs to merchants of accepting cards and their ability to negotiate those costs, and (4) the potential impact of various options intended to lower merchant costs.

To address these objectives, GAO reviewed and analyzed relevant studies, literature, and data on the card payment market and interviewed industry participants, including large and small card issuers (including community banks and credit unions), card processors, card networks, large merchants representing a significant proportion of retail sales, and small merchants from a variety of industries, and academic experts.

GAO provided a draft of this report to the Department of Justice, the Federal Trade Commission, and federal banking regulators, and we incorporated their technical comments where appropriate.

View GAO-10-45 or key components. For more information, contact Alicia Puente Cackley at (202) 512-8678 or cackleya@gao.gov.

## What GAO Found

According to Federal Reserve analysis, total costs of accepting credit cards for merchants have risen over time as consumers use cards more. Part of these increased costs also may be the result of how Visa and MasterCard competed to attract and retain issuers to offer cards by increasing the number of interchange fee categories and the level of these rates. Concerns remain over whether the level of these rates reflects market power—the ability of some card networks to raise prices without suffering competitive effects—or whether these fees reflect the costs that issuers incur to maintain credit card programs. Issuers, particularly smaller issuers such as community banks and credit unions, report relying on interchange fees as a significant source of revenue for their credit card operations, and analyses by banking regulators indicate such operations traditionally have been among the most profitable types of activities for large banks.

Some consumers have benefited from competition in the credit card market, as cards often have no annual fees, lower interest rates than they did years ago, and greater rewards. However, consumers who do not use credit cards may be paying higher prices for goods and services, as merchants pass on their increasing card acceptance costs to all of their customers.

For merchants, the benefits of accepting credit cards include increased sales and reduced labor costs. However, representatives from some of the large merchants with whom we spoke said their increased payment costs outstripped any increased sales. These merchants also reported that their inability to refuse popular cards and network rules (which prevent charging more for credit card than for cash payments or rejecting higher-cost cards) limited their ability to negotiate payment costs. Interchange fees are not federally regulated in the United States, but concerns about card costs have prompted federal investigations and private lawsuits, and authorities in more than 30 countries have taken or are considering taking actions to address such fees and other card network practices.

Proposals for reducing interchange fees in the United States or other countries have included (1) setting or limiting interchange fees, (2) requiring their disclosure to consumers, (3) prohibiting card networks from imposing rules on merchants that limit their ability to steer customers away from higher-cost cards, and (4) granting antitrust waivers to allow merchants and issuers to voluntarily negotiate rates. If these measures were adopted here, merchants would benefit from lower interchange fees. Consumers would also benefit if merchants reduced prices for goods and services, but identifying such savings would be difficult. Consumers also might face higher card use costs if issuers raised other fees or interest rates to compensate for lost interchange fee income. Each of these options also presents challenges for implementation, such as determining at which rate to set, providing more information to consumers, or addressing the interests of both large and small issuers and merchants in bargaining efforts.

_____ **United States Government Accountability Office**

# A2640

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 3 |
| | Fees Merchants Pay for Accepting Credit Cards Have Increased over Time and May Be Related to Competition for Issuers in the Credit Card Market | 13 |
| | While Competition among Issuers Has Increased Benefits and Lowered Costs for Some Cardholders, Other Consumers May Be Negatively Affected by Increased Card Use | 25 |
| | Although Accepting Credit Cards Provides Benefits, Merchants Report Card Costs Are Increasing Faster and Their Ability to Negotiate or Lower These Costs Is Limited | 29 |
| | Although Various Options to Lower Interchange Fees Exist, Impacts on Cardholders Could Be Mixed and Each Option Has Implementation Challenges | 44 |
| | Agency Comments and Our Evaluation | 48 |

| Appendix I | Objectives, Scope, and Methodology | 50 |
|---|---|---|

| Appendix II | Review of Options to Regulate Interchange Fee Rates and Terms of Credit Card Acceptance | 53 |
|---|---|---|

| Appendix III | GAO Contact and Staff Acknowledgments | 64 |
|---|---|---|

| Tables | | |
|---|---|---|
| | Table 1: Ten Largest Credit Card Issuers as of Year-end 2008 | 6 |
| | Table 2: Changes in Visa and MasterCard Domestic Credit Card Interchange Fee Rates, Numbers, and Average Rates, 1991 and 2009 | 15 |
| | Table 3: Litigation Involving Card Network Practices | 42 |

# A2641

## Figures

Figure 1: Growth in Credit Card Usage from 1993 to 2007                    5

Figure 2: Transfer of Fees in a Credit Card Transaction                    8

Figure 3: Changes in Interchange Fee Costs from 2000 to 2009              17

Figure 4. Return on Assets, Large U.S. Credit Card Banks, 1986-
2008 and All FDIC-Insured Commercial Banks, 1988-2008                    24

## Abbreviations

DOJ          Department of Justice
FDIC         Federal Deposit Insurance Corporation
FTC          Federal Trade Commission
OCC          Office of the Comptroller of the Currency
PIN          personal identification number
RBA          Reserve Bank of Australia
TILA         Truth in Lending Act

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

A2642



**United States Government Accountability Office**
**Washington, DC 20548**

November 19, 2009

The Honorable Christopher J. Dodd
Chairman
The Honorable Richard C. Shelby
Ranking Member
Committee on Banking, Housing, and Urban Affairs
United States Senate

The Honorable Olympia J. Snowe
Ranking Member
Committee on Small Business and Entrepreneurship
United States Senate

The Honorable Benjamin L. Cardin
The Honorable Tom Harkin
United States Senate

The Honorable Barney Frank
Chairman
The Honorable Spencer Bachus
Ranking Member
Committee on Financial Services
House of Representatives

Consumers are increasingly using credit cards to make payments for
goods and services. When a consumer uses a credit card to make a
purchase, the merchant does not receive the full purchase amount because
a certain portion of the sale is deducted and distributed among the
merchant's financial institution, the financial institution that issued the
card, and the card network that processes the transaction. The majority of
this amount generally is called the interchange fee and goes to the
financial institution that issued the card. As card use has become more
popular, the costs for merchants of accepting them have been rising, and
considerable debate has been occurring over these costs, and particularly
the level of interchange fee rates. In the United States, merchants have
sued the card networks several times over card acceptance rules and
costs. Several congressional committees have held hearings on the topic of
interchange fees and Members of Congress have introduced legislation
regarding interchange fees.

# A2643

In May 2009, Congress passed and the President signed the Credit Card Accountability Responsibility and Disclosure Act of 2009 (CARD Act), which directed us to conduct a study of credit card interchange fees.[1] In addition, we were asked by members of the Senate Small Business Committee to review the market for interchange fees. In response to both, we reviewed (1) how the fees merchants pay for accepting credit cards have changed over time and the factors affecting the competitiveness of the credit card market, (2) how credit card competition has affected consumers, (3) the benefits and costs to merchants of accepting cards and their ability to negotiate those costs, and (4) the potential impact of various options intended to lower merchant card fee costs.

To address our objectives, we reviewed economic and other academic literature and analyzed industry data on the structure of the credit card payment market and merchants' reported fees for payment acceptance.[2] We reviewed materials provided to us by the card networks about the structure of interchange fees, how those fees have changed over time, and the rules for payment card acceptance. We also conducted interviews with more than 80 organizations, including U.S. federal banking and other regulators, academic researchers, and industry participants. We also interviewed and obtained information from regulatory officials in Australia, which took actions regarding interchange fees in 2003. To learn how card issuers compete to attract cardholders and the role of interchange fee revenue, we interviewed representatives from national banking associations, from some of the largest credit card issuing banks, and from credit unions and community banks from across the United States. To learn more about the role of acquiring institutions and processors, we met with an acquiring bank association and several large acquiring banks and merchant data processors. To learn more about the fees merchants pay for card acceptance, we met with representatives of large merchant groups from a variety of industries, including mass market retailers, grocery store chains, and online retailers. These merchants represent some of the largest retailers in the United States, including eight that represented 42 percent of the wholesale and retail trade industries listed in the S&P 500 in 2008. In addition, we obtained and analyzed data provided by large merchants, merchant associations, and a large credit

---

[1]Pub. L. No. 111-24 § 501, 123 Stat. 1734, 1754 (2009).

[2]For this report, we focused on the structure of fees for accepting credit cards, not debit cards, although the fees for debit cards play a role in factors affecting the competitiveness of the overall payment card market.

## A2644

card processor on the costs of accepting credit cards and interchange fee changes over time. This information was used to corroborate some of the statements they made about the benefits of card use, but we did not independently verify these data. In general, publicly available data on interchange fee revenues, card issuer costs, and other quantitative information are limited or data could not be provided because of contractual restrictions or ongoing litigation. We also selected small merchants to interview from the Washington, D.C., and Springfield, Virginia, Chambers of Commerce. These merchants represented a diverse group of businesses, including boutique shops, sports clubs, and a health care professional. Our interviews with industry participants, academics, and regulators also provided us with an understanding of the potential impact of various options to lower credit card fees. See appendix I for more detailed information on our scope and methodology.

We conducted our work from May 2009 to November 2009 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

Payment card use has grown dramatically since the introduction of cards in the beginning of the 20th century. Hotels, oil companies, and department stores issued cards associated with charge accounts before World War I. In 1950, Diners Club established the first general purpose charge card that allowed its cardholders to purchase goods and services from many different merchants. In the late 1950s, Bank of America began offering the BankAmericard, one of the first general purpose credit cards. Unlike charge cards that require the balance to be paid in full each month, credit cards allow cardholders to make purchases up to a credit limit and pay the balance off over time. To increase the number of consumers carrying the card and to reach retailers outside of Bank of America's area of operations, other banks were given the opportunity to license Bank of America's credit card. As the network of banks issuing these credit cards expanded, the network was converted into a membership-owned corporation that became the Visa network. MasterCard began in 1966 as an association of member-owned banks. American Express launched its card network in 1958, and in the 1980s, Discover, then a business unit of Sears, issued Discover card. In 2006, MasterCard became a publicly traded company with a board of directors with a majority of directors that are

# A2645

independent from their financial institution customers. Visa became a publicly traded company in 2008, and its financial institution members became common stockholders with a minority of shares.

Today, customers can choose among different types of payment cards. Consumers can use debit cards with a personal identification number (PIN) they enter on payment or with a signature. The payment is transferred directly from the cardholder's account to the merchant's account. With a debit card, the payment comes from the cardholder's checking account. Credit cards allow cardholders to access borrowed funds to make a purchase and generally have a grace period between the purchase of an item and the payment date. Then the cardholder can pay the charges in full or extend the loan and keep making charges to the credit limit. Cardholders who do not pay for the charges in full are assessed finance charges by their financial institution and pay interest on the remaining balance. Credit cards offer cardholders several benefits, including

- faster transactions,

- the convenience of not having to carry cash or a checkbook,

- a convenient source of unsecured credit that allows consumers to finance their purchases over time,

- an interest-free period to finance purchases if balances are paid on time,[3]

- improved theft and loss prevention as compared with cash and easier dispute resolution in the event of problems,[4] and

- an easy record-keeping mechanism that can be useful for budgeting, planning, and income tax preparation.

[3]Typically, cardholders with no outstanding balance on their account have at least 21 days from the date of purchase to the date their credit card bill is due in which they are not charged interest.

[4]The Truth in Lending Act, generally limits consumers' liability for the unauthorized use of their cards to $50. See 12 CFR 226.12.

# A2646

**Consumer Use of Credit Cards Has Grown Dramatically, while a Few Large Banks Have Come to Account for Most Card Issuance**

The number of credit cards in circulation and the extent to which they are used has also grown dramatically. The range of goods and services that can be purchased with credit cards has expanded, with cards now being used to pay for groceries, health care, and federal and state income taxes. In 2007, U.S. consumers held more than 694 million credit cards from Visa, MasterCard, American Express, and Discover, and as shown in figure 1, the total value of transactions for which these cards were used exceeded $1.9 trillion, according to data from the *Card Industry Directory*.[5]

**Figure 1: Growth in Credit Card Usage from 1993 to 2007**



Source: SourceMedia. *Card Industry Directory*, 20th edition. GAO adjusted the transaction values for inflation and the values are reported in 2007 dollars.

Note: From 2003, the transaction value data from Visa and MasterCard represent purchase volume only. Before 2003, data included cash disbursements.

[5]This includes both consumer and commercial credit card charge volume. See *Card Industry Directory: The Blue Book of the Credit and Debit Card Industry in North America*, 20th ed. (Chicago, Ill., 2008). SourceMedia, the publisher of the *Card Industry Directory*, told us that the 20th edition is the last edition that will be published and that its information has migrated into a Web-based product called PaymentsSource.

# A2647

Many of the largest issuers of credit cards in the United States are commercial banks, including many of the largest banks in the country. More than 6,000 depository institutions issue credit cards, but over the past decade, the majority of accounts increasingly have become concentrated among a small number of large issuers. Table 1 shows the largest bank issuers of credit cards as of the end of 2008, and their percentage of the total United States credit card market, according to an industry newsletter.

**Table 1: Ten Largest Credit Card Issuers as of Year-end 2008**

| Card issuer | Percentage of total U.S. credit card market by credit card balances outstanding |
|---|---|
| JPMorgan Chase | 21 |
| Bank of America | 19 |
| Citi | 12 |
| American Express | 10 |
| Capital One | 7 |
| Discover | 6 |
| Wells Fargo | 4 |
| HSBC | 3 |
| U.S. Bank | 2 |
| USAA Savings | 2 |
| **Total** | **88** |

Source: GAO analysis of data from *The Nilson Report*, April 2009, Issue 923.

In addition, community banks, thrifts, and credit unions each issue credit and debit cards. According to information provided by banking regulators and banking associations, about 75 percent of community banks, 49 percent of credit unions, and 13 percent of thrifts issue credit cards.

## Transactions through Card Networks Involve Multiple Parties and Fees

Merchants' costs of payment card acceptance involve several different fees that are divided among the parties involved in a credit card transaction. The parties involved in processing credit card transactions vary depending on the network used by the card. The United States has four primary general purpose credit card networks. For the two largest networks—Visa and MasterCard—transactions involve four parties: (1) the financial institution that issued a cardholder's card, (2) the cardholder, (3) the merchant that accepts the cardholder's card, and (4) an acquiring financial institution. A merchant that accepts Visa or MasterCard credit

# A2648

cards enters into a contract with an acquiring institution that has a relationship with Visa or MasterCard (or both) to provide card payment processing services. The merchant's contract with the acquiring institution or its agent specifies the level of services the merchant receives, as well as the merchant discount fee and other fees that will apply to the processing of the merchant's card transactions.[6] The acquiring institution charges the merchant a merchant discount fee that is established through negotiations.

The majority of the merchant discount fee is generally paid from the acquiring institution to the issuing institution in the form of an interchange fee. A merchant does not pay the interchange fee directly. Rather, the Visa or MasterCard network transfers the interchange fee portion of the merchant discount fee from the acquiring institution to the issuing institution. The acquiring institution retains the balance of the merchant discount fee to cover its costs for processing the transaction.[7] Figure 2 illustrates the four parties in a typical credit card transaction and how fees are transferred among the parties. In this example, when a cardholder makes a $100 purchase, the merchant pays $2.20 in merchant discount fees for the transaction. This amount is divided between the issuing institution, which received $1.70 in interchange fees, and the acquiring institution, which receives 50 cents for processing the transaction.

---

[6]Although Visa and MasterCard only permit acquiring institutions to authorize transactions on their networks, these institutions may partner with a third-party processor or independent sales organization to directly contract with merchants.

[7]Visa and MasterCard receive payments directly from participating issuing and acquiring institutions based on processing and payment volume.

# A2649

**Figure 2: Transfer of Fees in a Credit Card Transaction**



Sources: GAO (analysis); Art Explosion (images).

Note: Individual credit transactions vary considerably, as do the terms of merchant acquiring contracts.

For transactions on the other two major card networks—American Express and Discover—generally only three parties are involved: the cardholder, the merchant, and one company that acts as both the issuing

# A2650

and acquiring entities.[8] Merchants that choose to accept these two types of cards typically negotiate directly with American Express and Discover over the merchant discount fees that will be assessed on their transactions.

Acquiring institutions provide the means for merchants to accept credit cards, by forwarding the request for authorization through the card network to the cardholder's issuing institution. The issuing institution authorizes the transaction by verifying that the account is valid and that the cardholder has a sufficient amount of credit for the sale. For merchants accepting cards in their stores, authorization generally occurs automatically through electronic point-of-sale terminals that read cards. Acquiring institutions clear and settle card purchases by providing payment from the issuing institution to the merchant's account, except for the interchange fees and their own service fees. According to industry estimates, the process takes between 24 and 72 hours for the merchant to receive payment. Acquiring institutions also assume the risks of a merchant defaulting on the promise of goods. For example, if a merchant becomes bankrupt, its acquiring institution is responsible for settling claims with the network and issuers whose cardholders are waiting for goods or services.

## Interchange Fees Represent the Largest Portion of Credit Card Payment Acceptance Fees

Interchange fees generally account for the largest portion of the fees for acceptance of Visa and MasterCard credit cards. The card networks set the fees, which vary based on several factors and generally range from 1 to 3 percent of the purchase price. Card network officials told us that they have developed lower rates to encourage certain merchants to accept their

---

[8]In the United States, since 2004 American Express has licensed a number of banks such as Bank of America to issue cards on the American Express network; however, it continues to act as the acquiring entity for merchants. Financial arrangements between American Express and third-party bank issuers are agreed upon independently, through separate bilateral agreements, and usually constitute a percentage of the transaction amount. Discover also has had card-issuing agreements with financial institutions such as GE Money Bank since 2004, and since 2006 has had merchant acquiring agreements with third parties. For transactions that occur on Discover cards issued by these third-party issuers at merchants having acceptance agreements with third-party acquirers, Discover receives interchange revenue from the acquiring institution and pays the card issuer an interchange fee.

# A2651

cards.[9] Acquiring banks and card network representatives also told us that certain merchants and transaction types are considered more risky than others and pay higher interchange fees for accepting card payments.

According to Visa and MasterCard officials, four main factors determine which interchange fee rates apply to a given transaction on their networks:

- Type of card: Different rates apply to different types of cards. Visa and MasterCard have separate interchange fee rates for general purpose consumer cards, rewards credit cards, commercial credit cards (issued to businesses), and debit cards. Debit card interchange fees generally are lower than those for credit cards. Among credit cards, premium cards such as those offering rewards and commercial cards generally have higher rates than those for standard or traditional cards.

- Merchant category: Card networks classify merchants according to their line of business. Network officials told us they develop lower interchange fee rates for industries that do not accept cards to encourage merchants in certain categories to accept cards. For example, grocery stores and utilities have lower interchange fees as a special incentive from the networks. Interchange fee rates are higher for merchants in industries such as travel and entertainment, in which network officials report customers spend more with their credit cards, providing the merchant with higher value.

- Merchant size (transaction volume): Merchants with large volumes of card transactions generally have lower interchange fee rates. Visa categorizes some merchants into three tiers based on transactions and sales volume, with top-tier merchants receiving the lowest rate. Visa and MasterCard officials told us that the lower rates also were designed to promote the use of their cards over other credit cards and forms of payment.

- Processing mode: Interchange fee rates also vary depending on how card transactions are processed. For example, transactions that occur without the card being physically present, such as on the Internet, have higher

---

[9]In addition, merchants may receive lower costs for card acceptance if they enter into a special relationship with a network or issuing bank. A co-branded card has the merchant's name and logo on it and can be used in the merchant's stores or in other locations. A private label card also has the merchant's name and logo on it, but can be used only to purchase goods and services from that merchant. Both types of cards offer incentives for merchants to promote the cards among their customer base. Representatives from large issuers told us that incentives could include a rebate on their interchange fees. We discuss co-branded card relationships in more detail later in this report.

# A2652

interchange fee rates because of the higher risk of fraud. Similarly, swiping a card through a card terminal, rather than manually entering the account number, would lower a merchant's interchange rate. The swiped transaction provides more information to the issuer authorizing the sale, and issuers and card networks consider such transactions to be less risky because the card was present.

Merchants generally learn of changes to their rates for accepting Visa and MasterCard cards through their acquiring institution. Smaller merchants generally receive one or more flat fees (known as a blended rate) for payment acceptance that include both the interchange fee and the acquiring institution's fee. For merchants with blended rates, the costs of acceptance are uniform for each card type and interchange fee rates may not be disclosed on statements as a separate fee. In contrast, larger merchants generally receive detailed statements from their acquiring institution and card processors, which include interchange fee categories, network fees, and fees from the acquiring institution. These statements reflect "cost-plus" rates, because the acquiring institution provides the merchant with the details of the costs passed on from the network along with the acquiring institution's own fees. Visa and MasterCard develop and publish interchange rate tables (available on their Web sites) that disclose the default rates that apply to various types of transactions. Visa and MasterCard typically publish new interchange schedules twice a year.

## Oversight of the Payment Card Market and Recent Legislative Initiatives

Various federal agencies oversee credit card issuers. The Federal Reserve oversees issuers that are chartered as state banks and are also members of the Federal Reserve System. The Office of the Comptroller of the Currency (OCC) supervises card issuers chartered as national banks. Other regulators are the Federal Deposit Insurance Corporation (FDIC), which oversees state-chartered banks with federally insured deposits that are not members of the Federal Reserve System; the Office of Thrift Supervision, which oversees federally chartered and state-chartered savings associations with federally insured deposits; and the National Credit Union Administration, which oversees federally chartered and state-chartered credit unions whose accounts are federally insured. As part of their oversight, these regulators review card issuers' compliance with the Truth In Lending Act (TILA)—the primary federal law pertaining to the extension of consumer credit—and ensure that an institution's credit card

# A2653

operations do not pose a threat to the institution's safety and soundness.[10] The Federal Trade Commission (FTC) generally has responsibility for enforcing TILA and other consumer protection laws for credit card issuers that are not subject to the enforcement authority of other federal regulators. To the extent that the imposition of interchange fees would constitute an anticompetitive or unfair business practice prohibited by the antitrust laws or the Federal Trade Commission Act, the Department of Justice (DOJ) and FTC, respectively, could take measures to ensure compliance with those laws.

Interchange fees are the subject of several federal legislative proposals. The Credit Card Fair Fee Acts of 2009, introduced in June 2009, would, among other things, establish a process by which merchant groups and providers of access to credit card networks could negotiate interchange fees and other terms of network participation under an exemption from federal antitrust laws.[11] The interchange fee would be made publicly available. Another proposal would require credit and debit card networks to remove constraints placed on merchants for card acceptance, such as requiring merchants to accept all cards from a particular network, and require issuers to disclose networks' fees to credit card users.[12]

---

[10]The Federal Reserve also has oversight of the debit card market under the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693, et. seq., implemented through Regulation E, which, among other things, contains disclosure requirements relating to the use of debit cards at merchant terminals. See 12 C.F.R. Part 205.

[11]This proposal was introduced as S. 1212 and as H.R. 2695.

[12]This proposal was introduced as H.R. 2382, captioned the "Credit Card Interchange Fees Act of 2009."

# A2654

## Fees Merchants Pay for Accepting Credit Cards Have Increased over Time and May Be Related to Competition for Issuers in the Credit Card Market

The amounts merchants pay to accept credit cards is increasing, as Federal Reserve data indicate that consumers increasingly use credit cards to make payments, but also because network competition in the credit card market may be contributing to rising interchange fees. As Visa and MasterCard have sought to attract new merchants to accept and issuers to offer their cards, the number of different interchange fee categories has grown. In addition, as the networks compete to attract financial institutions to issue cards on their networks, they may have increased their interchange fees to provide issuers with greater revenue from the fees. However, concerns remain over whether the level of interchange fee rates reflect the ability of some card networks to exercise market power by raising prices without suffering competitive effects, or whether these fees are the result of the costs that issuers incur to maintain their credit card programs.[13] Issuers, particularly smaller issuers such as community banks and credit unions, report relying on interchange fees as a significant source of revenue for their credit card operations, and analyses by banking regulators indicate that card activities traditionally have been among the most profitable types of activities for large banks.

---

[13]Businesses can possess market power when they have the ability to raise prices without suffering significant declines in business. The presence of market power is associated with factors in the marketplace such as a limited number of competitors and conditions that can create barriers for other businesses attempting to enter into the particular marketplace. DOJ and FTC examine the structure of the market to determine whether businesses exercise their market power in ways that are considered anticompetitive according to U.S. antitrust laws.

# A2655

**Reasons for the Increase in Merchant Card Acceptance Costs Include Consumers' Increasing Use of Credit and Debit Cards and Increases in Fee Rates**

The amount of fees that merchants pay for card transactions has been increasing in recent years, in part because of the increasing use of credit cards to make payments. The Federal Reserve recently estimated that the use of both checks and cash have declined, or at least grown more slowly than credit and debit card use, since the mid-1990s as more consumers switched to electronic forms of payment.[14] According to data from the American Bankers Association, since 2005 more than half of total retail transactions have been paid for using cards (either debit or credit).[15] Although the total value of fees that merchants paid for card transactions as well as the total value of interchange fees are not publicly available, economists at the Federal Reserve estimated that the value of interchange fees paid on Visa and MasterCard credit and debit cards has increased substantially, from about $20 billion in 2002 to approximately $35 billion to 45 billion in 2007.[16] As the total amount of interchange fees increased, so did merchants' total fees for accepting cards.

Merchants' card acceptance costs also have been increasing as a result of rising average interchange fee rates. Visa and MasterCard officials told us that their average effective interchange rates applied to transactions have remained fairly constant in recent years when transactions on debit cards, which have lower interchange fee rates, are included. However, our own analysis of Visa and MasterCard interchange rate schedules shows that the interchange rates for credit cards have been increasing and their structures have become more complex, as hundreds of different interchange fee rate categoriess for accepting credit cards now exist (see table 2). According to our analysis, in 1991, Visa and MasterCard each had 4 standard domestic credit card interchange fee rate categories, but by

---

[14]See Robin A. Prager, Mark D. Manuszak, Elizabeth K. Kiser, and Ron Borzekowski, "Interchange Fees and Payment Card Networks: Economics, Industry Developments, and Policy Issues." (Working Paper 2009-23, Federal Reserve Board Divisions of Research & Statistics and Monetary Affairs, Washington, D.C.: May 13, 2009). Data from *The Nilson Report*, an industry newsletter, indicates that since 2006, debit card purchases represent a greater share of transaction volume than credit card purchases. See *The Nilson Report*, November 2008, Issue 915.

[15]American Bankers Association/Dove Consulting. "2005/2006 Study of Consumer Payment Preferences" (Washington, D.C.: October 2005).

[16]Federal Reserve officials told us these numbers were calculated by multiplying the average interchange fee rate times the total amount of card payments for Visa and MasterCard credit, signature debit, and PIN debit cards. They noted that because they could not determine the volume of payments associated with each of the many interchange fee categories, this is a crude estimate and should be viewed as a rough approximation of the total. See Prager et al.

# A2656

2009, Visa had 60 and MasterCard had 243 different rate categories that could be charged to card transactions, although not all of these rates would apply to all merchants.[17] According to card network officials, the increase in the number of rates occurred as different types of merchants and cards were added to their interchange rate schedules. For example, the networks introduced new rates for certain industries that previously had not accepted cards (such as energy utility companies or government agencies) or for new methods of shopping (such as online purchases). In addition to the increase in the number of interchange fee rates, the maximum domestic credit card interchange fee per transaction also has increased, as shown in table 2. While some of the networks' interchange fee rates remained the same during this time and a few decreased, another reason merchant card acceptance costs are increasing may be that individual interchange fee rates also are increasing. According to our analysis, from 1991 to 2009, 43 percent of the individual Visa rates and 45 percent of the MasterCard rates that prevailed in 2009 had been increased since they were originally introduced.

**Table 2: Changes in Visa and MasterCard Domestic Credit Card Interchange Fee Rates, Numbers, and Average Rates, 1991 and 2009**

| Changes in rates from 1991 and 2009 | Visa | MasterCard |
|---|---|---|
| Number of interchange rate categories in 1991 | 4 | 4 |
| Number of interchange rate categories in 2009 | 60 | 243 |
| Range of interchange rates in 1991 | 1.25% to 1.91% | 1.30% to 2.08% |
| Range of interchange rates in 2009 | 0.95% to 2.95% | 0.90% to 3.25% |
| Percentage of rates that increased | 43% | 45% |
| Percentage of rates that stayed the same | 45% | 45% |
| Percentage of rates that decreased | 12% | 10% |

Source: GAO analysis of Visa and MasterCard interchange fees schedules.

Note: Any additional transaction fees or rates that were not based on a percentage of the total sales amount were excluded from this analysis. For example, Visa has a flat fee of 75 cents for payments accepted by utility companies. Analysis of increases or decreases in rates compared each rate when initially introduced with its level as of April 2009.

Our interchange fee rate analysis showed that the interchange fee rates that increased the most during this period were for some standard card

---

[17]Visa officials noted that some of these interchange rate categories have the same rate. In addition, they reported that at least one category was added as a processing alternative provided to acquiring institutions.

# A2657

types. For example, the rate that applied to MasterCard transactions using basic nonrewards credit cards at merchants that would not otherwise qualify for a special rate—called Merit III base—was 1.30 percent in 1991 and 1.58 percent in April 2009—representing a 22 percent increase.[18] A similar rate for Visa—known as CPS/Retail Credit—increased from 1.25 percent to 1.54 percent, or 23 percent, from 1995 to April 2009. In addition, several of the networks' higher interchange fee rates also increased during this period. For example, both networks' corporate card (issued to business customers) interchange fee rates increased considerably—Visa by 36 percent and MasterCard by 82 percent. Rates on other cards that had lower-cost incentive rates for sectors that previously did not take cards also increased. For example, MasterCard's interchange rate for standard credit cards used at a supermarket increased nearly 29 percent, from an introduction at 1.15 percent in 1998 to 1.48 percent in 2009.

Analysis by Federal Reserve staff also showed that interchange fee rates have increased, particularly for premium cards that have higher rates than basic cards.[19] As shown in figure 3, the interchange fee costs for Visa's and MasterCard's premium cards have increased about 24 percent since they were introduced in 2005. Interchange fee costs for basic credit cards have stayed roughly the same since 2005, with a 3-percent decline for MasterCard and none for Visa.

---

[18]Merchants that qualified for special rates for MasterCard included restaurants, convenience stores, supermarkets, and warehouse stores.

[19]See Prager and others.

# A2658

**Figure 3: Changes in Interchange Fee Costs from 2000 to 2009**



Source: GAO analysis based on publicly available data collected by the Federal Reserve.

Note: Interchange fees displayed assume a $40 purchase at a typical merchant. Fees are reported for each month in each year. Thicker lines are for premium cards.

Although limited information about cost trends for accepting cards exists for American Express and Discover, the rates these two networks charge have not generated the same level of concern as those of the other networks, in part because they are less widely used. Information on the rates that American Express and Discover charge merchants to accept their cards is limited; these networks do not publish the rates they charge merchants, but instead generally negotiate these charges with merchants on an individual basis. As discussed previously, American Express and Discover, for large merchants, generally serve as both the issuer and acquirer of their cards, so merchants' fees for accepting those cards represent their entire merchant discount fee. Representatives from American Express told us that they do not have interchange fees but instead contract directly with merchants for a fixed merchant discount rate for all types of American Express cards. Discover officials told us that Discover is moving from a single rate for each merchant that applies to all of their cards to a tiered interchange fee model, with higher interchange

# A2659

fees for rewards and corporate cards.[20] Although these networks do not make their merchant discount rate information publicly available, a recent survey of 750 small business owners found that merchants with fewer than 250 employees paid an average of 3.2 percent to accept American Express Cards and 2.5 percent for Discover cards, compared with the average merchant discount fee (which includes the interchange fee and acquiring costs) that these merchants reported of 2.3 percent for MasterCard and Visa.[21] According to data provided to us by American Express, the average merchant discount rate for its cards has decreased in recent years, from roughly 3.25 percent in 1990 to 2.56 percent in 2009.

## The Structure of the Card Networks and Increased Competition for Issuers May Increase the Price of Card Acceptance for Merchants

The structure of the credit card market is different from that of other markets and could be one reason why merchants' costs for card acceptance are rising. Economists and other researchers note that credit card networks function differently from most markets because the card market can be considered a "two-sided" market, in which two different groups—merchants and consumers—pay prices for goods or services offered by a producer. Other two-sided markets include newspapers, which charge different prices to consumers who purchase the publications and advertisers that purchase space in the publications. Typically, newspapers offer low subscription rate or per copy price to attract readers, while funding most of their costs from revenue received from advertisers. Charging low prices to encourage larger numbers of consumers to purchase the newspaper increases the paper's attractiveness to advertisers as a place to reach a large number of consumers, and thus allows publishers to charge such advertisers more. As a newspaper attracts more readers, it can charge higher prices to advertisers.

Similarly, card networks use interchange fees as a way to balance demand from both consumers (who want to use cards to pay for goods) and merchants (who accept cards as payment for goods). As with newspapers, the costs to both sides of the card market are not borne equally. To attract a sufficient number of consumers to use their cards, card networks

---

[20]Discover officials told us that after 2004, they were able to offer card-issuing agreements with other financial institutions. For transactions that occur on Discover cards issued by third-party issuers at merchants having acceptance arrangements with third-party acquirers, Discover receives interchange fees from the acquiring institution and also pays the card issuer an interchange fee.

[21]NFIB Research Foundation, "Credit Cards," *National Small Business Poll* 8, no. 3 (2008). Available at http://www.nfib.com/research-foundation/national-small-business-poll/.

**A2660**

compete to attract financial institutions to issue them, and institutions in turn compete to find additional cardholders. Just as readers have a variety of sources from which they can receive their news, consumers also have a number of different methods (such as cash, check, or credit card) by which they can pay for a good or service. Because of the choices consumers have available, card networks and issuers want to minimize the costs for consumers to carry their cards to encourage greater acceptance and use. In contrast, merchants have less choice about card costs, particularly once a large number of consumers are using a particular network's cards.[22] Whereas a consumer may not pay any fee or charge for using a card, card networks charge merchants for accepting cards through interchange and other network fees. Consumers' payment choices, such as using rewards cards with higher interchange fees, also affect merchants' costs for card acceptance.[23] As a result, some academic researchers have argued that card networks can keep attracting cardholders by offering them increasingly attractive terms while increasing costs to merchants, whose ability to refuse to accept cards is more limited.

The concentration of participants in the credit card network market also has raised concerns over competition and pricing. Visa and MasterCard together accounted for about 71 percent of U.S. credit card purchase volume in 2008, American Express for about 24 percent, and Discover for 5 percent, according to an industry newsletter.[24] Some economists and other academic researchers have argued that the large market share of Visa and MasterCard provides these networks with market power—the ability to raise prices without suffering significant negative competitive effects such as lost sales or reduced transaction volume. As more consumers demand to use Visa and MasterCard cards, merchants feel limited in their ability to refuse these cards even as interchange fee rates rise or as consumers increasingly use rewards cards that have higher interchange rates. These researchers cite the low market share for

---

[22]The more consumers use the network, the more attractive the network becomes to consumers, and the easier it becomes for the network to attract new customers to its cards. The increasing attractiveness of cards to consumers limits the ability of merchants to refuse that network's card, an effect known in economic theory as a network, or adoption, externality.

[23]Economists have also questioned whether consumers' payment choices appropriately affect the social costs and benefits of various payment methods. However, they note that determining whether a payment type is over or underused is extremely difficult. See Prager and others.

[24]See *The Nilson Report*, April 2009, Issue 924.

# A2661

Discover as evidence that a new product has had difficulty breaking into the mature market. With fewer cardholders, the attractiveness of this network's cards to merchants is reduced. In order for Discover or another low-cost credit card network to enter the market, it has to compete against the dominance of Visa and MasterCard, which already have successfully recruited thousands of financial institutions to issue their cards and millions of merchants to accept them.[25] Card networks face initial fixed costs, including building and maintaining the infrastructure to process transactions and promoting card usage. Many of the economists that study card market issues generally agree that card networks provide a valuable service that benefits issuers, consumers, and merchants. However, some have pointed out that once a network's initial start-up and coordination costs have been recovered, the justification for charging merchants higher prices for card acceptance is reduced.

Competition among networks for issuers also may increase merchants' card acceptance costs, as networks increase interchange fees. Although greater competition generally produces lower prices for goods and services, some economists have noted that competition among card networks instead increases costs for merchants. To maintain or increase their market share, networks compete for financial institutions to issue their cards, and the revenues that the issuers earn from interchange fees are an incentive to choose to issue one network's card over another. A recent court ruling increased the potential for competition among networks for issuers. Before 2001, Visa and MasterCard had exclusionary rules prohibiting their member institutions from issuing American Express or Discover cards. In 1998, DOJ initiated a lawsuit charging, among other things, that Visa and MasterCard had conspired to restrain trade by enacting and enforcing these exclusionary rules. The trial court held that Visa and MasterCard had violated section 1 of the Sherman Antitrust Act by enforcing their respective versions of the exclusionary rule.[26] As a result of the court's decision, an issuer of one of these network's cards now has the option to issue cards on the Visa, MasterCard, American Express, or Discover network, or a combination of them. Network officials from Visa told us that they actively compete to retain issuers on their network and interchange fees play a role in that effort. Our analysis of

---

[25]Similarly, merchants also face challenges in starting their own card network or card, because a large portion of their customers already have Visa and MasterCard brand cards.

[26]United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003), aff'g, 163 F. Supp. 2d. 322 (S.D.N.Y. 2001) and cert. denied, 543 U.S. 811 (2004).

# A2662

interchange fee rate schedules showed that Visa and MasterCard introduced several of their highest interchange fee rates after this decision, which led to a significant increase in the average interchange fee rates for both networks. According to our analysis, 46 percent of the different Visa interchange rates that prevailed in 2009 had been introduced since 2003, and the average of the new interchange rates created by that network since 2003 was 18 percent higher than the average of interchange rates introduced prior to 2003. Similarly, 89 percent of the different MasterCard interchange rates that prevailed in 2009 had been introduced since 2003, and the average of the interchange rates created by that network since 2003 was 11 percent higher. According to analysis provided by the Federal Reserve, Visa and MasterCard introduced higher interchange fee categories in 2005 for premium cards. Visa and MasterCard officials told us that Visa's "signature preferred" and MasterCard's "world card" interchange categories were limited only to higher-spending cardholders.

## Although Offering Cards Involves Various Costs, Issuers Traditionally Have Derived Significant Revenues from Interchange Fees

Issuers report that the revenue they receive from interchange fees is used to cover a variety of costs in their card programs. Establishing a credit card program by soliciting customers, offering them unsecured credit, and paying for any resulting credit or fraud losses involves many costs. Representatives from issuers and networks reported that interchange fees represent a value to merchants, as issuers' credit card programs provide merchants with increased sales and eliminate the need for merchants to create and maintain their own credit card operations or internal credit departments.[27] Among the costs that issuers told us they incur in running their credit card programs were costs related to preventing and addressing fraud and data breaches; write-offs for credit losses from delinquent or defaulting cardholders; funding costs associated with paying the merchant before receiving payment from the cardholder; paying for rewards and other cardholder benefits; and general operations, including the issuance of cards and credit card bill statements.

Although issuers incur costs for offering cards, concerns remain about the extent to which interchange fee levels closely relate to the level of card program expenses or whether they are set high so as to increase issuer profits. In a competitive market, the price of the product and the cost of

---

[27]We discuss the benefits and costs of card acceptance to merchants in more detail later in this report.

# A2663

producing it would be closely aligned. However, producers with market power—such as monopolists or those offering goods not generally offered by others—have the ability to charge high, noncompetitive prices. Representatives of issuers told us that interchange fees did not directly cover specific costs of establishing and maintaining a credit card program, but were one of several revenue sources for issuers, in addition to interest charges on outstanding balances and cardholder fees (such as a late fee or an annual fee). Representatives from a banking industry consultancy group told us that the allocation of issuers' revenue varied widely, as some issuers provide more benefits through greater rewards and others by offering more credit. For example, issuers derive revenue from cardholders who pay interest charges and other fees on their outstanding balances. However, issuers may receive little to no revenue from cardholders who pay off their balances on time. Representatives from large and small issuers told us that interchange fees provide them with income that covers the costs of providing short-term credit during the grace period and rewards benefits to those cardholders who do not pay interest charges or other fees.

Representatives of credit unions and community banks reported that revenue from interchange fees allowed them to cover expenses related to offering credit cards and compete with large issuers to offer their customers credit cards. According to data provided by the Independent Community Bankers of America, the interchange fee portion of community banks' credit card revenue varies widely, with some receiving little income from interchange fees because of inactive cards and others receiving nearly all of their income from interchange fees. Staff from this organization told us that they have contracted with a vendor processor that provides card processing for many of their members. They reported that of the 689 community banks that issue credit cards through this vendor, the average amount of revenue from interchange fees represented about 43 percent of these institutions' total card revenues. Credit unions and community banks had a higher portion of cardholders who did not carry a balance or incur penalty fees, according to representatives of financial institutions, so they had to rely more on interchange fee revenues than revenues from fee income and interest payments. Representatives of the smaller issuers also reported that they felt they had to offer rewards programs to compete with the larger issuers, but for some, rewards programs did not constitute a majority of their expenses. In addition, two of the credit unions with which we met outsourced the issuance and maintenance of a card program to a third party.

# A2664

Information on the amount of revenues larger financial institutions collect from interchange fees and how those revenues compare with their costs of card operations and rewards programs is limited. We were not able to obtain data from the largest card issuers about their revenues, profits, or expenses to compare interchange fee revenues with expenses. However, industry sources indicate that credit card issuers have derived a significant amount of revenue from interchange fees. According to an industry newsletter, in 2007, roughly 20 percent of Visa and MasterCard issuers' card-related revenue—roughly $24 billion—came from interchange fees, while their total costs (for costs of funds, charge-offs, operations, marketing, and fraud) were about $90 billion, and their profits after taxes $18.3 billion.[28] According to an economist working for the largest issuers, issuers pass on increased revenue from interchange fees to their cardholders in the form of greater rewards. He reported that from 2003 to 2008 one large credit card issuer provided an increasing portion of its interchange fee income as rewards to its cardholders and that Visa's traditional rewards, premium rewards, and superpremium interchange fee categories had minimum cardholder rewards programs associated with them. Beginning in March 2008, national and state-chartered banks had to submit data on revenues from credit and debit card interchange fees in quarterly reports on their condition and income (Call Reports) when such amounts exceeded certain thresholds.[29] However, officials from one banking regulator cautioned that they were still reviewing the consistency of the data provided on these forms.

Large issuers of credit cards traditionally have been among the most profitable banking institutions. Although credit card issuers have suffered losses in the recent economic downturn, a June 2009 Federal Reserve

---

[28]The *Card Industry Directory*, 2007 data. These data do not break out rewards as a separate cost. In addition, we were not able to verify these data with issuers. An economist from the Federal Reserve Bank of Kansas City and representatives of merchant groups have cited work by Diamond Consulting that broke down interchange fee expenses. This report estimated that of the components of interchange revenue, 44 percent went to issuer rewards and only 13 percent went to network and issuer processing. Since these data have been published, Diamond Consulting has issued a statement cautioning that these data were based on the author's views and not on data that issuers provided.

[29]The Federal Financial Institutions Examinations Council, the interagency body that prescribes uniform principles, standards, and report forms for the federal examination of financial institutions by the federal banking regulators and the state liaison committee, governs the collection of the Call Report data, but these requirements are only for banks overseen by the Office of the Comptroller of the Currency, the Federal Reserve, and the Federal Deposit Insurance Corporation.

# A2665

report points out that for large credit card banks, credit card earnings have been consistently higher than returns for all other commercial bank activities, as shown in figure 4.[30] Recent analysis by FDIC also shows that credit card lending remains a profitable business for credit card issuers, and an FDIC official recently testified that credit card lending has been one of the most profitable business lines for some time.[31] However, FDIC data also show that federally insured institutions that focus on credit card lending have lost some of their profitability in the economic downturn as these institutions experienced some of the highest rates of charge-offs.[32]

**Figure 4. Return on Assets, Large U.S. Credit Card Banks, 1986-2008 and All FDIC-Insured Commercial Banks, 1988-2008**



Sources: Federal Reserve analysis from Banks' Reports of Condition and Income, 1986-2008, *Report to Congress on the Profitability of Credit Card Operations of Depository Institutions*; GAO analysis of FDIC Quarterly Banking Profile Data, 1988-2008.

Note: Federal Reserve defines credit card banks as the bulk of their assets are individual loans and 90 percent or more of their consumer lending involves credit cards or related plans.

[30]Board of Governors of the Federal Reserve System, "Report to the Congress on the Profitability of Credit Card Operations of Depository Institutions" (Washington, D.C.: June 2009).

[31]Statement of Martin J. Gruenberg, Vice Chairman, Federal Deposit Insurance Corporation. "Credit Cardholders' Bill of Rights: Providing New Protections for Consumers" before the Subcommittee on Financial Institutions and Consumer Credit of the Financial Services Committee, U.S. House of Representatives. 110th Cong., 2nd sess. 2008.

[32]FDIC Quarterly Banking Profile, second quarter 2009.

# A2666

---

## While Competition among Issuers Has Increased Benefits and Lowered Costs for Some Cardholders, Other Consumers May Be Negatively Affected by Increased Card Use

Some consumers have benefited from competition in the credit card market, as those using credit cards enjoy lower fees and interest rates and greater rewards. Benefits to cardholders vary depending on how they use their cards; those with credit card debt accrue finance charges and may pay additional fees. However, consumers who do not use credit cards may be made worse off by paying higher prices for goods and services, as merchants pass on their increasing card acceptance costs to their customers.

---

### Cardholders Benefit from Rewards as Credit Card Issuers Compete for Their Business

Although most cards in the United States are issued by the largest issuers, consumers have a wide variety of issuers and cards to choose from. According to the Federal Reserve, over 6,000 depository institutions issue credit cards. These issuers range from some of the very largest financial institutions—such as Bank of America and Citigroup—to credit unions and community banks that range in size and can be small. While there are estimated to be thousands of credit unions and community banks that issue cards, the 10 largest issuers account for about 92 percent of all outstanding credit card debt.

Given the large number of issuers and widespread use of credit cards by consumers, issuers compete to obtain new customers and retain existing ones. According to the Survey of Consumer Finances, in 2007, 73 percent of U.S. families had a least one credit card. Issuers typically use mail solicitations to market their card products—mailing 3.8 billion solicitations in 2008—but representatives from one large issuer we spoke with told us that they can also advertise online and at their branch locations.[33] Issuers target their marketing efforts depending on cardholders' payment and use patterns. Cardholders paying their balance

---

[33] The number of mailings in 2008 represents a sharp decline from the 5.2 billion mailings in 2007 and likely reflects the effects of a weaker economy, rising unemployment, and increased credit risk among current and prospective card holders. The decline in activity may also reflect the effects of funding issues (as problems in the market for credit card-backed securitizations emerged in 2008 and may have reduced the ability of card issuers to fund their outstanding credit card liabilities at attractive rates.)

# A2667

in full each month (convenience users) and high-volume card users may be drawn to cards that offer rewards programs, while those cardholders carrying a balance may be more likely to choose a card that offers a low interest rate.

As competition for cardholders has intensified, issuers increasingly have turned to rewards programs to attract and retain cardholders. As discussed earlier, these programs are funded in part by interchange fee revenues. According to an industry study, 71 percent of cardholders held a rewards card in 2008.[34] Representatives of all of the large issuers with whom we spoke told us rewards cards represent a significant portion of the cards they offer and are designed with incentives to increase their use by cardholders. One issuer's staff told us that all of their bank's traditional credit cards that are in active status have a rewards component and they believe that rewards programs help them to build customer loyalty and to retain existing cardholders. A representative of another large issuer stated that about 51 percent of its cardholders have rewards cards, representing about 81 percent of total volume for the issuer, and a representative of another issuer reported that approximately 50 percent of its cards earn points that can be redeemed for rewards or other benefits. Visa and MasterCard also now allow issuing institutions to upgrade cardholders with basic cards to those with rewards without reissuing the card.

Competition among issuers also can lower many cardholders' credit card costs. For example, issuers compete with one another by offering cards with low interest rates. Representatives from one of the large issuers with whom we spoke stated that they typically offer these types of benefits to appeal to cardholders. For example, many issuers offer low temporary rates to transfer existing card balances to a new account. In 2006, we reported that many issuers attempted to obtain new cardholders by offering low, even zero, introductory interest rates for limited periods.[35]

---

[34]Diners Club introduced a rewards program that offered airline miles to its customers in 1984. Over time, an increasing variety of rewards have been offered to cardholders, including cash-back bonuses based on purchase volume and rewards point donations to charities, alumni associations, and environmental groups. Some issuers also began offering co-branded cards—with the merchant's and the network's name on the card—that provide discounts at the merchant with whom the issuer has established the co-branded relationship. Currently, cash-back bonuses of 3 to 5 percent are common on purchases at certain types of retailers.

[35]GAO, *Credit Cards: Increased Complexity in Rates and Fees Heightens Need for More Effective Disclosures to Consumers*, GAO-06-929 (Washington, D.C.: Sept. 12, 2006), 16.

# A2668

According to an issuer representative and industry analyst we interviewed at that time, low introductory interest rates were necessary to attract cardholders in a competitive environment in which most consumers who qualify for a credit card already have at least one. In addition to offering low interest rates, issuers compete by offering cards that have no annual fees and low fees for other actions associated with usage. These lower rates and fees can decrease the cost of using credit cards for some cardholders.

However, in recent months, changes in the economy and the passage of the CARD Act have led many issuers to "reprice" their credit card accounts by altering the rates, fees, and other terms that apply to cardholders' cards. For example, increasing numbers of consumers have been falling behind on their credit card payments. In the first quarter of 2009, the 30-day credit card delinquency rate reached its highest rate—6.6 percent—in 18 years. Provisions in the CARD Act—most of which will take effect in February 2010—limit the ability of card issuers to increase the interest rates, fees, or finance charges on outstanding balances to the conditions set forth in the act.[36] According to an industry publication, in anticipation of the law taking effect, some issuers have increased the interest rates they charge on consumer purchases as well as some of the fees associated with card usage, such as balance transfer fees. According to Federal Reserve data, interest rates on consumer credit card accounts have been increasing steadily each quarter since the second quarter of 2008, when rates were 11.88 percent.[37] Since that time, rates have increased to 13.32 percent in the second quarter of 2009.[38]

## Increased Use of Credit Cards May Not Benefit All Consumers

Increased merchant costs for card transactions may lead to higher prices for noncardholding consumers. As discussed earlier, merchants have faced increased costs from accepting credit cards in recent years, in part because of the increasing number of customers using credit cards and in

---

[36]See §101 (b) of the CARD Act, *to be codified at 15 U.S.C. § 1661i-1.*

[37]G.19 Federal Reserve Statistical Release. Consumer Credit, August 2009. (Washington, D.C.: October 7, 2009).

[38]Cardholders also can incur numerous costs associated with using their cards. Depending on how consumers use their cards, they may be assessed a variety of fees. For example, cardholders who make late payments may be charged a late payment fee. Or if a cardholder chooses to obtain a cash advance on the card, he or she may be assessed a fee for the advance. See GAO-06-929.

part because of the increase in average interchange fees, particularly from higher-fee rewards cards. Representatives of merchants we interviewed told us that they generally passed any increased costs—including the costs of accepting credit cards—on to their consumers through higher retail prices. Thus, all their customers may be paying higher prices for goods and services, whether using a credit card or not.

Economists disagree whether the increased use of rewards cards further increases costs for merchants. Some researchers state that the increased use of rewards cards, which have higher interchange fees, increase costs for merchants, as their customers switch from paying with cash, check, and basic credit cards to using rewards cards. As a result all customers, including cash and check users, may pay higher prices for goods and services. In addition, some economists have stated that because rewards cardholders do not pay for rewards cards directly, they use their rewards cards more for transactions than if their cards included explicit costs. For example, one study in which consumer survey data were used found that cardholders with rewards cards were more likely to use their cards exclusively than cardholders without rewards cards.[39]

However, the extent to which merchants increase retail prices to account for the costs associated with accepting cards is difficult to measure. Some researchers argue that consumers—even those paying cash or by check—may still be better off because of widespread card use. While merchants may pay more out of pocket to accept credit cards than they do for other forms of payment, credit cards also provide significant benefits to merchants, such as lower labor and processing costs and increased sales. For example, one of these researchers has theorized that the benefits of increased credit card use may lower merchants' costs, which in turn would allow them to sell their goods and services more cheaply.[40]

---

[39]Andrew Ching and Fumiko Hayashi. "Payment Card Rewards Programs and Consumer Payment Choice." (Federal Reserve Bank of Kansas City, Working Paper, May 13, 2008).

[40]Steven Semeraro. "The Reverse-Robin-Hood-Cross-Subsidy Hypothesis: Do Credit Card Systems Effectively Tax the Poor and Reward the Rich?" (Working Paper, San Diego, Calif., 2008).

# A2670

## Although Accepting Credit Cards Provides Benefits, Merchants Report Card Costs Are Increasing Faster and Their Ability to Negotiate or Lower These Costs Is Limited

Merchants can receive a wide range of benefits from accepting credit cards, and some merchants we interviewed reported receiving increased sales from credit cards. However, representatives of the large merchants with whom we spoke with said that their increased payment costs had not led to a corresponding increase in sales, particularly for cards with higher interchange fees such as rewards cards. In addition, these merchants reported that their ability to negotiate lower payment costs was limited by their inability to refuse popular network cards as well as network rules for card acceptance, which, among other things, preclude merchants from adding surcharges for credit card payments or rejecting higher-cost cards. Finally, although interchange fees are not regulated at the federal level in the United States, concerns regarding card costs have prompted DOJ investigations and private lawsuits, and authorities in more than 30 countries have taken or are considering taking actions to address such fees and other card network practices.

## Merchants Reported Benefits from Credit Card Acceptance Include Increased Sales, Faster Payments, and Lower Labor Costs

Merchants can receive a variety of benefits—primarily, increased sales—from accepting credit card payments. Increased sales can occur for several reasons. First, a customer without sufficient cash can make a purchase immediately using a credit card, resulting in a sale that the merchant otherwise would not have made. In addition, some research has shown that, when not paying with cash, some customers may purchase more than they would have otherwise.[41] These researchers say the additional spending occurs because paying with a card can feel less like true spending to some consumers than paying with cash. Representatives of card networks and issuers also report that consumers with rewards cards spend more because they factor in the price of the rewards they receive from their issuing institution, which also results in greater sales than the merchants would otherwise have made. One researcher noted that the amount of additional sales merchants receive from accepting credit cards can be greater for certain businesses. Customers more commonly use credit cards for large purchases and for purchases that they might not be able to pay off right away. Several of the merchants we interviewed have seen some evidence that accepting credit cards has increased their sales. For example, representatives from a national discount store and a small home improvement store told us that customers paying with credit cards spent more than customers paying with cash or debit cards. A dentist told

---

[41]See, for example, Tom Brown and Lacey Plache. "Paying with Plastic: Maybe Not So Crazy." *University of Chicago Law Review,* 73 (Winter 2006): 63-86

# A2671

us that his patients spent more on procedures because of the credit that their cards provided.

Representatives of the card networks also told us that they also are able to increase merchant sales by providing merchants with customer information to enhance their marketing efforts. For example, representatives from one card network told us that they have specific staff tasked with organizing marketing campaigns targeted to particular merchants to increase the sales these merchants make from this network's cardholders. For example, if cardholders purchased particular items, their next billing statement would include offers for additional discounts on future purchases at specific merchants that accept their card that also sell such items. The networks reported that through their respective databases, they help merchants identify and better understand their prospective, current, and lapsed customers and employ a variety of niche marketing approaches that ultimately serve to increase sales.

Accepting credit cards also allows merchants to make sales on credit at a generally lower cost than operating their own credit program. As noted previously, individual merchants originally offered credit cards that could be used only at their stores, but many such merchant programs have been discontinued now that cards issued by third parties—banks, credit unions, and thrifts—are available. Card network and issuer staff told us that credit cards allow merchants to obtain sales from customers that want to finance their purchases over time without the merchants having to incur the costs involved with offering credit. For example, they said merchants avoid the costs of credit losses, debt collection, credit quality assessment, card production, and statement preparation.

Credit card acceptance benefits merchants in other ways. For example, merchants can receive faster and more certain payment from customers using cards than from customers using other means, such as checks. Receiving the funds from a check can take as long as 5 days, but merchants can receive the proceeds from card payments from their acquiring institution in 1 or 2 calendar days.[42] For example, the dentist we interviewed told us that his credit card payments are credited to his bank account the day they are processed, providing him almost immediate

---

[42]Even though the legal maximum generally is 5 days, banks make funds available from the majority of consumer check deposits within 1 business day, according to the Federal Reserve. Federal Reserve staff noted that this maximum will change in early 2010.

# A2672

access to the funds. A small flower shop owner told us that she receives faster payments by credit card than from customers to whom she extends credit by sending a bill. Several of the merchant and banking organizations we interviewed also cited the certainty of credit card payments as a benefit to merchants. For example, the home improvement merchant noted that she preferred being paid by credit card to receiving bad checks. Similarly, a sports club owner reported that he prefers the guaranteed payment associated with accepting credit cards to the risks associated with accepting checks. Staff of an association that represents credit unions noted merchants that accept cards have less cash to handle and less risk of employee theft. Staff from a banking association noted that card acceptance reduces the need for merchants to make physical deposits, since card payments are settled directly with their financial institution. Economists have also documented the benefits of guaranteed payments to merchants.[43]

Card acceptance also can reduce the time merchants' customers spend at checkout and can reduce labor costs. For example, representatives of one large merchant told us that their analyses indicated that processing a check payment takes them an average of 70 seconds, processing a cash payment averages 51 seconds, and a credit card payment 32 seconds. Staff from card networks and card issuers told us that the efficiency of card payments has allowed merchants to reduce their staffing, thus saving on labor costs. For example, they noted that credit card customers at gas stations and other retail stores often can pay for purchases without necessarily interacting with an employee.

## Large Merchants Report Rising Use of Rewards Cards Leads to Costs That Are Not Commensurate with Benefits

Despite the benefits of payment card acceptance, representatives of several of the large merchants we interviewed reported that their costs of card acceptance have increased disproportionately in comparison with benefits, in large part because of increasing card use. Several of the large merchants we interviewed reported that as a percentage of sales, payment cards are more expensive to process than cash and checks, a fact they explained reflects the technological advances in check processing as well as a competitive market for check-processing services. They also reported that even allowing for the operational and administrative costs associated with processing cash (such as armored cars and losses by theft), credit

---

[43]See, for example, Daniel D. Garcia-Swartz, Robert W. Hahn, and Anne Layne-Farrar. "The Move toward a Cashless Society: A Closer Look at Payment Instrument Economics," *Review of Network Economics*, 5 (2) June 2006.

# A2673

card interchange fees result in credit card payments being more expensive for them overall. For example, staff from one large retail chain told us that for a $100 transaction, a credit card payment generally cost the company about 14 times as much to accept as cash. Other merchants reported that transaction costs for credit cards were two to four times more than their transaction costs for cash. Representatives from large national merchants also provided us with data showing that sales made with cash and checks have decreased in recent years—while sales made with credit cards—particularly those using high-interchange fee cards—have increased.

Although credit cards are supposed to generate increased sales for merchants in exchange for their acceptance costs, representatives of large merchants we interviewed told us that their card acceptance costs had increased faster than their sales. For example, a large home improvement retailer told us that although cards may have increased its sales in the past, this has not been occurring recently. According to its own analysis, the total cost the company has paid to accept MasterCard, Visa, American Express, and Discover cards combined increased by 16 percent from 2002 through 2008; however, sales for those same cards increased by only 10 percent during this period. Representatives of this merchant also told us that they had calculated that for every additional 1 percent their company has paid in card acceptance fees and costs, it has received 0.63 percent in additional sales. An official representing a large convenience store chain said that although he believes that a decade ago people may have spent more with credit cards than with cash or check because of the availability of credit, he no longer thinks that is true.

Several of the large merchants that we interviewed attributed their rising card acceptance costs to customers' increased use of rewards cards. Staff from these merchants all expressed concerns that the increasing use of rewards cards was increasing merchants' costs without providing commensurate benefits. For example, one large merchant provided us with data on its overall sales and its card acceptance costs. Our analysis of these data indicated that from 2005 to June 2009, this merchant's sales had increased 23 percent, but its card acceptance costs rose 31 percent. Rewards cards were presented as payment for less than 1 percent of its total sales volume in 2005 but accounted for almost 28 percent of its sales volume by June 2009. During this same period, sales processed on nonrewards cards fell by 43 percent. Several of the other large merchants we interviewed provided data that showed that the proportion of rewards cards presented as payment by their customers also had risen significantly in recent years. For example, representatives from one merchant said about 70 percent of payments on one network's cards transferred to

# A2674

rewards cards over the past 5 years, representing an increase in rewards cards use of 385 percent since rewards cards were introduced.

Further, several of the large merchants also told us that they do not always see correspondingly increased sales from rewards cards compared with other cards. For example, one large merchant provided us with data on its average purchase (ticket) size by payment means. According to our analysis of these data, in July 2005 the average ticket size for rewards cards transactions was around $203, but the average ticket size for nonrewards transactions was about $184—the average rewards card purchase exceeded a nonrewards purchase by $19, or about 10 percent, that month. However, during the 47 months from July 2005 through May 2009 for which data were available, the average ticket size for Visa rewards cards was lower than for nonrewards Visa transactions in 9 months—or about 19 percent of the time.

Although representatives from the card networks and issuers provided us with data indicating that rewards cardholders spent more than nonrewards cardholders, their analysis did not demonstrate that rewards cardholders spent more than they would have with other tender types, producing increased sales for merchants. The largest networks and issuers we interviewed provided data showing the total amount of spending by their rewards cardholders exceeded that of their nonrewards cardholders. One card network provided us with data that showed that according to its analyses, its three levels of rewards cards had higher average ticket amounts than its basic cards by over $4, almost $12, and over $26 for the highest level of rewards. However, other factors suggest that attributing increased sales to card use for merchants is difficult. For example, rewards cards generally have been offered to higher-income cardholders. Such cardholders might spend more than the average cardholder generally. Thus higher total spending on rewards cards by individual cardholders or increased ticket sizes for such cards may reflect only that those cardholders spend more in general, and not represent additional sales that a merchant otherwise would not have received. Similarly, higher total spending on rewards cards compared with spending on nonrewards cards could reflect that rewards cardholders tend to consolidate their spending on fewer cards—sometimes onto a single card—in order to maximize their ability to earn rewards. As a result, such cardholders may not be spending more overall but just limiting their payment methods. Furthermore, merchants may initiate other programs to increase sales. For example, representatives from a large national retailer told us that when the company started accepting credit cards, sales did increase, but they attributed this increase to the simultaneous introduction of promotions for

# A2675

their new products, and they did not feel that credit card acceptance added any proven incremental sales volume. This spending also may not represent additional sales to merchants. For example, some merchant officials and others told us that cardholders can buy only so much gas; they questioned whether cards actually increased gas station sales overall. Similarly, payments for certain other goods or services, such as taxes or business permits, are not likely to result in increased sales.

In addition, some of the large retailers and merchant trade associations told us that one of the reported benefits of credit card acceptance—guaranteed payment—was not always provided to merchants. These representatives also noted that merchants received significant amounts of chargebacks—in which the card issuer subtracted amounts previously credited to the merchant. Such chargebacks can occur either because of fraud or when the customer alleges that the goods were not as described or were never received. However, some of the merchants noted that researching such instances to have the charged amount reinstated is a labor-intensive process. As a result, some told us they had established minimum amounts under which they would not attempt to research and justify a charge. According to data provided by one large issuer, chargebacks as a percentage of sales on one network's cards ranged from 0.1 percent to 0.2 percent from December 2006 through June 2009.[44]

Merchants also reported bearing costs for fraud detection and prevention—another reported benefit of credit card acceptance. For example, the increased prevalence of computer hacking incidents in which criminals obtained unauthorized access to cardholder data prompted the card industry to develop the Payment Card Industry Data Security Standard.[45] According to merchants, the card networks have also mandated compliance with these standards, and merchants that fail to meet them are subject to higher interchange fees and fines of $25,000 or more. Although merchant officials acknowledged that such standards are necessary, they noted that they have had to incur significant expenses to comply with them. For example, representatives from one large merchant

---

[44]According to the issuer, these data reflect chargebacks that were accepted by the network, but not those that were rejected or adjudicated.

[45]These requirements include installing and maintaining systems to protect cardholder data; not using vendor-supplied defaults for system passwords and other security parameters; protecting stored cardholder data; and encrypting transmission of cardholder data across open, public networks.

# A2676

told us their company spent around $20 million initially to become compliant with these data security standards and has had to spend about $4 million annually to maintain that certification. Officials from another large retailer said their company also has spent millions of dollars becoming compliant with these standards. However, they said that their company has advocated increased data security for years, but noted that instead of just increasing costs for merchants to secure card information, the card networks should be developing payment types that are more secure. For example, several merchants we interviewed noted that other countries are moving away from cards that store sensitive data on magnetic stripes on the cards, which can be duplicated by criminals to create counterfeit cards, and instead are implementing cards that require the user to enter a PIN, which merchant representatives told us is more secure.

The small merchants we interviewed generally had mixed views about interchange fees and the overall cost of card acceptance. Some merchants, such as the owners of a private golf course and a flower shop, respectively, chose not to spend as much time examining their payment costs because the costs had remained either relatively constant or had not risen significantly in recent years. Finally, a few merchants noted they considered these fees as simply part of the cost of doing business.

## Although Able to Negotiate to Lower Some of Their Card-Processing Costs, Merchants Reported Limited Ability to Negotiate Lower Interchange Fees

Increased competition for acquiring services provides merchants with considerable choice and opportunities to negotiate and lower some of their card acceptance costs. As noted previously, the merchant discount fee that merchants pay to acquiring institutions has two components: the interchange fee—which represents the bulk of the total discount fee—and the processing costs. Hundreds of financial institutions and other firms compete as acquirers to provide card-processing services. Staff from merchants, issuers, and card networks told us that the acquiring market is competitive. According to a 2007 report published by the Federal Reserve Bank of Philadelphia, approximately 1.4 million merchants change acquiring institutions each year.[46] This report stated that this is the result of the merchants seeking lower prices for acquiring services and better services. According to acquirers and merchants we interviewed, acquirers provide customized acquiring services based on processing volume.

---

[46]Ann Kjos, "The Merchant-Acquiring Side of the Payment Card Industry: Structure, Operations, and Challenges," Federal Reserve Bank of Philadelphia (October 2007).

# A2677

Acquirers attract new merchant clients by pricing their services competitively and offering a variety of services to meet merchants' needs.

## Merchants Reported Acquirers Competed for Their Business and Ability to Decrease Acquiring Fees

The competition among acquirers gives merchants the opportunity to choose among competing acquirers and negotiate lower costs. Merchants of varying sizes that we interviewed reported that they have multiple acquiring institutions and processors competing for their business and have been able to successfully decrease the acquiring fee portion of their merchant discount fees in recent years. For example, several large merchants told us they periodically issue requests for proposal soliciting bids for acquiring services and receive several responses. However, some of the largest merchants told us their choice of firms that can provide them with adequate cost-processing services is generally limited to only some of the largest providers of acquiring services.

Small merchants may choose among numerous firms for processing services, including their own financial institutions. Eight of the nine small merchants we interviewed reported getting solicitations—some frequently—for their acquiring business or have shopped their acquiring business. Several of the small merchants with which we spoke used third-party processors for electronic payments. Merchants formed these business relationships with acquirers and processors through their own research, through agreements with their financial institutions, and through direct solicitations. Also, small merchants can find competitive providers on the Internet; for example, a warehouse store partners with a third-party processor to provide this service to small merchants.

## Merchants Report Limited Ability to Negotiate with Networks to Lower Majority of Card Acceptance Costs

Although merchants have reported success in negotiating their acquiring costs, several of the merchants we interviewed told us that their ability to lower their interchange fee costs was limited. These merchants told us they generally paid the rates listed in the Visa and MasterCard networks' default interchange fee schedules. Although the ability to refuse to accept Visa and MasterCard should provide merchants with the leverage to negotiate lower interchange fees, merchants reported that they could not refuse to take such cards because of customer demand. For example, several merchants told us that if they did not accept credit cards from Visa or MasterCard, their sales would decrease and they would lose business to competitors that did accept those cards.

Merchants told us that without the ability to refuse to take the two largest networks' cards, their attempts to negotiate lower fees for these networks' cards generally have not been successful in obtaining meaningful reductions in their interchange fees. According to staff from Visa and

# A2678

MasterCard, their networks are willing to negotiate with merchants. For example, officials from one network told us that their network has negotiated with merchants with sales that represent 26 percent of its overall processing volume. Only one of the large merchants we interviewed told us that the company had received a limited and temporary reduction in its interchange fee costs as a result of negotiations with Visa or MasterCard following the settlement of a lawsuit.[47] Two of the merchants we interviewed told us that they could receive reductions in interchange fee rates on one network's card if they did not accept another network's card. Other merchants told us that such negotiations were difficult for their businesses, because they had limited control over which type of credit card a customer would choose to use for a purchase.

Merchants we interviewed told us that other opportunities that Visa, MasterCard, and their issuers offered to merchants to reduce interchange fees generally have had limited success. For instance, merchants can create a co-branded card. In exchange for promoting the co-branded card, the merchant could receive compensation from the issuer or network or reduced interchange fees. However, merchants we interviewed told us that they have had limited success with co-branding because they had difficulty encouraging their own customers to switch to these cards. For example, representatives from several grocery store chains said that they have had difficulty getting customers with six to eight credit cards in their wallet to add an additional one for sales in their stores. They said that they would have to offer customers rewards to compete for purchase volume with the other cards. In addition, an owner of a convenience store chain started offering a co-branded card in 2002. He said that his stores issued a total of 2,500 cards in 7 years although the issuing financial institution anticipated that the convenience store would issue 10,000 cards annually; he told us that the rebates these cards offered—a 2-percent rebate at their stores, 1 percent on purchases elsewhere—were not competitive to his customers. Similarly, officials from a large national retailer told us that less than 1 percent of their sales were on their co-branded card. Smaller merchants we interviewed generally did not have relationships with issuers and networks. Representatives of issuers told us that the fact that merchants chose to enter into co-branded relationships was evidence that merchants receive greater sales and value from these programs.

---

[47]Determining the extent to which merchants are able to negotiate over interchange fees is difficult, as at least one merchant we interviewed did not provide us with details of the company's negotiations with the major card networks, citing contract provisions.

# A2679

In contrast to Visa and MasterCard, American Express and Discover generally act as their own acquirers and negotiate directly with the merchants accepting their cards. For example, representatives from American Express told us they negotiate a merchant discount rate directly with merchants for 1 to 5 year terms. While technically each merchant has a separate contract and rate, American Express officials noted that for many types of merchants, a standardized rate applies depending on transaction volume, with higher-volume merchants likely to pay less. The Discover card network conducts direct negotiations with large merchants and sets the merchant discount rates based upon these negotiations rather than publishing a schedule. Both the networks also use third-party acquirers that negotiate with the smaller merchants on behalf of their networks. As discussed previously, these networks have a lower market share than Visa and MasterCard, so merchants have greater ability to refuse to take such cards and a greater ability to negotiate costs and terms. Representatives of two of the grocery store owners we interviewed said that they had greater success in negotiating with American Express and Discover because these networks had lower market share and were trying to gain wider acceptance.

**Merchants View Network Rules as Further Limiting Their Ability to Negotiate Payment Costs**

Another factor that limits the leverage that merchants have to negotiate lower interchange fees are the card network rules. Each of the major card networks—Visa, MasterCard, American Express, and Discover—has various card acceptance rules that limit the options that merchants have for accepting or denying cards.[48] These rules include the following:

- No surcharges: Merchants may not impose a surcharge on consumers for the use of credit cards or cards with higher interchange fees.

- Honor all cards: Merchants are required to accept all credit cards within a network's brand.

- No discrimination/differentiation: Merchants may not differentiate between cards within a network or discourage the use of cards within a network.

---

[48]Not all of the networks have each of these rules, but if a merchant accepts cards from each of these networks, the merchant is subject to all of them. Visa, MasterCard, and American Express have posted some of their rules on their Web sites; Discover's rules are not available online.

# A2680

- No minimum or maximum charges: Merchants may not impose a price floor or price ceiling on credit card transactions.

- Preferred treatment: Merchants may not direct consumers away from or to a certain network's cards.

Merchants, some academic researchers, and merchant representatives argue that these rules constrain merchants' ability to limit the costs of credit card acceptance. For example, without the ability to surcharge for credit cards generally, for a particular network's cards, or for higher interchange fee cards, merchants are unable to steer customers toward lower-cost forms of payment or recoup some of their costs for higher-cost cards. In addition, without the ability to influence customers' payment choices, merchants are unable to use their influence with the networks to encourage them to lower interchange and other fees in general, or offer more lower-fee cards. Merchants also told us that the rule requiring them to accept all cards from a network means that they are forced to accept higher-cost cards. Some of the merchants with which we spoke told us that the inability to set minimum credit card purchase amounts meant that they sometimes incurred card-processing costs that made some sales uneconomical. For example, one merchant told us that when a customer pays for a small item, such as a newspaper or a pack of gum, with a rewards card, the costs to process the transaction could exceed profit on the item. The rules provide cardholders with the ability to use any card at any accepting merchant. However, cardholders may not realize that different cards can affect merchant costs to different degrees because merchants cannot take actions that either limit cardholders' ability to use certain cards or otherwise differentiate among cards.

Representatives of issuers and card networks told us that the network rules are designed to promote the wide acceptance of their cards and ensure that their cardholders have a positive experience with the card. For example, they told us that the "honor all cards" rule ensures that merchants will accept all cards from a particular network brand, which ensures that even the cards from smaller, lesser-known issuers such as credit unions and small banks are accepted. Issuers and card network representatives also told us that surcharges are illegal in some states and would diminish cardholders' expectations for the use of their card.[49] They

---

[49]The states that prohibit surcharging for credit cards include California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, and Texas.

# A2681

said that such prohibitions were intended to eliminate bait-and-switch tactics, in which merchants would advertise a low price, only to increase it at the point of sale if the customer used a credit card.

**Although the United States Does Not Regulate Interchange Fees, Card Cost Concerns Have Prompted Investigations, Lawsuits, and Actions in Other Countries**

Interchange fees are not regulated at the federal level in the United States. The Federal Reserve, under TILA, is responsible for implementing requirements relating to the disclosure of terms and conditions of consumer credit, including those applicable to credit card fees.[50] The various depository institution regulators—Federal Reserve, OCC, FDIC, Office of Thrift Supervision, and National Credit Union Administration—conduct examinations that can address how banks, thrifts, and credit unions that issue credit cards are complying with the TILA card disclosure requirements.[51] However, Federal Reserve staff told us that because interchange fees are paid by merchants' financial institutions and not directly assessed to consumers, such fees are not required to be disclosed to consumers. Staff from some of the banking regulators told us that they do not review the level at which interchange fees are set during their examinations, but instead review interchange fees as a revenue source for the institutions or the effect they may have on the financial stability of the issuer. Additionally, through the Federal Financial Institutions Examinations Council, the regulators also conduct annual examinations of the card networks to ensure that these entities are adequately managing the operational risks involved with card processing to ensure that such operations are conducted so as to reduce the potential for them to create financial problems for their institutions. Such examinations are done as a part of a program to review the activities of vendors or processors that provide services to depository institutions. Regulator staff told us that their oversight does not involve assessing how the networks set interchange fees.

Although no U.S. entity specifically regulates credit card interchange fees, card networks' practices can be subject to regulatory action by authorities responsible for enforcing competition laws. In the United States, DOJ and FTC have jurisdiction over credit card networks and issuers as part of enforcing U.S. antitrust laws or the Federal Trade Commission Act. As a

---

[50]See Federal Reserve Regulation E, 12 C.F.R. Part 226. TILA is set forth in Title I of the Consumer Credit Protection Act. See 15 U.S.C. § 1601, et. seq.

[51]FTC generally has responsibility for enforcing TILA and other consumer protection laws for credit card issuers that are not depository institutions.

result, DOJ and FTC can investigate if the imposition of interchange fees or other network or issuer practice constitutes an anticompetitive or unfair business practice prohibited by these laws.

The card networks' practices, including interchange fees, have been the subject of past and current investigations under these laws. As discussed previously, in 1998, DOJ sued Visa and MasterCard for alleged antitrust violations regarding, among other things, how these networks' rules in effect prevented issuers from issuing cards on their competitors' networks.[52] The court found that Visa's and MasterCard's "exclusionary rules," which prohibited member institutions from issuing cards by Discover and American Express, were a substantial restraint on competition in violation of the Sherman Act. Although the networks' imposition of interchange fees was specifically not the subject of the DOJ action, the trial court concluded that Visa and MasterCard had market power in the market for network services, citing large market shares in a highly concentrated market.[53] DOJ officials reported that they currently have another investigation under way in which they have been reviewing whether some of the networks' rules are anticompetitive. As discussed earlier, these rules include those that prevent merchants from steering customers to other forms of payment, levying surcharges for card transactions, or discriminating against cards by type. DOJ staff told us they have requested information from American Express, Discover, MasterCard, and Visa as part of this investigation. They were not able to provide an estimate for when any formal action resulting from the investigation might occur.

Interchange fees and other card network practices also have been the subject of private lawsuits. Since the mid-1980s, various lawsuits alleging problems with interchange fees and other card network practices have been litigated, as described in table 3.[54] As of September 2009, a class action was pending in the United States District Court for the Eastern District of New York, in which merchants claim that interchange fees have an anticompetitive effect that violates the federal antitrust laws. This case

---

[52]See United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003), aff'g, 163 F . Supp. 2d. 322 (S.D.N.Y. 2001) and cert. denied, 543 U.S. 811 (2004).

[53]344 F.3d at 240.

[54]For more information on these cases, see GAO, *Credit and Debit Cards: Federal Entities Are Taking Actions to Limit Their Interchange Fees, but Additional Revenue Collection Cost Savings May Exist,* GAO-08-558 (Washington, D.C.: May 15, 2008), 56.

# A2683

is a consolidation of at least 14 separate lawsuits against Visa and MasterCard and their member institutions that had been in four separate districts.[55]

**Table 3: Litigation Involving Card Network Practices**

| Date | Issues involved in litigation | Outcome |
|------|-------------------------------|---------|
| Mid-1980s | NaBanco–a third-party credit card processor—alleged that interchange fees constituted unlawful price fixing and had an anticompetitive effect.[a] | The court ruled that NaBanco failed to prove that the interchange fee at issue was an unlawful restraint of trade. |
| 1993 | In re Visa Check/Mastermoney Antitrust Litigation (Wal-Mart case)–Visa and MasterCard rules requiring merchants to accept debit cards as a condition of accepting credit cards were challenged by merchants as unlawful tying and devices to impose anticompetitive interchange fees.[b] | The case was settled in December 2003. |
| 1998 | DOJ case–Action included claim that Visa and MasterCard violated the Sherman Antitrust Act by enforcing their respective versions of a rule barring their member institutions from issuing American Express or Discover cards.[c] | The court found Visa's and MasterCard's exclusivity rules were a restraint on competition in violation of the Sherman Act. |
| 2008 | Kendall Decision—Merchants alleged that the defendants (Visa, MasterCard, Bank of America, Wells Fargo Bank, and U.S. Bank) conspired to set merchant discount fees and interchange fees in violation of Section 1 of the Sherman Act and Section 16 of the Clayton Act.[d] | The claim was dismissed because it failed to allege facts sufficient to establish a conspiracy. |

Sources:

[a]National Bancard Corp. v. Visa U.S.A., Inc. 596 F. Supp. 1231 (S.D. Fla. 1984), aff'd, 779 F.2d 592 (11th Cir. 1986).

[b]In re Visa Check/Mastermoney Antitrust Litig., 396 F.3d 96 (2d Cir. 2005), aff'g 297 F. Supp. 2d 503 (E.D.N.Y., 2003).

[c]United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003), aff'g, 163 F . Supp. 2d . 322 (S.D.N.Y. 2001), Cert. Denied, 543 U.S. 811 (2004).

[d]Kendall v. Visa U.S.A., Inc., 518 F.3d 1042 (9th Cir. 2008), aff'g 2005 U.S. Dist. LEXIS 21450 (N.D. Cal., July 25, 2005).

[55]In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 2006 U.S.Dist. LEXIS 45727; 2006-1 Trade Cas. (CCH) P75,278 (E.D.N.Y.).

# A2684

While interchange fees are not regulated in the United States, as of September 2009, more than 30 countries have acted or are considering acting to address competition or card cost concerns involving payment cards.[56] Some actions taken by these countries include the following:

- regulating relationships between merchants and issuers and card networks, such as prohibiting card networks from imposing certain rules on merchants;

- establishing maximum interchange fees or capping average interchange fees;

- allowing more institutions to enter the credit card market by changing the requirements to allow more institutions to qualify to act as issuers or acquirers; and

- conducting investigations into the functioning of the payment card market, including legal antitrust proceedings.

For example, authorities in Australia have taken various actions regarding credit card interchange fees and other card network practices since 2003 (see sidebar). In recent years, the European Commission has undertaken proceedings against card networks and set caps on cross-border interchange fees—those applying to card transactions in which a card issued in one country is used to make a purchase in another country—that affect transactions occurring in 31 European countries.[57] In 2007, the New Zealand Commerce Commission initiated proceedings against Visa and MasterCard and issuers of their cards that alleged price-fixing in the setting of fees. This resulted in an August 2009 settlement that included various actions affecting Visa cards, including directing acquirers and issuers to bilaterally negotiate interchange fees instead of having the

---

**History of Credit Interchange Fee Reform in Australia**

After a government study reported that interchange fees were above levels that could be justified, the Reserve Bank of Australia (RBA) took various actions, beginning with capping the average interchange fees Visa and MasterCard charged. In 2003, Visa and MasterCard were required to reduce their interchange fees from a weighted average of about 0.95 percent to about 0.5 percent and to eliminate rules restricting merchants' ability to impose surcharges for credit cards, In addition, beginning in 2007, these networks had to allow merchants to accept only credit or debit cards from a network, and allow merchants to steer their customers toward lower-cost forms of payment. Credit card payments have continued to grow, but at a slower rate than before these changes, as more consumers switched to debit cards. RBA studied the impact of these reforms and issued a report in September 2008 in which regulators concluded that the reform program had achieved its main objectives of improving competition in the payment card market and providing consumers with more information about the costs of various types of payment. In August 2009, RBA issued a statement that it would continue to regulate interchange fee rates at 0.5 percent.

---

[56]Federal Reserve economists and others report that these countries include Argentina, Australia, Austria, Brazil, Canada, Chile, Colombia, Denmark, Finland, France, Germany, Hungary, Israel, Italy, Mexico, New Zealand, Norway, Panama, the People's Republic of China, Poland, Portugal, Romania, Singapore, South Africa, South Korea, Spain, Sweden, Switzerland, Turkey, the United Kingdom, as well as others in the European Commission. See Terri Bradford and Fumiko Hayashi, "Developments in Interchange Fees in the U.S. and Abroad" (Payments System Research Briefing, Federal Reserve Bank of Kansas City, April 2008) and GAO-08-558.

[57]These countries are part of the European Economic Area, which includes the 27 members of the European Union as well as the members of the European Free Trade Association (Iceland, Liechtenstein, Norway, and Switzerland).

# A2685

network set them, removing that network's "no surcharge" rule and "no steering" rules, and allowing nonbank organizations to participate in the market as issuers or acquirers. Other countries are considering taking actions. For example, in June 2009, Canada's Standing Committee on Banking, Trade and Commerce reported the results of an investigation into this market, and recommended a number of actions, including permitting merchants to surcharge and steer customers toward low-cost payment methods, requiring merchants to disclose interchange fees to consumers, and prohibiting card networks' "honor all cards" rules.

## Although Various Options to Lower Interchange Fees Exist, Impacts on Cardholders Could Be Mixed and Each Option Has Implementation Challenges

Concerns about the rising costs of card acceptance for merchants have led to regulatory measures in some foreign jurisdictions and legislative initiatives in the current U.S. Congress. These options generally have involved one or more of the following approaches: (1) setting or limiting interchange fees; (2) requiring their disclosure to consumers; (3) prohibiting card networks from imposing rules on merchants, such as those that limit merchants' ability to discriminate among different types of cards or levy a surcharge for credit cards; and (4) granting antitrust waivers to allow merchants and issuers to voluntarily negotiate rates. Industry participants and others cited a variety of advantages and disadvantages associated with each option and suggested that the categories of stakeholders—such as merchants or issuers or large merchants versus small merchants—would be affected differently. They also noted that, in some cases, the ultimate impact of the option was not clear. A more detailed discussion of industry participants and others' views on the merits of each of the options can be found in appendix II.

Each of these options is designed to lower merchants' costs for card acceptance. For example, setting or capping interchange fees would limit the amount of interchange fees charged to merchants. Both RBA and the European Commission have used this approach, and regulators in other countries have worked with Visa and MasterCard to voluntarily reduce their interchange rates. Requiring the disclosure of interchange fees could lower merchants' fees if consumers changed their behavior after seeing the different costs associated with different forms of payment, and shifted from higher-cost forms of payment such as rewards and other credit cards toward less expensive forms of payment, such as debit cards. The option to eliminate certain network rules, such as the no-discrimination or no-surcharge rule, could allow merchants to either refuse to accept higher-

# A2686

cost cards or receive additional revenue from the consumer to help cover the costs of the interchange fees.[58] For example, a study of surcharging in the Netherlands reported that when merchants placed a surcharge on payment cards, customers there used that form of payment less often.[59] The ability to take these actions could provide merchants with bargaining power to more effectively negotiate with the card networks and issuers over interchange fee rates, even in merchants did not exercise this ability. Refusing to take certain cards issued by a network, such as those with higher interchange fees, could prompt networks and issuers to reduce the prevalence of such cards. Direct negotiation between merchants and issuers under an antitrust waiver also could grant merchants increased bargaining leverage in negotiating interchange fee rates and terms, with a goal of lower costs to merchants.

If interchange fees for merchants were lowered, consumers could benefit from lower prices for goods and services, but proving such an effect is difficult, and consumers may face higher costs for using their cards. With lower card acceptance costs, merchants may pass on their interchange fee savings through lower prices to consumers; however, the extent to which they would do so is unclear.[60] As discussed previously, consumers—even those paying with cash and by check—may be paying higher prices because of merchants' increased costs of interchange fees. By capping interchange fees, RBA estimates that fees to merchants were lower by about 1.1 billion Australian dollars for the period of March 2007 through February 2008, but officials acknowledged that it would be very difficult to provide conclusive evidence of the extent to which these savings have resulted in lower retail prices because so many factors affect such prices at any one time. Moreover, the degree of savings depends on whether or not merchants are increasing their prices because of higher interchange fee costs. Some merchant representatives we interviewed told us that merchants would take different steps to improve customer service if interchange fees were lowered, such as hire more employees. Customers

---

[58]Use of this option would have to be reconciled with state laws that, as previously noted, prohibit surcharges on credit card use.

[59]See Wilko Bolt, Nicole Jonker, and Corry van Renselaar, "Incentives at the Counter: An Empirical Analysis of Surcharging Card payments and Payment Behaviour in the Netherlands," (Working paper, De Nederlandsche Bank, December 2008).

[60]Federal Reserve economists noted that the extent to which merchants would pass on their interchange fee savings likely would depend on the competitiveness of the markets in which the merchants operate.

also may not experience lower prices if merchants' overall costs do not decrease. Several industry participants speculated that if merchants were allowed to refuse higher-cost cards, merchants would lose sales from customers using premium credit cards, who, network and issuer officials told us, spend more than customers using basic credit cards. A study of the Australian reforms by several economists reported that because the actual decrease in merchant costs was very small, merchants may have hesitated to lower prices, especially when their other costs might have been changing.[61]

Lowering interchange fee revenues for issuers could prompt issuers to increase cardholder costs or curtail cardholder credit availability. In Australia, issuers reduced rewards and raised annual fees following that country's interchange fee cap. In addition, with less interchange fee income, representatives of smaller issuers such as community banks and credit unions told us that they likely would not offer rewards cards and therefore would be unable to compete with the larger issuers in the market. One credit union official told us that the credit union could not offer credit cards because of the expense involved with running such a program. In addition, representatives of credit unions and community banks we interviewed said that they benefited from a network system that developed interchange rates to attract both merchants and issuers. Allowing merchants to refuse certain cards or negotiate rates directly with the issuers would eliminate smaller institutions from the process. Representatives of larger issuers told us that with less revenue from interchange fees, they would consider reducing the amount of credit they make available to their cardholders. Australian officials reported that since their reforms were instituted, the number of credit card accounts in Australia has continued to increase and smaller credit unions have remained in the credit card business, albeit with some of their operations outsourced.

Each of these options for lowering card fee costs presents challenges for implementation that would need to be overcome. For example, if interchange fees were capped or limited, an oversight agency or organization would have to be designated to determine how and to what level such fees should be set. In addition, economists and other

---

[61]See Howard Chang, David S. Evans, and Daniel D. Garcia-Swartz, "The Effect of Regulatory Intervention in Two-Sided Markets: An Assessment of Interchange-Fee Capping in Australia," *Review of Network Economics*, 4(4). December 2005, 328-358.

# A2688

researcher noted that determining an optimal level that effectively balances the costs and benefits among the networks, issuers, merchants, and consumers would be very difficult to do. When Australian officials set their interchange fee cap, they did so based on their assessment of the benefits and costs of different payment methods, but they also told us that many years of data would be needed to determine the effectiveness of the rate cap. If interchange fees were disclosed to consumers, issuers and merchants said that consumers might find the additional information confusing, and some merchants said that their cashiers might not be able to clearly communicate the correct interchange fee for the specific transaction. For the option that would allow merchants to discriminate among cards and add a surcharge for more expensive credit card transactions, merchants said that it would be difficult for them to determine which cards carry higher interchange rates.[62] Finally, the proposal to allow merchants to directly negotiate with issuers raised several issues from the industry participants we interviewed. They said that such negotiations could harm small merchants and small issuers, which do not have as much leverage as larger participants and, in some cases, lack the resources to participate in bargaining sessions. In addition, prudent exercise of this option would require an exemption from federal antitrust laws, which include provisions designed to protect consumers from the consequences of agreements in restraint of trade. DOJ officials have expressed their historical opposition to efforts to create exemptions to antitrust laws, stating that these exemptions should be used only in the rare instances in which a public policy objective compellingly outweighed free market values.

Although each option had advantages and disadvantages and difficulties in implementation, removing the networks' antisteering rules and restricting interchange fees with a cap or other limit were the two options that appeared to receive the most support from the large and small merchants and merchant trade associations with which we spoke. Removing the antisteering rules appears to have various advantages, including providing merchants with the ability to send signals to cardholders about which cards increase merchant acceptance costs, a change that could improve merchants' leverage in negotiating their payment costs. Merchants' ability to surcharge or refuse certain cards also could cause cardholders using rewards cards to be more aware of and to bear more of the cost of the

---

[62]As discussed earlier, Visa and MasterCard allow issuers to upgrade a card to a rewards status with higher interchange fee without issuing the cardholder a new card.

# A2689

rewards from which they currently benefit. This option also may require the least intervention, as merchants could decide whether to add surcharges or refuse certain cards based on their own customer mix. In addition, the potentially anticompetitive effects of these rules are also the subject of the current DOJ investigation and some of the private lawsuits. A significant advantage of capping or limiting interchange fees would be that it would reduce interchange fee costs most directly. The experience in Australia indicates that this option does lower merchant costs and Australian regulators and merchant representatives insist that consumers have also benefited, arguing that merchants in competitive markets generally lower prices. The main challenges to implementing this option are determining the right level of reduction, such as capping interchange rates at a level below that of rewards cards, and tailoring the change to avoid unintended effects on other networks or on smaller issuers.

## Agency Comments and Our Evaluation

We provided a draft of this report to the Department of Justice, the Board of Governors of the Federal Reserve, the Federal Trade Commission, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision for their review and comments. Through informal discussions, staff from DOJ, the Federal Reserve, Federal Deposit Insurance Corporation, and the National Credit Union Administration noted the quality of the report. Each of these agencies, as well as the Office of the Comptroller of the Currency and the Office of Thrift Supervision, also provided technical comments that were incorporated where appropriate. Federal Trade Commission staff noted they had no comments on the report.

We are sending copies of this report to interested congressional committees and members, the Department of Justice, Federal Trade Commission, Board of Governors of the Federal Reserve, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and other interested parties. In addition, this report will be available on our Web site at http://www.gao.gov.

**A2690**

If you or your staffs have any questions about this report, please contact me at 202-512-8678 or cackleya@gao.gov. Contact points for our Office of Congressional Relations and Office of Public Affairs can be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix III.

Alicia Puente Cackley
Director, Financial Markets and
    Community Investment

# A2691

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to describe (1) how the fees merchants pay for accepting credit cards have changed over time and the factors affecting the competitiveness of the credit card market, (2) how credit card competition has affected consumers, (3) the benefits and costs to merchants of accepting cards and their ability to negotiate those costs, and (4) the potential impact of various options intended to lower merchant card fee costs.

To assess how the fees merchants pay for accepting credit cards have changed over time, we reviewed relevant literature and analyzed available data on interchange fee rates provided by Federal Reserve staff, a large merchant, and a large credit card processor. To describe the factors affecting the competitiveness of the credit card market, including how credit card competition has affected consumers and merchants, we summarized economic and other academic literature. Our literature review built upon key studies to which experts we interviewed referred and which we found by reviewing research databases such as Econlit and through general Internet searches. In our literature review, we sought to summarize a diverse body of literature that described various views on the economics and policy implications of interchange fees. We also interviewed representatives and analyzed data from the four major credit card networks (American Express, Discover, MasterCard, and Visa) and several banking and acquiring trade associations, the members of which include large and small institutions that participate in the credit card system: the American Bankers Association, the Electronic Transfer Association, the Independent Community Bankers of America, the Credit Union National Association, and the National Association of Federal Credit Unions. In addition, we conducted interviews and analyzed data from three of the largest credit card issuers as measured by total outstanding credit card loans, as of December 31, 2007, in the *Card Industry Directory* and three of the largest credit card acquirers in the United States.[1] We also met with representatives of several small credit unions and community banks that issue credit cards. However, public information on interchange fee revenue, card issuers' costs, and other quantitative data from card networks and issuers is limited and ongoing litigation limited these entities' ability to share such information with us.

---

[1]*Card Industry Directory: The Blue Book of the Credit and Debit Card Industry in North America*, 20th ed. (Chicago, Ill., 2008)

# A2692

To learn more about merchants' costs for accepting credit cards, we consulted relevant literature and interviewed and reviewed payment cost data provided by several merchant trade associations, large national retail merchants, and small merchants from two local Chambers of Commerce. We met with officials from the National Retail Federation, the National Grocers Association, the Food Marketing Institute, the National Association of Convenience Stores, the Retail Industry Leaders Association, and the Small Business and Entrepreneurship Council. We met with representatives of 10 of the largest retail merchants in the United States; 8 of these represented 42 percent of the wholesale and retail trade industries listed in the S&P 500 in 2008, as well as one privately owned large company and one publicly traded large company that were not listed on the S&P 500. We selected the wholesale and retail categories because merchants in these industries accept and receive payments from consumers. We also selected small merchants to interview from the Washington, D.C., and Springfield, Virginia, Chambers of Commerce. These merchants represented a diverse group of businesses, including boutique shops, sports clubs, and a health care professional. In addition, we interviewed representatives of other organizations from across the country that accept payments from consumers, including hospital owners, utility companies, and a city government official. Although we selected merchant representatives to provide broad representation of merchant experiences with accepting credit cards, their responses may not be necessarily representative of the universe of small and large merchants. As a result, we could not generalize the results of our analysis to the entire market for merchant experiences with accepting credit cards and paying interchange fees. Where possible, we obtained information from card networks about benefits to merchants.

To describe the regulation of interchange fees both in the United States and in other countries, we met with officials from the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, and the National Credit Union Administration. We also reviewed studies of the impact of interchange fee reforms in other countries, and interviewed officials from the Reserve Bank of Australia on their actions related to interchange fees because Australia was one of the first countries to act, and sufficient time has passed to allow information on the impact of their actions to be available. To discuss federal antitrust activities, we interviewed officials from the Department of Justice and the Federal Trade Commission and updated our summary of major federal antitrust actions surrounding interchange rates from our 2008 report. Our interviews with industry participants, academics, and regulators also

# A2693

---

---

provided us with an understanding of the potential impact of various proposals to lower interchange fees.

Quantitative information used in this report was attributed to its source and supported by other corroborative evidence, such as industry sources, federal regulatory data, or interviews. In some instances we were able to do some testing of the data. We believe that these data are sufficiently reliable for the purposes of showing general trends in the credit card industry and merchant experiences with accepting credit card payments.

We conducted this audit in Washington, D.C., from May 2009 to November 2009, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Review of Options to Regulate Interchange Fee Rates and Terms of Credit Card Acceptance

| | |
|---|---|
| **Option 1: Limiting or Capping Interchange Fees** | Options to address increasing costs of interchange fees include setting or limiting interchange fees, with the intent of lowering costs for merchants and, potentially, consumers. For example, a regulatory agency could cap interchange fees at a single rate or an average rate or work with industry participants—such as networks, issuers, and merchants—to decrease the fees. Some countries have limited interchange fees using such methods. The Reserve Bank of Australia (RBA) has set a limit under which the weighted average of MasterCard and Visa interchange fees must fall. The European Commission recently reached an agreement with MasterCard that limits the average interchange fees that it can charge for cross-border transactions (purchases made in one country using a credit card issued in another) in the European Union. In addition, governments in other countries, such as Mexico, have worked with industry participants to voluntarily decrease interchange fee rates.[1] |

Merchants could realize lower costs if interchange fees were limited.[2] As discussed previously, many merchants are concerned that their interchange fee-related expenses have increased significantly in recent years. Some merchants in very competitive industries, such as retail and gas stations, told us that because they were unable to increase prices to cover increases in their interchange fees, their slim profit margins had further decreased in recent years. A representative of one franchise told us that even if interchange fees were capped at their current rates, this cap would help ensure long-term profitability.

Furthermore, consumers might benefit if merchants passed on their savings through lower prices. However, many industry participants acknowledged that it would be difficult to prove a direct link between lower interchange fees and lower consumer prices. Merchants and representatives of merchants in the retail industry have argued that because retail is one of the most competitive industries, retailers would have to lower prices if their interchange fee-related costs decreased. However, other industries may face pricing constraints. For example, representatives of two utility companies told us that they could not change

---

[1]For a discussion of changes in Australia, Israel, and Mexico, see GAO-08-558.

[2]Overall merchant discount fees may not decrease if card networks, issuers, or acquirers respond to decreased interchange fees by increasing other fees that make up total merchant discount fees. In addition, American Express and Discover do not have interchange fees. However, representatives of both card networks told us that that fee limits likely would affect them indirectly because they would have to decrease their merchant discount fees to compete with the other card networks.

# A2695

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

their prices without first getting approval from their respective regulatory bodies. Several economists have argued that the ability of merchants to pass on their savings from lower interchange fees would depend heavily on the respective merchants' size and market share, as well as other factors. While the amount of the price reduction might depend on these factors, some studies have demonstrated that a reduction in retailer costs in the competitive gasoline industry can lead to savings for consumers.[3] The Reserve Bank of Australia has estimated that savings to Australian consumers from decreased interchange fees and other interchange reforms likely exceeded 1.1 billion Australian dollars for the period of March 2007 to February 2008, but officials acknowledged that it would be very difficult to provide conclusive evidence of these savings. Others have argued that Australian merchants have not passed savings on to consumers, some of them citing economic literature that argues that such a reduction in merchant costs would not affect retail prices very quickly, even in the context of extensive competition.[4]

In contrast, limiting interchange fees could decrease the interchange revenues of issuers, but the impact on issuers would depend largely on the way in which the option is implemented. For instance, if an interchange fee cap were set at a level significantly below the current rates and applied to all interchange fees charged, then all issuers could be affected. But a cap also could be set at a relatively high rate, such as at the maximum rate for standard credit cards, or certain issuers could be excluded from the regulation. Card issuers, especially small issuers, oppose any option that would decrease their interchange fee revenues significantly. According to some industry participants, smaller issuers such as credit unions and community banks rely more heavily on such revenue than large banks, which receive more income from interest and other cardholder fees. Representatives of a credit union association told us that revenue from interchange fees made up over 20 percent of most credit unions' total card revenues. Several representatives of community banks and credit unions told us that they likely would not be able to offer rewards cards without

---

[3]For example, see Severin Borenstein, A. Colin Cameron, and Richard Gilbert. "Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes?" *The Quarterly Journal of Economics*, 112, no. 1 (February 1997): 305-339.

[4]See Robert Stillman and others. "Regulatory Intervention in the Payment Card Industry by the Reserve Bank of Australia: Analysis of the Evidence," CRA International (London, United Kingdom: Apr. 28, 2008).

# A2696

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

the revenues they received from interchange fees, and not offering such cards would decrease their overall ability to compete with larger banks.

In addition, many industry participants and others agreed that the costs of card acceptance might shift from merchants to cardholders if interchange fees were limited, card surcharges permitted, and interchange revenues decreased. However, they did not agree on whether the shift would be positive or negative. Some researchers have argued that such a shift would lead to more efficient outcomes, because cardholders would pay for the benefits—such as rewards—that they enjoyed. Or, as some economists have noted, cardholders faced with higher costs for using their credit cards might change their behavior by using rewards cards less frequently and opt for alternative payment methods such as debit cards, which could result in lower costs for merchants. Other economists have argued that any consumer savings from lower prices would not be sufficient to offset the negative impacts on cardholders. Representatives of issuers and card networks we interviewed told us that this option would affect cardholders negatively, because issuers likely would respond to their reduced interchange fee income by increasing cardholders' annual fees and other user fees, decreasing the value of rewards points, and possibly increasing interest rates and decreasing available credit. In Australia, cardholders' benefits as a portion of spending dropped an average of 23 percent from 2003 to 2007 following the interchange fee reforms.[5]

Moreover, a limit on interchange fees could affect merchants negatively if this option led to decreased overall retail sales or available credit. Some industry participants and others pointed to studies that illustrate that consumers tend to spend more when paying with credit cards than when using other payment methods, and that rewards cardholders spend even more than nonrewards cardholders. If consumers shifted from using rewards cards in response to decreased rewards and increased annual and user fees, merchants might realize lower sales revenues overall. Issuers, if faced with lower interchange fee revenues, could decide that some credit card programs were too expensive to maintain and might cut credit to cardholders, including merchants that depend on credit to finance business expenses. For example, the results of the National Small Business Poll indicate that about 74 percent of small businesses use

---

[5]Source: GAO analysis based on data presented in RBA, "Reform of Australia's Payment System: Issues for the 2007/2008 Review." (Sydney, Australia: May 2007).

# A2697

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

business credit cards and about 39 percent use personal credit cards for business purposes.[6]

If the fee limit option were chosen, a challenge for implementation would be setting and maintaining interchange fees at a level that effectively balanced the costs among networks, issuers, merchants, and consumers, which economists and others agree would be very difficult to do. Australian officials set their interchange fee limit using a cost-based approach, which they characterized as practical and meeting legislative requirements. They chose a cap based on the costs that issuers would incur for authorization and processing, fraud and fraud prevention, and funding the interest-free period; the costs of credit losses were not included. Using such an approach would require specialized knowledge of the benefits and costs of different payment methods, some of which may be difficult to measure accurately. In addition, industry participants and others do not agree on which costs should be covered by interchange fees; some issuers and card networks have argued that the fees should cover credit losses, but others have argued that issuers should cover credit losses with their interest revenues. Considerable cost also could be involved for an agency to collect and analyze extensive data from industry participants on interchange-related costs and benefits.

## Option 2: Requiring the Disclosure of Interchange Fees

A second option to address concerns about interchange fees would require the disclosure of interchange fees to consumers and is intended to increase their awareness of the fees and change their payment behavior. The fees could be disclosed to consumers on sales receipts, on consumers' card statements, or through generic notices that merchants would post advising their customers about interchange fee costs. Although Visa and MasterCard officials told us that their rules currently do not prohibit merchants from posting their interchange fee costs, other merchants and representatives from a large acquiring bank told us that this option is difficult to implement because merchants are unable to ascertain interchange fee costs until they submit payments for processing. As discussed previously, interchange fees vary depending on the type of card used and the method of processing used.

Disclosing interchange fees to consumers could result in lower costs to merchants, which then could pass the savings to consumers, but only if

---

[6]NFIB Research Foundation, "Credit Cards," National Small Business Poll 8, no. 3 (2008).

# A2698

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

consumers responded to such disclosures by decreasing their use of relatively expensive cards. Proponents contend that consumers deserve to understand interchange expenses facing merchants because consumers could be paying for at least a portion of these fees. If consumers shifted from using relatively costly credit cards to less expensive forms of payment, this would decrease interchange costs for merchants, which in turn could lower prices for consumers. However, many of the industry participants and others with whom we spoke predicted that most consumers would disregard information about interchange fees.

Such disclosures could be confusing for consumers. Merchants, issuers, and card networks expressed concern that their customers might not understand the information and might misinterpret the fees listed on the receipt or bank statement as an additional charge, rather than as a component of the total price. Merchants told us that it is very difficult for cashiers to distinguish between the numerous types of debit and credit cards, which have varying interchange rates. Thus, it could be very complicated for a cashier to clearly communicate to the consumer the correct interchange fee for the specific transaction.

Additionally, whichever party is responsible for disclosing information about interchange fees to consumers would incur the costs of updating its technology to allow for such disclosures. For disclosure in merchant receipts, merchants would incur the cost of changing their receipts. Issuers have reported that changes to card statements, such as the inclusion of additional disclosures, would generate costs for them.

## Option 3: Loosening Restrictions on Merchants for Card Acceptance

A third option would prohibit card networks (and other entities) from imposing rules on merchants that limit their ability to discriminate among different types of cards, or levy a surcharge for accepting credit cards.[7] The broad intent of this option is to decrease the costs to merchants of accepting cards by allowing them to steer their customers toward less expensive forms of payment. As discussed earlier, card networks generally impose rules on merchants that accept their cards, such as not allowing merchants to add a surcharge or discriminate among cards issued by the same network and prohibiting minimum purchase amounts.

---

[7]Some entities other than card networks have rules regulating merchant acceptance of cards for payment. For example, as discussed earlier, some states have laws that prohibit merchants from adding a surcharge for accepting credit cards.

# A2699

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

For merchants, the primary benefit of removing one or more of the restrictions for card acceptance could be lower costs. If the rule that merchants must honor all cards from a network were relaxed, merchants could refuse to accept cards with high interchange fees. For example, many of the merchants we interviewed with small average purchase amounts, such as convenience store owners, told us that they would receive significantly more benefits from accepting cards if they could steer consumers away from using cards with high interchange fees, especially in cases in which the purchase amount was lower than the total merchant discount fee. Several merchants told us that they would apply a minimum purchase amount for credit cards if they were allowed to, while one small merchant told us that its store already did so. If merchants could levy a surcharge, they also could receive additional revenue to cover their interchange fee-related costs. Although card networks allow merchants to discount for cash purchases, as required by law, some merchants and others have argued that the network rules and state requirements surrounding cash discounting make the practice too complicated. Merchants explained that currently they have to post a cash price and a card price for each item to offer cash discounts, which could confuse or irritate their customers, so an option that allowed merchants to add a surcharge and refuse certain cards would be a more feasible way for merchants to decrease their interchange fee-related costs.

This option also could improve merchants' bargaining power with card networks and issuers. According to some industry participants and researchers, the only leverage that merchants currently have to control their interchange-related expenses is to refuse to accept all of the cards of a given network.[8] As discussed previously, given the large market share of Visa and MasterCard, customers expect to be able to use those cards at a wide variety of merchants, and several of the merchants we interviewed told us they would lose sales if they refused to accept all cards from either of these networks. Some merchants told us that they would have a greater ability to manage their costs with the option to surcharge for credit cards or not accept cards with higher interchange fees.

This option also may reduce merchant costs as consumers shift away from higher-cost forms of payment (such as rewards cards) to less expensive forms of payment (such as debit cards). Some industry participants and

---

[8]As discussed previously, the Department of Justice (DOJ) is currently reviewing whether the current rules are anticompetitive.

# A2700

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

academic researchers have argued that such a shift would lead to more efficient outcomes such as lower prices for consumers (merchants might lower prices if interchange costs decreased). As mentioned previously, all consumers, even those paying with cash or check, bear the cost of merchants' costs for card acceptance. Proponents of this option reason that without signals about the costs of different payment mechanisms, such as limited card acceptance, surcharges, or cash discounts, consumers likely have overused cards with relatively high interchange fees. There is some empirical evidence that illustrates that surcharges can change consumers' choice of payment method. For example, a recent study conducted in the Netherlands, which allows surcharges, showed that consumers there altered their behavior in response to surcharges for debit cards. While 25 percent of consumers surveyed said that they would use their debit cards regardless of an applied surcharge, the majority stated that surcharges affected their choice of payment, with most using cash for sales tickets of less than 15 euros.[9] A survey conducted in Norway also illustrated that consumers there were quite sensitive to consumer prices that reflected payment costs.[10]

However, removing merchant rules for card acceptance also could affect cardholders, issuers, acquirers, and card networks. More specifically, cardholders might not be able to use their cards in as many locations and could face higher direct costs for card usage. Credit networks, issuers, and acquirers also argued that consumer protection issues would arise because card users would be treated differently than consumers using other payment methods such as cash. Some industry participants and others were concerned about the ability of merchants operating in less competitive markets to set surcharges at a higher level than would be needed to cover their merchant discount fees, thus resulting in a new stream of revenue for merchants.[11] Also, some noted that consumers would have less choice if small issuers were forced out of the market by reduced interchange revenues.

---

[9]See Wilko Bolt, Nicole Jonker, and Corry van Renselaar, "Incentives at the Counter: An Empirical Analysis of Surcharging Card Payments and Payment Behaviour in the Netherlands," (Working paper, De Nederlandsche Bank, December 2008).

[10]See David Humphrey, Moshe Kim, and Bent Vale, "Realizing the Gains from Electronic Payments: Costs, Pricing, and Payment Choice," *Journal of Money, Credit and Banking* 33, No. 2 (2001): 216-234.

[11]This effect could be countered by capping the amounts merchants surcharged so that merchants did not charge consumers for more than their cost of accepting the card.

# A2701

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

Additionally, if fewer consumers used cards and fewer merchants accepted cards, the overall benefits of the credit card network could decrease. As discussed previously, card networks can bring benefits to both consumers and merchants, and economists have argued that the benefits of a credit card network increase as more consumers use its cards and more merchants accept its cards. However, some economists have reported that the change of rules for card acceptance in Australia has not decreased the use of credit cards significantly and that credit card use has grown by at least 5 percent per year since 1995.[12]

If consumers shifted from using cards with higher interchange fees, issuers could see decreased revenues. As mentioned previously, interchange revenues make up a larger percentage of total revenue for small issuers than for large issuers. Representatives of some credit unions and community banks told us that they were concerned that under this option, merchants might discriminate against their cards. These representatives also told us that without sufficient interchange revenues, many credit unions and small banks likely would not be able to issue credit cards. However, representatives of RBA have reported that removing this network rule did not appear to have significantly decreased the number of smaller issuers offering credit cards. They said that some smaller institutions have found it commercially beneficial to outsource some or all of their issuing activities to larger financial institutions or specialist issuers. In such outsourcing arrangements, the cards still carry the small issuer's name but other providers provide the credit processing, and the credit. To preserve the ability of small issuers to successfully issue cards, some industry participants, including a large merchant, suggested that merchants could be allowed to refuse cards on the basis of costs, but could be prohibited from discriminating against cards on the basis of issuer.

The extent to which merchants would take advantage of changes to network rules on card acceptance was unclear. Many merchants of various sizes told us that they would not apply surcharges or refuse certain cards because they feared losing business, or because they thought that this could slow their checkout times. In addition, some merchants told us that they found it nearly impossible to distinguish among different types of credit and debit cards, making it difficult for them to determine which cards they should refuse or to which they should apply a surcharge

---

[12]See Robert Stillman and others. "Regulatory Intervention."

# A2702

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

because of higher interchange rates. In the Netherlands and Australia, where merchants are allowed to levy a surcharge, many merchants have opted not to do so. In Australia, the number of merchants that apply a surcharge for credit cards has been increasing since the practice was allowed in 2003. However, according to a banking research firm that collected data on behalf of the Reserve Bank of Australia, as of June 2009, only about 18 percent of very small merchants, 20 percent of small merchants, 26 percent of large merchants, and 34 percent of very large merchants levied surcharges for credit cards.[13] A study of surcharges on debit cards in the Netherlands found that about 22 percent of merchants added a charge for paying with a debit card (for sales below a certain amount).[14] The results of a national poll by the National Federation of Independent Business indicate that 29 percent of U.S. small businesses who accept credit card payments would apply a surcharge for card payments if their contracts with card networks allowed, and about 13 percent currently have a minimum purchase amount for credit card sales.[15]

## Option 4: Allowing Merchants and Issuers to Directly Negotiate Interchange Fees

A fourth option would allow merchants to directly negotiate with card issuers to reach an agreement on interchange fees and terms, which likely would result in lower costs for merchants. Because collective bargaining by commercial groups, such as groups of merchants or businesses, can violate U.S. antitrust laws, an exemption from those laws would be necessary to facilitate such a process.[16] According to DOJ, the granting of antitrust waivers in the United States can be justified only in very rare cases, but participants in specific industries have been granted antitrust

---

[13]East & Partners, the firm that collects the data, defines very small merchants as those with annual turnover between A$1 million and A$5 million, small merchants as those with turnover between A$5 million and A$20 million, large merchants as those with turnover between A$20 million and A$340 million, and very large merchants as those with turnover greater than A$340 million. See East & Partners, "Australian Merchant Acquiring & Cards Markets: Special Question Placement Report," (Sydney, Australia: June 2009).

[14]The average minimum purchase is 10 euros, and the average surcharge is about 2.3 percent of the sales ticket for purchases under this minimum amount. See Wilko Bolt, Nicole Jonker, and Corry van Renselaar, "Incentives at the Counter: An Empirical Analysis of Surcharging Card Payments and Payment Behavior in the Netherlands."

[15] NFIB Research Foundation, "Credit Cards," National Small Business Poll 8, no. 3 (2008).

[16]Both S. 1212 and H.R. 2695, described previously, contain exemptions from federal antitrust laws in connection with the negotiation process set up in those bills. The bills would exempt such negotiations from the antitrust laws defined in section 1 of the Clayton Act, 15 U.S.C. § 12, and the provisions of section 5 of the Federal Trade Commission Act that apply to unfair competition. 15 U.S.C. § 45.

# A2703

Appendix II: Review of Options to Regulate
Interchange Fee Rates and Terms of Credit
Card Acceptance

waivers, including those in the insurance industry and agricultural cooperatives.

According to its proponents, this option would allow merchants more leverage with card networks and issuers in negotiating interchange rates and terms and potentially lead to lower merchant costs. As discussed previously, some have argued that merchants, especially small merchants, are not able to negotiate interchange fees or terms with card networks or issuers, partly because of the large market shares of Visa, MasterCard, and the largest issuers. The large merchants we interviewed told us that their negotiations with card networks have been unsuccessful because they need to accept Visa and MasterCard cards to retain their customers and thus have to pay whatever prices Visa and MasterCard charge. Two of the small merchants we interviewed told us that they were unaware that such negotiations were possible. Some merchants and others have argued that allowing collective bargaining could result in a fairer interchange fee system because card networks would have less ability to set different rates for merchants based on industry type, volume of sales, and other factors; collective bargaining could result in one rate for all merchants.

However, as mentioned previously, any option that decreases interchange fees may have opposing effects on different stakeholders (for example, decreased costs but decreased credit availability for merchants or lower prices but higher fees for cardholders). If negotiations resulted in lower interchange fees for merchants, then merchants could pass these savings to consumers through lower prices. However, given that representatives of issuers and card networks told us that issuers would likely respond to decreased interchange revenues by increasing annual fees, decreasing the value of rewards points, and possibly increasing interest rates and decreasing available credit, cardholders could be harmed.

In addition, it could be difficult to ensure that small issuers and small merchants benefited from collective negotiations. Representatives of small issuers said that small issuers would not have sufficient market power to negotiate favorable interchange fees with a group of merchants. Furthermore, several of these representatives said they were concerned that merchants could come to agreements with large issuers under which the merchants would accept only the large issuers' cards. Some merchants with whom we spoke were skeptical about the potential for small merchants to benefit from the collective negotiations with networks and issuers. One small merchant told us that her store would not be able to participate in such negotiations because of limited staff resources.

# A2704

**Appendix II: Review of Options to Regulate Interchange Fee Rates and Terms of Credit Card Acceptance**

A significant legal barrier to implementing such negotiations is the need to obtain antitrust waivers, which DOJ has argued have been justified only in very rare instances in the United States. Credit card issuers and card network officials expressed concerns about removing antitrust exemptions that are designed to protect consumers from anticompetitive practices. In addition, DOJ officials have expressed their historical opposition to efforts to create exemptions to antitrust laws, stating that these exemptions should be used only in the rare instances in which a public policy objective compellingly outweighed free-market values. Furthermore, in response to a prior proposal that would have allowed for collective negotiations of interchange fees, DOJ officials expressed concern about the role that their agency would play in such negotiations.

**A2705**

# Appendix III: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Alicia Puente Cackley. 202-512-8678 or cackleya@gao.gov |
| **Staff Acknowledgments** | Cody Goebel, Assistant Director; Michael Aksman; Jessica Bryant-Bertail; Rudy Chatlos; Katherine Bittinger Eikel; Christine Houle; Nathan Gottfried; Yesook Merrill; Marc Molino; Rachel Munn; Barbara Roesmann; Paul Thompson; and C. Patrick Washington made key contributions to this report. |

# A2706

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |

Please Print on Recycled Paper

# A2707



**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 20 2011 ★

**BROOKLYN OFFICE**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, <br> STATE OF ARIZONA, <br> STATE OF CONNECTICUT, <br> STATE OF IDAHO, <br> STATE OF ILLINOIS, <br> STATE OF IOWA, <br> STATE OF MARYLAND, <br> STATE OF MICHIGAN, <br> STATE OF MISSOURI, <br> STATE OF MONTANA, <br> STATE OF NEBRASKA, <br> STATE OF NEW HAMPSHIRE, <br> STATE OF OHIO, <br> STATE OF RHODE ISLAND, <br> STATE OF TENNESSEE, <br> STATE OF TEXAS, <br> STATE OF UTAH, and <br> STATE OF VERMONT, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN EXPRESS COMPANY, <br> AMERICAN EXPRESS TRAVEL <br> RELATED SERVICES COMPANY, INC., <br> MASTERCARD INTERNATIONAL <br> INCORPORATED, and VISA INC., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action <br> No. CV-10-4496 <br><br> (Garaufis, J.) <br> (Reyes, M.J.) |

### FINAL JUDGMENT AS TO DEFENDANTS
### MASTERCARD INTERNATIONAL INCORPORATED AND VISA INC.

WHEREAS, Plaintiffs, the United States of America and the States of Arizona,

Connecticut, Idaho, Illinois, Iowa, Maryland, Michigan, Missouri, Montana, Nebraska, New

Hampshire, Ohio, Rhode Island, Tennessee, Texas, Utah, and Vermont filed their Amended

Complaint on December 21, 2010, alleging that Defendants each adopted rules that restrain

Merchants from encouraging consumers to use preferred payment forms, harming competition

and consumers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Plaintiffs and

Defendants MasterCard International Incorporated and Visa Inc., by their respective attorneys,

have consented to the entry of this Final Judgment without trial or adjudication of any issue of

fact or law;

WHEREAS, Defendants MasterCard and Visa have not admitted and do not admit either

the allegations set forth in the Complaint or any liability or wrongdoing;

AND WHEREAS, Defendants MasterCard and Visa agree to be bound by the provisions

of this Final Judgment pending its approval by the Court;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any

issue of fact or law, without this Final Judgment constituting any evidence against or admission

by Defendants MasterCard or Visa regarding any issue of fact or law, and upon consent of

MasterCard and Visa, it is ORDERED, ADJUDGED AND DECREED:

### I. JURISDICTION

This Court has jurisdiction over the subject matter of this action and over MasterCard and

Visa.  The Complaint states a claim upon which relief may be granted against MasterCard and

Visa under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1.

### II. DEFINITIONS

As used in this Final Judgment:

# A2709

1.      "Acquiring Bank" means a Person authorized by MasterCard or Visa to enter into agreements with Merchants to accept MasterCard's or Visa's General Purpose Cards as payment for goods or services.

2.      "American Express" means American Express Company, a New York corporation with its principal place of business in New York, New York, and American Express Travel Related Services Company, Inc., a Delaware corporation with its principal place of business in New York, New York, their successors and assigns, and their subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

3.      "Brand" means the brand or mark of a General Purpose Card Network.

4.      "Customer" means a Person that pays for goods or services.

5.      "Department of Justice" means the United States Department of Justice, Antitrust Division.

6.      "Discover" means Discover Financial Services, a Delaware corporation with its principal place of business in Riverwoods, Illinois, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

7.      "Form of Payment" means cash, a check, a debit card, a prepaid card, or any other means by which Customers pay for goods or services, and includes particular brands (*e.g.*, Star, NYCE) or types (*e.g.*, PIN debit) of debit cards or other means of payment.

8.      "General Purpose Card" means a credit or charge card issued pursuant to Rules of a General Purpose Card Network that enables consumers to make purchases from unrelated

3

Merchants without accessing or reserving funds, regardless of any other functions the card may have.

9.　　"General Purpose Card Network" means any Person that directly or indirectly assembles a group of unrelated Merchants to accept and a group of unrelated consumers to make purchases with General Purpose Cards bearing the Person's Brand, and includes General Purpose Card Networks such as Visa, MasterCard, American Express, and Discover.

10.　　"Issuing Bank" means a Person authorized by MasterCard or Visa to enter into agreements with cardholders for the use of that Defendant's General Purpose Cards for payment at a Merchant.

11.　　"MasterCard" means MasterCard International Incorporated, a Delaware corporation with its principal place of business in Purchase, New York, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

12.　　"Merchant" means a Person that accepts MasterCard's or Visa's General Purpose Cards as payment for goods or services.

13.　　"Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

14.　　"Plaintiff States" means the States of Arizona, Connecticut, Idaho, Illinois, Iowa, Maryland, Michigan, Missouri, Montana, Nebraska, New Hampshire, Ohio, Rhode Island, Tennessee, Texas, Utah, and Vermont.

4

# A2711

15.     "Rule" means any rule, bylaw, policy, standard, guideline, or practice applicable to Merchants in the United States.

16.     "Type" means a category of General Purpose Cards, including but not limited to traditional cards, rewards cards, or premium cards (*e.g.*, a "Visa Signature Card" or a "World MasterCard").

17.     "Visa" means Visa Inc., a Delaware corporation with its principal place of business in San Francisco, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees, but shall not include Visa Europe Limited and its wholly owned affiliates.

18.     The terms "and" and "or" have both conjunctive and disjunctive meanings.

### III. <u>APPLICABILITY</u>

This Final Judgment applies to MasterCard and Visa and all other Persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

### IV. <u>PROHIBITED CONDUCT</u>

A.     The purpose of this Section IV is to allow Merchants to attempt to influence the General Purpose Card or Form of Payment Customers select by providing choices and information in a competitive market.  This Final Judgment should be interpreted to promote such efforts and not limit them.  Accordingly, neither MasterCard nor Visa shall adopt, maintain, or enforce any Rule, or enter into or enforce any agreement that directly or indirectly prohibits, prevents, or restrains any Merchant in the United States from

## A2712

1. offering the Customer a discount or rebate, including an immediate discount or rebate at the point of sale, if the Customer uses a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

2. offering a free or discounted product if the Customer uses a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

3. offering a free or discounted or enhanced service if the Customer uses a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

4. offering the Customer an incentive, encouragement, or benefit for using a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment other than the General Purpose Card the Customer initially presents;

5. expressing a preference for the use of a particular Brand or Type of General Purpose Card or a particular Form of Payment;

6. promoting a particular Brand or Type of General Purpose Card or a particular Form or Forms of Payment through posted information, through the size, prominence, or sequencing of payment choices, or through other communications to a Customer;

6

## A2713

      7.     communicating to a Customer the reasonably estimated or actual costs incurred by the Merchant when a Customer uses a particular Brand or Type of General Purpose Card or a particular Form of Payment or the relative costs of using different Brands or Types of General Purpose Cards or different Forms of Payment; or

      8.     engaging in any other practices substantially equivalent to the practices described in Sections IV.A.1 through IV.A.7 of this Final Judgment.

    B.     Subject to compliance with the antitrust laws, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, and any other applicable state or federal law, nothing in this Final Judgment shall prohibit MasterCard or Visa from

      1.     enforcing existing agreements or entering into agreements pursuant to which a Merchant selects General Purpose Cards bearing the Defendant's Brand as the only General Purpose Cards the Merchant will accept as payment for goods and services;

      2.     enforcing existing agreements or entering into agreements pursuant to which a Merchant agrees that it will encourage Customers to use co-branded or affinity General Purpose Cards bearing both the Defendant's Brand and the co-brand or affinity partner's name, logo, or brand as payment for goods and services and will not encourage Customers to use General Purpose Cards bearing the Brand of any other General Purpose Card Network;

      3.     enforcing existing agreements or entering into agreements pursuant to which a Merchant agrees (i) that it will encourage Customers, through practices enumerated in Sections IV.A.1 through IV.A.8 of this Final Judgment, to use General Purpose Cards bearing the Defendant's Brand as payment for goods and services, and (ii) that it will not use one or more practices enumerated in Sections IV.A.1 through IV.A.8 of this Final Judgment to

7

encourage Customers to use General Purpose Cards bearing any other Person's Brand as payment for goods and services; *provided that* (a) any such agreement is individually negotiated with the Merchant and is not a standard agreement or part of a standard agreement generally offered by the Defendant to multiple Merchants, and (b) the Merchant's acceptance of the Defendant's General Purpose Cards as payment for goods and services is unrelated to and not conditioned upon the Merchant's entry into any such agreement;

      4.     adopting, maintaining, and enforcing Rules that prohibit Merchants from encouraging Customers to pay for goods or services using one of its General Purpose Cards issued by one particular Issuing Bank rather than by another of its General Purpose Cards issued by any other Issuing Bank.

C.     Subject to Section IV.A of this Final Judgment, nothing in this Final Judgment shall prohibit MasterCard or Visa from adopting, maintaining, and enforcing Rules that prohibit Merchants from disparaging its Brand.

D.     Neither MasterCard nor Visa shall adopt, maintain, or enforce any Rule, or enter into or enforce any agreement, that prohibits, prevents, restrains, deters, or inhibits an Acquiring Bank from supplying a Merchant, on a transaction-by-transaction or other basis, information regarding the costs or fees the Merchant would incur in accepting a General Purpose Card, including a particular Type of General Purpose Card, presented by the Customer as payment for that Customer's transaction.

## V. <u>REQUIRED CONDUCT</u>

A.     Within five business days after entry of this Final Judgment, MasterCard and Visa shall each delete, discontinue, and cease to enforce in the United States any Rule that it would be

8

prohibited from adopting, maintaining, or enforcing pursuant to Section IV of this Final

Judgment.

  B.  Within five business days after entry of this Final Judgment, Visa shall modify

the following portion of its Visa International Operating Regulations "Discount Offer – U.S.

Region 5.2.D.2" as follows:

    *Current language*:

    Discount Offer – U.S. Region 5.2.D.2

    In the U.S. Region, any purchase price advertised or otherwise disclosed by the
    Merchant must be the price associated with the use of a Visa Card or Visa
    Electron Card.

    A U.S. Merchant may offer a discount as an inducement for a Cardholder to use a
    means of payment that the Merchant prefers, provided that the discount is:

    •  Clearly disclosed as a discount from the standard price

    •  Non-discriminatory, as between a Cardholder who pays with a Visa Card
      and a cardholder who pays with a "comparable card"

    A "comparable card" for purposes of this rule is any other branded, general
    purpose payment card that uses the cardholder's signature as the primary means
    of cardholder authorization (e.g., MasterCard, Discover, American Express). Any
    discount made available to cardholders who pay with "comparable cards" must
    also be made available to Cardholders who wish to pay with Visa Cards. Any
    discount made available to a Cardholder who pays with a Visa Card is not
    required to be offered to cardholders who pay with "comparable cards."

    *Modified language*:

    Discount Offer – U.S. Region 5.2.D.2

    A U.S. Merchant may request or encourage a Cardholder to use a means of
    payment other than a Visa Card or a Visa Card of a different product type (*e.g.*,
    Visa Classic Card, Visa Traditional Rewards Card, Visa Signature Card) than the
    Visa Card the consumer initially presents. Except where prohibited by law, the
    Merchant may do so by methods that include, but are not limited to:

- Offering the consumer an immediate discount from the Merchant's list, stated, or standard price, a rebate, a free or discounted product or service, or any other incentive or benefit if the consumer uses a particular general purpose payment card with an acceptance brand other than a Visa Card or other particular means of payment

- Offering the consumer an immediate discount from the Merchant's list, stated, or standard price, a rebate, a free or discounted product or service, or any other incentive or benefit if the consumer, who initially presents a Visa Card, uses instead another general purpose payment card or another means of payment

- Expressing a preference for the use of a particular general purpose payment card or means of payment

- Promoting the use of a particular general purpose payment card with an acceptance brand other than Visa or means of payment through posted information, through the size, prominence, or sequencing of payment choices, or through other communications to consumers

- Communicating to consumers the reasonably estimated or actual costs incurred by the Merchant when a consumer uses a particular general purpose payment card or means of payment or the relative costs of using different general purpose payment cards or means of payment.

C.    Within five business days after entry of this Final Judgment, MasterCard shall

modify its *MasterCard Rules*, Rule 5.11.1 "Discrimination" in the United States as follows:

*Current language*:

A Merchant must not engage in any acceptance practice that discriminates against or discourages the use of a Card in favor of any other acceptance brand.

*Modified language*:

A Merchant may request or encourage a customer to use a payment card with an acceptance brand other than MasterCard or other form of payment or a Card of a different product type (*e.g.*, traditional cards, premium cards, rewards cards) than the Card the consumer initially presents. Except where prohibited by law, it may do so by methods that include, but are not limited to: (a) offering the customer an immediate discount from the Merchant's list, stated, or standard price, a rebate, a free or discounted product or service, or any other incentive or benefit if the customer uses a particular payment card with an acceptance brand other than

10

MasterCard or other particular form of payment; (b) offering the customer an immediate discount from the Merchant's list, stated, or standard price, a rebate, a free or discounted product or service, or any other incentive or benefit if the customer, who initially presents a MasterCard, uses instead another payment card or another form of payment; (c) expressing a preference for the use of a particular payment card or form of payment; (d) promoting the use of a particular general purpose payment card with an acceptance brand other than MasterCard or the use of a particular form or forms of payment through posted information, through the size, prominence, or sequencing of payment choices, or through other communications to customers (provided that merchants will abide by MasterCard's trademark standards relating to the display of its marks); or (e) communicating to customers the reasonably estimated or actual costs incurred by the Merchant when a customer uses particular payment cards or forms of payment or the relative costs of using different general purpose payment cards or forms of payment.

D.      Within ten business days after entry of this Final Judgment, MasterCard and Visa shall each furnish to the Department of Justice and the Plaintiff States an affidavit affirming that it has made the specific changes to its Rules required by Sections V.B (for Visa) and V.C (for MasterCard) of this Final Judgment and describing any additional changes, if any, it made pursuant to Section V.A of this Final Judgment.

E.      MasterCard and Visa shall each take the following actions to ensure that Merchants that accept its General Purpose Cards as payment for goods or services (i) are notified of this Final Judgment and the Rules changes MasterCard and Visa make pursuant to this Final Judgment; and (ii) are not restricted, discouraged, or prevented from engaging in any of the practices enumerated in Sections IV.A.1 through IV.A.8 of this Final Judgment:

1.      Within ten business days after entry of this Final Judgment, MasterCard and Visa shall each furnish to the Department of Justice and the Plaintiff States, for the approval of the Department of Justice, a proposed form of written notification to be provided to Acquiring Banks for distribution to Merchants:

11

       a.     describing the Rules changes each made pursuant to this Final Judgment; and

       b.     informing Merchants that they are permitted to engage in any of the practices enumerated in Sections IV.A.1 through IV.A.8 of this Final Judgment.

Within five business days after receiving the approval of the Department of Justice, the Defendant shall direct its Acquiring Banks to furnish to each of the Merchants in the United States with which the Acquiring Banks have entered an agreement to accept the Defendant's General Purpose Cards as payment for goods or services (i) a paper or electronic copy of the approved notification and (ii) a paper or electronic copy of this Final Judgment (or an Internet link to this Final Judgment). MasterCard and Visa shall direct the Acquiring Banks to provide such information in their next billing statement or within thirty days of their receipt of MasterCard's or Visa's direction, whichever is shorter.

     2.     Within five business days after entry of this Final Judgment, MasterCard and Visa shall each adopt a Rule forbidding its Acquiring Banks from adopting, maintaining, or enforcing Rules with respect to MasterCard or Visa General Purpose Cards that the Defendant would be prohibited from adopting, maintaining, or enforcing pursuant to Section IV of this Final Judgment.

     F.     MasterCard and Visa shall each notify the Department of Justice and the Plaintiff States, within five business days of such adoption or modification, if it adopts a new Rule that limits or restrains, or modifies an existing Rule in a manner that limits or restrains how Merchants accept, process, promote, or encourage use of Forms of Payment other than General

Purpose Cards or of General Purpose Cards bearing the Brand of another General Purpose Card Network.

## VI. COMPLIANCE INSPECTION

A.     For purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the Department of Justice, including consultants and other persons retained by the Department of Justice, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to MasterCard or Visa, be permitted:

1.     access during the Defendant's office hours to inspect and copy, or at the option of the United States, to require the Defendant to provide to the United States and the Plaintiff States hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of the Defendant, relating to any matters contained in this Final Judgment; and

2.     to interview, either informally or on the record, the Defendant's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by the Defendant.

B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, MasterCard and/or Visa shall submit written reports or respond to written interrogatories, under oath if requested, relating to any of the matters

13

contained in this Final Judgment as may be requested. Written reports authorized under this paragraph may, at the sole discretion of the United States, require a Defendant to conduct, at its cost, an independent audit or analysis relating to any of the matters contained in this Final Judgment.

      C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of (i) the executive branch of the United States or (ii) the Plaintiff States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

      D.     If at the time information or documents are furnished by a Defendant to the United States and the Plaintiff States, the Defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and the Defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States and Plaintiff States shall give the Defendant ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## VII. RETENTION OF JURISDICTION

      This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

14

## A2721

### VIII. NO LIMITATION ON GOVERNMENT RIGHTS

Nothing in this Final Judgment shall limit the right of the United States or of the Plaintiff States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule of MasterCard or Visa, including any current Rule and any Rule adopted in the future.

### IX. EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

### X. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: _July 20, 2011_

Court approval subject to procedures set forth in the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16

s/Nicholas G. Garaufis

United States District Judge

15

**A2722**



# Visa International Operating Regulations

15 October 2012



# A2723

**THIS PAGE INTENTIONALLY LEFT BLANK.**

# A2724

Visa International Operating Regulations

# Contents

Contents .................................................................................................................... iii

**Summary of Changes** ............................................................................................ 1

Quick Reference ...................................................................................................... 1

Overview ............................................................................................................... 1

Summary of Changes .............................................................................................. 7

Major Topics .......................................................................................................... 7

Miscellaneous Topics ............................................................................................. 21

AP Region Major Topics ......................................................................................... 35

Canada Region Major Topics .................................................................................. 38

CEMEA Region Major Topics .................................................................................. 40

LAC Region Major Topics ....................................................................................... 41

U.S. Region Major Topics ....................................................................................... 43

Other Revisions ..................................................................................................... 47

**About the Operating Regulations** ...................................................................... 49

General Overview ................................................................................................... 49

What are Operating Regulations? ........................................................................... 49

What Do Operating Regulations Include? ................................................................ 50

Organization .......................................................................................................... 50

Operating Regulations Structure ............................................................................ 50

Authoring Style ...................................................................................................... 52

General Authoring Conventions .............................................................................. 52

Contents Numbering .............................................................................................. 53

© 2012 Visa. All Rights Reserved.

# A2725

Visa International Operating Regulations

Section Numbering..................................................................53

**Chapter 1: Visa Operating Regulations Governance..................... 55**

Core Principle 1.1.......................................................... 55

The Operating Regulations........................................ 55

Core Principle 1.2.......................................................... 55

Visa Management.................................................... 55

Core Principle 1.3.......................................................... 55

Compliance............................................................ 55

Core Principle 1.4.......................................................... 56

Consistency............................................................ 56

Core Principle 1.5.......................................................... 56

Conflicts................................................................ 56

Core Principle 1.6.......................................................... 56

Variances and Waivers............................................ 56

Use and Application of Bylaws and Operating Regulations.......... 57

Obligation to Comply with Bylaws and Visa International Operating Regulations................... 57

Use and Application of Operating Regulations................... 57

Obligation to Comply with Operating Regulations................ 59

Local, Domestic, and Regional Operating Regulations and Private Agreements....................... 60

Regional Operating Regulations................................ 60

National, Group Members, and Private Agreements............. 60

Extensions to the Operating Regulations........................... 61

Publications with Equivalent Authority......................... 61

Variances or Waivers to the Operating Regulations................ 61

VISA PUBLIC                            15 October 2012
© 2012 Visa. All Rights Reserved.

# A2726

Visa International Operating Regulations

Variances or Waivers - Procedures........................................................................ 61

Confidentiality of Visa Materials........................................................................ 64

Confidentiality Requirements........................................................................ 64

Visa Right to Monitor, Audit, Inspect, or Investigate........................................ 65

Visa Right to Monitor, Audit, Inspect, or Investigate........................................ 65

Member Rights and Obligations........................................................................ 67

General Investigation Responsibilities................................................................ 68

Merchant Investigation Responsibilities............................................................ 70

Operating Regulations Compliance and Enforcement........................................ 70

Fines and Penalties - General............................................................................ 70

Fines and Penalties Process............................................................................ 71

Fines and Penalties for Repetitive and Willful Violation.................................... 73

Compliance - General........................................................................................ 74

Compliance Enforcement Appeals.................................................................... 74

Right of Termination of Merchant or Agents.................................................... 75

Visa Rights........................................................................................................ 75

Member Obligations.......................................................................................... 77

**Chapter 2: Visa System Participation........................................................ 79**

Core Principle 2.1.............................................................................................. 79

Bylaws and Operating Regulations.................................................................... 79

Core Principle 2.2.............................................................................................. 79

Third Party Registration.................................................................................... 79

Core Principle 2.3.............................................................................................. 80

Liabilities and Indemnifications........................................................................ 80

© 2012 Visa. All Rights Reserved.

# A2727

Visa International Operating Regulations

Membership.........................................................................................................80

    General Membership..........................................................................................80

    Sponsored Member..........................................................................................81

    Member Acquisition..........................................................................................81

    Quarterly Operating Certificate.........................................................................83

    Online Submission and Electronic Signature......................................................85

    Acquirer Licensing..........................................................................................86

Agents - Third Party and VisaNet Processors........................................................86

    General Agent Requirements............................................................................86

    VisaNet Processor Requirements.....................................................................89

    Third Party/ISO Requirements..........................................................................93

    Card Manufacturers and Personalizers.............................................................102

    Fines Related to Agents...................................................................................103

Liabilities and Indemnifications............................................................................104

    Members and Agents.......................................................................................104

    Visa Systems.................................................................................................104

    Visa Programs and Products............................................................................105

**Chapter 3: The Visa License............................................................................107**

    Core Principle 3.1...........................................................................................107

        Intellectual Property......................................................................................107

    Core Principle 3.2...........................................................................................107

        Brand and Licensed Technology.....................................................................107

    Core Principle 3.3...........................................................................................108

        BIN Licensing...............................................................................................108

          VISA PUBLIC           

© 2012 Visa. All Rights Reserved.

# A2728

---

**Visa International Operating Regulations**

Marks License....................................................................................................... 108

   Marks License Grant........................................................................................ 108

   Sponsorships/Partnerships Including Olympics.................................................. 110

BIN License and Administration............................................................................ 112

   License............................................................................................................ 112

   Administration.................................................................................................. 113

   Sales and Transfers........................................................................................ 118

   Mergers and Acquisitions................................................................................. 118

   Membership Status.......................................................................................... 119

BIN Licensee....................................................................................................... 119

   Responsibilities............................................................................................... 119

BIN Use............................................................................................................... 120

   Member Use.................................................................................................... 120

   Merchant Use and Disclosure of BIN Information.............................................. 122

Non-Visa BINs..................................................................................................... 125

   Non-Visa-Assigned BINs.................................................................................. 125

Software License.................................................................................................. 126

   Ownership and Confidentiality.......................................................................... 126

   Non-Transferability.......................................................................................... 126

   Limitations....................................................................................................... 127

Software Enhancements/Modifications.................................................................. 128

   Enhancements/Modifications............................................................................ 128

Use of Visa Systems............................................................................................ 128

   Visa Systems Use........................................................................................... 128

---

© 2012 Visa. All Rights Reserved.

# A2729

Visa U.S. Regulation II Certification Program............................................................. 132

Visa U.S. Regulation II Certification Program - AP Region, LAC Region, and U.S. Region.... 132

**Chapter 4: The Visa Brand**........................................................................................ **133**

Core Principle 4.1................................................................................................... 133

Brand Prominence.............................................................................................. 133

Core Principle 4.2................................................................................................... 133

Communications................................................................................................ 133

Core Principle 4.3................................................................................................... 134

Visa-Owned Mark on a Payment Device............................................................ 134

Core Principle 4.4................................................................................................... 134

Corporate Names............................................................................................... 134

Core Principle 4.5................................................................................................... 134

Denote and Promote Visa................................................................................... 134

Core Principle 4.6................................................................................................... 135

Card Acceptance Outside of Country of Issuance.............................................. 135

Core Principle 4.7................................................................................................... 135

Card Acceptance at Point-of-Sale...................................................................... 135

Marks....................................................................................................................... 135

General Use of Marks......................................................................................... 135

Use of Product Marks......................................................................................... 142

Corporate Identity................................................................................................... 143

Use of Brand in Corporate Identity.................................................................... 143

Use of Marks on Cards........................................................................................... 145

Marks Usage Requirements............................................................................... 145

© 2012 Visa. All Rights Reserved.

# A2730

Visa International Operating Regulations

Multiple Marks on Card.................................................................................145

Competitive Marks.......................................................................................147

General Card Design....................................................................................149

Member Identification....................................................................................150

Member Identification on Card......................................................................150

Affinity/Co-Branded Card Programs................................................................151

Non-Member Marks on Cards.......................................................................151

Global Co-Branded Card Program Requirements.............................................157

Affinity/Co-Branded Card Program Requirements............................................158

Brand Positioning........................................................................................172

Card and Product Positioning.......................................................................172

Use of Marks in Promotions, Advertisements, and Solicitations...........................174

Solicitations...............................................................................................174

Promotional Material...................................................................................175

Member Sponsorships..................................................................................178

Sponsorships Usage Requirements................................................................178

Electron Mark/Identifier................................................................................179

Electron Marks Usage Requirements..............................................................179

Interlink Program Marks................................................................................181

Interlink Program Marks Usage Requirements.................................................181

Plus Program Marks.....................................................................................182

Plus Program Marks Usage Requirements.......................................................182

**Chapter 5: Visa Products and Services................................................................185**

Core Principle 5.1.......................................................................................185

© 2012 Visa. All Rights Reserved.

# A2731

Visa International Operating Regulations

Issuing and Technology Standards................................................................... 185

Core Principle 5.2............................................................................................ 185

Issuing and Using Visa Products..................................................................... 185

Core Principle 5.3............................................................................................ 186

Card Design Requirements and Standards...................................................... 186

Card Issuance.................................................................................................. 186

Issuer Responsibilities - General..................................................................... 186

Account Range and BIN Use............................................................................ 188

Account Number Specifications........................................................................ 189

PIN Issuance.................................................................................................... 189

Expiration Date Standards............................................................................... 191

Issuer Performance Standards......................................................................... 191

Card Manufacture and Delivery....................................................................... 192

Card Shipping and Security.............................................................................. 192

Card Embossing, Printing, Encoding, and Personalization.............................. 194

Issuer Requirements - General........................................................................ 196

Exchange Rates............................................................................................... 196

Cardholder Liability.......................................................................................... 197

Provisional Credit............................................................................................. 199

Cardholder Applications................................................................................... 200

Confidentiality of Cardholder Information......................................................... 201

Data Retention and Transmission.................................................................... 202

Disputed Transactions - Canada Region......................................................... 203

Cardholder Notifications................................................................................... 204

© 2012 Visa. All Rights Reserved.

# A2732

---

Visa International Operating Regulations

---

Insurance Program - U.S. Region.........................................................................................207

Other Issuer Requirements..................................................................................................208

Magnetic-Stripe Requirements.................................................................................................209

General Magnetic-Stripe Requirements.............................................................................209

Magnetic-Stripe Encoding...................................................................................................209

Chip Card Requirements...........................................................................................................210

General Chip Card Requirements.......................................................................................210

Chip Card Technology Requirements.................................................................................217

Cardholder Verification Method..........................................................................................219

Card Authentication Method................................................................................................221

Cardholder Account Selection.............................................................................................222

Chip Card Post-Issuance Updates.....................................................................................223

Chip Issuer Liability..............................................................................................................224

EMV Liability Shift.................................................................................................................226

Proximity/Contactless Cards...............................................................................................228

Mobile Payment Devices......................................................................................................232

Limited Use Products.................................................................................................................233

Restricted Use Cards............................................................................................................233

Non-Standard Cards...................................................................................................................234

Non-Standard Card General Requirements.......................................................................234

Visa Mini Cards - U.S. Region............................................................................................235

Visa Micro Tag.......................................................................................................................236

Unembossed Cards...............................................................................................................236

Virtual Accounts..........................................................................................................................237

---

© 2012 Visa. All Rights Reserved.

# A2733

Visa International Operating Regulations

Virtual Accounts - General Requirements.................................................................. 237

Virtual Accounts - Consumer Programs................................................................... 237

V.me by Visa............................................................................................................. 238

V.me by Visa - General Requirements..................................................................... 238

Consumer Products.................................................................................................. 238

Visa Consumer Products - General Requirements................................................... 238

Visa Classic Cards................................................................................................... 239

Visa Charge Card..................................................................................................... 239

Visa Traditional Rewards Cards - U.S. Region........................................................ 240

Visa Debit Cards....................................................................................................... 243

Visa Electron Cards.................................................................................................. 245

Visa Gold/Premier Cards.......................................................................................... 246

Visa Infinite Cards.................................................................................................... 249

Visa Platinum Cards................................................................................................. 257

Visa Signature Cards................................................................................................ 265

Visa Signature Preferred Cards - U.S. Region........................................................ 276

Visa Check Cards - U.S. Region.............................................................................. 280

Secured Cards.......................................................................................................... 283

V PAY....................................................................................................................... 284

Visa Prepaid Products.............................................................................................. 285

Visa Prepaid Products - General Requirements....................................................... 285

Visa Consumer Prepaid Cards................................................................................. 290

Visa Prepaid Load Service....................................................................................... 295

Visa Prepaid Products - Visa ReadyLink................................................................. 295

© 2012 Visa. All Rights Reserved.

# A2734

Visa International Operating Regulations

Visa TravelMoney Program.................................................................... 297

    Visa TravelMoney......................................................................... 297

Original Credit Transaction................................................................... 299

    Original Credit Transaction - General Requirements............................ 299

Visa Money Transfer............................................................................. 300

    Money Transfer Original Credit – General Requirements...................... 300

Visa Commercial Products..................................................................... 301

    Visa Commercial Products - General Requirements............................ 301

    Visa Meetings Card....................................................................... 309

    Prepaid Commercial...................................................................... 311

    Visa Agro Card - LAC Region......................................................... 312

Visa Commercial Business Products........................................................ 314

    Commercial Business Products General Requirements......................... 314

    Visa Business Enhanced Cards....................................................... 316

    Visa Business Platinum Cards........................................................ 317

    Visa Signature Business Cards....................................................... 317

    Visa Business Check Cards............................................................ 324

    Visa Business Electron Cards......................................................... 325

    Visa Business Debit...................................................................... 326

    Visa Business Debit Cards - AP Region............................................ 327

    Visa Infinite Business Cards - Canada Region................................... 328

    Visa Cargo - LAC Region.............................................................. 332

Visa Commercial Purchasing Products..................................................... 334

    Purchasing Cards - General........................................................... 334

© 2012 Visa. All Rights Reserved.

# A2735

Visa International Operating Regulations

Visa Fleet Cards.................................................................................................... 336

Visa Large Purchase Advantage – U.S. Region .................................................... 338

Visa Commercial Corporate Products.................................................................... 339

Visa Corporate Prepaid Cards.............................................................................. 339

Visa Corporate Debit - LAC Region...................................................................... 340

Commercial Corporate Products - U.S. Region..................................................... 341

Visa Commercial Products Programs and Services.............................................. 342

V Distribution Program.......................................................................................... 342

Centralized Card Issuance.................................................................................... 343

Authorization Request and Settlement Amount Match – U.S. Region.................... 344

Global Support Services........................................................................................ 345

Visa Global Customer Assistance Services........................................................... 345

Emergency Cash Disbursement and Emergency Card Replacement..................... 349

Stand-In Processing............................................................................................... 352

Lost or Stolen Card Reporting............................................................................... 353

Emergency Request Fines and Penalties.............................................................. 354

Global Refund Service........................................................................................... 354

Cardholder Loyalty Program.................................................................................. 356

Visa Extras - U.S. Region...................................................................................... 356

Visa Loyalty Platform Services.............................................................................. 357

Visa Incentive Network - U.S. Region................................................................... 358

Visa SavingsEdge - U.S. Region........................................................................... 359

Credit Bureau Reporting - U.S. Region................................................................. 360

Credit Bureau Reporting Requirements - U.S. Region........................................... 360

© 2012 Visa. All Rights Reserved.

# A2736

Visa International Operating Regulations

Commercial Data Management and Reporting........................................................................... 362

   Commercial Solutions............................................................................................................. 362

   Enhanced Data....................................................................................................................... 364

POS Balance Inquiry Service.................................................................................................... 366

   POS Balance Inquiry Service Requirements......................................................................... 366

Visa POS Solutions Program - U.S. Region............................................................................. 367

   Visa POS Solutions Program Requirements - U.S. Region................................................... 367

Visa PIN Debit Gateway Service - U.S. Region....................................................................... 367

   Visa PIN Debit Gateway Service Requirements - U.S. Region............................................. 367

Plus Program............................................................................................................................ 368

   Plus Program Requirements.................................................................................................. 368

Visa Global ATM Network.......................................................................................................... 369

   Visa Global ATM Network Requirements.............................................................................. 369

   ATM Operators....................................................................................................................... 371

   ATM Balance Inquiry Service................................................................................................. 374

   ATM Fees............................................................................................................................... 375

   Global ATM Network PIN Requirements............................................................................... 380

   ATM Issuer Requirements - U.S. Region.............................................................................. 381

   ATM Access Fee Fines.......................................................................................................... 382

Preauthorized Payment Cancellation Service........................................................................... 383

   Preauthorized Payment Cancellation Service Requirements................................................ 383

Visa Payment Controls.............................................................................................................. 384

   Visa Payment Controls Service Information.......................................................................... 384

Visa Account Updater Service................................................................................................... 385

© 2012 Visa. All Rights Reserved.

# A2737

Visa Account Updater Service Requirements.........................................................................385

Health Care Eligibility Service - U.S. Region.......................................................................386

    Health Care Eligibility Service Requirements - U.S. Region...........................................386

Visa Risk Products and Services........................................................................................387

    Visa Advanced Authorization....................................................................................387

    Visa Risk Manager..................................................................................................388

    Visa Advanced ID Solutions - U.S. Region................................................................388

    BankruptcyPredict Service - U.S. Region..................................................................389

    MoneyChoices - U.S. Region...................................................................................392

    Address Verification Service (AVS)............................................................................392

    Card Recovery Bulletin (CRB)..................................................................................393

    Exception File.........................................................................................................396

    National Card Recovery File - U.S. Region................................................................397

    Account Number Verification Service.........................................................................397

Verified by Visa.................................................................................................................399

    Verified by Visa Participation Requirements...............................................................399

    Verified by Visa Non-Compliance Penalties...............................................................403

    Cardholder Authentication........................................................................................404

VisaVue Online..................................................................................................................408

    VisaVue Online Requirements..................................................................................408

Visa Online........................................................................................................................408

    Use of Visa Online.................................................................................................408

Visa Membership Management.............................................................................................409

    Client Portfolio Management Self-Service Tools Requirements.......................................409

© 2012 Visa. All Rights Reserved.

# A2738

Visa International Operating Regulations

VisaNet Gateway Services - AP Region........................................................................ 410

VisaNet Gateway Services Requirements - AP Region........................................... 410

Visa Transaction Alerts Service............................................................................... 410

Visa Transaction Alerts Service Requirements...................................................... 410

Visa Chip Services.................................................................................................... 411

Visa Chip Services Requirements........................................................................... 411

**Chapter 6: Payment Acceptance............................................................................... 413**

Core Principle 6.1.................................................................................................... 413

Display of Marks.................................................................................................. 413

Core Principle 6.2.................................................................................................... 413

Honor All Cards Properly Presented.................................................................... 413

Core Principle 6.3.................................................................................................... 414

No Surcharging Unless Required by Law.............................................................. 414

Core Principle 6.4.................................................................................................... 414

Merchant Qualification Standards........................................................................ 414

Merchant Agreement................................................................................................ 414

General Merchant Requirements.......................................................................... 414

Required Merchant Information............................................................................ 421

Acquirer's Jurisdiction.......................................................................................... 423

Payment Service Providers and Sponsored Merchants......................................... 425

International Airline Program................................................................................ 426

Acquirer Due Diligence........................................................................................ 427

Electronic Commerce Acquirer Agreement.......................................................... 428

Point-of-Transaction - Display of Marks................................................................. 428

© 2012 Visa. All Rights Reserved.

# A2739

Display of Marks at the Point of Sale..................................................................................... 428

Display of Marks at an ATM.................................................................................................. 432

Display of Marks Online........................................................................................................ 433

Manual Cash Disbursement.................................................................................................. 434

Point-of-Transaction Terminals................................................................................................... 435

Point-of-Transaction Terminal General Requirements............................................................ 435

Magnetic-Stripe Terminals.................................................................................................... 437

Chip-Reading Terminals........................................................................................................ 438

Proximity/Contactless Payment Terminals............................................................................. 448

Automated Fuel Dispensers.................................................................................................. 454

Unattended Acceptance Terminals........................................................................................ 457

Electronic Signature Capture Terminals................................................................................. 458

Terminals without a Printer.................................................................................................... 459

Account Number-Verifying Terminals..................................................................................... 460

Mobile Payment Acceptance Solution.................................................................................... 460

Honoring Cards........................................................................................................................... 461

General Acceptance Requirements........................................................................................ 461

Uniform Services.................................................................................................................. 463

Discount at the Point of Sale................................................................................................. 464

Cardholder Choice................................................................................................................ 466

Limited Acceptance.............................................................................................................. 467

Card Acceptance Canada Region.......................................................................................... 468

Card Acceptance Prohibitions..................................................................................................... 469

General Prohibitions.............................................................................................................. 469

© 2012 Visa. All Rights Reserved.

# A2740

Visa International Operating Regulations

Other Prohibitions........................................................................... 473

Authorization Requirements.............................................................. 475

General Authorization Requirements................................................ 475

ATM Declines.................................................................................. 480

T&E Authorizations......................................................................... 481

Floor Limits..................................................................................... 484

Partial Authorization........................................................................ 486

Authorization Reversals................................................................... 487

Card and Cardholder Verification...................................................... 488

Validation and Verification Requirements......................................... 488

Address Verification Service............................................................ 497

PIN Verification............................................................................... 498

Transaction Receipts........................................................................ 498

Transaction Receipt General Requirements....................................... 498

Transaction Receipt Data Requirements........................................... 501

Electronic and Manual Transaction Receipts..................................... 503

Transaction Receipt Delivery to Cardholder...................................... 512

Transaction Deposits........................................................................ 515

General Transaction Deposit Requirements....................................... 515

Transaction Deposit Time Limits...................................................... 515

Transaction Deposit Restrictions...................................................... 517

Credits and Refunds......................................................................... 518

General Credit and Refund Requirements......................................... 518

Proper Disclosure of Refund Policy.................................................. 519

© 2012 Visa. All Rights Reserved.

# A2741

Visa International Operating Regulations

Transaction Reversals...................................................................... 522

Convenience Fees........................................................................... 522

Convenience Fee General Requirements........................................... 522

Chip Card Acceptance..................................................................... 525

Chip Card Acceptance General Requirements.................................... 525

Chip Authorization........................................................................ 529

EMV Liability Shift and Fallback..................................................... 531

Visa Easy Payment Service (VEPS) Transactions................................ 534

Visa Easy Payment Service (VEPS) - General Requirements................. 534

Card-Not-Present Transactions......................................................... 539

Mail/Phone Order and Electronic Commerce Authorization Requirements............ 539

Mail/Phone Order and Electronic Commerce Merchant Outlet Requirements........ 540

Electronic Commerce General Requirements...................................... 541

Merchant Website Requirements..................................................... 548

Verified by Visa Participation Requirements...................................... 549

Electronic Commerce Financial Responsibility................................... 553

Payment Service Providers.............................................................. 554

Payment Service Providers (PSP) General Requirements...................... 554

Payment Service Providers (PSP) Acquirer Requirements..................... 556

High-Risk Internet Payment Service Providers................................... 558

Up-Selling and Negative Option Transactions.................................... 561

Up-Selling and Negative Option General Requirements....................... 561

Recurring Transactions................................................................... 563

Recurring Transaction General Requirements.................................... 563

© 2012 Visa. All Rights Reserved.

# A2742

Visa International Operating Regulations

Installment Transactions..................................................................................................... 565

    Installment Transaction General Requirements................................................................ 565

Delayed Delivery Transactions............................................................................................ 566

    Delayed Delivery Transaction General Requirements...................................................... 566

    Delayed Delivery Transaction Receipt Requirements....................................................... 567

Advance Payment Transactions - U.S. Region.................................................................... 568

    Advance Payment General Requirements......................................................................... 568

Dynamic Currency Conversion............................................................................................ 570

    Dynamic Currency Conversion - General Requirements.................................................. 570

    Dynamic Currency Conversion - Merchant Requirements................................................ 573

    Dynamic Currency Conversion - Acquirer Requirements................................................. 574

Manual Cash Disbursements............................................................................................... 576

    Manual Cash Disbursements Requirements..................................................................... 576

    Minimum and Maximum Cash Disbursement Amounts.................................................... 580

    Manual Cash Disbursement Restrictions.......................................................................... 580

Cash-Back Services............................................................................................................ 581

    Cash-Back Services General Requirements..................................................................... 581

    Cash-Back Transaction Requirements............................................................................. 584

ATM Transactions................................................................................................................ 585

    ATM Transaction General Requirements.......................................................................... 585

    ATM Transaction Receipts................................................................................................ 588

    ATM Misdispense.............................................................................................................. 590

    ATM Transaction Restrictions........................................................................................... 591

Quasi-Cash Transactions.................................................................................................... 591

© 2012 Visa. All Rights Reserved.

# A2743

Visa International Operating Regulations

Quasi-Cash Transaction General Requirements.................................................... 591

Wire Transfer Money Orders (WTMO)................................................................. 593

Scrip................................................................................................................ 596

Sale of Travelers Cheques and Foreign Currency............................................... 597

Original Credit Transactions.................................................................................. 597

Original Credit Transaction Processing Requirements........................................... 597

Money Transfer Original Credit Transactions.......................................................... 600

Money Transfer Original Credit Transaction Processing Requirements.................... 600

Mobile Commerce Transactions - AP Region.......................................................... 603

Mobile Commerce Transactions in India - AP Region............................................ 603

Account Funding Transactions.............................................................................. 603

Account Funding Transaction Processing Requirements........................................ 603

Aggregated Transactions...................................................................................... 604

Aggregated Transaction Requirements................................................................. 604

Deferred Payments - U.S. Region.......................................................................... 607

Deferred Payment Transactions........................................................................... 607

Acquirer Performance Standards - U.S. Region..................................................... 608

Retrieval Performance Rates - U.S. Region........................................................... 608

Chargeback Performance Rates - U.S. Region...................................................... 609

In-Transit............................................................................................................. 609

In-Transit Service - General Requirements............................................................ 609

In-Transit Service - Authorization Requirements.................................................... 611

In-Transit Service - Processing Requirements....................................................... 612

General T&E........................................................................................................ 613

© 2012 Visa. All Rights Reserved.

# A2744

**Visa International Operating Regulations**

General T&E Requirements.........................................................................................613

T&E Delayed or Amended Charges.............................................................................614

Airline Merchants.......................................................................................................615

International Airline Merchant Requirements.............................................................615

Car Rental Merchants.................................................................................................616

Delayed or Amended Charges....................................................................................616

Car Rental Advance Deposit......................................................................................619

Visa Reservation Service for Car Rentals - U.S. Region...........................................622

Hotels and Cruise Lines.............................................................................................626

Hotel and Cruise Line General Requirements............................................................626

Hotel Guaranteed Reservations.................................................................................627

Advance Deposit Service............................................................................................630

Priority Check-Out Service.........................................................................................634

Central Reservation Service.......................................................................................636

Timeshare Merchants.................................................................................................637

General Timeshare Merchant Requirements..............................................................637

Real-Time Clearing - U.S. Region..............................................................................638

Automated Fuel Dispensers Real-Time Clearing - U.S. Region.................................638

Gambling....................................................................................................................638

Online Gambling........................................................................................................638

Gambling Credits.......................................................................................................640

In-Transit Gambling...................................................................................................641

Debt Repayment Program - U.S. Region....................................................................643

Debt Repayment Program..........................................................................................643

© 2012 Visa. All Rights Reserved.

# A2745

---

Visa International Operating Regulations

Tax and Other Government Payments.......................................................................... 645

    Tax and Other Government Payments - AP Region................................................. 645

    Tax Payment Program Requirements - U.S. Region............................................... 646

    Tax Payment Program Fee Requirements - U.S. Region........................................ 647

Travelers Cheques.................................................................................................... 649

    Travelers Cheque Acceptance and Encashment.................................................... 649

Health Care Transactions.......................................................................................... 650

    Preauthorized Health Care Program Requirements - U.S. Region......................... 650

    Healthcare Auto-Substantiation - U.S. Region...................................................... 651

    Easy Pay Transaction - General Requirements - LAC Region................................ 651

    Easy Pay - Authorization - LAC Region................................................................ 652

V.me by Visa............................................................................................................ 653

    V.me by Visa - Merchant Requirements................................................................ 653

Visa Access Token................................................................................................... 654

    General Requirements.......................................................................................... 654

**Chapter 7: Transaction Processing.......................................................................... 657**

Core Principle 7.1.................................................................................................... 657

    Provide Authorization and Settlement Service...................................................... 657

Core Principle 7.2.................................................................................................... 657

    Rules Differ by Acceptance Environments........................................................... 657

Core Principle 7.3.................................................................................................... 657

    Financial Responsibility for Processed Transactions............................................ 657

Core Principle 7.4.................................................................................................... 658

    Authorize, Clear, and Settle International Transactions........................................ 658

---

© 2012 Visa. All Rights Reserved.

# A2746

---

Visa International Operating Regulations

---

Access to Visa Systems.................................................................................................. 658

    VisaNet Access.......................................................................................................... 658

Data Quality................................................................................................................... 660

    Authorization and Clearing Data Requirements....................................................... 660

Account BIN Range........................................................................................................ 663

    Account Range Table................................................................................................ 663

    Account Level Processing......................................................................................... 663

General Authorization Requirements.............................................................................. 664

    Authorization Services.............................................................................................. 664

    Authorization Computer Interface Requirements..................................................... 665

    Authorization Processing.......................................................................................... 667

    Issuer Authorization Requirements.......................................................................... 669

    Member Authorization Services................................................................................ 670

    Code 10 Authorizations - U.S. Region..................................................................... 671

    Authorization Amount............................................................................................... 672

Manual Authorizations.................................................................................................... 674

    Manual Authorization Procedures............................................................................ 674

Emergency Authorizations............................................................................................. 675

    Emergency Authorization Procedures...................................................................... 675

Partial Authorizations..................................................................................................... 677

    Partial Authorization Service Requirements............................................................. 677

Non-Visa Transaction Authorizations............................................................................. 678

    Processing Requirements......................................................................................... 678

Stand-In Processing (STIP)............................................................................................ 679

---

© 2012 Visa. All Rights Reserved.

# A2747

Stand-In Processing Requirements.......................................................................... 679

Authorization Request Monitoring............................................................................ 681

Authorization Request Monitoring Requirements.................................................. 681

Authorization Response Standards.......................................................................... 682

Approval, Referral, and Decline Rate Standards.................................................. 682

Automated Referral Service...................................................................................... 684

Automated Referral Service (ARS) - U.S. Region.............................................. 684

Referral Responses.................................................................................................... 686

Referral Response Requirements.......................................................................... 686

Authorization Reversals, Rejections, and Declines................................................ 691

Authorization Reversals and Rejections............................................................... 691

Declined Authorizations............................................................................................. 692

Decline Response Requirements............................................................................ 692

Allowable Decline and Referral Reasons by Product.......................................... 693

VisaNet Clearing........................................................................................................ 694

VisaNet Clearing - General Requirements............................................................ 694

Domestic Interchange............................................................................................. 700

Interchange Files and Tapes.................................................................................. 701

Currency Requirements........................................................................................... 701

ATM Clearing........................................................................................................... 702

Non-Visa Transaction Processing - U.S. Region................................................. 703

Single Message System (SMS)................................................................................ 703

General Requirements............................................................................................. 703

Online Financial and Deferred Clearing.................................................................. 704

© 2012 Visa. All Rights Reserved.

# A2748

---

Visa International Operating Regulations

Online Financial and Deferred Clearing General Requirements - U.S. Region.......................... 704

Online Financial Transactions................................................................................... 705

Clearing Reversals and Adjustments............................................................................... 706

Clearing Reversals........................................................................................................ 706

Adjustments.................................................................................................................. 708

Duplicate or Erroneous Data.......................................................................................... 709

Duplicate or Erroneous Data Processing Requirements..................................................... 709

Settlement..................................................................................................................... 712

General Settlement Requirements................................................................................... 712

Billing and Settlement Currencies................................................................................... 712

Settlement Account Requirements................................................................................... 713

Late Settlement Fee...................................................................................................... 713

Settlement Financial Obligations.................................................................................... 713

National Net Settlement................................................................................................. 714

Payment to Merchants.................................................................................................. 715

Transaction Receipt Processing....................................................................................... 716

Transaction Receipt Processing Time Limits..................................................................... 716

Transaction Receipt Processing - Invalid or Illegible Account Number................................... 720

Original Credit.............................................................................................................. 721

Original Credit - General................................................................................................ 721

Money Transfer Original Credit...................................................................................... 723

Money Transfer Original Credit - General........................................................................ 723

Bill Payment................................................................................................................. 726

Bill Payment Requirements - AP Region.......................................................................... 726

---

© 2012 Visa. All Rights Reserved.

# A2749

Visa International Operating Regulations

Bill Payment - U.S. Region...........................................................................................727

Bill Payment - U.S. Region...........................................................................................727

**Chapter 8: Risk Management......................................................................................729**

Core Principle 8.1........................................................................................................729

Adherence to Risk and Fraud Controls....................................................................729

Core Principle 8.2........................................................................................................729

Report All Fraud Activity to Visa..............................................................................729

Core Principle 8.3........................................................................................................729

Protect Visa Account and Transaction Data.............................................................729

Core Principle 8.4........................................................................................................730

Protect Against Illegal Activities..............................................................................730

Security and Fraud Control Requirements....................................................................730

General Security and Fraud Control Requirements....................................................730

Account and Transaction Information Security..............................................................732

Data Security...........................................................................................................732

Confidential Consumer Cardholder Information..........................................................736

Information Security Programs..................................................................................737

Fines and Penalties..................................................................................................740

Corporate Risk Reduction............................................................................................741

Corporate Risk Reduction - General.........................................................................741

Corporate Risk Reduction - Acquirer Requirements..................................................743

Anti-Money Laundering.............................................................................................745

Anti-Money Laundering Compliance.........................................................................746

Acquirer Risk Program - U.S. Region.......................................................................747

© 2012 Visa. All Rights Reserved.
VISA PUBLIC

# A2750

Visa International Operating Regulations

Compliance Monitoring.............................................................................. 748

  Member Activity Monitoring Requirements............................................... 748

  Chargeback Monitoring............................................................................ 753

  Fraud Monitoring..................................................................................... 761

  High-Brand Risk Merchant Monitoring..................................................... 768

Brand Protection....................................................................................... 779

  Global Brand Protection Program............................................................ 779

Fraud Reporting........................................................................................ 782

  Fraud Reporting Requirements................................................................ 782

  Fraud Reporting Compliance.................................................................... 784

  Fraud Reporting Fines and Penalties....................................................... 787

  Fraud Losses and Investigation............................................................... 787

Card Recovery.......................................................................................... 789

  Return of Recovered Cards..................................................................... 789

  Recovered Counterfeit Cards................................................................... 792

  Card Recovery at the Point of Sale.......................................................... 793

  Card Recovery at an ATM........................................................................ 794

  Recovered Card Handling Fees................................................................ 795

  Recovered Card Rewards........................................................................ 797

Counterfeit Losses.................................................................................... 800

  Counterfeit Transaction Liability............................................................... 800

  Global Compromised Account Recovery (GCAR)....................................... 802

  Account Data Compromise Recovery (ADCR) - U.S. Region..................... 807

  Data Compromise Recovery Solution (DCRS)........................................... 813

© 2012 Visa. All Rights Reserved.