# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),
13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON),
14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON),
14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON),
14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),
14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON)
14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON),
14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON),
14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

*On Appeal from the United States District Court
for the Eastern District of New York*

## JOINT DEFERRED APPENDIX
## VOLUME XX OF XXII
## Pages A4751 to A4924

*Submitted on Behalf of All Parties*

# **Table of Contents**

**Page**

**Volume I**

District Court Docket Entries ................................................... A1

**Volume II**

District Court Docket Entries (cont'd) ................................... A251

**Volume III**

District Court Docket Entries (cont'd) ................................... A501

**Volume IV**

District Court Docket Entries (cont'd) ................................... A751

Transfer Order, dated October 20, 2005 [Docket No. 2]...................... A822

Excerpts of First Consolidated Amended Class Action Complaint,
    dated April 24, 2006 [Docket No. 317] ......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238, dated July 21, 2006
    [Docket No. 455-4] ....................................................... A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney*
    *Antitrust Litigation*, CV-96-5238,
    dated July 21, 2006 [Docket No. 455-5]......................... A850

Excerpts of First Amended Supplemental Class Action Complaint
    (redacted), dated February 20, 2009 [Docket No. 1152]............... A856

Excerpts of Second Consolidated Amended Class Action
    Complaint (redacted), dated February 20, 2009
    [Docket No. 1153] ....................................................... A858

i

**Table of Contents**
**(continued)**

**Page**

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154]................ A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ........................................... A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] ......................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533].................. A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536] ........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ........................................................... A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ................................ A945

**Volume V**

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545]................. A1011

**Table of Contents**
**(continued)**

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
    Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
    Rule 56.1(b) (redacted), dated October 21, 2011
    [Docket No. 1550] ....................................................................... A1014

Excerpts of Network Defendants' Memorandum in Opposition to
    the Individual Plaintiffs' Motion for Summary Judgment
    (redacted), dated October 21, 2011 [Docket No. 1551]................ A1030

Excerpts of European Commission Notification Pursuant to Article
    254 of the EC Treaty (redacted), dated November 23, 2011
    [Docket No. 1573-3] ...................................................................... A1032

Notice of Filing of Memorandum of Understanding,
    dated July 13, 2012 [Docket No. 1587] ......................................... A1042

Memorandum of Understanding, dated July 13, 2012
    [Docket No. 1588] .......................................................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
    [Docket No. 1588-1] ...................................................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
    dated August 21, 2012 [Docket No. 1616-3]................................. A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
    Approval, dated October 19, 2012 [Docket No. 1656].................. A1086

Excerpts of Appendices to Definitive Class Settlement
    Agreement,dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
    Honorable John Gleeson, US District Judge,
    dated November 9, 2012 [Docket No. 1732]................................. A1096

**Table of Contents**
(continued)

**Page**

Excerpts of Revised Appendix F2: Notice of Class Action
    Settlement Authorized by the U.S. District Court, Eastern
    District of New York, dated November 26, 2012
    [Docket No. 1740-2] ...................................................................... A1098

Class Settlement Preliminary Approval Order,
    dated November 27, 2012 [Docket No. 1745]............................... A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
    Plaintiffs' Motion to Stay Class Settlement Preliminary
    Approval Order, dated November 29, 2012 [Docket No. 1751] ... A1111

Letter from Class Counsel to Judge Orenstein,
    dated December 10, 2012 [Docket No. 1760] ............................... A1114

Excerpts of Defendants' Memorandum in Support of Final
    Approval of Definitive Class Settlement Agreement,
    dated April 11, 2013 [Docket No. 2110] ....................................... A1118

Excerpts of Memorandum in Support of Class Plaintiffs' Motion
    for Final Approval of Settlement, dated April 11, 2013
    [Docket No. 2111-1] ....................................................................... A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
    of Class Plaintiffs' Motion for Final Approval of Settlement,
    dated April 11, 2013 [Docket No. 2111-2].................................... A1131

Declaration of Eric D. Green, dated April 11, 2013
    [Docket No. 2111-3] ....................................................................... A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
    Class Settlement, dated April 11, 2013 [Docket No. 2111-5] ....... A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
    Administrator's Implementation of Settlement Notice Plan,
    dated April 11, 2013 [Docket No. 2111-6].................................... A1200

iv

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
    Implementation and Adequacy of Settlement Notice Program,
       dated April 11, 2013 [Docket No. 2113-7]................................... A1215

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
       Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........ A1238

**Volume VI**

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
       Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
       (Cont'd)........................................................................................... A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
    Plaintiffs' Motion for Final Approval of Settlement and Class
    Plaintiffs' Joint Motion for Award of Attorneys' Fees,
    Expenses and Class Plaintiffs' Awards,
       dated April 11, 2013 [Docket No. 2113-6].................................... A1296

Excerpts of Objection of City of Oakland to Final Approval of
    Proposed Settlement, dated May 15, 2013 [Docket No. 2279] ..... A1434

Retailers and Merchants' Objection to Final Approval of the Class
    Action Definitive Settlement Agreement, dated May 15, 2013
    [Docket No. 2281] ......................................................................... A1437

Objection of U.S. Public Interest Research Group to Final
    Approval of Proposed Class Settlement, dated May 23, 2013
    [Docket No. 2361] ......................................................................... A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
    dated May 23, 2013 [Docket No. 2364] ........................................ A1476

Statement of Objections of B & H Foto Electronics Corp.,
    d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........ A1480

**Table of Contents**
**(continued)**

**Page**

Excerpts of Statement of Objections by Boscov's,
   dated May 24, 2013 [Docket No. 2411] ........................................   A1483

Retailers and Merchants' Objection to Final Approval of the Class
   Action Definitive Settlement Agreement, dated May 24, 2013
   [Docket No. 2421] ........................................................................   A1486

**Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
   Action Definitive Settlement Agreement, dated May 24, 2013
   [Docket No. 2421] (cont'd) ........................................................   A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] ..............   A1512

Excerpts of Objections of First Data Corporation, First Data
   Merchant Services, TASQ Technology, Inc., TRS Recovery
   Services Inc., First Data Government Solutions, and TeleCheck
   Services Inc. to Final Approval of Definitive Class Settlement
   Agreement, dated May 24, 2013 [Docket No. 2427] ....................   A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
   Proposed Settlement, dated May 24, 2013 [Docket No. 2432] .....   A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
   Approval of the Settlement, dated May 24, 2013
   [Docket No. 2433] ........................................................................   A1541

Excerpts of Objection of David's Bridal to Final Approval of the
   Proposed Settlement, dated May 24, 2013 [Docket No. 2434] .....   A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
   Proposed Settlement, dated May 24, 2013 [Docket No. 2435] .....   A1553

Declaration of John R. Manna, Vice President Operational
   Controller, Lowe's Companies, Inc., dated May 24, 2013
   [Docket No. 2437] ........................................................................   A1555

vi

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2438] ........................................................... A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2439] ........................................................... A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2441] ........................................................... A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
    Final Approval of the Proposed Settlement, dated May 25,
    2013 [Docket No. 2444] ................................................. A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2445] .................... A1588

Excerpts of Objection of Carter's to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2446] .................... A1601

Objection of Coborn's Incorporated to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
    Final Approval of the Proposed Settlement,
    dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
    the Settlement, dated May 25, 2013 [Docket No. 2449] .............. A1615

Objection of Alon USA, LP to Final Approval of the Proposed
    Settlement, dated May 25, 2013 [Docket No. 2450] .................... A1621

**Table of Contents**
(continued)

Page

Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2451] ........................................................................ A1627

Objection of IKEA US to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2458] .................... A1632

Objection of Jetro Holdings, LLC to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2459] ..... A1650

Objection of Michaels Stores, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2460] ..... A1656

Objection of NATSO Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2461] .................... A1659

Objection of National Restaurant Association to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2464] ........................................................................ A1667

Objection of Panera Bread Company to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2466] ..... A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2467] .................... A1681

Objection of Retail Industry Leaders Association to Final Approval
of the Settlement, dated May 25, 2013 [Docket No. 2469]........... A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2470] ........................................................................ A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2471] ............... A1699

# Table of Contents
## (continued)

**Page**

Excerpts of Objection of The Wendy's Company to Final Approval
    of the Proposed Settlement, dated May 25, 2013
        [Docket No. 2473] ......................................................... A1703

Objection of National Grocers Association to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
        [Docket No. 2493] ......................................................... A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
    Class Members WellPoint, Inc., etc., to the Proposed Rule
    23(b)(2) Settlement Agreement, dated May 27, 2013
        [Docket No. 2493-1] ....................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
    Objections of WellPoint Entities, dated May 17, 2013
        [Docket No. 2493-2] ....................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
    Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
        [Docket No. 2495] ......................................................... A1752

**Table of Contents**
(continued)

**Page**

Excerpts of Memorandum in Support of Objections of Absent
    Putative Rule 23(b)(2) Class Members Target Corporation,
    Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
    Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
    L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
    Ross Company, Closeout Distribution, Inc., Ascena Retail
    Group, Inc., Abercrombie & FitchCo., OfficeMax
    Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
    Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
    American Signature, Inc. to the Proposed Rule 23(b)(2) Class
    and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2495-1] ....................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,*
    *v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
    dated May 27, 2013 [Docket No. 2495-2] ...................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
    [Docket No. 2509] .......................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
    Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
    Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
    Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
    Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517]........... A1828

Statement of Objections of Office Depot, Inc., Viking Office
    Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
    and Solutions4Sure.com, Inc., dated May 27, 2013
    [Docket No. 2519] .......................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
    Superstore East, Inc., Staples the Office Superstore, LLC,
    Staples Contract & Commercial, Inc., Quill Corporation, Quill
    Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
    Thrive Networks, Inc., and SchoolKidz.com,
    dated May 27, 2013 [Docket No. 2525] ......................................... A1836

x

# **Table of Contents**
## (continued)

**Page**

Excerpts of Declaration of Michael S. Weisbach,
  dated May 27, 2013 [Docket No. 2533-2].....................................   A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
  Settlement, dated May 27, 2013 [Docket No. 2534] .....................   A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
  Settlement, dated May 27, 2013 [Docket No. 2536] .....................   A1847

Objections to Final Approval of Proposed Class Action Settlement
  and Notice of Intent to Appear of The Iron Barley Restaurant,
  Homestead Restaurant (Historical Homestead, Inc.), The Feral
  Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
  (d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
  dated May 28, 2013 [Docket No. 2537] ........................................   A1850

National Retail Federation Statement of Objection to Final
  Approval of the Proposed Rule 23(B)(2) Agreement,
  dated May 28, 2013 [Docket No. 2538] ........................................   A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
  28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2] .......   A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
  dated May 28, 2013 [Docket No. 2538-20]...................................   A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
  Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
  [Docket No. 2538-21].....................................................................   A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
  [Docket No. 2540] ..........................................................................   A1924

Objection of National Cooperative Grocers Association to Final
  Approval of the Proposed Settlement, dated May 28, 2013
  [Docket No. 2546] ..........................................................................   A1926

**Table of Contents**
**(continued)**

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
　　Proposed Settlement, dated May 28, 2013 [Docket No. 2559] ..... A1934

Objection of National Association of Convenience Stores to Final
　　Approval of Proposed Settlement, dated May 28, 2013
　　[Docket No. 2561] ........................................................................ A1942

Objection of Affiliated Foods Midwest to Final Approval of the
　　Proposed Settlement, dated May 28, 2013 [Docket No. 2563] ..... A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
　　Settlement, dated May 28, 2013 [Docket No. 2587] .................... A1963

The Home Depot's Statement of Objections to the Proposed Class
　　Settlement and Memorandum in Support, dated May 28, 2013
　　[Docket No. 2591] ........................................................................ A1973

**Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
　　Settlement and Memorandum in Support, dated May 28, 2013
　　[Docket No. 2591] (Cont'd) .......................................................... A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
　　Home Depot's Objection to the Proposed Class Settlement,
　　dated May 28, 2013 [Docket No. 2591-2] ..................................... A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
　　Settlement, dated May 28, 2013 [Docket No. 2592] .................... A2028

Objection of Consumers Union of United States, Inc. to Final
　　Approval of Proposed Class Settlement, dated May 28, 2013
　　[Docket No. 2598] ........................................................................ A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
　　Settlement, dated May 28, 2013 [Docket No. 2605] .................... A2040

**Table of Contents**
(continued)

Page

Excerpts of Objection of Starbucks to Final Approval of the
Proposed Settlement, dated May 28, 2013 [Docket No. 2606] ..... A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
Partners LLC, dated May 28, 2013 [Docket No. 2613]................. A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
dated May 28, 2013 [Docket No. 2613-1].................................... A2075

Objection of National Community Pharmacists Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2619] ........................................................................ A2107

Statement of Objections and Amici Curiae Brief of States to Final
Approval of the Settlement, dated May 28, 2013
[Docket No. 2623] ........................................................................ A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643] .................... A2147

Excerpts of Declaration of David Cote in Support of BlueCross
BlueShield of South Carolina Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-3]................. A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
and Blue Shield of Arizona, Inc. Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-4]................. A2180

Excerpts of Declaration of Matthew Brolly in Support of
Independence Blue Cross Objections to Proposed Settlement,
dated May 28, 2013 [Docket No. 2643-6].................................... A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
Cross of Northeastern Pennsylvania Objections to Proposed
Settlement, dated May 28, 2013 [Docket No. 2643-7]................. A2184

xiii

## **Table of Contents**
### (continued)

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28,
2013 [Docket No. 2644] .................................................................. A2186

Excerpts of Objection of American Express Company, American
Express Travel Related Services Company, Inc., Travel
Impressions, Ltd., American Express Publishing Corp., Serve
Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee,
USA, Amex Assurance Company, and Accertify, Inc. to the
Class Settlement Agreement, dated May 28, 2013 [Docket No.
2648] ........................................................................................... A2213

Declaration of Stephen B. McCurdy in Support of Objections of
American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

### **Volume X**

Notice of Motion of DFS Services LLC and Discover Bank to
Intervene, dated May 28, 2013 [Docket No. 2655] ....................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013
[Docket No. 2657-6] ....................................................................... A2252

Objection of DFS Services LLC, Discover Loans, Inc., and
Discover Bank to Final Approval of Proposed Settlement,
dated May 28, 2013 [Docket No. 2659] ........................................ A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule
23(b)(3) Damages Case, dated May 28, 2013
[Docket No. 2663] .......................................................................... A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in
Opposition to Motion for Final Approval of Settlement, dated
May 28, 2013 [Docket No. 2670] ................................................... A2278

**Table of Contents**
(continued)

**Page**

Excerpts of Declaration of Jeffrey I. Shinder in Support of
Opposition to Class Plaintiffs' Motion for Final Approval of
the Proposed Class Settlement, dated May 28, 2013
[Docket No. 2670-1] ....................................................... A2300

Excerpts of Report of Professor Jerry Hausman,
dated May 28, 2013 [Docket No. 2670-5] .................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
Shinder: "Industry Facts Concerning Debit Card Regulation
Under Section 920," by Stephen Craig Mott,
BetterBuyDesigns, on Behalf of the Merchants Payments
Coalition, submitted to Federal Reserve System, October 29,
2010; Attachment F: "2011 Interchange Fee Revenue, Covered
Issuer Costs, and Covered Issuer and Merchant Fraud Losses
Related to Debit Card Transactions," Board of Governors of
the Federal Reserve System, March 5, 2013
[Docket No. 2670-6] ....................................................... A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
- Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
Reactions to Credit Card Settlement", by Maria Aspan and
Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
Analysis of the Proposed Interchange Fee Litigation
Settlement," by Adam J. Levitin, Georgetown Law and
Economics Research Paper No. 12-033, August 21, 2012; Ex.
70: The Nilson Report, February 2013, Issue 1,011; American
Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
"Merchant Surcharging – Understanding Payment Card
Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
to Support the U.S. Merchant Litigation Settlement," Visa,
2013; Ex, 77: "Notice of MasterCard Rule Changes,"
MasterCard Worldwide, December 2012; Ex. 78:
Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
Territories, regarding Merchant Class Action Litigation
Settlement – Important Changes to Merchant Acceptance

**Table of Contents**
(continued)

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses
Q2 2012 Results - Earnings Call Transcript," Visa, May 20,
2013; Ex. 84: "New Visa, MasterCard fees stir debate within
industry," The Green Sheet Online, March 12, 2013; Ex. 94:
MasterCard Incorporated Management Discusses Q2 2012
Results - Earnings Call Transcript, May 20, 2013; Ex. 95:
MasterCard's CEO Discusses Q4 2012 Results - Earnings Call
Transcript, May 20, 2013 [Docket No. 2670-8] ........................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder:
Ex. 97: "Reform of Australia's Payments System: Preliminary
Conclusions of the 2007/08 Review," Reserve Bank of Australia,
April, 2008; Ex. 108: Amended and Restated Global Restructuring
Agreement [Docket No. 2670-9] ................................................... A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed
Class Settlement Agreement, dated June 5, 2013
[Docket No. 3074] ........................................................................ A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013
[Docket No. 3755] ........................................................................ A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed
Class Settlement Agreement, dated June 6, 2013
[Docket No. 4237] ........................................................................ A2405

Excerpts of Statement of Objections of the Society of Independent
Gasoline Marketers of America, dated June 7, 2013
[Docket No. 4640] ........................................................................ A2407

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated June 7, 2013 [Docket No. 4654] ...................... A2415

**Table of Contents**
**(continued)**

**Page**

Statement of Objections of Life Time Fitness, Inc.,
    dated June 11, 2013 [Docket No. 5385] ........................................  A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
    dated June 11, 2013 [Docket No. 5406] ......................................  A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
    [Docket No. 5651] ........................................................................  A2434

Excerpts of Defendants' Reply Memorandum in Support of
    Final Approval of Definitive Class Settlement Agreement,
    dated August 16, 2013 [Docket No. 5937] ...................................  A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
    Further Support of Settlement Final Approval,
    dated August 16, 2013 [Docket No. 5939] ...................................  A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
    [Docket No. 5939-3] ....................................................................  A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
    to the Proposed Class Settlement (redacted),
    dated August 16, 2013 [Docket No. 5939-5]................................  A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
    Plaintiffs' Motion for Final Approval of the Proposed Class
    Settlement, dated August 16, 2013 [Docket No. 5939-6]..............  A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
    Joint Motion for Award of Attorneys' Fees, Expenses and
    Class Plaintiffs' Awards, dated August 16, 2013
    [Docket No. 5940] ........................................................................  A2471

Excerpts of Reply Memorandum in Support of FDC's
    Motion to Opt Out of Rule 23(b)(2) Class Settlement,
    dated August 23, 2013 [Docket No. 5957] ...................................  A2473

**Table of Contents**
(continued)

**Page**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] .................................... A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
dated August 28, 2013 [Docket No. 5965] (Cont'd) .................... A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
Report of Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5978] ........................................................................ A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
Professor Alan O. Sykes, dated September 4, 2013
[Docket No. 5982] ........................................................................ A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
Correct Misstatements in Supplemental Declaration of
Craig Wildfang and in Opposition to Final Approval,
dated September 10, 2013 [Docket No. 6006-1] .......................... A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-2] .................................................................... A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-3] .................................................................... A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
Misstatements in Supplemental Declaration of Craig Wildfang
and in Opposition to Final Approval, dated September 10, 2013
[Docket No. 6006-4] .................................................................... A2553

**Table of Contents**
**(continued)**

**Page**

Excerpts of Transcript of Fairness Heating before the
    Honorable John Gleeson, U.S. District Court Judge,
        dated September 12, 2013 [Docket No. 6094]............................... A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
    dated December 13, 2013 [Docket No. 6125] ............................... A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
    dated December 13, 2013 [Docket No. 6126] ............................... A2588

Notice of Appeal of Target Group Objectors,
    dated December 13, 2013 [Docket No. 6128] ............................... A2589

Notice of Appeal of National Retail Federation,
    dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
    [Docket No. 6175] ........................................................................ A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
    WellPoint Objectors, dated January 10, 2014
    [Docket No. 6176] ........................................................................ A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
    [Docket No. 6178] ........................................................................ A2602

Notice of Appeal of First Data Corporation, First Data Merchant
    Services, TASQ Technology, Inc., TRS Recovery Services,
    Inc., First Data Government Solutions, and Telecheck Services,
    Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
    Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
    Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
    Tousled Hair Studio), and Kristina Newman – Hair,
    dated January 10, 2014 [Docket No. 6182] ................................... A2606

**Table of Contents**
**(continued)**

**Page**

Notice of Appeal of U.S. PIRG, dated January 13, 2014
[Docket No. 6189] ........................................................ A2608

Notice of Appeal of Consumers Union of United States, Inc.,
dated January 13, 2014 [Docket No. 6190] .................................. A2609

Amended Notice of Appeal of Target Group Objectors,
dated January 21, 2014 [Docket No. 6212] .................................. A2610

Amended Notice of Appeal of Temple Eagle,
dated January 13, 2014 [Docket No. 6227] .................................. A2611

Notice of Appeal of National Federation of Independent Business,
dated February 7, 2014 [Docket No. 6234] .................................. A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
Objectors and WellPoint Objectors, dated February 7, 2014
[Docket No. 6238] ........................................................ A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
Homestead Restaurant (Historical Homestead, Inc.), The Feral
Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
(d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
dated February 13, 2014 [Docket No. 6245] ................................ A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
(Amending Notice Of Appeal Filed December 13, 2013),
dated February 13, 2014 [Docket No. 6248] ................................ A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
dated February 13, 2014 [Docket No. 6251] ................................ A2625

## **Table of Contents**
### **(continued)**

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
LLC and Temple Eagle Partners LLC, dated February 18, 2014
[Docket No. 6257] ........................................................................ A2626

Amended Notice of Appeal of R & M Objectors,
dated February 25, 2014 [Docket No. 6263] ................................. A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
dated June 25, 2009 ...................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
Credit Cards: *Rising Interchange Fees Have Increased Costs
for Merchants, but Options for Reducing Fees Pose
Challenges*, dated 11/2009 ............................................................ A2638

Final Judgment as to Defendants MasterCard International
Incorporated and Visa Inc., *U.S. v. American Express Co.*,
CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
CV-4996 DE 143] .......................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

### **Volume XII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) ................................................... A2751

### **Volume XIII**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) ................................................... A3001

### **Volume XIV**

Visa International Operating Regulations,
dated October 15, 2012 (Cont'd) ................................................... A3251

# **Table of Contents**
## (continued)

**Page**

### Volume XV

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................... A3501

### Volume XVI

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................... A3751

### Volume XVII

Interlink Network, Inc. Operating Regulations,
    dated November 15, 2012 ............................................................ A4009

### Volume XVIII

MasterCard Rules, dated April 11, 2012 ............................................. A4259

### Volume XIX

MasterCard Rules, dated April 11, 2012 (Cont'd) .............................. A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
    Case T-111/08, Judgment of the General Court
    (Seventh Chamber), dated May 24, 2012 ...................................... A4614

Minute Order deeming all pending motions for relief withdrawn
    without prejudice to reinstatement if the settlement is not
    consummated, dated July 17, 2012................................................ A4616

Minute Order upholding Judge Orenstein's order denying
    disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

xxii

**Table of Contents**
**(continued)**

**Page**

Excerpts of Class Settlement Agreement, *In re Am. Express Anti-Steering Rules Antitrust Litig*. (NGG)(RER), No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014 [Docket No. 11-md-2221 DE 306-2] .............................................. A4623

**Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express Anti-Steering Rules Antitrust Litig*. (NGG)(RER), No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014 [Docket No. 11-md-2221 DE 306-2] (Cont'd) .............................. A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement, *In re: American Express Anti-Steering Rules Antitrust Litig*., 11-md-2221 (NGG)(RER), (Redacted - Public Version), dated April 15, 2014 [Docket No. 11-md-2221 DE 362] ....................................... A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American Express Anti-Steering Rules Antitrust Litig*., 11-md-02221 (NGG)(RER) (redacted), dated April 15, 2014 [Docket No. 11-md-2221 DE 370] .................................................. A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., No. 14-md-1720 (JG)(JO), dated July 18, 2014 [Docket No. 14-md-1720 DE 104] .................................................. A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., No. 14-md-1720 (JG)(JO), dated July 18, 2014 [Docket No. 14-md-1720 DE 105] ............................................... A4836

# Table of Contents
## (continued)

**Page**

## Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
    Judgment of the Court (Third Chamber),
    dated September 11, 2014............................................................... A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.*
    *Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
    dated September 26, 2014 [Docket No. 13-cv-5746 DE 41]......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
    No. 13-4537 ................................................................................ A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
    Education ..................................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
    U.S. District Court, Eastern District of New York ....................... A5090

## Volume XXII

### *Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
    (filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
    to Individual Plaintiffs' Statement of Undisputed Facts,
    Pursuant to Local Rule 56.1(b) (filed under seal),
    dated May 6, 2011 [Docket No. 1477-7] ...................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
    There is No Genuine Issue to be Tried (filed under seal), dated
    February 11, 2011 [Docket No. 1478-4] ...................................... A5125

**Table of Contents**
**(continued)**

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
dated July 2, 2009 [Docket No. 2088] ............................................ A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
under seal), dated December 14, 2009 [Docket No. 2088] ............ A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
seal), dated December 14, 2009 [Docket No. 2088] ...................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
dated May 3, 2011 [Docket No. 2088] .......................................... A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
dated May 3, 2011 [Docket No. 2088] .......................................... A5191

Memorandum of Law in Support of Motion to Intervene of DFS
Services LLC and Discover Bank (filed under seal), dated May
28, 2013 [Docket No. 2657-1] ...................................................... A5200

Declaration of Jennifer M. Selendy (filed under seal),
dated May 28, 2013 [Docket No. 2657-3] ...................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
dated May 28, 2013 [Docket No. 2657-4] ...................................... A5231

Declaration of Roger Hochschild (filed under seal),
dated May 28, 2013 [Docket No. 2657-5] ...................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
Notice of Class Action Settlement Authorized by the U.S.
District Court, Eastern District of New York (filed under seal)
[Docket No. 2657-7] ...................................................................... A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
dated July 2, 2009 ........................................................................ A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
dated December 15, 2009 .............................................................. A5295

**<u>Table of Contents</u>**
**(continued)**

<u>**Page**</u>

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
dated June 22, 2010 ........................................................................ A5297

# A4751

| | |
|---|---|
| *Spence v. Microsoft Corp. (Antitrust Litigation)* | Wis. Cir. Ct., 00-CV-003042 |
| *Pennington v. The Coca Cola Co. (Diet Coke)* | Mo. Cir. Ct., 04-CV-208580 |
| *Sunderman v. Regeneration Technologies, Inc. (Human Tissue Litigation)* | S.D. Ohio, 1:06-CV-075-MHW |
| *Splater v. Thermal Ease Hydronic Systems, Inc.* | Wash. Super. Ct., 03-2-33553-3-SEA |
| *Peyroux v. The United States of America (New Orleans Levee Breech)* | E.D. La., 06-2317 |
| *Chambers v. DaimlerChrysler Corp. (Neon Head Gaskets)* | N.C. Super. Ct., 01:CVS-1555 |
| *Ciabattari v. Toyota Motor Sales, U.S.A., Inc. (Sienna Run Flat Tires)* | N.D. Cal., C-05-04289-BZ |
| *In re Bridgestone Securities Litigation* | M.D. Tenn., 3:01-CV-0017 |
| *In re Mutual Funds Investment Litigation (Market Timing)* | D. Md., MDL No. 1586 |
| *Accounting Outsourcing v. Verizon Wireless* | M.D. La., 03-CV-161 |
| *Hensley v. Computer Sciences Corp.* | Ark. Cir. Ct., CV-2005-59-3 |
| *Peek v. Microsoft Corporation* | Ark. Cir. Ct., CV-2006-2612 |
| *Reynolds v. The Hartford Financial Services Group, Inc.* | D. Ore., CV-01-1529 BR |
| *Schwab v. Philip Morris USA, Inc.* | E.D. N.Y., CV-04-1945 |
| *Zarebski v. Hartford Insurance Co. of the Midwest* | Ark. Cir. Ct., CV-2006-409-3 |
| *In re Parmalat Securities Litigation* | S.D. N.Y., MDL No. 1653 (LAK) |
| *Beasley v. The Reliable Life Insurance Co.* | Ark. Cir. Ct., CV-2005-58-1 |
| *Sweeten v. American Empire Insurance Company* | Ark. Cir. Ct., 2007-154-3 |
| *Govt. Employees Hospital Assoc. v. Serono Int., S.A.* | D. Mass., 06-CA-10613-PBS |
| *Gunderson v. Focus Healthcare Management, Inc.* | 14th Jud. D. Ct. La., 2004-2417-D |
| *Gunderson v. F.A. Richard & Associates, Inc., et al.* | 14th Jud. D. Ct. La., 2004-2417-D |
| *Perez v. Manor Care of Carrollwood* | 13th Jud. Cir. Fla., 06-00574-E |
| *Pope v. Manor Care of Carrollwood* | 13th Jud. Cir. Fla., 06-01451-B |
| *West v. Carfax, Inc.* | Ohio C.P., 04-CV-1898 (ADL) |
| *Hunsucker v. American Standard Ins. Co. of Wisconsin* | Ark. Cir. Ct., CV-2007-155-3 |
| *In re Conagra Peanut Butter Products Liability Litigation* | N.D. Ga., MDL No. 1845 (TWT) |
| *The People of the State of CA v. Universal Life Resources (Cal DOI v. CIGNA)* | Cal. Super. Ct., GIC838913 |



PORTLAND AREA OFFICE   10300 SW ALLEN BLVD   BEAVERTON, OR 97005   T 503-597-7697
PHILADELPHIA AREA OFFICE   1420 LOCUST ST 30 F   PHILADELPHIA, PA 1910   T 215-721-2120

24

# A4752

| | |
|---|---|
| *Burgess v. Farmers Insurance Co., Inc.* | D. Okla., CJ-2001-292 |
| *Grays Harbor v. Carrier Corporation* | W.D. Wash., 05-05437-RBL |
| *Perrine v. E.I. Du Pont De Nemours & Co.* | W. Va. Cir. Ct., 04-C-296-2 |
| *In re Alstom SA Securities Litigation* | S.D. N.Y., 03-CV-6595 VM |
| *Brookshire Bros. v. Chiquita (Antitrust)* | S.D. Fla., 05-CIV-21962 |
| *Hoorman v. SmithKline Beecham* | Ill. Cir. Ct., 04-L-715 |
| *Santos v. Government of Guam (Earned Income Tax Credit)* | D. Guam, 04-00049 |
| *Johnson v. Progressive* | Ark. Cir. Ct., CV-2003-513 |
| *Bond v. American Family Insurance Co.* | D. Ariz., CV06-01249-PXH-DGC |
| *In re SCOR Holding (Switzerland) AG Litigation (Securities)* | S.D. N.Y., 04-cv-7897 |
| *Shoukry v. Fisher-Price, Inc. (Toy Safety)* | S.D. N.Y., 07-cv-7182 |
| *In re: Guidant Corp. Plantable Defibrillators Prod's Liab. Litigation* | D. Minn., MDL No. 1708 |
| *Clark v. Pfizer, Inc (Neurontin)* | C.P. Pa., 9709-3162 |
| *Angel v. U.S. Tire Recovery (Tire Fire)* | W. Va. Cir. Ct., 06-C-855 |
| *In re TJX Companies Retail Security Breach Litigation* | D. Mass., MDL No. 1838 |
| *Webb v. Liberty Mutual Insurance Co.* | Ark. Cir. Ct., CV-2007-418-3 |
| *Shaffer v. Continental Casualty Co. (Long Term Care Ins.)* | C.D. Cal., SACV06-2235-PSG |
| *Palace v. DaimlerChrysler (Defective Neon Head Gaskets)* | Ill. Cir. Ct., 01-CH-13168 |
| *Lockwood v. Certegy Check Services, Inc. (Stolen Financial Data)* | M.D. Fla., 8:07-cv-1434-T-23TGW |
| *Sherrill v. Progressive Northwestern Ins. Co.* | 18th D. Ct. Mont., DV-03-220 |
| *Gunderson v. F.A. Richard & Assocs., Inc. (AIG)* | 14th Jud. D. Ct. La., 2004-2417-D |
| *Jones v. Dominion Resources Services, Inc.* | S.D. W. Va., 2:06-cv-00671 |
| *Gunderson v. F.A. Richard & Assocs., Inc. (Wal-Mart)* | 14th Jud. D. Ct. La., 2004-2417-D |
| *In re Trans Union Corp. Privacy Litigation* | N.D. Ill., MDL No. 350 |
| *Gudo v. The Administrator of the Tulane Ed. Fund* | La. D. Ct., 2007-C-1959 |
| *Guidry v. American Public Life Insurance Co.* | 14th Jud. D. Ct. La., 2008-3465 |
| *McGee v. Continental Tire North America* | D. N.J., 2:06-CV-06234 (GEB) |



| PORTLAND AREA OFFICE | 10300 SW ALLEN BLVD | BEAVERTON, OR 97005 | T 503-597-7697 |
| PHILADELPHIA AREA OFFICE | 1420 LOCUST ST 30 F | PHILADELPHIA, PA 1910 | T 215-721-2120 |

25

# A4753

| | |
|---|---|
| *Sims v. Rosedale Cemetery Co.* | W. Va. Cir. Ct., 03-C-506 |
| *Gunderson v. F.A. Richard & Assocs., Inc. (Amerisafe)* | 14th Jud. D. Ct. La., 2004-002417 |
| *In Re Katrina Canal Breaches Consolidated Litigation* | E.D. La., 05-4182 |
| *In re Department of Veterans Affairs (VA) Data Theft Litigation* | D. D.C., MDL No. 1796 |
| *Dolen v. ABN AMRO Bank N.V. (Callable CD's)* | Ill. Cir. Ct., 01-L-454 and 01-L-493 |
| *Pavlov v. CNA (Long Term Care Insurance)* | N.D. Ohio, 5:07cv2580 |
| *Steele v. Pergo( Flooring Products)* | D. Ore., 07-CV-01493-BR |
| *Opelousas Trust Authority v. Summit Consulting* | 27th Jud. D. Ct. La., 07-C-3737-B |
| *Little v. Kia Motors America, Inc. (Braking Systems)* | N.J. Super. Ct., UNN-L-0800-01 |
| *Boone v. City of Philadelphia (Prisoner Strip Search)* | E.D. Pa., 05-CV-1851 |
| *In Re Countrywide Customer Data Breach Litigation* | W.D. Ky., MDL No.1998 |
| *Miller v. Basic Research (Weight-loss Supplement)* | D. Utah, 2:07-cv-00871-TS |
| *Gunderson v. F.A. Richard & Assocs., Inc. (Cambridge)* | 14th Jud. D. Ct. La., 2004-002417 |
| *Weiner v. Snapple Beverage Corporation* | S.D. N.Y., No. 07-CV-08742 |
| *Holk v. Snapple Beverage Corporation* | D. N.J., No 3:07-CV-03018-MJC-JJH |
| *Coyle v. Hornell Brewing Co. (Arizona Iced Tea)* | D. N.J., No. 08-CV-2797-JBS-JS |
| *In Re: Heartland Data Security Breach Litigation* | S.D. Tex., MDL No. 2046 |
| *Satterfield v. Simon & Schuster, Inc. (Text Messaging)* | N.D. Cal., No. 06-CV-2893 CW |
| *Schulte v. Fifth Third Bank (Overdraft Fees)* | N.D. Ill., No. 1:09-CV-06655 |
| *Trombley v. National City Bank (Overdraft Fees)* | D. D.C., No. 1:10-CV-00232 |
| *Vereen v. Lowe's Home Centers (Defective Drywall)* | Ga. Super. Ct., SU10-CV-2267B |
| *Mathena v. Webster Bank, N.A. (Overdraft Fees)* | D. Conn, No. 3:10-cv-01448 |
| *Delandro v. County of Allegheny (Prisoner Strip Search)* | W.D. Pa., No. 2:06-cv-00927 |
| *Gunderson v. F.A. Richard & Assocs., Inc. (First Health)* | 14th Jud. D. Ct. La., 2004-002417 |
| *Williams v. Hammerman & Gainer, Inc. (Hammerman)* | 27th Jud. D. Ct. La., No. 11-C-3187-B |
| *Williams v. Hammerman & Gainer, Inc. (Risk Management)* | 27th Jud. D. Ct. La., No. 11-C-3187-B |
| *Williams v. Hammerman & Gainer, Inc. (SIF Consultants)* | 27th Jud. D. Ct. La., No. 11-C-3187-B |
| *Gwiazdowski v. County of Chester (Prisoner Strip Search)* | E.D. Pa., No. 2:08cv4463 |

HILSOFT NOTIFICATIONS    PORTLAND AREA OFFICE    10300 SW ALLEN BLVD    BEAVERTON, OR 97005    T 503-597-7697
PHILADELPHIA AREA OFFICE    1420 LOCUST ST 30 F    PHILADELPHIA, PA 1910    T 215-721-2120

26

# A4754

| | |
|---|---|
| *Williams v. S.I.F. Consultants (CorVel Corporation)* | 27th Jud. D. Ct. La., No. 09-C-5244-C |
| *Sachar v. Iberiabank Corporation (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *LaCour v. Whitney Bank (Overdraft Fees)* | M.D. Fla., No. 8:11cv1896 |
| *Lawson v. BancorpSouth (Overdraft Fees)* | W.D. Ark., No. 1:12cv1016 |
| *McKinley v. Great Western Bank (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Wolfgeher v. Commerce Bank (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Harris v. Associated Bank (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Case v. Bank of Oklahoma (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Nelson v. Rabobank, N.A. (Overdraft Fees)* | Cal. Super. Ct., No. RIC 1101391 |
| *Fontaine v. Attorney General of Canada (Stirland Lake and Cristal Lake residential schools)* | Ont. Super. Ct., 00-CV-192059 CP |
| *Opelousas General Hospital Authority v. FairPay Solutions* | 27th Jud. D. Ct. La., 12-C-1599-C |
| *Marolda v. Symantec Corporation (Software Upgrades)* | N.D. Cal., No. 3:08-cv-05701 |
| *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010—Economic and Property Damages Settlement* | E.D. La., MDL No. 2179 |
| *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010—Medical Benefits Settlement* | E.D. La., MDL No. 2179 |
| *Vodanovich v. Boh Brothers Construction (Hurricane Katrina Levee Breaches)* | E.D. La., 05-cv-4191 |
| *Gessele et al. v. Jack in the Box, Inc.* | D.Or., No. 3:10-cv-960 |
| *Duval v. Citizens Financial Group, Inc. (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Mosser v. TD Bank, N.A. (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* | E.D. N.Y., MDL No. 1720 |
| *Saltzman v. Pella Corporation (Building Products)* | N.D. Ill., No. 06-cv-4481 |
| *In Re: Zurn Pex Plumbing, Products Liability Litigation* | D. Minn., MDL No. 1958 |
| *Blahut v. Harris, N.A. (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Eno v. M & I Marshall & Ilsley Bank (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Casayuran v. PNC Bank (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Anderson v. Compass Bank (Overdraft Fees)* | S.D. Fla., MDL No. 2036 |
| *Evans, et al. v. TIN, Inc. (Environmental)* | E.D. La., No. 2:11-cv-02067 |



| PORTLAND AREA OFFICE | 10300 SW ALLEN BLVD | BEAVERTON, OR 97005 | T 503-597-7697 |
| PHILADELPHIA AREA OFFICE | 1420 LOCUST ST 30 F | PHILADELPHIA, PA 1910 | T 215-721-2120 |

27

# A4755

| | |
|---|---|
| ***Opelousas General Hospital Authority v. Qmedtrix Systems, Inc.*** | 27th Jud. D. Ct. La., No. 12-C-1599-C |
| ***Williams v. SIF Consultants of Louisiana, Inc. et al.*** | 27th Jud. D. Ct. La., No. 09-C-5244-C |
| ***Miner v. Philip Morris Companies, Inc. et al.*** | Ark. Cir. Ct., No. 60CV03-4661 |
| ***Fontaine v. Attorney General of Canada (Mistassini Hostels Residential Schools)*** | Qué. Super. Ct., No. 500-06-000293-056 & No. 550-06-000021-056 (Hull) |
| ***Glube et al. v. Pella Corporation et al. (Building Products)*** | Ont. Super. Ct., No. CV-11-4322294-00CP |
| ***Yarger v. ING Bank*** | D. Del., No. 11-154-LPS |
| ***Price v. BP Products North America*** | N.D. Ill, No. 12-cv-06799 |
| ***National Trucking Financial Reclamation Services, LLC et al. v. Pilot Corporation et al.*** | E.D. Ark., No. 4:13-cv-00250-JMM |
| ***Johnson v. Community Bank, N.A. et al. (Overdraft Fees)*** | M.D. Pa., No. 3:12-cv-01405-RDM |
| ***Rose v. Bank of America Corporation, et al. (TCPA)*** | N.D. Cal., No. 11-cv-02390-EJD |
| ***McGann, et al., v. Schnuck Markets, Inc. (Data Breach)*** | Mo. Cir. Ct., No. 1322-CC00800 |
| ***Simmons v. Comerica Bank, N.A. (Overdraft Fees)*** | S.D. Fla., MDL No. 2036 |
| ***George Raymond Williams, M.D., Orthopedic Surgery, a Professional Medical, LLC, et al. v. Bestcomp, Inc., et al.*** | 27th Jud. D. Ct. La., No. 09-C-5242-B |
| ***Simpson v. Citizens Bank** (Overdraft Fees)* | E.D. Mich, No. 2:12-cv-10267 |
| ***In re: Plasma-Derivative Protein Therapies Antitrust Litigation*** | N.D. Ill, No. 09-CV-7666 |
| ***In re: Dow Corning Corporation (Breast Implants)*** | E.D. Mich., No. 00-X-0005 |
| ***Mello et al v. Susquehanna Bank (Overdraft Fees)*** | S.D. Fla., MDL No. 2036 |

Hilsoft-cv-130



PORTLAND AREA OFFICE      10300 SW ALLEN BLVD      BEAVERTON, OR 97005      T 503-597-7697
PHILADELPHIA AREA OFFICE  1420 LOCUST ST 30 F      PHILADELPHIA, PA 1910    T 215-721-2120

28

# A4756

## APPENDIX F — SETTLEMENT CLASS NOTICES

### APPENDIX F1

### POST CARD NOTICE

# A4757

# To all individuals and businesses that accept American Express cards: Notice of a class action settlement

*Si desea recibir esta notificación en español, llámenos o visite nuestra página web.*

This notice is authorized by the U.S. District Court, Eastern District of New York to inform you about a proposed settlement in *In re American Express Anti-Steering Rules Antitrust Litigation (II)*, No. 11-MD-2221 and *Marcus Corp. v American Express Co. et al.*, 13-CV-07355.  These cases allege that certain rules applicable to merchants that accept American Express cards violate antitrust laws and result in merchants paying excessive fees.  American Express denies the claims and says it has done nothing wrong. The Court has not decided which side is right because the parties agreed to settle.

**American Express's records show that you are included in the settlement.** The settlement applies to all merchants that accept American Express cards at any location in the United States (including at a physical merchant location, online or via a mobile application) as of or after December 23, 2013, onward.

**The Settlement Terms.** The settlement will require American Express to change its rules to allow merchants who accept American Express cards to charge customers an extra fee or "surcharge" if they pay with an American Express credit or charge card, under certain conditions including that any such surcharge apply to all credit and charge card transactions.  **The specific rule changes and terms of the settlement are explained in detail on the case website (www.AmexMerchantSettlement.com) in the Court-approved, long-form notice ("Notice") and Class Settlement Agreement.  You should review these documents carefully.**  Your legal rights are affected even if you do nothing.  You can also obtain copies of the Notice and Class Settlement Agreement by calling the toll-free number below.

If you want to seek monetary damages related to American Express's existing merchant rules, you can pursue those claims consistent with the dispute resolution provisions contained in your card acceptance agreement.  No money will be distributed to the class.

**Your Options.** You may object to the settlement by **Month/Date, 2014**.  The Notice available at the case website (www.AmexMerchantSettlement.com) explains how to object. The Court will hold a hearing on **Month/Date, 2014** to consider whether to approve the settlement and the request by the attorneys for the class for fees, expenses, and service awards up to a maximum total of $75 million.   You do not need to appear at the hearing or hire your own attorney, although you have the right to do so at your own expense. Regardless of whether you object, if the settlement is finally approved, you will be bound by the Court's final judgment, and the releases explained in the Class Settlement Agreement.

**Questions?  Visit www.AmexMerchantSettlement.com  or call 1-866-686-8694**

# A4758

## APPENDIX F — SETTLEMENT CLASS NOTICES

### APPENDIX F2

### PUBLICATION NOTICE

# A4759

# To all individuals and businesses that accept American Express cards: Notice of a class action settlement.

*Si desea recibir esta notificación en español, llámenos o visite nuestra página web.*

Notice of a class action settlement authorized by the U.S. District Court, Eastern District of New York.

This notice is authorized by the Court to inform you about an agreement to settle two class action lawsuits that may affect you.  The cases - *In re American Express Anti-Steering Rules Antitrust Litigation (II)*, No. 11-MD-2221 and *Marcus Corp. v American Express Co. et al.,* 13-CV-07355 - are in the U.S. District for the Eastern District of New York.  These cases allege that certain rules applicable to merchants that accept American Express cards violate antitrust laws and resulted in merchants paying excessive fees. The Court has not decided which side is right because the parties agreed to settle.

**Who's included?** The settlement applies to a class comprised of all merchants that accept American Express cards at any location in the United States (including at a physical merchant location, online or via a mobile application) as of or after December 23, 2013, onward.

**What are the Settlement terms?** The settlement will require American Express to change its rules to allow merchants who accept American Express cards to charge customers an extra fee or "surcharge" if they pay with an American Express credit or charge card under certain conditions including that any such surcharge apply to all credit and charge card transactions." to the end of the first sentence.   **The specific rule changes and terms of the settlement are explained in detail on the case website (www.AmexMerchantSettlement.com) in the Court-approved, long-form notice ("Notice") and Class Settlement Agreement.  You should review these documents carefully.**  Your legal rights are affected even if you do nothing.   You can also obtain copies of the Notice and Class Settlement Agreement by calling the toll-free number below.

You do not need to file a claim to receive the benefits of the rule changes provided for by the settlement.  If you want to seek monetary damages related to American Express's existing merchant rules, you can pursue those claims consistent with the dispute resolution provisions contained in your card acceptance agreement.  No money will be distributed to the class.

**Your options.** You may object to the settlement by **Month/Date, 2014**.  The Notice available at the website (www.AmexMerchantSettlement.com) explains how to object.  Regardless of whether you object, if the settlement is finally approved, you will be bound by the Court's final judgment and the releases explained in the Class Settlement Agreement, which is available at the website (www.AmexMerchantSettlement.com).

F2-2

# A4760

**Court hearing about the Settlement.**  The Court will hold a hearing on **Month/Date, 2014** to consider whether to approve the settlement and the request by the attorneys for the class for attorneys' fees, expenses, and service awards up to a maximum total of $75 million.   You do not need to appear at the hearing or hire your own attorney.  But you can if you want to, at your own cost.   The Court has appointed Friedman Law Group, LLP, Reinhardt, Wendorf & Blanchfield, and Patton Boggs LLP to represent the class.

**Questions?**  For more information about the settlement you should visit the website (www.AmexMerchantSettlement.com), email info@AmexMerchantSettlement.com, or call 1-866-686-8694
.

**A4761**

## APPENDIX F — SETTLEMENT CLASS NOTICES

## APPENDIX F3

## LONG FORM/WEBSITE NOTICE

**A4762**

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

# To all individuals and businesses that accept American Express cards:

## Notice of a class action settlement.

*A federal court directed this Notice. This is not a solicitation from a lawyer.*

- The Court has preliminarily approved a proposed settlement over allegations that certain rules applicable to individuals and businesses ("merchants") that accept American Express Cards in payment for goods or services violate the antitrust laws resulting in merchants paying excessive fees for accepting American Express cards.

- The settlement applies to a class comprised of all merchants that accept American Express cards at any location in the United States (including at a physical merchant location, online or mobile application), as of or after December 23, 2013, onward.

- The settlement will require American Express to change its merchant rules to allow merchants who accept American Express cards (i) to charge customers an extra fee or "surcharge" if they pay with an American Express credit or charge card, under certain conditions including that any such surcharge apply to all credit and charge card transactions and (ii) to decline acceptance of American Express traditional debit cards, if American Express decides in the future to issue a traditional debit card in the United States.

- If the settlement is approved and American Express changes it rules, any surcharge on American Express credit or charge cards must not be any higher, after accounting for any discounts offered at the point of sale, than any surcharge imposed on transactions made with other credit cards, payment cards, payment methods, products or services accepted by the merchant except for debit cards, cash, checks, wire or ACH transfers or proprietary store cards.

- The rule changes are explained in greater detail below and in the Class Settlement Agreement. A full copy of the Class Settlement Agreement is available on the case website at www.AmexMerchantSettlement.com or by calling 1-866-686-8694.

- Class members do not need to file a claim to receive the benefits of the settlement.

- No money will be distributed to the class. Any class member that wants to seek monetary damages related to American Express's existing merchant rules can pursue those claims consistent with the dispute resolution provisions contained in the merchant's card acceptance agreements and provisions have been made for access to the extensive evidentiary and litigation record that has been created by the attorneys for the class.

- This Notice explains the settlement and the class members' rights and options—**and the deadlines to exercise them**.

- If you are a member of the class your legal rights are affected whether you act or not. Read this Notice carefully.

QUESTIONS? CALL 1-866-686-8694 OR VISIT WWW.AMEXMERCHANTSETTLEMENT.COM

SI DESEA RECIBIR ESTA NOTIFICACIÓN EN ESPAÑOL, LLÁMENOS O VISITE NUESTRA PÁGINA WEB.

F3-2

# A4763

| LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **OBJECT** | Write to the Court about why you do not like any part of the settlement. To find out how to object, please read Question 9, below. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the settlement. |
| **DO NOTHING** | You are not required to take any action to receive the benefits of the settlement. |

- The Court in charge of this case still has to decide whether to approve the settlement.

- Regardless of whether you object, go to a hearing or do nothing, if the settlement is finally approved, you will be bound by the Court's final judgment and the releases explained in the Class Settlement Agreement.

- For the full terms of the settlement, you should review the Class Settlement Agreement, which is available on the case website at www.AmexMerchantSettlement.com or by calling 1-866-686-8694.  In the event of any conflict between the terms of this Notice and the Class Settlement Agreement, the terms of the Class Settlement Agreement shall control.

- Please check www.AmexMerchantSettlement.com for updates relating to the settlement or the settlement approval process.

# A4764

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION** ..................................................................................................**PAGE 4**
    1. Why is this Notice being provided?
    2. What is this lawsuit about?
    3. Why is this a class action?
    4. What is "injunctive relief"?
    5. Why is there a settlement?

**WHO IS IN THE SETTLEMENT** ..........................................................................................**PAGE 5**
    6. How do I know if I am part of the settlement?
    7. What if I am still not sure whether I am included?

**SETTLEMENT BENEFITS** ...............................................................................................**PAGE 6**
    8. What are the benefits of the settlement?

**OBJECTING TO THE SETTLEMENT** ...................................................................................**PAGE 7**
    9. How do I tell the Court if I do not like the settlement?
    10. How does the proposed settlement affect my rights?
    11. Can I get out of the settlement?

**THE LAWYERS REPRESENTING YOU** ..................................................................................**PAGE 9**
    12. Do I have a lawyer in this case?
    13. How will the lawyers be paid?

**THE COURT'S FAIRNESS HEARING** ..................................................................................**PAGE 9**
    14. When and where will the Court decide whether to approve the Settlement?
    15. Do I have to come to the Fairness Hearing?
    16. May I speak at the Fairness Hearing?

**IF YOU DO NOTHING** ..................................................................................................**PAGE 10**
    17. What happens if I do nothing?

**GETTING MORE INFORMATION** .......................................................................................**PAGE 10**
    18. How do I get more information?

# A4765

## BASIC INFORMATION

### 1. Why is this Notice being provided?

You have a right to know about the proposed settlement of this class action lawsuit and about your options relating to the settlement. This Notice explains the litigation, the settlement, your legal rights and what benefits are available.

Judge Nicholas Garaufis of the United States District Court for the Eastern District of New York is overseeing the settlement of the case known as *In re American Express Anti-Steering Rules Antitrust Litigation (II)*, No. 11-MD-2221 (NGG) (RER), along with the case known as *The Marcus Corporation v American Express Co. et al.,* 13-cv-07355 (NGG)(RER), which was transferred to Judge Garaufis in connection with the settlement approval process. For a complete procedural history of the cases included in the settlement, please read the Class Settlement Agreement posted on the case website.

The Court has preliminary approved the settlement; certified an "injunctive" class under Fed. R. Civ. P. 23(b)(2); approved a   plan for notifying Class members of the settlement and the opportunity to file objections;  and created a mechanism for granting final approval of all terms of the Class Settlement Agreement. As part of the final approval process for the settlement, the Court will also be asked to award attorneys' fees and expenses covering the litigation and related activities of counsel and service awards to the merchants that brought the litigation.

This case has been brought on behalf of merchants. The specific merchants that filed the cases are the "Class Plaintiffs" and the Court has authorized them to act on behalf of all merchants in the class in connection with the proposed settlement of the litigation. The Class Plaintiffs are: The Marcus Corporation; Animal Land, Inc., Firefly Air Solutions, LLC, Il Forno, Inc., Italian Colors Restaurant, Jasa Inc., Lopez-Dejonge, Inc., and Plymouth Oil Corp.

The Class Plaintiffs sued American Express Company and American Express Travel Related Services, Inc., which are referred to together in this Notice as "American Express" or "Defendants."

### 2. What is this lawsuit about?

The lawsuit is about American Express's rules for merchants that accept American Express cards as payment for goods and/or services and the fees paid by merchants for accepting American Express cards. Class Plaintiffs claim that American Express violated the antitrust laws by imposing rules that limited merchants from steering their customers to other payment methods and requiring merchants that want to accept any American Express cards to accept all American Express cards. The Class Plaintiffs claim that doing so insulated American Express from competitive pressure to lower merchant fees and caused an upward spiral in merchant fees for American Express, Visa and MasterCard.

American Express denies Class Plaintiffs' claims and says it has done nothing wrong. American Express says that the challenged conduct was lawful, justified, and benefited competition, merchants, and consumers.

# A4766

| **3.  Why is this a class action?** |
|---|

In a class action, one or more individuals or businesses sue on behalf of people or businesses with similar claims.  Together all of these people or businesses with similar claims and interests form a class, and are class members.

When a court decides a case or approves a settlement in a class action, that decision is applicable to all members of the class.  In this case, the Court has created a class and given its preliminary approval to the settlement.  The class that the court created is comprised of all merchants that accept American Express cards at any location in the United States (including at a physical merchant location, online or mobile application), as of or after December 23, 2013, onward.

The class is a mandatory class meaning that all members of the class will be bound by the settlement and that no class member can opt out of the class.

| **4.  What is "injunctive relief"?** |
|---|

The settlement benefits for class members fall under the category of "injunctive relief."  An injunction is when a court orders a person or a business to do or not to do something.  In this case, American Express has agreed to certain changes to its merchant rules related to card acceptance.  The changes to American Express's merchant rules are the benefit the class is receiving in this settlement.  The settlement does not offer payments to class members or adjust any merchant's fees for accepting American Express cards.  If a merchant wants to seek monetary damages related to American Express's merchant rules as they exist prior to the changes brought about by this settlement, the merchant remains free to pursue that claim consistent with the dispute resolution provisions of the merchant's card acceptance agreement.

| **5.  Why is there a settlement?** |
|---|

The Court did not decide which side was wrong or if any laws were violated.  Instead, both sides agreed to settle the litigation to avoid the cost and risk of trial and of appeals that would follow a trial.

The parties agreed to settle this case after close to eleven years of extensive litigation, including a decision by the United States Supreme Court upholding a provision in American Express's merchant card acceptance agreements requiring merchants to pursue claims against American Express on an individual basis in arbitration.  The settlement is the product of extensive negotiations, including mediation with an experienced mediator.  Class Plaintiffs and their counsel believe that settling this case is in the best interests of all class members because it allows class members to receive the benefit of the rules changes.

The settlement does not mean that any law was broken or that American Express did anything wrong.

## WHO IS IN THE SETTLEMENT

To see if you will be affected by the settlement, you first have to determine if you are a class member.

# A4767

| 6. How do I know if I am part of the settlement? |
|---|

**If you received a Postcard Notice in the mail, American Express' records show that you may be a class member.**

The class includes all merchants that accept American Express cards in payment for goods or services at any location in the United States (including at a physical merchant location, online or mobile application) as of or after December 23, 2013, and onward.  The class shall not include the named Defendants, their directors, officers, or members of their families.

| 7. What if I am still not sure whether I am included? |
|---|

If you are still not sure whether you are included, or have any other questions about the settlement, call 1-866-686-8694 or visit the case website www.AmexMerchantSettlement.com. You also may write with questions to Amex Merchant Settlement Administrator, PO Box 4349, Portland, OR 97208-4349 or send an e-mail to  questions@AmexMerchantSettlement.com.

## SETTLEMENT BENEFITS

| 8. What are the benefits of the settlement? |
|---|

American Express will amend its rules for merchants that accept American Express cards at any location in the United States (including at a physical merchant location, online or mobile application) to provide for the following:

a) Merchants will be able to charge a surcharge to customers who pay with an American Express credit or charge card, provided that:

    (i) any surcharge on American Express credit or charge cards must not be any higher, after accounting for any discounts offered at the point of sale, than any surcharge imposed on transactions made with other credit cards, payment cards, payment methods, products or services accepted by the merchant except for: (a) debit cards; (b) cash; (c) checks; (d) wire or ACH transfers; or (e) proprietary store cards.

    (ii) the amount of the surcharge does not exceed the American Express merchant discount rate applicable to that transaction and the amount of the surcharge the merchant is permitted to impose on any other credit card brand;

    (iii) the surcharge is fully disclosed to customers  on the same terms that the merchant is required to disclose Visa and MasterCard surcharges; and

    (iv) the merchant provides 30 days notice to American Express that it intends to surcharge.

b) American Express debit cards, including pre-paid or gift cards, may not be surcharged unless or until similar cards on competitors' brands are subject to surcharging.

c) If American Express offers a traditional debit card in the United States, American Express may not make that card subject to its Honor All Cards policy.  All existing cards

# A4768

remain subject to the Honor All Cards policy, which require merchants to accept all American Express-branded cards.

d) *Exception*:  A merchant may individually negotiate an agreement with American Express to waive or limit its rights to surcharge American Express cards if that agreement satisfies certain terms set forth in the Class Settlement Agreement.

e) Under the settlement, American Express will amend its rules no later than forty-five (45) days after the approval of the settlement becomes final.  If the Court's approval of the settlement is appealed, the settlement will not become final until forty-five (45) days after that appeal is resolved.

For the full terms of the settlement, including the benefits to the class, you should review the Class Settlement Agreement, which is available on the case website at www.AmexMerchantSettlement.com or by calling 1-866-686-8694.  In the event of any conflict between the terms of this Notice and the Class Settlement Agreement, the terms of the Class Settlement Agreement shall control.

## OBJECTING TO THE SETTLEMENT

| 9.  How do I tell the Court if I do not like the settlement? |
| --- |

You can tell the Court that you object to (disagree with) the terms of the Class Settlement Agreement.  You can give reasons why the Court should not approve the settlement.  You can also give reasons why the Court should not approve the petition for attorneys' fees and expenses or the service awards to the Class Plaintiffs that is detailed below in Question 13.  The Court will consider your views.

To object, you must file your Statement of Objection.  It must include the following:

a) The words "American Express Class Action Settlement";

b) State each and every objection you are making to the Settlement;

c) The specific reasons for each objection;

d) Legal support and evidence, if any, for each objection that you want to bring to the Court's attention;

e) Your name, address and phone number;

f) Information sufficient to establish that you are a member of the Settlement Class, such as your business name and address, and how long you have accepted American Express Cards; and

g) The full name, mail address, email address, and phone number of any counsel representing you in connection with the objections.

Your Statement of Objection must be filed by no later than April 11, 2014 (the "Class Objection Period") at the following address:

Clerk of the Court

# A4769

United Sates Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

You must also send a copy of your Statement of Objection to the following addresses postmarked by no later than April 11, 2014:

| CLASS COUNSEL | DEFENDANTS' COUNSEL |
|---|---|
| Mark Reinhardt<br>Reinhardt, Wendorf & Blanchfield<br>E-1250 First National Bank Bldg.<br>332 Minnesota St.<br>St. Paul, MN 55101 | John F. LaSalle<br>Boies, Schiller & Flexner LLP<br>575 Lexington Avenue, 7th Floor<br>New York, New York 10022 |

**Do not call the Court or any Judge's office to object to the Settlement**.  If you have questions, please visit www.AmexMerchantSettlement.com or call 1-866-686-8694.

## 10.  How does the proposed settlement affect my rights?

If the settlement becomes final, all class members will benefit from the changes to the American Express Rules.  In addition, if the settlement becomes final, all class members will be releasing Defendants (American Express Company and American Express Travel Related Services Company, Inc.) and other released parties from all claims that are identified and described in paragraphs 24-41 of the Class Settlement Agreement.  The Class Settlement Agreement may be viewed on the case website at www.AmexMerchantSettlement.com or you can receive a copy by mail by calling 1-866-686-8694.

The Class Settlement Agreement describes the released claims in necessary, accurate, legal terminology, so read it carefully.  In the event of any conflict between the terms of this Notice and the Class Settlement Agreement, the terms of the Class Settlement Agreement shall control.  You can talk to the law firms representing the class listed in Question 12 for free; or you can, at your own expense, talk to your own lawyer if you have questions about the released claims or what they mean.

## 11.  Can I get out of the settlement?

No.  The settlement requires American Express to make changes to its rules for merchants that accept American Express cards at any location in the United States (including at a physical merchant location, online or via mobile application), in ways that benefit all class members equally.  As explained above, this type of remedy is "injunctive."  Therefore, under this type of class action, you cannot exclude yourself from the class or this settlement.  However, as explained above, you can still object to the settlement.  If the settlement is finally approved, it will be applicable to all merchants regardless of whether or not they object.

# A4770

## THE LAWYERS REPRESENTING YOU

| 12.  Do I have a lawyer in this case? |
|---|

Yes.  The law firms identified below represent you and other class members:

| Gary B. Friedman<br>Tracey Kitzman<br>Friedman Law Group LLP<br>270 Lafayette Street<br>New York, NY 10012 | Read K. McCaffrey<br>Patton Boggs LLP<br>2550 M Street, NW<br>Washington, DC 20037 | Mark Reinhardt<br>Mark A. Wendorf<br>Reinhardt Wendorf & Blanchfield<br>1250 East First National Bank Bldg<br>332 Minnesota Street<br>St. Paul, MN 55101 |
|---|---|---|

These lawyers are called "Class Counsel."  You will not be charged for these lawyers or for other counsel involved in the settlement.  Any attorneys' fees, reimbursement of expenses and service awards to the Class Plaintiffs that are awarded by the Court will be paid directly by American Express.  If you want to be represented by your own lawyer, you may hire one at your own expense.  If you want to be represented by your own counsel in connection with an objection to this settlement, you must tell the Court of your request and send a copy of your request to Class Counsel.

| 13.  How will the lawyers be paid? |
|---|

Class Counsel will ask the Court for attorneys' fees and expense reimbursement for all counsel involved in the litigation, as well as service awards for the Class Plaintiffs.  American Express agrees it will pay for any such attorneys' fees, expenses, and service awards ordered by the Court up to a maximum of $75 million.

American Express will also pay up to $2 million in costs associated with providing notice of the settlement to the class.  It will also set up a $2 million fund to be used by Class Counsel to educate merchants about the changes to American Express's rules due to the settlement.

The amounts to be awarded as attorneys' fees, reimbursement of expenses, and service awards are all subject to approval by the Court.  Class Counsel will submit motions and petitions to the Court for that purpose no later than March 7, 2014.  Those motions and petitions and all supporting papers will be available at www.AmexMerchantSettlement.com shortly after they are filed.

## THE COURT'S FAIRNESS HEARING

| 14.  When and where will the Court decide whether to approve the settlement? |
|---|

The Court will hold a Fairness Hearing at _:__ _.m. on **Month Day, 2014**, United States District Court for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201.  At this hearing, the Court will hear arguments and consider whether the settlement should be approved as fair, adequate and reasonable.  The Court will also hear arguments and consider whether to approve Class Counsel's requests for attorneys' fees and expenses, and service awards.  If there are objections, the Court will hear and consider them.  The Court will also listen to any class members who have asked to be heard at the hearing.  We do not know how long the Court will take to decide these matters.

# A4771

The Fairness Hearing may be moved to a different date, time, or location without additional notice, so it is recommended that you periodically check the case website for updated information.

## 15.  Do I have to come to the Fairness Hearing?

No.  Class Counsel will answer the questions the Court may have concerning the settlement. But, you are welcome to come at your own expense.  If you send an objection, you do not have to come to court to talk about it.  As long as you mailed your written objection on time, the Court will consider it.  You may also pay your own lawyer to attend, but it is not necessary.

## 16.  May I speak at the Fairness Hearing?

You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter that it is your "notice of intention to appear in American Express Class Action Settlement."  Your notice of intention to appear must include your name, address and phone number, and the name, position, address and phone number of each person who intends to appear at the final approval hearing on your behalf.  Your notice of intention to appear must be filed with the Clerk of Court and mailed, postmarked no later than April 11, 2014 (the "Class Objection Period").  You must also send a copy of your notice of intention to appear to the addresses for Class Counsel and Defendants' Counsel listed in Question 9 above.

## IF YOU DO NOTHING

## 17.  What happens if I do nothing?

You are not required to take any action to receive the benefits of the settlement.  If the settlement is finally approved, you will be bound by the Court's Final Judgment and the release explained in the Class Settlement Agreement.

## GETTING MORE INFORMATION

## 18.  How do I get more information?

This Notice summarizes the proposed settlement and the benefits available.  More details are in the Class Settlement Agreement, which is available on the case website at www.AmexMerchantSettlement.com.  The website also contains the filings related to approval of the settlement and other case-related documents.

You also may call the toll-free number below or write with questions to Amex Merchant Settlement Administrator, PO Box 4349, Portland, OR 97208-4349 or send an e-mail to info@AmexMerchantSettlement.com.

**Do not call the Court or any Judge's office to get more information about the settlement.**

# A4772

## APPENDIX G — Class Settlement Order and Final Judgment

**[Caption for either Animal Land Consolidated Action or the Marcus Action]**

## CLASS SETTLEMENT ORDER AND FINAL JUDGMENT

On _____ \_\_, 2014, the Court held a final approval hearing on (1) whether the terms and conditions of the Definitive Class Settlement Agreement, including all its Appendices, entered into as of December 19, 2013 (the "Class Settlement Agreement") are fair, reasonable, and adequate for the settlement of the claims released against the Defendants in the Class Actions by Class Plaintiffs and the Settlement Class provisionally certified by the Court pursuant to the Class Settlement Agreement; and (2) whether judgment should be entered dismissing all causes of action against the Defendants seeking injunctive relief in those Class Actions with prejudice and all causes of action against the Defendants seeking damages in those Class Actions without prejudice.

The Court, having considered all papers filed concerning the Class Settlement Agreement, and all matters submitted to the Court at the final approval hearing and otherwise, hereby FINDS, with all terms used herein having the same meanings set forth and defined in the Class Settlement Agreement, that:

A.     This Court has jurisdiction over the Class Plaintiffs, the Settlement Class, and the Defendants, and jurisdiction to finally approve the Class Settlement Agreement.

B.     The notice procedures provided to the Settlement Class, including but not limited to the methods of identifying and notifying members of the Settlement Class, were fair, adequate, and sufficient, constituted the best practicable notice under the circumstances, and were reasonably calculated to apprise members of the Settlement Class that would be bound by the Class Settlement Agreement of the Action, the Class Settlement Agreement, and their

G-1

# A4773

objection rights, and fully satisfied the requirements of Federal Rule of Civil Procedure 23, any other applicable laws or rules of the Court, and due process.

C.      The notice requirements of the Class Action Fairness Act, 28 U.S.C. § 1715, have been met.

D.      The Court has held a final approval hearing to consider the fairness, reasonableness, and adequacy of the Class Settlement Agreement, and has been advised of all objections to the Class Settlement Agreement and has given due consideration thereto.

E.      The Class Settlement Agreement, including its consideration and release provisions:

(1)      was entered into in good faith, following arm's-length negotiations, and was not collusive;

(2)      is fair, reasonable, and adequate, and is in the best interests of the Settlement Class;

(3)      is consistent with the requirements of federal law and all applicable court rules, including Federal Rule of Civil Procedure 23; and

(4)      was entered into at a time when the record was sufficiently developed and complete to enable the Class Plaintiffs and the Defendants to have adequately evaluated and considered all terms of the Class Settlement Agreement.

ACCORDINGLY, pursuant to Federal Rule of Civil Procedure 23(e), the Class Settlement Agreement, the terms and conditions of which are hereby incorporated by reference, are hereby fully and finally APPROVED by the Court.

NOW, THEREFORE, based on good cause appearing therefor, it is hereby ORDERED, ADJUDGED, and DECREED that:

# A4774

1.      Based on and pursuant to the class action criteria of Federal Rules of Civil Procedure 23(a) and 23(b)(2), the Court hereby finally certifies, for settlement purposes only, a Settlement Class, from which exclusion were not and shall not be permitted, consisting of all Persons that as of the Settlement Preliminary Approval Date or in the future accept any American Express-Branded Cards at any location in the United States (including at a physical merchant location, online and mobile application), except that the Settlement Class shall not include the named Defendants, their directors, officers, or members of their families.

2.      The Settlement Class shall include all Persons, described in Paragraph 1 above, regardless of whether such Persons have restricted, in any way, the means by which they can resolve disputes against the Defendants or the procedural mechanisms available for the resolution of disputes against the Defendants.  Such restrictions include, without limitation, restrictions regarding or requiring arbitration, jury trials, participation in dispute resolution in a representative capacity, participation in dispute resolution as a member of a class or on a consolidated basis, or any other rights that may be available in court that are not available in arbitration.

3.      In the event of termination of the Class Settlement Agreement as provided therein, certification of the Settlement Class shall automatically be vacated and each Defendant may fully contest certification of any class as if no Settlement Class had been certified.

4.      The Class Plaintiffs shall continue to serve as representatives of the Settlement Class.  The law firms of Friedman Law Group LLP, Patton Boggs LLP, and Reinhardt, Wendorf & Blanchfield shall continue to serve as Class Counsel.

G-3

# A4775

5.      The definition of the proposed injunctive relief classes in the Operative Class Action Complaints are hereby amended to be the same as the Settlement Class finally certified above.

6.      Subject to Paragraphs 7–23 and the other terms of the Class Settlement Agreement, as consideration for the release of their claims, members of the Settlement Class will receive benefits from modifications of the American Express Merchant Regulations and/or American Express card acceptance agreements applicable to United States Merchant Locations, including the following.

a.      The American Express NDPs shall remain unchanged and shall continue to prohibit discrimination against the use of American Express-Branded Cards, except as expressly set forth in the Class Settlement Agreement.

b.      Any surcharge, whether expressed as a percentage or flat fee, that a merchant imposes on American Express-Branded Credit Card transactions must not be any higher than any surcharge imposed on transactions effected with any other Credit Card, payment card, payment method, products, or services accepted by the merchant, after accounting for any discounts or rebates offered at the point of sale, except for (i) Debit Cards; (ii) cash; (iii) checks; (iv) transfer of funds to merchants via bank wire transfer or via the Automated Clearing House of the Federal Reserve System; and (v) Proprietary Store Cards.  The phrase "after accounting for any discounts or rebates at the point of sale" shall mean that to the extent the merchant offers a rebate or discount at the point of sale for the use of any other Credit Card, payment card, payment service or payment method (except for Debit Cards, cash, checks, funds transfers as described above or Proprietary Store Cards), any surcharge, whether expressed as a percentage or flat fee, that the merchant imposes on American Express-Branded Credit Card transactions must not be higher than the net amount of (x) the surcharge imposed on transactions effected using such other Credit Card, payment card, payment service or payment method, offset by (y) such rebate or discount.

c.      In addition, no surcharge imposed on an American Express-Branded Credit Card, whether expressed as a percentage or flat fee, may be higher than the lowest of (i) the amount of the American Express Merchant Discount Rate charged to that merchant for American Express acceptance for the specific transaction; and (ii) any surcharge that the merchant is permitted to impose (which may be zero) on transactions effected with any other Credit Card, regardless of whether the merchant actually surcharges transactions effected on such other Credit Card in excess of the permitted amount..

d.      The American Express NDPs shall continue to prohibit any discrimination against American Express-Branded Debit Card transactions (including without limitation

G-4

# A4776

American Express-Branded Traditional Debit Card transactions) as compared to any Other Payment Network's Debit Card transactions.

      e.     Consistent with this Class Settlement Agreement, a merchant may impose a surcharge on Credit Card transactions, including without limitation American Express-Branded Credit Card transactions, without imposing any surcharge upon any transactions made directly with a Debit Card.

      f.     The American Express HAC Provisions remain unchanged and continue to require that merchants agreeing to accept American Express-Branded Cards must accept all American Express-Branded Cards, except that in the event that there is an American Express-Branded Traditional Debit Card, merchants can choose not to accept such American Express-Branded Traditional Debit Cards.

      g.     For the sake of clarity, the foregoing change to the American Express HAC Provisions would only permit a merchant that accepts American Express-Branded Cards to choose not to accept an American Express-Branded Traditional Debit Card.

      h.     The parties understand that (a) there currently are no American Express-Branded Traditional Debit Cards; and (b) American Express's HAC provisions will continue to require merchants that accept any American Express-Branded Cards to accept all currently existing American Express-Branded Cards.

      i.     Nothing in the Class Settlement Agreement or this Class Settlement Order and Final Judgment shall prevent Defendants from having a provision in the American Express Merchant Regulations or American Express card acceptance agreements that prevents merchants that charge a convenience fee from also charging a surcharge.

      j.     The foregoing amendments described above shall remain in effect until the Release Termination Date.

    7.     The Court orders Defendants to modify the American Express NDPs and American Express HAC Provisions in conformity with the Class Settlement Agreement.

    8.     Each member of the Settlement Class and each Settlement Class Releasing Party unconditionally, fully, and finally releases and forever discharges the Defendants and each of the other Settlement Class Released Parties from all released claims, and waives any rights to the protections afforded under California Civil Code Section 1542, South Dakota Codified Laws Section 20-7-11 and/or any other similar, comparable, or equivalent laws.

G-5

9.      Specifically, the members of the Settlement Class provide the following release and covenant not to sue:

a.      The "Settlement Class Releasing Parties" are the Class Plaintiffs, each and every member of the Settlement Class, and any of their respective past, present or future: officers and directors; stockholders, agents, employees, legal representatives, partners and associates (in their capacities as stockholders, agents, employees, legal representatives, partners, and associates of a member of the Settlement Class only); and trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns—whether or not they object to this Class Settlement Agreement, and whether or not they exercise any benefit provided under the Class Settlement Agreement, whether directly, representatively, derivatively, or in any other capacity.

b.      The "Settlement Class Released Parties" are all of the following:

i.      American Express Company and American Express Travel Related Services Company, Inc.

ii.      For each of the entities in Paragraph (i) above, each of their respective past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, affiliates, and associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934, as amended), or any other entities in which more than 50% of the equity interests are held, and any unaffiliated entities that are licensed to issue American Express-Branded Cards or are authorized or required to enforce the American Express HAC Provisions or the American Express NDPs.

iii.      For each of the entities in Paragraphs (9)(b)(i)-(ii) above, each of their respective past, present, and future principals, trustees, partners, officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, shareholders, advisors, predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of each of the foregoing entities to the extent a successor's, purchaser's, or acquirer's liability is based on the actions of the Settlement Class Released Parties as defined in Paragraphs (9)(b)(i)-(ii) above).

c.      In addition to the effect of the Class Settlement Order and Final Judgment entered in accordance with this Class Settlement Agreement, including but not limited to any *res judicata* effect, the Settlement Class Releasing Parties (i) hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Settlement Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for any form of declaratory, injunctive, or equitable relief and (ii) hereby expressly and irrevocably waive any and all defenses relating to any form of declaratory, injunctive, or equitable relief, in each case relating to the period from the beginning of time to and including the Release Termination Date, regardless of when such claims or defenses accrue, whether known or unknown, suspected or unsuspected, in law or in equity that any Settlement Class Releasing Party now has, or hereafter can, shall, or may in the

G-6

future have, arising out of or relating in any way to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Settlement Class Released Party that fall within the identical factual predicate doctrine as applied to the Marcus Action and the Animal Land Consolidated Action, including but not limited to any claims based on or relating to:

       i.      Any actual or alleged rules or provisions that limit merchants, in any way, from engaging in any of the following (except as explicitly provided by applicable law): indicating or implying a preference, directly or indirectly for any payment product or method of payment; dissuading customers from using American Express-Branded Cards; criticizing or mischaracterizing American Express-Branded Cards or any services or programs of American Express; persuading or prompting customers to use other payment products or methods of payment; imposing any restriction, conditions, or disadvantages on American Express-Branded Cards that are not imposed equally on all other payment products; engaging in activities that harm American Express's business or brand; promoting any payment products or methods of payment more actively than American Express-Branded Cards; communicating with customers about the cost of acceptance of payment cards, payment products, or methods of payments; displaying signs or decals of other payment products, payment cards, or methods of payment more prominently than signs or decals for American Express-Branded Cards; and any other conduct inconsistent with the American Express NDPs;

       ii.      Any actual or alleged "no surcharge" rules or provisions, "no discounting" rules or provisions, "non-discrimination" rules or provisions, "anti-steering" rules or provisions, rules or provisions that limit merchants in favoring or steering customers to use certain payment forms, or any point of sale practices relating to any American Express-Branded Cards;

       iii.      In any proceeding related to the American Express NDPs or American Express HAC Provisions, any claims or defenses that have been raised or could have been raised in these Actions concerning the enforceability or legality of any rules or provisions (as they currently exist or as they exist in the future in substantially similar form) that limit merchants, in any way, from consolidating or aggregating any claim with another claim asserted by any other Person; acting as a representative plaintiff in any class action; or participating in any class action as a non-representative member of the class.

       iv.      Any actual or alleged rules or provisions that require merchants to accept all American Express-Branded Cards, including but not limited to charge cards, credit cards, corporate cards, debit cards, prepaid cards, reloadable prepaid cards, Bluebird® cards, Serve® cards, and gift cards, as a condition of accepting any American Express-Branded Card;

       v.      Any actual or alleged rules or provisions that tie acceptance by merchants of any type of American Express-Branded Card to any other type of American Express-Branded Card;

       vi.      The future effect in the United States of the continued imposition of or adherence to any rule or provision identified above, any rule or provision as modified by this Class Settlement Agreement, and any rule or provision that is substantially similar; and

# A4779

vii.      Any conduct in these Actions, including the negotiation and execution of this Class Settlement Agreement.

And it is expressly agreed, for purposes of clarity, without expanding or limiting the foregoing, that any claims based on or relating to (i)-(vii) above are claims that fall within the identical factual predicate doctrine as applied to the Marcus Action and the Animal Land Consolidated Action.

d.      In addition to the effect of the Class Settlement Order and Final Judgment entered in accordance with this Class Settlement Agreement, including but not limited to any *res judicata* effect, the Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Settlement Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for any damages or other monetary relief relating to the period after the Provisions Change Date and continuing to and including the Release Termination Date, regardless of when such claims accrue, whether known or unknown, suspected or unsuspected, in law or in equity that any Settlement Class Releasing Party now has, or hereafter can, shall, or may in the future have, arising out of or relating in any way to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Settlement Class Released Party, provided such claims fall within the identical factual predicate doctrine as applied to the Marcus Action and the Animal Land Consolidated Action and provided further that such claims are based on the American Express NDPs or the American Express HAC Provisions (including as amended in connection with this Class Settlement Agreement), including but not limited to any claims based on the following:

i.      Any actual or alleged rules or provisions that limit merchants, in any way, from engaging in any of the following (except as explicitly provided by applicable law): indicating or implying a preference, directly or indirectly for any payment product or method of payment; dissuading customers from using American Express-Branded Cards; criticizing or mischaracterizing American Express-Branded Cards or any services or programs of American Express; persuading or prompting customers to use other payment products or methods of payment; imposing any restriction, conditions, or disadvantages on American Express-Branded Cards that are not imposed equally on all other payment products; engaging in activities that harm American Express's business or brand; promoting any payment products or methods of payment more actively than American Express-Branded Cards; communicating with customers about the cost of acceptance of payment cards, payment products, or methods of payments; displaying signs or decals of other payment products, payment cards, or methods of payment more prominently than signs or decals for American Express-Branded Cards; and any other conduct inconsistent with the American Express NDPs;

ii.      Any actual or alleged "no surcharge" rules or provisions, "no discounting" rules or provisions, "non-discrimination" rules or provisions, "anti-steering" rules or provisions, rules or provisions that limit merchants in favoring or steering customers to use certain payment forms, or any point of sale practices relating to any American Express-Branded Cards;

G-8

# A4780

iii.        Any actual or alleged rules or provisions that require merchants to accept all American Express-Branded Cards, including but not limited to charge cards, credit cards, corporate cards, debit cards, prepaid cards, reloadable prepaid cards, Bluebird® cards, Serve® cards, and gift cards, as a condition of accepting any American Express-Branded Card;

iv.        Any actual or alleged rules or provisions that tie acceptance by merchants of any type of American Express-Branded Card to any other type of American Express-Branded Card;

v.        The future effect in the United States of the continued imposition of or adherence to any rule or provision identified above, any rule or provision as modified by this Class Settlement Agreement, and any rule or provision that is substantially similar; and

And it is expressly agreed, for purposes of clarity, without expanding or limiting the foregoing, that any claims based on or relating to (i)-(v) above are claims that are based on the American Express NDPs or the American Express HAC Provisions.

e.        Each Settlement Class Releasing Party further expressly and irrevocably waives, and fully, finally, and forever settles and releases, any and all defenses, rights, and benefits that the Settlement Class Releasing Party may have or that may be derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the release contained in the preceding Paragraphs (9)(a)-(d). Without limiting the generality of the foregoing, each Settlement Class Releasing Party expressly and irrevocably waives and releases any and all defenses, rights, and benefits that the Settlement Class Releasing Party might otherwise have in relation to the release by virtue of the provisions of California Civil Code Section 1542, South Dakota Codified Laws Section 20-7-11, or similar laws of any other state or jurisdiction. CALIFORNIA CIVIL CODE SECTION 1542 PROVIDES: "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."  SECTION 20-7-11 PROVIDES: "UNKNOWN CLAIMS NOT RELEASED BY GENERAL RELEASE.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."  In addition, although each Settlement Class Releasing Party may hereafter discover facts other than, different from, or in addition to those that it or he or she knows or believes to be true with respect to any claims released in the preceding Paragraphs (9)(a)-(d), each Settlement Class Releasing Party hereby expressly waives, and fully, finally, and forever settles, discharges, and releases, any known or unknown, suspected or unsuspected, contingent or non-contingent claims within the scope of the preceding Paragraphs (9)(a)-(d), whether or not concealed or hidden, and without regard to the subsequent discovery or existence of such other, different, or additional facts. Class Plaintiffs acknowledge, and the members of the Settlement Class shall be deemed by operation of the Class Settlement Order and Final Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of this Class Settlement Agreement.

G-9

# A4781

f.      Each Settlement Class Releasing Party covenants and agrees that it shall not, hereafter, seek to establish, or permit another to act for it in a representative capacity to seek to establish, liability against any of the Settlement Class Released Parties based, in whole or in part, upon any conduct covered by any of the claims released in in Paragraphs (9)(a)-(e) above.

g.      For purposes of clarity, it is specifically intended for the release and covenant not to sue provisions of Paragraphs (9)(a)-(f) above to preclude all members of the Settlement Class from seeking or obtaining any form of declaratory, injunctive, or equitable relief prior to the Release Termination Date (which date shall be a minimum of ten years following the Provisions Change Date) with respect to any rule or provision that was or could have been challenged in these Actions as it is alleged to exist, now exists, may be modified in the manner provided in Paragraph 8 of the Class Settlement Agreement, subject to Paragraph 10 of the Class Settlement Agreement, or may in the future exist in the same or substantially similar form thereto.

h.      For purposes of clarity, it is specifically intended for the release and covenant not to sue provisions of Paragraphs (9)(a)-(f) above to preclude all members of the Settlement Class from seeking or obtaining any form of damages or other monetary relief allegedly arising during the period starting with the Provisions Change Date and ending with the Release Termination Date (which period shall be a minimum of ten years) with respect to any American Express NDPs or the American Express HAC Provisions (including as amended in connection with the Class Settlement Agreement) that was or could have been challenged in these Actions as it is alleged to exist, now exists, may be modified in the manner provided in Paragraph 8 of the Class Settlement Agreement, subject to Paragraph 10 of the Class Settlement Agreement, or may in the future exist in the same or substantially similar form thereto.

i.      For purposes of clarity, it is specifically intended for the release and covenant not to sue provisions of Paragraphs (9)(a)-(f) above to preclude all members of the Settlement Class from challenging the American Express NDPs, the American Express HAC Provisions, or the changes to those provisions described in Paragraph 8 of the Class Settlement Agreement, subject to Paragraph 10 of the Class Settlement Agreement (by seeking an injunction, a declaratory judgment, or any other form of equitable relief), or seeking damages associated with the American Express NDPs or the changes to those provisions described in Paragraph 8 of the Class Settlement Agreement, subject to Paragraph 10 of the Class Settlement Agreement, for a period starting with the Provisions Change Date and ending with the Release Termination Date (which period shall be for a minimum of ten years).

j.      It is intended for the release and covenant not to sue provisions of Paragraph (9)(a)-(f) to be as broad as legally permissible subject to the identical factual predicate doctrine as applied to the Animal Land Consolidated Action and the Marcus Action.

k.      For avoidance of doubt, no provision in this Class Settlement Agreement releases any claim of a Settlement Class Releasing Party that is based on:

i.      Breach of this Class Settlement Agreement;

G-10

ii.     *Parens patriae*, law enforcement, or regulation actions by any government or quasi-governmental entity to enforce sovereign or quasi-sovereign interests;

iii.     An action by a competitor except for claims by such competitor in its capacity as a merchant; or

iv.     Standard commercial disputes arising in the ordinary course of business regarding individual chargeback disputes, products liability, breach of warranty, misappropriation of cardholder data or invasion of privacy, compliance with technical specifications for a merchant's acceptance of a Credit Card or Debit Card, and any other dispute arising out of a breach of any contract between any of the Settlement Class Releasing Parties and any of the Settlement Class Released Parties; provided, however, that Paragraphs (9)(a)-(j) above and not this Paragraph shall control in the event that any such claim challenges the legality of any American Express HAC Provisions, any American Express NDPs, discrimination rule, provision, or other conduct covered by any of the claims released in Paragraphs (9)(a)-(j) above.

l.     The parties recognize that certain provisions or aspects of the American Express NDPs are currently being challenged by the Department of Justice in *United States v. American Express*, 10-cv-4496 (E.D.N.Y.) (NGG) (RER).  In the event that such litigation concludes with a judgment, order or consent decree implementing a further revision of American Express's rules, nothing in this release shall be deemed to affect any right that a member of the settlement class may have to seek enforcement of any such judgment, order or consent decree, or to enjoy any benefits or rights to injunctive relief secured by such judgment, order or consent decree.

m.     Each Settlement Class Releasing Party further releases each of the named Defendants and their counsel and experts in these Actions from any claims relating to the conduct in these Actions and defense of these Actions, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement.  Each named Defendant releases the Class Plaintiffs, other plaintiffs in the Class Actions, Class Counsel, and their respective experts in the Class Actions, from any claims relating to their institution or prosecution of the Class Actions, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement.

n.     In the event that the Class Settlement Agreement is terminated pursuant to Paragraphs 61–63 of the Class Settlement Agreement, or any condition for the Settlement Effective Date is not satisfied, the release and covenant not to sue provisions of Paragraphs (9)(a)-(m) above shall be null and void and unenforceable.

o.     Except as expressly set forth in Paragraphs 26 and 27 of the Class Settlement agreement, nothing in this Release shall affect the right of any Settlement Class Member to pursue any action or arbitration for damages for any claim.  Subject to the release and covenant not to sue, each of the putative class representatives in the Class Actions, including without limitation The Marcus Corporation, agrees that it can only pursue any damages claims through binding arbitration consistent with its card acceptance agreement with American Express (as amended or modified).

# A4783

      p.     The release and covenant not to sue of the Settlement Class shall remain in effect until the Release Termination Date.  No member of the Settlement Class can challenge the American Express NDPs or American Express HAC Provisions, or the amendments set forth in Paragraph 8 of the Class Settlement Agreement (by seeking an injunction, declaratory judgment, or any other form of equitable relief) or seek damages associated with the American Express NDPs or American Express HAC Provisions or the amendments set forth in Paragraph 8 of the Class Settlement Agreement relating to the period of time between the Provisions Change Date and the Release Termination Date.

      10.     All claims for injunctive relief sought in the Class Actions are dismissed with prejudice, with each party to bear its own costs, except as and to the extent provided for in the Class Settlement Agreement.

      11.     All claims for damages sought in the Class Actions, including without limitation the Marcus Action, are dismissed without prejudice, with each party to bear its own costs, except as and to the extent provided for in the Class Settlement Agreement.

      12.     All members of the Settlement Class, and those subject to their control, are hereby enjoined and forever barred from commencing, maintaining, or participating in, or permitting another to commence, maintain, or participate in on its behalf, any claims released against Settlement Class Released Parties.

      13.     Without affecting the finality of this judgment in any way, and as further provide in Paragraphs 64–67 of the Class Settlement Agreement, this Court hereby retains exclusive continuing jurisdiction in the Animal Land Consolidated Action and the Marcus Action over the Class Plaintiffs, the members of the Settlement Class, and the Defendants to implement, administer, consummate, and enforce this Class Settlement Agreement and the Class Settlement Order and Final Judgment, including any disputes relating to, or arising out of, the release and covenant not to sue of the Settlement Class or any claim that was or could have been alleged in these Actions.

# A4784

14.     The Defendants and the Class Plaintiffs agree, and the members of the Settlement Class will be deemed to have agreed, to submit irrevocably to the exclusive jurisdiction of the United States District Court for the Eastern District of New York for the resolution of any matter covered by this Class Settlement Agreement, the Class Settlement Order and Final Judgment, or the applicability of this Class Settlement Agreement or the Class Settlement Order and Final Judgment.

15.     All applications to the Court with respect to any aspect of this Class Settlement Agreement or the Class Settlement Order and Final Judgment shall be presented to and be determined by United States District Court Judge Nicholas Garaufis for resolution as a matter within the Actions, or, if he is not available, any other District Court Judge designated by the Eastern District of New York.  Without limiting the generality of the foregoing, it is hereby agreed that any suit, action, proceeding, or dispute of a Class Plaintiff or member of the Settlement Class, in which the provisions of this Class Settlement Agreement or the Class Settlement Order and Final Judgment are asserted as a ground for a defense, in whole or in part, to any claim or cause of action, or are otherwise raised as an objection, constitutes a suit, action, proceeding, or dispute arising out of or relating to this Class Settlement Agreement or the Class Settlement Order and Final Judgment.

16.     In the event that the provisions of this Class Settlement Agreement or the Class Settlement Order and Final Judgment are asserted by any Defendant or Settlement Class Released Party as a ground for a defense, in whole or in part, to any claim or cause of action, or are otherwise raised as an objection in any other suit, action, or proceeding by a Class Plaintiff or member of the Settlement Class, it is hereby agreed that the Settlement Class Released Parties shall be entitled to an immediate stay of that suit, action, or proceeding until after the Court has

G-13

# A4785

entered an order or judgment determining any issues relating to the defense or objections based on such provisions, and no further judicial review of such order or judgment is possible.

17.     In any arbitration proceeding filed by a merchant against American Express asserting a claim solely for damages relating to the American Express NDPs or American Express HAC Provisions where such claim was or could have been asserted in either of these Actions, both American Express and any merchant which has filed such a claim shall be permitted to receive in discovery in connection with such arbitration any court-filed documents in these Actions or any discovery in these Actions (including depositions, documents, interrogatory answers, and expert reports) that Class Counsel actually received or had the right to receive during the pendency of these Actions.  The parties agree that all discovery in the Marcus Action and all court-filed documents in the Marcus Action were reproduced or deemed reproduced to Class Counsel in the Animal Land Consolidated Action and are covered by the Animal Land Protective Order.  Before any merchant shall be permitted to receive any such documents or discovery, such merchant and its counsel shall agree (a) to be bound by a confidentiality agreement that provides at least the same level of protections as the Animal Land Protective Order and the Marcus Protective Order and (b) to follow substantially the same protections afforded to each such document or discovery as such document or discovery received pursuant to the Animal Land Animal Land Protective Order or Marcus Protective Order when initially produced.

18.     The terms and provisions of the Animal Land Protective Order and the Marcus Protective Order shall survive and continue in effect through and after any final adjudication of the Class Actions, except as modified by the Court.

# A4786

19.     Nothing in the Class Settlement Agreement or this Class Settlement Order and Final Judgment is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by any of the Defendants, or of the truth or validity or lack of truth or validity of any of the claims of allegations alleged in any of the Class Actions.

20.     Nothing in this Class Settlement Order and Final Judgment is intended to or shall modify the terms of the Class Settlement Agreement.

21.     Without limiting Paragraph 22 below, nothing in this Class Settlement Order and Final Judgment shall limit the ability of American Express to determine American Express Merchant Discount Rates or other pricing or fees applicable (either by rule or negotiated agreement) to individual merchants or groups of merchants.

22.     The parties recognize and agree that this Class Settlement Agreement shall be governed by the good faith and fair dealing obligations applicable to contracts under New York law.

23.     This Class Settlement Order and Final Judgment terminates and disposes of all claims against the Defendants in the Class Actions.  There is no just reason for delay in entering final judgment.  The Court hereby directs the Clerk to enter judgment forthwith in accordance with the terms of this Class Settlement Order and Final Judgment, which judgment shall be final and appealable.

IT IS SO ORDERED.

DATED: _____                    _____

                                       THE HONORABLE NICHOLAS GARAUFIS

G-15

# A4787

EXHIBIT 1 TO SETTLEMENT CLASS ORDER AND FINAL JUDGMENT

All putative class actions consolidated in *In re American Express Anti-Steering Rules Antitrust Litigation (II)*, No. 11-MD-2221 (E.D.N.Y.) (NGG)(RER), including but not limited to

*In re American Express Anti-Steering Rules Antitrust Litigation,* No. 06-CV-02974 (NGG) (RER) (E.D.N.Y.), formerly No. 06-CV-02974 (WHP) (S.D.N.Y.)

*Firefly Air Solutions, LLC v. American Express Company, et al.,* No. 10-cv-05200 (NGG) (RER) (E.D.N.Y.)

*Plymouth Oil Corp. v. American Express Company, et al.*, No. 10-cv-05369 (NGG) (RER) (E.D.N.Y.)

*Jasa, Inc. et al. v. American Express Company, et al.,* No. 11-cv-00732 (NGG) (RER) (E.D.N.Y.)

*Nat'l Supermarkets Ass'n, Inc. v American Express Company*, No. 11-cv-01448 (NGG) (RER) (E.D.N.Y.), formerly 10-CV-04551 (WHP) (S.D.N.Y.)

*Treehouse, Inc. v. American Express Company, et al.,* No. 11-cv-00882 (NGG) (RER) (E.D.N.Y.), formerly No. 10-CV-00790 (SLC) (W.D. Wis.)

*Il Forno, Inc. v. American Express Company, et al.,* No. 11-cv-00881 (NGG) (RER) (E.D.N.Y.), formerly No. 11-CV-00306 (AHM) (PJW) (C.D. Cal.)

All putative class actions consolidated in *In re American Express Anti-Steering Rules Antitrust Litigation,* No. 06-CV-02974 (E.D.N.Y.) (NGG)(RER), including but not limited to

*Animal Land, Inc., et al. v. American Express Company, et al.,* No. 09-CV-2291 (S.D.N.Y.) (WHP)

*Performance Labs, Inc. et al. v. American Express Company, et al.,* No. 06-CV-2974 (S.D.N.Y.) (WHP)

*Lopez DeJonge, Inc. et al.,  v. American Express Company. et al.*, No. 07-CV-1303 (S.D.N.Y.) (WHP)

*Nat'l Supermarkets Ass'n, Inc. v. American Express Company, et al.*, No. 06-CV-4551 (S.D.N.Y.) (WHP)

*The Marcus Corp. v. American Express Co. et al.*, No. 04-CV-05432 (GBD) (S.D.N.Y.)

**A4788**

### APPENDIX H — Counsel Names and Contact Information

Counsel for Class Plaintiffs and Interim Lead Counsel
In the Animal Land Consolidated Action

Gary B. Friedman
Tracey Kitzman
Friedman Law Group LLP
270 Lafayette Street
New York, NY 10012
Telephone:  (212) 680-5150
Facsimile:  (646) 277-1151
Email:  gfriedman@flgllp.com
Email:  tkitzman@flgllp.com


Read K. McCaffrey
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
Telephone:  (202) 457-6000
Facsimile:  (202) 457-5243
Email: rmccaffrey@pattonboggs.com

Mark Reinhardt
Mark A. Wendorf
Reinhardt Wendorf & Blanchfield
1250 East First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:  (651) 287-2100
Facsimile:  (651) 287-2103
Email:  m.reinhardt@rwblawfirm.com
Email:  m.wendorf@rwblawfirm.com

H-1

**A4789**

<u>Counsel for Defendants American Express Company and
American Express Travel Related Services Company, Inc.</u>

Donald L. Flexner
Philip C. Korologos
Eric J. Brenner
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
Email:  dflexner@bsfllp.com
Email:  pkorologos@bsfllp.com
Email:  ebrenner@bsfllp.com

Evan R. Chesler
Kevin J. Orsini
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700
Email:  echesler@cravath.com
Email:  korsini@cravath.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

This Document Relates To:                              11-MD-02221 (NGG) (RER)
CONSOLIDATED CLASS ACTION
-----------------------------------------------------------------x

THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

                                                       13-CV-07355 (NGG) (RER)
                           Plaintiff,

          - against -

AMERICAN EXPRESS COMPANY, et al.,          **REDACTED - PUBLIC VERSION**

                           Defendants.
-----------------------------------------------------------------x


### CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT


                                                       April 15, 2014

**A4791**

## TABLE OF CONTENTS

Table of Authorities .................................................................................. iii

I.      Introduction ................................................................................ 1

II.     Procedural History ...................................................................... 8

        A.      *Italian Colors* and *Marcus* Cases ........................................      8

        B.      Anti-Steering Rules Challenges ................................................10

        C.      Settlement Process ............................................................ 13

III.    Settlement Terms ........................................................................... 14

IV.     The Standards for Assessing Whether a Class Action
        Settlement is Fair, Reasonable, and Adequate ......................................... 17

V.      The "Presumption Of Fairness" Is Warranted Because The Settlement
        Was Negotiated At Arms' Length By Experienced Counsel After Meaningful
        Proceedings Before An Experienced And Respected Mediator ...................... 19

VI.     Evaluation Of The Applicable *Grinnell* Factors Confirms That
        The Settlement Satisfies The "Fair, Adequate and Reasonable" Standard .......... 20

        A.      Scope Of Litigation Factors (*Grinnell* Factors 1 and 3)...................... 21

        B.      Litigation Risk Factors (*Grinnell* Factors 4-6) ................................ 23

                1.      Liability Risk ............................................................. 23
                2.      Damages/ Relief Risk................................................... 24
                3.      Class Certification Risks................................................. 25
                4.      *Marcus* Action-Specific Risks......................................... 26

VII.    Discussion Of Anticipated Objections................................................. 27

        A.      Value Of Surcharging Rights In General (MDL 1720 Redux).............. 27

        B.      Lack Of Differential Surcharge Rights........................................ 30

                1.      The Credit-Debit Rate Differential Swamps Interbrand
                        Rate Differentials.................................................................. 30
                2.      Differential Surcharging Is Illegal In Ten States,
                        And No Constitutional Challenge Applies......................... 31
                3.      Alternative Sources For Differential Treatment Rights........... 33

i

**A4792**

        C.      Due Process/Adequacy Of Representation Considerations ................... 33

VIII.   Class Notice Was Adequate By Any Measure .......................................... 35

Conclusion ........................................................................................................... 36

ii

# A4793

### TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Express Co. v. Italian Colors Restaurant*,
130 S. Ct. 2401 (May 3, 2010)..................................................................... *passim*

*American Express Co. v. Italian Colors Restaurant*,
133 S. Ct. 2304 (2013) .............................................................................10

*AT&T Mobility v. Concepcion*,
131 S. Ct. 1740 (2011) ..............................................................................10

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).................................................................. *passim*

*Expressions Hair Design et al. v. Schneiderman*,
2013 U.S. Dist. LEXIS 143415 (S.D.N.Y. Oct. 3, 2013) .........................2, 27, 31, 32

*In re American Express Merchants Litig.*,
554 F.3d 300 (2d Cir. 2009)......................................................................10

*In re American Express Merchants Litig.*,
634 F.3d 187 (2d Cir. 2011)......................................................................10

*In re American Express Merchants Litig*,
667 F.3d 204 (2d Cir. 2012)......................................................................10

*In re American Express Merchants Litig*,
681 F.3d 139 (2d Cir. 2012)................................................................10, 25

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ..............................................................18

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
233 F.R.D. 306 (E.D.N.Y. 2006) ..............................................................17

*In re McDonnell Douglas Equip. Leasing Sec. Litig.*,
838 F. Supp. 729 (S.D.N.Y. 1993) ............................................................18

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y.), aff'd, 117 F.3d 721 (2d Cir. 1997) ......................17-18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2013 U.S. Dist. LEXIS 179340 (E.D.N.Y. Dec. 13, 2013) ("MDL 1720") .................. *passim*

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ..............................................................17

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008)................................................................20

*In re Visa Check-MasterMoney Antitr. Litig.*,
  280 F.3d 124 (2d Cir. 2001)..........................................................................23

*Italian Colors Rest. v. Am. Express Co.*,
  2003 WL 22682482 (N.D. Cal. Nov. 7, 2003) ...................................................8

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000)....................................................................... *passim*

*Marcus Corp. v. American Express Co.*,
  2005 U.S. Dist. LEXIS 13170 (S.D.N.Y. July 5, 2005) .........................................9

*Marisol A. v. Giuliani*,
  185 F.R.D. 152 (S.D.N.Y. 1999) ..................................................................24

*McReynolds v. Richards-Cantave*,
  588 F.3d 790 (2d Cir. 2009)...............................................................17, 20

*Robertson v. National Basketball Ass'n*,
  556 F.2d 682 (2d Cir. 1977)...............................................................19, 33

*Strougo v. Bassini*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003).................................................................18

*Thompson v. Metropolitan Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) .....................................................................19

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005).......................................................17, 34, 35

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)........................................................................ 18

**STATUTES**

Clayton Act § 16 ...........................................................................................21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ............................................................................... *passim*

U.S. Const. amend. I .............................................................................27, 31, 32

U.S. Const. amend. XIV ...............................................................................27

iv

Plaintiffs The Marcus Corporation, Animal Land, Inc., Firefly Air Solutions, LLC, Il Forno, Inc., Italian Colors Restaurant, Jasa Inc., Lopez-Dejonge, Inc., and Plymouth Oil Corp. ("Class Plaintiffs") respectfully submit this memorandum of law in support of their motion seeking an Order from this Court granting final approval of the settlement of the consolidated class action proceedings in *In re American Express Anti-Steering Rules Antitrust Litig.*, 11-MD-2221 (NGG) (RER) (the "*Amex ASR*" case) and *Marcus Corp. v. American Express Co.*, 13-CV-07355 (NGG) (RER) ("*Marcus*").

## I.    Introduction

The instant settlement caps a forty-year effort by U.S. merchants to obtain the right to assess "surcharges" on credit card transactions – *i.e.*, to use transparent price signals at the point of sale to recoup the cost of credit card acceptance and incent consumers to use cheaper payment products, such as debit or cash.

The long road to this settlement began in the mid-1970s, as lobbyists for Master Charge, BankAmericard and American Express convinced Congress to enact legislation that banned merchant surcharges. Senator William Proxmire of Wisconsin, one of the surcharge ban's chief opponents and a noted consumer advocate, explained why: "The nation's giant credit card companies want to perpetuate the myth that credit is free." Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12. Merchants were soon joined by consumer rights advocates and others in opposition to the federal surcharge ban, which took effect in 1976. By the early 1980s, Senator Proxmire remarked that "[n]ot one single consumer group supports the proposal to continue the ban on surcharges," which effectively forced cash payers and debit users to subsidize the cost of credit cards by preventing merchants from imposing those costs directly on credit card users. *Id.* Ultimately, the FTC, Federal Reserve and White House

1

# A4796

economists, as well as lawmakers from both parties, joined merchants in attacking the surcharge ban, and Congress affirmatively allowed the ban to lapse in 1984. See accompanying Declaration of Gary B. Friedman, at ¶ 7; *see generally*, *Expressions Hair Design et al. v. Schneiderman*, 2013 U.S. Dist. LEXIS 143415, at *11 (S.D.N.Y. Oct. 3, 2013).

But no sooner had the federal surcharge ban expired than the major credit card companies – by this time, Visa, MasterCard and American Express – all enacted or strengthened their own regulations, by-laws and contractual clauses effectively banning merchants from imposing surcharges on credit card transactions. The networks also employed fake-grass-roots "astroturf" organizations, with names like "Consumers Against Penalty Surcharges," to convince some 10 states during the mid-1980s to enact statutes banning merchant surcharges. Friedman Decl., ¶ 7. Accordingly, by the time Class Plaintiff Animal Land Inc. fired the first shot across the bow in an Atlanta federal court in May 2005 seeking to invalidate Visa's no-surcharge rule, the quest of U.S. merchants to obtain the right to surcharge credit card transactions appeared downright quixotic. By all appearances, merchant surcharging lay well out of legal reach -- buried underneath multiple layers of long-standing network rules and state laws.

And yet, as this Settlement Agreement comes before this Court for final approval, the entire edifice of anticompetitive private and public anti-surcharging restrictions in the United States is poised to collapse. *Animal Land* long ago blossomed into MDL 1720, a sprawling mass of litigation that finally settled this past year with Visa and MasterCard both agreeing to rescind their longstanding rules against merchant surcharging. The state statutes, meanwhile, have run into the U.S. Constitution, with District Judge Jed Rakoff declaring the New York statute unconstitutional in 2013, and Judge Gleeson finding "reason to believe" that the other state statutes will likewise "bit[e] the dust." *In re Payment Card Interchange Fee & Merch. Disc.*

2

# A4797

*Antitrust Litig.*, 2013 U.S. Dist. LEXIS 179340, at *60 (E.D.N.Y. Dec. 13, 2013). And while literally thousands of merchants complained in the MDL 1720 fairness proceedings that surcharge relief is meaningless until they are free to surcharge Amex – because of the way the new Visa/MasterCard surcharging rules are drawn – the instant settlement eliminates that impediment.

This settlement provides U.S. merchants for the first time ever with readily usable market-based tools for reversing the ever-escalating costs of payment card acceptance. Under the settlement here, merchants will be free to impose a separate charge to account for the costs of credit card acceptance, thus offering consumers a powerful and direct economic incentive to use debit cards – the cost of which is regulated by the Federal Reserve and far cheaper than credit card transactions. In fact, as shown by Class Plaintiffs' expert economist Dr. Alan Frankel, the average cost difference to a U.S. merchant between a credit and debit card transaction is a whopping 1.57% of the total purchase price. See Declaration of Alan S. Frankel, Ph.D., dated April 10, 2014, at ¶ 35. By driving consumers to debit, U.S. merchants stand to gain 1.57% of literally trillions of dollars over time.

The settlement is not perfect. In a perfect world, merchants would have the additional right to assess different surcharge amounts on different credit card brands, which the instant settlement does not allow. But the real price differences to merchants between and among credit card brands are, on average, very minor – especially when compared with the vast price differential between all credit cards, on the one hand, and debit cards on the other. So the settlement allows merchants to engage in the steering that most matters: moving customers away from credit cards to low-priced, and largely price-regulated, debit cards. And it allows merchants to engage in the type of surcharging they will *actually do*: applying a single, simple

3

## A4798

surcharge amount to all credit card transactions.  Moreover, as discussed below, the more

nuanced surcharging strategies that are not permitted under this settlement – often referred to as

"differential surcharging"[1] – have the disadvantage of remaining illegal in the states with anti-

surcharging statutes, whereas those statutes cannot constitutionally ban the simple surcharging

that is authorized by the settlement here.  See below at 31-32.

The proposed settlement also does not obtain for merchants relief against the various

non-surcharge-related anti-steering rules that Amex maintains, including rules against asking

customers to use non-Amex products instead of Amex cards, or offering discounts for the use of

competing credit card brands instead of Amex cards.  These rules are at the heart of the

Government's case against American Express, and the members of the class here will obtain full

injunctive relief as to these rules from a DOJ trial victory or consent decree.  Class Counsel has

always recognized that these rules are anticompetitive, and important.  Far from abandoning the

challenge to these rules, Class Counsel has issued a vote of confidence in our colleagues at the

Department of Justice.  And if DOJ is *not* able to prevail on these claims, Class Counsel has no

reason to believe that we would have prevailed.  Accordingly, the value to merchants of the

instant settlement is in no way undercut by the absence of relief as against the non-surcharge-

related anti-steering rules.

By all indications, U.S. merchants are poised to make broad use of their newly won rights

to impose surcharges upon credit card transactions.  A recent market study performed by Olinger

Group, a well respected market research firm, exhibited a 2-minute informational video to

---

[1] The term "differential surcharging" is misleading. What the settlement does not allow is *intra-credit-card* differential surcharging; *i.e.*, surcharging credit card brands differentially.  What the settlement *does* allow is differential surcharging as between debit and credit.  Nonetheless, we will generally use the phrase "differential surcharging" to mean intra-credit-card differential surcharging.

4

**A4799**

roughly 800 U.S. merchants from selected industries and then asked if they would surcharge. The video presented surcharging as automated and hassle-free, which is how vendors in the marketplace will present the option. The survey was directed at merchant sectors including dry cleaners, beauty salons, home improvement, auto repair, law firms and several others. *More than half* of those surveyed responded with an unequivocal yes – that they would surcharge. Of the remainder, most stated they would surcharge if some number of their competitors did. See The Olinger Group, Credit Card Merchant Surcharge Study, March 2014, annexed to the accompanying Declaration of Jude A. Olinger.

The easy-to-use surcharging solutions depicted in the Olinger video are almost at hand. As chronicled in the accompanying Declaration of Scott Levy, vendors in the marketplace are developing automated systems that can apply compliant surcharges, and the large Visa and MasterCard processing firms are just now beginning to roll out programs that allow for widespread carriage of surcharged transactions in compliance with Visa and MasterCard regulations. Levy Decl., ¶¶ 4-5. Once the instant settlement is finally approved, it is reasonable to expect that entrepreneurial service providers in the marketplace will be distributing marketing materials that look a lot like the Olinger video, to induce merchants to use their new tools broadly. And at the same time, Class Counsel will deploy a $2 million advertising fund, provided under the Settlement Agreement, to inform merchants of their new-found surcharging rights.

To be sure, it is impossible to predict with precision just how widespread surcharging will become, and just how much credit card volume will shift to debit as a consequence. But we do know that in Australia, within four years after the onset of the reforms there, some 10% of merchants (measured by volume) were already imposing surcharges, and that today – a decade

5

out – some 40% of merchants (measured by volume) are surcharging. See Frankel Decl., ¶ 41 and Fig. 4 (citing East & Partners 2013 Report). We also know that, when U.S. merchants institute a policy of surcharging credit card transactions, they will save 1.57% of the total sales amount on those transactions where the consumer switches to debit, and they will recover even more than that on those transactions where the consumer pays the surcharge. Frankel Decl., ¶¶ 35, 57.[2]

Finally, we know that U.S. credit card transaction volume is $2.4 trillion per year. See Frankel Decl., ¶ 17, n. 36 (citing Nilson Report # 1034 at 1, Friedman Decl. Ex. H). As a result, we know that merchants will save at least the following amounts, depending upon what percentage of U.S. merchants (by volume) come to engage in credit card surcharging:[3]

---

[2] The evidence shows that merchants simply *do not lose sales* from surcharging – just as one would expect, given that 40% of Australian merchants overall and 60% of large sophisticated merchants are surcharging.

[3] The formula here is (i) the percentage of merchants surcharging (by volume), times (ii) 1.57% times (iii) $2.4 trillion, over a 10-year period that holds constant the percentage of merchants surcharging. These values do not include the spill-over benefits that non-surcharging merchants stand to realize as consumers modify their habits to use debit cards more broadly. Nor do they presuppose any gains from reduced rates on credit card fees.

# A4801

| % of US Merchants Surcharging | Savings Per Year | Savings Over Ten-Year Period |
|---|---|---|
| 1% | $ 376.8 million | $3.76 billion |
| 10% | $3.76 billion | $37.68 billion |
| 20% | $7.53 billion | $75.36 billion |
| 30% | $11.30 billion | $113.04 billion |
| 40% (as in AU today) | $15.07 billion | $150.72 billion |

Finally, the consideration of any class action settlement must take stock of the alternatives. The alternative to this settlement is not a better settlement; it is no settlement. And if there is no settlement, then Class Plaintiffs will be compelled to pursue litigation that is fraught with risks. At the outset, of course, are all of the risks that attend proving liability in the face of the defenses that American Express has so aggressively asserted, including its arguments regarding market power, market definition, the implications of "two-sided markets," and the competitive effects of its practices. And beyond those merits risks, continued litigation in this case would require Class Plaintiffs to overcome Amex's position that any given merchant may only seek to change the relevant contractual anti-steering provisions *as to itself*, and not as to the marketplace more broadly. While Class Plaintiffs have strongly contested the point – and we do believe we have the better of the argument – it would be reckless in the wake of *Italian Colors* to write off Amex's chances of winning that particular battle, which is presently *sub judice* on this Court's docket. See Amex Reply Mem., 8/5/2013, DE 265. Moreover, any resolution of that issue is immediately appealable in either direction and, if recent history is any guide, could well delay resolution of the case for years to come.

7

**II.     Procedural History**

**A.     *Italian Colors and Marcus Corp. Cases***

In August 2003, a group of small merchants including Italian Colors Restaurant filed suit

in the Northern District of California challenging certain applications of American Express's

Honor All Cards rule under the antitrust laws.  Those actions were then transferred to the

Southern District of New York, *Italian Colors Rest. v. Am. Express Co.*, 2003 WL 22682482

(N.D. Cal. Nov. 7, 2003), where other similar cases were filed and consolidated by Judge

Daniels under the caption *In re American Express Merchants Litig.*, Master File No. 03-CV-9592

(the "*Italian Colors* cases").

The plaintiffs in the *Italian Colors* cases – like all small merchants subject to the standard

form American Express card acceptance agreement during that time frame – were bound by

arbitration clauses banning collective action and mandating one-on-one arbitral proceedings.  On

April 30, 2004, American Express moved to compel arbitration in the *Italian Colors* cases, and

Judge Daniels granted that motion on March 16, 2006.  *In re American Express Merchants Litig.*,

03-CV-9592, DE 20 and DE 34.

On July 13, 2004, The Marcus Corporation filed suit.  *Marcus Corp. v. American Express

Co. et al.*, 04-CV-05432 (GBD) (S.D.N.Y.).  Unlike the smaller merchant plaintiffs in the *Italian

Colors* cases, Marcus Corp. was not at that time subject to any arbitration provision.

Accordingly, *Marcus* proceeded with discovery as the *Italian Colors* plaintiffs commenced their

lengthy appellate journey challenging American Express's arbitration policy.

The point behind the *Marcus* case, and the parallel *Italian Colors* cases, was to give

merchants a competitive tool for combating card acceptance costs.  Specifically, plaintiffs argued

that certain applications of American Express's Honor All Cards rule harmed competition by

8

**A4803**

allowing Amex to offer inflated fees to prospective bank-issuers of Amex-branded revolving credit cards, thus causing Visa and MasterCard to increase the merchant fees from which they compensate banks, and generally inciting an ever-escalating upward spiral in merchant interchange fees.[4] As Judge Daniels recognized in denying Amex's motion to dismiss, plaintiff contended that American Express's tying arrangement worked a "radical realignment" of the market by "forcing MasterCard and Visa to either price their own services to merchants at inefficiently high levels, or risk losing all of the banks, and the U.S. credit card market, to American Express." *Marcus Corp. v. American Express Co.*, 2005 U.S. Dist. LEXIS 13170, at *7-8, 11 (S.D.N.Y. July 5, 2005).

Over the course of the ensuing five years, the parties in *Marcus* engaged in exceedingly hard-fought litigation. The litigation record included millions of pages produced by American Express and millions more produced by third-parties, including the complete record from *In re VisaCheck/MasterMoney Antitrust Litig.*, 96-CV-5238 (JG) (E.D.N.Y.). There was substantial deposition discovery of American Express, Marcus Corp. and third parties, in addition to which plaintiff requisitioned some seventy high-relevance depositions from *American Express Travel Related Services, Inc. v. Visa USA Inc. et al.*, 04-CV-08967 (BSJ) (S.D.N.Y.), which was proceeding contemporaneously, thus obviating scores of additional fact depositions in *Marcus*. In addition to discovery motions, the parties fully briefed and argued multiple substantive motions, including motions to dismiss on statute of limitations grounds, and a full-blown class certification motion following multiple expert depositions and reports. Further, after an

---

[4] As part of this same course of conduct, and to blaze a trail for the bank-issued Amex cards, Amex launched proprietary mass-market revolving credit card brands subject to the HAC tie, including its Blue and Costco cards. Class Plaintiffs based damages claims upon those tied products, arguing that they could not have been launched at prices exceeding Visa "plain vanilla" credit card prices absent the illegal tie.

exchange of extensive expert reports on merits and damages issues, and multiple *Daubert*

motions by the defendants (all of which were denied), both sides moved for summary judgment,

and both of those motions were fully briefed and argued in January 2009.

Also in January 2009, the Second Circuit issued the first of a series of decisions finding

that the class action waiver contained in the American Express arbitration clause was

unenforceable against the *Italian Colors* plaintiffs. *In re American Express Merchants Litig.*,

554 F.3d 300 (2d Cir. 2009). Some 15 months later, the Supreme Court then granted certiorari,

vacated the Second Circuit's decision and remanded for reconsideration of in light of certain

intervening authority. *American Express Co. v. Italian Colors Restaurant*, 130 S. Ct. 2401 (May

3, 2010). After another round of briefing, the Second Circuit in March 2011 then reaffirmed its

original ruling in *In re American Express Merchants Litig.*, 634 F.3d 187 (March 8, 2011)

("*Amex II*"). Shortly after that, the Supreme Court decided *AT&T Mobility v. Concepcion*, 131

S. Ct. 1740 (2011), broadly upholding an arbitration clause and class action waiver. Following

*Concepcion*, the Second Circuit then called for yet another round of briefing, after which it yet

again reaffirmed its earlier decisions. *In re American Express Merchants Litig*, 667 F.3d 204

(Feb. 1, 2012) ("*Amex III*"). After a motion for en banc reconsideration was narrowly defeated

by a deeply divided Court of Appeals, *In re American Express Merchants Litig*, 681 F.3d 139

(2d Cir. 2012) ("*Amex IV*"), American Express successfully petitioned the Supreme Court for

certiorari, and, on June 20, 2013, the Court reversed the Second Circuit's decision. *American

Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013).

   B.   *Anti-Steering Rules Challenges*

   During the course of discovery in the *Marcus* case, it became apparent to Class Counsel

and their economic experts that the rules circumscribing the ability of merchants to steer

# A4805

transactions to lower-cost payment forms were at the root of the competitive ills plaguing the payments industry. Based on the evidence uncovered in *Marcus*, plaintiffs' merits experts in that case opined that American Express's rules against steering operated to largely insulate it from competitive pricing pressures, and warranted a finding of substantial market power – economic arguments that would be echoed years later in the summary judgment arguments proffered to this Court by the Individual Merchant Plaintiffs.

In May 2005, Animal Land Inc., a pet transportation business based in Atlanta (and a Class Plaintiff here as well), filed an action against Visa entitled *Animal Land, Inc. v. Visa USA, Inc.*, 05-CV-01210 (JOF) (N.D. Ga.) challenging Visa's rules against surcharging. That action – which was followed in short order by cases challenging MasterCard's similar rule and cases that challenged the so-called "default interchange rules" of both networks – was the first case filed in what later became MDL 1720.

But as litigation challenging anti-steering and anti-surcharging rules broke out in 2005-06, Marcus Corp. was not at liberty to amend its complaint to challenge American Express's similar rule.[5] So instead, Class Counsel filed cases in late 2005 challenging American Express's rules restraining merchant surcharges in the MDL 1720 court, on behalf of other small merchant clients. After conferring with the parties in MDL 1720 and Magistrate Judge Orenstein, and American Express, Class Counsel then withdrew those actions and re-filed them in the Southern District of New York. Although the filings were marked related to *Marcus*, they were ultimately reassigned to Judge Pauley under the master file name *Performance Labs, Inc. et al. v. American*

---

[5] By early 2006, subsequent to a significant asset divestiture, Marcus Corp. had become subject to the standard form American Express card acceptance agreement applicable to smaller merchants, thus obligating it to arbitrate any new claims. By informal agreement of the parties, defendants did not seek to enforce the arbitration agreement as to the tying claims in *Marcus*, and Marcus Corp. did not seek to amend its complaint to add the anti-steering rules claims in the *Marcus* action.

11

# A4806

*Express Co., et al.*, 06-CV-2974 (WHP) (S.D.N.Y.) and then consolidated with additional filings as *In re American Express Anti-Steering Rules Antitrust Litig.*, 06-CV-2974 (WHP) (S.D.N.Y.) ("*Amex ASR*").

Because the merchants challenging Amex's anti-steering rules were all subject to the arbitration clause, the *Amex ASR* case was largely stayed from its inception in 2006 until the Second Circuit ruled in *Italian Colors* in January 2009. At that point, the parties commenced discovery in earnest before Judge Pauley. Also, in that time frame, a handful of larger merchants (who were either not bound by Amex's arbitration clause or as to whom Amex did not invoke that clause) filed claims that were substantially identical to the *Amex ASR* complaint in the Eastern District of New York, where they were assigned to this Court. *Rite Aid Corp., et al. v. American Express Travel Related Services, et al.*, Master File No. 08-CV-2315 (NGG) (E.D.N.Y.). Collectively, these plaintiffs are referred to below as the "Individual Merchant Plaintiffs."

In October 2009, relying on evidence adduced in *Marcus* and this action, Class Counsel submitted to the Justice Department – whom it understood was investigating Visa and MasterCard's rules relating to merchant steering – a white paper entitled "Why The Antitrust Division Should Challenge American Express's Anti-Steering Rules." Following extensive investigation of all three networks, the Justice Department announced on October 4, 2010 that it and seventeen plaintiff states had entered into consent decrees with Visa and MasterCard and filed an enforcement action against American Express challenging certain of its rules relating to merchant steering. *United States v. American Express Co.*, 10-CV-4496 (NGG) (E.D.N.Y.). Because both the DOJ's case and the Individual Merchant Plaintiffs' cases were pending in this

# A4807

Court, the *Amex ASR* plaintiffs initiated proceedings before the Judicial Panel on Multi-District Litigation, which then transferred the *Amex ASR* case to this Court.

Fact discovery in the *Amex ASR* case has been extensive, to say the least. Pursuant to laboriously negotiated discovery coordination protocols with defendants, the Individual Merchant Plaintiffs and the Department of Justice, the Class Plaintiffs participated in 120 depositions and marshaled a record that included more than 20 million pages of new documents.

### C.    *Settlement Process*

Back in the fall of 2006, after Judge Daniels granted the motion to compel arbitration in *Italian Colors* and before the initial Second Circuit decision, with discovery in *Marcus* in full swing and the first *ASR* case just then filed, the parties engaged in a series of face-to-face meetings designed to explore potential resolution. The meetings did not bear fruit, and the parties agreed to resume the conversation after the arbitration issue was finally resolved. That juncture would arrive seven years later.

The Supreme Court's June 2013 ruling in *Italian Colors* precipitated the instant settlement. First of all, the Court's broad ruling upholding Amex's collective action ban made it clear to Class Counsel that no damages class action was realistically feasible in *Amex ASR* or in *Marcus*. By 2013, class plaintiffs had discovered that virtually every Amex-accepting merchant in the U.S. was subject to a binding arbitration clause with American Express. So even if a non-arbitration-bound named plaintiff were free to proceed in court, it is likely Amex's arbitration clause would be upheld as against substantially all of the members of a putative class, such that a putative damages class could not even meet the numerosity requirement of Rule 23(a)(1).

However, it was also Class Counsel's judgment that a class action seeking market-wide injunctive relief remained viable, under *Italian Colors*. Thus, Class Plaintiffs vigorously resisted

13

Amex's motion to compel arbitration in the *Amex ASR* case, arguing that the *Italian Colors* decision and the language of the Card Acceptance Agreement do not in fact foreclose an action seeking broad injunctive relief.  The motion – which presents difficult and complex issues, carries the potential for yet another trip to the Supreme Court, and threatens the ability of 99% of U.S. merchants to ever obtain any relief against Amex's surcharging rules – was fully briefed in August 2013, and is currently *sub judice* before this Court.  (DEs 262-269).

It is against this backdrop that the parties have agreed to settle the instant litigation.  The parties thus engaged in intensive negotiations throughout the summer and fall of 2013, with the assistance of mediator Kenneth R. Feinberg.  Mr. Feinberg presided over numerous in-person and telephonic conferences, commencing before the Supreme Court released its *Italian Colors* ruling, and continuing to the present.  A declaration from Mr. Feinberg is submitted together with the parallel Motion For Attorneys' Fees And Costs.

**III.   Settlement Terms**

The Settlement Agreement, Friedman Decl., Ex. A, allows merchants to impose a surcharge upon Amex credit and charge card transactions so long as: (i) the amount of the surcharge does not exceed the discount rate applicable to that transaction and the amount of the surcharge the merchant imposes on any other credit card brand; (ii) the surcharge is fully disclosed, on the same terms that the merchant is required to disclose Visa and MasterCard surcharges; and (iii) the merchant provides 30 days notice to Amex that it intends to surcharge.  SA ¶ 8.  Debit cards, including pre-paid or gift cards, may not be surcharged unless or until similar cards on competitors' brands are subject to surcharging. See SA ¶ 8 and Amex Merchant Regulations, Friedman Decl., Ex. B at §3.2.

14

**A4809**

Meanwhile, Amex is prohibited from offering a traditional debit card subject to its Honor All Cards policy, lest such an offering undermine the surcharging relief provided in the agreement. SA ¶ 8. Specifically, Class Counsel was concerned that Amex might launch a rewards-bearing, high-fee, non-Durbin-regulated traditional debit card product and advertise that that product is "surcharge free." The appeal is obvious. And while Class Plaintiffs would take the position that such a campaign would constitute new conduct, outside the scope of the Release, the Settlement Agreement makes clear that merchants would be free to refuse to accept any such new product, irrespective of Amex's Honor All Cards policy.

The agreement also provides that Amex and a merchant may agree to waive the right to surcharge, provided that the contract is individually negotiated, for a set term of years and supported by actual consideration, *e.g.*, a discount rate reduction. SA ¶ 10. An obligation of good faith and fair dealing is expressly made applicable to any such contracts, SA ¶ 90, to ensure (as just one example) that Amex cannot threaten merchants with rate increases to induce them to enter agreements not to surcharge. And in fact, Class Counsel has received binding written acknowledgement from Amex counsel that any such threat would violate the contractual covenant of good faith and fair dealing. Letter from Philip C. Korologos dated December 16, 2013, Friedman Decl., Ex. W.

The release is a broad one, "specifically intended . . . to preclude all members of the Settlement Class from seeking . . . equitable relief prior to the Release Termination Date (which date shall be a minimum of ten years following the Provisions Change Date) with respect to any rule or provision that was or could have been challenged in these Actions" subject to the "identical factual predicate doctrine as applied to the [*Amex ASR* case] and the Marcus Action." SA ¶ 26. The release duration may also extend beyond ten years if Visa or MasterCard's rules

# A4810

remain unchanged, as well as Amex's rules, and so long as the equitable release in the MDL 1720 agreement remains in effect and has not been abrogated. SA ¶¶ 26, 1(vv). Conduct that is undertaken subsequent to final approval that is consistent with the rules as they exist subsequent to final approval, is released, and cannot form the predicate of an injunctive or damages claim. SA ¶¶ 26, 27.

There is no release whatsoever of any right that any class member presently has to sue for money damages. SA ¶ 40. On the contrary, the Agreement specifically contemplates that a merchant may pursue damages claims against American Express based on the anti-steering rules and Honor All Cards rules (as those rules exist before the rules changes take effect) under whatever dispute resolution terms are applicable to that merchant. SA ¶ 40. Recognizing that most merchants' agreements call for binding arbitration, the Agreement provides that arbitral claimants shall be entitled to receive the extensive evidentiary and litigation record that Class Counsel has amassed in these cases, subject only to the claimant's agreement to be bound by the applicable Protective Order (and the Court's agreement to amend that Order to reflect this arrangement). SA ¶ 68.

The Settlement Agreement also recognizes that the Department of Justice is pursuing the elimination of certain American Express "non-discrimination provisions," or anti-steering rules, and it ensures that class members will receive the full benefit of whatever injunctive relief DOJ is able to obtain from American Express after trial or via a consent decree. SA ¶ 35.

In addition, American Express has agreed to pay the attorneys' fees and costs incurred by Class Counsel and the dozens of law firms whose efforts over the past 10 ½ years have made this settlement possible, up to a cap of $75 million. SA ¶ 55. It will also pay (and in fact has paid) $2 million in costs associated with the provision of notice to the members of the class, SA ¶ 17, and

16

# A4811

will pay an additional $2 million as a fund "to be used solely by Class Counsel for the purpose of educating members of the Settlement Class about" their new-found surcharging rights. SA ¶ 18.

## IV.    The Standards for Assessing Whether a Class Action Settlement is Fair, Reasonable, and Adequate

The Second Circuit is "mindful of the strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.")  "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

The standard employed in the Second Circuit for the evaluation of a proposed settlement is clear: "Before such a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000), citing Fed. R. Civ. P. 23(e)(2).  "We have recognized a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement is reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery. Such a presumption is consistent with the strong judicial policy in favor of settlements, particularly in the class action context." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (internal quotations and citations omitted); *Wal-Mart* 396 F.3d at 116 (same). "So long as the integrity of the arm's length negotiation process is preserved . . . a

17

# A4812

strong initial presumption of fairness attaches to the proposed settlement." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that while a court should not give "rubber stamp approval" to a proposed settlement, it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974). In assessing a settlement, then, the court should neither substitute its judgment for that of the parties who negotiated the settlement, nor conduct a mini-trial on the action's merits. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (court should not substitute its "business judgment for that of counsel, absent evidence of fraud or overreaching"); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003) ("absent evidence of fraud or overreaching, courts consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of [class] counsel"); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 737 (S.D.N.Y. 1993) ("in analyzing a proposed [class] settlement, courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching").

In determining if a proposed settlement is fair, reasonable and adequate, courts in this Circuit look to the factors enumerated in *Grinnell*, 495 F.2d at 463. As modified for application to cases that do not involve a damages fund, "these so-called *Grinnell* factors include: (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, [and] (6) the risks of maintaining

18

# A4813

the class action through the trial." *Joel A.,* 218 F.3d at 138, citing *Robertson v. National Basketball Ass'n*, 556 F.2d 682, 684 n.1 (2d Cir. 1977).[6]  In finding that a settlement is fair, not every factor must weigh in favor of settlement; "rather the court should consider the totality of these factors in light of the particular circumstances." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

In this case, it is clear that the proposed settlement is entitled to the strongest presumption of fairness, and that consideration of the applicable *Grinnell* standards weighs unequivocally in favor of final approval.

## V. The "Presumption Of Fairness" Is Warranted Because The Settlement Was Negotiated At Arms' Length By Experienced Counsel After Meaningful Proceedings Before An Experienced And Respected Mediator

Following a full decade of highly adversarial litigation, this settlement agreement was negotiated over a period of six months between experienced and fully-informed counsel assisted by a nationally known and well respected mediator, Kenneth Feinberg.  As Mr. Feinberg recites in his Declaration in this matter, "the lawyers on both sides were deeply committed to their long-held positions.  To say they dealt with each other at arms' length is a real understatement.  To say that this case was hard-fought is even more of an understatement.  It was my observation that every inch of ground in this negotiation was earned; nothing was given."  Feinberg Decl., ¶ 10.

By the time the parties got to the bargaining table, they were in an excellent position to evaluate the prospects of continued litigation.  Over the 10-plus years since the initial case

---

[6] In addition to these six factors, the *Grinnell* test applied in damages cases also includes three additional factors which were omitted by the Second Circuit in the injunctive-only *Joel A.* case: "(7) the ability of the defendant to withstand a greater judgment . . . ; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . ." *Grinnell*, 495 F.2d at 463.

19

subject to this settlement was filed, Class Counsel participated in more than 160 depositions; reviewed and produced documents totaling in the tens of millions of pages; fully briefed and argued cross-motions for summary judgment supported by hundreds of exhibits; extensively briefed and argued motions to dismiss on statutes of limitations and arbitration grounds; prepared numerous expert reports and took and defended multiple expert depositions on merits and class certification issues; fully briefed and argued a class certification motion; and prosecuted an appeal through the Second Circuit (three separate rounds of briefing plus oral argument) and to the U.S. Supreme Court (two separate rounds of certiorari briefing and one full-blown merits appeal).

Informed as they were by all of these experiences, Class Counsel's negotiation of the instant settlement is entitled to the presumption of fairness. *See McReynolds*, 588 F.3d at 803 (presumption of fairness warranted "after meaningful discovery.") The presumption is further warranted by the testimony of Mr. Feinberg. Courts recognize that the use of an experienced mediator "in the settlement negotiations strongly supports a finding that they were conducted at arm's length and without collusion." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008).

**VI.  Evaluation Of The Applicable *Grinnell* Factors Confirms That The Settlement Satisfies The "Fair, Adequate and Reasonable" Standard**

Consideration of the *Grinnell* factors identified by the Second Circuit in *Joel A.* leaves little room for doubt that the settlement is "fair, adequate and reasonable" within the meaning of Rule 23(e). These factors – putting aside the "reaction of the class" factor, which is unripe for consideration until objections are filed – fall into two main groups: (a) the scope of the litigation to date and the likely scope into the future, absent settlement; and (b) the risks of establishing liability and relief, absent settlement.

20

# A4815

A.   **Scope Of Litigation Factors (*Grinnell* Factors 1 and 3)**

Approval is warranted in light of "(1) the complexity, expense and likely duration of the litigation" as well as "(3) the stage of the proceedings and the amount of the discovery completed." As set forth above, the litigation efforts to date have been staggering in their scope. And it stands to reason that a class trial or trials seeking sweeping relief for 4.2 million Amex merchants representing all industries, sizes and geographies would be likewise sprawling. Proceedings to date have run more than 10 years. Going forward, it is difficult to estimate what the timeline would be, but "many years" is a safe bet. In fact, truly massive additional delay is likely based upon the motion to compel arbitration of the Class Plaintiffs' equitable claims that was *sub judice* at the time this settlement was reached. The resolution of that motion would engender appeals that could very plausibly end up back in the U.S. Supreme Court on the open (and arguably cert-worthy) issue of whether an arbitration clause may force a party to relinquish the right to sue for broad relief under Clayton Act § 16.

The expense of continued litigation, meanwhile, is enormous. To date, compensable out-of-pocket expenses for expert witnesses, database management, travel and other items exceed $5 million, and the approximate value of lawyer-hours spent over the past decade of litigation is either $83.5 million or $99 million (depending on how one accounts for the time value of money), as discussed in more detail in the accompanying petition for attorneys' fees and costs. Here again, it is impossible to speculate what the costs and fees would be going forward but they will be very extensive on any scenario that does not posit Class Plaintiffs losing a dispositive motion in the near future.

Finally, while the extraordinary "amount of the discovery completed" was discussed above, the *quality* of the discovery taken in these cases relates directly to the relief achieved in

# A4816

this settlement.  In particular, painstaking investigation into Amex's real-world experience with

legal surcharging in Australia (including many depositions in Hawaii and elsewhere of Amex-

Australia witnesses) yielded unique evidence of the pro-competitive power of surcharging --

particularly where price regulation has driven a large gap between the pricing on competing

products.  Thus, in Australia, ██████████████████████ central bank regulation of Visa

and MasterCard credit card interchange rates opened up a large gap in pricing between those

products and Amex cards, giving merchants an incentive to surcharge Amex cards and drive

traffic to Visa/MasterCard.[7]  Likewise, in the U.S., the Federal Reserve's regulation of debit card

interchange has opened up a large gap between credit cards and debit cards, giving merchants an

incentive to surcharge credit cards and drive traffic to debit.  Discovery likewise established that

debit and credit are extremely close substitutes – indeed, one of the few areas of agreement

between the experts for Amex and the Individual Merchant Plaintiffs was that consumers can

readily be switched between debit and credit usage.[8]

---

[7]  *See, e.g.,* ████████████████████████████████████████



[8]  Individual Merchant Plaintiffs argued – as the Class Plaintiffs have always argued as well— that debit and credit cards *would* be considered part of the same relevant market *if* the surcharge and steering restrictions were abolished. ███████████████████████ ██████████████████ Amex's argument is that debit and credit cards should be considered part of the same relevant market *today*, because the challenged restraints cannot (as a legal or economic matter) be considered in defining a relevant product market.

# A4817

The structure of the settlement, then, very much grew out of the lessons learned in the discovery process. Class Counsel not only had ample opportunity through the discovery process to learn the strengths and weaknesses of its case, but also – and even more importantly – to understand the structural elements that promise merchants real value in the real world. In a word, we learned that what really matters is a settlement that provides merchants the ability to surcharge credit cards (even if monolithically) in favor of debit cards.

## B.  Litigation Risk Factors (*Grinnell* Factors 4-6)

The proposed settlement is further clearly reasonable in light of "(4) the risks of establishing liability, (5) the risks of establishing damages, [and] (6) the risks of maintaining the class action through the trial." *Joel A.*, 218 F.3d at 138.

### 1.  *Liability Risk*

While Class Counsel has always been unpersuaded by Amex's arguments that it lacks market power and that its rules relating to surcharging are pro-competitive, it is clear that these defenses pose very significant risks to the Class Plaintiffs. As this Court is aware from the summary judgment motions that Amex made in the Government and Individual Merchant Plaintiff cases, Amex is aggressively pursuing these defenses with some of the world's most highly regarded economic experts and lawyers. Its arguments are well presented, cogent, and likely to appeal to certain members of the Court of Appeals. *See, e.g.*, *In re Visa Check-MasterMoney Antitr. Litig.*, 280 F.3d 124, 147 (2d Cir. 2001) (Jacobs, C.J., dissenting from affirmance of class certification and expressing skepticism of plaintiffs' economic theories). Even if Amex loses at the district court level, it has long been Class Counsel's perception that Amex will emphasize that no appellate court has yet provided an in-depth treatment of the proper approach to market definition and market power in a so-called two-sided market, and it will

23

# A4818

invite a thorough economic exploration of what is arguably *terra nova* – a strategy that not only highlights the risk that Amex might convince an appellate tribunal that it lacks substantial market power, but one that underscores the tremendous length of the likely road ahead.

### 2.    *Damages/Relief Risk*

The Second Circuit in *Joel A.* seemingly included as a *Grinnell* factor the risk of "establishing damages," although that settlement did not include any release of damages claims. 218 F.3d at 142 (the "release explicitly preserves the right of an individual plaintiff to sue for damages") (internal punctuation omitted).  Arguably, the logic is that even in a case that has no damages release, it may be relevant to ascertain whether the settling class plaintiffs *could have* obtained a class damages award.  If so, this factor militates strongly in favor of approval.[9]

It is beyond serious dispute that a merchant class action for damages is simply unavailable in the wake of *Italian Colors*.  The overwhelming majority of Amex-accepting merchants in the U.S. are bound by an arbitration clause.  The remainder may only seek damages in accordance with the terms of their dispute resolution provisions, which invariably mandate one-on-one arbitration.  The instant settlement makes those arbitrations as viable and realistic an option as they can possibly be, expressly providing each individual arbitral claimant the right to access for use in its arbitration all of the copious data and evidence that Class Counsel has marshaled over the years of this litigation.  The litigation road to damages, by contrast, is simply a dead end after *Italian Colors*.

The risk of being unable to obtain any injunctive relief that would apply across the market is also extremely high, even if liability can be established.  On its pending motion to

---

[9]   It is also possible that the Court of Appeals simply misspoke, and really meant the risk of establishing entitlement to injunctive relief. See *Marisol A. v. Giuliani*, 185 F.R.D. 152, 164 (S.D.N.Y. 1999)  (enumerating factor as "Risk Of Establishing Damages [Remedies]") (brackets in original).  In any event, we discuss that injunctive relief risk immediately below.

# A4819

compel arbitration in *Amex ASR*, American Express contends that no merchant has any right to seek injunctive relief that would affect other merchants, but may seek relief *only* as to the contractual terms applicable *to that merchant*. See Amex Mem. dated 8/5/2013, DE 262; Reply Mem., DE 265. Specifically, Amex argues that the injury-in-fact claimed by any individual merchant (whether a large Individual Merchant Plaintiff or a small merchant) can be redressed by granting that individual merchant the right to steer or surcharge its own customers, and that marketwide relief is therefore not available in a non-class case, within the meaning of applicable case law. Amex Reply Mem, DE 265 at 4-7. Further, Amex argues that a 23(b)(2) class action aimed at changing its marketwide rules is unavailable under the text of the Card Acceptance Agreement and the Supreme Court's *Italian Colors* decision. *Id.*

Class Counsel vigorously opposed the motion, and we continue to believe we have the better of the argument. But the magnitude of the risk here is patent. Further, having made the round-trip to the Supreme Court in this matter twice already, it was Class Counsel's considered opinion that a Supreme Court grant of certiorari on this injunctive issue was not unlikely. And that assumes that Class Plaintiffs would prevail not only before this Court but also at the Circuit Court level, where the prospects of any appeal in this basic area are highly unpredictable, as the splintered *en banc* proceedings in *Italian Colors* demonstrated. *Amex IV*, 681 F.3d at 139 (opinion of Pooler, J.), 142 (Jacobs, C.J., dissenting), 149 (Cabranes, J. dissenting), 149 (Raggi J. dissenting).

### 3. *Class Certification Risks*

The sixth *Grinnell* factor refers to the "risks of maintaining the class action through the trial." Here, the risk of being unable to certify a class are significant for all the same reasons that

**A4820**

are discussed above relating to Amex's current motion to compel arbitration (inasmuch as the agreements ban class proceedings on their face).

### 4. *Marcus Action-Specific Risks*

Lastly, in the absence of this settlement, there is an overwhelming risk that merchants would receive no value from the *Marcus* litigation. While Marcus Corp. itself is not bound by an arbitration clause as pertains to the case challenging the Honor All Cards rule (see above at 11, n. 5) the fact is that virtually all members of the putative class Marcus seeks to represent *are* bound by the clause. In the judgment of Class Counsel, it is likely that a renewed motion by Marcus Corp. to certify a damages class would fail on numerosity grounds. *See* Fed. R. Civ. P. 23(a)(1).

And on top of that risk, Amex has of course asserted formidable merits defenses to the Honor All Cards case in its summary judgment motion, including that it lacks substantial market power; that plaintiffs failed to establish two separate products; that plaintiffs failed to establish likely anticompetitive effects of the coercive tie; and that the claim is time barred. In addition, while Marcus Corp.'s 2008 motion for class certification was denied not on the merits but merely as a scheduling matter, and subject to renewal, Amex did assert powerful defenses to that motion which it would reassert if the motion were revived. Among other defenses, Amex argues that if the relevant products were untied, such that the price of the tied product were to fall (which is the nub of plaintiffs' damage theory, *see* above at 9, n. 4), then the price of the tying product would rise – in which case, the effect on merchants could only be gauged by an individualized inquiry that looks at the payment mix at each merchant. While Plaintiffs submitted expert testimony and evidence to rebut that hypothesis in 2008, it is totally unclear how that issue would play out if litigated today.

# A4821

**VII.   Discussion Of Anticipated Objections**

It is premature to discuss the reaction of the members of the Class, as objections are not due to be filed until June 6, 2014 under the Court's scheduling order.  DE 334.  However, the Individual Merchant Plaintiffs have already raised certain issues in the preliminary approval process, representatives of certain objectors in the MDL 1720 case have indicated that they intend to likewise object here (letter to Court from Jeffrey I. Shinder, dated 2/21/14, DE 337) and a handful of early objections have been received already.  Accordingly, we can address here at a high level of generality some of the basic expected objections in this case.

**A.   Value Of Surcharging Rights In General (MDL 1720 Redux)**

Certain objectors in MDL 1720 voiced skepticism concerning the value to U.S. merchants of the right to surcharge – a theme that is echoed in some of the objections already filed here.  There were three main areas of argument.

1.   The "Amex Problem":  First, many merchants pointed out that the new Visa/MasterCard surcharging rules force Amex-accepting merchants to surcharge Amex transactions as a condition of being permitted to surcharge Visa and MasterCard transactions, and they argued that they are unable to surcharge Amex transactions because of Amex's rules.  *Payment Card Interchange*, 2013 U.S. Dist. LEXIS 179340 at *64-66.  Plainly, with the instant settlement, this objection is now moot.

2.   State Statutes:  Second, many merchants complained that they cannot use the new surcharging tool because they operate in states, like New York, that have enacted bans on surcharging.  But Class Counsel and colleagues have attacked those state statutes as unconstitutional, and Judge Rakoff of the Southern District recently struck down the New York statute on First and Fourteenth Amendment grounds in *Expressions*.  Indeed, observing in his

27

final approval decision that the New York statute "has bitten the dust in the brief interval since the fairness hearing," Judge Gleeson opined that "there is reason to believe that [the other] state-law impediments to a full deployment of the proposed relief" will likewise be held unconstitutional, adding that "[n]o-surcharge laws are not only anti-consumer, they are arguably irrational." *Payment Card Interchange*, 2013 U.S. Dist. LEXIS 179340 at *60. And since that time, identical constitutional challenges have indeed been filed to the anti-surcharging laws in Florida, Texas and California. *Dana's Railroad Supply v. Bondi*, 14-CV-00134-RH-CAS (N.D. Fla.); *Rowell v. Abbott*, 14-CV-00190-LY, (E.D. Tex.); *Italian Colors Restaurant v. Harris*, 14-CV-00604 (N.D. Cal.). And plaintiffs' counsel in all those cases (including Class Counsel here) have stated publicly their intent to challenge each and every such state antisurcharging law.

     3.    <u>Merchant Interest Level</u>. Third – a distant third, in terms of the amount of attention given to each objection – some merchants expressed skepticism concerning the extent to which U.S. merchants are likely to deploy surcharges in the near term. But there are strong reasons (many of which were not available to Judge Gleeson in MDL 1720) to expect widespread adoption of surcharging, including:

- In Australia, where observers were similarly skeptical about the uptake of surcharging at the start of the reform period, the latest data discloses that 60% of large merchants currently surcharge, and 40% of all merchants currently surcharge. Frankel Decl., ¶ 41 and Fig. 4.; East & Partners, Australian Merchant Payments, Market Analysis Report, December 2013, p. 31.

- In a recent study by market research firm Olinger Group, more than 60% of merchants who saw a 2-minute informational video stated that they would surcharge. Of the remainder, most stated they would surcharge if at least some of their competitors did. The video presented surcharging as automated and hassle-free, as vendors in the marketplace will surely present the option, and it was

28

# A4823

exhibited to merchant sectors including dry cleaners, beauty salons, home improvement, auto repair, law firms and several others. Olinger Decl., Ex. 1.

- In industries where Visa, MasterCard and American Express have allowed merchants for some years now to assess "convenience fees" – really just a euphemism for permissible surcharges – these fees are in fact imposed on substantial numbers of credit card transactions in those industries. In other words, where merchants *may* impose such fees, they *do* impose them, in substantial numbers. Frankel Decl., ¶ 36.

- Enforcement data obtained in cases challenging state anti-surcharging laws show considerable levels of merchant surcharging in clear violation of state laws. Florida officials, for example, sent 41 cease and desist letters to merchants for surcharging between January and June 2013 alone. Friedman Decl., ¶ 8.



- In the competitive acquiring marketplace in the U.S., entrepreneurial service providers are gearing up right now to offer services that automate the surcharge process, and are likely to advertise and promote surcharge-related services. Levy Decl., ¶¶ 4-5.

- Pursuant to the Settlement Agreement, Class Counsel will deploy a $2 million advertising fund, earmarked to inform merchants of their new-found surcharging rights. SA, Friedman Decl., Ex. A, ¶ 18.

# A4824

**B.    Lack Of Differential Surcharge Rights**

The Individual Merchant Plaintiffs have indicated that they will object to the extent that

the instant settlement does not allow them to engage in what the IMPs call "differential

surcharging" – *i.e.*, the imposition of surcharges that treat American Express credit cards less

favorably than surcharges upon other *credit* card brands.  This objection overlooks several key

realities.

1.    *The Credit-Debit Rate Differential Swamps Interbrand Rate Differentials*

First, the relative price differences to merchants between all credit cards and all debit

cards absolutely swamp any differences between and among the credit card brands.  As

discussed in the accompanying report of Dr. Alan Frankel, at 34, n. 76, the average *mix-adjusted*

price differential between Amex and MasterCard is reported by Amex as being just ▮▮▮ basis

points (▮▮%), and the mix adjusted premium over Visa is only ▮▮ basis points (▮▮%).[10]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And as Dr. Frankel shows, even if

one failed to adjust for mix, the premium over Visa, MasterCard and Discover would *still* only

be between ▮▮▮▮▮ basis points.  See Frankel Decl., at 18, Fig. 3.  These are extremely small

differences, and there is no evidence anywhere in the world that differentials of this magnitude

---

[10]   Mix adjustment, as used in this context, takes account of the product mix each merchant sees
on Amex.  So for example, a *mix adjusted* comparison would compare Amex corporate cards
with Visa commercial cards, and Amex Membership Rewards cards with Visa Signature cards.
A mix-adjusted analysis takes the product-mix breakdown of Amex (corporate vs. high-rewards
vs. plain-vanilla-revolving-credit vs. pre-paid cards, etc.) and asks what the fees would be if Visa
rates were applicable to that particular mix of transactions.  A *non-mix-adjusted* analysis, by
contrast, flatly assumes that all Visa transactions occur at the average Visa rate.  Failing to adjust
for mix overlooks that a surcharged Corporate Card holder will presumably switch to a Visa
commercial card, and a surcharged Platinum Card holder will presumably switch to Visa
Signature.

# A4825

(much less the more accurate, mix-adjusted magnitudes) would induce merchants to engage in differential surcharging, even if it were permitted.

The spread between credit cards and debit cards, on the other hand, is 157 basis points on average. Frankel Decl., ¶ 35. That spread is even greater than the spreads that prevailed in Australia between Amex and Visa/MasterCard at their high water mark. And as has been seen, those Australian differentials – the "giant gaps" that opened up in Australia -- were broad enough to incite widespread surcharging activity by merchants, and huge consequent cost savings.

The upshot here is two-fold. First, if merchants use the tools provided by this settlement and impose a single surcharge on all credit card transactions without imposing any surcharge on debit card transactions, the cost savings they will realize are more significant, by orders of magnitude, than what merchants could save by imposing surcharges on one credit card brand but not another. And second, the cost differential between credit and debit is such that real world data gives us reason to expect that merchants will want to use the surcharging tool to drive traffic from one product to the other. By contrast, there is no sound reason to expect the spreads between card brands would incite surcharging behavior.

> 2.  *Differential Surcharging Is Illegal In Ten States, And No Constitutional Challenge Applies*

As discussed above, ten states have statutes that make the imposition of surcharges on credit cards illegal. Having successfully knocked out the New York statute, *see Expressions, supra,* merchants represented by Class Counsel here have filed challenges to the three largest remaining states' anti-surcharging laws and plan to challenge the rest, based on the First Amendment to the U.S. Constitution. Critically, these constitutional challenges are *simply not available* to merchants who would seek to engage in differential surcharging.

31

# A4826

The constitutional challenge is not available in the differential surcharging context because the whole point of the constitutional case is that the illegal activity (imposing a fee for all credit card transactions) is mathematically identical to conduct that is expressly legal (offering a discount for anything but credit). If the merchant advertises a price of $100 and a $2 discount for debit/cash/checks, that is legal. But if he advertises a price of $98, and a $2 surcharge for using a credit card, that is illegal. In either case, the commercial offer is the exact same: a higher price for credit, and a lower price for everything else. What is different is merely how that commercial offer is communicated. Plainly, then, the laws do not regulate *conduct*; they regulate *speech*. And under clearly applicable commercial speech principles, the laws do not survive First Amendment scrutiny. *See Expressions,* 2013 U.S. Dist. LEXIS 143415.

But now change the facts, to address the would-be differential surcharger. What if a merchant-plaintiff wants to impose a surcharge *only* on American Express cards? This merchant's illegal activity (imposing a fee for just Amex transactions) is not mathematically equivalent to legally protected conduct (offering a discount for anything but credit). As applied to *this* merchant, then, the law does not regulate speech: it does not dictate the words he must use to communicate a plainly lawful offer; it bans *conduct*. This merchant thus has no First Amendment argument at all. If our clients in the case before Judge Rakoff had testified that they wanted to engage in this sort of "differential" surcharging, the *Expressions* case would have been dismissed out of hand. What our clients testified was that they wish to impose a single surcharge for the use of all credit cards, which is mathematically identical to a permitted discount for the use of everything but credit cards. *See, e.g.,* Supplemental Declaration of Steve Milles dated 7/29/2013, 13-CV-03775-JSR, DE 42.

# A4827

The implications here are powerful. While certain merchants may argue that their sole interest lies in seeking rights to engage in differential surcharging, those merchants ignore the fact that the laws of 10 states (including New York, California, Texas, Florida and others that collectively account for nearly half of U.S. transaction volume) prohibit the conduct they seek to engage in, and that these merchants have *no viable argument whatsoever* against those state statutes.

### 3.    *Alternative Sources For Differential Treatment Rights*

Lastly, it would be a mistake to consider the surcharging relief obtained here in a vacuum. Rather, as discussed above, this settlement is taking place on the eve of the Government's trial against American Express. If DOJ wins its trial, it will obtain important differential treatment rights for class members, including the right to offer discounts and other inducements for the use of competing credit card brands. Merchants whose primary focus is on chipping away at their credit card rates through negotiations – but who are disinclined for whatever reason to use the new surcharging tool to recoup acceptance costs or shift volume to debit – may gravitate towards relying on the DOJ-supplied tool of differential discounting.

On the other hand, if DOJ were to lose at trial, then merchants will not have the ability to engage in differential discounting. But then, if DOJ loses, it is hard to see why private plaintiffs would have won. On that scenario, the value of the relief obtained in the instant settlement will be all the more stark.

## C.    Due Process/Adequacy Of Representation Considerations

In complex injunctive settlements, there are invariably some class members who take the position that they would have preferred additional, better or different injunctive relief terms. Thus in *Robertson v. NBA*, 556 F.2d 682 (2d Cir. 1976), where the relief obtained by Class

33

**A4828**

Plaintiffs including Oscar Robertson served to revamp NBA draft policies, objectors including

Wilt Chamberlain complained that the relief stopped short of achieving true free agency.

Likewise, in *Joel A.*, 218 F.3d 132 (2d Cir. 2000), where the settlement agreement broadly

overhauled the child welfare system, objectors complained that it failed to achieve special

protections for gay foster children. And in *Wal-Mart*, which altered the Visa and MasterCard

honor-all-cards rules, objectors complained that the settlement failed to obtain relief on claims

they had brought attacking *other* Visa and MasterCard rules, including the so-called exclusionary

rule and the default interchange rules. In essence, the objectors in all these cases argued that the

class settlement "left significant claims on the table." *Wal-Mart*, 396 F.3d at 109-110.

But what matters, in the Second Circuit, is not whether an objector can conceive of better

or different relief. Indeed, it does not even matter whether the Class Plaintiffs *tried* to obtain

better or different relief. All that matters, the Second Circuit holds, is whether there was

*adequate representation*. The "essential question," according to the Court of Appeals in *Wal-

Mart*, "is whether the interests that were served by the settlement were compatible with those [of

the absent class members] when the plaintiffs negotiated the release of the [absent class

members'] separate claims." *Wal-Mart Stores*, 396 F.3d at 110. "Due process does not require

that all class claims be pursued. Instead, . . . adequate representation of a particular claim . . . is

determined by the alignment of interests of class members, not proof of vigorous pursuit of that

claim." 396 F.3d at 113.

In this case, the interests are perfectly aligned and represented. All Class Plaintiffs and

all class members have a shared – and indeed identical – interest in obtaining broad and

meaningful rights to surcharge. Class Plaintiffs did not contract to release any claims that they

themselves do not possess. On the contrary, they released claims that they *do* possess –

34

**A4829**

including the claim seeking broader differential surcharge rights – because their informed and conflict-free judgment was that the interests of all class members were best served by the instant settlement.

### VIII.   Class Notice Was Adequate By Any Measure

Due process requires that notice "fairly apprise the prospective members of the class of the terms of the proposed settlement and the options that are open to them in connection with the proceedings." *Wal-Mart,* 396 F.3d at 114.  The standard for determining the adequacy of a settlement notice in a class action "is measured by reasonableness." *Id.* at 113.

Here, the parties implemented a Court-approved notice plan that amply satisfies the requirements of due process and Rule 23.  As detailed in the report filed on March 25, 2014 by Epiq Solutions, the Court-appointed administrator charged with executing the notice plan approved by the Court in the preliminary approval order, Epiq Solutions: (1) sent postcards via First Class Mail to each of the millions of Amex-accepting merchants in the United States for whom American Express maintains a postal address, providing basic information on the settlement and directing them to the case website and a toll-free phone number for complete information; (2) published notice in a combination of national and regional business publications as well as retailer trade journals; and (3) established a case website containing a long-form notice and other case documents (www.amexmerchantsettlement.com), and established a toll-free telephone service to provide information regarding the settlement.  DE 346.

By any measure, the Court-approved notice plan was "reasonable" when it issued and it has been faithfully executed, as detailed in the report of the Class Administrator.

35

# A4830

## CONCLUSION

For all the foregoing reasons, Class Plaintiffs respectfully request that the Court grant

final approval of of the consolidated class action proceedings in *In re American Express Anti-*

*Steering Rules Antitrust Litig.*, 11-MD-2221 and *Marcus Corp. v. American Express Co.*, 13-CV-

07355.

Dated: April 15, 2014

                    **FRIEDMAN LAW GROUP, LLP**

                    /s/Gary B. Friedman
                    Gary B. Friedman
                    Tracey Kitzman
                    Scott Levy
                    Rebecca Quinn
                    270 Lafayette Street
                    New York, New York 10012
                    (212) 680-5150
                    gfriedman@flgllp.com

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
**REINHARDT WENDORF &**
**BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

# A4831

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**REDACTED VERSION**

-------------------------------------------------------------------x

IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

This Document Relates To:                          11-MD-02221 (NGG) (RER)
CONSOLIDATED CLASS ACTION

-------------------------------------------------------------------x

THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

                                         13-CV-07355 (NGG) (RER)

                Plaintiff,

      - against -

AMERICAN EXPRESS COMPANY et al.,

                Defendants.

-------------------------------------------------------------------x

**DECLARATION OF ALAN S. FRANKEL, PH.D.**

# A4832

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

20.     When the cost or profitability to the merchant of selling one product (or service) differs significantly from another, it is common for the merchant to set different prices (or other terms of sale) for the two products.  It surprises no one if a merchant posts different prices per pound for apples and oranges, or for different varieties of apples.

21.     In some cases, a merchant may choose not to differentiate the prices of alternative products despite cost differences between the two.[7]  But as the cost difference widens, more merchants will choose to treat buyers of the two products differently by charging different prices, and the extent of any price difference will tend to increase as the cost gap widens.  The same is true of services merchants provide to their customers.  Merchants may offer free parking, but they are less likely to do so in costly city locations than in lower cost suburban locations, all else equal.  Decisions whether to charge for ancillary services, or to set different prices for products that generate different costs to the merchant, are typically left to individual merchants, constrained by competition from other merchants and the necessity for them to cover their costs to remain in operation.  So some merchants might offer free delivery, while others charge for delivery, and still others offer free 5-day delivery but charge for faster delivery.  The competitive process determines to what extent those strategies succeed.

22.     Differential pricing or promotion at retail is a principal mechanism by which competition between merchants' *suppliers* occurs.  If a merchant sells products that are substitutes, any one supplier that attempts to increase its price (unrelated to market cost increases) runs the risk that merchants will raise the price for that supplier's products (or

---

[7]     I termed this phenomenon "price coherence" in a 1998 article.  Alan S. Frankel, Monopoly and Competition in the Supply and Exchange of Money, 66 Antitrust Law Journal 313 (1998).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

reduce promotional effort, etc.) but not the alternative products, inducing some consumers to switch to the lower cost products.  In a highly competitive market, the attempted price increase is defeated (or deterred), because so many sales are lost that the price increase proves to be unprofitable to the supplier.

### 3.   The Agreement Will Benefit Merchants

23.      In competitive markets, a low price supplier typically has a competitive *advantage* over a high price supplier (all else equal), because merchants will tend to set lower retail prices for lower cost products, i.e., they *steer*, and some consumers will shift their purchases to the lower priced product if they are (at least to some degree) substitutes.  A supplier that keeps its prices to merchants lower than suppliers of substitute products thus gains sales volume and can make up more profit from additional sales than it sacrifices by keeping its prices low.  Simultaneously, because the high priced supplier loses sales, its ability to profitably maintain or increase its prices is constrained by the existence of the low cost alternatives.

24.      Payment card networks like American Express have used anti-steering rules to suppress this basic competitive process with respect to the networks' card acceptance services provided to and paid for by merchants.  In this part, I explain the following.

- Credit cards typically cost merchants substantially more to accept than other payment methods, and in particular, debit cards.

- At the difference between the cost to merchants of accepting debit cards and credit cards in the United States, many merchants are likely to adopt credit card surcharges when they are permitted to do so.

- Surcharging permits merchants to recoup the cost of credit cards directly from customers who use credit cards.  This allows merchants to set lower posted prices.

9

# A4834

CIVIL CAUSE FOR CONFERENCE: Oral Argument (2/30).
2:00pm — 3:00pm

Before JUDGE: **GLEESON**     DATE: 7/18/2014     TIME: 11:30 Am — 1:00pm

Docket Number: 05MD 1720 and 14 MD 1720

TITLE: In Re Payment Card Interchange Fee and Merchant Discount Antitrust

Courtroom Deputy: **Ilene Lee**     CR: Tony Mancuso.

(Transcript Request Email:

APPEARANCES:
                                    Anthony Mancuso @
                                                  Nyed.uscourts.
   FOR PLAINTIFF:          (Please see attached list.)          gov)

   FOR PLAINTIFF:          _____

   FOR DEFENDANT:          (Please see attached list.)

   FOR DEFENDANT:          _____

✓ CASE CALLED.

- Oral Arguments heard in both cases regarding :

   • Defendant's motions to dismiss the Opt-Out complaints/claims.
        (The Court has DENIED these motions for the reasons as
        stated on the record.)
   • Defendant's motions to dismiss the Declaratory Judgment actions.
        (The Court has DENIED these motions for the reasons as
        stated on the record.)
   • Defendant's motion to dismiss the Salveson complaints.
             (The Court's decision is reserved and will be filed
                 separately via ECF.)

   • Future Opt-In procedures.
             (A proposed notice on these procedures is due by
                 Sept. 23, 2014.)
   • Third party claims filers.
             (Reports on status given—still ongoing.)
   • Franchiser/Franchisee.
             (Submissions are due by Sept. 23, 2014.)

# A4835

## ATTORNEY APPEARANCES FOR THE IN RE VISA/MASTERCARD CHECK CARD MDL ORAL ARGUMENT IN BOTH 05-MD-1720 AND 14-MD-1720

**Date:** **July 18, 2014**

**PLAINTIFFS/OBJECTORS:**

K. Craig Wildfang, Esq.
Alexandra Bernay, Esq.
Paul Slater, Esq.
Joseph Vanek, Esq.
James Bennett, Esq.
James Wilson, Esq.
Richard T. Victoria, Esq.
Robert Kaplan, Esq.
Kevin Landau, Esq.
Joseph M. Alioto, Esq.
Lingel H. Winters, Esq.
Jeffrey I. Shinder, Esq.
H. Laddie Montague, Esq.

**DEFENDANTS:**

Mark Ladner, Esq.
Robert Vizas, Esq.
Michael Shuster, Esq.
Michael Miller, Esq.
Peter S. Julian, Esq.
David Lesser, Esq.
Kenneth Gallo, Esq.
Gary Carney, Esq.
Keila Ravelo, Esq.
Matthew Freimuth, Esq.
Robert Mason, Esq.
Mark Merley, Esq.
Benjamin R. Nagin, Esq.
Gary J. Malone, Esq.

# A4836

1

```
1                        UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF NEW YORK
2

3      - - - - - - - - - - - - - - - - X

4      IN RE:   PAYMENT CARD              :
       INTERCHANGE FEE AND MERCHANT            05 MD 01720
5      DISCOUNT ANTITRUST LITIGATION    :      14 MD 1720
                                               United States Courthouse
6                                        :     Brooklyn, New York

7                                        :     July 18, 2014
                                               11:30 o'clock a.m.
8                                        :
9      - - - - - - - - - - - - - - - - X

10                       TRANSCRIPT OF HEARING
11                       BEFORE THE HONORABLE JOHN GLEESON
                         UNITED STATES DISTRICT JUDGE.
12

13     APPEARANCES:
14
       For the Plaintiffs:          PAUL SLATER, ESQ.
15                                  JAMES BENNETT, ESQ.
                                    JAMES WILSON, ESQ.
16                                  ROBERT KAPLAN, ESQ.
                                    JEFFREY I. SHINDER, ESQ.
17                                  ALEXANDRA BERNAY, ESQ.
                                    PAUL, SLATER, ESQ.
18                                  JOSEPH VANEK, ESQ.
                                    RICHARD T. VICTORIA, ESQ.
19                                  KEVIN LANDAU, ESQ.
                                    JOSEPH M. ALIOTO, ESQ.
20                                  LINGEL H. WINTERS, ESQ.

21     For the Defendants:         MARK LADNER, ESQ.
                                    ROBERT VIZAS, ESQ.
22                                  MICHAEL SHUSTER, ESQ.
                                    KENNETH GALLO, ESQ.
23                                  MICHAEL MILLER, ESQ.
                                    PETER S. JULIAN, ESQ.
24                                  DAVID LESSER, ESQ.
                                    GARY CARNEY, ESQ.
25                                  KEILA RAVELO, ESQ.
                                    MATTHEW FREIMUTH, ESQ.
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4837**

2

```
 1   APPEARANCES CONTINUED:          ROBERT MASON, ESQ.
                                     MARK MERLEY, ESQ.
 2                                   BENJAMIN R. NAGIN, ESQ.

 3   Court Reporter:                 Anthony M. Mancuso
                                     225 Cadman Plaza East
 4                                   Brooklyn, New York 11201
                                     (718) 613-2419
 5

 6   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
 7

 8              *         *         *         *         *

 9

10

11

12              (Case called; both sides ready.)

13              THE COURT:  Good morning.  Have a seat, everyone.

14   Welcome back.   There's been some back-and-forths on the time.

15   It strikes me I haven't been as helpful as I could be on that.

16   I'll make up for that this morning and this afternoon, because

17   there's some issues on which less argument, in my view, is

18   necessary than other issues.  I'll tip you off to that as we

19   go.

20              What I would like to do between now and when we

21   break for lunch is hear first from the defendants on their

22   motion to dismiss the opt-out claims.  I'm hopeful to hear

23   argument on both sides of those motions and the motions to

24   dismiss the declaratory judgment actions before lunch.  Might

25   be overly optimistic, but I don't think so.
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4838**

3

1          After lunch, we have the Savelson motion to dismiss.

2    And then the status update with regard to some of the issues

3    in the MDL is, now my order approving the settlement is up in

4    the circuit.

5          So, who is going to argue on behalf of the

6    defendant's motion to dismiss the opt-out complaints?

7          MR. VIZAS:  Your Honor.

8          THE COURT:  Hello, Mr. Vizas.

9          MR. VIZAS:  I'm going to do part of it.  We're going

10   to split it.

11         Four of the five motions are motions that the Court

12   has had an opportunity to hear about and read about in the

13   past:  The Visa check settlement, release argument, Buffalo

14   Broadcasting and the IPO's.  The fifth issue is a new one.

15         THE COURT:  The filed-rate opt-out.  Just to say it

16   makes me interested in hearing all about it.

17         MR. VIZAS:  Your Honor, I'm going to stand up later

18   and talk for maybe three minutes about that.  Mr. Gallo is

19   going to address Illinois Brick and IPO.  And on the other

20   issues, we're not going to make an affirmative presentation.

21   We'll respond to anything the Court or the plaintiffs have to

22   say.  That will be the initial presentations.

23         On the motions to dismiss, Mr. Shuster -- excuse me.

24   On the motions regarding the declaratory relief, Mr. Shuster

25   will argue, and Savelson will be Mr. Ladner.

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

# A4839

4

1           THE COURT:   Great.

2           MR. GALLO:   Good morning, your Honor.   It's a

3   pleasure to be here.

4           Your Honor, I am intending to keep my comments on

5   both Illinois Brick and the IPO motion at the outset quite

6   brief, because I know the Court is extremely familiar with the

7   issues, and I want to frankly reserve time to respond to what

8   I hear from the plaintiffs.   So, I will make a very brief

9   presentation unless you direct me to do something different.

10           On Illinois Brick, your Honor, we respectfully

11   submit that the complaint should be dismissed under Illinois

12   Brick.   The plaintiffs' claims are that Visa and MasterCard

13   rules have an effect of inflating the interchange.   The

14   claimants' claims are based on the fact that the acquirer pays

15   to the issuer, and that the acquirer passes some portion or

16   all of that from the interchange to the merchant.

17           Under Illinois Brick, it's the direct payor of the

18   overcharge that can recover damages, and in this case, the

19   direct payor of the inflated overcharge is the acquirer.   It's

20   not the merchant.   It is a pass-through to the merchant.

21   There are three circuit court decisions that have dismissed

22   either these interchange overcharge claims or very, very

23   similar claims.

24           In this circuit, as I know the Court is aware,

25   there's the Paycom decision, where what was discussed was the

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4840

5

1    fact that the acquirer had to pay charge-backs to the issuer.

2    That is, when a product was returned or something, there was a

3    charge-back for bad credit, and that the acquirer passed the

4    charge-back through to the merchant, and the merchants filed a

5    claim and said that charge-back fees were inflated.  And the

6    Second Circuit dismissed that claim under Illinois Brick,

7    saying the acquirer was the direct payor of the alleged

8    overcharge.  It's directly analogous to interchange.

9          THE COURT:  How would you have me respond to the

10   argument that's made by a number of plaintiffs?  I know it's

11   in the target plaintiff's brief.  We're at the motions to

12   dismiss stage.  We have a factual allegation that the

13   merchants actually paid the interchange fees.

14         MR. GALLO:  I would respond to that under Twombly,

15   your Honor.  I would respond to that under Twombly.

16         You cannot avoid a motion to dismiss by simply

17   leaving out of a complaint facts that everyone knows to be

18   true in this courtroom.  Everyone knows to be true.  Here is

19   my point.  This case is about the MasterCard and Visa rules.

20   They claim the rules inflate the interchange fee.  They cite

21   the rules repeatedly in their complaint, and they walk right

22   up to the edge of citing the MasterCard rules on interchange

23   and MasterCard rules.

24         For example, 9.1 they know, we know, the Court

25   knows.  It's in published judicial decisions.  It says that

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4841

6

1  the acquirer pays interchange to the issuer, and the

2  plaintiffs simply don't quote that, even though they know it's

3  in the rulings

4        The MasterCard and Visa rules say the merchant

5  contracts with the acquirer.  Some of the complaints make that

6  admission.  Everybody in this courtroom knows that the

7  merchant pays the acquirer.  It's been in pleadings in these

8  cases for years and years and years.

9        THE COURT:  I don't want to quarrel with you.  I

10  don't think it's dispositive, necessarily.

11        Wherein lies everyone knows this is a true

12  exception?

13

14        MR. GALLO:  Here is the point.  I don't think that

15  you can say that the MasterCard rules regarding interchange,

16  the MasterCard rules which they plead regarding the

17  relationship between acquirers and issuers and merchants,

18  cause interchange to be inflated, and then artfully draft a

19  pleading that leaves out the fact that the acquirer pays

20  interchange to the issuer, and instead simply plead merchants

21  pay it directly to the issuer.

22        THE COURT:  That's a fact.  It's not a conclusory

23  assertion of the sort that Iqbal says that I should put aside.

24  That's a fact.

25        MR. GALLO:  It is an allegation, your Honor, that I

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4842**

7

1    would suggest is an absolutely implausible allegation, in

2    light of the fact that there are judicial decisions that

3    recite how the system works and says the opposite, that no

4    lawyer in this courtroom can stand up, consistent with

5    Rule 11 --

6         THE COURT:  I was just about to say to you, I

7    wonder, to the extent you are right -- and they are going to

8    say you are wrong factually -- to the extent you are right,

9    one wonders whether the relief that you seek lies solely in

10   Rule 11, not in this everyone-knows-otherwise slice of

11   doctrine that you want me to adopt.

12        MR. GALLO:  I don't think any lawyer in this

13   courtroom is going stand up in front of you today, any of my

14   adversaries, and say that as a fact, there is actually a

15   payment that goes directly from a merchant to an issuer.  I

16   don't actually believe that any lawyer in this courtroom will

17   say that to the Court, because everyone knows it's not true.

18        I believe what they are doing when they say that is,

19   they are saying the economic reality is that the merchant pays

20   the acquirer and it gets passed through to the issuer.

21   Therefore, we're paying the issuer, even though -- so, in

22   other words, I don't think anybody is going to actually say to

23   you that they pay the issuer directly, because they know it's

24   not true, and I don't think any lawyer in this courtroom will

25   say that.  So, I don't think that's going to be a problem.  I

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

# A4843

8

1    think if asked, plaintiffs' counsel will admit that they pay

2    the acquirer and that their argument is simply one about the

3    economic effect.

4         I don't think that's the problem with the Paycom

5    decision.  In the Kendall decision, which in the Ninth Circuit

6    dismissed claims like these, interchange overcharge is an

7    indirect charge.

8         And the decision in the ATM case out of the Ninth

9    Circuit, which is a consumer decision, because interchange

10   runs the opposite direction in the ATM case and the consumer

11   claimed to be overcharged when a consumer paid a fee when he

12   or she used an ATM machine and had to pay the fee, that was

13   dismissed.  All three of those cases are, we submit,

14   dispositive.

15        Plaintiffs therefore end up relying on two

16   exceptions to Illinois Brick to try to ask you not to dismiss

17   the complaint, two exceptions that have never been recognized

18   in this circuit, and two exceptions that are not recognized by

19   the Supreme Court and exceptions that do exist in the Ninth

20   Circuit, but the Ninth Circuit nevertheless dismissed two

21   cases similar to this under Illinois Brick.

22        With respect to the IPO claims, your Honor, we

23   respectfully submit that those claims are barred as of the

24   date of the MasterCard, that claims based on a structural

25   conspiracy or a horizontal conspiracy to set interchange fees

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    or pass the MasterCard or Visa rules fail as of the date of

2    the MasterCard IPO and then the respective date of the Visa

3    IPO.  And there's really two prongs to this argument, and of

4    course the Court has already written on this, so I'll be very

5    short on this.

6            Post-IPO, there is no basis to conclude that an

7    independent MasterCard or Visa with an independent board and

8    independent fiduciary duties running to shareholders of those

9    entities is acting contrary to those duties to promote the

10   interests of banks rather than to promote the best interests

11   of MasterCard, and there's no allegations here that change

12   that result that your Honor reached in the class case.  The

13   allegations here are not materially different.

14           Since you reached that result, Judge Berman-Jackson

15   in Washington, D.C. in federal district court there has agreed

16   and reached the same result in another case brought against

17   MasterCard and Visa.

18           In the absence of structural conspiracy, the

19   plaintiffs would either have to prove actual horizontal

20   communications and agreements between and among the banks and

21   MasterCard and Visa to set interchange rates or to establish

22   the rules.  There are no such allegations.

23           Or, they would have to come up with some reasoning

24   why your Honor should infer the existence of such a horizontal

25   agreement, and all they can point to is the fact that the

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

# A4845

10

1    banks have agreed to follow the MasterCard and Visa rules by

2    joining MasterCard and agreeing to follow the rules.

3            The law is extremely clear, under cases like Kendall

4    and the Toscano case, the American Airlines case, the Ad Sat,

5    that joining and following the rules of an association or of a

6    network is not sufficient to establish a Section One

7    conspiracy.

8            And lastly, under the Interstate Circuit line of

9    cases and the Toys R Us line of cases, which say a Court may

10   infer a conspiracy if someone acts in a way that would make no

11   sense unilaterally -- that is, if it wouldn't be in the

12   unilateral interest of a bank to join MasterCard and Visa and

13   follow the rules -- in they join, one would say there must be

14   some sort of conspiracy going on, because the unilateral

15   action makes no sense.

16           Here, it makes perfect sense for any banks to join

17   the network, follow the rules of the network unilaterally.

18   City may join and Chase may not join.  City can make a lot of

19   money joining the network and following the rules.  You don't

20   need a conspiracy to explain a bank's decision to follow the

21   rules of the network.  Therefore, a conspiracy should not be

22   inferred.

23           Again, I would refer you to Judge Berman-Jackson's

24   decision, District of Colombia.  She addressed all the issues

25   that the plaintiffs raised here -- Interstate Circuit, Toys R

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    Us, American Needle -- found none of them support the finding

2    of an inference of a conspiracy in this setting.

3              Thank you, your Honor.

4              THE COURT:  Who is up next?

5              You're going to address Buffalo Broadcasting?

6              MR. VIZAS:  We're not going to address Buffalo

7    Broadcasting now.  We're going to wait and see what's done.

8    Filed rate is the other one.

9              Good morning.

10             THE COURT:  Good morning.

11             MR. VIZAS:  I'll be very brief.  As you can see by

12   our papers --

13             THE COURT:  By the way, the motions, all of them,

14   are very well briefed.  Thank you all for that.

15             MR. VIZAS:  The Durbin Amendment to the Dodd-Frank

16   Act, which became effective in October 2011, bars any claim

17   based on debit fees charged after that date pursuant to the

18   filed-rate doctrine.

19             I would like to make two basic points.

20             First, the case law that we've cited in the brief is

21   Simon and Canadian Import cases makes it clear that the

22   doctrine doesn't technically have to be a filed rate.  It's a

23   rate that is set by a federal agency, and not by a third

24   party.

25             When you look at the facts of this situation, I

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4847

12

1    think it's pretty clear the rate cap that Congress has set

2    pursuant to the Durbin Amendment is beyond dispute.  Congress

3    instructs the Federal Reserve Board to do an analysis -- I

4    think this is the important point -- of what is a reasonable

5    rate for debit interchange.

6         The Federal Reserve Board in this case followed that

7    mandate pursuant to congressional statute, and in 2011, after

8    a lot of analysis and work, published a rate that they said

9    was reasonable for debit interchange, and set a maximum cap

10   for debit beyond which you cannot charge.  The Fed expressly

11   said that the fee cap that they set -- I'm quoting -- is

12   reasonable and proportional to the cost incurred.  They set

13   the rate at twenty-one cents plus five basis points, and in

14   the future, they obviously, if they think it's necessary, will

15   reset that rate and it precludes Visa and MasterCard from

16   charging beyond that rate.

17        That's really it, in a nutshell, our argument.  We

18   think it's clear.  Obviously, it only applies after October

19   2011.  We're not making any claims before that time.

20        There's one point that the plaintiffs have raised

21   that we would like to concede, which is that the Durbin

22   Amendment has in it a limitation to cards issued by so-called

23   small banks.  A small bank is a bank with assets less than ten

24   billion dollars, and we do agree that it doesn't apply to

25   that, so we wouldn't seek relief.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4848

13

1          Thank you, your Honor.

2          THE COURT:   Thank you, Mr. Vizas.

3          Mr. Shinder.  Welcome back.

4          MR. SHINDER:   Thank you, your Honor.  Your Honor,

5     I'm going to lay out for you the order that we are prepared to

6     go in.  I'm happy to take your guidance, particularly given

7     how the defendants structured their presentation.

8          I'm going to argue first and I was intending to

9     argue the Visa check-release.  Then I was going to turn the

10    mike over to Mr. Wilson from the Target Group, who is prepared

11    to address the filed-rate doctrine, and he was going to argue

12    the 12(b)(6) standard and how they apply, how they compel an

13    independent evaluation of the various complaints here.

14         Since we have an omnibus motion that's attempting to

15    tar distinct complaints with the same brush -- and

16    parenthetically, your Honor, on behalf of the 7-Eleven

17    plaintiffs, we believe that defendants' argument can be

18    dispensed with -- on that Visa check, since they are facially

19    inappropriate for 12(b)(6), we would like to highlight for the

20    Court our complaint includes distinct allegations on the IPO

21    issue, on Illinois Brick that are set forth in our papers.

22    I'm not about to argue them, but if the Court wants to hear

23    about them later on, I'm happy to address how they feed into

24    and respond to the arguments the defendants are making.

25         Then Mr. Kaplan was going to take on, on behalf of

# A4849

14

1    the Easymark plaintiffs, Buffalo Broadcasting.  And then

2    Mr. Slater, last but not least, will be arguing the IPO and

3    Illinois Brick issue.

4              If you would like to hear any particular issues,

5    given what the defendants just did, happy to rearrange that

6    order.  If not --

7              THE COURT:  That sounds fine.

8              MR. SHINDER:  So, let me address the Visa

9    check-release argument.

10             Your Honor, this is a very simple issue, and this

11   motion -- this aspect of defendants' motion should be denied

12   for two reasons.  First, defendants' position on this motion

13   conflicts quite starkly with the bargain that the parties

14   struck in 2003, which is quite clearly laid out in the Visa

15   Check settlement agreement.

16             Second, defendants' current position, that release

17   somehow bars post-2003 interchange claims, was squarely

18   rejected by the Second Circuit in 2005.  Let me briefly

19   address both points.

20             First, as your Honor has previously found, the Visa

21   Check settlement release is unambiguous, and the plain text of

22   the settlement shows that any conduct post January 1, 2004,

23   including conduct that was related to the conduct at issue in

24   Visa Check, was not covered by the release.  The settlement

25   agreement expressly states that the release is limited to

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    claims "relating in any way to any conduct prior to January 1,

2    2004 concerning claims which were asserted in the case or

3    could have been asserted in the litigation."

4            That this cutoff date for the scope of the release

5    was intended to be a firm temporal boundary was not only

6    reflected in the language I just quoted, but is clear from the

7    relationship, the releases' relationship to the rest of the

8    settlement.  It is also clear from the consistent statements

9    of the proponents of the Visa Check settlement as to this

10   Court and to the Second Circuit, that the release did not

11   cover post-2003 conduct, including conduct related to the

12   conduct at issue in the Visa Check case.

13           While your Honor is intimately familiar with the

14   details of that settlement, forgive me for rehashing them,

15   just to put some of these arguments in context, Visa Check

16   settlement created a $3 billion, approximately $3 billion

17   settlement fund, which was designed to compensate members of

18   the Visa Check class for damages related to the

19   honor-all-cards tie-in rules, the 1992, the beginning of the

20   damage period to the summer of 2003.

21           Because Visa and MasterCard could not rescind their

22   honor-all-cards time rules to the end of 2003 due to certain

23   logistical issues, the settlement called for an interim

24   reduction in significant debit interchange rates between

25   August 1, 2003 and the end of 2003.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

Case 12-4671, Document 1273, 12/09/2014, 1389427, Page  128 of 201

# A4851

1          On January 1, 2004 the, honor-all-cards time rules

2     were rescinded per the agreement, and the settlement expressly

3     said that Visa and MasterCard were free to set whatever

4     interchange fees they liked, subject only to, quote

5     unquote, "applicable law and the dictates of the marketplace,"

6     and as of that date, any member of the Visa Check class was

7     free to sue Visa and MasterCard for any conduct, including

8     conduct related to the conduct at issue in Visa Check,

9     provided it occurred on or after January 1, 2004.  That was

10    the deal, and today defendants are trying do rewrite it.

11         In stark contrast to defendants' current position,

12    Mr. Gallo, speaking for the defendants in 2006, had it right

13    on their first motion on this issue in MDL 1720, which I'll

14    note was properly addressed to pre-2004 damages, when he said

15    "We get the release out to January 2004, and we paid three

16    billion for that release."

17         In other words, the honor-all-cards time rules, the

18    central issue in the Visa Check case, were in effect.  He also

19    got it right --

20         THE COURT:  I hate to interrupt you.  I actually

21    think you are right on this, so you don't need to argue it

22    that much longer.

23         We have to be setting some kind of record for the

24    series of cases, for the number of times the lawyers in the

25    cases are quoted with something they said in prior iterations

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4852

17

1    of the case is quoted right back at them.  I know it happened

2    to you a number of times, so it must feel good to do that.

3              MR. SHINDER:  All right.  I'll stop.

4              THE COURT:  If I have questions, I'll pose them to

5    you.  I actually think you have the better of this argument,

6    so if you don't mind me cutting you off a little bit.

7              MR. SHINDER:  I will turn it over this to

8    Mr. Wilson.  Thank you, your Honor.

9              THE COURT:  Thank you, Mr. Shinder.

10             MR. WILSON:  Your Honor, I'm Jim Wilson, and I'm

11   new, so I can't be quoted back in this case, but it's a

12   pleasure to appear before you.

13             Your Honor, I'm going to address first of all the

14   standard on the motion to dismiss, which your Honor has

15   already raised in his questions of opposing counsel.  Then I'm

16   very briefly going to address the filed-rate doctrine.

17             Your Honor, I'm sure, is aware of the giant donut

18   hole in the defendant's brief in this case is, they never

19   bothered to address the standard on a motion to dismiss.  And

20   this Court, I am sure, is also aware that the Anderson News

21   standard, which doesn't you allow the Court to choose between

22   competing plausible inferences, is the standard that applies

23   here.

24             What the defendants have done is try to avoid

25   Anderson News, I think on two bases.  One, in the reply memo,

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4853

18

1    any allegation they don't care for, they simply assert are

2    conclusory, and they try to hitch their wagon on some form of

3    judicial notice that is well beyond what either the Federal

4    Rules of Evidence would allow or certainly the motion to

5    dismiss standard would allow.

6         With respect to -- for example, the issue of

7    indirect purchaser -- and Mr. Slater is going to address the

8    specifics of that -- but what we have is a motion to dismiss

9    that essentially lumps numerous complaints allegation

10   together, doesn't address anyone's specific allegations, and

11   then argues that all of those allegations are conclusory.

12        We disagree.

13        For instance, the Target complaint has seventeen

14   different paragraphs alleging that we are the ones that pay

15   interchange.  I know that Mr. Gallo said that we can't

16   possibly allege that.  We believe we can.

17        We don't believe that the facts will ultimately show

18   that the representations made, for instance in the Kendall

19   case, will prove to be true.  We don't believe, for instance,

20   throughout the whole history of this, that what Mr. Gallo has

21   represented to be true will be what the proof shows.  The

22   bottom line is, we're not here today to decide between

23   competing plausible inferences.  Rather, our allegations have

24   to be accepted as true.

25        Your Honor himself, in the Precision Associates v.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4854**

19

1    Pinalpina World Transport case, was dealing with allegations

2    of surcharges in that case, and found allegations that

3    candidly I would say were far less specific than what we have

4    made here, were sufficient to survive the motion to dismiss

5    standard.  We think that same reasoning applies here, and

6    would apply to the allegations made by the other defendants in

7    their complaints.

8              I'll then just briefly, your Honor, unless you have

9    any questions about the standard, move on to filed rate.  I'm

10   going to be brief, because I think it's clear that this issue

11   affects only the smallest sliver of this case.  It only

12   affects debit cards, and as counsel has conceded, they are

13   probably only half of the volume of debit cards since the time

14   of the Durbin Amendment.

15             Our position, as set forth in our briefs, is very

16   simple.  First of all, contrary to what counsel said, we don't

17   believe this falls within the parameters of what is in fact a

18   filed rate, because counsel misspoke in saying that Visa and

19   MasterCard were constrained in what interchange rate could be

20   charged.

21             In fact, I believe it's the banks that are

22   constrained in what they can charge under Durbin.  Each of

23   those banks, in a competitive world, is free to charge less

24   than the Federal Reserve's ceiling on the rate of interchange,

25   and that, in fact, is further emphasized in the legislation

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   which requires that the cards carry two different networks to

2   enhance competition in that aspect of interchange.

3           The reality is, filed-rate doctrine is ultimately an

4   issue of statutory interpretation.  Did Congress intend to

5   adopt a filing statute, or did it intend something else?  We

6   would assert, as we have said in our briefs, Your Honor, that

7   there is no way that the filed-rate doctrine can be applied to

8   a statute that is specifically intended to enhance competition

9   in that aspect of interchange.

10          THE COURT:  Thank you, Mr. Wilson.

11          Who is next?

12          Mr. Kaplan.

13          MR. KAPLAN:  Good afternoon.  Nice to see you.

14          THE COURT:  Nice to see you.

15          MR. KAPLAN:  Buffalo Broadcasting.  I'll be very

16  brief.  That was a case that was decided after a full trial

17  before Judge Gagliardi.  It had a history to it where there

18  had been prior decisions.  CBS decision.  It was being run by,

19  at that time, Judge Connor.  I might say, Sylvester Ryan, used

20  to be the ASCAP judge.

21          The Second Circuit found that there were,

22  realistically, alternatives to the blanket license.  They

23  determined the decision in the legal and factual context in

24  which it currently exists.

25          Here, the complaints allege that there are no

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    realistic alternatives because of the rules that exist.  And I

2    also say that one of the realistic alternatives that the Court

3    found, the Second Circuit found, was that they could license

4    directly with the copyright holders.  Here.  That can't be

5    done.  You have to deal with all of the issuing banks.  You

6    can't try to do a deal with one bank and say.  I won't use

7    your card unless you deal with me.  It would be like in

8    Buffalo Broadcasting, if they had said, If you want Cole

9    Porter, you have to take Gershwin and you have to take other

10   people.  Here, the complaints allege there are no realistic

11   available alternatives.  That's what the complaints allege.

12   And the complaints also allege that you have to look at all of

13   the rules in context.  You can't just focus on one of them.

14          So, unless your Honor has questions, we don't think

15   Buffalo Broadcasting is applicable.

16          THE COURT:  Thank you, Mr. Kaplan.

17          MR. SLATER:  Good morning, your Honor.

18          THE COURT:  Good morning.

19          MR. SLATER:  Your Honor, I'm going to address the

20   two issues that Mr. Gallo addressed, the Illinois Brick and

21   the post-IPO conspiracy.  I would like to take Illinois Brick

22   first.

23          THE COURT:  That a factual allegation?

24          MR. SLATER:  It is.  It's specifically alleging that

25   we direct pay the interchange fee to the issuing bank.  It's

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4857

22

1    not conclusory.  In fact, it specifically alleged that the

2    money which is taken by the issuing bank comes directly out of

3    the money that is owed to the merchant.  In other words, they

4    take it right from the merchant's money that is a direct

5    payment of the interchange fee of the merchant from its money.

6    After that, it's just a fact dispute between us and the

7    defendants.

8          Secondly, assuming that Mr. Gallo is correct, and

9    assuming that the interchange fee is made by the acquiring

10   bank to the issuing bank.  That wouldn't help them at all, and

11   the reason is simple.  It's because of the co-conspirator

12   rule.  A plaintiff who directly pays a coconspirator, and the

13   acquiring banks are specifically alleged to be coconspirators,

14   is not barred by the indirect purchaser rule of Illinois

15   Brick.

16         Now, the defendants in their brief have claimed that

17   the coconspirator rule is an exception to Illinois Brick.

18   That's not true.  Illinois Brick simply doesn't apply when the

19   plaintiff directly pays the money to the alleged

20   coconspirator.  That's the specific holding of Judge

21   Easterbrooke in the Seventh Circuit in the Paper Systems v.

22   Nippon decision.

23         And I'll read very briefly from Judge Easterbrooke's

24   opinion.  He says "Illinois Brick allocates, to the first

25   nonco-conspirator in the distribution chain, the right to

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4858**

23

1   collect 100 percent of the damages."  The first

2   noncoconspirator is, of course, the merchants.  He then says

3   "The first buyer from a coconspirator is the right party to

4   sue."  Well, we're the first purchaser from -- we are the

5   first noncoconspirator purchaser.  We're the right party to

6   sue.  Judge Spencer, also of the Seventh Circuit, said the

7   same in In Re Brand-named Rug.  The Eleventh Circuit said the

8   same thing in Lowell v. American Cyanamid.

9        The Second Circuit has not specifically addressed

10  the topic.  There are two circuits, the Fourth and the Ninth,

11  on which defendant heavily relied.  It's the Dixon decision

12  out of the Fourth.  The In Re ATM decision out of the Ninth

13  cited which was by the defendants.  Those two circuits have a

14  rule which limits the coconspirator rule, and says that it

15  applies only where the plaintiff pays the price-fixed rate.

16       First of all, that limitation has been explicitly

17  rejected by district courts in this Sixth Circuit, which I'll

18  get to in a minute.

19       And secondly, assuming that that limitation is

20  correct, it again would not help the defendants at all.  I'll

21  explain that in a second, as well.

22       First, the district court decisions in this circuit,

23  Judge Schendlin in Lawman v. The NHL, Southern District of

24  ever of New York, about eighteen months ago, specifically

25  addressed this question of the limitation on the coconspirator

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4859

24

1    rule, and explicitly said that In Re ATM is wrong, and that
2    Judge Easterbrooke was correct, and decided that the first
3    purchaser who was not part of the conspiracy has standing to
4    bring the treble-damage action.

5         Your Honor, any other rule would leave the
6    wrongdoers free of any suit by any injured victim.  They would
7    skate, because of the Illinois Brick rule, the way they
8    interpret it.  No court has ever said that.

9         Now, as I said before, even if the Fourth Circuit
10   and the Ninth Circuit are exempt and this limitation exists,
11   precisely what Judge Schendlin said was untrue.  Even if the
12   limitation exists, it wouldn't help the defendants in this
13   case one whit.

14        Plaintiffs easily meet the test.  Now, the
15   plaintiffs have specifically alleged that the defendants and
16   their coconspirators agreed to and did impose the price-fixed
17   interchange rate on the merchants.  The defendants do not
18   accept that fact was true, as they are obligated to do.
19   Instead, they impermissibly make up a new fact.  It's not
20   alleged on the face of any complaint before them.

21        The new fact that they make up is the claim that
22   what the merchant pays is one discount rate, and that that
23   discount rate incorporates and includes within it the
24   interchange rate and also the fees that the merchant pays the
25   acquiring bank for acquiring services.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4860**

25

1            That fact is not only made up, it's false, and the
2     defendants know it's false.  Your Honor held specifically, in
3     approving of the class settlement in this case, that the
4     interchange rate is separately identified and broken out,
5     incorporated into the contracts of the merchants, and is a
6     separate identified price-fixed rate.  We claim it's price
7     fixed.  Your Honor didn't find that.  The specific rate is
8     broken out separately and separately paid and agreed to be
9     paid by the merchant in the agreement.
10           Now, your Honor said -- this is at page 23 of the
11    slip opinion, the issuing bank's interchange fees are
12    identifiable and separate from the total package of fees,
13    including other network fees and acquirer banks' merchant
14    discount fees.
15           Your Honor was correct.  And the contentions, the
16    facts they make up, which is that that finding is incorrect,
17    is not on the face of the complaint.  Really, it shouldn't be
18    argued on a motion to dismiss at all.
19           Before I leave the Illinois Brick issue, I would
20    like to mention Paycom, which Mr. Gallo addressed.  Your
21    Honor, in Paycom, Judge Winter in the Second Circuit
22    specifically found that the acquiring bank was not a
23    coconspirator, and that there was no rule in MasterCard to the
24    effect that the acquiring bank had to put the charge-back back
25    to the issuing bank, and as a result of that, there was no

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4861

26

1     occasion to address the coconspirator rule whatsoever in

2     Paycom.

3              Let me move to the post-IPO conspiracy.  The

4     defendants contend that as a matter of law, the conspiracy

5     must have ended when the banks sold their stock in MasterCard

6     and Visa.  Your Honor, that is demonstrably wrong for at least

7     four reasons, and I'll address three of them and stand on our

8     briefs with regard to the fourth.

9              First, it's specifically alleged, and this time in

10    the 7-Eleven complaint, that at the time the IPO's were

11    undertaken, that there was an agreement specifically amongst

12    the banks and MasterCard and Visa to the effect that the

13    anticompetitive rules, the rule we say are anticompetitive,

14    would be reincorporated and reiterated by the new entity, and

15    that that actually took place.  So, there's a specific factual

16    allegation that at the time of the IPO, they specifically

17    agreed to continue the unlawful rules.  It's even stated in an

18    SEC filing by Visa that they would reincorporate and continue

19    the same rules.

20             Secondly, it's specifically alleged in the

21    complaints that post-IPO, each of the associations, MasterCard

22    and Visa, entered into signed written agreements with each

23    member bank, and that those signed agreements -- in those

24    signed agreements, the member banks agreed to impose on the

25    merchants the anticompetitive rules and adhere to those rules

1   and enforce those rules against the merchants.   Every single

2   one of the banks signed a document agreeing to do that.

3          Section One of the Sherman Act prohibits every

4   contract, combination or conspiracy.   These are contracts.

5   The notion that a signed written agreement does not constitute

6   a common plan I think is close to silly.   It's a signed

7   written agreement to adhere to the same common plan, and they

8   all did adhere to it.

9          The Toscano case, which counsel mentioned, in that

10  case, the Court explicitly found that the supposed

11  coconspirator didn't endorse anything, had no part in drawing

12  up the rules, and really, it was just the impetus of his

13  contracting party.   He had nothing to do with it.

14         That's not the case here.   Here, the enforcement of

15  the rules against the merchant is done by the acquiring banks

16  pursuant to signed written documents and agreements.   Your

17  Honor, that's thousands of signed written agreements,

18  thousands, and is exactly the kind of series of unlawful

19  vertical agreements which, if it has an anticompetitive

20  effect, the Supreme Court addressed in Leegin and said the

21  courts must be weary of a series of anticompetitive contracts

22  or agreement that have an overall market anticompetitive

23  effect.

24         Third, according to the defendants, they necessarily

25  withdrew from the conspiracy pre-IPO, the existence of which

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   they do not deny, when they sold their stock.  Remarkably,

2   they make that argument without ever addressing the elements

3   of withdrawal from a conspiracy.  The elements are well-known

4   and simple.

5             First, the defendant must take affirmative steps to

6   disavow and defeat the anticompetitive purpose.  It's

7   specifically alleged that they took no affirmative steps to

8   disavow or defeat the purpose, and they don't contend

9   otherwise.

10            Secondly, the defendant must not continue to receive

11   benefits of the anticompetitive scheme here.  It's alleged

12   that they received the supercompetitive interchange fees and

13   prevented the competition between the different associations,

14   which was the purpose of the scheme to begin with.  They

15   continue to receive those benefits.

16            Thirdly, the defendant must take no additional acts

17   in furtherance of the scheme.  Here, they took many acts in

18   furtherance of the scheme, all specifically alleged.  All the

19   banks signed the agreements to continue the illegal rules, and

20   all of the banks are alleged to have continued to enforce

21   those rules against the merchant post-IPO.  Again, affirmative

22   acts in furtherance can't be withdrawal.

23            The defendants literally have no response to any of

24   this.  Instead, they say, We sold -- the banks sold their

25   stock, conspiracy must be over.  Cite no cases in support of

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    that.

2              The case law is directly to the contrary.  U.S. v.

3    Sax, Morton's Market, which we have both cited to your Honor,

4    both say that the sale of stock does not withdraw the entity

5    whose stock is sold from the conspiracy.

6              Your Honor, change in ownership, in stock ownership,

7    that doesn't affect the rules, didn't affect their conduct,

8    didn't affect their agreements to continue the same conduct,

9    is not a withdrawal from an antitrust conspiracy.

10             Your Honor, the fourth argument that we have is one

11   where we'll stand on the briefs.  The plaintiffs have

12   specifically alleged that there is a tacit agreement amongst

13   all of the bank members to continue to impose these rules on

14   the merchants, and that it's contrary to the individual

15   self-interest of every one of those banks to enter into an

16   agreement which says the merchant cannot give a discount to my

17   card and the merchant cannot impose a surcharge on my

18   competitor's cards.  Every bank is hurting itself, unless he

19   knows that all the other banks will reciprocate and all of

20   them will agree that they can't surcharge his card to move it

21   to their card, and can't give a discount to his card, again to

22   move it away from the other bank's card.

23             Your Honor, unless you have questions, that's all I

24   have.

25             THE COURT:  I don't, at the moment.  If that

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4865

30

 1    changes, I'll let you know.

 2              Thank you.

 3              All right.

 4              Any brief rebuttal?

 5              MR. GALLO:   Yes, your Honor.

 6              THE COURT:   Mr. Gallo.

 7              MR. GALLO:   Your Honor, on Illinois Brick, the

 8    question is, is there a plausible allegation that the merchant

 9    is the first payor of this inflated interchange rate?  And

10    notwithstanding what you just heard, there's no allegation

11    that the first payor of the interchange rate is the merchant.

12    That is, the acquirer.  It's admitted that the acquirer pays

13    it.

14              The point that Mr. Slater is making is that it shows

15    up in the -- goes from the acquirer's bank account, there's a

16    debit against the merchant's bank account, but there's no

17    assertion that the acquirer isn't paying the interchange

18    first.  And because of that, you have to pass-through the

19    problem that Illinois Brick is directed at the coconspirator

20    exception.  It's not been recognized in the circuit.  It's not

21    been recognized in the Supreme Court.

22              The cases where it has been applied are cases where

23    the actual alleged fee that was the result of the conspiracy

24    was charged to the plaintiff.  In this case, that's the

25    merchant discount fee.  It may or may not incorporate all or

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4866

31

1  part of the interchange fee, but it's a different fee.  The

2  interchange fee is allegedly passed through as part of that

3  fee.

4         Now, why is that so important?  Because in Judge

5  Easterbrooke's case, in the pharmaceutical case that was

6  referred to in Judge Posner's case in the Eleventh Circuit

7  case, all of those cases are cases where there's multiple

8  conspirators, some downstream, who are alleged to have fixed

9  the actual price that the plaintiff paid; not fixed a

10 component of the price the plaintiff paid, the actual price.

11 And because that's true, because they are fixing the actual

12 fee that the plaintiff paid, you avoid all the problems of

13 pass-through that Illinois Brick is worried about.

14        When instead, you have this situation where

15 interchange is just a component, then you walk right into the

16 Illinois Brick problem of trying to allocate how much of it

17 was actually passed through.

18        Judge Schendlin did disagree with that ruling.

19 That's true.  I think Judge Schendlin respectfully is wrong

20 about that, and secondly, her case actually was not a

21 pass-through case, so the issue didn't get crystalized.  Her

22 case was simply an allegation that the sports leagues, the

23 regional networks that have rights to broadcast the sports

24 leagues and the actual cable and satellite providers to

25 consumers conspired in such a way that it had the effect of

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4867

32

 1    inflating the price the consumer paid to the cable provider.
 2    There was not a pass-through problem like Illinois Brick.  So,
 3    I don't think that's a case that is particularly helpful in
 4    thinking about the issue.
 5             The Paycom case, the rules applicable in Paycom
 6    about not passing through charge-back, are equally true with
 7    respect to interchange.  There's no rule that requires
 8    interchange to be passed through.  Sometimes it is, sometimes
 9    it's not, depending on the negotiations between a merchant and
10    an acquirer.
11             Acquirers don't have to pass through interchange,
12    and a big, powerful merchant may be able to get a deal that's
13    very different than a less-powerful merchant in terms of what
14    percentages of anything is passed through.
15             With respect to the IPO, all of the arguments you
16    just heard, which were very forcefully and eloquently made,
17    were arguments you also heard when we had this argument with
18    respect to the class action.
19             And the fundamental point, that I say respectfully
20    and hope that I am correct, that the plaintiffs are missing in
21    your opinion is that these arguments don't address the
22    question of how can one infer that an independent board of
23    directors, with independent fiduciary duties, free from any
24    legal obligation or right to look at the interests of the
25    banks, as opposed to MasterCard continue rules in place that

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

```
 1   would benefit the banks and not benefit MasterCard and Visa,
 2   and the shareholders of MasterCard and Visa.  And there's no
 3   answer to that.
 4          The fact that pre-IPO the rules were in place, and
 5   post-IPO the board adopted the same rules, it does not lead to
 6   an inference that the independent directors are violating
 7   their fiduciary duties or doing something to promote the
 8   interest of the banks rather than the interest of MasterCard
 9   and Visa, and that runs through all of the arguments that you
10   heard.
11          Thank you, your Honor.
12          THE COURT:  Thank you, Mr. Gallo.
13          MR. VIZAS:  If I may say a few words about Buffalo
14   Broadcasting?
15
16          THE COURT:  Yes.
17          MR. VIZAS:  With respect to the Buffalo Broadcasting
18   argument, obviously this motion is targeted specifically at
19   the default interchange rule, not at the basket of rulings.
20          There is no dispute, and listening to plaintiffs'
21   arguments, I think there's no dispute at all that the default
22   interchange rule on its face allows issuing banks and
23   merchants to negotiate for different interchange rights.  No
24   one is required to accept an interchange rate if they have
25   other options in the face of the rules.
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4869

34

1              The second option that clearly merchants have, and

2       again, there's nothing alleged to rebut either of these, is

3       that the rules leave the banks, who are issuers of Visa cards,

4       free in their independent capacity to provide alternative

5       network services to merchants, to negotiate with merchants

6       irrespective and outside the Visa system.   That's why we think

7       that this motion, when you distill it to its heart, is

8       persuasive and in fact correct.

9              To respond briefly to two points made by counsel.

10      There was the suggestion about Buffalo Broadcasting that

11      somehow the holding turned on the fact that there had been

12      discovery and a trial, and it wouldn't be appropriate to apply

13      at the motion-to-dismiss stage.   Nothing in Buffalo

14      Broadcasting or the other cases cited suggests that Buffalo

15      Broadcasting's principles can't be applied at any stage.

16             In fact, Buffalo Broadcasting was cited in the

17      Second Circuit by applying principles of law.   It did not

18      refer to fact.

19             Secondly, the Paycom decision, which almost everyone

20      has talked about today and I would be derelict not to, the

21      Paycom decision that we cite in our brief, and I won't repeat

22      the brief, but the Paycom decision was at a pleading stage.   I

23      would like to quote briefly.   Just as in this case, in Paycom

24      the Court found that nothing that sufficiently alleges that

25      the network rules or an agreement among acquiring banks have

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4870

1    prevented plaintiffs from negotiating with the banks to create

2    an individualized solution.

3         That's all I really have to say.  I think it's that

4    clear.

5         THE COURT:  Thank you, Mr. Vizas.

6         Why don't I hear from the moving defendants in the

7    declaratory judgment actions.

8         Good afternoon.

9         THE COURT:  Good afternoon.

10         MR. MALONE:  Gary Malone.  Representing the

11    declaratory judgment defendants in the case of Visa v.

12    National Association of Convenience Stores.

13         Your Honor, the declaratory judgment defendants in

14    this action are moving to dismiss or for a stay of the

15    declaratory judgment complaint, because the essential truth

16    here is that the declaratory judgment plaintiffs, Visa and

17    MasterCard and the banks, are not really concerned about a

18    potential damages action for past conduct by these four trade

19    associations and three merchants.

20         What's really going on here, and what they have

21    essentially admitted to is that they are seeking a procedural

22    advantage here.  They hope to get an early summary judgment

23    here, your Honor, that they can then use against the parties

24    that are actually asserting claims here against the actual

25    opt-out plaintiffs in the many dozens of actions brought by

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4871

36

1    hundreds of opt-out plaintiffs.  They are not concerned about

2    the minor damages that they could be liable to these four

3    trade associates associations and three merchants, your Honor.

4            Because of that, this Court should either dismiss or

5    stay the declaratory judgment for several reasons that all go

6    to the central truth that there's no existing controversy

7    here.

8            THE COURT:  How can there not be a controversy?

9    They are in the case.

10            MR. MALONE:  They are in the case because they are

11    seeking a structural relief, and they want injunctive relief.

12            THE COURT:  Is there no prospect down the road of

13    the damages action?

14            MR. MALONE:  The only prospect of damages action

15    depends upon what happens in the Second Circuit.

16            THE COURT:  Some of the case law under the

17    Declaratory Judgment Act makes it pretty clear if there is a

18    controversy, they don't need to wait around until the

19    plaintiff seeks coercive relief.

20            And I hear what you are saying, that they have this

21    ulterior motive that gives them a tactical advantage.  So,

22    what if it's an appropriate deployment of the Declaratory

23    Judgment Act?

24            MR. MALONE:  Your Honor put your finger on it.  If

25    it's an appropriate act.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4872

37

1      THE COURT:  They know that you are not going to come

2   and seek damages at the far end of the circuit's decision.  I

3   thought this statute, one of its purposes, is to allow them to

4   seek a declaration now, rather than wait years to put this

5   dispute behind them.

6      MR. MALONE:  Your Honor, that's proper if there is

7   indeed an immediate controversy.  That's what the Supreme

8   Court said in the Med Immune case, which both sides have

9   cited.  The question is, is there a controversy of sufficient

10  immediacy?

11      In all the cases that the declaratory judgment

12  plaintiffs have cited, in which declaratory judgment action

13  was permitted for past conduct, there actually was an

14  immediate threat of litigation.  For example, in the Kidder

15  Peabody cases, which they have cited, not only was there an

16  immediate threat where the declaratory judgment defendants

17  said that they would sue for Federal Securities Act

18  violations, they actually brought a state court case on those

19  very same transactions.  They were actually suing them at the

20  time the declaratory judgment action was brought.

21      Here, we don't have that, your Honor.  These

22  declaratory judgment defendants have stated unequivocally they

23  are not going to even consider suing until after the Second

24  Circuit has ruled, and because of that, there's no immediacy

25  of -- immediate controversy.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4873

38

1          THE COURT:  In broad strokes, what are the temporal

2     boundaries of an immediate threat to sue?

3          MR. MALONE:  The cases, your Honor, don't really

4     give --

5          THE COURT:  Yes.

6          MR. MALONE:  What we can glean in the case where

7     there is an immediate threat, it's usually something within a

8     matter of days or weeks where there actually was a letter

9     saying, We might bring a suit.  We don't have that here, your

10    Honor.

11         THE COURT:  If it's too quick, then it might be

12    inappropriate use; right?

13         MR. MALONE:  Right.

14         THE COURT:  So, there's like a middle ground where

15    it's a safe deployment of the statute.  Too quick, it's an

16    abuse.  If it's not immediate enough, where is the sweet spot?

17         MR. MALONE:  I guess I could quote Potter Stewart

18    and say, You know it when you see it.  I guess this is a case

19    you know it doesn't occur here because of what you see.  What

20    you see is the declaratory judgment defendants saying, We're

21    definitely not going to sue before the decision in the Court

22    of Appeals.  So, there really is no immediate threat here.

23         THE COURT:  What's going on there?  What's the

24    schedule up there?

25         MR. MALONE:  We're waiting now for the opposition

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4874

39

1   briefs.

2            THE COURT:   Have the blue briefs been filed?

3            MR. MALONE:   Yes.   The initial briefs have been

4   filed by the appellate.   We're waiting for the appellees, and

5   then there will be reply briefs.

6            THE COURT:   Is there a period of time in which there

7   might be oral argument?  Do they do that?

8            MR. MALONE:   To be honest, I'm not sure.   In my

9   experience, it's typical there might be oral argument in the

10  ballpark of six months or so after.   I really have no idea.

11           THE COURT:   When are the red briefs due?

12           MR. MALONE:   Right now, October 14.

13           THE COURT:   Have fun up there.

14           MR. MALONE:   We plan to, your Honor.   But, your

15  Honor, that really shows that there is no immediate threat

16  here.   That determines the jurisdiction of this court, because

17  if there is no immediate controversy, there's no jurisdiction.

18           But going beyond that, your Honor, even if the Court

19  has jurisdiction, both sides admit this Court has the

20  discretion to decide not to hear this case.   And the Second

21  Circuit in the Doherty case noted that the fundamental purpose

22  of the declaratory judgment action is to avoid the accrual of

23  avoidable damages, and that --

24           THE COURT:   It's not limited to that?

25           MR. MALONE:   It's not limited.   That's the

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4875

40

1    fundamental purpose.

2              Your Honor, all the cases that permit the

3    declaratory judgment action to go forward when there's an

4    issue of past damages also have another component.  There's

5    also the question of the ongoing legal relationship of the

6    parties.  I can give some examples.

7              The other side cites the Kidder Peabody case in the

8    Second Circuit.  However, in that case, your Honor, the

9    declaratory judgment that was being sought dealt with whether

10   or not there can be a retroactive adjustment of stock rights.

11   So, the parties ongoing legal relationship actually was

12   affected.  Plus, in Kidder Peabody, there was actually a state

13   court action, so the declaratory judgment plaintiffs had the

14   prospect that rights might be prejudiced, because there could

15   be piecemeal litigation.

16             We simply don't have that here, your Honor.  All we

17   have here is a case that is solely limited to damages for past

18   conduct.  And as the cases recite, pages twelve to thirteen of

19   our opposing briefs show that this is not an appropriate use

20   of the declaratory judgment action and they dismiss those

21   actions regularly, your Honor.

22             Your Honor, all the cases that both sides have

23   cited, in which a declaratory judgment has been permitted when

24   there was an issue of past damages for past conduct, also had

25   an issue of what the ongoing legal relationship was with the

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4876

41

1    parties.   So, there's something immediate being decided.

2              Here, we don't have that, because of the settlement

3    in 1720.   Because of the b(2) release, there's no question

4    here to the ongoing legal relationship of the parties.   That

5    has been settled.

6              Finally, your Honor, even if your Honor does not

7    dismiss this case, we highly urge this Court to stay the case

8    until the Second Circuit makes its decision.   There's simply

9    no prejudice here that the declaratory judgment plaintiffs

10   would suffer.   All they say is, Well, we would still have the

11   uncertainty of whether we might have to pay damages in the

12   future.   Your Honor, uncertainty about the outcome of a case

13   is what you get every time there's a stay.   The question is,

14   is there any real prejudice to either side?   And here, there

15   is no prejudice.

16             If the Second Circuit decides this case by reversing

17   your Honor, then this becomes moot.   Then 1720 gets

18   resurrected.   If the Second Circuit affirms totally, at that

19   point then the declaratory judgment defendants will decide,

20   okay, do they want to sue or not?  But until that point,

21   there's simply no prejudice here to the declaratory judgment

22   plaintiffs which would really make sense.   It makes no sense

23   to waste the time of the parties on a case that just might not

24   occur.

25             I'll reserve any remaining time for rebuttal.   Thank

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4877

                                                                        42

1    you.

2              THE COURT:   Thank you.

3              MR. BENNETT:   My name is Jim Bennett.  I'm the

4    lawyer for Walmart.

5              THE COURT:   Good afternoon.

6              MR. BENNETT:   Good afternoon.   We have filed an

7    opt-out case shortly after we filed the motion to dismiss the

8    declaratory judgment action.   I believe that our motion should

9    still be granted on the grounds that the Court, I believe,

10   understands, which is that the declaratory judgment action as

11   to us seeks only a declaration of nonliability for past

12   conduct.

13             Our complaint, our opt-out complaint in paragraph

14   one, defines the damages period aspiring in November of 2012.

15   And in addition, Visa's motion says the damages period ends at

16   that point in time.   We cite Johnny vs. Metallica case, a

17   National Union case which says in essence that the declaratory

18   judgment act goes prospectively.   There has to be something

19   more than just past acts and past damages at issue in it.

20             And in this case, we don't have any of that.   And in

21   fact, we filed our -- we filed our opt-out case which then, of

22   course, gives the defendants the opportunity to get the

23   adjudication that they want.

24             So, everything that I think they would try to prove,

25   in our own case could be proved either defending our case, or

                ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

**A4878**

43

1    I suppose they could file a counterclaim for declaratory

2    judgment, which they have not done in any of the other cases

3    yet.

4              So, we have a situation where we're wanting damages

5    for a finite period based on past acts.

6              THE COURT:  You place a lot of weight on that.  It's

7    not in accord with my understanding of the scope of the

8    Declaratory Judgment Act.

9              There's cases in which declarations are sought that

10   are purely retrospective, deal with damages.  Sometimes it's

11   in insurance settings.  It doesn't have to be solely a concern

12   about engaging in future conduct that might produce liability.

13   I understand that might be the more common setting in which a

14   declaratory judgment is sought.  I don't understand it to be

15   limited in the manner that you describe or argue.

16             MR. BENNETT:  I believe -- we are, first off, not

17   contesting your jurisdiction over the case.  We're in the

18   Prudential section.  There are a series of Second Circuit

19   cases that say the purpose, not a, the purpose of a

20   declaratory remedy is to avoid accrual of avoidable damages to

21   one not certain of his rights.  We cite the Lukenbach cases

22   and the Doherty cases from the Second Circuit on that.  And it

23   is the case that you would have jurisdiction, because there's

24   a controversy based on past conduct.

25             But if you look at the cases that Visa cites in

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

1   response to us, it's not like Salomon Brothers, which is a

2   case where Salomon Brothers had a pattern contract that was

3   still being used on a go-forward basis.  The judge said, in

4   that case, At least it's going to declare the rights on a

5   go-forward basis for them.

6           Another case is an insurance case where the party

7   was trying to figure out if it would have coverage while a

8   reconstruction of the World Trade Center was going forward.

9   They are adjudicating some future rights.  We think that's the

10  case.

11          Here, unlike some of the cases, we filed our case,

12  too, so there's no purpose to be served in getting it

13  adjudicated.  We're here, we're before you, certainly until

14  you decide to remand the case to the Western District of

15  Arkansas.

16          THE COURT:  It's clear that -- it's not that it's

17  not a lot.  All that's at stake here, if the case goes to

18  trial, it goes to trial in the Western District of Arkansas

19  and not here.

20          MR. BENNETT:  I think that's correct.

21          THE COURT:  That may be your strongest argument.

22          MR. BENNETT:  There's no question that we're here

23  and we're before you for discovery and all of those things.

24  So, here, we filed the case just twelve days after we filed

25  our opt-out.  I believe there's simply absolutely no dispute

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4880

                                                                    45

1    that Visa said they expect to be in litigation with us, and

2    they said that at a prehearing conference with Judge

3    Orenstein.  They understood from the moment we opted out, we

4    are going to be in a case.  We think -- we're the plaintiff --

5    antitrust cases vary analogous to a tort case.  We think we

6    get to pick the forum for the trial.  We're happy to be here

7    in the meantime.

8              THE COURT:  You don't have to be happy to be here.

9    You're allowed to move even if you are not.

10             MR. BENNETT:  Thank you, your Honor.

11             THE COURT:  Thank you.

12             Any opposition to this position?

13             MR. SHUSTER.  There is opposition.  I want to keep

14   it brief.  I certainly don't want to snatch defeat from the

15   jaws of victory.

16             I do want to address a couple of issues, if I might.

17             One is, the lawsuit against the former named

18   plaintiffs is against four trade associations and three

19   retailers.  They do make an argument that's addressed to the

20   Court's subject matter jurisdiction when they argue that

21   there's no case or controversy.

22             And all I want to say on that is that there are --

23   the Second Circuit has rejected the proposition that a

24   representation from a declaratory judgment defendant that it

25   doesn't intend to brought a lawsuit is a sufficient basis to

                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    moot a controversy.  So, in the Kidder Peabody case -- here,

2    the declaratory judgment defendants are saying they won't

3    bring a case for a period of time or unless something happens.

4    In Kidder Peabody, the declaratory judgment action in the

5    Southern District of New York was whether the declaratory

6    judgment plaintiff had violated the securities laws, and the

7    Court said -- and the defendant said, We will never bring

8    those claims in our Texas state court action.  We'll never do

9    it.  And the Second Circuit said, A representation like that

10   is not enough to moot the controversy.

11          In a Southern District case in 2007, a similar

12   issue.  The declaratory judgment defendant submitted a

13   declaration in the case that it would never bring federal

14   securities law claims, and Judge Stein said, That's

15   inadequate.  They could change their mind.  They can do

16   whatever they please.

17          Here, they are not even saying they won't sue.  They

18   are just saying they won't sue for a period of time.  They're

19   saying they only seek structural relief, and will only sue if

20   the Second Circuit affirms your decision on settlement.

21          But if the Second Circuit affirms your decision on

22   settlement, the one thing that won't be available is

23   structural relief.  The only thing that will be available is

24   damages.  Three of these defendants are merchants with

25   substantial damages claims.  They are going to bring those

# A4882

47

1   claims one way or another, whether the Second Circuit affirms,

2   whether the Second Circuit reverses.

3          Of course, as your Honor said, we have the reality

4   that these are former named plaintiffs on one of the class

5   claims in MDL 1720.  We have been litigating with them for

6   nine years.  We're not seeking an unfair tactical advantage.

7   We're seeking finality.  We would like to be done litigating

8   with these parties.

9          On past conduct, you know, I don't have much to add.

10  There are several cases, as your Honor points out, that

11  adjudicate past conduct in the context of declaratory judgment

12  actions.  They are in our brief.  A couple of those cases cite

13  to a passage in Wright and Miller, which says it's easier to

14  decide declaratory judgment cases when the conduct is past,

15  because then, you don't have to sorry about an advisory

16  opinion, a hypothetical set of facts or anything else.  That

17  passage was cited to in one of the cases that Walmart cited,

18  which is the In Re Combustion case, Second Circuit case.  They

19  also -- the Second Circuit also cites the Salomon Brothers v.

20  Carey, which is a 1983 decision of Judge Motley, in which she

21  also cited to Wright and Miller.  She decided past conduct

22  issues.

23          Just a couple of arguments that the defendants have

24  that I would like to address.  Walmart says that we're

25  engaging in forum shopping.  The reason any of this is in this

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4883

48

1   court to begin with is because Walmart commenced an action in

2   the Eastern District of New York against these defendants in

3   1996.

4            Judge Nickerson had a case, 2002, it was a RICO -- a

5   series of RICO class actions had been filed in the Eastern

6   District of New York.  Those actions had been dismissed for

7   lack of RICO injury and failure to make out other elements of

8   a RICO claim.  The class plaintiffs in those actions then

9   filed a new action in the Southern District of California.

10  They got past a motion to dismiss there.  They then threatened

11  the original class defendants with further actions if there

12  wasn't a global settlement.  The original defendants filed a

13  declaratory judgment action at plaintiffs in the Eastern

14  District of New York, and the now declaratory judgment

15  defendants complained that it was forum shopping.

16           And here is what Judge Nickerson said:  The

17  circumstances do not warrant any discretionary declination,

18  transfer or stay order.  The card purchasers' lament that they

19  are the victims of the forum shopping can hardly be serious.

20  They initially chose this district to litigate their claims,

21  and have not been denied their choice of forum.

22           The one other argument that I wanted -- two other.

23  One is, the former named plaintiffs say that we filed this

24  declaratory judgment action against them to chill opt-outs.  I

25  just don't want to leave that unanswered.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1          THE COURT:  You don't have to address that.
2          MR. SHUSTER:  With that, the only last point I'll
3  make is on the issue of a stay.  It simply makes no sense.
4  The opt-out litigation is happening now.  It makes no sense to
5  stay the litigation as to one narrow little circumscribed
6  group of opt-out plaintiffs.
7          THE COURT:  Tell me what the prejudice would be to
8  the declaratory judgment plaintiffs if there's a stay.
9          MR. SHUSTER:  If there's a stay, what they are
10  saying, their counsel, Mr. Shinder is representing the
11  7-Eleven plaintiffs, anyway.  He'll participate in discovery.
12  They won't be prejudiced by a stay.  I think what they are
13  saying, they'll get the benefits of discovery, but they won't
14  make any discovery in the case.
15          If there are going to be opt-out plaintiffs, they
16  might was well participate in discovery together with other
17  opt-out plaintiffs.  We have defenses.  We have defenses we
18  would like to develop in discovery as to all the of opt-out
19  plaintiffs.  So, the prejudice is simply setting it aside, and
20  with them of all people, we have been litigating with them for
21  nine years, at some point, we think we're entitled to
22  finality.
23          THE COURT:  Okay.
24          MR. MALONE:  Your Honor, a minute for rebuttal.
25          THE COURT:  Of course.  You can have more than a

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

**A4885**

50

```
 1   minute.  Not too much more.
 2            MR. MALONE:  Just a couple of points, your Honor.
 3   With respect to the Kidder Peabody case that counsel just
 4   mentioned, in that case, there was actually a state court
 5   proceeding on the very transaction that was in issue in the
 6   declaratory judgment case.  So, there's a real danger of
 7   piecemeal litigation, where there could be inconsistent
 8   remedies.  So, there the declaratory judgment plaintiffs
 9   actually would be prejudiced.  It was not just an issue of
10   whether or not they are liable for past damages, past conduct.
11            THE COURT:  Don't I have a danger of piecemeal
12   litigation here if I wait until after the Circuit Court's
13   decision and then have a delayed onset of opt-out litigation?
14            MR. MALONE:  No, your Honor.  In Kidder Peabody,
15   there's danger of piecemeal litigation with respect to those
16   very parties, the identical parties.  Here, there's no other
17   litigation that the declaratory judgment defendants are
18   engaged in against the declaratory judgment plaintiffs.
19            And they could easily be unfolded in the same
20   discovery once the Second Circuit decides getting back to a
21   question your Honor raised previously about the expected
22   duration.  If you want to use the Visa Check case as a
23   benchmark, that took approximately two years in the appeal
24   process.
25            THE COURT:  Which one, the class cert. or the
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4886

51

1   approved?

2          MR. MALONE:  I believe the approved, your Honor.

3          With respect to the prejudice, your Honor, it's very

4   revealing just now counsel revealed no real prejudice to the

5   declaratory judgment plaintiffs if there is a stay here.  The

6   ongoing discovery that the parties are engaged in in the

7   opt-out cases can easily encompass the declaratory judgment

8   defendants if they actually decide to sue, and there is no

9   definite decision that there would be suing contrary to what

10  counsel said.  We think at the very least, a stay would be

11  appropriate here, and there would be no prejudice to the

12  declaratory judgment plaintiffs.

13         Thank you, your Honor.

14         THE COURT:  Thank you.

15         Did you want to be heard, sir?

16         MR. BENNETT:  Jim Bennett again for Walmart.

17         The reference was made to the cases that talk about

18  how sometimes a declaratory judgment is easier when the

19  conduct is in the past.  But in those cases, there's still

20  ongoing future damages that are accruing during that time

21  period, where the plaintiff who is a declaratory judgment

22  plaintiff could get the ruling and change their conduct and

23  cut that off.

24         So here, we both have conduct in the past and

25  damages that are cut off, and those are the two circumstances

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4887**

52

1    that we think are most significant.  As the Court knows, we're

2    not class representatives in the second class action, and the

3    last time we sued these people here was in 1996.  We have

4    decided we like the Western District of Arkansas for this

5    case, where we live, work and incurred our damages.  Thank

6    you.

7             THE COURT:  Thank you.

8             Perfect.  Five to 1:00.

9             I'm going to rule orally on most, if not all, of

10   what I have heard argument on already, but I'll do that after

11   the lunch hour, and then we'll proceed to the other matters

12   that are on the table today.

13            So, I'll see you at 2:00 o'clock.  Thank you.

14            (Lunch recess.)

15

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

**A4888**

53

1              A F T E R N O O N     S E S S I O N

2              THE COURT:  Please be seated.

3              The motions to dismiss the opt-out complaints are

4       denied.  In large part, my decision on these motions is driven

5       by the procedural posture of the cases.  The requirement that

6       I accept all well-pleaded factual allegations as true exists

7       on motions to dismiss.

8              It's fair to say that most of the arguments I reject

9       here today may need to be revisited if there are dispositive

10      motions at the conclusion of discovery.

11             Briefly -- and thank you again for your advocacy,

12      all of you.  As always, briefs are wonderful, and, if ever

13      this series of cases goes away, I'm going to miss them,

14      because the advocacy really is inspiring in some ways.

15             Briefly, to the extent the motions are based on the

16      IPO's, the Visa and MasterCard IPO's, I'm going to spare you

17      the applicable legal standards.  You know them, and I'll use

18      some terminology here that has become part of the vernacular

19      of the case, because you all know it.

20             But with respect to the IPO's, I agree with the

21      plaintiffs' argument that the allegations that the defendants

22      didn't withdraw from the illegal concerted activity and that

23      the IPO's left intact anticompetitive restraints plausibly

24      allege a violation of the antitrust laws.  I don't think the

25      defendants' arguments can be resolved on a motion to dismiss

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4889**

54

1   in this regard.

2            The same is true with regard to the Illinois Brick

3   argument.  I agree with a number of arguments overlap.  For

4   example, I agree with the target plaintiffs that the factual

5   allegations that the merchants actually paid the interchange

6   fees that they claim were fixed precludes my granting the

7   motion at this point.  I accept those allegations as true.

8   They are sufficient to fend off the Illinois Brick claim, at

9   least at this stage.

10            I don't need to address the other aspects of the

11   arguments at this point, including, for example, whether or

12   not the exceptions to the Illinois Brick doctrine are

13   applicable.

14            As to the Buffalo Broadcasting argument, again, at

15   this stage, the argument has no merit.  The allegations here

16   distinguish the default interchange from the blanket license

17   at issue in those cases -- in that case.

18            Plaintiffs here allege that default interchange is

19   one feature of the landscape that also includes the

20   honor-all-cards rule, the antisteering rules, and that, viewed

21   in its entirety, that landscape makes an agreed-upon

22   super-competitive fee, and that the banks have no incentive to

23   negotiate a different one.  The Circuit City plaintiffs say,

24   at page eleven of their brief, that this argument is premature

25   on a motion to dismiss, and I agree with that.  It's denied

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4890**

55

1    for that reason.

2              As for the release, I agree with the 7-Eleven

3    plaintiffs' argument, page 16 of their brief, that determining

4    whether the release applies to all of the allegations involves

5    a fact-intensive inquiry that can't be performed at this

6    juncture on a motion to dismiss.  There's many allegations of

7    post-2003 conduct.  I don't need to address the other aspects

8    of this category of the argument, either.

9              As for the filed-rate doctrine argument, I conclude

10   that that doctrine is inapplicable for the reasons set forth

11   in the target plaintiffs' brief.

12             I have considered all the arguments in support of

13   the motions to dismiss those opt-out complaints and find none

14   of them to have merit.  The motions are denied in their

15   entirety.

16             I'm also denying the motions to dismiss the

17   declaratory actions.  Walmart contends that the case seeks a

18   declaration of nonliability for past conduct and for damages

19   that accrued in the past.  Even accepting that

20   characterization as true, it doesn't mean the use of the

21   Declaratory Judgment Act is improper.  The Wright, Miller and

22   Kane treatise is instructive.  It says, at Section 3751, that

23   the declaratory judgment remedy  "...gives a means by which

24   rights and obligations may be adjudicated in cases involving

25   an actual controversy that has not reached the stage at which

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4891

56

1   either party may seek a coercive remedy, and, in cases in

2   which a party who could sue for coercive relief, has not yet

3   done so."  That latter use of the Declaratory Judgment Act is

4   squarely at issue before me.

5           In the same section, the treatise states:  "The

6   remedy made available by the Declaratory Judgment Act and Rule

7   57 is intended to minimize the danger of avoidable loss and

8   the unnecessary accrual of damages and to afford one

9   threatened with liability an early adjudication without

10  waiting until an adversary should see fit to begin an action

11  after the damage has accrued."

12          It goes on to talk about relieving potential

13  defendants of the Damoclean threat of litigation which a

14  harassing adversary might brandish while initiating suit at

15  his leisure or never.  There's no harassing adversaries here.

16  Everyone here is of the able and nonharassing sort.  But the

17  principle applies nonetheless.  In my view, the Declaratory

18  Judgment Act affords a mechanism by which these declaratory

19  judgment plaintiffs can litigate now an actual controversy.

20          The trade associations and retailers claim there is

21  no controversy.  But, of course, there is.  In fact, they've

22  been involved in it for a number of years.  Of course, there's

23  a controversy.  Of course, there's subject matter

24  jurisdiction.

25          It's also true that whether or not a declaratory

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4892

57

1    judgment action should proceed even when there's subject

2    matter jurisdiction is left to the discretion of the district

3    court.  And among the factors I should consider in determining

4    whether to exercise that discretion is whether the action

5    would resolve the differences between the parties.  Here, I

6    think it's clear that it will, the inconvenience and burden to

7    the litigants, and I see no meaningful inconvenience to the

8    declaratory judgment defendants in litigating their actual

9    controversy with Visa and MasterCard here in this forum.

10           I'm also instructed to consider whether there's been

11   any inequitable conduct on the part of the declaratory

12   judgment plaintiffs, and I see none here.  So, I think the

13   declaratory judgment action has been -- the Declaratory

14   Judgment Act is properly invoked by these plaintiffs.  I see

15   no prejudice to the declaratory judgment plaintiffs, no

16   meaningful prejudice to the declaratory judgment defendants,

17   if the case proceeds.  So, the application made in the

18   alternative to stay is denied.

19           Who wants to be heard with regard to the motions to

20   dismiss the Savelson claim complaint?

21           MR. LADNER:  Your Honor, Mark Ladner, counsel for

22   the Bank of America defendants.  I will present argument this

23   afternoon on behalf of all the Savelson defendants in support

24   of our motion to dismiss the Savelson complaint.  I'll try to

25   be brief this afternoon, since we've been here a long time

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4893

58

1    already, and I think our papers do a pretty good job of

2    setting out our argument.

3            Simply, the complaint should be dismissed because

4    the plaintiffs lack any trust standing, and because their

5    claims are barred by the Illinois Brick doctrine.

6            This is not the first time that consumers have

7    brought antitrust cases alleging harm from rules of Visa and

8    MasterCard.  After the settlement of the Walmart case, more

9    than twenty class actions were brought on behalf of consumers

10   alleging violations of the antitrust laws.  All of those cases

11   were dismissed, because the courts found that any alleged harm

12   to consumers was too indirect and attenuated to confer

13   antitrust standing.

14           The same is true here.  We start with that the

15   plaintiffs acknowledge in their complaint that a relevant

16   market is Visa and MasterCard credit and Debit Network

17   Services.  But the plaintiffs neither purchases network

18   services or pay interchange fees, and thus are neither

19   consumers or competitors in the network services market.

20           Plaintiffs in their complaint quote from the Visa

21   rule.  That's at paragraph 40 of the complaint, explaining the

22   use and application of interchange fees.  Interchange fees are

23   set for Visa on the Visa system, and by MasterCard on the

24   MasterCard system, and the Visa rule, which again is quoted

25   verbatim in the complaint, describes interchange fees as

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    "transfer fees between financial institutions."

2            Acquirers compete in the network services market to

3    provide a bundle of services to market -- to merchants, and

4    charge merchants a discount fee for those services.   On the

5    other hand, consumers purchase goods from merchants using a

6    credit card here or a debit card, and pay the price set by

7    merchants.

8            Cardholders, the plaintiffs here, do not pay any

9    additional transaction fee for those purchases.   They pay the

10    agreed price and no more, and that's it.

11            Based on the detailed description in the complaint

12    about how card transactions actually work under Twombly,

13    there's no plausible basis for plaintiffs' claim that they pay

14    interchange directly.   The Court need only draw reasonable

15    inferences from the factual allegations in the complaint, and

16    should not ignore the economic reality of how these

17    transactions actually work.

18            And in addition, scattered throughout the complaint

19    are references to the way the transactions actually work,

20    which is, there are interchange fees or transfer fees between

21    the acquiring bank and the issuing bank, and that the issuing

22    bank retains the interchange fee from the purchase price.

23            So, what this means in the context of this motion is

24    that the Court is free to question the plaintiffs' assertion

25    that cardholders pay interchange.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4895

60

1          Beyond that, their claims are hopelessly duplicative
2     and really entirely duplicative of the claims of the merchants
3     in this MDL, both the cases that have been settled and the
4     existing opt-out cases that your Honor is obviously aware of.
5          They are seeking, these plaintiffs are seeking to
6     recover the same interchange fees on the same transactions
7     that are and have been the subject of the merchant suits.  And
8     beyond that, they have not suffered any antitrust injury, and
9     that maybe is the most important part, probably in an effort
10    to distant themselves from the Walmart follow-along class
11    actions that were dismissed, because, as I said before, the
12    harm was found to be too indirect and to remote.
13         There was in their opposition brief disclaimer of
14    any reliances on a pass-through theory -- that's at page
15    fourteen of their opposition brief -- and they therefore
16    disavow any claim that there was any overcharge for the price
17    they paid for the goods or services purchased with the payment
18    card.  Rather, they claim they paid inflated fees, but further
19    claim that that did not result in an inflation of the price
20    they paid for the goods or services.  But without an alleged
21    overcharge in the price paid for the goods or services, there
22    is no antitrust injury and plaintiffs; therefore, lack of
23    standing.
24         Just a moment on Illinois Brick, since your Honor
25    knows more about Illinois Brick than probably all of your

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

**A4896**

61

1    colleagues on the bench at this point.

2         But this is a classic Illinois Brick case.  We

3    believe that we have a very strong argument, because the

4    cardholders don't pay interchange.  They are indirect

5    purchasers, and their federal claims are therefore barred

6    under the Illinois Brick doctrine.  I'll reserve some time for

7    rebuttal, if necessary.

8         THE COURT:  Thank you.

9         Good afternoon.

10        MR. ALIOTO:  Good afternoon, your Honor.  May it

11   please your Honor, my name is Joseph M. Alioto, and I was

12   appointed interim co-lead counsel for the Savelson plaintiffs

13   by Judge Orenstein.  They are the plaintiffs who are the

14   cardholders and/or consumers.  The allegations or the motion

15   to dismiss of course is based on 12(b)(6), and as the Court

16   has already said, the Court must take the allegations to be

17   true.

18        We have alleged all of the sufficient facts to show

19   that there was in fact a combination and conspiracy among the

20   defendant banks, and we've sued four banks.  We have not sued

21   Visa or MasterCard.  We have alleged that they and the other

22   banks are coconspirators.

23        We have alleged that the conspiracy -- how it was

24   formed and the basic terms of the conspiracy and the adherence

25   to it.  I don't think that there's been really a challenge in

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4897**

62

1    the Rule 12 motion to the violation or the allegations

2    submitting the violation.

3                 In addition, we have alleged that they have

4    separately agreed to conceal, and to conceal the fact that

5    there was an interchange rate and that it was by agreement

6    among the different banks.

7                 We have alleged, basically, your Honor, that there

8    is only one payor, there is only one person, one group that

9    paid anything, and the consumer, the cardholders, are the ones

10   that paid it, and that it was concealed from them is not a

11   defense by the defendants, and that the consumers,

12   cardholders, did not know about it is not a defense, as the

13   defendants just suggested.

14                In addition, I think -- and I would like to adopt,

15   as a matter of fact, one of the statements your Honor made,

16   that in fact the interchange is a hidden tax on the consumers.

17   The Court mentioned that, and used that metaphor -- maybe it's

18   not a metaphor.  It's taxation, definitely without

19   representation, but it is in fact a tax.

20                The Court also noted, I would like to respectfully

21   submit, in your Honor's memo of December 2013, that the

22   merchants should be leery of the situation of arguing to a

23   jury, because it might very well be their view that they are

24   the victims, they are the payors, they are the ones that paid.

25   What did they pay?  They paid the interchange agreement that

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4898**

63

1   was fixed.  Under antitrust injury, it's very clear, what is

2   the type of injury that would flow from a price-fixing

3   agreement?  And that is high super-competitive prices, and

4   that is the interchange rate itself.  Who paid it?  Who was

5   the first payor?  Who was the nonconspirator payor?  The

6   consumer is the one.  The consumer is the victim of this

7   conspiracy.

8             Certainly, the others were hurt, as well.

9             THE COURT:  What others, the merchants?

10            MR. ALIOTO:  There are certain values.  That's

11   different than price fixing and paying the super-competitive

12   price.

13            THE COURT:  I was wondering who the others were that

14   you referred to.

15            MR. ALIOTO:  Well, I believe that everyone in the

16   stream.  I believe that to some extent -- I believe that the

17   merchants were hurt in terms of their own ability to be able

18   to conduct their business, because what they were doing is,

19   they were being forced to do a number of things that they

20   otherwise would not have done in a free competitive society or

21   market.

22            THE COURT:  So, can they both recover, the merchants

23   and the cardholders?

24            MR. ALIOTO:  I don't know.  That's an important

25   question.  But I think that in terms of Illinois Brick, in

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4899

64

1    terms of money paid, cash out of pocket, there's only one, and

2    that's the consumer, and they paid it directly to the issuing

3    banks who have agreed to this, and after they pay, then

4    everybody cuts it up, and the issuing banks take their cut,

5    the acquiring banks take their cut, and the remainder is given

6    to the merchant.  That's the way it works.

7            If we don't pay, doesn't work.  So, we're the ones

8    that are paying the hidden fee.  And I believe that it is very

9    clear, certainly taking the allegations to be true -- as a

10   matter of fact, they cannot be disputed -- that there is only

11   one payor, and we are it.  We are certainly direct, because it

12   goes right to the bank who fixed the price.

13           In addition, I think, your Honor, that I would like

14   to just mention one thing, and that is that there is a

15   perspective that the defendants have raised where they say

16   there were these other class actions.  And to some extent,

17   your Honor, when you commented on what the jury might do, took

18   the same view.

19           The jury might view it as a situation in which this

20   has required the merchants to raise the prices on their

21   products or their services, and if you analyze it from that

22   perspective, you can see that courts might view it as being

23   too remote, if you view it from that perspective, because then

24   you would have to take a look at -- you would have to

25   determine which part of the product or service that was bought

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    caused the increase, if there be an increase.  We don't have

2    to do that, because we are the ones that did it.  We put in

3    our complaint -- we were very specific at page fifteen, your

4    Honor.

5           These folks agreed.  They published this price of

6    what everybody's going to charge, the percentage.  It starts

7    at 2.7 percent of any purchase, and ten cents, by the way, and

8    then subsequently, two years later, by 2010, they made it

9    2.950 plus ten cents, 2.95 percent.  Okay.  That is charged to

10   whom?  Only one person.  Who pays it?  We are it.  Nobody else

11   is paying anything.

12          If the perspective comes from the consumers and the

13   jury that would be there, obviously, it is plain that the ones

14   who are out-of-pocket, the ones who pay the cash, the ones who

15   pay the money --

16          THE COURT:  I get it.

17          MR. ALIOTO:  Okay.

18          Now, in the absence of that, what we also did, your

19   Honor, we went through associated contractors, general

20   contractors, because that's the basic standing case by the

21   Supreme Court.  There was not really much that the defendants

22   had to say about those particular criteria.  But I would like

23   to point out some of the things that they did not actually

24   meet, and that is, that in going through the six criteria of

25   the associated contractors, it asks for the nature of the

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4901

66

1    plaintiffs' alleged injury.  We paid the fixed price.  Okay.

2              It asks for the directness of the injury.  Can't be

3    more direct than taking it out of our pocket.  They actually

4    reached in and took it right out of our accounts.  If we

5    didn't have it -- it's kind of interesting.  They have this

6    immediate authorization.  What does that mean?  Do these guys

7    have the money?  If they have it, take it.  If they don't have

8    it, we might give them credit, but we'll get that back from

9    them.  They are going to pay it.

10             The third part was the speculative measure of harm.

11   Here, it's very clear.  They have given us the percentage that

12   was published and adhered to.  Everyone, as we allege, knew at

13   that time that all other banks were doing it, because if they

14   didn't do it, if all did not participate, it wouldn't work.

15   And if it were not concealed, if it were revealed, it could be

16   an item of negotiation, if not practically disappear.

17             There's some effort by them, as an excuse for this

18   price fixing, that this was used to begin this combination.

19             I would like to say this, that Savelson himself,

20   which, as I advised Judge Orenstein this morning, he's about

21   ninety-four or ninety-five.  He is the lead plaintiff.  He was

22   one of the architects of the system with MasterCard, and in

23   the '60s and '70s. He was the one who came up with a lot of

24   software that would make it work.  Price fixing was not part

25   of it at that time.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4902

67

1          And so, what I'm trying to say here is that if
2     there's an effort to see whether or not the damages are
3     speculative, you cannot get a better measure than what they
4     agreed that they were going to charge.  And then once that is
5     shown, and the fact of damage is, of course, that we paid, but
6     once that is shown, the amount, then the burden goes to them,
7     and under Eastman Kodak and Story Parchment.
8          The next one, your Honor, was the risk of
9     duplicative recovery.  This is not a hard one for us, your
10    Honor.
11         THE COURT:  Doesn't seem like anything is that hard
12    for you.
13         MR. ALIOTO:  I'm trying.
14         Anyway, that's fairly clear to us, and it's our
15    separate case.  I'm not going to suggest what the merchants
16    should do, but I think that they do have avenues they should
17    and could pursue.  As a matter of fact, it might even be more
18    than the so-called interchange rate itself.
19         The next one, your Honor --
20         THE COURT:  Let's go back to that one.  Isn't that
21    one of the concerns that was expressed in Illinois Brick?
22         MR. ALIOTO:  It was a concern, and that is the
23    reason why they said whether it's a windfall or not, the first
24    guy who pays is the guy who can sue.  That's the answer.
25    That's what they said was the answer.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4903

68

1          Now, of course, there were twenty-four states that

2     didn't agree with that, and they passed the so-called Illinois

3     Brick repealer statutes and they said, Indirect or direct, and

4     the Supreme Court said that was okay for them to do that.

5          But as far as Illinois Brick went, it's very strict

6     and sometimes it's not right.  This happens to be one of the

7     occasions in which it is definitely right.  Usually, one would

8     think of manufacturers, and then the only ones who could sue

9     would be their dealers.  Dealers have no likelihood of suing

10    their manufacturers, because they might be cut off.

11         In this case, there is every interest for the

12    consumer cardholder to sue.  As a matter of fact, your Honor,

13    we cited in -- this is in our surreply, I believe -- we cited

14    the Second Circuit case of the Publication Paper antitrust

15    litigation on pages one and two.  It's very interesting,

16    because when the Court there was saying how price fixing

17    agreements are conclusively presumed to be unreasonable and

18    therefore illegal, then the Court says, Because such

19    agreements are so likely to result in artificially higher

20    prices being charged to -- because such agreements are so

21    likely to result in artificially higher prices being charged

22    to consumers without accomplishing any legitimate business

23    purpose.

24         If there were a legitimate business purpose,

25    certainly they would tell the people that are paying it, but

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

**A4904**

                                                                69

1    they actually agreed to conceal it and hide it, as this Court,

2    in my opinion, properly characterized as a hidden tax on the

3    consumers.

4            The cites --

5            THE COURT:  The application of Illinois Brick

6    operates to whose disadvantage in this chain?  Who loses their

7    claim?  Obviously, not the cardholder, in your view.  The

8    merchant?

9            MR. ALIOTO:  Everyone who comes after the first

10   purchaser.  That's the Illinois Brick, so.

11           THE COURT:  The merchants are out of the box,

12   because they are the purchaser?

13           MR. ALIOTO:  That's Illinois Brick.

14           THE COURT:  You're not saying they are indirect, you

15   are saying they are not purchasers?

16           MR. ALIOTO:  I'm saying that they are not the direct

17   payors.  The language sometimes is used as the payor, who

18   pays.  There's only one person who pays.

19           THE COURT:  You are saying the merchants are the

20   indirect payors and they are the ones whose ox is gored by

21   Illinois Brick?

22           MR. ALIOTO:  First of all, I think in this case, I

23   believe that the merchants are not completely out of the

24   situation, because sometimes Illinois Brick has a -- it has a

25   very bad result and seemingly unfair result.  A lot of

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

# A4905

70

1    merchants were under a lot of restrictions, and the valuation

2    of their businesses and the lost profits of their businesses

3    are, in my opinion, substantial and have been substantially

4    affected by this conspiracy, even though they are not the

5    interchange payors.  But it's a different kind of damage.

6    It's a value damage.  It's different.  It's not the

7    overcharge.

8            According to Illinois Brick, the overcharge are the

9    people who first pay it.

10           THE COURT:  Okay.

11           MR. ALIOTO:  Thank you very much, your Honor.

12           THE COURT:  Thank you.

13           MR. ALIOTO:  Unless your Honor has any further

14   questions.

15           THE COURT:  I don't at this time.

16           MR. ALIOTO:  I would say that they have also filed a

17   motion against us for taking judicial notice.  Mr. Winters, my

18   co-lead counsel, is going to address that.  And also I believe

19   that -- they have not argued it.  I don't know.  Maybe they

20   have dropped it, your Honor.  Also, one of them was claiming

21   lack of personal jurisdiction, and Mr. Winters was also going

22   to argue that.  Neither of those have been argued, apparently.

23           THE COURT:  The fact that it's not orally argued

24   doesn't constitute an abandonment.

25           MR. ALIOTO:  There's nothing to rebut, I suppose, at

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4906

71

1    the moment.

2         THE COURT:  I understand.

3         Thank you, Mr. Alioto.

4         You must be Mr. Winters.

5         MR. WINTERS:  Yes, your Honor.

6         THE COURT:  Good afternoon.

7         MR. WINTERS:  Good afternoon.  I would just simply

8    say that there had been a request for judicial notice of the

9    settlement agreement in the merchants' case.  We believe it's

10   not relevant in the first place.  But in the second place,

11   Federal Rule of Evidence 408 probably would not permit that

12   document to be admitted.

13        What we are really getting down to is the issue of

14   duplicative stuff.  The question is legal liability, and the

15   settlement doesn't establish that the merchants had legal

16   liability of any kind, and I think your Honor pretty well

17   spelled that out.  So, that's pretty much our point.  Thank

18   you.

19        THE COURT:  Thank you, Mr. Winters.

20        MR. LADNER:  We have nothing to add.

21        THE COURT:  All right.

22        I'm going to take that motion under advisement.

23        Thank you for your argument.

24        I think that disposes of the oral argument on the

25   motions.  There's some other issues we need to address:  The

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

**A4907**

72

1    opt-in procedure regarding third-party claims filers and this

2    dust-up regarding franchisors or franchisees.

3              Anybody want to talk about any of those things?

4              MR. MONTAGUE:   Laddie Montague.

5              THE COURT:   Good afternoon.

6              MR. MONTAGUE:   Good afternoon, your Honor.  I'll

7    address the opt-in issue and where we are with that.

8              I think that the defendants and the class plaintiffs

9    are in agreement that we ought to pursue that, number one.

10   Number two is, the class plaintiffs have undertaken to draft a

11   form of notice which we have not shared with the defendants

12   yet, and we're happy to do that.  I think it's almost final,

13   in our state of mind.  Third is, we really haven't decided or

14   determined amongst ourselves what to recommend as to when that

15   should happen.

16             THE COURT:   That was one of my questions.

17             MR. MONTAGUE:   That's probably the toughest issue

18   that we have.  The question is, whether we put that into

19   motion before the appeal is filed or after the appeal is

20   determined.  I don't have an answer to that yet.

21             THE COURT:   All right.  In the first instance, I

22   think you and the defendants are probably in the best position

23   to make a proposal in that.  I would benefit very much from

24   your collective wisdom on that.  So, I await the outcome of

25   your discussions on it.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4908

73

1          MR. MONTAGUE:  That's the status of that.

2          THE COURT:  Okay.  This would be a notice to the

3    people who filed opt-outs, the merchants who filed opt-outs,

4    to give them an opportunity to opt back in.

5          MR. MONTAGUE:  I think it's something like seven

6    thousand, somewhere around seven thousand, and that would not

7    include -- excluded from that would be those opt-outs who have

8    filed litigation.

9          THE COURT:  Sounds right.

10         MR. MONTAGUE:  I suppose -- we did get a request

11   from the opt-out counsel that they be involved in the

12   procedure, and I think our position is, we would be happy to

13   serve them with a copy of the notice.  We really don't want

14   them in the consultations as to how we reach our decision.

15         THE COURT:  I understand.

16         Before I approve anything, I'll certainly -- we'll

17   deal with who has what sort of standing to address this issue

18   if and when I need to.  But before I do anything, I'll give an

19   opportunity to anyone to be heard on what I'm going to order

20   in that regard.

21         I do want to set a date.  I'll hear you on what that

22   date ought to be, so we structure this, a date for you to

23   report back to me, and hopefully with a proposed notice to

24   these folks who opted out.  What makes sense in terms of how

25   much time should pass?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

# A4909

74

1          MR. MONTAGUE:   The next status conference before

2     Judge Orenstein is September 23.

3          THE COURT:   That's fine my me.

4          MR. VIZAS:   That's fine by us, assuming we get -- we

5     do need to see the proposal.

6          THE COURT:   You're taking a tough stand on that.

7     Why don't we add that to the list of things that would be on

8     the agenda for September 23?  I don't mean to suggest

9     something other than something in writing to me for that date.

10          Thank you.

11          What else?  What's happening with the third-party

12     claims filers?  I know you are awaiting decisions from me.

13     Are we still in the post-hearing briefing?

14

15          MS. BERNAY:   Alexandra Bernay.

16          Your Honor, we have already had all the briefing for

17     all the hearings that we've actually had.  You postponed

18     without a date the hearing for Manor Capital, and you stated

19     that you were considering perhaps appointing the special

20     master.

21          THE COURT:   Yes.

22          MS. BERNAY:   In the meantime, we're continuing to

23     monitor, we actually sent out three new letters.  One, we have

24     actually met with their counsel.  We have sent out some

25     document requests.  The other, we have had some preliminary

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4910

75

1     discussions with their counsel.  And third, we have not yet

2     heard back from them.  We are still getting calls from the

3     class administrator.  They have slowed down dramatically.  We

4     think that's because of the disclaimers that your Honor has

5     required.  We've gotten about ten calls in the past month.

6     That's significantly less.

7              THE COURT:   Good.

8              MS. BERNAY:   We are awaiting some rulings from your

9     Honor.  If there's a need to schedule these additional three

10    hearings, we would do so.

11             THE COURT:   Good.

12             And stay on the case, please.  It's very important

13    to the class and, for that reason, it's important to me.

14             It's my expectation to get you some rulings that I

15    hope will provide if not a blueprint, at least some guidance

16    to the special master for any evidentiary hearings that are

17    referred to her.

18             MS. BERNAY:   Great.

19             I also have a very brief report on the data that

20    Visa and MasterCard were to provide.  So, they did provide us

21    some data.  Epic has looked at that.  They have informed me

22    that looking at that data, they don't have quite enough

23    information to be able to calculate and validate the default

24    interchange payment amount, and it's also currently not

25    sufficient to use in a claims process.  But we've spoken to

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4911

76

1    Visa and MasterCard counsel, and we're in discussions now, and

2    I think any issues regarding that data are going to be worked

3    out, probably in time for the next status conference, to give

4    you a better report.

5              THE COURT:  Okay.  Good.

6              MS. BERNAY:  Thank you, your Honor.

7              THE COURT:  Nice to see you as always.

8              There's a franchisor/franchisee.

9              MR. VIZAS:  Briefly, your Honor.  We discussed that.

10   We have been discussing it with class plaintiffs.  It's a

11   problem that we all agree has arisen, and we're trying to

12   develop to see if there's something we can do to bring

13   something to the Court by the September 23 date.  We're in

14   discussions, and we talked to Judge Orenstein this morning,

15   and we hope to have a written submission before the 23rd. We

16   think there's something the Court might be able to do.

17             THE COURT:  Good.  Sounds like something you are

18   working on and I need not pay attention to it at the moment.

19             MR. VIZAS:  I don't think today, but we'll be back

20   in September.

21             THE COURT:  Good.

22             What else, if anything, that anybody wants to

23   address before we adjourn?

24             I take that as a nothing.

25             As always, it's great to see the old faces, and nice

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

# A4912

77

1   to see some new ones, as well.   Have a good day, everyone, and

2   a nice weekend.

3

4                                    oooooo0oooooo

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4913

**'**
**'60s** - 66:23
**'70s** - 66:23

**0**
**01720** - 1:4
**05** - 1:4

**1**
**1** - 14:22, 15:1, 15:25, 16:1, 16:9
**100** - 23:1
**11** - 7:5, 7:10
**11201** - 2:4
**11:30** - 1:7
**12** - 62:1
**12(b)6** - 13:12, 13:19, 61:15
**14** - 1:5, 39:12
**16** - 55:3
**1720** - 1:5, 16:13, 41:3, 41:17, 47:5
**18** - 1:7
**1983** - 47:20
**1992** - 15:19
**1996** - 48:3, 52:3
**1:00** - 52:8

**2**
**2.7** - 65:7
**2.95** - 65:9
**2.950** - 65:9
**2002** - 48:4
**2003** - 14:14, 15:20, 15:22, 15:25
**2004** - 14:22, 15:2, 16:1, 16:9, 16:15
**2005** - 14:18
**2006** - 16:12
**2007** - 46:11
**2010** - 65:8
**2011** - 11:16, 12:7, 12:19
**2012** - 42:14
**2013** - 62:21
**2014** - 1:7
**225** - 2:3
**23** - 25:10, 74:2, 74:8, 76:13
**23rd** - 76:15
**2:00** - 52:13

**3**
**3** - 15:16
**3751** - 55:22

**4**
**40** - 58:21
**408** - 71:11

**5**
**57** - 56:7

**6**
**613-2419** - 2:4

**7**
**7-Eleven** - 13:16, 26:10, 49:11, 55:2

**718** - 2:4

**9**
**9.1** - 5:24

**A**
**A** - 12:23, 22:12, 46:9, 47:12, 53:1, 69:25
**ALEXANDRA** - 1:17
**ALUOTO** - 1:19, 61:10, 63:10, 63:15, 63:24, 65:17, 67:13, 67:22, 69:9, 69:13, 69:16, 69:22, 70:11, 70:13, 70:16, 70:25
**AM** - 1:7
**AND** - 1:4
**ANTITRUST** - 1:5
**APPEARANCES** - 1:13, 2:1
**ASCAP** - 20:20
**ATM** - 8:8, 8:10, 8:12, 23:12, 24:1
**According** - 70:8
**Acquirers** - 32:11, 59:2
**Act** - 11:16, 27:3, 36:17, 36:23, 37:17, 43:8, 55:21, 56:3, 56:6, 56:18, 57:14
**Ad** - 10:4
**After** - 3:1, 22:6, 58:8
**Again** - 10:23, 28:21
**Airlines** - 10:4
**Alexandra** - 74:15
**Alioto** - 61:11, 71:3
**All** - 8:13, 17:3, 28:18, 30:3, 40:16, 41:10, 44:17, 58:10, 71:21, 72:21
**Also** - 70:20
**Amendment** - 11:15, 12:2, 12:22, 19:14
**America** - 57:22
**American** - 10:4, 11:1, 23:8
**And** - 3:2, 3:19, 5:5, 8:8, 9:3, 10:8, 14:1, 17:19, 21:1, 21:12, 22:23, 23:19, 25:15, 30:9, 30:18, 31:11, 32:19, 33:2, 36:20, 39:20, 40:18, 41:14, 42:15, 42:20, 43:22, 45:22, 46:9, 48:16, 50:19, 57:3, 59:18, 60:7, 63:3, 64:8, 64:16, 66:15, 67:1, 67:4, 70:18, 75:1, 75:12
**Anderson** - 17:20, 17:25
**Another** - 44:6
**Anthony** - 2:3
**Any** - 30:4, 45:12
**Anybody** - 72:3
**Anyway** - 67:14
**Appeals** - 38:22
**Are** - 74:13
**Arkansas** - 44:15, 44:18, 52:4

**As** - 11:11, 52:1, 53:12, 54:14, 55:2, 55:9, 67:17, 68:12, 76:25
**Associates** - 18:25
**Association** - 35:12
**At** - 44:4
**August** - 15:25

**B**
**BEFORE** - 1:11
**BENJAMIN** - 2:2
**BENNETT** - 1:15, 42:3, 42:6, 43:16, 44:20, 44:22, 45:10, 51:16
**BERNAY** - 1:17, 74:15, 74:22, 75:8, 75:18, 76:6
**Bank** - 57:22
**Based** - 59:11
**Because** - 15:21, 31:4, 36:4, 41:3, 68:18
**Before** - 25:19, 73:16
**Bennett** - 42:3, 51:16
**Berman** - 9:14, 10:23
**Berman-Jackson** - 9:14
**Berman-Jackson's** - 10:23
**Bernay** - 74:15
**Beyond** - 60:1
**Board** - 12:3, 12:6
**Brand** - 23:7
**Brand-named** - 23:7
**Brick** - 3:19, 4:5, 4:10, 4:12, 4:17, 5:6, 8:16, 8:21, 13:21, 14:3, 21:20, 21:21, 22:15, 22:17, 22:18, 22:24, 24:7, 25:19, 30:7, 30:19, 31:13, 31:16, 32:2, 54:2, 54:8, 54:12, 58:5, 60:24, 60:25, 61:2, 61:6, 63:25, 67:21, 68:3, 68:5, 69:5, 69:10, 69:13, 69:21, 69:24, 70:8
**Briefly** - 53:11, 53:15, 76:9
**Broadcasting** - 3:14, 11:5, 11:7, 14:1, 20:15, 21:8, 21:15, 33:14, 33:17, 34:10, 34:14, 34:16, 54:14
**Broadcasting's** - 34:15
**Brooklyn** - 1:6, 2:4
**Brothers** - 44:1, 44:2, 47:19
**Buffalo** - 3:13, 11:5, 11:6, 14:1, 20:15, 21:8, 21:15, 33:13, 33:17, 34:10, 34:13, 34:14, 34:16, 54:14
**But** - 39:14, 39:18, 41:20, 43:25, 46:21, 51:19, 53:20, 56:16,

56:21, 58:17, 60:20, 61:2, 63:25, 65:22, 68:5, 70:5, 71:10, 73:18, 75:25
**By** - 11:13

**C**
**CARD** - 1:4
**CARNEY** - 1:24
**CAT** - 2:6
**CBS** - 20:18
**CONTINUED** - 2:1
**COURT** - 2:13, 3:8, 3:15, 4:1, 5:9, 6:9, 6:22, 7:6, 11:4, 11:10, 11:13, 13:2, 14:7, 16:20, 17:4, 17:9, 20:10, 20:14, 21:16, 21:18, 21:23, 29:25, 30:6, 33:12, 33:16, 35:5, 35:9, 36:8, 36:12, 36:16, 37:1, 38:1, 38:5, 38:11, 38:14, 38:23, 39:2, 39:6, 39:11, 39:13, 39:24, 42:2, 42:5, 43:6, 44:16, 44:21, 45:8, 45:11, 49:1, 49:7, 49:23, 49:25, 50:11, 50:25, 51:14, 52:7, 53:2, 61:8, 63:9, 63:13, 63:22, 65:16, 67:11, 67:20, 69:5, 69:11, 69:14, 69:19, 70:10, 70:12, 70:15, 70:23, 71:2, 71:6, 71:19, 71:21, 72:5, 72:16, 72:21, 73:2, 73:9, 73:15, 74:3, 74:6, 74:21, 75:7, 75:11, 76:5, 76:7, 76:17, 76:21
**Cadman** - 2:3
**California** - 48:9
**Can't** - 66:2
**Canadian** - 11:21
**Capital** - 74:18
**Cardholders** - 59:8
**Carey** - 47:20
**Case** - 2:12
**Center** - 44:8
**Certainly** - 63:8
**Chase** - 10:18
**Check** - 14:15, 14:21, 14:24, 15:9, 15:12, 15:15, 15:18, 16:6, 16:8, 16:18, 50:22
**Circuit** - 5:6, 8:5, 8:9, 8:20, 10:8, 10:25, 14:18, 15:10, 20:21, 21:3, 22:21, 23:6, 23:7, 23:9, 23:17, 24:9, 24:10, 25:21, 31:6, 34:17, 36:15, 37:24, 39:21, 40:8, 41:8, 41:16, 41:18, 43:18, 43:22, 45:23, 46:9, 46:20, 46:21, 47:1, 47:2, 47:18, 47:19, 50:12, 50:20, 54:23, 68:14
**Cite** - 28:25
**City** - 10:18, 54:23
**Cole** - 21:8
**Colombia** - 10:24

**Combustion** - 47:18
**Congress** - 12:1, 12:2, 20:4
**Connor** - 20:19
**Convenience** - 35:12
**Court** - 2:3, 3:11, 3:21, 4:6, 4:24, 5:24, 7:17, 8:19, 9:4, 10:9, 13:20, 13:22, 15:10, 17:20, 17:21, 21:2, 27:10, 27:20, 30:21, 34:24, 36:4, 37:8, 38:21, 39:18, 39:19, 41:7, 42:9, 46:7, 52:1, 59:14, 59:24, 61:15, 61:16, 62:17, 62:20, 65:21, 68:4, 68:16, 68:18, 69:1, 76:13, 76:16
**Court's** - 45:20, 50:12
**Courthouse** - 1:5
**Cyanamid** - 23:8

**D**
**DAVID** - 1:24
**DC** - 9:15
**DISCOUNT** - 1:5
**DISTRICT** - 1:1, 1:11
**Damoclean** - 56:13
**Dealers** - 68:9
**Debit** - 58:16
**December** - 62:21
**Declaratory** - 36:17, 36:22, 43:8, 55:21, 56:3, 56:6, 56:17, 57:13
**Defendants** - 1:21
**Did** - 20:4, 51:15
**District** - 10:24, 23:23, 44:14, 44:18, 46:5, 46:11, 48:2, 48:6, 48:9, 48:14, 52:4
**Dixon** - 23:11
**Do** - 39:7, 66:6
**Dodd** - 11:15
**Dodd-Frank** - 11:15
**Doesn't** - 67:11
**Doherty** - 39:21, 43:22
**Don't** - 50:11
**Durbin** - 11:15, 12:2, 12:21, 19:14, 19:22

**E**
**E** - 53:1
**EASTERN** - 1:1
**ESQ** - 1:14, 1:15, 1:16, 1:17, 1:18, 1:19, 1:20, 1:21, 1:22, 1:23, 1:24, 1:25, 2:1, 2:2
**Each** - 19:22
**East** - 2:3
**Easterbrooke** - 22:21, 24:2
**Easterbrooke's** - 22:23, 31:5
**Eastern** - 48:2,

**A4914**

2

48:5, 48:13
**Eastman**- 67:7
**Easymark**- 14:1
**Eleventh** - 23:7,
31:6
**Epic** - 75:21
**Even** - 24:11,
55:19
**Every** - 27:1, 29:18
**Everybody** - 6:6
**Everyone** - 5:18,
56:16, 66:12, 69:9
**Evidence** - 18:4,
71:11

**F**

**F**- 53:1
**FEE**- 1:4
**FREIMUTH**- 1:25
**Fed**- 12:10
**Federal**- 12:3,
12:6, 18:3, 19:24,
37:17, 71:11
**Filed**- 11:8
**Finally**- 41:6
**First**- 11:20, 14:12,
14:20, 19:16, 23:16,
23:22, 26:9, 28:5,
69:22
**Five**- 52:8
**For**- 1:14, 1:21,
5:24, 18:13, 37:14,
54:3
**Four**- 3:11
**Fourth**- 23:10,
23:12, 24:9
**Frank**- 11:15

**G**

**GALLO** - 1:22, 4:2,
5:14, 6:14, 6:25,
7:12, 30:5, 30:7
**GARY** - 1:24
**GLEESON** - 1:11
**Gagliardi**- 20:17
**Gallo** - 3:18, 16:12,
18:15, 18:20, 21:20,
22:8, 25:20, 30:6,
33:12
**Gary**- 35:10
**Gershwin**- 21:9
**Good**- 2:13, 4:2,
11:9, 11:10, 20:13,
21:17, 21:18, 35:8,
35:9, 42:5, 42:6,
61:9, 61:10, 71:6,
71:7, 72:5, 72:6,
75:7, 75:11, 76:5,
76:17, 76:21
**Great**- 4:1, 75:18
**Group**- 13:10

**H**

**H**- 1:20
**HEARING** - 1:10
**HONORABLE** -
1:11
**Have** - 2:13, 39:2,
39:13, 77:1
**He**- 16:18, 22:24,
23:2, 27:13, 66:21,
66:23
**He'll**- 49:11
**Hello** - 3:8
**Her** - 31:21

**Here** - 5:18, 6:14,
10:16, 20:25, 21:4,
21:10, 27:14, 28:17,
37:21, 41:2, 44:11,
46:17, 50:16, 57:5,
66:11
**Honor** - 3:7, 3:17,
4:2, 4:4, 4:10, 5:15,
6:25, 8:22, 9:12,
9:24, 11:3, 13:1,
13:4, 13:16, 14:10,
14:20, 15:13, 17:8,
17:10, 17:13, 17:14,
17:17, 18:25, 19:8,
20:6, 21:14, 21:17,
21:19, 24:5, 25:2,
25:7, 25:10, 25:15,
25:21, 26:6, 27:17,
29:3, 29:6, 29:10,
29:23, 30:5, 30:7,
33:11, 35:13, 35:23,
36:3, 36:24, 37:6,
37:21, 38:3, 38:10,
39:14, 39:15, 39:18,
40:2, 40:8, 40:16,
40:21, 40:22, 41:6,
41:12, 41:17, 45:10,
47:3, 47:10, 49:24,
50:2, 50:14, 50:21,
51:2, 51:3, 51:13,
57:21, 60:4, 60:24,
61:10, 61:11, 62:7,
62:15, 64:13, 64:17,
65:4, 65:19, 67:8,
67:10, 67:19, 68:12,
70:11, 70:13, 70:20,
71:5, 71:16, 72:6,
74:16, 75:4, 75:9,
76:6, 76:9
**Honor's** - 62:21
**How** - 5:9, 36:8
**However** - 40:8

**I**

**I** - 1:16, 2:15, 2:20,
2:25, 4:4, 4:6, 4:7,
4:8, 4:24, 5:10,
5:14, 5:15, 6:9,
6:14, 6:23, 6:25,
7:6, 7:12, 7:15,
7:18, 7:22, 7:24,
7:25, 8:4, 10:23,
11:19, 11:25, 12:3,
13:8, 13:9, 15:6,
16:20, 17:1, 17:4,
17:5, 17:7, 17:11,
17:20, 17:25, 18:15,
19:3, 19:10, 19:21,
20:19, 21:1, 21:6,
21:21, 24:9, 25:19,
27:6, 29:23, 29:25,
31:19, 32:3, 32:19,
32:20, 33:13, 33:21,
34:20, 34:21, 34:22,
35:3, 35:6, 36:20,
37:2, 38:17, 38:18,
39:10, 40:6, 42:8,
42:9, 42:24, 43:1,
43:13, 43:14, 43:16,
44:20, 44:25, 45:13,
45:14, 45:16, 45:22,
47:9, 47:24, 48:22,
48:24, 49:12, 50:11,
50:12, 51:2, 52:10,
53:1, 53:6, 53:8,
53:20, 53:24, 54:3,
54:4, 54:7, 54:10,

54:25, 55:2, 55:7,
55:9, 55:12, 57:3,
57:5, 57:7, 57:12,
57:14, 57:22, 58:1,
60:11, 61:11, 61:25,
62:14, 62:20, 63:13,
63:15, 63:16, 63:24,
63:25, 64:8, 64:13,
65:16, 65:22, 66:19,
66:20, 67:16, 68:13,
69:22, 70:15, 70:16,
70:18, 70:19, 70:25,
71:2, 71:7, 71:16,
71:24, 72:8, 72:12,
72:20, 72:21, 72:23,
72:24, 73:5, 73:10,
73:12, 73:15, 73:16,
73:18, 73:21, 74:8,
74:12, 75:14, 75:19,
76:2, 76:18, 76:19,
76:24
**I'll** - 2:16, 2:18,
9:4, 11:11, 16:13,
17:14, 19:8,
20:15, 22:23, 23:17,
23:20, 26:7, 30:1,
41:25, 49:2, 52:10,
52:13, 53:17, 57:24,
61:6, 72:6, 73:16,
73:18, 73:21
**I'm** - 2:22, 3:9,
3:17, 12:11, 13:5,
13:6, 13:8, 13:22,
13:23, 17:10, 17:13,
17:15, 17:17, 19:9,
21:19, 39:8, 42:3,
52:9, 53:13, 53:16,
55:16, 57:10, 67:1,
67:13, 67:15, 69:16,
71:22, 73:19
**IN** - 1:4
**INTERCHANGE** -
1:4
**IPO** - 3:19, 4:5,
8:22, 9:2, 9:3, 9:6,
13:20, 14:2, 21:21,
26:3, 26:16, 26:21,
27:25, 28:21, 32:15,
33:4, 33:5
**IPO's** - 3:14,
26:10, 53:16, 53:20,
53:23
**If** - 14:4, 14:6,
17:4, 21:8, 29:25,
33:13, 36:24, 38:11,
38:16, 41:16, 41:18,
49:9, 49:15, 50:22,
64:7, 65:12, 66:4,
66:7, 68:24, 75:9
**Illinois** - 3:19, 4:5,
4:10, 4:11, 4:17,
5:6, 8:16, 8:21,
13:21, 14:3, 21:20,
21:21, 22:14, 22:17,
22:18, 22:24, 24:7,
25:19, 30:7, 30:19,
31:13, 31:16, 32:2,
54:2, 54:8, 54:12,
58:5, 60:24, 60:25,
61:2, 61:6, 63:25,
67:21, 68:2, 68:5,
69:5, 69:10, 69:13,
69:21, 69:24, 70:8
**Immune** - 37:8
**Import** - 11:21
**In** - 4:24, 8:5, 9:18,
16:11, 16:17, 19:21,
22:1, 22:3, 23:7,

23:12, 24:1, 30:24,
34:16, 37:11, 38:1,
39:8, 46:4, 46:11,
47:18, 50:14, 53:4,
56:5, 56:17, 56:21,
62:14, 64:13,
68:11, 72:21, 74:22
**Indirect** - 68:3
**Instead** - 24:19,
28:24
**Interchange** -
58:22
**Interstate** - 10:8,
10:25
**Iqbal** - 6:23
**Is** - 36:12, 39:6
**Isn't** - 67:20
**It** - 2:15, 4:20,
5:25, 6:25, 15:8,
19:11, 20:17, 20:18,
21:7, 21:24, 30:25,
34:17, 41:22, 43:11,
49:3, 49:4, 50:9,
55:22, 56:12, 65:6,
66:2, 67:22
**It's** - 4:2, 4:19, 5:8,
5:25, 6:7, 6:22,
11:22, 21:24, 21:25,
22:11, 23:11, 24:19,
26:17, 27:6, 28:6,
28:11, 30:12, 30:20,
39:24, 39:25, 43:6,
44:16, 53:8, 54:25,
56:25, 62:18, 68:15,
70:6, 75:12, 75:14,
76:10

**J**

**JAMES** - 1:15
**JEFFREY** - 1:16
**JOHN** - 1:11
**JOSEPH** - 1:18,
1:19
**JUDGE** - 1:11
**JULIAN** - 1:23
**Jackson**- 9:14
**Jackson's**- 10:23
**January**- 14:22,
15:1, 16:1, 16:9,
16:15
**Jim**- 17:10, 42:3,
51:16
**Johnny**- 42:16
**Joseph**- 61:11
**Judge**- 9:14,
10:23, 20:17, 20:19,
22:20, 22:23, 23:6,
23:23, 24:2, 24:11,
25:21, 31:4, 31:6,
31:18, 31:19, 45:2,
46:14, 47:20, 48:4,
48:16, 61:13, 66:20,
74:2, 76:14
**Judgment**- 36:17,
36:23, 43:8, 55:21,
56:3, 56:6, 56:18,
57:14
**July**- 1:7
**Just**- 3:15, 34:23,
47:23, 50:2, 60:24

**K**

**KAPLAN** - 1:16,
20:13, 20:15
**KEILA** - 1:25
**KENNETH** - 1:22

**KEVIN** - 1:19
**Kane**- 55:22
**Kaplan** - 13:25,
20:12, 21:16
**Kendall** - 8:5, 10:3,
18:18
**Kidder** - 37:14,
40:7, 40:12, 46:1,
46:4, 50:3, 50:14
**Kodak**- 67:7

**L**

**LADNER** - 1:21,
57:21, 71:20
**LANDAU** - 1:19
**LESSER** - 1:24
**LINGEL** - 1:20
**LITIGATION** - 1:5
**Laddie** - 72:4
**Ladner** - 3:25,
57:21
**Lawman**- 23:23
**Leegin**- 27:20
**Let**- 14:18, 26:3
**Let's**- 67:20
**Lowell**- 23:8
**Lukenbach**- 43:21
**Lunch**- 52:14

**M**

**M** - 1:19, 2:3,
61:11
**MALONE** - 35:10,
36:10, 36:14, 36:24,
37:6, 38:3, 38:6,
38:13, 38:17, 38:25,
39:3, 39:8, 39:12,
39:14, 39:25, 49:24,
50:2, 50:14, 51:2
**MARK** - 1:21, 2:1
**MASON** - 2:1
**MATTHEW** - 1:25
**MD** - 1:4, 1:5
**MDL** - 3:3, 16:13,
47:5, 60:3
**MERCHANT** - 1:4
**MERLEY** - 2:1
**MICHAEL** - 1:22,
1:23
**MILLER** - 1:23
**MONTAGUE** -
72:4, 72:6, 72:17,
73:1, 73:5, 73:10,
74:1
**MR** - 3:7, 3:9,
3:17, 4:2, 5:14,
6:14, 6:25, 7:12,
11:6, 11:11, 11:15,
13:4, 14:8, 17:3,
17:7, 17:10, 20:13,
20:15, 21:17, 21:19,
21:24, 30:5, 30:7,
33:13, 33:17, 35:10,
36:10, 36:14, 36:24,
37:6, 38:3, 38:6,
38:13, 38:17, 38:25,
39:3, 39:8, 39:12,
39:14, 39:25, 42:3,
42:6, 43:16, 44:20,
44:22, 45:10, 45:13,
49:2, 49:9, 49:24,
50:2, 50:14, 51:2,
51:16, 57:21, 61:10,
63:10, 63:15, 63:24,
65:17, 67:13, 67:22,
69:9, 69:13, 69:16,

# A4915

3

69:22, 70:11, 70:13,
70:16, 70:25, 71:5,
71:7, 71:20, 72:4,
72:6, 72:17, 73:1,
73:5, 73:10, 74:1,
74:4, 76:9, 76:19
  **MS** - 74:15, 74:22,
75:8, 75:18, 76:6
  **Malone** - 35:10
  **Mancuso** - 2:3
  **Manor** - 74:18
  **Mark** - 57:21
  **Market** - 29:3
  **MasterCard** - 4:12,
5:19, 5:22, 5:23,
6:4, 6:15, 6:16,
8:24, 9:1, 9:2, 9:7,
9:11, 9:17, 9:21,
10:1, 10:2, 10:12,
12:15, 15:21, 16:3,
16:7, 19:19, 25:23,
26:5, 26:12, 26:21,
32:25, 33:1, 33:2,
33:8, 35:17, 53:16,
57:9, 58:8, 58:16,
58:23, 58:24, 61:21,
66:22, 75:20, 76:1
  **May** - 61:10
  **Maybe** - 70:19
  **Med** - 37:8
  **Metallica** - 42:16
  **Might** - 2:24
  **Miller** - 47:13,
47:21, 55:21
  **Montague** - 72:4
  **Morton's** - 29:3
  **Motley** - 47:20
  **Mr** - 3:8, 3:18,
3:23, 3:24, 3:25,
13:2, 13:3, 13:10,
13:25, 14:2, 16:12,
17:8, 17:9, 18:7,
18:15, 18:20, 20:10,
20:12, 21:16, 21:20,
22:8, 25:20, 30:6,
30:14, 33:12, 35:5,
49:10, 70:17, 70:21,
71:3, 71:4, 71:19
  **My** - 42:3

## N

**N** - 53:1
  **NAGIN** - 2:2
  **NEW** - 1:1
  **NHL** - 23:23
  **National** - 35:12,
42:17
  **Needle** - 11:1
  **Neither** - 70:22
  **Network** - 58:16
  **New** - 1:6, 2:4,
23:24, 46:5, 48:2,
48:6, 48:14
  **News** - 17:20,
17:25
  **Nice** - 20:13,
20:14, 76:7
  **Nickerson** - 48:4,
48:16
  **Ninth** - 8:5, 8:8,
8:19, 8:20, 23:10,
23:12, 24:10
  **Nippon** - 22:22
  **No** - 24:8, 33:23,
50:14
  **Nobody** - 65:10
  **Not** - 50:1

**Nothing** - 34:13
  **November** - 42:14
  **Now** - 22:16, 24:9,
24:14, 25:10, 31:4,
65:18, 68:1
  **Number** - 72:10

## O

**O** - 53:1
  **OF** - 1:1, 1:10
  **Obviously** - 12:18,
69:7
  **October** - 11:16,
12:18, 39:12
  **Of** - 47:3, 49:25,
56:22, 56:23
  **Okay** - 49:23, 65:9,
65:17, 66:1, 70:10,
73:2, 76:5
  **On** - 3:23, 3:24,
4:10, 16:1, 47:9,
59:4
  **One** - 10:6, 17:25,
27:3, 45:17, 48:23,
74:23
  **Only** - 65:10
  **Or** - 9:23
  **Orenstein** - 45:3,
61:13, 66:20, 74:2,
76:14
  **Our** - 19:15, 42:13

## P

**PAUL** - 1:14, 1:17
  **PAYMENT** - 1:4
  **PETER** - 1:23
  **Paper** - 22:21,
68:14
  **Parchment** - 67:7
  **Paycom** - 4:25,
8:4, 25:20, 25:21,
26:2, 32:5, 34:19,
34:21, 34:22, 34:23
  **Peabody** - 37:15,
40:7, 40:12, 46:1,
46:4, 50:3, 50:14
  **Perfect** - 52:8
  **Pinalpina** - 19:1
  **Plaintiffs** - 1:14,
8:15, 24:14, 54:18,
58:20
  **Plaza** - 2:3
  **Please** - 53:2
  **Plus** - 40:12
  **Porter** - 21:9
  **Posner's** - 31:6
  **Post** - 9:6
  **Post-IPO** - 9:6
  **Potter** - 38:17
  **Precision** - 18:25
  **Price** - 66:24
  **Proceedings** - 2:6
  **Prudential** - 43:18
  **Publication** -
68:14

## R

**R** - 2:2, 10:9, 10:25,
53:1
  **RAVELO** - 1:25
  **RE** - 1:4
  **RICHARD** - 1:18
  **RICO** - 48:4, 48:5,
48:7, 48:8
  **ROBERT** - 1:16,

1:21, 2:1
  **Rather** - 18:23,
60:18
  **Re** - 23:7, 23:12,
24:1, 47:18
  **Really** - 25:17
  **Remarkably** - 28:1
  **Reporter** - 2:3
  **Representing** -
35:10
  **Reserve** - 12:3,
12:6
  **Reserve's** - 19:24
  **Right** - 38:13,
39:12
  **Rug** - 23:7
  **Rule** - 7:5, 7:10,
56:6, 62:1, 71:11
  **Rules** - 18:4
  **Ryan** - 20:19

## S

**S** - 1:23, 53:1
  **SEC** - 26:18
  **SHINDER** - 1:16,
13:4, 14:8, 17:3,
17:7
  **SHUSTER** - 1:22,
45:13, 49:2, 49:9
  **SLATER** - 1:14,
1:17, 21:17, 21:19,
21:24
  **STATES** - 1:11
  **Salomon** - 44:1,
44:2, 47:19
  **Sat** - 10:4
  **Savelson** - 3:1,
3:25, 57:20, 57:23,
57:24, 61:12, 66:19
  **Sax** - 29:3
  **Schendlin** - 23:23,
24:11, 31:18, 31:19
  **Second** - 5:6,
14:16, 14:18, 15:10,
20:21, 21:3, 23:9,
25:21, 34:17, 36:15,
37:23, 39:20, 40:8,
41:8, 41:16, 41:18,
43:18, 43:22, 45:23,
46:9, 46:20, 46:21,
47:1, 47:2, 47:18,
47:19, 50:20, 68:14
  **Secondly** - 22:8,
26:20, 28:10, 34:19
  **Section** - 10:6,
27:3, 55:22
  **Securities** - 37:17
  **September** - 74:2,
74:8, 76:13, 76:20
  **Services** - 58:17
  **Seventh** - 22:21,
23:6
  **She** - 10:24, 47:21
  **Sherman** - 27:3
  **Shinder** - 13:3,
17:9, 49:10
  **Shuster** - 3:23,
3:24
  **Simon** - 11:21
  **Simply** - 58:3
  **Since** - 9:14, 13:14
  **Sixth** - 23:17
  **Slater** - 14:2, 18:7,
30:14
  **So** - 3:4, 4:8, 7:25,
14:8, 21:14, 26:15,
32:2, 36:21, 38:14,

38:22, 40:11, 41:1,
42:24, 43:4, 44:24,
46:1, 49:19, 50:6,
50:8, 51:24, 52:13,
57:12, 57:17, 59:23,
63:22, 64:7, 71:17,
72:24, 75:20
  **Some** - 6:5, 36:16
  **Sometimes** - 32:8,
43:10
  **Sounds** - 73:9,
76:17
  **Southern** - 23:23,
46:5, 46:11, 48:9
  **Spencer** - 23:6
  **States** - 1:5
  **Stein** - 46:14
  **Stewart** - 38:17
  **Stores** - 35:12
  **Story** - 67:7
  **Supreme** - 8:19,
27:20, 30:21, 37:7,
43:24, 68:4
  **Sylvester** - 20:19
  **Systems** - 22:21

## T

**T** - 1:18, 53:1
  **THE** - 1:11, 2:13,
3:8, 3:15, 4:1, 5:9,
6:9, 6:22, 7:6, 11:4,
11:10, 11:13, 13:2,
14:7, 16:20, 17:4,
17:9, 20:10, 20:14,
21:16, 21:18, 21:23,
29:25, 30:6, 33:12,
33:16, 35:5, 35:9,
36:8, 36:12, 36:16,
37:1, 38:1, 38:5,
38:11, 38:14, 38:23,
39:2, 39:6, 39:11,
39:13, 39:24, 42:2,
42:5, 43:6, 44:16,
44:21, 45:8, 45:11,
49:1, 49:7, 49:23,
49:25, 50:11, 50:25,
51:14, 52:7, 53:2,
61:8, 63:9, 63:13,
63:22, 65:16, 67:11,
67:20, 69:5, 69:11,
69:14, 69:19, 70:10,
70:12, 70:15, 70:23,
71:2, 71:6, 71:19,
71:21, 72:5, 72:16,
72:21, 73:2, 73:9,
73:15, 74:3, 74:6,
74:21, 75:7, 75:11,
76:5, 76:7, 76:17,
76:21
  **TRANSCRIPT** -
1:10
  **Target** - 13:10,
18:13
  **Tell** - 49:7
  **Texas** - 46:8
  **Thank** - 11:3,
11:14, 13:1, 13:2,
13:4, 17:8, 17:9,
20:10, 21:16, 30:2,
33:11, 33:12, 35:5,
41:25, 42:2, 45:10,
45:11, 51:13, 51:14,
52:5, 52:7, 52:13,
61:8, 70:11, 70:12,
71:3, 71:17, 71:19,
71:23, 74:10, 76:6
  **That** - 3:22, 5:2,

14:7, 15:4, 16:9,
20:16, 21:4, 21:23,
22:10, 25:1, 30:12,
39:16, 41:4, 44:21,
47:16, 56:3, 65:9,
72:16
  **That's** - 6:22, 6:24,
12:17, 21:11, 22:18,
22:20, 27:14, 31:19,
34:6, 35:3, 37:7,
39:25, 46:14, 58:21,
63:10, 63:24, 64:6,
67:24, 67:25, 69:10,
69:13, 72:17, 73:1,
74:3, 74:4, 75:6
  **The** - 3:13, 3:14,
3:15, 4:12, 4:13,
6:4, 9:12, 10:3,
11:15, 12:6, 12:10,
14:24, 18:21, 20:3,
20:21, 23:1, 23:3,
23:7, 23:9, 23:12,
23:23, 24:17, 24:21,
25:7, 26:3, 27:5,
27:9, 28:3, 28:23,
29:2, 29:11, 30:14,
30:22, 31:1, 32:5,
33:4, 34:1, 36:14,
37:9, 38:3, 39:3,
40:7, 41:13, 44:3,
46:12, 46:23, 47:25,
48:8, 48:12, 48:16,
48:18, 48:22, 49:4,
51:5, 51:17, 53:3,
53:5, 54:2, 54:15,
54:23, 55:14, 55:21,
56:5, 56:20, 58:14,
59:14, 61:14, 62:17,
62:20, 63:5, 63:6,
64:19, 66:10, 67:8,
67:19, 69:4, 69:5,
69:7, 69:11, 69:17,
70:23, 71:14, 71:25,
72:18, 74:1, 74:25
  **Then** - 13:9, 13:25,
17:15, 41:17
  **There** - 4:21, 9:22,
23:10, 32:2, 33:20,
34:10, 42:18, 43:18,
45:13, 47:10, 60:13,
63:10, 65:21
  **There's** - 2:14,
12:20, 32:7, 40:4,
41:8, 43:9, 44:22,
55:6, 56:15, 66:17,
69:18, 70:25, 71:25,
76:8
  **Therefore** - 7:21,
10:21
  **These** - 27:4,
37:21, 65:5
  **They** - 5:20, 12:12,
20:22, 24:6, 28:14,
35:22, 36:1, 36:9,
36:10, 37:1, 37:19,
44:9, 45:3, 45:19,
46:15, 46:17, 46:25,
47:12, 47:18, 48:10,
48:20, 49:12, 54:8,
59:9, 60:5, 61:4,
61:13, 62:25, 65:5,
66:3, 66:5, 66:9,
66:11, 75:3, 75:21
  **They're** - 46:18
  **Third** - 27:24,
72:13
  **Thirdly** - 28:16
  **This** - 5:19, 58:6,

# A4916

4

**Those** - 23:13, 48:6
**Three** - 46:24
**To** - 34:9, 39:8
**Too** - 38:15
**Toscano** - 10:4, 27:9
**Toys** - 10:9, 10:25
**Trade** - 44:8
**Transport** - 19:1
**Twombly** - 5:14, 5:15, 59:12

67:9, 68:6, 73:2

## U

**UNITED** - 1:11
**US** - 29:2
**Under** - 4:17, 63:1
**Union** - 42:17
**United** - 1:5
**Unless** - 70:13
**Us** - 10:9, 11:1
**Usually** - 68:7

## V

**VANEK** - 1:18
**VICTORIA** - 1:18
**VIZAS** - 1:21, 3:7, 3:9, 3:17, 11:6, 11:11, 11:15, 33:13, 33:17, 74:4, 76:9, 76:19
**Visa** - 3:13, 4:12, 5:19, 6:4, 9:1, 9:2, 9:7, 9:17, 9:21, 10:1, 10:12, 12:15, 13:9, 13:18, 14:8, 14:14, 14:20, 14:24, 15:9, 15:12, 15:15, 15:18, 15:21, 16:3, 16:6, 16:7, 16:8, 16:18, 19:18, 26:6, 26:12, 26:18, 26:22, 33:1, 33:2, 33:9, 34:3, 34:6, 35:11, 35:16, 43:25, 45:1, 50:22, 53:16, 57:9, 58:7, 58:16, 58:20, 58:23, 58:24, 61:21, 75:20, 76:1
**Visa's** - 42:15
**Vizas** - 3:8, 13:2, 35:5

## W

**WILSON** - 1:15, 17:10
**WINTERS** - 1:20, 71:5, 71:7
**Walmart** - 42:4, 47:17, 47:24, 48:1, 51:16, 55:17, 58:8, 60:10
**Washington** - 9:15
**We** - 5:12, 12:17, 16:15, 16:23, 18:12, 18:16, 18:17, 18:19, 19:5, 20:5, 25:6, 28:24, 38:9, 39:14, 40:16, 42:6, 42:16, 43:21, 44:9, 45:4, 45:5, 46:7, 47:5, 47:7, 49:17, 51:10, 52:3, 58:14, 61:2, 61:18, 61:20, 61:21, 61:23, 62:7, 64:11,

65:1, 65:2, 65:10, 66:1, 71:9, 71:20, 73:13, 74:24, 75:2, 75:3, 75:8, 76:9, 76:10, 76:15
**We'll** - 3:21, 46:8
**We're** - 3:9, 5:11, 11:6, 11:7, 12:19, 23:5, 38:20, 38:25, 39:4, 43:17, 44:13, 45:6, 47:6, 47:7, 76:13
**We've** - 75:5
**Welcome** - 2:14, 13:3
**Well** - 23:4, 41:10, 63:15
**Western** - 44:14, 44:18, 52:4
**What** - 2:20, 17:24, 38:6, 38:19, 62:25, 63:9, 66:6, 71:13, 73:24, 74:11, 76:22
**What's** - 35:20, 38:23, 74:11
**When** - 11:25, 31:14, 39:11
**Wherein** - 6:11
**Which** - 50:25
**While** - 15:13
**Who** - 11:4, 20:11, 57:19, 63:4, 63:5, 65:10, 69:6
**Why** - 35:6, 74:7
**Wilson** - 13:10, 17:8, 17:10, 20:10
**Winter** - 25:21
**Winters** - 70:17, 70:21, 71:4, 71:19
**With** - 8:22, 18:6, 32:15, 33:17, 49:2, 50:3, 51:3
**World** - 19:1, 44:8
**Wright** - 47:13, 47:21, 55:21

## X

**X** - 1:3, 1:9

## Y

**YORK** - 1:1
**Yes** - 30:5, 33:16, 38:5, 39:3, 71:5, 74:21
**York** - 1:6, 2:4, 23:24, 46:5, 48:2, 48:6, 48:14
**You** - 5:16, 10:19, 21:5, 21:13, 38:18, 43:6, 45:8, 49:1, 49:25, 53:17, 69:19, 71:4, 74:17
**You're** - 11:5, 45:9, 69:14, 74:6
**Your** - 3:7, 3:17, 4:4, 13:4, 14:10, 17:10, 17:13, 17:17, 18:25, 20:6, 21:19, 24:5, 25:2, 25:7, 25:15, 25:20, 26:6, 27:16, 29:6, 29:10, 29:23, 30:7, 35:13, 36:24, 37:6, 40:2, 40:22, 41:12, 49:24, 57:21, 74:16

## A

**abandonment** - 70:24
**ability** - 63:17
**able** - 32:12, 56:16, 63:17, 75:23, 76:16
**absence** - 9:18, 65:18
**absolutely** - 7:1, 44:25
**abuse** - 38:16
**accept** - 24:18, 33:24, 53:6, 54:7
**accepted** - 18:24
**accepting** - 55:19
**accomplishing** - 68:22
**accord** - 43:7
**according** - 27:24
**account** - 30:15, 30:16
**accounts** - 66:4
**accrual** - 39:22, 43:20, 56:8
**accrued** - 55:19, 56:11
**accruing** - 51:20
**acknowledge** - 58:15
**acquirer** - 4:14, 4:15, 4:19, 5:1, 5:3, 5:7, 6:1, 6:5, 6:7, 6:19, 7:20, 8:2, 25:13, 30:12, 30:17, 32:10
**acquirer's** - 30:15
**acquirers** - 6:17
**acquiring** - 22:9, 22:13, 24:25, 25:22, 25:24, 27:15, 34:25, 52:9, 61, 64:5
**act** - 36:25, 42:18
**acting** - 9:9
**action** - 10:15, 24:4, 32:18, 35:14, 35:18, 36:13, 36:14, 37:12, 37:20, 39:22, 40:3, 40:13, 40:20, 42:8, 42:10, 46:4, 46:8, 48:1, 48:9, 48:13, 48:24, 52:2, 56:10, 57:1, 57:4, 57:13
**actions** - 2:24, 35:7, 35:25, 40:21, 47:12, 48:5, 48:6, 48:8, 48:11, 55:17, 58:9, 60:11, 64:16
**activity** - 53:22
**acts** - 10:10, 28:16, 28:17, 28:22, 42:19, 43:5
**actual** - 9:19, 30:23, 31:9, 31:10, 31:11, 31:24, 35:24, 55:25, 56:19, 57:8
**add** - 47:9, 71:20, 74:7
**addition** - 42:15, 50:18, 62:3, 62:14, 64:13
**additional** - 28:16, 59:9, 75:9
**address** - 3:19, 11:5, 11:6, 13:11, 13:23, 14:8, 14:19,

17:13, 17:16, 17:19, 18:7, 18:10, 21:19, 26:1, 26:7, 32:21, 45:16, 47:24, 49:1, 54:10, 55:7, 70:18, 71:25, 72:7, 73:17, 76:23
**addressed** - 10:24, 16:14, 21:20, 23:9, 23:25, 25:20, 27:20, 45:19
**addressing** - 28:2
**adhere** - 26:25, 27:7, 27:8
**adhered** - 66:12
**adherence** - 61:24
**adjourn** - 76:23
**adjudicate** - 47:11
**adjudicated** - 44:13, 55:24
**adjudicating** - 44:9
**adjudication** - 42:23, 56:9
**adjustment** - 40:10
**administrator** - 75:3
**admission** - 6:6
**admit** - 8:15, 39:19
**admitted** - 30:12, 35:21, 71:12
**adopt** - 7:11, 20:5, 62:14
**adopted** - 33:5
**advantage** - 35:22, 36:21, 47:6
**adversaries** - 7:14, 56:15
**adversary** - 56:10, 56:14
**advised** - 66:20
**advisement** - 71:22
**advisory** - 47:15
**advocacy** - 53:11, 53:14
**affect** - 29:7, 29:8
**affected** - 40:12, 70:4
**affects** - 19:11, 19:12
**affirms** - 41:18, 46:20, 46:21, 47:1
**afford** - 56:8
**affords** - 56:18
**afternoon** - 2:16, 20:13, 35:8, 35:9, 42:5, 42:6, 57:23, 57:25, 61:9, 61:10, 71:6, 71:7, 72:5, 72:6
**agency** - 11:23
**agenda** - 74:8
**ago** - 23:24
**agree** - 12:24, 29:20, 53:20, 54:3, 54:4, 54:25, 55:2, 68:2, 76:11
**agreed** - 9:15, 10:1, 24:16, 25:8, 26:17, 26:24, 54:21, 59:10, 62:4, 64:3, 65:5, 67:4, 69:1
**agreed-upon** - 54:21
**agreeing** - 10:2, 27:2

**agreement** - 9:25, 14:15, 14:25, 16:2, 25:9, 26:11, 27:5, 27:7, 27:22, 29:12, 29:16, 34:25, 62:5, 62:25, 63:3, 71:9, 72:9
**agreements** - 9:20, 26:22, 26:23, 26:24, 27:16, 27:17, 27:19, 28:19, 29:8, 68:17, 68:19, 68:20
**allegation** - 5:12, 6:25, 7:1, 18:1, 18:9, 21:23, 26:16, 30:8, 30:10, 31:22
**allegations** - 9:11, 9:13, 9:22, 13:20, 18:10, 18:11, 18:23, 19:1, 19:2, 19:6, 53:6, 53:21, 54:5, 54:7, 54:15, 55:4, 55:6, 59:15, 61:14, 61:16, 62:1, 64:9
**allege** - 18:16, 20:25, 21:10, 21:11, 21:12, 53:24, 54:18, 66:12
**alleged** - 5:7, 22:1, 22:13, 22:19, 24:15, 24:20, 26:9, 26:20, 28:7, 28:11, 28:18, 28:20, 29:12, 30:23, 31:8, 34:2, 58:11, 60:20, 61:18, 61:21, 61:23, 62:3, 62:7, 66:1
**allegedly** - 31:2
**alleges** - 34:24
**alleging** - 18:14, 21:24, 58:7, 58:10
**allocate** - 31:16
**allocates** - 22:24
**allow** - 17:21, 18:4, 18:5, 37:3
**allowed** - 45:9
**allows** - 33:22
**almost** - 34:19, 72:12
**alternative** - 34:4, 57:18
**alternatives** - 20:22, 21:1, 21:2, 21:11
**amount** - 67:6, 75:24
**analogous** - 5:8, 45:5
**analysis** - 12:3, 12:8
**analyze** - 64:21
**answer** - 33:3, 67:24, 67:25, 72:20
**anticompetitive** - 6:13, 26:25, 27:19, 27:21, 27:22, 28:6, 28:11, 53:23
**antisteering** - 54:20
**antitrust** - 29:9, 45:5, 53:24, 58:7, 58:10, 58:13, 60:8, 60:22, 63:1, 68:14
**anyway** - 49:11
**appeal** - 50:23, 72:19
**appear** - 17:12
**appellate** - 39:4

appellees - 39:4
applicable - 16:5,
21:15, 32:5, 53:17,
54:13
application -
57:17, 58:22, 69:5
applied - 20:7,
30:22, 34:15
applies - 12:18,
17:22, 19:5, 23:15,
55:4, 56:17
apply - 12:24,
13:12, 19:6, 22:18,
34:12
applying - 34:17
appointed - 61:12
appointing - 74:19
appropriate -
34:12, 36:22, 36:25,
40:19, 51:11
approve - 73:16
approved - 51:1,
51:2
approving - 3:3,
25:3
architects - 66:22
argue - 3:5, 3:25,
13:8, 13:9, 13:11,
13:22, 16:21, 43:15,
45:20, 70:22
argued - 25:18,
70:19, 70:22, 70:23
argues - 18:11
arguing - 14:2,
62:22
argument - 2:17,
2:23, 3:13, 5:10,
8:2, 9:3, 12:17,
13:17, 14:9, 17:5,
28:2, 29:10, 32:17,
33:18, 39:7, 39:9,
44:21, 45:19, 48:22,
52:10, 53:21, 54:3,
54:14, 54:15, 54:24,
55:3, 55:8, 55:9,
57:22, 58:2, 61:3,
71:23, 71:24
arguments -
13:24, 15:15, 32:15,
32:17, 32:21, 33:9,
33:21, 47:23, 53:8,
53:25, 54:3, 54:11,
55:12
arisen - 76:11
artfully - 6:18
artificially - 68:19,
68:21
aside - 6:23, 49:19
aspect - 14:11,
20:2, 20:9
aspects - 54:10,
55:7
aspiring - 42:14
assert - 18:1, 20:6
asserted - 15:2,
15:3
asserting - 35:24
assertion - 6:23,
30:17, 59:24
assets - 12:23
associated -
65:19, 65:25
associates - 36:3
association - 10:5
associations -
26:21, 28:13, 35:19,
36:3, 45:18, 56:20
assuming - 22:8,

22:9, 23:19, 74:4
attempting - 13:14
attention - 76:18
attenuated - 58:12
authorization -
66:6
available - 21:11,
46:22, 46:23, 56:6
avenues - 67:16
avoid - 5:16,
17:24, 31:12, 39:22,
43:20
avoidable - 39:23,
43:20, 56:7
await - 72:24
awaiting - 74:12,
75:8
aware - 4:24,
17:17, 17:20, 60:4

## B

b(2 - 41:3
back-and-forths -
2:14
backs - 5:1
bad - 5:3, 69:25
ballpark - 39:10
bank - 10:12,
12:23, 21:6, 21:25,
22:2, 22:10, 24:25,
25:22, 25:24, 25:25,
26:23, 29:13, 29:18,
30:15, 30:16, 59:21,
59:22, 64:12
bank's - 10:20,
25:11, 29:22
banks - 9:10, 9:20,
10:1, 10:16, 12:23,
19:21, 19:23, 21:5,
22:13, 26:5, 26:12,
26:24, 27:2, 27:15,
28:19, 28:20, 28:24,
29:15, 29:19, 32:25,
33:1, 33:8, 33:22,
34:3, 34:25, 35:1,
35:17, 54:22, 61:20,
61:22, 62:6, 64:3,
64:4, 64:5, 66:13
banks' - 25:13
bargain - 14:13
barred - 8:23,
22:14, 58:5, 61:5
bars - 11:16, 14:17
based - 4:14, 8:24,
11:17, 43:5, 43:24,
53:15, 61:15
bases - 17:25
basic - 11:19,
61:24, 65:20
basis - 9:6, 12:13,
44:3, 44:5, 45:25,
59:13
basket - 33:19
became - 11:16
become - 53:18
becomes - 41:17
begin - 28:14,
48:1, 56:10, 66:18
beginning - 15:19
behalf - 3:5, 13:16,
13:25, 57:23, 58:9
behind - 37:5
bench - 61:1
benchmark -
50:23
benefit - 33:1,
72:23

benefits - 28:11,
28:15, 49:13
best - 9:10, 72:22
better - 17:5, 67:3,
76:4
between - 2:20,
6:17, 9:20, 15:24,
17:21, 18:22, 22:6,
28:13, 32:9, 57:5,
59:1, 59:20
beyond - 12:2,
12:10, 12:16, 18:3,
39:18, 60:8
big - 32:12
billion - 12:24,
15:16, 16:16
bit - 17:6
blanket - 20:22,
54:16
blue - 39:2
blueprint - 75:15
board - 9:7, 32:22,
33:5
bothered - 17:18
bottom - 18:22
bought - 64:25
boundaries - 38:2
boundary - 15:5
box - 69:11
brandish - 56:14
break - 2:21
brief - 4:6, 4:8,
5:11, 11:11, 11:20,
17:18, 19:10, 20:16,
22:16, 30:4, 34:21,
34:22, 45:14, 47:12,
54:24, 55:3, 55:11,
57:25, 60:13, 60:15,
75:19
briefed - 11:14
briefing - 74:13,
74:16
briefly - 14:18,
17:16, 19:8, 22:23,
34:9, 34:23
briefs - 19:15,
20:6, 26:8, 29:1,
39:1, 39:2, 39:3,
39:5, 39:11, 40:19,
53:12
bring - 24:4, 38:9,
46:3, 46:7, 46:13,
46:25, 76:12
broad - 38:1
broadcast - 31:23
broken - 25:4,
25:8
brought - 9:16,
35:25, 37:18, 37:20,
45:25, 58:7, 58:9
brush - 13:15
bundle - 59:3
burden - 57:6,
67:6
business - 63:18,
68:22, 68:24
businesses - 70:2
buyer - 23:3

## C

cable - 31:24, 32:1
calculate - 75:23
candidly - 19:3
cannot - 5:16,
12:10, 29:16, 29:17,
64:10, 67:3
cap - 12:1, 12:9,

12:11
capacity - 34:4
card - 21:7, 29:17,
29:20, 29:21, 29:22,
48:18, 59:6, 59:12,
60:18
cardholder -
68:12, 69:7
cardholders -
59:25, 61:4, 61:14,
62:9, 62:12, 63:23
cards - 12:22,
15:19, 15:22, 16:1,
16:17, 19:12, 19:13,
20:1, 29:18, 34:3,
54:20
care - 18:1
carry - 20:1
case - 4:18, 5:19,
8:8, 8:10, 9:12,
9:16, 10:4, 11:20,
12:6, 15:2, 15:12,
16:18, 17:1, 17:11,
17:18, 18:19, 19:1,
19:2, 19:11, 20:16,
24:13, 25:3, 27:9,
27:10, 27:14, 29:2,
30:24, 31:5, 31:6,
31:7, 31:20, 31:21,
31:22, 32:3, 32:5,
34:23, 35:11, 36:9,
36:10, 36:16, 37:8,
37:18, 38:6, 38:18,
39:20, 39:21, 40:7,
40:8, 40:17, 41:7,
41:12, 41:16, 41:23,
42:7, 42:16, 42:17,
42:20, 42:21, 42:25,
43:17, 43:23, 44:2,
44:4, 44:6, 44:10,
44:11, 44:14, 44:17,
44:24, 45:4, 45:5,
45:21, 46:1, 46:3,
46:11, 46:13, 47:18,
48:4, 49:14, 50:3,
50:4, 50:6, 50:22,
52:5, 53:19, 54:17,
55:17, 57:17, 58:8,
61:2, 65:20, 67:15,
68:11, 68:14, 69:22,
71:9, 75:12
cases - 6:8, 8:13,
8:21, 10:3, 10:9,
11:21, 16:24, 16:25,
28:25, 30:22, 31:7,
34:14, 37:11, 37:15,
38:3, 40:2, 40:18,
40:22, 43:2, 43:9,
43:19, 43:21, 43:22,
43:25, 44:11, 45:5,
47:10, 47:12, 47:14,
47:17, 51:7, 51:17,
51:19, 53:5, 53:13,
54:17, 55:24, 56:1,
58:7, 58:10, 60:3,
60:4
cash - 64:1, 65:14
category - 55:8
caused - 65:1
ceiling - 19:24
central - 16:18,
36:6
cents - 12:13,
65:7, 65:9
cert - 50:25
certain - 15:22,
43:21, 63:10
certainly - 18:4,

44:13, 45:14, 64:9,
64:11, 68:25, 73:16
chain - 22:25, 69:6
challenge - 61:25
change - 9:11,
29:6, 46:15, 51:22
changes - 30:1
characterization -
55:20
characterized -
69:2
charge - 5:1, 5:3,
5:4, 5:5, 8:7, 12:10,
19:22, 19:23, 25:24,
32:6, 59:4, 65:6,
67:4
charge-back - 5:3,
5:4, 5:5, 25:24, 32:6
charge-backs -
5:1
charged - 11:17,
19:20, 30:24, 65:9,
68:20, 68:21
charging - 12:16
check - 3:13, 13:9,
13:18, 14:9
check-release -
13:9, 14:9
chill - 48:24
choice - 48:21
choose - 17:21
chose - 48:20
circuit - 3:4, 4:21,
4:24, 8:18, 23:22,
30:20
circuit's - 37:2
circuits - 23:10,
23:13
circumscribed -
49:5
circumstances -
17:1, 51:25
cite - 5:20, 34:21,
42:16, 43:21, 47:12
cited - 11:20,
23:13, 29:3, 34:14,
34:16, 37:9, 37:12,
37:15, 40:23, 47:17,
47:21, 68:13
cites - 40:7, 43:25,
47:19, 69:4
citing - 5:22
claim - 5:5, 5:6,
5:20, 11:16, 24:21,
25:6, 48:8, 54:6,
54:8, 56:20, 57:20,
59:13, 60:16, 60:18,
60:19, 69:7
claimants' - 4:14
claimed - 8:11,
22:16
claiming - 70:20
claims - 2:22,
4:12, 4:14, 4:22,
4:23, 8:6, 8:22,
8:23, 8:24, 12:19,
14:17, 15:1, 15:2,
35:24, 46:8, 46:14,
46:25, 47:1, 47:5,
48:20, 58:5, 60:1,
60:2, 61:5, 72:1,
74:12, 75:25
class - 9:12,
15:18, 16:6, 25:3,
32:18, 47:4, 48:5,
48:8, 48:11, 50:25,
52:2, 58:9, 60:10,
64:16, 72:8, 72:10,

75:3, 75:13, 76:10
**classic** - 61:2
**clear** - 10:3, 11:21, 12:1, 12:18, 15:6, 15:8, 19:10, 35:4, 36:17, 44:16, 57:6, 63:1, 64:9, 66:11, 67:14
**clearly** - 14:14, 34:1
**close** - 27:6
**co** - 22:11, 61:12, 70:18
**co-conspirator** - 22:11
**co-lead** - 61:12, 70:18
**coconspirator** - 22:12, 22:17, 22:20, 23:3, 23:14, 23:25, 25:23, 26:1, 27:11, 30:19
**coconspirators** - 22:13, 24:16, 61:22
**coercive** - 36:19, 56:1, 56:2
**colleagues** - 61:1
**collect** - 23:1
**collective** - 72:24
**combination** - 27:4, 61:19, 66:18
**commenced** - 48:1
**commented** - 64:17
**comments** - 4:4
**common** - 27:6, 27:7, 43:13
**communications** - 9:20
**compel** - 13:12
**compensate** - 15:17
**compete** - 59:2
**competing** - 17:22, 18:23
**competition** - 20:2, 20:8, 28:13
**competitive** - 19:23, 54:22, 63:3, 63:11, 63:20
**competitor's** - 29:18
**competitors** - 58:19
**complained** - 48:15
**complaint** - 4:11, 5:17, 5:21, 8:17, 13:20, 18:13, 24:20, 25:17, 26:10, 35:15, 42:13, 57:20, 57:24, 58:3, 58:15, 58:20, 58:21, 58:25, 59:11, 59:15, 59:18, 65:3
**complaints** - 3:6, 6:5, 13:13, 13:15, 18:9, 19:7, 20:25, 21:10, 21:11, 21:12, 26:21, 53:3, 55:13
**completely** - 69:23
**component** - 31:10, 31:15, 40:4
**conceal** - 62:4, 69:1
**concealed** - 62:10, 66:15
**concede** - 12:21

**conceded** - 19:12
**concern** - 43:11, 67:22
**concerned** - 35:17, 36:1
**concerning** - 15:2
**concerns** - 67:21
**concerted** - 53:22
**conclude** - 9:6, 55:9
**conclusion** - 53:10
**conclusively** - 68:17
**conclusory** - 6:22, 18:2, 18:11, 22:1
**conduct** - 14:22, 14:23, 15:1, 15:11, 15:12, 16:7, 16:8, 29:7, 29:8, 35:18, 37:13, 40:18, 40:24, 42:12, 43:12, 43:24, 47:9, 47:11, 47:14, 47:21, 50:10, 51:19, 51:22, 51:24, 55:7, 55:18, 57:11, 63:18
**confer** - 58:12
**conference** - 45:2, 74:1, 76:3
**conflicts** - 14:13
**congressional** - 12:7
**consider** - 37:23, 57:3, 57:10
**considered** - 55:12
**considering** - 74:19
**consistent** - 7:4, 15:8
**conspiracy** - 8:25, 9:18, 10:7, 10:10, 10:14, 10:20, 10:21, 11:2, 21:21, 24:3, 26:3, 26:4, 27:4, 27:25, 28:3, 28:25, 29:5, 29:9, 30:23, 61:19, 61:23, 61:24, 63:7, 70:4
**conspirator** - 22:11, 22:25
**conspirators** - 31:8
**conspired** - 31:25
**constitute** - 27:5, 70:24
**constrained** - 19:19, 19:22
**consultations** - 73:14
**consumer** - 8:9, 8:10, 8:11, 32:1, 62:9, 63:6, 64:2, 68:12
**consumers** - 31:25, 58:6, 58:9, 58:12, 58:19, 59:5, 61:14, 62:11, 62:16, 65:12, 68:22, 69:3
**contend** - 26:4, 28:8
**contends** - 55:17
**contentions** - 25:15
**contesting** - 43:17
**context** - 15:15, 10:23, 21:13, 47:11, 59:23

**continue** - 26:17, 26:18, 28:10, 28:15, 28:19, 29:8, 29:13, 32:25
**continued** - 28:20
**continuing** - 74:22
**contract** - 27:4, 44:2
**contracting** - 27:13
**contractors** - 65:19, 65:20, 65:25
**contracts** - 6:5, 25:5, 27:4, 27:21
**contrary** - 9:9, 19:16, 29:2, 29:14, 51:9
**contrast** - 16:11
**controversy** - 36:6, 36:8, 36:18, 37:7, 37:9, 37:25, 39:17, 43:24, 45:21, 46:1, 46:10, 55:25, 56:19, 56:21, 56:23, 57:9
**copy** - 73:13
**copyright** - 21:4
**correct** - 2:8, 23:20, 24:2, 25:15, 32:20, 34:8, 44:20
**cost** - 12:12
**counsel** - 8:1, 17:15, 19:12, 19:16, 19:18, 27:9, 34:9, 49:10, 50:3, 51:4, 51:10, 57:21, 61:12, 70:18, 73:11, 74:24, 75:1, 76:1
**counterclaim** - 43:1
**couple** - 45:16, 47:12, 47:23, 50:2
**course** - 9:4, 23:2, 42:22, 47:3, 49:25, 56:21, 56:22, 56:23, 61:15, 67:5, 68:1
**court** - 4:21, 9:15, 23:22, 24:8, 37:18, 39:16, 40:13, 46:8, 48:1, 50:4, 57:3
**courtroom** - 5:18, 6:6, 7:4, 7:13, 7:16, 7:24
**courts** - 23:17, 27:21, 58:11, 64:22
**cover** - 15:11
**coverage** - 44:7
**covered** - 14:24
**create** - 35:1
**created** - 15:16
**credit** - 5:3, 58:16, 59:6, 66:8
**criteria** - 65:22, 65:24
**crystalized** - 31:21
**current** - 14:16, 16:11
**cut** - 51:23, 51:25, 64:4, 64:5, 68:10
**cutoff** - 15:4
**cuts** - 64:4
**cutting** - 17:6

— D —

**damage** - 15:20, 24:4, 56:11, 67:5, 70:5, 70:6

**damages** - 4:18, 15:18, 16:14, 23:1, 35:18, 36:2, 36:13, 36:14, 37:2, 39:23, 40:4, 40:17, 40:24, 41:11, 42:14, 42:15, 42:19, 43:4, 43:10, 43:20, 46:24, 46:25, 50:10, 51:20, 51:25, 52:5, 55:18, 56:8, 67:2
**danger** - 50:6, 50:11, 50:15, 56:7
**data** - 75:19, 75:21, 75:22, 76:2
**date** - 8:24, 9:1, 9:2, 11:17, 15:4, 16:6, 73:21, 73:22, 74:9, 74:18, 76:13
**days** - 38:8, 44:24
**deal** - 16:10, 21:5, 21:6, 21:7, 32:12, 43:10, 73:17
**dealers** - 68:9
**dealing** - 19:1
**dealt** - 40:9
**debit** - 11:17, 12:5, 12:9, 12:10, 15:24, 19:12, 19:13, 30:16, 59:6
**decide** - 18:22, 39:20, 41:19, 44:14, 47:14, 51:8
**decided** - 20:16, 24:2, 41:1, 47:21, 52:4, 72:13
**decides** - 41:16, 50:20
**decision** - 4:25, 8:5, 8:8, 8:9, 10:20, 10:24, 20:18, 20:23, 22:22, 23:11, 23:12, 34:19, 34:21, 34:22, 37:2, 38:21, 41:8, 46:20, 46:21, 47:20, 50:13, 51:9, 53:4, 73:14
**decisions** - 4:21, 5:25, 7:2, 20:18, 23:22, 74:12
**declaration** - 37:4, 42:11, 46:13, 55:18
**declarations** - 43:9
**declaratory** - 2:24, 3:24, 35:7, 35:11, 35:13, 35:15, 35:16, 36:5, 37:11, 37:12, 37:16, 37:20, 37:22, 38:20, 39:22, 40:3, 40:9, 40:13, 40:20, 40:23, 41:9, 41:19, 41:21, 42:8, 42:10, 42:17, 43:1, 43:14, 43:20, 45:24, 46:2, 46:4, 46:5, 46:12, 47:11, 47:14, 48:13, 48:14, 48:24, 49:8, 50:6, 50:8, 50:17, 50:18, 51:5, 51:7, 51:12, 51:18, 51:21, 55:17, 55:23, 56:18, 56:25, 57:8, 57:11, 57:13, 57:15, 57:16
**declare** - 44:4
**declination** - 48:17
**default** - 33:19,

33:21, 54:16, 54:18, 75:23
**defeat** - 28:6, 28:8, 45:14
**defendant** - 23:11, 28:5, 28:10, 28:16, 45:24, 46:7, 46:12, 61:20
**defendant's** - 3:6, 17:18
**defendants** - 2:21, 13:7, 13:24, 14:5, 16:10, 16:12, 17:24, 19:6, 22:7, 22:16, 23:13, 23:20, 24:12, 24:15, 24:17, 25:2, 26:4, 27:24, 28:23, 35:6, 35:11, 35:13, 37:16, 37:22, 38:20, 41:19, 42:22, 46:2, 46:24, 47:23, 48:2, 48:11, 48:12, 48:15, 50:17, 51:8, 53:21, 56:13, 57:8, 57:16, 57:22, 57:23, 62:11, 62:13, 64:15, 65:21, 72:8, 72:11, 72:22
**defendants'** - 13:17, 14:11, 14:12, 14:16, 16:11, 53:25
**defending** - 42:25
**defense** - 62:11, 62:12
**defenses** - 49:17
**defines** - 42:14
**definite** - 51:9
**definitely** - 38:21, 62:18, 68:7
**delayed** - 50:13
**demonstrably** - 26:6
**denied** - 14:11, 48:21, 53:4, 54:25, 55:14, 57:18
**deny** - 28:1
**denying** - 55:16
**deployment** - 36:22, 38:15
**derelict** - 34:20
**describe** - 43:15
**describes** - 58:25
**description** - 59:11
**designed** - 15:17
**detailed** - 59:11
**details** - 15:14
**determine** - 64:25
**determined** - 20:23, 72:14, 72:20
**determines** - 39:16
**determining** - 55:3, 57:3
**develop** - 49:18, 76:12
**dictates** - 16:5
**differences** - 57:5
**different** - 4:9, 9:13, 18:14, 20:1, 28:13, 31:1, 32:13, 33:23, 54:23, 62:6, 63:11, 70:5, 70:6
**direct** - 4:9, 4:17, 4:19, 5:7, 21:25, 22:4, 64:11, 66:3, 68:3, 69:16
**directed** - 30:19
**direction** - 8:10

**directly** - 5:8, 6:21, 7:15, 7:23, 21:4, 22:2, 22:12, 22:19, 29:2, 59:14, 64:2
**directness** - 66:2
**directors** - 32:23, 33:6
**disadvantage** - 69:6
**disagree** - 18:12, 31:18
**disappear** - 66:16
**disavow** - 28:6, 28:8, 60:16
**disclaimer** - 60:13
**disclaimers** - 75:4
**discount** - 24:22, 24:23, 25:14, 29:16, 29:21, 30:25, 59:4
**discovery** - 34:12, 44:23, 49:11, 49:13, 49:14, 49:16, 49:18, 50:20, 51:6, 53:14
**discretion** - 39:20, 57:2, 57:4
**discretionary** - 48:17
**discussed** - 4:25, 76:9
**discussing** - 76:10
**discussions** - 72:25, 75:1, 76:1, 76:14
**dismiss** - 2:22, 2:24, 3:1, 3:6, 3:23, 5:12, 5:16, 8:16, 17:14, 17:19, 18:5, 18:8, 19:4, 25:18, 34:13, 35:14, 36:4, 40:20, 41:7, 42:7, 48:10, 53:3, 53:7, 53:25, 54:25, 55:6, 55:13, 55:16, 57:20, 57:24, 61:15
**dismissed** - 4:11, 4:21, 5:6, 8:6, 8:13, 8:20, 48:6, 58:3, 58:11, 60:11
**dispensed** - 13:18
**disposes** - 71:24
**dispositive** - 6:10, 8:14, 53:9
**dispute** - 12:2, 22:6, 33:20, 33:21, 37:5, 44:25
**disputed** - 64:10
**distant** - 60:10
**distill** - 34:7
**distinct** - 13:15, 13:20
**distinguish** - 54:16
**distribution** - 22:25
**district** - 9:15, 23:17, 23:22, 48:20, 57:2
**doctrine** - 7:11, 11:18, 11:22, 13:11, 17:16, 20:3, 20:7, 54:12, 55:9, 55:10, 58:5, 61:6
**document** - 27:2, 71:12, 74:25
**documents** - 27:16
**dollars** - 12:24
**done** - 11:7, 17:24,

21:5, 27:15, 43:2, 47:7, 56:3, 63:20
**donut** - 17:17
**down** - 36:12, 71:13, 75:3
**downstream** - 31:8
**dozens** - 35:25
**draft** - 6:18, 72:10
**dramatically** - 75:3
**draw** - 59:14
**drawing** - 27:11
**driven** - 53:4
**dropped** - 70:20
**due** - 15:22, 39:11
**duplicative** - 60:1, 60:2, 67:9, 71:14
**duration** - 50:22
**during** - 51:20
**dust** - 72:2
**dust-up** - 72:2
**duties** - 9:8, 9:9, 32:23, 33:7

**E**

**early** - 35:22, 56:9
**easier** - 47:13, 51:18
**easily** - 24:14, 50:19, 51:7
**economic** - 7:19, 8:3, 59:16
**edge** - 5:22
**effect** - 4:13, 8:3, 16:18, 25:24, 26:12, 27:20, 27:23, 31:25
**effective** - 11:16
**effort** - 60:9, 66:17, 67:2
**eighteen** - 23:24
**either** - 4:22, 9:19, 18:3, 34:2, 36:4, 41:14, 42:25, 55:8, 56:1
**elements** - 28:2, 28:3, 48:7
**eleven** - 54:24
**eloquently** - 32:16
**emphasized** - 19:25
**encompass** - 51:7
**end** - 8:15, 15:22, 15:25, 37:2
**ended** - 26:5
**endorse** - 27:11
**ends** - 42:15
**enforce** - 27:1, 28:20
**enforcement** - 27:14
**engaged** - 50:18, 51:6
**engaging** - 43:12, 47:25
**enhance** - 20:2, 20:8
**enter** - 29:15
**entered** - 26:22
**entirely** - 60:2
**entirety** - 54:21, 55:15
**entities** - 9:9
**entitled** - 49:21
**entity** - 26:14, 29:4
**equally** - 32:6
**essence** - 42:17
**essential** - 35:15

**essentially** - 18:9, 35:21
**establish** - 9:21, 10:6, 71:15
**evaluation** - 13:13
**everyone-knows-otherwise** - 7:10
**evidentiary** - 75:16
**exactly** - 27:18
**example** - 5:24, 18:6, 37:14, 54:4, 54:11
**examples** - 40:6
**exception** - 6:12, 22:17, 30:20
**exceptions** - 8:16, 8:17, 8:18, 8:19, 54:12
**excluded** - 37:2
**excuse** - 3:23, 66:17
**exempt** - 24:10
**exercise** - 57:4
**exist** - 8:19, 21:1
**existence** - 9:24, 27:25
**existing** - 36:6, 60:4
**exists** - 20:24, 24:10, 24:12, 53:6
**expect** - 45:1
**expectation** - 75:14
**expected** - 50:21
**experience** - 39:9
**explain** - 10:20, 23:21
**explaining** - 58:21
**explicitly** - 23:16, 24:1, 27:10
**expressed** - 67:21
**expressly** - 12:10, 14:25, 16:2
**extent** - 7:7, 7:8, 53:15, 63:16, 64:16
**extremely** - 4:6, 10:3

**F**

**face** - 24:20, 25:17, 33:22, 33:25
**faces** - 76:25
**facially** - 13:18
**fact** - 4:14, 5:1, 6:19, 6:22, 6:24, 7:2, 7:14, 9:25, 19:17, 19:21, 19:25, 22:1, 22:6, 24:18, 24:19, 24:21, 25:1, 33:4, 34:8, 34:11, 34:16, 34:18, 42:21, 55:5, 56:21, 61:19, 62:4, 62:15, 62:16, 62:19, 64:10, 67:5, 67:17, 68:12, 70:23
**fact-intensive** - 55:5
**factors** - 57:3
**facts** - 5:17, 11:25, 18:17, 25:16, 47:16, 61:18
**factual** - 5:12, 20:23, 21:23, 26:15, 53:6, 54:4, 59:15
**factually** - 7:8
**fail** - 9:1
**failure** - 48:7

**fair** - 53:8
**fairly** - 67:14
**falls** - 19:17
**false** - 25:1, 25:2
**familiar** - 4:6, 15:13
**far** - 19:3, 37:2, 68:5
**feature** - 54:19
**federal** - 9:15, 11:23, 46:13, 61:5
**fee** - 5:20, 8:11, 8:12, 12:11, 21:25, 22:5, 22:9, 30:23, 30:25, 31:1, 31:2, 31:3, 31:12, 54:22, 59:4, 59:9, 59:22, 64:8
**feed** - 13:23
**fees** - 5:5, 5:13, 8:25, 11:17, 16:4, 24:24, 25:11, 25:12, 25:13, 25:14, 28:12, 54:6, 58:18, 58:22, 58:25, 59:1, 59:20, 60:6, 60:18
**fend** - 54:8
**few** - 33:13
**fiduciary** - 9:8, 32:23, 33:7
**fifteen** - 65:3
**fifth** - 3:14
**figure** - 44:7
**file** - 43:1
**filed** - 3:15, 5:4, 11:18, 11:22, 13:11, 17:16, 19:9, 19:18, 20:3, 20:7, 39:2, 39:4, 42:6, 42:7, 42:21, 44:11, 44:24, 48:5, 48:9, 48:12, 48:23, 55:9, 70:16, 72:19, 73:3, 73:8
**filed-rate** - 3:15, 11:18, 13:11, 17:16, 20:3, 20:7, 55:9
**filers** - 72:1, 74:12
**final** - 72:12
**finality** - 47:7, 49:22
**financial** - 59:1
**fine** - 14:7, 74:3, 74:4
**finger** - 36:24
**finite** - 43:5
**firm** - 15:5
**first** - 2:21, 13:8, 16:13, 17:13, 21:22, 22:24, 23:1, 23:3, 23:4, 23:5, 24:2, 30:9, 30:11, 30:18, 43:16, 58:6, 63:5, 67:23, 69:9, 70:9, 71:10, 72:21
**fit** - 56:10
**five** - 3:11, 12:13, 66:21
**fixed** - 23:15, 24:16, 25:6, 25:7, 31:8, 31:9, 54:6, 63:1, 64:12, 66:1
**fixing** - 31:11, 63:2, 63:11, 66:18, 66:24, 68:16
**flow** - 63:2
**focus** - 21:13
**folks** - 65:5, 73:24

**follow** - 10:1, 10:2, 10:13, 10:17, 10:20, 60:10
**follow-along** - 60:10
**followed** - 12:6
**following** - 10:5, 10:19
**forced** - 63:19
**forcefully** - 32:16
**forgive** - 15:14
**form** - 18:2, 72:11
**formed** - 61:24
**former** - 45:17, 47:4, 48:23
**forth** - 13:21, 19:15, 55:10
**forths** - 2:14
**forum** - 45:6, 47:25, 48:15, 48:19, 48:21, 57:9
**forward** - 40:3, 44:3, 44:5, 44:8
**four** - 26:7, 35:18, 36:2, 45:18, 61:20, 66:21, 68:1
**fourteen** - 60:15
**fourth** - 26:8, 29:10
**franchisees** - 72:2
**franchisor/franchisee** - 76:8
**franchisors** - 72:2
**frankly** - 4:7
**free** - 16:3, 16:7, 19:23, 24:6, 32:23, 34:4, 59:24, 63:20
**front** - 7:13
**full** - 20:16
**fun** - 39:13
**fund** - 15:17
**fundamental** - 32:19, 39:21, 40:1
**furtherance** - 28:17, 28:18, 28:22
**future** - 12:14, 41:12, 43:12, 44:9, 51:20

**G**

**general** - 65:19
**giant** - 17:17
**given** - 13:6, 14:5, 64:5, 66:11
**glean** - 38:6
**global** - 48:12
**go-forward** - 44:3, 44:5
**goods** - 59:5, 60:17, 60:20, 60:21
**gored** - 69:20
**granted** - 42:9
**granting** - 54:6
**great** - 76:25
**ground** - 38:14
**grounds** - 42:9
**group** - 49:6, 62:8
**guess** - 38:17, 38:18
**guidance** - 13:6, 75:15
**guy** - 67:24
**guys** - 66:6

**H**

**half** - 19:13

hand - 59:5
happy - 13:6,
13:23, 14:5, 45:6,
45:8, 72:12, 73:12
harassing - 56:14,
56:15
hard - 67:9, 67:11
hardly - 48:19
harm - 58:7, 58:11,
60:12, 66:10
hate - 16:20
hear - 2:21, 2:22,
3:12, 4:8, 13:22,
14:4, 35:6, 36:20,
39:20, 73:21
heard - 30:10,
32:16, 32:17, 33:10,
51:15, 52:10, 57:19,
73:19, 75:2
hearing - 3:16,
74:13, 74:18
hearings - 74:17,
75:10, 75:16
heart - 34:7
heavily - 23:11
held - 25:2
help - 22:10,
23:20, 24:12
helpful - 2:15,
32:3
hidden - 62:16,
64:8, 69:2
hide - 69:1
high - 63:3
higher - 68:19,
68:21
highlight - 13:19
highly - 41:7
himself - 18:25,
66:19
history - 18:20,
20:17
hitch - 18:2
holders - 21:4
holding - 22:20,
34:11
hole - 17:18
honest - 39:8
honor - 15:19,
15:22, 16:1, 16:17,
54:20
honor-all-cards -
15:19, 15:22, 16:1,
16:17, 54:20
hope - 32:20,
35:22, 75:15, 76:15
hopeful - 2:22
hopefully - 73:23
hopelessly - 60:1
horizontal - 8:25,
9:19, 9:24
hour - 52:11
hundreds - 36:1
hurt - 63:8, 63:17
hurting - 29:18
hypothetical -
47:16

**I**

idea - 39:10
identical - 50:16
identifiable -
25:12
identified - 25:4,
25:6
ignore - 59:16
illegal - 28:19,

53:22, 68:18
immediacy -
37:10, 37:24
immediate - 37:7,
37:14, 37:16, 37:25,
38:2, 38:7, 38:16,
38:22, 39:15, 39:17,
41:1, 66:6
impermissibly -
24:19
impetus - 27:12
implausible - 7:1
important - 12:4,
31:4, 60:9, 63:24,
75:12, 75:13
impose - 24:16,
26:24, 29:13, 29:17
improper - 55:21
inadequate -
46:15
inapplicable -
55:10
inappropriate -
13:19, 38:12
incentive - 54:22
include - 73:7
includes - 13:20,
24:23, 54:19
including - 14:23,
15:11, 16:7, 25:13,
54:11
inconsistent -
50:7
inconvenience -
57:6, 57:7
incorporate -
30:25
incorporated -
25:5
incorporates -
24:23
incorrect - 25:16
increase - 65:1
incurred - 12:12,
52:5
indeed - 37:7
independent - 9:7,
9:8, 13:13, 32:22,
32:23, 33:6, 34:4
indirect - 8:7,
18:7, 22:14, 58:12,
60:12, 61:4, 69:14,
69:20
individual - 29:14
individualized -
35:2
inequitable -
57:11
infer - 9:24, 10:10,
32:22
inference - 11:2,
33:6
inferences -
17:22, 18:23, 59:15
inferred - 10:22
inflate - 5:20
inflated - 4:19,
5:5, 6:18, 30:9,
60:18
inflating - 4:13,
32:1
inflation - 60:19
information -
75:23
informed - 75:21
initial - 3:22, 39:3
initiating - 56:14
injunctive - 36:11

injured - 24:6
injury - 48:7, 60:8,
60:22, 63:1, 63:2,
66:1, 66:2
inquiry - 55:5
inspiring - 53:14
instance - 18:13,
18:18, 18:19, 72:21
instead - 6:20,
31:14
institutions - 59:1
instructed - 57:10
instructive - 55:22
instructs - 12:3
insurance - 43:11,
44:6
intact - 53:23
intend - 20:4,
20:5, 45:25
intended - 15:5,
20:8, 56:7
intending - 4:4,
13:8
intensive - 55:5
interchange -
4:13, 4:16, 4:22,
5:8, 5:13, 5:20,
5:22, 6:1, 6:15,
6:18, 6:20, 8:6, 8:9,
8:25, 9:21, 12:5,
12:9, 14:17, 15:24,
16:4, 18:15, 19:19,
19:24, 20:2, 20:9,
21:25, 22:5, 22:9,
24:17, 24:24, 25:4,
25:11, 28:12, 30:9,
30:11, 30:17, 31:1,
31:2, 31:15, 32:7,
32:8, 32:11, 33:19,
33:22, 33:23, 33:24,
54:5, 54:16, 54:18,
58:18, 58:22, 58:25,
59:14, 59:20, 59:22,
59:25, 60:6, 61:4,
62:5, 62:16, 62:25,
63:4, 67:18, 70:5,
75:24
interest - 10:12,
29:15, 33:8, 68:11
interested - 3:16
interesting - 66:5,
68:15
interests - 9:10,
32:24
interim - 15:23,
61:12
interpret - 24:8
interpretation -
20:4
interrupt - 16:20
intimately - 15:13
invoked - 57:14
involved - 56:22,
73:11
involves - 55:4
involving - 55:24
irrespective - 34:6
issue - 3:14,
13:21, 14:3, 14:10,
14:23, 15:12, 16:8,
16:13, 16:18, 18:6,
19:10, 20:4, 25:19,
31:21, 32:4, 40:4,
40:24, 40:25, 42:19,
46:12, 49:3, 50:5,
50:9, 54:17, 56:4,
71:13, 72:7, 72:17,
73:17

issued - 12:22
issuer - 4:15, 5:1,
6:1, 6:20, 6:21,
7:15, 7:20, 7:21,
7:23
issuers - 6:17,
34:3
issues - 2:17,
2:18, 3:2, 3:20, 4:7,
10:24, 14:4, 15:23,
21:20, 45:16, 47:22,
71:25, 76:2
issuing - 21:5,
21:25, 22:2, 22:10,
25:11, 25:25, 33:22,
59:21, 64:2, 64:4
item - 66:16
iterations - 16:25
itself - 29:18, 63:4,
67:18

**J**

jaws - 45:15
job - 58:1
join - 10:12, 10:13,
10:16, 10:18
joining - 10:2,
10:5, 10:19
judge - 20:20, 44:3
judgment - 2:24,
35:7, 35:11, 35:13,
35:15, 35:16, 35:22,
36:5, 37:11, 37:12,
37:16, 37:20, 37:22,
38:20, 39:22, 40:3,
40:9, 40:13, 40:20,
40:23, 41:9, 41:19,
41:21, 42:8, 42:10,
42:18, 43:2, 43:14,
43:24, 46:2, 46:4,
46:6, 46:12, 47:11,
47:14, 48:13, 48:14,
48:24, 49:8, 50:6,
50:8, 50:17, 50:18,
51:5, 51:7, 51:12,
51:18, 51:21, 55:23,
56:19, 57:1, 57:8,
57:12, 57:13, 57:15,
57:16
judicial - 5:25, 7:2,
18:3, 70:17, 71:8
juncture - 55:6
jurisdiction -
39:16, 39:17, 39:19,
43:17, 43:23, 45:20,
56:24, 57:2, 70:21
jury - 62:23, 64:17,
64:19, 65:13

**K**

keep - 4:4, 45:13
kind - 16:23,
27:18, 66:5, 70:5,
71:16
known - 28:3
knows - 5:17,
5:18, 5:25, 6:6,
6:11, 7:10, 7:17,
29:19, 52:1, 60:25

**L**

lack - 48:7, 58:4,
60:22, 70:21
laid - 14:14
lament - 48:18

landscape - 54:19,
54:21
language - 15:6,
69:17
large - 53:4
last - 14:2, 49:2,
52:3
lastly - 10:8
latter - 56:3
law - 10:3, 11:20,
16:5, 26:4, 29:2,
34:17, 36:16, 46:14
laws - 46:6, 53:24,
58:10
lawsuit - 45:17,
45:25
lawyer - 7:4, 7:12,
7:16, 7:24, 42:4
lawyers - 16:24
lay - 13:5
lead - 33:5, 61:12,
66:21, 70:18
leagues - 31:22,
31:24
least - 14:2, 26:6,
44:4, 51:10, 54:9,
75:15
leave - 24:5,
25:19, 34:3, 48:25
leaves - 6:19
leaving - 5:17
leery - 62:22
left - 53:23, 57:2
legal - 20:23,
32:24, 40:5, 40:11,
40:25, 41:4, 53:17,
71:14, 71:15
legislation - 19:25
legitimate - 68:22,
68:24
leisure - 56:15
less - 2:17, 12:23,
19:3, 19:23, 32:13,
75:6
less-powerful -
32:13
letter - 38:8
letters - 74:23
liability - 43:12,
56:9, 71:14, 71:16
liable - 36:2, 50:10
license - 20:22,
21:3, 54:16
lies - 6:11, 7:9
light - 7:2
likelihood - 68:9
likely - 68:19,
68:21
limitation - 12:22,
23:16, 23:19, 23:25,
24:10, 24:12
limited - 14:25,
39:24, 39:25, 40:17,
43:15
limits - 23:14
line - 10:8, 10:9,
18:22
list - 74:7
listening - 33:20
literally - 28:23
litigants - 57:7
litigate - 48:20,
56:19
litigating - 47:5,
47:7, 49:20, 57:8
litigation - 15:3,
37:14, 40:15, 45:1,
49:4, 49:5, 50:7,

50:12, 50:13, 50:15,
50:17, 56:13, 68:15,
73:8
**live** - 52:5
**logistical** - 15:23
**look** - 11:25,
21:12, 32:24, 43:25,
64:24
**looked** - 75:21
**looking** - 75:22
**loses** - 69:6
**loss** - 56:7
**lost** - 70:2
**lumps** - 18:9
**lunch** - 2:21, 2:24,
3:1, 52:11

**M**

**machine** - 8:12
**mandate** - 12:7
**manner** - 43:15
**manufacturers** -
68:8, 68:10
**market** - 27:22,
58:16, 58:19, 59:2,
59:3, 63:21
**marketplace** - 16:5
**master** - 74:20,
75:16
**materially** - 9:13
**matter** - 26:4,
38:8, 45:20, 56:23,
57:2, 62:15, 64:10,
67:17, 68:12
**matters** - 52:11
**maximum** - 12:9
**mean** - 55:20,
66:6, 74:8
**meaningful** - 57:7,
57:16
**means** - 55:23,
59:23
**meantime** - 45:7,
74:22
**measure** - 66:10,
67:3
**mechanical** - 2:6
**mechanism** -
56:18
**meet** - 24:14,
65:24
**member** - 16:6,
26:23, 26:24
**members** - 15:17,
29:13
**memo** - 17:25,
62:21
**mention** - 25:20,
64:14
**mentioned** - 27:9,
50:4, 62:17
**merchant** - 4:16,
4:20, 5:4, 6:4, 6:7,
7:15, 7:19, 22:3,
22:5, 24:22, 24:24,
25:9, 25:13, 27:15,
28:21, 29:16, 29:17,
30:8, 30:11, 30:25,
32:9, 32:12, 32:13,
60:7, 64:6, 69:8
**merchant's** - 22:4,
30:16
**merchants** - 5:4,
5:13, 6:17, 6:20,
23:2, 24:17, 25:5,
26:25, 27:1, 29:14,
33:23, 34:1, 34:5,

35:19, 36:3, 46:24,
54:5, 59:3, 59:4,
59:5, 59:7, 60:2,
62:22, 63:9, 63:17,
63:22, 64:20, 67:15,
69:11, 69:19, 69:23,
70:1, 71:15, 73:3
**merchants'** - 71:9
**merit** - 54:15,
55:14
**met** - 74:24
**metaphor** - 62:17,
62:18
**middle** - 38:14
**might** - 20:19,
38:9, 38:11, 39:7,
39:9, 40:14, 41:11,
41:23, 43:12, 43:13,
45:16, 49:16, 56:14,
62:23, 64:17, 64:19,
64:22, 66:8, 67:17,
68:10, 76:16
**mike** - 13:10
**mind** - 17:6, 46:15,
72:13
**minimize** - 56:7
**minor** - 36:2
**minute** - 23:18,
49:24, 50:1
**minutes** - 3:18
**miss** - 53:13
**missing** - 32:20
**misspoke** - 19:18
**moment** - 29:25,
45:3, 60:24, 71:1,
76:18
**money** - 10:19,
22:2, 22:3, 22:4,
22:5, 22:19, 64:1,
65:15, 66:7
**monitor** - 74:23
**month** - 75:5
**months** - 23:24,
39:10
**moot** - 41:17,
46:1, 46:10
**morning** - 2:13,
2:16, 4:2, 11:9,
11:10, 21:17, 21:18,
66:20, 76:14
**most** - 52:1, 52:9,
53:8, 60:9
**motion** - 2:22, 3:1,
3:6, 4:5, 5:16,
13:14, 14:11, 14:12,
16:13, 17:14, 17:19,
18:4, 18:8, 19:4,
25:18, 33:18, 34:7,
34:13, 42:7, 42:8,
42:15, 48:10, 53:25,
54:7, 54:25, 55:6,
57:24, 59:23, 61:14,
62:1, 70:17, 71:22,
72:19
**motion-to-dismiss**
- 34:13
**motions** - 2:23,
3:11, 3:23, 3:24,
5:11, 11:13, 53:3,
53:4, 53:7, 53:10,
53:15, 55:13, 55:14,
55:16, 57:19, 71:25
**motive** - 36:21
**move** - 19:9, 26:3,
29:20, 29:22, 45:9
**moving** - 35:6,
35:14
**multiple** - 31:7

**must** - 10:13, 17:2,
26:5, 27:21, 28:5,
28:10, 28:16, 28:25,
61:16, 71:4

**N**

**name** - 42:3, 61:11
**named** - 23:7,
45:17, 47:4, 48:23
**narrow** - 49:5
**nature** - 65:25
**necessarily** - 6:10,
27:24
**necessary** - 2:18,
12:14, 61:7
**need** - 10:20,
16:21, 36:18, 53:9,
54:10, 55:7, 59:14,
71:25, 73:18, 74:5,
75:9, 76:18
**negotiate** - 33:23,
34:5, 54:23
**negotiating** - 35:1
**negotiation** -
66:16
**negotiations** -
32:9
**network** - 10:6,
10:17, 10:19, 10:21,
25:13, 34:5, 34:25,
58:17, 58:19, 59:2
**networks** - 20:1,
31:23
**never** - 8:17,
17:18, 46:7, 46:8,
46:13, 56:15
**nevertheless** -
8:20
**new** - 3:14, 17:11,
24:19, 24:21, 26:14,
48:9, 74:23, 77:1
**next** - 11:4, 20:11,
67:8, 67:19, 74:1,
76:3
**nice** - 76:25, 77:2
**nine** - 47:6, 49:21
**ninety** - 66:21
**ninety-five** - 66:21
**ninety-four** - 66:21
**nonco** - 22:25
**nonco-
conspirator** - 22:25
**nonconspirator**
- 23:2, 23:5
**nonconspirator** -
63:5
**none** - 11:1, 55:13,
57:12
**nonetheless** -
56:17
**nonharassing** -
56:16
**nonliability** -
42:11, 55:18
**note** - 16:14
**noted** - 39:21,
62:20
**nothing** - 27:13,
34:2, 34:24, 70:25,
71:20, 76:24
**notice** - 18:3,
70:17, 71:8, 72:11,
73:2, 73:13, 73:23
**notion** - 27:5
**notwithstanding** -
30:10
**number** - 5:10,

16:24, 17:2, 54:3,
56:22, 63:19, 72:9
**numerous** - 18:9
**nutshell** - 12:17

**O**

**o'clock** - 1:7,
52:13
**obligated** - 24:18
**obligation** - 32:24
**obligations** -
55:24
**obviously** - 12:14,
33:18, 60:4, 65:13
**occasion** - 26:1
**occasions** - 68:7
**occur** - 38:19,
41:24
**occurred** - 16:9
**old** - 76:25
**omnibus** - 13:14
**once** - 50:20, 67:4,
67:6
**one** - 3:14, 7:9,
8:2, 10:13, 11:8,
12:13, 12:20, 21:2,
21:6, 21:13, 24:13,
24:22, 27:2, 29:10,
29:15, 32:22, 33:24,
37:3, 42:14, 43:21,
46:22, 47:1, 47:4,
47:17, 48:22, 49:5,
50:25, 54:19, 54:23,
56:8, 62:8, 62:15,
63:6, 64:1, 64:11,
64:14, 65:10, 66:22,
66:23, 67:8, 67:9,
67:19, 67:20, 67:21,
68:6, 68:7, 68:15,
69:18, 70:20, 72:9,
72:16
**ones** - 18:14, 62:9,
62:24, 64:7, 65:2,
65:13, 65:14, 68:8,
69:20, 77:1
**ongoing** - 40:5,
40:11, 40:25, 41:4,
51:6, 51:20
**onset** - 50:13
**ooooooOoooooo**
- 77:4
**operates** - 69:6
**opinion** - 22:24,
25:11, 32:21, 47:16,
69:2, 70:3
**opportunity** -
3:12, 42:22, 73:4,
73:19
**opposed** - 32:25
**opposing** - 17:15,
40:19
**opposite** - 7:3,
8:10
**opposition** -
38:25, 45:12, 45:13,
60:13, 60:15
**opt** - 2:22, 3:6,
3:15, 35:25, 36:1,
42:7, 42:13, 42:21,
44:25, 48:24, 49:4,
49:6, 49:15, 49:17,
49:18, 50:13, 51:7,
53:3, 55:13, 60:4,
72:1, 72:7, 73:3,
73:4, 73:7, 73:11
**opt-in** - 72:1, 72:7
**opt-out** - 2:22, 3:6,

3:15, 35:25, 36:1,
42:7, 42:13, 42:21,
44:25, 49:4, 49:6,
49:15, 49:17, 49:18,
50:13, 51:7, 53:3,
55:13, 60:4, 73:4,
73:11
**opt-outs** - 48:24,
73:3, 73:7
**opted** - 45:3,
73:24
**optimistic** - 2:25
**option** - 34:1
**options** - 33:25
**oral** - 39:7, 39:9,
71:24
**orally** - 52:9, 70:23
**order** - 3:3, 13:5,
14:6, 48:18, 73:19
**original** - 48:11,
48:12
**otherwise** - 7:10,
28:9, 63:20
**ought** - 72:9,
73:22
**ourselves** - 72:14
**out-of-pocket** -
65:14
**outcome** - 41:12,
72:24
**outs** - 48:24, 73:3,
73:7
**outset** - 4:5
**outside** - 34:6
**overall** - 27:22
**overcharge** - 4:18,
4:19, 4:22, 5:8, 8:6,
60:16, 60:21, 70:7,
70:8
**overcharged** -
8:11
**overlap** - 54:3
**overly** - 2:25
**owed** - 22:3
**own** - 42:25, 63:17
**ownership** - 29:6
**ox** - 69:20

**P**

**package** - 25:12
**page** - 25:10,
54:24, 55:3, 60:14,
65:3
**pages** - 40:18,
68:15
**paid** - 5:13, 8:11,
16:15, 25:8, 25:9,
31:9, 31:10, 31:12,
32:1, 54:5, 60:17,
60:18, 60:20, 60:21,
62:9, 62:10, 62:24,
62:25, 63:4, 64:1,
64:2, 66:1, 67:5
**papers** - 11:12,
13:21, 58:1
**paragraph** - 42:13,
58:21
**paragraphs** -
18:14
**parameters** -
19:17
**parenthetically** -
13:16
**part** - 3:9, 24:3,
27:11, 31:1, 31:2,
53:4, 53:18, 57:11,
60:9, 64:25, 66:10,
66:24

**participate** - 49:11, 49:16, 66:14
**particular** - 14:4, 65:22
**particularly** - 13:6, 32:3
**parties** - 14:13, 35:23, 40:6, 40:11, 41:1, 41:4, 41:23, 47:8, 50:16, 51:6, 57:5
**party** - 11:24, 23:3, 23:5, 27:13, 44:6, 56:1, 56:2, 72:1, 74:11
**pass** - 4:20, 9:1, 30:18, 31:13, 31:21, 32:2, 32:11, 60:14, 73:25
**pass-through** - 4:20, 30:18, 31:13, 31:21, 32:2, 60:14
**passage** - 47:13, 47:17
**passed** - 5:3, 7:20, 31:2, 31:17, 32:8, 32:14, 68:2
**passes** - 4:15
**passing** - 32:6
**past** - 3:13, 35:18, 37:13, 40:4, 40:17, 40:24, 42:11, 42:19, 43:5, 43:24, 47:9, 47:11, 47:14, 47:21, 48:10, 50:10, 51:19, 51:24, 55:18, 55:19, 75:5
**pattern** - 44:2
**pay** - 5:1, 6:21, 7:23, 8:1, 8:12, 18:14, 21:25, 41:11, 58:18, 59:6, 59:8, 59:9, 59:13, 59:25, 61:4, 62:25, 64:3, 64:7, 65:14, 65:15, 66:9, 70:9, 76:18
**paying** - 7:21, 30:17, 63:11, 64:8, 65:11, 68:25
**payment** - 7:15, 22:5, 60:17, 75:24
**payor** - 4:17, 4:19, 5:7, 30:9, 30:11, 62:8, 63:5, 64:11, 69:17
**payors** - 62:24, 69:17, 69:20, 70:5
**pays** - 4:14, 6:1, 6:7, 6:19, 7:19, 22:12, 22:19, 23:15, 24:22, 24:24, 30:12, 65:10, 67:24, 69:18
**people** - 21:10, 49:20, 52:3, 68:25, 70:9, 73:3
**per** - 16:2
**percent** - 23:1, 65:7, 65:9
**percentage** - 65:6, 66:11
**percentages** - 32:14
**perfect** - 10:16
**performed** - 55:5
**perhaps** - 74:19
**period** - 15:20, 39:6, 42:14, 42:15, 43:5, 46:3, 46:18,

51:21
**permit** - 40:2, 71:11
**permitted** - 37:13, 40:23
**person** - 62:8, 65:10, 69:18
**personal** - 70:21
**perspective** - 64:15, 64:22, 64:23, 65:12
**persuasive** - 34:8
**pharmaceutical** - 31:5
**pick** - 45:6
**piecemeal** - 40:15, 50:7, 50:11, 50:15
**place** - 26:15, 32:25, 33:4, 43:6, 71:10
**plain** - 14:21, 65:13
**plaintiff** - 22:12, 22:19, 23:15, 30:24, 31:9, 31:10, 31:12, 36:19, 45:4, 46:6, 51:21, 51:22, 66:21
**plaintiff's** - 5:11
**plaintiffs** - 3:21, 4:8, 5:10, 6:2, 9:19, 10:25, 12:20, 13:17, 14:1, 24:15, 29:11, 32:20, 35:1, 35:16, 35:25, 36:1, 37:12, 40:13, 41:9, 41:22, 45:18, 47:4, 48:8, 48:13, 48:23, 49:6, 49:8, 49:11, 49:15, 49:17, 49:19, 50:8, 50:18, 51:5, 51:12, 54:4, 54:23, 56:19, 57:12, 57:14, 57:15, 58:4, 58:15, 58:17, 59:8, 60:5, 60:22, 61:12, 61:13, 72:8, 72:10, 76:10
**plaintiffs'** - 4:12, 8:1, 33:20, 53:21, 55:3, 55:11, 59:13, 59:24, 66:11
**plan** - 27:6, 27:7, 39:14
**plausible** - 17:22, 18:23, 30:8, 59:13
**plausibly** - 53:23
**plead** - 6:16, 6:20
**pleaded** - 53:6
**pleading** - 6:19, 34:22
**pleadings** - 6:7
**pleasure** - 4:3, 17:12
**plus** - 12:13, 65:9
**pocket** - 64:1, 65:14, 66:3
**point** - 5:19, 6:14, 9:25, 12:4, 12:20, 30:14, 32:19, 41:19, 41:20, 42:16, 49:2, 49:21, 54:7, 54:11, 61:1, 65:23, 71:17
**points** - 11:19, 12:13, 14:19, 34:9, 47:10, 50:2
**portion** - 4:15
**pose** - 17:4
**position** - 14:12, 14:16, 16:11, 19:15,

45:12, 72:22, 73:12
**possibly** - 18:16
**post** - 14:22, 21:21, 26:3, 26:21, 28:21, 33:5, 74:13
**post-2003** - 14:17, 15:11, 55:7
**post-IPO** - 21:21, 26:3, 26:21, 28:21, 33:5
**post-hearing** - 74:13
**postponed** - 74:17
**posture** - 53:5
**potential** - 35:18, 56:12
**powerful** - 32:12, 32:13
**practically** - 66:16
**pre** - 27:25, 33:4
**pre-2004** - 16:14
**pre-IPO** - 27:25, 33:4
**precisely** - 24:11
**precludes** - 12:15, 54:6
**prehearing** - 45:2
**prejudice** - 41:9, 41:14, 41:15, 41:21, 49:7, 49:19, 51:3, 51:4, 51:11, 57:15, 57:16
**prejudiced** - 40:14, 49:12, 50:9
**preliminary** - 74:25
**premature** - 54:24
**prepared** - 13:5, 13:10
**present** - 57:22
**presentation** - 3:20, 4:9, 13:7
**presentations** - 3:22
**presumed** - 68:17
**pretty** - 12:1, 36:17, 58:1, 71:16, 71:17
**prevented** - 28:13, 35:1
**previously** - 14:20, 50:21
**price** - 23:15, 24:16, 25:6, 31:9, 31:10, 32:1, 59:6, 59:10, 59:22, 60:16, 60:19, 60:21, 63:2, 63:11, 63:12, 64:12, 65:5, 66:1, 66:18, 68:18
**price-fixed** - 23:15, 24:16, 25:6
**price-fixing** - 63:2
**prices** - 63:3, 64:20, 68:20, 68:21
**principle** - 56:17
**principles** - 34:15, 34:17
**problem** - 7:25, 8:4, 30:19, 31:16, 32:2, 76:11
**problems** - 31:12
**procedural** - 35:21, 53:5
**procedure** - 72:1, 73:12
**proceed** - 52:11, 57:1

**proceeding** - 50:5
**proceeds** - 57:17
**process** - 50:24, 75:25
**produce** - 43:12
**produced** - 2:6
**product** - 5:2, 64:25
**products** - 64:21
**profits** - 70:2
**prohibits** - 27:3
**promote** - 9:9, 9:10, 33:7
**prongs** - 9:3
**proof** - 18:21
**proper** - 37:6
**properly** - 16:14, 57:14, 69:2
**proponents** - 15:9
**proportional** - 12:12
**proposal** - 72:23, 74:5
**proposed** - 73:23
**proposition** - 45:23
**prospect** - 36:12, 36:14, 40:14
**prospectively** - 42:18
**prove** - 9:19, 18:19, 42:24
**proved** - 42:25
**provide** - 34:4, 59:3, 75:15, 75:20
**provided** - 16:6
**provider** - 32:1
**providers** - 31:24
**published** - 5:25, 12:8, 65:5, 66:12
**purchase** - 59:5, 59:22, 65:7
**purchased** - 60:17
**purchaser** - 18:7, 22:14, 23:4, 23:5, 24:3, 69:10, 69:12
**purchasers** - 61:5, 69:15
**purchasers'** - 48:18
**purchases** - 58:17, 59:9
**purely** - 43:10
**purpose** - 28:6, 28:8, 28:14, 39:21, 40:1, 43:19, 44:12, 68:23, 68:24
**purposes** - 37:3
**pursuant** - 11:17, 12:2, 12:7, 27:16
**pursue** - 67:17, 72:9
**put** - 6:23, 15:15, 25:24, 36:24, 37:4, 65:2, 72:18

**Q**

**quarrel** - 6:9
**questions** - 17:4, 17:15, 19:9, 21:14, 29:23, 70:14, 72:16
**quick** - 38:11, 38:15
**quite** - 4:5, 14:13, 14:14, 75:22
**quote** - 6:2, 16:4, 34:23, 38:17, 58:20

**quoted** - 15:6, 16:25, 17:1, 17:11, 58:24
**quoting** - 12:11

**R**

**raise** - 64:20
**raised** - 10:25, 12:20, 17:15, 50:21, 64:15
**rate** - 3:15, 11:8, 11:18, 11:22, 11:23, 12:1, 12:5, 12:8, 12:13, 12:15, 12:16, 13:11, 17:16, 19:9, 19:18, 19:19, 19:24, 20:3, 20:7, 23:15, 24:17, 24:22, 24:23, 24:24, 25:4, 25:6, 25:7, 30:9, 30:11, 33:24, 55:9, 62:5, 63:4, 67:18
**rates** - 9:21, 15:24
**rather** - 9:10, 33:8, 37:4
**reach** - 73:14
**reached** - 9:12, 9:14, 9:16, 55:25, 66:4
**read** - 3:12, 22:23
**ready** - 2:12
**real** - 41:14, 50:6, 51:4
**realistic** - 21:1, 21:2, 21:10
**realistically** - 20:22
**reality** - 7:19, 20:3, 47:3, 59:16
**really** - 9:3, 12:17, 27:12, 35:3, 35:17, 35:20, 38:3, 38:22, 39:10, 39:15, 41:22, 53:14, 60:2, 61:25, 65:21, 71:13, 72:13, 73:13
**rearrange** - 14:5
**reason** - 22:11, 47:25, 55:1, 67:23, 75:13
**reasonable** - 12:4, 12:9, 12:12, 59:14
**reasoning** - 9:23, 19:5
**reasons** - 14:12, 26:7, 36:5, 55:10
**rebut** - 34:2, 70:25
**rebuttal** - 30:4, 41:25, 49:24, 61:7
**receive** - 28:10, 28:15
**received** - 28:12
**recess** - 52:14
**reciprocate** - 29:19
**recite** - 7:3, 40:18
**recognized** - 8:17, 8:18, 30:20, 30:21
**recommend** - 72:14
**reconstruction** - 44:8
**record** - 16:23
**recorded** - 2:6
**recover** - 4:18, 60:6, 63:22
**recovery** - 67:9

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

# A4923

11

**red** - 39:11
**reduction** - 15:24
**refer** - 10:23, 34:18
**reference** - 51:17
**references** - 59:19
**referred** - 31:6, 63:14, 75:17
**reflected** - 15:6
**regard** - 3:2, 26:8, 54:1, 54:2, 57:19, 73:20
**regarding** - 3:24, 6:15, 6:16, 72:1, 72:2, 76:2
**regional** - 31:23
**regularly** - 40:21
**rehashing** - 15:14
**reincorporate** - 26:18
**reincorporated** - 26:14
**reiterated** - 26:14
**reject** - 53:8
**rejected** - 14:18, 23:17, 45:23
**related** - 14:23, 15:11, 15:18, 16:8
**relating** - 15:1
**relationship** - 6:17, 15:7, 40:5, 40:11, 40:25, 41:4
**release** - 3:13, 13:9, 14:9, 14:16, 14:21, 14:24, 14:25, 15:4, 15:10, 16:15, 16:16, 41:3, 55:2, 55:4
**releases'** - 15:7
**relevant** - 58:15, 71:10
**reliances** - 60:14
**relied** - 23:11
**relief** - 3:24, 7:9, 12:25, 36:11, 36:19, 46:19, 46:23, 56:2
**relieving** - 56:12
**relying** - 8:15
**remainder** - 64:5
**remaining** - 41:25
**remand** - 44:14
**remedies** - 50:8
**remedy** - 43:20, 55:23, 56:1, 56:6
**remote** - 60:12, 64:23
**repealer** - 68:3
**repeat** - 34:21
**repeatedly** - 5:21
**reply** - 17:25, 39:5
**report** - 73:23, 75:19, 76:4
**representation** - 45:24, 46:9, 62:19
**representations** - 18:18
**representatives** - 52:2
**represented** - 18:21
**representing** - 49:10
**request** - 71:8, 73:10
**requests** - 74:25
**required** - 33:24, 64:20, 75:5
**requirement** - 53:5

**requires** - 20:1, 32:7
**rescind** - 15:21
**rescinded** - 16:2
**reserve** - 4:7, 41:25, 61:6
**reset** - 12:15
**resolve** - 57:5
**resolved** - 53:25
**respect** - 8:22, 18:6, 32:7, 32:15, 32:18, 33:17, 50:3, 50:15, 51:3, 53:20
**respectfully** - 4:10, 8:23, 31:19, 32:19, 62:20
**respective** - 9:2
**respond** - 3:21, 4:7, 5:9, 5:14, 5:15, 13:24, 34:9
**response** - 28:23, 44:1
**rest** - 15:7
**restraints** - 53:23
**restrictions** - 70:1
**result** - 9:12, 9:14, 9:16, 25:25, 30:23, 60:19, 68:19, 68:21, 69:25
**resurrected** - 41:18
**retailers** - 45:19, 56:20
**retains** - 59:22
**retroactive** - 40:10
**retrospective** - 43:10
**returned** - 5:2
**revealed** - 51:4, 66:15
**revealing** - 51:4
**reverses** - 47:2
**reversing** - 41:16
**revisited** - 53:9
**rewrite** - 16:10
**rights** - 31:23, 33:23, 40:10, 40:14, 43:21, 44:4, 44:9, 55:24
**risk** - 67:8
**road** - 36:12
**rule** - 22:12, 22:14, 22:17, 23:14, 24:1, 24:5, 24:7, 25:23, 26:1, 26:13, 32:7, 33:19, 33:22, 52:9, 54:20, 58:21, 58:24
**ruled** - 37:24
**rules** - 4:13, 5:19, 5:20, 5:21, 5:22, 5:23, 6:4, 6:15, 6:16, 9:1, 9:22, 10:1, 10:2, 10:5, 10:13, 10:17, 10:19, 10:21, 15:19, 15:22, 16:1, 16:17, 21:1, 21:13, 26:13, 26:17, 26:19, 26:25, 27:1, 27:12, 27:15, 28:19, 28:21, 29:7, 29:13, 32:5, 32:25, 33:4, 33:5, 33:25, 34:3, 34:25, 54:20, 58:7
**ruling** - 31:18, 51:22
**rulings** - 6:3, 33:19, 75:8, 75:14
**run** - 20:18

**running** - 9:8
**runs** - 8:10, 33:9

---

## S

**safe** - 38:15
**sale** - 29:4
**satellite** - 31:24
**scattered** - 59:18
**schedule** - 38:24, 75:9
**scheme** - 28:11, 28:14, 28:17, 28:18
**scope** - 15:4, 43:7
**seat** - 2:13
**seated** - 53:2
**second** - 23:21, 34:1, 52:2, 71:10
**secondly** - 23:19, 31:20
**section** - 43:18, 56:5
**securities** - 46:6, 46:14
**see** - 11:7, 11:11, 20:13, 20:14, 38:18, 38:19, 38:20, 52:13, 56:10, 57:7, 57:12, 57:14, 64:22, 67:2, 74:5, 76:7, 76:12, 76:25, 77:1
**seek** - 7:9, 12:25, 37:2, 37:4, 46:19, 56:1
**seeking** - 35:21, 36:11, 47:6, 47:7, 60:5
**seeks** - 36:19, 42:11, 55:17
**seem** - 67:11
**seemingly** - 69:25
**self** - 29:15
**self-interest** - 29:15
**sense** - 10:11, 10:15, 10:16, 41:22, 49:3, 49:4, 73:24
**sent** - 74:23, 74:24
**separate** - 25:6, 25:12, 67:15
**separately** - 25:4, 25:8, 62:4
**series** - 16:24, 27:18, 27:21, 43:18, 48:5, 53:13
**serious** - 48:19
**serve** - 73:13
**served** - 44:12
**service** - 64:25
**services** - 24:25, 34:5, 58:18, 58:19, 59:2, 59:3, 59:4, 60:17, 60:20, 60:21, 64:21
**set** - 8:25, 9:21, 11:23, 12:1, 12:9, 12:11, 12:12, 13:21, 16:3, 19:15, 47:16, 55:10, 58:23, 59:6, 73:21
**setting** - 11:2, 16:23, 43:13, 49:19, 58:2
**settings** - 43:11
**settled** - 41:5, 60:3
**settlement** - 3:3, 3:13, 14:15, 14:21, 14:22, 14:24, 15:8,

15:9, 15:14, 15:16, 15:17, 15:23, 16:2, 25:3, 41:2, 46:20, 46:22, 48:12, 58:8, 71:9, 71:15
**seven** - 73:5, 73:6
**seventeen** - 18:13
**several** - 36:5, 47:10
**shared** - 72:11
**shareholders** - 9:8, 33:2
**shopping** - 47:25, 48:15, 48:19
**short** - 9:5
**shortly** - 42:7
**show** - 18:17, 40:19, 61:18
**shown** - 67:5, 67:6
**shows** - 14:22, 18:21, 30:14, 39:15
**side** - 40:7, 41:14
**sides** - 2:12, 2:23, 37:8, 39:19, 40:22
**signed** - 26:22, 26:23, 26:24, 27:2, 27:5, 27:6, 27:16, 27:17, 28:19
**significant** - 15:24, 52:1
**significantly** - 75:6
**silly** - 27:6
**similar** - 4:23, 8:21, 46:11
**simple** - 14:10, 19:16, 22:11, 28:4
**simply** - 5:16, 6:2, 6:20, 8:2, 18:1, 22:18, 31:22, 40:16, 41:8, 41:21, 44:25, 49:3, 49:19, 71:7
**single** - 27:1
**situation** - 11:25, 31:14, 43:4, 62:22, 64:19, 69:24
**six** - 39:10, 65:24
**skate** - 24:7
**slice** - 7:10
**slip** - 25:11
**sliver** - 19:11
**slowed** - 75:3
**small** - 12:23
**smallest** - 19:11
**snatch** - 45:14
**so-called** - 12:22, 67:18, 68:2
**society** - 63:20
**software** - 66:24
**sold** - 26:5, 28:1, 28:24, 29:5
**solely** - 7:9, 40:17, 43:11
**solution** - 35:2
**someone** - 10:10
**sometimes** - 32:8, 51:18, 68:6, 69:17, 69:24
**somewhere** - 73:6
**sorry** - 47:15
**sort** - 6:23, 10:14, 56:16, 73:17
**sought** - 40:9, 43:9, 43:14
**sounds** - 14:7
**spare** - 53:16
**speaking** - 16:12
**special** - 74:19,

75:16
**specific** - 18:10, 19:3, 22:20, 25:7, 26:15, 65:3
**specifically** - 20:8, 21:24, 22:1, 22:13, 23:9, 23:24, 24:15, 25:2, 25:22, 26:9, 26:11, 26:16, 26:20, 28:7, 28:18, 29:12, 33:18
**specifics** - 18:8
**speculative** - 66:10, 67:5
**spelled** - 71:17
**split** - 3:10
**spoken** - 75:25
**sports** - 31:22, 31:23
**spot** - 38:16
**squarely** - 14:17, 56:4
**stage** - 5:12, 34:13, 34:15, 34:22, 54:9, 54:15, 55:25
**stake** - 44:17
**stand** - 3:17, 7:4, 7:13, 26:7, 29:11, 74:6
**standard** - 13:12, 17:14, 17:19, 17:21, 17:22, 18:5, 19:5, 19:9
**standards** - 53:17
**standing** - 24:3, 58:4, 58:13, 60:23, 65:20, 73:17
**stark** - 16:11
**starkly** - 14:13
**start** - 58:14
**starts** - 65:6
**state** - 37:18, 40:12, 46:8, 50:4, 72:13
**statements** - 15:8, 62:15
**states** - 14:25, 56:5, 68:1
**status** - 3:2, 73:1, 74:1, 76:3
**statute** - 12:7, 20:5, 20:8, 37:3, 38:15
**statutes** - 68:3
**statutory** - 20:4
**stay** - 35:14, 36:5, 41:7, 41:13, 48:18, 49:3, 49:5, 49:8, 49:9, 49:12, 51:5, 51:10, 57:18, 75:12
**stenography** - 2:6
**steps** - 28:5, 28:7
**still** - 41:10, 42:9, 44:3, 51:19, 74:13, 75:2
**stock** - 26:5, 28:1, 28:25, 29:4, 29:5, 29:6, 40:10
**stop** - 17:3
**stream** - 63:16
**strict** - 68:5
**strikes** - 2:15
**strokes** - 38:1
**strong** - 61:3
**strongest** - 44:21
**struck** - 14:14
**structural** - 8:24, 9:18, 36:11, 46:19,

46:23
**structure** - 73:22
**structured** - 13:7
**stuff** - 71:14
**subject** - 16:4,
45:20, 56:23, 57:1,
60:7
**submission** -
76:15
**submit** - 4:11,
8:13, 8:23, 62:21
**submitted** - 46:12
**submitting** - 62:2
**subsequently** -
65:8
**substantial** -
46:25, 70:3
**substantially** -
70:3
**sue** - 16:7, 23:4,
23:6, 37:17, 38:2,
38:21, 41:20, 46:17,
46:18, 46:19, 51:8,
56:2, 67:24, 68:8,
68:12
**sued** - 52:3, 61:20
**suffer** - 41:10
**suffered** - 60:8
**sufficient** - 10:6,
19:4, 37:9, 45:25,
54:8, 61:18, 75:25
**sufficiently** -
34:24
**suggest** - 7:1,
67:15, 74:8
**suggested** - 62:13
**suggestion** -
34:10
**suggests** - 34:14
**suing** - 37:19,
37:23, 51:9, 68:9
**suit** - 24:6, 38:9,
56:14
**suits** - 60:7
**summary** - 35:22
**summer** - 15:20
**super** - 54:22,
63:3, 63:11
**super-competitive**
- 54:22, 63:3, 63:11
**supercompetitive**
- 28:12
**support** - 11:1,
28:25, 55:12, 57:23
**suppose** - 43:1,
70:25, 73:10
**supposed** - 27:10
**surcharge** - 29:17,
29:20
**surcharges** - 19:2
**surreply** - 68:13
**survive** - 19:4
**sweet** - 38:16
**system** - 7:3, 34:6,
58:23, 58:24, 66:22

**T**

**table** - 52:12
**tacit** - 29:12
**tactical** - 36:21,
47:6
**tar** - 13:15
**target** - 5:11, 54:4,
55:11
**targeted** - 33:18
**tax** - 62:16, 62:19,
69:2

**taxation** - 62:18
**technically** - 11:22
**temporal** - 15:5,
38:1
**ten** - 12:23, 65:7,
65:9, 75:5
**terminology** -
53:18
**terms** - 32:13,
61:24, 63:17, 63:25,
64:1, 73:24
**test** - 24:14
**text** - 14:21
**themselves** -
60:10
**theory** - 60:14
**therefore** - 8:15,
60:15, 60:22, 61:5,
68:18
**they've** - 56:21
**thinking** - 32:4
**third** - 11:23,
66:10, 72:1, 74:11,
75:1
**third-party** - 72:1,
74:11
**thirteen** - 40:18
**thousand** - 73:6
**thousands** -
27:17, 27:18
**threat** - 37:14,
37:16, 38:2, 38:7,
38:22, 39:15, 56:13
**threatened** -
48:10, 56:9
**three** - 3:18, 4:21,
8:13, 16:15, 26:7,
35:19, 36:3, 45:18,
74:23, 75:9
**throughout** -
18:20, 59:18
**tie** - 15:19
**tie-in** - 15:19
**tip** - 2:18
**today** - 7:13,
16:10, 18:22, 34:20,
52:12, 53:9, 76:19
**together** - 18:10,
49:16
**took** - 26:15, 28:7,
28:17, 50:23, 64:17,
66:4
**topic** - 23:10
**tort** - 45:5
**total** - 25:12
**totally** - 41:18
**tough** - 74:6
**toughest** - 72:17
**trade** - 35:18, 36:3,
45:18, 56:20
**transaction** - 50:5,
59:9
**transactions** -
37:19, 59:12, 59:17,
59:19, 60:6
**transcript** - 2:6
**transfer** - 48:18,
59:1, 59:20
**treatise** - 55:22,
56:5
**treble** - 24:4
**treble-damage** -
24:4
**trial** - 20:16, 34:12,
44:18, 45:6
**true** - 5:18, 6:11,
7:17, 7:24, 18:19,
18:21, 18:24, 22:18,

24:18, 31:11, 31:19,
32:6, 53:6, 54:2,
54:7, 55:20, 56:25,
58:14, 61:17, 64:9
**trust** - 58:4
**truth** - 35:15, 36:6
**try** - 8:16, 17:24,
18:2, 21:6, 42:24,
57:24
**trying** - 16:10,
31:16, 44:7, 67:1,
67:13, 76:11
**turn** - 13:9, 17:7
**turned** - 34:11
**twelve** - 40:18,
44:24
**twenty** - 12:13,
58:9, 68:1
**twenty-four** - 68:1
**twenty-one** -
12:13
**two** - 8:15, 8:17,
8:18, 8:20, 9:3,
11:19, 14:12, 17:25,
20:1, 21:20, 23:10,
23:13, 34:9, 48:22,
50:23, 51:25, 65:8,
68:15, 72:10
**type** - 63:2
**typical** - 39:9

**U**

**ulterior** - 36:21
**ultimately** - 18:17,
20:3
**unambiguous** -
14:21
**unanswered** -
48:25
**uncertainty** -
41:11, 41:12
**under** - 4:11, 5:6,
5:14, 5:15, 8:21,
10:3, 10:8, 19:22,
36:16, 59:12, 61:6,
67:7, 70:1, 71:22
**understood** - 45:3
**undertaken** -
26:11, 72:10
**unequivocally** -
37:22
**unfair** - 47:6,
69:25
**unfolded** - 50:19
**unilateral** - 10:12,
10:14
**unilaterally** -
10:11, 10:17
**unlawful** - 26:17,
27:18
**unless** - 4:9, 19:8,
21:7, 21:14, 29:18,
29:23, 46:3
**unlike** - 44:11
**unnecessary** -
56:8
**unquote** - 16:5
**unreasonable** -
68:17
**untrue** - 24:11
**up** - 2:16, 3:3,
3:17, 5:22, 7:4,
7:13, 8:15, 9:23,
11:4, 24:19, 24:21,
25:1, 25:16, 27:12,
30:15, 38:24, 39:13,
64:4, 66:23, 72:2

**update** - 3:2
**urge** - 41:7

**V**

**validate** - 75:23
**valuation** - 70:1
**value** - 70:6
**values** - 63:10
**various** - 13:13
**vary** - 45:5
**verbatim** - 58:25
**vernacular** - 53:18
**vertical** - 27:19
**victim** - 24:6, 63:6
**victims** - 48:19,
62:24
**victory** - 45:15
**view** - 2:17, 56:17,
62:23, 64:18, 64:19,
64:22, 64:23, 69:7
**viewed** - 54:20
**violated** - 46:6
**violating** - 33:6
**violation** - 53:24,
62:1, 62:2
**violations** - 37:18,
58:10
**volume** - 19:13
**vs** - 42:16

**W**

**wagon** - 18:2
**wait** - 11:7, 36:18,
37:4, 50:12
**waiting** - 38:25,
39:4, 56:10
**walk** - 5:21, 31:15
**wants** - 13:22,
57:19, 76:22
**warrant** - 48:17
**waste** - 41:23
**ways** - 53:14
**weary** - 27:21
**weekend** - 77:2
**weeks** - 38:8
**weight** - 43:6
**well-known** - 28:3
**well-pleaded** -
53:6
**whatsoever** - 26:1
**whit** - 24:13
**whole** - 18:20
**windfall** - 67:23
**wisdom** - 72:24
**withdraw** - 29:4,
53:22
**withdrawal** - 28:3,
28:22, 29:9
**withdrew** - 27:25
**wonder** - 7:7
**wonderful** - 53:12
**wondering** - 63:13
**wonders** - 7:9
**words** - 7:22,
16:17, 22:3, 33:13
**works** - 7:3, 64:6
**world** - 19:23
**worried** - 31:13
**writing** - 74:9
**written** - 9:4,
26:22, 27:5, 27:7,
27:16, 27:17, 76:15
**wrongdoers** - 24:6

**Y**

**years** - 6:8, 37:4,
47:6, 49:21, 50:23,
56:22, 65:8