# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),
13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON),
14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON),
14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON),
14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),
14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON)
14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON),
14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON),
14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

*On Appeal from the United States District Court
for the Eastern District of New York*

## JOINT DEFERRED APPENDIX
## VOLUME XXI OF XXII
### Pages A4925 to A5103

*Submitted on Behalf of All Parties*

# **Table of Contents**

**Page**

**Volume I**

District Court Docket Entries ................................................................... A1

**Volume II**

District Court Docket Entries (cont'd) ................................................. A251

**Volume III**

District Court Docket Entries (cont'd) ................................................. A501

**Volume IV**

District Court Docket Entries (cont'd) ................................................. A751

Transfer Order, dated October 20, 2005 [Docket No. 2] ...................... A822

Excerpts of First Consolidated Amended Class Action Complaint,
    dated April 24, 2006 [Docket No. 317] .......................................... A825

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
    Antitrust Litigation*, CV-96-5238, dated July 21, 2006
    [Docket No. 455-4] ........................................................................ A844

Excerpts of Settlement Agreement - *In re Visa Check/MasterMoney
    Antitrust Litigation*, CV-96-5238,
    dated July 21, 2006 [Docket No. 455-5] ........................................ A850

Excerpts of First Amended Supplemental Class Action Complaint
    (redacted), dated February 20, 2009 [Docket No. 1152] ................ A856

Excerpts of Second Consolidated Amended Class Action
    Complaint (redacted), dated February 20, 2009
    [Docket No. 1153] ......................................................................... A858

i

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Second Supplemental Class Action Complaint
(redacted), dated February 20, 2009 [Docket No. 1154]............... A908

Excerpts of Memorandum of Law in Support of Class
Plaintiffs' Motion for Class Certification (redacted),
dated May 8, 2008 [Docket No. 1165] ........................................... A921

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Second Consolidated
Amended Class Action Complaint, dated June 2, 2009
[Docket No. 1226] ......................................................... A929

Excerpts of Class Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1533].................. A932

Excerpts of Individual Plaintiffs' Statement of Material Undisputed
Facts (redacted), dated October 21, 2011 [Docket No. 1536] ........ A935

Excerpts of Class Plaintiffs' Memorandum of Law in Support of
Their Motion for Summary Judgment (redacted), ated October
21, 2011 [Docket No. 1538] ........................................... A941

Excerpts of Class Plaintiffs' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 (redacted),
dated December 21, 2011 [Docket No. 1543] ................................ A945

## **Volume V**

Excerpts of Class Plaintiffs' Counterstatement of Facts in Response
to Defendants' Rule 56.1 Statement of Facts (Unannotated)
(redacted), dated October 21, 2011 [Docket No. 1545]................. A1011

# **Table of Contents**
## **(continued)**

**Page**

Excerpts of Defendants' Counter-Statement in Opposition to Class
Plaintiffs' Statement of Undisputed Facts, Pursuant to Local
Rule 56.1(b) (redacted), dated October 21, 2011
[Docket No. 1550] ........................................................................ A1014

Excerpts of Network Defendants' Memorandum in Opposition to
the Individual Plaintiffs' Motion for Summary Judgment
(redacted), dated October 21, 2011 [Docket No. 1551]................. A1030

Excerpts of European Commission Notification Pursuant to Article
254 of the EC Treaty (redacted), dated November 23, 2011
[Docket No. 1573-3] ....................................................................... A1032

Notice of Filing of Memorandum of Understanding,
dated July 13, 2012 [Docket No. 1587] ......................................... A1042

Memorandum of Understanding, dated July 13, 2012
[Docket No. 1588] .......................................................................... A1043

Excerpts of Class Settlement Agreement, dated July 13, 2012
[Docket No. 1588-1] ....................................................................... A1061

Letter from Robert Vizas to Jeffrey I. Shinder,
dated August 21, 2012 [Docket No. 1616-3]................................. A1074

Notice of Class Plaintiffs' Motion for Class Settlement Preliminary
Approval, dated October 19, 2012 [Docket No. 1656].................. A1086

Excerpts of Appendices to Definitive Class Settlement
Agreement, dated October 19, 2012 [Docket No. 1656-1]............. A1088

Excerpts of Transcript of Civil Cause for Oral Argument Before the
Honorable John Gleeson, US District Judge,
dated November 9, 2012 [Docket No. 1732]................................. A1096

# **Table of Contents**
## (continued)

**Page**

Excerpts of Revised Appendix F2: Notice of Class Action
    Settlement Authorized by the U.S. District Court, Eastern
    District of New York, dated November 26, 2012
    [Docket No. 1740-2] .................................................................... A1098

Class Settlement Preliminary Approval Order,
    dated November 27, 2012 [Docket No. 1745] .............................. A1100

Excerpts of Individual Plaintiffs' Opposition to Objecting
    Plaintiffs' Motion to Stay Class Settlement Preliminary
    Approval Order, dated November 29, 2012 [Docket No. 1751] ... A1111

Letter from Class Counsel to Judge Orenstein,
    dated December 10, 2012 [Docket No. 1760] .............................. A1114

Excerpts of Defendants' Memorandum in Support of Final
    Approval of Definitive Class Settlement Agreement,
    dated April 11, 2013 [Docket No. 2110] ...................................... A1118

Excerpts of Memorandum in Support of Class Plaintiffs'  Motion
    for Final Approval of Settlement, dated April 11, 2013
    [Docket No. 2111-1] ...................................................................... A1120

Declaration of the Honorable Edward A. Infante (Ret.) in Support
    of Class Plaintiffs' Motion for Final Approval of Settlement,
    dated April 11, 2013 [Docket No. 2111-2].................................... A1131

Declaration of Eric D. Green, dated April 11, 2013
    [Docket No. 2111-3] ...................................................................... A1137

Declaration of Alan S. Frankel, Ph.D. Relating to the Proposed
    Class Settlement, dated April 11, 2013 [Docket No. 2111-5] ....... A1145

Excerpts of Declaration of Nicole F. J. Hamann on Class
    Administrator's Implementation of Settlement Notice Plan,
    dated April 11, 2013 [Docket No. 2111-6].................................... A1200

iv

**Table of Contents**
**(continued)**

**Page**

Excerpts of Declaration of Cameron R. Azari, Esq. on
    Implementation and Adequacy of Settlement Notice Program,
    dated April 11, 2013 [Docket No. 2113-7].....................................  A1215

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
    Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5] ........  A1238

**Volume VI**

Declaration of Professor Charles Silver Concerning the
    Reasonableness of Class Counsel's Request for an Award of
    Attorneys' Fees, dated April 11, 2013 [Docket No. 2113-5]
    (Cont'd)...........................................................................................  A1251

Declaration of K. Craig Wildfang, Esq. in Support of Class
    Plaintiffs' Motion for Final Approval of Settlement and Class
    Plaintiffs' Joint Motion for Award of Attorneys' Fees,
    Expenses and Class Plaintiffs' Awards,
    dated April 11, 2013 [Docket No. 2113-6]....................................  A1296

Excerpts of Objection of City of Oakland to Final Approval of
    Proposed Settlement, dated May 15, 2013 [Docket No. 2279] .....  A1434

Retailers and Merchants' Objection to Final Approval of the Class
    Action Definitive Settlement Agreement, dated May 15, 2013
    [Docket No. 2281] ........................................................................  A1437

Objection of U.S. Public Interest Research Group to Final
    Approval of Proposed Class Settlement, dated May 23, 2013
    [Docket No. 2361] ........................................................................  A1470

Excerpts of Statement of Objections by Jo-Ann Stores, Inc.,
    dated May 23, 2013 [Docket No. 2364] ........................................  A1476

Statement of Objections of B & H Foto Electronics Corp.,
    d/b/a B & H Photo, dated May 22, 2013 [Docket No. 2408] ........  A1480

**Table of Contents**
**(continued)**

**Page**

Excerpts of Statement of Objections by Boscov's,
dated May 24, 2013 [Docket No. 2411] ........................................ A1483

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] ........................................................................ A1486

**Volume VII**

Retailers and Merchants' Objection to Final Approval of the Class
Action Definitive Settlement Agreement, dated May 24, 2013
[Docket No. 2421] (cont'd) ........................................................... A1501

Notice of Opt Outs, dated May 24, 2013 [Docket No. 2422] .............. A1512

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated May 24, 2013 [Docket No. 2427] .................... A1528

Excerpts of Objection of Aldo US Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2432] ..... A1538

Excerpts of Objection of BJ's Wholesale Club, Inc. to Final
Approval of the Settlement, dated May 24, 2013
[Docket No. 2433] ........................................................................ A1541

Excerpts of Objection of David's Bridal to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2434] ..... A1544

Excerpts of Objection of Dillard's, Inc. to Final Approval of the
Proposed Settlement, dated May 24, 2013 [Docket No. 2435] ..... A1553

Declaration of John R. Manna, Vice President Operational
Controller, Lowe's Companies, Inc., dated May 24, 2013
[Docket No. 2437] ........................................................................ A1555

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of RaceTrac Petroleum, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2438] ........................................................ A1566

Excerpts of Objection of Roundy's Supermarkets, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2439] ........................................................ A1568

Excerpts of Objection of Family Dollar Stores, Inc. to Final
    Approval of the Proposed Settlement, dated May 24, 2013
    [Docket No. 2441] ........................................................ A1570

Excerpts of Objection of 7-Eleven, Inc. to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2442] ..... A1575

Objection of The National Railroad Passenger Corporation to
    Final Approval of the Proposed Settlement, dated May 25,
    2013 [Docket No. 2444] ................................................ A1580

Objections of Best Buy Stores, L.P. to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2445] .................... A1588

Excerpts of Objection of Carter's to Final Approval of the
    Settlement, dated May 25, 2013 [Docket No. 2446] .................... A1601

Objection of Coborn's Incorporated to Final Approval of the
    Proposed Settlement, dated May 25, 2013 [Docket No. 2447] ..... A1606

Excerpts of Objection of Costco Wholesale Corporation to
    Final Approval of the Proposed Settlement,
    dated May 25, 2013 [Docket No. 2448] ........................................ A1613

Objection of D'Agostino Supermarkets, Inc. to Final Approval of
    the Settlement, dated May 25, 2013 [Docket No. 2449] .............. A1615

Objection of Alon USA, LP to Final Approval of the Proposed
    Settlement, dated May 25, 2013 [Docket No. 2450] .................... A1621

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of Barnes & Noble, Inc. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2451] ........................................................................ A1627

Objection of IKEA US to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2458] .................... A1632

Objection of Jetro Holdings, LLC to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2459] ..... A1650

Objection of Michaels Stores, Inc. to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2460] ..... A1656

Objection of NATSO Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2461] .................... A1659

Objection of National Restaurant Association to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2464] ........................................................................ A1667

Objection of Panera Bread Company to Final Approval of the
Proposed Settlement, dated May 25, 2013 [Docket No. 2466] ..... A1678

Objection of PetSmart, Inc. to Final Approval of the Proposed
Settlement, dated May 25, 2013 [Docket No. 2467] .................... A1681

Objection of Retail Industry Leaders Association to Final Approval
of the Settlement, dated May 25, 2013 [Docket No. 2469] .......... A1690

Excerpts of Objection of Sears Holdings Corp. to Final Approval of
the Proposed Settlement, dated May 25, 2013
[Docket No. 2470] ........................................................................ A1697

Excerpts of Objection of The Wet Seal, Inc. to Final Approval of
the Settlement, dated May 25, 2013 [Docket No. 2471] .............. A1699

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of The Wendy's Company to Final Approval
    of the Proposed Settlement, dated May 25, 2013
        [Docket No. 2473] ........................................................ A1703

Objection of National Grocers Association to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2475] ..... A1707

Objection of Petco Animal Supplies, Inc. to Final Approval of the
    Proposed Settlement, dated May 26, 2013 [Docket No. 2491] ..... A1715

Statement of Objections of WellPoint Entities, dated May 27, 2013
    [Docket No. 2493] ........................................................ A1724

Memorandum in Support of Objections of Putative Rule 23(b)(2)
    Class Members WellPoint, Inc., etc., to the Proposed Rule
    23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2493-1] ...................................................... A1734

Excerpts of Declaration of David Kretschmer in Support of
    Objections of WellPoint Entities, dated May 17, 2013
    [Docket No. 2493-2] ...................................................... A1746

**Volume VIII**

Statement of Objections of Target Corporation, Target Commercial
    Interiors, Inc., and TCC Cooking Co., dated May 27, 2013
    [Docket No. 2495] ........................................................ A1752

**Table of Contents**
**(continued)**

**Page**

Excerpts of Memorandum in Support of Objections of Absent
    Putative Rule 23(b)(2) Class Members Target Corporation,
    Macy's, Inc., Kohl's Corporation, The TJX Companies, Inc.,
    Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc.,
    L Brands, Inc., Big Lots Stores, Inc., PNS Stores, Inc., C.S.
    Ross Company, Closeout Distribution, Inc., Ascena Retail
    Group, Inc., Abercrombie & FitchCo., OfficeMax
    Incorporated, Saks Incorporated, The Bon-Ton Stores, Inc.,
    Chico's FAS, Inc., Luxottica U.S. Holdings Corp., and
    American Signature, Inc. to the Proposed Rule 23(b)(2) Class
    and Rule 23(b)(2) Settlement Agreement, dated May 27, 2013
    [Docket No. 2495-1] ....................................................................... A1756

Complaint and Demand for Jury Trial, *Target Corporation, et al.,*
    *v. Visa Inc., et al.*, Civil Action No. 13 CV 3477,
    dated May 27, 2013 [Docket No. 2495-2] ..................................... A1768

Statement of Objections of J. C. Penney, dated May 27, 2013
    [Docket No. 2509] ........................................................................... A1824

Statement of Objections of Macy's, Inc., Macy's Retail Holdings,
    Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC,
    Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's,
    Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The
    Outlet Store, Inc., dated May 27, 2013 [Docket No. 2517] ........... A1828

Statement of Objections of Office Depot, Inc., Viking Office
    Products, Inc., 4Sure.com, Inc., Computers4Sure.com, Inc.,
    and Solutions4Sure.com, Inc., dated May 27, 2013
    [Docket No. 2519] ........................................................................... A1832

Statement of Objections of Staples, Inc., Staples the Office
    Superstore East, Inc., Staples the Office Superstore, LLC,
    Staples Contract & Commercial, Inc., Quill Corporation, Quill
    Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc.,
    Thrive Networks, Inc., and SchoolKidz.com,
    dated May 27, 2013 [Docket No. 2525] ......................................... A1836

x

**Table of Contents**
**(continued)**

Page

Excerpts of Declaration of Michael S. Weisbach,
dated May 27, 2013 [Docket No. 2533-2].................................... A1841

Excerpts of Objection of Crate & Barrel to Final Approval of the
Settlement, dated May 27, 2013 [Docket No. 2534] ..................... A1843

Excerpts of Objection of Gap Inc. to Final Approval of the
Settlement, dated May 27, 2013 [Docket No. 2536] ..................... A1847

Objections to Final Approval of Proposed Class Action Settlement
and Notice of Intent to Appear of The Iron Barley Restaurant,
Homestead Restaurant (Historical Homestead, Inc.), The Feral
Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
(d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
dated May 28, 2013 [Docket No. 2537] ......................................... A1850

National Retail Federation Statement of Objection to Final
Approval of the Proposed Rule 23(B)(2) Agreement,
dated May 28, 2013 [Docket No. 2538] ........................................ A1875

Excerpts of Declaration of Mallory Duncan Made Pursuant to
28 U.S.C. § 1746, dated May 28, 2013 [Docket No. 2538-2] ....... A1903

Declaration of Dave's Pet City Made Pursuant to 28 U.S.C. § 1746,
dated May 28, 2013 [Docket No. 2538-20].................................... A1911

Declaration of Lipert International Inc. d/b/a Keith Lippert Gallery
Made Pursuant to 28 U.S.C. § 1746, dated May 28, 2013
[Docket No. 2538-21]..................................................................... A1916

Excerpts of State of Objections of Wawa, Inc., dated May 23, 2013
[Docket No. 2540] ......................................................................... A1924

Objection of National Cooperative Grocers Association to Final
Approval of the Proposed Settlement, dated May 28, 2013
[Docket No. 2546] ......................................................................... A1926

xi

**Table of Contents**
**(continued)**

**Page**

Objection of Whole Foods Market Entities to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2559] .....   A1934

Objection of National Association of Convenience Stores to Final
    Approval of Proposed Settlement, dated May 28, 2013
    [Docket No. 2561] ........................................................................   A1942

Objection of Affiliated Foods Midwest to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2563] .....   A1955

Objection of Foot Locker, Inc. to Final Approval of the Proposed
    Settlement, dated May 28, 2013 [Docket No. 2587] ....................   A1963

The Home Depot's Statement of Objections to the Proposed Class
    Settlement and Memorandum in Support, dated May 28, 2013
    [Docket No. 2591] ........................................................................   A1973

**Volume IX**

The Home Depot's Statement of Objections to the Proposed Class
    Settlement and Memorandum in Support, dated May 28, 2013
    [Docket No. 2591] (Cont'd) .........................................................   A2001

Excerpts of Declaration of Dwaine Kimmet in Support of The
    Home Depot's Objection to the Proposed Class Settlement,
    dated May 28, 2013 [Docket No. 2591-2] .....................................   A2026

Excerpts of Dell Inc.'s Statement of Objection to Final Approval of
    Settlement, dated May 28, 2013 [Docket No. 2592] ....................   A2028

Objection of Consumers Union of United States, Inc. to Final
    Approval of Proposed Class Settlement, dated May 28, 2013
    [Docket No. 2598] ........................................................................   A2030

Objection of Amazon.com, Inc. to Final Approval of the Proposed
    Settlement, dated May 28, 2013 [Docket No. 2605] ....................   A2040

xii

**Table of Contents**
**(continued)**

**Page**

Excerpts of Objection of Starbucks to Final Approval of the
    Proposed Settlement, dated May 28, 2013 [Docket No. 2606] .....  A2047

Objection of 1001 Property Solutions LLC and Temple Eagle
    Partners LLC, dated May 28, 2013 [Docket No. 2613].................  A2053

Declaration of Rick Bandas in Support of Objection to Settlement,
    dated May 28, 2013 [Docket No. 2613-1].....................................  A2075

Objection of National Community Pharmacists Association to Final
    Approval of the Proposed Settlement, dated May 28, 2013
    [Docket No. 2619] ........................................................................  A2107

Statement of Objections and Amici Curiae Brief of States to Final
    Approval of the Settlement, dated May 28, 2013
    [Docket No. 2623] ........................................................................  A2116

Blue Cross and Blue Shield Entities' Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643] ....................  A2147

Excerpts of Declaration of David Cote in Support of BlueCross
    BlueShield of South Carolina Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-3].................  A2178

Excerpts of Declaration of Garrett Calissi in Support of Blue Cross
    and Blue Shield of Arizona, Inc. Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-4].................  A2180

Excerpts of Declaration of Matthew Brolly in Support of
    Independence Blue Cross Objections to Proposed Settlement,
    dated May 28, 2013 [Docket No. 2643-6]....................................  A2182

Excerpts of Declaration of William J. Farrell in Support of Blue
    Cross of Northeastern Pennsylvania Objections to Proposed
    Settlement, dated May 28, 2013 [Docket No. 2643-7].................  A2184

# Table of Contents
## (continued)

**Page**

Walmart's Objection to the Proposed Settlement, dated May 28, 2013 [Docket No. 2644] .................................................................... A2186

Excerpts of Objection of American Express Company, American Express Travel Related Services Company, Inc., Travel Impressions, Ltd., American Express Publishing Corp., Serve Virtual Enterprises, Inc., ANCA 7 LLC d/b/a Vente Privee, USA, Amex Assurance Company, and Accertify, Inc. to the Class Settlement Agreement, dated May 28, 2013 [Docket No. 2648] ........................................................................................... A2213

Declaration of Stephen B. McCurdy in Support of Objections of American Express, dated May 23, 2013 [Docket No. 2648-1] ..... A2245

## Volume X

Notice of Motion of DFS Services LLC and Discover Bank to Intervene, dated May 28, 2013 [Docket No. 2655] ....................... A2249

Excerpts of Declaration of Roger Hochschild, dated May 28, 2013 [Docket No. 2657-6] ......................................................... A2252

Objection of DFS Services LLC, Discover Loans, Inc., and Discover Bank to Final Approval of Proposed Settlement, dated May 28, 2013 [Docket No. 2659] ......................................... A2263

Discover Financial Services' Notice of Intent to Opt-Out of Rule 23(b)(3) Damages Case, dated May 28, 2013 [Docket No. 2663] ......................................................... A2277

Excerpts of Objecting Plaintiffs' and Objectors' Memorandum in Opposition to Motion for Final Approval of Settlement, dated May 28, 2013 [Docket No. 2670] .................................................. A2278

**Table of Contents**
**(continued)**

Page

Excerpts of Declaration of Jeffrey I. Shinder in Support of
Opposition to Class Plaintiffs' Motion for Final Approval of
the Proposed Class Settlement, dated May 28, 2013
[Docket No. 2670-1] ........................................................ A2300

Excerpts of Report of Professor Jerry Hausman,
dated May 28, 2013 [Docket No. 2670-5] ..................................... A2302

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
Shinder: "Industry Facts Concerning Debit Card Regulation
Under Section 920," by Stephen Craig Mott,
BetterBuyDesigns, on Behalf of the Merchants Payments
Coalition, submitted to Federal Reserve System, October 29,
2010; Attachment F: "2011 Interchange Fee Revenue, Covered
Issuer Costs, and Covered Issuer and Merchant Fraud Losses
Related to Debit Card Transactions," Board of Governors of
the Federal Reserve System, March 5, 2013
[Docket No. 2670-6] ........................................................ A2327

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I.
Shinder: Ex. 66: Visa Management Discusses Q3 2012 Results
- Earnings Call Transcript; Ex. 67: "'We Won' vs. 'You Lost':
Reactions to Credit Card Settlement", by Maria Aspan and
Victoria Finkle, American Banker, July 16, 2012; Ex. 68: "An
Analysis of the Proposed Interchange Fee Litigation
Settlement," by Adam J. Levitin, Georgetown Law and
Economics Research Paper No. 12-033, August 21, 2012; Ex.
70: The Nilson Report, February 2013, Issue 1,011; American
Express Merchant Reference Guide - U.S., April 2013; Ex. 73:
"Merchant Surcharging – Understanding Payment Card
Changes," Visa, May 20, 2013; Ex. 76: "Operating Regulations
to Support the U.S. Merchant Litigation Settlement," Visa,
2013; Ex, 77: "Notice of MasterCard Rule Changes,"
MasterCard Worldwide, December 2012; Ex. 78:
Memorandum from Visa Inc. to Merchants in the U.S. and U.S.
Territories, regarding Merchant Class Action Litigation
Settlement – Important Changes to Merchant Acceptance

xv

**Table of Contents**
(continued)

Page

Practices, December 20, 2012; Ex. 82: "Visa's CEO Discusses
Q2 2012 Results - Earnings Call Transcript," Visa, May 20,
2013; Ex. 84: "New Visa, MasterCard fees stir debate within
industry," The Green Sheet Online, March 12, 2013; Ex. 94:
MasterCard Incorporated Management Discusses Q2 2012
Results - Earnings Call Transcript, May 20, 2013; Ex. 95:
MasterCard's CEO Discusses Q4 2012 Results - Earnings Call
Transcript, May 20, 2013 [Docket No. 2670-8] ........................... A2339

Excerpts of Exhibits to May 28, 2013 Declaration of Jeffrey I. Shinder:
Ex. 97: "Reform of Australia's Payments System: Preliminary
Conclusions of the 2007/08 Review," Reserve Bank of Australia,
April, 2008; Ex. 108: Amended and Restated Global Restructuring
Agreement [Docket No. 2670-9] ................................... A2394

Excerpts of Objections of Bridgestone Americas, Inc. to Proposed
Class Settlement Agreement, dated June 5, 2013
[Docket No. 3074] ....................................................... A2400

Statement of Objection of Heinen's Fine Foods, dated June 5, 2013
[Docket No. 3755] ....................................................... A2403

Excerpts of Objections of Williams-Sonoma, Inc. to the Proposed
Class Settlement Agreement, dated June 6, 2013
[Docket No. 4237] ....................................................... A2405

Excerpts of Statement of Objections of the Society of Independent
Gasoline Marketers of America, dated June 7, 2013
[Docket No. 4640] ....................................................... A2407

Excerpts of Objections of First Data Corporation, First Data
Merchant Services, TASQ Technology, Inc., TRS Recovery
Services Inc., First Data Government Solutions, and TeleCheck
Services Inc. to Final Approval of Definitive Class Settlement
Agreement, dated June 7, 2013 [Docket No. 4654] ...................... A2415

**Table of Contents**
**(continued)**

**Page**

Statement of Objections of Life Time Fitness, Inc.,
dated June 11, 2013 [Docket No. 5385] ........................ A2423

Letter from Kenneth A. Gallo to Judge Gleeson,
dated June 11, 2013 [Docket No. 5406] ...................... A2433

Letter from Class Plaintiffs' to Judge Gleeson, dated June 12, 2013
[Docket No. 5651] ....................................... A2434

Excerpts of Defendants' Reply Memorandum in Support of
Final Approval of Definitive Class Settlement Agreement,
dated August 16, 2013 [Docket No. 5937] .................. A2435

Excerpts of Class Plaintiffs' Reply Memorandum of Law in
Further Support of Settlement Final Approval,
dated August 16, 2013 [Docket No. 5939] .................. A2443

Excerpts of Declaration of Ryan W. Marth, dated August 16, 2013
[Docket No. 5939-3] ..................................... A2448

Excerpts of Reply Declaration of Alan S. Frankel, Ph.D. Relating
to the Proposed Class Settlement (redacted),
dated August 16, 2013 [Docket No. 5939-5] ................ A2463

Excerpts of Declaration of H. Theodore Grindal in Support of Class
Plaintiffs' Motion for Final Approval of the Proposed Class
Settlement, dated August 16, 2013 [Docket No. 5939-6] .............. A2468

Excerpts of Reply Memorandum in Support of Class Plaintiffs'
Joint Motion for Award of Attorneys' Fees, Expenses and
Class Plaintiffs' Awards, dated August 16, 2013
[Docket No. 5940] ....................................... A2471

Excerpts of Reply Memorandum in Support of FDC's
Motion to Opt Out of Rule 23(b)(2) Class Settlement,
dated August 23, 2013 [Docket No. 5957] .................. A2473

xvii

**Table of Contents**
**(continued)**

**Page**

Report from Court appointed expert Professor Alan O. Sykes,
  dated August 28, 2013 [Docket No. 5965] ..................................   A2475

**Volume XI**

Report from Court appointed expert Professor Alan O. Sykes,
  dated August 28, 2013 [Docket No. 5965] (Cont'd) ....................   A2501

Excerpts of Class Plaintiffs' Letter to Judge Gleeson Responding to
  Report of Professor Alan O. Sykes, dated September 4, 2013
  [Docket No. 5978] ........................................................................   A2526

Excerpts of Response by Professor Jerry Hausman to the Report of
  Professor Alan O. Sykes, dated September 4, 2013
  [Docket No. 5982] ........................................................................   A2531

Excerpts of Declaration of Henry Ogden Armour, NACS, to
  Correct Misstatements in Supplemental Declaration of
  Craig Wildfang and in Opposition to Final Approval,
  dated September 10, 2013 [Docket No. 6006-1] ...........................   A2536

Excerpts of Declaration of Robynn Shrader, NCGA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-2] ....................................................................   A2543

Excerpts of Declaration of Jennifer T. Mallon, NCPA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-3] ....................................................................   A2549

Excerpts of Declaration of Peter J. Larkin, NGA, to Correct
  Misstatements in Supplemental Declaration of Craig Wildfang
  and in Opposition to Final Approval, dated September 10, 2013
  [Docket No. 6006-4] ....................................................................   A2553

**Table of Contents**
**(continued)**

Excerpts of Transcript of Fairness Heating before the
Honorable John Gleeson, U.S. District Court Judge,
dated September 12, 2013 [Docket No. 6094]............................... A2559

Notice of Appeal of Objecting Plaintiffs and Objectors,
dated December 13, 2013 [Docket No. 6125] ............................... A2587

Notice of Appeal by Home Depot U.S.A., Inc.,
dated December 13, 2013 [Docket No. 6126] ............................... A2588

Notice of Appeal of Target Group Objectors,
dated December 13, 2013 [Docket No. 6128] ............................... A2589

Notice of Appeal of National Retail Federation,
dated January 2, 2014 [Docket No. 6148] .................................... A2590

Notice of Appeal of R & M Objectors, dated January 10, 2014
[Docket No. 6175] ........................................................................ A2591

Notice of Appeal of Blue Cross and Blue Shield Objectors and
WellPoint Objectors, dated January 10, 2014
[Docket No. 6176] ........................................................................ A2597

Notice of Appeal of Temple Eagle, dated January 10, 2014
[Docket No. 6178] ........................................................................ A2602

Notice of Appeal of First Data Corporation, First Data Merchant
Services, TASQ Technology, Inc., TRS Recovery Services,
Inc., First Data Government Solutions, and Telecheck Services,
Inc., dated January 10, 2014 [Docket No. 6179] .......................... A2605

Notice of Appeal of The Iron Barley Restaurant, Homestead
Restaurant (Historical Homestead, Inc.), The Feral Pig (KP
Group LLC), Paris Beauty Salon, Rachel Mustoe (d/b/a
Tousled Hair Studio), and Kristina Newman – Hair,
dated January 10, 2014 [Docket No. 6182] .................................. A2606

# **Table of Contents**
## **(continued)**

**Page**

Notice of Appeal of U.S. PIRG, dated January 13, 2014
[Docket No. 6189] ........................................................ A2608

Notice of Appeal of Consumers Union of United States, Inc.,
dated January 13, 2014 [Docket No. 6190] .................................. A2609

Amended Notice of Appeal of Target Group Objectors,
dated January 21, 2014 [Docket No. 6212] .................................. A2610

Amended Notice of Appeal of Temple Eagle,
dated January 13, 2014 [Docket No. 6227] .................................. A2611

Notice of Appeal of National Federation of Independent Business,
dated February 7, 2014 [Docket No. 6234] .................................. A2614

Subsequent Notice of Appeal by Blue Cross and Blue Shield
Objectors and WellPoint Objectors, dated February 7, 2014
[Docket No. 6238] ........................................................ A2615

Amended Notice of Appeal of The Iron Barley Restaurant,
Homestead Restaurant (Historical Homestead, Inc.), The Feral
Pig (KP Group LLC), Paris Beauty Salon, Rachel Mustoe
(d/b/a Tousled Hair Studio), and Kristina Newman – Hair,
dated February 13, 2014 [Docket No. 6245] ................................ A2620

Amended Notice of Appeal by Home Depot U.S.A., Inc.
(Amending Notice Of Appeal Filed December 13, 2013),
dated February 13, 2014 [Docket No. 6248] ................................ A2622

Amended Notice of Appeal of Objecting Plaintiffs and Target
Group Objectors, dated February 13, 2014 [Docket No. 6249] .... A2623

Notice of Appeal of Retail Industry Leaders Association,
dated February 13, 2014 [Docket No. 6251] ................................ A2625

# **Table of Contents**
## **(continued)**

**Page**

Second Amended Notice of Appeal of 1001 Property Solutions
    LLC and Temple Eagle Partners LLC, dated February 18, 2014
    [Docket No. 6257] ........................................................................ A2626

Amended Notice of Appeal of R & M Objectors,
    dated February 25, 2014 [Docket No. 6263] ................................. A2630

Excerpts of Expert Report of Joseph Stiglitz, Ph.D.,
    dated June 25, 2009 ...................................................................... A2636

U.S. Government Accountability Office, Pub. No. GAO-10-45,
    Credit Cards: *Rising Interchange Fees Have Increased Costs*
    *for Merchants, but Options for Reducing Fees Pose*
    *Challenges*, dated 11/2009 ........................................................... A2638

Final Judgment as to Defendants MasterCard International
    Incorporated and Visa Inc., *U.S. v. American Express Co.*,
    CV-10-4496 (E.D.N.Y. ), dated July 20, 2011 [Docket No. 10-
    CV-4996 DE 143]......................................................................... A2707

Visa International Operating Regulations, dated October 15, 2012 .... A2722

**Volume XII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................. A2751

**Volume XIII**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................. A3001

**Volume XIV**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) .................................................. A3251

## **Table of Contents**
### (continued)

**Page**

### **Volume XV**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3501

### **Volume XVI**

Visa International Operating Regulations,
    dated October 15, 2012 (Cont'd) ................................................... A3751

### **Volume XVII**

Interlink Network, Inc. Operating Regulations,
    dated November 15, 2012 ............................................................. A4009

### **Volume XVIII**

MasterCard Rules, dated April 11, 2012 ............................................. A4259

### **Volume XIX**

MasterCard Rules, dated April 11, 2012 (Cont'd) .............................. A4501

Excerpts of *Mastercard, Inc. and Others v. Eur. Comm'n*,
    Case T-111/08, Judgment of the General Court
    (Seventh Chamber), dated May 24, 2012 ...................................... A4614

Minute Order deeming all pending motions for relief withdrawn
    without prejudice to reinstatement if the settlement is not
    consummated, dated July 17, 2012................................................. A4616

Minute Order upholding Judge Orenstein's order denying
    disclosure of settlement agreement, dated September 19, 2013 .... A4618

Visa Form 10K (Annual Report), dated November 22, 2013 .............. A4620

**Table of Contents**
**(continued)**

**Page**

Excerpts of Class Settlement Agreement, *In re Am. Express
    Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
    No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
    [Docket No. 11-md-2221 DE 306-2]............................................. A4623

**Volume XX**

Excerpts of Class Settlement Agreement, *In re Am. Express
    Anti-Steering Rules Antitrust Litig*. (NGG)(RER),
    No. 11-md-2221 (E.D.N.Y.), dated January 7, 2014
    [Docket No. 11-md-2221 DE 306-2] (Cont'd) .............................. A4751

Class Plaintiffs' Memorandum of Law in Support of Motion for
    Final Approval of Class Action Settlement, *In re: American
    Express Anti-Steering Rules Antitrust Litig*., 11-md-2221
    (NGG)(RER), (Redacted - Public Version), dated April 15,
    2014 [Docket No. 11-md-2221 DE 362] ....................................... A4790

Excerpts of Declaration of Alan S. Frankel, Ph.D *In re: American
    Express Anti-Steering Rules Antitrust Litig*., 11-md-02221
    (NGG)(RER) (redacted), dated April 15, 2014
    [Docket No. 11-md-2221 DE 370] ................................................ A4831

Civil Cause for Conference, *In re Payment Card Interchange Fee
    and Merchant Discount Antitrust Litig*., No. 14-md-1720
    (JG)(JO), dated July 18, 2014
    [Docket No. 14-md-1720 DE 104] ................................................ A4834

Transcript of Hearing before Judge Gleeson, *In re Payment Card
    Interchange Fee and Merchant Discount Antitrust Litig*.,
    No. 14-md-1720 (JG)(JO), dated July 18, 2014
    [Docket No. 14-md-1720 DE 105] ................................................ A4836

# Table of Contents
## (continued)

**Page**

## Volume XXI

*MasterCard and Others v. European Comm'n*, Case C-382/12 P,
    Judgment of the Court (Third Chamber),
    dated September 11, 2014.............................................................. A4925

Third Amended Complaint and Jury Demand, *7-Eleven, Inc. v.*
    *Visa Inc*., Nos. 13-cv-5746 (JG)(JO), 14-md-1720(JG)(JO),
    dated September 26, 2014 [Docket No. 13-cv-5746 DE 41]......... A4972

Appellate Docket: *Expressions Hair Design v. Schneiderman*,
    No. 13-4537 ................................................................................. A5076

Excerpts of Card Acceptance Guidelines for Visa Merchants ............. A5085

The MasterCard Convenience Fee Program for Government and
    Education ..................................................................................... A5088

Excerpts of Notice of Class Action Settlement Authorized by the
    U.S. District Court, Eastern District of New York ...................... A5090

## Volume XXII

### *Volume Filed Under Seal*

Excerpts of Corrected First Amended Supplemental Complaint
    (filed under seal), dated March 27, 2009 [Docket No. 1170-4]..... A5104

Excerpts of Network Defendants' Counter-Statement in Opposition
    to Individual Plaintiffs' Statement of Undisputed Facts,
    Pursuant to Local Rule 56.1(b) (filed under seal),
    dated May 6, 2011 [Docket No. 1477-7] ...................................... A5114

Excerpts of Defendants' Statement of Material Facts as to Which
    There is No Genuine Issue to be Tried (filed under seal), dated
    February 11, 2011 [Docket No. 1478-4] ...................................... A5125

# Table of Contents
## (continued)

**Page**

Excerpts of Report of Mike McCormack (filed under seal),
dated July 2, 2009 [Docket No. 2088]............................................ A5135

Excerpts of Expert Report of Professor Kevin M. Murphy (filed
under seal), dated December 14, 2009 [Docket No. 2088]........... A5137

Excerpts of Report of Professor Kenneth G. Elzinga (filed under
seal), dated December 14, 2009 [Docket No. 2088]..................... A5177

Excerpts of Declaration of William M. Sheedy (filed under seal),
dated May 3, 2011 [Docket No. 2088] ......................................... A5183

Excerpts of Declaration of Timothy H. Murphy (filed under seal),
dated May 3, 2011 [Docket No. 2088] ......................................... A5191

Memorandum of Law in Support of Motion to Intervene of DFS
Services LLC and Discover Bank (filed under seal), dated May
28, 2013 [Docket No. 2657-1]...................................................... A5200

Declaration of Jennifer M. Selendy (filed under seal),
dated May 28, 2013 [Docket No. 2657-3].................................... A5229

DFS Services LLC v. Visa, Complaint (filed under seal),
dated May 28, 2013 [Docket No. 2657-4].................................... A5231

Declaration of Roger Hochschild (filed under seal),
dated May 28, 2013 [Docket No. 2657-5].................................... A5250

Exhibit 1 to May 28, 2013 Declaration of Roger Hochschild:
Notice of Class Action Settlement Authorized by the U.S.
District Court, Eastern District of New York (filed under seal)
[Docket No. 2657-7]..................................................................... A5261

Excerpts of Report of Alan S. Frankel, Ph.D. (filed under seal),
dated July 2, 2009 ........................................................................ A5290

Excerpts of Expert Report of Robert H. Topel (filed under seal),
dated December 15, 2009 .............................................................. A5295

## **Table of Contents**
### **(continued)**

**Page**

Excerpts of Rebuttal Report of Alan S. Frankel (filed under seal),
dated June 22, 2010 ........................................................ A5297

# A4925

## JUDGMENT OF THE COURT (Third Chamber)

## 11 September 2014 (*)

Table of contents

Background to the dispute and the decision at issue

The action before the General Court and the judgment under appeal

Forms of order sought

Admissibility of the cross-appeals

Substance

The third plea in the main appeal, alleging an error of law concerning the admissibility of certain annexes to the application at first instance

The judgment under appeal

Arguments of the parties

Findings of the Court

The second plea in the main appeal, alleging an error of law and/or inadequate reasoning with regard to the assessment of the question whether MasterCard is an association of undertakings

Arguments of the parties

Findings of the Court

– Admissibility

– Substance

The first plea in the main appeal, alleging an error of law and/or inadequate reasoning with regard to the assessment of the objective necessity of the alleged restriction of competition

The judgment under appeal

First part of the first plea in the main appeal

– Arguments of the parties

– Findings of the Court

Second and third parts of the first plea in the main appeal

– Arguments of the parties

# A4926

– Findings of the Court

Fourth part of the first plea in the main appeal

– Arguments of the parties

– Findings of the Court

The single plea in RBS's cross-appeal and the first plea in LBG's cross-appeal

The judgment under appeal

Arguments of the parties

– The single plea in RBS's cross-appeal

– The first plea in LBG's cross-appeal

Findings of the Court

– The Commission's objections of inadmissibility

– The substance of the single plea in RBS's cross-appeal and the first plea in LBG's cross-appeal

The second plea in LBG's cross-appeal

The judgment under appeal

First part of the second plea in LBG's cross-appeal

– Arguments of the parties

– Findings of the Court

Second part of the second plea in LBG's cross-appeal

– Arguments of the parties

– Findings of the Court

Third part of the second plea in LBG's cross-appeal

– Arguments of the parties

– Findings of the Court

Costs

(Appeal — Cross-appeals — Admissibility — Article 81 EC — Open system of payment by debit,

# A4927

charge and credit cards — Multilateral fallback interchange fees — Association of undertakings — Restrictions of competition by effect — Standard of judicial review — Concept of 'ancillary restriction' — Objectively necessary and proportionate nature — Appropriate 'counterfactual hypotheses' — Two-sided systems — Treatment of annexes to the application at first instance)

In Case C-382/12 P,

APPEAL under Article 56 of the Statute of the Court of Justice of the European Union, brought on 4 August 2012,

**MasterCard Inc.,** established in Wilmington (United States),

**MasterCard International Inc.,** established in Wilmington,

**MasterCard Europe SPRL,** established in Waterloo (Belgium),

represented by E. Barbier de la Serre, V. Brophy and B. Amory, avocats, and by T. Sharpe QC,

appellants,

the other parties to the proceedings being:

**European Commission,** represented by V. Bottka and N. Khan, acting as Agents,

defendant at first instance,

**Banco Santander SA,** established in Santander (Spain),

**Royal Bank of Scotland plc,** established in Edinburgh (United Kingdom), represented by D. Liddell, Solicitor, and M. Hoskins, Barrister,

**HSBC Bank plc,** established in London (United Kingdom), represented by R. Thompson QC,

**Bank of Scotland plc,** established in Edinburgh,

**Lloyds TSB Bank plc,** established in London,

represented by K. Fountoukakos-Kyriakakos and S. Wisking, Solicitors, and by J. Flynn QC,

**MBNA Europe Bank Ltd,** established in Chester (United Kingdom), represented by A. Davis, Solicitor,

**British Retail Consortium,** established in London, represented by R. Marchini, advocate, and A. Robertson, Barrister,

**EuroCommerce AISBL,** established in Brussels (Belgium), represented by J. Stuyck, advocaat,

**United Kingdom of Great Britain and Northern Ireland,** represented by M. Holt and C. Murrell, acting as Agents, and by J. Turner QC and J. Holmes, Barrister,

A4928

interveners at first instance,

THE COURT (Third Chamber),

composed of M. Ilešič, President of the Chamber, C.G. Fernlund, A. Ó Caoimh (Rapporteur), C. Toader and E. Jarašiūnas, Judges,

Advocate General: P. Mengozzi,

Registrar: L. Hewlett, Principal Administrator,

having regard to the written procedure and further to the hearing on 4 July 2013,

after hearing the Opinion of the Advocate General at the sitting on 30 January 2014,

gives the following

**Judgment**

1    By their appeal, MasterCard Inc. and its subsidiaries MasterCard International Inc. and MasterCard Europe SPRL request the Court to set aside the judgment of the General Court of the European Union in *MasterCard and Others* v *Commission* (T-111/08, EU:T:2012:260) ('the judgment under appeal'), by which the General Court dismissed their action for, principally, annulment of Commission Decision C(2007) 6474 final of 19 December 2007 relating to a proceeding under Article [81 EC] and Article 53 of the EEA Agreement (Cases COMP/34.579 — MasterCard, COMP/36.518 — EuroCommerce, COMP/38.580 — Commercial Cards; 'the decision at issue'), and, in the alternative, to annul Articles 3 to 5 and 7 of that decision.

2    By their respective cross-appeals, Royal Bank of Scotland plc ('RBS'), on the one hand, and, on the other, Bank of Scotland plc ('BoS') and Lloyds TSB Bank plc ('LTSB'), both of which (collectively 'LBG') are now under the control of Lloyds Banking Group plc and acting jointly for the purposes of the present proceedings, request the Court to set aside the judgment under appeal and to annul the decision at issue.

**Background to the dispute and the decision at issue**

3    As is apparent in particular from paragraphs 20, 24, 27, 35, 39 and 40 of the judgment under appeal, by the decision at issue, the Commission of the European Communities found, inter alia, in essence, that the setting of multilateral fallback interchange fees in the payment system operated by the international payment organisation known as 'MasterCard' ('MasterCard') which apply above all to cross-border bank card payments within the European Economic Area (EEA) or the euro area ('MIF') constituted a decision by an association of undertakings which led to a restriction of competition between participating banks providing merchants with services enabling them to accept MasterCard and/or Maestro debit, charge and credit cards, that that restriction was appreciable, that it affected trade between Member States, and that the appellants had not demonstrated to the requisite legal standard either that the MIF were objectively

# A4929

necessary for the operation of the MasterCard system or that the conditions for exemption imposed by Article 81(3) EC or Article 53(3) of the Agreement on the European Economic Area of 2 May 1992 (OJ 1994 L 1, p. 3) were satisfied.

4       It is evident from the file, and in particular from paragraph 17 of the judgment under appeal, that in an 'open' payment system such as the MasterCard system, the parties involved in each purchase made by bank card are, besides the owner of the payment system, the cardholder, the financial institution which issues that card (referred to as the 'issuing bank'), the merchant, and the financial institution providing that merchant with services enabling him to accept the card as a means of settling the transaction concerned (referred to as the 'acquiring bank').

5       The background and key elements of the decision at issue for the purposes of the appeal and the cross-appeals, as set out in paragraphs 1 to 44 of the judgment under appeal, may be summarised as follows.

6       The appellants are responsible for the management and coordination of the MasterCard and Maestro card payments system, which includes, inter alia, establishing the rules for the system and providing participating financial institutions with authorisation and compensation services. The issuing of MasterCard and Maestro cards and the conclusion of membership agreements with merchants for the acceptance of such cards are dealt with by those financial institutions.

7       Before 25 May 2006, MasterCard was wholly owned and the corresponding voting rights held by the participating financial institutions. On that date, MasterCard Inc. was the subject of an initial public offering ('the IPO') on the New York Stock Exchange (United States), which modified the structure and governance of MasterCard.

8       On 30 March 1992 and 27 June 1997, the Commission received complaints from British Retail Consortium ('BRC') and from EuroCommerce AISBL ('EuroCommerce') respectively against, inter alia, Europay International SA ('Europay'), now MasterCard Europe SPRL.

9       Europay submitted notifications to the Commission in respect of its entire payment system.

10      On 13 April 2002, the Commission published a notice pursuant to Article 19(3) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles [81 EC] and [82 EC] (OJ, English Special Edition 1959-1962, p. 87), in which it announced its intention to adopt a favourable position with respect to some of the rules of Europay's system, which did not include those relating to fallback interchange fees.

11      By the decision at issue, the Commission found that the appellants had infringed Article 81 EC and Article 53 of the Agreement on the European Economic Area. That decision includes the considerations set out below:

    –      Interchange fees concern the relationship between issuing and acquiring banks on settlement of card transactions and correspond to a sum deducted in favour of the issuing bank. These fees must be distinguished from the costs charged to merchants by the acquiring bank (merchant service charges; 'MSC'). The decision at issue relates only to the MIF, and not to the interchange fees agreed bilaterally between issuing and acquiring banks or the interchange fees set collectively at national level.

# A4930

—    It is necessary to distinguish between three different product markets in the sphere of open bank card systems: first of all, the 'inter-systems market', in which the various card systems compete; then the 'issuing market', in which the issuing banks compete for the business of the cardholders; and, lastly, the 'acquiring market', in which the acquiring banks compete for the merchants' business. The relevant market for the purposes of the decision at issue is made up of the national acquiring markets in the Member States of the EEA.

—    The appellants' decisions in relation to the setting of the MIF constitute decisions by an association of undertakings within the meaning of Article 81(1) EC, notwithstanding the changes in MasterCard's structure and governance arising from the IPO.

—    The MIF have the effect of inflating the base of the MSC, while the latter could be lower if there were no MIF and if there were a prohibition of unilateral pricing *a posteriori* of transactions by the issuing banks, that is to say, a rule prohibiting issuing and acquiring banks from defining the amount of the interchange fees after a purchase has been made by one of the issuing bank's cardholders from one of the acquiring bank's merchants and the transaction has been submitted for payment ('prohibition of *ex post* pricing'). The MIF therefore lead to a restriction of price competition between acquiring banks to the detriment of merchants and their customers.

—    MIF cannot be regarded as 'ancillary restrictions' in so far as they are not objectively necessary for the operation of an open payment card scheme. The scheme could function simply on the basis of the remuneration of issuing banks by cardholders, of acquiring banks by merchants, and of the owner of the scheme by the fees paid by the issuing and acquiring banks. Unlike restrictions which are necessary for implementing a main operation, restrictions which are merely desirable for the commercial success of that operation, or which offer greater efficiency, can be examined only within the framework of Article 81(3) EC.

—    With regard to the impact of the requirement, in the context of the MasterCard system, that all Maestro or MasterCard cards should be accepted irrespective of the issuing bank (the 'Honour All Cards Rule'), the elimination of the MIF would not mean that the issuing banks could freely and unilaterally set interchange fees, since that risk could be avoided by a rule having effects less restrictive of competition, such as the prohibition of *ex post* pricing.

—    As regards Article 81(3) EC, the economic arguments put forward by the appellants in relation to the role of the MIF in the balancing of the MasterCard system and its maximisation are inadequate for the purposes of establishing that the MIF generate objective advantages. The appellants notably did not produce evidence to show that any objective advantages counterbalanced the disadvantages of the MIF for merchants and their customers.

### The action before the General Court and the judgment under appeal

12    By application lodged at the Registry of the Court of First Instance (now 'the General Court') on 1 March 2008, the appellants brought an action for annulment of the decision at issue or, in the alternative, for annulment of Articles 3 to 5 and 7 thereof.

13    As is apparent from paragraph 73 of the judgment under appeal, the appellants put forward four pleas in

# A4931

law in support of their action, alleging, first, infringement of Article 81(1) EC as a result of errors in the analysis of the effects of the MIF on competition; secondly, infringement of Article 81(3) EC; thirdly, infringement of Article 81(1) EC as a result of the MIF being incorrectly characterised as decisions by an association of undertakings; and, fourthly, errors vitiating the administrative procedure and errors of fact.

14    In their interventions before the General Court, BRC, EuroCommerce and the United Kingdom of Great Britain and Northern Ireland contended that the appellants' action should be dismissed, while Banco Santander SA, RBS, HSBC Bank plc ('HSBC'), BoS, LTSB and MBNA Europe Bank Ltd ('MBNA') claimed, inter alia, that the decision at issue should be annulled.

15    By the judgment under appeal, the General Court dismissed the appellants' action, ruling, essentially, that they had not established that the decision at issue was vitiated by an error of law or a manifest error of assessment.

### Forms of order sought

16    The appellants claim that the Court of Justice should, in essence:

–    set aside the judgment under appeal;

–    annul the decision at issue; and

–    order the Commission to pay the costs of both sets of proceedings.

17    RBS, HSBC, LBG and MBNA submitted responses in support of the appeal, whereas BRC, EuroCommerce and the United Kingdom support the Commission in its contention, primarily, that the appeal should be dismissed and, in the alternative, that the action for annulment of the decision at issue should be dismissed.

18    The forms of order sought in the cross-appeals of RBS and LBG are, in essence, the same as those sought in the appeal.

19    The appellants support the forms of order sought in the cross-appeals, while the Commission, supported by BRC, contends that the cross-appeals should be dismissed.

### Admissibility of the cross-appeals

20    The Commission argues that the cross-appeals brought by RBS and LBG respectively are inadmissible, on the ground that each cross-appeal is included in the same document as the response to the main appeal lodged by the respective party concerned.

21    As the Commission points out, Article 176(2) of the Rules of Procedure of the Court of Justice, which entered into force on 1 November 2012, provides that the 'cross-appeal must be introduced by a document separate from the response'.

22    However, it must be noted that the electronic versions of the cross-appeals brought by RBS and LBG respectively were received at the Registry of the Court of Justice on 31 October 2012, and were followed

# A4932

by the lodging of the respective originals two and five days later.

23    Consequently, whether Article 57(7) of the Rules of Procedure in force from 1 November 2012 is applied, or Article 37(6) of the Rules of Procedure in force until that date, the fact remains that the cross-appeals were validly brought on 31 October 2012.

24    The Rules of Procedure in force on the latter date do not contain a provision corresponding to Article 176(2) invoked by the Commission. Therefore, the cross-appeals cannot be considered to be inadmissible in so far as they were submitted in responses to the main appeal.

25    The more specific objections of inadmissibility raised by the Commission will be examined in the context of the pleas in law concerned.

26    With regard to the main appeal, in so far as the Commission maintains, as a preliminary point, that that appeal is 'in a major part' inadmissible, the Commission is in fact pleading specifically that particular parts of that appeal are inadmissible, but is not claiming that the appeal is inadmissible in its entirety. Those specific objections must therefore be addressed in the context of the examination of the pleas concerned.

**Substance**

27    By their main appeal and their cross-appeals, the appellants, RBS and LBG complain that the General Court erred in law by ruling, in essence, that:

—    several annexes to the application at first instance were inadmissible (third plea in the main appeal);

—    the Commission did not err in concluding that the MasterCard payment system constitutes an 'association of undertakings' within the meaning of Article 81 EC, despite the changes brought about by the IPO (second plea in the main appeal);

—    the decision at issue demonstrates to the requisite legal standard that the MIF have restrictive effects on competition (RBS's cross-appeal and first plea in LBG's cross-appeal);

—    the MIF cannot be considered to be objectively necessary for the operation of the MasterCard system (first plea in the main appeal); and

—    the Commission was able to conclude without erring in law that the appellants had not demonstrated that the MIF satisfy the conditions imposed in Article 81(3) EC (second plea in LBG's cross-appeal).

28    The first plea in the main appeal, the cross-appeal of RBS and the first plea in the cross-appeal of LBG concern the question whether the General Court erred in law by endorsing the conclusion in the decision at issue that the setting of the MIF is covered by the prohibition rule laid down in Article 81(1) EC. For the purpose of dealing with these pleas, the Court would have to address, first, the third plea in the main appeal. Since examination of the first plea in the main appeal, RBS's cross-appeal and the first plea in LBG's cross-appeal would be rendered superfluous if the second plea in the main appeal were well founded, the Court must address, secondly, that second plea.

# A4933

*The third plea in the main appeal, alleging an error of law concerning the admissibility of certain annexes to the application at first instance*

The judgment under appeal

29     With regard to the complaint raised before the General Court in relation to the Commission's examination of the economic evidence submitted by the appellants during the procedure that led to the adoption of the decision at issue, the General Court stated, in paragraph 183 of the judgment under appeal, that the appellants were complaining that the Commission had failed to examine or respond to that evidence. The General Court noted, in paragraph 185 of the judgment under appeal, that that complaint 'is set out in particularly succinct terms in the application and that the arguments in support of it are in fact developed in Annexes A.13 [to] A.15 … drawn up by the various experts behind the economic evidence submitted during the administrative procedure and to which the [appellants] make a general reference'.

30     According to paragraphs 186 to 188 of the judgment under appeal:

'186     ... in paragraphs 52 to 54 of the application, the [appellants] merely state that they provided substantial economic arguments during the administrative procedure which have not been followed or which have been misrepresented by the Commission, and that "[their] economists' conclusions" sustain their legal analysis, according to which the Commission "was wrong [i]n concluding that the interchange fee [was] a restriction of competition; [t]o focus on the impact of the interchange fee (or differences in its level) on MSCs without considering the effect on cardholder charges; [and in] denying that the scheme [had] to set an interchange fee level that maximises the volume of transactions and ignoring that this would promote consumer welfare".

187     Therefore, it must be held that while the application presents the terms of the [appellants'] complaint, it does not include the arguments to support it.

188     Consequently, the Commission was correct to maintain that the text of the application does not reveal sufficiently precise information to enable this Court to be able to exercise its power of review and the Commission to prepare its defence.'

31     In the first part of the fourth plea of the application at first instance, in paragraphs 111 to 130 of that application, alleging infringement of the appellants' rights of defence, the appellants inter alia criticised the Commission for a 'lack of clarity in the letter of facts' which the Commission had sent to them on 23 March 2007, after the hearing on 14 and 15 November 2006. In that regard, the General Court observed, in paragraph 278 of the judgment under appeal, that 'the [appellants'] arguments are included in their application only in particularly succinct terms'. In paragraph 280 of that judgment, the General Court considered that, since the appellants had merely made a general reference to Annex A.20 to the application at first instance, no account could be taken of that annex.

32     In paragraphs 189 and 282 of the judgment under appeal, the General Court rejected as inadmissible the complaints relating, respectively, to the Commission's examination of the economic evidence submitted by the appellants and to a lack of clarity in the letter of facts.

Arguments of the parties

# A4934

33    The appellants claim that the General Court made errors of law with regard to the admissibility of several annexes to the application at first instance. Contrary to the requirements of Article 52(1) of the Charter of Fundamental Rights of the European Union, there is, according to the appellants, no legal basis on which the General Court may limit the right of access to the courts in this way.

34    In the alternative, even if the General Court had such powers, it erred in law in considering that that limitation had to be applied in the present case. In paragraphs 188 to 189 and 278 of the judgment under appeal, the General Court also made an error of assessment in considering that the text of certain complaints of the appellants did not reveal sufficiently precise information for the annexes relating thereto to be deemed admissible. The General Court should have concluded that paragraphs 52 to 54 and 122 of the application at first instance were sufficiently precise as regards the complaints and the arguments relied on, and that Annexes A.13 to A.15 and A.20 to that application were therefore admissible. In addition, in paragraph 219 of the judgment under appeal, the General Court did not rule on whether Annexes A.13 and A.14 to that application should be rejected, despite the fact that it rejected the claim referring to the very same annexes in paragraphs 185 to 189 of that judgment. In that regard, the appellants submit, in particular, that the fact that they identified, first, the specific points in that application which they wished to supplement with annexes and, secondly, the corresponding annexes, should have been sufficient.

35    In that context, the appellants also take issue with the statement in paragraph 190 of the judgment under appeal that, in essence, inasmuch as their complaint could be understood as criticising the Commission for 'having failed to take into account the economic arguments that demonstrate the advantages of the MIF for the MasterCard [payment] system, cardholders or consumers in general, [the complaint] is of no relevance in the context of a plea relating to infringement of Article 81(1) EC'.

36    According to the Commission, the appellants' reasoning in connection with the third plea in the main appeal is not clear. On the one hand, they claim that there is no legal basis to justify the limitation imposed by the General Court and that their right of access to the court is impaired. On the other hand, they maintain that the arguments set out in the annexes to the application at first instance were sufficiently summarised in the application, which is a question of fact that is inadmissible. Furthermore, the appellants do not explain how the outcome of the judgment under appeal would have been any different if the annexes concerned had been taken into account by the General Court.

37    RBS and HSBC do not comment on the third plea in the main appeal. LBG and MBNA support the plea but do not devote any specific arguments to it. BRC and EuroCommerce briefly contest the plea. Without putting forward a specific argument, the United Kingdom contends that the plea should be rejected.

Findings of the Court

38    Under Article 21 of the Statute of the Court of Justice of the European Union, applicable to the General Court by virtue of the first paragraph of Article 53 thereof, and Article 44(1)(c) of the Rules of Procedure of the General Court, each application is required to state the subject-matter of the proceedings and a summary of the pleas in law on which the application is based.

39    It is clear from the case-law of the Court of Justice that the 'summary of the pleas in law' which must be stated in any application, as provided for by those articles, means that the application must specify the nature of the grounds on which the application is based (see judgments in *Fives Lille Cail and Others* v *High Authority*, 19/60, 21/60, 2/61 and 3/61, EU:C:1961:30, 295, and *Grifoni* v *EAEC*, C-330/88,

# A4935

EU:C:1991:95, paragraph 18).

40    Thus, in particular, it is necessary, for an action before the General Court to be admissible, that the basic matters of law and fact relied on be indicated, at least in summary form, coherently and intelligibly in the application itself. Whilst the body of the application may certainly be supported and supplemented on specific points by references to extracts from documents annexed thereto, a general reference to other documents, even those annexed to the application, cannot make up for the absence of the essential arguments in law which, in accordance with the abovementioned provisions, must appear in the application (see, to that effect, judgments in *Dansk Rørindustri and Others* v *Commission*, C-189/02 P, C-202/02 P, C-205/02 P to C-208/02 P and C-213/02 P, EU:C:2005:408, paragraphs 94 to 100, and *Versalis* v *Commission*, C-511/11 P, EU:C:2013:386, paragraph 115).

41    In order to guarantee legal certainty and the sound administration of justice, the summary of the pleas in law of the applicant must be sufficiently clear and precise to enable the defendant to prepare its defence and the competent court to rule on the action (see, to that effect, judgment in *Grifoni* v *EAEC*, EU:C:1991:95, paragraph 18). Thus, it is not for the General Court to seek and identify in the annexes the pleas on which it may consider the action to be based (see judgment in *Dansk Rørindustri and Others* v *Commission*, EU:C:2005:408, paragraphs 97 and 100). Similar requirements are called for where a submission is made in support of a plea in law raised before the General Court (see judgment in *Versalis* v *Commission*, EU:C:2013:386, paragraph 115).

42    In those circumstances, the appellants are wrong to claim that there is no legal basis underpinning the approach taken by the General Court in relation to the account to be taken of the content of the annexes submitted to it.

43    With regard to the alternative arguments set out in paragraph 34 of the present judgment, it should be noted at the outset that, as is evident from paragraphs 189 and 282 of the judgment under appeal, the General Court declared inadmissible not the annexes in question, as the appellants claim, but two complaints which, although raised in the application at first instance, were not, according to the General Court's assessment, accompanied by sufficiently precise information for the General Court to be able to exercise its power of review and the opposing party to be able to provide its defence. In that respect, the appellants have therefore misread the judgment under appeal.

44    It is also on the basis of that misreading that the appellants invoke the fact that, in paragraph 219 of the judgment under appeal, the General Court — in the context of the second plea of the application at first instance — did not rule on whether Annexes A.13 and A.14 to that application should be rejected, while rejecting the claim referring to the very same annexes in paragraphs 185 to 189 of that judgment.

45    Furthermore, in the present appeal, the appellants have not claimed, much less established, that the General Court distorted the content or scope of the relevant parts of the application at first instance in paragraphs 186 and 278 of the judgment under appeal in going on to conclude that those parts of the application at first instance were not stated in sufficient detail to comply with the requirements of Article 44(1)(c) of the Rules of Procedure of the General Court, and that no account could be taken of the annexes relating thereto.

46    In so far as, as is evident from paragraph 35 of the present judgment, the appellants criticise paragraph 190 of the judgment under appeal, their argument must be rejected as ineffective, since that

# A4936

paragraph concerns a ground of the judgment under appeal included for the sake of completeness, as is apparent, inter alia, from the use of the introductory term '[m]oreover'.

47    In the light of the foregoing, the third plea in the main appeal must be rejected in its entirety.

*The second plea in the main appeal, alleging an error of law and/or inadequate reasoning with regard to the assessment of the question whether MasterCard is an association of undertakings*

48    As a preliminary point, it must be noted that, in paragraph 259 of the judgment under appeal, the General Court ruled as follows:

'It must be held that in view of the two factors mentioned above, namely the retention, after the IPO, of the banks' decision-making powers within [MasterCard] and the existence of a commonality of interests between that organisation and the banks on the issue of the MIF, the Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by [the IPO], [MasterCard] had continued to be an institutionalised form of coordination of the conduct of the [participating] banks. Consequently, the Commission was fully entitled to characterise as decisions by an association of undertakings the decisions taken by the bodies of [MasterCard] in determining the MIF.'

 Arguments of the parties

49    According to the appellants, in ruling that, notwithstanding the changes to its structure and form of governance brought about by the IPO, MasterCard is an association of undertakings when taking decisions relating to the MIF, the General Court made an error of law and/or failed to provide adequate reasoning for the judgment under appeal.

50    First of all, the alleged commonality of interests between MasterCard and the participating banks and the banks' decision-making powers after the IPO on matters other than the MIF are, according to the appellants, insufficient to support the view that MasterCard is an association of undertakings when taking decisions relating to the MIF. The appellants state that it follows from the case-law of the Court of Justice that an organisation cannot be characterised as an association of undertakings within the meaning of Article 81(1) EC where, on the one hand, it is not composed of a majority of representatives of those undertakings and, on the other, it is required by national legislation to pursue interests other than those of the undertakings when taking its decisions. After the IPO, the MasterCard Board was composed of a substantial majority of individuals having no affiliation with any financial institution. Moreover, MasterCard is a commercial entity separate from its banking customers, pursuing its own commercial interests, and guided by its Board of Directors which is required by law to act in accordance with its fiduciary duties towards the shareholders of MasterCard.

51    Next, after the IPO, the residual decision-making power of the participating banks on matters other than the MIF is manifestly irrelevant to the characterisation of MasterCard as an association of undertakings when taking decisions relating to the MIF. Thus, even on the assumption that, after the IPO, MasterCard could still be characterised as an association of undertakings when taking decisions on matters other than the MIF, that characterisation is irrelevant for the purpose of determining whether that is the case when it takes decisions that do concern the MIF. The appellants add that the inadequacy of the residual decision-making power of the participating banks on matters other than the MIF is confirmed by the use of the word 'seemed' in paragraph 249 of the judgment under appeal, which clearly shows that the factual

# A4937

elements were not even sufficient to support the view that MasterCard is an association of undertakings when deciding on matters other than the MIF.

52      The alleged commonality of interests between MasterCard and the participating banks in setting or maintaining high MIF is also wholly irrelevant and, in any event, inadequate for the purpose of characterising MasterCard as an association of undertakings. The judgment in *Verband der Sachversicherer* v *Commission* (45/85, EU:C:1987:34), cited in paragraph 251 of the judgment under appeal, does not support the view that a commonality of interests is a relevant factor in assessing whether there is an association of undertakings. Even on the assumption that the alleged commonality of interests between those banks and MasterCard is a relevant factor in determining whether MasterCard is an association of undertakings when taking decisions relating to the MIF, that factor would still be insufficient for that conclusion to be reached. The existence of an association of undertakings within the meaning of Article 81(1) EC cannot be inferred merely from the fact that a listed company may also take into account its customers' interests when adopting its decisions. More generally, moreover, inferring the existence of an association of undertakings for the purposes of applying competition law merely from the fact that two or more undertakings might have a common economic interest would lead to absurd and undesirable legal consequences, particularly in concentrated markets.

53      Lastly, the appellants submit that, even on the basis of the test of a commonality of interests, the Commission's position cannot be sustained. They criticise the General Court for having confined itself to stating that acquirers normally pass on the MIF to merchants and for having thus omitted to assess whether the Commission's assertion that the acquiring banks have an interest in high MIF was supported by any evidence.

54      The Commission contends, in essence, that the arguments summarised in paragraphs 50 to 52 of the present judgment, with the exception of those relating to the interpretation of the judgment in *Verband der Sachversicherer* v *Commission* (EU:C:1987:34), challenge the General Court's assessment of the facts and are therefore inadmissible. The Commission adds, in the context of its response regarding the substance, that, in so far as the second plea in the main appeal alleges inadequate reasoning, that plea is unsupported by arguments.

55      The United Kingdom maintains that the argument mentioned in paragraph 53 of the present judgment is inadmissible in so far as that argument is limited to challenging the assessment of the facts made at first instance.

56      As regards the substance, the Commission takes the view that, in accordance with the case-law, MasterCard may be characterised as an association of undertakings following the IPO, and the MIF as a decision of such an association. On that point it submits, in particular, that, depending on the circumstances, the Courts of the European Union have used a non-exhaustive multiplicity of criteria in order to determine the existence of an association of undertakings. In the present case, the members of MasterCard are exclusively issuing and acquiring banks, which have limited their commercial freedom by delegating certain decisions to their common organ, namely the MasterCard Global Board or its delegates, which sets the level of the MIF for them. According to the Commission, 'MasterCard's strained distinction about the role of commonality of interest' is not valid.

57      RBS, HSBC, LBG and MBNA endorse the second plea in the main appeal. HSBC takes the view, in particular, that the legal criteria consistently applied by the Court of Justice in order to identify an

# A4938

association of undertakings, particularly the fact that the association is controlled by representatives of its members and acts solely in their interests, are not met in this case. LBG submits, inter alia, that the criterion of a 'commonality of interests', wrongly used by the General Court, is far wider than the 'concurrence of wills' criterion applied in order to determine whether there is an agreement that falls within Article 81 EC, since it is satisfied even in the absence of any form of collusion.

58      BRC, EuroCommerce and the United Kingdom challenge the arguments relied on in support of the second plea in the main appeal. In that regard, EuroCommerce contends, in particular, that the decision of the association of undertakings which MasterCard constituted prior to the IPO is still in effect, and therefore there was no need either for the Commission or for the General Court to examine whether, after the IPO, MasterCard was still an association of undertakings. In the view of the United Kingdom that plea adopts an unduly formal approach to the categories of act which are caught by Article 81 EC. According to the United Kingdom, the essential condition of co-ordinated behaviour is clearly satisfied in the present case.

Findings of the Court

–      Admissibility

59      When the appellants claim, inter alia, in the context of the second plea in the main appeal, that the judgment under appeal lacks adequate reasoning, they are in fact merely arguing that the General Court misconstrued the concept of 'associations of undertakings' within the meaning of Article 81(1) EC. Consequently, in so far as this plea alleges a failure to provide adequate reasoning for the judgment, it must be rejected as inadmissible.

60      The Court must also uphold the objection of inadmissibility raised by the United Kingdom, set out in paragraph 55 of the present judgment. In that regard, it is clear from Article 256 TFEU and the first paragraph of Article 58 of the Statute of the Court of Justice that the General Court has exclusive jurisdiction, first, to find the facts, except where the substantive inaccuracy of its findings is apparent from the documents submitted to it, and, secondly, to assess those facts. However, when the General Court has found or assessed the facts, the Court of Justice has jurisdiction under Article 256 TFEU to review the legal characterisation of those facts by the General Court and the legal conclusions it has drawn from them (see, in particular, judgments in *General Motors* v *Commission*, C-551/03 P, EU:C:2006:229, paragraph 51, and *Evonik Degussa* v *Commission*, C-266/06 P, EU:C:2008:295, paragraph 72). It follows from this that, in so far as the appellants are, by the argument set out in paragraph 53 of the present judgment, attempting to obtain from the Court of Justice a reassessment of the facts found by the General Court, their argument must be rejected as inadmissible.

61      As to the remainder, in so far as the arguments set out in paragraphs 50 to 52 of the present judgment allege an error of law with regard to the assessment of the question whether MasterCard is an association of undertakings, it should be noted that, contrary to the Commission's contention, the appellants are not, in essence, merely challenging the assessment of the facts made at first instance, but are relying, for the main part, on questions of law which are admissible at the appeal stage.

–      Substance

62      Without prejudice to the right of economic operators to adapt themselves intelligently, but independently,

## A4939

to the existing or anticipated conduct of their competitors (see judgments in *Suiker Unie and Others* v *Commission*, 40/73 to 48/73, 50/73, 54/73 to 56/73, 111/73, 113/73 and 114/73, EU:C:1975:174, paragraph 174; *Ahlström Osakeyhtiö and Others* v *Commission*, C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85, EU:C:1993:120, paragraph 71; and *Asnef-Equifax and Administración del Estado*, C-238/05, EU:C:2006:734, paragraph 53 and the case-law cited), Article 81 EC catches all forms of cooperation and of collusion between undertakings, including by means of a collective structure or a common body, such as an association, which are calculated to produce the results which that provision aims to suppress (see, to that effect, judgments in *Nederlandse Vereniging voor de fruit en groentenimporthandel and Frubo* v *Commission*, 71/74, EU:C:1975:61, paragraph 30; *van Landewyck and Others* v *Commission*, 209/78 to 215/78 and 218/78, EU:C:1980:248, paragraph 88; and *Eurofer* v *Commission*, C-179/99 P, EU:C:2003:525, paragraph 23).

63      Thus, it is settled case-law that, although Article 81 EC distinguishes between 'concerted practice', 'agreements between undertakings' and 'decisions by associations of undertakings', the aim is to have the prohibitions of that article catch different forms of coordination between undertakings of their conduct on the market (see, in particular, judgments in *Imperial Chemical Industries* v *Commission*, 48/69, EU:C:1972:70, paragraph 64; *Commission* v *Anic Partecipazioni*, C-49/92 P, EU:C:1999:356, paragraph 112; and *Asnef-Equifax and Administración del Estado*, EU:C:2006:734, paragraph 32) and thus to prevent undertakings from being able to evade the rules on competition on account simply of the form in which they coordinate that conduct.

64      In the present case, as is apparent in particular from paragraph 238 of the judgment under appeal, it is undisputed that, before the IPO, MasterCard could be considered to be an 'association of undertakings' within the meaning of Article 81 EC. It is also apparent from that paragraph that, in the context of their third plea at first instance, the appellants complained that the Commission, in particular, had not taken into account the changes made by the IPO to MasterCard's structure and governance. In those circumstances, as is apparent from paragraph 244 of the judgment under appeal, the third plea before the General Court concerned the issue whether MasterCard could still be considered to be 'an institutionalised form of coordination of the banks' conduct' after the changes made by the IPO.

65      The arguments raised in the second plea in the main appeal must be examined in that context.

66      It is apparent from paragraph 259 of the judgment under appeal that, in relying, first, on the retention of the banks' decision-making power within MasterCard and, secondly, on the existence of a commonality of interests between that organisation and the banks on the issue of the MIF, the General Court rejected the appellants' arguments, recalled in paragraph 238 of the judgment under appeal, that, in essence, as a result of the changes to the structure and operation of MasterCard in the context of the IPO, that organisation could no longer be considered to be an 'association of undertakings' within the meaning of Article 81 EC at the time of the adoption of the decision at issue.

67      More specifically, as regards, in the first place, the arguments summarised in paragraphs 51 and 52 of the present judgment, it must be noted that the two factors on which the General Court concentrated in its analysis in the context of the third plea of the application at first instance must be read together. As is apparent from paragraph 238 of the judgment under appeal, the appellants had maintained that, after the IPO, the banks no longer controlled MasterCard and MasterCard determined the MIF unilaterally.

# A4940

Moreover, it is apparent from paragraph 239 of that judgment that it was claimed that the Commission had failed to establish that MasterCard was continuing to act in the interests of those banks or on their behalf, rather than on behalf of shareholders of MasterCard Inc.

68      In that regard, in paragraphs 245 to 249 of the judgment under appeal, the General Court essentially found in its definitive assessment of the facts, first, that, at the time of the adoption of the decision at issue, even though the MasterCard member banks were no longer taking part in the decision-making process within the bodies of that organisation in relation to the MIF, 'MasterCard ... seemed instead to be continuing to operate in Europe as an association of undertakings, in which the banks were not merely customers for the services provided but participated collectively and in a decentralised manner in all essential elements of the decision-making power'. It should be emphasised in that regard that, notwithstanding the General Court's inappropriate use of the word 'seemed' in that context, it is evident from a reading of the whole of paragraphs 245 to 249 of the judgment under appeal that the General Court did ascertain that, at the date of the decision at issue, the banks were continuing, collectively, to exercise decision-making powers in respect of the essential aspects of the operation of the MasterCard payment organisation after the IPO, which meant that the conclusions to be drawn from the IPO were very much to be set in perspective. Secondly, in paragraphs 250 to 258 of the judgment under appeal, the General Court also found, in essence, that the Commission had been able properly to conclude that the MIF reflected the banks' interests, because there was, on that point, a commonality of interests between MasterCard, its shareholders and the banks.

69      Taken together, those two factors, summarised in paragraph 259 of the judgment under appeal, effectively explain why, according to the General Court, the setting of the MIF by MasterCard continued to operate, notwithstanding the changes arising from the IPO, as 'an institutionalised form of coordination of the conduct of the banks'. According to the logic of the General Court in the judgment under appeal, given that MasterCard's interests and those of the shareholders of MasterCard Inc. converged with regard to the setting of the MIF, the participating banks were in a position to delegate the setting of those fees, while retaining decision-making powers in many other respects.

70      In addition, it is apparent on reading paragraphs 238 to 260 of the judgment under appeal as a whole, and in particular paragraphs 243 to 245, 249 and 259 thereof, that, in the context of its examination of the question whether the institutionalised form of cooperation by which MasterCard operated prior to the IPO had ceased to operate after that event, the General Court definitively found the two criteria at issue to be relevant on the basis of the elements of fact and of law existing at the time of the adoption of the decision at issue, its assessment falling within the broader factual framework of which it was seised.

71      In particular, the General Court considered the existence of a commonality of interests to be relevant in this instance not only on the basis of a theoretical concurrence of the banks' interests and those of MasterCard, but also having taken into account, in its definitive assessment of the facts, specific factual circumstances in respect of which no allegation of distortion was made, including, first, as is apparent from the parties' arguments as set out in paragraphs 238 and 239 of the judgment under appeal, the fact that it was undisputed that MasterCard was acting in the interests of the banks before the IPO; secondly, as is apparent from paragraph 256 of that judgment, the developments after the IPO which indicate that that organisation is, in reality, continuing to take into account concrete banks' interests in setting the level of the MIF; and, thirdly, as is apparent from paragraph 258 of the same judgment, the fact that the interests of MasterCard's shareholders do not conflict with those of the banks.

# A4941

72      In those circumstances, it was open to the General Court to find, in the particular circumstances of the case and taking into account the arguments expounded before it, that both the banks' residual decision-making powers after the IPO on matters other than the MIF, and the commonality of interests between MasterCard and the banks, were both relevant and sufficient for the purposes of assessing whether, after the IPO, MasterCard could still be considered to be an 'association of undertakings', within the meaning of Article 81 EC.

73      As to the reference, in paragraph 251 of the judgment under appeal, to the judgment in *Verband der Sachversicherer* v *Commission* (EU:C:1987:34, paragraph 29), it should be noted that that reference is intended simply to respond to the criticism, reproduced in paragraph 239 of the judgment under appeal, that the criterion of the existence of a commonality of interests between MasterCard and the banks was not based on any legal authority. Contrary to what is suggested by the appellants, in recalling in that context that 'it follows from the case-law of the Court of Justice that the existence of a commonality of interests or a common interest is a relevant factor for the purposes of assessing whether there is a decision by an association of undertakings within the meaning of Article 81(1) EC', the General Court did not seek to impose a general criterion, much less an exclusive criterion.

74      As regards, in the second place, the arguments summarised in paragraph 50 of the present judgment, it is admittedly apparent from the case-law of the Court that a decision taken by a body having regulatory powers within a given sector might fall outside the scope of Article 81 EC where that body is composed of a majority of representatives of the public authorities and where, on taking a decision, it must observe various public-interest criteria (see, in particular, judgment in *Pavlov and Others*, C-180/98 to C-184/98, EU:C:2000:428, paragraph 87 and the case-law cited).

75      Nevertheless, the case-law cited in the preceding paragraph related, in essence, to the question whether, when they were adopting particular legislation, the bodies concerned, which were composed at least partly of representatives of economic operators from a given sector, had to be regarded as being associations of undertakings, or, on the contrary, as exercising public powers. No such question arose before the General Court in the present case. Similarly, the facts and legal problems raised by the case that resulted in the judgment in *Wouters and Others* (C-309/99, EU:C:2002:98) and the associated Opinion (Opinion of Advocate General Léger in *Wouters and Others*, C-309/99, EU:C:2001:390), on which the appellants principally rely, are not comparable to those of the present case.

76      In the light of all the foregoing considerations, it must be held that, as the Advocate General noted in point 45 of his Opinion, the appellants cannot maintain that a body such as MasterCard cannot be classified as an association of undertakings when adopting decisions relating to the MIF, since it is apparent from the foregoing that the General Court correctly found that, when those decisions are taken, those undertakings intend or at least agree to coordinate their conduct by means of those decisions and that their collective interests coincide with those taken into account when those decisions are adopted, particularly in circumstances where the undertakings in question pursued, over several years, the same objective of joint regulation of the market within the framework of the same organisation, albeit under different forms.

77      Having regard to the foregoing, the second plea in the main appeal must be rejected.

*The first plea in the main appeal, alleging an error of law and/or inadequate reasoning with regard to the assessment of the objective necessity of the alleged restriction of competition*

# A4942

78    In the judgment under appeal, the General Court carried out an assessment of the objective necessity of the MIF, before addressing the question as to whether those fees produce anti-competitive effects. In those circumstances, it is appropriate, in the present judgment, to examine the plea concerning the ancillary nature of the MIF in relation to the MasterCard payment system, before addressing the plea relating to the possibly restrictive effects of those fees.

79    In essence, the first plea in the main appeal is expressed in four parts, the second, third and fourth of which are alternatives to the first.

The judgment under appeal

80    According to the General Court, the first plea of the application at first instance was composed, in essence, of two parts. In the first part of that plea, the appellants submitted that the Commission wrongly found that the MIF produced effects restrictive of competition. In the second part, the appellants claimed that the Commission ought to have concluded that the MIF were objectively necessary to the operation of the MasterCard system.

81    In examining in the first place that second part of the plea, the General Court stated the following in paragraph 89 of the judgment under appeal:

'... examination of the objective necessity of a restriction is a relatively abstract exercise. Only those restrictions which are necessary in order for the main operation to be able to function in any event may be regarded as falling within the scope of the theory of ancillary restrictions. Thus, considerations relating to the indispensable nature of the restriction in the light of the competitive situation on the relevant market are not part of an analysis of the ancillary nature of the restriction ...'

82    Next, the General Court stated, in paragraph 90 of the judgment under appeal, that 'the fact that the absence of the MIF may have adverse consequences for the functioning of the MasterCard system does not, in itself, mean that the MIF must be regarded as being objectively necessary, if it is apparent from an examination of the MasterCard system in its economic and legal context that it is still capable of functioning without it'. In paragraph 91 of its judgment, the General Court considered that '[t]he Commission's reasoning in inferring that the MIF is not objectively necessary from the fact that the MasterCard system could function without it is not, therefore, vitiated by any error of law'.

83    In paragraphs 94 to 99 of the judgment under appeal, the General Court rejected the appellants' argument that, in essence, the MIF is objectively necessary for the MasterCard system because it constitutes a default transaction settlement procedure, given that, without MIF, the Honour All Cards Rule would have the effect of placing acquiring banks 'at the mercy' of issuing banks.

84    In that context, after having found that the Commission's recourse to the prohibition of *ex post* pricing, as referred to in the fourth indent of paragraph 11 of the present judgment, does not disclose 'any manifest error of assessment', the General Court held, in paragraph 96 of the judgment under appeal, that '[t]he fact that there are default transaction settlement procedures less restrictive of competition than the MIF precludes the latter from being regarded as objectively necessary for the operation of the MasterCard system merely on the basis of the MIF's status as a default transaction settlement procedure'. In paragraph 99 of that judgment, it is stated, inter alia, that it was 'for the Commission to consider whether the premiss of a MasterCard system operating without a MIF was economically viable and could,

# A4943

therefore, be taken into account in the comparison'. However, the Commission, again according to paragraph 99, was 'not … obliged to demonstrate that market forces would compel the issuing and acquiring banks themselves to decide to adopt a rule less restrictive of competition than the MIF'.

85    Having held, in paragraph 120 of the judgment under appeal, that the Commission was legitimately able to conclude that the MIF were not objectively necessary for the operation of the MasterCard system, the General Court rejected the second part of the first plea of the application at first instance.

First part of the first plea in the main appeal

–    Arguments of the parties

86    The appellants submit that the General Court misapplied the test of the 'objective necessity' of a restriction. Instead of applying the test under which a given limitation on commercial autonomy is 'objectively necessary' if, without it, it is either impossible or difficult to achieve the main operation, the General Court applied, notably in paragraphs 89 and 90 of the judgment under appeal, an incomplete test according to which a restriction is objectively necessary only if, without it, the main operation is incapable of functioning. The appellants rely in that respect on paragraph 109 of the judgment of the General Court in *M6 and Others* v *Commission* (T-112/99, EU:T:2001:215), according to which '[i]f, without the restriction, the main operation is difficult or even impossible to implement, the restriction may be regarded as objectively necessary for its implementation'. According to the appellants, in paragraph 89 of the judgment under appeal, the General Court amalgamated the objective necessity test for the purpose of determining the ancillary nature of the restriction with the indispensability test under Article 81(3) EC.

87    The Commission contends that if the distinction between 'ancillary' restraints and the indispensable restrictions referred to in Article 81(3) EC is not to be rendered meaningless, it is only the 'necessity' of those restraints that enables a restriction that can be justified under Article 81(3) EC to be distinguished from a restriction that can, as an ancillary restraint, escape the application of Article 81(1) EC.

88    RBS, HSBC, LBG and MBNA endorse the first part of the first plea in the main appeal. In support of the Commission, BRC, EuroCommerce and the United Kingdom essentially contend that it is the appellants who are mistaken about the test in question.

–    Findings of the Court

89    It is apparent from the case-law of the Court of Justice that if a given operation or activity is not covered by the prohibition rule laid down in Article 81(1) EC, owing to its neutrality or positive effect in terms of competition, a restriction of the commercial autonomy of one or more of the participants in that operation or activity is not covered by that prohibition rule either if that restriction is objectively necessary to the implementation of that operation or that activity and proportionate to the objectives of one or the other (see to that effect, in particular, judgments in *Remia and Others* v *Commission*, 42/84, EU:C:1985:327, paragraphs 19 and 20; *Pronuptia de Paris*, 161/84, EU:C:1986:41, paragraphs 15 to 17; *DLG*, C-250/92, EU:C:1994:413, paragraph 35, and *Oude Luttikhuis and Others*, C-399/93, EU:C:1995:434, paragraphs 12 to 15).

90    Where it is not possible to dissociate such a restriction from the main operation or activity without jeopardising its existence and aims, it is necessary to examine the compatibility of that restriction with

# A4944

Article 81 EC in conjunction with the compatibility of the main operation or activity to which it is ancillary, even though, taken in isolation, such a restriction may appear on the face of it to be covered by the prohibition rule in Article 81(1) EC.

91     Where it is a matter of determining whether an anti-competitive restriction can escape the prohibition laid down in Article 81(1) EC because it is ancillary to a main operation that is not anti-competitive in nature, it is necessary to inquire whether that operation would be impossible to carry out in the absence of the restriction in question. Contrary to what the appellants claim, the fact that that operation is simply more difficult to implement or even less profitable without the restriction concerned cannot be deemed to give that restriction the 'objective necessity' required in order for it to be classified as ancillary. Such an interpretation would effectively extend that concept to restrictions which are not strictly indispensable to the implementation of the main operation. Such an outcome would undermine the effectiveness of the prohibition laid down in Article 81(1) EC.

92     However, that interpretation does not mean that there has been an amalgamation of, on the one hand, the conditions laid down by the case-law for the classification — for the purposes of the application of Article 81(1) EC — of a restriction as ancillary, and, on the other hand, the criterion of the indispensability required under Article 81(3) EC in order for a prohibited restriction to be exempted.

93     In that regard, suffice it to note that those two provisions have different objectives and that the latter criterion relates to the issue whether coordination between undertakings that is liable to have an appreciable adverse impact on the parameters of competition, such as the price, the quantity and quality of the goods or services, which is therefore covered by the prohibition rule laid down in Article 81(1) EC, can none the less, in the context of Article 81(3) EC, be considered indispensable to the improvement of production or distribution or to the promotion of technical or economic progress, while allowing consumers a fair share of the resulting benefits. By contrast, as is apparent from paragraphs 89 and 90 of the present judgment, the objective necessity test referred to in those paragraphs concerns the question whether, in the absence of a given restriction of commercial autonomy, a main operation or activity which is not caught by the prohibition laid down in Article 81(1) EC and to which that restriction is secondary, is likely not to be implemented or not to proceed.

94     In ruling, in paragraph 89 of the judgment under appeal, that '[o]nly those restrictions which are necessary in order for the main operation to be able to function in any event may be regarded as falling within the scope of the theory of ancillary restrictions', and in concluding, in paragraph 90 of the judgment under appeal, that 'the fact that the absence of the MIF may have adverse consequences for the functioning of the MasterCard system does not, in itself, mean that the MIF must be regarded as being objectively necessary, if it is apparent from an examination of the MasterCard system in its economic and legal context that it is still capable of functioning without it', the General Court did not, therefore, err in law.

95     In those circumstances, the first part of the first plea in the main appeal must be rejected.

Second and third parts of the first plea in the main appeal

    —     Arguments of the parties

96     By the second and third parts of the first plea in the main appeal, which it is appropriate to deal with together, the appellants complain that the General Court failed to assess the restriction of competition

# A4945

CURIA - Documents

constituted by the MIF, and therefore the issue of the objective necessity of those fees, in its proper context, by permitting the Commission to rely on a 'counterfactual hypothesis' — the prohibition of *ex post* pricing — that would never in fact occur. The Commission's view that some of the problems created by elimination of the MIF could be resolved by prohibiting *ex post* pricing is very different from an assessment of what would actually occur if the MIF were eliminated. The appellants claim that the General Court did not respond to the argument that such a prohibition simply would not occur without a regulatory intervention, but merely stated that the scenario envisaged did not have to be the result of market forces. By inserting a fictional condition in its analysis — the prohibition of *ex post* pricing — the Commission failed to comply with its obligation to assess the effects of the MIF on competition by comparison with what would actually occur in their absence. The appellants also complain that the General Court failed to state reasons, in that it did not explain how the prohibition of *ex post* pricing was materially different from the MIF actually applied by MasterCard.

97    In addition, the appellants claim, in essence, that the General Court ought not to have accepted what it describes, in paragraph 96 of the judgment under appeal, as '[t]he fact that there are default transaction settlement procedures less restrictive of competition than the MIF' when, in the decision at issue, the Commission had not first tried to understand how the activity in question would work in the absence of a default rule. According to the appellants, in the decision at issue the Commission simply replaced one default price with another, albeit one that was lower from the merchants' point of view.

98    Furthermore, the appellants criticise the General Court for having mischaracterised the 'counterfactual hypothesis' on which the Commission was actually relying before the General Court, according to which both the issuing banks and the acquiring banks should bear their own costs, without the need for a default rule consisting of an *ex post* pricing prohibition.

99    Lastly, the appellants maintain that the General Court wrongly substituted its own assessment for that of the Commission when examining the objective necessity of the MIF. The Commission's assessment was based on the combination of a number of findings set out in recitals 550 to 648 to the decision at issue. However, the General Court erred in relying on a limited number of those findings which played only a secondary role in that decision, while ignoring the core of the Commission's analysis and failing to acknowledge that that decision was composed of a body of evidence that, only taken together, purported to support the Commission's conclusions.

100    The Commission argues that the second and third parts of the first plea in the main appeal are inadmissible.

101    It submits that, by those parts of the plea, the appellants are challenging the General Court's assessment of the facts and evidence.

102    Moreover, the Commission contends that the appellants cannot rely, in support of their plea in the main appeal relating to the objective necessity of the MIF, on arguments originally put forward in support of a different plea in the application at first instance, which were accordingly addressed by the General Court in the context of that other plea. The Commission notes that the main appeal does not include any plea denying, as in the first part of the first plea of the application at first instance, that the MIF have the effect of restricting competition. In those circumstances, the Commission maintains, in essence, that the arguments raised to counter the assumption, in the examination of the objective necessity of the MIF, of a prohibition of *ex post* pricing as a realistic counterfactual hypothesis are inadmissible.

# A4946

CURIA - Documents

103    As regards the substance, the Commission states, in particular, that the case-law referring to what would occur in the absence of the agreement that is being examined concerns the prior question as to whether that agreement constitutes a restriction of competition at all. In the context of the first plea in the main appeal, however, the issue is that of determining whether an agreement which, *ex hypothesi*, is such a restriction is nevertheless necessary as ancillary to the functioning of a wider agreement. In that respect, the Commission notes that, in their appeal, the appellants do not contest the approach whereby the test of the 'objective necessity' of the MIF implies consideration of whether those fees are proportionate to the operation of the MasterCard system, which would invite consideration of whether there are less restrictive alternatives that are objectively possible.

104    RBS, HSBC, LBG and MBNA endorse the second and third parts of the first plea in the main appeal. BRC, EuroCommerce and the United Kingdom dispute the arguments raised by the appellants in support of those parts of the plea.

    –    Findings of the Court

105    Contrary to what is claimed by the Commission, the appellants are not simply challenging — without invoking the distortion of evidence — the General Court's assessment of the facts, but are raising questions of law which may, as such, be relied on in an appeal.

106    Next, it should be noted that, in so far as, by the objections of inadmissibility summarised in paragraph 102 of the present judgment, the Commission is merely claiming that certain arguments already put forward before the General Court are now put forward in the context of another plea, such objections cannot succeed. As regards the substance, as is apparent from paragraphs 96 and 97 of the present judgment, the appellants are critical of the fact that the General Court relied on the premiss of a prohibition of *ex post* pricing — a scenario which, in their view, would not occur, in the absence of MIF, without a regulatory intervention, and which in any event would not differ from that resulting from the existence of the MIF — in order to conclude in paragraph 96 of the judgment under appeal that '[t]he fact that there are default transaction settlement procedures less restrictive of competition than the MIF precludes the latter from being regarded as objectively necessary for the operation of the MasterCard system'.

107    It must be noted in that regard that, as is apparent from paragraphs 89 and 90 of the present judgment, in the context of the assessment, for the purposes of the application of Article 81(1) EC, of the ancillary nature of a given restriction of commercial autonomy in relation to a main operation or activity, it is necessary to consider not only whether that restriction is necessary for the implementation of the main operation or activity, but also whether that restriction is proportionate to the underlying objectives of that operation or activity.

108    It should be pointed out that, irrespective of the context or aim in relation to which a counterfactual hypothesis is used, it is important that that hypothesis is appropriate to the issue it is supposed to clarify and that the assumption on which it is based is not unrealistic.

109    Accordingly, in order to contest the ancillary nature of a restriction, as referred to in paragraphs 89 and 90 of the present judgment, the Commission may rely on the existence of realistic alternatives that are less restrictive of competition than the restriction at issue.

110    In that regard, as is apparent from paragraph 97 of the present judgment, the appellants also submit, in

# A4947

essence, that the General Court wrongly failed to penalise the Commission for not having tried, in the decision at issue, to understand how competition would function in the absence both of the MIF and of the prohibition of *ex post* pricing, a prohibition which the appellants would not have chosen to adopt without a regulatory intervention.

111    However, the alternatives on which the Commission may rely in the context of the assessment of the objective necessity of a restriction are not limited to the situation that would arise in the absence of the restriction in question but may also extend to other counterfactual hypotheses based, inter alia, on realistic situations that might arise in the absence of that restriction. The General Court was therefore correct in concluding, in paragraph 99 of the judgment under appeal, that the counterfactual hypothesis put forward by the Commission could be taken into account in the examination of the objective necessity of the MIF in so far as it was realistic and enabled the MasterCard system to be economically viable.

112    As regards the appellants' argument, set out in paragraph 96 of the present judgment, concerning a failure to state reasons, it must be held that that argument is unfounded. As is apparent from paragraphs 95 and 96 of the judgment under appeal, the General Court, in its definitive assessment of the facts, held that the Commission was fully entitled to conclude that the prohibition of *ex post* pricing was less restrictive of competition as it does not set a minimum price level on either side of the scheme, thus stating to the requisite legal standard the reasons for the conclusion set out in paragraph 99 of that judgment. In that regard, it should be borne in mind that the obligation to state reasons which applies to the General Court does not require that court to provide an account that follows exhaustively and one by one all the reasoning articulated by the parties to the case (judgment in *Aalborg Portland and Others* v *Commission*, C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P, EU:C:2004:6, paragraph 372).

113    Lastly, it must be stated that, as the Commission points out, the appellants' arguments to the effect that the General Court wrongly substituted its own assessment for that of the Commission when examining the objective necessity of the MIF amount, in fact, to a challenge in respect of the General Court's assessment of the evidence. On the grounds set out in paragraphs 94 to 120 of the judgment under appeal, at the end of a definitive appraisal of the facts of the case, which does not fall within the jurisdiction of the Court of Justice in the context of an appeal, the General Court held that 'the Commission was legitimately able to conclude that the MIF was not objectively necessary for the operation of the MasterCard system'. Those arguments must therefore be rejected as inadmissible.

114    In the light of the foregoing, the second and third parts of the first plea in the main appeal must be rejected, in so far as they seek to challenge the 'counterfactual hypothesis' employed by the General Court in its analysis of the objective necessity of the MIF and its assessment of the evidence in carrying out that analysis.

     Fourth part of the first plea in the main appeal

–    Arguments of the parties

115    The appellants submit that the General Court failed to apply the standard of judicial review required. In that regard, according to the appellants, even in the presence of complex economic assessments — a concept which should be interpreted strictly — the General Court, taking into account in particular Articles 47 and 48 of the Charter of Fundamental Rights of the European Union, could not dispense with

# A4948

the conduct of a full and in-depth review of the decisions of the Commission. In the present case, however, the General Court carried out a very limited examination in the context of its analysis of the objective necessity of the MIF. The General Court limited the review of the Commission's findings to that of a manifest error of assessment, although those findings did not entail genuinely complex economic assessments. Even on the assumption that the 'manifest error' test is applicable, the General Court resorted to a new test through which it checked the 'reasonableness' of the Commission's conclusion. The appellants submit that that defective standard of review led the General Court, inter alia, to consider only a limited number of the grounds set out in the decision at issue and to give them radically more weight than the Commission itself gave them.

116    The Commission contends that the fourth part of the first plea in the main appeal is ineffective, since the arguments developed in support of that plea are a reprise of the 'no restriction of competition' argument raised at first instance, which is not among the pleas in the main appeal.

117    As regards the substance, the Commission maintains that no complaint can be made regarding the use of the expression 'manifest error' in the judgment under appeal. A long section of the judgment under appeal — paragraphs 77 to 122 — is devoted to assessing the objective necessity of the MIF, and MasterCard's main arguments are rejected.

118    RBS, HSBC, LBG and MBNA endorse the fourth part of the first plea in the main appeal. BRC, EuroCommerce and the United Kingdom contend that it should be rejected.

–    Findings of the Court

119    It should be noted first that, in so far as, by their arguments in the fourth part of the first plea in the main appeal, the appellants take issue with the General Court for having misconstrued the standard of judicial review it should have adopted when analysing the legal criteria applied by the Commission in its assessment of the objective necessity of the MIF, the General Court was right, as is apparent from paragraphs 89 to 95 of the present judgment, to endorse the Commission's reasoning that the fact that the MIF are not objectively necessary could be inferred from the fact that the MasterCard system could function without them. In those circumstances, in so far as the appellants' arguments are critical of the General Court for having carried out too limited a review by confirming that legal test, those arguments are ineffective and must therefore be rejected.

120    Moreover, in so far as, by that fourth part of the plea, the appellants seek to challenge the standard of review adopted by the General Court when applying that test to the facts of the present case, it must be stated that the arguments relied on in that regard are essentially identical to those raised in the third part of the first plea in the main appeal, set out in paragraph 99 of the present judgment. Those arguments must therefore be rejected as inadmissible for the reasons stated in paragraph 113 of the present judgment.

121    Since the fourth part of the first plea in the main appeal is in part ineffective and in part inadmissible, it must be rejected. It follows from this that the first plea in the main appeal must be rejected in its entirety.

*The single plea in RBS's cross-appeal and the first plea in LBG's cross-appeal*

The judgment under appeal

# A4949

122    In paragraphs 123 to 193 of the judgment under appeal, the General Court rejected the first part of the first plea of the application at first instance, alleging errors of assessment in the analysis of the effects of the MIF on competition.

123    In paragraph 132 of the judgment under appeal, the General Court held that 'for the reasons mentioned in paragraphs 94 to 120 [thereof], the fact that the premiss of a MasterCard system operating without a MIF — solely on the basis of a rule prohibiting *ex post* pricing — appears to be economically viable is sufficient to justify its being taken into consideration in the context of the analysis of the effects of the MIF on competition'.

124    Paragraphs 142 and 143 of the judgment under appeal read as follows:

'142    ... the [appellants] submit, in essence, that the fact that the MIF had an impact on the level of the MSC does not affect competition between [acquiring banks], because the MIF applies in the same way to all [those banks] and operates as a cost that is common to all of them. Thus, the prohibition of *ex post* pricing would effectively impose a MIF set at zero which, from a competitive aspect, would be equivalent to and just as transparent as the current MIF, the only difference being the level at which it is set.

143    This line of argument cannot be accepted. Since it is acknowledged that the MIF sets a floor for the MSC and in so far as the Commission was legitimately entitled to find that a MasterCard system operating without a MIF would remain economically viable, it necessarily follows that the MIF has effects restrictive of competition. By comparison with an acquiring market operating without them, the MIF limits the pressure which merchants can exert on acquiring banks when negotiating the MSC by reducing the possibility of prices dropping below a certain threshold.'

125    In paragraphs 150, 157 and 158 of the judgment under appeal, the General Court considered that the Commission had correctly found that merchants are unable to constrain the level of the MIF sufficiently in so far as that constraint is in fact likely to arise only above a maximum merchants' tolerance threshold, when the cost of the transaction becomes more significant than the negative effects on merchants' custom of a refusal to accept such means of payment, or of discrimination in that regard.

126    According to paragraphs 181 and 182 of the judgment under appeal:

'181    In the second place, with regard to the criticism concerning the failure to take the two-sided nature of the market into consideration, it must be pointed out that, in that context, the [appellants] highlight the economic advantages that flow from the MIF. Thus, in essence, the [appellants] state that the MIF enables the operation of the MasterCard system to be optimised by financing expenditure intended to encourage cardholder acceptance and use. They deduce from this that it is not in the interest of banks to set the MIF at an excessive rate, and, moreover, that merchants benefit from the MIF. The [appellants] also complain that the Commission overlooked the impact of its decision on cardholders, by focusing exclusively on merchants alone. In that regard, a number of interveners add that in a system operating without the MIF they would be compelled to limit the advantages conferred on cardholders, or even to reduce their activity.

182    Such criticisms have no relevance in the context of a plea relating to infringement of Article 81(1) EC, in that they entail a weighing-up of the restrictive effects of the MIF on competition, legitimately

# A4950

established by the Commission, with any economic advantages that may ensue. However, it is only within the specific framework of Article 81(3) EC that the pro and anti-competitive aspects of a restriction may be weighed (see, to that effect, [judgment in] *Van den Bergh Foods* v *Commission*, [T-65/98, EU:T:2003:281], paragraph 107 and the case-law cited).'

Arguments of the parties

—    The single plea in RBS's cross-appeal

127    RBS maintains that, in relying on general considerations and assumptions, the General Court erred in law in its assessment of the existence of a restrictive effect on competition.

128    First of all, in assessing whether a decision has a restrictive effect on competition, the Commission should have considered what the actual 'counterfactual hypothesis' would have been in the absence of the MIF. By not penalising that omission, notably in paragraph 132 of the judgment under appeal, and by thus relying solely on the economic viability of the prohibition of *ex post* pricing rather than on any consideration of the likelihood of such a prohibition actually being adopted, the General Court erred in law by confusing the legal conditions for objective necessity and those for effects on competition.

129    Next, in RBS's submission, according to the logic of the judgment under appeal, the MIF are presumed to give rise to a restrictive effect on competition because they fix the level of the interchange fee rate to be paid by all acquiring banks alike. However, while that 'short form analysis' might be sufficient for 'object infringement' of Article 81(1) EC, where the restriction of competition is so obvious that it is not necessary to consider its effects, in circumstances where the Commission has not found such an infringement, that approach is, according to RBS, wholly inadequate for the purpose of drawing up an analysis of the effects. Neither the Commission nor the General Court based its analysis of the effects on specific and concrete evidence. Thus, in paragraph 143 of the judgment under appeal in particular, the General Court made the mistake of applying an object-based approach rather than an approach based on the effects.

130    Lastly, referring to paragraphs 143, 150, 157 and 158 of the judgment under appeal, RBS maintains that, in any event, the General Court's analysis of the effects of the MIF on competition is wrong in law and based on an assumption that is contradicted in the judgment under appeal, namely that merchants can exert pressure on acquiring banks when negotiating the MSC.

131    The appellants endorse the sole plea in RBS's cross-appeal. As to the arguments set out in paragraph 129 of the present judgment, they maintain that the only difference between the MIF and the 'counterfactual hypothesis' relied on in the judgment under appeal lies in the pricing level of the MIF. Just like the MIF, the prohibition of *ex post* pricing would be determined by MasterCard, would apply by default, and would have the effect of setting the price charged between those banks (at zero). According to the appellants, setting the level of the MIF at zero creates the same 'floor setting' effect as the MIF, albeit at a level more favourable to merchants and less so for cardholders. Thus, by failing to explain how the Commission's chosen 'counterfactual hypothesis' of a prohibition of *ex post* pricing would have less restrictive effects on competition than the MIF, the General Court failed to sufficiently reason its finding that the MIF has a restrictive effect on competition.

132    According to the Commission, although RBS refers to paragraphs 123 to 182 of the judgment under appeal in general terms in its cross-appeal, no error is alleged save as regards paragraph 132 of that

# A4951

judgment, and therefore that cross-appeal is admissible only in so far as it challenges paragraph 132.

133    As regards the substance, the Commission maintains, in essence, that RBS is acting on the basis of a misreading of the judgment under appeal. According to the Commission, it is very clear that in paragraph 132 et seq. of the judgment under appeal the General Court considered the effect of the MIF on competition by reference to conditions of competition in the absence of those fees.

134    According to the Commission, the claim that the MIF are not restrictive of competition is inherently implausible. RBS fails to have regard to the actual context. On that point, the Commission asserts that the MIF stem from a decision by an association of undertakings to set prices and that the restrictive effects of those fees are obvious.

135    The Commission takes the view that the General Court did not err in law in declaring that the prohibition of *ex post* pricing could serve as a realistic basis for comparing the situation with and without the MIF. According to the Commission, the MasterCard system is an artificial construct. It is not necessary for the operation of a two-sided market for one side of that market to remunerate the other, but that is how the appellants have chosen to construct their scheme. The Commission considers that, taking into account paragraphs 107 to 110 of the judgment under appeal, the General Court did not err in law in using the prohibition of *ex post* pricing as an alternative to the MIF.

136    In addition, the Commission disputes that the judgment under appeal is based on the premiss that high prices constitute in themselves an infringement of Article 81(1) EC. According to the Commission, the finding upheld by that judgment is that these high prices arise as the result of a restrictive agreement.

137    The Commission also challenges the assertion that the General Court did not base its analysis on specific and concrete evidence, and the assertion of contradictory reasoning, referred to in paragraph 130 of the present judgment.

       –    The first plea in LBG's cross-appeal

138    LBG submits that the General Court made errors of law in its analysis of the effects of the MIF on competition in paragraphs 123 to 193 of the judgment under appeal.

139    First of all, the General Court failed to deal with the relevant arguments or evidence before it, and failed to provide adequate reasoning as to how the MIF affect competition in the acquiring market, when the 'price fixing' was alleged in the issuing market. In particular, the General Court did not explain how the MIF affect competition in the acquiring market in which they merely constitute a common entrance cost for all competitors.

140    Next, in the light of the parties' arguments and in particular the economic evidence, the General Court, according to LBG, erred in law in excluding various elements from the analysis. In particular, in considering an infringement of Article 81(1) EC, the General Court failed to recognise the importance of constraints from other payment systems and the relevance of the two-sided nature of the system, which, according to the General Court, are relevant only in the context of Article 81(3) EC. In LBG's submission, in order to rule that the Commission had demonstrated to the requisite legal standard that there was a restriction of competition, the General Court had to be satisfied that the Commission had considered the alleged restriction of competition in its proper context.

# A4952

141   Lastly, according to LBG, the General Court applied an inappropriate standard of judicial review. As is apparent in particular from paragraph 169 of the judgment under appeal, the General Court actually applied a very limited standard of review, as distinct from that arising from the judgments in *Commission* v *Tetra Laval* (C-12/03 P, EU:C:2005:87, paragraph 39) and *KME Germany and Others* v *Commission* (C-272/09 P, EU:C:2011:810, paragraphs 94, 102 and 103).

142   The appellants endorse that plea with arguments similar to those invoked in support of RBS's cross-appeal.

143   The Commission takes the view, inter alia, that although BoS and LTSB were, in their capacity as interveners before the General Court, entitled to develop further arguments, they could not raise an entirely new plea for annulment relating to the definition of the relevant market, as the market definition used in the decision at issue had not been contested in the action at first instance. In that regard, the Commission asserts that paragraph 168 of the judgment under appeal, according to which '[t]he [appellants] and a number of interveners complain, in essence, that the Commission failed to take the two-sided nature of the market into account in its reasoning, and challenge the Commission's definition of the product market', is incorrect.

144   As regards the standard of review applied by the General Court to the economic evidence, the Commission claims that LBG's cross-appeal does not satisfy the requirements set out in Article 169(2) of the Rules of Procedure of the Court of Justice. Furthermore, the judgment in *KME Germany and Others* v *Commission* (EU:C:2011:810) is of limited relevance, being an appeal relating only to a fine and containing only *obiter dicta* on the standard of review of the legality of decisions.

145   Likewise, the Commission takes the view that LBG's argument in relation to the 'common entrance cost' was rejected by the General Court in paragraphs 142 and 143 of the judgment under appeal, which were not contested by LBG in accordance with the requirements of Article 169(2) of the Rules of Procedure of the Court of Justice.

146   Lastly, the Commission maintains that the complaint, reproduced in paragraph 140 of the present judgment, that the judgment under appeal failed to recognise the importance of the restrictive effects of other payment systems and did not take into account the two-sided nature of the system also does not comply with Article 169(2) of the Rules of Procedure, and is designed to obtain from the Court of Justice a reassessment of the facts.

Findings of the Court

—   The Commission's objections of inadmissibility

147   The objection of inadmissibility set out in paragraph 132 of the present judgment is based on an inaccurate reading of RBS's cross-appeal. Contrary to what is claimed by the Commission, RBS does not confine itself to referring generally to the General Court's analysis of the restrictive effects of the MIF, but relies on specific paragraphs of the judgment under appeal in support of its arguments, which are set out in paragraphs 129 and 130 of the present judgment. The objection of inadmissibility set out in paragraph 132 of the present judgment must therefore be rejected.

148   Furthermore, in so far as RBS complains, by its argument set out in paragraph 128 of the present

# A4953

CURIA - Documents

judgment, that the General Court failed to carry out a certain analysis, it must be borne in mind that where an appellant submits that the General Court did not respond to a plea, its submission cannot be challenged, in terms of the admissibility of the ground of appeal, on the basis that it does not cite any passage or part of the contested judgment as the specific object of its argument since, by definition, it is a failure to respond that is being alleged (see judgment in *Limburgse Vinyl Maatschappij and Others* v *Commission*, C-238/99 P, C-244/99 P, C-245/99 P, C-247/99 P, C-250/99 P to C-252/99 P and C-254/99 P, EU:C:2002:582, paragraph 423).

149    As to the argument set out in paragraph 143 of the present judgment, it is sufficient to hold that that argument is based on a misreading of LBG's cross-appeal. As is apparent from paragraphs 139 to 142 of the present judgment, LBG merely advances arguments relating to the absence of restrictive effects of the MIF without, however, challenging the definition of the relevant market as such. In those circumstances, the objection of inadmissibility set out in paragraph 143 must be rejected.

150    As regards the Commission's arguments, set out in paragraphs 144 to 146 of the present judgment, it should be borne in mind that, as is clear from paragraph 23 of this judgment, LBG's cross-appeal was brought on 31 October 2012. Article 169(2) of the Rules of Procedure of the Court of Justice, on which the Commission relies, did not enter into force until the following day. To the extent that that provision imposes a condition of admissibility by requiring that the pleas in law and legal arguments relied on in appeals 'identify precisely those points in the grounds of the decision of the General Court which are contested', it cannot be applied retroactively.

151    It is apparent, however, from Article 256 TFEU, the first paragraph of Article 58 of the Statute of the Court of Justice and Article 112(1)(c) of the latter's Rules of Procedure in force on the date on which LBG's cross-appeal was brought, that an appeal must indicate precisely the contested elements of the judgment which the appellant seeks to have set aside and also the legal arguments specifically advanced in support of the appeal (see, in particular, judgments in *Limburgse Vinyl Maatschappij and Others* v *Commission*, EU:C:2002:582, paragraphs 497 and 618, and *EFIM* v *Commission*, C-56/12 P, EU:C:2013:575, paragraph 21 and the case-law cited). An appeal or a plea which is too obscure for a response to be given does not satisfy those requirements and must be declared inadmissible (see, in particular, judgments in *Thyssen Stahl* v *Commission*, C-194/99 P, EU:C:2003:527, paragraphs 101 and 106; *Schindler Holding and Others* v *Commission*, C-501/11 P, EU:C:2013:522, paragraphs 43 to 45; and *EFIM* v *Commission*, EU:C:2013:575, paragraph 21).

152    In the present case, the first plea in LBG's cross-appeal expressly identifies a part of the judgment under appeal which it refers to as having failed to comply with the standard of judicial review, namely paragraph 169 thereof, with clear reasoning to support that argument. In addition, in so far as, by that plea, LBG complains that the General Court failed to take account of the two-sided nature of the system and considered that it would be relevant to do so only in the context of Article 81(3) EC, it is sufficiently clear that that complaint concerns paragraphs 181 and 182 of the judgment under appeal, by which the General Court found that the appellants' criticisms regarding the two-sided nature of the system were relevant only in the precise context of that provision. Furthermore, in so far as, by that plea, LBG takes issue with the General Court for having failed to recognise the importance of constraints from other payment systems, in the light of the case-law cited in paragraph 148 of the present judgment LBG cannot be criticised for having failed to enumerate the paragraphs of the judgment under appeal to which that complaint related. Lastly, contrary to the Commission's suggestion mentioned in paragraph 146 of the

# A4954

present judgment, such arguments do not merely challenge the assessment of the facts but constitute questions of law that are admissible at the appeal stage, since those arguments raise the question of the matters which should be taken into account when analysing the restrictive effects of the MIF under Article 81(1) EC.

153    It follows from this that the objections of inadmissibility set out in paragraphs 144 to 146 of the present judgment must also be rejected.

—    The substance of the single plea in RBS's cross-appeal and the first plea in LBG's cross-appeal

154    As is apparent from paragraph 141 of the present judgment, LBG complains that the General Court applied an inappropriate standard of judicial review, notably in paragraph 169 of the judgment under appeal.

155    As regards the extent of judicial review, it is apparent from EU case-law that where the General Court is seised, in accordance with Article 263 TFEU, of an action for annulment of a decision applying Article 81(1) EC, the General Court must as a general rule undertake, on the basis of the evidence adduced by the applicant in support of the pleas in law put forward, a full review of the question whether or not the conditions for the application of that provision are met (see, to that effect, judgments in *Remia and Others* v *Commission*, EU:C:1985:327, paragraph 34; *Chalkor* v *Commission*, C-386/10 P, EU:C:2011:815, paragraphs 54 and 62; and *Otis and Others*, C-199/11, EU:C:2012:684, paragraph 59). The General Court must also establish of its own motion that the Commission has stated reasons for its decision (see, to that effect, judgments in *Chalkor* v *Commission*, EU:C:2011:815, paragraph 61 and the case-law cited, and *Otis and Others*, EU:C:2012:684, paragraph 60).

156    In carrying out such a review, the General Court cannot use the Commission's margin of discretion, by virtue of the role assigned to it in competition policy by the EU and FEU Treaties, as a basis for dispensing with the conduct of an in-depth review of the law and of the facts (see, to that effect, judgments in *Chalkor* v *Commission*, EU:C:2011:815, paragraph 62, and *Otis and Others*, EU:C:2012:684, paragraph 61).

157    In the present case it must be noted that, in its assessment of the question of the restrictive effects of the MIF, the General Court used the expression 'limited review' in paragraph 169 of the judgment under appeal, which might suggest that it carried out a judicial review of the decision at issue that was more limited than that required by the case-law set out in paragraphs 155 and 156 of the present judgment.

158    However, in itself, such an expression does not necessarily demonstrate that the General Court did not in fact carry out the judicial review required. It is appropriate in this instance therefore to proceed to examine the pleas submitted to the Court of Justice (see by analogy, in particular, judgment in *KME Germany and Others* v *Commission*, EU:C:2011:810, paragraphs 108 and 109).

159    In the present case, by its argument relating to the inappropriate standard of judicial review, LBG relied specifically only on paragraph 169 of the judgment under appeal, a paragraph contained within the General Court's analysis of the complaints challenging the Commission's definition of the product market. However, in the present appeal, the appellants have not directly challenged the General Court's assessment in respect of that definition, namely the acquiring market.

## A4955

160   In those circumstances, in so far as it criticises the General Court for the level of judicial review applied in that part of its analysis, the argument raised by LBG is in any event ineffective. As to the remainder, LBG's argument concerning judicial review must be rejected as inadmissible, since it does not precisely identify the other parts of the judgment under appeal to which it relates.

161   As regards RBS's criticism, summarised in paragraph 128 of that judgment, that, in assessing whether a decision has a restrictive effect on competition, the Commission should have considered what the actual 'counterfactual hypothesis' would have been in the absence of the MIF, it should be noted that the Court of Justice has repeatedly held that in order to determine whether an agreement is to be considered to be prohibited by reason of the distortion of competition which is its effect, the competition in question should be assessed within the actual context in which it would occur in the absence of the agreement in dispute (see judgments in *LTM*, 56/65, EU:C:1966:38, 250; *Béguelin Import*, 22/71, EU:C:1971:113, paragraphs 16 and 17; *Lancôme and Cosparfrance Nederland*, 99/79, EU:C:1980:193, paragraph 26; *L'Oréal*, 31/80, EU:C:1980:289, paragraph 19; *ETA Fabriques d'Ébauches*, 31/85, EU:C:1985:494, paragraph 11; *Bagnasco and Others*, C-215/96 and C-216/96, EU:C:1999:12, paragraph 33 and the case-law cited; and also *General Motors* v *Commission*, EU:C:2006:229, paragraph 72). As the General Court rightly held, in paragraph 128 of the judgment under appeal, the same applies in the case of a decision of an association of undertakings within the meaning of Article 81 EC.

162   Nevertheless, it is apparent in particular from paragraph 132 of the judgment under appeal that, in order to assess the competitive effects of the MIF, the General Court relied on 'the premiss of a MasterCard system operating without a MIF — solely on the basis of a rule prohibiting *ex post* pricing', that is to say, on the same 'counterfactual hypothesis' it applied in order to examine whether the MIF could be regarded as an ancillary restriction as referred to in paragraphs 89 and 90 of the present judgment, in relation to the MasterCard payment system.

163   As is apparent from paragraph 108 of the present judgment, the same 'counterfactual hypothesis' is not necessarily appropriate to conceptually distinct issues. Where it is a matter of establishing whether the MIF have restrictive effects on competition, the question whether, without those fees, but by the effect of prohibiting *ex post* pricing, an open payment system such as the MasterCard system could remain viable is not, in itself, decisive.

164   By contrast, the Court should, to that end, assess the impact of the setting of the MIF on the parameters of competition, such as the price, the quantity and quality of the goods or services. Accordingly, it is necessary, in accordance with the settled case-law referred to in paragraph 161 of the present judgment, to assess the competition in question within the actual context in which it would occur in the absence of those fees.

165   In that regard, the Court of Justice has already had occasion to point out that, when appraising the effects of coordination between undertakings in the light of Article 81 EC, it is necessary to take into consideration the actual context in which the relevant coordination arrangements are situated, in particular the economic and legal context in which the undertakings concerned operate, the nature of the goods or services affected, as well as the real conditions of the functioning and the structure of the market or markets in question (see, to that effect, in particular, judgments in *Delimitis*, C-234/89, EU:C:1991:91, paragraphs 19 to 22; *Oude Luttikhuis and Others*, EU:C:1995:434, paragraph 10; *Asnef-Equifax and Administración del Estado*, EU:C:2006:734, paragraph 49 and the case-law cited; and *Erste Group*

# A4956

*Bank and Others* v *Commission*, C-125/07 P, C-133/07 P, C-135/07 P and C-137/07 P, EU:C:2009:576, paragraph 54).

166    It follows from this that the scenario envisaged on the basis of the hypothesis that the coordination arrangements in question are absent must be realistic. From that perspective, it is permissible, where appropriate, to take account of the likely developments that would occur on the market in the absence of those arrangements.

167    In the present case, however, the General Court did not in any way address the likelihood, or even plausibility, of the prohibition of *ex post* pricing if there were no MIF, in the context of its analysis of the restrictive effects of those fees. In particular, it did not, as required by the case-law set out in paragraphs 155 and 156 of the present judgment, address the issue as to how — taking into account in particular the obligations to which merchants and acquiring banks are subject under the Honour All Cards Rule, which is not the subject of the decision at issue — the issuing banks could be encouraged, in the absence of MIF, to refrain from demanding fees for the settlement of bank card transactions.

168    Admittedly, as is apparent from paragraph 111 of the present judgment, the General Court was not obliged, in the context of the examination of the ancillary nature — as referred to in paragraphs 89 and 90 of the present judgment — of the MIF, to examine whether it was likely that the prohibition of *ex post* pricing would occur in the absence of such fees. Nevertheless, taking into account the case-law referred to in paragraphs 161 and 165 of the present judgment, the situation is different in the separate context of establishing whether the MIF have restrictive effects on competition.

169    In those circumstances, it is correctly submitted in the present case that, in relying on the single criterion of economic viability, notably in paragraphs 132 and 143 of the judgment under appeal, to justify taking into consideration the prohibition of *ex post* pricing in the context of its analysis of the effects of the MIF on competition, and by failing therefore to explain in the context of that analysis whether it was likely that such a prohibition would occur in the absence of MIF otherwise than by means of a regulatory intervention, the General Court made an error of law.

170    It should be noted, however, that if the grounds of a decision of the General Court disclose an infringement of EU law but its operative part is shown to be well founded on other legal grounds, such infringement is not one that should bring about the annulment of that decision and it is appropriate to carry out a substitution of grounds (see, to that effect, judgments in *Lestelle* v *Commission*, C-30/91 P, EU:C:1992:252, paragraph 28, and *FIAMM and Others* v *Council and Commission*, C-120/06 P and C-121/06 P, EU:C:2008:476, paragraph 187 and the case-law cited).

171    That is the case here. The appellants' arguments before the General Court in relation to the objective necessity of the MIF, as described in paragraph 94 of the judgment under appeal, which is not contested in the present appeal, were based in essence on the claim that, without MIF, acquirers would be put at the mercy of issuers, who would be able to determine the level of the interchange fee unilaterally, since merchants and acquirers would be bound to accept the transaction.

172    In paragraphs 95 and 96 of the judgment under appeal, the General Court correctly considered, as is apparent from paragraphs 78 to 121 of the present judgment, that the Commission was fully entitled to conclude that 'the possibility that some issuing banks might hold up acquirers who are bound by the [Honour All Cards Rule] could be solved by a network rule that is less restrictive of competition than

## A4957

MasterCard's current solution that, by default, a certain level of interchange fees applies. The alternative solution would be a rule that imposes a prohibition on *ex post* pricing on the banks in the absence of a bilateral agreement between them'.

173    It follows from this that, as is evident from paragraphs 94 to 96 of the judgment under appeal, the only other option presenting itself at first instance as enabling the MasterCard system to operate without MIF was in fact the hypothesis of a system operating solely on the basis of a prohibition of *ex post* pricing. In those circumstances, that prohibition may be regarded as a 'counterfactual hypothesis' that is not only economically viable in the context of the MasterCard system but also plausible or indeed likely, given that there is nothing in the judgment under appeal to suggest, and it is common ground, that it was not in any way claimed before the General Court that MasterCard would have preferred to let its system collapse rather than adopt the other solution, that is to say, the prohibition of *ex post* pricing.

174    Consequently, even though the General Court wrongly considered that the economic viability of the prohibition of *ex post* pricing in the context of the MasterCard system was sufficient, by itself, to justify taking that prohibition into consideration in the analysis of the effects of the MIF on competition, in the circumstances of the present case, as described in the judgment under appeal, the General Court was entitled to rely in its analysis of the restrictive effects of the MIF on the same 'counterfactual hypothesis' it had used in the context of its analysis of the objective necessity of those fees, albeit for reasons other than those stated by the General Court in paragraphs 132 and 143 of the judgment under appeal. In those circumstances, the error of law established in paragraph 169 of the present judgment has no bearing on the analysis of the restrictive effects carried out by the General Court on the basis of the 'counterfactual hypothesis' in question.

175    Likewise, that error has no bearing on the operative part of the judgment under appeal, which is well founded on other legal grounds.

176    As to the argument, summarised in paragraph 140 of the present judgment, by which LBG accuses the General Court of having failed to recognise the importance of constraints from other systems, it is sufficient to note that, in paragraph 137 of the judgment under appeal, the General Court expressly found that the Commission was right to have taken inter-system competition into account in its analysis of the effects of the MIF. Based as it is on an erroneous interpretation of the judgment under appeal, that argument must therefore be rejected (see, to that effect, judgment in *Ojha* v *Commission*, C-294/95 P, EU:C:1996:434, paragraphs 48 and 49).

177    As regards the argument, also referred to in paragraph 140 of the present judgment, by which LBG accuses the General Court of having ruled the two-sided nature of the system to be relevant only in the context of Article 81(3) EC, it should be borne in mind that, as is apparent from paragraph 161 of the present judgment and as LBG, moreover, has submitted, the General Court was obliged to satisfy itself that the Commission had examined the alleged restriction of competition within its actual context. In order to determine whether coordination between undertakings must be considered to be prohibited by reason of the distortion of competition which it creates, it is necessary, according to the case-law referred to in paragraph 165 of the present judgment, to take into account any factor that is relevant, having regard, in particular, to the nature of the services concerned, as well as the real conditions of the functioning and the structure of the markets, in relation to the economic or legal context in which that coordination occurs, regardless of whether or not such a factor concerns the relevant market.

# A4958

178    In the present case the General Court found, in paragraph 173 of the judgment under appeal — and this has not been directly challenged in the present appeal — that the Commission could use the acquiring market as the relevant market for its analysis of the competitive effects of the MIF. Furthermore, as is apparent from paragraph 176 of the judgment under appeal, in its definitive assessment of the facts, which is not contested in the present appeal, the General Court found that there are certain forms of interaction between the 'issuing' and 'acquiring' sides, such as the complementary nature of the services, and the presence of indirect network effects, since the extent of merchants' acceptance of cards and the number of cards in circulation each affects the other.

179    In those circumstances, the economic and legal context of the coordination concerned includes, as the appellants, RBS and LBG maintain, the two-sided nature of MasterCard's open payment system, particularly since it is undisputed that there is interaction between the two sides of that system (see, by analogy, judgments in *Delimitis*, EU:C:1991:91, paragraphs 17 to 23, and *Allianz Hungária Biztosító and Others*, C-32/11, EU:C:2013:160, paragraph 42).

180    However, in the present case, as is apparent from paragraphs 181 and 182 of the judgment under appeal, the arguments essentially put before the General Court, which are not contested in the present appeal, did not include the argument now advanced by LBG in the context of the present appeal, according to which, in order to assess a restriction of competition in its proper context, it is necessary to take into account the two-sided nature of the system in question. On the contrary, the criticisms at first instance concerning the failure to take the two-sided nature of the system into account merely highlighted the economic advantages that flow from the MIF. As is evident from paragraph 93 of the present judgment and from the very wording of Article 81 EC, where it is established that a measure is liable to have an appreciable adverse impact on the parameters of competition, such as the price, the quantity and quality of the goods or services, and is therefore covered by the prohibition rule laid down in Article 81(1) EC, such advantages can be considered only in the context of Article 81(3) EC.

181    In the light of that finding, the General Court therefore correctly concluded, in paragraph 182 of the judgment under appeal, that the criticisms presented to it in relation to the two-sided nature of the system had no relevance in the context of a plea relating to infringement of Article 81(1) EC, in so far as they entailed the taking into account of economic advantages under that paragraph. The General Court also correctly concluded that any economic advantages that may ensue from the MIF are relevant only in the context of the analysis under Article 81(3) EC.

182    It follows from this that LBG's argument in relation to the two-sided nature of the system is based on an erroneous interpretation of the judgment under appeal and is not, therefore, well founded.

183    As regards RBS's complaint, summarised in paragraph 129 of the present judgment, that the General Court conducted a 'short form analysis' of the effects of the MIF, in particular in paragraph 143 of the judgment under appeal, the Commission retorts, as is clear from paragraph 134 of the present judgment, that the MIF stem from a decision by an association of undertakings to set prices and that the resulting anti-competitive effects are obvious.

184    In that regard, it is apparent from the case-law of the Court of Justice that certain types of coordination between undertakings reveal a sufficient degree of harm to competition for the examination of their effects to be considered unnecessary (see to that effect, in particular, judgments in *LTM*, EU:C:1966:38, 249; *Beef Industry Development Society and Barry Brothers*, C-209/07, EU:C:2008:643, paragraph 15;

# A4959

and *Allianz Hungária Biztosító and Others*, EU:C:2013:160, paragraph 34 and the case-law cited).

185    That case-law arises from the fact that certain forms of coordination between undertakings can be regarded, by their very nature, as being injurious to the proper functioning of normal competition (see to that effect, in particular, judgment in *Allianz Hungária Biztosító and Others*, EU:C:2013:160, paragraph 35 and the case-law cited).

186    It must however be borne in mind that, as is apparent in particular from paragraphs 27 and 141 of the judgment under appeal, the decision at issue is based not on the existence of an infringement by object as provided for in Article 81(1) EC, but on the effects of the MIF.

187    In those circumstances, contrary to what is suggested by the Commission, mere suppositions or assertions that the anti-competitive effects of the MIF are 'obvious' cannot therefore, on the basis of the case-law set out in paragraph 184 of the present judgment, be relied upon (see to that effect, in particular, judgment in *Compagnie royale asturienne des mines and Rheinzink* v *Commission*, 29/83 and 30/83, EU:C:1984:130, paragraphs 16 and 20).

188    As regards the arguments with which paragraphs 131, 139 and 142 of the present judgment are concerned, which intersect to a certain extent with RBS's argument set out in paragraph 129 of the present judgment, it must be observed that the obligation to state the reasons on which a judgment is based arises under Article 36 of the Statute of the Court of Justice, which applies to the General Court by virtue of the first paragraph of Article 53 of the Statute, and Article 81 of the Rules of Procedure of the General Court (see, in particular, judgment in *Deutsche Telekom* v *Commission*, C-280/08 P, EU:C:2010:603, paragraph 135).

189    It has consistently been held that the statement of the reasons on which a judgment is based must clearly and unequivocally disclose the General Court's reasoning in such a way as to enable the persons concerned to ascertain the reasons for the decision taken and the Court of Justice to exercise its power of review (see, in particular, judgments in *France Télécom* v *Commission*, C-202/07 P, EU:C:2009:214, paragraph 29, and *Ziegler* v *Commission*, C-439/11 P, EU:C:2013:513, paragraph 81). As has already been stated in paragraph 112 of the present judgment, the obligation to state reasons does not, however, require the General Court to provide an account that follows exhaustively and one by one all the reasoning articulated by the parties to the case. The reasoning may therefore be implicit, on condition that it enables the persons concerned to know why the General Court has not upheld their arguments and provides the Court of Justice with sufficient material for it to exercise its power of review (see, in particular, judgment in *Ziegler* v *Commission*, EU:C:2013:513, paragraph 82 and the case-law cited).

190    However, while it is the case, as is evident from paragraph 169 of the present judgment, that the General Court erred in law in its interpretation of Article 81(1) EC, in the light of the substitution of grounds in paragraphs 171 to 175 of this judgment, the arguments seeking to criticise the General Court for having conducted a 'short form' analysis of the effects of the MIF and for having given insufficient reasons in respect of that issue in the judgment under appeal cannot be founded on that sole error.

191    Moreover, in so far as the arguments mentioned in paragraph 188 of the present judgment seek to criticise the General Court for an inadequate analysis of or statement of reasons for the anti-competitive effects of the MIF, they cannot be upheld.

# A4960

192    Having properly relied on the 'counterfactual hypothesis' of a system operating on the basis of the prohibition of *ex post* pricing, contrary to RBS's contention, the General Court did not regard the MIF, by their very nature, as being injurious to the proper functioning of normal competition, but analysed the competitive effects of those fees. It must be pointed out that the General Court's analysis in that regard is not to be found only in paragraph 143 of the judgment under appeal, as RBS seems to suggest, but also includes all of the analysis in paragraphs 123 to 193 of that judgment.

193    In particular, while the General Court clearly explained in paragraph 143 of the judgment under appeal that the MIF had restrictive effects in that they '[limit] the pressure which merchants can exert on acquiring banks when negotiating the MSC by reducing the possibility of prices dropping below a certain threshold', in contrast with 'an acquiring market operating without them', the General Court did not merely presume that the MIF set a floor for the MSC but, on the contrary, proceeded to carry out a detailed examination in paragraphs 157 to 165 of the judgment under appeal in order to determine whether that was in fact the case.

194    It follows from this that RBS's argument that the analysis of the effects is comparable to an analysis of a restriction 'by object' is based on a partial reading of the judgment under appeal, focusing only on paragraph 143 thereof without taking into account the fuller examination of which it forms part.

195    Similarly, the appellants cannot criticise the General Court for having failed to explain how the hypothesis applied had less restrictive effects on competition than the MIF, given that the only difference between the two situations lies in the pricing level of the MIF. As the Commission rightly points out, the judgment under appeal is not based on the premiss that high prices in themselves constitute an infringement of Article 81(1) EC. On the contrary, as is apparent from the very wording of paragraph 143 of the judgment under appeal, high prices merely arise as the result of the MIF which limit the pressure which merchants could exert on acquiring banks, with a resulting reduction in competition between acquirers as regards the amount of the MSC.

196    In those circumstances, the Court of Justice is in a position to carry out its review of the analysis underlying the statements in paragraph 143 of the judgment under appeal. Taking into account the considerations in paragraphs 183 to 195 of the present judgment, the General Court gave reasons to the requisite legal standard for its analysis relating to the effects of the MIF on competition.

197    That conclusion is not undermined by the argument relating to the alleged contradiction in the grounds that was raised by RBS, which is set out in paragraph 130 of the present judgment. Suffice it to note that there is nothing contradictory in the General Court's reasoning in so far as it recognised that merchants are able to constrain the level of the MIF, while at the same time describing that pressure as insufficient to prevent the MIF from setting a floor and thereby reducing competition between acquirers. The General Court clearly explained in paragraph 158 of the judgment under appeal that the Commission was entitled to describe that constraint as insufficient in so far as it is liable to arise only above a maximum merchants' tolerance threshold. These are independent assessments which are not mutually contradictory, from which it follows that that argument is unfounded (see, by analogy, order in *Piau* v *Commission*, C-171/05 P, EU:C:2006:149, paragraph 85).

198    Having regard to all the foregoing, it must be held that while the General Court did err in law, as stated in paragraph 169 of the present judgment, that error is not capable of resulting in the judgment under appeal being set aside, in view of the substitution of grounds in paragraphs 171 to 175 of the present judgment.

# A4961

For the remainder, the arguments raised in the context of RBS's single plea and the first plea in LBG's cross-appeal are in part ineffective and in part unfounded.

199   In those circumstances, RBS's cross-appeal and the first plea in LBG's cross-appeal must be dismissed.

*The second plea in LBG's cross-appeal*

200   In essence, the second plea in LBG's cross-appeal, alleging infringement of Article 81(3) EC, is expressed in three parts. The appellants endorse this plea, while also submitting additional observations.

The judgment under appeal

201   According to the General Court, the second plea of the application at first instance was essentially in two parts. In the first part of this plea, the appellants complained that the Commission had imposed an excessively high burden of proof on them in relation to the proof that the conditions laid down in Article 81(3) EC had been satisfied. In the second part of the plea, they claimed that the Commission's analysis of those conditions was vitiated by manifest errors of assessment. Taking the view that it was impossible to examine that first part in the abstract, the General Court considered both parts of the second plea of the application at first instance together.

202   In paragraph 207 of the judgment under appeal, the General Court found that '[i]n so far as the MIF is not an ancillary restriction in relation to the MasterCard system, the Commission correctly considered whether there were appreciable objective advantages arising specifically from the MIF. Thus, the fact that the Commission admits in recital 679 to the [decision at issue] that payment card schemes such as the MasterCard system represent technical and economic progress is of no relevance to whether the MIF satisfies the first condition laid down under Article 81(3) EC'.

203   In paragraphs 208 to 216 of the judgment under appeal, the General Court examined the appellants' arguments concerning the role of the MIF in balancing the 'issuing' and 'acquiring' sides of the MasterCard system. In paragraph 217 of its judgment, the General Court concluded that '[i]n view of the foregoing, it must be held that the Commission was entitled, without thereby making a manifest error of assessment, to reject the arguments put forward by the [appellants] to show that the objective advantages which may arise from the MasterCard system are attributable to the role played by its MIF'.

204   In paragraph 220 of the judgment under appeal, the General Court added that, even on the assumption that it could be inferred that the MIF contribute to increasing the output of the MasterCard system, that is not sufficient to establish that they satisfy the first condition laid down in Article 81(3) EC. The General Court observed in that regard, in paragraph 221 of its judgment, that the primary beneficiaries of such an increase are the MasterCard payment organisation and participating banks, and that the improvement, within the meaning of Article 81(3) EC, cannot be assimilated to all the advantages which the parties obtain from the agreement in their production or distribution activities.

205   In paragraphs 222 to 225 of the judgment under appeal, the General Court considered the existence of appreciable objective advantages attributable to the MIF in regard to merchants and concluded, in paragraph 226 of that judgment that, 'in the absence of proof of a sufficiently close link between the MIF and the objective advantages enjoyed by merchants, the fact that the MIF may contribute to the increase in MasterCard system output is not, in itself, capable of establishing that the first condition laid down under

# A4962

Article 81(3) EC is satisfied'.

206   In paragraphs 227 to 229 of the judgment under appeal, the General Court found that, in the absence of proof of the existence of appreciable objective advantages attributable to the MIF in regard to merchants, one of the two groups of users affected by payment cards, the appellants' criticism that insufficient account was taken of the advantages of the MIF for cardholders was ineffective.

207   In the context of the appellants' arguments criticising the Commission for acting as a 'price regulator' in respect of the MIF, the General Court found, in paragraphs 230 to 232 of its judgment, that the Commission had examined and properly refuted the merits of the arguments developed by the appellants during the administrative procedure and that the lack of data capable of meeting the standard of economic proof demanded by the Commission, even if that were established, does not mean that the burden of proof is eased, or even reversed.

208   Lastly, in paragraphs 236 and 237 of the judgment under appeal, the General Court concluded its analysis of the second plea of the application at first instance, alleging infringement of Article 81(3) EC, in the following terms:

'236      In the light of the foregoing considerations, it must be concluded that the [appellants] have not established that the Commission's reasoning in relation to the first condition of Article 81(3) EC was unlawful. Since the conditions set out in that article must be met if that article is to apply, the second part of the plea must be rejected, and there is no need to examine the [appellants'] objections concerning the other aspects of the Commission's analysis pursuant to that article.

237      Consequently, the first part of the plea, relating to the excessively high burden of proof imposed on the [appellants], must also be rejected. It is clear from the explanations given above that the Commission examined the arguments and the evidence put forward by the [appellants] and, in the circumstances of the case, was properly able to conclude that they did not establish that the conditions for the application of Article 81(3) EC were fulfilled. In so far as the Commission was properly able to conclude that the [appellants] had not produced proof of the exception on which they were relying, the allegation relating to infringement of the principle *in dubio pro reo* must also be rejected.'

First part of the second plea in LBG's cross-appeal

–      Arguments of the parties

209   LBG submits that the General Court did not apply the correct test as regards the burden of proof, namely the balance of probabilities. Referring to the written observations which it submitted to the General Court in respect of Article 81(3) EC, LBG maintains that the General Court ought to have examined the whole MasterCard scheme, which brings significant benefits to cardholders and merchants. The General Court ought not to have required MasterCard to justify the precise level of the MIF but should simply have required justification for the methodology followed by MasterCard in setting the MIF.

210   In the Commission's view the three main claims raised by LBG in the context of the second plea in its cross-appeal are inadmissible in so far as they are based on vague and general assertions which make it impossible to identify which parts of the judgment under appeal are contested or on which legal grounds, in

# A4963

accordance with the requirements in Article 169(2) of the Rules of Procedure of the Court of Justice. LBG fails to identify clearly an error of law by the General Court and merely reiterates arguments already advanced at first instance.

211    More specifically, the Commission contends that LBG does not identify any paragraph of the judgment under appeal to support the first part of the second plea in its cross-appeal, nor does it comment on the case-law relied on by the General Court as regards the correct standard of proof.

212    As regards the substance, the Commission submits that, so far as concerns the first part of the second plea of the application at first instance relating to the burden of proof, the General Court correctly relied, in paragraphs 196 and 206 of the judgment under appeal, on settled case-law according to which, in order to benefit from Article 81(3) EC, the undertaking must rely on convincing arguments and evidence which the Commission must examine. By contrast, the balance of probabilities test proposed by LBG is not supported by any case-law.

213    Furthermore, the Commission considers that, in so far as LBG seems to contest the requirement of a causal link between the actual restriction and efficiency gains, that argument is ineffective as LBG does not challenge the relevant paragraph of the judgment under appeal, namely paragraph 207. In any event, such a requirement is compatible with the case-law and, consequently, LBG's arguments to the effect that, first, the MasterCard scheme offers significant benefits to consumers and merchants and, secondly, the General Court applied an overly strict test under Article 81(3) EC, cannot succeed.

214    Lastly, the Commission maintains that it is not a question of justifying the precise level of the MIF, but rather of answering the question whether the MIF results in any objective efficiency gains.

    –    Findings of the Court

215    As is evident from paragraphs 150 and 151 of the present judgment, even though Article 169(2) of the Rules of Procedure of the Court of Justice, on which the Commission relies, cannot be applied retroactively to LGB's cross-appeal, it is clear from the provisions in force on the date when that cross-appeal was brought, notably Article 256 TFEU, the first paragraph of Article 58 of the Statute of the Court of Justice and Article 112(1)(c) of the Rules of Procedure of the Court of Justice, that an appeal must indicate precisely the contested elements of the judgment which the appellant seeks to have set aside and also the legal arguments specifically advanced in support of the appeal.

216    That requirement is not satisfied by an appeal confined to repeating or reproducing word for word the pleas in law and arguments previously submitted to the General Court, including those based on facts expressly rejected by that court. In so far as such an appeal does not contain any arguments specifically contesting the judgment appealed against, it amounts in reality to no more than a request for re-examination of the application submitted to the General Court, which, under Article 58 of the Statute of the Court of Justice, the latter does not have jurisdiction to undertake (see judgment in *John Deere* v *Commission*, C-7/95 P, EU:C:1998:256, paragraph 20 and the case-law cited).

217    While LBG claims that the General Court erred in law in failing to adopt the balance of probabilities as a standard for the burden of proof under Article 81(3) EC, it must be stated that, in that respect, the cross-appeal does not indicate, nor is it possible to identify precisely, the paragraphs or the part of the judgment under appeal which it is criticising.

# A4964

218   It must also be stated that, by referring back to the arguments put forward in its statement of intervention at first instance, LBG is repeating the same arguments as those which it had already put before the General Court and is in fact seeking re-examination of its arguments without even attempting to adduce legal arguments specifically establishing that the General Court, by its approach, erred in law (see, to that effect, judgment in *John Deere* v *Commission*, EU:C:1998:256, paragraph 41).

219   Accordingly, the Commission's objection of inadmissibility is well founded and the first part of the second plea in LBG's cross-appeal is therefore inadmissible.

   *Second part of the second plea in LBG's cross-appeal*

   –   Arguments of the parties

220   By the second part of the second plea in its cross-appeal, LBG, supported by the appellants, claims that the General Court made an error of law in paragraph 233 of the judgment under appeal by focusing on the benefits to merchants only, despite recognising, in paragraph 228 of that judgment, that the advantages may be taken into account for any market and service that benefits from the existence of the agreement in question and, in paragraph 176 of that judgment, that there is a link between cardholders and merchants. The General Court thus wrongly ignored the significant advantages which the MasterCard system and the MIF bring for cardholders, and, moreover, the two-sided nature of the system and the optimisation of the system which the MIF help to achieve.

221   The appellants endorse LBG's reasoning and add that the grounds of the judgment under appeal are circular, contradictory and insufficient inasmuch as they confirm the failure of the decision at issue to take into account the advantages of the MIF for cardholders. In particular, in paragraphs 107, 110 and 118 of that judgment, the General Court acknowledges that cardholders would bear much higher costs if the MIF were removed or reduced; in paragraphs 178 and 233 of that judgment, that some financial compensation from merchants for the services provided to them by the issuing banks is justified; and, in paragraphs 182 and 228 of that judgment, that the function of the MIF that involves a reduction in cardholders' costs ought to be taken into account in relation to Article 81(3) EC. It is therefore impossible to understand how the General Court could then conclude that 'the [appellants'] criticism that insufficient account was taken of the advantages of the MIF for cardholders is, in all events, ineffective'.

222   The appellants also submit that the General Court contradicted itself, in paragraph 233 of the judgment under appeal, by acknowledging that some financial compensation for the services which issuing banks provide to merchants appears justified, although it is not possible to establish precisely to what extent, while claiming that MasterCard failed 'to identify the services provided by the banks issuing debit, charge or credit cards capable of constituting objective advantages for merchants'.

223   The appellants add that, even supposing that they had not managed to provide sufficient evidence that merchants obtain appreciable objective advantages from the MIF, the General Court did not explain why, in the light of the case-law cited in paragraph 228 of the judgment under appeal, the first two conditions in Article 81(3) EC could not be satisfied on the basis only of the advantages the MIF produce for cardholders, or why all the categories of consumers must benefit from the same part of the profit.

224   In addition to the more general grounds of inadmissibility put forward by the Commission, as set out in paragraph 210 of the present judgment, the Commission contends that the second part of the second plea

# A4965

in LBG's cross-appeal is insufficiently substantiated. LBG challenges certain findings of fact relating to the lack of efficiency gains or to the fair share of benefit for consumers, without, however, alleging any distortion.

225   As regards the substance, the Commission considers that the existence of efficiency gains on several markets does not guarantee a fair share of the benefit to consumers, in accordance with the second condition laid down in Article 81(3) EC. The lack of a fair share of the benefit is a finding of fact, which is not amenable to appeal. In any event, LBG did not explain how the General Court's finding in relation to the accrual of a fair share of the benefit to customers is legally wrong. The interrelated nature of the markets in the two-sided scheme does not weaken the general rule that a fair share of efficiency gains must at least accrue to the customers harmed by the restriction in question.

226   Moreover, according to the Commission, the General Court did not ignore the advantages to cardholders, the maximisation of system output or the two-sided nature of the scheme, but, in paragraphs 208 to 229 of the judgment under appeal, simply rejected the arguments relating thereto. The findings of fact in that regard are not amenable to appeal and, in any event, do not disclose any error of law.

– Findings of the Court

227   The objection of inadmissibility raised by the Commission, according to which the second part of the second plea in LBG's cross-appeal is not sufficiently substantiated, cannot be upheld. Suffice it to note that LBG identified the precise paragraph of the judgment under appeal containing the alleged error of law, namely paragraph 233, and substantiated its arguments by invoking other specific paragraphs of that judgment as well as supporting legal arguments. It follows from this that LBG's arguments in that regard satisfy the requirements of the provisions and the case-law cited in paragraphs 215 and 216 of the present judgment.

228   It should also be noted that, contrary to what the Commission maintains, by that second part of the plea, LBG is not merely challenging the assessment of the facts at first instance, but is raising in essence the question as to which markets may be regarded as generating the objective advantages that may be taken into account for the purposes of the analysis of the first condition laid down in Article 81(3) EC. That issue is a legal issue which is admissible at the appeal stage.

229   As regards the substance, it must be borne in mind that LBG, supported by the appellants, complains, in essence, that the General Court focused only on the advantages the MIF provide to merchants, thereby ignoring the advantages which the MasterCard scheme and the MIF provide to cardholders, as well as the two-sided nature of the system and the optimisation of that system which the MIF help to achieve.

230   The Court must reject at the outset the argument that the General Court wrongly ignored the advantages to cardholders resulting from the MasterCard scheme. It will be recalled that any decision by an association of undertakings which proves to be contrary to the provisions of Article 81(1) EC may be exempted under Article 81(3) EC only if it satisfies the conditions in that provision, including the condition that it contribute to improving the production or distribution of goods or to promoting technical or economic progress (see, to that effect, judgment in *Remia and Others* v *Commission*, EU:C:1985:327, paragraph 38). Furthermore, as is apparent from paragraphs 89 and 90 of the present judgment, where it is not possible to dissociate a decision by an association of undertakings from the main operation or activity with which it is associated without jeopardising its existence and aims, it is appropriate to examine

# A4966

the compatibility of that decision with Article 81 EC in conjunction with the compatibility of the main operation or activity to which it is ancillary.

231    By contrast, where it is established that such a decision is not objectively necessary to the implementation of a given operation or activity, only the objective advantages resulting specifically from that decision may be taken into account in the context of Article 81(3) EC (see, by analogy, judgment in *Remia and Others* v *Commission*, EU:C:1985:327, paragraph 47).

232    In the present case, as is apparent from paragraphs 78 to 121 of the present judgment, it was open to the General Court to find in paragraph 120 of the judgment under appeal, without erring in law, that the MIF were not objectively necessary for the operation of the MasterCard system. In the light of that conclusion, the General Court also correctly concluded, in paragraph 207 of that judgment, that analysis of the first condition laid down in Article 81(3) EC called for an examination of the appreciable objective advantages arising specifically from the MIF and not from the MasterCard system as a whole. It follows from this that the argument that the General Court wrongly ignored the advantages to cardholders resulting from the MasterCard scheme cannot be accepted.

233    As to the argument that the General Court ignored the optimisation of the MasterCard system which the MIF help to achieve, it must be pointed out that, in paragraphs 208 to 219 of the judgment under appeal, the General Court examined the appellants' arguments based on the role of the MIF in balancing the 'issuing' and 'acquiring' sides of that system, and concluded that the argument that the MIF contribute to increasing the output of the system should be rejected. It follows from this that LBG's argument in that respect is based on a misreading of the judgment under appeal and is therefore unfounded.

234    As regards the arguments that the General Court wrongly ignored the two-sided nature of the system and the advantages flowing from the MIF for cardholders, first of all, it is settled case-law that the improvement, within the meaning of the first condition laid down in Article 81(3) EC, cannot be identified with all the advantages which the parties obtain from the agreement in their production or distribution activities. The improvement must in particular display appreciable objective advantages of such a character as to compensate for the disadvantages which that agreement entails for competition (see judgment in *Consten and Grundig* v *Commission*, 56/64 and 58/64, EU:C:1966:41, 348).

235    Next, the Court notes that the examination of an agreement for the purposes of determining whether it contributes to the improvement of the production or distribution of goods or to the promotion of technical or economic progress, and whether that agreement generates appreciable objective advantages, must be undertaken in the light of the factual arguments and evidence provided by the undertakings (see to that effect, in connection with a request for exemption under Article 81(3) EC, judgment in *GlaxoSmithKline Services and Others* v *Commission and Others*, C-501/06 P, C-513/06 P, C-515/06 P and C-519/06 P, EU:C:2009:610, paragraph 102).

236    Such an examination may require the nature and specific features of the sector concerned by the agreement in question to be taken into account if its nature and those specific features are decisive for the outcome of the analysis (see judgment in *GlaxoSmithKline Services and Others* v *Commission and Others*, EU:C:2009:610, paragraph 103). Furthermore, under Article 81(3) EC, it is the beneficial nature of the effect on all consumers in the relevant markets that must be taken into consideration (see, to that effect, judgment in *Asnef-Equifax and Administración del Estado*, EU:C:2006:734, paragraph 70).

## A4967

237    It follows from this that, in the case of a two-sided system such as the MasterCard scheme, in order to assess whether a measure which in principle infringes the prohibition laid down in Article 81(1) EC — in so far as it creates restrictive effects in regard to one of the two groups of consumers associated with that system — can fulfil the first condition laid down in Article 81(3) EC, it is necessary to take into account the system of which that measure forms part, including, where appropriate, all the objective advantages flowing from that measure not only on the market in respect of which the restriction has been established, but also on the market which includes the other group of consumers associated with that system, in particular where, as in this instance, it is undisputed that there is interaction between the two sides of the system in question. To that end, it is necessary to assess, where appropriate, whether such advantages are of such a character as to compensate for the disadvantages which that measure entails for competition.

238    However, in the present case, LBG's argument that the General Court wrongly ignored the two-sided nature of the system cannot be accepted. As noted in paragraph 233 of the present judgment, in paragraphs 208 to 219 of the judgment under appeal, the General Court examined the appellants' arguments as to the role of the MIF in balancing the 'issuing' and 'acquiring' sides of the MasterCard system and, for that purpose, specifically recognised, in paragraph 210 of that judgment, that there was interaction between those two sides. The fact that the General Court concluded that the argument that the MIF contribute to increasing the output of the system should be rejected does not alter the fact that the General Court took the two-sided nature of the system in question into account in its analysis.

239    Likewise, the General Court also took into account the two-sided nature of the system when examining the advantages flowing from the MIF that are enjoyed by merchants, notably in paragraphs 222 and 223 of the judgment under appeal, in which it recognised that the increase in the number of cards in circulation may increase the utility of the MasterCard system as far as merchants are concerned, even though, in its definitive assessment of the facts, the General Court concluded that the risk of adverse effects for merchants is higher the greater the number of cards in circulation.

240    In particular, as regards the argument by which LBG complains that the General Court did not take into account the advantages flowing from the MIF for cardholders, it must be held that, in the light of what has been stated in paragraphs 234 to 236 of the present judgment, the General Court was, in principle, required, when examining the first condition laid down in Article 81(3) EC, to take into account all the objective advantages flowing from the MIF, not only on the relevant market, namely the acquiring market, but also on the separate but connected issuing market.

241    It follows from this that, should the General Court have found that there were appreciable objective advantages flowing from the MIF for merchants, even if those advantages did not in themselves prove sufficient to compensate for the restrictive effects identified pursuant to Article 81(1) EC, all the advantages on both consumer markets in the MasterCard scheme, including therefore on the cardholders' market, could, if necessary, have justified the MIF if, taken together, those advantages were of such a character as to compensate for the restrictive effects of those fees.

242    However, as is recalled in paragraph 234 of the present judgment, examination of the first condition laid down in Article 81(3) EC raises the question whether the advantages derived from the measure at issue are of such a character as to compensate for the disadvantages resulting therefrom. Thus, where, as in the present case, restrictive effects have been found on only one market of a two-sided system, the advantages flowing from the restrictive measure on a separate but connected market also associated with

# A4968

that system cannot, in themselves, be of such a character as to compensate for the disadvantages resulting from that measure in the absence of any proof of the existence of appreciable objective advantages attributable to that measure in the relevant market, in particular, as is apparent from paragraphs 21 and 168 to 180 of the judgment under appeal, where the consumers on those markets are not substantially the same.

243     In the present case, and without any distortion having been claimed in that regard, the General Court concluded in paragraph 226 of the judgment under appeal that there was no proof of the existence of objective advantages flowing from the MIF and enjoyed by merchants. In those circumstances, it was not necessary to examine the advantages flowing from the MIF for cardholders, since they cannot, by themselves, be of such a character as to compensate for the disadvantages resulting from those fees. The General Court was therefore fully entitled to find, in paragraph 229 of the judgment under appeal, that 'the [appellants'] criticism that insufficient account was taken of the advantages of the MIF for cardholders is, in all events, ineffective'.

244     As regards the appellants' arguments, set out in paragraph 221 of the present judgment, that the grounds of the judgment under appeal are circular, contradictory and insufficient on that point, those arguments cannot be accepted.

245     Even if the General Court had recognised, in its analysis of the objective necessity of the MIF, that there were advantages for cardholders that could, in principle, be taken into account under Article 81(3) EC, it was not necessary, as is apparent from paragraphs 240 to 243 of the present judgment, to examine such advantages in the present case. The General Court's reasoning on that point, in particular in paragraph 229 of the judgment under appeal, is not, therefore, contradictory.

246     As to the argument in paragraph 222 of the present judgment that the General Court contradicted itself in paragraph 233 of the judgment under appeal, it must be observed that that argument is based on a selective quotation, resulting therefore from a misreading of that judgment. In using the expression 'financial compensation', the General Court was referring not, as the appellants suggest, to objective advantages for merchants, but to the MSC. The General Court did not, therefore, acknowledge that financial compensation from merchants for the costs incurred by issuing banks for the services they provide to merchants appeared justified, but merely found that the appellants had to identify the advantages that could be deemed to justify the MSC.

247     As regards the appellants' argument that the General Court did not explain why the first two conditions in Article 81(3) EC could not be satisfied on the basis only of the advantages the MIF produce for cardholders, it is sufficient to refer to paragraphs 240 to 245 of the present judgment.

248     Lastly, in so far as the appellants complain that the General Court did not explain why all the categories of consumers must benefit from the same share of the profit resulting from the MIF, suffice it to note that that complaint is based on a misreading of the judgment under appeal. The General Court did not in any way find that each group of consumers should benefit from the same share of that profit, but merely indicated that, as merchants constitute one of the two groups of users affected by payment cards, they should also enjoy appreciable objective advantages attributable to the MIF. Thus, by using the word 'also' in paragraph 228 of its judgment, the General Court correctly indicated that merchants had to enjoy the MIF 'as well as' cardholders, and not 'to the same extent' as them.

# A4969

249   It must therefore be concluded that the appellants' arguments to the effect that the General Court did not state reasons to the requisite legal standard for the failure to take account of the advantages of the MIF for cardholders is unfounded.

250   In view of the foregoing, the second part of the second plea in LBG's cross-appeal must be rejected.

Third part of the second plea in LBG's cross-appeal

–   Arguments of the parties

251   By the third part of the second plea in its cross-appeal, LBG submits that the General Court suggested, in paragraph 233 of the judgment under appeal, that the only factors that can be taken into consideration in verifying whether the MIF are set at an appropriate level are the compensation by merchants for costs incurred by the issuing banks for the services provided to merchants, and the other revenues obtained by the issuing banks. LBG criticises the Commission for its restrictive approach in the present case, an approach which the Commission seems also to have adopted in the Visa MIF case (Case COMP/39.398 — Visa MIF, C(2010) 8760). Referring to the written observations it submitted to the General Court in respect of Article 81(3) EC, LBG maintains that the Commission should have followed the approach it adopted in other comparable areas where it accepted much broader justifications under Article 81(3) EC.

252   LBG maintains that the General Court erred in law in approving an overly strict test under Article 81(3) EC which fails to take into account the significant advantages arising from the MasterCard scheme and the MIF for cardholders and merchants. Furthermore, the General Court's methodology is unworkable in practice, since it requires precise evidence to justify specific levels of MIF, evidence which, however, is unlikely to be provided. Neither the Commission nor the General Court had provided any guidance on the precise methodology that MasterCard should follow in order to set the MIF at a justifiable level. This uncertainty is causing significant concerns for market operators and is likely to harm consumers by stunting innovation in the market.

253   In addition to the more general objections of inadmissibility raised by the Commission, as set out in paragraph 210 of the present judgment, the Commission considers the arguments put forward in support of the third part of the second plea in LBG's cross-appeal, regarding the alleged absence of guidance by the General Court, to be ineffective.

254   As regards the substance, the Commission takes the view that LBG's argument relating to the alleged lack of guidance on the justifiable level of MIF implies a reversal of the burden of proof and discloses no error of law. LBG contradicts itself when it refers to paragraph 233 of the judgment under appeal concerning the proof which the appellants could have produced in order to satisfy the first condition laid down in Article 81(3) EC. Lastly, the reference to the Visa MIF case, mentioned in paragraph 251 of the present judgment, is irrelevant in the context of the present appeal.

–   Findings of the Court

255   First of all, as regards the argument put forward by LBG that the Commission adopted too restrictive an approach in the present case, as also in the Visa MIF case mentioned in paragraph 251 of the present judgment, it is sufficient to hold that that argument does not in any way indicate the contested elements of

# A4970

the judgment under appeal and is therefore inadmissible.

256  Next, as regards the argument by which LBG complains that the General Court erred in law by approving an overly strict test which fails to take into account the significant advantages arising from the MasterCard scheme and the MIF for cardholders and merchants, that argument is, in essence, identical to those already examined in the context of the second part of the second plea in LBG's cross-appeal. That argument must therefore be rejected for the same reasons as those stated in paragraphs 227 to 250 of the present judgment.

257  Lastly, so far as concerns the arguments that the General Court's methodology is unworkable in practice, since it requires precise evidence to justify specific levels of MIF, which is unlikely to be provided, and the fact that neither the Commission nor the General Court provided any guidance on the precise methodology that MasterCard should follow in order to set the MIF at a justifiable level, it must be held that those arguments do not seek to claim that the General Court erred in law. Such arguments are therefore inadmissible.

258  The third part of the second plea in LBG's cross-appeal must therefore be rejected. Accordingly, the second plea in LBG's cross-appeal must be rejected in its entirety.

259  It follows from all the foregoing considerations that the main appeal and the two cross-appeals brought by RBS and LBG must be dismissed.

### Costs

260  Under Article 184(2) of the Rules of Procedure of the Court of Justice, where the appeal is unfounded, the Court is to make a decision as to the costs.

261  Under Article 138(1) of those Rules, which applies, *mutatis mutandis*, to the procedure on appeal by virtue of Article 184(1) of those Rules, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings.

262  Since the appellants have been unsuccessful in their appeal and the Commission has applied for its costs to be paid by them, the appellants must be ordered to bear their own costs and to pay the costs incurred by the Commission in relation to the main appeal.

263  As regards the cross-appeals, since RBS and LBG have been unsuccessful and the Commission has applied for costs, RBS and LBG must be ordered to bear their own costs and to pay the costs incurred by the Commission in relation to their respective cross-appeals.

264  Furthermore, by virtue of the combined provisions of Article 140(3) and Article 184(1) of the Rules of Procedure of the Court of Justice, it is appropriate in this instance to order that the appellants bear their own costs relating to the two cross-appeals and that RBS and LBG each bear their own costs relating to the cross-appeal brought by the other.

265  In accordance with Article 184(4) of those Rules, HSBC, MBNA, BRC and EuroCommerce shall bear their own costs relating to the main appeal and the cross-appeals. Since Banco Santander SA did not participate in the proceedings before the Court, it cannot be ordered to pay the costs thereof.

# A4971

266    Under Article 140(1) of those Rules, which is to be applied, *mutatis mutandis*, to the procedure on appeal by virtue of Article 184(1) of those Rules, the Member States which have intervened in the proceedings are to bear their own costs. In accordance with those provisions, the United Kingdom shall therefore bear its own costs.


On those grounds, the Court (Third Chamber) hereby:

1.    **Dismisses the main appeal and the cross-appeals;**

2.    **Orders MasterCard Inc., MasterCard International Inc. and MasterCard Europe SPRL to bear their own costs relating to the main appeal and the cross-appeals, and to pay the European Commission's costs relating to the main appeal;**

3.    **Orders Royal Bank of Scotland plc, Bank of Scotland plc and Lloyds TSB Bank plc to bear their own costs and to pay the European Commission's costs relating to their respective cross-appeals;**

4.    **Orders HSBC Bank plc, MBNA Europe Bank Ltd, British Retail Consortium, EuroCommerce AISBL and the United Kingdom of Great Britain and Northern Ireland to bear their own costs.**

[Signatures]

---

\* Language of the case: English.

# A4972

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 7-ELEVEN, INC., ACADEMY, LTD. D/B/A ACADEMY SPORTS + OUTDOORS, ALDO US INC. D/B/A ALDO AND CALL IT SPRING, ALIMENTATION COUCHE-TARD INC., ALON USA, LP, AMAZON.COM, INC., AMERICAN MULTI-CINEMA, INC., ASHLEY FURNITURE INDUSTRIES INC., BARNES & NOBLE, INC., BARNES & NOBLE COLLEGE BOOKSELLERS, LLC, BEALL'S, INC., BOSCOV'S, INC., BROOKSHIRE GROCERY COMPANY, BUC-EE'S LTD., THE BUCKLE, INC., THE CHILDREN'S PLACE RETAIL STORES, INC., COSTCO WHOLESALE CORP., CRACKER BARREL OLD COUNTRY STORE, INC., CUMBERLAND FARMS, INC., DICK'S SPORTING GOODS, INC., DILLARD'S, INC., DRURY HOTELS COMPANY, LLC, EUROMARKET DESIGNS, INC., D/B/A CRATE & BARREL AND CB2, MEADOWBROOK, L.L.C., D/B/A THE LAND OF NOD, EXPRESS, LLC, FAMILY DOLLAR STORES, INC., FAMILY EXPRESS CORPORATION, FLEET WHOLESALE SUPPLY CO., INC., MILLS MOTOR, INC., MILLS AUTO ENTERPRISES, INC., WILLMAR MOTORS, LLC, MILLS AUTO CENTER, INC., FLEET AND FARM OF ALEXANDRIA, INC., FLEET WHOLESALE SUPPLY OF FERGUS FALLS, INC., FLEET AND FARM OF GREEN BAY, INC., FLEET AND FARM OF MENOMONIE, INC., MILLS FLEET FARM, INC., FLEET AND FARM OF MANITOWOC, INC., FLEET AND FARM OF PLYMOUTH, INC., FLEET AND FARM SUPPLY COMPANY OF WEST BEND, INC., FLEET AND FARM OF WAUPACA, INC., MILLS E-COMMERCE ENTERPRISES, INC., BRAINERD LIVELY AUTO, LLC, FOOT LOCKER, INC., THE GAP, INC., GENESCO INC., GNC HOLDINGS, INC., THE GYMBOREE CORPORATION, IKEA NORTH AMERICA SERVICES, LLC, J. CREW GROUP, INC., LOWE'S COMPANIES, INC., MICHAELS STORES, INC., NEW YORK & COMPANY, INC., NIKE, INC., P.C. RICHARD & SON, INC., PACIFIC SUNWEAR OF CALIFORNIA, INC., PANDA RESTAURANT GROUP, INC., PANERA BREAD COMPANY, RALPH LAUREN CORPORATION, RECREATIONAL EQUIPMENT, INC., REPUBLIC SERVICES, INC., RESTORATION HARDWARE, INC., ROUNDY'S SUPERMARKETS, INC., STARBUCKS CORPORATION, STEIN MART, INC., SWAROVSKI U.S. HOLDING LIMITED, THE TALBOTS, | **THIRD AMENDED COMPLAINT AND JURY DEMAND**<br><br>No. 13-cv-05746(JG)(JO)<br><br>14-md-1720(JG)(JO) |

INC., THERMO FISHER SCIENTIFIC INC., THORNTONS
INC., THE WET SEAL, INC., WHOLE FOODS MARKET
GROUP, INC., WHOLE FOODS MARKET ROCKY
MOUNTAIN/SOUTHWEST, L.P., WHOLE FOODS
MARKET CALIFORNIA, INC., MRS. GOOCH'S NATURAL
FOOD MARKETS, INC., WHOLE FOOD COMPANY,
WHOLE FOODS MARKET PACIFIC NORTHWEST, INC.,
WFM-WO, INC., WFM NORTHERN NEVADA, INC., WFM
HAWAII, INC., WFM SOUTHERN NEVADA, INC., THE
WILLIAM CARTER COMPANY, COBORN'S,
INCORPORATED, D'AGOSTINO SUPERMARKETS, INC.,
JETRO CASH & CARRY ENTERPRISES, LLC, JETRO
HOLDINGS, LLC, NATIONAL ASSOCIATION OF
CONVENIENCE STORES, NATIONAL COMMUNITY
PHARMACISTS ASSOCIATION, AND NATIONAL
GROCERS ASSOCIATION,

*Plaintiffs,*

v.

VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL
SERVICE ASSOCIATION, MASTERCARD
INCORPORATED, MASTERCARD INTERNATIONAL
INCORPORATED, BANK OF AMERICA CORPORATION,
BANK OF AMERICA, N.A., FIA CARD SERVICES, N.A.,
JPMORGAN CHASE & CO., CHASE BANK USA, N.A.,
CHASE PAYMENTECH SOLUTIONS, LLC, JPMORGAN
CHASE BANK, N.A., CITIGROUP INC., CITIBANK, N.A.,
CITICORP PAYMENTS SERVICES, INC., WELLS FARGO
& COMPANY, AND WELLS FARGO BANK, N.A.,

*Defendants.*

Plaintiffs 7-Eleven, Inc., Academy, Ltd. d/b/a Academy Sports + Outdoors, Aldo US Inc.

d/b/a Aldo and Call It Spring, Alimentation Couche-Tard Inc., Alon USA, LP, Amazon.com,

Inc., American Multi-Cinema, Inc., Ashley Furniture Industries Inc., Barnes & Noble, Inc.,

Barnes & Noble College Booksellers, LLC, Beall's, Inc., Boscov's, Inc., Brookshire Grocery

Company, Buc-ee's Ltd., The Buckle, Inc., The Children's Place Retail Stores, Inc., Costco

Wholesale Corp., Cracker Barrel Old Country Store, Inc., Cumberland Farms, Inc., Dick's

# A4974

Sporting Goods, Inc., Dillard's, Inc., Drury Hotels Company, LLC, Euromarket Designs, Inc., d/b/a Crate & Barrel and CB2, Meadowbrook, L.L.C., d/b/a The Land of Nod, Express, LLC, Family Dollar Stores, Inc., Family Express Corporation, Fleet Wholesale Supply Co., Inc., Mills Motor, Inc., Mills Auto Enterprises, Inc., Willmar Motors, LLC, Mills Auto Center, Inc., Fleet and Farm of Alexandria, Inc., Fleet Wholesale Supply of Fergus Falls, Inc., Fleet and Farm of Green Bay, Inc., Fleet and Farm of Menomonie, Inc., Mills Fleet Farm, Inc., Fleet and Farm of Manitowoc, Inc., Fleet and Farm of Plymouth, Inc., Fleet and Farm Supply Company of West Bend, Inc., Fleet and Farm of Waupaca, Inc., Mills E-Commerce Enterprises, Inc., Brainerd Lively Auto, LLC, Foot Locker, Inc., The Gap, Inc., Genesco Inc., GNC Holdings, Inc., The Gymboree Corporation, IKEA North America Services, LLC, J. Crew Group, Inc., Lowe's Companies, Inc., Michaels Stores, Inc., New York & Company, Inc., NIKE, Inc., P.C. Richard & Son, Inc., Pacific Sunwear of California, Inc., Panda Restaurant Group, Inc., Panera Bread Company, Ralph Lauren Corporation, Recreational Equipment, Inc., Republic Services, Inc., Restoration Hardware, Inc., Roundy's Supermarkets, Inc., Starbucks Corporation, Stein Mart, Inc., Swarovski U.S. Holding Limited, The Talbots, Inc., Thermo Fisher Scientific Inc., Thorntons Inc., The Wet Seal, Inc., Whole Foods Market Group, Inc., Whole Foods Market Rocky Mountain/Southwest, L.P., Whole Foods Market California, Inc., Mrs. Gooch's Natural Food Markets, Inc., Whole Food Company, Whole Foods Market Pacific Northwest, Inc., WFM-WO, Inc., WFM Northern Nevada, Inc., WFM Hawaii, Inc., WFM Southern Nevada, Inc., The William Carter Company, Coborn's, Incorporated, D'Agostino Supermarkets, Inc., Jetro Cash & Carry Enterprises, LLC, Jetro Holdings, LLC, National Association of Convenience Stores, National Community Pharmacists Association, and National Grocers Association, by their undersigned attorneys Constantine Cannon LLP, allege upon knowledge with respect to their

3

own acts and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.        Plaintiffs are merchants from virtually every sector in the United States, including merchants in the following segments: home improvement, consumer electronics, supermarket, Internet, convenience store, fuel station, apparel and accessories, department store, jewelry and giftware, hardware, auto dealership and vehicle service center, hotel, hospitality, membership warehouse, books, sporting goods and outdoors, home office products, home appliances, health and wellness, arts and crafts, home furnishings, furniture and housewares, children's apparel and accessories, cosmetics and fragrances, footwear and headwear, movie theatre, scientific equipment, restaurant and café, and luxury goods.  Plaintiffs bring this action pursuant to federal and state antitrust laws in order to recover damages for anticompetitive conduct by the two electronic payment cartels in the United States: Visa and MasterCard.  These cartels' twin conspiracies and other anticompetitive conduct have already injured merchants and consumers on a magnitude of hundreds of billions of dollars during the Damages Period (January 1, 2004, through November 27, 2012), and they will cost merchants and consumers untold more billions.

2.        Given that the conduct in question is ongoing, Plaintiffs would be seeking monetary and equitable relief for the continuing harm caused by these restraints of trade if they were not barred from asserting such claims by the injunction in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720(JG)(JO) (E.D.N.Y.) ("MDL 1720").  Because of the injunction, however, Plaintiffs' claims concerning Interchange Fees are limited to past damages, even though the conduct continues to harm competition and inflict damages on Plaintiffs and their customers.

3.        When the Damages Period began in 2004, Visa and MasterCard were the

4

instrumentalities that effectuated the massive conspiracies among each association's owner/member banks that had agreed to unreasonably, and illegally, restrain competition. Prior to their corporate restructurings in 2006 and 2008, respectively, MasterCard and Visa were each organized as a membership corporation, the owners and members of which were virtually all of the competing banks that issued General Purpose Payment Cards to consumers and/or that signed merchants to accept such cards. Each membership corporation was governed by bank executives selected from Visa's and MasterCard's member banks, including the Bank Defendants. As the Second Circuit held, Visa and MasterCard were "not single entities; they [were] consortiums of competitors," *i.e.*, banks such as the Bank Defendants that issue General Purpose Payment Cards. *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003).

       4.     Throughout the Damages Period, Visa and MasterCard were the instrumentalities through which the competing banks that issued Visa and MasterCard General Purpose Payment Cards agreed not to compete with respect to merchant acceptance of those cards and fixed the Interchange Fees that merchants paid for acceptance of those cards. These conspiracies began when Visa and MasterCard were structured as "consortiums of competitors" and they continued unabated after their corporate reorganizations. In fact, Visa and MasterCard and the Bank Defendants designed the corporate restructurings of Visa and MasterCard to create veneers of separate independent entities that would mask the perpetuation of their anticompetitive cartels. The competing banks sitting on Visa's and MasterCard's boards ratified these transactions on the anticompetitive conditions that all banks continue to adhere to their agreements not to compete and that Visa and MasterCard maintain the default Interchange Fee rules that support the price-fixing conspiracies. Based on this continuation of the underlying conspiracies, nothing has changed since the IPOs and, if anything, Visa's and MasterCard's substantial market power has

5

increased.

5.      The Visa Defendants engaged in a conspiracy in restraint of trade in the General
Purpose Payment Card markets, and Visa has monopolized the General Purpose Debit Card
market in the United States.  The Visa Defendants' principal unlawful anticompetitive conduct
was an agreement to collusively fix the prices that merchants paid to accept Visa General
Purpose Payment Cards at supracompetitive levels, an agreement which implemented the banks'
scheme not to compete for merchant acceptance of their Visa General Purpose Payment Cards.
This unlawful agreement continues to this day.

6.      The MasterCard Defendants also engaged in a conspiracy in restraint of trade in
the General Purpose Payment Card markets in the United States.  The MasterCard Defendants'
principal unlawful anticompetitive conduct was an agreement to collusively fix the prices that
merchants paid to accept MasterCard General Purpose Payment Cards at supracompetitive
levels, an agreement which implemented the banks' scheme not to compete for merchant
acceptance of their MasterCard General Purpose Payment Cards.  This unlawful agreement
continues to this day.

7.      The Visa Defendants' and MasterCard Defendants' agreements to fix prices and
not to compete ensured that the Bank Defendants enjoyed, and continue to enjoy,
supracompetitive profits by maintaining the discipline of the Visa and MasterCard cartels.  The
Bank Defendants have consistently declined to individually negotiate General Purpose Payment
Card acceptance with merchants even when it would have been in their individual competitive
interest to do so.  The supracompetitive profits created by the conspiracies also have lured
additional banks into joining the conspiracies which has maintained and enhanced the cartels'
substantial market power.  These restraints have thus been both the glue binding Visa's and

6

# A4978

MasterCard's twin cartels with their member/owner banks, and the means through which Visa and MasterCard have expanded those cartels to achieve substantial market power in the General Purpose Payment Card markets, power they wielded throughout the Damages Period and power they continue to wield to this day.

8.      The Visa Defendants' and MasterCard Defendants' agreements not to compete and price-fixing schemes are naked restraints of trade and *per se* violations of Section 1 of the Sherman Act.

9.      Even if the Visa Defendants' and MasterCard Defendants' conduct is analyzed under the rule of reason, the substantial harm caused by the cartels shows that their conduct constituted unreasonable restraints of trade that violate Section 1 of the Sherman Act.  None of Defendants' anticompetitive rules and practices are reasonably necessary for the functioning of General Purpose Payment Card Networks.  Any benefits that Defendants claim are achieved by these restraints of trade can be accomplished by means that are less destructive and harmful to competition.  Even if these restraints have any competitive benefit, their anticompetitive effects—massive overcharges to merchants and maintenance of substantial market power— vastly outweigh any such benefit.

10.      The anticompetitive harm to merchants and consumers from Defendants' price fixing and other anticompetitive conduct has been staggering.  During the Damages Period, Defendants imposed Interchange Fees estimated at more than $350 billion on merchants and consumers in the United States.  Moreover, Defendants' anticompetitive conduct has limited competition in the General Purpose Payment Card markets, depriving participants in these markets of lower prices as well as innovation, new payment options, and cost-saving approaches (*e.g.*, to reduce fraud) that would have substantially benefited U.S. merchants and consumers.

7

## JURISDICTION AND VENUE

11.     This Third Amended Complaint is filed under Section 16 of the Clayton Act, 15

U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The

Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§

1331, 1337, 2201 and 2202.  The Court has jurisdiction over state antitrust and unfair

competition law claims alleged herein under 28 U.S.C. § 1367.

12.     Defendants transact business and are found in this District.  The interstate trade

and commerce involved and affected by the alleged violations of antitrust law occurred, in part,

within this District.  The acts complained of have had, and will have, substantial anticompetitive

effects in the District.  Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. §§

15, 22 and 26.

## DEFINITIONS

13.     The following terms are used in this Third Amended Complaint:

   a.     "Acquirer" means a bank or other financial institution that has been
          authorized by a General Purpose Payment Card Network to enter into
          agreements with merchants that enable those merchants to accept General
          Purpose Payment Cards for the purchase of goods and services.  Acquirers
          authorized by the Visa and MasterCard General Purpose Payment Card
          Networks to acquire Visa- and/or MasterCard-branded General Purpose
          Payment Card transactions are members or agents of those networks.

   b.     "Bank Defendants" refer to all Defendants in this action other than Visa and
          MasterCard.

   c.     "Charge Card" (also referred to as a "Travel and Entertainment Card" or
          "T&E card") is a General Purpose Credit Card for which the cardholder is
          required, under most circumstances, to pay the card balance in full each
          month.  Diners Club cards and traditional American Express Green, Gold,
          Platinum and Centurion (Black) cards without preset spending limits are
          examples of Charge Cards.

8

d.   "<u>Damages Period</u>" means the period from January 1, 2004 to November 27, 2012.

e.   "<u>General Purpose Credit Card</u>" during the Damages Period means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.  Examples of General Purpose Credit Cards are the Visa and MasterCard credit cards issued by the Bank Defendants, as well as certain Visa or MasterCard corporate cards, the Discover credit card issued by Discover Financial Services, and the Optima and Blue-type credit cards issued by American Express.  General Purpose Credit Cards also include Charge Cards such as the traditional American Express card that require payment at the end of a billing cycle.

f.   "<u>General Purpose Credit Card Network Services</u>" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Credit Cards are conducted, including authorization, clearance, and settlement.

g.   "<u>General Purpose Debit Card</u>" during the Damages Period means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account ("DDA"), at a bank or other financial institution. Visa's Signature Debit Card program (the "Visa Check Card") and MasterCard's Signature Debit Card program (sometimes referred to as "Debit MasterCard") are General Purpose Debit Cards, as are PIN Debit Cards authorized over Visa's Interlink and MasterCard's Maestro networks.  General Purpose Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's DDA.  Examples include, but are not limited to, payroll cards and cards associated with a flexible spending account, health reimbursement arrangement, or health savings account.

h.   "<u>General Purpose Debit Card Network Services</u>" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Debit Cards are conducted, including authorization, clearance, and settlement.

i.   "<u>General Purpose Payment Card</u>" means a General Purpose Credit Card or a General Purpose Debit Card.

j.   "<u>General Purpose Payment Card Network</u>" means an electronic payment system used to accept, transmit or process transactions made by General Purpose Payment Cards for money, goods or services and to transfer information and funds among Issuers, Acquirers, merchants and users of

9

General Purpose Payment Cards.  Both Visa and MasterCard operate General Purpose Payment Card Networks.

k.     "Honor All Issuers" rules are the "Honor All Cards" rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded General Purpose Credit Cards to accept all such General Purpose Credit Cards that carry the brand of that network, and the rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded General Purpose Debit Cards to accept all such General Purpose Debit Cards that carry the brand of the respective network.

l.     "Interchange Fees" are fees or rates fixed by Visa or MasterCard and their member banks that are paid to Issuers by merchants in conjunction with transactions in which Visa or MasterCard General Purpose Payment Cards are used as a means of payment for purchases of goods and services.  Interchange Fees are deducted by an Issuer from the funds owed to a merchant prior to the settlement of a Visa or MasterCard General Purpose Payment Card transaction.

m.     "Issuer" means a bank or other financial institution that issues General Purpose Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations.  Issuers authorized by the Visa and MasterCard General Purpose Payment Card Networks to issue Visa- and/or MasterCard-branded General Purpose Payment Cards are members of those networks.

n.     "MasterCard Defendants" refer to MasterCard Incorporated and MasterCard International Incorporated and all Bank Defendants that issued MasterCard-branded General Purpose Payment Cards during the Damages Period.

o.     "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping his or her card at the point-of-sale and entering a personal identification number ("PIN").  PIN Debit Card networks grew out of regional ATM networks and are processed differently than Signature Debit Card transactions.  Examples of PIN Debit Card networks include Visa's Interlink network, MasterCard's Maestro network, FIS's NYCE network, and First Data Corporation's STAR network.

p.     "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder.  The "Visa Signature Preferred Card" product and "World MasterCard Card" product are examples of Premium Payment Cards.

q.     "Signature Debit Card" means a General Purpose Debit Card with which the

10

cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.  Signature Debit Card transactions are processed in the same way as General Purpose Credit Card transactions.  Examples of Signature Debit Cards include the Visa Check Card product and the Debit MasterCard product.

r.    "Visa Defendants" refer to Visa Inc., Visa U.S.A. Inc., and Visa International Service Association and all Bank Defendants that issued Visa-branded General Purpose Payment Cards during the Damages Period.


## PARTIES

### A.    Plaintiffs

14.    All of the Plaintiffs accepted Visa and MasterCard General Purpose Payment Cards during the Damages Period, and were injured in their business or property as a result of the unlawful conduct alleged in this Third Amended Complaint.

15.    Plaintiff 7-Eleven, Inc. ("7-Eleven") is a Texas corporation with its principal place of business in Dallas, Texas.  7-Eleven operates, franchises, or licenses more than 10,100 7-Eleven stores in North America.  Globally, 7-Eleven has more than 50,700 stores in 16 countries.  As of December 31, 2012, 7-Eleven operated approximately 2,250 7-Eleven stores in the United States with approximately another 5,870 7-Eleven stores operated by 7-Eleven franchisees.  7-Eleven's revenue for 2012 exceeded $23 billion.  7-Eleven has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover on behalf of its corporate and franchised 7-Eleven stores in the United States the damages incurred as a result of the conduct detailed in this Third Amended Complaint.

16.    Plaintiff Academy, Ltd. ("Academy") is a privately held company based in Katy, Texas doing business as Academy Sports + Outdoors.  Academy is one of the nation's largest sporting goods and outdoor retailers, with a broad assortment of quality hunting, fishing, and

11

camping equipment and gear, along with sports and leisure products, footwear, and apparel. Academy operates 161 stores in the United States, and sells goods over the Internet to U.S. customers. Academy had over $3.5 billion in retail sales in 2012. Academy has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

17.     Plaintiff Aldo US Inc. is a privately held Delaware corporation doing business as Aldo and Call It Spring. Aldo US Inc. is a subsidiary of The Aldo Group, Inc. (together, with Aldo US Inc., "Aldo"), a privately held Canadian corporation. Aldo, through its U.S. brands Aldo and Call it Spring, and through its additional international brands Little Burgundy, and Globo, is a worldwide retailer of shoes and accessories. The company operates 418 Aldo stores and 30 Call it Spring stores in the United States, and sells goods over the Internet to U.S. consumers. Aldo has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

18.     Plaintiff Alimentation Couche-Tard Inc. ("Couche-Tard") is a Canadian corporation organized under the laws of Quebec, with its principal place of business in Laval, Quebec, Canada. In the United States, Couche-Tard is the largest independent convenience store operator in terms of number of company-operated stores. As of April 28, 2013, Couche-Tard's network comprised 6,094 convenience stores throughout North America, including 4,546 stores with road transportation fuel dispensing. Couche-Tard operates in the United States through its U.S. subsidiaries Circle K Stores Inc. and Mac's Convenience Stores LLC, which operate under the Circle K and Mac's banners, respectively. Couche-Tard has timely opted out of the proposed

12

# A4984

class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

19.    Plaintiff Alon USA, LP ("Alon LP") is a limited partnership organized under the State of Texas, and is a majority owned subsidiary of Alon USA Energy, Inc. (hereinafter, collectively with its affiliates, referred to as "Alon").  Alon markets and distributes motor fuels to more than 600 independent and 300 company-owned retail locations.  Alon is also the largest licensee of 7-Eleven in the United States, operating stores in Central and West Texas and New Mexico.  Alon LP had over $900 million in retail sales in 2012.  Alon LP has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any franchisees, subsidiaries, and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

20.    Plaintiff Amazon.com, Inc. ("Amazon") is a Delaware corporation with its principal place of business in Seattle, Washington.  Amazon opened its virtual doors on the World Wide Web in July 1995 and it seeks to offer Earth's Biggest Selection.  Amazon seeks to be Earth's most customer-centric company for four primary customer sets: consumers, sellers, enterprises, and content creators.  In addition, Amazon provides services, such as advertising services and co-branded credit card agreements.  Amazon serves consumers through its retail websites, and focuses on selection, price, and convenience.  Amazon's subsidiary, Zappos.com, Inc. ("Zappos") is an online service company that sells shoes, clothing, handbags, accessories and more through two main websites: Zappos.com and 6pm.com.  Amazon and Zappos have timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by their subsidiaries and/or affiliates that operate in the United

13

States, as a result of the conduct detailed in this Third Amended Complaint.

21.     Plaintiff American Multi-Cinema, Inc. ("AMC") is a Missouri corporation with its principal place of business in Leawood, Kansas.  AMC and its subsidiaries are principally involved in the theatrical exhibition business and own, operate or have interests in 342 movie theatres with 4,941 screens (as of March 30, 2013), primarily in the United States.  AMC had approximately $2.5 billion in retail sales in fiscal 2012.  AMC has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by all of its managed theaters and any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

22.     Plaintiff Barnes & Noble, Inc. ("Barnes & Noble") is a Delaware corporation with its principal place of business in New York, New York.  Barnes & Noble is one of the nation's largest booksellers and a leading content, commerce, and technology company providing customers easy and convenient access to books, magazines, newspapers, and other content across its multi-channel distribution platform.  Barnes & Noble operates 675 bookstores in all 50 states, and sells goods over the Internet to U.S. customers.  Barnes & Noble had approximately $5.025 billion in Barnes & Noble-branded store and Internet sales in 2012.  Barnes & Noble has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

23.     Plaintiff Barnes & Noble College Booksellers, LLC ("B&N College") is a Delaware limited liability company based in Basking Ridge, New Jersey.  B&N College is a majority owned subsidiary of Barnes & Noble.  B&N College operates 686 college bookstores at colleges and universities across the United States.  Its operations include the sales of textbooks

and course-related materials, emblematic apparel and gifts, trade books, school and dorm supplies, and convenience and café items on college and university campuses. B&N College also offers a textbook rental option to its customers, as well as electronic textbooks and other course materials through a proprietary digital platform. B&N College had approximately $1.8 billion in retail sales in 2012. B&N College has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

24.     Plaintiff Beall's, Inc. ("Beall's") is a privately held Florida corporation with its principal place of business in Bradenton, Florida. Beall's is engaged in the operation of two store formats through its wholly owned subsidiaries Beall's Department Stores, Inc. and Beall's Outlet Stores, Inc. Beall's owns and operates over 500 stores in the United States, primarily in small- and medium-sized communities in Florida and other southern U.S. states, and sells goods over the Internet to U.S. customers. Beall's had approximately $1.3 billion in retail sales in 2012. Beall's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

25.     Plaintiff Boscov's, Inc. ("Boscov's") is a Pennsylvania corporation with its principal place of business in Reading, Pennsylvania. Boscov's is a family owned department store founded by Solomon Boscov in 1911. Boscov's operates through 42 stores reaching across five states in the Mid-Atlantic region. Boscov's had net sales of approximately $1 billion in 2012. Boscov's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a

15

result of the conduct detailed in this Third Amended Complaint.

26.     Plaintiff Brookshire Grocery Company ("Brookshire") is a Texas corporation
with its principal place of business in Tyler, Texas.  Brookshire is a Texas-based regional food
chain that has been providing families with quality foods since 1928.  Brookshire operates more
than 150 store locations under the banners of Brookshire's Food Stores, Super 1 Foods Stores,
and FRESH by Brookshire's.  Brookshire has timely opted out of the proposed class settlement
in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries
and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

27.     Plaintiff The Buckle, Inc. ("The Buckle") is a Nebraska corporation with its
principal place of business in Kearney, Nebraska.  The Buckle is a retailer of medium to better-
priced casual apparel, footwear, and accessories for fashion-conscious young men and women.
As of February 2, 2013, The Buckle operated 440 retail stores in 43 states throughout the
continental United States under the names "Buckle" and "The Buckle," and it sells merchandise
over the Internet to U.S. customers.  The Buckle had net sales of approximately $1.1 billion in
2012.  The Buckle has timely opted out of the proposed class settlement in MDL 1720 and is
seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a
result of the conduct detailed in this Third Amended Complaint.

28.     Plaintiff The Children's Place Retail Stores, Inc. ("The Children's Place") is a
Delaware corporation with its principal place of business in Secaucus, New Jersey.  The
Children's Place is the largest pure-play children's specialty apparel retailer in North America.
The Children's Place operates 1,111 stores and sells goods over the Internet to U.S. consumers.
The Children's Place (Barbados) Inc. is a subsidiary of The Children's Place and operates The
Children's Place stores in Puerto Rico.  The Children's Place had net sales of $1.558 billion in

16

the United States and Puerto Rico for the fiscal year ended February 2, 2013. The Children's Place has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

29.   Plaintiff Costco Wholesale Corp. ("Costco") is a Washington corporation with its principal place of business in Issaquah, Washington. Founded in 1983 in Seattle, Washington, Costco owns and operates a chain of 622 membership warehouse stores in 41 states, the District of Columbia, and Puerto Rico, and sells goods over the Internet to U.S. customers. Costco had over $97 billion in retail sales in 2012. Costco has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

30.   Plaintiff Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") is a Tennessee corporation with its principal place of business in Lebanon, Tennessee. Cracker Barrel, along with its subsidiaries CBOCS West, Inc., CBOCS Pennsylvania, LLC, CBOCS Properties, Inc. and CBOCS Texas, LLC, is engaged in the operation and development of its old country stores and restaurants, which provide a rustic, old country-store design offering a full-service restaurant menu featuring home-style country food, and a wide variety of decorative and functional items featuring rocking chairs, holiday and seasonal gifts and toys, apparel, cookware and foods. Cracker Barrel operates over 600 stores in the U.S., and sells goods over the Internet. Cracker Barrel had over $2.5 billion in sales in 2012. Cracker Barrel has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third

17

# A4989

Amended Complaint.

31.     Plaintiff Cumberland Farms, Inc. ("Cumberland Farms") is a Delaware corporation with its principal place of business in Framingham, Massachusetts.  Cumberland Farms operates approximately 600 retail stores, gas stations, and a support system including petroleum and grocery distribution in 11 states across the Northeast and Florida.  Cumberland Farms's subsidiary, Gulf Oil Limited Partnership ("Gulf"), is a distributor of quality motor fuels to thousands of outlets across its 27-state footprint.  Gulf also supplies heating oil, lubricants, and bio-fuels.  Gulf owns and operates a dozen petroleum terminals and supplies wholesale product through many third-party  terminals.  Cumberland Farms and Gulf have timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

32.     Plaintiff Dick's Sporting Goods, Inc. ("Dick's") is a Delaware corporation with its principal place of business in Coraopolis, Pennsylvania.  Dick's was founded in 1948 and is an authentic full-line sporting goods retailer offering a broad assortment of brand name sporting goods equipment, apparel, and footwear in a specialty store environment.  Dick's and its affiliates operate over 600 stores in 44 states, and sell goods over the Internet to U.S. customers.  Dick's had approximately $5.8 billion in consolidated sales in 2012.  Dick's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

33.     Plaintiff Dillard's, Inc. ("Dillard's") is a Delaware corporation with its principal place of business in Little Rock, Arkansas.  Dillard's was founded in 1938 by William T. Dillard,

18

# A4990

and currently ranks among the nation's largest fashion apparel, cosmetics, and home furnishing retailers.  Dillard's operates 301 stores in the United States, and sells goods over the Internet to U.S. customers.  Dillard's had over $6.5 billion in retail sales in fiscal year 2012.  Dillard's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

34.     Plaintiff Drury Hotels Company, LLC ("Drury") is a privately owned Nevada limited liability company with its principal place of business in Cape Girardeau, Missouri.  Drury is a hotel management company that offers top-quality lodging at a reasonable price.  Drury operates more than 130 hotels in 20 states across the United States.  Drury had approximately $390 million in retail sales in 2012.  Drury has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

35.     Plaintiff Euromarket Designs, Inc., d/b/a Crate & Barrel and CB2 ("EDI"), is a privately held Illinois corporation, with its principal place of business in Northbrook, Illinois. EDI is a prominent retailer of housewares, home furnishings and furniture.  The company operates 86 Crate & Barrel stores and 11 CB2 stores in the United States, and sells goods over the Internet to U.S. customers (and to other customers around the world).  Plaintiff Meadowbrook, L.L.C., d/b/a The Land of Nod ("Meadowbrook"), is a privately held Illinois limited liability company, with its principal place of business in Morton Grove, Illinois.  Meadowbrook is a prominent retailer of children's furniture and home furnishings, toys and gifts, which operates 4 The Land of Nod stores in the United States, and sells goods over the Internet to U.S. customers (and to other customers around the world).  Crate & Barrel Holdings,

19

Inc. is the sole owner of EDI and Meadowbrook, and the holder of various assets relating to the companies' businesses.  EDI and Meadowbrook had approximately $1.3 billion in retail sales for the fiscal year ended February 3, 2013.  EDI and Meadowbrook timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

36.     Plaintiff Express, LLC ("Express") is a Delaware corporation with its principal place of business in Columbus, Ohio.  Express, LLC is wholly owned by Express, Inc.  Express is a specialty apparel and accessory retailer offering both women's and men's merchandise. Express has over 30 years of experience offering a distinct combination of style and quality at an attractive value, targeting women and men between 20 and 30 years old.  Express offers its customers an assortment of fashionable apparel and accessories to address fashion needs across multiple aspects of their lifestyles, including work, casual, jeanswear, and going-out occasions. As of February 2, 2013, Express operated 625 stores across the United States, Canada, and Puerto Rico.  Express also sells goods over the Internet to U.S. customers.  Express had net sales of over $2 billion in 2012.  Express has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

37.     Plaintiff Family Dollar Stores, Inc. ("Family Dollar") is a Delaware corporation with its principal place of business in Matthews, North Carolina.  Family Dollar operates a chain of more than 7,400 general merchandise retail discount stores in 45 states, providing value-conscious consumers with a selection of competitively priced merchandise in convenient

20

# A4992

neighborhood stores.  Family Dollar had net sales of over $9.3 billion in fiscal year 2012.

Family Dollar has timely opted out of the proposed class settlement in MDL 1720 and is seeking

to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in

the United States, as a result of the conduct detailed in this Third Amended Complaint.

38.     Plaintiffs Fleet Wholesale Supply Co., Inc., a Wisconsin corporation with its

principal place of business in Brainerd, Minnesota; Mills Motor, Inc., a Minnesota corporation

with its principal place of business in Brainerd, Minnesota; Mills Auto Enterprises, Inc., a

Minnesota corporation with its principal place of business in Brainerd, Minnesota; Willmar

Motors, LLC, a Minnesota limited liability company with its principal place of business in

Brainerd, Minnesota; Mills Auto Center, Inc., a Minnesota corporation with its principal place of

business in Brainerd, Minnesota; Fleet and Farm of Alexandria, Inc., a Minnesota corporation

with its principal place of business in Brainerd, Minnesota; Fleet Wholesale Supply of Fergus

Falls, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota;

Fleet and Farm of Green Bay, Inc., a Wisconsin corporation with its principal place of business

in Brainerd, Minnesota; Fleet and Farm of Menomonie, Inc., a Wisconsin corporation with its

principal place of business in Brainerd, Minnesota; Mills Fleet Farm, Inc., a Minnesota

corporation with its principal place of business in Brainerd, Minnesota; Fleet and Farm of

Manitowoc, Inc., a Wisconsin corporation with its principal place of business in Brainerd,

Minnesota; Fleet and Farm of Plymouth, Inc., a Wisconsin corporation with its principal place of

business in Brainerd, Minnesota; Fleet and Farm Supply Company of West Bend, Inc., a

Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Fleet and

Farm of Waupaca, Inc., a Wisconsin corporation with its principal place of business in Brainerd,

Minnesota; Mills E-Commerce Enterprises, Inc., a Minnesota corporation with its principal place

21

# A4993

of business in Brainerd, Minnesota; and Brainerd Lively Auto, LLC, a Minnesota limited liability company with its principal place of business in Brainerd, Minnesota (collectively, the "Mills Companies") individually own and operate dozens of stores and businesses in Minnesota, Wisconsin, Iowa, South Dakota, and North Dakota primarily under the "Mills," "Mills Fleet Farm," or "Mills Auto Group" brand names, including: retail stores, online stores, auto dealerships, vehicle service centers, and related operations.  The Mills Companies have timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

39.     Plaintiff Foot Locker, Inc. ("Foot Locker") is a New York corporation with its principal place of business in New York, New York.  Foot Locker is a leading global retailer of athletically inspired shoes and apparel with eight brands: Foot Locker, Kids Foot Locker, Lady Foot Locker, Footaction, Champs Sports, Eastbay, CCS and SIX:02.  Foot Locker owns and operates over 2,400 stores in the United States, and sells goods over the Internet to U.S. customers.  Foot Locker had approximately $6.2 billion in retail sales in 2012.  Foot Locker has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

40.     Plaintiff The Gap, Inc. ("Gap") is a Delaware corporation with its principal place of business in San Francisco, California.  Gap is a leading global specialty retailer with six brands: Gap, Banana Republic, Old Navy, Piperlime, Athleta, and Intermix.  Gap offers clothing, accessories, and personal care products for men, women, children, and babies in approximately 3,100 company operated stores in the United States and Canada, and sells goods over the Internet

22

to U.S. customers.  Gap also has significant retail and Internet operations outside of the United

States.  Gap had approximately $15.7 billion in retail sales in 2012.  Gap has timely opted out of

the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred,

including by any subsidiaries and/or affiliates that operate in the United States, as a result of the

conduct detailed in this Third Amended Complaint.

41.    Plaintiff Genesco Inc. ("Genesco") is a Tennessee corporation with its principal

place of business in Nashville, Tennessee.  Genesco is a specialty retailer that sells footwear,

headwear, sports apparel, and accessories in more than 2,400 retail stores throughout the U.S.

and internationally, principally under the names Journeys, Journeys Kidz, Shi by Journeys,

Underground by Journeys, Schuh, Lids, Lids Locker Room, and Johnston & Murphy.  Genesco

also sells goods over the Internet to U.S. customers.  Genesco had approximately $1.875

billion in U.S. retail sales in its fiscal year ended February 2, 2013.  Genesco has timely opted

out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a

result of the conduct detailed in this Third Amended Complaint.

42.    Plaintiff GNC Holdings, Inc. ("GNC") is a Delaware corporation with its

principal place of business in Pittsburgh, Pennsylvania.  GNC is a specialty retailer that sells

health and wellness products, including vitamins, minerals, and herbal supplement products,

sports nutrition products, and diet products.  GNC sells its products at over 8,100 locations

worldwide, and over the Internet to U.S. customers, including through its wholly owned

subsidiary LukcyVitamin.com.  GNC had approximately $1.8 billion in retail sales in 2012.

GNC has timely opted out of the proposed class settlement in MDL 1720 and is seeking to

recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the

23

# A4995

United States, as a result of the conduct detailed in this Third Amended Complaint.

43.     Plaintiff The Gymboree Corporation ("Gymboree") is a Delaware corporation with its principal place of business in San Francisco, California.  Gymboree is a specialty retailer that offers high-quality apparel and accessories for children, as well as play programs for children.  Gymboree's brands include Gymboree Retail Stores, Gymboree Outlet Stores, Janie and Jack Retail Shops, Crazy 8 Retail Stores, and Gymboree Play & Music Programs.  As of February 2, 2013, Gymboree operated 1,262 retail stores in the United States, Canada, and Australia, and it sells goods over the Internet to U.S. customers.  Gymboree had sales of over $1.2 billion for the fiscal year ended February 2, 2013.  Gymboree has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

44.     Plaintiff IKEA North America Services, LLC ("IKEA North America") is a Delaware limited liability company with its principal place of business in Conshohocken, Pennsylvania.  The IKEA Group is a global retailer whose stated vision and business idea is ". . . to create a better everyday life for the many people by offering a wide range of well-designed, functional home furnishing products at prices so low that as many people as possible will be able to afford them."  The retail operations of IKEA North America and its affiliates IKEA New York, LLC, IKEA U.S. East, LLC, and IKEA U.S. West, Inc. (collectively "IKEA US") are an extension of the global brand.  IKEA US currently operates 38 stores in the United States, and sells products over the Internet to U.S. customers.  IKEA US had approximately $4 billion in retail sales in 2012.  IKEA North America has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any

24

subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

45.    Plaintiff J. Crew Group, Inc. ("J. Crew") is a privately held Delaware corporation with its principal place of business in New York, New York.  J. Crew is a nationally recognized, multi-channel, multi-brand specialty retailer of women's, men's, and children's apparel, shoes and accessories.  As of March 20, 2013, J. Crew operated 296 retail stores in 47 states, and it sells merchandise over the Internet to U.S. customers.  J. Crew had $2.2 billion in revenues for the 2012 fiscal year, which ended on February 2, 2013.  J. Crew has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

46.    Plaintiff Lowe's Companies, Inc. ("Lowe's") is a North Carolina corporation with its principal place of business in Mooresville, North Carolina.  Through its operating subsidiaries Lowe's Home Centers, Inc. and Lowe's HIW, Inc., Lowe's operates 1,752 home improvement retail stores across the United States, and sells goods over the Internet to U.S. customers, including through its wholly owned subsidiary Allied Trade Group, Inc.  Lowe's had approximately $50.5 billion in retail sales in 2012.  Lowe's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

47.    Plaintiff Michaels Stores, Inc. ("Michaels") is a Delaware corporation with its principal place of business in Irving, Texas.  Michaels, together with any subsidiaries, is the largest arts and crafts specialty retailer in North America, providing materials, project ideas, and

25

education for creative activities.  Michaels owns and operates 1,115 Michaels stores in the

United States and Canada, as well as 123 Aaron Brothers stores in the United States, and sells

goods over the Internet to U.S. customers.  In fiscal 2012, Michaels had over $4.4 billion in retail

sales.  Michaels has timely opted out of the proposed class settlement in MDL 1720 and is

seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that

operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

48.     Plaintiff New York & Company, Inc. ("New York & Company") is a Delaware

corporation with its principal place of business in New York, New York.  New York & Company

is a leading specialty retailer of women's fashion apparel and accessories, and the modern wear-

to-work destination for women, providing perfectly fitting pants and NY Style that is feminine,

polished, on-trend and versatile.  As of February 2, 2013, New York & Company operated 519

stores in the United States, and it sells merchandise over the Internet to U.S. customers.  New

York & Company had approximately $1 billion in net sales in 2012.  New York & Company has

timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct

detailed in this Third Amended Complaint.

49.     Plaintiff NIKE, Inc. ("NIKE") is an Oregon corporation with its principal place of

business in Beaverton, Oregon.  NIKE's principal business activity is the design, development

and worldwide marketing of high quality footwear, apparel, equipment, accessories and services.

NIKE is the largest seller of athletic footwear and athletic apparel in the world.  NIKE sells its

products to retail accounts, through NIKE-owned retail stores and Internet sales, and through a

mix of independent distributors and licensees, in approximately 190 countries around the world.

NIKE had over $24 billion in revenue in Fiscal Year 2012.  NIKE has timely opted out of the

26

proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

50.    Plaintiff P.C. Richard & Son, Inc. ("P.C. Richard") is a Delaware corporation. P.C. Richard, through its subsidiaries (including, but not limited to, P.C. Richard & Son Long Island Corporation), is a privately owned and operated company founded in 1909. P.C. Richard is engaged principally in the retail sale of home appliances, televisions, consumer electronics, and home office products principally in the New York metropolitan area and in New Jersey, Connecticut and Northeast Philadelphia. As of January 31, 2013, the company operated 65 showrooms, and it sells merchandise over the Internet to U.S. customers. P.C. Richard has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

51.    Plaintiff Panda Restaurant Group, Inc. ("Panda RG") is a California corporation with its principal place of business in Rosemead, California. Panda RG operates a chain of restaurants that offer Chinese food, gourmet Mandarin and Szechuan cuisine, and Japanese grill favorites, as well as appetizers, soups and salads, entrees, noodles and rice products, and sides. Panda RG operates over 1,500 restaurants in 42 states and Puerto Rico. Panda RG had over $1.7 billion in revenue in 2012. Panda RG has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

52.    Plaintiff Panera Bread Company ("Panera") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Panera is a national bakery-café concept with

27

over 1,700 company-owned and franchise-operated bakery-café locations in 44 states, the District of Columbia, and Ontario, Canada.  Panera serves nearly 8 million customers per week system-wide, and is currently one of the largest food service companies in the United States. Panera had approximately $1.9 billion in retail sales in 2012.  Panera has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred by all of its entities that operate in the United States including, but not limited to, its subsidiaries, franchisees, and agents, as a result of the conduct detailed in this Third Amended Complaint.

53.     Plaintiff Ralph Lauren Corporation ("Ralph Lauren") is a Delaware corporation with its principal place of business in New York, New York.  Ralph Lauren is a global leader in the design, marketing, and distribution of premium lifestyle products, including men's, women's, and children's apparel, accessories, fragrances, and home furnishings.  Ralph Lauren operates in three distinct but integrated segments: Wholesale, Retail, and Licensing.  As of March 30, 2012, Ralph Lauren's merchandise was sold through 379 directly operated stores and through multiple wholesale outlets.  In addition, as of March 30, 2012, the Company operated 474 concession shop locations worldwide, and its global licensing partners operated 59 Ralph Lauren stores and 27 dedicated concession shops as well 58 Club Monaco stores.  Ralph Lauren also sells merchandise over the Internet to U.S. and certain other global customers.  Ralph Lauren had approximately $7 billion in sales in 2012.  Ralph Lauren has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

54.     Plaintiff Recreational Equipment, Inc. ("REI") is a member-owned consumer cooperative organized under the laws of the State of Washington with headquarters in Kent,

# A5000

Washington.  REI is a national outdoor retailer selling consumers the products they need to enjoy human-powered outdoor recreation.  REI offers its own line of quality award-winning gear and apparel, in addition to products from top brands for camping, climbing, cycling, fitness, hiking, paddling, snow sports, and travel.  REI is also the largest provider in the U.S. of education in outdoor recreation, through the REI Outdoor School and most of its stores.  REI operates 129 stores in the United States, and sells its products via the Internet and catalogue to U.S. customers. REI had approximately $2 billion in retail sales in 2012.  REI has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred as a result of the conduct detailed in this Third Amended Complaint.

55.     Plaintiff Republic Services, Inc. ("Republic") is a Delaware corporation with its principal place of business in Phoenix, Arizona.  Republic is the second largest provider of services in the domestic non-hazardous solid waste industry.  Republic provides non-hazardous solid waste collection services for commercial, industrial, municipal and residential customers through 334 collection operations in 39 states and Puerto Rico.  Republic had over $8 billion in revenue in 2012.  Republic has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

56.     Plaintiff Restoration Hardware, Inc. ("Restoration Hardware") is a Delaware corporation with its principal place of business in Corte Madera, California.  Restoration Hardware is a luxury home furnishings retailer that offers a growing number of categories including furniture, lighting, textiles, bathware, decorative accessories, outdoor and children's furnishings. These products are sold through the Company's stores, catalogs and websites. As of

May 4, 2013, the Company operated approximately 70 retail stores and 14 outlet stores in 29

states, the District of Columbia and Canada, and had sourcing operations in Shanghai and Hong

Kong.  Restoration Hardware had over $1 billion in net revenues in Fiscal 2012.  Restoration

Hardware has timely opted out of the proposed class settlement in MDL 1720 and is seeking to

recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the

United States, as a result of the conduct detailed in this Third Amended Complaint.

57.    Plaintiff Roundy's Supermarkets, Inc. ("Roundy's") is a Wisconsin corporation

with its principal place of business in Milwaukee, Wisconsin.  Roundy's, through its retail

banners Pick 'n Save, Rainbow, Copps, Metro Market, and Mariano's, is a leading Midwest

supermarket chain that operates over 161 stores in the United States.  Roundy's had nearly $4.0

billion in retail sales in 2012.  Roundy's has timely opted out of the proposed class settlement in

MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or

affiliates, as a result of the conduct detailed in this Third Amended Complaint.

58.    Plaintiff Starbucks Corporation ("Starbucks") is a Washington corporation with

its principal place of business in Seattle, Washington.  Starbucks is the premier roaster, marketer

and retailer of specialty coffee in the world, operating in 62 countries.  Starbucks purchases and

roasts high-quality coffees that it sells, along with handcrafted coffee, tea and other beverages

and a variety of fresh food items, through company-operated stores. Starbucks also sells a variety

of coffee and tea products and licenses its trademarks through other channels such as licensed

stores, grocery and national foodservice accounts.  Starbucks had revenues of approximately

$13.3 billion in Fiscal Year 2012.  Starbucks has timely opted out of the proposed class

settlement in MDL 1720 and is seeking to recover the damages incurred, including by any

subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed

# A5002

in this Third Amended Complaint.

59.     Plaintiff Stein Mart, Inc. ("Stein Mart") is a Florida corporation with its principal

place of business in Jacksonville, Florida.  Stein Mart is a national retailer offering the fashion

merchandise, service, and presentation of a better department or specialty store.  Stein Mart's

focused assortment of merchandise features current-season, moderate to better fashion apparel

for women and men, as well as accessories, shoes, and home fashions, all offered at prices

competitive with off-price retail chains.  Stein Mart operates 263 stores in the United States.

Stein Mart had approximately $1.18 billion in retail sales in 2012.  Stein Mart has timely opted

out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this

Third Amended Complaint.

60.     Plaintiff Swarovski U.S. Holding Limited ("Swarovski") is a Rhode Island

corporation with its principal place of business in Cranston, Rhode Island.  Swarovski, a

subsidiary of Swarovski International Holding AG, manufactures and markets crystal giftware

and jewelry.  Swarovski had approximately $485 million in retail sales in 2012.  Swarovski has

timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct

detailed in this Third Amended Complaint.

61.     Plaintiff The Talbots, Inc. ("Talbots") is a Delaware corporation with its principal

place of business in Hingham, Massachusetts.  Talbots is a specialty retailer and direct marketer

of women's apparel, accessories and shoes sold almost exclusively under the *Talbots* brand.

Talbots operates over 500 stores in the United States and Canada, and sells merchandise over the

Internet.  Talbots had over $1.1 billion in revenue in 2012.  Talbots has timely opted out of the

31

proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

62. Plaintiff Thermo Fisher Scientific Inc. ("TFS") is a Delaware corporation with its principal place of business in Waltham, Massachusetts. It is the world leader in serving science, enabling its customers to make the world healthier, cleaner and safer by providing analytical instruments, equipment, reagents and consumables, software and services for research, manufacturing, analysis, discovery and diagnostics. TFS serves more than 350,000 customers, including pharmaceutical and biotech companies, hospitals, clinical diagnostic labs, universities, research institutions, and government agencies. TFS had over $13 billion in revenue in 2012. TFS has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred by numerous TFS corporate entities that operate in the United States as a result of the conduct detailed in this Third Amended Complaint.

63. Plaintiff Thorntons Inc. ("Thorntons") is a Delaware corporation with its principal place of business in Louisville, Kentucky. As of this date, Thorntons operates 173 Retail Motor Fuel and Convenience Stores in the states of Illinois, Indiana, Ohio, Kentucky, Tennessee and Florida. Thorntons had over $2.3 billion in retail sales in 2012. Thorntons has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

64. Plaintiff The Wet Seal, Inc. ("Wet Seal") is a Delaware corporation with its principal place of business in Foothill Ranch, California. Wet Seal is a national multi-channel specialty retailer selling fashion apparel and accessory items designed for female customers aged

32

# A5004

13 to 39 years old.  As of February 2, 2013, Wet Seal operated 530 retail stores in 47 states and Puerto Rico, and it sells merchandise over the Internet to U.S. customers.  Wet Seal had approximately $580 million in sales in 2012.  Wet Seal has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Third Amended Complaint.

65.     Plaintiffs Whole Foods Market Group, Inc., a Delaware corporation with its principal place of business in Austin, Texas; Whole Foods Market Rocky Mountain/Southwest, L.P., a Texas limited partnership with its principal place of business in Austin, Texas; Whole Foods Market California, Inc., a California corporation with its principal place of business in Emeryville, California; Mrs. Gooch's Natural Food Markets, Inc., a California corporation with its principal place of business in Glendale, California; Whole Food Company, a Louisiana corporation with its principal place of business in Austin, Texas; Whole Foods Market Pacific Northwest, Inc., a Delaware corporation with its principal place of business in Bellevue, Washington; WFM-WO, Inc., a Delaware corporation with its principal place of business in Austin, Texas; WFM Northern Nevada, Inc., a Delaware corporation with its principal place of business in Austin, Texas; WFM Hawaii, Inc., a Hawaii corporation with its principal place of business in Glendale, California; and WFM Southern Nevada, Inc., a Delaware corporation with its principal place of business in Glendale, CA, are collectively referred to herein as "Whole Foods."  Whole Foods is the world's leading retailer of natural and organic foods and America's first national "Certified Organic" grocer.  Whole Foods's company mission is to promote the vitality and well-being of all individuals by supplying the highest quality, most wholesome foods available.  Whole Foods is the largest retailer of natural and organic foods in the United States

33

# A5005

and the 11th largest food retailer overall.  It currently operates approximately 350 stores in the

United States, Canada, and the United Kingdom.  Whole Foods had approximately $11.7 billion

in sales in Fiscal 2012.  Whole Foods has timely opted out of the proposed class settlement in

MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or

affiliates that operate in the United States, as a result of the conduct detailed in this Third

Amended Complaint.

      66.     Plaintiff The William Carter Company ("Carter's") is a Massachusetts

corporation with its principal place of business in Atlanta, Georgia.  Carter's is a leading

provider of apparel and related products exclusively for babies and young children, with history

dating back to 1865.  Carter's owns the *Carter's* and *OshKosh B'gosh* brands, two of the most

recognized brands in the U.S. children's apparel marketplace.  These brands are sold in leading

department stores, national chains, and specialty retailers domestically and internationally,

through more than 600 company-operated stores in the United States, Canada, and Japan, and to

U.S. customers over the Internet.  Carter's had over $1 billion in retail sales in 2012.  Carter's

has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

damages incurred, including by any subsidiaries and/or affiliates that operate in the United

States, as a result of the conduct detailed in this Third Amended Complaint.

      66.a.   Plaintiff Ashley Furniture Industries Inc. ("Ashley Furniture") is a Wisconsin

corporation with its principal place of business in Arcadia, Wisconsin.  Ashley Furniture is the

largest manufacturer of furniture in the world, and manufactures and distributes home

furnishings and accessories in the United States and internationally.  Ashley Furniture has timely

opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a

34

result of the conduct detailed in this Third Amended Complaint.

66.b.    Plaintiff Buc-ee's Ltd. ("Buc-ee's") is a Texas limited partnership with its principal place of business in Lake Jackson, Texas. Buc-ee's operates 29 retail stores in Texas. Buc-ee's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

66.c.    Plaintiff Family Express Corporation ("Family Express") is an Indiana corporation with its principal place of business in Valparaiso, Indiana. Family Express owns and operates 60 convenience stores and fueling centers in Northwest and North Central Indiana. Family Express has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

66.d.    Plaintiff Pacific Sunwear of Calfornia, Inc. ("PacSun") is a California corporation with its principal place of business in Anaheim, California. PacSun is a leading specialty retailer rooted in the action sports, fashion and music influences of the California lifestyle. PacSun operates over 600 stores throughout the United States and Puerto Rico. PacSun has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

66.e.    Plaintiff Coborn's, Incorporated ("Coborn's") is a Minnesota corporation with its principal place of business in St. Cloud, Minnesota. Founded in 1921, today Coborn's operates over 120 retail locations, including 48 grocery stores, throughout the Midwest. Coborn's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

35

damages incurred, including by any subsidiaries and/or affiliates that operate in the United

States, as a result of the conduct detailed in this Third Amended Complaint.

66.f.  Plaintiff D'Agostino Supermarkets, Inc. ("D'Agostino") is a retail grocery chain

operating under the laws of New York with its principal place of business in Larchmont, New

York.  D'Agostino operates 14 grocery stores in the state of New York.  D'Agostino has timely

opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a

result of the conduct detailed in this Third Amended Complaint.

66.g.  Plaintiff Jetro Cash & Carry Enterprises, LLC is a Delaware limited liability

company, and a subsidiary of Jetro Holdings, LLC, a Delaware limited liability company with its

principal place of business in College Point, New York (collectively, "Jetro").  Jetro is a

wholesale cash and carry, serving grocery retailers and foodservice operators, and operates a

total of 107 warehouses across 31 states under the names "Jetro Cash & Carry" and "Restaurant

Depot."  Jetro has timely opted out of the proposed class settlement in MDL 1720 and is seeking

to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in

the United States, as a result of the conduct detailed in this Third Amended Complaint.

66.h.  Plaintiff National Association of Convenience Stores ("NACS") is a trade

association organized under the laws of Virginia with its principal place of business in

Alexandria, Virginia.  NACS is an international trade association representing more than 2,200

retail and 1,600 supplier company members. NACS member companies do business in nearly 50

countries worldwide, with the majority of members based in the United States.  NACS has

timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

damages incurred, including by any subsidiaries and/or affiliates that operate in the United

States, as a result of the conduct detailed in this Third Amended Complaint.

66.i.  Plaintiff National Community Pharmacists Association ("NCPA") is a non-profit trade association organized under the laws of Virginia with its principal place of business in Alexandria, Virginia.  NCPA represents the pharmacist owners, managers, and employees of more than 23,000 independent community pharmacies across the United States.  NCPA has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred as a result of the conduct detailed in this Third Amended Complaint.

66.j.  Plaintiff National Grocers Association ("NGA") is a national trade association organized under the laws of the District of Columbia with its principal place of business in Arlington, Virginia.  NGA represents the retail and wholesale grocers that comprise the independent sector of the food distribution industry, as well as affiliated associations, manufacturers, and service suppliers.  NGA has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Third Amended Complaint.

B.     **Defendants**

1.     **Visa and MasterCard**

67.     Prior to the Visa IPO, Defendant Visa U.S.A. Inc. ("Visa U.S.A.") operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Its owner/members included approximately 14,000 banks.

68.     Prior to the Visa IPO, Defendant Visa International Service Association ("Visa International") operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Its owner/members included

37

approximately 21,000 banks.

69.     Prior to the Visa IPO, Visa U.S.A. and Visa International were each governed by a board of directors (and Visa International had regional boards of directors for each of its geographical regions) comprised of bank executives selected from their member banks, including some Bank Defendants.  Visa U.S.A. also was a regional group member of Visa International.

70.     Visa U.S.A. and Visa International, as well as other Visa entities not named as defendants in this Third Amended Complaint, conducted a number of corporate restructurings in 2007 and 2008 to combine several previously independent corporate entities into Defendant Visa Inc.  On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its member banks.  As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in Foster City, California.  Upon the restructuring, Visa U.S.A. and Visa International became wholly owned subsidiaries of Visa Inc. and they continue to operate as such today.  Visa Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

71.     Visa operates General Purpose Payment Card Networks and did so throughout the Damages Period.

72.     Prior to the MasterCard IPO, Defendant MasterCard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant MasterCard International Incorporated, a wholly owned subsidiary of MasterCard Incorporated with its principal place of business also in Purchase, New York, was a Delaware membership corporation that, prior to the MasterCard IPO, consisted of more than 23,000 owner/member banks worldwide and was the principal operating

38

subsidiary of MasterCard Incorporated.

73.    Prior to the MasterCard IPO, MasterCard Incorporated and MasterCard International Incorporated were governed by a global board of directors, as well as regional boards of directors for each of their geographical regions, that were comprised of bank executives selected from their member banks, including some Bank Defendants.

74.    On May 25, 2006, MasterCard Incorporated and MasterCard International Incorporated conducted an initial public offering and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to MasterCard's member banks.  As a result, MasterCard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York.  Upon the restructuring and continuing to this day, MasterCard International Incorporated has remained MasterCard Incorporated's principal operating subsidiary with its principal place of business also in Purchase, New York, and doing business as MasterCard Worldwide.  MasterCard Incorporated and MasterCard International Incorporated (and MasterCard Worldwide) are collectively referred to herein as "MasterCard."

75.    MasterCard operates General Purpose Payment Card Networks and did so throughout the Damages Period.

**2.      The Bank Defendants**

76.    Defendant Bank of America, N.A. is a national banking association with a principal place of business in Charlotte, North Carolina.  Defendant Bank of America Corporation is a Delaware Corporation with its principal place of business in Charlotte, North Carolina, and is the ultimate parent of Bank of America, N.A.  Defendant FIA Card Services, N.A., is a wholly owned subsidiary of NB Holdings, Inc., itself a wholly owned subsidiary of

39

# A5011

Bank of America Corporation.  FIA Card Services, N.A., is a national banking association with its principal place of business in Wilmington, Delaware.  Bank of America, N.A., and FIA Card Services, N.A., are members of Visa and MasterCard that issue Visa- and MasterCard-branded General Purpose Payment Cards.  Bank of America, N.A., Bank of America Corporation, FIA Card Services, N.A., and their predecessors and subsidiaries are collectively referred to herein as "Bank of America."

77.     Prior to the Visa IPO and at times during the Damages Period, Bank of America was represented on the Visa U.S.A. Board of Directors.  Prior to the MasterCard IPO and at times during the Damages Period, MBNA America Bank, N.A., which merged with and into Bank of America on January 1, 2006, was represented on the MasterCard U.S. and Global Boards of Directors.  Bank of America issues General Purpose Payment Cards to individuals and businesses throughout this judicial district.  It also provides card acceptance services to merchants throughout this judicial district through its substantial ownership in BA Merchant Services, LLC and Banc of America Merchant Services, LLC.  Bank of America has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Third Amended Complaint.

78.     Defendant JPMorgan Chase & Co. is a global financial firm that is incorporated in Delaware and has its principal place of business in New York, New York.  Defendant Chase Bank USA, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co. and issues Visa- and MasterCard-branded General Purpose Payment Cards.  Chase Bank USA, N.A. is a national banking association and has its principal place of business in Newark, Delaware.  Defendant Chase Paymentech Solutions, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Dallas, Texas.  Defendant JPMorgan Chase

40

# A5012

Bank, N.A., is a national bank organized under the laws of the United States with its principal place of business in Columbus, Ohio.  JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., and their predecessors and subsidiaries are collectively referred to herein as "Chase."

79.     Prior to the Visa IPO and at times during the Damages Period, Chase and various companies ultimately acquired by Chase (including Bank One Corporation and Bank One Delaware, N.A. (acquired by Chase in July 2004), Washington Mutual Bank (acquired by Chase in September 2008), and Providian National Bank (acquired by Washington Mutual in October 2005)) were represented on the Visa U.S.A. Board of Directors.  Prior to the MasterCard IPO and at times during the Damages Period, Chase was represented on the MasterCard Global Board of Directors and Washington Mutual was represented on the MasterCard U.S. Board of Directors.  Chase has also been represented on the Visa Inc. Board of Directors.  A longstanding Chase senior executive, Charles W. Scharf, has been installed as the CEO of Visa Inc., and another former Chase executive, Ryan McInerney, was recently hired as President of Visa Inc. Chase issues General Purpose Payment Cards to individuals and businesses throughout this judicial district.  It also provides card acceptance services to merchants throughout this judicial district.  Chase has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Third Amended Complaint.

80.     Defendant Citigroup Inc. is a global bank that is incorporated in Delaware and has its principal place of business in New York, New York.  Defendant Citibank, N.A. is a national bank located in South Dakota for purposes of the National Bank Act, with its main office in New York, New York, and is an indirect subsidiary of Citigroup Inc.  Citibank, N.A. issues Visa- and MasterCard-branded General Purpose Payment Cards.  Defendant Citicorp Payment Services,

41

Inc., a Delaware corporation with its principal place of business in Long Island City, New York,

is a subsidiary of Citibank, N.A.  Citigroup Inc., Citibank, N.A., Citicorp Payment Services, Inc.,

and their predecessors and subsidiaries are collectively referred to herein as "Citigroup."

81.     Prior to the MasterCard IPO and at times during the Damages Period, Citigroup

was represented on the MasterCard U.S. and Global Boards of Directors.  It has also been

represented on the post-IPO MasterCard Board of Directors.  Citigroup issues General Purpose

Payment Cards to individuals and businesses throughout this judicial district.  It also provides

card acceptance services to merchants throughout this judicial district.  Citibank has had actual

knowledge of, and has knowingly participated in, the conspiracies alleged in this Third Amended

Complaint.

82.     Defendant Wells Fargo & Company is a financial holding company which is

incorporated in Delaware with a principal place of business located in San Francisco, California.

Defendant Wells Fargo Bank, N.A. is a national association and wholly owned subsidiary of

Wells Fargo & Company with a main office located in Sioux Falls, South Dakota.  Wachovia

Bank, N.A. merged into Wells Fargo Bank, N.A.  Wells Fargo Bank, N.A., issues, and Wachovia

Bank, N.A., issued, Visa and MasterCard-branded General Purpose Payment Cards.  Wells Fargo

& Company, Wells Fargo Bank, N.A., and their predecessors and subsidiaries are collectively

referred to herein as "Wells Fargo."

83.     Prior to the Visa IPO and at times during the Damages Period, Wells Fargo and

Wachovia were represented on the Visa U.S.A. Board of Directors.  Wells Fargo issues General

Purpose Payment Cards to individuals and businesses throughout this judicial district.  Through

its "Wells Fargo Merchant Services" division, it also provides card acceptance services to

merchants throughout this judicial district.  Wells Fargo has had actual knowledge of, and has

# A5014

knowingly participated in, the conspiracies alleged in this Third Amended Complaint.

84.     Bank of America, Chase, Citigroup, and Wells Fargo are collectively referred to herein as the "Bank Defendants."  The Bank Defendants and/or entities they acquired were owner/member banks of the pre-IPO Visa and MasterCard networks.  The Bank Defendants are actual or potential competitors for the issuance of General Purpose Payment Cards and the acquisition of merchants.  The Bank Defendants are members of both Visa and MasterCard networks and have conspired with each other and with other Visa and MasterCard Issuers not to compete for merchants' acceptance of General Purpose Payment Cards, to require the payment of an Interchange Fee on every Visa and MasterCard transaction, and to fix the level of Interchange Fees that they charge to merchants.

85.     Certain banks, including some Bank Defendants, were board members of Visa from the beginning of the Damages Period through Visa's IPO in 2008 (and some banks, including Chase, were board members of post-IPO Visa).  As Visa board members and/or as owner/members of Visa, the banks (including the Bank Defendants) collectively controlled every aspect of Visa's business.  This collective control included the banks' agreements: (1) not to compete with one another for merchants' acceptance of Visa General Purpose Payment Cards; (2) to fix the Interchange Fees for Visa General Purpose Payment Card transactions in furtherance of their agreement not to compete; and (3) to set Visa's rules, including all the rules detailed in this Third Amended Complaint.  Additionally, given the banks' control over pre-IPO Visa, they explicitly agreed to proceed with Visa's IPO on the condition that Visa's post-IPO structure would enable substantive continuation of the agreement not to compete and price fixing detailed in this Third Amended Complaint.  All Visa member banks effectively delegated to Visa, in perpetuity, the ability to fix the banks' Interchange Fees to merchants.  Each Bank

43

# A5015

Defendant (and all Visa member banks) knew that all other Visa members were also delegating their pricing decisions to Visa and MasterCard, which arrangement was further ratified by an agreement of Visa's member banks when they voted to approve Visa's restructuring, and each Bank Defendant (and all Visa member banks) knew that Visa would continue to enforce, *inter alia,* its default Interchange Fee and Honor All Issuers rules.

86.     Certain banks, including some Bank Defendants, were board members of MasterCard from the beginning of the Damages Period through MasterCard's IPO in 2006 (and some banks, including Citigroup, were board members of post-IPO MasterCard).  As MasterCard board members and/or as owner/members of MasterCard, the banks (including the Bank Defendants) collectively controlled every aspect of MasterCard's business.  This collective control included the banks' agreements: (1) not to compete with one another for merchants' acceptance of MasterCard General Purpose Payment Cards; (2) to fix the Interchange Fees for MasterCard General Purpose Payment Card transactions in furtherance of their agreement not to compete; and (3) to set MasterCard's rules, including all the rules detailed in this Third Amended Complaint.  Additionally, given the banks' control over pre-IPO MasterCard, they explicitly agreed to proceed with MasterCard's IPO on the condition that MasterCard's post-IPO structure would enable substantive continuation of the agreement not to compete and price fixing detailed in this Third Amended Complaint.  All MasterCard member banks effectively delegated to MasterCard, in perpetuity, the ability to fix the banks' Interchange Fees to merchants.  Each Bank Defendant (and all MasterCard member banks) knew that all other MasterCard members were also delegating their pricing decisions to Visa and MasterCard, which arrangement was further ratified by an agreement of MasterCard's member banks when they voted to approve MasterCard's restructuring, and each Bank Defendant (and all MasterCard member banks) knew

44

that MasterCard would continue to enforce, *inter alia,* its default Interchange Fee and Honor All Issuers rules.

## FACTUAL ALLEGATIONS

**A.**   **Defendants' Cartels**

87.   Defendants created and maintained two separate cartels that implemented their agreements to fix prices and not to compete.  One conspiracy was perpetrated by the Visa Defendants; the other was perpetrated by the MasterCard Defendants.  Both conspiracies are ongoing.

88.   The pillars of each of these conspiracies are Visa's and MasterCard's Honor All Issuers rules.  Pursuant to these rules, each network's member/owner banks have agreed that any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network must accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.  These "all or nothing" rules thereby constitute agreements among the banks not to compete for merchants' acceptance of their General Purpose Credit (or Debit) Cards.

89.   To reinforce their agreements not to compete for merchant acceptance, each network's Issuers have colluded to fix the Interchange Fees they charge merchants on every transaction through the default Interchange Fee rules.  This has prevented merchants from realizing the price-reducing benefits of Issuers competing on price, which would have occurred in a competitive market.  Instead, merchants accepting either Visa or MasterCard General Purpose Payment Cards pay the same Interchange Fee on a given transaction regardless of which Issuer is involved.  There is no competition.  Within each conspiracy, Issuers charge merchants exactly the same inflated prices that are the products of the banks' collusion.  These banks

45

# A5017

typically compete vigorously for cardholders, but they do not compete for merchant acceptance or for the Interchange Fees that merchants pay to accept their Visa and MasterCard cards.

90.     Visa and MasterCard are the enterprises by which competing banks implement and effectuate their agreements not to compete and agreements to fix prices.  These schemes rely on rules—such as the Honor All Issuers rules, default Interchange Fee rules, and other rules and policies that establish mechanisms for monitoring and enforcing these price-fixing schemes— that bind all Visa and MasterCard Issuers and Acquirers.

91.     In addition to inflicting direct anticompetitive harm on merchants with these price-fixing conspiracies, Defendants also have used them to acquire and maintain their substantial market power.  Specifically, Visa and MasterCard used these supracompetitive Interchange Fees as an incentive for Issuers (who receive the Interchange Fees paid by merchants) to issue Visa and MasterCard General Purpose Payment Cards.  Using price fixing to induce Issuers to join their cartels, Visa and MasterCard acquired sufficient market power in the General Purpose Payment Card markets such that most merchants were compelled to accept their cards for payment.  Moreover, once a merchant started accepting Visa's and MasterCard's General Purpose Payment Cards for payment, it was impossible to stop accepting them.  Once Visa and MasterCard acquired substantial market power over merchants, they maintained it by forcing merchants to pay ever higher Interchange Fees to continue to fund these price-fixing schemes and thereby perpetually maintain and enhance their cartels' market power through the present day.

92.     Although Visa and MasterCard initially focused their anticompetitive conduct on General Purpose Credit Cards, once they achieved substantial market power in the General Purpose Credit Card market they leveraged it to achieve substantial market power in the General

46

Purpose Debit Card market by forcing merchants to accept Defendants' Signature Debit Card transactions as a condition of accepting Defendants' dominant General Purpose Credit Card transactions and by engaging in a variety of other exclusionary conduct.

93.     As the natural and intended consequences of their anticompetitive conduct, Defendants were able to set both General Purpose Credit Card and Debit Card Interchange Fees at supracompetitive levels.  Defendants' anticompetitive conduct generated more than $350 billion in Interchange Fees for the colluding Issuers during the Damages Period—fees paid by merchants and their customers.  Merchants paid these anticompetitive fees directly throughout the Damages Period and they continue to pay them to this day.

94.     Defendants' anticompetitive conduct during the Damages Period was not reasonably necessary to operate their General Purpose Payment Card Networks.  Domestic and international examples have demonstrated that Interchange Fees are economically unnecessary to encourage Issuers to issue General Purpose Payment Cards or for these payment systems to function.  *A fortiori*, Issuers' collusively-fixed, supracompetitive Interchange Fees are unjustifiable.

> **1.     During the Damages Period, Visa and MasterCard facilitated horizontal conspiracies of their member banks**

95.     As owners of Visa and MasterCard, and as board members and participants in key operating committees of pre-IPO Visa and MasterCard, the Bank Defendants, together with other co-conspiring Visa and MasterCard member banks, conspired to control every aspect of Visa's and MasterCard's business.  Such collective control was used to implement the member banks' agreements not to compete for merchant acceptance of General Purpose Payment Cards, and the associated agreements to fix the prices of Interchange Fees for Visa and MasterCard General

Purpose Payment Card transactions.  During the Damages Period, the Bank Defendants, together with other co-conspiring Visa and MasterCard member banks, ratified the default Interchange Fee schedules that were recommended by staff and consultants of Visa and MasterCard.  During the Damages Period, the conspiracies broadened as more banks joined Visa and MasterCard and agreed to abide by agreements not to compete and to fix prices.  The conspiracies also broadened during that time period when the banks added new high-Interchange-Fee products—such as the Visa Signature and Signature Preferred Cards and the World and World Elite MasterCard Cards—to the universe of Visa and MasterCard products that were subject to the conspiracies.

96.     In a decision affirming the condemnation of other exclusionary rules of Visa and MasterCard, the Second Circuit held in 2003 that Visa and MasterCard:

> are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These competitors have agreed to abide by a restrictive exclusivity provision. . . . <u>The restrictive provision is a horizontal restraint adopted by 20,000 competitors</u>.

*United States v. Visa U.S.A. Inc.*, 344 F.3d at 242 (emphasis added).  Like those restrictive provisions, to which the Bank Defendants agreed in their capacities, *inter alia*, as board members and/or owners of Visa and MasterCard, the anticompetitive conduct by Visa and MasterCard establishing the agreements not to compete and price-fixing schemes were the products of conspiracies among competing Issuers—conspiracies that continue to this day.

### 2.     The Honor All Issuers rules constituted unjustifiable horizontal agreements not to compete on price

97.     In order to eliminate any incentive for Issuers to compete for merchant acceptance based on the price of interchange, as they would have done in a competitive market, the Bank Defendants  on Visa's and MasterCard's governing boards of directors approved the Honor All

48

Issuers rules.  *See, e.g.*, Visa Rule 5.2.B, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 5.6.1, *MasterCard Rules* (Oct. 2008).  The rules require a merchant to accept <u>all</u> of a network's Issuers' General Purpose Credit (or all Debit) Cards bearing the network's brand if that merchant wants to accept any single Issuer's General Purpose Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer. These rules also prohibit merchants from steering consumers from using one Issuer's Visa or MasterCard General Purpose Payment Cards to using General Purpose Payment Cards issued by other Issuers or other cheaper forms of payment.

98.    These "all or nothing" rules support Defendants' cartels in the following manner. By forcing a merchant to accept all General Purpose Credit (or Debit) Cards bearing the network's brand, while barring merchants from steering by Issuer, Issuers need not worry about losing business to a lower-cost competitor because all cards issued by every Issuer must be accepted at the default Interchange Fee rates.  Thus, a merchant that must accept a Visa Signature Preferred Card transaction, which bears an Interchange Fee ranging from 2.10% to 2.95% (plus $0.10), cannot attempt to steer consumers to cheaper forms of payment or even to cheaper Visa (or MasterCard) standard General Purpose Credit Cards, for which the merchant would pay substantially lower, but still supracompetitive, Interchange Fees.  Because of the Honor All Issuers rules, Issuers have no incentive to enter into bilateral agreements outside the conspiracy, *i.e.*, Issuers are incentivized not to "cheat" on the price-fixing scheme.  Thus, the default Interchange Fees have become a price floor.

99.    If there had been no Honor All Issuers rules, it would have been in the economic interest of an individual, profit-maximizing Issuer to lower the price it charged in order to compete for merchants' business against other banks issuing similar General Purpose Payment

Cards.  These "all or nothing" rules, however, eliminated the incentives to engage in such competition and to lower prices below the anticompetitive, cartel-determined levels set forth in the default Interchange Fee schedule.  With the Honor All Issuers rules in place, it does not make economic sense for any Issuer to compete on price because merchants are forced to accept that Issuer's cards even though they are being charged inflated prices fixed by the cartels.  Because of these rules, Issuers have rebuffed overtures from merchants to enter into direct arrangements that would have benefited the Issuer.

100.    Visa and MasterCard have argued that the Honor All Issuers rules are necessary for their networks to function because, without them, universal acceptance of their General Purpose Payment Cards cannot be assured.  Visa's and MasterCard's conduct throughout the Damages Period reveals the pretextual nature of that justification.  Visa and MasterCard have permitted numerous products that function at only a subset of the locations that accept Visa and MasterCard General Purpose Credit (or Debit) Cards, and the introduction and proliferation of those products have not harmed the operation of their networks.  These include selective-acceptance (or selective-authorization) cards, which can be used only at certain merchant locations, even though they bear the Visa or MasterCard logos that supposedly connote universal acceptance of all the Visa or MasterCard brand's cards.  Examples include the increasingly-prominent flexible spending account cards and health reimbursement account cards, among others.  In addition, after the Damages Period, Visa and Chase entered an arrangement that purports to provide merchants the ability to prefer Chase-issued Visa General Purpose Payment Cards over other Visa General Purpose Payment Cards in certain limited circumstances.  These examples, among others, show that the Honor All Issuers rules are not necessary for a General Purpose Payment Card Network to function.  Moreover, even if the Honor All Issuers rules have

# A5022

some legitimate rationale, those objectives could be realized through less restrictive means.

### 3.  The default Interchange Fee rules are unlawful horizontal agreements on price

101.    The default Interchange Fee rules are the mechanisms that Defendants use to fix the prices of Interchange Fees.  Both Visa and MasterCard require that a default Interchange Fee apply to every transaction for which the Issuer and Acquirer has not entered into a separate, individually-negotiated agreement regarding fees (*i.e.*, bilateral agreement).  *See, e.g.*, Visa Rule 9.5, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 9.4, *MasterCard Rules* (Oct. 2008).  These rules underpinned the Interchange Fee schedules, which applied to Visa and MasterCard transactions throughout the Damages Period.

102.    While competition would have motivated rival Issuers to charge lower fees than the default Interchange Fees, they have never done so because the Honor All Issuers rules, working in tandem with the default Interchange Fee rules, eliminated any incentive for Issuers to charge fees below the anticompetitively high levels being fixed by the conspiracies.  As a result, there have been no bilateral agreements entered into by member banks of Visa or MasterCard.

103.    In order to identify any cartel members "cheating" by secretly offering lower Interchange Fees, Visa and MasterCard monitored each transaction to ensure application of the appropriate Interchange Fee.  At the same time, Visa's and MasterCard's rules required all Issuers and Acquirers to adhere to all network rules.  *See, e.g.*, Visa Rule 1.2.A, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 1.5.5, *MasterCard Rules* (Oct. 2008).  Member banks that violated any of these network rules were subject to fines and even expulsion from Visa and MasterCard and, by rule, the networks could

# A5023

not be held liable by these banks.  *See, e.g.*, Visa Rule 1.7, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); Visa Core Principles 1, 2.3, *Visa International Operating Regulations* (Oct. 15, 2010); MasterCard Rules 3.1, 3.1.2, 3.3, *MasterCard Rules* (Oct. 2008).  This enabled Visa and MasterCard to monitor compliance with, and enforce, the rules of their respective cartels.  These rules remain in place to this day.

104.    All Issuers used the same default Interchange Fee schedules for any given Visa and MasterCard payment transaction but, within each of those schedules, there was wide variability in the fees charged for various transactions.  For example, a schedule of default Interchange Fees set different fee levels for different card types (*e.g.*, standard General Purpose Credit Cards versus Premium Payment Cards).  This schedule of default Interchange Fees also imposed different fee levels by merchant category, with card-not-present merchants (merchants that sell goods and services to consumers without face-to-face interaction, *i.e.*, typically over the Internet or by telephone or mail-order) paying substantially higher rates and with supermarkets and warehouse clubs paying comparatively low rates.  This price discrimination evidenced Visa's and MasterCard's substantial market power.  While there were different fees within a given default Interchange Fee schedule, every Issuer applied the same fee schedule to a given transaction.  It is this collusion by every Issuer to set identical default Interchange Fee schedules that constitutes price fixing.

### 4.    Merchants pay Interchange Fees directly

105.    When a merchant accepts a Visa or MasterCard General Purpose Payment Card as payment for a transaction, that merchant is the direct purchaser of General Purpose Payment Card Network Services and directly pays the Interchange Fees associated with that transaction. The Issuer directly deducts the Interchange Fee from the net transaction amount passed through

52

to the merchant.  Accordingly, Issuers account for Interchange Fees as revenue, and merchants account for Interchange Fees as an expense.  In contrast, Acquirers do not account for Interchange Fees as an expense.

106.    This prior deduction of Interchange Fees from the net transaction amount received by the Acquirer stands in contrast to the payment of several network assessments imposed on Acquirers.  Acquirers pay these network assessments directly.  The network assessments are charged to the Acquirer, typically as part of a monthly invoice, and must be paid directly by them like any other cost of doing business (*e.g.*, electricity bills).  Acquirers treat these network assessments as expenses, unlike their treatment of Interchange Fees.

### 5.    Defendants have used their price-fixing schemes to establish, maintain, and enhance their long-held market power

107.    Using price fixing to induce Issuers to join their price-fixing cartels, Visa and MasterCard acquired substantial market power in the General Purpose Payment Card markets, as courts have repeatedly determined.  For example, in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 340, 342 (S.D.N.Y. 2001), the court determined that "[b]ecause Visa and MasterCard have large shares in a *highly* concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers." There, the United States "prove[d] through the testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." *Id.*  The Second Circuit affirmed this determination of market power, holding

that "Visa U.S.A. and MasterCard, jointly and separately, have power within the market for network services." *United States v. Visa U.S.A. Inc.*, 344 F.3d at 239.

108.    Visa's and MasterCard's substantial market power has persisted throughout the Damages Period and remains intact today.  In a recent Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, Dkt. #5 (E.D.N.Y. Oct. 4, 2010), at 6, the United States Department of Justice Antitrust Division ("Antitrust Division") alleged that Visa and MasterCard possessed market power in the "network services market" for General Purpose Cards (*i.e.*, general purpose credit and charge cards).  The non-discrimination restraints at issue in that case prevented merchants from "reducing [their] purchases of one network's services by encouraging [their] customers to choose a competing network's General Purpose Card." *Id.* at 7.  Although a merchant could theoretically resist high acceptance fees by no longer accepting Visa's or MasterCard's General Purpose Cards, the Antitrust Division recognized that the "all-or-nothing choice d[id] not effectively constrain Defendants' market power because merchants cannot refuse to accept these General Purpose Cards without alienating customers and losing significant sales." *Id.*

109.    These determinations that Visa and MasterCard possessed substantial market power are supported by direct evidence of that power.  That evidence includes: (1) Visa's and MasterCard's ability to raise Interchange Fees without the loss of merchant acceptance or transaction volume; (2) successful price discrimination such as the price discrimination described above; (3) setting Interchange Fees unrelated to costs; (4) the ability to enforce anticompetitive policies; and (5) forcing merchants and consumers to accept inferior products—including products that are susceptible to fraud.

54

a.  *Ability to raise Interchange Fees with impunity*

i.  *Visa*

110.    Starting in the 1970s, Visa has possessed and exercised substantial market power in the General Purpose Credit Card Network Services market, and that market power has increased significantly since then.  By the 1990s, Visa General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

111.    In the General Purpose Credit Card Network Services market, Visa raised General Purpose Credit Card Interchange Fees without merchants ceasing to accept Visa's General Purpose Credit Cards.  In fact, Visa typically gained volume after these increases.  For example, during the Damages Period, Visa permitted Issuers to reclassify standard Visa General Purpose Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that merchants paid for transactions made with such cards increased dramatically.  Notwithstanding the vigorous merchant opposition to these punitive price increases, no merchant dropped Visa as a result.

112.    Visa continued to possess by far the highest market shares and the highest number of General Purpose Credit Cards in circulation throughout the Damages Period.  Accordingly, most merchants must accept Visa General Purpose Credit Cards to remain viable.

113.    At the beginning of the Damages Period, Visa raised its Signature Debit Card Interchange Fees, and then throughout the Damages Period, Visa exercised its monopoly power to increase PIN Debit Card Interchange Fees as well.  Notwithstanding these price increases,

55

Visa's debit volumes have increased during the Damages Period.  As with General Purpose

Credit Cards, merchants could not drop Visa's Signature Debit or PIN Debit products despite

these significant price increases.  Visa's ability to increase Interchange Fees without losing

merchant acceptance or transaction volume directly evidences its monopoly power in the General

Purpose Debit Card market.

114.    Visa's monopoly power in the General Purpose Debit Card market and the

supracompetitive nature of General Purpose Debit Card Interchange Fees were confirmed by the

passage by Congress of Section 1075 of the Dodd-Frank Wall Street Reform and Consumer

Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin

Amendment"),[1] which required the Board of Governors of the Federal Reserve System (the

"Federal Reserve") to enact regulations to ensure that General Purpose Debit Card Interchange

Fees for covered Issuers (*i.e.*, banks with more than $10 billion in assets) are "reasonable and

proportional" to Issuer costs.  Section 920(a)(2) of the EFTA, 15 U.S.C. § 1693o-2(a)(2).  In

passing the Durbin Amendment, Congress made clear that the statute was designed to address

Visa's and MasterCard's ability to exercise substantial market power by raising Interchange Fees

well above cost.  Its principal author, Senator Richard J. Durbin, made numerous statements to

that effect on the floor of the Senate, including the following:

> For years, Visa and MasterCard, and their big bank backers, have unilaterally
> fixed prices on the fees small businesses pay every time they accept a debit card
> from a customer.  The two giant card networks control 80 percent of the debit
> card market—that is Visa and MasterCard.  And it is no surprise that debit
> interchange fees have risen, even as the price of processing the transaction has
> fallen. . . . Finally, Visa, MasterCard, and the Wall Street banks will face some
> check against their unbridled market power in the credit and debit industries.

---

[1] Section 1075 amended the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) ("EFTA") with a new Section
920, codified at 15 U.S.C. § 1693o-2.

156 Cong. Rec. S5,802–03 (daily ed. July 14, 2010).  Even though the Federal Reserve found

that most Issuers' costs were slightly above "par" (*i.e.*, zero), to implement the Durbin

Amendment it capped both Signature and PIN Debit Interchange Fees at $0.21 plus .05% plus an

additional $0.01 fraud-prevention adjustment.  *See Regulation II, Debit Card Interchange Fees

and Routing*, *Final Rule*, 76 Fed. Reg. 43,394 (July 20, 2011) (setting the cap); *Regulation II,

Debit Card Interchange Fees and Routing*, *Final Rule*, 77 Fed. Reg. 46,258 (Aug. 3, 2012)

(adding the fraud-prevention adjustment).  This cap, while significantly above cost for most

Issuers, substantially reduced the debit Interchange Fees that prevailed for years due to Visa's

dominance of this market.

### *ii.  MasterCard*

115.    MasterCard also has possessed and exercised substantial market power in the

General Purpose Credit Card Network Services market since the 1970s, and MasterCard's

market power also has increased significantly over the years.  By the 1990s, MasterCard General

Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in

the United States.  Accepting MasterCard General Purpose Credit Cards became a competitive

necessity for the vast majority of merchants, especially for card-not-present merchants that were

heavily reliant on accepting such cards remotely.

116.    Like Visa, MasterCard has continually raised the Interchange Fees that merchants

pay for accepting MasterCard General Purpose Credit Cards without losing merchant acceptance.

Like Visa, MasterCard permitted Issuers to reclassify standard MasterCard General Purpose

Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that

merchants paid for transactions made with such cards increased dramatically.  Notwithstanding

the vigorous merchant opposition to these punitive price increases, no merchant dropped

# A5029

MasterCard as a result.  Once a merchant begins to accept MasterCard (and Visa) General Purpose Credit Cards, it is virtually impossible for it to stop, and no merchants have.

117.    MasterCard's substantial market power was further evidenced by its ability to successfully charge merchants higher Interchange Fees than Visa charged, even though MasterCard had lower market shares.  Throughout the Damages Period, MasterCard fixed Interchange Fees that were higher than Visa's.  MasterCard designed this strategy to compensate for its self-perceived inferiority to Visa in other dimensions that could make MasterCard less attractive to Issuers absent the higher Interchange Fees.  If it did not have substantial individual market power over merchants, MasterCard could not have consistently and profitably maintained higher Interchange Fees than Visa, a competing network.

### b.    Price discrimination

118.    As one court has held, Visa's and MasterCard's "ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. . . . Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar' merchants.  [Visa and MasterCard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions." *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-41.  This price discrimination persisted throughout the Damages Period and continues to this day.

### c.    Setting supracompetitive prices unrelated to cost

119.    Visa and MasterCard did not set Interchange Fees based upon cost, as they would

58

have done in a competitive market.  For example, with respect to the General Purpose Debit Card

market, as noted above, the Federal Reserve found in 2011 that Visa's and MasterCard's

Signature Debit and PIN Debit Card rates were substantially above cost.  Visa's and

MasterCard's ability to succeed in this conduct and profit from it is additional direct evidence of

their substantial market power.

> d.    *Enforcement of anticompetitive rules and policies*

120.    Visa's and MasterCard's successful enforcement of anticompetitive rules and

policies that harmed merchants without losing merchant acceptance or transaction volume

further demonstrates the substantial market power that Visa and MasterCard had in the General

Purpose Payment Card markets.  Despite the adverse economic impact of these rules and policies

on merchants, given Visa's and MasterCard's substantial market power, merchants could not

afford to stop accepting Visa or MasterCard transactions.

> e.    *Forcing merchants and consumers to accept inferior products*

121.    Visa's and MasterCard's success in forcing merchants and consumers to accept

and use technologically-inferior products—including products that Visa and MasterCard knew

would increase fraud—is further evidence of their substantial market power.  Visa and

MasterCard could have dramatically reduced General Purpose Payment Card fraud in the United

States during the Damages Period simply by adopting new card technology to replace the

decades-old, fraud-prone magnetic stripe technology they forced merchants and consumers to

use.  Instead, Visa and MasterCard succeeded in shifting most of the cost of fraud losses to

merchants in this country through the implementation of various compliance programs and

liability rules.  They did so because they and their member banks profit from fraud which creates

a pretextual justification for high Interchange Fees.  Visa and MasterCard also profited from

fraud through punitive fines and fees for data breaches, another manifestation of their substantial market power.

122.    Visa and MasterCard have long recognized that the magnetic stripe technology that their General Purpose Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud-prone.  Yet Visa and MasterCard have perpetuated the use of magnetic stripe technology by, among other things, delaying to take steps to implement more secure technologies.  As a result, the United States has experienced the highest fraud rates, with the gap growing.  For example, the United States was not among the top 10 countries with the most counterfeit fraud in 2004 but, by early 2010, it accounted for 85% of total counterfeit fraud among all top 10 countries combined.  *See* Counterfeit Fraud Migration, European Payments Council (June 29-30, 2010) at 5-7.

123.    This is a direct result of the conspiracies detailed in this Third Amended Complaint.  Despite the availability of technology to reduce fraud, Visa and MasterCard had no incentive to adopt it in the United States or compete on this basis because they could shift fraud-related costs to merchants and thereby profit from fraud while insulating the banks from its costs.  Visa's and MasterCard's ability to impose inferior quality card products and to permit preventable fraud during the Damages Period is further direct evidence of their substantial market power.  To the extent that Plaintiffs were forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages that flow from the conspiracies.

124.    Visa's and MasterCard's substantial market power continued, and even increased, during the Damages Period.  In fact, even though Plaintiffs include some of the largest merchants in the country, none of the Plaintiffs can drop Visa or MasterCard General Purpose Credit or Debit Cards without losing an unacceptable number of sales.

60

### 6.     The MasterCard and Visa IPOs were changes in corporate form that maintained and enhanced the cartels

125.     During the Damages Period, the Bank Defendants that sat on the Visa and MasterCard boards, and controlled them, approved MasterCard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs. The Bank Defendants took advantage of their direct control over pre-IPO Visa and MasterCard to agree to post-IPO structures for Visa and MasterCard that were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Third Amended Complaint.

126.     These IPOs were a response to the growing antitrust challenges and adverse legal rulings regarding Visa's and MasterCard's organizational structures as associations of competing member banks.  *See, e.g.*, MasterCard Incorporated Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) at 72-73 (noting that MasterCard had "faced heightened regulatory scrutiny and legal challenges in recent years").

127.     In response to these legal defeats and a host of additional antitrust challenges, Defendants decided to change the organizational structures of Visa and MasterCard in order to attempt to evade antitrust liability through superficial changes in corporate form.  But in doing so, the Bank Defendants and the other members of Visa and MasterCard agreed prior to the IPOs that post-IPO Visa and MasterCard would continue to support the agreements not to compete and to fix prices.

128.     They implemented this agreement by structuring the IPOs so that they cosmetically changed the corporate forms, while leaving the anticompetitive conduct intact.  Pre-IPO, the Bank Defendants (and other Visa and MasterCard owner/member banks) conspired through Visa's and MasterCard's governing boards and/or their ownership of Visa and

# A5033

MasterCard to control every aspect of Visa's and MasterCard's businesses, including agreeing to fix the prices of Interchange Fees through ratification of the default Interchange Fee schedules and agreeing to set Visa's and MasterCard's rules, including maintaining the Honor All Issuers rules.

129.    Post-IPO, Visa and MasterCard act as the pricing and rules enforcement agents for their member banks.  Through the corporate reorganizations and subsequent IPOs, each Bank Defendant and all Visa and MasterCard member banks effectively delegated to Visa and MasterCard, in perpetuity, the ability to fix the bank's pricing to merchants.  Each Bank Defendant (and all Visa and MasterCard member banks) knew that all other Visa and MasterCard banks were also delegating their pricing decisions to Visa and MasterCard, which arrangement was ratified by a horizontal agreement of Visa's and MasterCard's member banks when they voted to approve Visa's and MasterCard's restructurings on these bases.

130.    Moreover, as part of the corporate reorganizations leading to their respective IPOs, the Bank Defendants and the other members of Visa and MasterCard reaffirmed and effectively readopted each network's rules, including the default Interchange Fee and Honor All Issuer rules.  Thus, the Bank Defendants' (and all Visa and MasterCard member banks') approval of this scheme was done knowing that all Visa and MasterCard member banks' Interchange Fees would be set by Visa and MasterCard.  This was a conscious commitment to an ongoing common scheme by horizontal competitors and, as such, is a continuing violation of Section 1 of the Sherman Act.  It maintains the pre-IPO status quo: Visa and MasterCard continue to set Interchange Fees for thousands of competing banks that, but for these conspiracies, would have independently competed for merchant acceptance.

131.    The IPOs increased the effectiveness of Defendants' price-fixing conspiracies as

62

# A5034

well as Visa's and MasterCard's substantial market power by consolidating decision-making and coordinating communications among the conspirators.  Visa's and MasterCard's economists opined in 1993—well before these IPOs were being considered—that "[t]here would be far less competition in this industry if Visa and MasterCard had chosen to operate as single companies."  David S. Evans and Richard L. Schmalensee, *The Economics of the Payment Card Industry* (1993), at 103.

132.    The anticompetitive effects of these ongoing conspiracies continue to harm merchants and consumers.  The banks continue to adhere to the rules at issue, without exception.  And Visa and MasterCard continue to wield substantial market power over merchants as a result.  In this regard, Visa and MasterCard and the Bank Defendants understood before the IPOs were consummated that, if Visa and MasterCard maintained the cartels' basic rules and structures, no bank would break rank and compete for merchant acceptance.  That is precisely what happened.

133.    The Defendants' post-IPO conduct confirms that the IPOs did not terminate their price-fixing cartels or reduce Visa's and MasterCard's substantial market power.  Visa's and MasterCard's anticompetitive rules, including the restraints at issue in this Third Amended Complaint, have remained the same.  Visa and MasterCard have exercised their substantial market power by imposing new network fees that merchants must pay.  Visa has engaged in a campaign to maintain its monopoly power in the General Purpose Debit Card market.  Perhaps most significantly, Visa's and MasterCard's Interchange Fees have remained at supracompetitive levels since the IPOs.  This continuity demonstrates that the IPOs perpetuated Defendants' anticompetitive schemes and their substantial market power.

134.    Government antitrust enforcers agree that these IPOs reflected changes merely in corporate form, not substantive conduct.  In 2007, the European Commission's Competition

Directorate issued a written determination that MasterCard's members had simply agreed to appoint MasterCard as their cartel manager to act in their collective best interest in setting the level of Interchange Fees.  In particular, the Competition Directorate's comprehensive decision found as follows:

> MasterCard's viewpoint that the IPO . . . had changed the organisation's governance so fundamentally that any decision of MasterCard Incorporated's Global Board no longer qualifies as [a] decision of an association [of its member banks] but rather as [a] "unilateral" act which each member bank bilaterally agrees to abide by, cannot be accepted. . . . MasterCard's member banks shaped and eventually approved the IPO in order to perpetuate the MIF [Multilateral Interchange Fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny.  Contrary to MasterCard's argument, the aim of avoiding exposure to antitrust risks due to the MasterCard MIF was a clear driving force behind the IPO.  Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making.  The member banks effectively "*outsourced*" this decision making to a new management body and made sure that their direct influence . . . would be limited to minority rights.  However, the banks also agreed to the IPO . . . after MasterCard's management assured them that the banks' interests will continue to be preserved under a new "enhanced customer approach" and via the local input of the banks in the decision making.  It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the member banks legitimately expected and therefore agreed that this Board would henceforth set the MIF in a manner that is in their common interest.

European Commission Decision, COMP/34.579, at ¶¶ 357, 378-379 (Dec. 19, 2007) (footnotes omitted, emphasis added).

135.    The fact that a majority of MasterCard's post-IPO directors were "independent" did not change the role of MasterCard as the "outsourced" pricing agent and manager of the members' Interchange Fee cartel:

> The circumstances that members of the Global Board are "independent" within the meaning of the NYSE criteria . . . is not a decisive question for there to be an association of undertakings.  As an organisation's members entrust decision making power to a common body with the expectations that the body's

subsequent coordination of their competitive behaviour will occur in the common interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision[s] of an association of undertakings.

*Id.* at ¶ 381.  Moreover, "[d]evelopments after the IPO also indicate that MasterCard's management takes into account concrete banks['] interests in setting the level of fallback interchange fees."  *Id.* at ¶ 389.

136.    In May 2012, the European General Court affirmed the Commission's conclusions:

> [T]he Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by MasterCard's IPO, the MasterCard payment organisation had continued to be an institutionalised form of coordination of the conduct of the banks.  Consequently, the Commission was fully entitled to characterize as decisions by an association of undertakings the decisions taken by the bodies of the MasterCard payment organisation in determining the MIF.

*MasterCard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 259 (May 24, 2012).  "[W]ith regard to merchants, what [MasterCard and it member banks] sought [post-IPO wa]s essentially the maximum threshold of their tolerance to the price of card transactions."  *Id.* at ¶ 257.

### 7.    Defendants' price-fixing schemes also are unlawful vertical price restraints

137.    The Interchange Fee price-fixing schemes adopted by Defendants also constituted anticompetitive and unreasonable vertical price restraints.  Visa and MasterCard entered into express vertical agreements with each of their member banks, binding all of their member banks to comply with the rules and regulations of their networks, including the rules at issue in this Third Amended Complaint.  In turn, Visa and MasterCard each acts as the enforcement agent and holds issuing and acquiring members responsible for compliance with the rules.  These two sets of vertical price restraints—one for Visa Defendants and the other for MasterCard

65

Defendants—continued in full effect during the Damages Period, including after Visa's and MasterCard's IPOs.

138.    For example, Rule 1.3 of the July 15, 2011 *MasterCard Rules* states: "[a]n applicant to be a Member must agree, and by execution and submission of an application to be a Member agrees, that it will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation."  In turn, "Standards" is defined as: "[t]he Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the operating regulations and procedures of the Corporation, including but not limited to any manuals, guides or bulletins, as may be amended from time to time."  *See* Definitions, *MasterCard Rules* (July 15, 2011).  Similarly, the "General Overview" of the April 10, 2011 *Visa International Operating Regulations* states: "[t]he *Visa International Operating Regulations* are set and modified by Visa to support the use and innovation of Visa products and services, and represent a binding contract between Visa and all Members."

### B.    Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without Justification

139.    Defendants have argued over the years that Interchange Fees are cost-based and necessary mechanisms to reimburse Issuers to motivate them to issue General Purpose Payment Cards.  The facts show otherwise.

140.    General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally.  Payment card networks can thrive without Interchange Fees.  Moreover, the Interchange Fees set by Defendants are not based on cost.  Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Third Amended Complaint.

### 1.    Banks would profit from issuing General Purpose Debit Cards even

# A5038

### without collectively-set Interchange Fees

141.    General Purpose Debit Cards have long been positioned by Visa and MasterCard and the banks as a replacement for cash and checks, both of which have cleared "at par" (*i.e.*, zero interchange) for decades.  As such, Issuers have strong economic incentives to issue General Purpose Debit Cards even without income from Interchange Fees.  General Purpose Debit Cards provide numerous economic benefits to Issuers that justify their issuance even without Interchange Fees.  These benefits include: (1) savings relative to the costs of processing checks and cash; (2) motivating cardholders to maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuer to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards.  Moreover, issuance of General Purpose Debit Cards enhances the "stickiness" of the Issuer's valuable relationship with its customers.

142.    When banks first began to offer PIN Debit Cards in the United States, they did not charge Interchange Fees.  To the contrary, they <u>paid</u> merchants to provide debit services, a practice known as "reverse," "negative," or "Issuer-paid" interchange.  Other banks provided debit services at par.  The market for General Purpose Debit Card Network Services expanded substantially during the time of Issuer-paid and at-par interchange.  This model prevailed until the early 1990s, when it changed only because Visa and MasterCard extended their cartels into debit.

143.    Beginning in the early 1990s, Visa and MasterCard aggressively began to implement and enforce a strategy to leverage their substantial market power in the General Purpose Credit Card market and force merchants to pay supracompetitive General Purpose Debit Card Interchange Fees.  The linchpin of this strategy was the enforcement of "credit/debit tying rules" which, until January 1, 2004, forced merchants that accepted Visa's and MasterCard's

# A5039

dominant General Purpose Credit Cards to also accept the networks' Signature Debit Card transactions.  Visa and MasterCard set the same or similar Interchange Fees for General Purpose Credit Card and Debit Card transactions notwithstanding the different costs and demand characteristics of such transactions.  Merchants had no choice but to accept Visa's and MasterCard's dominant, supracompetitively-priced General Purpose Credit Card products and were, therefore, forced to accept supracompetitive Signature Debit Card Interchange Fees.

144.    Visa and MasterCard then used the lucrative Interchange Fee stream created by this practice to induce additional Issuers to participate in the conspiracy and thereby entrench their dominance in the General Purpose Debit Card market.  This strategy successfully destroyed the at-par interchange model that had prevailed for debit prior to the 1990s, as Visa and MasterCard had intended.  Moreover, it distorted banks' incentives in debit, causing them to push the less secure, less efficient Signature Debit Card products of Visa and MasterCard and to suppress the safer, cheaper, and faster PIN Debit Card products that were being promoted by the competing PIN Debit Card networks, such as NYCE and STAR.

145.    The substantial non-interchange economic benefits of issuing General Purpose Debit Cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on General Purpose Debit Card Interchange Fees in the United States pursuant to the Durbin Amendment discussed above.  Addressing that impending regulatory cap, the CEO of Citigroup said: "We don't have much of an impact on debit card interchange or overdraft fees.  Those are really small impacts on us."  Citigroup Inc. Q4 2010 Earnings Call Transcript (Jan. 18, 2011).  The Chairman and CEO of City National Corporation predicted: "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material."  City National Corporation Q4 2010

68

Earnings Call Transcript (Jan. 20, 2011).  TCF Financial Corp.'s Chairman and CEO added that "[w]e'll obviously still be profitable" even if there is a cap imposed on debit Interchange Fees. Transcript to TCF Financial Corp.'s Conference Call, *TCF Discusses Lawsuit Challenging Durbin Amendment* (Oct. 12, 2010).

146.    The facts that General Purpose Debit Card issuance continues to be profitable and that debit volumes have increased since General Purpose Debit Card Interchange Fees for regulated banks declined significantly beginning in late 2011 reinforce the conclusion that General Purpose Debit Card Interchange Fees had been fixed at supracompetitive levels throughout the Damages Period.

147.    The experience in other industrialized countries also highlights that the development of debit in the United States, with cartel-determined supracompetitive Interchange Fees, was a function of anticompetitive conduct in the General Purpose Debit Card industry in this country.  Virtually all the countries with the highest debit usage—including Canada, Denmark, Finland, Iceland, the Netherlands, New Zealand, and Norway—utilize an at-par interchange pricing model.  For example, the Canadian debit system has always been based on at-par pricing, and Canada has traditionally had higher per capita debit usage than the United States, as well as higher debit penetration in merchant categories that do not accept PIN Debit Cards in the United States.

148.    The vast and successful U.S. checking system also demonstrates that Interchange Fees are not necessary for a General Purpose Debit Card Network to function.  Since 1916, by rule of the Federal Reserve, trillions of dollars of checks drawn on the U.S. national banking system have cleared at par.  Despite this prohibition on Interchange Fees, banks have continued to offer checks to their customers and have continued to accept and cash checks issued by other

69

banks.

2.     **Banks would profit from issuing General Purpose Credit Cards even without collectively-set Interchange Fees**

149.     In the 1980s, the default Interchange Fee rules were rationalized as being necessary to give General Purpose Credit Card Issuers incentives to issue such cards.  By 1990, it was apparent that General Purpose Credit Card Issuers were earning substantial profits from interest rates on revolving balances and annual fees, and therefore Interchange Fees were unnecessary to encourage General Purpose Credit Card issuance.  Since then, the evidence has continued to show that General Purpose Credit Card Issuers can be profitable without collectively-set Interchange Fees.

150.     International experience regarding Interchange Fees on General Purpose Credit Card transactions also indicates that Interchange Fees in the United States have been fixed at supracompetitive levels.  In Australia, the Reserve Bank of Australia regulated Visa's and MasterCard's General Purpose Credit Card Interchange Fees during the past decade.  Those regulations mandated a nearly 50% reduction (to an average of 50 basis points) of those Interchange Fees, rates that are much lower than those that prevailed in the United States during the Damages Period.  Prior to enactment of these regulations, Visa and MasterCard argued that such a reduction in Interchange Fees would cause a "death spiral" that would lead to a collapse of their networks and upheaval in the industry.  In reality, no such "death spiral" or collapse occurred.  Visa's and MasterCard's General Purpose Credit Card volumes have <u>increased</u> in Australia since the regulations went into effect.  Indeed, the European General Court recently reviewed the evidence from Australia and concluded: "[i]t is clear . . . that a substantial reduction in the MasterCard system's interchange fees that was imposed by the Reserve Bank of Australia had no notable impact on the system's viability . . . ."  *MasterCard, Inc. and Others v. European*

70

*Commission*, Case T-111/08, at ¶ 111 (May 24, 2012).

151.    Similarly, the European Commission undertook a comprehensive study of General Purpose Credit Card Interchange Fees in Europe, and its Competition Directorate undertook antitrust investigations into Interchange Fees charged by MasterCard's and Visa's European affiliates.  In 2002, the Commission and Visa reached a settlement that lowered Interchange Fees first to 0.7%, and then to a cost-based standard if lower.  This commitment expired in 2007, and the Commission began a new investigation, which continues.  Following Visa's 2002 commitment to limit consumer General Purpose Credit Card Interchange Fees to 0.7%, Visa announced in May 2013 that it will limit Interchange Fees to 0.3%.  In 2007, the Commission found MasterCard's setting of Interchange Fees to be unlawful, and MasterCard agreed to cap its Interchange Fees for transactions crossing national borders at 0.3% during the pendency of its appeal of that decision.  For years, therefore, the resulting European Interchange Fees have been substantially below those that prevail in the United States that often exceed 2.00% due to the proliferation of Premium Payment Cards.  Again, there have been no adverse effects—Visa's and MasterCard's General Purpose Credit Card volumes in Europe have increased during this period.

152.    In neither Australia nor the European Union do Visa and MasterCard enjoy the economies of scale and scope associated with the much larger General Purpose Payment Card markets in the United States.  Visa's and MasterCard's General Purpose Credit Card Interchange Fees in the United States are <u>higher</u> than nearly every other General Purpose Credit Card Network outside the United States, including Visa's and MasterCard's own networks in other countries.

153.    The costs associated with issuing Visa and MasterCard General Purpose Credit

# A5043

Cards have declined dramatically since 1990.  Issuer costs of funding a cardholder's grace period—known as float costs—have fallen significantly.  Visa and MasterCard General Purpose Credit Card Issuers have enjoyed additional savings from substantial decreases in hardware, processing, and telecommunications costs, as well as through economies of scale that have resulted from vastly-increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

154.    Notwithstanding these declines in Issuer costs, however, Visa and MasterCard have substantially raised their Interchange Fees.  For example, Visa has raised the Interchange Fees and/or cost of acceptance that apply to Visa General Purpose Credit Card transactions throughout the Damages Period.  MasterCard has done the same.  This demonstrates that Interchange Fees are not based on costs, but rather are a cartel's anticompetitive exercise of market power.

155.    Visa and MasterCard have argued that default Interchange Fees are justified because, as a result of their Honor All Issuers rules, an individual Issuer could otherwise potentially "hold up" merchants that accept Visa's and MasterCard's General Purpose Payment Cards by charging as high an Interchange Fee as that Issuer wishes.

156.    This "hold-up" problem is the result of the banks' anticompetitive agreements not to compete for merchant acceptance, *i.e.*, the Honor All Issuers rules.  Attempting to justify Interchange Fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as Defendants have sought to do, is perverse.  Price fixing in tandem with an agreement not to compete is not a justification for anticompetitive conduct.  It is anticompetitive conduct.

157.    Moreover, these schemes create a staggering amount of anticompetitive harm.  Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive

72

problem created by the schemes themselves) was credited as a procompetitive benefit—which it should not be—any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Third Amended Complaint.

        **3.**      **Anti-steering rules hid the costs of Visa and MasterCard transactions from consumers, thereby inhibiting competition from other networks and reinforcing the Visa and MasterCard cartels**

      158.    In a competitive world, some merchants could have used financial incentives and marketing to steer customers to other networks or forms of payment and, by increasing customers' price sensitivity to Interchange Fees, steering could have led to network competition. Visa and MasterCard prevented this from happening by enforcing anti-steering rules that prohibited merchants from making the cost of Visa and MasterCard transactions transparent to consumers and from making consumers who use the cards bear the associated costs.

      159.    During the Damages Period, the anti-steering rules included Visa's and MasterCard's rules that prohibited merchants from offering discounts to consumers that used General Purpose Payment Cards that were less expensive than Visa or MasterCard General Purpose Payment Cards.  These rules remained in effect until Visa and MasterCard revised them to permit such discounting pursuant to a July 20, 2011 consent decree they entered into with the Antitrust Division.  Visa and MasterCard, however, still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment, including one bank's Visa or MasterCard General Purpose Payment Cards instead of more expensive Visa or MasterCard General Purpose Payment Cards issued by other banks.  Such discounting by Visa or MasterCard Issuer would force Visa and MasterCard member banks to compete for merchant acceptance.

      160.    The anti-steering restraints also include rules that prevented (and still prevent) banks from linking to multiple networks on General Purpose Credit Cards.  Because of the way

the General Purpose Debit Card industry developed, with most cards originating as ATM/PIN Debit Cards, General Purpose Debit Cards have long had multiple network linkages (or "bugs") on them, and that has facilitated the most effective form of steering for merchants—routing transactions to cheaper General Purpose Payment Card Networks.  There is no technical reason why multiple network functionality could not co-reside on General Purpose Credit Cards.  Visa and MasterCard rules, however, blocked that from happening throughout the Damages Period.

161.    The anti-steering restraints also include the rules that prevent merchants that accept Visa and MasterCard from testing differential acceptance or new ways to steer transactions to cheaper General Purpose Payment Card Networks at certain locations that operate under a single banner.  That is the way most merchants pilot new products, and such testing would have enabled merchants to introduce new ways to force the banks to compete for merchant acceptance.

162.    The anti-steering rules also included Visa's and MasterCard's prohibitions against surcharging their transactions.  Visa's previous no-surcharge rule (*see, e.g.*, Rule 5.2.F, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008)) provided that "[a] Merchant must not . . . [a]dd any surcharge to [t]ransactions."  MasterCard's previous no-surcharge rule (*see, e.g.*, Rule 5.9.2, *MasterCard Rules* (Oct. 2008)) similarly provided that "[a] Merchant must not directly or indirectly require any [MasterCard] Cardholder to pay a surcharge or any part of any Merchant discount . . . ."  While Visa and MasterCard modified these rules under the proposed settlement in MDL 1720 to permit surcharging of Visa and MasterCard General Purpose Credit Card transactions in limited circumstances effective January 27, 2013, the no-surcharging rules remain in place for Visa and MasterCard General Purpose Debit Card transactions.

163.   There were no procompetitive justifications for these anti-steering rules.  If merchants had not been restrained by these rules, some of them could have played Visa and MasterCard or the banks against one another by steering or threatening to steer customers away from using more expensive Visa and MasterCard General Purpose Payment Cards.  Were it not for the restraints, merchants could have used such tactics to try to negotiate more favorable terms from Visa or MasterCard or from individual Issuers.  As a result, the anti-steering rules, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

**C.   The Visa Defendants Engaged in Additional Anticompetitive Conduct That Monopolized, or Attempted to Monopolize, the General Purpose Debit Card Services Market**

164.   The Visa Defendants' anticompetitive conduct has not been limited to the Interchange Fee price-fixing cartels detailed above.[2]  The Visa Defendants engaged in additional conduct to exclude competition with the purpose and effect of giving Visa a monopoly in the market for General Purpose Debit Card Network Services.  This included conduct occurring during the Damages Period, such as dedication agreements between Visa and Issuers of Visa General Purpose Debit Cards and the imposition of fixed network fees to blunt competition in the General Purpose Debit Card market.

165.   These exclusionary acts have continued to suppress competition in the market for General Purpose Debit Card Network Services, and thereby have enabled the Visa Defendants to charge higher Interchange Fees and Visa to charge higher network fees than they otherwise would have been able to charge merchants.

**1.   Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market**

---

[2] The allegations in Paragraphs 164 through 175 are set forth on behalf of all Plaintiffs with the exception of 7-Eleven.

166.    When the Damages Period began, Visa possessed monopoly power in the General

Purpose Debit Card market.  Its share of that market was approximately 60%, as it comprised

80% of the Signature Debit Card segment and was increasing its PIN Debit Card share through

deals with the largest Issuers of Visa General Purpose Debit Cards.  By early 2004, Visa had

entered into long-term dedication agreements with most of its large Issuers that "prevent[ed]

Visa banks from switching to MasterCard" which, at the time, was the only other Signature

Debit Card network.  *United States v. Visa U.S.A. Inc.*, No. 98-cv-7076(BSJ), 2007 WL

1741885, at *2 (S.D.N.Y. July 15, 2007).  Accordingly, Visa "essentially lock[ed] up 89% of the

volume of its top 100 debit Issuers."  *Id.* at *1.  Those deals and the installed base of Visa- and

Interlink-branded General Purpose Debit Cards enabled Visa to maintain its monopoly power

even after it was forced to relinquish the tying rule by the antitrust settlements in the *In re Visa*

*Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.).

167.    By 2005, Visa's Interlink became the leading PIN Debit Card network with 36%

of that segment of the General Purpose Debit Card market.  Visa maintained that position in PIN

Debit, along with its dominant position in Signature Debit, throughout the Damages Period.  It

did so through various deals with debit Issuers.  These deals, entered on exclusive or near-

exclusive terms, made Visa's Interlink the exclusive or primary PIN Debit Card acceptance mark

on well over 100 million debit cards.  These deals gave Visa the power to raise Interlink's

Interchange Fees during the Damages Period because, even if a merchant tried to drop Interlink

and its high rates, the merchant would pay more as transactions defaulted to the still-pricier Visa

Signature Debit Card rates.  There were no other options on many Visa General Purpose Debit

Cards.  This exclusivity on many such cards remained intact until April 2012, when Federal

Reserve regulations mandated that General Purpose Debit Card Issuers put a competing

network's functionality on their debit cards.

168.    Visa used its monopoly power to suppress PIN Debit during the Damages Period. As Visa continued to drive up Interlink Interchange Fees, the competing PIN Debit Card networks raised their rates to maintain volume in a market that had long been dominated by Visa. The result was the convergence of PIN Debit Card and Signature Debit Card rates at high *ad valorem* prices, a trend that contributed significantly to the suppression of PIN Debit Card acceptance in the United States, a longstanding Visa objective.  With Signature Debit Card and PIN Debit Card Interchange Fees coming into alignment, merchant willingness to install PIN pads to accept PIN Debit Cards was materially reduced.  In PIN Debit alone, in large part because of Visa's conduct, merchants faced market-wide effective Interchange Fee increases of an estimated 234% between 1998 and 2006.

### 2.    Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market post-Durbin

169.    By 2010, when Congress passed the Durbin Amendment, Visa's monopoly power in the General Purpose Debit Card market rested primarily on two anticompetitive prongs—the greater Interchange Fees associated with Signature Debit than PIN debit (which buttressed Visa's leading position in Signature Debit) and Visa's exclusive (Signature and/or PIN Debit) deals with many of the largest debit Issuers.  The Durbin Amendment threatened both for two reasons. First, the regulations that the Federal Reserve promulgated regarding General Purpose Debit Card Interchange Fees eliminated the distinction between Signature and PIN Debit for the large regulated Issuers that supported the dominance of Visa Check, Visa's Signature Debit product. Second, the Durbin Amendment repealed Visa's exclusive deals with Issuers by requiring that all General Purpose Debit Cards bear an unaffiliated network on each card.  That requirement subjected Visa to potential competition to reduce Interchange Fees and network fees to win

# A5049

merchant routing decisions.  Many commentators observed that Visa could lose significant portions of its volume, and at least one concluded that up to 80 percent of its PIN Debit volume was at risk.

170.    Visa responded by implementing a fixed fee known as the Fixed Acquirer Network Fee ("FANF") effective April 2012.  The FANF is nothing more than a substantial price increase on merchants that Visa is using strategically as a lever to win General Purpose Debit Card deals with merchants.  If the merchant accepts any Visa General Purpose Payment Card transactions, credit or debit, the merchant must pay this fixed fee to "access" Visa's networks and, perversely, the more locations the merchant operates the greater the fee it has to pay.  This construct restores the tie between General Purpose Debit Card acceptance and General Purpose Credit Card acceptance that Visa previously utilized as the linchpin of its strategy to dominate the General Purpose Debit Card market.  It does so because the only way merchants can avoid the fee is to drop all Visa products, and the only way merchants can mitigate the fee is to route General Purpose Debit Card volume to Visa.  The FANF further penalizes a merchant for routing a transaction over a competing PIN Debit network because, if the merchant did that, then it would not be able to reduce its fixed fee by shifting volume to Visa.  In fact, because the merchant must pay Visa's fixed fee whether it routes the transaction to Visa or not, the merchant will, in effect, pay twice for the transaction.  The modest reduction that Visa belatedly offers for "selective acceptance" of Visa General Purpose Debit Cards or Visa General Purpose Credit Cards does nothing to alter the FANF's desired impact—to lock in Visa debit acceptance and force the merchant to route as many General Purpose Debit Card transactions as possible to Visa.

171.    The FANF maintained Visa's monopoly power by compromising the PIN Debit networks' ability to compete and by neutralizing the competitive dynamic that should have been

78

introduced by the Durbin Amendment.  While Visa leveraged its power in the General Purpose

Credit Card market to distort competition in the General Purpose Debit Card market with the

FANF, the competing PIN Debit networks cannot do that.  If they tried to implement such a fee,

merchants would stop accepting their General Purpose Debit Cards.  As a result, Visa has gained

a war chest that empowers it to win debit deals with merchants that cannot be matched by the

competition.  Visa has achieved these volumes, which have maintained its monopoly power, not

because it has better General Purpose Debit Card Networks but because it has the power to use a

tying arrangement and an anticompetitive fixed fee to foreclose competition.

172.    At least one industry analyst recognized that Visa's conduct was likely to severely

foreclose competition from PIN Debit Card networks and cement Visa's market power:

- "Tapping the entire Visa customer base to subsidize aggressive PIN-debit pricing should significantly boost Interlink's market share, possibly above today's exclusivity-driven levels.  This aggressive approach is clearly bad news for competing PIN-debit networks as they simply won't be able to match price with post-Durbin Visa."  *See* Chris Brendler *et al.*, "New Fee Structure; Near-Term Pain, Long-Run Gain," *Stifel Nicolaus* (Aug. 1, 2011).

- "In our view, the [FANF], once established, should actually increase Visa's long-run pricing power since merchants will have little ability to deter future price increases . . . [W]e think this fee gives Visa enormous long-run pricing power as there are few governors on future price increases . . . Over time, we think Visa near-term margin sacrifice will be easily offset by market share gains and additional pricing power." *Id.*

173.    As a result of this conduct, Visa has maintained its monopoly power post-Durbin.

Its share of the General Purpose Debit Card market remains at monopolistic levels and is poised

to increase, and its ability to impose supracompetitive and economically unjustified fixed

network access fees reflects its continuing monopoly power.

174.    Visa's monopoly power in the General Purpose Debit Card market is protected by

high barriers to entry.  To be a viable payment network competitor, a potential entrant would

need both (1) widespread, if not ubiquitous, merchant acceptance and (2) large-scale distribution

# A5051

to consumers through Issuers.  While each poses a formidable barrier in its own right, the economic reality is that a new entrant must clear both barriers simultaneously.  Merchants are generally unwilling to accept a payment card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a payment card brand that is not widely accepted by merchants.  Therefore, starting a new network, whether debit or credit, with sufficient scale to challenge Visa or MasterCard is extremely difficult.  These high barriers to entry, coupled with the entrenched dominance of Visa and MasterCard, explain in large part why no meaningful entry has occurred in the General Purpose Credit Card and Debit Card markets since Discover entered three decades ago in 1985.

175.    The Antitrust Division recently highlighted this structural barrier to entry in the context of the General Purpose Credit Card market in its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, Dkt. #5, at 7 (E.D.N.Y. Oct. 4, 2010):

> Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market.  Barriers to entry and expansion include the prohibitive cost of establishing a physical network over which General Purpose Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders.  Defendants, which achieved these necessities early in the history of the industry, hold substantial early-mover advantages over prospective subsequent entrants.  Successful entry today would be difficult, time consuming, and expensive.

## ANTITRUST INJURY

176.    Defendants' price-fixing cartels and Visa's monopolistic conduct have caused substantial and ongoing anticompetitive harm to merchants as direct purchasers of General Purpose Payment Card Network Services in the form of inflated Interchange Fees paid directly by those merchants, foreclosure of network competitors, and reduced output.  Merchants and

their customers have borne—and continue to bear—the brunt of hundreds of billions of dollars of supracompetitive fees and severely decreased consumer welfare.

177.   Each Plaintiff has suffered direct antitrust injury from Defendants' conduct in violation of the antitrust laws set out above.  During the Damages Period, each Plaintiff had a contract with an Acquirer under which each Plaintiff directly paid the applicable Interchange Fee to the relevant Issuer with respect to transactions in which a Plaintiff accepted a Visa General Purpose Payment Card as a method of payment.  As a result, each Plaintiff paid (and continues to pay) substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Third Amended Complaint.  Each Plaintiff also was (and continues to be) deprived of the benefits of competition limited by this conduct in the relevant markets.

178.   Because the supracompetitive Interchange Fees that Plaintiffs had to pay were a substantial cost of doing business, Plaintiffs were forced to raise retail prices paid by their customers and/or to reduce retail services provided to their customers as a means of offsetting these Interchange Fees.  As a result, retail sales were below what they would have been and thereby harmed the economy.  Moreover, as evidenced by the impact on merchant acceptance of the mandated Interchange Fee reductions in Australia, inflated Interchange Fees also artificially reduce merchant acceptance of General Purpose Payment Cards.  These reductions in retail sales and merchant acceptance, coupled with the limitations on competition from other networks resulting from Defendants' anticompetitive conduct, significantly reduced output below what it would have been.  By imposing a massive and hidden tax on both merchants and consumers, Defendants' conduct decreased consumer welfare and imposed substantial anticompetitive harm.

179.   Moreover, because of the conduct detailed in this Third Amended Complaint, Plaintiffs could not limit these higher retail prices to customers using the General Purpose

81

# A5053

Payment Cards that generated the underlying Interchange Fees.  All customers, including less affluent ones who are more likely to pay with cash, had to bear the cost of these inflated Interchange Fees in the form of higher retail prices.

180.    Further, the imposition of supracompetitive Interchange Fees distorted Issuer incentives in both markets, perpetuating the fraud-prone magnetic stripe system in the United States.  This diminution of innovation is a further harm to competition.

## RELEVANT MARKETS

181.    Merchants' demand for General Purpose Payment Card Network Services (authorization, clearance, and settlement of transactions for which a merchant accepts a General Purpose Payment Card) stems from consumer demand for using General Purpose Payment Cards to pay for goods and services.  Accordingly, because consumer demand establishes both a distinct General Purpose Credit Card market as well as a General Purpose Debit Card market, there are corresponding markets, based upon derived merchant demand, for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

**A.    There Are Distinct Markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services**

**1.    General Purpose Credit Card Network Services**

182.    There were relevant product markets for General Purpose Credit Cards and General Purpose Credit Card Network Services throughout the Damages Period.  The existence of these markets have been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Third Amended Complaint.  These markets continue to be relevant product markets to this day.

183.    General Purpose Credit Cards allow a consumer to purchase goods and services

82

by accessing a line of credit extended to the cardholder by the Issuer that issued the card. These cards provided (and still provide) consumers deferred payment and, typically, the opportunity to revolve balances over time. Charge Cards are a subset of General Purpose Credit Cards that require the consumer to pay off the balance owed upon receipt of their statement, usually monthly.

184.    From the consumer perspective, there are no close substitutes for General Purpose Credit Cards because other forms of payment do not offer comparable credit facilities. Therefore, General Purpose Credit Cards are better suited for large purchases that a consumer needs to finance over time than are payment methods such as cash, checks, and General Purpose Debit Cards that do not allow deferred payment. This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for General Purpose Credit Card transactions consistently has significantly exceeded the average ticket for General Purpose Debit Card transactions since the mid-1990s.

185.    In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, the court held that "consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards." The court also found that Issuers "do not view cash or checks as 'competitive' with general purpose [credit] cards." *Id.* Most consumers do not want to carry large sums of cash to make large purchases, and checks do not match the acceptance of General Purpose Credit Cards.

186.    Thus, the evidence demonstrates that General Purpose Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions, and for which other payment methods are not close substitutes. A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to establish a market for General Purpose Credit Cards.

83

# A5055

This was the case throughout the Damages Period.

187.    As the court held in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, "it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such [hypothetical] price increase unprofitable for a hypothetical monopolist of general purpose [credit] card products."

188.    Limited purpose proprietary credit cards, such as the Sears' card, generally were (and are) accepted only by a single merchant.  Consumers, as a result, did not (and do not) consider proprietary credit cards to be reasonably interchangeable with General Purpose Credit Cards that can be used at numerous merchant locations, as recognized by the court in *United States v. Visa U.S.A. Inc.*  That court held that "[b]ecause proprietary cards, such as a Sear[s'] or Macy's card, are accepted only at a single merchant[,] consumers do not believe that proprietary cards are substitutes for general purpose [credit and T&E] cards and therefore they should not be included in the relevant market."  163 F. Supp. 2d. at 336.  Because of their limited utility, proprietary cards did not (and do not) constrain the prices to merchants for accepting General Purpose Credit Cards.

189.    The events in 2003 following the settlement of the *Visa Check* class action challenging the credit/debit tying rules also support the conclusion that General Purpose Credit Cards and Debit Cards are in separate markets.  The settlements required Visa and MasterCard to untie General Purpose Credit Card and Debit Card acceptance and give merchants the right to choose to accept one product without the other.  Once the settlements went into effect and the tie between credit and debit acceptance was broken, Visa and MasterCard increased General Purpose Credit Card Interchange Fees and reduced Signature Debit Card Interchange Fees.  This outcome demonstrates that General Purpose Credit Cards and Debit Cards are in separate

84

# A5056

markets.

190.    Interchange Fees for both PIN Debit Cards and Signature Debit Cards have decreased since the Federal Reserve promulgated regulations pursuant to the Durbin Amendment, but General Purpose Credit Card Interchange Fees have not decreased in response to reduced General Purpose Debit Card fees to merchants.  The absence of sensitivity of General Purpose Credit Card Interchange Fees to Interchange Fees for General Purpose Debit Cards is strong economic evidence that General Purpose Credit Cards and Debit Cards are not in the same relevant market.

191.    During the Damages Period, Visa and MasterCard have continued to raise General Purpose Credit Card Interchange Fees, including significant rate increases for Premium Payment Card transactions, and no merchants have stopped accepting Visa and MasterCard General Purpose Credit Card transactions.  This shows that merchants continue to believe that a sufficient number of consumers view General Purpose Credit Cards as unique and that merchants must accept them.  General Purpose Credit Card Network Services is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

## 2.    General Purpose Debit Card Network Services

192.    There were relevant product markets for General Purpose Debit Cards and General Purpose Debit Card Network Services throughout the Damages Period.  These markets consisted of both Signature Debit Cards and PIN Debit Cards.  The existence of these markets has been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Third Amended Complaint.  These markets continue to be relevant product markets to this day.

85

# A5057

193.    General Purpose Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account, usually a DDA or checking account.  General Purpose Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.  Depending on the type of debit transaction, payment is withdrawn from the cardholder's account and transferred to the merchant within one to several days later.

194.    Both PIN Debit Cards and Signature Debit Cards offer basically the same functionality to consumers—a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account (usually a checking account) to the merchant's account.  While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes.  Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this.

195.    General Purpose Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions.  Because payments are deducted in a matter of hours (or a few days at most) from a consumer's DDA, General Purpose Debit Cards are strongly differentiated from General Purpose Credit Cards.  Consumers do not consider General Purpose Credit Cards to be an adequate substitute for General Purpose Debit Cards.  Consumers tend to use General Purpose Debit Cards for everyday purchases, such as groceries, small household items, and other small value purchases, especially of non-durable goods.  Many consumers segment their purchases and prefer to put these everyday purchases on their General Purpose Debit Cards and use their General Purpose Credit Cards for larger-ticket items that are not consumed on a monthly basis.

196.    In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 337, the court held that:

> Consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards.  Due to their relative lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a PIN number, are not adequate [substitutes for general purpose credit cards].  Similarly Visa and MasterCard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose [credit] cards. . . .  Knowledgeable industry executives agree with these conclusions.

197.    General Purpose Debit Cards are safer than carrying cash and do not require that a consumer plan ahead (*e.g.*, by withdrawing cash from a bank account in order to make purchases).  As Visa and MasterCard have acknowledged, General Purpose Debit Cards also are more widely accepted than checks, making them suitable for transactions at many merchants where checks are not an option.  Consumers view General Purpose Debit Cards as superior to cash and checks and, thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase.  Cash and checks also are not reasonably interchangeable with General Purpose Debit Card Network Services for merchants.  As the price of PIN Debit Card acceptance increased from a negative price (*i.e.*, merchants were paid to accept debit because it saved banks' check and cash processing costs) to zero (at-par) to the supracompetitive levels of today, merchants did not substitute away from debit.

198.    Merchant demand exists separately for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.  As noted by the court in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG), 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003), "[o]verwhelming evidence establishes that merchant demand for credit card [network] services is distinct from merchant demand for debit card network services." "[D]ebit card [network] services is a well-defined submarket characterized by an inelasticity of

demand and universal recognition by the public, the parties, and the industry as a whole." *Visa Check*, 2003 WL 1712568, at *7.

**B.     The Geographic Market for All Relevant Product Markets Is the United States**

199.     The geographic market for all relevant product markets was the United States throughout the Damages Period, and that continues to be the case to this day.  Many of Visa's and MasterCard's rules regarding General Purpose Credit Card and General Purpose Debit Card transactions applied only to the U.S. market.  Visa and MasterCard also set policies and pricing—including Interchange Fees—separately for the United States from other regions. Additionally, U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards issued in other countries—and therefore other currencies—to be adequate substitutes for General Purpose Credit Cards or General Purpose Debit Cards issued by U.S. banks.  Defendants also have demonstrated that small but significant, non-transitory increases in prices limited to these product markets in the United States have been profitable and have not caused merchants to turn to other services sufficiently to make these price increases unprofitable.

## FIRST CLAIM FOR RELIEF

### Against the Visa Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Network Services

200.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

201.     The Visa Defendants' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

88

202.    The Visa Defendants maintained the conspiracy for Visa General Purpose Credit Card transactions throughout the Damages Period.

203.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

204.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

205.    Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

206.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

### SECOND CLAIM FOR RELIEF

**Against the Visa Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Network Services**

207.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

208.    The Visa Defendants' agreement not to compete and price-fixing schemes

89

# A5061

constituted anticompetitive horizontal restraints.

209.   The Visa Defendants maintained the conspiracy for Visa General Purpose Debit Card transactions throughout the Damages Period.

210.   This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

211.   The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

212.   Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

213.   As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## THIRD CLAIM FOR RELIEF

### Against the MasterCard Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Network Services

214.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

90

# A5062

215.    The MasterCard Defendants' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

216.    The MasterCard Defendants maintained the conspiracy for MasterCard General Purpose Credit Card transactions throughout the Damages Period.

217.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for MasterCard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/member banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

218.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

219.    Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

220.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## FOURTH CLAIM FOR RELIEF

### Against the MasterCard Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Network Services

221.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

# A5063

through 199 with the same force and effect as if set forth here in full.

222.    The MasterCard Defendants' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

223.    The MasterCard Defendants maintained the conspiracy for MasterCard General Purpose Debit Card transactions throughout the Damages Period.

224.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for MasterCard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/member banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

225.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

226.    Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

227.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## FIFTH CLAIM FOR RELIEF

**Against the Visa Defendants for Vertical Price Restraints in the
Market for General Purpose Credit Card Network Services**

228.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 199 with the same force and effect as if set forth here in full.

229.    The Visa Defendants' price-fixing schemes constituted unreasonable and

anticompetitive vertical restraints.

230.    Visa entered into an express vertical agreement with each of the Bank Defendants

and with each of Visa's member/owner banks, binding all of them to comply with the rules and

regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules.

In turn, Visa acted as the enforcement agent for its rules and regulations and held issuing and

acquiring members responsible for compliance with these rules and regulations.  These

agreements continued in full effect throughout the Damages Period.

231.    These vertical price restraints imposed supracompetitive Interchange Fees on

merchants for Visa General Purpose Credit Card transactions, and it imposed additional damages

in the form of network fees, fines, and fraud losses.  These restraints continued in full effect

throughout the Damages Period and constituted unreasonable restraints of trade in violation of

Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved

no legitimate efficiency benefit to offset its substantial anticompetitive effects.

232.    Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

233.    As a result of this violation of Section 1 of the Sherman Act throughout the

Damages Period, Plaintiffs were injured in their business and property in an amount not

presently known with precision.

## SIXTH CLAIM FOR RELIEF

**Against the Visa Defendants for Vertical Price Restraints in the
Market for General Purpose Debit Card Network Services**

234.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 199 with the same force and effect as if set forth here in full.

235.    The Visa Defendants' price-fixing schemes constituted unreasonable and

anticompetitive vertical restraints.

236.    Visa entered into an express vertical agreement with each of the Bank Defendants

and with each of Visa's member/owner banks, binding all of them to comply with the rules and

regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules.

In turn, Visa acted as the enforcement agent for its rules and regulations and held issuing and

acquiring members responsible for compliance with these rules and regulations.  These

agreements continued in full effect throughout the Damages Period.

237.    These vertical price restraints imposed supracompetitive Interchange Fees on

merchants for Visa General Purpose Debit Card transactions, and it imposed additional damages

in the form of network fees, fines, and fraud losses.  These restraints continued in full effect

throughout the Damages Period and constituted unreasonable restraints of trade in violation of

Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved

no legitimate efficiency benefit to offset its substantial anticompetitive effects.

238.    Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

239.    As a result of this violation of Section 1 of the Sherman Act throughout the

Damages Period, Plaintiffs were injured in their business and property in an amount not

presently known with precision.

**A5066**

## SEVENTH CLAIM FOR RELIEF

### Against the MasterCard Defendants for Vertical Price Restraints in the Market for General Purpose Credit Card Network Services

240.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

241.     The MasterCard Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

242.     MasterCard entered into an express vertical agreement with each of the Bank Defendants and with each of MasterCard's member banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages Period.

243.     These vertical price restraints imposed supracompetitive Interchange Fees on merchants for MasterCard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

244.     Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

245.     As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

95

### EIGHTH CLAIM FOR RELIEF

**Against the MasterCard Defendants for Vertical Price Restraints in the Market for General Purpose Debit Card Network Services**

246.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

247.     The MasterCard Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

248.     MasterCard entered into an express vertical agreement with each of the Bank Defendants and with each of MasterCard's member banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages period.

249.     These vertical price restraints imposed supracompetitive Interchange Fees on merchants for MasterCard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

250.     Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

251.     As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

96

**A5068**

## NINTH CLAIM FOR RELIEF

### Against Visa for Monopolization of the Market for
### General Purpose Debit Card Network Services

252.    Plaintiffs (with the exception of 7-Eleven) repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

253.    Through the anticompetitive acts set forth above, Visa has unlawfully acquired monopoly power in the market for General Purpose Debit Card Network Services.  Visa has taken acts that have the effect of giving it power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

254.    Through the FANF, Visa has further unlawfully maintained its monopoly power through anticompetitive conduct that had the purpose and effect of excluding competition from, and raising the costs of, other providers of General Purpose Debit Card Network Services.

255.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Plaintiffs suffered injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees and network fees.  Plaintiffs suffered antitrust injury from these acts of monopolization.

256.    Visa's unlawful acquisition of monopoly power constituted a violation of Section 2 of the Sherman Act.  Visa's unlawful maintenance of monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

**A5069**

## TENTH CLAIM FOR RELIEF

**Against Visa for Attempted Monopolization of the Market
for General Purpose Debit Card Network Services**

257.     Plaintiffs (with the exception of 7-Eleven) repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

258.     Visa has taken acts that have the effect of giving Visa power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

259.     Visa specifically intended to monopolize the market for General Purpose Debit Card Network Services, as evidenced by its specific intent to obtain power over Interchange Fee and network fee pricing for General Purpose Debit Card Network Services, its specific intent to exclude competition in the market for General Purpose Debit Card Network Services, and by its specific intent to take acts with the effects of giving Visa power over price and excluding competition.

260.     To the extent it does not already possess monopoly power, there is a dangerous probability that Visa will obtain monopoly power in the market for General Purpose Debit Card Network Services through the FANF.

261.     As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Plaintiffs suffered injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees.  Plaintiffs suffered antitrust injury from these attempted acts of monopolization.

262.     Visa's attempted monopolization constituted and, through the FANF, continues to

98

constitute a violation of Section 2 of the Sherman Act.

**ELEVENTH CLAIM FOR RELIEF**

**Against Visa and the Bank Defendants for Conspiracy to Monopolize
the Market for General Purpose Debit Card Network Services**

263.    Plaintiffs (with the exception of 7-Eleven) repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

264.    Visa and the Bank Defendants combined and conspired among themselves with the specific intent to monopolize the market for General Purpose Debit Card Network Services.

265.    This conspiracy was successful, as Visa, through the overt acts described above, acquired, enhanced, and maintained monopoly power in the market for General Purpose Debit Card Network Services during the Damages Period.

266.    As a direct and proximate result of Visa and the Bank Defendants' conspiracy to monopolize, Interchange Fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Plaintiffs suffered antitrust injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees.

267.    Visa and the Bank Defendants' conspiracy to monopolize constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

**TWELFTH CLAIM FOR RELIEF**

**Against All Defendants for Violation of State
Antitrust and Unfair Competition Laws**

268.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

269.    By reason of the foregoing, Defendants entered into agreements in restraint of

99

# A5071

trade and/or engaged in anticompetitive practices in violation of Alabama Code § 8-10-1 et seq.

270.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 et seq.

271.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of California Bus. & Prof. Code § 16700 et seq. and Cal. Bus. & Prof. Code § 17200 et seq.

272.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 4501 et seq.

273.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 501.201 et seq.

274.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 et seq.

275.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 et seq.

276.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 et seq.

277.   By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 et

100

seq.

278.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine Rev. Stat. Ann. 10, § 1101 et seq.

279.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 et seq.

280.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. Ann. § 325D.49 et seq.

281.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Mississippi Code Ann. § 75-21-1 et seq.

282.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 et seq.

283.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. Ann. § 598A.010 et seq.

284.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 et seq.

285.    By reason of the foregoing, Defendants entered into agreements in restraint of

# A5073

trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 et seq. and § 369-A.

286.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 et seq.

287.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51-08.1-01 et seq.

288.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. Ann. § 646.705 et seq.

289.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws Ann. § 6-36-1 et seq.

290.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1 et seq.

291.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 et seq.

292.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. 9 § 2451 et seq.

102

293.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wisconsin Stat. Ann. § 133.01 et seq.

294.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs suffered injury to their business and property in each of these states by paying such artificially-inflated, supracompetitive Interchange Fees for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully demand:

A.    that the Court declare, adjudge, and decree that Defendants have committed the violations of law alleged herein;

B.    that the Court award damages sustained by Plaintiffs because of Defendants' misconduct (to the extent that such damages claims are not barred by the release in MDL 1720), in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees, and costs of suit;

C.    that the Court enjoin Visa's FANF; and

D.    that the Court grant such other and further relief as it may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

# A5075

DATED:  New York, New York
        September 26, 2014

**CONSTANTINE CANNON LLP**

By:_____/s/ Jeffrey I. Shinder_____
    Jeffrey I. Shinder
    Gary J. Malone
    A. Owen Glist
    Ankur Kapoor
    David A. Scupp
    335 Madison Avenue, 9th Floor
    New York, New York 10017
    Telephone:  (212) 350-2700
    Facsimile:  (212) 350-2701

    W. Stephen Cannon
    Richard O. Levine
    One Franklin Square
    1301 K Street, N.W., Suite 1050 East
    Washington, DC 20005
    Telephone: (202) 204-3500
    Facsimile: (212) 204-3501

    *Counsel for Plaintiffs*

104

# A5076

**General Docket**
**Court of Appeals, 2nd Circuit**

| | |
|---|---|
| **Court of Appeals Docket #:** 13-4537 | **Docketed:** 12/03/2013 |

**Nature of Suit:** 3950 LOCAL QUESTION-Constitutional
Expressions Hair Design v. Schneiderman
**Appeal From:** SDNY (NEW YORK CITY)
**Fee Status:** Paid

**Case Type Information:**
    1) Civil
    2) Private
    3) -

**Originating Court Information:**
    **District:** 0208-1 : 13-cv-3775
    **Trial Judge:** Jed S. Rakoff, U.S. District Judge
    **Date Filed:** 06/04/2013
    **Date Order/Judgment:**                  **Date NOA Filed:**
    11/04/2013                               12/02/2013

**Prior Cases:**
    None

**Current Cases:**

| | **Lead** | **Member** | **Start** | **End** |
|---|---|---|---|---|
| Consolidated | | | | |
| | 13-4533 | 13-4537 | 12/03/2013 | |

| | |
|---|---|
| **Panel Assignment:** | Not available |

| | | |
|---|---|---|
| David Ross | | Gary B. Friedman, Esq., - |
| | Plaintiff - Appellee | Direct: 212-680-5150 |
| | | [COR LD NTC Retained] |
| | | Friedman Law Group LLP |
| | | Suite 1410 |
| | | 270 Lafayette Street |
| | | New York, NY 10012 |
| | | |
| | | Deepak Gupta, Esq., - |
| | | Direct: 202-888-1741 |
| | | [COR LD NTC Retained] |
| | | Gupta Beck PLLC |
| | | 1735 20th Street, NW |
| | | Washington, DC 20009 |
| | | |
| Patio.com LLC | | Gary B. Friedman, Esq., - |
| | Plaintiff - Appellee | Direct: 212-680-5150 |
| | | [COR LD NTC Retained] |
| | | (see above) |
| | | |
| | | Deepak Gupta, Esq., - |
| | | Direct: 202-888-1741 |
| | | [COR LD NTC Retained] |
| | | (see above) |
| | | |
| Steve Milles | | Gary B. Friedman, Esq., - |
| | Plaintiff - Appellee | Direct: 212-680-5150 |
| | | [COR LD NTC Retained] |
| | | (see above) |
| | | |
| | | Deepak Gupta, Esq., - |
| | | Direct: 202-888-1741 |
| | | [COR LD NTC Retained] |
| | | (see above) |
| | | |
| Five Points Academy | | Gary B. Friedman, Esq., - |
| | Plaintiff - Appellee | Direct: 212-680-5150 |

# A5077

|  |  |
|---|---|
|  | [COR LD NTC Retained]<br>(see above) |
|  | Deepak Gupta, Esq., -<br>Direct: 202-888-1741<br>[COR LD NTC Retained]<br>(see above) |
| Donna Pabst<br>      Plaintiff - Appellee | Gary B. Friedman, Esq., -<br>Direct: 212-680-5150<br>[COR LD NTC Retained]<br>(see above) |
|  | Deepak Gupta, Esq., -<br>Direct: 202-888-1741<br>[COR LD NTC Retained]<br>(see above) |
| Bunda Starr Corp.<br>      Plaintiff - Appellee | Gary B. Friedman, Esq., -<br>Direct: 212-680-5150<br>[COR LD NTC Retained]<br>(see above) |
|  | Deepak Gupta, Esq., -<br>Direct: 202-888-1741<br>[COR LD NTC Retained]<br>(see above) |
| Peter Freeman<br>      Plaintiff - Appellee | Gary B. Friedman, Esq., -<br>Direct: 212-680-5150<br>[COR LD NTC Retained]<br>(see above) |
|  | Deepak Gupta, Esq., -<br>Direct: 202-888-1741<br>[COR LD NTC Retained]<br>(see above) |
| The Brooklyn Farmacy & Soda Fountain, Inc<br>      Plaintiff - Appellee | Gary B. Friedman, Esq., -<br>Direct: 212-680-5150<br>[COR LD NTC Retained]<br>(see above) |
|  | Deepak Gupta, Esq., -<br>Direct: 202-888-1741<br>[COR LD NTC Retained]<br>(see above) |
| Linda Fiacco<br>      Plaintiff - Appellee | Gary B. Friedman, Esq., -<br>Direct: 212-680-5150<br>[COR LD NTC Retained]<br>(see above) |
|  | Deepak Gupta, Esq., -<br>Direct: 202-888-1741<br>[COR LD NTC Retained]<br>(see above) |
| Expressions Hair Design<br>      Plaintiff - Appellee | Gary B. Friedman, Esq., -<br>Direct: 212-680-5150<br>[COR LD NTC Retained]<br>(see above) |
|  | Deepak Gupta, Esq., -<br>Direct: 202-888-1741<br>[COR LD NTC Retained]<br>(see above) |

# A5078

Gerald Mollen, in his official capacity as District Attorney of
Broome County
        Defendant

Eric T. Schneiderman, In his official capacity as Attorney General
of the State of New York
        Defendant

Judith Naomi Vale, Esq., -
Direct: 212-416-6274
[COR LD NTC Government]
New York State Office of the Attorney General
120 Broadway
New York, NY 10271

Cyrus R. Vance, Jr., in his official capacity as District Attorney of
New York County
        Defendant - Appellant

Ronald Emanuel Sternberg, Assistant Corporation Counsel
Direct: 212-788-1070
[COR LD NTC Government]
New York City Law Department
6-186
100 Church Street
New York, NY 10007

District Attorney Charles J. Hynes, in his official capacity as
District Attorney of Kings County
        Defendant - Appellant

Ronald Emanuel Sternberg, Assistant Corporation Counsel
Direct: 212-788-1070
[COR LD NTC Government]
(see above)

Credit Union Association of New York
        Amicus Curiae

Henry Charles Meier, Attorney General
Direct: 518-437-8144
[COR LD NTC Retained]
Credit Union Association of New York
1021 Watervliet Shaker
Albany, NY 12205

Consumer Action
        Amicus Curiae

J. Douglas Richards, -
Direct: 212-838-7797
[COR LD NTC Retained]
Cohen Milstein Sellers & Toll, PLLC
14th Floor
88 Pine Street
New York, NY 10005

National Association of Consumer Advocates
        Amicus Curiae

J. Douglas Richards, -
Direct: 212-838-7797
[COR LD NTC Retained]
(see above)

National Consumer League
        Amicus Curiae

J. Douglas Richards, -
Direct: 212-838-7797
[COR LD NTC Retained]
(see above)

U.S. Public Interest Research Group
        Amicus Curiae

J. Douglas Richards, -
Direct: 212-838-7797
[COR LD NTC Retained]
(see above)

# A5079

FOR THE CAPTION AND COMPLETE SET OF ATTORNEYS LISTED PLEASE SEE THE LEAD DOCKET NUMBER 13-4533.

# A5080

| 12/03/2013 | 1<br>29 pg, 1.06 MB | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellants District Attorney Charles J. Hynes and Cyrus R. Vance, Jr., FILED. [1105783] [13-4537] [Entered: 12/03/2013 03:52 PM] |
|---|---|---|
| 12/03/2013 | 2<br>7 pg, 728.73 KB | DISTRICT COURT JUDGMENT, dated 11/14/2013, RECEIVED.[1105794] [13-4537, 13-4533] [Entered: 12/03/2013 03:55 PM] |
| 12/03/2013 | 4<br>29 pg, 154.36 KB | ELECTRONIC INDEX, in lieu of record, FILED.[1105811] [13-4537] [Entered: 12/03/2013 03:58 PM] |
| 12/03/2013 | 5 | NOTE: See lead case, 13-4533, containing complete set of docket entries.[1105839] [13-4537] [Entered: 12/03/2013 04:07 PM] |
| 12/03/2013 | 6<br>27 pg, 1.02 MB | NEW CASE # 13-4537, on behalf of District Attorney Charles J. Hynes and Cyrus R. Vance, Jr. in 13-4533, FILED.[1105844] [13-4533, 13-4537] [Entered: 12/03/2013 04:09 PM] |
| 12/05/2013 | 7<br>20 pg, 72.38 KB | PAYMENT OF DOCKETING FEE, on behalf of Appellants District Attorney Charles J. Hynes and Cyrus R. Vance, Jr., district court receipt # 46540108262, FILED.[1107313] [13-4537] [Entered: 12/05/2013 09:56 AM] |
| 12/12/2013 | 8<br>1 pg, 431.69 KB | NOTICE OF APPEARANCE AS SUBSTITUTE COUNSEL, on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, FILED. Service date 12/12/2013 by CM/ECF. [1113526] [13-4533, 13-4537] [Entered: 12/12/2013 01:58 PM] |
| 12/12/2013 | 9 | ATTORNEY, Judith Vale, [8], in place of attorney Garrett Coyle, SUBSTITUTED.[1113559] [13-4533, 13-4537] [Entered: 12/12/2013 02:20 PM] |
| 12/12/2013 | 10<br>2 pg, 75.23 KB | NOTICE OF APPEARANCE AS SUBSTITUTE COUNSEL, on behalf of Appellant District Attorney Charles J. Hynes and Cyrus R. Vance, Jr., FILED. Service date 10/12/2013 by CM/ECF. [1113588] [13-4537] [Entered: 12/12/2013 02:34 PM] |
| 12/12/2013 | 11<br>1 pg, 428.25 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, FILED. Service date 12/12/2013 by CM/ECF.[1113801] [13-4533, 13-4537] [Entered: 12/12/2013 03:56 PM] |
| 12/12/2013 | 12 | FORM C, on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, FILED. Service date 12/12/2013 by CM/ECF.[1113893] [13-4533, 13-4537] [Entered: 12/12/2013 07:42 PM] |
| 12/12/2013 | 13<br>1 pg, 430.26 KB | FORM D, on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, FILED. Service date 12/12/2013 by CM/ECF.[1113894] [13-4533, 13-4537] [Entered: 12/12/2013 07:43 PM] |
| 12/13/2013 | 14 | ATTORNEY, Ronald E. Sternberg, [10], in place of attorney Michael A. Cardozo, SUBSTITUTED. [1114102] [13-4537, 13-4533] [Entered: 12/13/2013 10:19 AM] |
| 12/13/2013 | 15<br>2 pg, 66.92 KB | DEFECTIVE DOCUMENT, FORM C, [12], on behalf of Appellant Eric T. Schneiderman in 13-4533, FILED.[1114124] [13-4533, 13-4537] [Entered: 12/13/2013 10:25 AM] |
| 12/13/2013 | 16<br>74 pg, 3.87 MB | FORM C, on behalf of Eric T. Schneiderman in 13-4537, Appellant Eric T. Schneiderman in 13-4533, FILED. Service date 12/13/2013 by CM/ECF.[1114329] [13-4537, 13-4533] [Entered: 12/13/2013 11:41 AM] |
| 12/13/2013 | 17 | CURED DEFECTIVE: FORM C, [16], [15], [12], on behalf of Appellant Eric T. Schneiderman in 13-4537, FILED.[1114464] [13-4537, 13-4533] [Entered: 12/13/2013 12:28 PM] |
| 12/13/2013 | 19<br>83 pg, 4.92 MB | FORM C, on behalf of Appellant District Attorney Charles J. Hynes and Cyrus R. Vance, Jr. in 13-4537, 13-4533, FILED. Service date 12/13/2013 by CM/ECF.[1114502] [13-4537, 13-4533] [Entered: 12/13/2013 12:50 PM] |
| 12/13/2013 | 20<br>20 pg, 738.25 KB | FORM D, on behalf of Appellant District Attorney Charles J. Hynes and Cyrus R. Vance, Jr. in 13-4537, 13-4533, FILED. Service date 12/13/2013 by CM/ECF.[1114504] [13-4537, 13-4533] [Entered: 12/13/2013 12:50 PM] |
| 12/16/2013 | 22<br>1 pg, 496.8 KB | LR 31.2 SCHEDULING NOTIFICATION, on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, informing Court of proposed due date 03/14/2014, RECEIVED. Service date 12/16/2013 by CM/ECF. [1115325] [13-4533, 13-4537] [Entered: 12/16/2013 11:41 AM] |
| 12/18/2013 | 25<br>1 pg, 37.5 KB | NEW CASE MANAGER, Jason Wang, ASSIGNED.[1117184] [13-4533, 13-4537] [Entered: 12/18/2013 08:40 AM] |
| 12/18/2013 | 26<br>1 pg, 61.52 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 12/18/2013 by CM/ECF.[1117252] [13-4533, 13-4537] [Entered: 12/18/2013 09:15 AM] |

# A5081

| 12/23/2013 | 28<br>1 pg, 27.66 KB | LR 31.2 SCHEDULING NOTIFICATION, on behalf of Appellant District Attorney Charles J. Hynes and Cyrus R. Vance, Jr. in 13-4533, 13-4537, informing Court of proposed due date 03/14/2014, RECEIVED. Service date 12/23/2013 by CM/ECF.[1121208] [13-4533, 13-4537] [Entered: 12/23/2013 03:12 PM] |
|---|---|---|
| 03/13/2014 | 29 | JOINT APPENDIX, volume 1 of 1, (pp. 1-200), on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, FILED. Service date 03/13/2014 by CM/ECF.[1178027] [13-4533, 13-4537] [Entered: 03/13/2014 08:17 PM] |
| 03/13/2014 | 30<br>80 pg, 359.55 KB | BRIEF, on behalf of Appellant Eric T. Schneiderman, FILED. Service date 03/13/2014 by CM/ECF. [1178032] [13-4533, 13-4537] [Entered: 03/13/2014 10:26 PM] |
| 03/14/2014 | 31<br>7 pg, 39.63 KB | BRIEF, on behalf of Appellant District Attorney Charles J. Hynes and Cyrus R. Vance, Jr. in 13-4537, FILED. Service date 03/14/2014 by CM/ECF.[1178665] [13-4533, 13-4537] [Entered: 03/14/2014 02:51 PM] |
| 03/17/2014 | 36<br>1 pg, 691.8 KB | LR 31.2 SCHEDULING NOTIFICATION, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, informing Court of proposed due date 06/13/2014, RECEIVED. Service date 03/17/2014 by CM/ECF.[1179993] [13-4533, 13-4537] [Entered: 03/17/2014 11:51 PM] |
| 03/18/2014 | 37<br>224 pg, 12.21 MB | JOINT APPENDIX, volume 1 of 1, (pp. 1-219), on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, FILED. Service date 03/18/2014 by CM/ECF.[1181040] [13-4533, 13-4537] [Entered: 03/18/2014 06:36 PM] |
| 03/18/2014 | 38<br>80 pg, 873.9 KB | CORRECTED BRIEF, on behalf of Appellant Eric T. Schneiderman in 13-4533, Eric T. Schneiderman in 13-4537, FILED. Service date 03/18/2014 by CM/ECF. [1181042] [13-4533, 13-4537] [Entered: 03/18/2014 06:40 PM] |
| 03/19/2014 | 39 | CORRECTED BRIEF, on behalf of Appellant District Attorney Charles J. Hynes and Cyrus R. Vance, Jr. in 13-4537, FILED. Service date 03/19/2013 by CM/ECF. [1182212] [13-4533, 13-4537] [Entered: 03/19/2014 04:46 PM] |
| 03/19/2014 | 40<br>7 pg, 44.8 KB | CORRECTED BRIEF, on behalf of Appellant District Attorney Charles J. Hynes and Cyrus R. Vance, Jr. in 13-4537, FILED. Service date 03/19/2014 by CM/ECF. [1182286] [13-4533, 13-4537] [Entered: 03/19/2014 06:02 PM] |
| 03/21/2014 | 44 | MOTION TO FILE AMICUS CURIAE BRIEF, on behalf of Non-Party Filer(s), FILED. Service date03/20/2014 by CM/ECF.[1184254] [13-4533, 13-4537] [Entered: 03/21/2014 01:55 PM] |
| 04/02/2014 | 47 | AMICUS BRIEF, on behalf of Amicus Curiae Credit Union Association of New York, FILED. Service date 04/02/2014 by CM/ECF. [1192909] [13-4537]--[Edited 04/02/2014 by JW] [Entered: 04/02/2014 02:02 PM] |
| 04/02/2014 | 48<br>1 pg, 295.13 KB | NOTICE OF APPEARANCE AS AMICUS COUNSEL, on behalf of Amicus Curiae Credit Union Association of New York, FILED. Service date 04/02/2014 by CM/ECF. [1192919] [13-4537, 13-4533]-- [Edited 04/02/2014 by JW] [Entered: 04/02/2014 02:10 PM] |
| 04/02/2014 | 49 | NEW PARTY, Amicus Curiae Credit Union Association of New York in 13-4533 and 13-4537, ADDED. [1193145] [13-4533, 13-4537] [Entered: 04/02/2014 03:56 PM] |
| 04/02/2014 | 50<br>2 pg, 66.69 KB | DEFECTIVE DOCUMENT, amicus brief[47], on behalf of Amicus Curiae Credit Union Association of New York in 13-4537, FILED.[1193173] [13-4537, 13-4533] [Entered: 04/02/2014 04:05 PM] |
| 04/04/2014 | 51 | CORRECTED BRIEF, on behalf of Amicus Curiae Credit Union Association of New York in 13-4533, FILED. Service date 04/03/2014 by CM/ECF. [1195138] [13-4533, 13-4537] [Entered: 04/04/2014 02:45 PM] |
| 04/09/2014 | 52<br>2 pg, 67.21 KB | DEFECTIVE DOCUMENT, corrected brief[51], on behalf of Amicus Curiae Credit Union Association of New York in 13-4533, FILED.[1198352] [13-4533, 13-4537] [Entered: 04/09/2014 03:33 PM] |
| 06/13/2014 | 53 | BRIEF, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 06/13/2014 by CM/ECF. [1248603] [13-4533, 13-4537] [Entered: 06/13/2014 11:57 PM] |
| 06/16/2014 | 54<br>1 pg, 103.88 KB | ORAL ARGUMENT STATEMENT LR 34.1 (a), on behalf of filer Attorney Judith Naomi Vale, Esq. for Appellant Eric T. Schneiderman in 13-4533, Attorney Judith Naomi Vale, Esq. for Eric T. Schneiderman in 13-4537, FILED. Service date 06/16/2014 by CM/ECF. [1248824] [13-4533, 13-4537] [Entered: 06/16/2014 10:21 AM] |
| 06/16/2014 | 55<br>1 pg, 96.14 KB | ORAL ARGUMENT STATEMENT LR 34.1 (a), on behalf of filer Attorney Mr. Deepak Gupta, Esq. for Appellee Expressions Hair Design, Linda Fiacco, The Brooklyn Farmacy & Soda Fountain, Inc, Peter Freeman, Bunda Starr Corp., Donna Pabst, Five Points Academy, Steve Milles, Patio.com LLC and David Ross in 13-4533, 13-4537, FILED. Service date 06/16/2014 by CM/ECF. [1248963] [13-4533, 13-4537] [Entered: 06/16/2014 11:32 AM] |

# A5082

| 06/16/2014 | 56 | CORRECTED BRIEF, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 06/16/2014 by CM/ECF. [1249693] [13-4533, 13-4537] [Entered: 06/16/2014 09:08 PM] |
|---|---|---|
| 06/18/2014 | 58 | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 06/18/2014 by CM/ECF. [1251699] [13-4533, 13-4537] [Entered: 06/18/2014 03:56 PM] |
| 06/19/2014 | 59<br>2 pg, 92.31 KB | NOTICE OF APPEARANCE AS AMICUS COUNSEL, on behalf of Amicus Curiae Consumer Action, National Association of Consumer Advocates, National Consumer League and U.S. Public Interest Research Group, FILED. Service date 06/19/2014 by CM/ECF. [1252282] [13-4533, 13-4537]--[Edited 06/19/2014 by JW] [Entered: 06/19/2014 10:44 AM] |
| 06/19/2014 | 60<br>2 pg, 66.8 KB | DEFECTIVE DOCUMENTS, brief and corrected brief [56], [53], on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4537, FILED. [1252502] [13-4533, 13-4537] [Entered: 06/19/2014 12:07 PM] |
| 06/19/2014 | 61 | NEW PARTY, Amicus Curiae Consumer Action, National Association of Consumer Advocates, National Consumer League and U.S. Public Interest Research Group in 13-4533, ADDED.[1252741] [13-4533, 13-4537] [Entered: 06/19/2014 02:40 PM] |
| 06/23/2014 | 62 | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 06/23/2014 by CM/ECF. [1255611] [13-4533, 13-4537] [Entered: 06/23/2014 08:31 PM] |
| 06/24/2014 | 63<br>73 pg, 698.08 KB | MOTION, to file document, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 06/24/2014 by CM/ECF. [1256388] [13-4533, 13-4537] [Entered: 06/24/2014 02:30 PM] |
| 06/25/2014 | 65<br>1 pg, 155.96 KB | MOTION ORDER, granting motion to file corrected principal brief[53] filed by Appellee Expressions Hair Design, Linda Fiacco, The Brooklyn Farmacy & Soda Fountain, Inc, Peter Freeman, Bunda Starr Corp., Donna Pabst, Five Points Academy, Steve Milles, Patio.com LLC and David Ross in 13-4533, FILED. [1256994][65] [13-4533, 13-4537] [Entered: 06/25/2014 10:21 AM] |
| 06/27/2014 | 66 | CURED DEFECTIVE CORRECTED BRIEF[1258312-2], on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, FILED. [1259369] [13-4533, 13-4537] [Entered: 06/27/2014 02:36 PM] |
| 06/27/2014 | 68<br>43 pg, 300.14 KB | REPLY BRIEF, on behalf of Appellant Eric T. Schneiderman, FILED. Service date 06/27/2014 by CM/ECF. [1259753] [13-4533, 13-4537] [Entered: 06/27/2014 08:07 PM] |
| 07/17/2014 | 69 | CASE CALENDARING, for the week of 09/22/2014, PROPOSED.[1273195] [13-4533, 13-4537] [Entered: 07/17/2014 10:47 AM] |
| 08/13/2014 | 73 | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 08/13/2014 by CM/ECF. [1293971] [13-4533, 13-4537] [Entered: 08/13/2014 11:38 AM] |
| 08/13/2014 | 74<br>1 pg, 75.43 KB | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, FILED. Service date 08/13/2014 by CM/ECF. [1294675] [13-4533, 13-4537] [Entered: 08/13/2014 05:23 PM] |
| 08/15/2014 | 75 | CASE CALENDARING, for the week of 10/20/2014, PROPOSED.[1296821] [13-4533, 13-4537] [Entered: 08/15/2014 05:02 PM] |
| 09/10/2014 | 78 | CASE CALENDARING, for the week of 11/17/2014, PROPOSED.[1316378] [13-4533, 13-4537] [Entered: 09/10/2014 11:48 AM] |
| 09/23/2014 | 81 | CASE CALENDARING, for the week of 12/08/2014, A, PROPOSED.[1327428] [13-4533, 13-4537] [Entered: 09/23/2014 04:32 PM] |
| 11/19/2014 | 84<br>1 pg, 703.49 KB | LETTER, dated 11/19/2014 in re: dates unavailable for oral argument, on behalf of Appellee Bunda Starr Corp., Expressions Hair Design, Linda Fiacco, Five Points Academy, Peter Freeman, Steve Milles, Donna Pabst, Patio.com LLC, David Ross and The Brooklyn Farmacy & Soda Fountain, Inc in 13-4533, 13-4537, RECEIVED. Service date 11/19/2014 by CM/ECF.[1373683] [13-4533, 13-4537]--[Edited 11/19/2014 by AM] [Entered: 11/19/2014 12:53 PM] |

# A5083

13-4537 Docket

# A5084

11/19/2014                                        13-4537 Docket

Clear All

○ Documents and Docket Summary
○ Documents Only

☑ Include Page Numbers

Selected Pages: 0         Selected Size: 0 KB

View Selected

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 11/19/2014 18:36:31 | | | |
| PACER Login: | cc6277 | Client Code: | 1000005DAS |
| Description: | Docket Report (full) | Search Criteria: | 13-4537 |
| Billable Pages: | 5 | Cost: | 0.50 |

**A5085**

# Card Acceptance Guidelines
# for Visa Merchants

*VISA*



# A5086



Section 1: Getting Down to Basics

## Convenience Fees*

 

For merchants who offer an alternate payment channel (i.e., mail, telephone, or e-commerce) for customers to pay for goods or services, a convenience fee may be added to the transaction amount. If the merchant chooses to assess a convenience fee to its customers, the merchant **must** adhere to Visa rules regarding convenience fees.

*For further information on Convenience Fees, please contact your acquirer.*

 

An AP or U.S. merchant that charges a convenience fee must ensure that the fee is:

- Charged for a bona fide convenience in the form of an alternative payment channel (i.e., mail, telephone, e-commerce) outside the merchant's customary payment channels (i.e., not solely for the acceptance of the Visa card).

- Disclosed clearly to the cardholder as a charge for the alternative payment channel convenience.

- Disclosed before the completion of the transaction and the cardholder is given the opportunity to cancel.

- Added only to a transaction completed in a card-absent environment.

- A flat or fixed amount, regardless of the value of the payment due**.

- Applicable to all forms of payment accepted in the payment channel.

- Included as part of the total amount of the transaction.

The Convenience Fee must not be:

- Charged by any third party.

- Added to a recurring transaction.

Further, in the U.S. region or in a U.S. territory, a merchant that assesses a surcharge on a Visa credit card transaction must not charge a convenience fee in addition to the surcharge.

## Government and Education Payment Program Service Fee



Properly disclose and process any Government and Education Payment Program Service fees.

In the U.S. region, a government or education merchant may assess a fixed or variable service fee for processing a Visa card transaction if the service fee is:

- Clearly disclosed before the completion of the transaction and the cardholder is given the opportunity to cancel.

- Processed as a separate transaction. The merchant name field of the Service Fee Transaction Clearing Record must contain the words "Service Fee" as specified in "VisaNet Clearing Message Content Standards" (Exhibit NN).

---

* Convenience Fees are permitted only under certain circumstances in the U.S., Asia Pacific, and certain countries in CEMEA in restricted environments.

** In AP, an ad valorem amount is allowed where the merchant's pricing is subject to regulatory controls that make a flat fee infeasible.

Card Acceptance Guidelines for Visa Merchants
© 2014 Visa. All Rights Reserved.

# A5087

Section 1: Getting Down to Basics

The service fee must be disclosed to the cardholder as a fee assessed by the merchant or the third party.

A merchant participating in the Government and Education Payment Program must not:

- Charge a convenience fee in addition to the service fee.
- Assess a service fee in addition to the U.S. credit card surcharge.

 In the CEMEA region (Russia and Egypt only), a merchant may assess a government service fee.

To ensure service fees are properly assessed, please contact your acquirer.

## Laundering

**Deposit transactions only for your own business.** Depositing transactions for a business that does not have a valid merchant agreement is called laundering. Laundering is not allowed; it is a form of fraud associated with high chargeback rates and the potential for accommodating illegal activity.

## Zero-Percent Tip

 **In the U.S. for restaurant, taxicab, limousine, bar, tavern, beauty/barber shop, and health/beauty spa merchant transactions with a Visa credit or debit card, authorize only for the known amount, not the transaction amount plus estimated tip.** Cardholders now have the ability to check their credit or checking accounts almost instantaneously via phone, the Internet, or an ATM. An authorization that includes an estimated tip can reduce a cardholder's available funds or credit by an unrecognizable or unexpected amount. This kind of transaction may occur if a cardholder leaves a cash tip or adds a tip that is less than the estimated amount used for authorization. For example, a restaurant authorizes for an estimated 20 percent tip, but the customer adds on only 15 percent.

   **In AP, Canada, CEMEA, and LAC, if the exact amount of the tip is known at the time of authorization, then it should be included in the authorization amount. This is common for chip and PIN transactions.**





> Restaurant, taxicab, limousine, bar, tavern, beauty/barber shop, and health/beauty spa authorizations are valid for the transaction amount plus or minus 20 percent to protect merchants from chargeback liability for failure to obtain proper authorization.

> Restaurants are permitted and protected from chargeback for failure to obtain proper authorization if they clear for an amount up to 20 percent more than they authorized, and the same is true up to 15 percent additional for hotel, car rental, and cruise line merchants. For car rental, this threshold is the greater of 15 percent or $75.00.

For further information on zero-percent tip authorization, contact your acquirer.

**A5088**



# The MasterCard®
# Convenience Fee Program for
# Government and Education



## Program Summary

MasterCard continues to have in place (with modifications) a convenience fee program for participating pre-certified government and education entities, or their third-party agents. Participants in the program will be permitted to assess a convenience fee for MasterCard transactions, whether conducted in person, Internet, phone, mail or kiosk, while not requiring a fee on cash, check, Automated Clearing House (ACH), and personal identification number (PIN)-based debit, provided that the conditions set out below are satisfied.

## Eligible Payments and Allowable Convenience Fees

- Eligible payments include payments collected by the entity from individuals and businesses that are eligible to be collected on a payment card.
- The convenience fee can be assessed as either a flat per transaction fee, a variable/tiered rate fee based on the amount owed, or a fixed percentage of the amount owed.

- The convenience fee assessed for consumer debit cards and commercial debit cards can be different than the convenience fee assessed for MasterCard consumer credit cards and MasterCard commercial credit cards.
- The convenience fee for MasterCard consumer credit cards can be different than the convenience fee for MasterCard commercial credit cards.

## Program Participation Eligibility and Requirements

The MasterCard Convenience Fee Program is open to the following educational institutions and public sector merchant categories:

- Elementary and secondary schools for tuition and related fees, and school-maintained room and board
- Colleges, universities, professional schools, and junior colleges for tuition and related fees, and school-maintained room and board
- Local, state, and federal courts of law that administer and process court fees, alimony, and child support payments

# A5089

## Program Participation Eligibility and Requirements (continued)

- Government entities that administer and process local, state, and federal fines
- Local, state, and federal entities that engage in financial administration and taxation
- Government Services; merchants that provide general support services for the government

Your acquirer (see "How to Get Started") will be able to determine whether your institution or public sector agency is eligible for the MasterCard Convenience Fee Program. Once that determination has been made, your acquirer will need to register you for the program—whether you have already started a card acceptance program or are launching a new program.

As a participant in the program, your organization must also meet these additional requirements:

- Participants that store, transmit, or process MasterCard account data for Internet-based transactions must provide evidence of compliance with the MasterCard Site Data Protection (SDP) program's underlying *Payment Card Industry* (PCI) *Data Security Standard* (DSS) to their acquirer. Evidence of compliance must include a successful quarterly scan report from a MasterCard approved scanning vendor and a compliant annual self-assessment questionnaire.
- Participants using a third-party agent for storage and processing of MasterCard account data must document such on their registration form so MasterCard can ensure that the agent is SDP compliant.
- Registration of PCI compliance is an annual requirement.

## Processing Requirements

- Cardholders must be notified of the convenience fee at the time of payment and be given the opportunity to opt out of the sale. In no case may the entity collecting payment be allowed to charge the fee without disclosure to the cardholder prior to finalizing payment.

- Payments and convenience fees must be processed under the correct and same merchant category code that is associated with one of the eligible merchant categories.
- A customer service number must be transmitted to your acquirer for both the payment and the convenience fee collected.

## How To Get Started

If you already accept MasterCard payment cards, contact your acquirer for more information about the program.

If you do not currently accept MasterCard credit and debit cards, it's easy to begin. Your first step is to obtain an "acquirer," which is simply a financial institution that is a licensed MasterCard customer providing services such as card payment processing, hardware and software, and monthly statements.

Speak to your current commercial financial institution about card processing services. Or register to receive referrals to acquirers that can help you begin accepting payment cards by visiting www.mastercardmerchant.com.

## To Learn More

To learn more about the MasterCard Convenience Fee Program, contact your acquirer or send an email message to jim_reed@mastercard.com.

11-505783 03/13
©2013 MasterCard. Proprietary. All rights reserved.



# A5090

# A $6+ billion settlement will provide payments and other benefits to merchants that accepted Visa and MasterCard since 2004.

*A federal court directed this Notice. This is not a solicitation from a lawyer.*

- The Court has preliminarily approved a proposed $6+ billion settlement in a class action lawsuit, called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (JG)(JO). The lawsuit is about claims that merchants paid excessive fees to accept Visa and MasterCard cards because Visa and MasterCard, individually, and together with their respective member banks, violated the antitrust laws.

- The monetary portion of the settlement consists of two funds. The first is a cash fund in the amount of $6.05 billion that will pay valid claims of any person, business or other entity that accepted Visa or MasterCard branded credit or debit cards in the U.S. between January 1, 2004 and November 28, 2012. The second fund is estimated to be up to approximately $1.2 billion in total and is equivalent to a portion of the interchange fees attributable to merchants that do not exclude themselves from the Rule 23(b)(3) Settlement Class ("Cash Settlement Class") and that accepted Visa and MasterCard credit cards during an eight-month period to begin by July 29, 2013. This fund will pay valid claims of members of the Cash Settlement Class that accepted Visa or MasterCard credit cards during the eight-month period.

- The settlement will also require Visa and MasterCard to change some rules for merchants who accept their cards, including to allow merchants to do the following:

  - Charge customers an extra fee if they pay with Visa or MasterCard credit cards,
  - Offer discounts to customers who pay with payment forms less expensive than Visa or MasterCard credit or debit cards,
  - Accept Visa or MasterCard cards at fewer than all of the merchant's trade names or banners, and
  - Form "buying groups" that meet certain criteria to negotiate with Visa and MasterCard.

  The rule changes are explained in greater detail below and in the Class Settlement Agreement.

- The settlement creates two classes: Cash Settlement Class (Rule 23(b)(3) Settlement Class) and Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class).

- This Notice has important information for merchants that accept Visa or MasterCard now or that accepted Visa and MasterCard at any time since January 1, 2004. It explains the settlement in a class action lawsuit. It also explains your rights and options in this case.

- For the full terms of the settlement, you should look at the Definitive Class Settlement Agreement and its Appendices (the "Class Settlement Agreement"), available at www.PaymentCardSettlement.com or by calling 1-800-625-6440. In the event of any conflict between the terms of this Notice and the Class Settlement Agreement, the terms of the Class Settlement Agreement shall control.

- Please check www.PaymentCardSettlement.com for any updates relating to the settlement or the settlement approval process.

**QUESTIONS? CALL 1-800-625-6440 OR VISIT WWW.PAYMENTCARDSETTLEMENT.COM**

# A5091

MasterCard credit cards during that eight-month period and files a valid claim ("Authorized Interchange Claimant") will get money from the Interchange Fund. The money in this fund will also be used to pay:

- The cost of settlement administration and notice, as approved by the Court, and
- Any attorneys' fees and expenses that may be approved by the Court.

The money in this fund will not be returned to Defendants, even if the settlement is terminated. If this settlement is terminated, the Court will decide how to distribute this fund.

## 8. How do I ask for money from this settlement?

You must file a valid claim to get money from this settlement. If the Court finally approves the settlement, and you do not exclude yourself from the Cash Settlement Class, you will receive a claim form in the mail or by email. You may also get a claim form at: www.PaymentCardSettlement.com, or call: 1-800-625-6440.

**How much money will I get?**

It is anticipated that the amount paid from the Cash Settlement Fund will be based on your actual or estimated interchange fees attributable to Visa and MasterCard transactions from January 1, 2004 through November 28, 2012.

The amount paid from the Interchange Fund will based on one-tenth of 1% of the merchant's Visa and MasterCard credit card transaction volume during the eight-month period to begin by July 29, 2013.

Valid claims will be paid from the Cash Settlement Fund and/or the Interchange Fund. The amount of money each eligible claimant will receive from the Cash Settlement Fund depends on the money available to pay all claims, the total dollar value of all valid claims filed, the deduction described above not to exceed 25% of the Cash Settlement Fund, the cost of class administration and notice, money awards to Class Plaintiffs, and attorneys' fees and expenses approved by the Court. The amount of money each eligible claimant will receive from the Interchange Fund depends on the money available to pay all claims, the total dollar value of all valid claims filed, the cost of class administration and notice, and attorneys' fees and expenses approved by the Court. Each claimant's payment will be paid in proportion to all claimants' payments.

Details about how all claims are calculated will be available at www.PaymentCardSettlement.com starting no later than April 11, 2013.

## 9. What do the members of the Rule Changes Settlement Class get?

If the Court approves the settlement, Visa and MasterCard will make changes to their rules and practices. These changes will benefit the Rule Changes Settlement Class.

The rule changes, which will start no later than January 27, 2013, are summarized below. To see a detailed description of the rule changes, including other rules not listed here, see the Class Settlement Agreement, paragraphs 40–65.

**Brand Surcharge Rules on Credit (not Debit) Cards**

Merchants will be able to charge an extra fee to all customers who pay with Visa or MasterCard branded credit cards. This is called a brand-level surcharge, and it is allowed if the surcharge:

- is the same for all Visa credit cards or all MasterCard credit cards;
- is not more than the merchant's average Visa or MasterCard merchant discount rate (calculated historically or based on the previous month); and

# A5092

The settlement will also resolve any merchant claims based upon the future effect in the United States of:

- any Visa or MasterCard rules, as of November 27, 2012, that are not to be modified pursuant to the settlement,

- the modified rules provided for in the settlement, or

- any other rules substantially similar to any such rules.

The releases will not bar claims involving new conduct or rules in the future that are not substantially similar to either existing conduct or rules or conduct or rules modified by the settlement (e.g. imposition of a new rule not substantially similar to existing rules or rules modified by the settlement, or reversion to the old rules modified by the settlement). The releases also will not bar claims involving certain specified standard commercial disputes arising in the ordinary course of business.

**The full text of the Releases for both the Cash Settlement Class (Rule 23(b)(3) Settlement Class) and Rule Changes Settlement Class (Rule 23(b)(2) Settlement Class) is set forth at pages 18 to 27 of this Notice. The Releases describe the released claims in legal language. You should carefully read the Releases and if you have questions about them, you may:**

- Call Class Counsel listed in Question 17 at no charge,

- Talk to a lawyer, at your own expense, about the releases and what they mean to you. The complete Settlement Agreement may also be viewed on the website.

**Important!** If you want to keep your right to be part of any other lawsuit that asks for money based on similar claims, you must opt-out (exclude yourself) from the Cash Settlement Class of this settlement. You **cannot** be excluded from the Rule Changes Settlement Class.

| | |
|---|---|
| **12.** | **How do I opt-out of the Cash Settlement Class of this settlement?** |

To opt-out (exclude yourself) from the Cash Settlement Class (Rule 23(b)(3) Settlement Class) of this Settlement, send a letter to:

Payment Card Interchange Fee Settlement
P.O. Box 2530
Portland, OR 97208-2530

Your letter must be postmarked by **May 28, 2013**. You cannot exclude yourself by phone, fax, email or online.

**Should I send my letter by regular mail?**

Yes. Send your letter by first-class mail and pay for the postage. Keep a copy for your records.

**What should my letter say?**

Your letter must be signed by a person authorized to do so and state as follows:

- I want to exclude [name of merchant] from the Cash Settlement Class of the settlement in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*.

- My personal information is:

    Name (first, middle, last):
    Position:
    Name of Merchant:

# A5093

Address:
Phone No.:
Merchant's taxpayer identification number:

- The business names, brand names, and addresses of the stores or sales locations that I want to exclude from the Cash Settlement Class are:

    (list all businesses and addresses of each store or sales location)

- My position at the business that gives me the authority to exclude it from the Cash Settlement Class is as follows:

**Warning!** If your letter is sent after the deadline it will be considered invalid. If this happens, you won't be excluded from the Cash Settlement Class, and you will still be part of the settlement and will be bound by all of its terms.

| **13. If I exclude myself from the Cash Settlement Class, can I still get money from this settlement?** |
|---|

No. If you exclude yourself from the Cash Settlement Class (Rule 23(b)(3) Settlement Class):

- You cannot get money from this settlement, and
- You cannot object to the Cash Settlement (but you can still object to the Rule Changes).

The deadline to exclude yourself is: **May 28, 2013**. To do this, see: www.PaymentCardSettlement.com. *Important!* If you exclude yourself, do not file a claim form asking for payment.

**Can I exclude myself from the Rule Changes Settlement Class?**

No. You cannot be excluded from the Rule Changes Settlement Class. But you may object to the Rule Changes Settlement, if you want to.

| **14. If I do not exclude myself from the Cash Settlement Class, can I sue these Defendants for damages for past conduct later?** |
|---|

No. If you do not exclude yourself, you give up your right to sue any of the released parties described in the Class Settlement Agreement for damages for past conduct.

## HOW TO DISAGREE WITH THE SETTLEMENT

| **15. What if I disagree with the settlement?** |
|---|

You may tell the Court you object to (disagree with) the settlement for the Rule Changes Settlement Class. You may also object to the settlement for the Cash Settlement Class if you do not exclude yourself. The Court will consider your objection(s) when it decides whether or not to finally approve the settlement.

**How do I tell the Court I disagree with the settlement?**

You must file a Statement of Objections with the Court at this address:

United States District Court for the Eastern District of New York
Clerk of Court
225 Cadman Plaza
Brooklyn, NY 11201

**QUESTIONS? CALL 1-800-625-6440 OR VISIT WWW.PAYMENTCARDSETTLEMENT.COM**
12

# A5094

To receive a copy of the Class Settlement Agreement or other documents related to this lawsuit, you may:

Visit:    www.PaymentCardSettlement.com
Write to:  Payment Card Interchange Fee Settlement
        P.O. Box 2530
        Portland OR 97208-2530
Email:    info@PaymentCardSettlement.com
Call:     1-800-625-6440 – *toll-free*

If you do not get a Claim Form in the mail or by email, you may download one at: www.PaymentCardSettlement.com, or call: 1-800-625-6440.

**Please do not attempt to contact Judge Gleeson or the Clerk of Court with any questions.**

## THE FULL TEXT OF THE RELEASES

| 25. What is the full text of the Release for the Cash Settlement Class? |
|---|

31. The "Rule 23(b)(3) Settlement Class Releasing Parties" are the Class Plaintiffs, each and every member of the Rule 23(b)(3) Settlement Class that does not become an Opt Out, and any of their respective past, present, or future: officers and directors; stockholders, agents, employees, legal representatives, partners, and associates (in their capacities as stockholders, agents, employees, legal representatives, partners, and associates of a member of the Rule 23(b)(3) Settlement Class only); and trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns — whether or not they object to this Class Settlement Agreement, and whether or not they make a claim for payment from the Class Settlement Cash Escrow Account(s) or the Class Settlement Interchange Escrow Account(s), whether directly, representatively, derivatively, or in any other capacity.

32. The "Rule 23(b)(3) Settlement Class Released Parties" are all of the following:

(a) Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Asia Pacific Region, Visa Canada Association, Visa Central & Eastern Europe, Middle East & Africa Region, Visa Europe, Visa Europe Limited, Visa Latin America & Caribbean Region, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any Visa-Branded Cards or to acquire any Visa-Branded Card transactions.

(b) MasterCard International Incorporated, MasterCard Incorporated, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any MasterCard-Branded Cards or to acquire any MasterCard-Branded Card transactions.

(c) Bank of America, N.A.; BA Merchant Services LLC (formerly known as National Processing, Inc.); Bank of America Corporation; MBNA America Bank, N.A., and FIA Card Services, N.A.

(d) Barclays Bank plc; Barclays Bank Delaware; and Barclays Financial Corp.

(e) Capital One Bank (USA), N.A.; Capital One F.S.B.; and Capital One Financial Corporation.

(f) Chase Bank USA, N.A.; Chase Manhattan Bank USA, N.A.; Chase Paymentech Solutions, LLC; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; Bank One Corporation; and Bank One Delaware, N.A.

(g) Citibank (South Dakota), N.A.; Citibank N.A.; Citigroup Inc.; and Citicorp.

(h) Fifth Third Bancorp.

(i) First National Bank of Omaha.

(j) HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; and HSBC Bank plc.

(k) National City Corporation and National City Bank of Kentucky.

(l) SunTrust Banks, Inc. and SunTrust Bank.

(m) Texas Independent Bancshares, Inc.

(n) Wachovia Bank, N.A. and Wachovia Corporation.

(o) Washington Mutual, Inc.; Washington Mutual Bank; Providian National Bank (also known as Washington Mutual Card Services, Inc.); and Providian Financial Corporation.

(p) Wells Fargo & Company and Wells Fargo Bank, N.A.

(q) Each and every entity or person alleged to be a co-conspirator of any Defendant in any of the Operative Class Complaints or any of the Class Actions.

(r) Each of the past, present, or future member or customer financial institutions of Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Europe, Visa Europe Limited, MasterCard International Incorporated, or MasterCard Incorporated.

(s) For each of the entities or persons in Paragraphs 32(a)-(r) above, each of their respective past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, affiliates, and associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), or any other entity in which more than 50% of the equity interests are held.

(t) For each of the entities or persons in Paragraphs 32(a)-(s) above, each of their respective past, present, and future predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of any of the Defendants to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(3) Settlement Class Released Parties as defined in Paragraphs 32(a)-(s) above).

(u) For each of the entities or persons in Paragraphs 32(a)-(t) above, each of their respective past, present, and future principals, trustees, partners, officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, shareholders, advisors, predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of each of the foregoing entities to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(3) Settlement Class Released Parties as defined in Paragraphs 32(a)-(t) above).

# A5096

33. This release applies solely to the Rule 23(b)(3) Settlement Class Releasing Parties. In addition to the effect of the Class Settlement Order and Final Judgment entered in accordance with this Class Settlement Agreement, including but not limited to any *res judicata* effect, the Rule 23(b)(3) Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Rule 23(b)(3) Settlement Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, *parens patriae*, or otherwise in nature, for damages, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, regardless of when such claims accrue, whether known or unknown, suspected or unsuspected, in law or in equity that any Rule 23(b)(3) Settlement Class Releasing Party ever had, now has, or hereafter can, shall, or may in the future have, arising out of or relating in any way to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party that are alleged or which could have been alleged from the beginning of time until the date of the Court's entry of the Class Settlement Preliminary Approval Order in any of the Operative Class Complaints or Class Action complaints, or in any amendments to the Operative Class Complaints or Class Action complaints, including but not limited to any claims based on or relating to:

(a) any interchange rules, interchange fees, or interchange rates, or any other Rule of any Visa Defendant or MasterCard Defendant, or any agreement involving any Visa Defendant or any MasterCard Defendant and any other Rule 23(b)(3) Settlement Class Released Party, and/or any merchant arising out of or relating to interchange rules, interchange fees, or interchange rates, card issuance, or card acceptance with respect to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

(b) any Merchant Fee of any Rule 23(b)(3) Settlement Released Party relating to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

(c) any actual or alleged "no surcharge" rules, "honor all cards" rules, "no minimum purchase" rules, "no discounting" rules, "non-discrimination" rules, "anti-steering" rules, Rules that limit merchants in favoring or steering customers to use certain payment systems, "all outlets" rules, "no bypass" rules, or "no multi-issuer" rules, or any other actual or alleged Rule of any Rule 23(b)(3) Settlement Class Released Party relating to any Visa-Branded Cards or any MasterCard-Branded Cards, or a merchant's point of sale practices relating to any Visa-Branded Cards or any MasterCard-Branded Cards;

(d) any actual or alleged agreement (i) between or among any Visa Defendant and any MasterCard Defendant, (ii) between or among any Visa Defendant or MasterCard Defendant and any other Rule 23(b)(3) Settlement Class Released Party or Parties, or (iii) between or among any Visa Defendant, MasterCard Defendant, or any other Rule 23(b)(3) Settlement Class Released Party or Parties relating to conduct or Rules of any Visa Defendant or any MasterCard Defendant;

(e) any reorganization, restructuring, initial or other public offering, or other corporate structuring of any Visa Defendant or MasterCard Defendant;

(f) any service of an employee or agent of any Rule 23(b)(3) Settlement Class Released Party on any board or committee of any Visa Defendant or MasterCard Defendant;

(g) the future effect in the United States of the continued imposition of or adherence to any Rule of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order,

# A5097

any Rule modified or to be modified pursuant to this Class Settlement Agreement, or any Rule that is substantially similar to any Rule in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order or any Rule modified or to be modified pursuant to this Class Settlement Agreement;

(h) the future effect in the United States of any conduct of any Rule 23(b)(3) Settlement Class Released Party substantially similar to the conduct of any Rule 23(b)(3) Settlement Class Released Party related to or arising out of interchange rules, interchange fees, or interchange rates, any Rule of any Visa Defendant or MasterCard Defendant modified or to be modified pursuant to this Class Settlement Agreement, any other Rule of any Visa Defendant or any MasterCard Defendant in effect as of the date of the Court's entry of the Class Settlement Preliminary Approval Order, or any Rule substantially similar to any of the foregoing Rules;

(i) any conduct of this Action, including without limitation any settlement discussions relating to this Action, the negotiation of and agreement to this Class Settlement Agreement by the Defendants or any member or customer financial institution of the Visa Defendants or the MasterCard Defendants, or any terms or effect of this Class Settlement Agreement (other than claims to enforce this Class Settlement Agreement), including any changes in the Rule 23(b)(3) Settlement Class Released Parties' Rules as a result of this Class Settlement Agreement;

and it is expressly agreed, for purposes of clarity, without expanding or limiting the foregoing, that any claims based on or relating to (a)-(i) above are claims that were or could have been alleged in this Action.

34. Each Rule 23(b)(3) Settlement Class Releasing Party further expressly and irrevocably waives, and fully, finally, and forever settles and releases, any and all defenses, rights, and benefits that the Rule 23(b)(3) Settlement Class Releasing Party may have or that may be derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the release contained in the preceding Paragraphs 31-33. Without limiting the generality of the foregoing, each Rule 23(b)(3) Settlement Class Releasing Party expressly and irrevocably waives and releases any and all defenses, rights, and benefits that the Rule 23(b)(3) Settlement Class Releasing Party might otherwise have in relation to the release by virtue of the provisions of California Civil Code Section 1542 or similar laws of any other state or jurisdiction. SECTION 1542 PROVIDES: "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." In addition, although each Rule 23(b)(3) Settlement Class Releasing Party may hereafter discover facts other than, different from, or in addition to those that it or he or she knows or believes to be true with respect to any claims released in the preceding Paragraphs 31-33, each Rule 23(b)(3) Settlement Class Releasing Party hereby expressly waives, and fully, finally, and forever settles, discharges, and releases, any known or unknown, suspected or unsuspected, contingent or non-contingent claims within the scope of the preceding Paragraphs 31-33, whether or not concealed or hidden, and without regard to the subsequent discovery or existence of such other, different, or additional facts. Class Plaintiffs acknowledge, and the members of the Rule 23(b)(3) Settlement Class shall be deemed by operation of the Class Settlement Order and Final Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of this Class Settlement Agreement.

35. Each Rule 23(b)(3) Settlement Class Releasing Party covenants and agrees that it shall not, hereafter, seek to establish, or permit another to act for it in a representative capacity to seek to

# A5098

establish, liability against any of the Rule 23(b)(3) Settlement Class Released Parties based, in whole or in part, upon any conduct covered by any of the claims released in Paragraphs 31-34 above.

36. For avoidance of doubt, no other provision of this Class Settlement Agreement releases any claim of a Rule 23(b)(3) Settlement Class Releasing Party that is based on:

(a) breach of this Class Settlement Agreement;

(b) standard commercial disputes arising in the ordinary course of business under contracts or commercial relations regarding loans, lines of credit, or other related banking or credit relations, individual chargeback disputes, products liability, breach of warranty, misappropriation of cardholder data or invasion of privacy, compliance with technical specifications for a merchant's acceptance of Credit Cards or Debit Cards, and any other dispute arising out of a breach of any contract between any of the Rule 23(b)(3) Settlement Class Releasing Parties and any of the Rule 23(b)(3) Settlement Class Released Parties; provided, however, that Paragraphs 31-35 [of the Class Settlement Agreement] and not this Paragraph shall control in the event that any such claim challenges the legality of interchange rules, interchange rates, or interchange fees, or any other Rule fee, charge, or other conduct covered by any of the claims released in Paragraphs 31-35 above; or

(c) the claims alleged in the currently operative complaints against the current defendants in (i) NACS, et al. v. Board of Governors of the Federal Reserve System, No. 11-CV-02075-RJL (D.D.C.), and (ii) In re ATM Fee Antitrust Litigation, No. 04-CV-02676-CRB (N.D. Cal) (including claims that have been asserted to have been alleged in the Second Amended and Third Amended Complaints against Bank of America, N.A.).

37. Each Rule 23(b)(3) Settlement Class Releasing Party further releases each of the Visa Defendants, MasterCard Defendants, and Bank Defendants and their counsel and experts in this Action from any claims relating to the defense of this Action, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement. Each Visa Defendant, MasterCard Defendant, and Bank Defendant releases the Class Plaintiffs, the other plaintiffs in the Class Actions, Class Counsel, Class Plaintiffs' other counsel who have participated in any settlement conferences before the Court for a Class Plaintiff that executes this Class Settlement Agreement, and their respective experts in the Class Actions, from any claims relating to their institution or prosecution of the Class Actions, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement.

38. In the event that this Class Settlement Agreement is terminated pursuant to Paragraphs 96-98 below, or any condition for the Settlement Final Approval Date is not satisfied, the release and covenant not to sue provisions of Paragraphs 31-37 above shall be null and void and unenforceable.

## 26. What is the full text of the Release for the Rule Changes Settlement Class?

66. The "Rule 23(b)(2) Settlement Class Releasing Parties" are the Class Plaintiffs, each and every member of the Rule 23(b)(2) Settlement Class, and any of their respective past, present, or future: officers and directors; stockholders, agents, employees, legal representatives, partners, and associates (in their capacities as stockholders, agents, employees, legal representatives, partners, and associates of a member of the Rule 23(b)(2) Settlement Class only); and trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns — whether or not they object to this Class Settlement Agreement, and whether or not they exercise any

# A5099

benefit provided under the Class Settlement Agreement, whether directly, representatively, derivatively, or in any other capacity.

67. The "Rule 23(b)(2) Settlement Class Released Parties" are all of the following:

(a) Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Asia Pacific Region, Visa Canada Association, Visa Central & Eastern Europe, Middle East & Africa Region, Visa Europe, Visa Europe Limited, Visa Latin America & Caribbean Region, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any Visa-Branded Cards or to acquire any Visa-Branded Card transactions.

(b) MasterCard International Incorporated, MasterCard Incorporated, and any other entity that now authorizes or licenses, or in the past has authorized or licensed, a financial institution to issue any MasterCard-Branded Cards or to acquire any MasterCard-Branded Card transactions.

(c) Bank of America, N.A.; BA Merchant Services LLC (formerly known as National Processing, Inc.); Bank of America Corporation; MBNA America Bank, N.A., and FIA Card Services, N.A.

(d) Barclays Bank plc; Barclays Bank Delaware; and Barclays Financial Corp.

(e) Capital One Bank (USA), N.A.; Capital One F.S.B.; and Capital One Financial Corporation.

(f) Chase Bank USA, N.A.; Chase Manhattan Bank USA, N.A.; Chase Paymentech Solutions, LLC; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; Bank One Corporation; and Bank One Delaware, N.A.

(g) Citibank (South Dakota), N.A.; Citibank N.A.; Citigroup Inc.; and Citicorp.

(h) Fifth Third Bancorp.

(i) First National Bank of Omaha.

(j) HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; and HSBC Bank plc.

(k) National City Corporation and National City Bank of Kentucky.

(l) SunTrust Banks, Inc. and SunTrust Bank.

(m) Texas Independent Bancshares, Inc.

(n) Wachovia Bank, N.A. and Wachovia Corporation.

(o) Washington Mutual, Inc.; Washington Mutual Bank; Providian National Bank (also known as Washington Mutual Card Services, Inc.); and Providian Financial Corporation.

(p) Wells Fargo & Company and Wells Fargo Bank, N.A.

(q) Each and every entity or person alleged to be a co-conspirator of any Defendant in any of the Operative Class Complaints or any of the Class Actions.

# A5100

(r)  Each of the past, present, or future member or customer financial institutions of Visa U.S.A. Inc., Visa International Service Association, Visa Inc., Visa Europe, Visa Europe Limited, MasterCard International Incorporated, or MasterCard Incorporated.

(s)  For each of the entities or persons in Paragraphs 67(a)-(r) above, each of their respective past, present, and future, direct and indirect, parents (including holding companies), subsidiaries, affiliates, and associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), or any other entity in which more than 50% of the equity interests are held.

(t)  For each of the entities or persons in Paragraphs 67(a)-(s) above, each of their respective past, present, and future predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of any of the Defendants to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(2) Settlement Class Released Parties as defined in Paragraphs 67(a)-(s) above).

(u)  For each of the entities or persons in Paragraphs 67(a)-(t) above, each of their respective past, present, and future principals, trustees, partners, officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, shareholders, advisors, predecessors, successors, purchasers, and assigns (including acquirers of all or substantially all of the assets, stock, or other ownership interests of each of the foregoing entities to the extent a successor's, purchaser's, or acquirer's liability is based on the Rule 23(b)(2) Settlement Class Released Parties as defined in Paragraphs 67(a)-(t) above).

68. This release applies solely to the Rule 23(b)(2) Settlement Class Releasing Parties. In addition to the effect of the Class Settlement Order and Final Judgment entered in accordance with this Class Settlement Agreement, including but not limited to any *res judicata* effect, the Rule 23(b)(2) Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Rule 23(b)(2) Settlement Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, *parens patriae*, or otherwise in nature, for any form of declaratory, injunctive, or equitable relief, or any damages or other monetary relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order, regardless of when such claims accrue, whether known or unknown, suspected or unsuspected, in law or in equity that any Rule 23(b)(2) Settlement Class Releasing Party now has, or hereafter can, shall, or may in the future have, arising out of or relating in any way to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(2) Settlement Class Released Party that are alleged or which could have been alleged from the beginning of time until the date of the Court's entry of the Class Settlement Preliminary Approval Order in any of the Operative Class Complaints or Class Action complaints, or in any amendments to the Operative Class Complaints or Class Action complaints, including but not limited to any claims based on or relating to:

(a) any interchange rules, interchange fees, or interchange rates, or any other Rule of any Visa Defendant or MasterCard Defendant, or any agreement involving any Visa Defendant or any MasterCard Defendant and any other Rule 23(b)(2) Settlement Class Released Party, and/or any merchant arising out of or relating to interchange rules, interchange fees, or interchange rates, card issuance, or card acceptance with respect to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

# A5101

(b) any Merchant Fee of any Rule 23(b)(2) Settlement Released Party relating to any Visa-Branded Card transactions in the United States or any MasterCard-Branded Card transactions in the United States;

(c) any actual or alleged "no surcharge" rules, "honor all cards" rules, "no minimum purchase" rules, "no discounting" rules, "non-discrimination" rules, "anti-steering" rules, Rules that limit merchants in favoring or steering customers to use certain payment systems, "all outlets" rules, "no bypass" rules, or "no multi-issuer" rules, or any other actual or alleged Rule of any Rule 23(b)(2) Settlement Class Released Party relating to any Visa-Branded Cards or any MasterCard-Branded Cards, or a merchant's point of sale practices relating to any Visa-Branded Cards or any MasterCard-Branded Cards;

(d) any actual or alleged agreement (i) between or among any Visa Defendant and any MasterCard Defendant, (ii) between or among any Visa Defendant or MasterCard Defendant and any other Rule 23(b)(2) Settlement Class Released Party or Parties, or (iii) between or among any Visa Defendant, MasterCard Defendant, or any other Rule 23(b)(2) Settlement Class Released Party or Parties relating to conduct or Rules of any Visa Defendant or any MasterCard Defendant;

(e) any reorganization, restructuring, initial or other public offering, or other corporate structuring of any Visa Defendant or MasterCard Defendant;

(f) any service of an employee or agent of any Rule 23(b)(2) Settlement Class Released Party on any board or committee of any Visa Defendant or MasterCard Defendant;

(g) the future effect in the United States of the continued imposition of or adherence to any Rule of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order, any Rule modified or to be modified pursuant to this Class Settlement Agreement, or any Rule that is substantially similar to any Rule in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order or any Rule modified or to be modified pursuant to this Class Settlement Agreement;

(h) the future effect in the United States of any conduct of any Rule 23(b)(2) Settlement Class Released Party substantially similar to the conduct of any Rule 23(b)(2) Settlement Class Released Party related to or arising out of interchange rules, interchange fees, or interchange rates, any Rule of any Visa Defendant or MasterCard Defendant modified or to be modified pursuant to this Class Settlement Agreement, any other Rule of any Visa Defendant or any MasterCard Defendant in effect as of the date of the Court's entry of the Class Settlement Preliminary Approval Order, or any Rule substantially similar to any of the foregoing Rules;

(i) any conduct of this Action, including without limitation any settlement discussions relating to this Action, the negotiation of and agreement to this Class Settlement Agreement by the Defendants or any member or customer financial institution of the Visa Defendants or the MasterCard Defendants, or any terms or effect of this Class Settlement Agreement (other than claims to enforce this Class Settlement Agreement), including any changes in the Rule 23(b)(2) Settlement Class Released Parties' Rules as a result of this Class Settlement Agreement;

and it is expressly agreed, for purposes of clarity, without expanding or limiting the foregoing, that any claims based on or relating to (a)-(i) above are claims that were or could have been alleged in this Action.

Provided, however, that any Opt Out that is also a member of the Rule 23(b)(2) Settlement Class shall not be deemed to have released any claims for damages based on

# A5102

any Rules or other conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party prior to the date of the Court's entry of the Class Settlement Preliminary Approval Order.

69. Each Rule 23(b)(2) Settlement Class Releasing Party further expressly and irrevocably waives, and fully, finally, and forever settles and releases, any and all defenses, rights, and benefits that the Rule 23(b)(2) Settlement Class Releasing Party may have or that may be derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the release contained in the preceding Paragraphs 66-68. Without limiting the generality of the foregoing, each Rule 23(b)(2) Settlement Class Releasing Party expressly and irrevocably waives and releases any and all defenses, rights, and benefits that the Rule 23(b)(2) Settlement Class Releasing Party might otherwise have in relation to the release by virtue of the provisions of California Civil Code Section 1542 or similar laws of any other state or jurisdiction. SECTION 1542 PROVIDES: "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." In addition, although each Rule 23(b)(2) Settlement Class Releasing Party may hereafter discover facts other than, different from, or in addition to those that it or he or she knows or believes to be true with respect to any claims released in the preceding Paragraphs 66-68, each Rule 23(b)(2) Settlement Class Releasing Party hereby expressly waives, and fully, finally, and forever settles, discharges, and releases, any known or unknown, suspected or unsuspected, contingent or non-contingent claims within the scope of the preceding Paragraphs 66-68, whether or not concealed or hidden, and without regard to the subsequent discovery or existence of such other, different, or additional facts. Class Plaintiffs acknowledge, and the members of the Rule 23(b)(2) Settlement Class shall be deemed by operation of the Class Settlement Order and Final Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of this Class Settlement Agreement.

70. Each Rule 23(b)(2) Settlement Class Releasing Party covenants and agrees that it shall not, hereafter, seek to establish, or permit another to act for it in a representative capacity to seek to establish, liability against any of the Rule 23(b)(2) Settlement Class Released Parties based, in whole or in part, upon any conduct covered by any of the claims released in Paragraphs 66-69 above.

71. For purposes of clarity, it is specifically intended for the release and covenant not to sue provisions of Paragraphs 66-70 above to preclude all members of the Rule 23(b)(2) Settlement Class from seeking or obtaining any form of declaratory, injunctive, or equitable relief, or damages or other monetary relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order with respect to any Rule of any Visa Defendant or any MasterCard Defendant, and the compliance by any Bank Defendant with any such Rule, as it is alleged to exist, now exists, may be modified in the manner provided in Paragraphs 40-45 and 53-57 above, or may in the future exist in the same or substantially similar form thereto.

72. For avoidance of doubt, no other provision of this Class Settlement Agreement releases any claim of a Rule 23(b)(2) Settlement Class Releasing Party that is based on:

(a) breach of this Class Settlement Agreement;

(b) standard commercial disputes arising in the ordinary course of business under contracts or commercial relations regarding loans, lines of credit, or other related banking or credit relations, individual chargeback disputes, products liability, breach of warranty, misappropriation of cardholder data or invasion of privacy, compliance with technical specifications for a merchant's acceptance of Credit Cards or Debit Cards, and any other

# A5103

dispute arising out of a breach of any contract between any of the Rule 23(b)(2) Settlement Class Releasing Parties and any of the Rule 23(b)(2) Settlement Class Released Parties; provided, however, that Paragraphs 66-71 above and not this Paragraph shall control in the event that any such claim challenges the legality of interchange rules, interchange rates, or interchange fees, or any other Rule, fee, charge, or other conduct covered by any of the claims released in Paragraphs 66-71 above;

(c) the claims alleged in the currently operative complaints against the current defendants in (i) *NACS, et al. v. Board of Governors of the Federal Reserve System*, No. 11-CV-02075-RJL (D.D.C.), and (ii) *In re ATM Fee Antitrust Litigation*, No. 04-CV-02676-CRB (N.D. Cal) (including claims that have been asserted to have been alleged in the Second Amended or Third Amended Complaints against Bank of America, N.A.); or

(d) a claim seeking only injunctive relief against only the Visa Defendants regarding the legality of Visa's Fixed Acquirer Network Fee.

73. Each Rule 23(b)(2) Settlement Class Releasing Party further releases each of the Visa Defendants, MasterCard Defendants, and Bank Defendants and their counsel and experts in this Action from any claims relating to the defense of this Action, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement. Each Visa Defendant, MasterCard Defendant, and Bank Defendant releases the Class Plaintiffs, other plaintiffs in the Class Actions, Class Counsel, Class Plaintiffs' other counsel who have participated in any settlement conferences before the Court for a Class Plaintiff that executes this Class Settlement Agreement, and their respective experts in the Class Actions, from any claims relating to their institution or prosecution of the Class Actions, including the negotiation and terms of this Class Settlement Agreement, except for any claims relating to enforcement of this Class Settlement Agreement.

74. In the event that this Class Settlement Agreement is terminated pursuant to Paragraphs 96-98 below, or any condition for the Settlement Final Approval Date is not satisfied, the release and covenant not to sue provisions of Paragraphs 66-73 above shall be null and void and unenforceable.

JOINT DEFERRED APPENDIX CONTINUED
IN FOLLOWING VOLUME